

Dated  November 3 , 1995

WHEREAS Sam Shaw, as Settlor, and Sam Shaw, Meta Stevens and Edith Marcus, as Trustees, entered into a certain Trust Agreement dated October 4, 1994 (the "Agreement"); and

WHEREAS Article SECOND of said Trust Agreement reserves to the Settlor the right:

> "****to alter, amend, revoke or terminate the trust created hereby, or any of the terms of this Trust Agreement, in whole or in part****"

NOW, THEREFORE, the undersigned Sam Shaw pursuant to the authority reserved by him hereby amends Paragraph (A)(4) of Article FOURTH to read as follows:

> "(4)      one-third (1/3) of the balance thereof, in equal shares to those of SAM'S grandchildren, CYNTHIA CONTI, ROBERT CONTI, MELISSA STEVENS, DAVID MARCUS, REBEKA MARCUS, and AUSTIN SHAW, who are at least eighteen (18) years of age. Any person other than those named above shall not be entitled to any distribution. Any undistributed net income shall be accumulated and added to principal."

NOW, THEREFORE, the undersigned Sam Shaw pursuant to the foregoing authority reserved by him hereby also amends Paragraph (C) of Article FOURTH to read as follows:

> "(C)      This trust shall terminate upon the date which is twenty-one (21) years after the date of the death of the survivor of META, her husband, EDITH, her husband and SAM'S

-2-

grandchildren, CYNTHIA CONTI, ROBERT CONTI, MELISSA STEVENS, DAVID MARCUS, REBEKA MARKUS, and AUSTIN SHAW."

_____ (L.S.)
SAM SHAW

STATE OF NEW YORK        )

COUNTY OF NEW YORK       )

On this 3rd day of November, 1995, before me personally came SAM SHAW to me known and known to me to be the person described in and who executed to foregoing instrument and who acknowledged that he executed the same.

_____
Notary Public

LISA WEYMAN
Notary Public, State of New York
No. 31-4885085
Qualified in New York County
Commission Expires February 24, 1996

-3-



INDENTURE OF TRUST dated this 2.2. day of *April* , 1998 by and between SAM SHAW as Grantor, and SAM SHAW, EDITH MARCUS and META STEVENS, as Trustees.

## W I T N E S S E T H:

The Grantor hereby transfers, assigns, sets over and delivers to the Trustees the property mentioned and described in Schedule A annexed hereto and hereby made a part hereof, receipt whereof is hereby acknowledged by the Trustees, TO HAVE AND TO HOLD the same IN TRUST upon the terms and conditions hereinafter set forth:

### FIRST

A. I.    During the lifetime of the Grantor, the Trustees shall hold the property hereinbefore conveyed to them IN TRUST, to invest and reinvest the same, to collect the rents, income and profits thereof and to pay or apply the entire net income therefrom to or to the use of Grantor, during his lifetime.

II. The Trustees are hereby authorized and empowered to pay or apply to or to the use of Grantor, such sums from or portions of the principal of said trust (even to the extent of the entire amount of said principal) as the Trustees, shall from time to time in their sole and unreviewable discretion determine.

-1-

B.     Upon the death of the Grantor, the following provisions of this Paragraph B shall take effect:

I.     The Trustees shall pay, out of the principal of said trust

(i)     Any inheritance, estate, transfer, succession and death taxes or duties, including any interest thereon) imposed in any jurisdiction whatsoever, upon or in relation to any property owned by Grantor at the time of his death or which shall form part of Grantor's gross estate for the purposes of any such tax or duty (whether passing under this Indenture of Trust, under Grantor's Last Will and Testament or otherwise),

(ii)     Any debts owing by the Grantor at the time of his death, and

(iii)     Any expenses arising in connection with the Grantor's funeral.

II.     The balance of the principal shall be divided into two (2) equal shares and paid over and distributed as follows:

(i)     One (1) equal share to the Grantor's daughter, EDITH MARCUS, or if she is not then living, to her then living issue, in equal shares, per stirpes.

(ii)     One (1) equal share to the Grantor's daughter, META STEVENS, or if she is not then living, to her then living issue, in equal shares, per stirpes.

C.     Grantor has intentionally made no provision for his son, LARRY SHAW,

-2-

or his issue, for reasons that are well known to him.

## SECOND

If both EDITH MARCUS and META STEVENS shall resign or shall for any other reason cease to act as Trustees hereunder, my grandson, DAVID MARCUS, and my granddaughter, CYNTHIA CONTI, or the survivor of them, are hereby appointed successor Trustees in their place and stead.

## THIRD

Any Trustee acting hereunder may at any time resign his or her office of Trustee by written declaration, duly signed by him or her and delivered to his or her then acting co-trustee or, if there be none, to the person(s) designated as his or her successor(s).

A signed copy of such declaration of resignation shall be annexed to this Indenture of Trust.

## FOURTH

I. The Trustees named herein hereby assume the trust created by this Indenture of Trust and undertake to carry out each and every provision thereof.

II. Any successor Trustee hereunder shall, in order to qualify, execute an instrument in writing, duly acknowledged, expressly agreeing to assume the trust created by

-3-

this Indenture of Trust and to carry out each and every provision thereof, and such instrument shall be annexed to this Indenture of Trust.

III. At any time as there shall be three Trustees acting hereunder, Grantor directs that a majority of the Trustees may do any act or execute any instrument with the same validity and force as if such act were done or such instrument were executed by all the Trustees; PROVIDED, HOWEVER, that a Trustee shall not be liable or responsible for any act done or any instrument executed by any of the other Trustees wherein such Trustee shall not have participated or consented. The authority contained in the preceding sentence shall not be deemed to be a limitation upon or a lessening of any authority which the Trustees would otherwise have under applicable law to authorize any one or more of their number alone to perform any act or execute any instrument in the name of all the Trustees.

IV. No Trustee acting hereunder shall incur any liability for any act done or omitted in the exercise of his or her duties as such Trustee in good faith.

V. No Trustee acting hereunder shall be required to post any bond or other security for the faithful performance of his or her duties hereunder.

## FIFTH

I. The Trustees are hereby authorized and empowered, in their discretion, to defer in whole or in part payment or distribution of any property vesting absolutely in a minor upon the termination of the trust hereunder until such minor shall have attained majority.

-4-

II. The Trustees are further authorized and empowered, in their unreviewable discretion, to apply to the use of such minor so much of the income of such property so held for the minor's benefit, and of the principal thereof, and at such time or times, as the Trustees shall deem advisable, any income not so applied to be accumulated and added to the principal fund so held by the Trustees for the benefit of such minor. Such income or principal may be applied to the use of such minor, in the Trustees' discretion, in any one or more of the following ways:

(a) by paying or distributing the same for the benefit of such minor, to the parent or guardian of such minor; to

(i)    any adult member of such minor's family,

(ii)   the guardian of such minor, or

(iii)  the Trustees hereunder, as Custodians for such minor under the New York Transfers to Minors Act or under any other Transfers to Minors Act authorizing such payment; or to any other person having the care or control of such minor for the time being, without the Trustees, in any of the above cases,

-5-

being under any obligation to look to the proper application

of any such payment or distribution by the person receiving it.

(b)  by expending the time, for the benefit and account

of such minor, in such manner as the Trustees shall, in their sole and

unreviewable discretion, determine; and/or

(c)  by paying to the minor direct such sum as the Trustees

may consider suitable as an allowance.  Any payment hereinabove

authorized shall be a full discharge to the Trustees with respect thereto.

III.  With respect to any property held under this Article FIFTH

the Trustees shall have all the powers, privileges, discretions and immunities conferred upon

the Trustees under Article SIXTH hereof, and shall be entitled to commissions at the rates

and in the manner payable to testamentary trustees under the laws of the State of New York

as in effect from time to time; and the Trustees shall not be required to give any bond or

other security for the faithful performance of their duties hereunder in any jurisdiction

whatsoever or, if any bond is required, the Trustees shall not be required to give any surety

thereon.

-6-

## SIXTH

The Trustees shall have, with respect to any and all property at any time held by them hereunder, the following powers, in addition to those conferred by law:

1. To retain any such property as an investment without regard to the proportion which such property, or property of a similar character, so held, may bear to the entire amount of the trust estate whether or not such property is of the class in which Trustees are authorized by law or any rule of court to invest trust funds.

2. To sell any such property at either public or private sale, for cash or on credit, to exchange such property; and to grant options for the purchase thereof.

3. To invest and reinvest in property of any character, real or personal, foreign or domestic, including, but without limiting the generality of the foregoing, bonds, notes, debentures, mortgages, common and preferred stocks, shares or interests in investment trusts, without being limited to the class of securities in which Trustees are authorized by law or any rule of court to invest trust funds and without regard to the proportion which any such property or property of a similar character held by the Trustees may bear to the entire amount of the trust estate.

4. To consent to and participate in any plan or reorganization, consolidation,

-7-

merger, combination or other similar plan, and to consent to any contract, lease, mortgage, purchase, sale or other action by any corporation pursuant to such plan.

5. To deposit any such property with any protective, reorganization or similar committee, to delegate discretionary power thereto, to pay part of its expenses and compensation and any assessments levied with respect to such property.

6. To exercise all conversion, subscription, voting and other rights of whatsoever nature pertaining to any such property, and to grant proxies, discretionary or otherwise, in respect thereof.

7. To register and hold securities or other property in the name of a nominee without indicating their fiduciary capacity, and the liability of the Trustees shall be neither increased nor decreased thereby.

8. To compromise, settle or arbitrate any claim in favor of or against the trust.

9. To determine whether, and if so, to what extent, premiums on investments shall be amortized.

10. To maintain one or more custody accounts with any bank or trust company, wherever located, and to retain investment counsel or investment advisers, accountants and attorneys (including any firm with which any of the Trustees is associated as

-8-

a partner, employee, stockholder, officer, director or consultant) and to charge the cost of any such custody account or any commissions, fees or other compensation payable to any such investment counsel or investment advisers, accountants or attorneys to the principal or income of the trust as they may deem appropriate, in addition to the commissions otherwise payable to the Trustees.

11.   To determine whether any dividend, or other corporate distribution in the nature of a dividend, other than an ordinary cash dividend, declared and paid upon any security held in the trust, whether payable in cash, in stock (issued by the corporation declaring the same or by any other corporation), in bonds, or otherwise, shall be treated as and allocable to principal or income, or partly to principal and partly to income, and the Trustees shall not be required to treat any particular dividend in the same manner as previous dividends upon the same or other securities, or to make any determination on the basis of whether any particular dividend represents in whole or in part a distribution of earnings or surplus regardless of when earned or created.

12.   To deal with any brokerage firm, banking firm or bank in connection with the sale, purchase or exchange of any property at any time held or to be acquired by them, irrespective of whether such brokerage firm, banking firm or bank shall be acting as principal

-9-

or agent in any such transactions and the Trustees shall not be liable to the trust for any participating interest which they or any of them may have in any commission, profit or other compensation received by any such brokerage firm or bank in connection with any such transaction.

13. To do all such acts, take all such proceedings and exercise all such rights and privileges, although not hereinbefore specifically mentioned, with relation to any such property, as if the absolute owner thereof, and in connection therewith to make, execute and deliver any instruments and to enter into any covenants or agreements binding the trust hereby created.

SEVENTH

In addition to the powers conferred to the Trustees under Article SIXTH of this Indenture of Trust, the Trustees shall have the power to retain the Grantor's collection of photographs, negatives and transparencies for such time as the Trustees shall determine in their discretion; to take any actions that the Trustees shall determine in their discretion to enhance the collection of photographs, negatives and transparencies; and to sell the collection, or any part thereof, of photographs, negatives and transparencies as a collection upon such terms and conditions as the Trustees shall determine in their discretion.

-10-

## EIGHTH

The Trustees are authorized to receive and to hold as part of the principal of said trust any additional property acceptable to them which may at any time hereafter be transferred to them by the Grantor or by any other person.

## NINTH

The trust hereby created shall be a revocable trust and the Grantor shall have the power at any time and from time to revoke or amend the trust in whole or in part, by written instrument duly signed and acknowledged and annexed to this Indenture of Trust; and a copy of such instrument shall be delivered to Grantor's then acting co-trustee(s) hereunder.

<u>TENTH</u>

The trust hereby created shall be a New York Trust and shall in all respects be administered and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF the Grantor and the Trustees have hereunto set their respective hands and seals the day and year first above written.

_____
SAM SHAW, Grantor and Trustee

_____
EDITH MARCUS, Trustee

_____
META STEVENS, Trustee

-12-

STATE OF NEW YORK   )
COUNTY OF NEW YORK) SS.:


On this  22  day of  *April*            , 1998 before me personally
appeared SAM SHAW, to me known and known to me to be the individual named in and
who executed the foregoing document both as Grantor and Trustee.

RAYMOND V. J. SCHRAG
Notary Public, State of New York
No. 31-4518348
Qualified in New York County
Term Expires March 30, 19
*June 30, 1998*

STATE OF NEW YORK   )
COUNTY OF NEW YORK) SS.:


On this  22  day of,  *April*          , 1998 before me personally
appeared EDITH MARCUS, to me known and known to me to be the Trustee named in and
who executed the foregoing document.

RAYMOND V. J. SCHRAG
Notary Public, State of New York
No. 31-4518348
Qualified in New York County
Term Expires March 30, 19
*June 30, 1998*

STATE OF NEW YORK   )
COUNTY OF NEW YORK) SS.:


On this  22  day of  *April*            , 1998 before me personally
appeared META STEVENS, to me known and known to me to be the Trustee named in and
who executed the foregoing document.

RAYMOND V. J. SCHRAG
Notary Public, State of New York
No. 31-4518348
Qualified in New York County
Term Expires March 30, 19
*June 30, 1998*

-13-

SCHEDULE A


Grantor's entire collection of photographs, negatives, transparencies, scripts, writings, books, works in progress and the copyrights and trademarks (if any) pertaining thereto created by the Grantor or by any other artist.



1

1.

2       SUPREME COURT OF THE STATE OF NEW YORK
        COUNTY OF NEW YORK:   CIVIL TERM
3       --------------------------------------X
        EDITH SHAW MARCUS and META SHAW STEVENS,
4       as Temporary Administrators of the
        Estate of SAM SHAW,
5
                        Plaintiffs,
6                                                Index No.
                 - against -                     123783/94
7
        MARTIN BRESSLER, LARRY SHAW,
8       SUSAN SHAW, BRESSLER & BRESSLER,
        VALERIE GOODMAN, 1912 PRODUCTIONS,
9       INC., MARC WEINSTEIN, individually
        and d/b/a COLOR GROUP,
10
                        Defendants.
11      --------------------------------------X
                             80 Centre Street
12                           New York, New York 10007
                             June 5, 2002
13

14

15      B E F O R E:

16              HONORABLE MARTIN EVANS,
                              Judicial Hearing Officer
17

18      A P P E A R A N C E S:

19              MEYER, GREENAWALT, TAUB & WILD, LLP
                Attorneys for the Plaintiffs
20              230 Park Avenue
                New York, New York 10169
21              BY:  WILLIAM GREENAWALT, ESQ.
                        -and-
22                   SAUL RUDES, ESQ.
                     605 Third Avenue
23                   New York, New York 10158

24

25

26

                DEBRA SALZMAN, RMR, Official Court Reporter

2

Proceedings

1

2    A P P E A R A N C E S: (Cont'd)

3        JEFFREY P. TUNICK, ESQ.
         Attorneys for Defendants
4        150 Main Street
         Nyack, New York 10960
5                -and-
             MICHAEL J. MARINO, ESQ.
6
         RUBIN & SHANG
7        Attorneys for the Plaintiff
         9 East 40th Street
8        New York, New York 10016
         BY:  JEFFREY RUBIN, ESQ.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEBRA SALZMAN, RMR, Official Court Reporter

3

Proceedings

A F T E R N O O N   S E S S I O N

MR. MARINO:  It is hereby stipulated and agreed by and between the parties to the within action and their attorneys, all of which are present, that the above entitled action is hereby settled on the following terms and conditions:

Number 1.  An entity will be formed. Whether that entity be a corporation, limited liability partnership, joint venture, what type of entity it will be will be determined by what is most reasonably efficient with respect to making money, tax consequences and the like.

The name of that entity will be the Shaw Family Archives.  Whether it be Shaw Family Archives Inc., LLC, partnership, "Shaw Family Archives" will be the primary name.

Larry Shaw, Meta Shaw Stevens and Edith Shaw Marcus shall be principals in that entity and their respective interests in that entity will be the following: Larry Shaw shall own 50 percent of that entity.  Meta Shaw Stevens and Edith Shaw Marcus -- off the record.

(Discussion held off the record.)

MR. MARINO:  Meta Shaw Stevens shall own 25 percent of that entity and Edith Shaw Marcus shall own

DEBRA SALZMAN, RMR, Official Court Reporter

4

Proceedings

1

2    25 percent of that entity.

3             That entity shall own and take possession

4    of, in a manner set forth below, all of the

5    photographs involved in this litigation.  That

6    includes --

7             MR. RUBIN:  Off the record.

8             (Discussion held off the record.)

9             MR. MARINO:  That includes each and every

10   photograph shot by either Sam Shaw or Larry Shaw

11   during the course of their respective careers,

12   lifetimes --

13            JHO EVANS:  Excuse me.  Wait a minute.

14            There were some photographs that were

15   claimed by both Sam and Larry Shaw, but Sam Shaw's

16   attorneys weren't aware they were taken by her but

17   owned by Columbia pictures.  If you want to dispose of

18   those photographs, they're not a party to it.

19            MR. MARINO:  Your Honor, I don't think we

20   can dispose of them via stipulation.

21            JHO EVANS:  From the point of view of the

22   stipulation you can.

23            (Discussion held off the record.)

24            MR. MARINO:  The photographs included in the

25   collection to be owned by the Shaw family foundation

26   entity include -- Shaw Family Archives entity include


DEBRA SALZMAN, RMR, Official Court Reporter

5

Proceedings

1

2    all of those photographs now in the possession -- I

3    can't do that either.

4                (Discussion held off the record.)

5                MR. MARINO:   (Continuing) All of the

6    photographs taken -- snapped by Sam Shaw and/or Larry

7    Shaw during the course of their lifetimes, together

8    with those photographs taken by third parties which

9    either of them claim as being owned by them via some

10   gift or sale from a third party, all subject to claims

11   by said third parties.

12               There shall be appointed what we have termed

13   a "superagent."  The superagent shall have two roles:

14   number one, the primary role shall be the custodian of

15   all the photographs hereinbefore mentioned.  However,

16   it is in the interest of all the parties to keep that

17   group of photographs within the possession of the

18   superagent at a minimum in order to save costs.

19               Let me go back for a minute.  The primary or

20   one of the roles of the super agent shall be to

21   warehouse and maintain all of the photographs subject

22   to a reduction in that collection pursuant to the

23   agreement of the principals: Larry, Meta and Edith.

24               The second role for the super agent is to

25   determine the commercial reasonableness of each and

26   every deal brought to the Shaw Family Archive entity.


DEBRA SALZMAN, RMR, Official Court Reporter

6

Proceedings

1

2      Each and every deal brought to the Shaw Family entity

3      upon which there is not agreement between Larry, Edith

4      and Meta, and with respect to that their votes are 50

5      percent Larry, and 50 percent total for Edith and

6      Meta, 25 percent each.

7              In the event of a deadlock, 50/50 deadlock,

8      the super agent will determine whether or not a deal

9      shall go forward depending on its commercial

10     reasonableness.  The respective voting power is 50

11     percent Larry, no matter what the entity; 25 percent

12     Edith, 25 percent Meta.

13             Let me try to back up.  With respect to all

14     types of transactions other than outright sales of

15     photographs, the procedure is as follows: If the

16     parties agree either to do or to not do the

17     transaction, the super agent need not be involved.

18             If, however, there is a deadlock on whether

19     or not to do the transaction the transaction must go

20     to the super agent who will determine whether or not

21     it is commercially reasonable to do and his

22     determination shall be final.

23             However, with respect to the outright sale

24     of an image, photograph -- if with respect to the

25     outright sale of a photograph, negative or

26     transparency, photographic print, negative or

DEBRA SALZMAN, RMR, Official Court Reporter

Proceedings

transparency, again, if the parties -- withdraw that.

If any of the parties wishes not to do the
transaction and even if it is a minority position,
then -- withdrawn.  That's not right.

MR. RUBIN:  Keep going.

MR. MARINO:  If it is a minority position,
and the super agent makes the determination that the
deal is commercially reasonable, the party, either
Larry, Edith or Meta, dissenting, or parties, will
have the right of first refusal to make that deal.

JHO EVANS:  Off the record.

(Discussion held off the record.)

MR. MARINO:  Let's back up a little bit.

In the event --

MR. RUBIN:  Off the record.

(Discussion held off the record.)

MR. MARINO:  Let me back up.

With respect to an outright sale as
previously stated, if any of the parties -- with
respect to the outright sale of a photographic print,
negative or transparency, if any of the parties -- let
me continue.

With respect to the outright sale of a
photographic print, negative or transparency or
contact sheet, which is a print, in the event of

DEBRA SALZMAN, RMR, Official Court Reporter

8

Proceedings

1

2   unanimity between the parties, the deal shall go

3   forward.

4         In the event that there is a majority in

5   favor of the deal, the dissenting party may

6   nonetheless match the deal presented within five days,

7   and if said deal is not matched by this dissenting

8   party within said five-day period the deal shall go

9   forward.

10        In the event there is a deadlock that the

11   decision as to whether or not to go forward with that

12   transaction shall be in the hands of the super agent,

13   and if the super agent makes the determination that

14   the deal should go forward because it is commercially

15   reasonable, then any of the dissenting parties to that

16   deal among the principals shall have the right, within

17   five days after the super agent makes determination,

18   to go forward to match the deal.  If they cannot match

19   the deal within that said five-day period the deal

20   goes forward.

21        Now, all of the principals, Larry, Edith and

22   Meta, may act as subagents for the collection, and

23   they shall be compensated by the entity for each deal

24   that is brought to the super agent -- excuse me --

25   each deal that is brought to the entity via the super

26   agent in an amount which is commercially reasonable

DEBRA SALZMAN, RMR, Official Court Reporter

1        Proceedings

2   given industry standards.

3            To clarify, they shall be compensated an

4   agency commission in an amount which is reasonable in

5   accordance with industry standards for all deals

6   brought and consummated.  Said compensation upon

7   consummation shall only be paid in the event money is

8   received with respect to that transaction by the

9   entity.

10           With respect to any monies coming in, any

11  monies generated by the collection as described

12  previously, all monies shall be paid directly to the

13  entity, and any commissions or expenses as will be

14  laid out below will all be paid by the entity after

15  receipt of said -- off the record.

16           (Discussion held off the record.)

17           MR. MARINO:  In the event any income

18  generated by the collection is payable to anyone

19  other -- any one or any entity other than the Shaw

20  Family Archives, the person or entity receiving that

21  check or money or cash shall immediately endorse it

22  over and deliver it to the super agent on behalf of

23  the Shaw Family Archives.

24           The commission paid to the subagent shall be

25  a percentage based on the gross amount generated and

26  collected in connection with the transaction, and such

            DEBRA SALZMAN, RMR, Official Court Reporter

10

Proceedings

1

2   commissions shall be paid by the entity to the agent

3   after said generated money is deposited and cleared in

4   the entity bank account.

5          All expenses incurred by agents, whether

6   they be Larry, Meta or Edith, or any other outside

7   agents shall be borne by the agent as the agent's cost

8   of doing business.

9          However, in the event either Larry, Meta or

10  Edith, or any other outside agent request that certain

11  expenses be borne by the entity because of

12  extraordinary circumstances, then if Meta, Larry and

13  Edith agree they will be borne by the entity.  If

14  there is a deadlock -- withdrawn.

15         A majority of the parties may agree to have

16  the entity bear such expenses, or a majority of the

17  parties may agree that the expenses should not be

18  borne by the entity.  In the event of a deadlock, the

19  super agent will determine the expenses sought to be

20  borne by the entity using a commercially reasonable

21  standard.

22         Any such expenses advanced by a subagent

23  without the prior written approval of the entity --

24  forget that.  Forget that.  It's assumed.

25         The parties herein, Larry, Meta and Edith,

26  shall each be entitled to a percentage of the net

DEBRA SALZMAN, RMR, Official Court Reporter

11

                              Proceedings

1

2      proceeds of all income-generating transactions after

3      the payment of all reasonable and necessary expenses,

4      which shall include the agency commission, if any,

5      subagency commission, if any, and after the payment of

6      all expenses reasonable and necessary to house and

7      maintain the collection, including any and all fees,

8      reasonable and necessary fees paid to the super

9      agent.

10                 JHO EVANS:  Off the record.

11                 (Discussion held off the record.)

12                 MR. MARINO:  Just by way of example only,

13     expenses shall include the super agent's fee, the cost

14     of housing and maintaining the collection -- by

15     "maintaining," I mean kept boxes, glassine envelopes,

16     folders, maintain -- but it shall also include the

17     administration of the entity's business affairs and

18     shall also include the scanning and inventorying of

19     all the images in the collection.

20                 The net proceeds after the deduction of the

21     aforementioned expenses shall be split in the

22     following manner:  50 percent to Larry Shaw; 25 percent

23     to Meta Shaw Stevens; 25 percent to Edith Shaw

24     Marcus.

25                 JHO EVANS:  Off the record.

26                 (Discussion held off the record.)


                DEBRA SALZMAN, RMR, Official Court Reporter

12

Proceedings

1.

2          MR. MARINO:  Any reference herein to the

3     principals' ownership of a share in the entity -- I

4     said that wrong.  The principals of the entity shall

5     herein -- the next subject.

6          The parties, each of them individually,

7     Larry Shaw, Meta Shaw Stevens Edith Shaw Marcus

8     individually, indemnify and hold the other harmless,

9     including the entity, for any and all claims, losses

10    or liabilities incurred by any of the parties or the

11    entity.

12          Each of the individual parties agrees to

13    indemnify and hold harmless --

14          MR. RUBIN:  Each of the principals of the

15    entity agree to indemnify and hold harmless the entity

16    and each other from any claims made against them for

17    any transaction that they conducted in relation to the

18    subject of the entity prior to this date.

19          JHO EVANS:  Can you tell me what it is

20    you're referring to?

21          MR. RUBIN:  What we're referring to is in

22    the event one of the parties had done a transaction --

23    off the record.

24          (Discussion held off the record.)

25          MR. RUBIN:  From any claims including any

26    lawsuits, including but not limited to any lawsuits


DEBRA SALZMAN, RMR, Official Court Reporter

13

| | Proceedings |
|---|---|
| 1 | |
| 2 | which are made against any of the principals for any |
| 3 | transaction conducted by such principals or their |
| 4 | agents, each respective principal or their agents in |
| 5 | relation to the corpus of the entity. |
| 6 | JHO EVANS:  I take it that what you're |
| 7 | referring to is if any claims are made against this |
| 8 | proposed entity, whatever it is, corporation or LLC, |
| 9 | by an    rd person arising out of any activities that |
| 10 | a           any of these three individuals who are |
| 11 |              before today, those individuals will |
| 12 |         ırmless and indemnify the entity |
| 13 |            arising out of those claims.  Is |
| 14 | |
| 15 |                   ect, your Honor. |
| 1f |                   ntity and each other. |
| |                ᴧ:  And the other principals. |
| |             ARINO:  Individually. |
| |           ᴊHO EVANS:  Indemnify each other from the |
| |        made against them. |
| |        MR. MARINO:  Exactly what you said, except |
| | the indemnity also extends to the individuals. |
| |        MR. GREENAWALT:  And would also be, your |
| 24 | Honor, for acts of those parties if the parties have |
| 25 | agents and have done things in their name, then that |
| 26 | would also apply. |

DEBRA SALZMAN, RMR, Official Court Reporter

14

Proceedings

1.

2        MR. MARINO:  And I am saying it has to be

3    authorized agents.

4        MR. RUBIN:  Our problem is Darius, where

5    there is a claim by Larry that he is acting without

6    authority.

7        JHO EVANS:  What you're saying is if he

8    makes any claim against the entity, Larry Shaw will

9    hold the entity harmless against them.  Is that

10   right?

11       MR. RUBIN:  That's what it should be.  We

12   didn't have any dealings with them.

13       JHO EVANS:  Is that true?

14       MR. MARINO:  That's what they are

15   suggesting.  All I'm saying is that the agent be an

16   authorized agent in order for the indemnity to take

17   effect, and then the issue of whether it was

18   authorized or not is --

19       MR. RUDES:  Just a second on that.

20       JHO EVANS:  If this fellow was not an

21   authorized agent and he makes some claim again the

22   entity, even though he was unauthorized, and suppose

23   somebody is from Australia and says they were

24   authorized by Meta Stevens to sell these photographs

25   and he wasn't, should there be an indemnity by Meta

26   Stevens against the entity?


DEBRA SALZMAN, RMR, Official Court Reporter

15

Proceedings

1

2          MR. RUBIN:  No.  Our problem is with Darius

3   specifically because Darius was doing business with

4   Larry, and if Darius had done -- if Darius had done

5   business with another person, and that person comes

6   against the entity claiming that there was some

7   problem in the sale, we shouldn't have to pay for the

8   defense of that.

9          JHO EVANS:  I fail to see how any person can

10  make a claim against an entity arising out of a past

11  action if the entity has not been in existence.

12         MR GREENAWALT:  Not just against the

13  entity.  The way Mr. Marino put it, it's also claims

14  against any one of the principals or their acts for

15  any of those transactions.

16         JHO EVANS:  Is there a possibility that

17  Darius will make claims against Stevens and Marcus?

18         MR. RUBIN:  I don't know.  There was a

19  contract that he signed with the receiver.  I have no

20  idea -- I haven't seen the contract -- I have no idea

21  who is responsible for that.

22         MR. TUNICK:  The receiver, he signed the

23  deal, he's responsible for it.

24         MR. RUBIN:  The receiver signs in his

25  representative capacity.

26         MR. GREENAWALT:  Darius and the receiver

DEBRA SALZMAN, RMR, Official Court Reporter

16

Proceedings

1

2   signed a contract.

3          JHO EVANS:  But he was authorized to do so,

4   wasn't he?  If he was authorized to sign a contract

5   and based on that contract, that's an authorized

6   contract.

7          MR GREENAWALT:  Darius is only supposed to

8   do certain things under the contract.

9          JHO EVANS:  I don't know, if there's a claim

10  based on the contract that should be indemnified.

11         MR. GREENAWALT:  If somebody claims against

12  Darius outside of the contract or claims against Larry

13  or Meta, claims against them for acts up to now,

14  that's what we're trying to get into the indemnity.

15         MR. TUNICK:  Authorized agent.

16         JHO EVANS:  You want the entity indemnified

17  for claims against Larry.

18         MR GREENAWALT:  By a third person.

19         JHO EVANS:  I don't understand that but --

20         MR GREENAWALT:  If somebody claims Larry has

21  done something strange and Larry owes somebody a

22  hundred thousand dollars for some reason, okay --

23         MR. RUDES:  Not "for some reason," for work

24  he did on behalf of marketing the photos.

25         JHO EVANS:  That's not a claim against the

26  entity.


DEBRA SALZMAN, RMR, Official Court Reporter

Proceedings

MR GREENAWALT:  The point is --

JHO EVANS:  How can that be a claim against the entity?

MR. MARINO:  This indemnity makes no sense. This indemnity makes no sense.

JHO EVANS:  It doesn't make any sense.

MR. MARINO:  The indemnity makes no sense at all.

JHO EVANS:  That doesn't make any sense.

MR. RUBIN:  Judge, there's another issue that there is a claim --

JHO EVANS:  You're forming a corporation. Somebody is making a claim against Larry for past acts.  How is the corporation involved?

MR. MARINO:  The extent of the claim can only be against Larry and Larry's interest in the entity.

MR. RUBIN:  Here is the problem.  The problem is that there is an issue that some pictures which Larry has are also claimed by another party, a photographer as being his.  If those become the subject of --

JHO EVANS:  Wait a minute.  Tell me that again.  Some third party makes a claim against what?

MR. RUBIN:  Larry has claimed that certain

DEBRA SALZMAN, RMR, Official Court Reporter

| 1 | Proceedings |

pictures are authored by himself.  There is another

photographer that made a claim that those pictures are

not Larry's but his.  Those then, however, will become

part of this entity and will be marketed as part of

the entity.

If that person, that photographer, sues the

entity in claiming that those pictures are his not

Larry's, we want Larry to defend it.

MR. MARINO:  There are a similar amount of

photographs on the other end.

JHO EVANS:  We know that there are claims by

third parties.

MR. TUNICK:  We already said that.

MR. RUBIN:  Who pays for the defense of the

lawsuit?

JHO EVANS:  We know there are claims by

third parties against some of these photographs.  Some

of these photographs were claimed by Larry Shaw and

also claimed by Sam Shaw.  Now, if this third party

comes in against the corporation and says those are

mine, who is going to indemnify the corporation?

MR. RUBIN:  I'm saying there are certain

pictures that Larry claims were taken.  There is a

pictures taken by Atami (phonetic) that he took.  If

in fact there is a lawsuit, Larry makes these part of

19

1           Proceedings

2     the corpus of the entity, if this person comes in and

3     brings a lawsuit, who pays for --

4               MR. TUNICK:  Don't take them as part of the

5     corpus.

6               MR. MARINO:  Turn them over.

7               MR. TUNICK:  Don't take them.

8               MR. RUBIN:  That's not the point.

9               MR. TUNICK:  Came them back to Atami.

10              JHO EVANS:  Is there any likelihood of that

11    happening?

12              MR GREENAWALT:  Well, your Honor, I think

13    two of the groups you were referring to, Maureen

14    Lambrey and Jessica Burstein, Jessica says so far as

15    she's concerned Sam, she feels, could have those.

16              JHO EVANS:  I don't care.  She testified

17    that she took them and the ownership of them is in

18    Columbia Pictures.  That's what she testified to.

19    What kind of a claim can she make?  She doesn't own

20    the photographs.

21              MR GREENAWALT:  I understand.

22              I suppose Columbia could make a claim, your

23    Honor.

24              JHO EVANS:  Don't look for something that

25    doesn't exist.

26              MR. RUBIN:  The women are concerned about

1                           Proceedings

2          being responsible or being responsible for something

3          that was done previously which may be wrong or have

4          some consequences against them and the entity, that's

5          all, so they just want to be held harmless for that

6          because they don't know what Larry was doing and

7          they're willing to do it reciprocally.

8                        MR. RUDES:  Each party here represents that

9          they have done nothing in any way which would expose

10         the individual or the entity to anymore suits or any

11         other suits or any attempts to recover in any fashion,

12         and they acknowledge that in entering into this

13         agreement they have been relying on the

14         representations and warranties.

15                        MR. MARINO:  That's fine.  I'm happy with

16         that.

17                        JHO EVANS:  What more do you need?  That's

18         all you need.

19                        Both sides agree to that?

20                        MR. MARINO:  Yes, we're fine, Judge.

21                        MR GREENAWALT:  Just a minute.

22                        JHO EVANS:  Next point.

23                        MR. MARINO:  Now we move on to attribution.

24                        All of the photographs involved in this

25         collection shall be the property -- shall be termed a

26         part of the Shaw Family Archives.


                   DEBRA SALZMAN, RMR, Official Court Reporter

21

                              Proceedings

1
2           With respect to the individual authorship of
3   an individual image, all of the Marilyn Monroes will
4   be -- I was about to state that all of the Marilyn
5   Monroes can be attributed to Sam Shaw, except that my
6   client just raised 72 photographs or 36 photographs --
7   are they printed or negatives?
8           (Discussion held off the record.)
9           MR. MARINO: The parties have agreed that
10  the attribution of the photographs involved in this
11  collection will be determined by Judge Evans based on
12  his findings, which will be based in turn on the
13  evidence adduced at trial over the past seven years.
14          MR GREENAWALT: I'm not willing to let
15  Marilyn Monroe be attributed to Larry Shaw.
16          MR. MARINO: Let me tell you, since we
17  didn't present any evidence on that during seven
18  years --
19          MR. GREENAWALT: No, no, no.
20          MR. RUBIN: Hold it. I don't know what the
21  problem is. I thought we agreed.
22          MR. MARINO: We did agree.
23          MR. TUNICK: Larry tells us two rolls are
24  Larry Shaw's photographs of Marilyn Monroe. If we can
25  agree that all Marilyn Monroe photographs can be
26  attributed to Sam Shaw except for a certain two rolls,


              DEBRA SALZMAN, RMR, Official Court Reporter

22

1        Proceedings

2    then we have no problem.

3                MR GREENAWALT:  Fine.

4                MR. RUBIN:  We're agreeing to that.

5                MR GREENAWALT:  We don't agree necessarily

6    on the two rolls.

7                MR. MARINO:  Larry, you have to agree that

8    Judge Evans will determine them, that's all.

9                MR. RUBIN:  Judge Evans will two determine

10   the two rolls.

11               MR. LARRY SHAW:  There has been testimony on

12   that.

13               MR. MARINO:  Fine.

14               MR. TUNICK:  Fine.  That takes care of

15   Marilyn Monroe.

16               MR. RUBIN:  Let's discuss it.

17               (Discussion held off the record.)

18               MR. RUDES:  Next.

19               MR. RUBIN:  The two rolls will be determined

20   by the judge.

21               MR. MARINO:  The two rolls --

22               MR. TUNICK:  Stop.  It's there.

23               MR. MARINO:  As far as authorship with

24   respect to the balance of the photographs, images,

25   transparencies, negatives involved in this

26   transaction, the authorship shall be determined by

DEBRA SALZMAN, RMR, Official Court Reporter

23

Proceedings

1
2   Judge Evans based on the evidence adduced in this case
3   over the past seven years.
4           In the event any of the parties, Larry, Meta
5   or Edith, have marketed any photograph outside of the
6   parameters, a photograph, any image, any transparency
7   of any kind, have marketed any of those images outside
8   the parameters of this agreement, then that party
9   shall be penalized in the following manner --
10  start again.
11          In the event any of the parties herein from
12  this date forward, June 5, 2002, market,
13  commercialize, attempt to sell, attempt to make any
14  type of deal with respect to an image involved in this
15  transaction --
16          JHO EVANS:  What about gifts?
17          MR. MARINO:  Gifts are included, if they
18  attempt to gift -- off the record.
19          (Discussion held off the record.)
20          MR. MARINO:  (Continuing) Including gifts,
21  without the agreement of the other parties -- excuse
22  me -- without the majority agreement of the other
23  parties, then that person shall be penalized in the
24  following manner: they will be subject to treble
25  damages in the event monies are received.  In the
26  event of a gift they will be subject to treble damages

DEBRA SALZMAN, RMR, Official Court Reporter

24

Proceedings

1

2  on the value of the damages, on the value of the

3  photograph plus $10,000.

4          Off the record.

5          (Discussion held off the record.)

6          MR. LARRY SHAW:  I will not agree on that.

7          MR. TUNICK:  Strike that.

8          (Discussion held off the record.)

9          MR. MARINO:  No $10,000, just treble

10  damages.

11          In the event any of the parties market,

12  commercially exploit, sell or even gift one of the

13  images that should be a part of this collection but

14  has not been previously -- but has not been turned

15  over pursuant to this stipulation, that party will be

16  penalized in the following manner: they will be

17  subject to treble damages and they will be penalized,

18  in addition be penalized in the amount of $10,000 per

19  occurrence.

20          MR. TUNICK:  Also the value --

21          MR GREENAWALT:  Also you don't have to --

22          MR. TUNICK:  After discovered photographs,

23  images, transparencies, whatever was listed, turned in

24  by any principal to the super agent, any ones turned

25  in after this date, any photographs turned in -- any

26  photographs after discovered -- how about after

DEBRA SALZMAN, RMR, Official Court Reporter

Proceedings

1  Proceedings
2  discovered photographs?  I'm giving everybody the
3  benefit of the doubt.
4          MR. LARRY SHAW:  After recovered.
5          MR. MARINO:  After discovered or after
6  recovered photographs, beautiful.
7          MR. RUDES:  Very good.
8          MR. TUNICK:  (Continuing) Turned over to the
9  super agent or the entity shall not be subject to the
10  aforementioned penalties.
11          MR. MARINO:  Fine.  Okay.
12          MR. RUDES:  One thing clarified, Madam
13  Reporter.  At the outset when Mr. Marino made
14  reference to images and all that stuff, could you put
15  "collectively known as photographs" so we don't have
16  to worry about anything cropping up if he left out a
17  word.
18          COURT REPORTER:  Your statement is now on
19  the record.
20          MR. MARINO:  In the event of any dispute
21  arising out of the terms and conditions of this
22  stipulation, said dispute shall be --
23          MR. RUDES:  No arbitration.  Leave it out.
24          MR. MARINO:  Judge, can you help us out
25  here?  All the parties agree, I think, that Myron
26  Beldock is an appropriate super agent.


DEBRA SALZMAN, RMR, Official Court Reporter

26

Proceedings

1

2          However, we are unclear on how to deal with

3    whether -- how he gets fired or how he gets renewed.

4    In the event of a deadlock there's no super agent to

5    make a determination.

6          MR. TUNICK:  That's the last point we had.

7          MR. RUDES:  Go back to court and get a new

8    receiver.

9          MR GREENAWALT:  Your Honor, let me explain

10   some of the reason for this.  There are many people

11   who would love to have some control of this

12   collection, who are experts in this field, who we

13   are -- we've been told on good source would really

14   market this collection tremendously.  Myron Beldock is

15   a fine guy but he's a very, very busy lawyer.

16          JHO EVANS:  In that case, use your people as

17   subagents.

18          MR GREENAWALT:  We want to have some

19   provisions for maybe cutting down the cost of the

20   super agent's administration, such as having True

21   Color --

22          JHO EVANS:  What you're saying is you want

23   somebody else as a super agent?

24          MR GREENAWALT:  At some period.

25          JHO EVANS:  Is that what you're saying?

26          MR GREENAWALT:  We would like somebody else


DEBRA SALZMAN, RMR, Official Court Reporter

Proceedings

now.  We are acceding to Beldock for the time being,
but we want to have another way to get another
superagent, or if True Color can take it over, the
pictures --

MR. MARINO:  I'm sorry.

(Discussion held off the record.)

JHO EVANS:  You have agreed on everything
now except whether Beldock will continue in some way.
Everything else is agreed?

MR. TUNICK:  Yes.

MR. MARINO:  Yes.

JHO EVANS:  Everything agreed except the
question of what happens if you don't like Beldock.

MR. RUBIN:  Right.

MR GREENAWALT:  We have one more thing.

JHO EVANS:  Is everything else agreed except
that?

MR. RUBIN:  The only other issue is what
lab, the place of storage.  Right now it's my
understanding that these are stored at True Color
Laboratories.

MR. LARRY SHAW:  A portion are stored there.

MR. RUBIN:  A portion stored there and a
portion stored at Edie's house.

Is that true?

DEBRA SALZMAN, RMR, Official Court Reporter

                        Proceedings
 1
 2          MS. SHAW MARCUS:  Yes.
 3          MR. RUBIN:  Is there a problem if you put
 4      all the photos at True Color?
 5          MR. MARINO:  The problem is the expense; it
 6      seems to me a waste of money.
 7          (Discussion held off the record.)
 8          MR. MARINO:  Let's do that.  To start, at
 9      some point get together and determine --
10          MR. TUNICK:  Just so they're in one place.
11          MR. RUDES:  We're going to store them all at
12      True Color and then decide what they're going to do?
13          MR. MARINO:  They can be scanned at True
14      Color.
15          MR. TUNICK:  They're going to be stored at
16      True Color Lab.  All photos have to be delivered to
17      True Color Lab.
18          JHO EVANS:  Let's say this.  If two-thirds
19      of the parties agree --
20          MR. TUNICK:  That this is a deal --
21          JHO EVANS:  -- that any photograph can be
22      taken out and given to any one of the parties, that
23      will be done.
24          MR. MARINO:  I'm happy with that.
25          MR. RUDES:  There's a problem now about
26      family photos that are in bins, which they say have to

            DEBRA SALZMAN, RMR, Official Court Reporter

29

Proceedings

go into --

JHO EVANS:  You didn't hear what I just suggested.

MR. RUDES:  No.

JHO EVANS:  That if two-thirds of the parties agree, any photographs can be given to any of the parties.

MR. RUDES:  Yes, two-thirds.  Well, then suppose we have a split 50/50.

MR. MARINO:  Saul, if the photographs that are there now are the ones that Larry previously said were okay to go to Meta or Edith, he's going to say it again.  They stand as exactly the same relationship as the photographs that were never claimed by Sam.

MR. RUDES:  Just a minute.  We have photos in bins.  We are going to count them up and we're going to make an offer to sell them to the individual sisters.

MR. MARINO:  No, you're going to turn them over and we're going to look at them.  Nobody is selling anything.

MR. RUDES:  We agree that the photos are there.  I'm bringing an offer for certain photos to buy them and you turn me down, pay me for the price. I don't understand why this is any different.

DEBRA SALZMAN, RMR, Official Court Reporter

30

1

2          (Discussion held off the record.)

3          JHO EVANS:  I have a solution for that one,

4     Mr. Rudes, it's very simple.

5          The so-called family photographs will all be

6     put into one special pot or box, and if the parties

7     can't agree I'll decide.

8          MR. RUDES:  That's the end.

9          MR. TUNICK:  Fine.

10         MR. MARINO:  That ends that.

11         JHO EVANS:  Is there anything left now?  You

12    said there was a question of a laboratory and then a

13    question of family photographs was raised, and the

14    question of the replacement possibly of Mr. Beldock.

15    Is there anything else or have those been resolved?

16         MR GREENAWALT:  The laboratory is True

17    Color.

18         MR. MARINO:  Fine, until the parties agree

19    otherwise.

20         JHO EVANS:  The laboratory is resolved; the

21    family photographs are resolved.

22         Why even bother at this point of going into

23    the question of replacing Beldock when you got nobody

24    else in mind?

25         MR. MARINO:  Exactly.

26         MR. RUBIN:  I'll take it.


DEBRA SALZMAN, RMR, Official Court Reporter

Proceedings

1

2          JHO EVANS:  You're wasting time.

3          MR. MARINO:  Your Honor, should we have an

4     allocution?

5          JHO EVANS:  We will, as soon as Mr. Rudes

6     sits down.

7               First I will ask all counsel, have you all

8     heard the stipulation?

9          MR. MARINO:  Yes, we have.

10         MR. RUBIN:  Yes.

11         MR. RUDES:  Yes.

12         MR. GREENAWALT:  Yes.

13         JHO EVANS:  Do you individually agree with

14    that?

15         MR GREENAWALT:  Yes.

16         MR. RUBIN:  Yes.

17         MR. MARINO:  Yes.

18         MR. RUDES:  Yes.

19         JHO EVANS:  Do you agree with that on behalf

20    of your clients?

21         MR. RUBIN:  One other thing.  My

22    understanding is that this stipulation settles this

23    lawsuit in its entirety.

24         MR. MARINO:  Excuse me.  Are you referring

25    to the pending motion?

26         MR. RUBIN:  In its entirety.


                 DEBRA SALZMAN, RMR, Official Court Reporter

32

Proceedings

MR. MARINO:  That is our motion.

MR. RUBIN:  In its entirety and --

MR. MARINO:  No, not a chance.

MR. RUBIN:  And is therefore discontinued with prejudice after we allocute to the stipulation.

MR. MARINO:  Your Honor, there is not a chance in hell of Mr. Tunick and I withdrawing the pending motion.  We would be happy, happy to try to resolve it amicably, but it's not going to be withdrawn.  This is not Larry's motion; it is our motion.

JHO EVANS:  All right.  Aside from that, do you agree with the stipulation, aside from that one question?

MR. RUBIN:  Right.  But my understanding is that this will discontinue the lawsuit with prejudice.

JHO EVANS:  Aside from that.

MR. RUBIN:  As far as this.

JHO EVANS:  Aside from the motion, aside from that question, do you agree with the stipulation?

MR. RUBIN:  Yes, if it discontinues the lawsuit with prejudice.

JHO EVANS:  Aside from that question, do you

DEBRA SALZMAN, RMR, Official Court Reporter

33

Proceedings

1    agree with that?

2            MR. RUBIN:  Yes.

3            MR GREENAWALT:  My understanding was that it

4    did away with the motion.  That was never raised that

5    this was going to be continued.

6            JHO EVANS:  Aside from that, do you agree

7    with the stipulation?

8            MR. RUBIN:  Aside from that I agree with it.

9            JHO EVANS:  Mr. Greenawalt, do you agree

10    with that, aside from that one question?

11            MR GREENAWALT:  That's a major question,

12    "aside from that," I can't agree to it if that's

13    what's going to continue.

14            MR. RUBIN:  Aside from that.

15            MR. RUDES:  He said aside from that.

16            MR. GREENAWALT:  Again aside from that, the

17    terms are okay, but I was sure --

18            JHO EVANS:  That's what I was asking you.

19            Aside from that, Mr. Larry Shaw, do you

20    further stipulate, aside from that one question, do

21    you agree with the stipulation?

22            MR. LARRY SHAW:  Yes, your Honor, I do.

23            JHO EVANS:  Have you been advised by your

24    attorneys with respect to that?

25            MR. LARRY SHAW:  By my attorneys I've been

34

Proceedings

1

2    advised, I argued at length and I have agreed.

3        JHO EVANS:  Now, I'll ask Edith Marcus, have

4    you heard the terms of the stipulation?

5        MS. SHAW MARCUS:  Yes.

6        JHO EVANS:  Have you discussed it with your

7    lawyers?

8        MS. SHAW MARCUS:  Yes.

9        JHO EVANS:  And having discussed it and

10   being advised of the terms, do you agree with it with

11   the exception of this one question that's just been

12   raised?

13       MS. SHAW MARCUS:  Yes.

14       JHO EVANS:  Ms. Stevens, have you heard the

15   terms of the stipulation?

16       MS. SHAW STEVENS:  Yes.

17       JHO EVANS:  Have you discussed it with your

18   lawyers?

19       MS. SHAW STEVENS:  Yes.

20       JHO EVANS:  Aside from this one question

21   that's been raised, do you agree with it?

22       MS. SHAW STEVENS:  Yes.

23       JHO EVANS:  I'm going to ask Mr. Marcus,

24   you're not formally a party but you're actually a

25   party.  You heard the terms of the stipulation.  Have

26   you discussed it with yours lawyers?


DEBRA SALZMAN, RMR, Official Court Reporter

35

Proceedings

1

2        MR. MARCUS:  Yes, your Honor.

3        JHO EVANS:  Do you agree with them?

4        MR. MARCUS:  Yes.

5        JHO EVANS:  Except for this one point.

6        Now we have one point of dispute.  There's

7   another question that I will raise in a few minutes.

8   I think it will be advisable for you talk about, maybe

9   as you suggested -- it's too late today to continue

10  with the hearing -- some amicable settlement.  We'll

11  continue again on Monday.

12        The other question in my mind is this.

13  Before me, to which I have taken evidence, is about

14  9,800 photographs.  There are maybe a hundred thousand

15  or whatever it was that the receiver has, and I take

16  it there may be a dispute as to who owns or who should

17  be attributable to those photographs.  I haven't heard

18  any evidence with respect to them and I'm really not

19  in a position to make that decision as to those.  I

20  can't say they can be attributed to one or another.

21        How do you want to handle that?

22        MR. MARINO:  Your Honor, I would suggest

23  that since you can't make a determination on those,

24  that we go back to my original suggestion, which was

25  if the parties can't agree, that the image itself will

26  be termed "an image owned by the Shaw Family Archive,"

DEBRA SALZMAN, RMR, Official Court Reporter

36

Proceedings

1

2    and unless the parties can agree on an attribution --

3        JHO EVANS:  The question is, they will be

4    owned by the Shaw Family Archives.

5        MR. MARINO:  The specific authorship.

6        JHO EVANS:  The question is one of

7    attribution.

8        MR. MARINO:  Your Honor, there doesn't have

9    to be a specific attribution to every photograph.  It

10   can still be marketed.

11       MR. GREENAWALT:  Your Honor, one of the

12   points about that hundred thousand or 75,000 pictures

13   is that there are many overlaps with the 9,800.

14       JHO EVANS:  That doesn't make any

15   difference.  If I decide the 9,800, there may be

16   others that are not.

17       MR GREENAWALT:  These are all taken --

18       JHO EVANS:  Obviously if I decide Picture A

19   is attributed to John Jones, a copy of Picture A is

20   attributable to John Jones.  It's pretty clear.  There

21   were others that are not.

22       MR GREENAWALT:  I understand, but we have,

23   obviously, as have you, not heard any evidence.

24       JHO EVANS:  That matter was never before

25   me.

26       MR. GREENAWALT:  I know you ruled that,

DEBRA SALZMAN, RMR, Official Court Reporter

00/12/2002 10:56 FAX 212 681 6075                                    Ø038

Proceedings

1

2  that's right.  There are also, by the way, your Honor,

3  some pictures that have been turned into the receiver.

4          JHO EVANS:  Without arguing the point, the

5  question is how to handle it.

6          MR GREENAWALT:  I'm mentioning the pictures

7  that have been turned into the receiver.  We're just

8  about to make a motion to get those considered by your

9  Honor.

10          JHO EVANS:  To get what?

11          MR GREENAWALT:  Mr. Darius and Larry Shaw

12  turned over to the receiver in the spring of 2001 --

13          JHO EVANS:  He has them, the receiver has

14  them.

15          MR GREENAWALT:  Those need to be decided

16  upon also, your Honor.  There's a much less number of

17  those, only about, say, 250 of those but they're

18  important ones.  We need to have those decided too.

19          JHO EVANS:  The question of the

20  attribution.

21          MR GREENAWALT:  Yes, a lot of those, a lot

22  of those Larry Shaw has also by a document attributed

23  them to Sam Shaw, but we need to have those decided as

24  well.

25          JHO EVANS:  Can we continue this on Monday?

26          MR. RUBIN:  I can't be here on Monday.

DEBRA SALZMAN, RMR, Official Court Reporter

38

```
 1                        Proceedings
 2            JHO EVANS:  You have able counsel to take
 3       over for you.
 4            (Proceedings adjourned to June 9, 2002.)
 5                 *      *      *      *
 6            The foregoing is hereby certified to be a
 7       true and correct transcript of the proceedings held in
 8       this matter.
 9
10
11
12            DEBRA SALZMAN, RMR
13            Senior Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25
26
```

DEBRA SALZMAN, RMR, Official Court Reporter