## MARCUS & GREBEN
### ATTORNEYS AT LAW

BRIAN L. GREBEN
PARTNER

1650 BROADWAY, SUITE 707
NEW YORK, NEW YORK 10019

TEL: 646.536.7602
     917.612.0486
FAX: 516.829.0008

EMAIL:  brian@marcusandgreben.com

April 30, 2006

**VIA FACSIMILE ONLY**
**(914) 390-4152**
Hon. Judge Colleen McMahon
United States District Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

   Re: *Shaw Family Archives, Ltd., et al. v. CMG Worldwide, Inc., et al.*
     Docket No: 05 cv. 3939
     *CMG Worldwide, Inc., et al. v. Bradford Licensing Associates, et al.*
     Southern District of Indiana Docket No.: 1:05 cv. 0423

Dear Judge McMahon:

This correspondence is sent pursuant to your request for the legal papers filed in the Southern District of Indiana in support of Bradford Licensing Associates ("Bradford") and the Shaw Family Archives' ("SFA") motions to dismiss the Indiana proceedings against them for lack of personal jurisdiction. Accordingly, please find the enclosed copies of Bradford's Memorandum of Law, filed in the Southern District of Indiana on or about July 5, 2005; the Affidavit of Len Reiter submitted in support of Bradford's Memorandum of Law; SFA's Memorandum of Law, filed in the Southern District of Indiana on or about July 5, 2005; the Affidavit of Larry Shaw submitted in support of SFA's Memorandum of Law; Bradford's Reply in support of its motion to dismiss, filed in the Southern District of Indiana on or about August 15, 2005; and SFA's Reply in support of its motion to dismiss, filed in the Southern District of Indiana on or about August 15, 2005. These documents demonstrate that neither Bradford nor SFA had sufficient contacts with Indiana for either party to be subject to its jurisdiction.

Bradford and SFA suspect that CMG and MMLLC will argue that these actions should be governed by the laws of a State other than New York despite the fact that Bradford and SFA are not subject to Indiana jurisdiction. This suspicion is based on CMG and MMLLC's letter of April 21, 2006, pursuant to which they (unsuccessfully) sought to have the actions transferred to California, and on the fact that CMG and MMLLC have been forum shopping since the initiation of these actions. CMG and MMLLC originally commenced their suit in Indiana, despite the fact that Marilyn Monroe was indisputably not an Indiana resident or domiciliary at the time of her death, because Indiana law maintains a post-mortem right of publicity lasting for 100 years after death. Ind. Code Ann. § 32-36-1-8. Indeed, there is little doubt that this action was commenced in Indiana as a result of CMG and MMLLC's determination to have the right of publicity issue governed by Indiana's unusual law. Instead of establishing a home office in New York, Los

Angeles, or a similar media/entertainment center, CMG chose Indianapolis, Indiana. Indiana has the broadest protection for the right to publicity of famous personalities, both living and dead, in the country. CMG's President, Mark Roesler, was the driving force behind the Indiana right of publicity statute. Mr. Roseler's website features a "timeline" which claims:

> 1994: Roesler became the force behind the instatement of Indiana's Right of Publicity Statute, now regarded as the most progressive and celebrity-friendly worldwide.

See http://markroesler.com/about/timeline.htm#.

CMG and MMLLC are, no doubt, desperate to avoid the application of New York law, because under New York Law Civil Rights Law Sec. 50, ownership of the rights of privacy and publicity are extinguished at the time of the subject's death.[1] *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585 (2d Cir. 1990) (holding that a publisher's marketing of a calendar containing photographs of the late Babe Ruth could not have violated Ruth's right of publicity because, pursuant to NY Civ. R. § 50, "[t]he right of privacy protection…is clearly limited to 'any living person,'" and that a "right to privacy claim is personal to the individual and is extinguished upon [the individual's] death.") (citations omitted); *James v. Delilah Films, Inc.*, 144 Misc.2d 374, 378-79, 544 N.Y.S.2d 447, 451 (Sup. Ct., N.Y. Cty., 1989) (holding, in action involving publication of images and performances of deceased musicians, that "those plaintiffs who are successors in interest [to the deceased musicians] have no cause of action under Civil Rights Law §§ 50, 51, as the statutory rights created by said law do not survive death. Whatever rights belonged to [the deceased musicians] were extinguished at their deaths.") (citations omitted). Moreover, under New York law, CMG and MMLLC may not assert a common-law right to publicity regarding images of Marilyn Monroe: "Since the 'right of publicity' is encompassed under the Civil rights Law as an aspect of the right of privacy, which…is exclusively statutory in this state, the plaintiff cannot claim an independent common-law right of publicity." *Stephano v. News Group Publications*, 64 N.Y.2d 174, 183, 485 N.Y.S.2d 220, 224 (1994). See also *Pirone, supra*, 894 F.2d at 585. These cases clearly establish that under New York law, any possible right of publicity to the name, image and persona of Marilyn Monroe ceased to exist at the time of her death. It should be noted that, in a case brought by the Executor of Marilyn Monroe's Estate, the Appellate Division, First Department, has already held that any right of publicity regarding images of Marilyn Monroe terminated at the time of Monroe's death. *Frosch v. Grosset & Dunlap, Inc.*, 75 A.D.2d 768, 427 N.Y.S.2d 828 (1st Dep't 1980).

CMG and MMLLC have picked California as the second choice on their forum-shopping list because California may recognize a post-mortem right of publicity under certain circumstances. However, California law cannot be applied to these actions because Marilyn Monroe, at the time of her death, was a resident and domiciliary of New York. That Monroe was a resident and domiciliary of New York is demonstrated by the fact that her will was probated in New York; that the Petition for Designation of Appraiser that was prepared for the Surrogate's Court in connection with the probating of Monroe's estate states that she was a resident of 444 East 57th Street, New York, New York, at the time of her passing; and that the documentation prepared in

---

[1] NY Civ. R. § 50 states that:
> A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture *of any living person* without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor [emphasis provided].

connection with the probating of Monroe's will is replete with references to Monroe having been a New York City resident at the time of her death. Because Monroe was a New York resident and domiciliary at the time of her passing, New York law governs the right to publish her images and photographs. *Groucho Marx Productions, Inc. v. Day and Night Co.*, 689 F.2d 317, 320 (2d Cir. 1981) (noting, in holding that California law governed the right of publicity at issue in that action, that "[t]he three Marx Brothers, with whom we are here concerned, were California residents at the time of their deaths…Plaintiff Susan Marx is a California resident, purporting to assert Harpo's right of publicity as the trustee of the residuary trust under Harpo's will, which was probated in California."); *Jim Henson Prods. v. John T. Brady & Assocs.*, 867 F.Supp. 175, 188 (S.D.N.Y. 1994) ("The parties agree that Connecticut law governs any postmortem right of publicity [the deceased] might have, since he died a citizen and resident of that state."); *Mathews v. ABC Television, Inc.*, 1989 U.S. Dist. LEXIS 10694 (S.D.N.Y. 1989) (noting, in holding that New York law governs the right of publicity at issue in that action, that the relevant "[d]efendants…all reside in New York and are, or were, principal officers of…[New York] corporate defendants.").

CMG and MMLLC have indicated that they will take the position that although Marilyn Monroe may have been a New York resident when she died, she was a California domicile. This position is incorrect. The undersigned's firm has reviewed Ms. Monroe's probate files, and they contain nothing to indicate that she was a California domicile. Indeed, they contain evidence that points to the opposite conclusion. For example, while the Order Fixing Estate Tax prepared for Ms. Monroe's estate lists hundreds of thousands of dollars of New York assets and a New York Estate tax debt of $16,072.52, it lists a California tax debt of only $2,614.24 at the time of Ms. Monroe's death, and a total California tax debt of only $3,271.68 after interest was calculated. A copy of the Order Fixing Tax has in enclosed herewith. Moreover, when the estate of Marilyn Monroe started a lawsuit regarding the contents of a book about Ms. Monroe that was published after she died, they started an action in New York that relied upon New York law on the issue of post-mortem rights to publicity. *See Frosch, supra.* In the *Frosch* matter, the plaintiff – who was the Executor of the Estate of Marilyn Monroe – affirmatively stated in his Bill of Particulars that New York law was the basis of his claims. See Demand and Response No. 4 of the *Frosch* Bill of Particulars, a copy of which is enclosed herewith.

Finally, even if, *arguendo*, Marilyn Monroe was a California domiciliary at the time of her death (and she was not), the fact that she was indisputably a *New York resident* when she died is sufficient grounds for New York law to govern this matter. This is demonstrated by the fact that the cases quotes provided above do not discuss domicile – they discuss *residence*. The fact that Ms. Monroe was a New York resident when she died mandates that this matter must be governed by New York right to publicity law.

Thank you for your time and consideration. Kindly contact the undersigned should you have any questions.

Very truly yours,

Brian L. Greben (BG 1572)

cc: Orin Snyder, Esq.

Encls.