# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

CMG WORLDWIDE, INC., an Indiana )
Corporation and MARILYN MONROE, LLC, )
a Delaware Limited Liability Company, )
            )
          Plaintiffs, )
            )
v.                ) Cause No.:1:05-cv-0423-DFH-WTL
            )
            )
BRADFORD LICENSING ASSOCIATES, )
THE SHAW FAMILY ARCHIVES, Ltd., )
a New York Corporation, JAMES E )
DOUGHERTY, and VALHALLA )
PRODUCTIONS, LLC, a Maine Limited )
Liability Company, )
            )
          Defendants )

## DECLARATION OF CRISTINA PIQUINELA
## IN SUPPORT OF RESPONSE TO MOTION TO DISMISS

I, Cristina Piquinela, declare as follows:

1.     I am over eighteen years of age and am fully competent to make this Declaration The facts contained herein are stated upon my personal knowledge

2.     I am the Vice President of Marketing and Licensing for CMG. I have been employed with CMG since September of 1996 and have been the Account Executive for Marilyn Monroe LLC since 1999 I have held my current position since January 2004

3.     As Vice President of Marketing and Licensing, I am actively involved in the marketing and licensing of nearly 200 entertainment, sports, historical and music celebrities, as well as trademarks belonging to various corporate entities (our clients). I serve as a link between


EXHIBIT
A

licensees and our clients with regards to negotiations, permissions, artwork submissions and product approvals.

4.    I also serve as the primary Account Executive for Marilyn Monroe LLC. In this capacity, I have the primary responsibility of negotiating a large number of all the incoming license agreements for Marilyn Monroe LLC and for communicating with licensees. Moreover, I coordinate deal submissions and artwork approvals for every Marilyn Monroe LLC licensing or promotional program, whether I or another CMG employee originated that program. I review Marilyn Monroe LLC monthly reports, including royalty reports.

5.    As a result of my employment with CMG, I am familiar with the images, signatures, trademarks, copyrights, and rights of publicity owned and utilized by Marilyn Monroe LLC and licensed by various licensees throughout the world. CMG originally secured the right to manage and exploit the Monroe Intellectual Property rights ten (10) years ago.

6.    Throughout my employment with CMG (which is incorporated in Indiana), I have consistently and exclusively worked out of CMG Corporate Headquarters, which is located at 10500 Crosspoint Boulevard, Indianapolis, Indiana.

7.    While CMG has two satellite offices - one in Los Angeles, California and the other in Rio de Janeiro, Brazil - neither of these offices is the usual or customary location for business related to Marilyn Monroe LLC. Indeed, the vast majority of business related to Marilyn Monroe LLC is conducted in Indianapolis.

8.    Generally, CMG's Indianapolis headquarters are a hub for all of CMG's business administration, and every single deal passes through and is maintained in Indianapolis. For example, the contracts administration department which tracks and processes every single

CP declaration [705].doc

2

contract is located in Indianapolis   The departments responsible for cutting the checks and preparing the monthly reports sent to clients are located in Indianapolis

9.       All documents and materials relating to Marilyn Monroe LLC, and more specifically, to the rights at issue in this case, are located in Indianapolis, Indiana  For example, I maintain on my local hard drive and in my personal hard copy files a complete set of records for Marilyn Monroe LLC, which I must consult on a frequent and regular basis to carry out my routine duties   Because I have a non-portable desktop computer, my filing system is not accessible outside my Indianapolis office    CMG also stores Marilyn Monroe LLC-related artwork and proposed and produced product prototypes and samples in its Indianapolis office.

10       Virtually all employees of CMG who regularly work on the Marilyn Monroe LLC account are located in Indianapolis, Indiana   In addition to myself, the following employees regularly work on the Marilyn Monroe account and reside and work in Indiana: (1) Jamie Maslanka (2) Samira Ali (3) Kunal Dua (4) Jeff Bear (5) Maria Gejdosova and (6) Sarah Small. Ms. Maslanka, Ms. Ali, and Mr. Dua are all involved with negotiating licensing deals on behalf of Marilyn Monroe LLC.   Mr. Bear is the Vice President of Contracts Administration; in that capacity, he processes all the Marilyn Monroe LLC agreements and tracks royalty reports, among other things.   Ms. Gejdosova is responsible for overseeing that Marilyn Monroe LLC receives its payments due under the agreements, and Ms. Small prepares all the monthly reports that are submitted to Marilyn Monroe LLC.

11.      Given that my ability to get my day-to-day work completed depends on my actual presence in my office, it would be incredibly inconvenient were CMG required to litigate this action in California. For example, I receive -- virtually on a daily basis   - artwork from existing licensees seeking approval to develop, produce and market a new product. Pursuant to standard

terms in each and every licensing agreement, I am required to seek approval from Marilyn Monroe LLC and respond to the licensee's request within a short specified period of time, often just a few days. While some licensees transmit this artwork electronically, others cannot readily do so and only send hard copies of artwork. Therefore, each day I am out of my Indianapolis office hinders my ability to perform my job effectively and efficiently.

12.    Moreover, I—as well as the above-mentioned CMG employees—am also responsible for work on many other accounts. Therefore, our absence from the office presents serious obstacles to our ability to effectively serve our other clients.

13.    In addition, several of CMG's licensees have contacted us due to confusion caused by Bradford Licensing Associates as to CMG's rights with regard to the Monroe Intellectual Property rights. Specifically, Trevco (a Michigan company) and The Lyon Company (a Utah company), have expressed confusion regarding Bradford Licensing Associates and its statements and representations suggesting that Trevco and The Lyon Company could secure licensing agreements from Bradford Licensing Associates for the use of the Monroe Intellectual Property Rights.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on the ____ of July, 2005, at Indianapolis, Indiana.

CRISTINA PIQUINELA

CP declaration (7505).doc

4

Monday, July 25, 2005 max

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 5 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 1 of 4
Case 1:05-cv-00423-DFH-WTL    Document 22    Filed 05/23/2005    Page 1 of 17

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| CMG WORLDWIDE, INC., and<br>MARILYN MONROE, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:05-cv-0423-DFH-WTL |
| | ) | |
| BRADFORD LICENSING ASSOCIATES, | ) | |
| THE SHAW FAMILY ARCHIVES, LTD., | ) | |
| and JAMES E. DOUGHERTY, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF LARRY SHAW

After having first been duly sworn, Larry Shaw states:

1.    I am an adult over the age of eighteen (18), have personal knowledge of the matters stated herein, and am competent to attest to such matters.

2    I am currently the chief executive officer of Shaw Family Archives, Ltd. ("SFA"). I have held this position since the creation of SFA on June 19th of 2002.

3.    SFA is a Limited Liability Company formed under New York law, with its primary place of business located in New York.

4.    SFA was created as part of the settlement of a lawsuit (the "Lawsuit") between my father Sam Shaw and me, relating to the ownership of photographs taken my Sam and myself (the "photographs"). The settlement agreement was entered into by myself and my sisters Meta Shaw Stevens and Edith Shaw Marcus, as executors of my father's estate. The lawsuit settlement created SFA; vested ownership of the photographs in SFA; and provided that I owned

(25)



Case 1:05-cv-03939-CM     Document 27-3     Filed 05/01/2006     Page 6 of 62

Case 1:05-cv-00423-DFH-WTL     Document 44     Filed 07/25/2005     Page 2 of 4
Case 1:05-cv-00423-DFH-WTL     Document 42     Filed 05/25/2005     Page 2 of 17

a fifty percent (50%) interest in SFA and both my sisters owned twenty-five percent (25%) interests respectively.

5.     SFA has never advertised or solicited business in Indiana through visits, telephone calls, written communications or otherwise.

6.     I personally visited Indiana on three occasions in the early 1990's for AAU wrestling meets, but I have never been to Indiana on any SFA business. Additionally, I am unaware of any SFA representative and/or agent having ever made any trip to Indiana on any SFA-related business.

7.     SFA has no office, employees or agents located in the State of Indiana. There are no known records or incidents of any SFA employee ever being in Indiana on SFA-related business.

8      SFA has never appeared in court in Indiana or invoked the protection or authority of Indiana's government for any purpose other than this action.

9      SFA has no governmental licenses in Indiana.

10.     SFA has never entered into any contractual relationship with any resident or citizen of Indiana or any business entity with its primary place of business in Indiana. In fact, SFA has, since its creation, purposefully refused to conduct business in Indiana as part of its business strategy.

11.     SFA maintains a passive worldwide web Internet site located at http://www.spc-promotions.com (the "Internet site"). SFA has a second affiliated Internet site located at http://www.samshaw.com (the "Sam Shaw site")  SFA does not accept orders or conduct business directly through either the Internet site or the Sam Shaw site. True and accurate paper

25

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 7 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 3 of 4
Case 1:05-cv-00423-DFH-WTL    Document 22    Filed 05/03/2005    Page 3 of 17

reproductions of the Shaw Family Archives' Internet site and the Sam Shaw site are attached hereto as Exhibits A and B respectively.

12.    Currently, the SFA contains and owns photographs of Marilyn Monroe taken by Sam and/or myself (the "Marilyn Monroe Limited Edition Collection" images). These photographs and the right to market same were transferred to the SFA as part of the settlement agreement between the parties to the Lawsuit between myself and Sam Shaw's estate.

13.    On or about February 14, 2004 SFA entered into an Image Licensing Agreement with Schani Krug/Valhalla Productions ("Valhalla"), a New Hampshire film production company with its principal place of business in New Hampshire (the "Image Agreement"). A true and accurate copy of the Image Agreement is attached hereto as Exhibit C. The Image Agreement was negotiated and entered into subject to SFA's policy of not conducting business in Indiana. It does not involve any action and/or business activity by SFA in Indiana.

14.    The Image Agreement related to the use of SFA Marilyn Monroe Limited Edition Collection images in a film/video/DVD project pertaining to Marilyn Monroe's first husband, Jim Dougherty's, life story entitled "Marilyn's Man" (the "Project"). Pursuant to the Image Agreement, Valhalla, and its marketing agent Bradford Licensing, were entitled to use SFA Images solely in the Project and in the marketing, media and merchandising of the Project, so long as such marketing, media and merchandising were not done in Indiana.

15    Prior to the creation of SFA, Meta Shaw Stevens and Edith Shaw Marcus communicated with Mark Roesler, the president of CMG Worldwide, Inc. ("CMG"). CMG was reportedly interested in seeing and perhaps using images in Sam Shaw's collection of images. Additionally there was a meeting between Meta Shaw Stevens, Edith Shaw Marcus and Mr. Roesler in New York, New York in late 1999 or early 2000. These communications did not

(L3)

Case 1:05-cv-03939-CM     Document 27-3     Filed 05/01/2006     Page 8 of 62

Case 1:05-cv-00423-DFH-WTL     Document 44     Filed 07/25/2005     Page 4 of 4
Case 1:05-cv-00423-DFH-WTL     Document 22     Filed 05/05/2005     Page 4 of 17

relate to the transactions at issue in this lawsuit. Further, no contractual relationship developed from these communications  Finally, these communications were not conducted on behalf of SFA, which did not even exist as a legal entity at that time. In fact, at the time these conversations took place, the Lawsuit was ongoing between the different Shaw family members.

16.    Meta Shaw Stevens had follow-up conversations with Mr Roesler following the creation of SFA in early 2002. These conversations did not lead to any business and/or contractual relationship between SFA and CMG, and none of these conversations related to the transactions at issue in this lawsuit.

17.    SFA has made no efforts to serve, directly or indirectly, the Indiana market for its services. In fact, SFA has specifically structured its business activities to avoid the privilege of conducting business in Indiana.

FURTHER AFFIANT SAITH NOT

I affirm, under the penalties for perjury, that the foregoing representations are true to the best of my knowledge.

Dated: MAY 25, 2005                    _Larry Shaw_

959162 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CMG WORLDWIDE, INC., an Indiana          )
Corporation and MARILYN MONROE, LLC,     )
a Delaware Limited Liability Company,    )
                                         )
              Plaintiffs,                )
                                         )
v.                                       ) Cause No :1:05-cv-0423-DFH-WTL
                                         )
                                         )
BRADFORD LICENSING ASSOCIATES,           )
THE SHAW FAMILY ARCHIVES, Ltd.,          )
a New York Corporation, JAMES E.         )
DOUGHERTY, and VALHALLA                  )
PRODUCTIONS, LLC, a Maine Limited        )
Liability Company,                       )
                                         )
              Defendants.                )

## DECLARATION OF JONATHAN FABER
## IN SUPPORT OF RESPONSE TO MOTION TO DISMISS

I, JONATHAN FABER, declare as follows:

1.     I am over eighteen years of age and I am fully competent to make this Declaration. The facts contained herein are stated upon my personal knowledge.

2.     I have been employed by CMG Worldwide Inc. ("CMG") since 1997. I am currently the President of CMG. As President of CMG, one of my responsibilities is to direct legal operations.

3.     CMG was organized in April 1998 under the name Curtis Management Group, Inc. CMG became incorporated under the name Curtis Management Group, Inc., on April 5. CMG changed its name to CMG Worldwide, Inc., on June 19, 1995.

4.     CMG was created prior to enactment of the Indiana Right of Publicity Act, which was enacted in 1994.

JF declaration (7705).doc



5.    CMG is organized in Indiana because Indiana is the state of residency of CMG's Sole shareholder, Mark Roesler.

6    In performing my duties for CMG, I became aware of a business entity located in Los Angeles, California, operating under the name "CMZ Handbags and Jewelry" which was selling handbags bearing Marilyn Monroe's image and/or picture. CMZ had not obtained a license from CMG to sell these handbags. When contacted, CMZ informed CMG that it did not need to obtain a license from CMG to sell the handbags bearing Marilyn Monroe's picture and/or image because it had obtained the requisite license from Larry Shaw on behalf of the Shaw Family Archives, Ltd. Thereafter, CMZ forwarded a copy of the licensing agreement to CMG. Larry Shaw also informed CMZ that CMG had had no right or interest in the Monroe Intellectual Property Rights.

7    The following individuals possess information relevant to this case do not reside in California:

Graphique de France: Woburn, MA
Laura White
Nick Debrule

Bradford Exchange: Niles, IL
Clara Meadows
Kelly Ann Colgan

Quark, Inc : Denver, CO
Cliff Kaplan

Franklin Mint: Aston, PA
Howard Lucker
Lori O'Leary

Pinder Lane: NY, NY
Bob Thixton

JI declaration (7D5) doc

2

BBDO New York: NY, NY
Jennifer Barbagello

Playing Mantis: Mishawaka, IN
Thomas Lowe
Richard Snyder
Amy Curl

Salton Maxim: Mt. Prospect, IL
William Rue
Leon Dreimann

Corbis: Seattle, WA
Dave Green

I declare under the penalty of perjury under the laws of the United States that the

foregoing is true and correct and that this declaration was executed on the 25th day of July,

2005, at Indianapolis, Indiana

_____

JONATHAN FABER



# CMG WORLDWIDE
*Representing the World s Greatest Legends*

## Via Facsimile
## Confirmation Via First Class Mail

July 16, 2003

CMZ HANDBAGS & JEWELRY
Attn: Legal Counsel
1028 A Santee
Los Angeles, CA 90015

Re:     **Unauthorized Use of James Dean**

Dear Sir or Madam:

CMG Worldwide, Inc., ("CMG"), is the exclusive, worldwide agent for James Dean, Inc, proprietor of certain trademark rights, the right of association and sponsorship and right of publicity in and to the James Dean name, image, and likeness. As such, CMG pursues and prosecutes all claims and causes of action arising out of, or relating to, the unauthorized use of the name, image and likeness of James Dean

CMG has learned that CMZ Handbags & Jewelry is using James Dean in association with handbags it is selling. Be advised that such unauthorized use is in contravention to the aforementioned rights and will not be tolerated.

This letter therefore represents a formal demand that CMZ Handbags & Jewlery immediately cease and desist any and all unauthorized use of James Dean. Be advised that a fee will be required to absolve your company for the unauthorized use of our client that has already occurred.

We will expect your acknowledgment and response within <u>five</u> days of your receipt of this letter, confirming your willingness to cease and desist all use of James Dean in association with your business. In addition, we request that you provide an accounting of all sales of handbags featuring the image of James Dean.

Should you fail to comply with our request, be advised that CMG is prepared to utilize all legal avenues available to ensure that our client is disassociated from your company and that it is fairly compensated for any and all past use

Nothing contained herein or omitted herefrom constitutes a waiver of any of the rights or remedies at law or in equity of James Dean, Inc , and CMG Worldwide, Inc , all of which are hereby expressly reserved.

Respectfully,

Lawrence V Molnar, Esq.
Legal Counsel

cc:     Mark Roesler, Esq., Chairman & CEO
          James Dean, Inc.



EXHIBIT
C-1

**Los Angeles**
8560 Sunset Blvd. 10th Floor Penthouse
West Hollywood, California 90069 USA
Phone 310 854 1005 Fax 317 570 5500

**Corporate Headquarters**
10500 Crosspoint Boulevard
Indianapolis, Indiana 46256 USA
Phone 317 570 5000 Fax 317 570 5500

www.CMGWorldwide.com

**Rio de Janeiro**
Praia de Botafogo, 228 - Sala 1111
Rio de Janeiro, 22359-900 Brasil
Phone +55 (21) 2552 4490 Fax +55 (21) 2551 9046

Message                                                   Page 1 of 2

## Jamie Maslanka

**From:**     Cristina Piquinela
**Sent:**      Thursday, April 10, 2003 11:11 AM
**To:**        Jamie Maslanka
**Subject:** FW: CMG Worlwide/handbags

-----Original Message-----
**From:** Cristina Piquinela
**Sent:** Tuesday, April 01, 2003 5:27 PM
**To:** 'disnewms@msn.com'
**Subject:** CMG Worlwide/handbags

Dear Rafiq,

Thank you for your e-mail and interest in our clients. I will be happy to work with you on a handbag program incorporating our clients. In order to get started, I do need to receive more information from you. Specifically please let me know the following:

1 Specific products that you would be interested in doing (if more than one kind) and number of different designs and styles
2 Price points (wholesale and retail) per style
3 Number of units per product that you estimate producing per personality
4 Term that you are interested in
5 Please send me your complete company information, a catalog and a couple of nice samples for my reference.

Once I have a better idea of the scope of the program that you have in mind, I will be able to give you the parameters for the use of our various client. In the meantime please visit our website at www.cmgworldwide.com where you will be able to find a complete listing of our clients as well as specific information and photos of each client

I look forward to receiving the above information from you

Best wishes,

**Cris Piquinela**
Vice President of Marketing & Licensing

Direct line (317) 570-5502

CMG Worldwide
10500 Crosspoint Blvd
Indpls, IN 46256
www.cmgww.com

----Original Message-----
**From:** www-data [mailto:www-data@marilyn.cmgww.com]
**Sent:** Friday, March 28, 2003 10:36 PM
**To:** Mark Roesler
**Subject:** CMG Worldwide Website: Product Campaign Application

Form submitted on 03-28-2003 10:03pm.
Contact Name: **Rafiq Chaudry**

4/10/03

EXHIBIT

C-2

Message                                                                    Page 2 of 2

Company: **CMZ**
Email: **disnewms@msn.com**
Web site:
Telephone: **2137602626**
Fax: **2137471845**
Street 1: **1028A Santee St**
Street 2:
City: **Los Angeles**
State: **CA**
Postal Code: **90015**
Country: **us**
Which CMG client(s) are you interested in utilizing in an advertising or merchandising campaign?
(CMG Client List )
**Marilyn Monroe, James Dean, Audrey Hepburn**
What is the description of the product? **handbags, purses**
What are the approximate the wholesale and/or retail prices of the product(s)? **wholesale: $14-$25.00**
By what date do you expect to release the product? (Ex: 08/04/02) **ASAP**
Please describe your normal distribution for the product, ie direct to consumer, through distributors,
through wholesalers, etc  Approximate wholesale and/or retail prices of the product? **all interested
markets, $30-$65.00 retail**
When do you expect to release the product? **ASAP**

4/10/03





## CMZ
*HANDBAGS JEWELRY*

1028 A Santee          Tel: 213.747 1876
Los Angeles, CA 90015     Fax: 213.747 1845
e-mail: 4cmz@sbcglobal.net

Dear Sir :

You have been mis-informed of our current James Dean production. We are not selling any James Dean merchandise with the exception of one that is licensed by C.M.G. We are also selling Marylin merchandise, licensed by Impulse Wear Inc. We ARE planning to produce James Dean products, with your concent. We would like an application for a license for both Monroe and Dean. We would like an application and will be happy to pay the charges/fees and send you samples of the production. Please arrange or direct the person/department helpful for aqquiring copywrights.

We again assure you that we posses only licensed James Dean handbags, which we purchase from Main Street Wholesalers. Copies of the sales reciept are attached to the enclosed fax. We will also send you a shipment of the product in-question. We would also like a license for other Dean and Monroe products, Please notify us off how we can contact you, in person.

waiting for your reply,

CMZ

07/22/03

· If you have any questions please contact us

**EXHIBIT**

C-4

Jul-22-03 08:14A Nino                                    213-624-0192                    P.02

# Won Trading

548 E 31st Street
Los Angeles, CA 90011
Phone 323-235-5678 John
Fax 323-235-5585

# Invoice

| Date | Invoice # |
|------|-----------|
| 6/30/2003 | 13255 |

**Bill To**

C M Z
1028 Santee
Los Angeles, CA 90015
Tel. 213-747-1876
Fax 213-747-1845

**Ship To**

C.M.Z
1028 Santee
Los Angeles, CA 90015
Tel. 213-747-1876
Fax. 213-747-1845

| P.O. No. | Terms | Due Date | Rep | Ship Date | Ship Via |
|----------|-------|----------|-----|-----------|----------|
|  | Net 7 | 7/7/2003 | C | 6/30/2003 | Won Trading |

| Item | Description | Qty | Rate | Amount |
|------|-------------|-----|------|--------|
| MP6351-Black | Monroe bag (Small) 24/ct | 120 | 14 00 | 1,680 00 |
| MP6351-Natural | Monroe bag (Small) 24/ct | 120 | 14 00 | 1,680 00 |
| MP6353-Black | Monroe bag (Large) 24/ct | 48 | 14 00 | 672 00 |
| MP6353-Natural | Monroe bag (Large) 24/ct | 48 | 14 00 | 672 00 |

*Paid ck.*

| Total | $4,704.00 |
|-------|-----------|
| **Balance Due** | $4,704.00 |



EXHIBIT

C-5

## CORAL FASHION HANDBAG

210 E. Olympic Blvd.
Suite 310
Los Angeles, CA 90015
TEL 213-747-4432   FAX 213-747-6032

# Invoice

| DATE | INVOICE # |
|------|-----------|
| 7/19/2003 | 1037 |

| BILL TO | SHIP TO |
|---------|---------|
| C M Z<br>1028 A Santee<br>Los Angeles, CA 90015 | C M Z<br>1028 A Santee<br>Los Angeles, CA 90015 |

| P.O. NUMBER | TERMS | REP | SHIP | VIA | F.O.B | PROJECT |
|-------------|-------|-----|------|-----|-------|---------|
| | Due on receipt | BH | 7/19/2003 | DELIVERY | | |

| QUANTITY | ITEM CODE | DESCRIPTION | PRICE EACH | AMOUNT |
|----------|-----------|-------------|------------|--------|
| 16 | MB-5324J | Marilyn Print Bag | 19 00 | 304 00 |
| | | 1 BOX | | |

Thank you for your business.

| | Total | $304.00 |
|--|-------|---------|

EXHIBIT

tabbies

C-6

CORAL FASHION HANDBAG

210 E. Olympic Blvd.
Suite 310
Los Angeles, CA 90015
TEL 213-747-4432   FAX 213-747-6032

# Invoice



| DATE | INVOICE # |
|------|-----------|
| 7/17/2003 | 1024 |

**BILL TO**

C M Z

**SHIP TO**

| P.O. NUMBER | TERMS | REP | SHIP | VIA | F.O.B | PROJECT |
|-------------|-------|-----|------|-----|-------|---------|
| | Due on receipt | BH | 7/17/2003 | DELIVERY | | |

| QUANTITY | ITEM CODE | DESCRIPTION | PRICE EACH | AMOUNT |
|----------|-----------|-------------|------------|--------|
| 25 | JR-4862 | Jame Print Bag | 18.00 | 450.00 |

*1 BOX*

Thank you for your business.

| | Total | $450.00 |
|---|-------|---------|

EXHIBIT

C-7

# CMZ
### HANDBAGS JEWELRY

ATTENTION

1028 A Santee
Los Angeles, CA 90015
e-mail: 4cmz@sbcglobal.net

Tel: 213.747.1876
Fax: 213. 747.1845

MR. LARRY ..

Please find enclosed (7) SEVEN PAGES, and we
are pleased to furnished any other information.
You need in this regard, We are sending you
a package for merchandised we buy from this peoples.
I am also sending you one sample/poster of the
picture we intrested to make with your consent.
Please send us or fax us one application for
copyrights or terms & conditions.

Thanking You.

07/22/03

CMZ
1028-A SANTEE ST
LOS ANGELES CA 90015

EXHIBIT

C-8



**CMZ**
*HANDBAGS JEWELRY*

1028 A Santee
Los Angeles, CA 90015

Tel: 213.747 1876
Fax: 213. 747 1845

JAN 26, 04

Mr. SABER.

I am SENDING you the agreement
between CMZ & Mr. SHAW.
I HOPE WE can SOLVE the questions
you might have.
Please let us know if you need
any thing else.

THANK),

1 JAN 04

FAX - 317 570 5500



EXHIBIT

C-9

**SHAW FAMILY ARCHIVES, LTD.**
225 Hudson Terrace
Piermont, New York 10968

Tel: 845-359-9528
Fax: 845-359-3176
e-mail: larry@spc-promotions.com

October 6, 2003

CMZ Handbags and Jewelry
1028 A Santee St.
Los Angeles, Ca 90015

Dear Alan:

Enclosed are two copies of our proposed license agreement. I have initialed each page and
signed the last page. If everything is satisfactory with you, please sign and send back one copy
to me.

Included in this package is my lawyers letter and memorandum of law regarding the right to
commercially exploit Marilyn Monroe photographs by Sam Shaw. The key issue here is that the
Estate of Marilyn Monroe now being represented by CMG is not entitled to posthumous rights of
publicity because New York State does not recognize posthumous rights of publicity. And when
Marilyn Monroe died she was a resident of New York State.

Show these papers to your lawyer. He can check these facts out legally. The law has not
changed since 1993 and Federal Law follows State Law in the United States

Don't forget to send me 4 more examples of each handbag.

Best regards,

*Larry Shaw*

Larry Shaw

**EXHIBIT**

C-10

## LICENSE AGREEMENT

Agreement entered into by and between SHAW FAMILY ARCHIVES, LTD., located at 225 Hudson Terrace, Piermont, New York, 10968, ("LICENSOR"), and CMZ Handbags and Jewelry, located at 1028 A Santee Street, Los Angeles, CA 90015, ("LICENSEE")

WHEREAS, LICENSOR is the rights holder for purposes of the License granted herein and WHEREAS, LICENSEE wishes to reproduce and adapt certain photographs taken by Sam Shaw of the late Marilyn Monroe (the photographs, CMZ – Marilyn Monroe – black and white, image #1 and CMZ – Marilyn Monroe – black and white, image #4, attachment A) for purposes of creating Handbags (PRODUCT) and for the packaging thereof

WHEREAS, LICENSOR wishes to grant LICENSEE the right to reproduce and adapt the photographs for such use:

Therefore, in consideration of the terms and conditions herein contained, the parties hereto agree as follows:

FIRST:  GRANT

Subject to the terms of this Agreement, LICENSOR grants LICENSEE the right to reproduce and adapt the Photographs, in the manufacture, distribution and sale of the PRODUCT, (Two Handbags) limited to 1,000 units of the PRODUCT utilizing CMZ - Marilyn Monroe – black and white image #1, and 1,000 units of the PRODUCT utilizing CMZ – Marilyn Monroe – black and white image #4 , and the packaging and promotion thereof. The rights granted herein apply only to the rights of copyright in and to the photographs.  The grant herein does not include any rights of trademark in and to the name Marilyn Monroe.

SECOND:  TERM

This License shall be for a period of one year, commencing from October 31, 2003 and terminating September 30, 2004.

THIRD:  TERRITORY

Licensee shall be permitted to distribute and sell the PRODUCT under License throughout the world.

FOURTH:  QUALITY



1



EXHIBIT

C-11

Licensee acknowledges that if goods manufactured (Handbags) are of inferior quality in material and workmanship, the substantial goodwill which Licensor has built up and now possesses in the image will be impaired. Accordingly Licensee warrants that the Handbags shall be reasonably adequate and suited to their exploitation to best advantage

FIFTH:  MATERIALS

Licensor has or will supply Licensee with all visual materials in a form satisfactory to Licensee. These materials shall remain the property of Licensor and Licensee agrees to return them promptly upon completion of production and not to copy them or duplicate them for use in violation of this agreement on these or any other product or uses.

SIXTH:  PROMOTION

Licensee shall be permitted to utilize the photographs in promotion and advertisement of the product, (two Marilyn Monroe Handbags, CMZ -- Marilyn Monroe – black and white image #1, and CMZ – Marilyn Monroe – black and white image #4), provided the required credit is given as set forth below

SEVENTH:  CREDIT AND COPYRIGHT NOTICE

All reproductions and adaptations of the PHOTOGRAPHS, be it utilized upon the product, the packaging or in promotional material shall state:
© SAM SHAW

EIGHTH:  LICENSORS WARRANTIES AND INDENTIFICATION

Licensor warrants and represents that licensor has the right to enter into this agreement and that Sam Shaw is the photographer of the PHOTOGRAPHS which are the subject of this agreement. Licensor shall indemnify Licensee against any loss resulting from the violation of such warranty.

NINTH:  LICENSEE WARRANTIES AND INDEMNIFICATION

Licensee warrants that the PRODUCT conforms to all applicable state, federal or foreign laws relating to safety and that all promotional material relating to the PRODUCT shall be accurate. LICENSEE shall indemnify LICENSOR, from any loss resulting from the violation of such warranty.

TENTH:  FEES

The total number of products which are the subject of this license is two (2) and shall be as follows:



2



1   Handbags (utilizing CMZ - Marilyn Monroe – black and white image #1) .1,000 units
2.  Handbags (utilizing CMZ – Marilyn Monroe – black and white image #4) .1,000 units

The fee paid to Licensor to be as follows:

$1,500 per image applied against a royalty of 10% of the gross wholesale price paid to CMZ Handbags and Jewelry, with no deductions of any kind shall be paid to Shaw Family Archives, Ltd. on a quarterly basis with a sales report and royalty statement in accordance with normal and usual business practices.

Licensee will supply Licensor with a complement of 6 examples of each licensed product.

ELEVENTH:  MISCELLANEOUS

This agreement shall constitute the entire Agreement between the parties and shall not be changed except in writing.

This Agreement shall be interpreted in accordance with the law of the State of New York

Any dispute between the parties shall be adjudicated within the New York State judicial system

This Agreement shall be binding upon the parties hereto, their successors and assigns.

AGREED TO by

SHAW FAMILY ARCHIVES, LTD                    CMZ Handbags & Jewelry

By: _Larry Shaw_                             By: _S. cckkhar_

Date: _Oct 6, 2003_                          Date:

3

EXHIBIT
C-13

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 25 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 1 of 3
Case 1:05-cv-00423-DFH-WTL    Document 27    Filed 05/27/2005    Page 15 of 17

# IMAGE LICENSING AGREEMENT

This PRODUCTION AGREEMENT is between the following parties: Mr. Schani Krug/Valhalla Productions (heretofore known as LICENSEE), a film production company based at: PO BOX 4211 Portsmouth, NH, 04211, and Mr. Larry Shaw of Shaw Family Archives, hereto known as LICENSOR, residing at: 225 Hudson Terrace, Piermont, NY 10968.

## THE PROJECT

This Production Agreement involves the production and filming of a 2 hour biographical documentary film/video/DVD of Mr. Jim Dougherty's life story, known as "Marilyn's Man." This PROJECT will be produced by Valhalla Productions, and directed and Produced by Schani Krug.  The image merchandising of said PROJECT will be known as "The Shaw Family Archives Marilyn Monroe Limited Edition Collection," and will be merchandised by Bradford Licensing.

## DISBURSEMENT OF DIVIDENDS

All parties agree to the following: VALHALLA PRODUCTIONS/LICENSEE will pay and dispense any revenues immediately to Larrry Shaw (LICENSOR) within 30 days of any profits or revenues generated by PROJECT upon receipt of any advance, monies from distributors, merchandisers, television/cable networks and publishers, and Bradford Licensing.

## FORM OF PAYMENT
*~ or the 5% ~*

All dividends from PROJECT will be paid in U.S. funds, unless parties agree to an amended or additional agreement or addendum to this effect. The LICENSEE will pay LICENSOR a royalty of 60 percent in U.S. funds of any Marilyn Monroe Image licensed by SHAW FAMILY ARCHIVES for said PROJECT ~~after adjusted~~ gross from royalties Licensee derives from Bradford Licensing of photo images of Marilyn Monroe taken by Sam Shaw or Larry Shaw. The remaining 40 percent will go to Licensee.

*Additionally, licensee will receive 1 point in the film's gross, including all auxiliary rights sk*

Page 1 of 3





**EXHIBIT**

1C



**EXHIBIT**

D

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 26 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 2 of 3
Case 1:05-cv-00423-DFH-WTL    Document 27    Filed 05/27/2005    Page 16 of 17

## IMAGE RIGHTS

The above parties agree to allow the IMAGE RIGHTS, likeness, art rendering, and any and all images mutually selected of Marilyn Monroe, taken by Sam Shaw or Larry Shaw to be used in the PROJECT for the duration of this agreement for promotional purposes, as well as in any format (i.e., video, DVD, CD, advertisement, audio cassette, etc.), as well as market and media, and merchandising of said images by Valhalla Productions throught their merchandising agent, Bradford Licensing, during the interim of the COPYRIGHT of said PROJECT.

## DURATION OF AGREEMENT

The duration of this PRODUCTION AGREEMENT extends from the signing of this agreement by all parties, through the final day of the life of the U.S. COPYRIGHT of said PROJECT, as per the laws of the United States Copyright Office.

## BINDING EFFECT

This AGREEMENT shall be binding on and insure to the benefit of the respective parties, their heirs, successors, administrators, executors and assigns. In the event of the death of any of the above-mentioned parties, his or her executors will honor the terms and conditions of this agreement in full.

## FORMAT OF IMAGES

LICENSOR will suppy to LICENSEE high resolution scans of said images of Marilyn Monroe suitable for reproduction from the Shaw Family Archives.

## ENTIRE AGREEMENT

This PRODUCTION AGREEMENT constitutes the entire agreement between all parties, and may be modified only in writing signed and agreed to by all parties. This PRODUCTION AGREEMENT may be signed in counterparts, each of which shall be deemed an original, but which together shall constitute one PRODUCTION AGREEMENT. If any provision of this PRODUCTION AGREEMENT is determined by a court of competent jurisdiction to be unenforceable, the remaining provisions shall continue in full force and effect. If any disputes arise between the parties they must notify each other in writing by certified mail within 30 days of this dispute, outlining these disputes and any possible resolutions thereof.



Page 2 of 3

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 27 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 3 of 3
Case 1:05-cv-00423-DFH-WTL    Document 27    Filed 05/27/2005    Page 17 of 17

SIGNED AND AGREED TO BY ALL PARTIES        DATE: February 14, 2004


BY: VALHALLA PRODUCTIONS/MR. SCHANI KRUG

BY: Schani Krug (LICENSEE)

BY:
MR. LARRY SHAW/SHAW FAMILY ARCHIVES
BY: Mr. Larry Shaw   (LICENSOR)


Page 3 of 3

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 28 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 1 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 2 of 15

# TABLE OF CONTENTS

SUBJECT                                                              PAGE

1. Definitions ...........................................................................................1

2. Objectives of Licensing Program .....................................................2

3. BLA's Role, Responsibilities and Obligations .................................2

    3.1 BLA's Role, and Responsibilities .............................................2
    3.2 BLA's Obligations .....................................................................4

4. OWNER's Role, Responsibilities and Obligations ..........................4

    4.1 Resources .................................................................................4
    4.2 Legal .........................................................................................4
    4.3 Identification of BLA ................................................................5

5. Confidentiality .................................................................................5

6. Warranties ........................................................................................5

    6.1 OWNER's Warranties ...............................................................5
    6.2 BLA's Warranties .....................................................................6

7. Indemnification .................................................................................6

    7.1 Indemnities to OWNER ............................................................6
    7.2 Indemnities to BLA ..................................................................6

8. Exclusivity ........................................................................................6

9. Reservation of Rights ........................................................................7

10. Territory ..........................................................................................7

11. Term .................................................................................................7

    11.1 Commencement .......................................................................7
    11.2 Renewal ..................................................................................8

12. Limitations on Liability ...................................................................8

13. Compensation ..................................................................................8

    13.1 BLA Compensation .................................................................8
    13.2 Expenses ..................................................................................8
    13.3 Post-Term Licenses and Compensation ..................................9
    13.4 Licensee Payment ....................................................................9
    13.5 BLA's books and records; inspection; inspection by OWNER ....9
    13.6 Compensation and reimbursement of BLA ...........................10

14. Return of Material ..........................................................................10

i

EXHIBIT

E

Case 1:05-cv-03939-CM     Document 27-3     Filed 05/01/2006     Page 29 of 62

Case 1:05-cv-00423-DFH-WTL     Document 44     Filed 07/25/2005     Page 2 of 14
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 3 of 15

15  Independent Counsel ....................................................................................... 10

16  Miscellaneous ................................................................................................ 10

    16.1. Notice. ...................................................................................... 10
    16.2. Independent Contractor. .......................................................... 10
    16.3. Entire Agreement/Waiver. ........................................................ 11
    16.4. Assignment .............................................................................. 11
    16.5. Headings. .................................................................................. 11
    16.6. Governing Law. ........................................................................ 11
    16.7. Arbitration ................................................................................ 11

Case 1:05-cv-03939-CM     Document 27-3     Filed 05/01/2006     Page 30 of 62

Case 1:05-cv-00423-DFH-WTL     Document 44     Filed 07/25/2005     Page 3 of 14
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 4 of 15

## LICENSING REPRESENTATION AGREEMENT

Agreement made as of February 1, 2004 between Valhalla Productions, a New Hampshire company, having it's principal place of business at PO Box 4211 Portsmouth, NH 03802 ("OWNER"), and Bradford Licensing Associates ("BLA"), a New York limited partnership, having its principal place of business at 209 Cooper Ave., Upper Montclair, NJ 07043.

WHEREAS, OWNER has developed and is in the process of further developing certain proprietary intellectual property, and will continue to develop said proprietary intellectual property, including art work, illustrations, names, logos, characters, and related elements (collectively "the Properties"); and

WHEREAS, one of the reasons for creation of the aforesaid intellectual property is to create revenue from it through the licensing of Rights to use it to third parties; and

WHEREAS, OWNER is willing and desirous to grant Licenses on terms satisfactory to it to other parties primarily on a royalty-generating basis to use certain of the Rights related to the aforesaid creative properties as part of a coordinated, planned licensing program; and

WHEREAS, BLA is skilled in marketing, soliciting, negotiating and structuring Licenses as well as in operating and administering the licensing of the Properties; and

WHEREAS, OWNER is engaging the services of BLA in connection with the development, implementation and administration of the licensing of the Properties;

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein, and for other good and valuable consideration, the parties hereby agree as follows:

1.     Definitions.

(a)     "Rights" means the right to use the Properties including without limitation names, logos, characters, copyrights, trademarks, designs, slogans, fictional locales and similar material now or hereafter developed or owned by OWNER having their origin directly in the Properties developed by OWNER which may be developed on the basis of the concepts of the Properties for purposes including without limitation:

(i)     the manufacture, production, and distribution of tangible products making use of such intellectual property primarily for ultimate retail sales specifically including but not limited to apparel and accessories, social expressions (party goods), greeting cards, home furnishings, gift items, novelties and all types of collectibles.

(b)     "License" means any grant of Rights by OWNER to a third party whether on a royalty-generating or a fixed fee basis.

(c)     "Licensed Products" means any goods, services or promotions manufactured, distributed, sold, provided or otherwise developed or offered under a License.

(d)     "Licensee" means any third party to whom OWNER grants a License as well as any other party acting under a License whether as a sub-licensee or otherwise.

(e)     "Licensing Revenues" shall mean all revenues from royalties, guarantees, advances and fees engendered through BLA's efforts with respect to licensing the Properties, limited to the rights granted to it under this Agreement, except as limited by paragraph 13.1(a).

(f)     "Term" means the period commencing upon execution of this Agreement and continuing until terminated in accordance with paragraph 11.

(g)     "Properties" refers to the OWNER's property(ies), as listed in Exhibit A.

2.     Objectives of Licensing Program.

2.1.     OWNER's objectives in granting Licenses are:

(a)     to create a source of income;

(b)     to increase consumer visibility of OWNER's intellectual Properties;

(c)     to enhance the image and perception of OWNER's Properties, especially by selectively choosing Licensed Products and by regulating the channels of distribution of Licensed Products;

(d)     to expand and extend the awareness of OWNER's trademarks into new categories of consumer goods.

3     BLA's Role, Responsibilities and Obligations.

3.1.     BLA's Role and Responsibilities BLA shall endeavor consistent with good business practice to accomplish the above objectives by carrying out the following responsibilities:

(a)     New Licensees. To promote and market the Rights in accordance with this Agreement to potential Licensees in all licensing applications and all markets, authorized by this Agreement by: diligently searching for, developing and obtaining new Licenses for OWNER; identifying and approaching prospective Licensees; developing product treatments; negotiating terms and conditions of prospective Licenses;

(b)     New Themes and Categories. To develop in conjunction with OWNER new product categories;

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 32 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 5 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 6 of 15

    (c)    <u>Administration</u>. To manage OWNER's Licensing program in accordance with this Agreement by:

    (i)    Handling all aspects of securing new Licenses such as, but not limited to, product approval, art approval, quality approval, Licensee approval, trademark usage, insurance coverage, negotiating contractual obligations within parameters established by OWNER, advertising and packaging approval and the like, all of which shall be subject to OWNER's final approval which shall be at OWNER's sole discretion;

    (ii)    Supervising and monitoring Licensees to review advertising and promotional activities to oversee adherence to quality control standards, and generally to monitor performance of, and insure compliance with, all other contractual provisions and obligations;

    (iii)    Supervising and monitoring the financial aspects of the Licenses, including the collection of royalties and all other payments as referred to in paragraph 13, advising as to the untimely payment of royalties and other payments due and the untimely submission of financial reports due as well as analyzing such reports to verify compliance with contractual obligations and assisting in OWNER's efforts to achieve such compliance. Licensee royalty payments are to be made payable to Bradford Licensing Associates and sent to BLA. As part of its responsibilities under this subparagraph BLA may, at OWNER's request, or after recommending such an audit to OWNER, with OWNER's permission, from time to time conduct audits of Licensees or engage others to conduct such audits. The expense of any such audit shall be borne by the parties in the same proportion as the parties share in the revenues generated by such Licensee, unless either party gives notice to the other that it will not participate in the audit, in which case any increased royalties that the audit reveals to be due shall be the property of the party conducting the audit to the extent of the documented cost of audit plus thirty percent (30%) (it being understood that all Licensee agreements will require such licensees to pay the expenses of audits when willful discrepancies are disclosed or when errors in excess of one (1%) per cent of total royalties due are revealed);

    (iv)    When and if appropriate, coordinating and supervising the joint efforts among Licensees and OWNER to develop and implement joint advertising, merchandising and promotional efforts and programs, subject to OWNER's final approval;

    (v)    Enhance OWNER's licensing image and visibility in the licensing community as well as with the public by various public relations activities such as, for example, articles in the press, advertisements and trade show booths and the like;

    (vi)    Maximize OWNER's income and sources of income from licensing.

    (d)    <u>Unsolicited Requests</u>. To handle unsolicited requests to OWNER or BLA for Licenses;

    (e)    <u>Consultation</u>. To generally and continually consult with OWNER on all aspects of the development of the Properties including, without limitation, methods of

3

Case 1:05-cv-03939-CM     Document 27-3     Filed 05/01/2006     Page 33 of 62

Case 1:05-cv-00423-DFH-WTL     Document 44     Filed 07/25/2005     Page 6 of 14
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 7 of 15

    (e)   Consultation. To generally and continually consult with OWNER on all aspects of the development of the Properties including, without limitation, methods of maximizing the exposure and profitability of the intellectual properties underlying the Rights hereunder, and Licensing uses of them;

    (f)   Foreign Agents. BLA will retain agents in foreign territories. BLA will supervise foreign agents, all of whom shall report directly to BLA.

  3.2.  BLA's Obligations.

    (a)   Good Faith Negotiations. BLA has the authority to approach prospective Licensees on behalf of OWNER. It may enter non-binding negotiations and must reveal to all prospective Licensees that it has no final authority to commit OWNER to any agreement. BLA will submit all proposed License agreements in writing to OWNER. OWNER will respond to a proposed License agreement within ten (10) business days after receipt. OWNER will have absolute sole discretion in granting licenses, although OWNER shall not exercise this right unreasonably.

    (b)   Resources. BLA shall make all reasonable efforts to employ whatever resources are necessary to appropriately discharge its administrative responsibilities and obligations under this Agreement.

    (c)   Rights. BLA acknowledges that it shall gain no right whatsoever in the Rights by virtue of this Agreement.

4.   OWNER's Role, Responsibilities and Obligations.

  4.1.  Resources. OWNER shall produce any and all statements, agreements and any correspondence from licensee to BLA, and shall provide marketing material, reproducible trademark artwork, style guides and information relating to the Properties, and will appropriately work with BLA to develop and implement the licensing program.

  4.2.  Legal.

    (a)   The parties shall each retain and use their own counsel in carrying out their duties under this Agreement. OWNER shall provide all appropriate legal assistance in approving Licenses, collection of payments and reports, enforcement of contractual obligations and filing trademark registrations for all product categories and territories. BLA shall be responsible for preliminary negotiations of licensing agreements, preparing initial drafts of agreements and the legal costs associated therewith. Final decisions regarding such matters shall be in OWNER's reasonable discretion after giving due regard to the maximization of revenue for BLA and OWNER a view towards long range goals of OWNER.

    (b)   OWNER shall approve a form License agreement which shall be the only form BLA shall use, with no changes except as specifically approved by OWNER; such approval of changes shall be at the sole discretion of OWNER.

4

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 34 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 7 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 8 of 15

(c)    OWNER shall have complete and exclusive responsibility for the protection and defense of the Rights. OWNER shall enforce its ownership of the Rights and maintain the Rights in licensable condition. BLA shall promptly notify OWNER of any possible infringements of which it becomes aware or any claims against OWNER brought to its attention and shall provide reasonable cooperation in this regard. BLA shall take no other action whatsoever regarding any such infringements or claims.

4.3.    Identification of BLA. OWNER will use its best efforts to include a statement as follows on all advertising for its licensing program:

"Exclusive Licensing Agent for The Jim Dougherty and Norma Jeane Limited Edition Collection Bradford Licensing Associates, New York, New York"

5    Confidentiality. During and after the Term of this Agreement, the parties shall keep confidential any of the other's proprietary information, knowledge or trade secrets, such as but not limited to, marketing and advertising plans, financial information and data, Licensing plans, research data and the like, of which it becomes aware during the course of its dealings with the other which is not in the public domain or otherwise known to any party to whom disclosure is made, unless it later falls into the public domain through no action of the other. If either party is uncertain about the status of a particular piece of information, it shall first consult with the other to determine such status. Should either party be served with a subpoena or formal or informal governmental inquiry, or similar request, for the disclosure of confidential information it shall immediately make known to the other the existence of such subpoena or request for disclosure and give the other party maximum permitted time to take whatever action it deems appropriate. Once such notification has been given, compliance with any such subpoena, inquiry or request for disclosure shall not be a violation of this provision.

6    Warranties.

6.1.    OWNER's Warranties. OWNER warrants and represents that:

(a)    It has the right and power to enter into and to fully perform this Agreement;

(b)    BLA shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of the Rights other than the Licensee royalty payments contemplated under this Agreement and registration fees which a Licensee may be required to pay to register a particular trademark in its territory;

(c)    It is the originator or creator or is otherwise fully authorized to use all of the Properties (including without limitation material which is or may be protected by copyright or trademark laws) which are subject matter of this Agreement. No use of the Properties permitted by this Agreement will violate any law or infringe upon or violate the rights of any other person, firm or corporation;

5

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 35 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 8 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 9 of 15

(d)    It has not heretofore entered into any agreement with respect to the Rights which will limit either party's performance under this Agreement, except as set forth in Exhibit B, attached;

(e)    No person, firm or corporation other than BLA has any right to perform services contemplated hereunder;

(f)    No use of the Rights as envisioned by this Agreement will violate any law or infringe upon or violate the rights of any person, firm or corporation;

(g)    It is the owner of the Properties.

6.2.    BLA's Warranties.  BLA warrants and represents that:

(a)    It has the right and power to enter into and to fully perform this Agreement;

(b)    It has not heretofore entered into any agreement with respect to the Rights which will limit either party's performance under this Agreement;

(c)    It shall perform the services contemplated hereunder.

7.    Indemnification.

7.1.    Indemnities to OWNER.  During the Term of this Agreement and thereafter, BLA shall indemnify and hold OWNER harmless from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, settlements, judgments, suits, costs and expenses including reasonable attorneys' fees on any trial, arbitration, mediation or appeal therefrom, or disbursements of any kind or nature whatsoever which arise out of a claim or cause of action brought by a third party including any Licensee against OWNER based upon: (i) any statements, agreements, or representations made by BLA (or any agent, employee, or representative of BLA) in soliciting prospective Licensees for OWNER when such statements, agreements or representations are false and material or are inconsistent with the terms of this Agreement; and (ii) any act or omission by BLA (or any agent, employee, or representative thereof) which is not authorized hereunder and which is in breach of the terms of this Agreement.

7.2.    Indemnities to BLA.  During the Term of this Agreement and thereafter, OWNER shall indemnify and hold BLA harmless from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, settlements, judgments, suits, costs, expenses including reasonable attorneys' fees, or disbursements of any kind or nature whatsoever which arise out of a claim or cause of action related to this Agreement brought by a third party, including any Licensee, against BLA or its officers, employees or agents, including, without limiting the foregoing, such claims arising out of BLA's handling of the licensing program and any alleged breach of any warranties made by OWNER hereunder or due to the Rights, but not including those claims or causes of action referred to in paragraph 7.1.

8.    Exclusivity.

6

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 36 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 9 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 10 of 15

During the Term BLA shall be the sole exclusive agent and representative of OWNER with regard to granting of Licenses in the Rights Territory. This Agreement shall not apply to the limited situation wherein OWNER creates tangible products making use of the Rights for free distribution as premiums to promote the Properties concept in respect to which BLA has not performed any services, provided however that if any Licensee produces similar products, OWNER will provide that Licensee the opportunity to sell OWNER the items at its usual wholesale price. OWNER may promote the Properties itself by using Licensee's products or items OWNER shall purchase such items from Licensees at cost without royalties payable.

OWNER may grant to BLA non-exclusive rights to develop products under terms and conditions to be separately negotiated.

9.    Reservation of Rights.

All rights not expressly granted to BLA herein are reserved to OWNER.

10.    Territory.

This Agreement pertains to Licensees worldwide

11.    Term.

11.1.    Commencement. The term of this Agreement will commence on signing by all parties and will continue for three (3) years or until terminated by the happening of one of the following events:

(a)    By the other party if one of the parties discontinues its business, becomes insolvent, makes an assignment for the benefit of creditors, is placed in receivership, files a voluntary petition in bankruptcy, fails to vacate an involuntary bankruptcy petition filed against it within sixty (60) days from the date of such filing, or is dissolved for any cause whatsoever;

(b)    By the other party if one of the parties fails to substantially comply with or perform any one or more of the terms or conditions of this Agreement, provided, however, that:

(i)    the complaining party gives notice of the alleged breach to the other; and

(ii)    the party to whom the complaint is addressed has thirty (30) business days to cure the alleged breach to the reasonable satisfaction of the complaining party.

(c)    By OWNER, if BLA fails to use significant, conscientious and diligent efforts to promote the Properties, including failing to devote time and manpower to the OWNER account, failing to return phone calls or other communications from OWNER in a timely manner, failing to provide reports or other requests for information from OWNER and generally failing to actively market the Properties.

LA_DOCS\372851.1

Case 1:05-cv-03939-CM     Document 27-3     Filed 05/01/2006     Page 37 of 62

Case 1:05-cv-00423-DFH-WTL     Document 44     Filed 07/25/2005     Page 10 of 14
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 11 of 15

(d)    If during the first year of this Agreement BLA fails to perform promised services, OWNER shall give notice to BLA and BLA shall have ninety (90) days to correct deficiencies.

11.2    <u>Renewal</u>  This Agreement shall be automatically renewed by BLA for successive additional three (3) year periods ("Renewal Term[s]"), provided, however, that OWNER shall have sixty (60) days prior to the automatic renewal date to deny renewal at its sole discretion. Renewal shall be on the same terms and conditions as stated in this Agreement. In the event OWNER denies renewal, this Agreement shall terminate at the end of the Initial Term or any applicable Renewal Term, and all of BLA's interest in and to the Rights shall terminate and revert to OWNER, subject only to the specific Post-Term Compensation set forth in paragraph 13.3 below.

12.    <u>Limitations on Liability</u>.

12.1    BLA does not warrant that it will be able to place any Licenses for the Rights but it will exercise reasonable efforts, good faith and due diligence in attempting to do so.

12.2    BLA shall not be liable for any failure of OWNER to receive funds due from a Licensee or from any default or other act or omission of a Licensee, except as the direct result of an act or omission of negligence for which BLA is in breach of this Agreement. In no event will BLA be liable for negligence with respect to any audit or the failure to recommend that any audit be conducted, unless OWNER requests that a specific audit be conducted and BLA refuses to do so.

13.    <u>Compensation</u>.

13.1.    <u>BLA Compensation</u>.

In consideration of BLA's services hereunder, BLA will receive the following compensation:

(a)    In consideration of BLA's services hereunder, BLA will receive as compensation 35% of Licensing Revenues generated in the United States and 45% of Licensing Revenues generated Internationally. This compensation schedule will apply to total combined Licensing Revenues earned from the Rights in the Territory, except as discussed in paragraph 13.1(b), where a lower rate shall apply. BLA will be responsible for compensating international agents. Licensing Revenues shall not include situations by mutual agreement where expenses incurred at the request of OWNER pursuant to paragraph 13.4 should be deducted from revenue prior to calculating BLA's compensation. The calculation of BLA's percentage of Licensing Revenues, as set forth above, shall not be calculated on an annual basis, but, rather, for the life of this Agreement.

13.2.    <u>Expenses</u>. In addition to amounts paid pursuant to subparagraphs, 13.1 above OWNER shall reimburse BLA for all reasonable pre-approved expenses incurred at the request or direction of OWNER. Such expenses shall include, but shall not be limited to, costs incurred by BLA to attend OWNER's marketing or sales meeting (when requested by OWNER to so

8

Case 1:05-cv-03939-CM     Document 27-3     Filed 05/01/2006     Page 38 of 62

Case 1:05-cv-00423-DFH-WTL     Document 44     Filed 07/25/2005     Page 11 of 14
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 12 of 15

attend), expenses incurred for producing promotional art work, samples or demos of products or the Properties when requested to do so by OWNER. It is specifically understood that all general marketing and promotional expenses, such as the cost or postage, mailings and the like, and attendance at trade shows shall all be borne by BLA.

13.3. Post-Term Licenses and Compensation. BLA shall be entitled to Post-term Compensation on the same basis as during the Term pursuant to sub-paragraph 13.1, 13.2 for Licenses in effect on the termination of this Agreement for term of such Licenses, including any renewals or extensions. In addition BLA shall be entitled to the same compensation if within eighteen (18) months following termination, a License is entered into with a Licensee which, during the Term, had been approached by BLA and was so identified to OWNER and was in subject of serious negotiations with BLA.

13.4. Licensee Payment. Licensee royalty payments are to be made payable to Bradford Licensing Associates and sent to BLA. On or before the sixtieth (60th) day following the close of each calendar quarter, BLA shall furnish to OWNER a full and accurate statement of all amounts received by BLA and deposited into BLA's account during the preceding calendar quarter under all Licenses together with any payment due OWNER hereunder. It is understood that OWNER shall be provided copies of royalty reports when being furnished to BLA during the term of this Agreement.

13.5. BLA's books and records; inspection; inspection by OWNER. BLA shall maintain complete and accurate books and records with respect to its activities, receipts and disbursements with respect to the Properties and the licensing thereof hereunder, including without limitation all receipts, all payment and expenses, and all other financial matters in which it was involved with respect to the Properties. OWNER or its duly authorized representative shall have the right, after reasonable notice to BLA, during usual business hours, but not more than once each year, to examine the books and records pertaining to OWNER, at the place where the same are regularly maintained, insofar as they relate to the Properties, and make copies thereof and take extracts therefrom. Such examination shall be at the cost of OWNER, unless errors aggregating more than five percent (5%) of the total sum accrued (including advances) to OWNER are found to be to OWNER's disadvantage, in which case the reasonable cost of such examination shall be borne by BLA.

13.6. Compensation and Reimbursement of BLA. OWNER shall not be responsible or liable for any payment or reimbursement to BLA, and BLA shall not be entitled to retain out of any monies received by it in connection with its performance of this Agreement, except as herein expressly provided.

9

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 39 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 12 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 13 of 15

14.    Return of Material.  Upon termination, BLA shall promptly return all materials and all other information related to dealing with or otherwise involving OWNER or any of its concepts, designs, logos or anything related thereto in its possession OWNER and OWNER shall arrange to communicate to all Licensees and other interested parties the fact that BLA no longer represents OWNER.

15.    Independent Counsel.  OWNER is not relying upon BLA's counsel for advice regarding the effect of this Agreement.  OWNER has been advised by BLA's counsel to seek independent counsel review and has either done so or waives any and all claims against BLA and BLA's counsel resulting from the failure to do so.

16.    Miscellaneous.

16.1.    Notice.  All notices and other communications between the parties shall be in writing and shall be deemed given on the date five (5) days after the same is either actually received, or mailed by certified or registered mail, return receipt requested, postage prepaid and addressed as follows:

|  |  |
|---|---|
| If to OWNER: | Valhalla Productions |
|  | PO Box 4211 |
|  | Portsmouth, NH 03802 |
|  | Attn: Schani Krug |
|  | Ph: 207-752-0624 |
|  |  |
| If to BLA: | Bradford Licensing Associates |
|  | 209 Cooper Avenue |
|  | Upper Montclair, NJ 07043 |
|  | Attn:  Leonard Reiter |
|  | (973) 509-0200 |
|  | (973) 509-7419 FAX |

By giving notice in conformity with this paragraph a party may designate a specific individual to whom various administrative notices called for by this Agreement are to be sent.  Both parties are under a continuing obligation to provide prompt notice if the addresses set forth above are changed.

16.2.    Independent Contractor.    This Agreement creates no agency, partnership, employment, joint relationship or joint venture between the parties hereto, or mutual responsibility on behalf of one party for the debts or liabilities of the other.  The parties hereto agree that each is acting as an independent contractor and that any BLA employees are in no sense the employees, agents or servants of OWNER.  Neither party shall have the power or authority to bind or obligate the other.

10

LA_DOCS\372851 1

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 40 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 13 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 14 of 15

16.3    Entire Agreement/Waiver    This Agreement contains the entire understanding between the parties and supersedes all prior agreements, representations and undertakings. It may only be modified, supplemented or altered by a writing signed by both parties. No failure or delay on the part of either party insisting on compliance with any provision herein or in exercising any right, power or remedy hereunder shall operate as a waiver or modification thereof; nor shall any single or partial exercise of any such right, power or remedy hereunder preclude any other or further exercise of any other right, power or remedy hereunder

16.4.    Assignment. This Agreement is not assignable by either party without the express approval of the other.

16.5.    Headings    Provision and paragraph headings used in this Agreement are for convenience purposes only and shall not constitute part of this Agreement nor have any legal significance whatsoever in interpreting the provisions of this Agreement.

16.6.    Governing Law. This Agreement shall be governed by and interpreted in accordance with the laws of the State of New Jersey.

16.7.    Arbitration. It is understood and agreed that any and all disputes, controversies or claims arising under or in any way related to the Agreement or to the parties' warranties and duties to be made and performed under the Agreement, including, without limitation, the general validity or enforceability of any of the provisions of this Agreement, shall be submitted to final and binding arbitration in Newark, New Jersey, under the auspices and rules of the American Arbitration Association. There shall be one arbitrator. The decision of the arbitrator shall be final and binding and shall be enforceable in any court of competent jurisdiction.

IN WITNESS HEREOF, the parties have caused this Agreement to be executed as of the date first above written.

VALHALLA PRODUCTIONS

By: ___Schani Krug___
Name:  SCHANI KRUG
Its:    Director/ Producer

BRADFORD LICENSING ASSOCIATES

By: _____
Name: LEN REITER
Its:    President

11

## EXHIBIT A

### Property(ies)

The Jim Dougherty and Norma Jeane Limited Edition Collection

LA_DOCS\372851.1

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 42 of 62
Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 1 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 2 of 22

LICENSE AGREEMENT

TABLE OF CONTENTS

1.  GRANT OF LICENSE

2.  TERRITORY

3.  TERM

4.  CONSIDERATION AND RELATED LICENSEE OBLIGATIONS

5.  REPRESENTATIVE

6.  STATEMENTS, PAYMENTS AND RECORDS

7.  QUALITY STANDARDS AND CONTROL

8.  THE PROPERTY

9.  LICENSEE RIGHTS AND OBLIGATIONS

10. TERMINATION AND EXPIRATION

11. ASSIGNABILITY

12. NOTICES AND PAYMENTS

13. MISCELLANEOUS

Schedules and Exhibits

Schedule A - Brands

Schedule B - Licensed Products

Schedule C - Territory

Exhibit A  - Statement Format



Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 43 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 2 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 3 of 22

## LICENSE AGREEMENT

AGREEMENT made and effective as of the 15th day of April 2004, by and between Valhalla Productions a corporation of the State of New Hampshire, with its principal place of business at PO Box 4211 Portsmouth, New Hampshire 03802 U.S.A. (hereinafter referred to as "LICENSOR") and The Italia Collection a corporation of [the State of] California with its principal place of business at 53 Muckelemi St. Suite F, San Bautista, CA 95045 (hereinafter referred to as "LICENSEE").

WHEREAS, LICENSOR is the owner of certain proprietary intellectual property, including but not limited, to trademarks, trade dress, logos, designs, slogans, copyrights and other similar materials (the "Property") used in connection with the brands set forth on Schedule A of this Agreement; and

WHEREAS, LICENSEE desires to obtain the right and license to use the Property on and in connection with the manufacture, distribution and sale of Licensed Product(s) in the Territory (both as hereinafter defined) under certain terms and conditions and LICENSOR is willing to grant LICENSEE such right and license.

NOW THEREFORE, in consideration of and incorporating the above premises and of the mutual covenants, conditions and agreements herein contained, the parties agree as follows:

## GRANT OF LICENSE

1.1    Grant.  LICENSOR hereby grants to LICENSEE, and LICENSEE hereby accepts upon the terms and conditions herein specified, the non-exclusive right and license to utilize the Property in the Territory solely upon and in connection with the manufacture, distribution and sale of the products shown on Schedule B hereof (the "Licensed Product(s)").   LICENSEE understands that advertising and distribution of said Licensed Products through retail, mail order catalogs, the internet and any other form of commerce must preclude sales in the state of Indiana, USA.  In the event of any question about whether any specific product or products are Licensed Products, the determination of LICENSOR shall be conclusive.

1.2    Retail Distribution of Licensed Products.   The Licensed Products manufactured under this Agreement shall be placed in distribution by the LICENSEE in a fully finished condition solely for immediate or eventual sale at the retail market level or its equivalent and in that same condition and for the use intended by LICENSOR.  In no event shall the Licensed Products be sold to any party if the LICENSEE knows, or should have known, that the Licensed Products will be thereafter altered, modified, re-packaged, filled, made part of something else or used in any other unauthorized manner by any party in the chain of distribution.

1.3     Reservation of Rights

(a)     LICENSOR retains all rights not expressly and exclusively conveyed to LICENSEE hereunder, and it is acknowledged that LICENSOR may grant licenses to others to use the Property in connection with other products.

(b)     LICENSOR reserves the right to itself use, manufacture, distribute and sell, or have others manufacture, distribute and sell for it, the same type of product using the Property in all other channels of distribution such as, but not limited to, premiums, promotions (including those involving payment or partial payment by customers), athletic, entertainment and other sponsorship-related programs, catalogues, mail order, electronic commerce, and restricted venues, e.g., events, concerts, sports events, recreation, theme and amusement parks, schools, stadiums, theaters. In the event, however, that LICENSEE acts as a supplier of such products to LICENSOR or any parties authorized by LICENSOR, such sales shall be subject to the provisions of no. 4.1 of this Agreement regarding Royalties.

(c)     From time to time, opportunities of a short term nature may arise using a particular new application of the Property wherein LICENSOR will ask LICENSEE to produce on an expedited basis Licensed Products either for LICENSOR to use for premium or promotional purposes, or to be sold by LICENSEE at retail, or both, and if LICENSEE is unable or unwilling to so produce such Licensed Products within time frames acceptable to LICENSOR as well as meeting LICENSOR's other reasonable requisites under the circumstances, such as sufficient distributional capability and appropriate price and quality, LICENSOR shall have the right to seek and license other parties for this limited opportunity only.

(d)     If LICENSOR becomes aware of the inability or unwillingness of LICENSEE to fill an order for Licensed Products for LICENSOR or any customer, LICENSOR shall have the right to seek and license another party or parties to fill said order(s).

1.4     No Right to Sub-License.     LICENSEE has no right to sub-license the rights granted by this Agreement.


TERRITORY


2.     The rights of distribution and sale granted to LICENSEE under this Agreement shall be limited to those jurisdictions set forth on Schedule C hereto and LICENSEE agrees that it will not make or authorize any use, direct or indirect, in any other area and that it will not knowingly sell Licensed Products to persons who intend, or are likely, to resell them in any other area.

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 45 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 4 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 5 of 22

## TERM

3.    Term.  The term ("Term") of this Agreement shall be a period of two (2) years, commencing on April 15, 2004 and terminating on April 14, 2006, unless sooner terminated in accordance with the provisions of this Agreement.

## CONSIDERATION AND RELATED LICENSEE OBLIGATIONS

4.1    Royalties.  In consideration of the right and license herein granted, LICENSEE shall pay to LICENSOR a sum ("Royalties") equal to ten per cent (10%) of all Net Sales (as defined below) by or on behalf of LICENSEE of the Licensed Products. Royalties shall accrue when the Licensed Products are invoiced or shipped, whichever occurs first, and shall be payable concurrently with the periodic statements required in no. 6 herein.  The term "Net Sales" shall mean the gross invoice price billed customers less customary trade discounts, rebates, returns actually credited, and transportation and taxes actually charged to and paid by the customer, but with no other deductions of any kind whatsoever, provided, however, that if LICENSEE sells Licensed Products to a party owned, in whole or in part, or controlled by, or related to, the LICENSEE, the invoice price used to determine Net Sales shall be the invoice price at which the Licensed Products are re-sold by the related party to an unrelated customer in an arms-length transaction.

4.2    Advance.  LICENSEE agrees to pay LICENSOR the sum of $1,500.00 upon execution of this Agreement which shall be deemed to be a non-refundable advance ("Advance") against Royalties due, counting against the total minimum referred to in no. 4.3 below.

4.3    Guaranteed   Minimum   Royalties.    LICENSEE   agrees   that, notwithstanding the actual amount of Net Sales, it shall be obliged to make the following total minimum payment to LICENSOR for the full Term ("Guaranteed Minimum Royalties"):

$2,500.00

Until the total for the full Term is reached, for each quarter LICENSEE shall pay the greater of the actual Royalties owed under no. 4.1 or Guaranteed Minimum Royalties as follows:

$1,500 due upon signing
$1,000 due January 1, 2005

4.4    First Shipment Date.  LICENSEE agrees it will commence distribution of Licensed Products in reasonable quantities through customary channels of trade no later than July 1, 2004.  If this does not occur, this Agreement will automatically terminate and LICENSEE shall forfeit the Advance payment of no. 4.2.

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 46 of 62
Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 5 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 6 of 22

REPRESENTATIVE

5.    From time to time, LICENSOR may designate one or more representatives ("Representative") upon notice to LICENSEE, to generally act on behalf of LICENSOR sometimes in conjunction with LICENSOR and sometimes in its place and stead, such as, but not limited to, receiving payments, made payable to LICENSOR unless otherwise specified, and statements as set forth in no. 6 and performing the various quality control functions as set forth in no. 7. In the event such a Representative is designated, all references to administrative duties of the LICENSOR in this Agreement may be construed as referring to the Representative if appropriate to carry out the purposes of this Agreement. LICENSOR agrees that it will be bound by any authorized communications or representations of its Representative and cannot repudiate same. LICENSOR, at its complete discretion, may replace a Representative, upon written notice to LICENSEE, without affecting the validity of this Agreement.

## STATEMENTS, PAYMENTS AND RECORDS

6.1    Statements. Within thirty (30) days after the end of each calendar quarter during the term of this Agreement, LICENSEE shall deliver to LICENSOR, or its Representative if so specified, a complete and accurate statement, in the format set forth in Exhibit A, certified to be accurate by LICENSEE (if LICENSEE is a corporation, by an officer or authorized person of LICENSEE), setting forth:

(a)    LICENSEE'S net shipments, by number of each Licensed Product, reported separately, for the preceeding quarter;

(b)    LICENSEE'S Net Sales for each Licensed Product, reported separately, for the preceeding quarter; and

(c)    a computation of Royalties due, taking into account any Guaranteed Minimum Royalties which may be due to the extent that the Guaranteed Minimum Royalties exceed earned Royalties.

Such statements shall be furnished to Representative (Bradford Licensing Associates) whether or not any of the Licensed Products have been shipped during the period.

6.2    Payments. Each statement delivered pursuant to no. 6.1 shall be accompanied by a check payable to Representative (Bradford Licensing Associates) or other party specified by LICENSOR in full payment of any Royalties or other payments due for the period.

6.3    Records. LICENSEE shall keep, maintain and preserve in LICENSEE'S principal place of business during the Term and for at least two (2) years following expiration or termination of this Agreement or any renewals, complete and accurate records and accounts covering all transactions relating to this Agreement including,

Case 1:05-cv-03939-CM     Document 27-3     Filed 05/01/2006     Page 47 of 62

Case 1:05-cv-00423-DFH-WTL     Document 44     Filed 07/25/2005     Page 6 of 21
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 7 of 22

without limitation, invoices, correspondence, banking, financial and all other pertinent records and accounts. Such records and accounts shall be maintained in accordance with generally accepted accounting procedures and principles and shall be available for inspection and audit at LICENSOR'S expense at any time or times during the Term and for two (2) years thereafter, during reasonable business hours and upon reasonable notice by LICENSOR or its nominees. LICENSEE agrees not to cause or permit any interference with LICENSOR or nominees of LICENSOR in the performance of their duties of inspection and audit. In the event any errors or discrepancies are discovered in any records, statements or accounts or in payments resulting therefrom, they shall immediately be rectified and the appropriate payments made by LICENSEE, together with interest at the then Citibank, N.A. prime rate per annum compounded from the date the payment was originally due. Should any willful errors or discrepancies be disclosed as a result of the inspection or audit or otherwise, then in addition to all other relief to which LICENSOR may be entitled, including the right to immediately terminate this Agreement, LICENSEE shall promptly reimburse LICENSOR for the full cost of such inspection and audit, together with interest at the then Citibank, N.A. prime rate per annum for any additional monies found to be due as a result of the inspection or audit compounded from the date the payment was originally due.

     6.4    <u>Right to Dispute Records</u>. Receipt or acceptance by LICENSOR or its nominees of any of the statements furnished pursuant to this Agreement, the exercise by LICENSOR in whole or in part at any time or times of the right to audit and inspect records and accounts, or the receipt or deposit by LICENSOR or its nominees of any payment tendered by or on behalf of LICENSEE shall be without prejudice to any rights or remedies of LICENSOR and shall not prevent LICENSOR from thereafter disputing the accuracy of any such statements, payments, records and accounts.

<u>QUALITY STANDARDS AND CONTROL</u>

     7.1    <u>Quality Standards</u>. All Licensed Products and related materials displaying the Property, such as, but not limited to, containers, packaging, wrapping materials, labels, hang tags, advertising materials, promotional materials, catalogs, artwork, and other pictorial and textual materials to be used in connection with the Licensed Products, (collectively the "Licensed Products/Materials") must meet the standards of nature and quality prescribed by LICENSOR. All Licensed Products/Materials shall be of high standards and of such quality as will, in LICENSOR'S sole judgment, protect and enhance the Property and the substantial goodwill pertaining thereto, and in all cases the quality shall be at least as high as the quality of samples approved by LICENSOR.

     7.2    <u>Control</u>. LICENSEE shall insure at all times that the Licensed Products/Materials meet in fact LICENSOR'S standards of nature and quality and LICENSEE shall cooperate fully in all reasonable ways with LICENSOR in enabling LICENSOR to ascertain that all Licensed Products/Materials meet said standards. By way of example rather than limitation, LICENSEE shall:

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 48 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 7 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 8 of 22

(a)    permit, upon reasonable advance notice, LICENSOR or its Representative to visit during regular working hours LICENSEE'S premises where Licensed Products/Materials are manufactured, packaged, sold or distributed for the purpose of inspection of the manufacturing process and related activities; and

(b)    upon request of LICENSOR or its Representative, send to LICENSOR or its Representative reasonable quantities of samples (not exceeding six units of any item) of Licensed Products/Materials, at LICENSEE'S expense, for the purposes of testing, inspection and review.

7.3    Prior Approval. No Licensed Product shall be manufactured, distributed, sold or used by LICENSEE prior to LICENSOR'S written approval of pre-production prototypes or samples of each such Licensed Product/Material.    Further written approval will be necessary if there is any change proposed by LICENSOR or LICENSEE in type, style, model, grade, description or the like from any previously approved Licensed Products/Materials.    Should approval or disapproval of samples submitted prior to manufacture or use not be received by LICENSEE within fifteen (15) days of the submission, LICENSEE must, in writing, request a reply.    Failure to receive a reply shall be deemed approval by LICENSOR if LICENSOR or its Representative does not notify LICENSEE of LICENSOR'S disapproval within an additional fifteen (15) days.    Licensed Products/Materials shall not be manufactured, distributed, sold or used which differ from the approved samples.    All costs associated with the approval process shall be borne by LICENSEE.

7.4    Deficiency.    Promptly upon receipt from LICENSOR or its Representative of information or notice that any Licensed Products/Materials manufactured, sold or used by LICENSEE does not or has not met the specifications or standards of nature and quality prescribed by LICENSOR, LICENSEE shall correct such deficiency forthwith at LICENSEE'S expense.    LICENSEE shall thereupon submit samples of the corrected Licensed Products/Materials pursuant to no. 7.3, for approval.    In the event the deficiency is that of substandard Licensed Product or that of material mis-use of the

Property, all existing inventory or work in progress of Licensed Products/Materials containing the deficiency shall, at LICENSEE'S expense, either be corrected to LICENSOR'S satisfaction or shall be destroyed.    The foregoing shall not preclude or limit in any way LICENSOR'S rights under no. 10 herein.

THE PROPERTY

8.1    Ownership.    LICENSEE shall use the Property only in connection with the Licensed Products and agrees that all of LICENSEE'S use under this Agreement inures to the benefit of LICENSOR.    LICENSEE acknowledges that LICENSOR is the owner of the Property and the goodwill associated therewith and the Property is valid. LICENSEE agrees not to contest LICENSOR'S ownership or the validity of the Property during or after the Term.    Apart from the right of LICENSEE to use the Property pursuant to this Agreement, LICENSEE shall acquire no right, title or interest of any kind or nature whatsoever in or to the Property or the goodwill associated therewith.

Case 1:05-cv-03939-CM     Document 27-3     Filed 05/01/2006     Page 49 of 62

Case 1:05-cv-00423-DFH-WTL     Document 44     Filed 07/25/2005     Page 8 of 21
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 9 of 22

8.2     Approval.  LICENSEE shall use the Property only in such form and manner as is specifically approved in writing by LICENSOR and, upon request by LICENSOR, affix thereto any legends, markings and notices of trademark registration or LICENSOR-LICENSEE relationship specified by LICENSOR, or any other notice of LICENSOR'S ownership, including copyright.  LICENSOR shall have the right to approve all advertising, displays and other material using the Property prepared by LICENSEE.  LICENSEE agrees to follow LICENSOR'S instructions and guidelines regarding proper usage of the Property in all respects.

8.3     LICENSEE Contributions.  LICENSEE agrees that all artwork, graphics, layouts slogans, names, titles or similar materials incorporating, or being used in association with, the Property which may be created by the LICENSEE or its subcontractors pursuant to this Agreement shall become the sole property of LICENSOR, including trademark and copyright rights, and LICENSEE agrees on behalf of itself, its employees, its subcontractors and any other party with whom it may contract to create such materials, to promptly execute any and all appropriate documents, e.g., assignments, in this regard. LICENSEE warrants and represents that all such materials which it creates or uses are original and to the best of its knowledge, do not infringe the copyright or trademark rights of others.

8.4     Protection and Defense.  LICENSOR agrees to protect and defend the Property at its sole cost and expense.  LICENSOR agrees to indemnify and hold LICENSEE harmless from only those claims, liabilities, damages (not including any consequential, indirect or punitive damages), costs or expenses solely and strictly related to the Property as properly used by LICENSEE pursuant to this Agreement, provided that LICENSEE shall cooperate fully with LICENSOR in the defense and protection of the Property and shall promptly advise LICENSOR in writing of any potentially infringing uses by others in addition to any suits brought, or claims made, against LICENSEE involving the Property.  Decisions involving the protection and defense of the Property shall be solely in the discretion of LICENSOR; LICENSEE shall take no actions in this regard without the express written permission of LICENSOR.

8.5     LICENSEE Cooperation.  LICENSEE agrees to join with LICENSOR in any application to enter LICENSEE as a registered or permitted user, or the like, of the Property with any appropriate governmental agency or entity.  Upon termination or expiration of this Agreement for any reason whatsoever, LICENSOR may immediately apply to cancel LICENSEE'S status as a registered or permitted user and LICENSEE shall consent in writing to the cancellation and shall join in any cancellation petition. The expense of any of the foregoing recording activities shall be borne by LICENSOR.

8.6     Restrictions On Other Marks and Trade Names.  During or after the Term, LICENSEE shall not use any other trademarks or other property similar to the Property. During or after the Term, LICENSEE shall not use or register, in whole or in part, the Property or LICENSOR'S name, or anything similar thereto, as part of LICENSEE'S name or as the name of any entity directly or indirectly associated with LICENSEE'S activities or as a domain name.

Case 1:05-cv-03939-CM     Document 27-3     Filed 05/01/2006     Page 50 of 62

Case 1:05-cv-00423-DFH-WTL     Document 44     Filed 07/25/2005     Page 9 of 21
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 10 of 22

8.7     Changes to Property.  LICENSOR shall have the right at any time, upon notice, to make additions to, deletions from, and changes in the Property at its complete discretion, and LICENSEE shall adopt and use any and all such additions, deletions and changes as soon as practicable in all new production of the Licensed Products/Materials.

8.8     Termination.     Immediately upon termination or expiration of this Agreement, subject to the provisions of no. 10, LICENSEE shall immediately cease all use of the Property and all rights granted LICENSEE hereunder shall revert to LICENSOR.


## LICENSEE RIGHTS AND OBLIGATIONS

9.1     Subcontracting.  LICENSEE shall have the right to subcontract for the manufacture and production of the Licensed Products/Materials provided however, that, irrespective of, or in addition to any other agreements between LICENSEE and a subcontractor, LICENSEE agrees that any such subcontractor shall:

(i)     be fully subject to, and bound by, every provision of this Agreement;

(ii)     be made aware that it may not sell any Licensed Products manufactured by it to anyone but LICENSEE;

(iii)     agree that any related designs, labels, packaging or other materials incorporating or associated with the Property shall become the property of LICENSOR and that LICENSEE shall be responsible for obtaining any relevant supporting legal documentation;

(iv)     agree to immediately cease all manufacture of Licensed Products upon notice of termination or expiration of this Agreement; and

further provided that:

(v)     a breach by a subcontractor of any provision of this Agreement shall be considered a breach by LICENSEE;

(vi)     LICENSEE shall remain primarily and completely obligated under all of the provisions of this Agreement;

(vii)     LICENSEE shall promptly furnish to LICENSOR a list of all such subcontractors and shall update this list each quarter; and

(viii)     LICENSEE agrees to immediately notify any sub-contractor in writing upon termination or expiration of this Agreement, with a copy sent to LICENSOR.

9.2     Best Efforts.

(a)     LICENSEE shall use its best efforts to continuously design, manufacture, advertise, sell and ship all of the Licensed Products in all of the Territory in commercially reasonable quantities and shall continuously and diligently during the Term produce an inventory of Licensed Products and procure and maintain facilities and trained personnel sufficient and adequate to accomplish the foregoing.  In no event, once sales have commenced shall LICENSEE allow a period of more than ninety (90) days to elapse during which it does not manufacture, sell or distribute the Licensed Products in commercially reasonable quantities.

(b)     Failure to comply with any of the foregoing in (a) may result in removal from this License of one or more of the unused or unexploited brands, Licensed Products or Territories set forth on Schedules A, B or C, upon written notice from LICENSOR.

9.3     Compliance with Laws.  LICENSEE warrants and represents that it will comply with all laws, regulations, ordinances, governmental standards and the like applicable to the manufacture, sale, distribution, promotion and advertisement of the Licensed Products and agrees to indemnify and hold LICENSOR and its Representatives harmless in this regard.

9.4     Goodwill.  LICENSEE acknowledges the tremendous value and goodwill of the Property accruing solely to LICENSOR and agrees not to use the Property in any manner which may, in LICENSOR'S judgment, be in bad taste, be inconsistent with LICENSOR'S public image or which may in any way disparage LICENSOR or its reputation, including, but not limited to, types and placement of advertising and types of channels of distribution, nor take any action which will harm or jeopardize the Property or LICENSOR'S ownership thereof, in any way.

9.5     Confidentiality.  During the Term and thereafter, LICENSEE shall keep confidential any of LICENSOR's confidential proprietary information, knowledge or trade secrets, such as but not limited to, marketing and advertising plans, licensing plans, market research data and the like, of which it becomes aware during the course of its relationship with LICENSOR.  If LICENSEE is uncertain about the status of a particular piece of information, it shall consult with LICENSOR to determine such status.  This confidentiality obligation shall cease when the information becomes generally known to the public.

9.6     Indemnification.  Except for those directly and solely related to and arising from the Property, LICENSEE agrees to assume the defense of, and to indemnify and hold LICENSOR, its subsidiaries, affiliates, franchisees, successors and assigns and its Representatives harmless from any and all liabilities, damages, claims, judgments, awards, fines, penalties, or other payments (including reasonable counsel fees), which may be incurred by any or all of them arising out of any claims or suits which may be brought or made against LICENSOR or those in privity with LICENSOR for injuries resulting from LICENSEE'S manufacture, advertising, packaging, labeling, promotion, sale, distribution or use of the Licensed Products, including those arising

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 52 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 11 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 12 of 22

- 11 -

from claims involving copyright, patent, trademark, mask work or software, or any unauthorized use by LICENSEE of the Property, or out of any breach by LICENSEE of any provisions of this Agreement, provided LICENSOR shall give prompt notice and reasonable cooperation and assistance to LICENSEE relative to any such claim or suit brought to its attention. This provision shall survive indefinitely the termination or expiration of this Agreement.

9.7    Insurance. LICENSEE agrees to obtain and keep in force, at its own expense, product liability insurance with respect to the Licensed Products, with a thirty (30) day notice of cancellation provision, from a recognized and responsible insurance company authorized to conduct an insurance business in New York with an A.M. Best Company rating of no less than A-XII. Such insurance company shall name LICENSOR as an additional insured, and provide protection in the amount of at least $1,000,000.00. LICENSEE shall, within thirty (30) days from the date hereof, submit to LICENSOR a copy of such insurance policy or a copy of a fully paid certificate of insurance therefor. Maintenance of such insurance and performance of LICENSEE of its obligations hereunder shall not relieve LICENSEE of liability under the indemnity contained in no. 9.6. LICENSEE agrees to maintain such product liability insurance for a period coextensive with that for which indemnification might be required under the provisions of this Agreement and in no event less than five (5) years beyond termination of this Agreement.


## TERMINATION AND EXPIRATION


10.1    Termination for Default. LICENSOR shall have the right to terminate this Agreement without prejudice to any other rights which it may have if:

(a)    LICENSEE defaults in the performance of any of its obligations, representations or warranties provided for in this Agreement; or

(b)    any court, arbitration panel, government agency or body finds that the Licensed Products manufactured by LICENSEE are defective in any way, manner or form; or

(c)    the LICENSEE shall be unable to pay its debts when due, or shall make any assignment for the benefit of creditors, or shall file any petition under the bankruptcy or insolvency laws of any jurisdiction, country or place, or shall have or suffer a receiver or trustee to be appointed for its business or property, or be adjudicated a bankrupt or an insolvent; or

(d)    a subcontractor engages in conduct which, if engaged in by LICENSEE, would entitle LICENSOR to terminate this Agreement. However, LICENSOR will endeavor to discuss with LICENSEE what action LICENSEE must take or cause to be taken to remedy any damages to LICENSOR resulting from such subcontractor's conduct. The nature and extent of the action to be taken shall be at LICENSOR'S sole and absolute discretion.

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 53 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 12 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 13 of 22
-12-

10.2    Notice of Termination and Right of Correction. In the event any of these defaults occur, LICENSOR may give notice of termination, such notice to be in writing to LICENSEE pursuant to the provisions of no. 12. Subject to the provisions of no. 10.3 and excepting a default in any payment due hereunder which must be corrected within ten (10) days of receipt of the notice and can only be corrected by payment, the LICENSEE shall have twenty (20) days after the receipt of notice in which to correct the situation giving rise to the notice, or to assure to LICENSOR'S satisfaction that appropriate corrective measures are being taken.    For the purposes hereof, the cessation by LICENSEE of all sales and distribution of the Licensed Products which shall have given rise to a default hereunder shall be deemed a correction of such default.    Failing such satisfactory correction or assurance, this Agreement shall terminate.    Nothing contained in provision no. 7.4 herein shall preclude or limit LICENSOR'S rights hereunder.

10.3    Exceptions to Right of Correction. Notwithstanding the provisions of no. 10.2, LICENSEE shall have no right of correction in the event:

        (a)    of willful errors or discrepancies in LICENSEE'S records as referred to in no. 6.3;

        (b)    statements or payments as set forth in no. 6.1 and 6.2 are late more than twice in any year during the Term;

        (c)    of the occurrence of the same default, other than concerning statements or payments under no. 6.1 or 6.2, more than twice during the Term, or during any renewal period;

        (d)    of default of the provisions of any provision covering a First Shipment Date obligation.

10.4    Post-Termination Obligations.

        (a)    Delivery of Final Statement. LICENSEE shall within thirty (30) days after termination, deliver to LICENSOR a final statement certifying the number and description of Licensed Products on hand or in process of manufacture and make all payments due LICENSOR. LICENSOR shall also have the right to conduct a physical inventory in order to ascertain such inventory or verify such statement. There shall be no right of disposal of Licensed Products in the event of termination.

        (b)    Payment. Any and all payments then or later due from LICENSEE, including all prospective Guaranteed Minimum Royalties due for the full Term during which the termination takes place, shall then be accelerated and immediately due and payable to LICENSOR, less any Royalties or advances already paid, and no portion of any prior payments shall be repayable to LICENSEE.

        (c)    Delivery of Property. Upon termination of this Agreement, all labels, signs, packages, wrappers, cartons, circulars, advertisements and other items bearing or containing any reproduction or representation of any of the Property shall automatically and without cost to LICENSOR become the property of LICENSOR, and

LICENSEE shall immediately deliver the same to LICENSOR'S place of business or any other location designated by LICENSOR.  The reasonable cost of such delivery shall be paid by the LICENSOR.

      (d)    Delivery of List of Accounts.  Upon termination of this Agreement, LICENSEE shall promptly deliver to LICENSOR a copy of the most recent lists of all accounts to which it sells Licensed Products and a list of all subcontractors or manufacturers of LICENSEE.

      (e)    Guaranteed Minimum Royalties.  Upon termination of this Agreement , the total amount of outstanding Guaranteed Minimum Royalties, if any, due through the full time period during which this occurs shall become immediately due and payable, less any Royalties or advances already paid.

    10.6    <u>Expiration - Right of Disposal</u>.

      (a)    LICENSEE shall within thirty (30) days after the normal expiration of the Term or any renewal to deliver to LICENSOR a final statement certifying the number and description of Licensed Products on hand or in process of manufacture and make all payments due LICENSOR.  LICENSOR shall also have the right to conduct a physical inventory in order to ascertain such inventory or verify such statement.

      (b)    After expiration of this Agreement, provided all sums due LICENSOR have first been paid, and statements due are furnished, LICENSEE may dispose of the Licensed Products in compliance with this Agreement which are in LICENSEE'S inventory or in process of manufacture at the time of expiration for a period of ninety (90) days after said expiration; provided further that all Royalties with respect to that disposal period are paid and statements therefor are furnished in accordance with the terms of this Agreement within thirty (30) days after the disposal period has ended.

      (c)    Any right of disposal by LICENSEE shall not prohibit LICENSOR from granting rights to others to use the Property on Licensed Product during that disposal period.

ASSIGNABILITY

    11.    This Agreement may be freely assigned by LICENSOR without LICENSEE'S consent or approval.  This Agreement, or any of the rights therein, may not be sold, transferred or assigned, in whole or in part by LICENSEE, except as provided for in no. 9.1, without the express written consent of LICENSOR.  If assigned, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

- 14 -

## NOTICES AND PAYMENTS

12.    All notices and other communications which either party hereto is required or may desire to give to the other, except for payments and statements which shall be sent to the party designated by LICENSOR, e.g., the Representative referred to in no. 5, shall be given by addressing the same to the other or to the Representative of LICENSOR at the address hereinafter set forth in this paragraph, or at such other address as may be designated in writing by any party in a notice to the other given in the manner prescribed in this paragraph. All such notices shall be deemed given when sent so addressed by certified or registered mail, postage prepaid or by hand delivery, with proof of receipt, or by a reputable express delivery company which requires proof of receipt, such as, but not limited to, Federal Express® or Airborne® . The addresses to which the foregoing shall be given are the following:

If To LICENSOR:

Valhalla Productions
PO Box 4211
Portsmouth NH  03802

Attention:  Schani Krug

If To LICENSEE:

The Italia Collection
53 Muckelemi St. Suite F
San Juan Bautista, CA  95045

Attention: Richard Jackson

with a copy to:  Bradford Licensing Associates, 209 Cooper Avenue, Upper Montclair, NJ  07043.

## MISCELLANEOUS

13.1    Remedy For Breach.  LICENSEE acknowledges and agrees that a breach of any of the covenants, agreements or undertakings hereunder will cause LICENSOR irreparable injury which cannot be readily remedied in damages or solely by termination of this Agreement and that LICENSOR, in addition to all other legal and equitable remedies including costs and reasonable attorneys' fees, shall have the right of injunction for any breach of this Agreement by LICENSEE.

13.2    Relationship Between LICENSOR and LICENSEE.  Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, or agency relationship between the parties hereto or shall be deemed to render LICENSOR or its Representatives liable for any of the debts or obligations of LICENSEE .  LICENSEE shall in no way be considered an agent or representative of LICENSOR in any dealings which LICENSEE may have with any third party and neither of the parties hereto nor any of their employees or agents shall have the power or authority to bind or obligate the other party.

13.3    Survival of Provisions.  The expiration or termination of this Agreement shall not affect those provisions, and the rights and obligations therein, set forth in this Agreement which either:

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 56 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 15 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 16 of 22

-15-

       (a)    by their terms state, or evidence the intent of the parties, that the provisions survive the expiration or termination of the Agreement, or

       (b)    must survive to give effect to the provisions of this Agreement.

    13.4    <u>Entirety of Agreement; Amendment</u>.  This Agreement constitutes and contains the entire agreement of the parties hereto relating to the subject matter hereof and no oral or written statements, representations, documents, promises or any other prior materials not embodied herein shall be of any force or effect.  This Agreement cannot be amended, altered or modified except by a written instrument executed by both parties hereto.  Once so executed, such amendments shall become an integral part of this Agreement, subject to all the terms and conditions herein and shall have full force and effect.

    13.5    <u>No Waiver.</u>  The failure or delay of LICENSOR to exercise its rights under this Agreement or to complain of any act, omission or default on the part of LICENSEE, no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed or construed to be a waiver by LICENSOR of its rights under this Agreement or a waiver of any subsequent breach or default of the terms or provisions of this Agreement.

    13.6    <u>Invalidity.</u>  If this Agreement is subject to the approval of any government or government agency or similar entity, and such approval is not obtained, or is obtained but later revoked, it is understood and agreed to by the parties that this Agreement is immediately rendered null and void and terminated, with neither party liable for any resultant damages, costs or expenses of the other.  But for the foregoing, if any term, covenant, condition or provision of this Agreement or the application thereof to any person or circumstance, shall to any extent be held to be invalid, illegal or unenforceable in any respect, the remainder of this Agreement, or application of such term or provision to a person or circumstance other than to those as to which it is held invalid, illegal or unenforceable, shall not be affected thereby, and each term, covenant, condition or provision of this Agreement shall be valid and shall be enforced to the fullest extent provided by law.

    13.7    <u>Construction.</u>  This Agreement shall be governed by and construed in accordance with the laws of the State of New Hampshire of the United States of America and the Courts of the State of New Hampshire and/or the federal courts situate in New Hampshire shall have sole and exclusive jurisdiction over all disputes arising out of this Agreement.

    13.8    <u>Headings.</u>  The headings as to contents of particular provisions herein are inserted only for convenience and are in no way to be construed as part of this Agreement or as a modification of the scope of any terms or provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first set forth hereinabove.


Valhalla Productions (LICENSOR)


By:_____
    Name:  Schani Krug
    Title: Director/Producer


                        (LICENSEE)


By:_____
    Name:  Richard Jackson
    Title: President

<u>Schedule A</u>

<u>Property</u>
Marilyn's Man
(The Jim Dougherty and Norma Jeane Limited Edition Collection)
(Shaw Family Archives)

Schedule <u>B</u>

<u>Licensed Products</u>

Charm Bracelets
Charm Watches

- 19 -

Schedule C

Territory

USA

Case 1:05-cv-03939-CM     Document 27-3     Filed 05/01/2006     Page 61 of 62

Case 1:05-cv-00423-DFH-WTL     Document 44     Filed 07/25/2005     Page 20 of 21
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 21 of 22
- 20 -

## Exhibit A – Statement

Licensee:  
Address:

Date:  
For the Calendar Quarter Ending:

Licensing Program: Marilyn's Man  
(The Jim Dougherty and Norma Jeane Limited Edition Collection

**U.S.A.**

List All Products (list by country)                    _____

Net Shipments by Unit (Itemize by product):            _____

Net $ Sales (Itemize by product):                      _____

Total (all products) Net $ Sales:                      _____

**Combined Net $ Sales for all territories:**           _____

Royalty Rate %:                                        _____

Total Royalties Due:                                   _____

Minimum Royalties Due:                                 _____

Minimum Royalties Already Paid:                        _____

Total Payment Due:                                     _____

State Advertising Expenditures (by Product):           _____

By:_____

Name:_____

Title:_____

Original statement and corresponding back up report, plus check made payable to: **Bradford Licensing Associates**

Mail to:          Bradford Licensing Associates  
                  209 Cooper Avenue  
                  Upper Montclair, NJ 07043  
                  Attn: Leonard F. Reiter  
                  973-509-0200

Case 1:05-cv-03939-CM    Document 27-3    Filed 05/01/2006    Page 62 of 62

Case 1:05-cv-00423-DFH-WTL    Document 44    Filed 07/25/2005    Page 21 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 22 of 22

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first set forth hereinabove.

Valhalla Productions (LICENSOR)

By: _____
    Name: Schani Krug
    Title: Director/Producer


                                    (LICENSEE)

By: _____
    Name: Richard Jackson
    Title: President