Untitled Document                                                                                    Page 1 of 1



Marilyn Monroe



| Qty | Stock# | Product Name | Price |
|---|---|---|---|
| 0 | MM200 | 7 Year Itch | |



| Qty | Stock# | Product Name | Price |
|---|---|---|---|
| 0 | MM201 | In White Swimsuit | |



| Qty | Stock# | Product Name | Price |
|---|---|---|---|
| 0 | MM202 | Marilyn Color Photo | |



| Qty | Stock# | Product Name | Price |
|---|---|---|---|
| 0 | MM203 | Marilyn in Window | |



| Qty | Stock# | Product Name | Price |
|---|---|---|---|
| 0 | MM204 | Marilyn Singing | |



| Qty | Stock# | Product Name | Price |
|---|---|---|---|
| 0 | MM205 | Marilyn - Pink Background | |



EXHIBIT
D-19

Case 1:05-cv-03939-CM    Document 27-7    Filed 05/01/2006    Page 3 of 38

Case 1:05-cv-00423-DFH-WTL    Document 45    Filed 07/25/2005    Page 1 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 2 of 15

## TABLE OF CONTENTS

SUBJECT                                                                    PAGE

1  Definitions ............................................................................... 1

2. Objectives of Licensing Program .......................................... 2

3  BLA's Role, Responsibilities and Obligations ....................... 2

    3.1. BLA's Role, and Responsibilities .................................. 2
    3.2. BLA's Obligations ....................................................... 4

4  OWNER's Role, Responsibilities and Obligations .................. 4

    4.1. Resources .................................................................... 4
    4.2. Legal ........................................................................... 4
    4.3. Identification of BLA .................................................... 5

5  Confidentiality ........................................................................ 5

6. Warranties .............................................................................. 5

    6.1. OWNER's Warranties .................................................. 5
    6.2. BLA's Warranties ........................................................ 6

7. Indemnification ...................................................................... 6

    7.1. Indemnities to OWNER ............................................... 6
    7.2. Indemnities to BLA ..................................................... 6

8. Exclusivity ............................................................................. 6

9. Reservation of Rights ............................................................. 7

10. Territory ............................................................................... 7

11. Term ..................................................................................... 7

    11.1. Commencement ......................................................... 7
    11.2. Renewal ................................................................... 8

12. Limitations on Liability .......................................................... 8

13. Compensation ....................................................................... 8

    13.1. BLA Compensation .................................................... 8
    13.2. Expenses ................................................................. 8
    13.3. Post-Term Licenses and Compensation ..................... 9
    13.4 Licensee Payment ..................................................... 9
    13.5. BLA's books and records; inspection; inspection by OWNER ..... 9
    13.6. Compensation and reimbursement of BLA ................. 10

14. Return of Material ............................................................... 10

EXHIBIT
E

Case 1:05-cv-03939-CM    Document 27-7    Filed 05/01/2006    Page 4 of 38
Case 1:05-cv-00423-DFH-WTL    Document 45    Filed 07/25/2005    Page 2 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 3 of 15

15. Independent Counsel .................................................................................................10

16. Miscellaneous ..........................................................................................................10
    16.1. Notice............................................................................................................ 10
    16.2. Independent Contractor................................................................................10
    16.3. Entire Agreement/Waiver.............................................................................11
    16.4. Assignment...................................................................................................11
    16.5. Headings.......................................................................................................11
    16.6. Governing Law.............................................................................................11
    16.7. Arbitration ...................................................................................................11

LA_DOCS\372851.1

Case 1:05-cv-03939-CM     Document 27-7     Filed 05/01/2006     Page 5 of 38

Case 1:05-cv-00423-DFH-WTL     Document 45     Filed 07/25/2005     Page 3 of 14
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 4 of 15

## LICENSING REPRESENTATION AGREEMENT

Agreement made as of February 1, 2004 between Valhalla Productions, a New Hampshire company, having it's principal place of business at PO Box 4211 Portsmouth, NH 03802 ("OWNER"), and Bradford Licensing Associates ("BLA"), a New York limited partnership, having its principal place of business at 209 Cooper Ave , Upper Montclair, NJ 07043.

WHEREAS, OWNER has developed and is in the process of further developing certain proprietary intellectual property, and will continue to develop said proprietary intellectual property, including art work, illustrations, names, logos, characters, and related elements (collectively "the Properties"); and

WHEREAS, one of the reasons for creation of the aforesaid intellectual property is to create revenue from it through the licensing of Rights to use it to third parties; and

WHEREAS, OWNER is willing and desirous to grant Licenses on terms satisfactory to it to other parties primarily on a royalty-generating basis to use certain of the Rights related to the aforesaid creative properties as part of a coordinated, planned licensing program; and

WHEREAS, BLA is skilled in marketing, soliciting, negotiating and structuring Licenses as well as in operating and administering the licensing of the Properties; and

WHEREAS, OWNER is engaging the services of BLA in connection with the development, implementation and administration of the licensing of the Properties;

NOW, THEREFORE, in consideration of the mutual promises and undertakings set forth herein, and for other good and valuable consideration, the parties hereby agree as follows:

1.    Definitions.

(a)    "Rights" means the right to use the Properties including without limitation names, logos, characters, copyrights, trademarks, designs, slogans, fictional locales and similar material now or hereafter developed or owned by OWNER having their origin directly in the Properties developed by OWNER which may be developed on the basis of the concepts of the Properties for purposes including without limitation:

(i)    the manufacture, production, and distribution of tangible products making use of such intellectual property primarily for ultimate retail sales specifically including but not limited to apparel and accessories, social expressions (party goods), greeting cards, home furnishings, gift items, novelties and all types of collectibles.

Case 1:05-cv-03939-CM    Document 27-7    Filed 05/01/2006    Page 6 of 38

Case 1:05-cv-00423-DFH-WTL    Document 45    Filed 07/25/2005    Page 4 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 5 of 15

(b)    "License" means any grant of Rights by OWNER to a third party whether on a royalty-generating or a fixed fee basis.

(c)    "Licensed Products" means any goods, services or promotions manufactured, distributed, sold, provided or otherwise developed or offered under a License.

(d)    "Licensee" means any third party to whom OWNER grants a License as well as any other party acting under a License whether as a sub-licensee or otherwise.

(e)    "Licensing Revenues" shall mean all revenues from royalties, guarantees, advances and fees engendered through BLA's efforts with respect to licensing the Properties, limited to the rights granted to it under this Agreement, except as limited by paragraph 13.1(a).

(f)    "Term" means the period commencing upon execution of this Agreement and continuing until terminated in accordance with paragraph 11.

(g)    "Properties" refers to the OWNER's property(ies), as listed in Exhibit A.

2.    Objectives of Licensing Program.

2.1.    OWNER's objectives in granting Licenses are:

(a)    to create a source of income;

(b)    to increase consumer visibility of OWNER's intellectual Properties;

(c)    to enhance the image and perception of OWNER's Properties, especially by selectively choosing Licensed Products and by regulating the channels of distribution of Licensed Products;

(d)    to expand and extend the awareness of OWNER's trademarks into new categories of consumer goods.

3.    BLA's Role, Responsibilities and Obligations.

3.1    BLA's Role and Responsibilities BLA shall endeavor consistent with good business practice to accomplish the above objectives by carrying out the following responsibilities:

(a)    New Licensees. To promote and market the Rights in accordance with this Agreement to potential Licensees in all licensing applications and all markets, authorized by this Agreement by: diligently searching for, developing and obtaining new Licenses for OWNER; identifying and approaching prospective Licensees; developing product treatments; negotiating terms and conditions of prospective Licenses;

(b)    New Themes and Categories  To develop in conjunction with OWNER new product categories;

LA_DOCS\372851 1

2

Case 1:05-cv-03939-CM     Document 27-7     Filed 05/01/2006     Page 7 of 38

Case 1:05-cv-00423-DFH-WTL     Document 45     Filed 07/25/2005     Page 5 of 14
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 6 of 15

     (c)    Administration. To manage OWNER's Licensing program in accordance with this Agreement by:

     (i)    Handling all aspects of securing new Licenses such as, but not limited to, product approval, art approval, quality approval, Licensee approval, trademark usage, insurance coverage, negotiating contractual obligations within parameters established by OWNER, advertising and packaging approval and the like, all of which shall be subject to OWNER's final approval which shall be at OWNER's sole discretion;

     (ii)    Supervising and monitoring Licensees to review advertising and promotional activities to oversee adherence to quality control standards, and generally to monitor performance of, and insure compliance with, all other contractual provisions and obligations;

     (iii)    Supervising and monitoring the financial aspects of the Licenses, including the collection of royalties and all other payments as referred to in paragraph 13, advising as to the untimely payment of royalties and other payments due and the untimely submission of financial reports due as well as analyzing such reports to verify compliance with contractual obligations and assisting in OWNER's efforts to achieve such compliance. Licensee royalty payments are to be made payable to Bradford Licensing Associates and sent to BLA. As part of its responsibilities under this subparagraph BLA may, at OWNER's request, or after recommending such an audit to OWNER, with OWNER's permission, from time to time conduct audits of Licensees or engage others to conduct such audits. The expense of any such audit shall be borne by the parties in the same proportion as the parties share in the revenues generated by such Licensee, unless either party gives notice to the other that it will not participate in the audit, in which case any increased royalties that the audit reveals to be due shall be the property of the party conducting the audit to the extent of the documented cost of audit plus thirty percent (30%) (it being understood that all Licensee agreements will require such licensees to pay the expenses of audits when willful discrepancies are disclosed or when errors in excess of one (1%) per cent of total royalties due are revealed);

     (iv)    When and if appropriate, coordinating and supervising the joint efforts among Licensees and OWNER to develop and implement joint advertising, merchandising and promotional efforts and programs, subject to OWNER's final approval;

     (v)    Enhance OWNER's licensing image and visibility in the licensing community as well as with the public by various public relations activities such as, for example, articles in the press, advertisements and trade show booths and the like;

     (vi)    Maximize OWNER's income and sources of income from licensing.

     (d)    Unsolicited Requests. To handle unsolicited requests to OWNER or BLA for Licenses;

     (e)    Consultation. To generally and continually consult with OWNER on all aspects of the development of the Properties including, without limitation, methods of

3

Case 1:05-cv-03939-CM    Document 27-7    Filed 05/01/2006    Page 8 of 38

Case 1:05-cv-00423-DFH-WTL    Document 45    Filed 07/25/2005    Page 6 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 7 of 15

(e)    Consultation. To generally and continually consult with OWNER on all aspects of the development of the Properties including, without limitation, methods of maximizing the exposure and profitability of the intellectual properties underlying the Rights hereunder, and Licensing uses of them;

(f)    Foreign Agents. BLA will retain agents in foreign territories. BLA will supervise foreign agents, all of whom shall report directly to BLA.

3.2.    BLA's Obligations.

(a)    Good Faith Negotiations. BLA has the authority to approach prospective Licensees on behalf of OWNER. It may enter non-binding negotiations and must reveal to all prospective Licensees that it has no final authority to commit OWNER to any agreement. BLA will submit all proposed License agreements in writing to OWNER. OWNER will respond to a proposed License agreement within ten (10) business days after receipt. OWNER will have absolute sole discretion in granting licenses, although OWNER shall not exercise this right unreasonably.

(b)    Resources. BLA shall make all reasonable efforts to employ whatever resources are necessary to appropriately discharge its administrative responsibilities and obligations under this Agreement.

(c)    Rights. BLA acknowledges that it shall gain no right whatsoever in the Rights by virtue of this Agreement.

4.    OWNER's Role, Responsibilities and Obligations.

4.1.    Resources. OWNER shall produce any and all statements, agreements and any correspondence from licensee to BLA, and shall provide marketing material, reproducible trademark artwork, style guides and information relating to the Properties, and will appropriately work with BLA to develop and implement the licensing program.

4.2.    Legal.

(a)    The parties shall each retain and use their own counsel in carrying out their duties under this Agreement. OWNER shall provide all appropriate legal assistance in approving Licenses, collection of payments and reports, enforcement of contractual obligations and filing trademark registrations for all product categories and territories. BLA shall be responsible for preliminary negotiations of licensing agreements, preparing initial drafts of agreements and the legal costs associated therewith. Final decisions regarding such matters shall be in OWNER's reasonable discretion after giving due regard to the maximization of revenue for BLA and OWNER a view towards long range goals of OWNER.

(b)    OWNER shall approve a form License agreement which shall be the only form BLA shall use, with no changes except as specifically approved by OWNER; such approval of changes shall be at the sole discretion of OWNER.

LA_DOCS\372851.1

(c)    OWNER shall have complete and exclusive responsibility for the protection and defense of the Rights. OWNER shall enforce its ownership of the Rights and maintain the Rights in licensable condition. BLA shall promptly notify OWNER of any possible infringements of which it becomes aware or any claims against OWNER brought to its attention and shall provide reasonable cooperation in this regard. BLA shall take no other action whatsoever regarding any such infringements or claims.

4.3.    Identification of BLA. OWNER will use its best efforts to include a statement as follows on all advertising for its licensing program:

"Exclusive Licensing Agent for The Jim Dougherty and Norma Jeane Limited Edition Collection Bradford Licensing Associates, New York, New York"

5.    Confidentiality. During and after the Term of this Agreement, the parties shall keep confidential any of the other's proprietary information, knowledge or trade secrets, such as but not limited to, marketing and advertising plans, financial information and data, Licensing plans, research data and the like, of which it becomes aware during the course of its dealings with the other which is not in the public domain or otherwise known to any party to whom disclosure is made, unless it later falls into the public domain through no action of the other. If either party is uncertain about the status of a particular piece of information, it shall first consult with the other to determine such status. Should either party be served with a subpoena or formal or informal governmental inquiry, or similar request, for the disclosure of confidential information it shall immediately make known to the other the existence of such subpoena or request for disclosure and give the other party maximum permitted time to take whatever action it deems appropriate. Once such notification has been given, compliance with any such subpoena, inquiry or request for disclosure shall not be a violation of this provision

6    Warranties.

6.1.    OWNER's Warranties. OWNER warrants and represents that:

(a)    It has the right and power to enter into and to fully perform this Agreement;

(b)    BLA shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of the Rights other than the Licensee royalty payments contemplated under this Agreement and registration fees which a Licensee may be required to pay to register a particular trademark in its territory;

(c)    It is the originator or creator or is otherwise fully authorized to use all of the Properties (including without limitation material which is or may be protected by copyright or trademark laws) which are subject matter of this Agreement. No use of the Properties permitted by this Agreement will violate any law or infringe upon or violate the rights of any other person, firm or corporation;

5

Case 1:05-cv-03939-CM    Document 27-7    Filed 05/01/2006    Page 10 of 38

Case 1:05-cv-00423-DFH-WTL    Document 45    Filed 07/25/2005    Page 8 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 9 of 15

(d)    It has not heretofore entered into any agreement with respect to the Rights which will limit either party's performance under this Agreement, except as set forth in Exhibit B, attached;

(e)    No person, firm or corporation other than BLA has any right to perform services contemplated hereunder;

(f)    No use of the Rights as envisioned by this Agreement will violate any law or infringe upon or violate the rights of any person, firm or corporation;

(g)    It is the owner of the Properties.

6.2.    BLA's Warranties. BLA warrants and represents that:

(a)    It has the right and power to enter into and to fully perform this Agreement;

(b)    It has not heretofore entered into any agreement with respect to the Rights which will limit either party's performance under this Agreement;

(c)    It shall perform the services contemplated hereunder.

7.    Indemnification.

7.1.    Indemnities to OWNER    During the Term of this Agreement and thereafter, BLA shall indemnify and hold OWNER harmless from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, settlements, judgments, suits, costs and expenses including reasonable attorneys' fees on any trial, arbitration, mediation or appeal therefrom, or disbursements of any kind or nature whatsoever which arise out of a claim or cause of action brought by a third party including any Licensee against OWNER based upon: (i) any statements, agreements, or representations made by BLA (or any agent, employee, or representative of BLA) in soliciting prospective Licensees for OWNER when such statements, agreements or representations are false and material or are inconsistent with the terms of this Agreement; and (ii) any act or omission by BLA (or any agent, employee, or representative thereof) which is not authorized hereunder and which is in breach of the terms of this Agreement.

7.2.    Indemnities to BLA. During the Term of this Agreement and thereafter, OWNER shall indemnify and hold BLA harmless from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, settlements, judgments, suits, costs, expenses including reasonable attorneys' fees, or disbursements of any kind or nature whatsoever which arise out of a claim or cause of action related to this Agreement brought by a third party, including any Licensee, against BLA or its officers, employees or agents, including, without limiting the foregoing, such claims arising out of BLA's handling of the licensing program and any alleged breach of any warranties made by OWNER hereunder or due to the Rights, but not including those claims or causes of action referred to in paragraph 7.1.

8.    Exclusivity.

6

Case 1:05-cv-03939-CM    Document 27-7    Filed 05/01/2006    Page 11 of 38

Case 1:05-cv-00423-DFH-WTL    Document 45    Filed 07/25/2005    Page 9 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 10 of 15

During the Term BLA shall be the sole exclusive agent and representative of OWNER with regard to granting of Licenses in the Rights Territory. This Agreement shall not apply to the limited situation wherein OWNER creates tangible products making use of the Rights for free distribution as premiums to promote the Properties concept in respect to which BLA has not performed any services, provided however that if any Licensee produces similar products, OWNER will provide that Licensee the opportunity to sell OWNER the items at its usual wholesale price. OWNER may promote the Properties itself by using Licensee's products or items. OWNER shall purchase such items from Licensees at cost without royalties payable.

OWNER may grant to BLA non-exclusive rights to develop products under terms and conditions to be separately negotiated.

9.    Reservation of Rights

All rights not expressly granted to BLA herein are reserved to OWNER.

10.    Territory.

This Agreement pertains to Licensees worldwide.

11.    Term.

11.1.    Commencement    The term of this Agreement will commence on signing by all parties and will continue for three (3) years or until terminated by the happening of one of the following events:

(a)    By the other party if one of the parties discontinues its business, becomes insolvent, makes an assignment for the benefit of creditors, is placed in receivership, files a voluntary petition in bankruptcy, fails to vacate an involuntary bankruptcy petition filed against it within sixty (60) days from the date of such filing, or is dissolved for any cause whatsoever;

(b)    By the other party if one of the parties fails to substantially comply with or perform any one or more of the terms or conditions of this Agreement, provided, however, that:

(i)    the complaining party gives notice of the alleged breach to the other; and

(ii)    the party to whom the complaint is addressed has thirty (30) business days to cure the alleged breach to the reasonable satisfaction of the complaining party.

(c)    By OWNER, if BLA fails to use significant, conscientious and diligent efforts to promote the Properties, including failing to devote time and manpower to the OWNER account, failing to return phone calls or other communications from OWNER in a timely manner, failing to provide reports or other requests for information from OWNER and generally failing to actively market the Properties.

7

(d)    If during the first year of this Agreement BLA fails to perform promised services, OWNER shall give notice to BLA and BLA shall have ninety (90) days to correct deficiencies.

11.2.    Renewal.    This Agreement shall be automatically renewed by BLA for successive additional three (3) year periods ("Renewal Term[s]"), provided, however, that OWNER shall have sixty (60) days prior to the automatic renewal date to deny renewal at its sole discretion. Renewal shall be on the same terms and conditions as stated in this Agreement. In the event OWNER denies renewal, this Agreement shall terminate at the end of the Initial Term or any applicable Renewal Term, and all of BLA's interest in and to the Rights shall terminate and revert to OWNER, subject only to the specific Post-Term Compensation set forth in paragraph 13.3 below.

12.    Limitations on Liability.

12.1    BLA does not warrant that it will be able to place any Licenses for the Rights but it will exercise reasonable efforts, good faith and due diligence in attempting to do so.

12.2    BLA shall not be liable for any failure of OWNER to receive funds due from a Licensee or from any default or other act or omission of a Licensee, except as the direct result of an act or omission of negligence for which BLA is in breach of this Agreement. In no event will BLA be liable for negligence with respect to any audit or the failure to recommend that any audit be conducted, unless OWNER requests that a specific audit be conducted and BLA refuses to do so.

13.    Compensation.

13.1.    BLA Compensation.

In consideration of BLA's services hereunder, BLA will receive the following compensation:

(a)    In consideration of BLA's services hereunder, BLA will receive as compensation 35% of Licensing Revenues generated in the United States and 45% of Licensing Revenues generated Internationally. This compensation schedule will apply to total combined Licensing Revenues earned from the Rights in the Territory, except as discussed in paragraph 13.1(b), where a lower rate shall apply. BLA will be responsible for compensating international agents. Licensing Revenues shall not include situations by mutual agreement where expenses incurred at the request of OWNER pursuant to paragraph 13.4 should be deducted from revenue prior to calculating BLA's compensation. The calculation of BLA's percentage of Licensing Revenues, as set forth above, shall not be calculated on an annual basis, but, rather, for the life of this Agreement.

13.2    Expenses.    In addition to amounts paid pursuant to subparagraphs, 13.1 above OWNER shall reimburse BLA for all reasonable pre-approved expenses incurred at the request or direction of OWNER. Such expenses shall include, but shall not be limited to, costs incurred by BLA to attend OWNER's marketing or sales meeting (when requested by OWNER to so

8

attend), expenses incurred for producing promotional art work, samples or demos of products or the Properties when requested to do so by OWNER. It is specifically understood that all general marketing and promotional expenses, such as the cost or postage, mailings and the like, and attendance at trade shows shall all be borne by BLA.

    13.3.  Post-Term Licenses and Compensation. BLA shall be entitled to Post-term Compensation on the same basis as during the Term pursuant to sub-paragraph 13.1, 13.2 for Licenses in effect on the termination of this Agreement for term of such Licenses, including any renewals or extensions... In addition BLA shall be entitled to the same compensation if within eighteen (18) months following termination, a License is entered into with a Licensee which, during the Term, had been approached by BLA and was so identified to OWNER and was in subject of serious negotiations with BLA.

    13.4.  Licensee Payment. Licensee royalty payments are to be made payable to Bradford Licensing Associates and sent to BLA. On or before the sixtieth (60th) day following the close of each calendar quarter, BLA shall furnish to OWNER a full and accurate statement of all amounts received by BLA and deposited into BLA's account during the preceding calendar quarter under all Licenses together with any payment due OWNER hereunder. It is understood that OWNER shall be provided copies of royalty reports when being furnished to BLA during the term of this Agreement.

    13.5.  BLA's books and records; inspection; inspection by OWNER. BLA shall maintain complete and accurate books and records with respect to its activities, receipts and disbursements with respect to the Properties and the licensing thereof hereunder, including without limitation all receipts, all payment and expenses, and all other financial matters in which it was involved with respect to the Properties. OWNER or its duly authorized representative shall have the right, after reasonable notice to BLA, during usual business hours, but not more than once each year, to examine the books and records pertaining to OWNER, at the place where the same are regularly maintained, insofar as they relate to the Properties, and make copies thereof and take extracts therefrom. Such examination shall be at the cost of OWNER, unless errors aggregating more than five percent (5%) of the total sum accrued (including advances) to OWNER are found to be to OWNER's disadvantage, in which case the reasonable cost of such examination shall be borne by BLA.

    13.6.  Compensation and Reimbursement of BLA. OWNER shall not be responsible or liable for any payment or reimbursement to BLA, and BLA shall not be entitled to retain out of any monies received by it in connection with its performance of this Agreement, except as herein expressly provided.

9

14.    Return of Material.  Upon termination, BLA shall promptly return all materials and all other information related to dealing with or otherwise involving OWNER or any of its concepts, designs, logos or anything related thereto in its possession OWNER and OWNER shall arrange to communicate to all Licensees and other interested parties the fact that BLA no longer represents OWNER.

15.    Independent Counsel.  OWNER is not relying upon BLA's counsel for advice regarding the effect of this Agreement.  OWNER has been advised by BLA's counsel to seek independent counsel review and has either done so or waives any and all claims against BLA and BLA's counsel resulting from the failure to do so.

16.    Miscellaneous.

16.1.    Notice.  All notices and other communications between the parties shall be in writing and shall be deemed given on the date five (5) days after the same is either actually received, or mailed by certified or registered mail, return receipt requested, postage prepaid and addressed as follows:

            If to OWNER:        Valhalla Productions
                                PO Box 4211
                                Portsmouth, NH 03802
                                Attn: Schani Krug
                                Ph: 207-752-0624


            If to BLA:          Bradford Licensing Associates
                                209 Cooper Avenue
                                Upper Montclair, NJ 07043
                                Attn: Leonard Reiter
                                (973) 509-0200
                                (973) 509-7419 FAX


By giving notice in conformity with this paragraph a party may designate a specific individual to whom various administrative notices called for by this Agreement are to be sent.  Both parties are under a continuing obligation to provide prompt notice if the addresses set forth above are changed.

16.2.    Independent Contractor.    This Agreement creates no agency, partnership, employment, joint relationship or joint venture between the parties hereto, or mutual responsibility on behalf of one party for the debts or liabilities of the other.  The parties hereto agree that each is acting as an independent contractor and that any BLA employees are in no sense the employees, agents or servants of OWNER.  Neither party shall have the power or authority to bind or obligate the other.

LA_DOCS\372851 1

Case 1:05-cv-03939-CM    Document 27-7    Filed 05/01/2006    Page 15 of 38

Case 1:05-cv-00423-DFH-WTL    Document 45    Filed 07/25/2005    Page 13 of 14
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 14 of 15

16.3.  Entire Agreement/Waiver.  This Agreement contains the entire understanding between the parties and supersedes all prior agreements, representations and undertakings.  It may only be modified, supplemented or altered by a writing signed by both parties.  No failure or delay on the part of either party insisting on compliance with any provision herein or in exercising any right, power or remedy hereunder shall operate as a waiver or modification thereof; nor shall any single or partial exercise of any such right, power or remedy hereunder preclude any other or further exercise of any other right, power or remedy hereunder.

16.4.  Assignment.  This Agreement is not assignable by either party without the express approval of the other.

16.5.  Headings.  Provision and paragraph headings used in this Agreement are for convenience purposes only and shall not constitute part of this Agreement nor have any legal significance whatsoever in interpreting the provisions of this Agreement.

16.6.  Governing Law.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of New Jersey.

16.7.  Arbitration.  It is understood and agreed that any and all disputes, controversies or claims arising under or in any way related to the Agreement or to the parties' warranties and duties to be made and performed under the Agreement, including, without limitation, the general validity or enforceability of any of the provisions of this Agreement, shall be submitted to final and binding arbitration in Newark, New Jersey, under the auspices and rules of the American Arbitration Association.  There shall be one arbitrator.  The decision of the arbitrator shall be final and binding and shall be enforceable in any court of competent jurisdiction.

IN WITNESS HEREOF, the parties have caused this Agreement to be executed as of the date first above written.

VALHALLA PRODUCTIONS                    BRADFORD LICENSING ASSOCIATES

By:  _Schani Krug_                      By: _____
Name:  SCHANI KRUG                      Name:  LEN REITER
Its:     Director/ Producer             Its:     President

LA_DOCS\372851.1

# EXHIBIT A

## Property(ies)

The Jim Dougherty and Norma Jeane Limited Edition Collection

12

<u>LICENSE AGREEMENT</u>

<u>TABLE OF CONTENTS</u>

1. GRANT OF LICENSE

2. TERRITORY

3. TERM

4. CONSIDERATION AND RELATED LICENSEE OBLIGATIONS

5. REPRESENTATIVE

6. STATEMENTS, PAYMENTS AND RECORDS

7. QUALITY STANDARDS AND CONTROL

8. THE PROPERTY

9. LICENSEE RIGHTS AND OBLIGATIONS

10. TERMINATION AND EXPIRATION

11. ASSIGNABILITY

12. NOTICES AND PAYMENTS

13. MISCELLANEOUS

<u>Schedules and Exhibits</u>

Schedule A - Brands

Schedule B - Licensed Products

Schedule C - Territory

Exhibit A  - Statement Format



## LICENSE AGREEMENT

AGREEMENT made and effective as of the 15th day of April 2004, by and between Valhalla Productions a corporation of the State of New Hampshire, with its principal place of business at PO Box 4211 Portsmouth, New Hampshire 03802 U.S.A. (hereinafter referred to as "LICENSOR") and The Italia Collection a corporation of [the State of] California with its principal place of business at 53 Muckelemi St. Suite F, San Bautista, CA 95045 (hereinafter referred to as "LICENSEE").

WHEREAS, LICENSOR is the owner of certain proprietary intellectual property, including but not limited, to trademarks, trade dress, logos, designs, slogans, copyrights and other similar materials (the "Property") used in connection with the brands set forth on Schedule A of this Agreement; and

WHEREAS, LICENSEE desires to obtain the right and license to use the Property on and in connection with the manufacture, distribution and sale of Licensed Product(s) in the Territory (both as hereinafter defined) under certain terms and conditions and LICENSOR is willing to grant LICENSEE such right and license.

NOW THEREFORE, in consideration of and incorporating the above premises and of the mutual covenants, conditions and agreements herein contained, the parties agree as follows:

## GRANT OF LICENSE

1.1     Grant.  LICENSOR hereby grants to LICENSEE, and LICENSEE hereby accepts upon the terms and conditions herein specified, the non-exclusive right and license to utilize the Property in the Territory solely upon and in connection with the manufacture, distribution and sale of the products shown on Schedule B hereof (the "Licensed Product(s)").    LICENSEE understands that advertising and distribution of said Licensed Products through retail, mail order catalogs, the internet and any other form of commerce must preclude sales in the state of Indiana, USA.  In the event of any question about whether any specific product or products are Licensed Products, the determination of LICENSOR shall be conclusive.

1.2     Retail Distribution of Licensed Products.   The Licensed Products manufactured under this Agreement shall be placed in distribution by the LICENSEE in a fully finished condition solely for immediate or eventual sale at the retail market level or its equivalent and in that same condition and for the use intended by LICENSOR.  In no event shall the Licensed Products be sold to any party if the LICENSEE knows, or should have known, that the Licensed Products will be thereafter altered, modified, re-packaged, filled, made part of something else or used in any other unauthorized manner by any party in the chain of distribution.

1.3    Reservation of Rights

(a)    LICENSOR retains all rights not expressly and exclusively conveyed to LICENSEE hereunder, and it is acknowledged that LICENSOR may grant licenses to others to use the Property in connection with other products.

(b)    LICENSOR reserves the right to itself use, manufacture, distribute and sell, or have others manufacture, distribute and sell for it, the same type of product using the Property in all other channels of distribution such as, but not limited to, premiums, promotions (including those involving payment or partial payment by customers), athletic, entertainment and other sponsorship-related programs, catalogues, mail order, electronic commerce, and restricted venues, e.g., events, concerts, sports events, recreation, theme and amusement parks, schools, stadiums, theaters. In the event, however, that LICENSEE acts as a supplier of such products to LICENSOR or any parties authorized by LICENSOR, such sales shall be subject to the provisions of no. 4.1 of this Agreement regarding Royalties.

(c)    From time to time, opportunities of a short term nature may arise using a particular new application of the Property wherein LICENSOR will ask LICENSEE to produce on an expedited basis Licensed Products either for LICENSOR to use for premium or promotional purposes, or to be sold by LICENSEE at retail, or both, and if LICENSEE is unable or unwilling to so produce such Licensed Products within time frames acceptable to LICENSOR as well as meeting LICENSOR's other reasonable requisites under the circumstances, such as sufficient distributional capability and appropriate price and quality, LICENSOR shall have the right to seek and license other parties for this limited opportunity only.

(d)    If LICENSOR becomes aware of the inability or unwillingness of LICENSEE to fill an order for Licensed Products for LICENSOR or any customer, LICENSOR shall have the right to seek and license another party or parties to fill said order(s).

1.4    No Right to Sub-License.    LICENSEE has no right to sub-license the rights granted by this Agreement.

TERRITORY

2.    The rights of distribution and sale granted to LICENSEE under this Agreement shall be limited to those jurisdictions set forth on Schedule C hereto and LICENSEE agrees that it will not make or authorize any use, direct or indirect, in any other area and that it will not knowingly sell Licensed Products to persons who intend, or are likely, to resell them in any other area.

TERM

3.    Term.  The term ("Term") of this Agreement shall be a period of two (2) years, commencing on April 15, 2004 and terminating on April 14, 2006, unless sooner terminated in accordance with the provisions of this Agreement.

CONSIDERATION AND RELATED LICENSEE OBLIGATIONS

4.1    Royalties.  In consideration of the right and license herein granted, LICENSEE shall pay to LICENSOR a sum ("Royalties") equal to ten per cent (10%) of all Net Sales (as defined below) by or on behalf of LICENSEE of the Licensed Products. Royalties shall accrue when the Licensed Products are invoiced or shipped, whichever occurs first, and shall be payable concurrently with the periodic statements required in no. 6 herein.  The term "Net Sales" shall mean the gross invoice price billed customers less customary trade discounts, rebates, returns actually credited, and transportation and taxes actually charged to and paid by the customer, but with no other deductions of any kind whatsoever, provided, however, that if LICENSEE sells Licensed Products to a party owned, in whole or in part, or controlled by, or related to, the LICENSEE, the invoice price used to determine Net Sales shall be the invoice price at which the Licensed Products are re-sold by the related party to an unrelated customer in an arms-length transaction.

4.2    Advance.  LICENSEE agrees to pay LICENSOR the sum of $1,500.00 upon execution of this Agreement which shall be deemed to be a non-refundable advance ("Advance") against Royalties due, counting against the total minimum referred to in no. 4.3 below.

4.3    Guaranteed    Minimum    Royalties.    LICENSEE    agrees    that, notwithstanding the actual amount of Net Sales, it shall be obliged to make the following total minimum payment to LICENSOR for the full Term ("Guaranteed Minimum Royalties"):

$2,500.00

Until the total for the full Term is reached, for each quarter LICENSEE shall pay the greater of the actual Royalties owed under no. 4.1 or Guaranteed Minimum Royalties as follows:

$1,500 due upon signing
$1,000 due January 1, 2005

4.4    First Shipment Date.  LICENSEE agrees it will commence distribution of Licensed Products in reasonable quantities through customary channels of trade no later than July 1, 2004.  If this does not occur, this Agreement will automatically terminate and LICENSEE shall forfeit the Advance payment of no. 4.2.

REPRESENTATIVE

5.    From time to time, LICENSOR may designate one or more representatives ("Representative") upon notice to LICENSEE, to generally act on behalf of LICENSOR sometimes in conjunction with LICENSOR and sometimes in its place and stead, such as, but not limited to, receiving payments, made payable to LICENSOR unless otherwise specified, and statements as set forth in no. 6 and performing the various quality control functions as set forth in no. 7. In the event such a Representative is designated, all references to administrative duties of the LICENSOR in this Agreement may be construed as referring to the Representative if appropriate to carry out the purposes of this Agreement. LICENSOR agrees that it will be bound by any authorized communications or representations of its Representative and cannot repudiate same. LICENSOR, at its complete discretion, may replace a Representative, upon written notice to LICENSEE, without affecting the validity of this Agreement.

## STATEMENTS, PAYMENTS AND RECORDS

6.1    Statements. Within thirty (30) days after the end of each calendar quarter during the term of this Agreement, LICENSEE shall deliver to LICENSOR, or its Representative if so specified, a complete and accurate statement, in the format set forth in Exhibit A, certified to be accurate by LICENSEE (if LICENSEE is a corporation, by an officer or authorized person of LICENSEE), setting forth:

(a)    LICENSEE'S net shipments, by number of each Licensed Product, reported separately, for the preceeding quarter;

(b)    LICENSEE'S Net Sales for each Licensed Product, reported separately, for the preceeding quarter; and

(c)    a computation of Royalties due, taking into account any Guaranteed Minimum Royalties which may be due to the extent that the Guaranteed Minimum Royalties exceed earned Royalties.

Such statements shall be furnished to Representative (Bradford Licensing Associates) whether or not any of the Licensed Products have been shipped during the period.

6.2    Payments. Each statement delivered pursuant to no. 6.1 shall be accompanied by a check payable to Representative (Bradford Licensing Associates) or other party specified by LICENSOR in full payment of any Royalties or other payments due for the period.

6.3    Records. LICENSEE shall keep, maintain and preserve in LICENSEE'S principal place of business during the Term and for at least two (2) years following expiration or termination of this Agreement or any renewals, complete and accurate records and accounts covering all transactions relating to this Agreement including,

Case 1:05-cv-03939-CM    Document 27-7    Filed 05/01/2006    Page 22 of 38

Case 1:05-cv-00423-DFH-WTL    Document 45    Filed 07/25/2005    Page 6 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 7 of 22

-6-

without limitation, invoices, correspondence, banking, financial and all other pertinent records and accounts. Such records and accounts shall be maintained in accordance with generally accepted accounting procedures and principles and shall be available for inspection and audit at LICENSOR'S expense at any time or times during the Term and for two (2) years thereafter, during reasonable business hours and upon reasonable notice by LICENSOR or its nominees. LICENSEE agrees not to cause or permit any interference with LICENSOR or nominees of LICENSOR in the performance of their duties of inspection and audit. In the event any errors or discrepancies are discovered in any records, statements or accounts or in payments resulting therefrom, they shall immediately be rectified and the appropriate payments made by LICENSEE, together with interest at the then Citibank, N.A. prime rate per annum compounded from the date the payment was originally due. Should any willful errors or discrepancies be disclosed as a result of the inspection or audit or otherwise, then in addition to all other relief to which LICENSOR may be entitled, including the right to immediately terminate this Agreement, LICENSEE shall promptly reimburse LICENSOR for the full cost of such inspection and audit, together with interest at the then Citibank, N.A. prime rate per annum for any additional monies found to be due as a result of the inspection or audit compounded from the date the payment was originally due.

6.4    Right to Dispute Records. Receipt or acceptance by LICENSOR or its nominees of any of the statements furnished pursuant to this Agreement, the exercise by LICENSOR in whole or in part at any time or times of the right to audit and inspect records and accounts, or the receipt or deposit by LICENSOR or its nominees of any payment tendered by or on behalf of LICENSEE shall be without prejudice to any rights or remedies of LICENSOR and shall not prevent LICENSOR from thereafter disputing the accuracy of any such statements, payments, records and accounts.

## QUALITY STANDARDS AND CONTROL

7.1    Quality Standards. All Licensed Products and related materials displaying the Property, such as, but not limited to, containers, packaging, wrapping materials, labels, hang tags, advertising materials, promotional materials, catalogs, artwork, and other pictorial and textual materials to be used in connection with the Licensed Products, (collectively the "Licensed Products/Materials") must meet the standards of nature and quality prescribed by LICENSOR. All Licensed Products/Materials shall be of high standards and of such quality as will, in LICENSOR'S sole judgment, protect and enhance the Property and the substantial goodwill pertaining thereto, and in all cases the quality shall be at least as high as the quality of samples approved by LICENSOR.

7.2    Control. LICENSEE shall insure at all times that the Licensed Products/Materials meet in fact LICENSOR'S standards of nature and quality and LICENSEE shall cooperate fully in all reasonable ways with LICENSOR in enabling LICENSOR to ascertain that all Licensed Products/Materials meet said standards. By way of example rather than limitation, LICENSEE shall:

       (a)    permit, upon reasonable advance notice, LICENSOR or its Representative to visit during regular working hours LICENSEE'S premises where Licensed Products/Materials are manufactured, packaged, sold or distributed for the purpose of inspection of the manufacturing process and related activities; and

       (b)    upon request of LICENSOR or its Representative, send to LICENSOR or its Representative reasonable quantities of samples (not exceeding six units of any item) of Licensed Products/Materials, at LICENSEE'S expense, for the purposes of testing, inspection and review.

    7.3    Prior Approval. No Licensed Product shall be manufactured, distributed, sold or used by LICENSEE prior to LICENSOR'S written approval of pre-production prototypes or samples of each such Licensed Product/Material.    Further written approval will be necessary if there is any change proposed by LICENSOR or LICENSEE in type, style, model, grade, description or the like from any previously approved Licensed Products/Materials.   Should approval or disapproval of samples submitted prior to manufacture or use not be received by LICENSEE within fifteen (15) days of the submission, LICENSEE must, in writing, request a reply.  Failure to receive a reply shall be deemed approval by LICENSOR if LICENSOR or its Representative does not notify LICENSEE of LICENSOR'S disapproval within an additional fifteen (15) days. Licensed Products/Materials shall not be manufactured, distributed, sold or used which differ from the approved samples.  All costs associated with the approval process shall be borne by LICENSEE.

    7.4    Deficiency. Promptly upon receipt from LICENSOR or its Representative of information or notice that any Licensed Products/Materials manufactured, sold or used by LICENSEE does not or has not met the specifications or standards of nature and quality prescribed by LICENSOR, LICENSEE shall correct such deficiency forthwith at LICENSEE'S expense.  LICENSEE shall thereupon submit samples of the corrected Licensed Products/Materials pursuant to no. 7.3, for approval.   In the event the deficiency is that of substandard Licensed Product or that of material mis-use of the

Property, all existing inventory or work in progress of Licensed Products/Materials containing the deficiency shall, at LICENSEE'S expense, either be corrected to LICENSOR'S satisfaction or shall be destroyed.  The foregoing shall not preclude or limit in any way LICENSOR'S rights under no. 10 herein.

THE PROPERTY

    8.1    Ownership. LICENSEE shall use the Property only in connection with the Licensed Products and agrees that all of LICENSEE'S use under this Agreement inures to the benefit of LICENSOR.  LICENSEE acknowledges that LICENSOR is the owner of the Property and the goodwill associated therewith and the Property is valid. LICENSEE agrees not to contest LICENSOR'S ownership or the validity of the Property during or after the Term. Apart from the right of LICENSEE to use the Property pursuant to this Agreement, LICENSEE shall acquire no right, title or interest of any kind or nature whatsoever in or to the Property or the goodwill associated therewith.

8.2    Approval.  LICENSEE shall use the Property only in such form and manner as is specifically approved in writing by LICENSOR, upon request by LICENSOR, affix thereto any legends, markings and notices of trademark registration or LICENSOR-LICENSEE relationship specified by LICENSOR, or any other notice of LICENSOR'S ownership, including copyright.  LICENSOR shall have the right to approve all advertising, displays and other material using the Property prepared by LICENSEE.  LICENSEE agrees to follow LICENSOR'S instructions and guidelines regarding proper usage of the Property in all respects.

8.3    LICENSEE Contributions.  LICENSEE agrees that all artwork, graphics, layouts slogans, names, titles or similar materials incorporating, or being used in association with, the Property which may be created by the LICENSEE or its subcontractors pursuant to this Agreement shall become the sole property of LICENSOR, including trademark and copyright rights, and LICENSEE agrees on behalf of itself, its employees, its subcontractors and any other party with whom it may contract to create such materials, to promptly execute any and all appropriate documents, e.g., assignments, in this regard.  LICENSEE warrants and represents that all such materials which it creates or uses are original and to the best of its knowledge, do not infringe the copyright or trademark rights of others.

8.4    Protection and Defense.  LICENSOR agrees to protect and defend the Property at its sole cost and expense.  LICENSOR agrees to indemnify and hold LICENSEE harmless from only those claims, liabilities, damages (not including any consequential, indirect or punitive damages), costs or expenses solely and strictly related to the Property as properly used by LICENSEE pursuant to this Agreement, provided that LICENSEE shall cooperate fully with LICENSOR in the defense and protection of the Property and shall promptly advise LICENSOR in writing of any potentially infringing uses by others in addition to any suits brought, or claims made, against LICENSEE involving the Property.  Decisions involving the protection and defense of the Property shall be solely in the discretion of LICENSOR; LICENSEE shall take no actions in this regard without the express written permission of LICENSOR.

8.5    LICENSEE Cooperation.  LICENSEE agrees to join with LICENSOR in any application to enter LICENSEE as a registered or permitted user, or the like, of the Property with any appropriate governmental agency or entity.  Upon termination or expiration of this Agreement for any reason whatsoever, LICENSOR may immediately apply to cancel LICENSEE'S status as a registered or permitted user and LICENSEE shall consent in writing to the cancellation and shall join in any cancellation petition. The expense of any of the foregoing recording activities shall be borne by LICENSOR.

8.6    Restrictions On Other Marks and Trade Names.  During or after the Term, LICENSEE shall not use any other trademarks or other property similar to the Property.  During or after the Term, LICENSEE shall not use or register, in whole or in part, the Property or LICENSOR'S name, or anything similar thereto, as part of LICENSEE'S name or as the name of any entity directly or indirectly associated with LICENSEE'S activities or as a domain name.

Case 1:05-cv-03939-CM    Document 27-7    Filed 05/01/2006    Page 25 of 38

Case 1:05-cv-00423-DFH-WTL    Document 45    Filed 07/25/2005    Page 9 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 10 of 22

8.7    Changes to Property.  LICENSOR shall have the right at any time, upon notice, to make additions to, deletions from, and changes in the Property at its complete discretion, and LICENSEE shall adopt and use any and all such additions, deletions and changes as soon as practicable in all new production of the Licensed Products/Materials.

8.8    Termination.    Immediately upon termination or expiration of this Agreement, subject to the provisions of no. 10, LICENSEE shall immediately cease all use of the Property and all rights granted LICENSEE hereunder shall revert to LICENSOR.

## LICENSEE RIGHTS AND OBLIGATIONS

9.1    Subcontracting.  LICENSEE shall have the right to subcontract for the manufacture and production of the Licensed Products/Materials provided however, that, irrespective of, or in addition to any other agreements between LICENSEE and a subcontractor, LICENSEE agrees that any such subcontractor shall:

(i)    be fully subject to, and bound by, every provision of this Agreement;

(ii)    be made aware that it may not sell any Licensed Products manufactured by it to anyone but LICENSEE;

(iii)    agree that any related designs, labels, packaging or other materials incorporating or associated with the Property shall become the property of LICENSOR and that LICENSEE shall be responsible for obtaining any relevant supporting legal documentation;

(iv)    agree to immediately cease all manufacture of Licensed Products upon notice of termination or expiration of this Agreement; and

further provided that:

(v)    a breach by a subcontractor of any provision of this Agreement shall be considered a breach by LICENSEE;

(vi)    LICENSEE shall remain primarily and completely obligated under all of the provisions of this Agreement;

(vii)    LICENSEE shall promptly furnish to LICENSOR a list of all such subcontractors and shall update this list each quarter; and

(viii)    LICENSEE agrees to immediately notify any sub-contractor in writing upon termination or expiration of this Agreement, with a copy sent to LICENSOR.

9.2    Best Efforts.

(a)    LICENSEE shall use its best efforts to continuously design, manufacture, advertise, sell and ship all of the Licensed Products in all of the Territory in commercially reasonable quantities and shall continuously and diligently during the Term produce an inventory of Licensed Products and procure and maintain facilities and trained personnel sufficient and adequate to accomplish the foregoing. In no event, once sales have commenced shall LICENSEE allow a period of more than ninety (90) days to elapse during which it does not manufacture, sell or distribute the Licensed Products in commercially reasonable quantities.

(b)    Failure to comply with any of the foregoing in (a) may result in removal from this License of one or more of the unused or unexploited brands, Licensed Products or Territories set forth on Schedules A, B or C, upon written notice from LICENSOR.

9.3    Compliance with Laws. LICENSEE warrants and represents that it will comply with all laws, regulations, ordinances, governmental standards and the like applicable to the manufacture, sale, distribution, promotion and advertisement of the Licensed Products and agrees to indemnify and hold LICENSOR and its Representatives harmless in this regard.

9.4    Goodwill. LICENSEE acknowledges the tremendous value and goodwill of the Property accruing solely to LICENSOR and agrees not to use the Property in any manner which may, in LICENSOR'S judgment, be in bad taste, be inconsistent with LICENSOR'S public image or which may in any way disparage LICENSOR or its reputation, including, but not limited to, types and placement of advertising and types of channels of distribution, nor take any action which will harm or jeopardize the Property or LICENSOR'S ownership thereof, in any way.

9.5    Confidentiality. During the Term and thereafter, LICENSEE shall keep confidential any of LICENSOR's confidential proprietary information, knowledge or trade secrets, such as but not limited to, marketing and advertising plans, licensing plans, market research data and the like, of which it becomes aware during the course of its relationship with LICENSOR. If LICENSEE is uncertain about the status of a particular piece of information, it shall consult with LICENSOR to determine such status. This confidentiality obligation shall cease when the information becomes generally known to the public.

9.6    Indemnification. Except for those directly and solely related to and arising from the Property, LICENSEE agrees to assume the defense of, and to indemnify and hold LICENSOR, its subsidiaries, affiliates, franchisees, successors and assigns and its Representatives harmless from any and all liabilities, damages, claims, judgments, awards, fines, penalties, or other payments (including reasonable counsel fees), which may be incurred by any or all of them arising out of any claims or suits which may be brought or made against LICENSOR or those in privity with LICENSOR for injuries resulting from LICENSEE'S manufacture, advertising, packaging, labeling, promotion, sale, distribution or use of the Licensed Products, including those arising

-11-

from claims involving copyright, patent, trademark, mask work or software, or any unauthorized use by LICENSEE of the Property, or out of any breach by LICENSEE of any provisions of this Agreement, provided LICENSOR shall give prompt notice and reasonable cooperation and assistance to LICENSEE relative to any such claim or suit brought to its attention. This provision shall survive indefinitely the termination or expiration of this Agreement.

9.7    Insurance. LICENSEE agrees to obtain and keep in force, at its own expense, product liability insurance with respect to the Licensed Products, with a thirty (30) day notice of cancellation provision, from a recognized and responsible insurance company authorized to conduct an insurance business in New York with an A.M. Best Company rating of no less than A-XII. Such insurance company shall name LICENSOR as an additional insured, and provide protection in the amount of at least $1,000,000.00. LICENSEE shall, within thirty (30) days from the date hereof, submit to LICENSOR a copy of such insurance policy or a copy of a fully paid certificate of insurance therefor. Maintenance of such insurance and performance of LICENSEE of its obligations hereunder shall not relieve LICENSEE of liability under the indemnity contained in no. 9.6. LICENSEE agrees to maintain such product liability insurance for a period coextensive with that for which indemnification might be required under the provisions of this Agreement and in no event less than five (5) years beyond termination of this Agreement.

## TERMINATION AND EXPIRATION

10.1    Termination for Default. LICENSOR shall have the right to terminate this Agreement without prejudice to any other rights which it may have if:

(a)    LICENSEE defaults in the performance of any of its obligations, representations or warranties provided for in this Agreement; or

(b)    any court, arbitration panel, government agency or body finds that the Licensed Products manufactured by LICENSEE are defective in any way, manner or form; or

(c)    the LICENSEE shall be unable to pay its debts when due, or shall make any assignment for the benefit of creditors, or shall file any petition under the bankruptcy or insolvency laws of any jurisdiction, country or place, or shall have or suffer a receiver or trustee to be appointed for its business or property, or be adjudicated a bankrupt or an insolvent; or

(d)    a subcontractor engages in conduct which, if engaged in by LICENSEE, would entitle LICENSOR to terminate this Agreement. However, LICENSOR will endeavor to discuss with LICENSEE what action LICENSEE must take or cause to be taken to remedy any damages to LICENSOR resulting from such subcontractor's conduct. The nature and extent of the action to be taken shall be at LICENSOR'S sole and absolute discretion.

-12-

10.2    Notice of Termination and Right of Correction.  In the event any of these defaults occur, LICENSOR may give notice of termination, such notice to be in writing to LICENSEE pursuant to the provisions of no. 12.  Subject to the provisions of no. 10.3 and excepting a default in any payment due hereunder which must be corrected within ten (10) days of receipt of the notice and can only be corrected by payment, the LICENSEE shall have twenty (20) days after the receipt of notice in which to correct the situation giving rise to the notice, or to assure to LICENSOR'S satisfaction that appropriate corrective measures are being taken.  For the purposes hereof, the cessation by LICENSEE of all sales and distribution of the Licensed Products which shall have given rise to a default hereunder shall be deemed a correction of such default.  Failing such satisfactory correction or assurance, this Agreement shall terminate.  Nothing contained in provision no. 7.4 herein shall preclude or limit LICENSOR'S rights hereunder.

10.3    Exceptions to Right of Correction.  Notwithstanding the provisions of no. 10.2, LICENSEE shall have no right of correction in the event:

    (a)    of willful errors or discrepancies in LICENSEE'S records as referred to in no. 6.3;

    (b)    statements or payments as set forth in no. 6.1 and 6.2 are late more than twice in any year during the Term;

    (c)    of the occurrence of the same default, other than concerning statements or payments under no. 6.1 or 6.2, more than twice during the Term, or during any renewal period;

    (d)    of default of the provisions of any provision covering a First Shipment Date obligation.

10.4    Post-Termination Obligations.

    (a)    Delivery of Final Statement.  LICENSEE shall within thirty (30) days after termination, deliver to LICENSOR a final statement certifying the number and description of Licensed Products on hand or in process of manufacture and make all payments due LICENSOR.  LICENSOR shall also have the right to conduct a physical inventory in order to ascertain such inventory or verify such statement.  There shall be no right of disposal of Licensed Products in the event of termination.

    (b)    Payment.  Any and all payments then or later due from LICENSEE, including all prospective Guaranteed Minimum Royalties due for the full Term during which the termination takes place, shall then be accelerated and immediately due and payable to LICENSOR, less any Royalties or advances already paid, and no portion of any prior payments shall be repayable to LICENSEE.

    (c)    Delivery of Property.  Upon termination of this Agreement, all labels, signs, packages, wrappers, cartons, circulars, advertisements and other items bearing or containing any reproduction or representation of any of the Property shall automatically and without cost to LICENSOR become the property of LICENSOR, and

Case 1:05-cv-03939-CM    Document 27-7    Filed 05/01/2006    Page 29 of 38

Case 1:05-cv-00423-DFH-WTL    Document 45    Filed 07/25/2005    Page 13 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 14 of 22

LICENSEE shall immediately deliver the same to LICENSOR'S place of business or any other location designated by LICENSOR. The reasonable cost of such delivery shall be paid by the LICENSOR.

(d)    Delivery of List of Accounts.  Upon termination of this Agreement, LICENSEE shall promptly deliver to LICENSOR a copy of the most recent lists of all accounts to which it sells Licensed Products and a list of all subcontractors or manufacturers of LICENSEE.

(e)    Guaranteed Minimum Royalties.    Upon termination of this Agreement , the total amount of outstanding Guaranteed Minimum Royalties, if any, due through the full time period during which this occurs shall become immediately due and payable, less any Royalties or advances already paid.

10.6    Expiration - Right of Disposal.

(a)    LICENSEE shall within thirty (30) days after the normal expiration of the Term or any renewal to deliver to LICENSOR a final statement certifying the number and description of Licensed Products on hand or in process of manufacture and make all payments due LICENSOR.  LICENSOR shall also have the right to conduct a physical inventory in order to ascertain such inventory or verify such statement.

(b)    After expiration of this Agreement, provided all sums due LICENSOR have first been paid, and statements due are furnished, LICENSEE may dispose of the Licensed Products in compliance with this Agreement which are in LICENSEE'S inventory or in process of manufacture at the time of expiration for a period of ninety (90) days after said expiration; provided further that all Royalties with respect to that disposal period are paid and statements therefor are furnished in accordance with the terms of this Agreement within thirty (30) days after the disposal period has ended.

(c)    Any right of disposal by LICENSEE shall not prohibit LICENSOR from granting rights to others to use the Property on Licensed Product during that disposal period.


ASSIGNABILITY


11.    This Agreement may be freely assigned by LICENSOR without LICENSEE'S consent or approval.  This Agreement, or any of the rights therein, may not be sold, transferred or assigned, in whole or in part by LICENSEE, except as provided for in no. 9.1, without the express written consent of LICENSOR.  If assigned, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

## NOTICES AND PAYMENTS

12.    All notices and other communications which either party hereto is required or may desire to give to the other, except for payments and statements which shall be sent to the party designated by LICENSOR, e.g., the Representative referred to in no. 5, shall be given by addressing the same to the other or to the Representative of LICENSOR at the address hereinafter set forth in this paragraph, or at such other address as may be designated in writing by any party in a notice to the other given in the manner prescribed in this paragraph. All such notices shall be deemed given when sent so addressed by certified or registered mail, postage prepaid or by hand delivery, with proof of receipt, or by a reputable express delivery company which requires proof of receipt, such as, but not limited to, Federal Express® or Airborne®. The addresses to which the foregoing shall be given are the following:

If To LICENSOR:                    If To LICENSEE:

Valhalla Productions               The Italia Collection
PO Box 4211                        53 Muckelemi St. Suite F
Portsmouth NH  03802               San Juan Bautista, CA  95045

Attention: Schani Krug            Attention: Richard Jackson

with a copy to:  Bradford Licensing Associates, 209 Cooper Avenue, Upper Montclair, NJ  07043.

## MISCELLANEOUS

13.1    Remedy For Breach.  LICENSEE acknowledges and agrees that a breach of any of the covenants, agreements or undertakings hereunder will cause LICENSOR irreparable injury which cannot be readily remedied in damages or solely by termination of this Agreement and that LICENSOR, in addition to all other legal and equitable remedies including costs and reasonable attorneys' fees, shall have the right of injunction for any breach of this Agreement by LICENSEE.

13.2    Relationship Between LICENSOR and LICENSEE.  Nothing herein shall create, be deemed to create or be construed as creating any partnership, employer-employee, joint venture, or agency relationship between the parties hereto or shall be deemed to render LICENSOR or its Representatives liable for any of the debts or obligations of LICENSEE .  LICENSEE shall in no way be considered an agent or representative of LICENSOR in any dealings which LICENSEE may have with any third party and neither of the parties hereto nor any of their employees or agents shall have the power or authority to bind or obligate the other party.

13.3    Survival of Provisions.  The expiration or termination of this Agreement shall not affect those provisions, and the rights and obligations therein, set forth in this Agreement which either:

Case 1:05-cv-03939-CM     Document 27-7     Filed 05/01/2006     Page 31 of 38

Case 1:05-cv-00423-DFH-WTL     Document 45     Filed 07/25/2005     Page 15 of 21
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 16 of 22
- 15 -

      (a)    by their terms state, or evidence the intent of the parties, that the provisions survive the expiration or termination of the Agreement, or

      (b)    must survive to give effect to the provisions of this Agreement.

      13.4    <u>Entirety of Agreement; Amendment</u>.  This Agreement constitutes and contains the entire agreement of the parties hereto relating to the subject matter hereof and no oral or written statements, representations, documents, promises or any other prior materials not embodied herein shall be of any force or effect.  This Agreement cannot be amended, altered or modified except by a written instrument executed by both parties hereto.  Once so executed, such amendments shall become an integral part of this Agreement, subject to all the terms and conditions herein and shall have full force and effect.

      13.5    <u>No Waiver</u>.  The failure or delay of LICENSOR to exercise its rights under this Agreement or to complain of any act, omission or default on the part of LICENSEE, no matter how long the same may continue, or to insist upon a strict performance of any of the terms or provisions herein, shall not be deemed or construed to be a waiver by LICENSOR of its rights under this Agreement or a waiver of any subsequent breach or default of the terms or provisions of this Agreement.

      13.6    <u>Invalidity</u>.  If this Agreement is subject to the approval of any government or government agency or similar entity, and such approval is not obtained, or is obtained but later revoked, it is understood and agreed to by the parties that this Agreement is immediately rendered null and void and terminated, with neither party liable for any resultant damages, costs or expenses of the other.  But for the foregoing, if any term, covenant, condition or provision of this Agreement or the application thereof to any person or circumstance, shall to any extent be held to be invalid, illegal or unenforceable in any respect, the remainder of this Agreement, or application of such term or provision to a person or circumstance other than to those as to which it is held invalid, illegal or unenforceable, shall not be affected thereby, and each term, covenant, condition or provision of this Agreement shall be valid and shall be enforced to the fullest extent provided by law.

      13.7    <u>Construction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New Hampshire of the United States of America and the Courts of the State of New Hampshire and/or the federal courts situate in New Hampshire shall have sole and exclusive jurisdiction over all disputes arising out of this Agreement.

      13.8    <u>Headings</u>.  The headings as to contents of particular provisions herein are inserted only for convenience and are in no way to be construed as part of this Agreement or as a modification of the scope of any terms or provisions of this Agreement.

- 16 -

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first set forth hereinabove.

Valhalla Productions (LICENSOR)


By:_____
    Name:  Schani Krug
    Title: Director/Producer

                        (LICENSEE)


By:_____
    Name:  Richard Jackson
    Title: President

- 17 -

Schedule A

Property
Marilyn's Man
(The Jim Dougherty and Norma Jeane Limited Edition Collection)
(Shaw Family Archives)

Schedule B


Licensed Products

Charm Bracelets
Charm Watches

- 19 -

## Schedule C

## Territory

USA

Case 1:05-cv-03939-CM     Document 27-7     Filed 05/01/2006     Page 36 of 38

Case 1:05-cv-00423-DFH-WTL     Document 45     Filed 07/25/2005     Page 20 of 21
Case 1:05-cv-00423-DFH-WTL     Document 25     Filed 05/20/2005     Page 21 of 22
- 20 -

**Exhibit A – Statement**

Licensee:                                Date:
Address:                                 For the Calendar Quarter Ending:


Licensing Program:  Marilyn's Man
(The Jim Dougherty and Norma Jeane Limited Edition Collection

                                         **U.S.A.**

List All Products (list by country)      _____

Net Shipments by Unit (Itemize by product):    _____

Net $ Sales (Itemize by product):        _____

Total (all products) Net $ Sales:        _____

**Combined Net $ Sales for all territories:**    _____

Royalty Rate %:                          _____

Total Royalties Due:                     _____

Minimum Royalties Due:                   _____

Minimum Royalties Already Paid:          _____

Total Payment Due:                       _____

State Advertising Expenditures (by Product):    _____


By:_____

Name:_____

Title:_____

Original statement and corresponding back up report, plus check made payable to:  **Bradford Licensing Associates**

Mail to:          Bradford Licensing Associates
                  209 Cooper Avenue
                  Upper Montclair, NJ  07043
                  Attn:  Leonard F. Reiter
                  973-509-0200

Case 1:05-cv-03939-CM    Document 27-7    Filed 05/01/2006    Page 37 of 38

Case 1:05-cv-00423-DFH-WTL    Document 45    Filed 07/25/2005    Page 21 of 21
Case 1:05-cv-00423-DFH-WTL    Document 25    Filed 05/20/2005    Page 22 of 22

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first set forth hereinabove.

Valhalla Productions (LICENSOR)

By: _____
Name: Schani Krug
Title: Director/Producer

(LICENSEE)

By: _____
Name: Richard Jackson
Title: President



EXHIBIT

G