UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


------------------------------------------------------------------x

SHAW FAMILY ARCHIVES, LTD.,
BRADFORD LICENSING INC., JAMES E.
DOUGHERTY, and VALHALLA
PRODUCTIONS LLC.

            Plaintiffs/Consolidated Defendants,

  - against -                         05 Civ. 3939 (CM)(MDF)

CMG WORLDWIDE, INC. and MARILYN
MONROE, LLC.

            Defendants/Consolidated Plaintiffs.

------------------------------------------------------------------x


MEMORANDUM DECISION REGARDING CHOICE OF LAW

McMahon, J:

      The facts as alleged by the parties are as follows:

      Marilyn Monroe LLC ("MMLLC") is a limited liability company organized under Delaware law with its principal place of business in Indiana. It purports to own the *rem* of the postmortem right of publicity of Marilyn Monroe, perhaps the most famous American sex symbol of the twentieth century. MMLLC acquired these rights from its creator, Anna Strasberg. She allegedly inherited the rights from her husband Lee Strasberg, one of the sole devisees under Monroe's will.

      CMG Worldwide is an Indiana corporation with its principal place of business in Indiana. Its primary business is licensing the names and likenesses of celebrities – both living and deceased – for commercial purposes. In 1995, CMG entered into an agreement with MMLLC to

manage its rights to the Marilyn Monroe identity. Pinquela Aff. ¶ 5. All licensing agreements pertaining to the Marilyn Monroe publicity rights are now handled through CMG's Indianapolis office. Id. ¶ 8.

The Shaw Family Archives ("SFA") is a limited liability company organized under New York law with its primary place of business in New York. Affidavit of Larry Shaw, ¶ 3. SFA holds the copyrights to various photographs taken by the late Sam Shaw and his son Larry Shaw. Id. ¶ 4. Among these photographs were a series of photographs of Marilyn Monroe, dubbed the "Marilyn Monroe Limited Edition Collection" (the "Marilyn Images"). Id. ¶ 12.  The series contains many canonical Marilyn images, including several staged photographs of the famous "subway grate" scene from the movie *The Seven Year Itch*.

Bradford Licensing Associates ("Bradford") is a New Jersey limited liability company with its principal place of business in Montclair, New Jersey. Affidavit of Len Reiter, ¶ 3.[1] Like CMG, Bradford owns no intellectual property of its own; rather, it finds commercial opportunities for the intellectual property of others. Bradford struck a deal with SFA to promote the Marilyn Monroe Limited Edition photographs.

Neither SFA nor Bradford has any office or other permanent presence in the state of Indiana. Neither regularly does business there. At one point prior to the creation of SFA, several of its founders negotiated with CMG for the use of the Marilyn Images; however, those negotiations took place in New York and did not result in any business agreement. Shaw. Aff. ¶ 15.

---

[1]In at least one instance, Bradford referred to itself as a New York limited liability company. Affidavit of Jonathan Faber, Ex. E.

Both SFA and Bradford operate web sites in connection with the sale and licensing of its copyrights. See http://www.samshaw.com; http://www.bradfordlicensing.com. These sites purport to be non-transactional; that is, they contain text and images, but do not permit potential customers to conduct business with the companies electronically. The Bradford website currently bears a large-print disclaimer reading, "**No Marilyn Monroe images shall be licensed for sale or distribution in Indiana or in any jurisdiction that also requires the consent of the right of publicity holder." See http://www.bradfordlicensing.com/client_overview/norma_jeane.html.

To date, the partnership between SFA and Bradshaw has led to at least two licensing agreements for the Marilyn Images. First, on October 6, 2003, SFA licensed the use of the Marilyn Images to CMZ Handbags and Jewelry ("CMZ"), a California company that manufactures and markets a line of Marilyn handbags. Affidavit of Jonathan Faber, Ex. C-13. During negotiations, SFA allegedly told CMZ that the Indiana plaintiffs possessed no valid right of publicity concerning Marilyn Monroe.[2] Faber Aff. ¶ 6.

Second, Bradford entered into an agreement with Valhalla Productions, a New Hampshire business with its principal place of business in New Hampshire, on February 1, 2004.[3] Reiter Aff. ¶ 10. At that time, Valhalla was marketing "Marilyn's Man," a documentary film about James Dougherty, Marilyn Monroe's first husband. Id. Pursuant to the Bradford/Valhalla agreement, Bradford brokered an arrangement between Valhalla and SFA for the use of the Marilyn Images. It also assisted Valhalla in marketing the Marilyn's Man property

---

[2] I am in receipt of a letter from the Indiana defendants, dated May 10, 2006, averring that no such representation was made. All that does is raise a disputed issue of fact, which will need to be resolved at trial.

[3] Valhalla is also referred to as a Maine limited liability company in papers filed .

to various foreign entities.

On March 23, 2005, CMG and MMLLC ("the Indiana plaintiffs") filed suit against SFA,
Bradford, Valhalla Productions, and James Dougherty ("the Indiana defendants") in the Southern
District of Indiana, (No. 05 Cv. 0423), alleging that Bradford's agreements with Valhalla and
others violated Indiana's Right of Publicity Law. 32 Ind. Code, Art. 36, Chap. 1, §§ 1–20. The
complaint also raised claims of unfair competition, libel, and interference with a business
advantage.

On April 19, 2005, apparently prior to being served in the Indiana action, SFA and two
surviving Shaw siblings (but not Bradford) filed suit against CMG and MMLLC in the Southern
District of New York (No. 05 Civ. 3939), alleging that defendants violated SFA's copyrights by
using Marilyn images from the Shaw Archive without permission.

SFA and Bradford then moved to dismiss the Indiana action on the grounds of lack of
personal jurisdiction under Fed. R. Civ. P. 12(b)(2), or in the alternative to transfer the action to
the Southern District of New York pursuant to 28 U.S.C. § 1404(a).[4]  At the same time, by
motion dated June 3, 2005, CMG and MMLLC sought to dismiss, stay or transfer the pending
New York action in favor of the Indiana action. This Court, by order dated July 6, 2005, stayed
proceedings of the New York action pending resolution of the jurisdictional issue in Indiana. See
Memorandum Order Staying Decision, Shaw Family Archives et al. v. CMG Worldwide Inc.,
No. 05 Civ. 3939 (S.D.N.Y. July 6, 2005).

By order dated March 25, 2006, the Honorable David F. Hamilton granted the Indiana

---

[4]It appears that James Dougherty died shortly after the Indiana lawsuit was filed. Neither
he nor his estate joined the SFA and Bradford motions to dismiss.

-4-

defendants' motion to transfer venue and ordered the action transferred to this District. <u>See</u> Entry

on Motions to Dismiss or to Transfer Venue, <u>CMG Worldwide et al. v. Shaw Family Archives et</u>

<u>al.</u>, No. 05 Civ. 0423 (S.D. Ind. Mar. 25, 2006).  It denied the motion to dismiss for lack of

personal jurisdiction as moot. With all proceedings between the Indiana plaintiffs and Indiana

defendants now in the Southern District of New York, all pending actions were consolidated into

a single action. Order, <u>Shaw Family Archives et al. v. CMG Worldwide Inc.</u>, No. 05 Civ. 3939

(S.D.N.Y. May 2, 2006).

By letter dated April 21, 2006, the Indiana plaintiffs sought to have the newly-

consolidated actions transferred to the Central District of California, where several actions are

pending between the Indiana plaintiffs and other photographers who purport to own copyrights

in images of Marilyn Monroe.  That request was denied on April 24, 2006.

This Court then re-addressed the issue that was moot only in Indiana, not in New York:

whether the Indiana court had personal jurisdiction over the Indiana defendants. The parties were

invited to submit their briefs from the Indiana motion to dismiss, and to supplement them with an

additional three page letter brief.

Having received submissions by both parties, I now decide the following issues (and only

the following issues): (1) whether SFA and Bradshaw, the defendants in the Indiana action, were

in fact subject to personal jurisdiction there; (2) if so, whether the "first-to-file" rule would

dictate the use of Indiana choice of law rules in place of New York choice of law rules; and (3)

which state's choice of law rules should be used to determine the governing law in this case.

**Discussion**

First, it is clear that the laws of the original forum state (Indiana) and the current forum state (New York) conflict. New York and Indiana do not share common choice of law rules in tort: New York follows the rules of interest analysis as set forward in the Second Restatement of Conflicts of Laws, see Babcock v. Jackson, 12 N.Y.2d 473, 481-82, 240 N.Y.S.2d 743 (N.Y. 1963); while Indiana still embraces the traditional lex loci delecti rule. Simon v. United States, 805 N.E.2d 798, 805 (Ind. 2004).

Furthermore, as to substantive law, New York holds that a publicity right adheres only to living persons; one's right of publicity is extinguished at death. See N.Y. Civil Rights L. § 50; see also Pirone v. Macmillan, Inc., 894 F.2d 579, 585-86 (2d Cir. 1990). Indiana, by contrast, has established a statutory right of publicity for a hundred years after an individual's death. 32 Ind. Code, Art. 36 Chap. 1 § 8(a). That right comprises an individual's name, voice, signature, photograph, image, likeness, distinctive appearance, gestures or mannerisms. Id. § 7. The allegations in this case all pertain to the publicity right of Marilyn Monroe, who is decidedly not among the living. Therefore, for the Indiana plaintiffs to have stated a valid cause of action, Indiana law must govern their claims. If New York law governs, their claims lack merit.

A. Personal Jurisdiction

As a general rule, a federal court sitting in diversity or with pendent jurisdiction over state law claims applies the *choice of law rules* of the state in which it sits. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 497, 61 S. Ct. 1020, (1941). This Court ordinarily applies New York's choice of law rules, because it sits in New York. However, where the case in

-6-

question is transferred from one district to another under 28 U.S.C. § 1404(a), the transferee

court must adopt the law, including choice-of-law principles, of the transferor court. Van Dusen

v. Barrack, 376 U.S. 612, 639 (1964). "A change of venue under § 1404(a) generally should be,

with respect to state law, but a change of courtrooms." Id.

  However, at least one such exception to this rule exists: where the defendant in the

transferred action was not subject to personal jurisdiction in the original forum, then the

transferee court must apply its own choice of law rules.[5] See Hatfill v. Foster, 372 F. Supp. 2d

725, 728 (S.D.N.Y. 2005) *vacated on other grounds by* 415 F. Supp. 2d 353 (S.D.N.Y. 2006).

  Therefore, the first issue that must be addressed is whether Bradford and SFA were

subject to personal jurisdiction in Indiana in the originally filed action. I conclude that they were.

  In order to determine whether the Indiana defendants were amenable to personal

jurisdiction in the original forum, this Court must undertake a two-part analysis. First, it must

determine whether the defendants were within the reach of Indiana's long-arm statute. Second, it

must conclude that the reach of the Indiana long-arm comports with the requirements of due

process. Mart v. Ness, 703 N.E.2d 190, 192 (Ind. 1998).

  Indiana's long-arm statute, Trial Proc. R. § 4.4(A), was amended in 2002 to permit

"jurisdiction on any basis not inconsistent with the Constitutions of this state or the United

States." This language has been interpreted to extend long-arm jurisdiction to the limit permitted

by the Due Process clause. In re Estate of Baker, 837 N.E.2d 603, 609 n.2 (Ind. 2005).

---

  [5]Of course, the defendant in the transferred action must have raised the issue of lack of
personal jurisdiction before the transferor court. Such is the case here.

Therefore, the long-arm inquiry and the due process inquiry collapse into one question.[6]

The requirements of due process are well known: the defendants must have "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408, 414, 104 S. Ct. 1868 (1984) (internal citations omitted).

This test may be satisfied by a defendant's "continuous and systematic" contact with the forum, thus permitting the exercise of so-called general jurisdiction. Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 448-49, 72 S. Ct. 413 (1952). On the record before me, however, there is no support, and really no allegation, that the Indiana defendants has such contacts with the state of Indiana.

However, personal jurisdiction may also be based on specific jurisdiction: when litigation arises out of the defendant's tortious conduct within or "purposefully directed" at the forum state.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472-73, 105 S. Ct. 2174 (1985).

The high-water mark of specific jurisdiction was established in Calder v. Jones, 465 U.S. 783, 104 S. Ct. 1482 (1984). In that case, a California citizen was allegedly defamed by a National Enquirer article written and published in Florida and subsequently circulated in California. The author and editor of the article had no systematic contacts with the state of California, but had reached out to California citizens by telephone while conducting research. In upholding the California state court's exercise of personal jurisdiction over the Florida

---

[6] The right of publicity statute contains its own long-arm statute: 32 Ind. Code Art. 16 Chap. 1, § 9. Passed before the expansion of the Indiana long-arm, the right–of-publicity long arm lists certain activities related to the exploitation of a right of publicity that subject an individual to personal jurisdiction in Indiana. Id.  The fact that this section was not amended along with Trial Proc. R. § 4.4(A) seems to have been an oversight.

-8-

defendants, the Supreme Court stated that an intentional tort "expressly aimed" at the forum state and causing damage there may subject the tortfeasors to personal jurisdiction there. Id. at 789. Even though defendants were not personally responsible for the article's circulation in the forum state, the fact that they were aware of the article's circulation and the "potentially devastating impact" of the article on its subject was sufficient to satisfy the requirements of due process. See id. at 789-90.

It appears to this Court that defendants have done everything possible not to "expressly aim" their conduct at Indiana. Indeed, they have expressly *not aimed* their business at Indiana – they refuse to do business with anyone in the state.

However, the Supreme Court's opinion in Calder has been given a broad reading by the Seventh Circuit. In Indianapolis Colts, Inc. v. Metro. Baltimore Football Club L.P., 34 F.3d 410 (1994), the Indianapolis Colts sought to enjoin the use of the name "Baltimore CFL Colts" by a team in a competing football league as a violation of their trademark. The Seventh Circuit held that the fact that Baltimore CFL Colts games had been broadcast in Indiana, the forum state, was sufficient to satisfy any requirement of "entry" there. Id. at 412. The court also opined that, in light of Calder, out-of-state conduct causing in-state injury, even absent entry, should make an individual subject to personal jurisdiction in the forum. Id. at 411-12.

Subsequently, in Janmark v. Reidy, 132 F.3d 1200 (7th Cir. 1997), the Seventh Circuit jettisoned the "entry" requirement for intentional torts altogether and permitted the exercise of specific personal jurisdiction over out-of-state defendants based solely on economic harm caused to the plaintiff in the forum state. Id. at 1202. The defendant in that case, a shopping cart manufacturer, threatened to sue out-of-state customers of the plaintiff, a competing cart

manufacturer, unless they switched to the defendant's product. Defendant had no contacts with

the forum state, and had directed its tortious conduct only at other out-of-state parties. But the

court nonetheless held that "the tort of which Janmark complains is interference with prospective

economic advantage... and this tort was not complete (because no injury occurred) until

Janmark's customer canceled the order; the injury and thus the tort occurred in Illinois [the

forum state]." Id.

    Subsequent decisions by lower courts in the Seventh Circuit indicate that some courts are

troubled by Janmark. Several courts have embraced its holding that injury alone is sufficient to

confer jurisdiction. See Divine/Whittman-Hart Inc. v. King, No. 02 C 2486, 2002 WL 1611585,

*5 (N.D. Ill. July 22, 2002); Bunn-O-Matic Corp. v. Bunn Coffee Svcs. Inc., 47 U.S.P.Q. 1859,

1861 n.1 (C.D. Ill. 1998). Others attempt to avoid any lurking constitutional problem by locating

some "entry" or other contact with the forum state that would justify jurisdiction under the

standard set out in Indianapolis Colts.[7]  See  Caterpillar Inc. v. Miskin Scraper Works, Inc., 256

F. Supp. 2d 849, 852 (C.D. Ill. 2003); Softee Mfg. LLC v. Mazner, No. 03 C. 3367, 2003 WL

23521295, *5 (N.D. Ill. 2003).

    However, the holding of Janmark itself seems clear: mere economic harm in the forum

state is enough for personal jurisdiction over the alleged tortfeasor. Such is the case here: the

_____

    [7]The Supreme Court has not opined on the Janmark rule, and it has not been favorably
viewed in other circuits. See IMO Ind. Inc. v. Kiekert AG, 155 F.3d 254 (3d Cir. 1998) (noting
the narrower reading of Calder in the First, Fourth, Fifth, Eighth, Ninth and Tenth Circuits and
adopting that view); Scotts Co. v. Aventis S.A., 145 Fed.Appx. 109, (6th Cir. 2005). But
see Silent Drive, Inc. v. Strong Industries, Inc., 326 F.3d 1194, 1205-1206 (Fed. Cir. 2003). The
Second Circuit has not yet discussed Janmark or the "effects test" generally, although it has
indicated that some conduct that is "purposefully directed" into the forum is required for
specific jurisdiction under Calder. See LiButti v. U.S., 178 F.3d 114, 123 (2d Cir. 1999). This
suggests that the Second Circuit would not adopt Janmark as its reading of Calder.

Indiana plaintiffs have alleged that they suffered economic harm from the out-of-state conduct of the Indiana defendants, which allegedly included counseling other out-of-state parties that they did not need a license from the Indiana plaintiffs in order to use the Shaw images. Therefore, I conclude that the defendants in the Indiana lawsuit were amenable to jurisdiction in Indiana under the Seventh Circuit's due process jurisprudence, which I must apply to this transferred case.

B. First to File Rule

Given that the Indiana defendants were, in fact, amenable to suit in Indiana, Indiana choice-of-law principles apply, as required by Van Dusen. The fact that the Indiana defendants are themselves plaintiffs in a related but later-filed New York action does not alter that decision.

The "first to file" rule is well established in the Second Circuit: where two competing lawsuits have been filed in different jurisdictions, the first action filed is given priority and the second action may be suspended in the interests of judicial economy.  First City Nat. Bank & Trust Co. v. Simmons, 878 F.2d 76, 79 (2d Cir. 1989). Such is the case here: had the Indiana court not transferred the Indiana action here, this Court would have held the New York action in abeyance pending the outcome of that action..

The Second Circuit has found that, in some cases,  "the balance of convenience... or... special circumstances" warrant deviation from the first-to-file rule: either by permitting a later-filed case to continue or mandating the dismissal of an earlier case in favor of a later-filed case in another jurisdiction.. Id. (internal citations omitted); see also William Gluckin & Co. v. Int'l Playtex Corp., 407 F.2d 177, 178 (2d Cir. 1969). Such circumstances include forum-shopping on

the part of the plaintiff in the first action, or the so-called "customer rule" (permitting suits against direct patent infringers to continue despite the existence of earlier suits against the infringer's customers). No such special circumstances here: it is not forum-shopping for the Indiana plaintiffs to have availed themselves of their home state, and there are no facts before me that would invoke the "customer rule." Therefore, application of the first-to-file rule is proper. This Court will treat the consolidated action before me as an Indiana action transferred under 28 U.S.C. § 1404(a) for choice of law purposes, and apply Indiana choice of law rules.


C. Indiana Choice of Law Rules

Indiana is a *lex loci delecti* jurisdiction: meaning that its courts apply the substantive law of the place of the tort. Simon v. United States, 805 N.E.2d 798, 805 (Ind. 2004). The traditional *lex loci* rule holds that the place of the tort is the place where the injury to the plaintiff occurred. In re Estate of Bruck, 632 N.E.2d 745, 747 (Ind. 1994).

 However, Indiana's adherence to the *lex loci* rule is not absolute; Indiana courts have embraced principles of interest analysis where "the place of the tort 'bears little connection' to this legal action." Simon, 805 N.E.2d at 805 (citing Hubbard Mfg. Co. v. Greeson, 515 N.E.2d 1071, 1074 (Ind. 1987)). In such cases, Indiana courts may look to additional factors, such as "1) the place where the conduct causing the injury occurred; 2) the residence or place of business of the parties; and 3) the place where the relationship is centered." Hubbard Mfg. Co., 515 N.E.2d at 1073-74 (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)).

In property cases, Indiana seems to adhere to the majority view that the law of the situs of the property governs. Cable Co. v. McElhoe, 58 Ind. App. 637 (2d Div. 1915). The situs of

intangible personal property, such the Marilyn Monroe publicity right, is the legal domicile of its owner. Carter v. Estate of Davis, 813 N.E.2d 1209, 1216 (Ind. App. 2004) (citing Phillips v. Scalf, 778 N.E.2d 480, 483-84 (Ind. Ct. App.2002)).

Indiana also does not recognize the principle of *decepage*, which the principle of applying the law of different jurisdictions to different aspects of a tort case – for instance, in a negligence case, applying the negligence standards of the jurisdiction where the negligence allegedly occurred, but the damages regime of the domicile of the victim. Simon, 805 N.E.2d at 802. Rather, Indiana courts apply a single state's law to all aspects of a cause of action.[8]

Beyond selecting the governing choice of law principles, this Court is reluctant to make extensive holdings about the applicable substantive law without a more fully developed factual record. The parties are invited to more fully brief the issue of governing substantive law in their inevitable summary judgment motion.

This constitutes the decision of the Court.

Dated: May 19, 2006

U.S.D.J.

BY FAX TO ALL COUNSEL

---

[8]Of course, different causes of action raised in the same complaint may be governed by the laws of different jurisdictions.

-13-