UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SHAW FAMILY ARCHIVES, LTD., BRADFORD
LICENSING, INC., JAMES E. DOUGHERTY,
And VALHALLA PRODUCTIONS, LLC.

                     05 CV 3939 (CM)

       Plaintiffs/Consolidated Deendants,

                     **Honorable Colleen McMahon**

     -against-

CMG WORLDWIDE, INC.,
and MARILYN MONROE, LLC,,

       Defendants/Consolidated Plaintiffs
------------------------------------------------------------x

**DECLARATION OF EDITH MARCUS IN SUPPORT SFA AND BRADFORD'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO MMLLC'S MOTION FOR SUMMARY JUDGMENT.**

Marcus & Greben
1650 Broadway
Suite 707
New York, NY 10019
Tel: 646-536-7602
Fax: 212-765-2210

Attorneys for Plaintiff/Consolidated Defendant SFA, Plaintiff Edith Marcus and Meta Stevens and Consolidated Defendant Bradford Licensing, Inc.

I, EDITH MARCUS, declare as follows:

1. I am over the eighteen years of age and am fully competent to make this Declaration. The facts contained herein are stated upon my personal knowledge.

2. My father, Sam Shaw, was one of the foremost photographers of his time. Although initially renowned for his career as a photojournalist for Colliers Magazine, he is most notably remembered for his unique photographs of Marilyn Monroe and the lifelong friendship that existed between them. Additionally Mr. Shaw's remarkable portraitists of famous personalities graced the covers of Life and Look magazines. My father was also a producer of the film "Paris Blues,"[1] as well as many other films by director John Cassavetes.

3. Sam Shaw and Marilyn Monroe met on the set of "Viva Zapata" in 1951. As a young contract player with 20th Century Fox, Marilyn was asked by the film's director, Elia Kazan, to drive Sam Shaw, the well known photographer, around to various set locations. That chance meeting resulted in an enduring friendship that intensified throughout their lives. My father, as a photographer and friend, took thousands of photographs of Marilyn Monroe, including the famous flying skirt series of photographs that are the most iconic photographs of her in existence. Given his close personal relationship with Ms. Monroe, he was able to photograph Marilyn in private moments when she was relaxed and vulnerable, thereby capturing some of the most beloved images of her.

4. Marilyn Monroe was a frequent guest of our parents and at our family gatherings. Additionally, she called my father and mother constantly as her phone was her lifeline to her friends. She felt so close to my entire family that she took me to the

---

[1] A copy of a New York Times article about "Paris Blues" from 1961 is annexed hereto as Exhibit "A."

circus on my ninth birthday. We celebrated our birthday together as we were both born on the same day, June 1st. In order not to be noticed by the public, Marilyn wore a scarf, sunglasses and did not wear makeup. She also told me that if I wanted something, not to call her by name, but to call her "hey you," "hey there" or "haystack." We had such a great time; I remember my birthday experience with Marilyn to this day, over 50 years later.

5. Marilyn Monroe was also a devoted friend to my father. During my father's time as a photo journalist in the 1940's, he did several stories on longshoremen and a waterfront priest. These stories formed the basis of an idea he had for a film. The screenplay was shown to Elia Kazan by Marilyn Monroe. However, as often occurs in Hollywood, Elia Kazan took over creative control and made the film, "On the Waterfront," as his own. At the initial concept, Marilyn Monroe and Marlon Brando, both personal friends of Mr. Shaw, were to star in the film. However, out of loyalty to Sam Shaw, Marilyn Monroe refused to be involved in the film.

6. Sam Shaw was the author and owner of all copyrights to the photographs he took. He passed away in 1999. Pursuant to a settlement reached in the Supreme Court of the State of New York, County of New York, on June 5, 2002, it was agreed that an entity owned by Meta Stevens, Larry Shaw and myself would have the right to market, and offer for commercial exploitation, the Shaw Collection.[2]

7. I am currently one of three shareholders and owners of the Shaw Family Archives, Ltd. ("SFA"). I have held this position since the creation of SFA on June 19,

---

[2] Said settlement was the result of an action commenced by Sam Shaw in 1994 against his son, Larry Shaw, to determine, among other things, the owner of the right to market and license Sam Shaw's Marilyn Monroe photographs.

2002. The remaining shareholders/owners of SFA are my sister, Meta Stevens, and my brother, Larry Shaw.

8. SFA is a Limited Liability Company formed under New York law, with its primary place of business located in the County of Rockland, State of New York.

9. Plaintiffs have never advertised or solicited business in Indiana through visits, telephone calls, and written communication or otherwise. I am unaware of any owner of SFA, representative or agent having ever been in Indiana on SFA-related business. SFA has no office, employees or agents located in the State of Indiana. There are no known records or incidents if any SFA shareholder, owner or employee ever being in Indiana on SFA-related business.

10. Neither SFA nor any of its share or owners have ever appeared in court in Indiana or invoked the protection or authority of Indiana's government for any purpose other than to defend itself in *CMG Worldwide, Inc. v. Bradford Licensing Associates,* an action pending in the United States District Court for the Southern District of New York under Case No. 1:05-cv-DHF-WTL ("the Indiana action"). The Indiana action was commenced by the defendants in the instant action. SFA is a named defendant in the Indiana action.

11. None of the plaintiffs have governmental licenses in Indiana.

12. Plaintiffs have never entered into any contractual relationship with any resident or citizen of Indiana or any business entity with its primary place of business in Indiana. Indeed, SFA has, since its creation, purposefully refused to conduct business in Indiana as part of its business strategy.

13. Larry Shaw maintains a passive worldwide web Internet site located at http://www.spc-promotions.com/ (the "SPC site"). Meta Stevens and I have a second affiliated Internet site located at http://www.samshaw.com/ (the "Sam Shaw site"). SFA does not accept orders or conduct business directly through either site. Instead, the SPC site and the Sam Shaw site merely make available information about SFA and its images and the photographer Sam Shaw.

14. Prior to the creation of SFA, Meta Stevens and I communicated with Mark Roesler, the president of CMG Worldwide, Inc. ("CMG"). CMG was reportedly interested in seeing and perhaps representing the images from Sam Shaw's collection of images. Additionally, there was a meeting between Meta Stevens, Mark Roesler and myself in New York, New York in June of 1999. These communications did not relate to the transactions at issue in this lawsuit or the Indiana action. Moreover, no contractual relationship developed from these communications. Finally, these communications were not conducted on behalf of SFA, which did not even exist as a legal entity at that time.

15. At the aforementioned meetings with Mr. Roesler, my sister and I advised him that Larry Shaw hard marketed and licensed Sam Shaw's photographs during the 1980's and early 1990's. We were interested in CMG agreeing to represent the Estate of Sam Shaw as a means of creating a business relationship with CMG, myself, Meta Stevens and Larry Shaw, thus leading to a settlement. We advised Mr. Roesler further, that some deals, which Larry Shaw had completed prior to 1994, were still in effect and were being renewed, but that, for the most part, due to a court's injunction, no new deals were being done. Mr. Roesler advised us to contact his counsel in Indiana, Jonathan Farber, and maybe they could provide support and a means to settlement. At his request,

in June of 1999, I called and spoke with Jonathan Farber. I told him about the lawsuit and advised him that we believed Larry Shaw was continuing to market Sam Shaw's Marilyn Monroe photographs throughout the world and that Larry had marketed them as Sam's agent for many years prior his termination as Sam's agent in 1994. We further advised Mr. Farber that, as a means to settlement, we were interested in CMG representing Sam Shaw's entire archive. At no time during this conversation did Mr. Farber advise me that Marilyn Monroe, LLC., the Estate of Marilyn Monroe or CMG owned or controlled Marilyn Monroe's right of publicity, nor did Farber state that Sam Shaw, his representatives or assignees could not market or license any Marilyn Monroe images.

16. Meta Stevens had follow-up conversations with Mr. Roesler following the creation of SFA in early 2002. Mr. Rosler congratulated us for settling our inter-family legal claims and reiterated his desire to work with us. These conversations did not lead to any business and/or contractual relationship between SFA and CMG, and none of these conversations related to the transactions at issue in this lawsuit. Further, prior to being served with a complaint herein, nobody from CMG or MMLLC ever contacted us regarding any claim that SFA was violating any of MMLLC's rights.

17. Plaintiffs have made no effort to serve, directly or indirectly, the Indiana market with its services. Indeed, SFA has specifically structured its business activities to avoid conducting business in Indiana.

18. SFA merely licenses to others the right to re-produce the copyrighted images taken by Sam Shaw, SFA is not in the business of creating or selling any merchandise other than prints.

19. My attorney has informed me that defendants' claim that SFA violated Indiana Right of Publicity Law §32-36-1, et seq., is without merit and that essentially no discovery has occurred. My attorney has informed me that the basis for the instant Motion for Partial Summary Judgment was the sale of a single t-shirt bearing a Marilyn Monroe image in a Target Store in Indiana. Defendants claim in this regard is completely incorrect. SFA does not create, license or sell any merchandise containing the images of Marilyn Monroe. SFA merely licenses to others the right to use images controlled by SFA.

20. It should also be noted that Larry Shaw, Meta Stevens and I are all individuals of very modest means. SFA is a new company and continues to struggle today. I believe that SFA's financial difficulties, as well as the related financial burden that has been shouldered by SFA's shareholders, is a direct result of the improper behavior of defendants.

21. MMLLC, conversely, makes millions of dollars per year, in part, from the labors of my father, and the work of other photographers who also befriended and photographed Marilyn Monroe. We believe that MMLLC, rather than relying on actual law, is using its superior financial position to attack the families of Marilyn's photographers to protect and/or create a right it never had.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on the 24th day of November, 2006, at Tappan, New York.

_____
EDITH MARCUS