**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
SHAW FAMILY ARCHIVES, LTD.,                                    :
BRADFORD LICENSING, INC., JAMES E.                            :
DOUGHERTY, and VALHALLA                                        :
PRODUCTIONS, LLC.                                              :        05 CV 3939 (CM)
:
       Plaintiffs/Consolidated Defendants,               :
:
   v.                                                        :
:
CMG WORLDWIDE, INC. and MARILYN                               :        Honorable Colleen McMahon
MONROE, LLC,                                                   :
:
       Defendants/Consolidated Plaintiffs.               :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MARILYN MONROE, LLC'S REPLY MEMORANDUM IN SUPPORT OF MOTION
FOR SUMMARY JUDGMENT ON COUNT II AGAINST SHAW FAMILY
ARCHIVES, LTD. AND MEMORANDUM IN OPPOSITION TO CONSOLIDATED
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
47th Floor
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Attorneys for Defendant/Consolidated Plaintiff
Marilyn Monroe LLC

# TABLE OF CONTENTS

Page

I. REPLY MEMORANDUM IN SUPPORT OF MMLLC's MOTION FOR PARTIAL SUMMARY JUDGMENT ........................................................................1

    A.    The Indiana ROP Statute Applies Regardless of a Person's Domicile ..................2

    B.    MMLLC Has Standing to Assert Right of Publicity Claims ..................................4

        1.    The Indiana Statute "Retroactively" Bestows Property Rights...................4

        2.    Marilyn Monroe's Publicity Rights Passed to Lee Strasberg and the Residuary Beneficiaries of Her Will, Who Passed Them to MMLLC. .......5

    C.    SFA Violated the Indiana ROP Statute...................................................................11

    D.    MMLLC's ROP Claims are not Preempted by Federal Copyright Law ...............14

II. MEMORANDUM IN OPPOSITION TO SFA PARTIES' CROSS MOTION FOR SUMMARY JUDGMENT ..............................................................................16

    A.    MMLLC is Not Collaterally Estopped ................................................................17

        1.    The Surrogate's Court Proceedings Do Not Trigger Collateral Estoppel ..19

        2.    Collateral Estoppel Does Not Apply To The BOE Proceeding................21

        3.    The *Frosch* Case Does Not Preclude Litigation Regarding Marilyn Monroe's Domicile At the Time Of Her Death.........................................23

        4.    MMLLC is Not In Privity With Mr. Frosch .........................................24

    B.    MMLLC is Not Judicially Estopped........................................................................25

        1.    Prior Statements Are not Clearly Inconsistent with MMLLC's Position in this Litigation ............................................................................................26

        2.    The SFA Parties Have Not Proven and Cannot Prove That the Prior Representations Were Successful For Purposes of Judicial Estoppel .......27

        3.    MMLLC Would Not Derive An Unfair Advantage Or Impose An Unfair Detriment on Defendants If Not Estopped.................................................29

    C.    Notwithstanding the Irrelevance of Marilyn Monroe's Domicile to SFA's Violations of the Indiana Statute, Indisputable Facts Establish that She Died a California Domiciliary ........................................................................................30

    D.    The Indiana RoP Created a Right In Favor of MMLLC.......................................33

    E.    The SFA Parties Have Not Established Laches....................................................33

III. Conclusion .............................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

### Cases

*Acridge v. Evangelical Lutheran Good Samaritan Soc'y,*
334 F.3d 444 (5th Cir. 2003) ...................................................................... 26

*Alaska Dep't of Envtl. Conservation v. EPA,*
540 U.S. 461, 124 S. Ct. 983 (2004) ........................................................... 10

*Allen v. Zurich Ins. Co.,*
667 F.2d 1162 (4th Cir. 1982) .................................................................... 29

*Allison v. Ticor Title Ins. Co.,*
979 F.2d 1187 (7th Cir. 1992) .................................................................... 35

*Beuchel v. Bain,*
766 N.E.2d 914, 740 N.Y.S.2d 252 (2001) ................................................. 25

*Brown v. Ames,*
201 F.3d 654 (5th Cir. 2000) ...................................................................... 22

*Carter v. Estate of Davis,*
813 N.E.2d 1209 (Ind. App. 2005) ......................................................... 9, 10

*Conopco, Inc. v. Campbell Soup Co.,*
95 F.3d 187 (2d Cir. 1996) ......................................................................... 42

*Crosby v. Bowater Inc.,*
No. 05 C 3478, 2006 U.S. Dist. LEXIS 67144 (N.D. Ill. Sept. 1, 2006).......... 35, 36

*Downing v. Abercrombie & Fitch,*
265 F.3d 994 (9th Cir. 2001) .................................................................. 21, 23

*Estate of Hermon,*
39 Cal. App.4th 1525 (1995) ...................................................................... 16

*Estate of Karkeet,*
56 Cal. 2d 277 (1961) ................................................................................. 16

*Estate of Wilson,*
184 Cal. 63 (1920) ..................................................................................... 16

*Ezekiel v. Michel,*
66 F.3d 894 (7th Cir. 1995) ........................................................................ 37

*Frederick v. Wilbourne,*
73 So. 442 (Ala. 1916).............................................................................. 28

*Frosch v. Grosset & Dunlap, Inc.,*
75 A.D.2d 768, 427 N.Y.S.2d 828 (N.Y. App. Div. 1980) ........................ 25, 30, 31

*Gottlieb v. Kest,*
141 Cal. App. 4th 110 (2006) ..................................................................... 29

*Hawxhurst v. Pettibone Corp.,*
40 F.3d 175 (7th Cir. 1994) ........................................................................ 40

*Hot Wax, Inc. v. Turtle Wax, Inc.,*
191 F.3d 813 (7th Cir. 1999) ...................................................................... 40

Page(s)

*Hydranautics v. Filmtec Corp.,*
    204 F.3d 880 (9th Cir. 2000) ............................................................. 25

*In re Burns,*
    218 B.R. 897 (Bankr. N. D. Ind. 1998)................................................. 34

*In re Estate of Brown,*
    505 N.Y.S.2d 334, 132 Misc. 2d 811 (Surr. Ct. 1986) .......................... 34

*In re Estate of Goyette,*
    123 Cal. App.4th 67 (2004) ................................................................. 16

*In re Estate of Grant,*
    83 Misc. 257, 144 N.Y.S. 567 (N.Y. Misc. 1913)................................. 36

*In re Estate of Jones,*
    341 N.E.2d 565, 379 N.Y.S.2d 55 (1975) ............................................ 17

*In re Estate of Kosek,*
    294 N.E. 2d 188, 341 N.Y.S.2d 593 (1973) ......................................... 16

*In re Estate of O'Brien,*
    165 Misc. 2d 459, 627 N.Y.S.2d 544 (Sur. Ct. 1995) ........................... 16

*In re Mulhern's Estate,*
    31 A.D.2d 317, 297 N.Y.S. 2d 485 (N.Y. App. Div. 1969) .................. 36

*In re Rosenfield's Estate,*
    76 N.Y.S.2d 177, 944 N.Y. Misc. LEXIS 2812 (Surr. Ct. 1944).......... 27

*In re Schunk,*
    No. 321397, 2005 N.Y. Misc. LEXIS 1312 (Sur. Ct. June 29, 2005) .... 13

*In re Will of Shailer,*
    9 Misc. 2d 62, 172 N.Y.S.2d 724 (Surr. Ct. 1957) .............................. 35

*Joplin Enterprises v. Allen,*
    795 F. Supp. 349 (W.D. Wash. 1992).................................................. 12

*Kaiser v. Loomis,*
    391 F.2d 1007 (6th Cir. 1968) ............................................................ 38

*Kanz v. Wilson,*
    703 So. 2d 1331 (La. Ct. App. 1998)................................................... 26

*Kling v. Hallmark Cards, Inc.,*
    225 F.3d 1030 (9th Cir. 2000) ............................................................ 40

*KNB Enterprises v. Matthews,*
    78 Cal. App. 4th 362 (2000) ............................................................... 22

*Laws v. Sony Music Entm't, Inc.,*
    448 F.3d 1134 (9th Cir. 2006) ...................................................... 22, 23

*Lew v. Moss,*
    797 F.2d 747 (9th Cir. 1986) ......................................................... 38, 39

*Lord Simon Cairns v. Franklin Mint Co.,*
    292 F.3d 1139 (9th Cir. 2002) ............................................................ 10

*Lucido v. Superior Court,*
    51 Cal. 3d 335 (1990) ................................................................... 25, 32

Page(s)

*M.J. Woods, Inc. v. Conopco, Inc.*,
   271 F. Supp. 2d 576 (S.D.N.Y. 2003) ........................................................ 25

*Matter of Herm's Estate*,
   284 N.W.2d 191 (Iowa 1979) .................................................................... 31

*McCormick v. Aderholt*,
   293 F.3d 1254 (11th Cir. 2002) ................................................................ 38

*Miller v. Glenn Miller Prods.*,
   318 F. Supp. 2d 923 (C.D. Cal. 2004) ........................................... 13, 14, 41

*Mississippi Band of Choctaw Indians v. Holyfield*,
   490 U.S. 30, 109 S. Ct. 1597 (1989) ......................................................... 34

*New Hampshire v. Maine*,
   532 U.S. 742, 121 S. Ct. 1808 (2001) .................................................. 32, 33

*Newman v. Wells Fargo Bank*,
   14 Cal. 4th 126 (1996) .............................................................................. 16

*Offshore Sportswear, Inc. v. Vuarnet Int'l, B.V.*,
   114 F.3d 848 (9th Cir. 1997) .................................................................... 25

*Overby v. Gordon*,
   177 U.S. 214, 20 S. Ct. 603 (1900) ........................................................... 28

*People v. Preston*,
   43 Cal. App. 4th 450, 50 Cal. Rptr.2d 778 (1996) .................................... 28

*People v. Sims*,
   32 Cal. 3d 468 (1982) .......................................................................... 28, 29

*People v. Taylor*,
   12 Cal.3d 686 (1974) ................................................................................ 29

*Phillips v. Scalf*,
   778 N.E.2d 480 (Ind. Ct. App. 2002) ........................................... 9, 10, 12

*Pooley v. National Hole-In-One Ass'n*,
   89 F. Supp. 2d 1108 (D. Ariz. 2000) ........................................................ 19

*Richards & O'Neil v. Conk*,
   774 N.E.2d 540 (Ind. Ct. App. 2002) ....................................................... 20

*Russell v. Price*,
   612 F.2d 1123 (9th Cir. 1979) .................................................................. 42

*S.D.I. Corp. v. Fireman's Fund Ins. Cos.*,
   208 A.D.2d 706, 617 N.Y.S.2d 790 (N.Y. App. Div. 1994) ...................... 25

*Scalf v. Lake County Convention and Visitors Bureau, Inc.*,
   Cause No. 45D10-0406-PI-00093 (Lake Super. Ct., Ind., filed Jan. 9, 2005) ......... 11

*Schnyder v. State Bd. of Equalization*,
   101 Cal. App. 4th 538 (2003) ................................................................... 29

*Sekaquaptewa v. MacDonald*,
   575 F.2d 239 (9th Cir. 1978) .................................................................... 29

*State ex rel. Flaugher v. Rogers*,
   77 N.E.2d 594 (Ind. 1948) ....................................................................... 34

Page(s)

*Strasberg v. Odyssey Group, Inc.*,
    51 Cal. App. 4th 906 (1996) ................................................................ 35

*Tilt v. Kelsey*,
    207 U.S. 43, 28 S. Ct. 1 (1907) .......................................................... 28

*Toney v. L'Oreal USA, Inc.*,
    406 F.3d 905 (7th Cir. 2005) ........................................................ 21, 22

*United States v. Christian*,
    342 F.3d 744 (7th Cir. 2003) ............................................................. 32

*United States v. Utah Constr. Co.*,
    384 U.S. 394 (1966) ........................................................................... 28

*Van Dusen v. Barrack*,
    376 U.S. 612, 84 S. Ct. 805 (1964) ................................................... 32

*Wabash Grain, Inc. v. Smith*,
    700 N.E.2d 234 (Ind. Ct. App. 1998) ................................................ 33

*Welch v. Mr. Christmas Inc.*,
    440 N.E.2d 1317, 454 N.Y.S.2d 971 (1982) ..................................... 19

*Williams v. North Carolina*,
    325 U.S. 226, 65 S. Ct. 1092 (1945) ................................................. 28

*Wit v. Berman*,
    306 F.3d 1256 (2d Cir. 2002) ............................................................ 38

## Statutes

Cal Civ. Code § 3344.1 ............................................................................. 18

Cal. Civ. Code § 990 .................................................................................. 12

Cal. Prob. Code § 11642 ............................................................................ 13

Cal. Prob. Code § 21102(a) ........................................................................ 16

Cal. Prob. Code § 21120 ............................................................................ 16

Cal. Welf. & Inst. Code § 10980 ................................................................ 28

EPTL § 11-1.1(b)(1) ................................................................................... 13

EPTL § 3-5.1 .............................................................................................. 13

Ind. Civ. Code § 32-36-1-16 ................................................................ 17, 18

Ind. Code § 32-36-1-1 (1994) .................................................................... 24

Ind. Code § 32-36-1-1, *et seq.* .................................................................... 8

Ind. Code § 32-36-1-6 ................................................................................ 11

Ind. Code § 32-36-1-8 ................................................................................ 11

Ind. Code §32-36-1-2(2) ............................................................................ 20

Ind. Code §32-36-1-7 ................................................................................. 11

Ind. Code. § 32-36-1-8 .......................................................................... 11, 19

Ind. Code. § 32-36-1-9 ............................................................................... 20

N.Y. Surr. Ct. Proc. Act § 206 (1967) ...................................................... 35

Uniform Probate Code § 2-602 .................................................................. 13

Page(s)

**Other Authorities**

Restatement (Second) of Conflicts § 11(2) (1988) ....................................................... 38

Restatement (Second) of Judgments § 27 cmts. d (1982) ...................................... 25, 31

Restatement (Third) of Property, Wills and Other Donative Transfers § 10.1 (1999) ................ 16

**Treatises**

2 Am. Jur. 2d Estoppel and Waiver § 137 (2006) ...................................................... 32

31 C.J.S. Estoppel and Waiver § 161 .......................................................................... 32

39 Am. Jur. 2d Proof of Facts § 587 (2004) ............................................................... 39

Arthur R. Miller et al., 18 Federal Practice and Procedure § 4419
    (2d ed. 2002) ................................................................................................... 25

Black's Law Dictionary
    (8th ed. 2004) .................................................................................................. 34

## I.

## REPLY MEMORANDUM IN SUPPORT OF MMLLC's MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant/Consolidated Plaintiff Marilyn Monroe, LLC's ("MMLLC") moving papers demonstrated that it is entitled to summary judgment on Count II of its Second Amended Complaint ("SAC") against Shaw Family Archives, Ltd. ("SFA").

The Indiana Right of Publicity ("RoP") statute creates liability for *any act* infringing upon a celebrity's right of publicity in Indiana, *no matter where the celebrity was domiciled*. Ind. Code §32-36-1-1(a). SFA erroneously contends that Ms. Monroe has no enforceable right of publicity in Indiana, arguing she was domiciled in New York at the time of her death, a state that does not currently recognize a post-mortem right of publicity. In other words, SFA argues that Ms. Monroe's domicile somehow impacts her right of publicity in Indiana.[1]  This is not so.

SFA also argues that MMLLC does not have "standing" to assert claims based on infringements of Marilyn Monroe's right of publicity. But undisputed facts show that MMLLC is the rightful owner of Ms. Monroe's postmortem publicity rights. Marilyn Monroe's will, devised all property "to which [Ms. Monroe] shall be in any way entitled." Statement of Undisputed Facts ("SUF") ¶ 10. This residual clause included property rights created and bestowed to the Monroe Estate by Indiana's RoP statute in 1994. In quoting Ms. Monroe's will

---

[1] Even if relevant to an Indiana RoP claim, Marilyn Monroe was *not* domiciled in New York at her death; but was, in fact, domiciled in California. See *infra* Section II.C. At a minimum there is a genuine dispute concerning Ms. Monroe's domicile at her death.

to the Court, SFA omits this crucial conveyance language and avoids citing provisions of New York probate law that permit an estate to obtain new property rights after the decedent's death.[2]

### A.    The Indiana ROP Statute Applies Regardless of a Person's Domicile

Indiana's RoP statute expressly states that domicile is not relevant to a celebrity's ability to recover for RoP infringements.  MMLLC's Mot. 9-14.  Despite the plain statutory language, SFA contends that a celebrity's estate can only seek redress for RoP violations if a post-mortem right has already been recognized by the celebrity's state of domicile.  SFA's Memorandum of Law in Support of Mot. for Summ. J. 7 ("SFA's Mot.").

Citing *Phillips v. Scalf*, 778 N.E.2d 480 (Ind. Ct. App. 2002), SFA misleadingly argues that under Indiana law, the situs of intangible property, including the right of publicity, is the domicile state of the decedent.  In fact, in *Phillips*, the court held that the situs of John Dillinger's right of publicity was the legal domicile of the *owner* of the rights, not the domicile of John Dillinger.  *Id.* at 483.  *See also Carter v. Estate of Davis*, 813 N.E.2d 1209 (Ind. App. 2005) (restating that holding of *Phillips* was that situs of intangible property was home of the *owner*, not the decedent).  In its Memorandum Decision Regarding Choice of Law (May 19, 2006) ("Memorandum Decision"), this Court cited *Phillips* and *Carter* for exactly such a proposition.

---

[2]  On December 11, 2006, in a related action involving alleged infringements of Marilyn Monroe's publicity rights, Judge Margaret Morrow of the Central District of California issued a Tentative Order Granting Defendants' Motion for Summary Judgment on the issue of standing, tentatively ruling that Marilyn Monroe's right of publicity could not have been devised through her 1962 will because a descendible, postmortem right was not recognized at the time.  MMLLC respectfully submits that the tentative ruling was in error, and is hopeful that Judge Morrow will reconsider before issuing a final order.  At the hearing that same day, Judge Morrow directed the parties to file supplemental briefs on the standing issue.  Judge Morrow's tentative order, and the supplemental brief filed by MMLLC on December 16, 2006, are attached to the Declaration of Michelle Craven ("Craven Decl.") at Exh. 2 and Exh. 3, respectively.  Defendants in that action were permitted to file a supplemental reply brief by December 29, 2006.

Under *Phillips*, the situs of Marilyn Monroe's right of publicity is either Delaware (MMLLC's state of incorporation) or California (MMLLC's principal place of business). Furthermore, neither *Phillips* nor *Carter* support SFA's position that Indiana somehow conditions a right of publicity on recognition of such a right by the situs of the right of publicity or a deceased personality's state of domicile. SFA's Mot. at 8.

SFA also misleadingly cites what it characterizes as California's "similar" RoP statute. *Id*. But California's statute could not be more different: unlike Indiana, California expressly looks to a celebrity's domicile to determine whether rights of publicity survive the celebrity's death. *Lord Simon Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1147 (9th Cir. 2002). Unlike the Indiana statute, the California statute does not include "regardless of domicile" language. In *Cairns,* a case which SFA cites but fails to discuss, the Ninth Circuit recognized that had the California legislature included the phrase "regardless of domicile" in the statute, it would have demonstrated an intent to create and protect a postmortem right of publicity within California, *even if* such a right was not recognized by the celebrity's home state. *See* 292 F.3d at 1147-48. Interpreting "regardless of domicile" to mean that a court should look to a personality's domicile before deciding the existence of publicity rights would be illogical and contrary to several long-standing principles of statutory construction. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 489, 124 S. Ct. 983, 1002 n.13 (2004) ("It is, moreover, a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (internal

citations omitted).  California and Indiana law are very different.[3]  This Court should reject

SFA's strained reading of Indiana's RoP statute and give full effect to the statute's plain language.

    **B.**    **MMLLC Has Standing to Assert Right of Publicity Claims**

    MMLLC has standing to bring a Right of Publicity claim under the Indiana Statute.  First,

the Indiana Statute "retroactively" bestowed a right of publicity upon all deceased celebrities that

died with 100 years of passage of the statute.  Ind. Code. § 32-36-1-8.  Second, Marilyn

Monroe's posthumous right of publicity in Indiana passed to the residuary beneficiaries of her

will, whose interests in the estate are now owned by MMLLC.

    **1.**    **The Indiana Statute "Retroactively" Bestows Property Rights**

    SFA argues that the Indiana RoP statute is not retroactive and, therefore, does not create a

right of publicity in Marilyn Monroe.  SFA's argument fails.  The Indiana Statute bestows a right

of publicity, which is plainly defined as a "personality's property interest."  Ind. Code §32-36-1-

7.  A personality is defined as a "living or deceased natural person," and infringements of a

personality's rights are recoverable at any point within 100 years of the personality's death.  Ind.

Code §§ 32-36-1-6, -8.  Therefore, the statute, from the day it was enacted, bestowed rights of

publicity to personalities (and their transferees and devisees), regardless of whether they were

alive or dead at the time.  The only Indiana case discussing this issue determined that "to read

Indiana's Right of Publicity Statute prospectively . . . would eviscerate both the legislative intent

and the underlying purpose for the statute in contravention to the general rules of statutory

construction."  *See* Craven Decl., Exh. 1 at Exh. B (*Scalf v. Lake County Convention and Visitors

Bureau, Inc.*, Cause No. 45D10-0406-PI-00093 at p.5 (Lake Super. Ct., Ind., filed Jan. 9, 2005)).

---

   [3]  Indeed, SFA talks out of both sides of its mouth on this point, arguing in its brief that Indiana
has the "most dead celebrity friendly" statute in the nation.  SFA's Mot. 1.

In *Scalf,* the court concluded: "The Indiana Right of Publicity Statute should therefore, be read retroactively, in accordance with the statute." *Id.* Although it is an interlocutory order and therefore not binding authority here, the *Scalf* opinion demonstrates how an Indiana court would rule on this question. *See also Phillips v. Scalf*, 778 N.E.2d 480 (Ind. Ct. App. 2002) (the only published Indiana decision to deal with the Indiana RoP statute, while not addressing this issue, expressed no reservations about applying Indiana's RoP statute to John Dillinger even though he died in the 1930s).[4] SFA confuses two different meanings of retroactivity: the Indiana statute did not "retroactively" bestow the right to recover for infringements that occurred prior to enactment of the statute, rather, it retroactively awarded property rights to those such as Marilyn Monroe that perished before the statute's enactment, and created a right of action for infringements occurring after passage of the law.

### 2. Marilyn Monroe's Publicity Rights Passed to Lee Strasberg and the Residuary Beneficiaries of Her Will, Who Passed Them to MMLLC.

The publicity rights created by the Indiana RoP statute are devisable and they passed through Marilyn Monroe's will to her residuary beneficiaries, who transferred them to MMLLC to hold and administer. SFA asserts that Ms. Monroe could not have passed by will any rights under the Indiana RoP statute because that statute was not passed until 1994 and thus it was impossible for her to devise a right that did not yet exist. SFA is wrong.

The residuary clause of Ms. Monroe's will was effective to pass property rights acquired after death, and before closure of probate, to the estate of Lee Strasberg and the other residual

---

[4] Other courts have also applied posthumous statutory rights of publicity granted by other states retroactively. *See, e.g., Joplin Enterprises v. Allen*, 795 F. Supp. 349 (W.D. Wash. 1992) (applying California's former postmortem Right of Publicity statute, Cal. Civ. Code § 990, now Cal. Civ. Code § 3344.1, which was enacted in 1985, to Janis Joplin, who had died in 1970 well before the statute's enactment).

beneficiaries.  Relevant New York and California law expresses a willingness to allow property

acquired after death, including rights of publicity, to pass through a decedent's will.[5]  *See Miller*

*v. Glenn Miller Prods.*, 318 F. Supp. 2d 923 (C.D. Cal. 2004) *aff'd, Miller v. Glenn Miller*

*Prods., Inc.*, 454 F.3d 975 (9th Cir. 2006); *In re Schunk*, No. 321397, 2005 N.Y. Misc. LEXIS

1312 (Sur. Ct. June 29, 2005); Cal. Prob. Code § 11642; EPTL § 11-1.1(b)(1).  Moreover, the

Restatement (Third) of Property, Wills and Other Donative Transfers § 10.1 (1999), recognizes

that a decedent's probate estate "consists of property acquired by the decedent's estate at *or after*

*the decedent's death*." (emphasis added); *see also* Uniform Probate Code § 2-602 ("A will may

provide for the passage of all property the testator owns at death and all property acquired by the

estate after the testator's death.").

Both New York and California recognize by statute that an estate may acquire, add, or

discover property after the testator's death.  *See* Cal. Prob. Code § 11642; EPTL § 11-1.1(b)(1).

In California, property "acquired or discovered" even after close of probate is disposed of

pursuant to the court order of final distribution, if the property was subject to the order's terms

(as through a residuary clause).  Cal. Prob. Code § 11642.  Similarly, New York probate law

provides an executor with the capacity to "accept additions to [the] estate from sources other

than the estate."  EPTL § 11-1.1(b)(1).  These rules underscore the importance of testamentary

intent, and reinforce it by ensuring that residuary beneficiaries actually receive anything and

---

[5]  Although Ms. Monroe's will was probated in the Surrogate's Court in New York, "[t]he
intrinsic validity, effect, revocation or alteration of a testamentary disposition of personal
property… [is] determined by the law of the jurisdiction in which the decedent
was domiciled at death."  New York Est. Powers & Trusts Law ("EPTL") § 3-5.1.  Marilyn
Monroe was a domiciliary of California at her death, accordingly, California estate law
should determine whether her will was effective to transfer her right of publicity.  However,
as discussed *infra*, the same result would obtain under New York probate law.

everything to which the decedent was entitled, including property discovered, added, acquired or adequately defined after death. *See In re Hite*, 700 S.W.2d at 717 (Tex. App. 1985) ("[O]ne of the functions of a residuary clause is to dispose of property that the testator may have overlooked, property that lacked particular definition or property that the testatrix did not know that she was entitled to at the time the will was executed.")[6]

While not expressly deciding the instant issue, both *Schunk*, a recent case from the Surrogate's Court, and *Miller*, a recent case from the Central District of California, signal that courts—consistent with the general rules set forth above— would allow a statutory property right acquired after death to pass through a decedent's will. In *Schunk*, for example, a New York Surrogate's Court directed that a portion of a postmortem statutory award by the federal government to victims of the September 11th attacks pass through the decedent's will. *Schunk*, 2005 N.Y. Misc. LEXIS 1312 at *12. Similarly, in *Miller*, the court considered Glenn Miller's posthumous right of publicity under California Civil Code Section 3344.1 a property right that was devised through Miller's residuary clause in 1944, licensed by the residual beneficiary in 1956, and again conveyed by Miller's wife's residuary clause in 1966. 318 F. Supp. 2d at 927.

That is precisely what happened here. Although Marilyn Monroe died on August 5, 1962, her estate remained open until June 19, 2001, when the Surrogate's Court of New York,

---

[6] SFA cites *In re Estate of Gernon*, 226 N.Y.S.2d 940 (1962) for the proposition that in 1962, only property owned by the testator at death was devisable by will in the state of New York. However, the *Gernon* court made clear that a will is interpreted as applying to all property owned by the testator at the date of death "*[i]n the absence of a contrary intent.*" *Id.* at 942 (emphasis added). In *Gernon*, the court was confronted with a limited, specific devise that plainly evidenced no intent to bequeath property broadly. Conversely, Ms. Monroe's intent can be inferred from the broad residuary clause included in her will. Moreover, as discussed *infra*, Ms. Monroe's probate was open until 2001, and both California and New York probate courts would allow additions of property acquired by a decedent's estate after death.

(where the probate of Ms. Monroe's will occurred) authorized Anna Strasberg, in her capacity as

Administratrix C.T.A. (an administrator appointed by the court to fulfill the duties of the executor

when a previous executor has died) of the Marilyn Monroe estate, to "transfer all assets of the

estate" to Marilyn Monroe LLC ("MMLLC"), a corporation formed for the benefit of the

residuary beneficiaries of the estate.[7]  Additional Material Undisputed Facts ("AUF") ¶ 28.  The

Petition filed by the administratrix requesting the issuance of the June 19, 2001 Order included in

its description of the assets of the estate Marilyn Monroe's "Intellectual Property Rights," which

were defined as "decedent's participation rights in motion pictures and royalties from the

licensing of the Decedent's name, likeness and signature.  AUF ¶ 26.[8]  Thus, the assets that the

Surrogate's Court authorized the administratrix to transfer included Ms. Monroe's publicity

rights.

---

[7]  The residuary clause of Marilyn Monroe's will provided that the residue of her estate was to
be distributed as follows:  (i) the lesser of $40,000 or 25 percent to May Reis; (ii) 25 percent
of the balance to Dr. Marianne Kris, one of her psychiatrists, and; (iii) the remainder to Lee
Strasberg, her close friend and acting coach.  AUF ¶ 13.  During probate of the estate, May
Reis was paid $40,000, thereby making Mr. Strasberg's residual interest 75 percent.  AUF ¶
14.  By the time that a Decree on a Voluntary Final Accounting and Related Matters
("Decree") was issued by the Surrogate's Court, Mr. Strasberg and Dr. Kris had died.  AUF ¶
15.  The Decree directed that Mr. Strasberg's 75 percent residue interest in the Monroe Estate
be distributed to his estate (of which Anna Strasberg was executrix as well) and Dr. Kris' 25
percent be distributed to the Anna Freud Centre, a non-profit foundation that was the
beneficiary under Dr. Kris' will.  The Decree approved transfer of these interests in the
residual estate to MMLLC.  AUF ¶ 28.

[8]  In the Petition, the administratrix informed the Surrogate's Court that MMLLC was being
created to hold Ms. Monroe's publicity rights and other Intellectual Property Rights.  AUF ¶
25.  Moreover, as shown by accountings covering the period 1980 to 2001, for decades the
Surrogate's Court supervised and approved the collection and the distribution to the residuary
beneficiaries of royalties generated by the estate's exercise of Ms. Monroe's publicity rights.
AUF ¶ 21, 24.

This was in accord with Marilyn Monroe's clear intent, which is of paramount importance in construing her will.  California recognizes the importance of testamentary intent in California Probate Code § 21102(a), which states:  "The intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument."  *See also Newman v. Wells Fargo Bank*, 14 Cal. 4th 126, 134 (1996) ("The paramount rule in the construction of wills, to which all other rules must yield, is that a will is to be construed according to the intention of the testator as expressed therein, and this intention must be given effect as far as possible."); *Estate of Hermon*, 39 Cal. App. 4th 1525 (1995) (intention of testator is "polestar" in interpretation of a will).  Construing a will according to testamentary intent is a "cardinal rule," and other rules of construction are subordinate.  *Estate of Karkeet*, 56 Cal. 2d 277, 281 (1961).  New York similarly acknowledges the supremacy of testamentary intent in will interpretation.  *E.g., In re Estate of Kosek*, 294 N.E. 2d 188, 191, 341 N.Y.S.2d 593, 597 (1973); *In re Estate of O'Brien*, 165 Misc. 2d 459, 461, 627 N.Y.S.2d 544, 546 (Sur. Ct. 1995).  The Restatement (Third) of Property, Wills and Other Donative Transfers § 10.1 (1999) further emphasizes that "[t]he controlling consideration in determining the meaning of a donative document is the donor's intention.  The donor's intention is given effect to the maximum extent allowable by law."

In addition, a probate court also will invariably attempt to construe a will in a manner that avoids intestacy.  *O'Brien*, 165 Misc. 2d at 461, 627 N.Y.S.2d at 546; *see also In re Estate of Goyette*, 123 Cal. App. 4th 67, 74 (2004); Cal. Prob. Code § 21120 ("Preference is to be given to an interpretation of an instrument that will prevent intestacy or failure of a transfer, rather than one that will result in intestacy or failure of a transfer").  This rule favors residuary devisees, and assumes that a testate decedent did not intend for any part of her estate to pass through intestacy.

*O'Brien*, 627 N.Y.S.2d at 546, 165 Misc. 2d at 461 ("The law favors a construction that a testator intended to make a valid disposition of his entire estate."); *see also* Ind. Civ. Code § 32-36-1-16 (providing that intestate succession of an RoP is a last resort in the event that the right has not been effectively transferred or devised). To that end, a court will construe a residuary clause broadly and liberally as including a decedent's property in order to avoid intestacy wherever possible, unless there is affirmative evidence of contrary intent. *In re Estate of Jones*, 341 N.E.2d 565, 568, 379 N.Y.S.2d 55, 60 (1975); *Estate of Russell*, 69 Cal. 2d 200, 213 (1968); *see also O'Brien*, 165 Misc. 2d at 462, 627 N.Y.S.2d at 546.

Marilyn Monroe expressly indicated in her will that she intended that the residuary estate include *all* property "to which I shall be in any way be entitled." SUF ¶ 10. In fact, Ms. Monroe's will left only a specific devise of $100,000 in trust for her mother, while leaving the rest, residue and remainder of her estate to the residuary beneficiaries. *Id.* Under SFA's proposed interpretation of Ms. Monroe's will, her statutory posthumous rights of publicity would have fallen intestate to Ms. Monroe's mother, if alive, and not to the residuary beneficiaries. Such a result is manifestly contrary to Ms. Monroe's intent. Moreover, to deny the residuary beneficiaries Ms. Monroe's publicity rights is to favor intestacy, without any countervailing policies and despite the liberal interpretation that the law requires a court give a residuary clause in order to avoid intestacy.

Thus, recent case law and applicable probate statutes amply support just one conclusion: a New York or California probate court would construe Ms. Monroe's rights of publicity in Indiana as within the ambit of her residuary clause. Therefore, even assuming that Ms. Monroe had no right of publicity to devise in 1962, Lee Strasberg and the other residuary beneficiaries (whose interests have been poured into MMLLC) were entitled to any property rights bestowed

upon Ms. Monroe after death and before closure of the probate estate in 2001. Accordingly, MMLLC is the owner of Ms. Monroe's postmortem publicity rights and has standing to pursue its claims here.[9]

### C.    SFA Violated the Indiana ROP Statute

Indiana's RoP statute makes a party civilly liable for "use [of] a personality's right of publicity for a commercial purpose" without written consent. Ind. Code § 32-36-1-16 (1994). On September 6, 2006, a T-shirt was purchased for $9.99 at a Target Store in Indianapolis, Indiana, bearing the picture, image and likeness of Marilyn Monroe. SUF ¶¶ 2-3, 5. That T-shirt displayed the words "Shaw Family Archives" printed on the inside neck label and on a tag affixed to the T-shirt. SUF ¶ 4. Regardless of what contractual arrangements SFA might have had with its T-shirt licensees, SFA used Ms. Monroe's image in connection with the transaction and profited from the sale of an infringing image in Indiana. These undisputed facts establish, as

---

[9] While not relevant to MMLLC's motion for summary judgment for violations of the Indiana RoP Statute, SFA has filed a broader cross-motion for summary judgment on MMLLC's claims under other states' right of publicity laws, including California's postmortem RoP statute, which was passed in 1984. SFA Mot. at 18; Cal Civ. Code § 3344.1. The California statute, which expressly reaches back to provide publicity rights in celebrities who died after 1914, also makes transfer by intestacy a last resort if there is no transfer by testamentary documents. Cal. Civ. Code. § 3344.1(d) (making intestate inheritance "subject to" there being no transfer by contract, trust or testamentary document). Under SFA's analysis of standing, any celebrity that died before a postmortem right of publicity was recognized by statute could not have that right vest in the decedent's devisees. For example, Albert Einstein's statutory right of publicity in California is registered with the California Secretary of State to the Hebrew University of Jerusalem ("Hebrew University"), a university co-founded by Einstein, who died in 1955 but is still is one of the highest earning deceased personalities. *See* Craven Decl., Exh 10 at Exh. E-G. According to SFA's logic, the Hebrew University would be divested of Albert Einstein's very valuable right of publicity, contrary to his testamentary intent, because the Hebrew University is not one of the specified familial heirs under California intestacy laws (nor would it own the right under the intestacy provisions of the Indiana statute).

a matter of law, that SFA unlawfully used Ms. Monroe's right of publicity for a commercial purpose in the state of Indiana. *See* MMLLC's Mot. for Summ. J. 13-17.

SFA attempts to disclaim responsibility for the sale of "Marilyn" T-shirts in Indiana by blaming its licensees. SFA asserts that it is not responsible for the sale of the T-shirt and further contends, without providing a shred of evidence, that its licensing agreements direct licensees to avoid sales in Indiana, and indemnify SFA for any right of publicity infringements by licensees. See SFA's Mot. 15. SFA's contention that it had no knowledge of infringing activities by its licensees is not a defense to a right of publicity action; intent is not a necessary element of liability in the Indiana statute. Ind. Code § 32-36-1-8. *See also Welch v. Mr. Christmas Inc.*, 440 N.E.2d 1317, 1319, 454 N.Y.S.2d 971, 972 (1982) (holding that "knowledge is not an element" of New York's privacy statute, which incorporated the right of publicity, and finding defendant Christmas tree manufacturer liable for infringing advertisements distributed by television station without defendant's knowledge); *Pooley v. National Hole-In-One Ass'n*, 89 F. Supp. 2d 1108, 1114-15 (D. Ariz. 2000) (finding that manufacturer of videotape could not rely on outside parties to obtain needed consent, as the common law right of publicity "does *not* include the element of fault.") (emphasis in original). Moreover, SFA has not impleaded any of its licensees as third-party defendants here, nor has SFA sought indemnification from its licensees in the event that SFA is found liable for violations of the statute. *Id.* But even if SFA had, that would not immunize it from liability to MMLLC. The T-shirt itself, which proudly announces that it is offered for sale by "Shaw Family Associates," is iron-clad evidence of SFA's illegal use and profit from Marilyn Monroe's right of publicity in Indiana.

But the T-shirt sale is not SFA's only act of infringement within Indiana. SFA also advertises its goods and services on a website that reaches viewers within Indiana. The Indiana

12

statute prohibits a party from using a celebrity's name and image on and in connection with advertisements, solicitations or promotion of commercial activities within Indiana. Ind. Code §32-36-1-2(2). The website, operated by SFA and its "partner" Bradford, advertises Ms. Monroe's name and likeness in an effort to solicit licensing business. *See* MMLLC's Mot. 15, n.6. It is irrelevant that other courts have found a website alone insufficient to support the exercise of personal jurisdiction. *See* SFA's Mot. 16-17. Jurisdiction is not at issue here. This Court already has determined that the exercise of personal jurisdiction over SFA is appropriate. Memorandum Decision at 11. What is relevant is that, before initiation of this lawsuit, SFA held itself out as a licensor of Marilyn Monroe images in Indiana, and advertised within the state using her image. *See* MMLLC's Mot. J. 15, n.6. In doing so, SFA devalued, infringed and tread upon a right of publicity owned in Indiana by MMLLC, whether or not a single product was even sold within the state. Under the law, advertising alone is a separate violation. SFA is therefore liable to MMLLC for violations of the Indiana RoP statute.

SFA cites a subsection of the statute stating that one who "knowingly causes advertising or promotional material … to be published, distributed, exhibited or disseminated within Indiana; Submits to the jurisdiction of Indiana courts." Ind. Code. § 32-36-1-9. This subsection has nothing to do with liability, but is entirely directed at defining certain predicates for personal jurisdiction in Indiana. Thus, it has no bearing on SFA's liability to MMLLC.[10] That the Indiana legislature did not include the same "knowingly requirement" in the liability provisions of Ind. Code § 32-36-1-8 demonstrates that intent is not a requirement for liability. Therefore, to

---

[10] Notably, since passage of the Indiana RoP statute, Indiana's long-arm jurisdiction has been expanded to the full extent of federal due process. *Richards & O'Neil v. Conk*, 774 N.E.2d 540, 550 n.6 (Ind. Ct. App. 2002) (citing Ind. Trial Rule 4.4(A) (effective Jan. 1, 2003)). Therefore, the long-arm provision of the Indiana RoP statute cited by SFA is arguably moot.

establish SFA's liability, MMLLC does have to not prove that SFA knowingly caused the sale of the T-shirt, but simply that SFA used Marilyn Monroe's image for a commercial purpose within the state. SFA's profit from the sale of infringing t-shirts and internet advertising available within the state easily satisfy this standard.

### D.    MMLLC's ROP Claims are not Preempted by Federal Copyright Law

SFA contends that the Copyright Act, 17 U.S.C. § 301(a), entirely preempts MMLLC's right of publicity claims in Count II. Preemption only occurs, however, when two conditions are fully satisfied: *First*, the fixed, tangible work at issue falls within the "subject matter" of copyright; and, *second*, the right of publicity claim is "equivalent" to a right protected by copyright law. *See Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1003 (9th Cir. 2001); *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 909 (7th Cir. 2005). Neither condition is satisfied here.

In *Downing,* the Ninth Circuit specifically held that a state-law claim to protect a celebrity's persona is *not* preempted by the Copyright Act when the celebrity's name, image or likeness appear in a fully copyrighted photograph. The court held that while a photograph is itself protectible copyright material, a "*person's name or likeness is not a work of authorship within the meaning of 17 U.S.C. § 102*. This is true notwithstanding the fact that [Plaintiffs'] names and likenesses are embodied in a copyrightable photograph." *Downing,* 265 F.3d at 1003-04 (internal cites omitted; emphasis supplied). This Ninth Circuit authority is consistent with sister courts and commentators who likewise find that the "subject matter" of a right of publicity claim—*i.e.*, a celebrity's "persona"—is legally distinct from the rights protected by copyright. .[11]

---

[11]  *See* McCarthy, The Rights of Publicity and Privacy § 11.13[C] ("assertion of infringement of the Right of Publicity because of defendant's unpermitted commercial use of a picture of plaintiff is not assertion of infringement of copyrightable "subject matter" in one photograph

[Footnote continued on next page]

SFA argues, however, that the Ninth Circuit's recent opinion in *Laws v. Sony Music Entm't, Inc.,* 448 F.3d 1134, 1138-41 (9th Cir. 2006) somehow announced a complete reversal of *Downing* and, therefore, states a "new" blanket rule whereby the use of any copyrightable work preempts a state law right of publicity claim.  *See* SFA's. Mot. 17.  There is no support for this contention; to the contrary, the Ninth Circuit was very clear that *Downing* "involved[d] photographs used in advertising *and [is] distinguishable*" from the facts before the Court in *Laws*.  *See* 448 F.3d at 1141 (emphasis added).  Unlike the matter before this Court, *Laws* involved only the straight use of portions of a copyrighted vocal performance within another vocal performance that was the subject of copyright—the Court expressly found that case *did not involve* the use of the celebrity's "image, name or the voice recording in any promotional materials."  448 F.3d at 1142.  In confirming the opinion in *Downing*, the Ninth Circuit explained this critical distinction by noting that in *Downing*:

> [Defendants] had suggested that [plaintiffs] had endorsed [defendants'] t-shirts. Accordingly, we concluded that "it is not the publication of the photograph itself, as a creative work of authorship, that is the basis for [plaintiffs'] claims, but rather, it is the use of the [plaintiffs'] likenesses and their names pictured in the published photograph."  We thus concluded that the claim was not within the subject matter of copyright because "[a] person's name or likeness is not a work of authorship within the meaning of 17 U.S.C. § 102."

*Id*. at 1141 (emphasis supplied).

While there may theoretically be circumstances where it is difficult to draw the line between what is preempted by *Laws* and what is permitted by *Downing*, this case does not present such a circumstance.  Count II of MMLLC's SAC states a claim for SFA's use of Ms.

---

[Footnote continued from previous page]
of plaintiff"); s*ee also Toney*, 406 F.3d 905 (finding Copyright Act does not preempt right of publicity claims under similar Illinois right of publicity statute); *KNB Enterprises v. Matthews*, 78 Cal. App. 4th 362, 365 (2000); *Brown v. Ames*, 201 F.3d 654, 658 (5th Cir. 2000).

Monroe's name, image and likeness "on or in connection with the sale, solicitation, promotion, and advertising of products, merchandise, goods and services"—the very uses the Ninth Circuit found did not preempt publicity claims in both *Downing* and *Laws*. And SFA's own pleadings in this action admit that its "photographs have been used for, among other things, *advertising, magazines, calendars, and on wine bottles*. SFA Amended Complaint ¶ 14. Even to the extent that SFA could prove valid copyright ownership of the photographs, using the photographs for such commercial purposes exploits the persona of Ms. Monroe and suggests that she either endorses the product or is associated with it. Copyright law does not preempt a celebrity's right to prevent this in Indiana or anywhere else.[12] MMLLC's right of publicity claims are not preempted.

## II.

### MEMORANDUM IN OPPOSITION TO SFA PARTIES' CROSS MOTION FOR SUMMARY JUDGMENT

The SFA parties' primary argument in support of their motion for summary judgment (and in opposition to MMLLC's motion) is that Marilyn Monroe has no postmortem right of publicity because she died a domiciliary of New York.[13] Their argument fails. MMLLC has sued SFA (and the other Consolidated Defendants) for violations of the Indiana RoP statute,

___

[12] The second requirement for copyright preemption, as noted above, is that the right asserted under state law must be equivalent to the exclusive rights contained in § 106 of the Copyright Act. When the use in question involves copyrighted photographs for advertising purposes, the Ninth Circuit has also ruled that rights of publicity are not equivalent to rights protected by the Copyright Act. *See Downing,* 265 F.3d at 1005.

[13] MMLLC has moved for summary judgment against only SFA. However, SFA and co-Plaintiff/co-Consolidated Defendant Bradford Licensing, Inc. have both cross-moved for summary judgment on Count II of MMLLC's SAC. To prevent confusion, the cross-moving parties will be collectively referred to as "the SFA parties."

because of their improper use of the name, image and likeness of Ms. Monroe for commercial purposes in Indiana without MMLLC's consent or authorization. Importantly, as discussed above, domicile is immaterial to Plaintiffs' statutory postmortem publicity claim under Indiana law. *See supra* Sec. I(A); Ind. Code § 32-36-1-1(a) (1994).

Moreover, because the Indiana RoP statute applies regardless of domicile, the SFA parties' collateral and judicial estoppel arguments presented in support of their cross-motion for summary judgment are also unavailing. The SFA parties seek to use collateral and judicial estoppel only to conclusively establish that Ms. Monroe was a domiciliary of New York at the time of her death, which is immaterial to violations of the Indiana right of publicity law. Nevertheless to the extent that this Court were to accept the SFA parties' incorrect assertion that the Indiana statute does not independently create a right of publicity but merely provides a remedy within Indiana for enforcement of a right that otherwise exists, the SFA parties' cross-motion must still be denied. Marilyn Monroe died a domiciliary of California and thus possessed a postmortem right of publicity under the law of that state. *See infra* Section II.C.

Nor are MMLLC's claims barred by the doctrine of laches. Until recently, SFA recognized, abided by and overtly acknowledged MMLLC's rights. Moreover, SFA suffered no prejudice, as required by laches. The SFA parties' cross-motion for summary judgment should therefore be denied.

### A. MMLLC is Not Collaterally Estopped

The SFA parties' assertion of collateral estoppel is irrelevant to Plaintiffs' right of publicity claims under the Indiana RoP. In any event, the contention that Plaintiffs are collaterally estopped from litigating Ms. Monroe's domicile at death is unsupportable because none of the three proceedings upon which the SFA parties rely—(1) New York Surrogate's Court proceedings ("Surrogate's Court"); (2) *Frosch v. Grosset & Dunlap, Inc.*, 75 A.D.2d 768, 427

N.Y.S.2d 828 (N.Y. App. Div. 1980) ("Frosch Case"); and (3) the California Board of

Equalization proceeding ("BOE proceeding")—warrant application of this doctrine.[14]

       The California Supreme Court has articulated five threshold requirements for the

application of collateral estoppel:  (1) the issue sought to be precluded from relitigation must be

identical to that decided in a former proceeding; (2) this issue must have been actually litigated

in the former proceeding; (3) it must have been necessarily decided in the former proceeding; (4)

the decision in the former proceeding must be final and on the merits; and (5) the party against

whom preclusion is sought must be the same as, or in privity with, the party to the former

proceeding.  *See Lucido v. Superior Court*, 51 Cal. 3d 335, 341 (1990).[15]

       A heavy burden is on the party asserting the estoppel to demonstrate—with an

evidentiary showing—that it can meet all of the required elements.  *See, e.g., Lucido*, 51 Cal. 3d

at 341; *Offshore Sportswear, Inc. v. Vuarnet Int'l, B.V.*, 114 F.3d 848, 850 (9th Cir. 1997); *S.D.I.

Corp. v. Fireman's Fund Ins. Cos.*, 208 A.D.2d 706, 708, 617 N.Y.S.2d 790,792 (N.Y. App. Div.

1994).  Defendants fail to establish these essential elements with respect to each of the

---

[14]  MMLLC agrees that the state of decision determines a judgment's preclusive effect.  SFA
Mot. 19.  Both New York and California collateral estoppel laws operate almost identically
under federal and state law.  *See Hydranautics v. Filmtec Corp.*, 204 F.3d 880, 885 (9th Cir.
2000); *M.J. Woods, Inc. v. Conopco, Inc.*, 271 F. Supp. 2d 576, 580 (S.D.N.Y. 2003).

[15]  While New York relies on two elements for collateral estoppel, the same fundamental
principles underlie the doctrine in both states.  *See Beuchel v. Bain*, 766 N.E.2d 914, 919,
740 N.Y.S.2d 252, 257 (2001).  SFA cites a three-prong test for collateral estoppel from
*Hydranautics v. Filmtec Corp.*, 204 F.3d 880, 888 (9th Cir. 2000), that merges the identical
issue and necessarily decided elements into one element but does not specifically include the
"actually litigated" prong, a fundamental requirement of collateral estoppel.  *See* Restatement
(Second) of Judgments § 27 cmts. d, e (1982); Arthur R. Miller et al., 18 Federal Practice and
Procedure, § 4419 (2d ed. 2002).

proceedings upon which they rely.  None of the proceedings addressed Ms. Monroe's domicile at all, much less her domicile for right of publicity purposes.

> **1.     The Surrogate's Court Proceedings Do Not Trigger Collateral Estoppel**

Marilyn Monroe's domicile in this action is certainly not conclusively established, contrary to the actual facts of her life, by the fact that the Estate's tax appraiser and the Estate's executor, Aaron Frosch, filled out pre-printed documents with form language stating that the decedent was a "resident" of New York, or by an order of the Surrogate's Court confirming the amount of taxes owed by the estate.  "Domicile" and "residence" are distinct concepts and the Surrogate's Court itself never decided Ms. Monroe's actual domicile.  The issue of her domicile was not even remotely actually litigated in the Surrogate's Court; it was not contested, and *no evidence was ever presented* as to Ms. Monroe's actual domicile.

In a similar case, the Fifth Circuit refused to apply collateral estoppel as to the issue of domicile on the basis that it had not been actually litigated in an earlier probate proceeding in New Mexico state court.  *Acridge v. Evangelical Lutheran Good Samaritan Soc'y*, 334 F.3d 444 (5th Cir. 2003).  Like SFA here, plaintiffs in *Acridge* contended that collateral estoppel precluded the relitigation of decedent's domicile where the New Mexico court had already declared decedent had died a New Mexico domiciliary and accordingly probated his will.  *Id.* at 452.  The Fifth Circuit disagreed and found there to be "no evidence that the issue of [decedent's] domicile was ever fully litigated in state court; all we have is the *bare statement by the court* that [decedent] was a New Mexico domiciliary."  *Id.* (emphasis added).  As such, "this court is not required to give preclusive effect to the determination by the New Mexico state court that [decedent] was domiciled in that state."  *Id.*  Other courts have similarly applied this rule in the probate context.  *See Kanz v. Wilson*, 703 So. 2d 1331 (La. Ct. App. 1998) (holding that

executor's statement to a Texas probate court that decedent was domiciled in Texas did not preclude executor from maintaining in subsequent litigation that decedent was domiciled in Louisiana at the time of her death); *In re Rosenfield's Estate*, 76 N.Y.S.2d 177, 179, 944 N.Y. Misc. LEXIS 2812, at *3 (Surr. Ct. 1944) (finding that "an allegation of the domicile of the testator in the petition for probate is not an estoppel against a subsequent application for the determination of true domicile").

MMLLC's case here against the application of collateral estoppel is even stronger than in *Acridge*, because the only evidence offered by the SFA parties are pre-printed form documents indicating that Ms. Monroe was a resident, not a domiciliary, of New York, and an "Order Fixing Tax on Report" issued by the Surrogate's Court, stating that the estate owed $17,948.42 in taxes. The SFA parties do not adequately explain how the Surrogate's Court proceedings satisfy elements necessary to warrant application of collateral estoppel. *See* SFA's Mot. at 19-20. No parties to the Surrogate's Court proceeding adduced evidence regarding Ms. Monroe's intent to be domiciled in New York at the time of her death, the critical inquiry in any domicile analysis. And like *Acridge*, there is no evidence that the issue of her domicile was ever actually or fully litigated in the New York Surrogate's Court.

In addition, the form statements submitted by Aaron Frosch and the tax appraiser regarding Marilyn Monroe's residence were not essential to any judgment in the Surrogate's Court. Indeed, the SFA parties fail to assert that the Surrogate's Court issued any *judgment* regarding Ms. Monroe's domicile. It is axiomatic that collateral estoppel cannot apply where no valid, final judgment exists from a prior case, and the SFA parties' argument is completely

20

devoid of any claim that a valid and final judgment on the merits was ever rendered in the

Surrogate's Court regarding Ms. Monroe's domicile.[16]

### 2.    Collateral Estoppel Does Not Apply To The BOE Proceeding

While the California Board of Equalization ("BOE") stated that Marilyn Monroe was a

New York resident, the indicia considered in a determination of domicile were neither

considered nor weighed by the BOE because the respondent California Franchise Tax Board did

not dispute or litigate the issue of her domicile.  Domicile is a question of intent, and Ms.

Monroe's intent was neither addressed nor placed at issue in the BOE proceeding.

The California Supreme Court has stated that collateral estoppel applies to agency

decisions when the agency 1) acted in a judicial capacity; 2) resolved disputed issues of material

fact; and 3) the parties had an adequate opportunity to litigate the issues.  *See People v. Sims*, 32

Cal. 3d 468, 479 (1982), *superseded by statute on other grounds*, West's Ann. Cal. Welf. & Inst.

Code § 10980, *as recognized in People v. Preston*, 43 Cal. App. 4th 450, 50 Cal. Rptr.2d 778

(1996), (citing *United States v. Utah Constr. Co.*, 384 U.S. 394, 86 S. Ct. 1545 (1966)).  The

Court in *Sims* stated:  "This standard formulated by the Supreme Court [in *Utah Construction*] is

sound, and it comports with the public policy underlying the collateral estoppel doctrine 'of

---

[16] Even if there had been a determination of Ms. Monroe's domicile in the Surrogate's Court, long-standing authorities have uniformly held that one court's determination of a decedent's domicile is neither conclusive as to domicile, nor is it evidence of domicile in a collateral proceeding.  *See e.g., Tilt v. Kelsey*, 207 U.S. 43, 51-53, 28 S. Ct. 1, 4 (1907) ("[F]ull faith and credit due to the proceedings of the New Jersey court do not require that the courts of New York shall be bound by its adjudication on the question of domicile.  On the contrary, it is open to the courts of any state in the trial of a collateral issue, to determine, upon the evidence produced, the true domicile of the deceased."); *Williams v. North Carolina*, 325 U.S. 226, 231, 65 S. Ct. 1092, 1096 (1945); *Overby v. Gordon*, 177 U.S. 214, 227, 20 S. Ct. 603, 608 (1900) (prior finding that decedent was a Georgia domiciliary not binding on a District of Columbia court); *Frederick v. Wilbourne*, 73 So. 442, 446 (Ala. 1916).

limited litigation by preventing a party who has had one fair trial on an issue from again drawing it into controversy.'" *Id.* (citations omitted).

Marilyn Monroe's domicile, however, was not a disputed issue of fact in the BOE proceeding. Indeed, the SFA parties have failed to satisfy their burden in demonstrating that the agency accepted any evidence, conducted any hearing, examined, cross-examined or otherwise heard any witness testimony as to Ms. Monroe's intent—the key factor in a domicile inquiry. *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982) (denying preclusion because party asserting collateral estoppel failed to carry its burden of establishing issue was actually litigated). In other words, the BOE's *conclusory* assertion that "Marilyn Monroe was a resident of New York at the time of her death", Declaration of David Marcus ("Marcus Decl.") ¶ 11, Exhibit J, does not give rise to collateral estoppel. *See Gottlieb v. Kest*, 141 Cal. App. 4th 110, 148 (2006) (stating that an issue is actually litigated '[w]hen [it] is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined . . . .'" (quoting *People v. Carter*, 36 Cal.4th 1215, 1240 (2005)); *Schnyder v. State Bd. of Equalization*, 101 Cal. App. 4th 538, 550 (2002) ("For collateral estoppel (issue preclusion) to apply, the foreclosed issue must have been 'actually litigated and determined' in a prior action."); *Sekaquaptewa v. MacDonald*, 575 F.2d 239, 247 (9th Cir. 1978) (same).[17] Therefore, the BOE proceeding cannot serve to bar litigation of the domicile issue.

_____

[17] Moreover, the doctrine of collateral estoppel is designed "(1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation." *People v. Taylor*, 12 Cal.3d 686, 695 (1974). Here, none of the purposes of collateral estoppel would be served by applying the doctrine. First, this case is not repetitive of tax issues presented to the California BOE over thirty years ago regarding the Estate of Marilyn Monroe's tax liability. Second, a finding of Marilyn

[Footnote continued on next page]

    3.     **The *Frosch* Case Does Not Preclude Litigation Regarding Marilyn Monroe's Domicile At the Time Of Her Death**

The SFA parties mischaracterize the issue addressed in the *Frosch* Case.  Although the claim was premised on a violation of the right of publicity, the actual issue was whether the book in dispute was a "literary work" because literary works do not give rise to a cause of action for a violation of the right of publicity.  This is not an issue here.  The court in *Frosch* disagreed with Aaron Frosch, the executor of the Monroe Estate, that the book was not a literary work, instead affirming the trial court's decision that the book at issue was a protected literary work immune from a right of publicity claim.  *See Frosch*, 75 A.D.2d at 768-69, 427 N.Y.S.2d at 828-29.  The decision speaks for itself:

> Special Term [the lower court] held that the book here involved is what it purports to be, a biography, and as such did not give rise to a cause of action in favor of the estate for violation of a right of publicity.  Plaintiff disputes the characterization of the book as a biography.  We think it does not matter whether the book is properly described as a biography, or a fictional biography, or any other kind of literary work.  It is not for a court to pass on literary categories, or literary judgment.  It is enough that the book is a literary work and not simply a disguised commercial advertisement for the sale of goods or services.  The protection of the right of free expression is so important that we should not extend any right of publicity, if such exists, to give rise to a cause of action against the publication of a literary work of a deceased person.

*See Id.*  In fact, in *Frosch*, the trial court granted summary judgment for defendants based on the literary nature of the work.  AUF ¶ 19.  The defendants' dispositive motion in *Frosch* explicitly stated that for purposes of the motion it would be conceded that the Monroe estate *had* a right of publicity.  AUF ¶ 18.  Therefore, Ms. Monroe's domicile could not have been actually

---

[Footnote continued from previous page]
Monroe's domicile here would not be inconsistent with statements by the BOE as to the Estate of Marilyn Monroe's residence for tax purposes.  Finally, there is no vexatiousness in this litigation with respect to an unrelated administrative tax case from 1975.

or necessarily decided by the trial or appellate court.[18]  The appellate court ultimately affirmed the holding of the trial court that under the First Amendment, plaintiff could not maintain a right of publicity cause of action against this literary work, whether or not a right of publicity existed. *See Frosch*, 75 A.D.2d at 768-69, 427 N.Y.S.2d at 827-28; *see also Joplin Enterprises v. Allen*, 795 F. Supp. 349 (W.D. Wash. 1992) (describing the Frosch Case as one correctly decided on First Amendment grounds).  It was on this basis that Mr. Frosch's claim, as executor of the Monroe Estate, was dismissed.  The parties did not litigate (nor did the court decide) whether Ms. Monroe had a postmortem right of publicity, and the parties certainly did not litigate Marilyn Monroe's domicile.   The Frosch case cannot collaterally estop Plaintiffs here.

### 4.    MMLLC is Not In Privity With Mr. Frosch

Even if the SFA parties could satisfy the other elements of collateral estoppel, which they cannot, the doctrine is still inapplicable because there is no privity.  Unlike Mr. Frosch, the executor of the Monroe Estate, MMLLC is merely a transferee of the beneficiaries of the estate, and an estate's executor and the estate's beneficiaries are not in privity.  *See Matter of Herm's Estate*, 284 N.W.2d 191, 196 (Iowa 1979) ("An executor or administrator is an officer of the court.  Such officer is not an agent of the heirs or beneficiaries:  He or she does not derive his or her powers from them and is not subject to their control.  It follows that the relation of privity

---

[18]  As to whether an issue was actually litigated, the Restatement asserts:

An issue is not actually litigated . . . if it is raised by a material allegation of a party's pleading but is admitted (explicitly or by virtue of a failure to deny) in a responsive pleading; nor is it actually litigated if it is raised in an allegation by one party and is admitted by the other before evidence on the issue is adduced at trial; nor is it actually litigated if it is the subject of a stipulation between the parties.

Restatement (Second) of Judgments § 27, cmt. e (1982).

ordinarily does not exist between an administrator and the distributees from an estate . . . ."); *see also* 2 Am. Jur. 2d Estoppel and Waiver § 137 (2006) (same); 31 C.J.S. Estoppel and Waiver § 161. Therefore, determinations against Mr. Frosch, if any, as executor of the Estate would not collaterally estop MMLLC in this distinct litigation. *See, e.g., Lucido*, 51 Cal. 3d at 341 (application of collateral estoppel requires privity with the party to the former case).

### B.    MMLLC is Not Judicially Estopped

Judicial estoppel prevents "a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814 (2001) (internal quotations omitted).[19] Its purpose is to protect the integrity of the judicial process by preventing a party from playing fast and loose with the courts. *See New Hampshire*, 532 U.S. at 749-50, 121 S. Ct. at 1814-15. *New Hampshire* identified three factors: (1) the party's later position is clearly inconsistent with its prior position; (2) the party has succeeded in persuading the court to accept its earlier position; and (3) the party would derive an "unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 750-51, 121 S. Ct. at 1815; *see also Jarrard v. CDI Telcoms., Inc.*, 408 F.3d 905, 914-915 (7th Cir. 2005). The Seventh Circuit has stated that: "A fourth factor to consider is whether the operative facts remain the same in both cases." *Id.* (citing *Ogden Martin Sys.*, 179 F.3d at 527); *see also United States v. Christian*, 342 F.3d 744, 747 (7th Cir. 2003).

---

[19] Because this case was transferred from the Southern District of Indiana pursuant to Section 1404(a), this Court should apply the doctrine of judicial estoppel as would a court in the Southern District of Indiana. *See Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S. Ct. 805, 821 (1964).

As with collateral estoppel, *supra*, the burden is on the party asserting judicial estoppel, here the SFA parties, to demonstrate—*with an evidentiary showing*—that it can meet all of the required elements.  Here, the SFA parties do not make any effort to do so, instead stating in a conclusory fashion that "Plaintiffs must now be judicially estopped from disclaiming those admissions."  SFA's Mot. 26.[20]  The SFA parties do not specify which "admissions" they are referring to, or how any previous representations satisfy the elements of judicial estoppel.

### 1.    Prior Statements Are not Clearly Inconsistent with MMLLC's Position in this Litigation

The SFA parties have not attempted to make an evidentiary showing of which statements by MMLLC supposedly satisfy the elements of judicial estoppel.  They simply broadly assert that MMLLC has taken unspecified inconsistent positions in prior proceedings.  This is not so.

For example, statements regarding Ms. Monroe's New York residence made to the Surrogate's Court are not inconsistent with Plaintiffs' assertions regarding Ms. Monroe's domicile being California in this litigation, because being a "resident" of New York and a "domiciliary" of California are not mutually exclusive.[21]  Therefore, the statements made to the Surrogate's Court

---

[20]  Additionally, judicial estoppel is inapplicable to any statements made by Mr. Frosch—in the Surrogate's Court and the BOE proceeding—as opposed to those made by Ms. Strasberg.  Mr. Frosch is not the same party as Ms. Strasberg or MMLLC, which is a fundamental requirement of judicial estoppel.  *See, e.g., New Hampshire*, 532 U.S. at 749, 121 S. Ct. at 1814; *see also Wabash Grain, Inc. v. Smith*, 700 N.E.2d 234, 238 (Ind. Ct. App. 1998) ("Smith directs us to no authority, and we find none, in which judicial estoppel has been used to preclude one party from asserting a particular position because a different party had made a conflicting assertion or argument in a prior proceeding.  These facts do not support a judicial estoppel.").  Unlike collateral estoppel, even if there was privity between Mr. Frosch and Ms. Strasberg, which there is not, see *supra* Sec. II.A.4, judicial estoppel does not apply to parties in privity, only the same parties.

[21]  SFA erroneously conflates "residence" and "domicile," but they are distinct concepts:  A person's residence refers to "[t]he place where one actually lives, as distinguished from a domicile . . . *Residence usu*. just means bodily presence as an inhabitant in a given place;

[Footnote continued on next page]

do not judicially estop MMLLC in this litigation from demonstrating that Ms. Monroe was a California domiciliary at the time of her death.

The BOE proceedings also do not warrant the application of judicial estoppel. Although Mr. Frosch apparently represented the *Estate* as a New York domiciliary, he never represented that Ms. Monroe herself was a domiciliary of New York. Statements allegedly made by Mr. Frosch as to the Monroe Estate's domicile or Ms. Monroe's *residence* do not bind Plaintiffs nor preclude this Court from determining Ms. Monroe's domicile. Moreover, as discussed below, Ms. Monroe can be a domiciliary of New York for probate purposes *and* a domiciliary of California for purposes of her right of publicity. *See infra* n. 25.

### 2.     The SFA Parties Have Not Proven and Cannot Prove That the Prior Representations Were Successful For Purposes of Judicial Estoppel

Even if the SFA parties could prove that past statements were inconsistent with the position taken in this litigation, which they cannot, the doctrine of judicial estoppel aims to prevent a party that prevails in one lawsuit on one ground from repudiating that same ground in another lawsuit. *Jarrard*, 408 F.3d at 914; see also *Ogden Martin Sys.*, 179 F.3d at 526. "Precedent from the Seventh Circuit has consistently and repeatedly stressed the significance, for purposes of judicial estoppel analysis, of whether a litigant prevailed in a prior suit on the basis

---

[Footnote continued from previous page]
   *domicile* usu. requires bodily presence **plus an intention to make the place one's home.**") Black's Law Dictionary (8th ed. 2004) (Westlaw) (emphasis added). The distinction between domicile and residence here is critical because there is nothing inconsistent with Marilyn Monroe being a resident of New York and a domiciliary of California. Cases affirming the legal distinction between residence and domicile are legion. *Eg. In re Burns*, 218 B.R. 897, 898-99 (Bankr. N. D. Ind. 1998) ("Consequently, a person's residence may be at one place, while their domicile may be at another."); *State ex rel. Flaugher v. Rogers*, 77 N.E.2d 594, 595 (Ind. 1948) (same); *In re Estate of Brown*, 505 N.Y.S.2d 334, 337, 132 Misc. 2d 811, 815 (Surr. Ct. 1986); *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48, 109 S. Ct. 1597, 1608 (1989) ("'Domicile' is not necessarily synonymous with 'residence,' and one can reside in one place but be domiciled in another.") (citations omitted).

of a position directly inconsistent with its position in a subsequent suit." *Crosby v. Bowater Inc.*, No. 05 C 3478, 2006 U.S. Dist. LEXIS 67144, at *22-23 (N.D. Ill. Sept. 1, 2006) (citing a litany of cases). The SFA parties cannot satisfy this element.[22]

Not only did the Monroe Estate not prevail in the BOE proceeding, it actually lost. The BOE denied the Estate's alternative contentions that it was either not subject to California taxes or it should receive a tax credit for taxes paid in New York. Further, because Ms. Monroe's will could legally be probated in New York as long as she had some personal property there (she possessed personal property in a New York apartment when she died), her Estate also did not prevail in any way by statements made to the Surrogate's Court regarding her residence. *See* N.Y. Surr. Ct. Proc. Act § 206 (1967) (formerly NY Surr. Ct. Act § 45) (Surrogate's Court may exercise jurisdiction over a will, whether or not the decedent was a domiciliary of the state, as long as the decedent owns personal property in the state); *see also In re Will of Shailer*, 9 Misc. 2d 62, 172 N.Y.S.2d 724 (Surr. Ct. 1957).

Thus, the Monroe Estate did not prevail based on any statements made to the Surrogate's Court. *See, e.g., Jarrard*, 408 F.3d at 914 ("the party must have prevailed on the basis of its earlier position" for judicial estoppel to apply); *Allison v. Ticor Title Ins. Co.*, 979 F.2d 1187, 1193 (7th Cir. 1992). Even if the Estate did prevail, which the SFA parties cannot establish, Mr.

---

[22] The SFA parties do not argue that judicial estoppel applies to the Frosch Case, in which Mr. Frosch did not prevail; they do contend, however, that judicial estoppel somehow applies to *Strasberg v. Odyssey Group, Inc.*, 51 Cal. App. 4th 906 (1996), but they fail to point to any admissions, judicial or otherwise, made by MMLLC in that case. That case had nothing to do with Ms. Monroe's domicile or her right of publicity; instead, it involved the ownership of certain personal property of Ms. Monroe that her former business manager had improperly retained upon Ms. Monroe's death. Therefore, SFA's unsupported claim that judicial estoppel applies to that case is baseless.

Frosch's statements to the Surrogate's Court are irrelevant to Ms. Monroe's actual domicile at the time of her death and therefore cannot form the basis of judicial estoppel here.[23]

### 3.    MMLLC Would Not Derive An Unfair Advantage Or Impose An Unfair Detriment on Defendants If Not Estopped

Whether Plaintiffs benefited from the decision of the court in the prior suit is material to the equitable analysis for judicial estoppel .  In *Crosby v. Bowater, Inc.*, 2006 U.S. Dist. LEXIS 67144, at *25-27, the court stated:

> The Seventh Circuit in *Carnegie* stressed the fact that the parties to be estopped there "reaped a benefit" from the position they asserted in the prior litigation; thus, judicial estoppel was equitably applied because "they cannot now be permitted to seek a further benefit from reversing their position." *Carnegie*, 376 F.3d at 660.  Precedent stresses the importance of this "benefit" to the judicial estoppel analysis. The Supreme Court . . . determined that allowing such a litigant to assert the inconsistent position would undermine the "integrity of the judicial process." *Id; New Hampshire*, 532 U.S. at 755 (applying judicial estoppel against New Hampshire, when "[h]aving convinced this Court to accept one interpretation of 'Middle of the River,' and having benefited from that interpretation, New Hampshire now urges an inconsistent interpretation to gain an additional advantage at Maine's expense.").

Here, MMLLC reaped no benefit.  Mr. Frosch's representation to the Board of Equalization actually caused the Estate to lose the case and pay more taxes.  Moreover, the SFA parties have

---

[23]  Many courts find statements made by executors/trixes irrelevant, even (1) where the will had already been submitted to probate on the basis of that statement and (2) it was the very same executor/trix lodging a challenge against his or her prior representation of domicile.  For example, in a case where decedent's will had already been submitted to probate in New York Surrogate's Court based on the executrix's contention that the decedent died a New York domiciliary , the executrix—in connection with a proposed tax assessment against the estate—subsequently took the position that decedent had, in fact, been domiciled in Washington, D.C. when he died.  *In re Estate of Grant*, 83 Misc. 257, 260, 144 N.Y.S. 567, 570 (N.Y. Misc. 1913).  Recognizing that an "executrix cannot change the actual domicile of the testator by her own admissions after testator's death, nor can she do so by her own acts, . . ." the court considered the fact the decedent had left New York "with his entire family" to take up "his permanent and only residence" in federal territory and concluded that decedent was not domiciled in New York at the time of death.  *Id.* at 260, 270-72; *In re Mulhern's Estate*, 31 A.D.2d 317, 318, 297 N.Y.S. 2d 485, 487 (N.Y. App. Div. 1969).

not and cannot point to any benefit MMLLC obtained by Mr. Frosch's decision to probate the will in the New York Surrogate's Court.  MMLLC is not trying to play fast and loose with the Court, and the integrity of the judicial process is not being compromised in any way by the proper adjudication of Ms. Monroe's actual domicile at the time of her death.[24]

C.    **Notwithstanding the Irrelevance of Marilyn Monroe's Domicile to SFA's Violations of the Indiana Statute, Indisputable Facts Establish that She Died a California Domiciliary**

The SFA parties' motion must also be denied because their argument that no right of publicity survived Marilyn Monroe's death on the basis that she was a New York domiciliary is contrary to undisputed material facts.  Marilyn Monroe's domicile at the time of her death must be determined based on facts from before her death.  The statements and actions of others after her death (upon which the SFA parties' attorneys rely) do not and cannot change the fact that when the California-born Ms. Monroe died in her home in California on August 5, 1962, she was domiciled in California.  Even a brief examination of the evidence from Ms. Monroe's later days leads to the inexorable conclusion that Marilyn Monroe—who was born, educated, attained global celebrity status, owned her only home, lived nearly all her life and died in her home in

---

[24] The Seventh Circuit also considers applying the doctrine of judicial estoppel only when there are successive litigations arising from the same factual circumstances.  *See Ezekiel v. Michel*, 66 F.3d 894, 904 (7th Cir. 1995) *see also Ogden*, 179 F.3d at 527-528; *Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d at 702.  That is not the case here, where the prior administrative and probate proceedings did not involve litigation about Ms. Monroe's posthumous publicity rights or her domicile.

California—was a domiciliary of California upon her death.[25]  To the extent that domicile is material to Count II—which it is not, given the plain language of Indiana's RoP statute—at a minimum the evidence proffered by MMLLC illustrates that there is a sharp and genuine dispute as to Ms. Monroe's domicile at the time of her death.

"A person's domicile is the place of his true, fixed and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom . . . ."  *McCormick v. Aderholt*, 293 F.3d 1254, 1257-58 (11th Cir. 2002) (citing *Mas v. Perry*, 489 F.2d 1396, 1399 (5th Cir. 1974), *cert. denied*, 419 U.S. 842, 95 S.Ct. 74 (1974)).  "[T]wo things are indispensable" to acquire a new domicile: (1) actually residing in AND (2) manifesting intent to remain and make that new location "home" or one's principal establishment. *Kaiser v. Loomis*, 391 F.2d 1007, 1009 (6th Cir. 1968); *see also Lew*, 797 F.2d at 750 ("change in domicile requires the confluence of (a) physical presence at the new location with (b) an intention to remain there indefinitely.").  In determining whether an individual has in fact acquired a new domicile, courts evaluate various indicia, with no particular factor being determinative.  These include, but are not limited to: current residence, rental v. ownership of real property, place of business, membership in professional and social organizations, location of household and family members, location of driver's license and vehicle registration, voting

---

[25]  Even if Marilyn Monroe were deemed a New York domiciliary for probate purposes, the quintessential Hollywood film icon should *also* be considered a California domiciliary for purposes of her right of publicity.  Indeed, "one may be legally domiciled in different places for different legal purposes[.]"  *Wit v. Berman*, 306 F.3d 1256, 1260 (2d Cir. 2002); *Acridge,* 334 F.3d 444.  "Every person has a domicil at all times and, *at least for the same purpose*, no person has more than one domicil at a time."  Restatement (Second) of Conflicts § 11(2) (1988) (emphasis added).

registration, and tax payment. *See id.* at 750 (citing cases); *Lagersen*, 169 Cal. App.2d at 366-67; 39 Am. Jur. 2d Proof of Facts § 587 (2004).

For Marilyn Monroe, all roads lead to California. Born on June 1, 1926 in Los Angeles General Hospital, Marilyn Monroe grew up and attended school in L.A. AUF ¶ 1. After marrying James Dougherty in California (whom she divorced several years later), Marilyn Monroe began modeling and, soon thereafter, landed her first contract with a Hollywood studio, Twentieth Century FOX, in 1946. AUF ¶ 2. In the following years, Ms. Monroe appeared in numerous Hollywood films, including such hits as How To Marry a Millionaire and Gentlemen Prefer Blondes. AUF ¶ 3. Through these roles, Marilyn Monroe attained iconographic celebrity status, garnering admirers worldwide. During these years, she met and married the San Francisco-based, world famous baseball player Joe DiMaggio, at City Hall in San Francisco, California. AUF ¶ 4. Though Ms. Monroe spent several years in the mid to late 1950s on the East Coast—living in Connecticut initially with Milton H. Greene's family and later with her third husband, playwright Arthur Miller, and studying at the Actors' Studio in New York with coaches Lee and Paula Strasberg— she returned to lived full time in Los Angeles well before her August 1962 death. AUF ¶ 5-7.

In early 1962, Marilyn Monroe purchased the only home she ever owned, a Spanish-style bungalow located at 12305 Fifth Helena Drive in Brentwood, California, and bearing the inscription on the front steps "Cursum Perficio," or "I have completed my journey." AUF ¶ 7. Though she maintained a Connecticut driver's license, it contains her Brentwood address, and no Connecticut or New York address. AUF ¶ 12. Approaching the renovation and decoration of her new home with pride and passion, Marilyn Monroe embarked on a trip to Mexico to

purchase furnishings and soon moved into the home with her dog, Mafia, who was licensed in Los Angeles, California.  AUF ¶ 8.

Throughout 1962, Marilyn Monroe prepared for her next Hollywood film, "Something's Got To Give," and regularly attended psychotherapy sessions in Los Angeles.  AUF ¶ 9. Throughout that summer, Marilyn Monroe spent a great deal of time with Joe DiMaggio and, by most accounts, they decided to remarry on August 8, 1962.  But on August 5, Ms. Monroe was tragically found dead in her California home.  AUF ¶ 10.  She was buried at the Westwood Memorial Cemetery in Los Angeles.  AUF ¶ 11.[26]

### D.    The Indiana RoP Created a Right In Favor of MMLLC.

As discussed in Section I.A, *supra*, SFA's contention that the Indiana RoP statute did not create rights in favor of Marilyn Monroe is false, and those arguments pertaining to construction of the Indiana Statute are incorporated by reference here.

### E.    The SFA Parties Have Not Established Laches

The SFA parties bear the burden to prove laches.  *See Hawxhurst v. Pettibone Corp.*, 40 F.3d 175, 182 n.5 (7th Cir. 1994).  The SFA parties must prove:  (1) MMLLC's inexcusable delay in asserting a right; and (2) prejudice.  *See, Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999); *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030 (9th Cir. 2000).

The SFA parties present no evidence of any specific licensing of Ms. Monroe's Right of Publicity of which Plaintiffs were or should have been aware.  Indeed, to the contrary, SFA's

---

[26]  These facts illustrate Marilyn Monroe's presence in and intent to make California her home at the end of her life—as it was in the beginning.  She died a domiciliary of California.  SFA's "facts" about New York domicile—all well before Ms. Monroe's death, or statements made by others thereafter—at most demonstrate that there is a genuine dispute as to Marilyn Monroe's domicile.  They do not support the SFA parties' motion for summary judgment under these circumstances.

contention that MMLLC is barred by laches is flatly belied by SFA's own sworn testimony.  The

SFA parties admit that they do not "hold themselves out as the owner of Marilyn Monroe's right

of publicity" Reiter Decl. ¶ 11, and that "SFA does not create, license or sell any merchandise

containing the images of Marilyn Monroe.  SFA merely licenses to others the right use images

controlled by SFA." Stevens Decl. ¶¶ 6, 7; *see also* SFA Parties' Statement of Facts No. 24;

Marcus Decl. ¶ 18.  In other words, the SFA parties argue, on the one hand, that laches should

apply to supposed infringements (of which they present no specific evidence) that took place

outside of the statute of limitations period, while simultaneously arguing, on the other hand, that

there were no infringements and SFA is not in the business of licensing such infringements.

SFA cannot have it both ways.

 Accordingly, Plaintiffs had no reason to bring a lawsuit for infringement of the Right of

Publicity until recently, when SFA's conduct indicated that, through Bradford Licensing, SFA

intended to expand its licensing activities to infringe on Plaintiffs' rights.  AUF ¶¶ 31-39.

MMLLC and CMG initiated this suit when they became aware of SFA's activities in Indiana, and

now have undisputed evidence of SFA's illegal use of Ms. Monroe's likeness in Indiana.

Therefore, MMLLC has not unreasonably delayed bringing its claims.[27]

 Additionally, SFA has not proven prejudice.  SFA asserts that it would go out of business

if MMLLC's claims prevail.  But contrary to this unsupported assertion, SFA has stated that it

only licenses the copyrighted photographs of Sam Shaw—it is not in the business of licensing

---

[27] Defendants cannot rely on *Miller v. Glenn Miller Prods., Inc.*, 318 F. Supp. 2d 923 (C.D. Cal. 2004), *aff'd*, 454 F.3d 975, 997 (9th Cir. 2006).  Unlike here, where SFA has no evidence of infringements, in *Miller*, defendant presented evidence that it sold infringing merchandise of a deceased personality, Glenn Miller, at performances and that plaintiff attended those performances and even admitted to being aware of such infringing sales.

Ms. Monroe's Right of Publicity.  SFA can continue to license its pictures, while MMLLC

licenses Ms. Monroe's Right of Publicity.  SFA did not spend money or change position

believing that MMLLC and CMG would not assert ownership over the rights, which is the type

of prejudice that laches contemplates.  AUF ¶ 33; *see Conopco, Inc. v. Campbell Soup Co*., 95

F.3d 187, 192 (2d Cir. 1996).

## III.

### Conclusion

For the foregoing reasons, MMLLC's Motion for Summary Judgment on Count II should

be granted, and the SFA parties' Cross-Motion for Summary Judgment should be denied.


Dated: New York, New York
       December 22, 2006

                                        Respectfully submitted,


                                        By:  _____/s/  Orin Snyder_____
                                             Orin Snyder (OS-3122)
                                             Michelle Craven (MC-8556)

                                        GIBSON, DUNN & CRUTCHER LLP
                                        200 Park Avenue
                                        47th Floor
                                        New York, New York 10166-0193
                                        Telephone: (212) 351-2400
                                        Facsimile: (212) 351-4335

                                        Attorneys for Defendant/Consolidated Plaintiff
                                        Marilyn Monroe, LLC

Of Counsel:

William E. Wegner