UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ꜧ
SHAW FAMILY ARCHIVES, LTD., EDITH : 
MARCUS and META STEVENS,                  :05 CV 3939 (CM)
                                                              :
                   Plaintiffs,                           :
         v.                                                  :Honorable Colleen McMahon
                                                              :
CMG WORLDWIDE, INC., an Indiana Corporation  :
and MARILYN MONROE, LLC, a Delaware Limited :
Liability Company,                                  :
                                                              :
                   Defendants.                        :
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - ꜧ

## RESPONSE TO THE SFA PARTIES'
## RULE 56.1 STATEMENT

Defendant/Consolidated Plaintiff Marilyn Monroe, LLC ("MMLLC"), pursuant to Rule

56.1 of the Local Rules of the United States District Court for the Southern District of New

York, respectfully submits the following response to the Combined Statement of Facts in

Support of the Cross-Motion of Shaw Family Archives, Ltd. ("SFA") and Bradford Licensing,

Inc. ("Bradford") (collectively, the "SFA Parties") for Summary Judgment and Counter-

Statement of Facts in Opposition to MMLLC's Motion for Summary Judgment, as well as

Additional Undisputed Material Facts ("AUF") in opposition to the SFA Parties' cross-motion

for summary judgment.

## MMLLC'S RESPONSE TO THE SFA PARTIES' RULE 56.1
## STATEMENT

As indicated in MMLLC's individual responses, the SFA Parties have cited evidence that

does not support – or failed to cite evidence that supports – certain of the statements made by

them as required by Rule 56.1(d); certain statements of the SFA Parties' Rule 56.1 Statement

contain legal arguments or improper characterizations; and certain statements need additional

facts, information or testimony to make the statements the SFA Parties have made accurate or

not misleading.  In addition, some statements of the SFA Parties' Rule 56.1 Statement contain

inadmissible evidence, and some statements do not contain facts material to the SFA Parties'

cross-motion for summary judgment.

MMLLC respectfully requests that the Court strike or disregard the SFA Parties'

unsupported, inaccurate, inadmissible or argumentative and conclusory statements.  *See Holtz v.

Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here the cited materials do not support

the factual assertions in the statements, the Court is free to disregard the assertion." (internal

quotations omitted)); *Epstein v. Kemper Ins. Co.*, 210 F.Supp.2d 308, 314 (S.D.N.Y. 2002)

("Statements in a . . . Rule 56.1 statement are inappropriate if they . . . are conclusory or

argumentative, or do not cite to supporting evidence.").

**MMLLC's Response to Statement No. 1:**

MMLLC admits that Marilyn Monroe's will was drafted and executed in New York

County.

**MMLLC's Response to Statement No. 2:**

MMLLC admits that Ms. Monroe's will was subject to primary probate in New York

County Surrogate's Court.

**MMLLC's Response to Statement No. 3:**

MMLLC disputes the SFA Parties' assertions in this statement.  Mr. Frosch, in his

capacity as "Executor of the Estate of Marilyn Monroe," was responsible for carrying out the

provisions in Ms. Monroe's will.  In that capacity, Mr. Frosch cannot bind all the heirs or

beneficiaries of the Estate, including Ms. Strasberg.  Mr. Frosch's role as executor was simply to divvy the Monroe Estate's assets to their rightful owners, and any dispute between alleged holders of Estate property were determined by the Surrogate's Court and simply carried out by Mr. Frosch.  He did not have the power to bind all of the various beneficiaries and heirs to the Monroe Estate with his off-the-cuff, irrelevant, and erroneous statements.

MMLLC does not dispute the assertion that Ms. Strasberg stated that Marilyn Monroe died a resident of the State of New York.

**MMLLC's Response to Statement No. 4:**

MMLLC admits that, according to documents and filings made by Aaron Frosch, the Estate of Marilyn Monroe was taxed in New York.  MMLLC respectfully refers the Court to those documents and filings for their contents.

**MMLLC's Response to Statement No. 5:**

MMLLC disputes the SFA Parties' assertions in this statement.  While the California Board of Equalization ("BOE") stated that Marilyn Monroe was a resident of New York, there is no evidence that any of the indicia of domicile were ever considered and/or weighed by the Court because the respondent, the California Franchise Tax Board, did not dispute or litigate the issue of her domicile.  Domicile is a question of intent, and Ms. Monroe's intent was not at issue in the BOE proceeding.  There is no evidence that Ms. Monroe's intent, the real issue in determining domicile, was ever properly addressed in the BOE proceeding:  no evidence was submitted on Marilyn Monroe's intent, no hearing conducted, and no witnesses were examined or cross-examined as to her intent—the key factor in a domicile inquiry.  Moreover, Ms. Monroe bought her first and only home in California six months before she died, so she certainly was at least a resident of California.  *See* AUF 7; Craven Decl., Exh. 1, at Exhs. C, L, and M.

3

**MMLLC's Response to Statement No. 6:**

MMLLC disputes the SFA Parties' assertions in this statement.  Mr. Frosch, in his capacity as "Executor of the Estate of Marilyn Monroe," was responsible for carrying out the provisions in Ms. Monroe's will.  In that capacity, Mr. Frosch cannot bind all the heirs or beneficiaries of the Estate, including Mr. Strasberg.  Mr. Frosch's role as executor was simply to divvy the Monroe Estate's assets to their rightful owners, and any dispute between alleged holders of Estate property were determined by the Surrogate's Court and simply carried out by Mr. Frosch.  He did not have the power to bind all of the various beneficiaries and heirs to the Monroe Estate with his off-the-cuff, irrelevant, and erroneous statements.

**MMLLC's Response to Statement No. 7:**

MMLLC does not dispute this statement.

**MMLLC's Response to Statement No. 8:**

MMLLC does not dispute that MMLLC has sold the personal property of Ms. Monroe at auction from 1999 to June 2005.  MMLLC disputes the rest of the assertions in this statement because they are conclusory and argumentative and therefore do not contain facts material to the determination of the SFA Parties' cross-motion for summary judgment.

**MMLLC's Response to Statement No. 9:**

MMLLC disputes the SFA Parties' assertions in this statement.  The SFA Parties have failed to offer any admissible evidence of these "facts."  The Court cannot consider "facts" on summary judgment that have absolutely no evidentiary foundation.  Moreover, a purported transcription from 1955 is irrelevant to prove Ms. Monroe's domicile at the time of her death, seven years later in 1962.

**MMLLC's Response to Statement No. 10:**

MMLLC disputes the SFA Parties' assertions in this statement. The *Frosch* court addressed whether the book in dispute was a literary work because literary works do not give rise to a cause of action for a violation of the right of publicity. The court did not decide whether Ms. Monroe's Right of Publicity existed at all. In fact, to the contrary, the parties in *Frosch v. Grosset & Dunlap*, 75 A.D.2d 768 (N.Y. App. Div. 1980), conceded for purposes of the motion regarding whether the book was a First Amendment protected literary work, that Ms. Monroe had a posthumous right of publicity. *See* AUF 17-20; Craven Decl., Exhs. 4-9. Moreover, the trial court decided that the book at issue was protected by the First Amendment, and the appellate division affirmed that judgment. *See id.*

**MMLLC's Response to Statement No. 11:**

MMLLC disputes the SFA Parties' assertions in this statement. The SFA Parties have failed to offer any admissible evidence of these "facts." The Court cannot consider "facts" on summary judgment that have absolutely no evidentiary foundation. MMLLC maintains that Ms. Monroe was domiciled in California at the time of her death. *See* AUF 1-12.

**MMLLC's Response to Statement No. 12:**

MMLLC disputes the SFA Parties' assertions in this statement. The SFA Parties have failed to offer any admissible evidence of these "facts." The Court cannot consider "facts" on summary judgment that have absolutely no evidentiary foundation. Moreover, the SFA Parties' assertions are conclusory and argumentative and therefore do not contain facts material to the determination of the SFA Parties' cross-motion for summary judgment.

**MMLLC's Response to Statement No. 13:**

MMLLC disputes the Shaw Parties' assertions in this statement. The SFA Parties sold a T-shirt bearing Marilyn Monroe's name, image and likeness in the state of Indiana. The undisputed facts regarding this T-shirt sale were laid out in the Statement of Undisputed Facts in support of MMLLC's Motion for Summary Judgment on Count II against SFA ("MMLLC's SUF") (filed on Oct. 25, 2006). *See* SUF 1-7. Additionally, the SFA Parties advertise their products and services directly to persons in Indiana through various internet websites. *See* SUF 15-18; *see also* Declaration of Edith Marcus in support of SFA and Bradford's Cross-Motion for Summary Judgment and in Opposition to MMLLC's Motion for Summary Judgment ("Marcus Decl.") ¶ 13; Declaration of Len Reiter in support of SFA and Bradford's Cross-Motion for Summary Judgment and in Opposition to MMLLC's Motion for Summary Judgment ("Reiter Decl.") ¶ 10. Moreover, there may be additional infringing activities that the SFA Parties have engaged in within the state of Indiana. For example, SFA's license with CMZ handbags for the production of handbags with Ms. Monroe's image on it did not have any limitation as to the territory of distribution: "Licensee shall be permitted to distribute and sell the PRODUCT under License *throughout the world*." Declaration of Larry Shaw in support of SFA and Bradford's Cross-Motion for Summary Judgment and in Opposition to MMLLC's Motion for Summary Judgment ("Shaw Decl.") ¶ 27, Ex. I (emphasis added). Therefore, the SFA Parties' conclusory statement that it has never advertised or solicited business in Indiana is disingenuous. *See* MMLLC's Memorandum of Law in Support of Motion for Summary Judgment ("MMLLC's Memo") at 14-16.

**MMLLC's Response to Statement No. 14:**

MMLLC disputes the Shaw Parties' assertions in this statement. The SFA Parties sold a T-shirt bearing Marilyn Monroe's name, image and likeness in the state of Indiana. The

undisputed facts regarding this T-shirt sale were laid out in MMLLC's SUF. *See* SUF 1-7.

Additionally, the SFA Parties advertise their products and services directly to persons in Indiana

through various internet websites. *See* SUF 15-18; *see also* Marcus Decl. ¶ 13; Reiter Decl. ¶ 10.

Moreover, there may be additional infringing activities that the SFA Parties have engaged in

within the state of Indiana. For example, SFA's license with CMZ handbags for the production

of handbags with Ms. Monroe's image on it did not have any limitation as to the territory of

distribution: "Licensee shall be permitted to distribute and sell the PRODUCT under License

*throughout the world*." Shaw Decl. ¶ 27, Ex. I (emphasis added). Therefore, the SFA Parties'

conclusory statement that it has never advertised or solicited business in Indiana is disingenuous.

*See* MMLLC's Memo at 14-16.

**MMLLC's Response to Statement No. 15:**

MMLLC disputes the Shaw Parties' assertions in this statement. The SFA Parties sold a

T-shirt bearing Marilyn Monroe's name, image and likeness in the state of Indiana. The

undisputed facts regarding this T-shirt sale were laid out in MMLLC's SUF. *See* SUF 1-7.

Additionally, the SFA Parties advertise their products and services directly to persons in Indiana

through various internet websites. *See* SUF 15-18; *see also* Marcus Decl. ¶ 13; Reiter Decl. ¶ 10.

In fact, it was only after MMLLC filed this litigation that the SFA Parties' added the phrase

"[n]o images shall be licensed for sale or distribution in Indiana" to their website. *See*

MMLLC's memo at 15, n.6. Moreover, there may be additional infringing activities that the

SFA Parties have engaged in within the state of Indiana. For example, SFA's license with CMZ

handbags for the production of handbags with Ms. Monroe's image on it did not have any

limitation as to the territory of distribution: "Licensee shall be permitted to distribute and sell the

PRODUCT under License *throughout the world*." Shaw Decl. ¶ 27, Ex. I (emphasis added).

Therefore, the SFA Parties' conclusory statement that it has made it part of its business strategy to avoid Indiana is disingenuous.  *See* MMLLC's Memo at 14-16.

**MMLLC's Response to Statement No. 16:**

MMLLC disputes the Shaw Parties' assertions in this statement.  The SFA Parties advertise their products and services directly to persons in Indiana through various internet websites.  *See* SUF 15-18; *see also* Marcus Decl. ¶ 13; Reiter Decl. ¶ 10.  In fact, it was only after MMLLC filed this litigation that the SFA Parties' added the phrase "[n]o images shall be licensed for sale or distribution in Indiana" to their website.  *See* MMLLC's Memo at 15, n.6.

**MMLLC's Response to Statement No. 17:**

MMLLC disputes the SFA Parties' assertions in this statement.  The SFA Parties have failed to offer any admissible evidence of these "facts" regarding their licensing of Sam Shaw's photographs of Marilyn Monroe since 1987 or anybody's knowledge of such licensing activities.  The Court cannot consider "facts" on summary judgment that have absolutely no evidentiary foundation.  Moreover, the SFA Parties' assertions are conclusory and argumentative and therefore do not contain facts material to the determination of the SFA Parties' cross-motion for summary judgment.  Additionally, the SFA Parties' contentions are belied by No. 24 in their Statement of Facts where they state that "SFA merely licenses to others the right to use photographic images it owns and controls, it does not create, license, or sell actual merchandise." Or, as they stated elsewhere:  "Neither Bradford nor SFA hold themselves out as the owner of Marilyn Monroe's right of publicity . . . ."  Reiter Decl. ¶ 11.  In other words, SFA (and its predecessors) was not licensing rights that infringe upon MMLLC's rights.  Finally, contrary to the SFA Parties' assertions, the Shaw family acknowledged years ago that the Monroe Estate

owned the right of publicity and various trademarks in Marilyn Monroe and that CMG administered those rights.  *See* Roesler Decl. ¶¶  4-5.

**MMLLC's Response to Statement No. 18:**

MMLLC disputes the SFA Parties' assertions in this statement because they do not contain facts material to the SFA Parties' cross-motion for summary judgment.  Additionally, the SFA Parties' contentions are belied by No. 24 in their Statement of Facts where they state that "SFA merely licenses to others the right to use photographic images it owns and controls, it does not create, license, or sell actual merchandise."  Or, as they stated elsewhere:  "Neither Bradford nor SFA hold themselves out as the owner of Marilyn Monroe's right of publicity . . . ."  Reiter Decl. ¶ 11.  In other words, SFA can coexist with MMLLC by continuing to license their copyrights in Shaw images, while MMLLC licenses the right of publicity.

**MMLLC's Response to Statement No. 19:**

MMLLC does not have information sufficient to form a belief as to the accuracy of this statement or the testimony cited therein.

**MMLLC's Response to Statement No. 21:**

MMLLC does not dispute that the Roger Richman Agency was MMLLC's exclusive agent until 1994.  CMG has been MMLLC's exclusive agent since 1995.  *See* Supplemental Declaration of Anna Strasberg in support of MMLLC's Motion for Summ. J. and in Opposition to SFA and Bradford's Cross-Motion for Summ. J. ("Strasberg Supp. Decl.") ¶ 7; Supplemental Declaration of Mark Roesler in support of MMLLC's Motion for Summ. J. and in Opposition to SFA and Bradford's Cross-Motion for Summ. J. ("Roesler Supp. Decl.") ¶ 3.

**MMLLC's Response to Statement No. 22:**

MMLLC disputes the SFA Parties' assertions in this statement because they do not contain facts material to the SFA Parties' cross-motion for summary judgment.

**MMLLC's Response to Statement No. 23:**

MMLLC does not dispute that SFA and Bradford filed an answer in this action. MMLLC respectfully refers the Court to that answer for its contents. *See* Declaration of David Marcus ("Marcus Decl.") ¶ 3, Ex. B.

**MMLLC's Response to Statement No. 24:**

MMLLC disputes the SFA parties' assertions in this statement. The SFA parties have failed to offer any admissible evidence of these "facts." The Court cannot consider "facts" on summary judgment that have absolutely no evidentiary foundation. Moreover, the SFA Parties' assertions are conclusory and argumentative and therefore do not contain facts material to the determination of the SFA Parties' cross-motion for summary judgment. The SFA Parties sold a T-shirt bearing Marilyn Monroe's name, image and likeness in the state of Indiana. The undisputed facts regarding this T-shirt sale were laid out in MMLLC's SUF. *See* SUF 1-7. Additionally, the SFA Parties advertise their products and services directly to persons in Indiana through various internet websites. *See* SUF 15-18; *see also* Marcus Decl. ¶ 13; Reiter Decl. ¶ 10. Moreover, there may be additional infringing activities that the SFA Parties have engaged in within the state of Indiana. For example, SFA's license with CMZ handbags for the production of handbags with Ms. Monroe's image on it did not have any limitation as to the territory of distribution: "Licensee shall be permitted to distribute and sell the PRODUCT under License *throughout the world*." Shaw Decl. ¶ 27, Ex. I (emphasis added).

**MMLLC's Response to Statement No. 25:**

MMLLC disputes the SFA Parties' assertions in this statement.  The SFA Parties have failed to offer any admissible evidence of these "facts."  The Court cannot consider "facts" on summary judgment that have absolutely no evidentiary foundation.  Moreover, the SFA Parties' assertions are conclusory and argumentative and therefore do not contain facts material to the determination of the SFA Parties' cross-motion for summary judgment.

## ADDITIONAL MATERIAL UNDISPUTED FACTS

In addition, MMLLC submits these additional facts in opposition to' cross-motion for summary judgment:

1.      Born Norma Jeane Mortenson on June 1, 1926, in Los Angeles General Hospital in California, Marilyn Monroe grew up and attended school in Los Angeles.  *See* Declaration of Michelle M. Craven, dated December 22, 2006 ("Craven Decl.") Exh. 1 at Exh. S.

2.      After marrying James Dougherty at the age of sixteen in California (whom she divorced several years later), Marilyn Monroe began modeling and, soon thereafter, landed her first contract with the Hollywood studio, Twentieth Century FOX, in 1946.  *See* Craven Decl., Exh. 1 at Exhs. N, O, Q, and S.

3.      In the years that followed, Marilyn Monroe appeared in numerous Hollywood films, including such hits as *How to Marry a Millionaire* and *Gentlemen Prefer Blondes*.  *See* Craven Decl., Exh. 1 at Exhs. N and P.

4.      During these years, she met and married the San Francisco-based, world famous baseball player Joe DiMaggio, at City Hall in San Francisco, California.  *See* Craven Decl., Exh. 1 at Exhs. G, H, N, and P.

5.     Marilyn Monroe spent several years in the mid- to late 1950s on the East Coast, initially living with Milton H. Greene's family in Connecticut and later with her third husband, the famous playwright Arthur Miller.  *See* Craven Decl., Exh. 1 at Exh. T.

6.     Marilyn Monroe studied at the Actors' Studio in New York with coaches Lee and Paula Strasberg.  *See* Craven Decl., Exh. 1 at Exh. S.

7.     In early 1962, Marilyn Monroe purchased the only home she ever owned, a Spanish bungalow located at 12305 Fifth Helena Drive in Brentwood and bearing the inscription on the front steps "Cursum Perficio," or "I have completed my journey."  *See* Craven Decl., Exh. 1, at Exhs. C, L, and M.

8.     Approaching the renovation and decoration of her new home with pride and passion, Marilyn Monroe embarked on a trip to Mexico to purchase furnishing s and soon moved in with her dog, Mafia, licensed in the state of California.  *See* Craven Decl., Exh. 1 at Exhs. D, J, M.

9.     As 1962 continued, Marilyn Monroe began preparing for her next Hollywood film, *Something's Got To Give*, and regularly attended psychotherapy sessions with Dr. Greenson in Los Angeles.  *See* Craven Decl., Exh. 1 at Exhs. L, M, R, and S.

10.     On August 5, 1962, Marilyn Monroe was tragically found dead in her Brentwood home, the result of an apparent overdose.  *See* Craven Decl., Exh. 1 at Exh. I.

11.     Joe DiMaggio made the funeral arrangements for Marilyn Monroe, and she was later buried at the Westwood Memorial Cemetery, located at 1218 Glendon Avenue in Los Angeles, California.  *See* Craven Decl., Exh. 1 at Exh. J.

12.     Though Marilyn Monroe maintained a Connecticut driver's license, it contains her Brentwood address, and no Connecticut or New York address. *See* Craven Decl., Exh. 1 at Exh. F.

13.     The residuary clause of Marilyn Monroe's will included three beneficiaries: (i) May Reis was bequested $40,000.00 or 25% of the residuary estate, whichever was lesser; (ii) Dr. Marianne Kris was bequested 25% of the remaining balance of the residuary estate; (iii) Lee Strasberg was bequested the rest of the remaining balance of the residuary estate. *See* Declaration of Anna Strasberg in Support of MMLLC's Motion for Summary Judgment ("Strasberg Decl."), Exhibit C.

14.     During probate of Marilyn Monroe's estate, May Reis was paid $40,000.00 in accordance with the residuary clause of the will, thus leaving Dr. Marianne Kris with 25% and Lee Strasberg with 75% of the remainder of the residual estate. *See* Supplemental Declaration of Anna Strasberg ("Strasberg Supp. Decl.") at ¶ 4.

15.     During the probate of the Monroe Estate, both Dr. Kris and Lee Strasberg died, and their interests in the estate passed to the Anna Freud Centre and to the Estate of Lee Strasberg, respectively. *See* Strasberg Supp. Decl. at ¶ 4.

16.     Aaron Frosch was the executor of the Estate of Marilyn Monroe until his death in April 1989. *See* Strasberg Supp. Decl. at ¶ 5.

17.     *Frosch v. Grosset & Dunlap, Inc.*, 75 A.D.2d 768 (N.Y. App. Div. 1980) involved an action initiated by Aaron Frosch in his capacity as executor of the Estate of Marilyn Monroe. Frosch alleged that a book written by Norman Mailer infringed Marilyn Monroe's right of publicity. *See Frosch v. Grosset & Dunlap*, 75 A.D.2d 768 (N.Y. App. Div. 1980).

18.     Defendants in *Frosch v. Grosset & Dunlap, Inc.* filed a Motion to Dismiss and/or for Summary Judgment with the trial court, arguing that the book written by Mr. Mailer was a literary work entitled to First Amendment protection from right of publicity claims.  In the motion, defendants stated that "for the purposes of this motion (and only for the purposes of this motion), it will be assumed that a common law right of publicity would be recognized in New York."  *See* Craven Decl., Exh. 4.

19.     The trial court granted defendants' motion for summary judgment based on the First Amendment protection of the book by Mr. Mailer.  *See* Craven Decl., Exh. 5.

20.     The trial court's grant of summary judgment was appealed, and was affirmed by the appellate division in *Frosch v. Grosset & Dunlap, Inc.*, 75 A.D.2d 768 (N.Y. App. Div. 1980).

21.     On May 7, 1990, Marjorie Frosch, executrix of the Estate of Aaron Frosch, submitted an Account of Executors and Administrators of the Estate of Marilyn Monroe to the Surrogate's Court, County of New York, including schedules showing payments made to the Estate of Marilyn Monroe by Roger Richman Agency, Inc., the agent responsible for licensing Marilyn Monroe's name, image and likeness, between July 1, 1980 and April 29, 1989.  *See* Strasberg Supp. Decl., Exh. A.

22.     Anna Strasberg was appointed Administratrix C.T.A. of the Estate of Marilyn Monroe by the Surrogate's Court, County of New York, on July 20, 1989.  *See* Strasberg Supp. Decl., Exh. B.

23.     During her service as Administratrix C.T.A. of the Monroe estate, which spanned from July 20, 1989 to June 19, 2001, Anna Strasberg was not aware of any infringing licensing activities by the Shaw family.  *See* Strasberg Supp. Decl., ¶ 7.

24.     A final Account of Executors and Administrators was received by the Surrogate's Court, County of New York on December 11, 2000, including schedules showing payments made to the estate of Marilyn Monroe between July 20, 1989 and October 3, 2001 by licensees who had licensed Marilyn Monroe's publicity rights from the estate's licensing agent. *See* Strasberg Supp. Decl., Exh. C.

25.     On or about October 18, 2000, Anna Strasberg submitted to the Surrogate's Court, County of New York, a Petition for Judicial Settlement of Final Account of Administratrix C.T.A. and For An Order Authorizing Petitioner to (1) Execute Limited Liability Agreement; (2) Establish and Operate Limited Liability Company; (3) Use Estate Assets to Establish Limited Liability Company; (4) Distribute Interests to Residuary Beneficiaries; (5) For Order Vacating Order to Compel Fiduciaries to Account; and (6) Discharge of Prior Executor ("Petition for Judicial Settlement"). *See* Strasberg Supp. Decl., Exh. D.

26.     The Petition for Judicial Settlement included in its description of the assets of the estate Marilyn Monroe's "Intellectual Property Rights," which were defined as "decedent's participation rights in motion pictures and royalties from the licensing of the Decedent's name, likeness and signature." *See* Strasberg Supp. Decl., Exh. D.

27.     Appended to the Petition for Judicial Settlement were several documents, including the articles of incorporation of MMLLC, as well as proposed assignments of interests in the Marilyn Monroe estate of the remaining residuary beneficiaries, the Estate of Lee Strasberg and the Anna Freud Center. *See* Strasberg Supp. Decl., Exh. D.

28.     On June 19, 2001, the Surrogate's Court of New York issued a Decree on a Voluntary Accounting and Related Matters authorizing Anna Strasberg, in her capacity as

Administratrix C.T.A., to transfer all assets of the Estate of Marilyn Monroe to MMLLC.  *See* Strasberg Supp. Decl., Exh. E.

29.    In approving the final accounting of the estate, the Decree on a Voluntary Accounting and Related Matters found the state and condition of the account to include $15,956,520.01 in income collected between 1989 and 2000.  This amount was taken from the final Account of Executors and Administrators submitted to the Surrogate's Court, which included revenues derived from the licensing of Marilyn Monroe's name, image and likeness. *See* Strasberg Supp. Decl., ¶ 10, Exh. E.

30.    Since 1995, CMG Worldwide, Inc. ("CMG") has been the official representative for management and exploitation of the name, image, persona and likeness of Marilyn Monroe. *See* Declaration of Mark Roesler, dated December 22, 2006 ("Roesler Decl.") ¶ 3.

31.    At least as early as June 1999, CMG had been communicating with members of the Shaw Family.  Sam Shaw's daughters, Edith Marcus and Meta Stevens, acknowledged that the Marilyn Monroe Estate owned numerous trademark rights and the right of publicity, but wanted to have CMG either represent the Shaw images or in the alternative refer some of the companies with whom we had licensed the Marilyn rights to them.  Roesler Decl. ¶ 4.

32.    The Shaw family has had many communications with CMG since 1999 regarding the Monroe Intellectual Property Rights, and CMG has spoken to Larry Shaw, Meta Shaw-Stevens, Frank Stevens, and other members of the Shaw family personally on a number of occasions.  Throughout these communications, CMG repeatedly made the Shaw family aware of MMLLC's and CMG's interest in and rights to the Monroe Intellectual Property Rights. Moreover, it was clear from the Shaw family's and SFA's conduct that SFA was fully aware that

the Monroe Intellectual Property Rights are owned by MMLLC and administered by CMG, and it was my opinion that they respected those rights.  Roesler Decl. ¶ 5.

33.    Until 2004, SFA never disputed or indicated that it would not recognize the rights of CMG or Marilyn Monroe LLC.  Until 2004, CMG was not aware of any licenses granted by SFA involving the Monroe Intellectual Property Rights.  *See* Roesler Decl. ¶ 6.

34.    In reliance on the fact that SFA had worked amicably with CMG and Marilyn Monroe LLC to secure numerous licenses for many years, CMG and MMLLC decided to continue working with SFA while monitoring its licensing activities to assure that their rights were not violated.  *See* Roesler Decl. ¶ 7.

35.    On March 2, 2004, CMG received an email communication from a licensee informing CMG that it had recently received an email communication from Bradford Licensing informing the licensee that Bradford had a significant number of Marilyn Monroe images available for licensing and that a separate license from the Monroe Estate was not needed.  *See* Roesler Decl. ¶ 8.

36.    On March 4, 2004, CMG mailed a letter to Len Reiter, president of Bradford Licensing Associates, providing notice of CMG's awareness of Bradford's activities involving its alleged representation of, and unauthorized use of, the Monroe Intellectual Property Rights. This letter included a demand that Bradford immediately cease and desist "from engaging in activities which conflict with CMG's exclusive right to represent Marilyn Monroe LLC."  The letter also included a demand that Bradford "cease and desist from licensing any good which implicates the [Monroe Intellectual Property Rights][.]". *See* Roesler Decl. ¶ 9, Exh. A.

37.    Shortly thereafter CMG became aware that Bradford Licensing had posted an internet website and announced that "[o]ver 500 never before seen photos and clips . . . are now

available for license." The website included an invitation to contact Michele Minieri, Director of Marketing & Licensing at Bradford, providing her email address. *See* Roesler Decl. ¶ 10, Exh. B.

38.    On March 9, 2004, CMG received an email communication from a licensee displaying an email solicitation from Bradford Licensing asserting that because Marilyn Monroe's name is in the public domain, Bradford can use her name in association with various photographs. *See* Roesler Decl. ¶ 11, Exh. C.

39.    In light of the developments between CMG and the SFA Parties, CMG and MMLLC filed this lawsuit in the Southern District of Indiana on March 18, 2005. *See* Roesler Decl. ¶ 12.

Dated: New York, New York
       December 22, 2006

                                        /s/ Orin Snyder
                                        Orin Snyder (OS-3122)
                                        Michelle Craven (MC-8556)
                                        **GIBSON, DUNN & CRUTCHER LLP**
                                        200 Park Avenue, 47th Floor
                                        New York, New York 10166
                                        T: (212) 351-4000
                                        F: (212) 351-4035

                                        Attorneys for Defendant/Consolidated Plaintiff
                                        Marilyn Monroe LLC

100136077_2.DOC