# Exhibit 1

1   WILLIAM E. WEGNER, SBN 101486
    Email: wwegner@gibsondunn.com
2   AMNON Z. SIEGEL, SBN 234981
    Email: asiegel@gibsondunn.com
3   GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Avenue
4   Los Angeles, California 90071-3197
    Telephone: (213) 229-7000
5   Facsimile: (213) 229-7520

6   Attorneys for Plaintiffs,
    MARILYN MONROE LLC and
7   ANNA STRASBERG

8   DANIEL L. WARSHAW, SBN 185365
    Email: dwarshaw@pswplaw.com
9   PEARSON, SOTER, WARSHAW & PENNY LLP
    15165 Ventura Blvd., Suite 400
10  Sherman Oaks, CA 91403
    Telephone: (818) 788-8300
11  Facsimile: (818) 788-8104

12  JONATHAN G. POLAK (admitted *pro hac vice*)
    Email: jpolak@sommerbarnard.com
13  SOMMER BARNARD PC
    One Indiana Square, Suite 3500
14  211 N. Pennsylvania
    Indianapolis, IN 46204
15  (317) 713-3500 Phone
    (317) 713-3699 Fax
16
    Attorneys for Plaintiff,
17  CMG WORLDWIDE, INC.

18
19              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
20                    WESTERN DIVISION

21
22  CMG WORLDWIDE, INC., an Indiana          CASE NO.  CV-05-02200-MMM (Ex)
    Corporation, and MARILYN MONROE
    LLC, a Delaware Limited Liability        **DECLARATION OF AMNON Z.**
23  Company,                                 **SIEGEL IN SUPPORT OF**
                                             **PLAINTIFFS' OPPOSITION TO**
24             Plaintiffs,                   **DEFENDANTS' MOTION FOR**
                                             **SUMMARY JUDGMENT**
25       v.
                                             [Plaintiffs' Opposition to Defendants'
26  TOM KELLEY STUDIOS, INC., a              Motion for Summary Judgment; Separate
    California Corporation,                  Statement of Genuine Issues and Additional
27                                           Material Facts; Plaintiffs' Evidentiary
               Defendant.                    Objections; and Declarations of Mark
28                                           Roesler, Cristina Piquinela, Anna Strasberg,



CLERK, U.S. ... COURT

OCT 2 7 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

Gibson, Dunn &
Crutcher LLP

and Amy L. Wright filed concurrently herewith]

Honorable Margaret M. Morrow

Hearing Date:     December 11, 2006
Time:             10:00 a.m.
Place:            Room 790
Trial Date:       June 26, 2007

CMG WORLDWIDE, INC., an Indiana Corporation, and MARILYN MONROE, LLC, a Delaware Limited Liability Company,

       Plaintiffs,

    v.

THE MILTON H. GREENE ARCHIVES, INC.,

       Defendant.

THE MILTON H. GREENE ARCHIVES, INC.,

       Plaintiff,

    v.

CMG WORLDWIDE, INC., an Indiana Corporation, and MARILYN MONROE, LLC, a Delaware Limited Liability Company, ANNA STRASBERG, an individual,

       Defendants.

TOM KELLEY STUDIOS, INC., a California Corporation,

       Plaintiff,

    v.

CMG WORLDWIDE, INC., an Indiana Corporation, and MARILYN MONROE, LLC, a Delaware Limited Liability Company, ANNA STRASBERG, an individual,

       Defendants.

<u>DECLARATION OF AMNON Z. SIEGEL</u>

I, AMNON Z. SIEGEL, declare as follows:

1.    I am an attorney at law, duly licensed to practice before all of the Courts of the State of California.  I am an associate at Gibson, Dunn, and Crutcher LLP in Los Angeles, California, and I represent Plaintiff Marilyn Monroe, LLC ("MMLLC") in this consolidated action.  I have personal knowledge of the matters stated herein and could, and would, testify competently thereto if necessary.

2.    Attached hereto as **Exhibit A** is a true and correct copy of this Court's February 6, 2006 Scheduling Conference Order.

3.    Attached hereto as **Exhibit B** is a true and correct copy of the Order Granting Plaintiff's Motion for Partial Summary Judgment, filed on January 9, 2005 in *Scalf v. Lake County Convention and Visitors Bureau, Inc.*, Cause No. 45D10-0406-PI-00093 (Lake Super. Ct., Crown Point, Ind.).

4.    Attached hereto as **Exhibit C** is a true and correct copy of the certified Grant Deed to Marilyn Monroe's house in Brentwood, California, dated January 22, 1962, and recorded on February 8, 1962 in the Los Angeles County Recorder's Office.

5.    Attached hereto as **Exhibit D** is a true and correct copy of the receipt for the dog license for Marilyn Monroe's dog, Mafia, registered in the City of Los Angeles, on July 9, 1962.

6.    Attached hereto as **Exhibit E** is a true and correct copy of the Application for Lump-Sum Death Payment by Inez Melson on February 19, 1964, for the Department of Health, Education, and Welfare of the Social Security Administration..

7.    Attached hereto as **Exhibit F** is a true and correct copy of Marilyn Monroe's Connecticut Driver's License, listing her California address, dated July 11, 1962.

8.    Attached hereto as **Exhibit G** is a true and correct copy of an article from Life, entitled "Merger of Two Worlds: Marilyn and Joe find a secret wedding is not for them," dated January 25, 1954.

Gibson, Dunn &
Crutcher LLP

3

9.    Attached hereto as **Exhibit H** is a true and correct copy of an article from the Los Angeles Examiner, entitled "Marilyn Monroe, DiMaggio Married," dated January 15, 1954.

10.    Attached hereto as **Exhibit I** is a true and correct copy of an article from the San Francisco Chronicle, entitled "Joe's Plan to Be Near Marilyn," dated August 14, 1962.

11.    Attached hereto as **Exhibit J** is a true and correct copy of an article from Life, entitled "Memories of Marilyn," dated August 17, 1962.

12.    Attached hereto as **Exhibit K** is a true and correct copy of an article from Life, entitled "Marilyn Monroe, The Last Interview," dated August 1992.

13.    Attached hereto as **Exhibit L** is a true and correct copy of an article from Esquire, entitled "Marilyn Monroe's Last Picture Show," dated July 1973.

14.    Attached hereto as **Exhibit M** is a true and correct copy of an article from Chicago Tribune, entitled "Marilyn's confidante: The woman Mailer forgot to interview," dated September 11, 1973.

15.    Attached hereto as **Exhibit N** is a true and correct copy of an article from Cosmopolitan, entitled "Question: Dumb blonde or bluntly honest?," dated May 1953.

16.    Attached hereto as **Exhibit O** is a true and correct copy of an article from People, entitled "MM's first husband waxes nostalgic," dated May 31, 1976.

17.    Attached hereto as **Exhibit P** is a true and correct copy of an article from Time, entitled "Storybook Romance," dated January 25, 1954.

18.    Attached hereto as **Exhibit Q** is a true and correct copy of an article from Los Angeles Times, entitled "Wolves Howl for 'Niece' Just Like Marilyn Monroe," dated August 27, 1950.

19.    Attached hereto as **Exhibit R** is a true and correct copy of an article from Los Angeles Times, entitled "Marilyn Monroe Mystery Persists," dated September 29, 1985.

Gibson, Dunn &
Crutcher LLP

20.     Attached hereto as **Exhibit S** is a true and correct copy of a page from the MSN Encarta Online Encyclopedia about Marilyn Monroe.

21.     Attached hereto as **Exhibit T** is a true and correct copy of Marilyn Monroe's Declaration of Trust for Gladys Baker, her mother, dated October 26, 1959.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on the 27th day of October, 2006, at Los Angeles, California.

AMNON Z. SIEGEL

100099941_1.DOC

Gibson, Dunn &
Crutcher LLP

5

# Tab A

SEND

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Case No.   **CV 05-02200-MMM(Mcx)**                          Date   February 06, 2006
       CV 05-02516
       CV 05-05973 ✓
       CV 05-07627

Title   **The Milton Green Archives vs. CMG Worldwide, Inc., et al**
     Consolidated cases:
         Tom Kelley Studios, Inc. vs. CMG Worldwide, Inc.
         CMG Worldwide, Inc., et al vs. Tom Kelley Studios
         CMG Worldwide, Inc, et al vs. The Milton Green Archives

Present: The Honorable     MARGARET M. MORROW

      ANEL HUERTA                                  MARK SCHWEITZER
       Deputy Clerk                                      Court Reporter

**Attorneys Present for Plaintiffs and Defendants respectfully:**

Jonathan Polk via Telephone
William Wegner
Theodore Penny
Surjit Soni
M. Danton Richardson

**Proceedings:**          SCHEDULING CONFERENCE

Scheduling conference is held and counsel are present.

The Court hereby orders that CMG & Marilyn Monroe parties will be deemed plaintiffs in the case and that Milton Green and Tom Kelley Studios parties will be deemed defendants in the case. Defendants' complaints are deemed as defendants' counter-claims. See CV 05-2200 docket entry 1(filed on March 25, 2005) and CV 05-02568 docket entry 1 (filed on April 7, 2005). All parties are directed to respond to outstanding complaints no later than February 21, 2006.

The parties are directed to the Attorney Settlement Officer Panel for settlement conference to be completed no later than October 13, 2006. (See Order/Referral to ADR Pilot Program).

After conferring with counsel, the Court schedules the following dates:

Rule 26 disclosures:                                          March 06, 2006
Deadline to file motions/stipulations seeking
    amendment of pleadings:                       April 03,2006
Further telephone status conference:        July 20, 2006 at 5:00 p.m.
Fact discovery cut-off:                               August 11, 2006
Initial expert disclosures:                          August 25, 200
Rebuttal expert disclosures:                       September 08, 2006



DOCKETED ON CM

FEB 2 7 2006

BY ___ 007

Expert discovery cut-off:                                    September 29, 2006
(All discovery motions are to be filed sufficiently
in advance of the discovery cut-off date that they
may be heard on or before that date)
Motions hearing cut-off:                                     October 30, 2006 at 10:00 a.m.
Pretrial Conference:                                         November 27, 2006 at 9:00 a.m.
(Including motions in limine)
Jury Trial:                                                  January 02, 2007 at 8:30 a.m.

     Plaintiffs' counsel is to initiate the call for the further telephone status conference through the
telephone operator to include all counsel of record and chambers at **(213) 894-2957**.  If there is any
problem completing the call, counsel should contact the courtroom deputy, Anel Huerta, at (213) 894-
7857.

# Tab B

STATE OF INDIANA    )
                           ) SS.
COUNTY OF LAKE     )

JEFFREY G. SCALF,           )

      Plaintiff,          )

v.                         )

LAKE COUNTY CONVENTION AND  )
VISITORS BUREAU, INC.,       )

      Defendant.       )

IN THE LAKE SUPERIOR COURT
CIVIL DIVISION, ROOM SIX
CROWN POINT, INDIANA

Cause No. 45D10-0406-PL-00093

## Filed in Open Court

### JAN 09 2005

*Thomas R. Philpot*
CLERK LAKE SUPERIOR COURT

## ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANT'S MOTION FOR LEAVE TO FILE A THIRD PARTY COMPLAINT, DENYING PLAINTIFF'S MOTION TO STRIKE, AND DENYING DEFENDANT'S MOTION TO STRIKE

This matter is before the Court for ruling on the Plaintiff's Motion for Partial Summary Judgment as to Count I of the Complaint, Defendant's Cross-Motion for Summary Judgment, Defendant's Motion for Leave to file a Third Party Complaint, Plaintiff's Motion to Strike, and Defendant's Motion to Strike. The parties have fully briefed all relevant issues. A hearing of the Motions was held March 8, 2005. Plaintiff, Jeffrey Scalf (Scalf), appeared by counsel, Jonathan G. Polak and Amy L. Wright. Defendant, Lake County Convention and Visitors Bureau, Inc. (LCCVB), appeared by counsel, Richard P. Long, Daniel C. Kuzman, and Connie J. Postelli. After hearing argument by counsel, the Court took the matter under advisement. The Court is appreciative of the excellent written and oral advocacy of counsel in this case.

Plaintiff is the great nephew of John Herbert Dillinger (Dillinger). He has acquired a seventy-five percent interest in Dillinger's personality through assignment from his grandmother and two great aunts. LCCVB is a non-profit entity, created by I.C. §6-9-2-3 et seq., whose purpose is to market Lake County to businesses and visitors. On September 21, 1997, LCCVB entered into an

LAW OFFICES        Fax 219-972-7110        Jan 10 2006 12:45pm    P004/010

*Jeffrey Scalf v. Lake County Convention and Visitors Bureau, Inc.*
Cause No. 45D10-0406-PL-00093
January 9, 2006
Page 2

agreement to purchase the Dillinger Museum Collection for $417,500.00 from Joe Pinkston (Pinkston). Pinkston, who had been using Dillinger's personality without consent, owned no interest in Dillinger's personality. As a result, no personality interest was transferred to LCCVB via the sale of the Dillinger Museum Collection. Finally, since its purchase of the Dillinger Museum Collection, LCCVB has neither obtained consent for its use of the Dillinger personality from Scalf, nor anyone acting on Scalf's behalf.

The case was originally heard on June 12, 2002, by Judge Danikolas. At the conclusion of the hearing, the Court took the matter under advisement. On November 7, 2002, Judge Danikolas granted the Plaintiff's Motion for Summary Judgment. LCCVB filed a Motion to Correct Errors on November 18, 2002. On December 22, 2003, the Court vacated its judgment for Plaintiff and recused itself from the case. This Court accepted appointment as Special Judge in this cause of action on June 22, 2004.

Summary judgment is appropriate when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *SMDFUND, Inc. v. Fort Wayne Allen County Airport Auth.*, 831 N.E.2d 725, 728 (Ind. 2005), citing *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 151 (Ind. 2005). In deciding summary judgment, all evidence must be construed in favor of the non-moving party. *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 973 (Ind. 2005), citing *Tibbs v. Huber, Hunt & Nichols, Inc.*, 668 N.E.2d 248, 249 (Ind. 1996). To be successful in their bid for summary judgment, the moving party must demonstrate that there is no genuine issue of material fact. *Butler v. City of Peru*, 733 N.E.2d 912, 915 (Ind. 2000), citing *Mullin v. Municipal City of South Bend*, 639 N.E.2d 278, 281 (Ind. 1994); see also Ind. Trial Rule 56(E); *Shell Oil Co. V. Lovold Co.*, 705 N.E.2d 981, 984 (Ind. 1998). Once the moving party establishes this, the burden shifts to the non-movant who must exhibit specific facts indicating the "existence of a genuine issue for trial on each challenged element of the cause of action." *Butler*, 733 N.E.2d at 915 citing *Mullin v. Municipal City of South Bend*, 639 N.E.2d 278, 281 (Ind. 1994); see also Ind. Trial Rule 56(E); *Shell Oil Co. V. Lovold Co.*, 705 N.E.2d 981, 984 (Ind. 1998).

*Jeffrey Scalf v. Lake County Convention and Visitors Bureau, Inc.*
Cause No. 45D10-0406-PL-00093
January 9, 2006
Page 3

Indiana's Right of Publicity Statute provides that "after the death of an intestate personality, the rights and remedies of this chapter may be exercised and enforced by a person who possesses [a fifty percent minimum interest] of the personality's recognized rights." I.C. § 32-36-1-18 (2005). For purposes of the statute, the term 'person' is defined as "a natural person, . . . a corporation, or an unincorporated association." I.C. § 32-36-1-5 (2005). In 1997, Scalf acquired, through assignation, a fifty percent interest in Dillinger's publicity rights. Furthermore, in 2001, he obtained an additional twenty-five percent interest. Thus, under the statue, Scalf, as a seventy-five percent holder in interest, may bring suit to enforce the rights of publicity provided by the statute.

In Count I of the Complaint and Scalf's subsequent Partial Motion for Summary Judgment, Scalf contends that LCCVB violated Indiana's Right of Publicity Statute by failing to obtain written consent to use Dillinger's personality for a commercial purpose. Indiana's Right of Publicity Statute recognizes a 'right of publicity' as a property interest in a personality's "(1) name . . . (4) photograph; (5) image; (6) likeness; [or] (7) distinctive appearance." I.C. § 32-36-1-7. For purposes of the statute, personality indicates a "living or deceased natural person whose: (1) name . . . (4) photograph; (5) image; (6) likeness; [or] (7) distinctive appearance . . . has commercial value, whether or not the person uses or authorizes the use of the person's rights of publicity for a commercial purpose during the person's lifetime." I.C. § 32-36-1-6 (2005). LCCVB argues that they have not used Dillinger's personality for a commercial purpose. However, 'commercial purpose' is construed by the statute to mean:

> the use of an aspect of a personality's right of publicity . . . .: (1) On or in connection with a product, merchandise, goods, services, or commercial activities. (2) For advertising or soliciting purchases of products, merchandise, goods, services, or for promoting commercial activities. (3) For purposes of fundraising.

I.C. § 32-36-1-2 (2005). I.C. § 6-9-2-5.5 provides that the purpose of the LCCVB is to "promote and encourage conventions, trade shows, special events, recreation, and visitors [thereby] encouraging investment, job creation and retention, and economic growth and diversity." I.C. § 6-9-2-5.5 Sec. 5.5 (2005). LCCVB uses Dillinger's name and likeness to promote Lake County in an

LAW OFFICES        Fax 219-972-7110        Jan 10 2006 12:48pm  P006/010

*Jeffrey Scalf v. Lake County Convention and Visitors Bureau, Inc.*
Cause No. 45D10-0406-PL-00093
January 9, 2006
Page 4

effort to attract both visitors and businesses. This use constitutes the advertising and solicitation of products, goods, services, and the promotion of commercial activities. Additionally, LCCVB runs the Dillinger museum, a fundraising operation, to which they charge an admission fee. Accordingly, LCCVB's use of Dillinger's personality does, under the Right of Publicity Statute, represent a commercial purpose.

Furthermore, section seventeen of Indiana's Right of Publicity Statute provides that written consent may be exercised and enforced by either a personality or a person who obtained rights to the personality under section sixteen or eighteen. I.C. § 32-36-1-17 (2005). Section sixteen stipulates that,

> [t]he rights recognized under this chapter are property rights, freely transferable and descendible, in whole or in part, by the following: (1) Contract ... (3) Gift. (4) Trust. (5) Testamentary document. (6) Operation of the laws of intestate succession applicable to the state administering the estate and property of an intestate deceased personality, regardless of whether the state recognizes the property rights set forth under this chapter.

I.C. § 32-36-1-16 (2005). Likewise, section eighteen states,

> [a] person may not use an aspect of a personality's right of publicity for a commercial purpose during the personality's lifetime or for one hundred (100) years after the date of the personality's death without having obtained previous written consent from a person specified in section 17 [I.C. 32-36-1-17] of this chapter.

I.C. § 32-36-1-8(a) (2005). Scalf has obtained a seventy-five percent interest in Dillinger's personality. Further, LCCVB admits that they have not received written consent to use Dillinger's personality from either Scalf, or someone representing Scalf. Thus, LCCVB is deemed to be in violation of Indiana's Right of Publicity Statute.

In determining whether the Indiana Right of Publicity Statute should be read retroactively, Scalf asserts that this Court should construe the statute in accordance with the plain language of the statute. The essential goal in interpreting a statute is to ascertain and effectuate the legislative intent. *Wiggins v. State*, 737 N.E.2d 437 (Ind. Ct. App. 2000), *citing Woods v. State*, 703 N.E.2d 1115, 1117 (Ind. Ct. App. 1998); *Freeman v. State*, 658 N.E.2d 68, 70 (Ind. 1995). To determine

LAW OFFICES    Fax 219-972-1110    Jan 10 2006 12:46pm P007/010

*Jeffrey Scalf v. Lake County Convention and Visitors Bureau, Inc.*
Cause No. 45D10-0406-PL-00093
January 9, 2006
Page 5

legislative intent, courts must consider the objectives and purposes of the statute as well as the policy underlying the statute's enactment. *Woods v. State*, 703 N.E.2d 1115, 1117 (Ind. Ct. App. 1998), *citing Miller v. State*, 641 N.E.2d 64, 68 (Ind. Ct. App. 1994), *trans. denied; see also Wiggins v. State*, 737 N.E.2d 437 (Ind. Ct. App. 2000); *D.R. v. State*, 729 N.E.2d 597 (Ind. Ct. App. 2000). When "a statute has not previously been construed, its interpretation is controlled by the express language of the statute and by application of the general rules of statutory constructions." I.C. § 1-1-4-1 (2005); *Woods*, 703 N.E.2d at 1117, *citing Blackmon v. Duckworth*, 675 N.E.2d 349, 351 (Ind. Ct. App. 1996). "Preeminent among the rules of statutory construction is that we look to the plain language of the statute and attribute the common, ordinary meaning to terms found in everyday speech." *Woods*, 737 N.E.2d at 1117 (Ind. Ct. App. 1998), *citing Nield v. State*, 677 N.E.2d 79, 82 (Ind. Ct. App. 1997). Moreover, "[i]n giving effect to the legislative intention, the objects and purposes of the statute in question must be considered, as well as the effect and consequences of such interpretation." *Figg v. Bryan Rental Inc.*, 646 N.E.2d 69, 72-73 (Ind. Ct. App. 1995) *citing Holmes v. Review Bd. of Ind. Employment Sec. Div.*, 451 N.E.2d 83, 86 (Ind. Ct. App. 1983).

The statute clearly indicates that rights of publicity are considered property rights in Indiana. As such, those rights are descendible and transferable. *See* I.C. § 32-36-1-16 (2005). Additionally, the Indiana Right of Publicity Statute clearly provides that such rights apply to natural persons both living and deceased. *See* I.C. § 32-36-1-6 (2005); *see also* I.C. § 32-36-1-18 (2005) (recognizing the rights and remedies available post-mortem). Moreover, the statute stipulates that such rights endure, following the personality's death, for a period of one hundred years. *See* I.C. § 32-36-1-8(a) (2005). Thus, to read Indiana's Right of Publicity Statute prospectively, as requested by LCCVB, would eviscerate both the legislative intent and the underlying purpose for the statute in contravention to the general rules of statutory construction. The Indiana Right of Publicity Statute should therefore be read retroactively, in accordance with the statute.

The Indiana Right of Publicity Statute allows for monetary and injunctive relief. Under I.C. § 32-36-1-10,

*Jeffrey Scalf v. Lake County Convention and Visitors Bureau, Inc.*
Cause No. 45D10-0406-PL-00093
January 9, 2006
Page 6

A person who violates section 8 [I.C. 32-36-1-8] of this chapter may be liable for any of the following: (1) Damages in the amount of: (A) one thousand dollars ($1,000); or (B) actual damages, including profits derived from the unauthorized use; whichever is greater. (2) Treble or punitive damages, as the injured party may elect, if the violation under section 8 of this chapter is knowing, willful, or intentional.

I.C. § 32-36-1-10 (2005). In computing actual damages, the plaintiff is compelled to "prove the gross revenue attributable to the unauthorized use; and (2) the defendant is required to prove properly deductible expenses." I.C. § 32-36-1-11 (2005). Finally, in addition to damages, the court: "(1) shall award to the prevailing party reasonable attorney's fees, costs, and expenses relating to an action under this chapter; and (2) may order temporary or permanent injunctive relief, except as provided by Section 13 [I.C. 32-36-1-13] of this chapter." I.C. § 32-36-1-12 (2005).

LCCVB, in its Cross Motion for Summary Judgment, argues that Scalf is foreclosed from bringing a right of publicity tort action under I.C. Code § 34-13-3-8 as LCCVB is a political subdivision. I.C. § 34-13-3-8 states, "a claim against a political subdivision is barred unless notice is filed with: (1) the governing body of that political subdivision; and (2) the Indiana political subdivision risk management commission ... within one hundred eighty (180) days after the loss occurs." I.C. § 34-13-3-8 (2005). However, for purposes of this chapter, "the following shall be treated as political subdivisions: (1) A community action agency... (2) An individual or corporation rendering public transportation services ... [and] (3) A volunteer fire department..." I.C. § 34-13-3-22 (2005). As LCCVB is neither an individual or corporation rendering public transportation services, nor a volunteer fire department, the Indiana Tort Claims Notice Statute will only apply if LCCVB qualifies as a community action agency. A community action agency is defined by I.C. § 12-14-23-2 as:

an entity that meets the following conditions:

(1)   Is any of the following:

(A)   A private nonprofit organization ... located within a community.

LAW OFFICES      Fax 219-972-7110      Jan 10 2006 12:47pm P009/010

*Jeffrey Scalf v. Lake County Convention and Visitors Bureau, Inc.*
Cause No. 45D10-0406-PL-00093
January 9, 2006
Page 7

---

(B)    A private nonprofit organization that is located in a county... within reasonable proximity of a community.

(C)    A political subdivision, if there is no qualified nonprofit organization identified that meets the criteria set forth in clause A or B.

(2)    Has the authority under state or federal law to receive money to support the community action programs described in sections 3 and 4 [I.C. 12-14-23-3 and I.C. 12-14-23-4] of this chapter.

(3)    Is designated as a community action agency by the governor or by federal law.

I.C. § 12-14-23-2. In *LCEOC, Inc. v. Greer*, the Court held, to be deemed a community action program an entity must meet all of the conditions listed in I.C. § 12-14-23-2. *LCEOC, Inc. v. Greer*, 735 N.E.2d 206, 207&-209 (Ind. 2000). Even if LCCVB is held to meet sections one and three of these statutory conditions, it fails to meet section two. I.C. § 12-14-23-3 provides that a "community actions program" means a community based and operated program that meets the following conditions: (1) Includes or is designed to include a sufficient number of projects or components to provide a range of services and activities that have a measurable and potentially major impact on causes of poverty . . . ." I.C. § 12-14-23-3 (2005). Likewise, Section 12-14-23-4 states, "(a) The components of a community action program shall be designed to assist participants, including the poor and near poor, persons with disabilities, farmworkers, the elderly, and youth, to do the following: . . . ." I.C. § 12-14-23-4 (2005). Since LCCVB does not provide services which reduce poverty levels, it does not qualify as a community action program, and therefore is not a political subdivision for purposes of the Indiana Tort Claims Notice Statute.

Furthermore, LCCVB's argument that it has been designated by I.C. § 6-9-2-3 as a political subdivision is erroneous. Section 6-9-2-3 states "(a) For purposes of this section, the size of a political subdivision is based on the population determined in the last federal decennial census..." I.C. § 6-9-2-3 (2005) Thus, the phrase "political subdivision" is (1) limited to this chapter, and (2) determined by the size of a given population as noted in the last federal census. Moreover, I.C. § 6-9-2-4 states that, "(a) The bureau may: . . . (2) sue and be sued." I.C. § 6-9-2-4 (2005). Since

*Jeffrey Scalf v. Lake County Convention and Visitors Bureau, Inc.*
Cause No. 45D10-0406-PL-00093
January 9, 2006
Page 8

---

LCCVB does not meet the requirements of a political subdivision under I.C. § 34-13-3-22, and its argument that it has been designated as a political subdivision by statute fails, it is not a political subdivision for purposes of the Tort Claims Notice Act, and Scalf is not foreclosed from bringing suit. LCCVB's remaining arguments address Counts II - IV of the complaint which the Court need not address at this time.

In sum, the Court may not grant summary judgment if a genuine issue of fact exists. Scalf as a seventy-five percent holder of interest, may bring a cause of action under the Indiana Right of Publicity Statute when an entity uses such personality for a commercial purpose without prior written consent. LCCVB admits that it has never received written consent from Scalf, or his representatives. Additionally, LCCVB has used Dillinger's personality for a commercial purpose, as defined by the statute. Further, LCCVB's claim that it is a political subdivision for purposes of the Indiana Tort Claims Notice Act fails as it does not meet the statutory conditions for such an entity under that chapter. Finally, the Right of Publicity Statute should be read retroactively as to do otherwise would negate the very reason and purpose of the statute's existence.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Plaintiff's Partial Motion for Summary Judgment is GRANTED. Defendant's Cross-Motion for Summary Judgment is DENIED. Defendant's Motion to File Third-Party Complaint as to the remaining counts is GRANTED. Plaintiff's and Defendant's Motions to Strike are DENIED.

SO ORDERED THIS 9TH DAY OF JANUARY, 2006.

JOHN R. PERA, JUDGE
LAKE SUPERIOR COURT
CIVIL DIVISION, ROOM NO. SIX

Distribution by Court:
Jonathan G. Polak
Amy L. Wright
Richard P. Long
Daniel C. Kuzman
Connie J. Postelli

Dated: 1/9/06 (via facsimile)
CCS Entry:
Distributed: RP

# Tab C

BK D1506 PG 115

RECORDING REQUESTED BY
CITY NATIONAL BANK OF BEVERLY HILLS

AND WHEN RECORDED MAIL TO

Name: Marilyn Monroe
Street Address: c/o Gang, Tyre, Rudin & Brown
6400 Sunset Boulevard
City & State: Los Angeles 28, California

RECORDED IN OFFICIAL RECORDS
OF LOS ANGELES COUNTY, CALIF.
FOR TITLE INSURANCE & TRUST CO.
FEB 8 1962 AT 8 A.M.
RAY E. LEE, County Recorder

FEE $2 0 0

SPACE ABOVE THIS LINE FOR RECORDER'S USE



AFFIX I.R.S. $ 63.25 IN THIS SPACE

## Grant Deed
THIS FORM FURNISHED BY TITLE INSURANCE AND TRUST COMPANY

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

WILLIAM R. PAGEN and DORIS AILEEN PAGEN, husband and wife

hereby GRANT(S) to

MARILYN MONROE, an unmarried woman

the following described real property in the
county of        Los Angeles        state of California:

Lot 20 of Tract 5462, Sheets 1 and 2, as per map recorded in
Book 58 Pages 71 and 72 of Maps, in the office of the county
recorder of said county.

Dated:    January 22, 1962

STATE OF CALIFORNIA,
COUNTY OF Los Angeles } SS.
On January 29 1962 before me, the under-
signed, a Notary Public in and for said County and State, personally
appeared    WILLIAM R. PAGEN
and
DORIS AILEEN PAGEN
, known to me
to be the person S whose names are subscribed to the within
instrument and acknowledged that they executed the same.
WITNESS my hand and official seal.
(Seal)    CRRIS R HEDGES
Signature Cha. R. Hedgs

My Commission Expires July 13 1965 Name (Typed or Printed)
Notary Public in and for said County and State
If executed by a Corporation the Corporation Form of
Acknowledgment must be used.

398 1-61

William R. Pagen
Doris Aileen Pagen
Doris Aileen Pagen

Title Order No. 775525 14mml

Escrow No.    3694

536

# Tab D

RESIDENCE (Print) 12305 5th Helena Dr 49

NAME (Print) Marilyn Monroe     No. 13610

TELEPHONE     DATE 7-9, 1962     1962-1963

BREED Maltese     NAME Mafia     SEX M

DESCRIPTION 1389     Date 5/26/62     1 Yr. 6 Yr.

A   C-No.
Receipt of $3.00 is hereby acknowledged as payment of license tax for the
privilege of keeping one DOG (described above) in the City of Los Angeles
between July 1, 1962, and June 30, 1963.  Sec. 53.15, L. A. Mun. Code.

Deputy     L. Wilke

Form 41-E—95M—1-62 (T-15 to 18)
Keep This Receipt — Keep Tag on Dog — Please Read Other Side

CITY OF LOS ANGELES
DEPARTMENT OF ANIMAL REGULATION
D O G   L I C E N S E
Due July 1, 1962 — Expires June 30, 1963
PAID $3.00 FEE
IMPORTANT
SAVE THIS RECEIPT
KEEP TAG ON DOG AT ALL TIMES
OBEY THE LEASH LAW

Deputy     L. Wilke

Charles Navarro
CONTROLLER

KEEP YOUR DOG'S ANTI-RABIES VACCINATION CERTIFICATE HANDY AT ALL TIMES

Any member of the Department is authorized to enter any premises on which a dog is kept to demand exhibition of license for such dog, and to inspect premises for law violations.

Any person owning or keeping a dog over 4 months old shall secure a dog license annually for the privilege of keeping such dog. License is due July 1st each year and expires the following June 30th. Full fee is required for any part of a year.

License is not transferable to another person nor to another dog.

A stray or unclaimed dog may be sold seven days after impounding.

SEC. 53.06.2, L. A. MUN. CODE, RESTRAINT OF DOGS.  (LEASH LAW).

Every person owning or having charge, care, custody or control of any dog shall keep such dog exclusively upon his own premises; provided, however, that such dog may be off such premises if it be under the control of a competent person and restrained by a substantial chain or leash not exceeding 6 feet in length.

**IF DOG IS LOST CHECK NEAREST ANIMAL SHELTER**

VACCINATION CERTIFICATE HANDY AT ALL TIMES

authorized to enter any premises on which a dog is
each dog and to inspect premises for law violations.

4 months old shall secure a dog license annu-
nse is due July 1st each year and expires the
part of a year.

r to another dog.

after impounding.

SS. (LEASH LAW).

y control of any dog shall keep
ever than such dog may be off
and restrained by a substantial

HELTER

ER _Monroe, Marilyn_ Date 5-26-62
(Please print)    Last Name    First Name

dress _13305-5th Helena Dr., W. LA._

# CERTIFICATE OF RABIES VACCINATION

THIS IS TO CERTIFY that I have vaccinated a dog of this description
with Anti-Rabies Vaccine—  ☐ **Phenolized**    ☒ **Chick Embryo Origin**
                              (one-yr. vaccine)        (two-yr. vaccine)

_M. Pure Maltese_   Named _Mafia_
Sex    Age    Breed

Weight _6_    Color or _White_    Vaccination _1387_
              Markings              Tag No.

_286_    _Dr._    _Geo. L. McShan_
Ser. No.    Mfgr.    Veterinarian

**RETAIN THIS CERTIFICATE — NO DUPLICATES ISSUED**

# Tab E

DEPARTMENT OF HEALTH, EDUCATION, ... WELFARE
SOCIAL SECURITY ADMINISTRATION

Form approved.
Budget Bureau No. 72-R129.14

## APPLICATION FOR LUMP-SUM DEATH PAYMENT *

(This application must be filed within 2 years after the date of
death of the wage earner or self-employed person.)

All items on this form requiring an answer must be answered or marked "Unknown."

(Do not write in this space)

*Hollywood
Calif
2/19/64*

NOTICE.—Whoever makes or causes to be made any false statement or representation of a material fact for use in determining the right to or the amount of Federal old-age, survivors, or disability insurance benefits or in determining an individual's disability is subject, under the Social Security Act, to not more than a $1,000 fine or 1 year of imprisonment, or both.

*Not used*

*Marilyn Monroe*
(Name of deceased wage earner or self-employed person)

5 6 3 - 3 2 - 0 7 6 4
(Social security account number)

I, _____*Inez C Melson*_____, hereby
(Full name of applicant)

apply for the lump-sum death payment and/or for any Federal old-age and survivors insurance benefits payable to me under Title II of the Social Security Act, as amended.

<table>
<tr><td rowspan="20" style="writing-mode:vertical">PLEASE DO NOT WRITE IN MARGIN</td></tr>
<tr><td>1.</td><td colspan="4">When was the deceased born? <i>5/29/25</i>     <i>6/1/26</i><br>(Month, day, and year)</td></tr>
<tr><td>2.</td><td colspan="4">When and where did death occur? <i>8/5/62</i>   <i>Los Angeles, Calif</i><br>(Month, day, and year)      (City and State)</td></tr>
<tr><td>3.</td><td colspan="4">In what state or foreign country did the deceased have his fixed, permanent home when he died? <i>Calif.</i></td></tr>
<tr><td>4.</td><td colspan="4"><i>(a)</i> Did the deceased ever serve in the military or naval service of the United States?.............   [ ] Yes   [X] No</td></tr>
</table>

4. (a) Did the deceased ever serve in the military or naval service of the United States?.............  ☐ Yes  ☒ No

   If "Yes," answer (b).

   (b) Was the deceased in active service after September 7, 1939, and before January 1, 1957?.......  ☐ Yes  ☐ No

   If "Yes," answer (c) and (d).

   (c) Give branch and dates of service during the period specified in (b) above _____

   (d) Has anyone (including the deceased) received, or does anyone expect to receive, from any Federal agency other than the Social Security Administration, a benefit based on the employment, military service, disability, or death of the deceased?.............  ☐ Yes  ☐ No

   If "Yes," name such person(s) _____

   List all such agencies _____

5. Did the deceased work in the railroad industry at any time on or after January 1, 1937?.............  ☐ Yes  ☒ No

6. Give the names and addresses of the deceased's employers during the 12 months before his death; if the deceased worked in agricultural employment, give this information for the year of death and the year before. *(If self-employed, write "Self-employed.")*

| Name and Address of Employer | Work Began | | Work Ended | |
|---|---|---|---|---|
| | Month | Year | Month | Year |
| *20th Century Fox*<br>*Los Angeles, Calif.* | | | | *1962* |
| | | | | |
| | | | | |

7. If the deceased was self-employed last year or the year before, give:

   Year      Kind of Trade or Business      *Amount of Net Earnings*

   _____  _____  ☐ Less than $400  $400 or more ☐

   _____  _____  ☐ Less than $400  $400 or more ☐

*This may also be considered an application for insurance benefits payable under section 5 of the Railroad Retirement Act.

Form OA-C8 (6-63)

| 8. | About how much did the deceased earn from employment and self-employment during the year in which he died? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ 0 4800 |

| 9. | Was the deceased ever married? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☒ Yes  ☐ No |

*If "Yes," give the following information about each marriage; include the marriage, if any, in effect at the time of the death of the deceased.*

| Date and Place of Marriage(s) | | To Whom Married | How Marriage Ended | Marriage Ended | |
|---|---|---|---|---|---|
| Mo., Day, Yr. | City and State | | | Date | Place |
| 6/19/42 | Van Nuys, Calif. | James Edward Dougherty | Divorced | 9/13/46 | Clark County Nevada |
| 1/14/54 | San Franc. Calif. | Joseph Paul Di Maggio | Divorced | 10/31/55 | Los Angeles County California |
| 6/ /56 | White Plns New York | Arthur Miller | Divorced | 1/ /6? | Mexico |

**IF THE DECEASED LEFT A WIDOW OR WIDOWER SURVIVING, CONTINUE WITH QUESTION 10. IF NEITHER SURVIVED, CONTINUE WITH QUESTION 15.**

| 10. | *(a)* Name and address of widow or widower . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| | *(b)* Were the deceased and the surviving spouse living together at the same address when the deceased died? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes  ☐ No |
| | *(c)* If the deceased or surviving spouse was away from home (whether or not temporarily) when the deceased died, give the following: which was away; date last home; reason absence began; reason they were apart at time of death; if hospitalized, name of hospital and nature of confinement. |

| 11. | IF YOU ARE THE WIDOWER, were you receiving at least one-half of your support from your wife at the time of her death? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes  ☐ No |

**IF YOU ARE THE WIDOW OR WIDOWER, ANSWER QUESTIONS 12, 13, AND 14.**

| 12. | State your date of birth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| | (Month, day, and year) |

| 13. | Indicate by ( ✓ ) whether your marriage to the deceased was performed by: |
| | Clergyman or authorized public official ☐   or  ☐ Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . |
| | (Explain) |

| 14. | Were you married before your marriage to the deceased? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes  ☐ No |

*If "Yes," give the following information about each of your previous marriages.*

| Previous Marriage(s) | | To Whom Married | How Marriage Ended | Marriage Ended | |
|---|---|---|---|---|---|
| Mo., Day, Yr. | City and State | | | Date | Place |
| | | | | | |
| | | | | | |
| | | | | | |

PLEASE DO NOT WRITE IN MARGIN

IF YOU ARE NOT THE WIDOW OR WIDOWER, OR IF YOU ARE THE WIDOW OR WIDOWER BUT YOU AND THE DECEASED WERE NOT LIVING IN THE SAME HOUSEHOLD AT THE TIME OF DEATH, ANSWER THE FOLLOWING QUESTIONS.

<div style="transform: rotate(-90deg)">PLEASE DO NOT WRITE IN MARGIN</div>

15. What is your relationship to the deceased? *Gladys Eley — Mother Conservator of the estate*

16. (a) What was the total amount of the burial expenses incurred by or through a funeral home (hereafter referred to as "burial expenses")?........... $ *4,352.00*

(b) Did you assume responsibility for payment of all or any part of such expenses?............... ☒ ☑ No

(c) Did anyone else assume responsibility for payment of such expenses?............... ☐ Yes ☑ No
If "Yes," give names and addresses.

(d) What amount of burial expenses shown in 16(a) did you pay?............... $ *None* (If none, write "None")
*✓Amount: $4,352.00*

(e) Was any part of the burial expenses in 16(a) paid by others?............... ☒ Yes ☒ No
If "Yes," give the following information

| Name and Address of Such Other Person | His Relationship to Deceased | Amount Paid |
|---|---|---|
| *Estate of Marilyn Monroe* | | $ *4352 00* |
| | | $ |
| | | $ |

17. Have you received, or will you receive, any amount in cash or property toward the burial expenses shown in 16(a) paid by you? (Do not include proceeds from an insurance policy or benefits from a fraternal association, union, or employer)............... ☐ Yes ☑ No
If "Yes," give the following information

| Source of Payment | Date Payment Received or Expected | Amount |
|---|---|---|
| | | $ |
| | | $ |
| | | $ |

18. Has application for reimbursement for, or payment of, burial expenses been, or will it be filed with the Veterans Administration or any other Federal Agency?............... ☐ Yes ☑ No
If "Yes," give the following information

| | |
|---|---|
| $ | |
| (Name of agency) | (Amount claimed) |

| |
|---|
| (Name of person filing with other agency) |

| 19. | IF YOU ARE NOT RELATED TO THE DECEASED BY BLOOD OR MARRIAGE, why did you pay or assume responsibility for the burial expenses? |
|---|---|
| | *Conservator* |

---

IF ALL OR ANY OF THE BURIAL EXPENSES SHOWN IN 16(a) ARE UNPAID, the lump-sum payment (or that part of it equal to the unpaid expenses) can be made ONLY to the funeral home.  To authorize such payment, the following must be completed.

20.  I hereby authorize the Social Security Administration to make payment of the lump sum to the

.................................................................................................................
(Name and address of funeral home)

such payment to be applied toward the unpaid $ ...................... expenses.
                                        (Amount)

---

REMARKS:  (This space may be used for explaining any answers to the questions.   If you need more space, attach a separate sheet.)

NAME & ADDRESS OF FUNERAL HOME:
Westwood Memorial Park and Mortuary, 1218 Glendon Avenue, West Los Angeles, California, 90024

COPY OF APPOINTMENT PAPERS
Attached hereto.

*PLEASE DO NOT WRITE IN MARGIN*

---

Knowing that anyone making a false statement or representation of a material fact for use in determining the right to or the amount of Federal old-age, survivors, or disability insurance benefits or in determining an individual's disability, commits a crime punishable under Federal law, I certify that the above statements are true.

| If this application has been signed by mark (X), two witnesses who know the applicant must sign below, giving their full addresses. | Signature of applicant *(Write in ink—First, Middle Initial, Last Name)* |
|---|---|
| 1. Name | SIGN HERE |
| Address *(Street number, City, State and ZIP Code)* | Mailing Address *(P.O. Box, No. and street or route)* 9110 Sunset Boulevard, Suite 120 |
| 2. Name | City, State and ZIP Code Los Angeles, California, 90069 |
| Address *(Street number, City, State and ZIP Code)* | Date *(Mo., Day, and Year)* 2/19/64 — Telephone No. *(If none available, write "None.")* 276-1129 |
| | Enter name of county *(if any)* in which you now live Los Angeles |

U.S. GOVERNMENT PRINTING OFFICE : 1963 OF—691-722

# Tab F



STATE OF CONNECTICUT
MOTOR VEHICLE OPERATOR'S LICENSE

VOID UNLESS VALIDATED WITH

DATE          JUL 11 62

COMMISSIONER          TYPE
                      9L50D

Marilyn Monroe
NAME

12305 - 5th Helena Dr.
MAIL ADDRESS—STREET AND NUMBER

Los Angeles 49, Calif.
CITY OR TOWN          STATE

$ 6 00    181034533    5 05
FEE PAID    OPERATOR NUMBER    HEIGHT

06 30 64    06 01 26    1
EXPIRATION DATE    DATE OF BIRTH    TYPE OF LIC.

WRITTEN SIGNATURE OF OPERATOR

DEPT. OF MOTOR VEHICLES
165 CAPITOL AVENUE
HARTFORD 13, CONN.



HARTFORD
JUL 13 '62
CONN.

U.S.POSTAGE
04

# Tab G

# LIFE

DIANE SINCLAIR:
DANCES OUT MOVIES ON TV

20 CENTS

JANUARY 25, 1954



**TIPPED-OFF MOB** of reporters and fans waited for the couple at city hall. Later one newsman peered over judge's transom to give crowd kiss-by-kiss report of progress inside.

# MERGER OF TWO WORLDS

## Marilyn and Joe find a secret wedding is not for them

The bedlam (*above*) and the national recognition of a hitherto unknown judge (*below*) was caused by the marriage of a macaroni company vice president and an orphan girl named Norma Jeane Mortenson. This does not sound like an event of national interest, but a glance at the other pictures shows why two huge fan clubs found their differing interests focused, for the moment, on the same event. The bridegroom was Joe DiMaggio, 39, the perfect baseball player of only yesterday; the bride was Marilyn Monroe, the inheritor today of a sexy movie tradition founded by Jean Harlow. They had hoped to get married in secret but ever since Marilyn failed to show up in Hollywood for her part in a movie called *Pink Tights*, rumors spread that the couple had eloped everywhere from Reno to Istanbul. But finally last week, veiling their plans with the secrecy of an atomic test, they slipped into San Francisco's city hall unnoticed—they thought. After having been besieged, battered and befriended by scores of riled reporters, Judge Peery (*below*) made a remarkable comment: "Sometimes I'm glad I'm not Joe."



**EYEWITNESS ACCOUNT** of the vow-taking is given over national hookup by Judge Charles Peery (*left*), who was first shoved aside, then made much of by excited reporters.

**EAGER EXIT** from city hall is made by the newly married DiMaggios. Ruffled by unexpected crowd, Joe yelled out, "I've had enough of this mob. Let's call the reception off."



32





**MOONING COUPLE** wait in the judge's office for misplaced license. Edgy from the delay, Joe pleaded, "I don't want to rush you but we've got to get on with the ceremony."



**VANISHING BRIDE** jumps into Joe's car for a fast honeymoon getaway. Only by intense sleuthing reporters later learned they stopped for the night in a Paso Robles motel.

33

# Tab H



# Los Angeles Examiner

Examiner Building, 1111 S. Broadway, Zone 54          Examiner Telephone Richmond 1212

VOL. LI.—NO. 35          LOS ANGELES, FRIDAY, JANUARY 15, 1954          CCC          Four Sections

## WIFE KILLED IN MARKET AS 75 LOOK ON

**Estranged Mate Walks Away; Takes Own Life at Home**

*(Photos on Page 8)*

Before any of the 75 shoppers in a Studio City supermarket could stop him, a stony-faced defense worker shot and killed his estranged wife last night. He later took his own life.

The victim of what a witness described as a "cold-blooded killing" was Mrs. Jean Weaver, 30, an attractive brunette of 4709½ Fulton avenue, Sherman Oaks.

About two hours later, police found her husband, Greg Weaver, 37, a toolmaker in a Burbank defense plant, dead in his apartment at 11174 Agua Vista street, North Hollywood.

Mrs. Weaver was a checker at the No. 1 stand at a market at 12338 Ventura boulevard, at the corner of Coldwater Canyon.

**SEEN AT MARKET**

The checker at the No. 2 stand, Lois Grant, of 3302 West Chandler boulevard, Burbank, a close friend of the slain woman, said she noticed Mrs. Weaver's husband, Greg, standing at the door of the market shortly before 9 p. m.

"He had a crazy look in his eye," Miss Grant told Detective Henry Acorn. "He just stood there staring at her."

Miss Grant said that as Weaver, darting a menace in her direction

# Marilyn Monroe, Di Maggio Married



## DRAFT OF LAW TO VACCINATE DOGS ORDERED

**Tumult Marks Council Hearing on Anti-Rabies Program**

*(Full page of pictures on Page 3)*

Drafting of an ordinance which would compel anti-rabies vaccination of every dog in Los Angeles was voted by the City Council following a stormy public hearing yesterday.

## INDIA TO PUT POWS BACK WITH CAPTORS

**UN, Reds Warned of Jan. 20 Deadline by Gen. Thimayya**

PAN MUN JOM, Jan. 15 (Friday).—(UP)—India decided yesterday on its own to start turning back nearly 23,000 disputed prisoners to their captors January 20—three days ahead of the deadline—and said it either side freed them it would violate the armistice.

## President Greater Security

### Dividend Tax Cut Voted by House Unit

**Enactment Would Aid Stockholders**

WASHINGTON, Jan. 14 (INS)—The House ways and means committee voted today to give stockholders partial relief from so-called double taxation on their dividends.

## Gov. Knight Apartment Here Robbed of $400

**Los Angeles Examiner**
2—Sec. I    |Fri. Jan. 15, 1954

# S. F. City Hall Crowd Chases DiMagg

## 'BLIND DATE' BEGAN AFFAIR

### Girl Out of Orphanage Taken to Bosom by Joe's Family

(Continued from Page One)

only to her studio, but to her friends as well.

She and Joe will honeymoon for a week.

I predicted this marriage would, take place this month because our No. 1 boxoffice girl and her Joe went househunting in Burlingame, the fashionable suburb of San Francisco. This I had straight and not only printed it in my column, but told it on the radio.

Marilyn, who has been living with Joe's sister in San Francisco, had her telephone disconnected so that reporters could not reach her. Not that she minds publicity, but Joe, who had plenty of it when he was a baseball star with the Yankees, hates it. That was probably the reason for the secrecy on their marriage.

### METEORIC RISE—

We were all alerted a week ago by reports that Marilyn and Joe were going to be married in Las Vegas. I have no doubt they did plan to be married there, but were frightened off when it was known they had reservations in the gambling city.

Marilyn's meteoric rise to fame is one of the stories that make Hollywood such a fabulous place. She started out as an aircraft worker on the assembly line, and it was Joseph Schenck who gave her her start at 20th Century-Fox.

Later she was let out at that studio and her first successful came at M-O-M when she made "Asphalt Jungle." Curvaceous Marilyn first attracted attention with her swinging hips and her walk, which has been described as the most sexy one on the screen.

Later she was signed again by 20th, and Darryl Zanuck gave her such pictures as "Gentlemen Prefer Blondes" and "How to Marry a Millionaire," and started her on the career that made her the most highly publicized actress of our day.

### BLIND DATE—

Marilyn met Joe on a blind date about two years ago and, much to the surprise of everyone, they fell in love. Since Marilyn had never seen a baseball game in her life, and Joe was not interested in motion pictures, no one expected them to become that serious.

Joe took Marilyn right into the bosom of his family and to their girl brought up in an orphanage, it was the most perfect thing that could have ever happened. She had never had any family life and Joe, like all Italians, loves his family.

At the time of the death of her agent, Johnny Hyde, Marilyn came to see me and said she had been bitterly criticized for not marrying Johnny.

### GRATEFUL—

"I'd never marry a man I didn't love," she told me. "And though I admired and respected Johnny and am grateful too the way he steered my career and the great service he gave me, I didn't love him."

"There have always been ideas about Marilyn's scandalous indications, but I know she is sincerely interested in trying to improve herself. She has talked to me many times about books—

she is reading and wants to read.

I think that everyone who knows this girl, who has risen against such enormous odds, wishes her great happiness.

I believe they will make their home in San Francisco except for such times as she is working in Hollywood. San Francisco is Joe's home town, and his sisters and brothers live there. Marilyn has already given up her apartment in Beverly Hills.

### SECOND MARRIAGES—

It is the second marriage for both. Marilyn was married to Jim Dougherty in 1943 and divorced him in Las Vegas in 1946. She was just a youngster when they were married, and they were divorced when he came out of the service.

Joe was formerly married to Dorothy Arnold, by whom he has a son, and I understand that the little boy adores Marilyn, as do all males, regardless of age.



**RADIANT** smile from Marilyn Monroe is her response to from Joe DiMaggio as they face newsmen in San Francisco before marriage.
—International News sounphoto.



**EXIT**—With Best Man Reno Barrochini leading way, Marilyn Monroe, appearing slightly flustered, and Joe | DiMaggio leave Jud after wedding. Said ju to kiss the bride, and

## Riverside Drive Bypass Proposed

Construction of a bypass road to ease traffic congestion at Riverside drive and Los Feliz boulevard, adjoining the entrance of Griffith Park, was recommended by the City Traffic Commission yesterday.

The plan, suggested by Traffic Engineer Ralph T. Dorsey, calls for building an angle road from Riverside drive north of the intersection and curving eastward across the corner of Griffith Park to join Los Feliz near the bridge over the Los Angeles River.

## Cinema Editors Elect Officers

William Murphy, 20th Century-Fox Film editor, is the new president of American Cinema Editors, Inc.

George Amy was elected vice president, and Rita Warren was re-elected to her post as secretary. Fred Berger succeeded Ted J. Kent as treasurer.

## Joe Says Honeymoon to Be Brief; Both Must Get to Jobs Again

(Continued from Page One) can guarantee that," he said, grinning.

But his curvaceous bride, generally referred to as the hottest property on the 20th Century-Fox lot was more positive on this point.

"I'd like to have six," she giggled.

As though trying to steal home in the ninth inning, DiMaggio, his bride-to-be and a small wedding party slipped into the City Hall by the basement entrance at exactly 1 p.m.

Joe, tall, broad-shouldered and graying, was wearing a trim blue suit, white shirt and blue polka dot tie. He is 39.

Marilyn, 25, was wearing her smile, false eyelashes and a smart broadcloth suit with a pert ermine collar. Her nails had natural polish.

### WORD LEAKS OUT—

With them were Mel and Mrs. Frank "Lefty" O'Doul, DiMaggio's first baseball manager; Mr. and Mrs. Tom DiMaggio and Mr. and Mrs. Reno Barsocchini.

The party had hardly entered the City Hall when word leaked out that something was cooking in the matrimonial department and reporters, city clerks and well wishers began gravitating to the third floor.

Thereafter, all was confusion as autograph hunters, photographers and reporters vied for space with the wedding party in Judge Perry's chambers.

Marilyn held a large white orchid in her left hand as she explained to the press that she would be glad to love, honor "and obey" the great Yankee star.

"I need him two years ago on a blind date in Los Angeles," she said, "and a couple of days ago we started talking about this."

By "this" she was referring to the swirling commotion and impending marriage ceremony.

DiMaggio puffed nervously on a cigar while reporters

popped questions at his fiancee.

"All right, fellows," he said at last, "I don't want to rush you, but we've got to get on with the ceremony."

The actress, who was raised in an orphanage and had 11 sets of foster parents, seemed amused by reporters asking whether she planned to give up moviemaking for homemaking.

"What difference does it make?" Joe suggested," she quipped, giving a little look to one of her pretty legs.

"This is no time to talk about stupendous, DiMaggio interrupted, "we got to get going. We got to put a lot of miles behind us."

Where were they going on their honeymoon?"

DiMaggio smiled.

"North, South, East and West," he said.

The judge's chambers were finally cleared and the press removed itself to a tiny office just outside. Beyond the office was the hall where 200 persons pressed in for a glimpse of the happy couple.

### CRY: RESOUNDS—

A reporter standing on a desk was able to look over the transom.

"They're not getting married. They're drinking martinis," he reported been to the anxious crowd.

Then a cry went up for the man with the marriage license. It seemed the bride and groom and the judge and wedding party were literally trapped in the judge's chambers without a marriage license.

A man identified as David Dunn, deputy county clerk, beat his way through the crowd with a handful of blank marriage licenses.

He went into the room where Marilyn and Joe were waiting but emerged again a minute later. It seemed he needed a typewriter, and so a great howl

went up from the crowd calling for a machine.

Once these details had been squared away, Marilyn gave her name as Norma Jeane Dougherty, 25. Her first husband, whom she divorced in 1946, was James Dougherty.

Joe listed himself on the license as Joseph Paul DiMaggio, 39.

The wedding went off smoothly in a space of three minutes between 1:48 p. m. and 1:48 p. m. After that, the couple moved into Judge Perry's court and posed themselves for photographers, in a manner newly photographed in Hollywood.

### "LET'S 'GO," SAYS JOE—

Finally, becoming tired of the hubbub thing, Joe gave his blonde bride a playful pat and almost growled, "Let's go."

They raced down the City Hall corridors pursued by press and public and made the mistake of heading for the Real Estate Department which leads to exactly nowhere.

Then, they were forced to double back, dash through the pursuing crowds and run for the elevator. Scores of persons tried to beat them downstairs by running at breakneck speeds down the stairs.

When the DiMaggio, married once previously at the church in Hollywood as this fact that once again rated to be known that she had posed in the nude for picture calendars.

She explained at the time that she had no compunctions about doing this because "I was broke and hungry."

"Besides," she added, "I had the radio on."

### COMMUTERS—

DiMaggio said their honeymoon will be relatively short because Marilyn will have to return to Hollywood and he has to go to New York for a television sports show.

"We'll probably be doing a lot of commuting," he said, "but San Francisco will be our headquarters."

Harassed 20th Century Fox officials indicated that every concession will be made to the gal who showed America "how

## Ton of Money Buys This Thief 1 to 10, in Prison

Selling a ton of money is a difficult job, Harold H. Berthiaume admitted yesterday to Superior Judge Harold W. Schweitzer.

Especially when it is shiny, mint-new silver. like the 2000 pounds of coins in question, stolen last August from a San Bernardino coin collector.

Berthiaume said he even "cooked" some of it is a frying pan, to make it look used and thus avoid suspicion.

But his travels about the state with a carload of the stuff, trying to change it into currency, quickly put police on his trail, Berthiaume said.

Judge Schweitzer sentenced him to a prison term of 1 to 10 years for grand theft.

The three youthful who actually stole the coins are awaiting sentence in Juvenile Hall.

## Oil Mist Halted by Roofing Plants

Another industry — manufacture of roofing using asphalt— has been brought under complete smog control through installation of expensive devices to control oil mist emissions, it was announced yesterday.

Assistant Smog Control Chief Robert L. Chass said all six roofing firms in the county, operating 11 asphalt roofing "saturators" which once emitted several tons of oil mists into the air daily, have installed controls.

## Ford New Test

DETROIT — Ford Motor wage depart correspondence

## Lena Ho Unh

ROSAMON Lena Horne famous Hayt after illness about 9:30 a Los Comple about 50 m

## Sad Gander



## Lad Seeks Lost Cocker Spanie

Ten-year-old Ronald Robbins yesterday appealed to the Examiner for help in finding his

## Singer Says He'll Wed Doris

they did plan to be married there, but were frightened off when it was known they had reservations in the gambling city.

Marilyn's meteoric rise to fame is one of the stories that make Hollywood such a fabulous place. She started out as an aircraft worker on the assembly line, and it was Joseph Schenck who gave her her start at 20th Century-Fox.

Later she was let out at that studio and her first success came at M-G-M when she made "Asphalt Jungle." Curvaceous Marilyn first attracted attention with her swinging hips and her walk, which has been described as the most sexy yet on the screen.

Later she was signed again by 20th, and Darryl Zanuck gave her such pictures as "Gentlemen Prefer Blondes" and "How to Marry a Millionaire," and so started her on the career that made her the most widely publicized actress of our day.

## BLIND DATE

Marilyn met Joe on a blind date about two years ago and, much to the surprise of everyone, they fell in love. Since Marilyn had never seen a baseball game in her life, and Joe was not interested in motion pictures, no one expected them to be interested in each other.

Joe took Marilyn right into the bosom of his family and to this girl brought up in an orphanage, it was the most perfect thing that could have happened. She had never had any family life and Joe, like all Italians, loves his family.

At the time of the death of her agent, Johnny Hyde, Marilyn came to see me and said she had been bitterly criticized for not marrying Johnny.

## GRATEFUL

"I'd been merely a man I didn't love," she told me, "and though I admired and was grateful to Johnny and I enjoyed being with him, I didn't have time.

"There were always those about Hollywood I knew were national figures"

she is reading and wants to read.

I think that everyone who knows this girl, who has risen against such enormous odds, wishes her great happiness.

I believe they will make their home in San Francisco—except for such times as she is working in Hollywood. San Francisco is Joe's home town, and his sisters and brothers live there. Marilyn has already given up her apartment in Beverly Hills.

## SECOND MARRIAGES

It is the second marriage for both. Marilyn was married to Jim Dougherty in 1942 and divorced him in Las Vegas in 1946. She was just a youngster when they were married, and they were divorced when he came out of the service.

Joe was formerly married to Dorothy Arnold, by whom he has a son, and I might add that the little boy adores Marilyn, as do all males, regardless of age.

## WORD LEAKS OUT

With them were Mr. and Mrs. Frank "Lefty" O'Doul, DiMaggio's first baseball manager; Mr. and Mrs. Tom DiMaggio and Mr. and Mrs. Reno Barsocchini.

The party had hardly entered the City Hall when word leaked out that something was cooking in the matrimonial department and reporters, city clerks and well wishers began gravitating to the third floor.

Thereafter, all was confusion as autograph hunters, photographers and reporters pled for space with the wedding party in Judge Perry's chambers.

Marilyn held a large white orchid in her left hand as she explained to the press that she would be glad to hold "news" had other press

# Joe Says Honeymoon to Be Brief; Both Must Get to Jobs Again

(Continued from Page One)

can guarantee that," he said, grinning.

But his curvaceous bride, generally referred to as the hottest property on the 20th Century-Fox lot was more positive on this point.

"I'd like to have six," she giggled.

As though trying to steal home in the ninth inning, DiMaggio, his bride-to-be and a small wedding party slipped into the City Hall by the basement entrance at exactly 1 p.m.

Joe, tall, broad-shouldered and graying, was wearing a blue suit, white shirt and blue polka dot tie. He is 39.

Marilyn, 25, was wearing her smile, false eyelashes and a smart broadcloth suit with a pert ermine collar. Her nails had natural polish.

Judge's chambers were finally cleared and the press removed itself to a city office just outside. Beyond the office was the hall where 200 persons pressed in for a glimpse of the happy couple.

## CRY RESOUNDS

A reporter standing on a desk was able to look over the transom.

"They're not getting married. They're drinking martinis," he reported back to the anxious crowd.

Then a cry went up for the man with the marriage license. It reached the bride and groom and the judge and wedding party were literally trapped in the judge's chambers without a marriage license.

A mad identification

popped questions at his fiancee. "All right, fellows," he said, at last, "I don't want to rush you, but we've got to get on with the ceremony."

The actress, who was raised in an orphanage and had 11 sets of foster parents, seemed amused by reporters asking whether she planned to give up moviemaking for homemaking.

"What difference does it make?" she suspended," she quipped, giving a little kick to one of her pretty legs.

"This is no time to talk about suspensions," DiMaggio interrupted, "we got to get going. We got to put a lot of miles behind us."

Where were they going on their honeymoon?—

DiMaggio smiled.

"North, South, East and West," he said.

The judge's chambers went up from the crowd calling for a machine.

Once these details had been squared away, Marilyn gave her name as Norma Jeane Dougherty, 25. Her first husband, whom she divorced in 1946, was James Dougherty.

Joe listed himself on the license as Joseph Paul DiMaggio, 39.

The wedding went off smoothly in a space of three minutes between 1:48 p.m. and 1:48 p.m. After that, the couple moved into Judge Peery's court where they kissed for photographers in a manner rarely photographed in Hollywood.

## "LET'S GO," SAYS JOE

Finally, becoming tired of the sort of thing, Joe gave his bride a playful pat and almost growled, "Let's go."

They raced down the City Hall corridor pursued by press and public and made the mile dash of heading for the Real Estate Department which leads to nearby nowhere.

Then, they were forced to double back,—dash through the pursuing crowds and run for the elevator. Scores of persons tried to beat them downstairs by running at breakneck speeds down the stairs.

The new Mrs. DiMaggio, married once previously at the age of 16, rose rapidly to film stardom after it became known that she had posed in the nude for picture calendars.

She explained at the time she had just accomplished about doing this because "I was broke and..."

## COMPLETE

# Ton of Money Buys This Thief; 1 to 10 in Prison

Selling a ton of money is a difficult job. Harold F. Berthiaume admitted yesterday to Superior Judge Harold W. Schweitzer.

Especially when it is shiny, new silver like the 2000 pounds of coins in question, stolen last August from a San Bernardino coin collector.

Berthiaume said he even "cooked" some of it in a frying pan, to make it look used and thus avoid suspicion.

But his travels about the state with a carload of the stuff, trying to change it into currency, quickly put police on his trail, Berthiaume said.

Judge Schweitzer sentenced him to a prison term of 1 to 10 years for grand theft.

The three burglars who actually stole the coins are awaiting sentence.

# Oil Mist Halted by Roofing Plants

Another industry—manufacture of roofing using asphalt—has been brought under complete smog control through installation of expensive devices to control oil mist emissions, it was announced yesterday.

Assistant Smog Control Chief Robert L. Chass said all asphalt roofing firms in the county, operating 11 asphalt roofing "saturators," which once emitted red smog haze to pall into the air daily, have installed smog controls.

# Riverside Drive Bypass Proposed

Construction of a bypass road to ease traffic congestion at Riverside drive and Los Feliz boulevard, adjoining the entrance of Griffith Park, was recommended by the City Traffic Commission yesterday.

The plan, suggested by Traffic Engineer Ralph T. Dorsey, calls for building an angle road from Riverside drive north of the intersection and curving eastward across the corner of Griffith Park to join Los Feliz boulevard over the bridge over the Los Angeles River.

## Cinema Editors Elect Officers

# Singer Says He'll Wed Doris

# Sad Gand

# Too Cold in N.Y.? Suspect Gives Up, Prefers L.A. Jail

# Led-Seeks Lost Cooker Scene

# ll *Crowd Chases DiMaggios*

## NASH, HUDSON MERGER 'OK'D

### Auto, Kelvinator Divisions to Keep Separate Identities





**iMaggio as they face news- Francisco before marriage.**
—International News soundphoto.

**EXIT**—With Best Man Reno Bar-socchini leading way, Marilyn Monroe, appearing slightly flustered, and Joe

DiMaggio leave judge's chambers after wedding. Said judge: "I forgot to kiss the bride, and I'm sorry."
—Associated Press wirephoto.

DETROIT, Jan. 14.—(AP)—Consolidation of Nash-Kelvinator Corporation and Hudson Motor Car Company was approved today by directors of the companies subject to stockholder approval. Stockholder meetings will be held in March.

The resulting corporation will be known as American Motors Corporation with combined assets of more than $355,000,000.

Under the plan Nash, Hudson and Kelvinator will operate as separate divisions of American Motors. The dealer and sales organizations will retain their separate identities.

It was contemplated that A. E. Barit, president of Hudson, will serve as a director and consultant and George W. Mason, president and board chairman of Nash-Kelvinator, as president and board chairman of American Motors.

Under the agreement, three shares of Hudson stock will be converted into two shares of American Motors stock and each share of Nash-Kelvinator stock will continue as one share of American Motors.

## neymoon to Be Brief; Both Get to Jobs Again

popped questions at his fiancee.
"All right, fellows," he said at last, "I don't want to rush you, but we've got to get on with the ceremony."

The actress, who was raised in an orphanage and had 11 sets of foster parents, seemed amused by reporters asking whether she planned to give up moviemaking for homemaking.

"What difference does it make? I'm suspended," she quipped, giving a little kick to one of her pretty legs.

"This is no time to talk about suspensions," DiMaggio interrupted, "we got to get going. We got to put a lot of miles behind us."

Where were they going on their honeymoon?

DiMaggio smiled.

"North, South, East and West," he said.

The judge's chambers were finally cleared and the press removed itself to a tiny office just outside. Beyond the office was the Hall where 200 persons pressed in for a glimpse of the happy couple.

### CROWD RESOUNDS

A reporter standing on a fence was able to look over the transom.

"I'm not getting married. They're drinking champagne," he reported back to the anxious crowd.

Then a cry went up from inside will the marriage license. It proved the bride and groom had Judge and wedding cake were liberally inserted. The judge's chambers without marriage license.

A man identified as David Dunn, an early county clerk...

went up from the crowd calling for a machine.

Once these details had been squared away, Marilyn gave her name as Norma Jean Dougherty, 25. Her first husband, whom she divorced in 1946, was James Dougherty.

Joe listed himself on the license as Joseph Paul DiMaggio, 39.

The wedding went off smoothly. In a space of three minutes between 1:48 p.m. and 1:48 p.m. After that the couple moved into Judge Peery's court where they kissed for photographers in a manner rarely photographed in Hollywood.

### 'LET'S GO,' SAYS JOE

Finally, becoming tired of this sort of thing, Joe gave his blonde bride a playful pat and almost proved, "Let's go."

They raced down the City Hall corridors pursued by press and public and made the mistake of heading for the Real Estate Department which leads to exactly nowhere.

Then, they were forced to double back, dash through the pursuing crowds and run for the elevator. Scores of persons tried to beat them downstairs by running at breakneck speeds down the stairs.

The new Mrs. DiMaggio, married once previously at the age of 16, rose rapidly to film stardom after it became known that she had posed in the nude for picture calendars.

She explained at the time that she had no compunctions about doing this because "I was broke and hungry."

"Besides," she added, "I had the radio on."

### COMMUTERS

DiMaggio said their honeymoon will be relatively short because Marilyn will have no release in Hollywood and he has to go to New York for a television sports show.

"We'll probably be doing a lot of commuting," he said. "I'll live Francisco will be our headquarters."

Harassed 20th Century-Fox

## Ton of Money Buys This Thief, 1 to 10 in Prison

Selling a ton of money is a difficult job, Harold F. Berthiaume admitted yesterday to Superior Judge Harold W. Schweitzer.

Especially when it is shiny, mint-new silver, like the 2000 pounds of coins in question, stolen last August from a San Bernardino coin collector.

Berthiaume pleaded guilty "cooked" scheme of it to a trying plan, to make it look jured with that crook operation.

But his frantic about state mint, remained on the...

## Ford Plans New Arizona Test Ground

DETROIT...

## Oil Mist Halted By Roofing Plants

Another industry manufacture of roofing using asphalt... has been brought under complete smog control through installation of explosive devices to control oil mist suddenly, it was announced yesterday.

Assistant Smog Control Chief Robert L. Chass said all six roofing firms in the country operating 11 asphalt roofing "saturators" which once emitted at seven barrels of oil mist into the air daily, have installed controls.

## Lena Horne, Mate Unhurt in Crash

ROSAMOND, Jan...
Lena Horne and Lennie Hayton...

## Sad Gander Stays North