# Exhibit 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE MILTON H. GREENE ARCHIVES, INC., <br><br> Plaintiff, <br><br> v. <br><br> CMG WORLDWIDE, INC., an Indiana Corporation, and MARILYN MONROE, LLC, a Delaware Limited Liability Company, ANNA STRASBERG, an individual, <br><br> Defendants. | CASE NO. CV 05-2200 MMM (Mcx) <br><br> TENTATIVE ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| AND CONSOLIDATED ACTIONS | |

On March 25, 2005, The Milton H. Green Archives, Inc. filed an action against CMG Worldwide Inc., Marilyn Monroe LLC, and Anna Strasberg. On May 3, 2005, the court consolidated the case with two other actions – *Shirley De Dienes et al. v. CMG Worldwide, Inc. et al.* (No. CV 05-2516)[1] and *Tom Kelley Studio, Inc. v. CMG Worldwide, Inc. et al.* (No. CV

---

[1] On February 2, 2006, the court dismissed this action, without prejudice, pursuant to the parties' stipulation.

05-2568).[2] On December 14, 2005, the court consolidated two additional actions with the pending case – *CMG Worldwide, Inc., et al. v. Tom Kelley Studios* (No. CV 05-5973) and *CMG Worldwide, Inc., et al. v. The Milton H. Green Archives, Inc.* (No. CV 05-7627).[3] The latter two actions were originally filed by CMG Worldwide, Inc. and Marilyn Monroe, LLC (the "CMG Parties" or "plaintiffs") in the United States District Court for the Southern District of Indiana and were transferred to this district pursuant to 28 U.S.C. § 1404(a) on August 9, 2005.[4] All of the actions seek to have the court resolve competing claims to ownership of the legal right to use, license, and distribute certain photographs of Marilyn Monroe. In their complaints against the Milton H. Green Archives, Inc. and Tom Kelley Studios, Inc. (the "MHG Parties" or "defendants"), the CMG Parties assert that they own the "Right of Publicity and Privacy in and to the Marilyn Monroe name, image, and persona" created by "the Indiana Right of Publicity Act, I.C. § 32-36-1-1 et seq., and other applicable right of publicity laws." The CMG Parties contend that defendants have infringed this right by using Marilyn Monroe's name, image and likeness "in connection with the sale, solicitation, promotion, and advertising of products, merchandise, goods and services" without their consent or authorization.[5]

On October 6, 2006, the MHG Parties filed a motion for summary judgment. They argue, *inter alia*, that plaintiffs' right of publicity claims are preempted by the Copyright Act, 28 U.S.C. §§ 101-1332, and that, even if the claims are not preempted, plaintiffs have failed to adduce any

---

[2]Tom Kelley Studio, Inc. sued the same defendants as did The Milton H. Greene Archive, Inc. – CMG Worldwide Inc., Marilyn Monroe LLC, and Anna Strasberg.

[3]These actions were filed by CMG Worldwide, Inc. and Marilyn Monroe, LLC, but *not* by Anna Strasberg. The court will refer to CMG Worldwide and Marilyn Monroe, LLC as the "CMG Parties."

[4]On February 6, 2006, the court issued a scheduling order, which denominated the CMG Parties plaintiffs and the MHG Parties defendants for purposes of the consolidated actions. The court based this order on the fact that the Indiana action in which the CMG Parties are plaintiffs, was the first filed action.

[5]Plaintiffs' First Amended Complaint against Milton H. Greene Archives, Inc., ¶¶ 7, 24-26; Plaintiffs' First Amended Complaint against Tom Kelley Studios, Inc., ¶¶ 7, 28-30.

evidence that they have "standing" to assert claims based on Marilyn Monroe's right of publicity.[6] In essence, defendants argue that, even if a posthumous "right of publicity" in Marilyn Monroe's name, image and likeness exists, plaintiffs cannot show that they came into possession of that right.[7]

## I. FACTUAL BACKGROUND

The parties expend considerable effort attempting to create triable issues of fact by objecting to nearly every piece of evidence adduced by their opponents in support of or opposition to the motion for summary judgment. After reviewing the applicable law, however, the court concludes that resolution of this motion depends on a limited number of facts that are undisputed.

Milton H. Greene and Tom Kelley, Sr. were professional photographers and contemporaries of Marilyn Monroe.[8] Defendants purport to own copyrights in various photographs of Marilyn Monroe that Greene and Kelley took during her lifetime.[9] Plaintiffs allege that defendants are using the photographs "on or in connection with the sale, solicitation,

---

[6] Defendants' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment ("Defs.' Mem.") at 32-34.

[7] Defendants also argue that (1) Marilyn Monroe was domiciled in New York at the time of her death, such that no right of publicity could survive her passing; (2) even if Marilyn Monroe was not a New York domiciliary at the time of her death, plaintiffs are collaterally and judicially estopped from asserting otherwise; (3) Indiana's right of publicity statute does not apply to Marilyn Monroe; and (4) plaintiffs' claims are barred by laches. Defendants' motion also challenged plaintiffs' copyright infringement claims (see *id.* at 43-47); those claims have since been dismissed without prejudice pursuant to the parties' stipulation.

[8] Defendants' Statement of Uncontroverted Facts and Conclusions of Law Submitted in Support of Their Motion for Summary Judgment ("Defs.' Facts"), ¶ 1; Plaintiffs' Statement of Genuine Issues of Material Fact ["MF"] and Additional Material Facts ["AMF"] in Response to Defendants' Statement of Uncontroverted Facts in Support of Defendants' Motion for Summary Judgment ("Pls.' Facts"), MF ¶ 1.

[9] Defs.' Facts, ¶¶ 4, 8. Plaintiffs dispute this fact. (See Pls.' Facts, MF ¶¶ 4, 8.) Whether defendants own copyrights in photographs of Marilyn Monroe is immaterial to court's resolution of the motion, however.

3

promotion, and advertising of products, merchandise, goods and services" without their authorization or consent,[10] and thus violating a right of publicity in Marilyn Monroe's name, image and likeness that purportedly passed to plaintiffs through her will.[11]

---

[10] Plaintiffs' First Amended Complaint Against Milton H. Greene Archives, Inc., ¶¶ 7, 24-26; Plaintiffs' First Amended Complaint Against Tom Kelly Studios, Inc., ¶¶ 7, 28-30.

[11] Pls.' Facts, AMF ¶¶ 20-22; Defendants' Response to Plaintiffs' Statement of Genuine Issues of Material Fact and Additional Material Facts Re Defendant's Motion for Summary Judgment ("Defs.' Reply Facts"), AMF ¶¶ 20-22 (disputing this fact only to the extent that it states the legal conclusion that Marilyn Monroe's right of publicity passed through her will). The court denies defendants' "request to strike" essentially all evidence adduced by plaintiffs in opposition to defendants' motion for summary judgment. Defendants contend the evidence should be excluded both because it was not adequately identified in plaintiffs' initial disclosures, and also because it was improperly withheld from defendants during discovery. (See Objections to and Request To Strike Evidence Submitted in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Defs.' Request To Strike").)

Defendants' Request To Strike is denied. Plaintiffs' initial disclosures adequately identified by "category" the documents they ultimately produced in opposition to defendants' motion for summary judgment. This is all that is required by Rule 26(a)(1)(B) of the Federal Rules of Civil Procedure. See *DE Technologies, Inc. v. Dell Inc.*, Civil Action No.: 7:04cv00628, 2006 WL 3500962, *5 (W.D. Va. Dec. 4, 2006) ("Dell correctly argues that the initial disclosure required by Rule 26 does not require the production of the documents upon which a party intends to rely. Instead, in lieu of production, Rule 26 allows a party to provide 'a description by category and location of, all documents, . . . that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment"); *Sizemore v. Wal-Mart Stores, Inc.*, No. Civ.A. H-05-1589, 2006 WL 1698291, *3 (S.D. Tex. June 16, 2006) ("Plaintiff states in her Response that Wal-Mart identified relevant documents in its Initial Disclosures but did not produce the documents. Rule 26(a) of the Federal Rules of Civil Procedure, however, requires only that the documents be described by category and location. . ."); *CP Solutions PTE, Ltd. v. General Elec. Co.*, No. 3:04cv2150(JBA)(WIG), 2006 WL 1272615, *1 (D. Conn. Feb. 6, 2006) ("The disclosing party, however, does not have to produce actual documents. It can comply fully with its initial disclosure obligation by providing a description by category and location of all documents, data compilations, and tangible things it expects to use during the proceeding"). Plaintiffs stated, for example, that they would rely on documents establishing Marilyn Monroe's domicile at the time of her death (as did defendants), and on documents supporting their claim that defendants were aware of and had recognized plaintiffs' asserted rights in Marilyn Monroe's right of publicity. Plaintiffs represent, moreover, that many of the documents they adduced in opposition to defendants' motion for summary judgment were not in their possession, custody or control at the time they made the initial disclosures. The court thus concludes that they met their disclosure obligations under Rule 26(a)(1)(B).

Marilyn Monroe died testate on August 5, 1962.[12] Her will, which did not expressly bequeath a right of publicity, contained the following residuary clause:

> SIXTH: All the rest, residue and remainder of my estate, both real and personal, or whatsoever nature and wheresoever situate, of which I shall die seized or possessed or to which I shall be in any way entitled, or over which I shall possess any power of appointment by Will at the time of my death, including any lapsed legacies, I give, devise and bequeath as follows:

---

The court also rejects defendants' contention that plaintiffs abused the discovery process by "producing" documents for the first time in opposition to defendants' motion. As plaintiffs note, neither party produced *any* documents before defendants' motion for summary judgment was filed. (See Plaintiffs' Opposition to Defendants' Objections to and Request to Strike Evidence in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 4.) Indeed, defendants concede that their motion – which was filed less than two months after the parties first served written discovery on one another – was "a 'show me' motion . . . directed at Plaintiffs' claims and their lack of basis." (Defendants' Reply in Support of Objections to Strike Evidence Submitted in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, at 6 n. 5, 10 n. 7.) If this was defendants' intent, plaintiffs' opposition provided exactly what defendants sought – information regarding the "basis" of plaintiffs' claims.

Moreover, defendants did not move to compel further responses to their discovery requests before filing this motion, a recognized first step in enforcing an opponent's discovery obligations. See FED.R.CIV.PROC. 37(a). Rather, they sought an order striking all of plaintiffs' evidence. Such an order may be entered under Rule 37(d) where a party fails to serve a written response to a request to produce or written answers or objections to interrogatories. See FED.R.CIV.PROC. 37(d); see also 8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus, FEDERAL PRACTICE & PROCEDURE § 2291 (2006) ("If [a party] serves a response, but fails to say that inspection will be permitted as requested or fails to permit the inspection itself a motion under Rule 37(a) to compel inspection is available, but Rule 37(d) is inapplicable"); *id.* ("The provisions of Rule 37(d) with regard to interrogatories do not apply 'for anything less than a serious or total failure to respond to interrogatories'"). There is no evidence here that plaintiffs failed to serve a written response to defendants' document production request or written answers and objections to interrogatories; rather, it appears that defendants did not believe the response was adequate or complete. Finally, to the extent Rule 37(d) is applicable, the court finds, under the circumstances of this case, that it would not be "just" to strike all of plaintiffs' evidence. See FED.R.CIV.PROC. 37(d) (stating that the court "may make such orders in regard to the failure as are just"). The proper forum for defendants' discovery dispute with plaintiffs is a hearing on a motion to compel before the magistrate judge.

[12] Pls.' Facts, AMF ¶ 10; Defs.' Reply Facts, AMF ¶ 10.

5

(a) To MAY REIS the sum of $40,000.00 or 25% of the total remainder of my estate, whichever shall be the lesser.

(b) To DR. MARIANNE KRIS 25% of the balance thereof, to be used by her as set forth in ARTICLE FIFTH (d) of this my Last Will and Testament.

(c) To LEE STRASBERG the entire remaining balance.[13]

The will was subject to primary probate in New York.[14]

## II. DISCUSSION

### A. Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than in its favor. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id*. If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC. 56(e).

In viewing evidence at the summary judgment stage, the court does not make credibility

---

[13]Declaration of Greg T. Hill Submitted in Support of Defendants' Motions for Summary Judgment, Exhibit 13; Declaration of Anna Strasberg in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, Exhibit C.

[14]Defs.' Facts, ¶¶ 16, 18-19; Pls.' Facts, AMF ¶ 26.

determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED. R. CIV. PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

### B. Whether Plaintiffs' Asserted Right of Publicity Claims Are Preempted by the Copyright Act

As a threshold matter, the court must determine whether plaintiffs' right of publicity claims are preempted by the Copyright Act. State law claims are preempted by the Copyright Act only if (1) they concern a work that is within the subject matter of copyright and (2) the state law rights asserted are "equivalent" to rights protected by copyright law. See 17 U.S.C. § 301(a); *Laws v. Sony Music Entertainment*, 448 F.3d 1134, 1138-39 (9th Cir. 2006); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003 (9th Cir. 2001); see also *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 909 (7th Cir. 2005). State law claims are not "equivalent" if they contain "an element which changes the nature of the action 'so that it is qualitatively different from a copyright infringement claim.'" *Summit Machine Tool Manufacturing Corp. v. Victor CNC Systems, Inc.*, 7 F.3d 1434, 1439-40 (9th Cir. 1993); see also *Laws*, 448 F.3d at 1144 (noting that "[t]he mere presence of an additional element . . . is not enough to qualitatively distinguish [a plaintiff's] right of publicity claim from a claim in copyright"; instead, that "extra element must transform the [underlying] nature of the action").

The parties dispute which of two Ninth Circuit decisions – *Laws* or *Downing* – provides the standard for evaluating preemption in this case. The court concludes that *Downing* is the applicable precedent. There, the Ninth Circuit considered whether a state law right of publicity claim based on the use of a copyrighted photograph was preempted by the Copyright Act. Retailer Abercrombie & Fitch used a copyrighted photograph of plaintiffs, who were surfers, in a surf-themed sales catalogue promoting its clothing lines. Abercrombie published the photograph

without obtaining the surfers' consent, having purchased it earlier from a professional surf photographer. *Downing*, 265 F.3d at 1000. The catalogue identified the surfers by name, and offered T-shirts identical to those they wore in the photograph for sale. *Id.* The Ninth Circuit held that the surfers' right to control use of their name, image, and likeness, which was the basis for their claim, was not the "subject matter" of copyright. It stated:

> "The photograph itself, as a pictorial work of authorship, is subject matter protected by the Copyright Act. . . . However, it is not the publication of the photograph itself, as a creative work of authorship, that is the basis for [the surfers'] claims, but rather, it is the use of [their] likenesses and their names pictured in the published photograph. . . . A person's name or likeness is not a work of authorship within the meaning of 17 U.S.C. § 102. This is true notwithstanding the fact that [the surfers'] names and likeness are embodied in a copyrightable photograph." *Id.* at 1003-04 (citation omitted).

In reaching this conclusion, the Ninth Circuit relied, *inter alia*, on Professor McCarthy's treatise on the right of publicity and privacy, which states:

> "The 'subject matter' of a Right of Publicity claim is not a particular picture or photograph of plaintiff. Rather, what is protected by the Right of Publicity is the very identity or persona of the plaintiff as a human being. . . . While copyright in a given photograph may be owned by the person depicted in it, the exact image in that photograph is not the underlying 'right' asserted in a Right of Publicity case. To argue that the photograph is identical with the person is to confuse illusion and illustration with reality. Thus, assertion of infringement of the Right of Publicity because of defendant's unpermitted commercial use of a picture of plaintiff is not assertion of infringement of copyrightable 'subject matter' in one photograph of plaintiff." J. Thomas McCarthy, RIGHTS OF PUBLICITY AND PRIVACY § 11.13[C], at 11-72-73 (1997) (quoted in *Downing*, 265 F.3d at 1004).

The *Downing* court also concluded that the second prerequisite to copyright preemption was not met, because "the subject matter of the [the surfers'] . . . right of publicity claims is their names

8

and likenesses, which are not copyrightable, [and therefore] the claims are not equivalent to the exclusive rights contained in § 106." *Id.* at 1005.

*Downing* compels the conclusion that plaintiffs' right of publicity claims are not preempted by the Copyright Act. Plaintiffs allege that defendants have exploited Marilyn Monroe's name, image, and likeness – as embodied in photographs that defendants purport to have copyrighted – "on or in connection with the sale, solicitation, promotion, and advertising of products, merchandise, goods and services" without their authorization or consent.[15] Plaintiffs do not challenge defendants' right to publish or otherwise exploit their photographs as "creative work[s] of authorship" protected by copyright. Rather, they contend that defendants are commercially exploiting Marilyn Monroe's name, image and likeness by licensing photographs containing her image to third-party vendors for use in promoting various consumer products. The *Downing* court found that claims based on precisely this kind of use of copyrighted photographs were not preempted by federal law.

Defendants contend that *Laws*, rather than *Downing*, controls. They assert that *Laws* held that right of publicity claims are preempted if they are based solely on commercial exploitation of copyrighted works,[16] and that it distinguished *Downing* on the basis that Abercrombie did not simply exploit copyrighted photographs commercially, but suggested that plaintiffs endorsed its

---

[15]Plaintiffs' First Amended Complaint Against Milton H. Greene Archives, Inc., ¶¶ 7, 24-26; Plaintiffs' First Amended Complaint Against Tom Kelly Studios, Inc., ¶¶ 7, 28-30. Plaintiffs contend that defendants' pleadings in the consolidated cases constitute judicial admissions that defendants have used purportedly copyrighted photographs to exploit Marilyn Monroe's name, image, and likeness commercially. (See Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Pls.' Opp.") at 39 (citing Milton H. Greene Archives, Inc. Complaint Against CMG Worldwide Inc. et al., ¶ 18 ("[MHG] photographs have been used for, among other things, advertising, magazines, calendars, and on wine bottles. Such licenses can run as much as $25,000 for a single use of one Marilyn Monroe photograph"); Tom Kelley Studio, Inc. Complaint Against CMG Worldwide, Inc. et al., ¶¶ 16, 30 (alleging that Kelley Studios "works to . . . commercialize [its] photographs" and to "commercially exploit the images of Marilyn Monroe").)

[16]Defendants' Reply in Support of Motion for Summary Judgment ("Defs.' Reply") at 22.

products by using their names and reproducing the T-shirts they wore.[17] Defendants argue that, in contrast to Abercrombie, they do nothing more than license use of their photographs for commercial purposes. They assert there is no evidence that they have licensed Marilyn Monroe's name, suggested her endorsement of a particular product, or allowed the photographs to be used on products that look like those being used by Monroe in the photographs.[18]

Defendants' reliance on *Laws* is unavailing. There, the Ninth Circuit held that, when a copyrighted sound recording is produced, the singer's interest in her "voice" and the copyright holder's interest in the recording as "an original work[ ] of [creative] authorship" essentially merge, so that the Copyright Act preempts claims based on licensing of the sound recording for commercial purposes, e.g., in advertising campaigns. *Laws*, 448 F.3d at 1139-41 ("Although California law recognizes an assertable interest in the publicity associated with one's voice, we think it is clear that federal copyright law preempts a claim alleging misappropriation of one's voice when the entirety of the allegedly misappropriated vocal performance is contained within a copyrighted medium"). The *Laws* court recognized that use of copyrighted photographs in advertising implicates a separate set of interests, however, and thus that such uses "are distinguishable" from the commercial licensing of a sound recording. *Id.* at 1141. In this regard, it acknowledged *Downing*'s holding that "'a person's name or likeness is not a work of authorship within the meaning of [the Copyright Act],'" *id.* (quoting *Downing*, 265 F.3d at 1004), and implicitly recognized that an individual's likeness does not merge into a photograph that is a "work of [creative] authorship" in the same manner that an artist's voice merges into a copyrighted sound recording. See also 1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 1.01[B][1][c], at 1-28 (2006) ("[N]ame and likeness do not become a work of authorship simply because they are embodied in a copyrightable work").[19] In short, the *Laws*

---

[17]*Id.*

[18]*Id.* at 22-23.

[19]In contrast, the *Laws* court noted that, like a person's "voice" captured on a sound recording during a vocal performance, a person's "likeness" captured on film during a dramatic

10

court distinguished a photographer's creative work, which is separate from the "likeness" of the person whose image he captures on film, from a singer's creative work, which merges with the "voice" she uses to record. Given this merger, the court stated, the singer's assertion of a right of publicity in her voice necessarily "challeng[ed] control of the artistic work itself," and therefore concerned the subject matter of copyright. *Laws*, 448 F.3d at 1142; see also *Toney*, 406 F.3d at 910 ("Toney's identity is not fixed in a tangible medium of expression. There is no 'work of authorship' at issue in Toney's right of publicity claim. A person's likeness – her persona – is not authored and it is not fixed. The fact that an image of the person might be fixed in a copyrightable photograph does not change this," quoted in *Laws*, 448 F.3d at 1142).[20]

Consequently, the court concludes that *Downing*, not *Laws*, controls, and that plaintiffs' right of publicity claims are not preempted by the Copyright Act.[21] Unlike a voice captured in a sound recording, Marilyn Monroe's "likeness" did not merge into defendants' photographs so completely that she (or her successors-in-interest) cannot assert an interest in her persona separate and distinct from defendants' interest in their photographs as creative works of art.

---

performance merges with the creative work of authorship itself. As a result, it suggested, the Copyright Act *would* preempt a right of publicity claim based on a copyright holder's screening of a motion picture that embodied an actor's "name, pictures, and likeness without [his] consent." *Laws*, 448 F.3d at 1142-43 (discussing *Fleet v. CBS, Inc.*, 50 Cal.App.4th 1911 (1996)); see also *Downing*, 265 F.3d at 1005 n. 4 ("In *Fleet*, the plaintiffs were actors in a copyrighted film. The claims of the plaintiffs were based on their dramatic performance in a film CBS sought to distribute. . . . This is clearly distinguishable from this case where the Appellants' claim is based on the use of their names and likenesses, which are not copyrightable").

[20] Defendants assert that the *Laws* court questioned *Toney*'s reasoning. (Defs.' Reply at 23 n. 28.) The court does not agree. The *Laws* court simply found that *Toney* – which involved commercial exploitation of a copyrighted photograph rather than commercial exploitation of a copyrighted sound recording – was inapposite in resolving the preemption issue before it.

[21] One other court that has considered precisely the issue is in accord. See *Bonner v. Fuji Photo Film*, No. C 06-4274 CRB, 2006 WL 3327894, *2 (N.D. Cal. Nov. 13, 2006) (stating, in a case that involved the alleged misappropriation of plaintiff's photograph for use on the packaging of disposable cameras, that "[d]efendant's effort to force this case under the umbrella of *Laws* is utterly unpersuasive. . . . The Court concludes that this case is squarely controlled by the surfers' case and not the singer's").

11

### C. Whether Plaintiffs Have Established Ownership of Marilyn Monroe's Posthumous Right of Publicity

In their motion for summary judgment, defendants argue that plaintiffs cannot adduce evidence that they have "standing" to assert claims based on Marilyn Monroe's right of publicity.[22] They contend that, even if a posthumous "right of publicity" in Marilyn Monroe's name, likeness and persona exists, plaintiffs cannot demonstrate that they are the owners of that right.[23]

---

[22] Defs.' Mem. at 32-34.

[23] Defendants argue that, as a mere licensee of Marilyn Monroe's purported right of publicity, CMG lacks "the requisite ownership interest" to "sue on violations of rights [it] merely represent[s] on behalf of [its] principals." (*Id.* at 33.) This argument lacks merit. Under the licensing agreement between Marilyn Monroe LLC ("MMLLC") and CMG, CMG was appointed the "sole and exclusive licensing agent world-wide" for "merchandising and advertising" Marilyn Monroe's right of publicity. (See Pls.' Facts, AMF ¶¶ 18; Defs.' Reply Facts, AMF ¶¶ 18).) To the extent, therefore, that MMLLC owns and is capable of licensing Marilyn Monroe's right of publicity, CMG has standing to sue for violation of that right. See *MJ & Partners Restaurant Ltd. Partnership v. Zadikoff*, 10 F.Supp.2d 922, 930 (N.D. Ill. 1998) (noting that the "weight of authority" favors the view that "a[n] [exclusive] licensee of a celebrity's name may state a cause of action for misappropriation of the right to publicity"); *Bi-Rite Enterprises, Inc. v. Button Master*, 555 F.Supp. 1188, 1199-1200 (S.D.N.Y. 1983) ("Plaintiff Bi-Rite, as the exclusive licensee of various rock groups, may also assert this [right of publicity] claim. Unlike privacy rights, which protect personality and feelings and are therefore not assignable, the right of publicity gives rise to a 'proprietary' interest in the commercial value of one's persona which is assignable and may be freely licensed. This proprietary interest is much like a copyright; it embodies a bundle of exclusive marketing rights which its holder may transfer in its entirety by an assignment or in part by exclusive licenses. Holders of exclusive licenses gain standing to protect their interests against all who would encroach on the exclusive rights embodied in the licenses" (citations omitted)), opinion supplemented on other grounds, 578 F.Supp. 59 (S.D.N.Y. 1983); see also 2 J. Thomas McCarthy, THE RIGHTS OF PUBLICITY AND PRIVACY, § 10:53 (2d ed. 2005) ("A licensee of exclusive rights of publicity has standing to sue for infringements which impinge upon its area of exclusive rights as defined in the license").

The authorities cited by defendants for the proposition that CMG lacks standing to sue (see Defs.' Reply at 18 n. 22) are inapposite. See *Exhibitors' Serv., Inc., v. Am. Multi-Cinema, Inc.*, 788 F.2d 574, 578-79 (9th Cir. 1986) (holding, on the specific facts of the case, that a motion picture licensing agent was not a "proper party" to assert an antitrust claim against motion picture exhibitors because its injury "was not of the type the antitrust laws were intended to forestall" (internal quotation marks omitted)); *Pickett v. IBP, Inc.*, 197 F.R.D. 510, 516 (M.D. Ala. 2000) (holding that "feedlot" owners lacked standing to "bring suit to recover for the injuries suffered

12

Plaintiffs counter:

> "It is undisputed that in her last will and testament Marilyn Monroe devised 75% of the 'rest, residue and remainder of [her] estate, both real and personal, or whatsoever nature and whatsoever situate . . . to which I shall be in any way entitled' to Lee Strasberg, her close friend and acting coach. By definition, this personal property included the right of publicity, and courts have uniformly held that the right of publicity is a property right. When Lee Strasberg died, Ms. Monroe's publicity rights passed by will to his wife, Anna Strasberg. In 2001, Mrs. Strasberg formed MMLLC and transferred, along with the 25% interest holder, all of her rights and interests in the estate of Marilyn Monroe, including, but not limited to, the right of publicity, to MMLLC."[24]

Citing these transfers, they assert "[t]he chain of title to Marilyn Monroe's Right of Publicity is simple."[25]

Defendants argue that title to Marilyn Monroe's right of publicity could not have passed as plaintiffs contend, since "no post mortem [right of publicity] existed in 1962 under either New York[,] . . . California [or Indiana] law and . . . [thus] none could have been transferred by will or through the New York surrogate proceedings."[26] Although they cite no authority supporting their position, defendants assert that "Ms. Monroe could not transfer what she did not have and

---

by the owners of cattle which they fed and marketed").

[24] Pls.' Opp. at 36. Although the court need not reach the issue, it doubts that plaintiffs have adduced sufficient evidence to raise a triable issue respecting Anna Strasberg's transfer of her purported interest in Marilyn Monroe's right of publicity to MMLLC. Exhibit B to the Declaration of Anna Strasberg, which plaintiffs submit as evidence of this transfer, appears instead to document the transfer of a membership interest in MMLLC *from* Marilyn Monroe's Estate *to* Anna Strasberg and the Anna Freud Centre. (See Declaration of Anna Strasberg in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, ¶¶ 2-3 & Exhibit B.) Obviously, the court cannot infer – based upon a transfer *from* the Estate *to* Strasberg – that Strasberg transferred rights *from* herself *to* MMLLC.

[25] *Id.* at 35.

[26] Defs.' Reply at 17.

13

[that] her Will plainly transferred only property she was seized in and had possession of at the time of her death."[27]

As a general principle of probate law, "under no circumstances, in the absence of a valid power, can any amount of testamentary intent produce the effect of subjecting property not owned by a testator at the date of his death to any disposition whatever." *In re Van Winkle's Will*, 86 N.Y.S.2d 597, 600 (Sur. Ct. 1949). This rule applies to wills probated in New York, see *id.*; see also N.Y. EST. POWERS & TRUSTS LAW § 3-3.1 (formerly N.Y. DECEDENT EST. LAW § 14) ("[A] disposition by the testator of all his property passes all of the property he was entitled to dispose of *at the time of his death*" (emphasis added)),[28] as well as to wills probated in California.[29] See,

---

[27] *Id.*

[28] In addition, New York law deems certain property interests too speculative to be bequeathed by will, e.g., an individual's "distributive share" in another's estate. See *In re Penrose's Estate*, 299 N.Y.S. 844 (Sur. Ct. 1937). Rather than passing through an individual's will, such interests – if and when they come into existence – are distributed by the laws of intestacy. See *id.* at 847-48 (holding that a testator could not bequeath by will his possible interest in the estate of his sister, and that the property had to be distributed according to the laws of intestacy). California appears to treat such interests similarly. See CAL. PROBATE CODE § 92 (abrogating the common-law rule that bequests to predeceased devisees lapse and providing that such bequests, if left to a testator's "kindred," pass to the predeceased devisee's "lineal issue," if any, *but do not pass through the predeceased devisee's will*), currently codified at CAL. PROBATE CODE § 21109-21110.

[29] As a result, the court is not required to conduct a choice-of-law analysis to determine whether Marilyn Monroe had testamentary power to bequeath a posthumous right of publicity through her will. While typically such questions are decided by reference to the law of the testator's domicile (see, e.g., N.Y. EST. POWERS & TRUSTS LAW § 3-5.1(b)(2) (formerly DECEDENT EST. LAW § 47) ("The intrinsic validity, effect, revocation or alteration of a testamentary disposition of personal property, and the manner in which such property devolves when not disposed of by will, are determined by the law of the jurisdiction in which the decedent was domiciled at death"); *In re Moore's Estate*, 190 Cal.App.2d 833, 841-42 (1961) (recognizing that, under CAL. CIVIL CODE § 946, decedent's personal property should be distributed according to the law or his or her domicile), no party argues that Marilyn Monroe was domiciled in a state other than California or New York at the time of her death. Since both California and New York treat property not owned by a testator at death in the same fashion, there is no need to conduct a choice of law analysis, and also no need to resolve the parties' factual dispute regarding Marilyn Monroe's domicile in fact.

14

e.g., *In re Buzza's Estate*, 194 Cal.App.2d 598, 601 (1961) ("It is settled law that a will is construed as applying to and disposing of the estate in its condition at the time of death. A testator may dispose only of such property as is subject to his testamentary power, and the testator is presumed to know the law. In interpreting a will, a court should view the will in a manner which will reveal the intent of the testator as disclosed by the language in the will and, if possible, effectuate that intent. This does not mean, however, that a testator may validly dispose of non-existent property" (citations omitted)); see also *McKay v. Lauriston*, 204 Cal. 557, 569-70 (1928) ("[I]f . . . the wife had no vested interest in the community property [before death], and upon her death her mere expectancy or inchoate interest therein ceased and terminated, after her death there was no property, nor any interest in any property, to which either the husband or any other person could succeed to by descent or succession or by any other means or method").[30]

It is undisputed that none of New York, California, or Indiana recognized a descendable, posthumous right of publicity in 1962 when Marilyn Monroe died.[31] As a result, under either New

---

[30] As noted, this is a general principle of probate law that is applicable in many, if not all, states. See, e.g., *In re Estate of Braman*, 258 A.2d 492, 494 (Pa. 1969) ("During his lifetime, a person cannot give or dispose of property which he does not own or in which he has no interest; no more so can a person make a post-mortem distribution of property which at the time of his death he does not own or in which he has no right, legal or equitable"); *Ware v. Beach*, 322 P.2d 635, 639 (Okla. 1958) ("[P]roperty descends upon death and vests immediately in the heirs, legatees and devisees, subject only to control of the county court for purposes of administration. Since one has a vested right in property to which he succeeds . . . under the will of a decedent immediately upon the death of the decedent, it follows that an estate must be distributed among heirs and distributees according to the law as it exists at the time of death of the decedent" (citations omitted)); *Conlee v. Conlee*, 269 N.W. 259, 263 (Iowa 1936) ("No matter what the provisions of the will are when probated, it confers no rights in property not owned by the testator at the time of her death, and in no event could it be made to avoid contractual obligations assumed during her life," quoting *Steward v. Todd*, 173 N.W. 619, 624 (Iowa 1919)); 80 AM.JUR.2D WILLS § 1168 ("A person cannot make a postmortem distribution of property which he or she did not own, at the time of his or her death, or in which such a person had [no] legal or equitable right. Thus, property acquired by a testator's estate after his or her death may not pass under the residuary clause of the will"); 96 C.J.S. WILLS § 1088 (same).

[31] California created a descendable, posthumous right of publicity in 1984, with the passage of its post-mortem right of publicity statute. See CAL. CIVIL CODE § 3344.1 (formerly CAL. CIVIL CODE § 990). Before passage of this act, California recognized a common-law right of

15

York or California law, Marilyn Monroe could not have passed such a right through the residual clause of her will. This is true regardless of her domicile at the time of death and despite any rights thereafter conferred by the Indiana Right of Publicity Act. Both the California and Indiana posthumous right of publicity statutes recognize the fact that an individual (a "personality") cannot bequeath a statutory property right that she did not possess at the time of her death. The California statute provides that – if no "transfer" of a personality's posthumous right of publicity has occurred on or before the personality's death (either "by contract or by means of trust or testamentary

---

publicity, but that right expired on an individual's death. See *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal.3d 860, 861 (1979) ("In *Lugosi v. Universal Pictures*, [25 Cal.3d 813 (1979)], we hold that the right of publicity protects against the unauthorized use of one's name, likeness or personality, but that the right is not descendible and expires upon the death of the person so protected"); *Gionfriddo v. Major League Baseball*, 94 Cal.App.4th 400, 408-09 (2001) ("In California the right of publicity is both a common law right and a statutory right. . . . [In *Lugosi*], the Supreme Court held that, because the common law right of publicity derived from the right of privacy, it did not survive the death of the person whose identity was exploited and was not descendible to heirs or assignees. In 1984, the Legislature enacted a second statutory right of publicity that was 'freely transferable' to the assignees or passed to the heirs of deceased persons" (citations omitted)).

Indiana created a descendable, posthumous right of publicity in 1994, with the passage of the Indiana Right of Publicity Act. See IND. CODE § 32-36-1-1 to -20 (formerly IND. CODE § 32-13-1-1 to -20); *Phillips v. Scalf*, 778 N.E.2d 480, 483 (Ind. App. 2002) (emphasizing that the state's Right of Publicity Act "*creates* a 'property right' in a personality's right of publicity" (emphasis added)). Before that time, Indiana common law protected the right of publicity through a personal tort action for invasion of privacy. See *Continental Optic Co. v. Reed*, 86 N.E.2d 306, 309 (Ind. Ct. App. 1949); see also *Time Inc. v. Sand Creek Partners, Inc.*, 825 F.Supp. 210, 212 (S.D. Ind. 1993) (applying Indiana law). As a personal right, this common law right of publicity was inalienable; moreover, under the Indiana survivorship statute, a cause of action for invasion of privacy does not survive an individual's death. See IND. CODE § 34-9-3-1.

New York does not recognize a descendable, posthumous right of publicity, either at common law or by statute. See, e.g., *Pirone v. MacMillan, Inc.*, 984 F.2d 579, 585-86 (2d Cir. 1990) (observing that the right of publicity under New York law is exclusively statutory, personal to the individual, and extinguished upon his death (citing, inter alia, *Smith v. Long Island Jewish-Hillside Medical Center*, 499 N.Y.S.2d 167, 168 (App. Div. 1986), and *Stephano v. News Group Pubs.*, 474 N.E.2d 580, 584 (N.Y. 1984)); see also 4B William R. Golden & Kathryn E. Diaz, N.Y. PRACTICE: COMMERCIAL LITIGATION IN NEW YORK STATE COURTS, § 83:7 (2d ed. West 2006) ("[T]he New York Legislature has routinely voted down bills over the years that would have expanded the right of privacy to reach non-commercial usages or provide a post-mortem right of publicity").

documents") – then "the rights recognized under this section . . . vest" directly in certain statutorily specified heirs. See CAL. CIVIL CODE § 3344.1(b)-(d). Similarly, the Indiana statute provides that if a "personality" has not transferred her right of publicity by "contract," "license," "gift," "trust," or "testamentary document," the right "vest[s]" in those individuals entitled to her property through the "[o]peration of the laws of intestate succession applicable to the state administering the estate and property of the intestate deceased personality, regardless of whether the state recognizes the property rights set forth under this chapter." See IND. CODE §§ 32-36-1-16 to -18.[32] In short, to the extent a posthumous right of publicity vested *in Marilyn Monroe* by statutory enactment after her death, Marilyn Monroe would not be capable of devising that right through her will.[33] Because plaintiffs have not shown that they are otherwise entitled to exercise

---

[32] For purposes of the Indiana statute, "the laws of intestate succession applicable to the state administering the estate and property of the intestate deceased personality" are set forth by § 4-1.1 of the N.Y. Estate Powers & Trusts Law.

[33] The court recognizes that the "law attempts to avoid an intestacy and any construction which favors a residuary disposition should be upheld and sustained whenever possible." *In re Estate of O'Brien*, 627 N.Y.S.2d 544, 546 (Sur. Ct. 1995); see also *In re Estate of Goyette*, 123 Cal.App.4th 67, 74 (2004) ("It is the strongly favored policy of the law that wills be construed in a manner that avoids intestacy"). At the same time, however, "[t]he court cannot create a testamentary disposition which is not expressed or readily to be implied" simply to avoid intestacy. *In re Williams' Will*, 221 N.Y.S.2d 799, 800 (Sur. Ct. 1961); see also *In re Klewer's Estate*, 124 Cal.App.2d 219, 224 (1954) ("A will is not open to construction merely because it does not dispose of all of the testator's property. Courts are not permitted in order to avoid a conclusion of intestacy to adopt a construction based on conjecture as to what the testator may have intended, although not expressed" (internal quotation marks omitted)). As the *Estate of Braman* court noted: "[T]he purpose of a residuary clause in a will is to pass the Whole estate and to avoid an intestacy and . . . [the court's] duty is to accomplish that purpose, if possible . . .[;] [thus,] a General residuary clause carries every interest, known or unknown, immediate or remote, unless such interest is clearly excluded. However, these principles do not apply until it has been demonstrated that the testator at the time of death actually had an interest, recognized in law or in equity, as opposed to an expectancy in the property; absent such an interest, post-mortem disposition of the property cannot be exercised." *Estate of Braman*, 258 A.2d at 494-95. In addition, the court notes that neither party has adduced evidence that Marilyn Monroe contemplated during her lifetime the possibility that a future statutory enactment would grant her a descendable, posthumous right of publicity. As a result, plaintiffs cannot show that, by recognizing a right of publicity in plaintiffs, as successors-in-interest to Lee Strasberg, the court is in some manner effectuating Marilyn Monroe's intent.

17

1  Marilyn Monroe's posthumous right of publicity by operation of either the California or Indiana
2  statutes, their right of publicity claims fail.

### III.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.

DATED: December 11, 2006

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE