# Exhibit 6

768

*To be argued by*
**Frank R. Curtis**

New York County Clerk's Index No. 01527/75

# New York Supreme Court

## Appellate Division—First Department

DO NOT CIRCULATE

JUN 3   1980

N.Y.S. LAW LIBRARY

**Aaron Frosch,**
Executor of the Estate of Marilyn Monroe,

*Plaintiff-Appellant.*

—against—

Grosset & Dunlap, Inc., Alskog, Inc., Norman Mailer,
Lawrence Schiller and Allen Hurlburt,

*Defendants-Respondents.*

## BRIEF FOR DEFENDANT-RESPONDENT
## NORMAN MAILER

Rembar & Curtis
*Attorneys for Defendant-Respondent*
*Norman Mailer*
19 West 44th Street
New York, New York 10036
(212) 575-8500

TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTORY STATEMENT | 1 |
| COUNTERSTATEMENT OF QUESTIONS INVOLVED | 2 |
| ARGUMENT | 3 |
| Point I – There is no descendible common law right of publicity in New York | 3 |
| Point II – An action for "fictionalization" under the "false light" tort does not survive the death of the individual portrayed | 15 |
| Point III – The allegations in this case would not establish a cause of action under the "false light" tort even if that tort did extend to accounts of a deceased person's life | 21 |
| A. Frosch disavowed any "false light" claim | 21 |
| B. The claims actually advanced in the Complaint are not actionable | 25 |
| C. The statements cited in Frosch's brief do not establish a cause of action under the "false light" tort. | 35 |
| CONCLUSION | 47 |

## INTRODUCTORY STATEMENT

This is an action by Aaron Frosch ("Frosch"),
executor of the estate of Marilyn Monroe, against the
author Norman Mailer ("Mailer"), the publisher Grosset &
Dunlap, Inc. ("Grosset") and others involved in the publi-
cation of a biography of Miss Monroe. The book, entitled
Marilyn, was published in 1973 more than ten years after
Miss Monroe's death. The executor claims that the publi-
cation of this biography infringes a "right of publicity"
in Miss Monroe's name and likeness which is the property of
her estate.

The present action was commenced in 1975. Three
years later, defendants moved for summary judgment.* The
court below granted that motion, and Frosch has appealed.

The "Statement of Facts" in Frosch's brief is not,
of course, a statement of "facts" at all. It is simply part

---

*Frosch's brief states (p. 15) that summary judgment was
granted "even before discovery has been completed". There
is no dispute in the record that discovery was incomplete
after three years because Frosch himself refused to
answer questions (Curtis affid. ¶3 at A46).



of his argument, without legal citations. However. no
counterstatement of the facts is necessary. The primary
"fact" is the book itself, which was among the papers sub-
mitted to the court below (A9). (The purported
quotations from the book in Frosch's "Statement of Facts"
are discussed at pages 39 to 46 below.) Although Frosch
claims the book is "fictionalized," he did not offer a single
affidavit from any party claiming to have knowledge of the
events recounted in the book.

### COUNTERSTATEMENT OF QUESTIONS INVOLVED

There are three questions involved in this appeal.
If _any_ of these three questions is decided in favor of
Respondents, the decision below must be affirmed.

1.  Is a descendible common law "right of publicity"
recognized under the law of New York in any circumstances?
The court below did not decide this question.

2.  Even if such a "right of publicity" were recog-
nized in New York in certain circumstances, would a claim for
substantial "fictionalization" of an individual's life story
be the type of claim which survives death? The court below
correctly held that such a claim would not survive death.

-2-

2674



3.  Even if such a claim did survive death, could such a claim be maintained on the facts of this case?  The court below correctly decided that such a claim could not be maintained on the facts presented here.

ARGUMENT

Point I:  There is no descendible common law
right of publicity in New York

Sections 50 and 51 of the New York Civil Rights Law give to a living person a "right of privacy" against the un-authorized use of his name and likeness for advertising purposes or for purposes of trade.  The decisions of the New York courts, discussed further below, make clear that this statutory right is exclusive.  The supposedly descendible common law right upon which Appellant Frosch relies simply does not exist in New York.  (Indeed, as pointed out below, even in those states where a common law right has been recognized, it has generally been held not to survive the death of the individual named or portrayed.)

The Court below rested its decision upon the narrower basis that at least the sort of "right of privacy" relied upon by Frosch in this case -- namely, the "false light"

-3-



tort giving an individual a right against the substantial
"fictionalization" of his life story -- does not survive death
(A14).  This narrower basis will be discussed in Point II below.  In
addition, affirmance would be required on the facts of this
case, even if that right did survive death (see Point III
below).  However, since Frosch's entire case depends upon a
mistaken premise that there is a descendible common law right
in New York, this broader defect should be addressed at the
outset.

        Before considering the specific question of whether
there is a descendible common law right in New York, it may
be helpful to review briefly the history and nature of the
right of privacy, including the purported common law "right
of publicity" upon which plaintiff relies.

        A relatively new concept in the law, the right of
privacy has developed slowly since the appearance in 1890 of
a law review article by Samuel D. Warren and Louis D. Brandeis
urging the recognition of such a right.  See Warren & Brandeis,
"The Right to Privacy," 4 Harv. L. Rev. 193 (1890).  A right
of privacy is now recognized, to some degree at least, by
nearly all of the states.  Prosser, Law of Torts §117, at
804 (4th ed. 1971).

-4-

In fact, the phrase "invasion of privacy" covers four separate though somewhat related torts, which Dean Prosser has labelled (1) "intrusion," (2) "public disclosure of private facts," (3) "false light in the public eye" and (4) "appropriation." Prosser's categorization and description of these four torts have been quoted with approval in both federal and New York decisions. See, for example, Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977); Factors Etc., Inc. v. Pro Arts, Inc., 579 F. 2d 215 (2d Cir. 1978) cert. denied, 440 U.S. 908 (1979); Nader v. General Motors Corp., 57 Misc. 2d 301 (Sup. Ct. N.Y. Cty. 1962), aff'd 31 App. Div. 2d 392 (1st Dept. 1969), aff'd 25 N.Y. 2d 560 (1970). Prosser's four categories have also been adopted in the Restatement Second of Torts §652 (1977).

"Intrusion," the first of these torts, is concerned with the invasion of an individual's physical solitude or seclusion -- e.g., invasion of the home, peering through windows, wire-tapping. Prosser, supra, at 807-808. The second tort, "public disclosure of private facts," consists of the publication, in a "highly objectionable" way, of private information about an individual, causing him emotional distress. Id. at 809. The third tort, "false light in the public eye,"

-5-



involves the publication of substantially fictionalized accounts of an individual's life. The "false light" tort is thus a close cousin of the tort of defamation. See id. at 813. The last of these four torts, "appropriation," consists of another's use of an individual's name or likeness for advertising or other commercial purposes. Id. at 804. The effect of this tort is to create "an exclusive right in the individual plaintiff to a species of trade name, his own, and a kind of trademark in his likeness." Id. at 807.

It is this final right, labelled "appropriation" by Prosser, which others have sometimes referred to as the "right of publicity."

> "The fourth type, appropriation of plaintiff's name or likeness for defendant's benefit, has in recent years acquired the label, right of publicity." Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215, 220 (2d Cir. 1978); and see Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562 (1977).

The general question of whether a common law right of privacy should be recognized in New York was first considered by the Court of Appeals in 1902 in Roberson v. Rochester Folding Box Co., 171 N.Y. 538. Roberson involved the most blatant possible appropriation of plaintiff's likeness -- defendants used plaintiff's picture, without her permission, in

-6-



a multitude of advertisements for their flour. Nonetheless,
the Court of Appeals held that there was no common law right
against such misappropriation. It noted the problems in-
volved in deciding the scope of such a judicially created
right and invited the Legislature to enact an appropriately
limited remedy, if it saw fit. 171 N.Y. at 545, 555.

Of particular interest to the present case is that
the Court of Appeals specifically noted that it had already
held that even if such a right did exist at common law, that
right ceased upon the death of the individual portrayed and
did not pass to his descendants. 171 N.Y. at 551, discussing
Schuyler v. Curtis, 147 N.Y. 434 (1895).

The Legislature responded to the Court of Appeals'
suggestion by enacting in 1903 the statutory provisions now
contained in Civil Rights Law §§50-51. As the Court of Appeals
had suggested, the statutory right was a strictly limited one.
Section 50 makes it a misdemeanor to use the name or picture
of a living person for advertising purposes or purposes of
trade, and section 51 creates a private cause of action on
the part of the individual named or portrayed in that manner.
This limited statutory right is thus a purely personal right.
It cannot be assigned (Rosemont Enterprises, Inc. v. Urban

-7-

2679



<u>Systems, Inc.</u>, 72 Misc. 2d 788 (Sup. Ct. N.Y. Cty. 1973));
and it does not survive the death of the individual whose name
or likeness is used (<u>Schumann</u> v. <u>Loew's Inc.</u>, 135 N.Y.S. 2d
361 (Sup. Ct. N.Y. Cty. 1954)).

The Court of Appeals has never varied from its
decision in <u>Roberson</u> that there is no common law right of
privacy or publicity in New York.  In the absence of a statute,
it might (or might not) have reconsidered in later years its
absolute rejection of such a right in circumstances as blatant
as those presented in the original <u>Roberson</u> case.  However,
once the Legislature had acted and set statutory limits on
the right of privacy, the Court of Appeals and the lower New
York courts properly recognized that the Legislature had pre-
empted the field.  The right of privacy in this State "rests
solely in and is limited by statute".  <u>Flores</u> v. <u>Mosler Safe
Co.</u>, 7 N.Y. 2d 276, 280 (1959); <u>Kiss</u> v. <u>County of Putnam</u>, 59
App. Div. 2d 773 (2d Dept. 1977).*

---

*One of those limits is that any privacy action must be brought
within one year.  CPLR 215(3).  We believe the same statute of
limitations would be applied if a common law right of publicity
were recognized in New York, but there are (understandably) no
decided cases on this question.  If a longer period were per-
mitted, the statutory limits imposed by the New York legislature
could be evaded in this respect, as well as others.  In the
present case, although the order appealed from is not based on
the statute of limitations, the action was in <u>fact</u> commenced
well over a year after the publication at issue.  See A23, 27,
28.

2680

However, beginning in the early 1950's, the
federal courts were presented with an occasional case in
which plaintiff attempted to evade the restrictions of the
New York statute (primarily the fact that it created a non-
assignable personal right) by arguing that there should also
be recognized a parallel common law "right of publicity" in
New York.  The federal courts accepted that argument, despite
the fact that this so-called "right of publicity" was aimed
at precisely the same kind of commercial appropriation of
name and likeness which the New York Court of Appeals had
held in Roberson was not actionable at common law and for
which the New York Legislature had fashioned a statutory right
(but a limited right) in sections 50 and 51 of the Civil
Rights Law.  See Haelan Laboratories, Inc. v. Topps Chewing
Gum, Inc., 202 F.2d 866 (2d Cir. 1953). cert. denied 346
U.S. 816 (1953).  And twenty-two years later, in 1975, a
district court judge held for the first time that this common
law right of publicity might not end with the death of the
individual named or portrayed.  Price v. Hal Roach Studios,
Inc., 400 F. Supp. 836, 844 (S.D.N.Y. 1975).

In the years immediately after the Topps Chewing
Gum case in 1953, the New York Court of Appeals had no
occasion to consider the correctness of the federal court's

-9-

2681



conclusion, though lower New York courts expressed their
doubts about the existence of any common law right of
publicity in New York. See, for example, Paulsen v. Persona-
lity Posters, 59 Misc. 2d 444 (Sup. Ct. N.Y. Cty. 1968).

However, within the last few years, the Court of
Appeals has been presented with such common law claims and
has rejected those claims firmly and unequivocally. In
Wojtowicz v. Delacorte Press, N.Y.L.J. August 26, 1976, p. 5,
col. 5, (Sup. Ct. N.Y. Cty.), Special Term held that plaintiffs'
claim did not fall within the terms of New York's "severely
limited right of privacy statute", but argued that the Roberson
decision had been "eroded" by later federal decision and that
a common law claim might exist "irrespective of the limiting
provisions of the Civil Rights Law." Ibid. at p. 6, col. 1.
The Appellate Division reversed and dismissed those causes of
action, and the Court of Appeals affirmed that dismissal.

> "[W]hatever may be the law in other juris-
> dictions with respect to the right to judicial
> relief for invasion of privacy in consequence
> of unreasonable publicity, in our State thus
> far there has been no recognition of such right
> other than under sections 50 and 51 of the Civil
> Rights Law. (See Nader v. General Motors Corp.,
> 25 N.Y. 2d 560, 573 [concurring opinion of
> Breitel, J.]; Flores v. Mosler Safe Co., 7 N.Y.
> 2d 276, 280.)" Wojtowicz v. Delacorte Press,
> 43 N.Y. 2d 858, 860 (1978).

-10-



Subsequent New York decisions have repeated that
there is no common law right in this State. Any right
against the use of an individual's name or picture is purely
statutory. Cohen v. Hallmark Cards, 45 N.Y. 2d 493, 497 n.2
(1978); Matter of Dora P., 68 App. Div. 2d 719, 730 n. 2
(1st Dept. 1979).* Subsequent federal decisions applying
New York law have also followed Hojtowicz, though they have
noted a possible limited exception for extreme physical
intrusion, on the theory that a cause of action for such
intrusion was recognized in New York even before Roberson
and the enactment of Civil Rights Law 750 and 51. Lutz v.
Hoffman, ___ F. Supp. ___, 4 Media Law Reporter 2294, 2296
(E.D.N.Y. 1979); Birnbaum v. United States, 588 F. 2d 319,
324 n. 8 (2d Cir. 1978).**

_____

*The statement in Lombardo v. Doyle, Dane & Bernbach, Inc.,
58 App. Div. 2d 709 (2d Dept. 1977) that there is a
descendible right of publicity in New York was dictum (since
the plaintiff was still alive) and the Second Department's
decision in Lombardo was plainly overruled by the Court of
Appeals' decision in Hojtowicz in the following year.

**In Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215
(2d Cir. 1978), the Second Circuit followed the earlier
Southern District decision in Price v. Hal Roach Studios
and held that there was a descendible common law right in
New York. But the Factors case was decided only four
months after Hojtowicz and the Second Circuit's opinion makes
clear that Hojtowicz was not considered. Moreover, in Factors

[footnote continued on following page.]

-11-

2683

It is worth noting that, even where a common-law right has been recognized, the most recent opinions (and, we submit, the better reasoned opinions) have held that such right does not survive the death of the individual named or portrayed. Memphis Development Foundation v. Factors Etc., Inc., ___ F.2d ___ (Sixth Cir. 1980); Lugosi v. Universal Pictures, ___ Cal. 3d ___, 603 P. 2d 425, 5 Media Law Reporter 2185 (1979).*  The Sixth Circuit explained as

---

[footnote continued from previous page]

the Court stressed that the right had been licensed during the subject's life and the question was whether that exclusive license remained valid after his death. 579 F. 2d at 221-222. An assignment of the right during life is the "touchstone" of those few cases which have recognized a descendible right. Memphis Development Foundation v. Factors Etc., Inc., ___ F.2d ___ (Sixth Cir.) (slip opinion of March 6, 1980 at p. 3). Here, Frosch has admitted that he knows of no such licenses during Marilyn Monroe's lifetime (A 70-71) (the "Milton Green arrangement" mentioned at A 71 was for a book authored or co-authored by Miss Monroe, A 71-72, and was licensed long after her death, A 60).

*As noted above, even before the New York Court of Appeals held that a common law right should not be recognized in New York, that Court had ruled that any such alleged right would not be descendible in any event. Roberson v. Rochester Folding Box Co., 171 N.Y. at 551, discussing Schuyler v. Curtis, 147 N.Y. 434 (1895).

-12-



follows the reasons for holding that the common law right is not descendible:

> "...[T]here are strong reasons for declining to recognize the inheritability of the right. A whole set of practical problems of judicial line-drawing would arise should the courts recognize such an inheritable right. How long would the "property" interest last? In perpetuity? For a term of years? Is the right of publicity taxable? At what point does the right collide with the right of free expression guaranteed by the first amendment? Does the right apply to elected officials and military heroes whose fame was gained on the public payroll, as well as to movie stars, singers and athletes?... Our legal system normally does not pass on to heirs other similar personal attributes even though the attributes may be shared during life by others or have some commercial value. Titles, offices and reputation are not inheritable. Neither are trust or distrust and friendship or enmity descendible. An employment contract during life does not create the right for heirs to take over the job. Fame falls in the same category as reputation; it is an attribute from which others may benefit but may not own.

> "The law of defamation, designed to protect against the destruction of reputation including the loss of earning capacity associated with it, provides an analogy. There is no right of action for defamation after death. See Restatement (Second) of Torts § 560 (rev. ed. 1977). The two interests that support the inheritability of the right of publicity, namely, the "effort and creativity" and the "hopes and expectations" of the decedent, would also support an action for libel or slander for destruction of name and reputation after death. Neither of these reasons, however, is sufficient to overcome the common law policy terminating the action for defamation upon death." (Slip opinion, March 6, 1980, at 5-6) (Docket No. 79-1270).

2685



See also <u>Lugosi v. Universal Pictures</u>, 603 P. 2d at
430-431.*

　　　　In New York, there is an even stronger reason
to avoid the problems of such judicial line-drawing.
The New York Legislature has already delineated by
statute those uses of an individual's name or likeness
which are actionable in this State.  The Legislature
limited the statutory right under Civil Rights Law
§50 and 51 to living persons and that limitation should
not be evaded by judicially creating a common law right
under a different name.

─ ── ───────

*The dissenting opinion in <u>Lugosi</u> suggested that the
duration problem could be solved by imposing a limit
of fifty years after the subject's death.  603 P. 2d
at 446-447.  It is hard to imagine a more flagrant
example of attempted judicial legislation.

2686



Point II:  An action for "fictionalization"
under the "false light" tort does not survive
the death of the individual portrayed.

Even in those jurisdictions which do recognize
a descendible common law "right of publicity," that right
is distinct from the so-called "false light" tort upon
which plaintiff here relies.  The decided cases in all
jurisdictions are unanimous in holding that the latter
right ceases with the death of the party portrayed.

As noted in Point I above, the so-called
"false light" tort consists in the publication of fiction-
alized versions of a person's life, and is one of four torts
commonly subsumed within the phrase "invasion of privacy."
The "false light" tort is closely akin to an action for
libel and slander and subject to similar constitutional
restraints.  In both types of action, a public figure may
recover only if he can allege and prove that defendants pub-
lished what they knew to be false or acted with reckless
disregard for truth  or falsity.  As to defamation actions,
see _Gertz_ v. _Robert Welch, Inc._, 418 U.S. 323 (1974).  As
to "false light" privacy actions, see _Time, Inc._ v. _Hill_,
385 U.S. 374 (1967).

2687

As also explained in Point I, invasion of the "right of publicity" is another name for the tort which Prosser called "appropriation." Invasion of the "right of publicity" is thus a distinct tort from "false light" and rests upon a very different basis. The United States Supreme Court emphasized the distinct bases for these two torts in Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 573 (1977):

> "'The interest protected' in permitting recovery for placing the plaintiff in a false light 'is clearly that of reputation, with the same overtones of mental distress as in defamation.' Prosser, [Privacy], 48 Calif. L. Rev. [383], at 400. By contrast, the State's interest in permitting a 'right of publicity' is in protecting the proprietary interest of the individual in his act in part to encourage such entertainment."

Indeed, those few courts which have held the "right of publicity" to be descendible have rested their conclusion on precisely this difference. The right of publicity, they have argued, might be thought to rest on a "property" basis somewhat analogous to trademark and therefore survive death, whereas the other privacy torts rest only on injury to feeling and are universally recognized to terminate at death. As to those other privacy torts (including "false light"), "... death is a logical conclusion to any such claim." Factors Etc., Inc.

-16-

v. Pro Arts, Inc., 579 F.2d 215, 221 (2d Cir. 1978); Price
v. Hal Roach Studios, Inc., 400 F. Supp. 836, 844 (S.D.N.Y.
1975).

The California Supreme Court recently dealt with
precisely this question in Guglielmi v. Spelling Goldman
Productions, ____ Cal.3d __ , 603 P.2d 454, 5 Media Law
Reporter 2208 (1979), involving a fictionalized film version
of Rudolph Valentino's life. The unanimous court held that
there was no "false light" tort after the death of the indi-
vidual involved. A majority of the court reached that con-
clusion based upon its conclusion in the Lugosi case (cited
in Point I above) that the entire common law right recognized
in California (all four privacy torts) expires upon the death
of the person so portrayed. The remaining members of the court,
in a concurring opinion by Chief Justice Bird, held that even
if a right of publicity did survive, that right would not ex-
tend to either biographical or fictionalized versions of the
subject's life.

> "While few courts have addressed
> the question of the parameters of the
> right of publicity in the context of ex-
> pressive activities, their response has
> been consistent. Whether the publication
> involved was factual and biographical or
> fictional, the right of publicity has not
> been held to outweigh the value of free
> expression." 603 P.2d 461-462 (footnotes
> omitted).

\*    \*    \*

-17-



"It is clear that works of fiction are constitutionally protected in the same manner as political treatises and topical news stories. Using fiction as a vehicle, commentaries on our values, habits, customs, laws, prejudices, justice, heritage and future are frequently expressed. What may be difficult to communicate or understand when factually reported may be poignant and powerful if offered in satire, science fiction or parable. ... Even the author who creates distracting tales for amusement is entitled to constitutional protection." 603 P.2d at 459 (citations omitted).

\* \* \*

"The facts of the present case are strikingly illustrative. Valentino was a Hollywood star. His life and career are part of the cultural history of an era. As the title of respondents' film suggests, Valentino became a "legend," a symbol of the romantic screen idol and lover. His lingering persona is an apt topic for poetry or song, biography or fiction. Whether respondents' work constitutes a serious appraisal of Valentino's stature or mere fantasy is a judgment left to the reader or viewer, not the courts." 603 P.2d at 460.

Chief Justice Bird's comments on the "legend" of film star Valentino as an "apt topic" for biography or fiction apply equally to Marilyn Monroe, the subject of the present action.

The Restatement of Torts Second §652I (1977) adopts this same position that the "false light" tort does

-18-



not survive the death of the party portrayed.  And see
Justice v. Belo Broadcasting, __ F. Supp. ___ , 4 Media
Law Reporter 2065, 2067 (N.D. Texas 1979).

    The court below rested its decision on precisely
this point:

> "Although, as plaintiff contends, when
> biography departs from facts and becomes
> a work of fiction exploiting the name of
> a well-known person there is an actionable
> breach of privacy, (See Spahn v. Julian
> Messner, Inc., supra) any such claim does
> not survive death, as it is based on
> injuries to feeling, emotion, and personal
> pride, as to which 'death is a logical
> conclusion.' Factors, etc., Inc., v. Pro
> Arts, Inc., 579 F.2d 215, 221-222 (2d Cir.
> 1978)." (A 14)

    Although this conclusion of the court below obviously
defeats any possible cause of action by Frosch, his appellate
brief makes no effort to  confront this point directly.
Instead, his brief first discusses (pp. 6-9) those federal
cases holding that there is a common law "right of publicity,"
including the decision in Price v. Hal Roach that such a
right of publicity is descendible.  Then, Frosch's brief
switches (pp. 9-11) to state court "false light" cases
brought by living persons under §51 of the New York Civil
Rights Law, primarily Spahn v. Julian Messner, Inc., 21 N.Y.2d

-19-

2691

124 (1967).  In an effort to confuse, Frosch's brief
(p. 10) describes the <u>Spahn</u> case as one involving "wrongful
appropriation of his [plaintiff's] right of publicity."
But it was the statutory right of privacy -- specifically
the "false light" tort under Civil Rights Law §51 -- that
was involved in <u>Spahn</u>, not the supposedly descendible
common law "right of publicity" upon which Frosch relies.*

Frosch's attorneys have not been able to point
to a single case, in this or any other jurisdiction, in
which it has been held that the representative of a de-
ceased person may maintain an action for a fictionalized
version of the deceased's life story.  As with a cause of
action for libel, to which the "false light" tort is closely
allied, "death is a logical conclusion to any such claim."
<u>Factors Etc., Inc.</u> v. <u>Pro Arts, Inc.</u>, 579 F.2d 215, 221
(2d Cir. 1978).

---

*In a similar effort to confuse, Frosch's brief (p. 12)
compares the present case to <u>Youssoupoff</u> v. <u>Columbia
Broadcasting Systems</u>, Inc., 19 App. Div. 2d 865 (1st Dept.
1963) and incorrectly describes the latter as "<u>a similar
action</u> for invasion of right of privacy" (emphasis added).
<u>Youssoupoff</u>, like <u>Spahn</u> but unlike this case, was an action
under Civil Rights Law §51.

-20-



Point III:  The allegations in this case
would not establish a cause of action under
the "false light" tort even if that tort did
extend to accounts of a deceased person's
life.

Either of the above two points is sufficient,
independent of the other, to require affirmance of the
decision below.  But even if the "false light" tort did
apply to allegedly "fictionalized" accounts of a deceased
person's life, Frosch still could not succeed in the
present case.  He has previously disavowed any "false
light" claim and, in any event, the passages set forth in
Frosch's brief are legally insufficient to establish a
cause of action under the "false light" tort.

A.  Frosch disavowed any "false
light" claim.

In the papers and proceedings leading up to the
motion below, Frosch made no claim that the work at issue
had been fictionalized.  On the contrary, he insisted
that the question of the book's accuracy or inaccuracy
was irrelevant to his claim.

The Complaint does not allege that there are
any fictionalized passages in the book.  There is at most

-21-

an allegation which might be understood as a half-hearted
reference to the question of fictionalization. It appears
at the beginning of paragraph 10 of the Complaint (A 19).
That paragraph, in toto, is as follows:

> "Rather than reflect an accurate
> biographical portrayal of the life of
> the decedent, the said book was inten-
> tionally designed and executed by the
> defendants to create a nostalgic media-
> image of the decedent having the potential
> for maximum commercial exploitation of
> the exclusive property right in the
> decedent's publicity possessed by the
> decedent and her estate."

It will be noted that the paragraph involves a complete
non sequitur. There is no inconsistency between factual
accuracy and commercial goals. Moreover, this vague and
half-hearted suggestion that the book might not be totally
accurate -- without supplying even a hint of what those
inaccuracies might be -- falls far short of alleging
substantial falsifications in the book. See Rosemont
Enterprises v. Random House, 58 Misc.2d 1, 5-6 (Sup. Ct. N.Y.
Cty. 1963), aff'd without opinion, 32 App. Div 2d 943 (1st
Dept. 1969); Estate of Hemingway v. Random House, Inc., 23
N.Y. 2d 341, 352 (1968).

Nor would a mere allegation of substantial fictiona-
lization be sufficient. Before a public figure (and Marilyn
Monroe was certainly a public figure -- see paragraph 5 of the

-22-