Complaint at A 18), can recover for the unauthorized presentation of his life story "... it must be shown, in addition to the other requirements of the statute, that the presentation is infected with material and substantial falsification and that the work was published with knowledge of such falsification or with a reckless disregard for truth." Spahn v. Julian Messner, Inc., 21 N.Y. 2d 124, 127 (1967). In the absence of such an allegation, the Complaint is insufficient. Cabin v. Community Newspapers, 50 Misc. 2d 574 (Sup. Ct. Nass. Cty. 1966) aff'd 27 App. Div. 2d 543 (2d Dept. 1966).*

Moreover, if the Complaint suggests that Frosch was considering a claim that Miss Monroe's life had been fictionalized, he plainly abandoned that claim in the course of this litigation. In Question No. 7 of the Demand for Bill of Particulars (A 29), Frosch was asked to state "in what manner the said book failed to reflect an accurate biographical portrayal of the life of the decedent." Frosch's

---

*Despite suggestions to the contrary in Frosch's brief, unless he can show that the book contains specific misrepresentations amounting to "substantial falsification" and that such misrepresentations were published with knowledge of falsity or reckless disregard of the truth, it is "immaterial" whether the book "is viewed as an historical work or a fictional work." Meeropol v. Nizer, 560 F.2d 1061, 1066 (2d Cir. 1977).

-23-



Bill of Particulars (A 34) identified no inaccuracies in
the book but merely referred to "Mailer's own statement"
in Chapter 1, page 18 of <u>Marilyn</u>, which Frosch purported
to quote as follows:

> "for here is a feature writer who has
> included in his source of material the
> work of other feature writers and so
> develops a book with fact embellished by
> factoids (to join the hungry ranks of
> those who coin a word) that is, facts
> which have no existence before appearing
> in a magazine or newspaper, creations
> which are not so much live as a product
> to manipulate emotion in the silent
> majority."

But when the entire passage is accurately quoted, it is
perfectly clear that the words that, according to Frosch,
comprise a confession of inaccuracy by author Mailer, are
actually Mailer's criticism of another author's book.

> "[T]he two histories already published
> show the 'imitations of a conventional
> approach.  The first, by Maurice Zolotow,
> <u>Marilyn Monroe</u>, written while she was
> still alive, is filled with interesting
> psychoanalytical insights of the sort
> one can hear at a New York coffee table
> when two intelligent people are analyzing
> a third, but much  of the conversation is
> reamed with overstressed anecdotes.  For
> here is a feature writer who has included
> in his source material the work of other
> feature writers and so develops a book
> with facts embellished by factoids (to

2696



> join the hungry ranks of those who coin
> a word), that is, facts which have no
> existence before appearing in a maga-
> zine or newspaper, creations which are
> not so much lies as a product to manipu-
> late emotion in the Silent Majority."
> (A 94)

Thus, Frosch's Bill of Particulars does not point to a single inaccuracy in Mailer's entire book. Where, as here, the plaintiff has disavowed a claim in his bill of particulars or limited his answer to certain claims, he will not be permitted to offer evidence on any omitted claims. Mammarella v. Con Edison Co., 44 App. Div. 2d 571 (2d Dept. 1974); Kondas v. Gallo Original Iron Works, Inc., 8 App. Div. 2d 955 (2d Dept. 1959); Voccia v. Pleasure Boat Co., 239 App. Div. 165 (1st Dept. 1933), aff'd 264 N.Y. 656 (1934).

Even more important perhaps is that, during Frosch's deposition, his counsel conceded -- indeed, he insisted -- that the question of inaccuracy was irrelevant to this case and directed Frosch not answer questions on that subject. The following exchange appears at Appendix page 65, during questioning by counsel for defendant Grosset:

> "MR. KATZ [Grosset's counsel]: I will
> ask Mr. Frosch to delineate for me each
> and every statement that he contends is
> inaccurate.

-25-

2697



"A  Contend
"Q  Contends is inaccurate in the book,
LYN.
"MR. BARRY SINGER [Frosch's counsel]:
I would object to your question.
"MR. CURTIS [Mailer's counsel]:  May we
ask the basis of your objection?
"MR. BARRY SINGER:  The basis of my
objection is that it is irrelevant.  It is
the same basis for the objection that I made
to an interrogatory which asks substantially
the same thing."

Following further discussion among counsel, the point was

repeated (A 66):

"MR. CURTIS:  I think you [referring to
Frosch's counsel, Barry Singer] said it was
irrelevant.  Are you withdrawing that part
of your objection or are you also maintaining
that the question is irrelevant?
"MR. BARRY SINGER:  I have not withdrawn
anything I am saying.
"MR. CURTIS:  Would you please read back
the beginning of Mr. Singer's objection.
"(Objection read back by reporter.)"

Where, as here, plaintiff's counsel has insisted that certain

requested information is irrelevant, he will be precluded

from any later reliance upon such information.  Mammarella v.

Con Edison Co., supra.

There is, we submit, no possible reason for this

Court to give further consideration to claims not raised in

the Complaint and which Appellant has repeatedly disavowed.

B.  The claims actually advanced in the
Complaint are not actionable.

As noted above, the Complaint does not even allege

the "false light" tort.  Though the Complaint is far from a

2698

...el of clarity, it appears to rely upon the number of
pictures in the book, i s allegedly sensationalistic nature,
and the profit motive behind its publication. Although we
understand from Frosch's brief that he has now abandoned
these other claims and purports to rely on the "false light"
theory he had previously disavowed, it may be helpful to
review briefly the far-fetched nature of his original claim,
before discussing (in section C below) the equally far-
fetched claim which he now advances.

Though Frosch does not dare say so directly, there
is implicit -- in the Complaint as a whole (A 17 to 21) and,
in Frosch's claim that Mailer's book might injure an auto-
biography written in whole or part by Miss Monroe (see fn.
on p. 35 below) -- a claim that her estate has the exclusive
right to her life story. This is patently untrue. The
statutory right of privacy secured by section 51 of the New
York Civil Rights Law and the supposed common-law right of
publicity where it has been recognized by the federal courts
are both limited by the strong public policy in favor of free
dissemination of information relating to matters of public
interest. This public policy is of constitutional dimensions.
See, e.g., Time v. Hill, 385 U.S. 374, 382-94 (1967); Paulsen
v. Personality Posters, Inc., 59 Misc. 2d 444, 447-48 (Sup.
Ct. N.Y. Cty. 1968). But in fact that public policy has long

-27-

2699

been recognized in shaping the contours of t[...]
privacy and publici y, even apart from these Constitutional
considerations.  The courts have consistently held that such
a right arises only where the name or likeness has been used
for advertising or other commercial purposes.

Specifically on the subject of biography, it has
long been held, even as to living persons, that publication
of biographical and other information about public figures
or other matters of public interest is outside the ambit of
the right of privacy or any purported common law right of
publicity.  Sidis v. F-R Publishing Corp., 113 F.2d 806 (2d
Cir. 1940); Koussevitsky v. Allen, Towne & Heath, 188 Misc.
479 (Sup. Ct. N.Y. Cty. 1947), aff'd 272 App. Div. 759 (1st Dept.
1947).

> "The publication of a biography is clearly
> outside the ambit of the "commercial use"
> contemplated by the "right of publicity" and
> such right can have no application to the publi-
> cation of factual material which is constitu-
> tionally protected.  Just as a public figure's
> "right of privacy" must yield to the public in-
> terest so too must the "right of publicity" bow
> where such conflicts with the free dissemination
> of thoughts, ideas, newsworthy events, and
> matters of public interest.  Because of such con-
> siderations, a public figure can have no ex-
> clusive rights to his own life story, and others
> need no consent or permission of the subject to
> write a biography of a celebrity."  Rosemont En-
> terprises, Inc. v. Random House, 58 Misc. 2d 1,
> 6-7 (Sup. Ct. N.Y. Cty. 1968), aff'd without
> opinion 32 App. Div. 2d 892 (1st Dept. 1969)
> (emphasis added).

Prosch's Complaint seeks to evade this holding by what can only be described as an exercise in semantics. The book Marilyn, according to the Complaint (¶¶ 8-9 at A 19), is not a book at all, but "a large collection of photographs of the decedent accompanied by a narrative and explanatory text" which "were purposefully assembled into book form." But this contorted description does not alter the fact that the work is a book -- specifically, a full-length biography of Marilyn Monroe with accompanying photographs. That should be apparent even from reading the Complaint. If there could be any question as to the nature of the work from the pleadings alone, the copy of Marilyn submitted with the other motion papers to the court below would resolve that question.

Nor is there any merit in the suggestion, implicit in the Complaint, that the presence of photographs in the book makes its publication actionable. The New York Court of Appeals has held:

> "The law is settled...that 'A picture illustrating an article on a matter of public interest is not considered used for the purpose of trade or advertising within the prohibition of the statute *** unless it has no real relationship to the article *** or unless the article is an advertisement in disguise'." Murray v. New York Magazine Co., 27 N.Y. 2d 406, 408-409 (1971)

The Murray case, in which the Court of Appeals reversed the lower court's denial of summary judgment, involved a photograph

2701

~~lationship to~~ ~~eing t~~ ~~e~~

tenuous.* Here, by contrast, Frosch is complaining about the presence of pictures of Marilyn Monroe in her biography. Nothing could be more appropriate.

Indeed, even if there were little or no textual matter, the book would still not violate any right of Miss Monroe's estate. It is entirely permissible to portray a public figure, or even a private person involved in some matter of public interest, in still photographs (Murray v. New York Magazine Co., 27 N.Y. 2d 406 (1971) (magazine cover); LaForge v. Fairchild Publications, Inc., 23 App. Div. 2d 636 (1st Dept. 1964) ("pictorial story"); Pagan v. New York Herald Tribune, 32 App. Div. 2d 341 (1st Dept. 1969) (fashion photo-graphs in magazine supplement); Paulsen v. Personality Posters, 59 Misc. 2d 444 (Sup. Ct. N.Y. Cty. 1968) (poster)); or in motion pictures or television programs (Humiston v. Universal

_____

*See also Booth v. Curtis Publishing Co., 15 App. Div. 2d 343 (1st Dept. 1962) (photograph of prominent actress in a resort pool used in connection with a travel magazine article and later in advertisements for the magazine); Friedan v. Friedan, 414 F.Supp. 77 (S.D.N.Y. 1976) (photograph of feminist's ex-husband used in her auto-biography and television commercials, despite their sub-sequent divorce and the fact that plaintiff had made "every effort to preserve his identity as a private person over the twenty-five years since it was taken"); LaForge v. Fairchild Publications, Inc., 23 App. Div. at 636 (1st Dept. 1964) (photograph of plaintiff at a race track used in a fashion magazine).

-30-

2702



v. Pathe News, 16 F.Supp. 746 (S.D.N.Y. 1936); University of
Notre Dame Du Lac v. Twentieth Century-Fox Film Corp., 15
N.Y. 2d 940 (1965); Man v. Warner Bros., Inc., 317 F. Supp.
50 (S.D.N.Y. 1970); (Gautier v. Pro-Football,
304 N.Y. 354 (1952); or in comic strips (Molony v. Boys Comics
Publishers, 277 App. Div. 166 (1st Dept. 1950)).

Equally irrelevant are plaintiff's allegations that
Marilyn, in addition to containing photographs. "...was not
intended to, and did not, dispassionately disseminate news and
information of public interest..." (Complaint ¶11 at A 20
and was designed to create "a nostalgic media-image of the
decedent having a potential for maximum commercial exploi-
tation" (Complaint ¶10 at A 19). Books which are "passionate,"
"nostalgic" and "commercial" are nonetheless protected against
suit by the subjects of such books, as will be demonstrated below.

There is no requirement that matters of public
interest be treated "dispassionately." Indeed, nothing could
be better calculated to sap the vitality of public discussion
than a rule making the protected status of speech depend on a
determination that the speaker approached his subject

-31-

2703

passionately."* Thus, for example, "a lurid and spicey
delineation" of "highly intimate details of [plaintiffs']
lives, accompanied by the photographs" was held not to be
actionable in Goelet v. Confidential, Inc., 5 App. Div. 2d
226, 229-230 (1st Dept. 1958). Similarly, the story and
photographs of an incident in which two children were trapped
in a refrigerator and died were held not to be actionable,
despite "the sensational manner in which it treats its
subject." Costlow v. Cusimano, 34 App. Div. 2d 196, 199 (4th
Dept. 1970).

Nor is there any legal significance to the allega-
tion that the book was intended to evoke a feeling of
nostalgia. It is hard to understand why Miss Monroe's estate
should complain that the book expresses -- and seeks to
perpetuate -- fondness for Miss Monroe and a sadness at her
passing. One would think her estate should applaud, not

_____

*As the Supreme Court has observed in a libel context,
cases such as this one must be considered "...against
the background of a profound national commitment to the
principle that debate on public issues should be un-
inhibited, robust, and wide-open...." New York Times Co.
v. Sullivan, 376 U.S. 254, 270 (1964). "[D]ebate on public
issues will not be uninhibited if the speaker must run the
risk that it will be proved in court that he spoke out of
hatred...." Garrison v. Louisiana, 379 U.S. 64, 73 (1964).

2704

condemn, those who perpetuate fond memories of her.
Certainly, a longing for what has passed is a common
and wholly legitimate part of many biographical and other
historical works.  But even if such nostalgia were of a
purely frivolous kind (and we believe it plainly is not),
that would not aid plaintiff.

> "That the format may deviate from traditional
> patterns of political commentary, or that to
> some it may appear more entertaining than in-
> forming, would not alter its protected status.
> It is not for this or any court to pass value
> judgments predicated upon ephemeral sub-
> jective considerations which would serve to
> stifle free expression.  'What is one man's
> amusement, teaches another's doctrine'
> (Winters v. New York, 333 U.S. 507, 510).
> Thus, whether the poster involved be considered
> as a significant satirical commentary upon the
> current presidential contest, or merely as a
> humorous presentation of a well-known enter-
> tainer's publicity gambit or in any other light,
> be it social criticism or pure entertainment,
> it is sufficiently relevant to a matter of public
> interest to be a form of expression which is
> constitutionally protected and 'deserving of sub-
> stantial freedom.'  (Cf. University of Notre
> Dame v. 20th Century Fox, 22 A. D. 2d 452,
> supra.)"  Paulsen v. Personality Posters, 59
> Misc. 2d 444, 450 (Sup. Ct. N.Y. Cty. 1968).

Courts have made clear that they should not and will not sit
in judgment on the esthetic value or historical importance of
works sued upon.  Molony v. Boy Comics Publishers, 277 App.
Div. 166, 171 (1st Dept. 1950); Sidis v. F-R Publishing Corp.,
113 F. 2d 806, 809 (2d Cir. 1940); Chaplin v. NBC, 15 F.R.D.
134, 138-39 (S.D.N.Y. 1953); Rosemont Enterprises v. Random
House, 58 Misc. 2d 1,5 (Sup. Ct. N.Y. Cty. 1968), aff'd

2705

opinion, 32 App. Div. 2d 892 (1st Dept. 1969).
There is no doubt that entertainment, as well as news,
enjoys First Amendment protection." Zacchini v. Scripps-
Howard Broadcasting Co., 433 U.S. 562, 578 (1977).

Finally, the implication that defendants were
motivated by profit considerations is wholly irrelevant, as
countless cases have held. See, for example, University of
Notre Dame v. Twentieth Century-Fox Film Corporation, 22 App.
Civ. 2d 452 (1st Dept. 1964), aff'd on opinion below 15 N.Y.
2d 940 (1965); Man v. Warner Bros., Inc., 317 F. Supp. 50
(S.D.N.Y. 1970); Paulsen v. Personality Posters, 59 Misc.
2d 444 (Sup. Ct. N.Y. Cty. 1968) Koussevitzky v. Allen,
Towne & Heath, Inc., 188 Misc. 479 (Sup. Ct. N.Y. Cty.),
aff'd 272 App. Div. 759 (1st Dept. 1947); Humiston v. Universal
Film Mfg. Co., 189 App. Div. 467 (1st Dept. 1919).

Just a cursory glance at Marilyn will demonstrate
that it is a thoroughly legitimate biography of Marilyn
Monroe, with text by a Pulitzer Prize-winning author (Mailer



outstanding photographs of her at various stages of her career. It is a beautiful book and a fine tribute to Miss Monroe and her career. But even if that were not so -- if it were instead a lurid and frivolous work produced for only the crassest of commercial reasons -- its publication would still not violate any right belonging to her estate.*

---

*Frosch complained (A 92) that Mailer's book might impair the sale of a biography authorized by Marilyn Monroe's estate. It should be explained that the work authorized by the estate was a manuscript that Marilyn Monroe "had written... either alone or with the aid of someone else...." (See Frosch's deposition at A 71-72). Obviously, in such circumstances -- where Marilyn Monroe was author or co-author of the manuscript -- the work could be published only with the consent of Miss Monroe or her estate. But, a public figure and his or her estate can have no exclusive rights to that figure's life story.

-35-

2707

C. The statements cited in ~~~~~~~
brief do not establish ~~~~
under the "false light" tort.

Even if a "false light" claim survived Marilyn
Monroe's death and even if such a claim had not been ex-
pressly disavowed by Frosch, he could not avoid summary
judgment on the facts in this case.  The court below properly
held (A 15) that Mailer's book was not a case like Spahn in
which a few scant biographical facts were mere appendages
to an essentially fictional account which the author
attempted to pass off as the truth.  See Spahn v. Julian
Messner, Inc., 21 N.Y. 2d 124, 127 (1967).

The "Argument" portion of Frosch's brief does not
discuss any alleged errors in the book.  This argument is
instead set forth in the early part of his brief, which he
has mislabelled a "Statement of Facts."  We presume that it
is these portions of the book (set forth at pages 3 to 5 of
Frosch's brief) which he now contends are actionable, although
this itemization excludes certain passages set forth in
Frosch's affidavit below (see A 90 and last two paragraphs
on A 91) and includes passages not set forth in Frosch's
affidavit below (the three pages quoted at page 5 of Frosch's
brief did not appear anywhere in Frosch's papers below).

It should be pointed out that this "Statement of
Facts," like Frosch's affidavit below, relies upon alleged

-36-

improprieties that even Frosch's counsel recognizes to
be insufficient. For example the Statement of Facts
and Frosch's affidavit both claim that the book is erotic
(brief p. 3 and A 90-92) and sensationalized (brief p. 4 and
A 69). But the remainder of Frosch's brief advances no
claim that these alleged improprieties of taste are legally
relevant. Frosch's briefs below did not, and his appellate
brief does not, attempt to dispute that, as discussed in
section B above, even "lurid," "intimate," and "sensational"
accounts of a subject's life are not actionable.

Similarly, Frosch's attorneys acknowledged (at
pages 10-11 of their brief below) that statements which are
explicitly fictional cannot be actionable, citing Hicks v.
Casablanca Records & Filmworks, 464 F. Supp. 426, 432-433
(S.D.N.Y. 1978). In the "false light" context, as in the
libel context, it is only false representations of fact which
are actionable, not opinion or speculation. Gertz v. Robert
Welch, Inc., 418 U.S. 323, 339-340 (1974); Buckley v. Littell,
539 F. 2d 882, 893 (2d Cir. 1976); cert denied 429 U.S. 1062
(1977); Hotchner v. Castillo-Puche, 551 F. 2d 910, 913 (2d
Cir. 1977). Even before the Hicks case, cited by Frosch,
the principle that explicitly fictional accounts are not
actionable had been clearly established in the New York courts.
In Rosemont Enterprises, Inc. v. McGraw-Hill Book Co., 85 Misc.

-37-

2d 583 (Sup. Ct. N.Y. Cty. 1975), the court refused to
enjoin the proposed publication, as a novel, of the book
about Howard Hughes which Clifford Irving had previously
attempted to pass off as an authorized autobiography.

> "Howard Hughes is no different from any
> other person in that he cannot have a monopoly,
> nor can he give a monopoly to any entity
> with respect to works concerning his life.
> 'A public figure can have no exclusive rights
> to his own life story, and others need no
> consent or permission of the subject to
> write a biography of a celebrity.' (Rose-
> mont Enterprises, Inc. v. Random House, Inc.,
> 58 Misc. 2d 6-7, aff'd. 32 AD 2d 892.) In
> keeping with the above, it should go with-
> out saying that a person need not get the
> consent of a celebrity to write a fictional
> piece about that person, even if the
> fictional work is in the form of an auto-
> biography, so long as it is made clear that
> the creative work is fictional." 85 Misc. 2d
> at 587 (emphasis added).*

Yet, as discussed further below, Prosch's "Statement of
Fact" (like his affidavit below) blithely disregards this

---

*See also Leopold v. Levin, 45 Ill. 2d 434, 259 N.E. 2d
434, 259 N.E. 2d 250 (1970) (explicitly fictionalized
motion picture based on the lives of Leopold and Loeb);
University of Notre Dame v. Twentieth Century-Fox Film
Corporation 22 App. Div. 2d 452, 45 (1st Dept. 1964)
aff'd on opinion below 15 N.Y. 2d 940, 945 (the only
question is whether rational readers or viewers would
believe the book or motion picture "are anything more
than fiction").

2710

~~distinction~~ and purports to rely upon statements which
~~are explicit the "precise degree of "speculation" is in~~
volved.

   We turn now to a consideration of the several
quotations set forth in Frosch's Statement of Facts.
For convenience, those items have been grouped together
and numbered in the following paragraphs.

   (1) The second and third paragraphs on page 3
of Frosch's brief are simply a repetition of the misrepre-
sentation in his Bill of Particulars that Mailer's state-
ment about "factoids" refers to his own book. (See p. 24
above.) Frosch cannot dispute that this is a knowing
misrepresentation of the book's content and that the error
has been pointed out repeatedly in the briefs below. A full
and accurate quotation of the sentence is set forth at page 24
above and makes perfectly clear that the statement in
question constituted Mailer's criticism of an earlier bio-
graphy of Marilyn Monroe by Maurice Zolotow.

   (2) The fourth and fifth paragraphs on page 3
(which carries over to the top of page 4) of Frosch's brief
are selected snippets from a discussion at pages 13 to 20 of
the book dealing with the difficulty of writing biography
in general and specifically the biography of an actress. The

2711



with the following

on:

> "But why not assume Marilyn Monroe
> opens the entire problem of biography?
> The question is whether a person can be
> comprehended by the facts of the life,
> and this does not even begin to take into
> account that abdominable magnetism of facts.
> They always attract polar facts. Rare is the
> piece of special evidence in any life that
> is not quickly contradicted by other witnesses.
> In a career like Monroe's, where no one can
> be certain whether she was playing an old
> role, experimenting with a new one, or even
> being nothing less than the true self (which
> she had spent her life trying to discover),
> the establishing of facts dissolves into the
> deeper enigma of how reality may appear to a
> truly talented actor. Since the psychological
> heft of a role has more existential presence
> than daily life (and in fact the role creates
> real reactions in everyone who sees it), so
> the twilight between reality and fantasy is
> obliged to become more predominant for a
> great actor than for others. Even if a few
> of the facts of Monroe's life can be verified,
> therefore, or, equally, if we learn the sad
> fact that Monroe reminiscing about her past
> at a given moment is not being accurate -- to
> say the least! -- how little is established.
> For an actor lives with the lie as if it were
> truth. A false truth can offer more reality
> than the truth that was altered." (A 94)

In these passages, Mailer merely recognizes the limit of his

power to discover the facts, a limit that all biographers

must face. (And he points out that, in the case of a great

actress, whose professional life and stardom rest upon the

fantasy of film and stage, her own fantasies about her past

may reveal more about her than the historical facts she

altered.) Mailer is honest enough to admit such limits and

2712

promises (in the sentence at the top of the second column
on A 95, which immediately precedes the passage quoted by
Frosch, but which Frosch has carefully avoided including)
that any speculation will be "underlined" as such.

(3)  The first full paragraph on page 4 of Frosch's
brief deals with the sexual allure of Monroe's photographs --
specifically, the publicity photographs distributed following
her return to Twentieth-Century Fox.  The statement in the
book is as follows:

> "She takes up where she began on her first
> contract [with Twentieth-Century Fox] three
> years before, and her publicity stills begin
> once again to cross thousands of newspaper
> desks, her face pops forth.  Irrepressibly,
> she whispers in the ear of the man who looks
> at the photo 'You can fuck me if you're lucky,
> Mr. Sugar.'"

The statement in the second sentence obviously does not
purport to be an actual statement by Miss Monroe to indivi-
ual editors at "thousands of newspaper desks."  It is a
comment on the sexual suggestiveness of the Marilyn Monroe
photographs.*

— — —  — — — —

*The selection of this passage (and others mentioned in
Frosch's affidavit below but omitted in his Statement of
Fact -- see A 90) reflect Appellant's objection to the
"sexual tone" of Mailer's book (A 90).  This professed
prudishness on the part of Miss Monroe's Executor is impossible
to understand.  Marilyn Monroe was America's sexual idol
and it was her explicit sexuality which gave rise to the
publicity value that Frosch purports to be suing upon.

[footnote continued on following page]

-41-

2713



(4)  The second full paragraph on page 4 of
Frosch's brief quotes dialogue from page 92 of the book.
Consistent with Mailer's promise earlier that specu-
lation would be "underlined," Mailer stresses at the
beginning of the quoted passage that he has `invent[ed]
the following dialogue."  As noted above, Frosch properly

_____

[footnote continued from previous page]

Critic and essayist Diana Trilling is quoted on Marilyn
Monroe at page 16 of the book as follows:

> "The boldness with which she could
> parade herself and yet never be gross,
> her sexual flamboyance and bravado which
> yet breathed an air of mystery and
> reticence, her voice which carried such
> ripe overtones of erotic excitement and
> yet was the voice of a shy child --
> these complications were integral to her
> gift.

It is difficult to imagine that any meaningful book
about Marilyn Monroe could be written without a discussion
of her appeal and status as a sex symbol.  But even if
her sexuality were less central, that would not make any
more relevant the "sexual tone" of the statements about
which Frosch complains.  As pointed out above, even lurid
and sensationalistic accounts are not actionable as
"fictionalization."

~~mits that explicit speculation is not act.~~

(5)  The first paragraph on page 5 refers to a statement about Clark Gable's being Marilyn Monroe's "secret father."  But the passage as a whole makes clear that Mailer is simply relating one of the adolescent Marilyn Monroe's own fantasies:

> "In her early teens, she kept a picture of Gable on her wall <u>and lied to high school friends that Gable was her secret father</u>... Illegitimate she might be, but still selected for a high destiny -- Clark Gable was her secret father."  (A 96, emphasis added.)

(6)  The second paragraph on page 5 refers to the possibility that Marilyn may have had a premonition of her eventual suicide and mentioned it to her  first husband.  The paragraph in the book which immediately follows

---

*Moreoever, the speculation only involves the details of the dialogue.  There is no doubt, and Frosch does not dispute, that motion picture executives at Twentieth Century-Fox closely questioned Marilyn Monroe when it was discovered that she had posed in the nude some years earlier and at least one such executive urged her to deny it.  See, for example, Maurice Zolotow, <u>Marilyn Monroe</u> 119 (1960).  Understandably, there is no full account of exactly what was said on that occasion.  Certainly Frosch nowhere claims to have been there -- or, indeed, to have any knowledge of what was or was not said -- and consequently he cannot and does not deny that Mailer's speculation may well reflect the general substance of the questions asked by the Fox executives and Marilyn Monroe's answers.

2715

the ▓▓▓▓▓▓▓ Fros ▓▓▓▓ ▓▓▓▓▓

this possibility is a reasonable one in light of her
first husband's later comments about her instability and,
specifically, her repeated statements that she would kill
herself if he died or left her and (b) that despite the
reasonableness of this inference there is no evidence that
she actually told her husband that she feared she would
kill herself some day in any event (i.e. even if he stayed
married to her).

> "There is no record of such a conversa-
> tion, no particle of evidence to underwrite
> it, except that she is forever ready to tell
> him in their marriage that if he were to die
> or go away she would jump off the Santa Monica
> pier. It must have been said with enough
> seriousness to have brought forth the remark
> from Dougherty after her death that even if
> Norma Jean had remained with him she might
> have broken down." (A 97)

It is impossible to understand Prosch's objection. Obviously,
he cannot deny that Marilyn Monroe committed suicide. Nor,
apparently, does he dispute that she told her first husband,
on several occasions, that she would commit suicide in
certain circumstances (namely, if he died or left) and that
he concluded she was mentally unstable. (See, for example,
Fred Guiles, Norma Jean 38, 42 (McGraw-Hill 1969).) Indeed,
there is nothing in this record to indicate that Mailer's
inference is incorrect. This point is not even mentioned in

-44-

2716

_____ he know[s]
what was in Marilyn Monroe's mind at the time or what she
said to her first husband.* But even if the inference were
incorrect, the fact and degree of speculation involved is
"underlined," as Mailer promised at the outset and this
cannot possibly be actionable.

(7) The final passage, in the third paragraph on
page 5, is introduced by Mailer's statement that "we can
take a fair idea" of how, in private, Monroe scourged
dramatist Arthur Miller, her third husband, from dialogue
in Miller's later and at least partly autobiographical play,
After the Fall. Following several lines from the play,
Mailer adds that Monroe was, during this period of her
marriage to Miller, "beginning to sound like many another
drunken blonde" and was "throwing herself at Montand."
Again, it is impossible to understand Frosch's objection.
Surely, Frosch does not dispute that Miller's play is a
partly autobiographical account of his marriage to Marilyn
Monroe or that, as noted earlier on the same page in the book
(A 166), she was rude to him even in public during the latter
part of their marriage. What then is supposedly actionable

_____

*As noted earlier, Frosch did not submit a single
affidavit from anyone claiming personal knowledge of any
falsehoods in the book, and he refused to reveal what
factual investigation he himself had undertaken (A 47-50).

-45-

here? Does Frosch dispute that at times Marilyn Monroe sounded like "many another drunken blonde"? Does he dispute her two-month love affair with Yves Montand while they were filming Let's Make Love? It is impossible to know, since Frosch does not say. In any event, the record does not support any possible claim that Frosch might make about this passage because, once again, the point was not even raised in the papers below. There is no explanation of what he finds objectionable and no affidavit or other evidence to show falsity.*

———  —— ——— ———

Thus, "there is not a single showing of any specific misrepresentation of fact". Rosemont Enterprises v. Random House, 58 Misc. 2d 1.5 (Sup. Ct. N.Y.Cty. 1968), aff'd

———————————

*As to the semi-autobiographical nature of After the Fall, see, for example, Fred Guiles, Norma Jean 330-331 (McGraw-Hill 1969). Guiles, like Mailer, quotes dialogue from After the Fall and suggests the parallels in Monroe's marriage to Miller (pp. 219, 329-330). As to her some-times sounding like a "drunken blonde," see Norma Jean at 228 and 169 ("Marilyn's voice was fuzzy with alcohol, probably vermouth, then her favorite insulation when fretful.") As to her "throwing herself" at Montand, see Norma Jean at 253 (Montand said "Do you think he [Miller] doesn't know that she [Monroe] is beginning to throw her-self at me?")

-46-

2718

without opinion 32 App. Div. 2d 892 (1st Dept. 1969).

Certainly, there is no basis in the record for holding that
the book "is infected with substantial and material
falsification", as would be required to sustain a cause
of action under the "false light" tort. Spahn v. Julian
Messner, Inc., 21 N.Y. 2d 124,127 (1967). Mailer describes
at the outset the difficulties a biographer encounters in
trying to discover the real truth about Marilyn Monroe and,
at a few points in the course of the book, he points out that
no one knows for sure what sent on inside her mind or in her
private conversation and then goes to say what is known and
offers possible inferences as to what she thought or said,
being careful in each case to underline where he has gone
beyond the proven facts. None of this would be actionable,
even if Miss Monroe were still alive.


CONCLUSION

Marilyn Monroe was perhaps this country's most
famous sexual idol. She was also, as the book makes clear,
a fine actress and a fascinating public personality.
Respondents and others have every right to write and publish
one or many books about her. Appellant Frosch's attempt to
monopolize the publication of biographies about Marilyn

-47-

2719



Monroe (see fn. at p. 35 _supra_) is without basis and the
present suit, seeking to create such a monopoly, was
properly dismissed by the court below. As noted at the
outset, that dismissal must be affirmed if _any_ of the three
questions involved in this appeal is decided in Respondents'
favor.

Dated:  March 31, 1980

                           Respectfully submitted.

                           Rembar & Curtis
                           Attorneys for Defendant-
                            Respondent Norman Mailer
                           19 West 44th Street
                           New York, NY 10036
                           (212) 575-8500

-48-