# EXHIBIT A

LICENSE AGREEMENT

## TABLE OF CONTENTS

1. GRANT OF LICENSE
2. TERRITORY
3. TERM
4. CONSIDERATION AND RELATED LICENSEE OBLIGATIONS
5. REPRESENTATIVE
6. STATEMENTS, PAYMENTS AND RECORDS
7. QUALITY STANDARDS AND CONTROL
8. THE PROPERTY
9. LICENSEE RIGHTS AND OBLIGATIONS
10. TERMINATION AND EXPIRATION
11. ASSIGNABILITY
12. NOTICES AND PAYMENTS
13. MISCELLANEOUS

Schedules and Exhibits

Schedule A - Brands
Schedule B - Licensed Products
Schedule C - Territory
Exhibit A - Statement Format

## LICENSE AGREEMENT

AGREEMENT made and effective as of the 17th day of March, 2005 by and between Shaw Family Archives a corporation of the State of New York, with its principal place of business at 225 Hudson Terrance, Piermont 10968 U.S.A. (hereinafter referred to as "LICENSOR") and Central Mills, Inc. a corporation of the State of New York with its principal place of business at 1407 Broadway, 24th Floor, New York, NY 10018 (hereinafter referred to as "LICENSEE").

WHEREAS, LICENSOR is the owner of certain proprietary intellectual property, including but not limited, to logos, designs, slogans, copyrights and other similar materials (the "Property") used in connection with the brands set forth on Schedule A of this Agreement; and

WHEREAS, LICENSEE desires to obtain the right and license to use the Property on and in connection with the manufacture, distribution and sale of Licensed Product(s) in the Territory (both as hereinafter defined) under certain terms and conditions and LICENSOR is willing to grant LICENSEE such right and license.

NOW THEREFORE, in consideration of and incorporating the above premises and of the mutual covenants, conditions and agreements herein contained, the parties agree as follows:

### GRANT OF LICENSE

1.1  Grant. LICENSOR hereby grants to LICENSEE, and LICENSEE hereby accepts upon the terms and conditions herein specified, the exclusive right and license to utilize the Property in the Territory solely upon and in connection with the manufacture, distribution and sale of the products shown on Schedule B hereof (the "Licensed Product(s)").  LICENSEE understands that advertising and distribution of said Licensed Products through retail, mail order catalogs, the internet and any other form of commerce must preclude sales in the state of Indiana, USA. In the event of any question about whether any specific product or products are Licensed Products, the determination of LICENSOR shall be conclusive after notice has been given to Licensee and Licensee has had an opportunity to fully discuss the merits of any such conflict.

1.2  Retail Distribution of Licensed Products.  The Licensed Products manufactured under this Agreement shall be placed in distribution by the LICENSEE in a fully finished condition solely for immediate or eventual sale at the retail market level or its equivalent and in that same condition and for the use contemplated by LICENSOR under this agreement. In no event shall the Licensed Products be sold to any party if the LICENSEE has actual knowledge of, that the Licensed Products will be thereafter altered, modified, re-packaged, filled, made part of something else or used in any other unauthorized manner by any party in the chain of distribution.

1.3  Reservation of Rights

(a)  LICENSOR retains all rights not expressly and exclusively conveyed to LICENSEE hereunder, and it is acknowledged that LICENSOR may grant licenses to others to use the Property in connection with other products.

(b)  LICENSOR reserves the right to itself use, manufacture, distribute and sell, or have others manufacture, distribute and sell for it, the same type of product using the Property in all other channels of distribution such as, but not limited to, premiums, promotions (including those involving payment or partial payment by customers), athletic, entertainment and other sponsorship-related programs, catalogues, mail order, electronic commerce, and restricted venues, e.g., events, concerts, sports events, recreation, theme and amusement parks, schools, stadiums, theaters. In the event, however, that LICENSEE acts as a supplier of such products to LICENSOR or any parties authorized by LICENSOR, such sales shall be subject to the provisions of no. 4.1 of this Agreement regarding Royalties.

(c)  From time to time, opportunities of a short term nature may arise using a particular new application of the Property wherein LICENSOR will ask LICENSEE to produce on an expedited basis Licensed Products either for LICENSOR to use for premium or promotional purposes, or to be sold by LICENSEE at retail, or both, and if LICENSEE is unable or unwilling to so produce such Licensed Products within time frames acceptable to LICENSOR as well as meeting LICENSOR's other reasonable requisites under the circumstances, such as sufficient distributional capability and appropriate price and quality, LICENSOR shall have the right to seek and license other parties for this limited opportunity only.

1.4  No Right to Sub-License.  LICENSEE has no right to sub-license the rights granted by this Agreement.

TERRITORY

2.  The rights of distribution and sale granted to LICENSEE under this Agreement shall be limited to those jurisdictions set forth on Schedule C hereto and LICENSEE agrees that it will not make or authorize any use, direct or indirect, in any other area and that it will not knowingly sell Licensed Products to persons who intend, to resell them in any other area.

## TERM

3. **Term.** The term ("Term") of this Agreement shall be a period one (1) year nine (9) months, commencing on April 1, 2005, and terminating on December 31, 2007, unless sooner terminated in accordance with the provisions of this Agreement.

## CONSIDERATION AND RELATED LICENSEE OBLIGATIONS

4.1 **Royalties.** In consideration of the right and license herein granted, LICENSEE shall pay to LICENSOR a sum ("Royalties") equal to eight percent (8%) of all Net Sales (as defined below) by or on behalf of LICENSEE of the Licensed Products. Royalties shall accrue when the Licensed Products are invoiced or shipped, whichever occurs first, and shall be payable concurrently with the periodic statements required in no. 6 herein. The term "Net Sales" shall mean the gross invoice price billed customers less a maximum 2% deduction for customary trade discounts, allowances, rebates, returns actually credited, and charged to and paid by the customer, but with no other deductions of any kind whatsoever, provided, however, that if LICENSEE sells Licensed Products to a party owned, in whole or in part, or controlled by, or related to, the LICENSEE, the invoice price used to determine Net Sales shall be based on the invoice price at which the Licensed Products are re-sold by the related party to an unrelated customer in an arms-length transaction.

4.2 **Advance.** LICENSEE agrees to pay LICENSOR the sum of $15,000 upon execution of this Agreement which shall be deemed to be a non-refundable advance ("Advance") against Royalties due, counting against the total minimum referred to in no. 4.3 below.

4.3 **Guaranteed Minimum Royalties.** LICENSEE agrees that, notwithstanding the actual amount of Net Sales, it shall be obliged to make certain minimum payments each period as set forth below to LICENSOR ("Guaranteed Minimum Royalties"). Until the period total is reached, for each quarter LICENSEE shall pay the greater of the actual Royalties owed under no. 4.1 or the Guaranteed Minimum Royalties as follows:

Total Guaranteed Minimum Royalties:  $50,000
$15,000 Payable under 4.2
$3,500 due July 1, 2005
$3,500 due October 1, 2005
$3,500 due January 2, 2006
$3,500 due April 1, 2006
$3,500 due July 1, 2006
$3,500 due October 1, 2006
$3,500 due January 2, 2007
$3,500 due April 1, 2007
$3,500 due July 1, 2007
$3,500 due October 1, 2007

4.4  **First Shipment Date.** LICENSEE agrees it will commence distribution of Licensed Products in reasonable quantities through customary channels of trade no later than Fall 2005/ Spring 2006. If this does not occur, this Agreement will automatically terminate and LICENSEE shall forfeit the Advance payment of no. 4.2.

## REPRESENTATIVE

5.  From time to time, LICENSOR may designate in writing one or more representatives ("Representative") upon notice to LICENSEE, to generally act on behalf of LICENSOR sometimes in conjunction with LICENSOR and sometimes in its place and stead, such as, but not limited to, receiving payments, made payable to LICENSOR unless otherwise specified, and statements as set forth in no. 6 and performing the various quality control functions as set forth in no. 7. In the event such a Representative is designated, all references to administrative duties of the LICENSOR in this Agreement may be construed as referring to the Representative if appropriate to carry out the purposes of this Agreement. LICENSOR agrees that it will be bound by any authorized communications or representations of its Representative and cannot repudiate same. LICENSOR, at its complete discretion, may replace a Representative, upon written notice to LICENSEE, without affecting the validity of this Agreement.

## STATEMENTS, PAYMENTS AND RECORDS

6.1  **Statements.** Within ten days after the end of each quarter, of each contract year, beginning July 1, 2005, LICENSEE shall deliver to LICENSOR, or its Representative if so specified, a complete and accurate statement, in the format set forth in Exhibit A, certified to be accurate by LICENSEE (if LICENSEE is a corporation, by an officer or authorized person of LICENSEE), setting forth:

(a)  LICENSEE'S net shipments, by number of each Licensed Product, reported separately, for the preceding quarter;

(b)  LICENSEE'S Net Sales for each Licensed Product, reported separately, for the preceding quarter; and

(c)  a computation of Royalties due, taking into account any Guaranteed Minimum Royalties which may be due to the extent that the Guaranteed Minimum Royalties exceed earned Royalties.

Such statements shall be furnished to Representative (Bradford Licensing Associates) whether or not any of the Licensed Products have been shipped during the period.



LICENSOR to ascertain that Licensed Products/Materials meet said standards. By way of example rather than limitation, LICENSEE shall:

(a) permit, upon reasonable advance notice, LICENSOR or its Representative to visit during regular working hours LICENSEE'S premises where Licensed Products/Materials are manufactured, packaged, sold or distributed for the purpose of inspection of the manufacturing process and related activities; and

(b) upon request of LICENSOR or its Representative, send to LICENSOR or its Representative reasonable quantities of samples (not exceeding six units of any item) of Licensed Products/Materials, at LICENSEE'S expense, for the purposes of testing, inspection and review.

7.3 <u>Prior Approval</u>. No Licensed Product shall be manufactured, distributed, sold or used by LICENSEE prior to LICENSOR'S written approval of pre-production prototypes or samples of each such Licensed Product/Material. Further written approval will be necessary if there is any change proposed by LICENSOR or LICENSEE in type, style, model, grade, description or the like from any previously approved Licensed Products/Materials. Should approval or disapproval of samples submitted prior to manufacture or use not be received by LICENSEE within fifteen (15) days of the submission, LICENSEE must, in writing, request a reply. Failure to receive a reply shall be deemed approval by LICENSOR if LICENSOR or its Representative does not notify LICENSEE of LICENSOR'S disapproval within an additional fifteen (15) days. Licensed Products/Materials shall not be manufactured, distributed, sold or used which differ from the approved samples. All costs associated with the approval process shall be borne by LICENSEE.

7.4 <u>Deficiency</u>. Promptly upon receipt from LICENSOR or its Representative of information or notice that any Licensed Products/Materials manufactured, sold or used by LICENSEE does not or has not met the specifications or standards of nature and quality prescribed by LICENSOR, LICENSEE shall correct such deficiency forthwith at LICENSEE'S expense. LICENSEE shall thereupon submit samples of the corrected Licensed Products/Materials pursuant to no. 7.3, for approval. In the event the deficiency is that of substandard Licensed Product or that of material mis-use of the Property, all existing inventory or work in progress of Licensed Products/Materials containing the deficiency shall, at LICENSEE'S expense, either be corrected to LICENSOR'S satisfaction or may be sold provided all indicia of the property has first been removed. The foregoing shall not preclude or limit in any way LICENSOR'S rights under no. 10 herein.

## THE PROPERTY

8.1 <u>Ownership</u>. LICENSEE shall use the Property only in connection with the Licensed Products and agrees that all of LICENSEE'S use under this Agreement inures to the benefit of LICENSOR. LICENSEE acknowledges that LICENSOR is the owner of the Property and the goodwill associated therewith and the Property is valid. LICENSEE agrees not to contest LICENSOR'S ownership or the validity of the Property

being granted under the terms of this Agreement to use the Property pursuant to this Agreement, LICENSEE shall acquire no right, title or interest of any kind or nature whatsoever in or to the Property or the goodwill associated therewith.

8.2  **Approval**. LICENSEE shall use the Property only in such form and manner as is specifically approved in writing by LICENSOR and, upon request by LICENSOR, affix thereto any legends, markings and notices of trademark registration or LICENSOR-LICENSEE relationship specified by LICENSOR, or any other notice of LICENSOR'S ownership, including copyright. LICENSOR shall have the right to approve all advertising, displays and other material using the Property prepared by LICENSEE. LICENSEE agrees to follow LICENSOR'S instructions and guidelines regarding proper usage of the Property in all respects. Licensor agrees that approvals will not be unreasonably withheld or delayed.

8.3  **LICENSEE Contributions**. LICENSEE agrees that all artwork, graphics, layouts slogans, names, titles or similar materials incorporating, or being used in association with, the Property which may be created by the LICENSEE or its subcontractors pursuant to this Agreement shall become the sole property of LICENSOR, including trademark and copyright rights, and LICENSEE agrees on behalf of itself, its employees, its subcontractors and any other party with whom it may contract to create such materials, to promptly execute any and all appropriate documents, e.g., assignments, in this regard. LICENSEE warrants and represents that all such materials which it creates or uses are original and to the best of its knowledge, do not infringe the copyright or trademark rights of others.

8.4  **Protection and Defense**. LICENSOR agrees to protect and defend the Property at its sole cost and expense. LICENSOR agrees to indemnify and hold LICENSEES shareholders, officers, directors, employees, and agents harmless from only those claims, liabilities, damages (not including any consequential, indirect or punitive damages), costs or expenses solely and strictly related to the Property as properly used by LICENSEE pursuant to this Agreement, provided that LICENSEE shall cooperate fully with LICENSOR in the defense and protection of the Property and shall promptly advise LICENSOR in writing of any actual infringing uses by others in addition to any suits brought, or written claims made, against LICENSEE involving the Property. Decisions involving the protection and defense of the Property shall be solely in the discretion of LICENSOR; LICENSEE shall take no actions in this regard without the express written permission of LICENSOR.

8.5  **LICENSEE Cooperation**. LICENSEE agrees to join with LICENSOR in any application to enter LICENSEE as a registered or permitted user, or the like, of the Property with any appropriate governmental agency or entity. Upon termination or expiration of this Agreement for any reason whatsoever, LICENSOR may immediately apply to cancel LICENSEE'S status as a registered or permitted user and LICENSEE shall consent in writing to the cancellation and shall join in any cancellation petition. The expense of any of the foregoing recording activities shall be borne by LICENSOR.

8.6  **Restrictions On Other Marks and Trade Names**. During the Term LICENSEE shall not use any other trademarks or other property similar to the Property. During the Term, LICENSEE shall not use or register, in whole or in part, the Property

of LICENSOR'S name, or anything similar thereto, as part of LICENSEE'S name or as the name of any entity directly or indirectly associated with LICENSEE'S activities or as a domain name.

8.7    Changes to Property. LICENSOR shall have the right at any time, upon notice, to make additions to, deletions from, and changes in the Property at its complete discretion, and LICENSEE shall adopt and use any and all such additions, deletions and changes as soon as practicable in all new production of the Licensed Products/Materials provided that an such changes do not frustrate the intent of this agreement.

8.8    Termination. Immediately upon termination or expiration of this Agreement, subject to the provisions of no. 10, LICENSEE shall immediately cease all use of the Property and all rights granted LICENSEE hereunder shall revert to LICENSOR.

8.9    Rights. LICENSOR represents and warrants that: (i) LICENSOR has the full right, power and authority to enter into this Agreement and to grant the rights provided hereunder to LICENSEE; (ii) LICENSOR is the owner of the property free and clear of any claims of third parties; and (iii) this Agreement constitutes a valid and binding obligation of LICENSOR enforceable in accordance with its terms and, that LICENSOR'S performance of all its obligations and covenants hereunder does not and will not violate any provision of any law or regulation, agreement or other instrument to which LICENSOR may be bound.

## LICENSEE RIGHTS AND OBLIGATIONS

9.1    Subcontracting. LICENSEE shall have the right to subcontract for the manufacture and production of the Licensed Products/Materials provided however, that, irrespective of, or in addition to any other agreements between LICENSEE and a subcontractor, LICENSEE agrees that any such subcontractor shall:

(i)    be fully subject to, and bound by, every provision of this Agreement;

(ii)   be made aware that it may not sell any Licensed Products manufactured by it to anyone but LICENSEE;

(iii)  agree that any related designs, labels, packaging or other materials incorporating or associated with the Property shall become the property of LICENSOR and that LICENSEE shall be responsible for obtaining any relevant supporting legal documentation;

(iv)   agree to immediately cease all manufacture of Licensed Products upon notice of termination or expiration of this Agreement; and further provided that:

confidential proprietary information, knowledge or trade secrets, such as but not limited to, marketing and advertising plans, licensing plans, market research data and the like, of which it becomes aware during the course of its relationship with LICENSOR and LICENSEE. If LICENSEE or LICENSOR is uncertain about the status of a particular piece of information, it shall consult with either LICENSOR or LICENSEE to determine such status. This confidentiality obligation shall cease when the information becomes generally known to the public.

9.6   Indemnification.   Except for those directly and solely related to and arising from the Property, LICENSEE agrees to assume the defense of, and to indemnify and hold LICENSOR, its subsidiaries, affiliates, franchisees, successors and assigns and its Representatives harmless from any and all liabilities, damages, claims, judgments, awards, fines, penalties, or other payments (including reasonable counsel fees), which may be incurred by any or all of them arising out of any claims or suits which may be brought or made against LICENSOR or those in privity with LICENSOR for injuries resulting from LICENSEE'S manufacture, advertising, packaging, labeling, promotion, sale, distribution or use of the Licensed Products, including those arising from claims involving copyright, patent, trademark, mask work or software, or any unauthorized use by LICENSEE of the Property, or out of any breach by LICENSEE of any provisions of this Agreement, provided LICENSOR shall give prompt notice and reasonable cooperation and assistance to LICENSEE relative to any such claim or suit brought to its attention. This provision shall survive indefinitely the termination or expiration of this Agreement as limited by the applicable statute of limitations.

9.7   Insurance.   LICENSEE agrees to obtain and keep in force, at its own expense, product liability insurance with respect to the Licensed Products, with a thirty (30) day notice of cancellation provision, from a recognized and responsible insurance company authorized to conduct an insurance business in New York with an A.M. Best Company rating of no less than A-XII. Such insurance company shall name LICENSOR as an additional insured, and provide protection in the amount of at least $1,000,000.00. LICENSEE shall, within thirty (30) days from the date hereof, submit to LICENSOR a copy of such insurance policy or a copy of a fully paid certificate of insurance therefor. Maintenance of such insurance and performance of LICENSEE of its obligations hereunder shall not relieve LICENSEE of liability under the indemnity contained in no.

9.8 LICENSEE agrees to maintain such product liability insurance for a period coextensive with that for which indemnification might be required under the provisions of this Agreement and in no event less than five (5) years beyond termination of this Agreement or as measured by the applicable statute of limitations, whichever is shorter.

## TERMINATION AND EXPIRATION

10.1   Termination for Default.   LICENSOR shall have the right to terminate this Agreement without prejudice to any other rights which it may have if:

(a)   LICENSEE defaults in the performance of any of its material obligations, representations or warranties provided for in this Agreement; or