UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAW FAMILY ARCHIVE, LTD., EDITH MARCUS, META STEVENS, BRADFORD
LICENSING, INC., JAMES E. DOUGHERTY,
And VALHALLA PRODUCTIONS, LLC.

05 CV 3939 (CM)

Plaintiffs/Consolidated Defendants,

**Honorable Colleen McMahon**

-against-

CMG WORLDWIDE, INC.,
and MARILYN MONROE, LLC.,

Defendants/Consolidated Plaintiffs.

-----------------------------------------------------------x

### SHAW FAMILIY ARCHIVE, LTD'S AND BRADFORD LICENSING, INC.'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT DISMISSING COUNT II OF CONSOLIDATED DEFENDANTS' COMPLAINT

Respectfully submitted,

By: _____
David Marcus (DM-0960)
Marcus & Greben
1650 Broadway
Suite 707
New York, NY 10019
Tel: 646-536-7602
Fax: 212-765-2210

Attorneys for plaintiff/consolidated
defendant SFA, plaintiff Edith
Marcus and Meta Stevens and
Consolidated Defendant Bradford
Licensing, Inc.

# TABLE OF CONTENTS

ARGUMENT

1:    THE IA ROP STATUTE DOES NOT CREATE A RIGHT OF
PUBLCITY...................................................................1

II    MARILYN MONROE DIED A NEW YORK STATE DOMICILE
AND NEW YORK DOES NOT PERMIT ANY TRANSFER OR
DEVISE OF AN INDIVIDUAL'S RIGHT OF
PRIVACY...................................................................3

    A.    Defendants Are Collaterally Estopped from Claiming that Marilyn
Monroe Was Not Domiciled in New York and Defendants Are
Further Estopped From Claiming That MMLLC Owns a Right of
Publicity in Marilyn Monroe as that issue has already been
litigated...................................................................5

        1.    The Orders, Findings and Determinations of New York
Surrogates Court Collaterally Estop MMLLC From
Arguing Marilyn Monroe's Domicile.........................5

        2.    The Board of Equalization Proceedings Determined That
Marilyn Monroe Was Not a Resident of California and,
Therefore Under California Law, She Could Not be a
California Domicile.........................................7

        3.    The New York State Appellate Division, First
Department, Previously Decided That the Estate
of Marilyn Monroe Did Not Own Any Post Mortem
Right of Publicity in Marilyn Monroe's Persona ..........8

    B.    Defendants are Judicially Estopped From Asserting that Marilyn
Monroe Was Domiciled in California

        1.    The Estate of Marilyn Monroe's Statements and Assertions
Regarding Marilyn Monroe's Residence and Domicile at
Probate and Surrogate's Proceedings Should Judicially Estop
Defendants From Asserting That Marilyn Monroe Was
Domiciled in California.....................................9

        2.    The Estate of Marilyn Monroe's Statements and Assertions
Regarding Marilyn Monroe's Residence and Domicile in the

BOE Proceeding Judicially Estop Defendants From Asserting
That Marilyn Monroe Was Domiciled in California..........10

3.  The Estate of Marilyn Monroe's Statements and Assertions
Regarding Marilyn Monroe's Residence and Domicile in
*Frosch* Should Judicially Estop Defendants From Asserting
That Marilyn Monroe Was Domiciled in California.........10

C.  Based Upon All Facts and Evidence Presented, and Upon State and Federal
Law, Marilyn Monroe Died Domiciled in New York State...................11

III.  EVEN IF, HYPOTHETICALLY, MARILYN MONROE WERE DEEMED
TO HAVE OWNED A CALIFORNIA DOMICILE, MMLLC DOES NOT
OWN A POSTHUMOUS RIGHT OF PUBLICTY IN MARILYN
MONROE'S PERSONA.................................................................16

A.  Marilyn Monroe's Will Reflects the Intent to Bequeath Only What
She Owned at the Time of Her Death.....................................16

B.  Marilyn Monroe Lacked the Legal Capacity to Bequeath Property
She Did Not Own at the Time of Her Death..............................18

C.  Even If Ms. Monroe Is Deemed to Have Been Granted a Right of
Publicity by Cal. Civ. Code § 3344.1, The Property Vested in Her
Familial Heirs..................................................................20

D.  Even If Ms. Monroe Died a California Domiciliary, Her Right of
Publicity Could Not Be Transferred Pursuant To The Residuary
Clause of Her Will as Testamentary Disposition Was Only Available
to Those Who Died After 1985..............................................20

E.  Cal. Civ. Code § 3344.1 Has No Retroactive Effect....................22

IV  EVEN IF THE COURT FINDS MMLLC OWNS A RIGHT OF
PUBLICITY, THE DOCTRINE OF LATCHES SHOULD APPLY AS
MMLLC AND ITS PREDECESSORS SAT ON THEIR RIGHTS FOR
OVER 20 YEARS...................................................................22

V  COPYRIGHT LAW PREEMPTS MMLLC'S CLAIMS HEREIN...........23

VI  PLAINTIFFS DID NOT VIOLATE THE IA ROP STATUTE................24

*Acridge v. Evangelical Lutheran Good Samaritan Society*
(334 F.3d 444 (5th Cir. 2003)................................................6

Appeal of *Earl F. and Helen W. Brucker*,
Cal. St. Bd. of Equal., July 18, 1961................................7

*Bassett v. Salter*
(25 N.Y.S.2d 176 (1940)................................................20

*Brinkly v. Casablancas*
(80 A.D.2d 428; 438 N.Y.S.2d 1004 (1981)................................8

*Cairns v. Franklin Mint Co.*
Cause No. 4510-0406-PI-00093 (2005)................................2

*Estate of Braman*
258 A.2d 492, 494 (Pa. 1969)................................18,19

*Estate of Haskell J. Dye*
92 Cal.App.4[th] 966 (2001)................................20

*Estate of Wellings*
197 C. 189, 195 (1925)................................22

*Frosch v. Grosset & Dunlap*
75 A.D.2d 768 (N.Y.App.Div 1980)................................3,8-11

*Groucho March Productions, Inc., v. Day and Night Company, Inc.*,
523 F.Supp 485 (S.D.N.Y 1981)................................8

*Hartford Accident & Indemnity Co. v. Dana Corp.*
690 N.E.2d 285, 294 (1997)................................3

*In re Estate of Dow*,
81 Misc.2d 506, 366 N.Y.S.2d 831 (N.Y.Sur.Ct. 1975)................................7

*In re Cooper's Estate*,
73 Misc. 2d 904 1973................................22

*In Re Buzza's Estate*

194 Cal.App.2d 598, 601 (1961).................................................18

*In re Estate of David*
P.2d 7... Document 89      Filed 01/17/20

*In Re Estate of O'Brien*
627 N.Y.S.2d 544 (Sur. Ct. 1995).......................................5

*In Re Estate of Uhl*
33 A.D.3d 181 (2006).......................................................22

*In Re Gernon Estate*
35 Misc.2d 12, 226 N.Y.S.2d 940 (1962)............................18

*In Re Hunter*
2004 SlipOp 02392 (2nd Dept.2004)....................................5

*In Re Klewer's Estate*
124 Cal.App.2d 219, 224 (1954).........................................18

*In Re Moynahan's Estate*
158 MISC. 821 (1936).......................................................22

*In Re Resler's Estate*
433 Cal.2d 726, 732-733(1955)..........................................17

*In Re Slade's Estate*
154 Misc. 275, 277-278; 276 N.Y.S. 956, 958-959 (1935)........5

*In Re Sullivan's Estate*
31 Cal.App. 2d 527 (1939)................................................20

*In Re Van Winkle's Will*
86 N.Y.S.2d 597, 600 (Sur.Ct. 1949).................................18

*In Re White*
174 B.K. 775, 778 (Bkcy S.D., Ill. 1994))...........................17

*In Re Williams' Will*
221 N.Y.S.2d 799, 800 (Sur. Ct. 1961)..............................17

*Kudelko v. Dalessio*
2006 NY SlipOp 26488 (2006)...........................................22

*Laws v. Sony Music Entertainment, Inc.*
448 F.3d 1134, 1141 (9th Cir. 2006)...................................24

*Lucido v. Superior Court of Mendocino County*
51 Cal.3d 335; 795 P.2d 1223; 272 Cal. Rpter. 767 (Cal. 1990)................5

*Matter of Best*
66 NY2d 151, 157 (1985)..................................................22

*Matter of Herm's Estate*
284 N.W.2d 191 (1979)...................................................5

*Matter of Reily v. Reid*
45 NY2d 24 (Ct.App.NY 1978)............................................5

*Matter of Ziegler*
161 Misc. 2d 2003 (1994)................................................6

*Maurice F. Jones Trust v. Barnett Banks Trust Co.*
637 N.E.2d, 1301 (1994).................................................3

*McKay v. Luarinson*
204 Cal. 557, 569-70 (1928)...........................................17,18

*O'Brien v. City of Syracuse*
54 NY2d 353(Ct.App.NY 1981)...........................................5

*People v. Hayes*
49 Cal.3d 1260, 111274 (1989)..........................................22

*Phillips v. Scalf*
778 N.E.2d 480 (Ind. 2002))...........................................3

*Pirone v. Macmillian, Incorporated*
894 F.2d 579 (2nd Cir. 1990)...........................................8

*Pray v. Gehman*
98 N.Y. 351, 358 (Ct.App.NY 1885))....................................6

*Scalf v. Lake County Convention and Visitors Bureau, Inc.*
Cause No. 4510-0406-PI-00093 (2005)...................................3

*Smith v. Long Island Jewish-Hillside Medical Center*
118 AD2d 553; 499 NYS2d 167...........................................8

*Southwest Bank, N.A. v. Lawrence*
66 N.Y.2d 910, 911 (N.Y. 1984)...................................2, 11, 8, 21

*Stephano v. News Group Publications, Inc.*
64 N.Y.2d 174; 474 N.E.2d 580; 485 N.Y.S.2d 220 (Ct.App;. N.Y. 1984) ...8

*Welch*
322 P.2d 635, 649 (Okla. 1958).....................................17

*Welch v. Mr. Christmas Inc.*
440 N.E.2d 1317, 454 N.Y.S.2d 971 (1982)......................24

*Wright v. City of Morro Bay*
144 Cal.App.4th 767 (2006)............................................22

**Statutes**

Indiana Code § 32-36-1....................................................1-4,23,24

Cal. Civ. Code § 3344.1...............................1,2,4,16,18,20-23

Cal.Civ. Code Section 671................................................18

Cal.Prob. § 7000..............................................................25

Cal. Prob. § 21114............................................................18

Fla.Stats.Ann. § 540.08 ...................................................21

New York Civil Law § 50 and 51......................................11

New York EPTL 3-5-1 (b)(2).(e)........................................3.

New York <u>EPTL</u>, s 3-5.1, subd. (e).....................................7

**Miscellaneous**

10 A.L.R. 4th 1193..........................................................8

62A Am. Jur. 2d Privacy § 17...........................................8

A Lindey on Entertainment, Publ. & the Arts Section 3:19 (3d ed)

Law of Defamation Section 10:27 (2d Ed).........................8

New York Pattern Jury Instructions, .NY PJI 3:45.............8

*Restatement (Second) of Conflict of Laws* § 11 cmt. K (1988)................6

Restatement, Second Torts §. 625-I...................................8

## ARGUMENT

Marilyn Monroe LLC's ("MMLLC") and CMG Worldwide, Inc.'s ("CMG") (collectively, "defendants") Count II in its Second Amended Complaint is predicated upon MMLLC's claim of ownership of a right of publicity in Marilyn Monroe's persona and the alleged infringement of this right pursuant to Indiana Code §32-36-1, *et seq.* (the "IA ROP Statute"). Shaw Family Archives, Ltd. ("SFA") and Bradford Licensing, Inc. ("Bradford") (collectively, "plaintiffs"), in their Memorandum in Support of their Cross-Motion (the "SFA/Bradford Motion"), demonstrated that: (i) Ms. Monroe did not devise any right of publicity to Lee Strasberg and Marianne Kris (now succeeded by the Anna Frued Center); (ii) although the IA ROP Statute does create a post-mortem right of publicity cause of action, it *does not* create the right itself; (iii) Defendants' claims are barred due to Copyright Preclusion; and (iv) that the doctrine of latches bars Defendants from claiming any right of publicity pertaining to Marilyn Monroe.

Defendants failed to address most of the cases cited in the SFA/Bradford Motion. Their failure is tantamount to a concession that these cases support Plaintiffs' legal arguments.

MMLLC's Memorandum in Reply and Opposition to the SFA/Bradford Motion("MMLLC's Opposition"), is based on the false presumption that the IA ROP Statute created a post-mortem right of publicity for the benefit of MMLLC, and that Ms. Monroe's will devised that right. Moreover, Defendants now claim, for the first time, that Ms. Monroe was domiciled in California at the time of her death and that Cal. Civ. Code § 3344.1 should be constructed to give MMLLC a right of publicity. However, *the IA ROP Statute did not create a post-mortem right of publicity with respect to Marilyn Monroe*. Ms. Monroe had no connection to Indiana, and it is well settled that a person's right of privacy/publicity is determined by the law of the individual's domicile state. Because Ms. Monroe died a domicile of New York, which does not recognize a

post-mortem right of publicity, MMLLC's claim for a right of publicity must be denied, as a matter of law and summary judgment should be granted. If, hypothetically, Ms. Monroe died a domiciliary of California, then a) the Court must construct her will to determine whether the law permits the testamentary disposition of assets not owned at the time of death; b) if Ms. Monroe, in her will, intended to bequeath a right that did not yet exist; and c), if pursuant to Cal. Civ. Code § 3344.1, any right of publicity which may have been created vested pursuant to intestate succession and lapsed. Under either scenario, MMLLC does not own a right of publicity in Marilyn Monroe's persona and summary judgment should be granted.[1]

## POINT I:
### THE IA ROP STATUTE DOES NOT CREATE A RIGHT OF PUBLCITY

As explained in the SFA/Bradford Motion, the IA ROP Statute merely gives an individual/entity who owns a post-mortem right of publicity the right to sue in Indiana based upon a violation of that statute in Indiana, regardless of the domicile of the deceased. Further, this right to sue, and this right alone, is descendible. The IA ROP Statute does not create, as defendants would have this court believe, a post-mortem right of publicity in Indiana regardless of the laws of the state where the decedent was domiciled at death.[2]

It is well settled New York State Law that questions regarding personal property rights of a decedent constitutes personal property and is to be determined by applying the substantive law of the decedent's domicile. *Southwest Bank, N.A. v. Lawrence* 66 N.Y.2d 910, 911; 489 N.E.2d 744, 745; 498 N.Y.S.2d 775; 54 USLW 2344 (Ct.App;. N.Y. 1984)(where the Court of Appeals,

---

[1] In fact, the Federal Court in California hearing the related actions is likely to find that Marilyn Monroe did not bequeath any right of publicity to Lee Strasberg and Dr. Marianne Kris. (See Marcus Supplemental Declaration ¶2, Exhibit A.
[2] MMLLC's reliance upon *Cairns. v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002) for the proposition that the Indiana Statute creates a posthumous right of publicity regardless of the laws of the state of domicile of the decedent is misguided. The portion upon which MMLLC relies is merely dicta. Furthermore, see the SFA/Bradford Motion at page 8, footnote 6.

2

applying the law of Tennessee Williams' domicile state, Florida, held that the estate did not own a right of publicity because Florida Law only recognized transfers before death and only to family members). See also EPTL 3-5-1 (b)(2).(e). Marilyn Monroe died domiciled in New York and New York State Law does not recognize a posthumous right of privacy or publicity. (See *Frosch, infra*). Marilyn Monroe's will was drafted, signed and probated in New York pursuant to New York State Law and, pursuant to Indiana law, the law of the state where the will was drafted, signed and probated controls. *Maurice F. Jones Trust v. Barnett Banks trust Co. N.A.*, 637 N.E.2d, 1301, 1304 (Ind.Ct.App. 1994). As such, Defendants cannot rely on the IA ROP Statute, as the right of publicity in Marilyn Monroe's persona did not survive her death.

Furthermore, as set forth on page 13 of plaintiffs' Memorandum in support, the IA ROP Statute has no retroactive effect, as no such provision was included in the statute. Defendant's construction would contradict well-settled case law that a statute is to be applied prospectively, not retroactively, unless the statute contains language that gives it retroactive effect. Defendant's construction of the statute would also interfere with the United States Commerce the Full Faith and Credit Clause, the right to contact and cause an unlawful taking from persons who enjoyed free use of Marilyn Monroe's name, likeness and image which was unprotected for 32 years prior to the enactment of said Indiana Statute. (See pages 12-13 of the SFA/Bradford Motion). Defendants only rely on *Phillips v. Scalf*, 778 N.E.2d 480 (Ind.Ct.App. 2002) and the unpublished interlocutory trial court decision *in Scalf v. Lake County Convention and Visitors Bureau, Inc.*, Cause No. 4510-0406-PI-00093 (Lake County Superior Ct.. Indiana, filed January 9, 2005) as authority for its argument that the IA ROP Statute should be applied retroactively, despite conceding that it is an interlocutory order and therefore not binding authority. (See *Hartford Accident & Indemnity Co. v. Down Corp.*, 690 N.E.2d 1301, 1304 (Ind.Ct.App. 1997)).

The holding in Phillips is not controlling herein as the deceased celebrity died an Indiana <s>domicile, whereas Marilyn Monroe was never domiciled in Indiana and the court did not</s> address the issue of retroactivity. Furthermore, MMLLC claims that it was the Indiana's legislative intent for the Indian ROP Statute to be retroactive in effect is completely unsupported.

Moreover, MMLLC cannot show that it is the successor in interest to any post-mortem right of publicity in Marilyn Monroe. As previously set forth in the SFA/Bradford Motion, and as will be more fully set forth below in section III, Marilyn Monroe's will did not bequeath any property that she did not own on the date of death. (See pages 9-12 of the SFA/Bradford Motion in Support and section III A-C below. Finally, despite the fact Plaintiffs showed that MMLLC failed to include any documents or evidence that Anna Strasberg and the Anna Frued Centre transferred any alleged right of publicity to MMLLC, MMLLC's Opposition also lacked the requisite documents and proof to evidence such a transfer. (See page 14 of the SFA/Bradford Motion). As such, Defendants lacked the capacity to commence their action against Plaintiffs.

For the reasons set forth above, plaintiffs respectfully submit that their Cross-Motion for Summary Judgment should be granted.

## POINT II.
### MARILYN MONROE DIED A NEW YORK STATE DOMICILE AND NEW YORK DOES NOT PERMIT ANY TRANSFER OR DEVISE OF AN INDIVIDUAL'S RIGHT OF PRIVACY

In the SFA/Bradford Motion, Plaintiffs demonstrated that Marilyn Monroe died domiciled in New York State, and that New York does not recognize posthumous rights of publicity for its domiciliaries. Defendants, in MMLLC's Opposition, claim for the first time that Marilyn Monroe was actually domiciled in California and that it alternatively claims ownership of Marilyn Monroe's post mortem right of publicity by virtue of the enactment of Cal. Civ. § 3344.1. MMLLC, however, failed to address any of the assertions, facts and documents

4

submitted by Plaintiffs.      As noted in plaintiffs' memorandum in support, defendants' claims, including their claim that Ms. Monroe was not domiciled in New York, are precluded by the doctrines of collateral and judicial estoppel. See pages [18-26] of the SFA/Bradford Motion. The doctrines of res judicata and collateral estoppel have expaned in scope and New York has adopted the "transactional" approach in deciding res judicata cases). See *O'Brien v. City of Syracuse*, 54 NY2d 353 (Ct.App.NY 1981). New York State's Court of Appeals has stated that this doctrine is strong enough "to bar a second action even where further investigation of the law or facts indicates that the controversy has been erroneously decided." *Matter of Reilly v. Reid*, 45 NY2d 24 (Ct.App.NY 1978). At all times herein mentioned, there was privity between the beneficiaries of the Estate of Marilyn Monroe (which includes Lee Strasberg and Dr. Marianne Kris) and Aaron Frosch, the estate's trustee and executor. Any statement to the contrary is unsupported by law and defies logic. MMLLC argues that Aaron Frosch did not have privity with the beneficiaries of the Estate of Marilyn Monroe as he was merely the executor of the Estate of Marilyn Monroe and moreover, cites to irrelevant case law as authority.[3] Conveniently MMLLC fails to mention that Mr. Frosch was also the trustee for the estate, and that, although placed on notice, none of the beneficiaries made any effort to oppose, block or refute Mr. Frosch's work performed on behalf of the Estate of Marilyn Monroe. (See *In Re Hunter*, 2004 SlipOp 02392 (Ct.App.NY. 2004), (where the court found the Court's decisions based upon

---

[3] MMLLC failed to respond to *In Re Slade's Estate*, 154 Misc. 275, 277-278; 276 N.Y.S. 956, 958-959 (Sur.Ct.N.Y. 1935), wherein the court held that claims and filings made by the executor of a will were binding on the widow. Instead, MMLLC cites to two non-New York State cases, *Matter of Herm's Estate*, 284 N.W.2d 191 (Iowa 1979) and *Lucido v. Superior Court of Mendocino County*, 51 Cal.3d 335; 795 P.2d 1223; 272 Cal. Rptr. 767 (Cal. 1990). However, neither case cited is applicable herein. (*In Matter of Herm's Estate*, the Court upheld the invalidation of a will where the testator was incompetent and the nephew of the deceased was found to have used undue influence, and in *Lucido* the issue of privity was not addressed).

actions of the testator/executor had the effect of res judicata, provided the beneficiaries had notice of the proceedings).(See Marcus Supp. Decl ¶3 Exhibit B).

939-CM     Document 89     Filed 01/17/2007

**A.    Defendants Are Collaterally Estopped from Claiming that Marilyn Monroe Was Not Domiciled in New York and Defendants Are Further Estopped From Claiming That MMLLC Owns a Right of Publicity in Marilyn Monroe as that issue has already been litigated.**

### 1.    The Orders, Findings and Determinations of New York Surrogates Court Collaterally Estop MMLLC From Arguing Marilyn Monroe's Domicile.

It is the general rule that every decree of the Surrogates Court is conclusive as to all matters embraced therein against ever person over whom jurisdiction was obtained. (See In re Hunter, infra; citing *Pray v. Gehman*, 98 N.Y. 351, 358 (Ct.App.NY 1885); *Matter of Ziegler*, 161 Misc. 2d 2003 (1994)). As set forth in the SFA/Bradford Motion, all documents submitted by Aaron Frosch, trustee and executor of the Estate of Marilyn Monroe, and later by Anna Strasberg as Administratrix of the Estate, stated that Marilyn Monroe was a resident/domicile of New York.[4] (See pages 19-26 of the SFA/Bradford Motion). Although MMLLC is correct in asserting that a person need not be a domicile/resident of New York State in order to have their will probated their provided they own real property in New York, Marilyn Monroe was not a non-resident. (See pages 19-22 of the SFA/Bradford Motion). Accordingly, defendants are estopped from arguing that Marilyn Monroe was not a New York domicile at the time of her death.

Further, Ms. Monroe's will was probated and constructed pursuant to New York law. In 1990, Anna Strasberg, as Administratrix of the Estate of Marilyn Monroe, filed an application with New York County Surrogates Court seeking a decree constructing Ms. Monroe's will and the court cites numerous New York State cases in the memorandum in the construction of the

---

[4] *The word resident, in many statutes, can sometimes be used to mean domicile.* (See Restatement (Second) of Conflict of Laws § 11 cmt. K (1988). In *Acridge v. Evangelical Lutheran Good Samaritan Society*, 334 F.3d 444 (5th Cir. 2003), the court used the term "State of residence" to mean "domicile."

will. (See Marcus Supp. Decl. C)  It is well settled that a court hearing a probate matter, and in particular the apportionment of estate taxes, will apply the law of the deceased's domicile when constructing a will. (*See* Estates, Powers & Trusts Law (EPTL), s 3--5.1, subd. (e); *In re Estate of Dow*, 81 Misc.2d 506, 509; 366 N.Y.S.2d 831 (N.Y.Sur.Ct. 1975))

### 2. The Board of Equalization Proceedings Determined That Marilyn Monroe Was Not a Resident of California and, Therefore Under California Law, She Could Not be a California Domicile.

In the Board of Equalization ("BOE") Proceeding on April 22, 1975, the BOE found that Marilyn Monroe was a non-resident of California at the time of her death and, as such, her Estate was not entitled to a set-off of taxes. (See pages 21-22 of the SFA/Bradford Motion). The fact that Ms. Monroe was found to be a non-resident means that under California Law, Marilyn Monroe could not have been a domicile of that State. According to California Law, a California domicile is presumed to also be a resident <u>unless</u>, during that taxable year, that individual was outside California for other than a temporary or transitory purpose. (See Appeal of *Earl F. and Helen W. Brucker*, Cal. St. Bd. of Equal., July 18, 1961 (p. 152) Marcus Supp. Decl. Exhibit D). In MMLLC's Opposition, it now asserts that Marilyn Monroe was domiciled in California and had lived in that State for most of 1962. (see page 32 of MMLLC's Opposition)  If Marilyn Monroe was domiciled in California when she died, then Marilyn Monroe would also, by definition, have to be a California resident.  However, since Marilyn Monroe was already determined by the BOE to be a non-California resident when she died, despite the fact she allegedly lived in California most of 1962, she cannot be a California domicile. The only way for Marilyn Monroe to have lived for most of 1962 in California and not be a resident is that she was domiciled elsewhere; in this case New York.

3. **The New York State Appellate Division, First Department, Previously Decided That the Estate of Marilyn Monroe Did Not Own Any Post Mortem Right of Publicity in Marilyn Monroe's Persona**

In *Frosch v. Grosset & Dunlap*, 75 A.D.2d 768 (N.Y.App.Div. 1980), the 1st Department held that no right of privacy pertaining to Marilyn Monroe existed as New York State Law does not recognize post-mortem rights of publicity. Additionally, when deciding Frosch, the Court already determined the Marilyn Monroe was domiciled in New York State when she died as it applied New York Law to determine whether such a right ever existed. (See *Southwest Bank, N.A., supra*; see also page 23 of the SFA/Bradford Motion) Had Marilyn Monroe died domiciled in another State, then the Court in Frosch would have rendered its decision based upon the law of that State.

MMLLC claims that the holding in Frosch was merely based upon First Amendment principals which trumped the estate's right of privacy claim. However, this was clearly not what happened. Contrary to MMLLC's assertions, Frosch has repeatedly been cited for it's holding that the Estate of Marilyn Monroe did not own a right of publicity in Ms. Monroe's persona.[5] Even New York's Pattern Jury Instructions rely on *Frosch* for that proposition in their pattern jury instructions.[6] (See NY PJI 3:45)

---

[5] (See *Brinkley v. Casablancas*, 80 A.D.2d 428; 438 N.Y.S.2d 1004 (1981); *Pirone v. Macmillan, Incorporated*, 894 F.2d 579 (2nd Cir. 1990); *Groucho March Productions, Inc., v. Day and Night Company, Inc.*, 523 F.Supp 485 (S.D.N.Y 1981); *Stephano v. News Group Publications, Inc.*, 64 N.Y.2d 174; 474 N.E.2d 580; 485 N.Y.S.2d 220 (Ct.App;. N.Y. 1984); 10 A.L.R. 4th 1193; 62A Am. Jur. 2d Privacy § 17; 1 A Lindey on Entertainment, Publ. & the Arts Section 3:19 (3d ed.); 2 Law of Defamation Section 10:27 (2d Ed)

[6] New York Pattern Jury Instructions, .NY PJI 3:45, with respect to New York's right of privacy, sets forth:

> Only a living person is within the statutory protection. Thus use of the name or picture of a deceased person does not give rise to a cause of action in favor of the estate, *Smith v. Long Island Jewish-Hillside Medical Center*, 118 AD2d 553; 499 NYS2d 167,nor does a right of "publicity" survive for the benefit of decedent's estate, *Frosch v. Grosset & Dunlap, Inc.* 75 Ad2d 768, 427 NYS2d 828; see generally Restatement, Second Torts Section. 625-I....

Although the trial court's order granting summary judgment in *Frosch* was based upon

Amendment free speech principals, the Appellate Division decisively held that New York State does not recognize a transferable right of privacy and does not recognize a common law right of publicity. (See pages 22-24 of the SFA/Bradford Motion). MMLLC cannot now credibly claim that it should not be estopped from claiming ownership of a post mortem right of publicity in New York or that Marilyn Monroe was domiciled elsewhere than New York State when she died.

**B.     Defendants are Judicially Estopped From Asserting that Marilyn Monroe Was Domiciled in California**

   **1.     The Estate of Marilyn Monroe's Statements and Assertions Regarding Marilyn Monroe's Residence and Domicile at Probate and Surrogate's Proceedings Should Judicially Estop Defendants From Asserting That Marilyn Monroe Was Domiciled in California.**

Marilyn Monroe's will was probated in New York as if she were a resident domicile. Nowhere in any of the probate or surrogate documents did the Estate of Marilyn Monroe ever allege that Marilyn was a resident or domicile of the State of California. As a result thereof, Ms. Monroe's will was probated and constructed pursuant to New York State Law and her estate paid New York State estate taxes.

MMLLC's claim that Marilyn Monroe was a resident/domicile of California is clearly inconsistent with the prior claim and assertion in Court that Marilyn Monroe was a New York resident/domicile. A great amount of confusion regarding the state of the law on these issues would result were the Court to adopt this an inconsistent position now. Moreover, MMLLC will now derive an unfair advantage if it now is allowed to claim Marilyn Monroe was domiciled in New York. Finally, it should be noted that, the Estate of Marilyn Monroe achieved a benefit by affording itself of New York State probate law and New York State Courts. The voluminous file

contained in New York State Surrogates Court indicates that the probate and other related surrogates proceedings cost considerable judicial recourses.

939-CM   Document 89   Filed 01/17/2007

2.    **The Estate of Marilyn Monroe's Statements and Assertions Regarding Marilyn Monroe's Residence and Domicile in the BOE Proceeding Judicially Estop Defendants From Asserting That Marilyn Monroe Was Domiciled in California.**

As noted above, the Estate of Marilyn Monroe claimed that Marilyn Monroe was a New York State resident/domicile, not a resident of California. Based upon these assertions, the BOE determined that Marilyn Monroe was not a resident of the State of California. (See pages 21-22 of the SFA/Bradford Motion). This caused the BOE to hold that the Estate of Marilyn Monroe must pay taxes on the sources of income collected in which were derived from work Ms. Monroe performed in California only. Although the Estate of Marilyn Monroe was unable to avoid paying taxes on this source of income, it did avoid having to pay estate taxes on the corpus of the Estate, and upon the entire stream of income that flowed into the Estate. As set forth above and in pages 21-22, 24-26 of the SFA/Bradford Motion, the fact that Marilyn Monroe was not a resident in California, despite the fact she lived and worked in that State for most of 1962, prevents a determination that she was a California domicile.

MMLLC's position now is clearly inconsistent with the Estate of Marilyn Monroe's prior position. If MMLLC is able to now to successfully claim that Marilyn Monroe was a resident and domicile of California, the end result is that Estate of Marilyn Monroe will have evaded substantial taxes in California.

3.    **The Estate of Marilyn Monroe's Statements and Assertions Regarding Marilyn Monroe's Residence and Domicile in *Frosch* Should Judicially Estop Defendants From Asserting That Marilyn Monroe Was Domiciled in California.**

In *Frosch*, Aaron Frosch, as trustee and executor of the Estate of Marilyn Monroe,

certain book about Marilyn Monroe. Mr. Frosch, in the Estate's Response to Verified Bill of

Particulars, set forth that the claim was made pursuant to New York Civil Law §§ 50 and 51, and

that a separate right of existed publicity in New York. (See Marcus Additional Decl.¶6 Exhibit

E). MMLLC should not now be able to claim Ms. Monroe was domiciled any place other than

New York when she died.

## C.    Based Upon All Facts and Evidence Presented, and Upon State and Federal Law, Marilyn Monroe Died Domiciled in New York State.

As set forth in page 26 and 27 of the SFA/Bradford Motion, according to Federal and

State Law, a person has only one domicile. Although MMLLC does not dispute this, it also

makes the counter intuitive argument that even if Marilyn Monroe is domiciled in New York for

probate purposes, she should be considered a domicile in California for right of publicity

purposes. (See page 31 of MMLLC's Opposition). The cases cited by MMLLC do not support

this contradictory and mistaken argument. New York Courts, when probating a will, consider a

right of publicity to be a property right and apply the law of that person's domicile when

determining whether such a right exists. *Southwest Bank, N.A. at 745.*

As noted on page 27 of plaintiffs' Memorandum in Support, in 1955 Marilyn Monroe

indicated her intent to move to New York until she retired, and then to retire in Brooklyn, New

York. This statement was made on NBC radio on June 12, 1955 on the Monitor Beacon

program. By going to http:/www.mnitorbeacon.com/sounddownloads.html, and clicking on the

link to David Garroway's interview with Marilyn Monroe, this Court can hear, **in Marilyn's**

**own words and voice,** that her new home for life was New York and that she intended to remain

there after retirement. MMLLC, in its Response to SFA and Bradford's Statement pursuant to

Local Rule 56.1, number 9, claims that such a recording does not exist, and even if it did, would have no bearing on Ms. Monroe's domicile in 1962. As this Court can see for itself, this statement was actually made. In addition to this statement: Marilyn Monroe: moved to New York in 1954 See Supp. Marcus Decl.¶¶7-8 Exhibit F and G).; (ii) started and operated a film production company in New York called Marilyn Monroe Productions, Inc See Supp. Marcus Decl. ¶8 Exhibit G); (iii) married Arthur Miller in June of 1956 and lived with him at 444 East 57th Street, New York (See page 27 of SFA/Bradford Motion and Marcus Supp. Decl. ¶16 Exhibit L); (iv) continued to live at that address after their divorce in 1961 and maintained that residence until the time of her death; (See page 27 of SFA/Bradford Motion); (v) submitted an application to New York City Civil Court in February of 1956 to legally change her name to Marilyn Monroe (See Marcus Supp. Decl. ¶9 Exh. H); (vii) had numerous bank accounts in New York (See Marcus Supp. Decl. ¶8 Exh.G and Exhibit U to the Declaration of David Marcus dated November 29, 2006 ("Marcus Motion Decl."); (viii) obtained a dog license in New York (See page 28 of the SFA/Bradford Motion); (ix) went about her daily life in New York (See Marcus Supp. Dec. ¶¶10,13, 15 and 18 Exhibits I and L and pages 27 and 28 of the SFA/Bradford Motion); (x) sent letters on behalf of Marilyn Monroe Productions on letterhead, with her New York City address, up to the time of her death as late as March 29, 1962 (See Exhibit T to the Marcus Motion Decl.); (xi) signed a designation of residence in the State of New York in 1959 (See Exhibit V to the Marcus Motion Decl.); (xii) had her New York address on her SAG card (See Exhibit U to the Marcus Motion Decl.); (xiii) paid New York State Income Taxes up to, and including, the date of her death;[7] (xiv) had her will probated in New York pursuant to New York State Law (See pages 9-12 and 19-20 of he SFA/Bradford Motion); (xv)

---

[7] In Exhibit H to the Marcus Motion Decl., Schedule F of the estate filing indicates that Marilyn Monroe's Estate received a tax refund from New York State, in the amount of $4,935.36 for taxes paid for the year 1962, the year Marilyn Monroe died.

and the BOE determined that Marilyn Monroe was not a resident of California, but a resident of New York. Once a person has established New York State as their domicile, as Marilyn Monroe did, said domicile does not change "until you can demonstrate that you have abandoned your New York domicile outside New York State" (See pages 26 and 27 of the SFA/Bradford Motion).

MMLLC, it its opposition, merely claims that Marilyn Monroe died domiciled in California. In support of that bald assertion, MMLLC submitted four (4) pieces of evidence. First, MMLLC submitted a deed to a house purchased by Ms. Monroe in California in February of 1962. The fact that a movie celebrity, such as Marilyn Monroe, who as a matter of necessity sometimes spent months at a time in California working on a film, purchases a home in California does not indicate a desire to terminate her established domicile in New York. [8] As this Court is familiar with the New York City apartment market, many people living in New York rent and consider themselves New Yorkers. At the same time, many of these people purchase homes in other areas as a weekend or summer home, yet maintain themselves as New York domiciliaries. Further, the home she purchased in California was described as modest in nature (especially for a celebrity of the ilk of Ms. Monroe) and sparsely furnished. (Marcus Supp. Decl. ¶ 33 and Craven Supp. Decl. Exhibit 1 at Exhibit J.) By all accounts, whenever Ms. Monroe had time off from the film, she flew back to New York to study with her friend and acting coach, Lee Strasberg and, on one instance, sang "Happy Birthday Mr. President" for President Kennedy at Madison Square Garden. (See Marcus Supp. Decl. ¶¶ 27, 29 and 30)

---

[8] In fact, in Richard Meryman's first Life Magazine article printed in 1962, from an interview taken almost a month before her death, Ms. Monroe stated that "[I]n the morning, the garbage men that go by 57th Street when I come out the door say 'Marilyn, hi! How do you feel this morning?' To me, it's an honor, and I love them for it." (See Marcus Supp. Decl. Exh. J).

13

MMLLC placed great emphasis on the fact that the front step of her California house contained the inscription "Cursum Perficio" or "I have completed my journey" to fail to advise this court that said inscription was not carved or created by Ms. Monroe, it came with the house. This inscription, therefore, should not be inferred to have any meaning with Ms. Monroe and definitely cannot be used as a basis for the claim that she gave up her New York domicile. Moreover, it must be noted that while MMLLC claimed that Marilyn Monroe went to Mexico to purchase furniture for her California residence, by all accounts her house was sparsely furnished and the value of her furniture and personal effects in California was substantially less than in her New York apartment., (See Marcus Motion Decl. Exhibit H, Schedule F therein.

Second, MMLLC submitted a dog license for her dog, Mafia, dated May 26, 2006, permitting Ms. Monroe the right to keep her dog in the City of Los Angeles for a year. This license is not proof that Ms. Monroe changed her domicile to New York, rather that Ms. Monroe took the necessary steps to legally keep her dog in Los Angeles while she was filming her movie. Moreover, as noted above, Ms. Monroe also obtained a New York dog license.

Third, MMLLC annexed an application for certain death benefits filled out by Ms. Monroe's maid. This form, filled out by Ms. Monroe's maid after her death, on its face fails to establish that Marilyn Monroe changed her domicile from New York to California.

Four, MMLLC provided an unsigned Connecticut Motor vehicle license of Ms. Monroe setting forth a California Address. As this license is not signed by Ms. Monroe, it is impossible to determine whether Ms. Monroe personally requested this document and if it was ever legally valid. Most importantly, although the license lists a California address, it was issued in Connecticut, not California.

MMLLC notes that Marilyn Monroe sought psychiatric treatment in California in 1962. The fact that Marilyn was treating with a psychiatrist in California cannot be interpreted to mean she gave up her New York domicile. It is well known that Marilyn Monroe suffered from mental illness; indeed, her death was ruled a suicide. It therefore makes perfect sense that she would seek psychiatric treatment in California while working on her film. In fact, Ms. Monroe's psychiatrist was retained by 20th Century Fox in order to help ensure that she was able to cope with her drug and alcohol problems and get to the set on time. (Marcus Supp. Decl. ¶23)). Conveniently, MMLLC neglected to inform the Court that in 1961, Marilyn Monroe was treated in February 1961 at the Payne Whitney Psychiatric Clinic for mental illness and was ultimately transferred to Columbia Presbyterian Medical Center where she was admitted for over a month. (See Marcus Supp. Decl. ¶12 Exh. K).

MMLLC also claims that Marilyn Monroe intended to re-marry Joe DiMaggio. This claim, even if true, would not dispositively indicate that Marilyn Monroe had left New York. However, by all accounts, Marilyn Monroe never would have re-married Joe DiMaggio. Marilyn and Joe DiMaggio divorced in 1954 after a tumultuous short marriage. While it is true that Marilyn Monroe and Joe DiMaggio remained friends until her death, it has been reported that Marilyn Monroe left Joe DiMaggio because she found him boring. (Marcus Supp. Decl. ¶_ Exh. L)). Moreover, it is well known that in 1962 Marilyn Monroe was having a relationship with President Kennedy and Robert Kennedy. (Marcus Supp. Decl. ¶30).

Defendants have failed to demonstrate that Marilyn Monroe changed her domicile from New York to California. Tellingly, although MMLLC had unfettered access to thousands of documents and items concerning Marilyn Monroe, MMLLC was only able to produce four documents, none of which support its claim that Ms. Monroe gave up her New York domicile in

favor of California. Additionally, as set forth above, Ms. Monroe was already found, by the

BOE, to be a resident of New York and a non-resident of California at the time of her death.

Under the facts set forth herein and by MMLLC, it is impossible for Ms. Monroe, as a non-

resident of the Estate of California, to be a California domicile.

## POINT III
### EVEN IF, HYPOTHETICALLY, MARILYN MONROE WERE DEEMED TO HAVE BEEN A CALIFORNIA DOMICILE, MMLLC DOES NOT OWN A POSTHUMOUS RIGHT OF PUBLICTY IN MARILYN MONROE'S PERSONA

MMLLC claims that, pursuant to Cal. Civ. Code § 3344.1, which became effective on

January 1, 1985, Lee Strasberg received a 75% interest in Marilyn Monroe's right of publicity by

virtue of the residuary clause in her will. As will be shown below, this assertion is erroneous.[9]

### A. Marilyn Monroe's Will Reflects the Intent to Bequeath Only What She Owned at the Time of Her Death

MMLLC argues that it was the intent of Marilyn Monroe to devise her right of publicity

to Lee Strasberg and Dr. Marianne Kris in her residuary clause. However, a simple construction

of her will indicates no such intent. The relevant provision of Marilyn Monroe's will provided

as follows:

> SIXTH: All the rest, residue and remainder of my estate, both real and personal, of whatever nature and wheresoever situate, **of which I shall die seized or possessed or to which I shall in any way be entitled, or over which I shall possess any power of appointment by will at the time of my death,** including any lapsed legacies, I give, devise and bequeath as follows…. [Emphasis Added]

(See page 11 of the SFA/Bradford Motion). Moreover, Ms. Monroe, in the will's residuary

clause, specifically bequeathed only that which "I shall die seized or possessed" or "to which I

shall in any way be entitled, or over which I shall possess any power of appointment by will at

---

[9] In footnote 9 of MMLLC's Opposition, MMLLC claims that under Plaintiffs' analysis of standing, Hebrew University would be divested of its ownership rights in Albert Einstein's right of publicity. This issue was merely introduced as a red-herring. However, as a matter if law, if Hebrew University has been exercising a property right that it does not own and this Court's decision herein may negatively impact Hebrew University's alleged claims, that should not persuade this Court from applying the law correctly.

16

the time of my death." It was therefore Ms. Monroe's intent to bequeath only what was in her

actual possession or what she was otherwise entitled to at the time of death.

MMLLC would argue that the phrase "or to which I shall in any way be entitled" allowed

for the devise of property obtained by Ms. Monroe after her death. However, this phrase cannot

be read separately from the entire sentence, as it is specifically modified by the words "of which

I shall die."[10] Further, this construction is consistent with the next phrase; "or over which I shall

possess any power or appointment by will at the time of my death."

In construing the intent of Ms. Monroe, one must look at her entire will. The Fourth and

Fifth clauses both contain specific bequeaths of property that existed at the time of her death.

There is no reference to or suggestion of any future interest or expectancy[11]. Since the claimed

interest in Marilyn Monroe's right of publicity did not exist until over twenty two (22) years after

her death, Ms. Monroe did not have a future interest in said right.

In constructing wills, it is presumed that the deceased testator knew as a matter of law

that he or she had no power to dispose of property they did not own and over which they had no

power of disposition. *In re Resler's Estate*, 433 Cal.2d 726, 732-733 (1955). Further, the

effective law on the date of the testator's death determines the devise's rights. *Ware v. Beach*,

322 P.2d 635, 649 (Okla. 1958); *In re* White, 174 B.K. 775, 778 (Bkcy S.D., Ill. 1994) *In re*

*Estate of David*, 762 P.2d 745, 746 (Colo.A. 1998).

It is well established that "[t]he court cannot create a testamentary disposition which is

not expressed or readily to be implied" in order to avoid intestacy. *In Re Williams' Will*, 221

---

[10] For a more lengthy argument regarding the construction of Ms. Monroe's will regarding her intent, and
the meaning of the words, phrases and modifiers used, Plaintiffs respectfully request this Court read
Section II of the Supplemental Reply of Greene and Kelley. (Marcus Supp. Decl. Exh. A).

[11] A future estate is created when the disposition creating it becomes legally effective. (EPTL 7-1.14 to 7-
1.18). Upon death, any mere expectancy is terminated. *McKay v. Luarinson*, 204 Cal. 557, 569-70 (Cal.
1928)).

17

N.Y.S.2d 799, 800 (Sur.Ct.NY 1961); *In Re Klewer's Estate*, 124 Cal.App.2d 219, 224 (1954); *Estate of Buzman*, 258 A.2d at 492, 494 (Pa. 1969)("where although it is the duty of the court to attempt to pass the entire estate through the residuary clause, those principals do not apply until it has been shown that the testator at the time of death ad an actual interest in said property"). Thus a court will not add newly acquired property to a residuary clause merely to avoid intestacy; rather, the court will look to the intent of the party and determine whether such property could legally be devised by a testator.

Accordingly, Ms. Monroe's intent was, and only could be, to bequeath property she owned or was entitled to on the date of her death. On August 5, 1962, Ms. Monroe was not entitled to any right of publicity. As such, Ms. Monroe bequeathed no such right of publicity.

## B. Marilyn Monroe Lacked the Legal Capacity to Bequeath Property She Did Not Own at the Time of Her Death.

It is well settled law in New York that a property right cannot be devised by will unless it is owned by the testator on the date of death. (See *In Re Van Winkle's Will*, 86 N.Y.S.2d 597, 600 (Sur.Ct.NY 1949); *In re Gernon's Estate*, 35 Misc.2d 12, 226 N.Y.S.2d 940 (Sur.Ct. NY 1962). This rule applies to wills probated in New York. (See N.Y. Est. Powers & Trusts Law Section 303.1 ("A disposition by the testator of all his property passes all of the property he was entitled to dispose at the time of his death"). This rule also applies to all wills probated in California. (See *In Re Buzza's Estate*, 194 Cal.App.2d 598, 601 (1961); and *McKay* at 569-570.) See also Cal.Civ. Code Section 671 and Cal. Probate Code Section 21114.

Assuming, arguendo, that Marilyn Monroe died domiciled in California, it is undisputed that Ms. Monroe had no capacity to take or hold property in 1985, 22 years after she died. Any property which she would have been granted in 1985, assuming Cal. Civ. Code § 3344.1 granted

her a right, would have gone to her familial heirs according to that statute, not according to any residuary clause in her will.

A testator cannot lawfully acquire property after death. As per the cases cited above and the cases cited by the Court in the pending order of the Court granting summary judgment (see Craven Supp. Decl. Exh. 2), without even an expectancy interest in obtaining a right of publicity, the residuary clause in her will could not devise a right of publicity. (*In Estate of Braman, supra*).

MMLLC argues that its submissions in the New York probate proceedings in New York State Surrogates Court confirm ownership of the right of publicity in Marilyn Monroe's persona This claim is incorrect and misleading. Neither MMLLC, nor its predecessors, ever disclosed, or had assessed for tax purposes, the claimed right of publicity. None of the asset statements filed with the Surrogates Court reflects such an asset and the Tax Assessor's final accounting does not show either this asset or any associated tax. It stands to reason that an asset as valuable as one purporting to generate almost $16,000,000.00 during the period of probate would have triggered a probate tax to be payable to the State of New York and the United States Government. Rather, it appears that MMLLC, and its predecessors, led the tax authorities to conclude that the income received was generated from licensing associated with Ms. Monroe's films and sale of Ms. Monroe's personal objects.

Even if the New York State Surrogates Court was aware that certain monies being collected from the licensing of Ms. Monroe's name, likeness or image and permitted these monies to be distributed, this does not mean the Surrogates Court recognized such a right. Rather, the Surrogates Court acted in a general house keeping capacity, permitting the Estate to distribute funds and pay its debts. Any resulting orders regarding distributions does not indicate

intent to construct Ms. Monroe's will or include a right of publicity as an asset. Indeed, there is

939-CM     Document 89     Filed 01/17/2007

no evidence that the Surrogates Court scrutinized these transactions, and any license fees extracted from third parties through threats of suit asserting non-existent rights are not lawfully acquired by the estate.

### C.     Even If Ms. Monroe Is Deemed to Have Been Granted a Right of Publicity by Cal. Civ. Code § 3344.1, The Property Vested in Her Familial Heirs.

Under the Rule of Lapse, if a devisee predeceases the testator, the bequest fails. *In re Sullivan's Estate*, 31 Cal.App. 2d 527 (1939); *Bassett v. Salter*, 25 N.Y.S.2d 176 (Sup.Ct.NY 1940). In New York and California anti-lapse statutes provide that if a bequest is made to a person who predeceases the testator, the bequest doest not lapse but returns to the testator's residuary estate if so specified, otherwise, all such property passes to the devisee's heirs at law. *Estate of Haskell J. Dye*, 92 Cal.App.4th 966 (2001); *In the Matter of the Estate of Ida Goldberg*, 36 A.D.2d 631 (N.Y.App.Div.1971).

If the grant of property right pursuant to Cal. Civ. Code § 3344.1 is viewed as a bequest, it does not convey such a right to Ms. Monroe, who died 22 years before that statute became effective. It would then pass under the Anti-Lapse statute to her heirs, if any survived her. None did, so the bequest would lapse.[12]

Cal. Civ. Code § 3344.1 contains a vesting provision setting forth that only family heirs of a deceased person are entitled to receive an interest in that person's right of publicity. MMLLC (or its predecessors) are not among the class of heirs that would be entitled to an interest in Ms. Monroe's post-mortem right of publicity.

### D.     Even If Ms. Monroe Died a California Domiciliary, Her Right of Publicity Could Not Be Transferred Pursuant To The Residuary Clause of Her Will as Testamentary Disposition Was Only Available to Those Who Died After 1985.

---

[12] Ms. Monroe's only surviving family, her mother, Gladys Baker, and her half-sister, both died prior to January 1, 1985.

Cal. Civ. Code § 3344.1 did not allow for the testamentary devise of a person's right of
publicity, only to contractual transferees of personalities alive on January 1, 2985, or thereafter,
and the heirs of pre-deceased heirs who took under Cal. Civ. Code § 3344.1(d).[13] Further, no

transfer by contract or trust could have been made by individuals who predeceased the effective

date of the statute because they would have had no legal or equitable interest to transfer.

The legislative history of Cal. Civ. Code. § 3344.1 confirms that it was the intent of the

legislature to pass the statute for the benefit of the heirs of deceased personalities, not for

deceased personalities themselves. In a letter dated August 31, 1984, to California's Governor

from the bill's author, Senator William Campbell, Mr. Campbell writes"

> Senate Bill 613 will take existing rights of publicity enjoyed by living celebrities
> under current law, and extend them to their **heirs** for a period of 50 years beyond
> the death of the celebrity. **I think it is very important that this right is given to
> heirs**…I believe that the heirs of a celebrity should be entitled to protect against
> offensive merchandising of their relatives' likeness or name. [Emphasis added]

(Marcus Supp. Decl. ¶17 Exh. M). Further, the June 18, 1984 Assembly Committee on the

Judiciary Minutes confirm the intent to confer these rights upon heirs of the deceased and that

the deceased personality can only transfer the right inter vivos, and not by testamentary act.

(Marcus Supp. Decl. Exh. N). The August 15, 1983 Minutes include Staff Comments which

confirm this legislative intent:

> Under this bill, a person's right of publicity would be transferred to his surviving
> spouse and children or grandchildren upon his death, absent a contract entered
> into his lifetime.

Marcus Supp. Decl. Exh. O). As such, any right created by Cal. Civ. Code § 3344.1 would have

vested in Marilyn Monroe's familiar heirs who survived her. As her only familial heirs died

prior to the statutes effective date, these rights lapsed pursuant to § 3344.1(e).

---

[13] See. *Southwest Bank, N.A, infa.* (Where Florida's statute, Fla.Stats.Ann. § 540.08, only permitted
transfers of a right of publicity before death or, if after death, then the right could only vest to the
personality's heirs).

**E.    Cal. Civ. Code § 3344.1 Has No Retroactive Effect.**

Under California law, the estate of the testator vests in the heirs or devisees at the time of the testator's death. (Cal.Prob. § 7000). The Legislature lacks the authority to change this law retroactively. *Estate of Wellings*, 197 C. 189, 195 (1925); *In Re Moynahan's Estate*, 158 MISC. 821 (Sur.Ct.NY 1936). Moreover, absent a clear indication otherwise, it is accepted statutory construction that a statute operates prospectively only. (*People v. Hayes*, 49 Cal.3d 1260, 111274 (1989). Additionally, statutes that are substantive in nature may not be applied retroactively. *Wright v. City of Morro Bay*, 144 Cal. App.4th 767 (2006).[14] When a statute establishes a cause of action where one did not previously exist, such a statue has only prospective application. *Kudelko v. Dalessio*, __ N.Y.S.2d __, 2006 WL 3490969 (2006).

## POINT IV
### EVEN IF THE COURT FINDS MMLLC OWNS A RIGHT OF PUBLICITY, THE DOCTRINE OF LATCHES SHOULD APPLY AS MMLLC AND ITS PREDECESSORS SAT ON THEIR RIGHTS FOR OVER 20 YEARS.AS

With respect to latches, SFA and Bradford rely on the law and facts set forth on pages 29-30 of the SFA/Bradford Motion and the facts set forth below. Contrary to the assertions of MMLLC, MMLLC and its predecessors were aware that Larry Shaw, as agent for Sam Shaw, and Sam Shaw's former attorney, Martin Bressler, had denied and refuted any post-mortem right of publicity in Marilyn Monroe for decades. (See Larry Shaw's Declaration dated November 28, 2006 ("Shaw Motion Decl.") and Shaw Supplemental Declaration ("Shaw Supp. Decl.") ¶¶3, 6, 7, 11 and 12). In the mid to late 1980's, Larry Shaw made numerous licenses using Sam Shaw's Marilyn Monroe images. (See Shaw Motion Decl.). As late as 1993, Martin Bressler wrote a letter refuting any such right of publicity, which was subsequently disseminated to dozens of

---

[14] See also *In re Cooper's Estate*, 73 Misc. 2d 904 1973) (where the Surrogates Court held that the new statute could apply retroactively to wills executed before the effective date of the statute but not if the testator died before the statutes effective date; *In re Estate of Uhl*, 33 A.D.3d 181 (N.Y.App.Div. 2006); and *Matter of Best*, 66 N.Y.2d 151, 157 (NY 1985).

licensees. (Shaw Supp. Decl. Exh. ¶12). Larry Shaw was advised by some of these licensees that the Roger Richman Agency, on behalf of the Estate of Marilyn Monroe, was contemplating suing Larry Shaw and Sam Shaw as a result of these letters. (Shaw Supp. Decl. ¶12 ) Further, Mr. Richman spoke to Larry Shaw on several occasions regarding Mr. Bressler's Letter. (Shaw Supp. Decl. ¶12 ) No such lawsuit was filed. The Roger Richman Agency and the Estate of Marilyn Monroe were aware of, or should have known of Larry Shaw's licensing activities.

In page 34 of MMLLC's Opposition, MMLLC claims that it only recently discovered that Plaintiffs had been licensing SFA's Marilyn Monroe images and only then commenced suit. However, CMG, a large sophisticated corporation with a dedicated legal staff and offices in Indiana and Rio De Janeiro surely knew or should have known that Larry Shaw, and later SFA, was licensing and had been licensing Sam Shaw's Marilyn Monroe images. ( Shaw Supp. Decl. ¶¶12 and 13) Moreover, although MMLLC claims to have sued Plaintiffs for damages due to infringement of the IA ROP Statute, MMLLC conveniently failed to sue any of the parties who actually sold the allegedly offensive goods in Indiana. (Shaw Supp. Decl.. Decl. ¶4).

Further, Mr. Roesler never advised Edith Marcus, Meta Stevens or Larry Shaw that CMG was the exclusive holder of any right of publicity in Marilyn Monroe. (See Meta Stevens Supplemental Declaration, Edith Marcus Supplemental Declaration and Shaw Supp. Decl ¶3). However, even if he had, this does not refute the fact that MMLLC waited 20 years after Cal Civ. Code Section 3344.1 became effective and 11 years after the IA ROP Statute became effective.

In the event latches are not applied herein, plaintiffs will be irreparably damaged. (Shaw Supp. Decl. ¶¶6, 7, 8, 9, 10 and Reiter Supp. Decl. ¶8).

## POINT V
## COPYRIGHT LAW PREEMPTS MMLLC'S CLAIMS HEREIN

Though not available when Plaintiffs submitted their Memorandum in Support of their

Motion for Summary Judgment, they provide a copy of SFA's contract with Freeze herein. (See Reiter Supp. Decl. Exh. A). As per Section 2 of said agreement, Freeze, and its assigns, were strictly forbidden from doing any business in the State of Indiana. Furthermore, as per section 9.6 of that agreement, Freeze is to indemnify SFA for all costs or expenses incurred as the result of Freeze's failure to refrain from doing business in Indiana. SFA has not commenced a third party action against Freeze at this time because the time to do so, without court approval, has passed. In fact, SFA was first advised of this claimed infringement on October 25, 2006. SFA has also asked this Court's permission to commence a third party action against Valhalla Productions, LLC. ("Valhalla"). (See page 3, footnote 3, of the SFA/Bradford Motion).

As per the well settled case law previously set forth on pages 16 and 17 of the SFA/Bradford Motion, plaintiffs' websites do not violate the IA ROP. With respect to SFA, its websites merely illustrate the images contained within the collection. Since SFA controls the copyrights of the images contained therein, their websites do not violate the IA ROP Statute.

Further, Plaintiffs merely license the right to copy SFA's images of Marilyn Monroe to third parties. (See pages 15-16 of the SFA/Bradford Motion) They do not grant any right of publicity. Whether or not these third parties seek permission from MMLLC as well falls on the licensee.

As set forth above, the actual intent of defendants' action against plaintiffs was to effectively obtain a declaratory judgment on their right of publicity claim. Therefore, any claim by Defendants for damages and legal costs are disingenuous and should not be granted.

## CONCLUSION

Plaintiffs' Cross-Motion for Summary Judgment should be granted in its entirety.

_____
David M. Marcus

CM    Document 89    Filed 01/17/2