UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

SHAW FAMILY ARCHIVES, LTD., BRADFORD    :
LICENSING, INC., JAMES DOUGHERTY,    :
VALHALLA PRODUCTIONS, LLC., EDITH    :
MARCUS and META STEVENS,    :        05 CV 3939 (CM)
    :
    Plaintiffs/Consolidated Defendants    :
    :        **Honorable Colleen**
    :        **McMahon**
    -against-    :
    :
CMG WORLDWIDE, INC., an Indiana Corporation,    :
and MARILYN MONROE, LLC, a Delaware Limited    :
Liability Company,    :
    :
    Defendants/Consolidated Plaintiffs.    :
    :

------------------------------------------------------------------------x

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF
THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

Law Offices of Christopher Serbagi
488 Madison Avenue, Ste. 1120
New York, New York 10022
Tel: 212-593-2112
Fax: 212-308-8582

Marcus & Greben
1650 Broadway, Ste. 707
New York, New York 10019
Tel: 646-536-7602
Fax: 212-765-2210

Attorneys for plaintiff/consolidated
defendant Shaw Family Archives,
Ltd., Bradford Licensing, Inc., Edith
Marcus and Meta Stevens

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT..................................................…..................................1

PROCEDURAL BACKGROUND...........................................................................…....3

STATEMENT OF FACTS....................................................................................…......5

ARGUMENT..........................................................................................................…......6

I.      MMLLC IS JUDICIALLY ESTOPPED FROM ARGUING THAT MS. MONROE
        DID NOT DIE A NEW YORK DOMICILIARY.…..............................................6

        A.      Ms. Strasberg's Representations to the Hawaii District Court
                Judicially Estop MMLLC Here ............................................................…......7

        B.      Mr. Frosch's Representations Before The California Tax Appraiser
                Judicially Estop MMLLC Here.................................................................14

II.     THE COURT SHOULD HOLD THAT MMLLC IS COLLATERALLY
        ESTOPPED FROM ARGUING THAT MS. MONROE DID NOT DIE A NEW
        YORK DOMICILIARY..................................................................................15

III.    MMLLC'S JUDICIAL REPRESNTATIONS AND MS. MONROE'S
        OWN WORDS JUSTIFY THE COURT'S IMPOSITION OF SUMMARY
        JUDGMENT ON THE ISSUE OF MS. MONROE'S NEW YORK
        DOMICILE.…...............................................................…..............................18

        A.      MMLLC's Collective Judicial Representations Establish That Ms. Monroe
                Died A New York Domiciliary..........................................…...................18

        B.      Ms. Monroe's Own Words And The Words of Her Closest Friends and
                Employees Establish That She Died a New York Domiciliary.................19

IV.     MMLLC'S ARGUMENTS IN OPPOSITION TO THE SHAW FAMILY'S
        SUMMARY JUDGMENT MOTION ARE BASELESS ...............................21

        A.      MMLLC Is Incorrect As a Matter of Law That Ms. Monroe Can Have
                More Than One Legal Domicile..............................................................21

        B.      MMLLC Is Incorrect As A Matter of Law That Judicial Estoppel Does
                Not Apply To Parties In Privity Like MMLLC And Mr. Frosch…...........21

    1. Judicial Estoppel Applies to Parties In Privity...........................22

    2. MMLLC Is In Privity With Both Ms. Strasberg and
      Mr. Frosch.................................................................23

  C. MMLLC Is Incorrect That The Surrogate's Proceedings Do Not Trigger
    Collateral Estoppel............................................................24

CONCLUSION........................................................................25

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Acridge v. Evangelical Lutheran Good Samaritan Soc'y
334 F.3d 444 (5th Cir. 2003)...........................................................23, 24

Aramony v. United Way of America,
No. 96 Civ. 3962, 1998 WL 324874 (S.D.N.Y. June 18, 1998)...................20

Bates v. Long Island R.R. Co.,
997 F.2d 1028 (2d Cir.), cert denied, 510 U.S. 992, 114 S.Ct. 550 (1993)..........7

Bethesda Lutheran Homes and Services, Inc. v. Born,
238 F.3d 853 (7th Cir. 2001)............................................................13

California v. Texas,
457 U.S. 164, 102 S.Ct. 2335 (1982)..................................................21

Capopoulos v. Chater,
No. 95 C 3274, 1996 WL 717456 (N.D. Ill. Dec. 9, 1996)....................12, 22

DeCinto v. Westchester County Med. Ctr.,
821 F.2d 111 (2d Cir. 1987).............................................................16

Hatfill v. Foster,
415 F.Supp.2d 353 (S.D.N.Y. 2006)....................................................21

In re Cassidy,
892 F.2d 637 (7th Cir. 1990).........................................................11, 13

In re Estate of Connally,
34 Misc.2d 132, 226 N.Y.S.2d 125 (N.Y. Surr. 1962)..............................23

In re Morgan Guarantee Trust Co.,
28 N.Y.2d 155, 162, 320 N.Y.S.2d 905, 909, cert. denied,
404 U.S. 826, 92 S.Ct. 58 (1971)......................................................16

Jarrard v. CDI Telecommunications, Inc.,
408 F.3d 905 (7th Cir. 2005)............................................................7

Juan C. v. Cortines,
89 N.Y.2d 659, 657 N.Y.S.2d 581 (1997) ...........................................16

Kaufman v. Lilly & Co.,
    65 N.Y.2d 449 (1985)............................................................16

Ladd v. ITT Corp.,
    148 F.3d 753 (7th Cir. 1998).............................…...11, 12, 13, 22

LaFleur v. Whitman,
    300 F.3d 256, 271 (2d Cir. 2002)............................................15

Lee Loi Industries, Inc. v. Impact Brokerage Corp.,
    No. 05 CV 10788 VM, 2007 WL 441837 (S.D.N.Y. 2007)......................…...18

Matter of Fabbri,
    1 N.Y.2d 236, 159 N.Y.S.2d 184 (1957)....................................…...17

New Hampshire v. Maine,
    532 U.S. 742, 121 S.Ct. 1808 (2001)...................................…..6, 22

Ogden Martin Sys. Of Indianapolis, Inc. v. Whiting Corp.,
    179 F.3d 523 (7th Cir. 1999)..........................................…...7, 9

Providence & Worchester Railroad Co.,
    No. Civ. A. No. 88-1162-WF, 1990 WL 85506 (D. Mass. June 15, 1990)..........10

Ryan v. New York Telephone,
    62 N.Y.2d 494, 500, 478 N.Y.S.2d 823 (1984)................................15

Simon v. Safelite Glass Corp.,
    934 F. Supp. 261 (E.D.N.Y. 1996)...........................................15

Simon v. Safelite Glass Corp.,
    128 F.3d 68 (2d Cir. 1997).................................................7

Steele v. Anderson,
    No. 03-CV-1251, 2004 WL 45527 (N.D.N.Y. 2004)..........................10, 11

TM Patents, L.P. and TM Creditors, LLC v. Int'l Business Machines Corp.,
    121 F.Supp.2d 349,  360 (S.D.N.Y. 2000)....................................7

Van Dusen v. Barrack,
    376 U.S. 612, 84 S.Ct. 805 (1964).........................................6

Wabash Grain, Inc. v. Smith,
    700 N.E.2d 234 (Ind. Ct. App. 1998).......................................22

**Statutes**

E.P.T.L. § 3-5.1…………………………………………………………………16

E.P.T.L. § 11-1.1(b)(12)…………………………………………………………23

F.R.E.801(d)(2)…………………………………………………………………19

F.R.E. 804(a)(4)(5)………………………………………………………………19

F.R.E. 804(b)(1)…………………………………………………………………19

F.R.E. 807………………………………………………………………………20

**Miscellaneous**

Advisory Committee Notes to F.R.E. (d)(2) (1972)…………………………….....19

Plaintiffs Shaw Family Archives, Ltd., Bradford Licensing, Inc., Meta Stevens, and Edith Marcus (the "Shaw Family") respectfully submit this supplemental memorandum of law in support of their cross motion for summary judgment on Count II of the Defendants' Second Amended Complaint, and for such other relief as the Court may deem just and proper.

## PRELIMINARY STATEMENT

If the spirit of Marilyn Monroe appeared before this Court and testified that she died a California domiciliary, she would still be unable to avoid the preclusive impact of forty-four years of binding judicial representations and court rulings that she died a New York domiciliary. Ms. Monroe did die a New York domiciliary. MMLLC agrees, which is why it has consistently argued that point, under oath, to federal and state courts in New York, Hawaii, and California since Ms. Monroe died in 1962. Now that MMLLC's financial interests are better served by a contrary position, it expects this Court to believe, in a discernable shifting of gears, that Ms. Monroe died, magically, and for the very first time, a California domiciliary. To protect the sanctity of the oath and the integrity of the judicial process, the Court should apply the doctrines of judicial (and collateral estoppel) to preclude MMLLC from arguing that Ms. Monroe died anything but a New York domiciliary.

We have never seen a case where the application of judicial estoppel is as appropriate as it is here. Courts that have applied judicial estoppel usually do so in the context of a single contrary representation that was adopted or relied upon by a court or judicial body in a prior proceeding. Here, MMLLC (via the Estate of Marilyn Monroe) represented in judicial proceedings that Ms. Monroe died a New York domiciliary, not just once, but numerous times over the course of at least forty-four years. For example:

- Ms. Strasberg, as a defendant in a Hawaii federal district court, repeatedly and strenuously argued that Ms. Monroe died a New York <u>domiciliary</u> so that the court would apply favorable New York law to her claims. The court relied on Ms. Strasberg's representation, applied New York law, and dismissed the case as a result.

- When the State of California tried to impose inheritance taxes on the Estate, Mr. Frosch submitted five detailed affidavits, including his own, along with friends and employees of Ms. Monroe, all of whom set forth numerous <u>facts</u> supporting the Estate's position that Ms. Monroe died a <u>New York domiciliary</u>, including testimony that <u>Ms. Monroe told those parties</u> that she considered her New York apartment to be her permanent residence. The Tax Appraiser adopted Mr. Frosch's arguments and did not levy inheritance taxes on the Estate based on Mr. Frosch's submissions.

- Ms. Strasberg represented to the New York Surrogate's Court that Ms. Monroe died a New York <u>domiciliary</u> in an effort to obtain the remaining twenty-five percent of the Estate that Ms. Monroe had bequeathed to her psychiatrist Marianne Kris. The court adopted Ms. Strasberg's representation, applied New York law to the construction of the Will because Ms. Monroe died a New York domiciliary, and denied Ms. Strasberg's claim to the remaining twenty-five percent of the Estate.

- Photographer Mr. Tom Kelly brought an action in New York Surrogate's Court to obtain the return of transparencies of Ms. Monroe. Mr. Kelly stated to the court that Ms. Monroe died a New York domiciliary. Not only did Mr. Frosch not correct that representation, he admitted that Ms. Monroe had no rights of privacy and the Estate has no exclusive rights to her image.

In all those proceedings, never once did Mr. Frosch, Ms. Strasberg, or their respective lawyers ever once argue that Ms. Monroe died a California domiciliary or even a California resident, as they surely would have done had they had any basis to do so.

As Executor and Trustee of the Estate of Marilyn Monroe (the "Estate"), Mr. Frosch's judicial representations were binding on the Estate, and therefore on MMLLC, who now owns the Estate's purported intellectual property. Mr. Frosch spoke for the Estate and none of the beneficiaries ever objected to his longstanding representation that Ms. Monroe died a New York domiciliary. However, in addition to Mr. Frosch, MMLLC faces another hurdle that not even its team of lawyers cannot overcome: her name is Anna Strasberg. Not only was she the Administratrix of the Estate, but she is also the seventy-five percent beneficiary and controlling owner of Defendant MMLLC. She succeeded in Mr. Frosch's duties as Executor of the Estate.

2

Had she disagreed with his representation to the New York and California Surrogate Courts that Ms. Monroe died a New York domiciliary, it would have been her fiduciary obligation to correct the record. On the contrary, Ms. Strasberg, more than anyone, argued for and benefited from her consistent judicial representation that Ms. Monroe died a New York domiciliary. Ms. Strasberg was so vehement in her position that Marilyn Monroe died a New York domiciliary that she even persuaded the Hawaii federal court to take "judicial notice" of Ms. Monroe's New York domiciliary and requested that the court deny even limited discovery into that issue because it was so undisputed. Under these circumstances, judicial estoppel not only technically applies, but we have yet to see a case where the law and equities so require its application.

For all the foregoing reasons, this Court should hold that MMLLC is judicially and collaterally estopped from arguing that Ms. Monroe died anything but a New York domiciliary, find that Ms. Monroe had no right of publicity to pass to her heirs and beneficiaries, and grant the Shaw Family's Summary Judgment motion on Count II of Defendants' Amended Complaint. This is the only equitable and legally supportable decision under the facts of this case.

## PROCEDURAL BACKGROUND

The procedural history of this case and its genesis from the Defendants' Indiana action has already been well briefed. Thus, Plaintiffs set forth only the facts that led to the Court's decision to grant Plaintiffs' request for supplemental briefing on the issue of Ms. Monroe's domicile at the time of her death.

### The Genesis of the Court's Order to Submit Supplemental Briefing on the Issue of Ms. Monroe's Domicile at the Time of Her Death

On or about October 25, 2006, Defendant MMLLC filed its motion for summary judgment on Count II of its Second Amended Complaint. Plaintiffs filed their opposition and cross-motion for summary judgment on or about November 29, 2006. MMLLC's papers were

3

fully briefed by December 22, 2006. In MMLLC's memoranda of law, both in support of its position and in opposition to the Plaintiffs' motions, MMLLC repeatedly represented to this Court that Ms. Monroe died a California domiciliary. At the time, the only documents in Plaintiffs' possession stated that Ms. Monroe died a "resident" of New York. Defendants seized on this lack of evidence in the Plaintiffs' possession and told this Court that "resident" does not mean "domicile." MMLLC Reply Brief, at 19, 26.

On or about February 13, 2007, Defendants produced their first document production, which consisted of approximately 53,000 pages; on February 26, 2007, Defendants produced another 6,000 pages of documents. The Defendants' produced their documents on disks, which contained a separate Tiff file for each page of the production. Despite the Plaintiffs' repeated request, the Defendants refused to produce these documents in hard copy or in a manner in which Plaintiffs could reasonably access. Defendants also refused to pay for the significant cost to Plaintiffs associated with hiring an outside vendor to open 60,000 Tiff files and print them out.

On or about March 5-6, 2007, the Plaintiffs completed their review of the first few pages of Defendants' document production and it found numerous new documents that directly contradict MMLLC's representation to this Court that Ms. Monroe died a California domiciliary (the "New Documents"). That the New Documents were not technically due to be produced when MMLLC submitted its summary judgment briefs is true, but that is not at issue. The issue is that MMLLC tried to escape the application of New York law by telling the Court that Ms. Monroe died a California domiciliary, which the New Documents reveal MMLLC did not even believe to be the case.

By letter dated March 6, 2007, Plaintiffs wrote the Court and requested the opportunity to submit supplemental briefs on the significance of the New Documents. On March 7, 2007, the

4

Court requested all parties to attend a conference with the Court in Chambers, which was subsequently scheduled for March 12, 2007. The Court requested that Plaintiffs' counsel bring the New Documents to the conference for the Court's review. Plaintiffs complied.

**The March 12, 2007 Conference With the Court**

On March 12, 2007, the Court held that (i) the Plaintiffs would submit a brief in ten days on the issue of domicile and MMLLC would have ten days to respond and (ii) it would refer the issue of MMLLC's possible discovery abuse to Magistrate Judge Fox at a later date. MMLLC argued to the Court that domicile was not the only issue for the Court to consider and that MMLLC could rely on the Indiana Right to Publicity statute, which they claimed would apply no matter where Ms. Monroe was domiciled at the time of her death. The Court rejected those arguments and stated that if it found that Ms. Monroe died a New York domiciliary, then Ms. Monroe would have no right of publicity to pass to her beneficiaries or heirs. Thus, the dispositive issue of Ms. Monroe's domicile at the time of her death is now squarely before the court. The Shaw Family is grateful to the Court for the opportunity to submit a supplemental brief on this important issue.

## <u>STATEMENT OF FACTS</u>

The Shaw Family has already set forth the undisputed facts concerning Ms. Monroe's domicile at the time of her death in its Rule 56.1 Statement of Undisputed Facts. The Shaw Family submits herewith a Supplemental Rule 56.1 Statement of Undisputed Facts ("SSUF") that contains the facts set forth in the New Documents.

## ARGUMENT

**I.    MMLLC IS JUDICIALLY ESTOPPED FROM ARGUING THAT MS. MONROE DID NOT DIE A NEW YORK DOMICILIARY**

The doctrine of judicial estoppel precludes a party who succeeds in maintaining a certain position in one proceeding from thereafter assuming a contrary position in a subsequent litigation just because his interests have changed.  New Hampshire v. Maine, 532 U.S. 742, 742-43, 121 S.Ct. 1808, 1810-11 (2001).  Unlike equitable estoppel which is designed to ensure fairness between the parties, judicial estoppel protects the sanctity of the oath.  The purpose of the doctrine is to "protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment."  Id.  at 743.  The New Hampshire Court recognized that judicial estoppel is not reducible to any general formulation and that "considerations of equity" prevail.  Id.

The Court should apply Second Circuit law on judicial estoppel because this Court's ability to protect the integrity of the federal judicial institution from manipulation by litigants should not vary according to the state in which the underlying dispute arose.  MMLLC has stated that it should apply the same law that the Southern District of Indiana would have applied and cites Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S.Ct. 805, 821 (1964) for the proposition.  MMLLC's Reply Memo, at 25 n. 19.  However, Van Dusen states only that "the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue."  Id. at 639.  In any event, the Court's application of judicial estoppel in the present case would be consistent with both Second Circuit and Seventh Circuit law.  The Second Circuit recognizes two elements for judicial estoppel to apply:  First, the party against whom estoppel is asserted must have argued an inconsistent position in a prior proceeding and, second, the prior inconsistent position must have been adopted by the court in some manner.

Bates v. Long Island R.R. Co., 997 F.2d 1028, 1038 (2d Cir.), cert denied, 510 U.S. 992, 114 S.Ct. 550 (1993). For the second element to be satisfied, all that is required is that there be evidence of "judicial endorsement" of the parties assertion. Id. The Second Circuit has also recognized that judicial estoppel does not apply when the first statement resulted from a good faith mistake. TM Patents, L.P. and TM Creditors, LLC v. Int'l Business Machines Corp., 121 F.Supp.2d 349, 360 (S.D.N.Y. 2000) (citing Simon v. Safelite Glass Corp., 128 F.3d 68, 71 (2d Cir. 1997)). Seventh Circuit law is not substantially different in that it has recognized that there is "no precise or rigid formula" that guides the application of judicial estoppel. Jarrard v. CDI Telecommunications, Inc., 408 F.3d 905, (7th Cir. 2005). Should the Court apply Seventh Circuit law, some cases in that Circuit have considered whether the operative facts remain the same in both cases." Ogden Martin Sys. Of Indianapolis, Inc. v. Whiting Corp., 179 F.3d 523 (7th Cir. 1999). Like the Second Circuit, the Seventh Circuit employs judicial estoppel as a tool "to protect the integrity of the judicial process" and "to protect the courts from being manipulated by chameleonic litigants (like MMLLC) who seek to prevail, twice on opposite theories." Jarred, 408 F.3d at 914 (citing a series of Seventh Circuit cases for that proposition).

## A.    Ms. Strasberg's Representations to the Hawaii District Court Judicially Estop MMLLC Here

In the federal Hawaii litigation, the issue of domicile was critical. In that case, a woman by the name of Nancy Miracle sued Ms. Strasberg (in her capacity as Administratrix) in the United States District Court for the District of Hawaii. SSUF ¶ 29. Ms. Miracle argued that she was entitled to fifty percent of the Estate as a pretermitted heir. Id. In her motion to dismiss the Complaint, Ms. Strasberg strenuously argued that because Ms. Monroe died a New York domiciliary, the Court should apply New York law and dismiss the case because New York Estate law did not provide a recovery for children (like Ms. Miracle), who were born before a

testator executed her will. SSUF ¶¶ 30-31. Ms. Strasberg also argued that Ms. Monroe died a New York domiciliary in support of her motion to dismiss for lack of personal jurisdiction. SSUF ¶ 32. Ironically, Ms. Miracle requested that the Court apply California law, which she claimed would have permitted the action to continue. SSUF ¶ 33.

The district court explicitly adopted Ms. Strasberg's representation that Ms. Monroe died a New York domiciliary, applied New York law as a result, and dismissed the case for failure to state a substantive claim and for lack of personal jurisdiction. SSUF ¶ 35. In response to Ms. Miracle's request to conduct limited discovery on the issue of domicile, Ms. Strasberg even stated to the court that Ms. Monroe's status as a New York domiciliary was so well-settled and indisputable that the Court should deny Ms. Miracle even limited discovery on that issue and take "judicial notice" of the New York Surrogate's determination that Ms. Monroe died a New York domiciliary. SSUF ¶ 34. The court granted that request as well. SSUF ¶ 35.

Both Second and Seventh Circuit law support the Court's application of judicial estoppel here. First, there is no question that MMLLC adopted a position in the Hawaii litigation that is contrary to the one it has adopted here. Not only did MMLLC argue that Ms. Monroe died a New York domiciliary, it, quite ironically, did so against an opponent who argued that Ms. Monroe died a California domiciliary, which makes MMLLC's present position all that more implausible and contradictory.

Second, Ms. Strasberg's statement that Ms. Monroe died a New York domiciliary was not only "adopted by the first tribunal in some manner," it was the substantive basis for the court's decision to dismiss the case, both with respect to the failure to state a claim and lack of personal jurisdiction. Finally, there is no way to characterize Ms. Strasberg's representation to

8

the Hawaii District Court as a mistake. The only mistake she has made is in the current case, which is the mistake of trying to pull the wool over the eyes of this Court.

With respect to the additional Seventh Circuit consideration that the "the facts at issue must be the same in both cases," that simply means that a representation in one proceeding cannot be made in such an entirely different context that it would fail to be considered contrary to a representation in another proceeding. For example, in the Ogden case, the Seventh Circuit held that the facts at issue were not the same so that judicial estoppel would not apply. 179 F.3d at 527-28. In that case, in order to obtain the benefit of the applicable statute of limitations, the defendant had successfully argued in a prior litigation that a crane had become an improvement to real property twenty-years after it was installed. Id. at 527. In this way, the defendant was able to successfully state that the applicable statute of limitations was based on contract or tort arising from improvements to real property. Subsequently, the same defendant argued before the Ogden court that a contract for the sale of cranes was a transaction in goods in order to gain the benefit of a different statute of limitations. Id. An important distinction between the respective cases was that each case involved an independent contract and the contract in Ogden did not require the defendant to install the cranes. Id. The Ogden court held that the defendant would not be estopped to argue that a separate contract with a separate party for the manufacture and installation of two cranes involved a transaction in goods. Id. at 528.

Here, the "fact at issue" in the Hawaii litigation and the present case is absolutely identical. The issue in both cases is where Ms. Monroe was domiciled at the time of her death. Accordingly, the Court's application of judicial estoppel here meet both the letter and the spirit of the law in the Second and Seventh Circuits.

The District Court of the Northern District of New York recently applied the doctrine of judicial estoppel to preclude a defendant from re-litigating the issue of domicile under a strikingly similar factual scenario to the present case. The only difference between the cases is that judicial estoppel is far more appropriate here. In <u>Steele v. Anderson</u>, No. 03-CV-1251, 2004 WL 45527 (N.D.N.Y. Jan. 8, 2004), shareholders brought a state-court derivative action on behalf of a corporation against the former officers and directors of Dunes Hotels and Casinos, Inc. ("Dunes"). <u>Id.</u> at *1. The issue before the court was whether the Defendants had properly removed the action to federal court on the basis of diversity jurisdiction or whether there was an absence of complete diversity between the parties. <u>Id.</u> at *2. Defendants (who were citizens of California) argued that the plaintiff's pleadings stated only that Dunes is a domestic corporation incorporated in the State of New York. <u>Id.</u> The court held that the defendants were judicially estopped from arguing that Dunes does not have a principal place of business in California because, in a prior litigation in California, Defendants represented that "Dunes is domiciled in Davis, California." <u>Id.</u> As stated by the <u>Steele</u> court, because the Eastern District of California adopted that "factual representation," "Defendants may not now deny this fact." <u>Id.</u> <u>Providence & Worchester Railroad Co.</u>, No. Civ. A. No. 88-1162-WF, 1990 WL 85506, *6 (D. Mass. June 15, 1990) is also instructive. There, the court applied judicial estoppel to preclude the plaintiff from arguing that its principle place of business is Rhode Island (in an attempt to preserve federal diversity jurisdiction) when it had asserted in prior litigations that its principle place of business was Massachusetts.

The similarities between the <u>Steele</u> case and the present case are striking. In <u>Steele</u>, the Defendants argued that the plaintiff was domiciled in New York despite their previous assertion that plaintiff was domiciled in California. In the present case, Ms. Strasberg argued in the

10

Hawaii litigation that Ms. Monroe was domiciled in New York, but would now have this Court believe that she died a California domiciliary. The Court should follow the well reasoned Steele decision and preclude MMLLC from contradicting its prior judicial representation.

There are far more reasons for this Court to apply the doctrine of judicial estoppel in this case than were present is Steele. In Steele, the court applied judicial estoppel to a single representation in a single affidavit. Here, in the Hawaii litigation alone, Ms. Strasberg repeatedly argued that Ms. Monroe died a New York domiciliary and the Court not only adopted that representation, but relied on it as the basis of its ruling on two major issues. However, unlike the present case, the defendants in Steele cleverly avoided an outright misrepresentation by declining to affirmatively assert in the second litigation that the plaintiffs were domiciled in California. Here, MMLLC went much further than the Steele defendants by affirmatively arguing before this Court a position that is not only insupportable, but a position that it did not believe to be true. Here, because MMLLC's misrepresentations are far more numerous and directly contradictory to what it told the district court Judge in Hawaii, the equities scream for judicial estoppel, as opposed to the case in Steele where it was just technically applied. Thus, the Hawaii litigation alone provides ample support for the Court to apply judicial estoppel and hold that, because Ms. Monroe died a New York domiciliary, MMLLC had and has no right of publicity to assert here.

MMLLC would like the Court to believe that the Seventh Circuit is restrictive in its application of judicial estoppel, but that is untrue. In fact, in some ways Seventh Circuit law is less stringent than Second Circuit law, which limits application of judicial estoppel to factual representations, which the Seventh Circuit does not. In re Cassidy, 892 F.2d 637, 641-42 (7th Cir.) (holding that judicial estoppel precludes parties from re-litigating legal positions as well as factual statements), cert. denied, 498 U.S. 812, 111 S.Ct. 48 (1990). For example, in Ladd v.

11

ITT Corp., 148 F.3d 753 (7th Cir. 1998), the plaintiff Rebecca Ladd injured herself while on the job and sought total disability benefits under the employee disabilities benefit plan. Id. at 754. In order to reduce the amount it would have to pay Ms. Ladd under the employee plan, MetLife encouraged Ms. Ladd to apply for social security benefits and provided her with legal representation to assist her with the application. Id. at 755. As a result, the administrative law judge found that Ms. Ladd was disabled and awarded her benefits. Id. When Ms. Ladd sought additional benefits under the employee plan, MetLife denied her claim on grounds that she was not disabled. Id. Ms. Ladd brought suit in the district court, which denied her claim for summary judgment on the issue of whether MetLife had improperly denied her claim.

The Seventh Circuit reversed the district court's refusal to grant summary judgment by finding that Defendants were judicially estopped from arguing that Ms. Ladd was not disabled because it encouraged Ms. Ladd to make a contrary representation before the Social Security Administration. Id. at 756. Significantly, the court applied judicial estoppel (even though the defendants were not technically parties to the prior proceeding) because they provided her legal representation and "prevailed there in a practical sense." Id. The Seventh Circuit stated:

> If we reflect on the purpose of the doctrine, which is it to reduce
> fraud in the legal process by forcing a modicum of consistency on
> a repeating litigant, we see that its spirit is applicable here. To
> lighten the cost to the employee benefit plan of Ladd's disability,
> the defendants encouraged and supported her effort to demonstrate
> total disability to the Social Security Administration, going so far
> as to provide her with legal representation . . . In effect, having
> won once the defendants repudiated the basis of their first victory
> in order to win a second victory.

Id. Likewise, in Capopoulos v. Chater, No. 95 C 3274, 1996 WL 717456 (N.D. Ill. Dec. 9, 1996), the court also recognized that judicial estoppel is applicable to parties in privity. Id. at *2. In that case, the court applied judicial estoppel, *sua sponte*, against a surviving son who tried to

collect Social Security survivor benefits by claiming that his father earned self-employment income. The court granted estoppel on the grounds that his deceased father had collected SSI disability benefits during his lifetime by asserting that he had not worked and could not work. Id. at *2-3; In re Cassidy, 892 F.2d at 640-41 (applying judicial estoppel to preclude party from re-litigating issue of dischargeability of his tax debts; advocating flexible application of doctrine to prevent a second "full scale adjudication of an issue that the court has already resolved against him); Bethesda Lutheran Homes and Services, Inc. v. Born, 238 F.3d 853, 857-58 (7th Cir. 2001) (holding plaintiffs who successfully argued in a prior litigation that Medicaid regulations and Wisconsin state law were unconstitutional could not argue that the regulations were constitutional in subsequent suit).

The Court's application of judicial estoppel is entirely consistent with Seventh Circuit precedent. In the Ladd case, the Seventh Circuit reversed the district court's refusal to apply the doctrine even though ITT and MetLife were not parties to the prior proceeding. The Ladd court found that because ITT and MetLife hired Ms. Ladd's lawyer and advocated that she take a certain position, they had "prevailed there in a practical sense." Here, it was Ms. Strasberg herself, as Administratrix and beneficiary, who argued to the Hawaii district court that Ms. Monroe died a New York domiciliary. Ms. Strasberg is majority owner of MMLLC, an entity she charged with the management of the Estate's intellectual property rights that she acquired under Ms. Monroe's Will. Therefore, just like ITT and Met Life, MMLLC benefits – at the very least -- "in a practical sense" by Ms. Strasberg's prior representations to the district court in Hawaii.

For all the foregoing reasons, the Court should apply the doctrine of judicial estoppel based on Ms. Strasberg's representation to a federal judge in Hawaii that Ms. Monroe died a New York domiciliary.

### B.    Mr. Frosch's Representations Before The California Tax Appraiser Judicially Estop MMLLC Here

By letter dated March 4, 1966, Mr. Frosch filed a petition with the California Inheritance Tax Appraiser (the "Tax Appraiser") in order to avoid paying California taxes on the entire Estate. SSUF ¶ 9.  In support of that application, Mr. Frosch filed an affidavit along with four other affidavits from Ms. Monroe's close friends and employees, all of whom testified, in detail, that (i) they knew based on personal knowledge that Ms. Monroe considered her New York apartment to be her permanent residence and (ii) Ms. Monroe told them that she was only temporarily in California while filming and that  she intended to return to her permanent residence in New York.  SSUF ¶ 10.

Mr. Frosch submitted to the Tax Appraiser an affidavit by Ralph L. Roberts, who swore that he was a close personal friend of Ms. Monroe since 1955 and spoke with her once a day on average.  Id.  Mr. Roberts testified that Ms. Monroe told him that she (i) "considered her trips to California merely as visits for the purpose of appearing in various motion picture films;" (ii) purchased her California house only for the temporary purpose of appearing in a movie because she disliked living in hotels; (iii) "considered her New York apartment as her permanent home and permanent residence" which she retained on a full time basis while temporarily filming in California.  Id.  Ms. Monroe's personal housekeeper in New York, Ms. Hattie Stephenson, testified that Ms. Monroe instructed her that she would be in California only temporarily while filming and that Ms. Monroe told her on several occasions "that she considered her said apartment in New York as her permanent residence and told me that her said New York

14

apartment was her permanent home." Id. Ms. Stephenson further testified that two days prior to Ms. Monroe's death, Ms. Monroe requested that Ms. Stephenson temporarily stay with her in California for one month prior to returning to her permanent New York residence. Id. Affidavits that Mr. Frosch submitted by Ms. Monroe's private secretary and public relations counsel and close friend both stated that Ms. Monroe told them that she was only temporarily in California for filming and that she considered her New York apartment to be her "permanent residence." Id. Finally, Mr. Frosch himself stated that Ms. Monroe resided only "temporarily in Los Angeles" while filming and considered New York to be her "permanent residence." Id.

Based on Mr. Frosch's submissions, the Estate did not pay California taxes on the gross value of the Estate (it only paid taxes on the property located in California) and Mr. Frosch later characterized his efforts on behalf of the Estate as "successful." SSUF ¶¶ 14, 24. The Court should judicially estop MMLLC from arguing that Ms. Monroe died anything but a New York domiciliary because he argued to the California Inheritance Tax Appraiser that she died a New York domiciliary. Simon v. Safelite Glass Corp., 943 F. Supp. 261, 266 (E.D.N.Y. 1996) ("the truth is no less important to an administrative body acting in a quasi-judicial capacity than it is to a court of law"), aff'd, 128 F.3d 68 (2d Cir. 1997).

While it is true that the notarized affidavits he submitted were entitled "Affidavit Concerning Residence," all the affiants, including Mr. Frosch, strenuously argued that Ms. Monroe died a New York domiciliary. SSUF ¶ 10.

## II.    THE COURT SHOULD HOLD THAT MMLLC IS COLLATERALLY ESTOPPED FROM ARGUING THAT MS. MONROE DID NOT DIE A NEW YORK DOMICILIARY

Under New York law, the doctrine of collateral estoppel "precludes a party from re-litigating in a subsequent action or proceeding an issue clearly raised against that party or those

in privity, whether or not the tribunals or causes of action are the same." Ryan v. New York Telephone, 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823 (1984).  A federal court must apply the collateral estoppel rules of the state that rendered a prior judgment on the same issues before the court.  LaFleur v. Whitman, 300 F.3d 256, 271 (2d Cir. 2002).  There are two requirements that must be satisfied before the doctrine applies: (1) "the identical issue necessarily must have been decided in the prior action and be decisive of the present action" and (2) "the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination." Juan C. v. Cortines, 89 N.Y.2d 659, 667, 657 N.Y.S.2d 581, 585 (1997) (quoting Kaufman v. Lilly & Co., 65 N.Y.2d 449 (1985)).  Under New York law, the burden rests with the proponent of the application of collateral estoppel to demonstrate the identicality and decisiveness of the allegedly precluded issues, while the burden rests on the opponent to establish the absence of a full and fair opportunity to litigate the issue in a prior action or proceeding.  DeCinto v. Westchester County Med. Ctr., 821 F.2d 111, 117 (2d Cir. 1987).

The law in New York is longstanding and well settled:  the courts of New York will look to the law of the State where a decedent was domiciled in order to interpret her Will.  E.P.T.L. Section 3-5.1, subd. (e) states:

> Interpretation of a testamentary disposition of personal property shall be made in accordance with the local law of the jurisdiction in which the testator was domiciled at the time the will was executed:

E.P.T.L. Section 3-5.1, subd. (e) (emphasis added).  The New York legislature enacted that provision of the E.P.T.L. in 1966, which remains unmodified through today.  The Court of Appeals frequently reiterated that black letter law by stating:

> If anything is settled, it is that the courts of New York will look to the law of the testator's domicile for the meaning and

16

interpretation of language used by him in disposing of his personal
property by will.

In re Morgan Guarantee Trust Co., 28 N.Y.2d 155, 162, 320 N.Y.S.2d 905, 909, cert. denied,

404 U.S. 826, 92 S.Ct. 58 (1971).  In fact, the same law was in effect both prior to the time when

Ms. Monroe executed her will and the time she passed in 1962.  Matter of Fabbri, 2 N.Y.2d 236,

239, 159 N.Y.S.2d 184, 186 (1957).

     In July 1989, Ms. Strasberg argued to the New York Surrogate's Court that it should

interpret the Wills of Ms. Monroe and Ms. Marianne Kris so that Ms. Strasberg would obtain one

hundred percent of the residuary Estate, rather than just the seventy-five percent that Lee

Strasberg left her in his will.   SSUF ¶ 27.  In particular, Ms. Strasberg argued that because Ms.

Marianne Kris did not specifically devise the twenty-five percent of the residuary estate to the

Anna Freud Centre during her lifetime, the court should rule that her Executor should not have

that opportunity.  Id.  In support of Ms. Strasberg's July 28, 1989 Petition to the court, she stated

that "[t]he decedent died on August 5, 1962, domiciled in the City and State of New York . . ."

Id.  The court had to have adopted Ms. Strasberg's representation that Ms. Monroe died a New

York domiciliary because it applied only New York law to interpret her Will.  To hold otherwise

would be to assume that the Court ignored longstanding statutory law and rulings from the New

York Court of Appeals.

     Judicial estoppel also applies to Ms. Strasberg's representations to the New York

Surrogate's Court because she "successfully" convinced the court to interpret the respective

Wills (based on Ms. Monroe's status as a New York domiciliary) so that she could proceed with

her duties as Administratrix of the Estate.

III.  **MMLLC'S JUDICIAL REPRESNTATIONS AND MS. MONROE'S OWN WORDS JUSTIFY THE COURT'S IMPOSITION OF SUMMARY JUDGMENT ON THE ISSUE OF MS. MONROE'S NEW YORK DOMICIILE**

A.  **MMLLC's Collective Judicial Representations Establish That Ms. Monroe Died A New York Domiciliary**

Putting aside the issue of whether estoppel applies, which it clearly does, MMLLC so frequently represented that Ms. Monroe died a New York domiciliary and resident that its contrary representation now is simply incredible.  It is well-settled that while courts should not assess credibility on summary judgment, evidence that is contradictory or implausible may be disregarded.  Lee Loi Industries, Inc. v. Impact Brokerage Corp., No. 05 CV 10788 VM, 2007 WL 441837, *4 (S.D.N.Y. Feb. 7, 2007).  It is inconceivable that any party would so frequently represent that it was domiciled in New York if that were not the case. SSUF ¶¶ 1-38.  Summary judgment is appropriate because the undisputed facts in conjunction with MMLLC's repeated judicial representations demonstrate that Ms. Monroe died a New York domiciliary.  Id. Accordingly, this Court should find that Ms. Monroe died a New York domiciliary, hold that Ms. Monroe had no right of publicity to pass to her heirs and beneficiaries as a result, and grant the Shaw Family's summary judgment motion on Count II of Defendants' Second Amended Complaint.

As set forth above, Ms. Strasberg's represented to the Hawaii District Court and the New York's Surrogate's Court that Ms. Monroe died a New York domiciliary.  SSUF ¶¶ 29-35. Additionally, Mr. Frosch argued that Ms. Monroe died a New York domiciliary on at least three separate occasions: first in 1962 to the California Superior Court when he filed the Ancillary Probate Petition (SSUF ¶ 5); second in 1976 to the California Superior Court when he sought to recover statutory and extraordinary executor's commissions and attorney's fees (SSUF ¶ 23); and

third in 1980 when he filed a Petition for Final Accounting with the New York Surrogate's Court (SSUF ¶ 24).

Mr. Frosch also repeatedly referred to Ms. Monroe as a New York resident. For example, in 1964 when he filed a Petition for Designation of Appraiser with the New York Surrogate's Court (SSUF ¶ 9); again in 1969 when he listed the value of the New York Estate with the Surrogate's Court (SSUF ¶ 17); again in 1972 to the California Board of Equalization (SSUF ¶ 19); and again in 1976 with California Superior Court when he sought to recover statutory and extraordinary executor's commissions and attorney's fees (SSUF ¶ 23). While the term "resident" obviously has a different legal significance than "domicile," the fact that the Estate has also consistently represented that Ms. Monroe died a New York resident is highly relevant given the absence of any evidence that the Estate has ever referred to Ms. Monroe as a California resident, let alone a California domiciliary.

## B.     Ms. Monroe's Own Words And The Words of Her Closest Friends and Employees Establish That She Died a New York Domiciliary

The affidavits that Mr. Frosch submitted to the California Tax Appraiser are admissible for two purposes. First, they are admissible to show what Ms. Monroe stated that New York was her permanent residence. Second, they are admissible to show what others believed, based on their observations, to be her permanent residence. These affidavits are admissible as either non-hearsay or under a variety of hearsay exceptions.

First, Mr. Frosch submitted the affidavits to the California Inheritance Tax Appraiser in connection with his duties as Executor and Trustee of the Estate. SSUF ¶ 10. The Court can reasonably infer that Mr. Frosch acted properly and would not have submitted the affidavits (including his own), unless he believed them to be true and accurate statements. The F.R.E. 801 Advisory Committee Notes to the 1972 Proposed Rules, Notes to Subdivision (d)(2) state that

19

"[u]nder established principles an admission maybe made by adopting or acquiescing in the statement of another." Accordingly, because Mr. Frosch represented the Estate, the affidavits are admissible as an admission by a party opponent pursuant to F.R.E. 801 (d)(2).

Second, to the extent that the affidavits are considered hearsay or double hearsay, they are admissible under F.R.E. 804(a)(4)(5) because the affiants are unavailable and Frosch submitted the affidavits in connection with a different proceeding. 804(b)(1).

Third, the affidavits are admissible under residual hearsay exception because, as required by the F.R.E. 807, the statements therein are (i) offered as evidence of a material fact (Ms. Monroe's domicile); (ii) the statement is more probative of the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts (Ms. Monroe's intent); and (iii) the general purposes of the Rules and the interests of justice will be best served by admission of the statement into evidence. In <u>Aramony v. United Way of America</u>, No. 96 Civ. 3962, 1998 WL 324874 (S.D.N.Y. June 18, 1998), the defendant argued (on a motion for reconsideration) that the court erred by admitting a third party affidavit submitted by the plaintiff in opposition to the defendant's summary judgment motion. The affidavit contained a transcript of testimony submitted by that third party in connection with a prior proceeding. The court stated that "[e]ven if he refuses to appear, his prior testimony may be admissible under Fed.R.Evid. 807, the residual hearsay exception."

The affidavits have a high degree of reliability because (i) they were produced by MMLLC's own files; (ii) Mr. Frosch submitted them to the California Tax Appraiser in connection with his duties and responsibilities as Executor and Trustee of the Estate; (iii) they are signed by intimate and long standing personal friends and employees of Ms. Monroe; and

(iv) these affidavits are not self serving because, at the time, California taxes were lower than New York taxes.  SSUF ¶ 19.

Based on MMLLC's repeated judicial representations and Ms. Monroe's own words, there is no question of material fact that Ms. Monroe died a New York domiciliary. Accordingly, she died without a right of publicity to pass to her heirs and beneficiaries. MMLLC has no right of publicity in Marilyn Monroe and the Court should grant summary judgment to the Shaw Family as a result.

## IV.    MMLLC'S ARGUMENTS IN OPPOSITION TO THE SHAW FAMILY'S SUMMARY JUDGMENT MOTION ARE BASELESS

### A.    MMLLC Is Incorrect As a Matter of Law That Ms. Monroe Can Have More Than One Legal Domicile

MMLLC hopes to avoid the import of its longstanding representation that Ms. Monroe died a New York domiciliary by arguing that a person can have more than one domicile.  Thus, MMLLC would have this Court believe that it meant a different type of domicile when it told the Hawaii District Court, the New York Surrogate Court, and the California Tax authorities that Ms. Monroe died a New York domiciliary.

The United States Supreme Court has stated that "it is the law of each State that an individual has but one domicile."  California v. Texas, 457 U.S. 164, 165, 102 S.Ct. 2335, 2336 (1982).  This Court has followed that well established doctrine and held that "New York permits a party to have but one domicile at a time."  Hatfill v. Foster, 415 F.Supp.2d 353, 368 (S.D.N.Y. 2006).  However, even assuming that MMLLC is correct, its representations in Surrogate's Court are directly relevant here because all the proceedings at issue, including this proceeding, involve Ms. Monroe's property rights.  Moreover, in the Hawaii case, Ms. Strasberg argued that Ms. Monroe died a New York domiciliary to a federal district court.  Additionally, MMLLC has not

cited a single case (and there are none), where a party has avoided the application of estoppel in this manner.

**B.    MMLLC Is Incorrect As A Matter of Law That Judicial Estoppel Does Not Apply To Parties In Privity Like MMLLC And Mr. Frosch**

**1.    Judicial Estoppel Applies to Parties In Privity**

MMLLC argues in its summary judgment papers, without any basis whatsoever, that judicial estoppel does not apply to parties in privity, only to the "same parties." MMLLC Reply Memo, at 26 n. 20. As the Court can see from MMLLC's papers, it has no basis to make this statement and the cases it cites are entirely inapplicable. In particular, MMLLC cites to the New Hampshire case, 532 U.S. at 749, 121 S.Ct. at 1814, but the Supreme Court did not even address the issue of whether judicial estoppel applies to parties in privity. MMLLC also miscites to Wabash Grain, Inc. v. Smith, 700 N.E.2d 234, 238 (Ind. Ct. App. 1998), which held only that estoppel cannot apply to entirely different parties. Wabash also did not address the issue of whether judicial estoppel applies to parties in privity. However, Wabash did say that "[w]e note that identity of parties is not necessarily required for the application of judicial estoppel." Id.

MMLLC argues that the Court should apply Seventh Circuit law on judicial estoppel, but the Seventh Circuit Court of Appeals has applied judicial estoppel to parties in privity. Ladd, 148 F.3d at 756 (applying judicial estoppel to defendant's employer, who provided legal representation to defendant in prior proceeding and "prevailed there in a practical sense"); Capopoulos, 1996 WL at 717456, at * 2 (applying judicial estoppel against surviving son based on his deceased father's representations). Although we have not seen any cases where the Second Circuit has had occasion to apply judicial estoppel to parties in privity, it has done so in the context of collateral estoppel and res judicata.

22

### 2.    MMLLC Is In Privity With Both Ms. Strasberg and Mr. Frosch

MMLLC argues that Frosch's representations are irrelevant because MMLLC and Frosch are not in privity. MMLLC's argument is contrary to law and MMLLC's cases are off point and irrelevant to the issue.

First, Ms. Strasberg cannot now dispute Mr. Frosch's representations when she failed to do so over the last four decades. At no point in the last forty-four years has any party to the original probate proceeding, including Anna Strasberg, disputed the issue of Marilyn Monroe's domicile. Even if Ms. Strasberg moved to re-open the Monroe probate proceedings on grounds that Mr. Frosch improperly identified Ms. Monroe as a New York domiciliary, she would be unable to do so because she had every opportunity to challenge that representation but failed to do so. In re Estate of Connally, 34 Misc.2d 132, 226 N.Y.S.2d 125 (N.Y. Surr. 1962) (holding that beneficiary with notice lost opportunity to challenge the Surrogate Court's finding of domicile because it was presented as a fact in the petition and it was uncontroverted at the time). On the contrary, not only did Anna Strasberg fail to challenge Mr. Frosch's representations, but she also argued to the New York Surrogate's Court that Marilyn Monroe died a New York domiciliary. As successor to Mr. Frosch's duties, Anna Strasberg assumed all of the powers and duties of the original fiduciary. See E.P.T.L. § 11-1.1(b)(12).

MMLLC argues that a Surrogate Court's determination of domicile is not conclusive as to domicile. MMLLC's Reply Memo, at 21 n. 16. The Shaw Family does not deny that parties to the original probate proceeding may at one time have been permitted to contest the issue of Marilyn Monroe's domicile. However, because all the parties had notice of those proceedings and failed to contest its holdings, there is no basis to do so now.

**C.  MMLLC Is Incorrect That The Surrogate's Proceedings Do Not Trigger Collateral Estoppel**

MMLLC has argued, without basis, that the Surrogate's proceedings do not trigger collateral estoppel.  MMLLC Reply Memo, at 19.  It is unclear why MMLLC believes that estoppel cannot apply to Mr. Frosch's and Ms. Strasberg's judicial representations just because they were made in a Surrogate's court, but the cases it cited in its summary judgment reply brief are entirely inapplicable.  By way of example, the Shaw Family will briefly address MMLLC's leading case here.

MMLLC emphasizes <u>Acridge v. Evangelical Lutheran Good Samaritan Soc'y</u>, 334 F.3d 444 (5th Cir. 2003) for the proposition that MMLLC is not precluded from re-litigating domicile.  MMLLC Reply Memo, at 19.  The issue in <u>Acridge</u> was whether  a plaintiff could preclude a defendant from relitigating the issue of domicile given that a New Mexico probate court had already stated that the decedent died a New Mexico domiciliary.  The Fifth Circuit held that the defendant could relitigate the issue of domicile because (i) "whether or not Louis Acridge was a New York domiciliary was not necessary to the determination that his estate was eligible for probate in New Mexico . . ." and (ii) "none of the defendants was a party to the probate proceedings, nor were his interests represented by someone who was a party to those proceedings."  <u>Acridge</u>, 334 F.3d at 452-53.

Unlike the situation in <u>Acridge</u>, Ms. Strasberg's assertion to the New York Surrogate's Court that Ms. Monroe died a New York domiciliary was directly necessary to the proceedings because, based on her representation, the court applied New York law to interpret the Monroe Will.  <u>See</u> <i>supra</i>, Sec. II .  We know that the court relied on Ms. Strasberg's representation because the court was bound to apply the law in which the decedent was domiciled at the time of her death.  <u>Id</u>.  Moreover, none of the parties objected to the court's decision to apply New York

24

law, which is further evidence that it agreed with the court's actions. Finally, unlike <u>Acridge</u>, Ms. Strasberg was not only a party to the proceeding, she was the Administratrix of the Estate at the time. Thus, because she obviously had notice, <u>Acridge</u> is entirely inapplicable here. The other cases that MMLLC cited are inapplicable for similar reasons.

Perhaps the reason that MMLLC cited cases like <u>Acridge</u> is because the Shaw Family did not have the New Documents in its possession at the time, and was therefore not able to discuss the more significant preclusive effect of the proceedings discussed herein. The Shaw Family thanks the Court for the opportunity to raise those new proceedings in this memorandum.

## CONCLUSION

For all the foregoing reasons, the Shaw Family respectfully requests that the Court hold that MMLLC is judicially and collaterally estopped from arguing that Ms. Monroe died anything but a New York domiciliary; find that Ms. Monroe had no right of publicity to pass to her heirs and beneficiaries (including MMLLC), and grant the Shaw Family's Summary Judgment motion on Count II of Defendants' Second Amended Complaint. This is the only equitable and legally supportable decision under the facts of this case.

Dated:  New York, New York
          March 26, 2007

Respectfully Submitted,

By: _Christopher Serbagi_
Christopher Serbagi (CS 7746)
David Marcus (DM 0960)
Law Offices of Christopher Serbagi
488 Madison Avenue, Suite 1120
New York, New York  10022
(212) 593-2112

Attorneys for Plaintiffs/Consolidated Defendants
Shaw Family Archives, Bradford Licensing, Inc.,
Edith Marcus and Meta Stevens