EX. O

COPY

1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   ----------------------------------x

4   SHAW FAMILY ARCHIVES, LTD.,
    EDITH MARCUS, and META STEVENS
5
                              Plaintiffs,
6
           - against -
7
    CMG WORLDWIDE, Inc., an Indiana
8   corporation, and MARILYN MONROE,
    Limited, a Delaware limited
9   liability company,

10                            Defendants.
    ----------------------------------x
11

12              Ellen Grauer Court Reporters
                126 East 56th Street
13              New York, New York

14

15

16              December 26, 2007
                12:01 p.m.
17

18

19              30(b)(6) deposition of MARK
    ROESLER, before Marlene Lee, CSR, CRR, a Notary
20  Public of the State of New York.

21

22

23       ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
24              New York, New York
                212-750-6434
25              Ref: 86257

46

ROESLER

1
2      A.    Mine's signed by Orin Snyder.
3            MR. MINCH:  Sorry about that.
4      Q.    On the next page after that there's
5   a signature by Ted Minch.  Do you see that?
6      A.    I do.
7      Q.    Mr. Minch is your attorney in this
8   matter; correct?
9      A.    Correct.
10     Q.    You have no reason to believe that
11  this is not the document that was submitted in
12  connection with this matter, do you?
13     A.    That's correct.
14     Q.    Did you review this document before
15  it was filed?
16     A.    Yes.
17     Q.    When?
18     A.    Late July.  Early August.  I'm not
19  sure.
20     Q.    To make sure that all the factual
21  representations in here were true and accurate;
22  is that right?
23           MS. COLBATH:  Objection.
24           MR. MINCH:  Objection.
25     A.    Yes, that's correct.

1                          ROESLER
2          Q.    Sitting here today, you don't have
3    any reason to believe that any of the factual
4    representations in this complaint are untrue,
5    do you --
6                MR. MINCH:  Objection.
7          A.    Not that I know of.
8          Q.    -- or misleading in any way?
9                MR. MINCH:  Objection.
10         A.    Not that I know of.
11         Q.    And as head of CMG, certainly if
12   there was anything in here that was incorrect,
13   you would notify your attorneys of that and
14   make the necessary corrections; correct?
15         A.    I would endeavor to, yes.
16         Q.    Turning to the 30(b)(6) notice, No.
17   1, the factual basis for Count 1 in defendants'
18   Third Amended Complaint, what is the factual
19   basis for Count 1 in defendants' Third Amended
20   Complaint as far as CMG is concerned?  To help
21   you, I turn you to page 6 where Count 1 starts
22   and goes on till the end.
23               What is the factual basis for Count
24   1?
25         A.    Just that the Shaw Group, through

48

ROESLER

1
2    the representative Bradford, has -- represents
3    various licensees.  That their images are
4    protected by copyright and we do not believe
5    that to be the case.
6        Q.    Anything else?
7        A.    I think that's the basis, you know.
8    I think that's it.
9        Q.    What images does CMG -- let me
10   rephrase.  What images of Marilyn Monroe in the
11   Shaw family collection does CMG believe are in
12   the public domain?
13       A.    All of the images that were
14   published between -- you know, prior to, I
15   believe, '77.  All the images that were
16   published that did not have notice on them, we
17   know that those are in the public domain.  We
18   know the Rizzoli book is in the public domain.
19   And we -- and from my -- from my meetings with
20   the two daughters, I also knew that there were
21   issues with these images being -- having valid
22   copyrights.
23       Q.    Let's start with your first
24   statement, which is, "All images that were
25   published prior to '77 without notice are in

49

                              ROESLER
1
2   the public domain."  1977, are you referring
3   to?
4              What particular images are you
5   referring to in the Shaw family collection of
6   Marilyn Monroe?
7              MS. COLBATH:  Objection.
8              MR. MINCH:  Objection.
9       A.    Images taken by Mr. Shaw.
10      Q.    Can you identify them any further
11  than that?
12             MR. MINCH:  Objection.
13             MS. COLBATH:  Objection.
14      Q.    Any particular books?  Names of
15  photographs?
16      A.    There were many publications back
17  in those times, like Photoplay, and different
18  publications that published -- continually
19  published these different photos of people like
20  Marilyn Monroe and other entertainment
21  personalities.  So there were many, many, many,
22  many images all published at that time.
23  Typically they were all published without
24  notice, or many of them were published without
25  notice.

ROESLER

1

2     Q.   Can you refer to any particular

3 books that were published that are in the Shaw

4 Family collection that were published before

5 1977 without notice?

6             MR. MINCH:  Objection.

7             MS. COLBATH:  Objection.

8     Q.   Any specific books?

9             MS. COLBATH:  Objection.

10    A.   No.  I don't know of any particular

11 books.

12    Q.   Can you identify any particular

13 Shaw Family registrations for images of Marilyn

14 Monroe that were published prior to -- that are

15 for images of Marilyn Monroe that were

16 published prior to 1977 without notice?

17             MS. COLBATH:  Could I have the

18        question read back?  I think I have an

19        objection.

20             (The pending question was read

21        back.)

22             MS. COLBATH:  Objection.

23             MR. MINCH:  Objection.

24    A.   I don't understand that question.

25    Q.   Often -- usually a registration

51

1                          ROESLER
2    will have a title to it.
3          A.    Right.
4          Q.    Some way to identify it; correct?
5                (Discussion off the record.)
6          Q.    Generally a copyright registration
7    has a title to identify it; correct?
8                MS. COLBATH:  Objection.
9                MR. MINCH:  Objection.
10         A.    Often.
11         Q.    Can you identify any of the titles
12   of Shaw Family registrations for Marilyn Monroe
13   that are for images of Marilyn Monroe that were
14   published prior to 1977 without notice?
15               MS. COLBATH:  Objection.
16               MR. MINCH:  Objection.
17         A.    I'm aware of at least two copyright
18   registrations that were filed for the Shaw --
19   by the Shaws.  But I thought those were after
20   '77.  But I'm not sure, without looking at
21   them.  I thought they were for two different
22   books.  So I don't know if that's responsive to
23   your question.
24         Q.    Well, I'm referring to the ones
25   that were published prior to '77, following

52

1                    ROESLER

2   your testimony.

3              MS. COLBATH:  Objection.

4         A.   I'm sorry.  I still don't

5   understand your question.

6         Q.   I'll rephrase it.

7              MR. SERBAGI:  If you can read it

8         back.

9              MS. COLBATH:  The witness said he

10        didn't understand the question.  Having

11        it read back I don't think cures that.

12             MR. SERBAGI:  Go ahead.

13             MS. COLBATH:  Objection to form.

14             MR. SERBAGI:  I'll start again.

15        Q.   To set up the question a little

16   bit, you were talking about copyright

17   registrations generally have titles to identify

18   them; correct?

19        A.   Okay.

20        Q.   And you had testified earlier

21   that -- when I asked you what images of Marilyn

22   Monroe from the Shaw Family collection were in

23   the public domain, you testified that those

24   published prior to 1977 without notice.  Do you

25   recall that?

53

                            ROESLER

1

2       A.      That's correct.

3               MR. MINCH:  Objection.

4       Q.      And what I'm asking is: Can you

5  identify the titles of any Shaw Family

6  copyright registrations of Marilyn Monroe that

7  are for images of Marilyn Monroe that were

8  published prior to 1977 without notice?

9               MS. COLBATH:  Objection.

10              MR. MINCH:  Objection.

11      A.      I -- I don't think I can.  I'm

12  still a little confused by the question.  But I

13  think my answer is, I don't think I can.

14      Q.      I want to make sure that I'm fair

15  to you and that you completely understand the

16  question.

17      A.      Okay.

18      Q.      Sometimes this process is

19  difficult.  I want to ask it in a way that you

20  understand.

21      A.      Okay.

22      Q.      Maybe if you tell me what you don't

23  understand about the question, I can clarify it

24  for you.

25              MS. COLBATH:  Objection.

54

1                         ROESLER

2              MR. MINCH:  Objection.

3      A.      I'm unclear about what registration

4   you're speaking about and what the time period

5   of that registration is.

6      Q.      Well, any registration that is

7   for -- in the Shaw Family collection for a

8   Marilyn Monroe image --

9      A.      Okay.

10     Q.      -- that covers an image of Marilyn

11  Monroe that was published prior to 1977 without

12  notice.

13              MS. COLBATH:  Objection.

14              MR. MINCH:  Objection.

15              MS. COLBATH:  Could I have that

16         question read back?  It didn't sound

17         like -- I think he appended a question at

18         the end.  Read back that last question.

19     Q.      What I'm asking you is to identify,

20  if you can, the title of any Shaw Family

21  copyright registration for Marilyn Monroe --

22              MS. COLBATH:  Objection.

23              MR. MINCH:  Objection.

24     Q.      -- that covers an image of Marilyn

25  Monroe prior to 1977 without notice.

55

1                          ROESLER

2                MS. COLBATH:  Objection.

3                MR. MINCH:  Objection.

4           A.    I'm trying to chart this out so I

5    understand your question.  But you're talking

6    subsequent to 1977, a registration that might

7    go back and cover something that was published

8    prior to '77; is that correct?

9           Q.    The registration itself can be any

10   date.  I'm just asking you to identify any Shaw

11   Family copyright registration for Marilyn

12   Monroe that is for an image that was published

13   prior to 1977 without notice.

14               MS. COLBATH:  Objection.

15               MR. MINCH:  Objection.

16          A.    I -- I can't do that.  I do know

17   that there were apparently two copyright

18   registrations in, I believe, after -- the late

19   1990s.  And for what period of time --

20   obviously they were photos of Marilyn while she

21   was alive.  But whether those were published

22   prior to that registration or not, I don't

23   know.

24          Q.    Okay.  You mentioned also, as part

25   of your answer when we were discussing -- let

56

ROESLER

1
2     me start -- let me rephrase.  To give some
3     background, again, we're talking about your
4     testimony of Shaw Family images of Marilyn
5     Monroe that were published prior to '77 without
6     notice.  And part of your answer earlier was
7     that you referred to various publications where
8     images of Marilyn Monroe were published without
9     notice prior to '77.
10                Can you identify, sitting here
11    today, the names of any of those publications
12    and when they were -- start with that.
13                MR. MINCH:  Objection.
14                MS. COLBATH:  Objection.
15         Q.    The names of those publications
16    that you referred to.
17                MS. COLBATH:  Objection.
18                MR. MINCH:  Objection.
19         A.    One was Photoplay.  I don't
20    remember all the names of the various
21    publications, but there were a myriad of
22    publications back then.
23         Q.    Let's start with Photoplay.
24                MS. COLBATH:  Were you finished
25            with the answer?

57

ROESLER

1

2      A.    There were a myriad of publications

3  back in those days.

4      Q.    Let's start with Photoplay.  Can

5  you identify any Shaw Family image of Marilyn

6  Monroe that was published in Photoplay prior to

7  '77 without notice?

8              MS. COLBATH:  Objection.

9              MR. MINCH:  Objection.

10     A.    I'm aware of many of them that were

11  published back then by --

12     Q.    Name one.

13             MS. COLBATH:  Objection.

14             MR. MINCH:  Objection.

15     A.    Name one particular photo?  Well, I

16  don't have the name of a particular photo.  I

17  mean, I could produce the -- I could produce

18  the Photoplays.

19     Q.    I'm just asking if you know.  Okay.

20  Now, the second part of your answer earlier was

21  that you believed -- I think you said you knew

22  that the Rizzoli book is in the public domain;

23  correct?

24     A.    That's correct.

25     Q.    The Rizzoli work, so we're clear,

ROESLER

1

2   is what's referred to in the Second Amended

3   Complaint; correct?

4           A.    That's correct.

5           Q.    What is the basis for your

6   statement that the Rizzoli book is in the

7   public domain?

8           A.    Just the decision and my general

9   knowledge about the -- about that decision.

10          Q.    What decision are you referring to,

11  sir?

12          A.    The decision involving the Rizzoli

13  book that was handed down.

14          Q.    What decision is that?

15                MR. MINCH:   Objection.

16                MS. COLBATH:   Objection.

17          A.    I don't have a specific name of it.

18          Q.    Did you review that decision?

19                MR. MINCH:   Objection.

20          A.    I don't know that I personally

21  reviewed it.  But counsel had reviewed it.

22          Q.    Do you know whether that decision

23  was final or not final?

24                MR. MINCH:   Objection.

25                MS. COLBATH:   Objection.

59

ROESLER

1

2          A.    I don't have specific information

3     on that.

4          Q.    Well, prior to submitting this

5     complaint in this action, did you investigate

6     that matter?

7                MR. MINCH:  Objection.

8                MS. COLBATH:  Objection.

9          A.    Not specifically.

10         Q.    This decision that you're referring

11    to that you can't tell me what it is, can you

12    tell me what the Court held in that decision?

13               MS. COLBATH:  Objection.

14               MR. MINCH:  Objection.  For the

15          record, are you testifying?  Or is Mr.

16          Roesler testifying?

17               MR. SERBAGI:  I'm leading up to my

18          question, so he understands.

19               MR. MINCH:  I don't understand

20          who's testifying.

21               MS. COLBATH:  You frequently make

22          speeches before questions.  I find that

23          totally inappropriate.  The witness is

24          here to answer your questions but not to

25          listen to speeches.  I'd like to note

60

ROESLER

1

2      that for the record and ask that you

3      conform to the Federal Rules.

4              MR. SERBAGI:  Let me tell you

5      something, Ms. Colbath.  What I'm saying

6      before the question is purposely to lead

7      up to the question so the witness

8      understands the context of the question.

9      Sometimes it's not easy to ask a

10      question.  I'm not making speeches.

11              Your speaking objections are

12      objectionable.  They're interfering with

13      this deposition.  And it's censurable

14      conduct, and I'm going to bring it before

15      Judge Fox.  Let's continue.

16      Q.      The decision that you're referring

17 to that spoke of Rizzoli as being in the public

18 domain, do you know what that Court held?

19              MS. COLBATH:  Objection.

20              MR. MINCH:  Objection.

21      A.      Not specifically.

22      Q.      I'm going to read you the question

23 that I asked earlier, and the answer, for

24 context purposes only so we understand where we

25 are right now.

61

ROESLER

1

2          I asked you, "What is the basis for

3    your statement that the Rizzoli book is in the

4    public domain?"

5          You stated, "Just the decision and

6    my general knowledge about that decision?"

7          What general knowledge about that

8    decision are you referring to, Mr. Roesler?

9    A.    Just that various images of Marilyn

10   Monroe that were contained in that book were in

11   the public domain because they were published

12   without notice.

13   Q.    What's the basis for your statement

14   that they were published without notice?

15   A.    Just my general knowledge of

16   discussing it with Marilyn Monroe LLC's

17   counsel.

18   Q.    Anything else?

19   A.    No.

20   Q.    What counsel are you referring to?

21   A.    Gibson Dunn & Crutcher.

22   Q.    When did that discussion take

23   place?

24        MR. MINCH:   Objection.

25        MS. COLBATH:   Objection.

62

ROESLER

1

2      A.    Around -- right after the decision.

3  Shortly after the decision.

4      Q.    What decision?  So we're clear for

5  the record.

6      A.    The Rizzoli.

7      Q.    Who did you speak with at Gibson

8  Dunn & Crutcher?

9          MR. MINCH:  Objection.

10     A.    I believe a man named Mr. Wegner.

11     Q.    How long was that discussion?

12     A.    I don't recall exactly.  It was a

13  couple of years ago.

14     Q.    Over the phone?  Or in person?

15         MR. MINCH:  Objection.

16     A.    Phone.

17         MS. COLBATH:  Objection.

18     Q.    Longer than five minutes?

19         MR. MINCH:  Objection.

20     A.    I believe so.  It was longer than

21  five minutes.

22     Q.    Twenty minutes?

23         MR. MINCH:  Objection.

24         MS. COLBATH:  I'm going to caution

25      the witness not to disclose any of the

63

```
 1                    ROESLER
 2        details of the conversation.
 3        Q.    Which I wouldn't ask you to
 4   disclose, anyway.
 5        A.    I don't recall the length of the
 6   conversation.
 7        Q.    Did Mr. Wegner provide you any
 8   documents?  Without disclosing the nature of
 9   the testimony or what the documents said, did
10   Mr. Wegner provide you any documents to support
11   the firm's -- Gibson Dunn & Crutcher's belief
12   that the Rizzoli work was in the public domain?
13             MR. MINCH:  Objection.
14             THE WITNESS:  I'm not sure that
15        that's not protected attorney/client
16        privilege.
17        Q.    I'm not going to ask you -- so
18   we're clear -- the nature of any communications
19   or the nature of any legal advice that Gibson
20   Dunn & Crutcher or Mr. Wegner may have provided
21   to you.  I'm not asking you for the substance
22   of any legal communication.  I'm merely asking
23   you if Mr. Wegner gave you any documents to
24   support his belief that the Rizzoli work is in
25   the public domain.
```

64

```
 1                    ROESLER
 2           MR. MINCH:  And again, I object to
 3      the extent it would call for disclosure
 4      of attorney/client-privileged
 5      information.
 6           MS. COLBATH:  Objection.
 7      A.    The matter was discussed at length,
 8  and what beyond that, I'm not -- I'm not
 9  comfortable divulging what I feel is
10  attorney/client-privileged information.
11      Q.    Well, you're an attorney; correct,
12  Mr. Roesler?
13      A.    Correct.
14      Q.    You're very familiar with what
15  attorney/client privilege is; is that correct?
16           MS. COLBATH:  Objection.
17           MR. MINCH:  Objection.
18      Q.    Is that a yes?
19      A.    Yes.
20      Q.    Do you believe it's attorney/client
21  privilege when an attorney gives a client a
22  document?  The mere act of giving a document,
23  is that attorney/client privilege?
24           MR. MINCH:  Objection.
25           MS. COLBATH:  Objection.
```

65

ROESLER

1

2     A.     Could be.

3     Q.     Okay.  I'll ask again: Did Mr.

4  Wegner give you any documents -- I'm not asking

5  what the documents said.  I'm not asking what

6  you said to Mr. Wegner concerning it or what

7  Mr. Wegner said to you.  I'm merely asking you,

8  did he give you any documents to support his

9  belief that the Rizzoli work is in the public

10 domain?

11              MS. COLBATH:  Objection.

12              MR. MINCH:  Objection.

13    A.     I don't have a recollection as to

14 what he gave me.

15    Q.     What was your concern over the

16 attorney/client privilege, according to your

17 testimony?

18              MR. MINCH:  Objection.

19              MS. COLBATH:  Objection.

20    A.     The matter was discussed.  The

21 matter was discussed.  And -- the matter was

22 discussed.

23 (INF)         MR. SERBAGI:  I'd like to make a

24 request that you investigate the issue of

25 whether Mr. Wegner provided Mr. Roesler any

66

ROESLER

documents in connection with that matter of the

Rizzoli book, and if so, if it's privileged, it

be identified on a privilege log.

MR. MINCH:  On what basis am I

making this investigation?

MR. SERBAGI:  First of all, I said

"if."  So I'm not --

MR. MINCH:  I want to know what

your basis is for me undertaking this

investigation.

MR. SERBAGI:  We can talk about it

a little more.  But briefly, the

witness's testimony was somewhat

equivocal on the issue.  He doesn't

recall if there were documents exchanged

or not.  I'm merely asking if there were,

and if there was, identify the basis for

the privilege.

MR. MINCH:  That's his answer.  He

doesn't recall.

MR. SERBAGI:  Let's move on.

Q.    You mentioned, as part of your

answer as to why certain Shaw Family images

were in the public domain earlier, a meeting

ROESLER

1                              ROESLER

2    acknowledgment that it was approved or an

3    e-mail or something.

4        Q.    And subsequent to the preparation

5    of a deal memo, is there any other document

6    prior to the formalized agreement between MMLLC

7    and the third party that is prepared?

8                MR. MINCH:  Objection.

9                MS. COLBATH:  Objection.

10       A.    Not -- not that I know of.  No.

11       Q.    Does the deal memo bind the

12    respective parties?

13               MS. COLBATH:  Objection.

14               MR. MINCH:  Objection.

15       A.    The respective parties being --

16       Q.    Being CMG, MMLLC, and the third

17    party that wants to license images of Marilyn

18    Monroe.

19               MR. MINCH:  Objection.

20               MS. COLBATH:  Objection.

21       A.    No.  No.

22       Q.    So until there's a formalized

23    license agreement, all the parties can walk

24    away without any legal consequences.

25               MR. MINCH:  Objection.

80

1                    ROESLER
2            MS. COLBATH:  Objection.
3      Q.    Is that correct?
4      A.    Presumably.  I mean, there's no
5 legally enforceable contract.
6      Q.    Now, getting back to your earlier
7 testimony, when I asked you the basis -- and
8 now we're finally getting back to where this
9 all came from, the basis for CMG's belief
10 that -- I'm referring now to Roesler 1 -- the
11 factual basis for Count 1 in defendants' Third
12 Amended Complaint.
13            When I asked you what is the
14 factual basis for Count 1 in defendants' Third
15 Amended Complaint earlier, do you recall saying
16 that part of that is representations that the
17 Shaw Family has made to various licensees that
18 their images are protected by copyright, and
19 CMG does not believe that to be the case?  Do
20 you recall that testimony?
21            MS. COLBATH:  Objection.
22            MR. MINCH:  I want to interject.
23       Perhaps he wants his answer read back to
24       him so that he can understand
25       specifically what his response was to

81

                            ROESLER

1    that given question.

2        Q.    Well, if need be we'll go back to

3    it, but do you generally recall that testimony?

4        A.    I do.

5        Q.    Now, I want to ask you what you

6    meant by that.  Representations to various

7    licensees.  What did you mean?

8        A.    The --

9              MS. COLBATH:  Objection.

10       A.    The activities that the estate --

11   I'm sorry -- that the Shaw Family collectively

12   is involved in.  That was Larry when he was

13   alive, and their representative, the Bradford

14   Group.

15       Q.    And what type of activities are you

16   referring to?

17       A.    Their marketing activities.

18       Q.    What type of marketing activities

19   are you referring to?

20       A.    The manner in which they represent

21   the collection, the representations they make

22   to various licensees, the promotions they do,

23   the letters that they send out.

24       Q.    Okay.  Let's talk about the

82

                        ROESLER

representations made to various licensees.

What representations are you talking about?

Who made them, and to whom?

        MS. COLBATH:  Objection.

        MR. MINCH:  Objection.

    Q.    Let me rephrase.  What

representations are you talking about?

        MR. MINCH:  Objection.

    A.    The representations that either the

family members make or their representative,

the Bradford Group, makes.

    Q.    What I'm trying to do is get at the

specific representations that you're talking

about.  Who within the Shaw Family made the

representations that you're talking about?

    A.    Well, I mean, it's hard to recount

specifics.  But it's -- I mean, numerous

representations.  Larry used to make those

representations to -- I remember a company

called Dolce & Gabbana that Larry was

negotiating with, telling them that they only

needed a license for his images, copyright to

his images, to the representations that

Bradford makes as their representative.

83

ROESLER

1

2       Q.    Anything else that you can think

3  of, sitting here today?

4       A.    No.  No.

5       Q.    Let's talk about the representation

6  that you claim Larry made to Dolce & Gabbana.

7  Was that representation made in writing?

8       A.    That Larry made to them?  I don't

9  recall.

10      Q.    So you don't know if it was writing

11  or verbally.

12      A.    Right.

13      Q.    What's the basis for the

14  representation?

15           MR. MINCH:  Objection.

16      Q.    Let me rephrase the question.  When

17  did Larry make this purported representation to

18  Dolce & Gabbana?

19           MS. COLBATH:  Objection.

20           MR. MINCH:  Objection.

21      A.    Maybe a year and a half ago, give

22  or take six months.

23      Q.    Who did Larry speak to at Dolce &

24  Gabbana?

25      A.    I don't remember the name.

84

ROESLER

1

2      Q.    You don't know whether it was in

3      writing?

4            MR. MINCH:  Objection.

5            MS. COLBATH:  Objection.

6      A.    I just know from Dolce & Gabbana

7      reporting back to us.

8      Q.    Who at Dolce & Gabbana reported

9      back to you?

10     A.    I don't know.

11     Q.    Was it a he or she?

12           MR. MINCH:  Objection.

13     A.    I don't even remember if it was a

14     he or she.

15     Q.    Was it in writing, or verbally?

16           MS. COLBATH:  Objection.

17           MR. MINCH:  Objection.

18     A.    I don't recall that.

19     Q.    So we're clear, what did -- was

20     this a representative of Dolce & Gabbana?

21           MR. MINCH:  Objection.

22     A.    Yes.  Yes.  It was -- go ahead.

23           It was on a tee-shirt program that

24     we were doing, and the thing we're doing

25     involving Marilyn Monroe.

85

```
 1                        ROESLER
 2        Q.    Do you recall the image that was at
 3   issue of Marilyn Monroe?
 4        A.    With respect to the Shaw?
 5        Q.    Yes.
 6        A.    No, I don't recall the specific
 7   image.
 8        Q.    Do you recall whether that image
 9   was protected by copyright or not?
10        A.    No.
11              MR. MINCH:   Objection.
12        Q.    Do you remember the title of the
13   person within Dolce & Gabbana who made this
14   purported representation?
15              MR. MINCH:   Objection.
16              MS. COLBATH:   Objection.
17        A.    No.
18        Q.    Do you know whether they had
19   authority to bind Dolce & Gabbana in their
20   representations or not?
21              MR. MINCH:   Objection.
22              MS. COLBATH:   Objection.
23        A.    I'm assuming they did.
24        Q.    What's the basis for that
25   assumption?
```

86

                              ROESLER

1

2        A.    Just in the normal course of

3    dealings when you're dealing with -- with a

4    company.  A company representative.

5        Q.    Other than that, you have no other

6    basis?

7        A.    No.

8        Q.    How many images of Marilyn Monroe

9    were involved in this tee-shirt program that

10   you're referring to between Shaw Family

11   Archives and Dolce & Gabbana; do you know?

12              MR. MINCH:  Objection.

13       A.    I think there were four.

14       Q.    What's the basis for that

15   statement?

16              MS. COLBATH:  Objection.

17       A.    My recollection.

18       Q.    Do you, sitting here today, have a

19   basis for that recollection?

20              MR. MINCH:  Objection.

21              MS. COLBATH:  Objection.

22       A.    Just by memory.

23       Q.    Did this Dolce & Gabbana

24   representative tell you there were four images

25   involved?

87

ROESLER

A.    Yes.  But I was also dealing with
Larry on it, too.  I had had a couple
discussions with Larry and Meta on it.

Q.    What was the context of those
discussions?

A.    The context of the discussions were
that Meta really wanted to be able to do that
Dolce & Gabbana program.  So she asked me if I
could try to make it happen, and also involve
their images.  And I said I would do my best to
make it happen and have it involve their
images.  And I don't know -- I think.  So
discussions were with me and Dolce & Gabbana
personally.  I think some of the other
discussions were perhaps with Chris in the
office.

Q.    But you don't recall what
particular images of Marilyn Monroe, sitting
here today, were at issue in that tee-shirt
program with Dolce & Gabbana?

MR. MINCH:  Objection.

A.    I don't think I ever knew what
specific images.  I think they were dealing
directly with Larry on different images.

88

1                       ROESLER

2          Q.    Do you know if -- did Larry send a

3    cease-and-desist letter to Dolce & Gabbana?

4                MR. MINCH:  Objection.

5          A.    I don't know.

6          Q.    Do you know if anybody at Shaw

7    Family Archives sent a cease-and-desist letter

8    to Dolce & Gabbana in connection with this

9    tee-shirt program?

10               MR. MINCH:  Objection.

11         A.    I don't know.

12         Q.    Do you know if anybody at Shaw

13   Family Archives threatened Dolce & Gabbana in

14   any way with copyright infringement for using

15   Shaw Family images of Marilyn Monroe?

16               MR. MINCH:  Objection.

17         A.    I don't think they used them.  I

18   think there was a discussion to use them.

19         Q.    So Dolce & Gabbana had not

20   finalized any decision to use any particular

21   images of Marilyn Monroe during these tee-shirt

22   program discussions?

23         A.    That's correct.

24         Q.    Those discussions were in their

25   incipient stages; is that correct?

89

```
 1                      ROESLER
 2        A.    That's correct.
 3        Q.    Was a deal ever finalized with CMG
 4   or MMLLC in connection with Dolce & Gabbana?
 5             MS. COLBATH:  Objection.
 6             MR. MINCH:  Objection.
 7        Q.    For uses of images of Marilyn
 8   Monroe?
 9             MS. COLBATH:  Objection.
10             MR. MINCH:  Objection.
11        Q.    Let me rephrase.  In connection
12   with this particular tee-shirt program we're
13   talking about, was there ever a finalized
14   agreement deal between MMLLC, CMG, and Dolce &
15   Gabbana?
16             MR. MINCH:  Objection.
17             MS. COLBATH:  Objection.
18        A.    Yes.
19        Q.    What was the nature of that
20   agreement?
21             MR. MINCH:  Objection.
22        A.    Well, the nature of the agreement
23   was a licensing agreement.
24        Q.    Between Dolce & Gabbana and MMLLC?
25        A.    That's correct.
```

90

```
                            ROESLER
 1
 2        Q.     For uses of images of Marilyn

 3   Monroe?

 4               MR. MINCH:  Objection.

 5               MS. COLBATH:  Objection.

 6        A.     License agreement for the Marilyn

 7   Monroe LLC granted to Dolce & Gabbana, and they

 8   also had an arrangement with different entities

 9   for the selection of -- I think they were four

10   different photographs.  And who they ultimately

11   went with, I don't know, whether it was Corbus

12   or Getty or what.  So I don't know what images

13   they -- who they selected the images from.

14        Q.     When you say, "I think there were

15   four different photographs" in your prior

16   answer, were you referring to four different

17   photographs of Marilyn Monroe?

18        A.     Yes.

19               MR. MINCH:  Objection.

20        Q.     When you said you don't know who

21   they ultimately went with, Corbus or Getty --

22               MR. MINCH:  Objection.

23        Q.     -- what did you mean by that?

24        A.     They selected and paid for four

25   different photos from -- whether they got those
```

91

                              ROESLER
1
2    from Getty, Corbus, Shaw, whoever, they paid
3    for the use of those photos in addition to the
4    license with the Marilyn Monroe LLC.
5              Q.    When was that agreement signed?
6              MR. MINCH:  Objection.
7              Q.    With Dolce & Gabbana?
8              A.    As I testified a few moments ago, I
9    don't know.  Eighteen months ago, give or take.
10   I seem to recall it was like a year ago this
11   past summer.  So 18 months ago.  I think that's
12   when I was in regular contact with Meta, Edie,
13   and Larry.
14             Q.    Is that deal ongoing?
15             A.    I'm sorry?
16             MR. MINCH:  Objection.
17             MS. COLBATH:  Objection.
18             Q.    Is that deal between MMLLC and
19   Dolce & Gabbana ongoing, in force as we sit
20   here today?
21             MS. COLBATH:  Objection.
22             A.    I don't think so.  I think it was
23   pretty limited program.
24             Q.    In what way?
25             MR. MINCH:  Objection.

92

1                              ROESLER

2          Q.     Time?

3          A.     Timewise.

4          Q.     Who made the decision -- when you

5    say it was pretty limited timewise, what do you

6    mean?

7                  MR. MINCH:   Objection.

8          A.     It may only have been a six-month

9    promotion.   Limited number of tee-shirts.   It

10   was a small deal.   It may have been a couple

11   thousand tee-shirts.   Higher-end tee-shirts

12   that they sold, but a small program.

13         Q.     And they paid MMLLC for the use of

14   those images?

15                 MS. COLBATH:   Objection.

16                 MR. MINCH:   Objection.

17         A.     No.   They paid -- they paid Marilyn

18   Monroe LLC for the license to use the

19   intellectual property rights of Marilyn Monroe.

20         Q.     Thank you.   You had mentioned

21   that -- getting back to the beginning of how we

22   got into this --

23                 (Discussion off the record.)

24         Q.     You mentioned that Larry had

25   discussions -- was having discussions with

93

1                           ROESLER
2      Dolce & Gabbana; correct?
3           A.    Correct.
4           Q.    And it's because of this unknown
5      party within Dolce & Gabbana that you know of
6      these discussions; correct?
7                      MR. MINCH:  Objection.
8                      MS. COLBATH:  Objection.
9           A.    Right.
10          Q.    Do you know what Larry said to
11     Dolce & Gabbana?
12                     MR. MINCH:  Objection.
13          A.    He told them not to deal with us,
14     that they didn't need a license from us, that
15     they could get all the rights from him and just
16     use the photographs, and that they owned the
17     copyrights to the photographs, and there was no
18     reason to pay anything else.
19          Q.    But sitting here today, you don't
20     know what photographs were at issue.
21                     MS. COLBATH:  Objection.
22                     MR. MINCH:  Objection.
23          A.    Correct.
24          Q.    And sitting here today, you don't
25     know whether Larry ever sent a cease-and-desist

94

```
 1                           ROESLER
 2     letter to Dolce & Gabbana, do you?
 3               MR. MINCH:  Objection.
 4          A.    Well, based on what we've talked
 5     about, I don't know why he would have sent a
 6     cease-and-desist letter.  I'm not sure what you
 7     mean by that.
 8          Q.    You had mentioned that this party
 9     within Dolce mentioned that Larry had mentioned
10     to this employee of Dolce & Gabbana that they
11     didn't need a license from MMLLC.
12          A.    Right.  Well, I wouldn't
13     necessarily --
14               MS. COLBATH:  Let me object.
15               MR. MINCH:  Objection.
16               MS. COLBATH:  Could I have the
17          question read back?
18               MR. SERBAGI:  He is in the middle
19          of his answer.  That is blatant coaching.
20               THE WITNESS:  Maybe if I answer it
21          you won't need it read back.
22          A.    Just to clarify --
23          Q.    Let me know.
24          A.    I wouldn't characterize
25     communication from the Shaws or their
```

95

ROESLER

1

2    representative to a licensee saying that they

3    own the copyrights as a cease-and-desist

4    letter.  I wouldn't characterize it as that,

5    because it's a negotiation at that point.

6              So it's -- there's nothing to cease

7    and desist, I mean unless you said you could

8    cease and desist the negotiation.  So there's a

9    discussion going on where -- where they're

10   making certain representations that you don't

11   need to continue those discussions with Marilyn

12   Monroe LLC.  You can just continue those

13   discussions with us.

14        Q.    Right.  Thank you for clarifying

15   that.

16        A.    Okay.  So we're on the same --

17        Q.    That's helpful.  Thank you.  Did --

18   do you know whether Dolce & Gabbana -- let's

19   get back do the purported representations that

20   this employee within Dolce made.

21        A.    Uh-huh.

22        Q.    So the record is clear and it

23   doesn't get garbled up in all the other

24   questions I've asked, you don't know the name

25   of the employee?

96

```
 1                      ROESLER
 2        A.    No.
 3              MS. COLBATH:  Objection.
 4              MR. MINCH:  Objection.
 5              (Discussion off the record.)
 6        Q.    Do you know whether that employee
 7   is currently at Dolce?
 8        A.    No.
 9        Q.    Did you take any notes when you had
10   a discussion with this employee at Dolce?
11        A.    No.
12        Q.    Is there anything in your files
13   that memorialize this purported discussion with
14   Dolce?
15              MR. MINCH:  Objection.
16        A.    Perhaps.  Perhaps.
17        Q.    Would that have been something that
18   you would have produced in connection with this
19   litigation?
20              MR. MINCH:  Objection.
21        A.    I don't know.
22        Q.    Other than -- and this is all
23   getting back to the initial question, which
24   was, you had stated there were representations
25   that the Shaw Family made to various licensees.
```

97

```
 1                      ROESLER
 2    And one of those representations was in
 3    connection with this tee-shirt program with
 4    Dolce & Gabbana.  Putting that aside, are there
 5    any other representations that you know of that
 6    the Shaw Family made to licensees of MMLLC
 7    regarding images of Marilyn Monroe?
 8                  MR. MINCH:  Objection.
 9                  MS. COLBATH:  Objection.
10        Q.      And rights they purportedly have in
11    them?
12                  MR. MINCH:  Objection.
13                  MS. COLBATH:  Objection.
14                  MR. MINCH:  I want to make sure,
15           for the record, that we understand -- I'm
16           a little bit lost right now what
17           representations you're speaking of.  I
18           don't want to testify for Mr. Roesler.
19           I'm confused.  I'm not sure -- I want to
20           make sure that Mr. Roesler is clear.
21        Q.      Do you understand what I'm talking
22    about?
23        A.      I have a question for you.
24        Q.      Sure.
25        A.      On your --
```

98

ROESLER

1

2      Q.    Just like a lawyer to ask a

3  question of the --

4      A.    When you say licensees of Marilyn

5  Monroe LLC, do you want to broaden that to

6  companies that they've done business with that

7  aren't licensees of Marilyn Monroe LLC?

8  Because the universe, so to speak, is companies

9  that have licenses with Marilyn, some of which

10  do and do not have also licenses with the

11  Shaws.  And then the rest of that universe is

12  the companies that just have licenses with the

13  Shaws and not with Marilyn Monroe LLC.

14         So I was confused by your question.

15  You said just Marilyn Monroe LLC.

16      Q.    You're absolutely right.  That is a

17  good distinction to make.  I'd like to make

18  that distinction right now.  Let's talk about

19  the universe of companies that have done

20  business with MMLLC or would like to do

21  business with MMLLC, anybody that -- any

22  company that had discussions with MMLLC.

23      A.    Okay.

24      Q.    Let's limit the next portion of

25  this discussion to that.  And are there any

99

ROESLER

1

2    specific communications that you know of from

3    the Shaw Family to those -- let's call them

4    prospective and actual licensees of MMLLC --

5    regarding rights that the Shaw Family has in

6    Marilyn Monroe?

7          A.    It's my understanding there are,

8    but the specifics of those would probably -- I

9    don't necessarily know the specifics of it

10   because I'm not necessarily on the front lines

11   of all of those discussions.  And I can just go

12   back to what I said earlier, which was I know

13   often the people that we're working with are

14   also being -- have encounters with the Shaw

15   Group or their representative, Bradford.  And

16   it creates the -- what do you call it --

17   confusion, the questions, and so forth.

18         Q.    Let's get into details of that.  Do

19   you know of any particular -- can you, sitting

20   here today, name a specific licensee that would

21   fall into what you describe as this confusion

22   that's been created?

23               MR. MINCH:  Objection.

24               MS. COLBATH:  Objection.

25         A.    Well, again, some of the details of

100

ROESLER

1

2  all the various licensees that would fall in

3  there, I can't necessarily recite all of those,

4  but there's numerous ones.  I mean, there's --

5  you know, we had a situation with -- I believe

6  the company was Frieze.  It's just hard for me

7  to remember some of the names.  But quite a

8  few.  I'd say in excess of 15 or 20 different

9  companies in different parts -- I mean,

10  different discussions with these different

11  companies in terms of --

12       Q.    Let's talk about it.  With respect

13  to Frieze, what happened there?

14            MR. MINCH:  Objection.

15       A.    Well, it's easier to explain the

16  end result, and then, you know, back it up from

17  the end result.  It's difficult for me to give

18  you all the details of what happened, you know,

19  in-between.  But the end result is often these

20  people either don't do a program at all, or

21  they do a program and just do a license with --

22  through Bradford with the Shaw -- with the Shaw

23  Group.

24            So I guess, you know, if you ask me

25  all the various details of how all of those

101

```
 1                        ROESLER
 2   transpired, I don't necessarily know all those
 3   details.
 4        Q.    All right.  We were talking about
 5   Frieze.
 6        A.    Okay.
 7        Q.    I'm going to ask you the details of
 8   that.  If you can't remember, you can't
 9   remember.
10        A.    Okay.  Fair enough.
11        Q.    What did -- what are the
12   representations that Shaw Family purportedly
13   made to Frieze?
14             MR. MINCH:  Objection.
15        A.    Well, my recollection was that we
16   had communicated with Frieze and objected to
17   the use of -- the use of the words "Marilyn
18   Monroe" because we had a trademark in the
19   apparel class and they were using images of --
20   I'm sure it was Shaw.  I mean, sometimes they
21   get different photographers messed up, but I
22   think in this case it was Shaw.  And they said
23   that they were comfortable with the
24   representations and indemnities they had from
25   the Shaw and Bradford Group and they didn't
```

102

                              ROESLER

1

2    need a license for Marilyn Monroe LLC.

3         Q.    For what?  A license for what?

4              MR. MINCH:  Objection.

5         A.    A license for, in this case,

6    trademarks of Marilyn Monroe.

7         Q.    You're referring to the written

8    word, "Marilyn Monroe"?

9         A.    Yes.

10        Q.    Specifically in stylized format;

11   correct?

12             MS. COLBATH:  Objection.

13        Q.    Cursive.

14        A.    I'm not sure I'm referring to it

15   specifically in that --

16        Q.    Okay.  With respect to Frieze, were

17   there discussions between MMLLC -- you

18   mentioned that Frieze said they didn't need a

19   license from MMLLC with respect to the

20   trademarks.  Did they say to you, Frieze, that

21   they didn't need a license from MMLLC with

22   respect to any of the images of Marilyn Monroe

23   that you have in your collection --

24             MR. MINCH:  Objection.

25             MS. COLBATH:  Objection.

103

1                     ROESLER
2        Q.    -- and that MMLLC has in its
3    collection?
4        A.    I'm sorry.  The images.  I'm
5    confused by what you mean by that.  They'd
6    already selected their images.
7        Q.    So you had a deal with Frieze for
8    the images of Marilyn Monroe?
9              MR. MINCH:  Objection.
10             MS. COLBATH:  Objection.
11       Q.    What did you mean by they already
12   selected the images?
13             MR. MINCH:  Objection.
14             MS. COLBATH:  Objection.
15       A.    They had a license from the Shaws
16   for various images on tee-shirts of Marilyn
17   Monroe.  So presumably they had a copyright
18   license with the Shaws.  I never saw the
19   license.
20       Q.    You said that they have a license
21   from the Shaws for various images of Marilyn
22   Monroe; correct?
23       A.    That's correct.
24       Q.    Do you agree?
25             (Brief interruption.)