104

1                    ROESLER
2              (Discussion off the record.)
3         Q.    Do you know what images of Marilyn
4    Monroe we're talking about?
5         A.    No.
6              MR. MINCH:  Objection.
7         Q.    Do you know if those images of
8    Marilyn Monroe were protected by copyright or
9    not?
10             MR. MINCH:  Objection.
11        A.    No.
12        Q.    Did you undertake to find out the
13   answer to that question prior to your
14   deposition today?
15             MR. MINCH:  Objection.
16        A.    No.
17        Q.    You said earlier that presumably
18   the deal between the Shaw Family and Frieze was
19   for the copyright -- licensing of the
20   copyright; correct?
21        A.    Correct.
22        Q.    But you don't know that's the case,
23   do you?
24             MR. MINCH:  Objection.
25        A.    I mean, I can't make a definitive

105

ROESLER

1

2  statement on that.  That's why I said

3  presumably.

4        Q.    You didn't see the agreement

5  between the Shaw Family and Frieze, did you?

6             MR. MINCH:  Objection.

7        A.    No.

8             (Discussion off the record.)

9        Q.    So we're clear, the MMLLC had not

10  offered Frieze -- did Frieze come to MMLLC and

11  request permission to license any images of

12  Marilyn Monroe?

13             MR. MINCH:  Objection.

14        A.    No.

15        Q.    So I'm going to ask you a couple of

16  obvious questions.  I'd like to get it for the

17  record.  With respect to images of Marilyn

18  Monroe, Frieze -- there was never a deal

19  memorandum between CMG, MMLLC, and Frieze for

20  the licensing of images of Marilyn Monroe;

21  correct?

22             MR. MINCH:  Objection.

23        A.    Correct.

24        Q.    And there was never any formalized

25  license agreement memorializing the terms of

106

                         ROESLER
1
2      any agreement for Frieze to license images of

3      Marilyn Monroe; isn't that right?

4                  MR. MINCH:  Objection.

5           A.    Correct.

6           Q.    Now, to refresh my recollection,

7      what representations did you say that the Shaw

8      Family had made to Frieze regarding images of

9      Marilyn Monroe, if any?

10                 MR. MINCH:  Objection.

11          A.    That they didn't need any license

12     to proceed with their program of -- that

13     involved Marilyn Monroe from Marilyn Monroe

14     LLC.

15          Q.    And in particular, you identified

16     the trademarks.

17          A.    The trademarks or right of

18     publicity.

19          Q.    So you're saying that Larry Shaw

20     said to someone at Frieze that they didn't need

21     a right of publicity for Marilyn Monroe?

22                 MR. MINCH:  Objection.

23          A.    You're -- Larry was Dolce &

24     Gabbana.  I'm not sure who Frieze was, whether

25     it was Bradford or --

107

1                        ROESLER

2          Q.    So you don't know whether it was

3     Bradford, Meta Stevens, Edith Marcus, or Larry

4     Shaw that made this purported representation to

5     Frieze that they didn't need a right of

6     publicity from the estate?

7                    MR. MINCH:  Objection.

8                    MS. COLBATH:  Objection.

9          A.    That's correct.

10                    MR. SERBAGI:  Did you hear the

11          question?  You just walked in the room.

12                    (Discussion off the record.)

13          Q.    Do you know when this purported

14     representation was made to Frieze?

15                    MR. MINCH:  Objection.

16          A.    I'd say that was early on in the

17     litigation, so I'd say three years ago.

18          Q.    Do you know who at Frieze the

19     representation was made to?

20          A.    No.

21          Q.    How did you find -- first find out

22     about this purported representation?

23                    MR. MINCH:  Objection.

24          A.    Well, it was discussed for a number

25     of months.  The whole situation was discussed

```
 1                         ROESLER
 2      internally and with counsel.
 3           Q.     The question is how did you first
 4      find out about the purported representation
 5      that one of the entities we've discussed
 6      represented to Frieze that they didn't need a
 7      right of publicity for Marilyn Monroe?
 8                     MR. MINCH:  Objection.
 9                     MS. COLBATH:  Objection.
10           A.     I don't recall how I first found
11      out.
12           Q.     You don't know if it was by
13      telephone?
14           A.     No.
15                     MR. MINCH:  Objection.
16           Q.     You don't know if it was by letter?
17                     MR. MINCH:  Objection.
18           A.     No.
19           Q.     You don't know who it was?
20                     MR. MINCH:  Objection.
21           A.     No.
22                     (Discussion off the record.)
23           Q.     You don't know who from my clients
24      made the representation?
25                     MR. MINCH:  Objection.
```

109

                        ROESLER

1

2      A.    I do not.

3      Q.    You don't know how they made the

4   representation?

5            MR. MINCH:  Objection.

6      A.    I do not.

7      Q.    You don't know when they made the

8   representation?

9            MR. MINCH:  Objection.

10     A.    You mean the year?

11     Q.    Yes.

12     A.    2005.

13     Q.    Do you know if it was prior to

14  Judge McMann's decision in this case --

15           MR. MINCH:  Objection.

16     Q.    -- ruling that the estate of

17  Marilyn Monroe has no right of publicity?

18           MR. MINCH:  Objection.

19           MS. COLBATH:  Objection.

20     A.    You said it was 2005.  So that

21  ruling was 2007.

22     Q.    So it was before.

23     A.    It was before.

24           (Discussion off the record.)

25           THE VIDEOGRAPHER:  We are now off

110

1                           ROESLER
2        the record at approximately 2:14 p.m.
3               (The luncheon recess was taken at
4        2:14 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

111

```
 1                    ROESLER
 2         A F T E R N O O N   S E S S I O N
 3                    2:40 p.m.
 4           M A R K   R O E S L E R ,
 5      having been previously duly sworn by the
 6      notary, was examined and testified
 7      further as follows:
 8               THE VIDEOGRAPHER:  This is tape 3
 9      in the deposition of Mark Roesler.  We
10      are now on the record at approximately
11      2:40 p.m.
12               EXAMINATION RESUMED BY MR. SERBAGI:
13      Q.     Good afternoon, Mr. Roesler.
14      A.     Good afternoon.
15      Q.     Now, you were speaking about
16      representations that Mr. Shaw purportedly made
17      to Frieze, prior to the break; correct?
18      A.     Correct.
19      Q.     And you stated that Larry had
20      represented to someone at Frieze that they
21      didn't need to go to the estate for right of
22      publicity; correct?
23      A.     No.  That's not correct.  What we
24      talked about was that the Larry discussion was
25      with Dolce & Gabbana.
```

112

1                     ROESLER

2          Q.     I apologize.

3          A.     And we weren't sure who discussion

4     with Frieze was, whether it was Bradford or

5     Shaws or whoever.

6          Q.     Right.  At least with respect to

7     the right of publicity, whatever representation

8     somebody at Shaw or Bradford made -- let me

9     restate that.  So we're clear, sometime in --

10    to refresh my recollection, when was that

11    statement that somebody at Shaw made to Frieze,

12    in what year, approximately, that you're

13    referring to?

14               MR. MINCH:  Do you want to have

15          your answer read back to you?

16               THE WITNESS:  I don't think so.  I

17          think I remember what it was.

18          A.     It was when the litigation first

19    started.  So around 2005.

20          Q.     And one of my clients made the

21    representation that Frieze didn't need a right

22    of publicity from the estate of Marilyn Monroe,

23    MMLLC; correct?

24               MR. MINCH:  Objection.

25               MS. COLBATH:  Objection.

113

ROESLER

Q.    That's what you're saying?

A.    No.    What I said was that Frieze
was told that they did not need to secure any
approvals other than from Bradford/Shaw.    That
it wasn't necessary to clear any other rights
with the Marilyn Monroe estate.

Q.    At least with respect to the right
of publicity, whoever made that statement was
correct, weren't they?

MS. COLBATH:  Objection.

MR. MINCH:  Objection.

Q.    That they didn't need at the time
clearance from MMLLC or CMG for a right of
publicity?

MR. MINCH:  Objection.

MS. COLBATH:  Objection.

A.    That was a pretty compound
question.  Do you want to repeat that?  My
short answer is no, that's not correct.  But if
you want to go back and dissect that a bit.

Q.    Judge McMann ruled in May of 2005
that are MMLLC does not have a right of
publicity --

A.    2007.

114

1                          ROESLER

2          Q.    Excuse me.  -- May of 2007 that

3    MMLLC does not have right of publicity in

4    Marilyn Monroe; correct?

5                MS. COLBATH:  Objection.

6          A.    That is -- there was a ruling

7    something to that effect, yes.

8          Q.    And soon after that decision, Judge

9    Morrow in California made a similar ruling;

10   correct?

11               MR. MINCH:  Objection.

12         A.    A similar ruling, yes.

13         Q.    So it turned out that the

14   representation from someone at the Shaw Family

15   or Bradford to Frieze that they didn't need

16   permission to -- in terms of having a right of

17   publicity, they didn't need to license a right

18   of publicity from MMLLC or CMG, that was a

19   correct representation at the time, wasn't it?

20               MR. MINCH:  Objection.

21               MS. COLBATH:  Objection.

22         A.    Well, my answer to that was no.  My

23   answer to that was no.

24         Q.    What's the basis for saying no?

25               MR. MINCH:  Objection.

115

                              ROESLER

1                          MS. COLBATH:  Objection.

2         A.     Well, a couple comments about what

3    you just said.  Number one, you said with

4    respect to the right of publicity.  And our

5    position has always been that Marilyn Monroe

6    LLC has a portfolio of intellectual property

7    rights that we discussed earlier, including

8    whatever rights exist with respect to the right

9    of publicity is one of those assets that they

10   possess.

11              So jumping back ahead to your

12   comment on Frieze, no.  We think that the

13   actions by Frieze were, at a minimum, a clear

14   infringement on the trademark rights of Marilyn

15   Monroe LLC.

16        Q.     I'm speaking only about the right

17   of publicity now, putting aside the trademark

18   issue.

19                    MR. MINCH:  Objection.

20        A.     If you want to rephrase your

21   question to hone in on that, I'll -- or however

22   you want to do that.  We can go back to it.

23        Q.     With respect to Frieze, you're

24   saying that somebody -- one of my clients made

116

ROESLER

1  a representation to someone at Frieze that they

2  didn't need the right to license a right of

3  publicity among other rights from MMLLC and

4  CMG.

5  A.    Okay.   Let's stop there if we

6  could, because I don't know exactly what the

7  extent of those representations were between

8  your client and Frieze and whether those

9  representations simply stopped at the

10 discussion on the right of publicity, or

11 included all rights of Marilyn Monroe, or what.

12 So I can't definitively answer that question.

13 Q.    Do you know whether one of my

14 clients, Shaw Family, or Bradford, Meta

15 Stevens, or Edith Marcus ever told Frieze that

16 they don't need to license a right of publicity

17 from CMG or MMLLC?

18          MR. MINCH:   Objection.

19 A.    I don't know specifically what they

20 said.  No.  I don't have specific knowledge.

21 Q.    So we're clear, you don't have

22 specific knowledge what my clients -- I'm

23 referring to my clients collectively as

24 Bradford, Meta Stevens, Edith Marcus and Shaw

117

1                    ROESLER
2    Family Archives.  For the remainder of this
3    deposition you'll understand what I mean when I
4    say "my clients"?
5         A.    Yes, I will.
6         Q.    To be clear, putting aside the
7    right of publicity issue which you've just
8    testified about, can you tell me the specifics
9    of what my clients purportedly said to Frieze
10   regarding the other purported intellectual
11   property in possession of MMLLC for Marilyn
12   Monroe?
13                    MR. MINCH:  Objection.
14        A.    I can't tell you the specifics of
15   the conversation that any of your clients had
16   with Frieze.  I can only tell you that the end
17   result was Frieze telling us that they were
18   assured that they did not need to secure any
19   rights from Marilyn Monroe LLC, and therefore
20   would continue to sell the products as they
21   were, and would not -- would not negotiate any
22   type of license or whatever with Marilyn Monroe
23   LLC.
24                    And we had an existing relationship
25   with Frieze with some of our other clients,

118

```
 1                        ROESLER
 2    some of our other celebrity clients who we
 3    were -- had an open dialogue with Frieze.
 4         Q.    And --
 5         A.    It was not a contentious dialogue,
 6    I guess is the best way do describe it.
 7         Q.    Okay.  Now, you mentioned that
 8    Frieze, you know what the ultimate result is,
 9    that Frieze came to a determination that they
10    didn't need to license any intellectual
11    property from MMLLC.  My question is: Do you
12    know how they came to that determination?
13              MR. MINCH:  Objection.
14         A.    No.
15         Q.    Do you know whether that
16    determination was based on advice of their
17    legal counsel?
18              MR. MINCH:  Objection.
19         A.    I'm sure it involved their legal
20    counsel.  But I don't know the specifics of
21    that.  I don't know the specifics.
22         Q.    But you don't know one way or the
23    other --
24         A.    No.
25              MR. MINCH:  Objection.
```

119

ROESLER

1

2          MS. COLBATH:  Objection.

3      Q.     -- whether Frieze's decision not to

4    license intellectual property from MMLLC was

5    based on advice of counsel or not.

6          MR. MINCH:  Objection.

7      Q.     Correct?

8      A.     That's correct.

9      Q.     You don't know whether the Friezes'

10   decision not to proceed with licensing

11   intellectual property relating to Marilyn

12   Monroe from MMLLC was a result of their own

13   in-house analysis from their business people;

14   correct?

15         MR. MINCH:  Objection.

16         MS. COLBATH:  Objection.

17     A.     Well, I mean, that wouldn't be

18   logical.  That assumption wouldn't be logical.

19   I mean, this was in their legal department, and

20   it was involving the legalities, not the -- not

21   whether or not they would proceed with the

22   program, because they were doing the program

23   with Marilyn.

24     Q.     I guess in essence what I'm getting

25   at, finally, to make the record clear, you

120

ROESLER

1                                  ROESLER

2    don't know how they came to the determination

3    to make the decision whether to proceed with

4    MMLLC licensing Marilyn Monroe-related

5    intellectual property.  You don't know how they

6    came to that decision, do you?

7                MR. MINCH:  Objection.

8                MS. COLBATH:  Objection.

9        A.    That is correct.

10       Q.    Again, getting back to the initial

11   question, was representations that you've

12   stated that my clients have made to licensees

13   or potential licensees of MMLLC regarding

14   Marilyn Monroe images, you've mentioned Frieze

15   and you've mentioned Dolce & Gabbana.  Sitting

16   here today, can you tell me any others where

17   Shaw Family or any of my clients represented

18   that they didn't need to go to the estate to

19   license Marilyn Monroe-related intellectual

20   property?

21               MR. MINCH:  Objection.

22       A.    Well, sometimes I can remember the

23   products, but I can't remember the names.  I

24   mean, I know there were different products out

25   there.  Like there was some ladies' underwear.

121

ROESLER

1
2  There was some -- there was a bath care line.
3  And there was a party good line.  But I can't
4  remember the companies.  The names.
5        Q.    So the record is clear, you can't,
6  sitting here today, tell me the name of any
7  company other than Frieze and Dolce & Gabbana
8  where my clients represented to them that they
9  didn't need to go to MMLLC or CMG to license
10 Monroe-related intellectual property, whether
11 that be right of publicity or any other
12 intellectual property that the estate
13 purportedly has; correct?
14            MR. MINCH:  Objection.
15       A.    Sitting here today with the
16 information that I have, I could not.  But my
17 office could, or I could -- we have access to
18 that information.  But I don't have a specific
19 recollection of all the names.
20       Q.    Well -- or any other name other
21 than the ones you've just mentioned; right?
22       A.    That's correct.
23       Q.    Now, with respect to these various
24 products that you're speaking of, ladies'
25 underwear, I think you said, bath care line,

122

ROESLER

1

2    party care line, what did you mean by that,

3    specific products?  What were you referring to

4    when you spoke about products?

5                MS. COLBATH:  Objection.

6         A.    Companies that -- companies that

7    were either engaged in discussions or were

8    doing programs with Bradford that reached the

9    conclusion that they did not need to work with

10   Marilyn Monroe LLC.

11        Q.    Can you identify the nature of any

12   specific communication to any specific

13   company -- let me rephrase that.  You testified

14   earlier you can't remember any other companies

15   other than the two you've mentioned, Frieze and

16   Dolce & Gabbana; correct?

17        A.    Correct.

18              MR. MINCH:  Objection.

19              MS. COLBATH:  Objection.

20        Q.    Can you recall, sitting here today,

21   any specific representation that was made by

22   any of my clients referring to any of the

23   companies that own the products that you've

24   referred to here regarding their necessity to

25   go to MMLLC to license Marilyn Monroe

123

```
1                       ROESLER
2    intellectual property?
3                 MR. MINCH:   Objection.
4         A.     I cannot.
5         Q.     Not only can you not remember the
6    nature of the representation, but I'm sure
7    you're not -- it would follow that you're not
8    able to recall, sitting here today, who in
9    particular of my clients, whether it was Meta
10   Stevens, Edith Marcus, Larry Shaw, Bradford,
11   made these purported representations; is that
12   right?
13                MR. MINCH:   Objection.
14                MS. COLBATH:   Objection.
15        A.     That's correct.
16        Q.     And with respect to these
17   additional products that you're talking about,
18   ladies' underwear, bath care line, party care
19   line, you don't know, sitting here today,
20   whether any of my clients asserted to the
21   owners of these products that we had -- meaning
22   my clients -- valid copyrights that would have
23   precluded -- valid copyrights that would
24   have -- let me rephrase.
25                With respect to these additional
```

124

ROESLER

1

2      products we're talking about and the

3      representations that my clients purportedly

4      made, do you know what images -- particular

5      images of Marilyn Monroe my clients purportedly

6      were speaking of when they had these

7      representations -- when they made these

8      representations to these other companies?

9                  MS. COLBATH:  Objection.

10                 MR. MINCH:  Objection.

11         A.     I'm sorry, Chris.

12         Q.     I'll try to rephrase.  What I'm

13     getting at is that you're asserting that

14     certain representations were made by my clients

15     regarding rights to images of Marilyn Monroe

16     that my clients may have had, purportedly,

17     copyrights.

18         A.     Correct.

19         Q.     I'm asking can you identify,

20     sitting here today, the copyrights at issue of

21     Marilyn Monroe?

22         A.     No, I cannot.

23         Q.     Or images of the Marilyn Monroe

24     issue?

25         A.     I cannot.

125

ROESLER

1

2      Q.    So we're absolutely clear for the

3  record, other than Frieze and Dolce & Gabbana,

4  sitting here today, you can't identify any

5  specific licenses or potential licenses of

6  MMLLC that either any of my clients purportedly

7  made representations to regarding rights to

8  images of Marilyn Monroe?

9                MR. MINCH:  Objection.

10               MS. COLBATH:  Objection.

11     A.    Not without specific information

12  from my office, that's correct.  I can't,

13  sitting here today, at this exact moment,

14  give -- recall any of the specifics.

15     Q.    Did you undertake to ascertain that

16  information before you came to the deposition

17  today?

18               MR. MINCH:  Objection.

19     A.    No.  Not that specific

20  information.

21     Q.    What information did you attempt to

22  ascertain?

23               MR. MINCH:  Objection.

24     A.    Well, I work in this every day, so

25  I have a wide -- a decent memory, not as good

126

ROESLER

1

2   as it used to be, so I'm testifying as to what

3   I know and what I recall.

4        Q.    I understand.

5        A.    I mean, to ask me for names and

6   specifics on companies and who said what,

7   that's hard for me to truthfully tell you.  I

8   don't have that information at my fingertips.

9        Q.    Sure.

10       A.    Or in my mind.

11       Q.    Has MMLLC, through CMG, ever

12   licensed any of the images of Marilyn Monroe --

13   well, let me rephrase.  CMG doesn't license

14   actual images of Marilyn Monroe.  It licenses

15   intellectual property; is that correct?

16            MS. COLBATH:  Objection.

17       A.    Will you clarify what the

18   difference is?  I mean, images are -- I mean,

19   if an image is protected by a copyright, that's

20   an intellectual property right that you could

21   license.  And what Bradford and Shaw folks do

22   is, they license the intellectual property

23   rights of the images they own.

24       Q.    Right.  But Shaw also has images of

25   Marilyn Monroe, actual prints, in their

127

1                       ROESLER
2    collection, don't they?
3                  MS. COLBATH:  Objection.
4        A.     Yes.
5        Q.     So they license actual images at
6    times; right?
7        A.     I'm confused what you mean by
8    "license images."  You mean sell images.
9    Specifically sell limited edition prints?
10       Q.     Let me rephrase the question.  With
11   respect to Marilyn Monroe, what MMLLC does is
12   license -- they have in the past and to date --
13   license a right of publicity in Marilyn Monroe;
14   correct?
15                 MS. COLBATH:  Objection.
16       A.     That is not correct.  That's
17   partially -- partially correct, but standing on
18   its own would be incorrect.
19       Q.     Why don't you clarify it for me.
20       A.     Marilyn Monroe LLC has a portfolio
21   of intellectual property rights.  Those include
22   certain copyrights.  They have both film
23   footage and images that they own the copyrights
24   to.  They have artwork, illustrations that they
25   own the copyrights to.  They have various

128

ROESLER

1
2  trademarks around the world for Marilyn Monroe.
3  They have the right of publicity when and where
4  it exists.  They have common-law trademark
5  rights.  Common-law right of publicity rights.
6  They have Lanham Act rights.  So there's this
7  portfolio of intellectual property rights that
8  they -- that the entity owns.
9       Q.   And licenses.
10      A.   And licenses.  Correct.
11      Q.   Has MMLLC, through CMG, ever
12  licensed any of the images of Marilyn Monroe
13  that appear in the Rizzoli book?
14           MR. MINCH:  Objection.
15      A.   I don't --
16           MS. COLBATH:  Objection.
17      A.   I don't know.  I don't know.  I
18  don't know.
19      Q.   Did you undertake to find the
20  answer to that question prior to the submission
21  of the Third Amended Complaint in this action?
22           MR. MINCH:  Objection.
23      A.   I mean, there's -- I guess you'd
24  have to hone in on your question just a little
25  more, because there's two aspects to that.

129

ROESLER

1  Aspect number one would be, do any licensees

2  use those images in the Rizzoli book on their

3  own because they believe that they are in the

4  public domain?

5          And part two of that would be, do

6  we actually take those images and send them out

7  to people and encourage them to use those

8  images that are -- that were taken by Sam Shaw

9  and contained in the Rizzoli book?

10          Would you agree with me, those are

11  the two aspects of that?  I'm just trying to

12  answer it as efficiently and correctly as --

13      Q.    I guess -- let me rephrase the

14  question, then.  I'll take that.  When I say

15  "I'll take that," I'll leave that testimony and

16  go on to another -- rephrase the question I was

17  trying to ask.

18      A.    Okay.

19      Q.    Has MMLLC ever licensed to any of

20  its licensees, through CMG or anybody else, to

21  your knowledge, any of the images that appear

22  in the Rizzoli book?

23          MR. MINCH:  Objection.

24          MS. COLBATH:  Objection.

130

ROESLER

1

2      A.    Will you define the word "license"?

3   Your definition of the word "license."

4      Q.    What's your definition of the word

5   "license"?

6              MR. MINCH:  Objection.

7              MS. COLBATH:  Objection.

8      A.    Well, to answer that, I think what

9   I'll do is tell you what I think you -- what I

10  hear you saying on that question, is: Have we

11  ever provided images and charged a fee for

12  images that were taken by the photographer Sam

13  Shaw and contained in the Rizzoli book?  Is

14  that the question?

15     Q.    That is the question.

16     A.    Okay.  Not to my knowledge.

17     Q.    Sitting here today, do you know of

18  any instances where MMLLC or CMG made offers to

19  specific licensees to use images of Marilyn

20  Monroe taken by Sam Shaw that are contained in

21  the Rizzoli book?

22             MS. COLBATH:  Objection.

23             MR. MINCH:  Objection.

24     A.    Not to my knowledge.  Not to my

25  knowledge.

131

ROESLER

Q.    Do you know of any particular
company, sitting here today, that desired to
use, in connection with the sale of goods and
services, images of Marilyn Monroe taken by Sam
Shaw that are contained in the Rizzoli book?

MS. COLBATH:  Could I have that
read back again?

Q.    Let me rephrase it.  It's not
complete.  Let me add on to the end, "and
didn't do so because they were fearful of being
sued by the Shaw Family or any of my clients?"

MR. SERBAGI:  You can read the
whole thing back.

(The record was read as requested.)

MR. MINCH:  Objection.

MS. COLBATH:  Objection.

A.    No.

MR. SERBAGI:  Let's mark as Roesler
Exhibit 3 a book entitled "Marilyn
Monroe, the Life, the Myth."

(Roesler Exhibit 3 for
identification, book, "Marilyn Monroe,
the Life, the Myth.")

(Discussion off the record.)

132

ROESLER

Q.    So the record is clear, I'm not
going to ask you any other questions about that
book other than when we're talking about the
Rizzoli book today.  Is that what is marked as
Roesler 3 in fact the Rizzoli book?

A.    It is.

Q.    Thank you.

(Discussion off the record.)

Q.    Has MMLLC or CMG ever licensed any
of the images of Marilyn Monroe contained in
what is referred to in this litigation as the
Ballantine book, otherwise known as "Marilyn
Monroe As the Girl"?

MR. MINCH:  Objection.

A.    I don't have specific knowledge of
that.

Q.    Do you know, sitting here today,
whether MMLLC or CMG ever engaged in any
negotiations with parties that desired to
license from MMLLC, CMG images of Marilyn
Monroe that are contained in the Ballantine
book?

MR. MINCH:  Objection.

THE WITNESS:  Do you mind repeating

133

ROESLER

1

2       that question?

3              (The pending question was read

4       back.)

5       A.    I don't have any specific knowledge

6  of that.

7       Q.    Sitting here today, do you know

8  whether any company or individual or entity

9  ever declined the opportunity to use images of

10 Marilyn Monroe that are contained in the

11 Ballantine book because they were fearful of

12 being sued by the Shaw Family?

13             MR. MINCH:  Objection.

14             MS. COLBATH:  Objection.

15      Q.    Or any of my clients?

16      A.    I do not.

17             (Discussion off the record.)

18      Q.    I'd like to talk about the Third

19 Amended Complaint a little bit with you, Mr.

20 Roesler.

21      A.    Okay.

22      Q.    What role did CMG play in filing

23 this litigation against my clients in Indiana?

24             MR. MINCH:  Objection.

25             MS. COLBATH:  Objection.

134

ROESLER

1

2      A.    I'm sorry.  You've confused me

3  because you said you're talking about the Third

4  Amended Complaint.

5      Q.    You are correct.  Let me rephrase

6  the question.  I'm trying to get a little

7  background.  Let's put aside the Third Amended

8  Complaint for now.  Thank you for clarifying

9  that.

10     A.    Put the Third Amended Complaint

11  aside?

12     Q.    Put it aside.  We'll get to it.

13            What role did CMG play in the

14  decision to sue my clients in Indiana for a

15  violation of the right of publicity and various

16  other criminal statutes and other causes of

17  action?

18            MR. MINCH:  Objection.

19     A.    We brought the problem to the

20  attention of Marilyn Monroe LLC and their

21  counsel, Gibson Dunn & Crutcher, because of

22  the -- the aggressive marketing that was being

23  undertaken by the Bradford Group and the

24  position that there was no -- that the Marilyn

25  Monroe LLC did not have any enforceable

135

```
 1                      ROESLER
 2   intellectual property rights.
 3             MR. SERBAGI:  I'd like to mark as
 4        Roesler Exhibit 4 a document entitled
 5        "Complaint for Damages and Injunctive
 6        Relief."
 7             (Roesler Exhibit 4 for
 8        identification, document, "Complaint for
 9        Damages and Injunctive Relief.")
10        Q.    What is this document?
11        A.    This was the initial action that
12   was filed.
13        Q.    When you say "the initial action
14   that was filed," you mean in Indiana for CMG
15   and MMLLC as plaintiffs against Bradford
16   Licensing and Shaw Family Archives?
17             MR. MINCH:  Objection.
18        A.    That's correct.
19        Q.    Turn to the last page.  It's
20   signed.  Do you see there the signature of
21   Jonathan Pollock?
22        A.    I do.
23        Q.    And do you have any reason to
24   believe that this was not the actual complaint
25   that was filed in the Indiana action?
```

136

```
1                         ROESLER
2          A.    I do not.
3          Q.    And what role did CMG play in the
4    decision, the final decision, to file suit
5    against my clients?
6                  MR. MINCH:  Objection.
7                  MS. COLBATH:  Objection.
8          Q.    Was that a decision primarily made
9    by MMLLC?  Or by CMG?
10                 MR. MINCH:  Objection.
11         A.    It was a collective decision.
12         Q.    Did you provide your thoughts on
13   the issue to MMLLC?
14         A.    I did.
15         Q.    What were your thoughts on the
16   issue?
17                 MR. MINCH:  Objection.
18                 MS. COLBATH:  Objection.
19         A.    My recommendation was that we file
20   an action.
21         Q.    And why did you make that
22   recommendation?
23                 MR. MINCH:  Objection.
24         A.    As I stated earlier, because of
25   what was happening with Bradford in the
```

137

ROESLER

1

2    marketplace.

3         Q.    Because my clients were

4    interfering with -- what you believed was

5    interfering with MMLLC and CMG's ability to

6    license images of Marilyn Monroe?

7              MS. COLBATH:  Objection.

8              MR. MINCH:  Objection.

9         A.    Well, no, I would not characterize

10   it that way.

11        Q.    How would you characterize it?

12             MR. MINCH:  Objection.

13             MS. COLBATH:  Objection.

14             MR. SERBAGI:  How would you

15        characterize it is an objectionable

16        question?

17             MR. MINCH:  I'm still --

18        Q.    Let's go on.  You answer.

19        A.    I would characterize it as an

20   interference with the licensing, marketing,

21   protecting of intellectual property rights of

22   Marilyn Monroe LLC.

23        Q.    Do you regret having filed this

24   action against my clients?

25             MR. MINCH:  Objection.

157

1                          ROESLER

2                MS. COLBATH:  Objection.

3                MR. MINCH:  Objection.

4         Q.    Pleadings.  I meant to say

5    pleadings.

6         A.    It's entirely possible pleadings

7    are filed without me personally seeing them.

8         Q.    Even a complaint?

9                MR. MINCH:  Objection.

10        A.    Possible.  Yes.

11        Q.    So it's possible that you would

12   have permitted your attorneys to file this

13   second amended complaint without you reviewing

14   it and checking its factual accuracy?

15                MR. MINCH:  Objection.

16        A.    It's possible.

17        Q.    Turning to Count 9, declaration of

18   Mr. Shaw's copyrights.  Is there any specific

19   work identified that is owned by my clients

20   that you are asserting is in the public domain

21   in Count 9?

22                MR. MINCH:  Objection.

23                MS. COLBATH:  Could you reread

24        that?

25                (The pending question was read

158

1                          ROESLER

2          back.)

3                  MS. COLBATH:  Objection.

4          A.    I think it's a collection that's --

5     of the work that was filed without proper

6     notices.

7          Q.    And I'd like you to tell me --

8     identify particular works you're talking about.

9                  MR. MINCH:  Objection.

10         A.    I can't identify those specific

11    works at this moment in time.

12         Q.    Let's turn to what has been

13    previously marked as Roesler 2.  It's the Third

14    Amended Complaint.  Turn to paragraph 22, sir.

15    It's on page 5.  Can you read that into the

16    record?

17         A.     "Shaws asserted either by itself

18    or through Bradford that it possesses valid,

19    enforceable copyrights pursuant to Copyright

20    Act 17 USC, Section 101, in each and every

21    photograph that constitutes the Monroe/Shaw

22    photographs in the Shaw limited edition

23    Marilyn/Norma Jean collection, hereinafter the

24    Shaw collection."

25         Q.    Thank you.  What was the basis for

159

1                    ROESLER
2    that?
3              MR. MINCH:  Objection.
4              MS. COLBATH:  Objection.
5         Q.    Let me rephrase.  What is the basis
6    for that statement?
7              MR. MINCH:  Objection.
8         A.    I believe the basis is that
9    representations that Bradford makes with
10   respect to the collection.
11        Q.    Well, what representations are you
12   talking about?
13             MR. MINCH:  Objection.
14             MS. COLBATH:  Objection.
15        A.    I don't have specific information.
16        Q.    You don't have specific information
17   of representations that Bradford has made;
18   correct?
19        A.    That's correct.
20        Q.    Nor do you have specific
21   representations that the Shaw Family Archives
22   made; correct?
23             MR. MINCH:  Objection.
24        A.    I personally don't.
25        Q.    Nor do you have specific

160

1                           ROESLER
2       representations that were made by Edith -- that
3       may have been made by Edith Marcus or Meta
4       Stevens; correct?
5                   MR. MINCH:   Objection.
6           A.      That's correct.  I don't.
7           Q.      Let's look at paragraph 23.   If you
8       could read that, sir.
9           A.       "In 1999 the United States
10      District Court for the Southern District of New
11      York ruled in the case of Shaw v. Rizzoli
12      International Publishing, No. 96 Civil - 4259
13      JFK SDNY, that certain photographs that
14      comprise the Monroe/Shaw photographs and/or the
15      Shaw collection and that were published in the
16      book entitled 'Marilyn Monroe, The Life, the
17      Myth,' quotes, 'the Rizzoli works,' have
18      entered the public domain.
19                   "In that case the Honorable John G.
20      Cotell ruled that the copyrights in the Rizzoli
21      works expired and such photographs entered the
22      public domain and no renewals were obtained
23      with respect to them."
24          Q.      Thank you, sir.   What is the basis
25      for that statement?

161

ROESLER

2          MR. MINCH:  Objection.

3          A.    I don't know.  The attorneys

4    drafted -- handling the case drafted that.  I

5    don't specifically know.

6          Q.    Let's look at paragraph 24.  If you

7    could read that into the record, please.

8          A.    "Upon information and belief there

9    are photographs other than the Rizzoli works

10   that comprise the Monroe/Shaw photographs

11   and/or the Shaw collection that were published

12   prior to January 1, 1964 and for which

13   copyright renewals were not obtained during the

14   final year of the initial 28-year copyright

15   term for such works.

16          "Accordingly, upon information and

17   belief, such other photographs similarly

18   entered the public domain."

19         Q.    What was the basis for making that

20   statement?

21          MR. MINCH:  Objection.

22         A.    I'm assuming this was the various

23   photographs that were published without notice.

24         Q.    You say you're assuming that.  But

25   you don't know that to be a fact, do you?

162

```
 1                      ROESLER
 2            MR. MINCH:  Objection.
 3            MS. COLBATH:  Objection.
 4       A.   That would be my educated
 5  assumption.
 6       Q.   You don't know that to be a fact,
 7  do you?
 8            MR. MINCH:  Objection.
 9            MS. COLBATH:  Objection.
10       A.   It would be my belief, yes.  My
11  belief.
12       Q.   Your belief based on what?
13            MR. MINCH:  Objection.
14       A.   Based upon the manner of research
15  that the attorneys did when they filed this.
16       Q.   Putting aside what your attorneys
17  may have told you or not told you, do you have
18  any independent basis to believe what is
19  contained in paragraph 24?
20       A.   Well, other than what my attorneys
21  have told me?  My own personal knowledge of
22  photographs that were published prior to 1964
23  in which copyright renewals were not obtained.
24  Yes, my legal conclusion is, those images are
25  in the public domain, independent of what
```

163

ROESLER

1

2    attorneys that drafted this told me.

3        Q.    Let's talk about that, then.   What

4    photos are you talking about?

5        A.    Well --

6            MR. MINCH:  Objection.

7        A.    There exist photos other than the

8    Rizzoli works.  Photos that were contained in

9    the various periodicals that we keep talking

10   about, that we go back to, such as Photoplay.

11       Q.    Can you identify any of those

12   photographs, sitting here today?

13           MR. MINCH:  Objection.

14       A.    We go back to the same discussion.

15       Q.    Same discussion, meaning you can't

16   identify the particular photographs; correct?

17           MR. MINCH:  Objection.

18           MS. COLBATH:  Objection.

19           (Discussion off the record.)

20       Q.    You can't identify the particular

21   photographs; correct?

22           MS. COLBATH:  Objection.

23           MR. MINCH:  Objection.

24       A.    At this moment, that's correct.

25       Q.    You can't identify what photographs

164

```
1                     ROESLER
2    were purportedly obtained -- published in the
3    photo op publications sitting here today --
4              MR. MINCH:  Objection.
5              MS. COLBATH:  Objection.
6         A.   Sitting here at this moment, that's
7    correct.
8         Q.   So in fact you really don't have
9    any personal knowledge of the information
10   contained in paragraph 24, do you?
11             MR. MINCH:  Objection.
12             MS. COLBATH:  Objection.
13        A.   That's incorrect.
14        Q.   Again, what is the personal
15   knowledge, so we're clear?
16             MR. MINCH:  Objection.
17        A.   My knowledge of the photographs
18   that have been published.
19        Q.   Which you can't identify.
20             MR. MINCH:  Objection.
21             MS. COLBATH:  Objection.
22        A.   At this moment.
23        Q.   Look at paragraph 25.  Read that
24   into the record, please, sir.
25        A.   "For example, in 1955 Ballantine
```

165

ROESLER

1

2     Books published a book entitled 'Marilyn Monroe

3     As the Girl,' featuring over 100 photographs of

4     Marilyn Monroe that were taken by Sam Shaw.

5              "Upon information and belief, Mr.

6     Shaw registered his copyright in this work in

7     the Library of Congress in 1955 under

8     registration No. A 193450 but failed to renew

9     such copyright during the final year of the

10    initial 28-year copyright term for such work or

11    at any time.

12             "As a result, the copyright for

13    this work expired in 1983 and photographs

14    contained in this work fell into the public

15    domain."

16         Q.    What's the basis for the

17    information in that paragraph?

18              MR. MINCH:  Objection.

19              MS. COLBATH:  Objection.

20         A.    I believe research at the law firm

21    that handled this did.

22         Q.    Do you have any of your own

23    personal knowledge or information contained in

24    this paragraph?

25         A.    No.

166

ROESLER

2              MR. MINCH:  Objection.

3        Q.    If you look at paragraph 26.  Read

4  that into the record, please.

5        A.    "Further, on information and

6  belief, other photographs that comprise the

7  Monroe/Shaw photographs and/or the Shaw

8  collection were initially published without

9  copyright notice prior to March 1, 1989 when

10  notice was required under the United States

11  Copyright Act, and these photographs also have

12  been in the public domain."

13        Q.    What's the basis for that

14  statement, sir?

15              MR. MINCH:  Objection.

16        A.    The same.  Knowledge of the various

17  photographs that were published by the various

18  periodicals and publications.

19        Q.    Right.  And other than what you've

20  testified, you have nothing else to add?

21        A.    That's correct.

22        Q.    And the same answer for 27?

23              MS. COLBATH:  Objection.

24        Q.    You don't have any personal

25  knowledge but rely on your attorneys for that

```
                      ROESLER
 1
 2  information?
 3              MR. MINCH:  Objection.
 4              MS. COLBATH:  Objection.
 5       Q.    Is that right?
 6       A.    That's correct.
 7       Q.    Looking at -- continue on into
 8  Count 1.  Well, let's -- strike that.
 9              Turn to page 1, please, sir.
10              MR. MINCH:  Are we still working on
11  Exhibit --
12       Q.    What is identified as page 1 of the
13  Third Amended Complaint.
14              MR. MINCH:  That's Roesler 2;
15  correct?
16              MR. SERBAGI:  That's correct.
17       Q.    Paragraph 4.  Do you see that?
18       A.    I'm sorry?  Paragraph 4?
19       Q.    Yes.
20       A.    On page -- okay.  Yes.
21       Q.    What's marked as 1.
22       A.    Okay.
23       Q.    Look at the second sentence there,
24  please.  I'm going to read that into the
25  record.
```