UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SHAW FAMILY ARCHIVES, LTD., BRADFORD
LICENSING, INC., JAMES E. DOUGHERTY, and
VALHALLA PRODUCTIONS, LLC.

                                  Plaintiffs,          Index No. 05 CV 3939 (CM)

        -against-

CMG WORLDWIDE, INC., an Indiana Corporation
and MARILYN MONROE, LLC, a Delaware
Limited Liability Company,

                                Defendants.
-----------------------------------------------------------------X

## PLAINTIFFS'/CONSOLIDATED DEFENDANTS' RESPONSES AND OBJECTIONS TO DEFENDANT/CONSOLIDATED PLAINTIFF MMLLC'S FIRST SET OF INTERROGATORIES

Plaintiffs/Consolidated Defendants ("Plaintiffs"), by and through the undersigned counsel, responds to Defendant/Consolidated Plaintiff MMLLC's ("Defendant")First Set of Interrogatories to Plaintiffs, as follows:

## GENERAL OBJECTIONS

In addition to specific objections asserted with respect to specific interrogatory responses, Plaintiffs assert the following general objections with respect to each and every one of Defendant's interrogatories:

1.      Plaintiffs object to the extent that Defendant's discovery requests seek to impose duties or obligations on Plaintiffs beyond those imposed by the Federal Rules of Civil Procedure or the Local Rules of the Southern District of New York.

2. Plaintiffs object to the extent that Defendant's discovery requests are overbroad, vague, unduly burdensome, oppressive, ambiguous or otherwise unclear as to the precise information sought.

3. Plaintiffs object to the extent that Defendant's discovery requests are not reasonably calculated to lead to the discovery of admissible evidence and/or calls for information and/or documents that are irrelevant or immaterial.

4. Plaintiffs object to the extent that Defendant's discovery requests seek production of information and/or documents which are no longer in existence or which are not in Plaintiff's possession, custody or control.

5. Plaintiffs objects to the extent that Defendant's discovery requests seek production of information and/or documents, which are dated, were prepared or relate to facts, events or activities that occurred after the commencement of this action.

6. Plaintiffs object to the extent that Defendant's discovery requests seek production of information and/or documents which are publicly available, and/or equally or more readily available to Defendant.

7. Plaintiffs object to the extent that Defendant's discovery requests seek production of documents, which are subject to the attorney-client privilege, constitute work product, or are otherwise immune from discovery.

8. Nothing in these responses shall be construed as a waiver or any of the objections contained herein or any privilege or immunity.

9. Plaintiffs object to the extent that Defendant's discovery requests are unreasonably cumulative and duplicative.

10. Any production of information or documents by Plaintiffs in response to Defendant's discovery requests shall not be construed as a waiver of Plaintiffs' right to object to the use of such documents, or their proffered admission into evidence, at trial, or in any motion in other proceedings in or related to this action.

11. If Plaintiffs inadvertently produce information and/or documents that are or may be the subject of any of the objections contained herein, such production is not intended to be, nor shall it be deemed to be, a waiver of objections with respect to such information, documents or any withheld information. Plaintiffs reserve his right to demand the return of such information, including all copies of such documents and any notes, extracts or excerpts pertaining thereto.

12. Plaintiffs' discovery and investigation in connection with this lawsuit are continuing. Plaintiffs object because Defendants' failure to produce documents in a timely manner has significantly hindered Plaintiffs' ability to formulate complete responses to these interrogatories. Accordingly, Plaintiffs reserve the right to amend these interrogatory responses and will do so when its investigation is complete.

## INTERROGATORY RESPONSES

### INTERROGATORY NO. 1:

State all facts concerning your licensing for commercial use any of the Monroe/Shaw Photographs without the authorization, consent, involvement, or participation of MMLLC or CMG.

### RESPONSE TO INTERROGATORY NO. 1

Plaintiffs objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further objects to the extent that it seeks discovery of information, which is subject to the attorney-client privilege, work product immunity, or any other applicable privilege or immunity. Plaintiffs further objects to the extent that this interrogatory assumes that "authorization, consent, involvement or participation of MMLLC or

CMG" is required for the licensing of the Monroe/Shaw Photographs. Without waiving the foregoing objections, Plaintiffs respond as follows:

On or about August 7, 2006, Shaw Family Archives hired Bradford to manage the licensing program for the SFA. Bradford's activities on behalf of SFA include contacting licensees, negotiating license agreements, executing agreements, managing all art and product development, and working closely with licensees on new marketing initiatives to expand distribution and consumer demand for all merchandise. The licenses Bradford arranges on behalf of SFA are a limited right solely to use the Monroe/Shaw Photographs. Moreover, all license agreements Bradford arranges on behalf of SFA are for entities located outside of Indiana.

MMLLC's request for "all facts concerning [Plaintiffs'] licensing for commercial use of the Monroe/Shaw Photographs" is entirely irrelevant to any asserted claim. In particular, Defendants' Complaint is limited to two types of claims: (i) causes of action based entirely on Indiana Statutes and (ii) causes of action that are based on Plaintiffs' purported representations to third parties concerning MMLLC's alleged intellectual property rights. Because all of Plaintiffs' license agreements explicitly <u>prohibit the licensee from selling, manufacturing, and advertising in Indiana</u> and none of the license agreements contain any mention of either Defendant, they can have no bearing on Defendants' claims. The relevancy of Plaintiffs' licensing arrangements is currently before Magistrate Judge Fox. Plaintiffs reserve the right to amend this interrogatory response pending Judge Fox's ruling.

## INTERROGATORY NO. 2:

Identifying all persons or entities with knowledge or information concerning your response to interrogatory No. 1.

## RESPONSE TO INTERROGATORY NO. 2

Larry Shaw, Edith Marcus, Meta Stevens, Len Reiter, Michelle Minieri, Sabrina Puleo, Romina Cuba, and Emrah Lepinski, Christopher Serbagi, Brian Greben, and David Marcus.

## INTERROGATORY NO. 3:

Identify any piece of litigation, aside from the instant litigation, between you and any other person concerning your ownership of the Monroe/Shaw Photographs.

## RESPONSE TO INTERROGATORY NO. 3

1. <u>Sam Shaw v. Martin Bressler</u>, Index No. 123783/1994, New York State Supreme Court
2. <u>Sam Shaw v. St. Martin's Press, Inc., Suzanne Sommer Productions, Susan Bernard</u>, Index No. 93 Civ. 2871(LAP), United States District Court, Southern District of New York.
3. <u>Tunick v. Shaw, et al.</u>, Index No. 116636/03, New York State Supreme Court

4

4. <u>Shaw, et al v. Rizzoli Int'l.</u>, et al, Index No. 1:96-cv-04259-JGK-MHD, United States District Court, Southern District of New York

5. <u>Tom Kelley Studios, et al v. Int'l. Collectors, et al.</u>, Index No. 1:97-cv-00056-WK, United States District Court, Southern District of New York.

## INTERROGATORY NO. 4:

State the specific nature of damages to you that you claim is the result of CMG or MMLLC's conduct, including but not limited to (a) the date on which such damages occurred; (b) the amount of such damages; and (c) the proximate cause of such damages.

## RESPONSE TO INTERROGATORY NO. 4

Plaintiffs objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further objects to the extent that it seeks discovery of information, which is subject to the attorney-client privilege, work product immunity, or any other applicable privilege or immunity. Plaintiffs further objects on grounds that its investigation of the damages they have suffered is ongoing and much of the information it needs to fully ascertain the extent of damage suffered as a result of Defendants' unlawful activities in the possession of Defendants or third parties. Defendants reserve the right to supplement this request.

Subject to and without waiving the foregoing general and specific objections, Plaintiffs state as follows:

1) Plaintiffs have been damaged by a cease and desist letter, dated May 2, 2006 that Defendant CMG sent to Urban Outfitters. The letter threatened legal action against Urban Outfitters based on its purported offer for sale and/or sale of tee shirts bearing the Monroe/Shaw Photographs (the "Sales"). The tee shirts in question were provided to Urban Outfitters by Plaintiffs' licensee, Gagwear. CMG made a number of false and damaging claims in its letter, including but not limited to, CMG's representation that (i) Defendants have rights of publicity to the Marilyn Monroe image and likeness and (ii) Urban Outfitters is selling unlicensed Marilyn Monroe tee-shirts, which CMG falsely claimed violated Defendants' intellectual property rights. CMG's demand for, *inter alia*, compensation and threat of legal action proximately caused Urban Outfitters to pull Gagwear products bearing the Monroe/Shaw Photographs from the shelves, which resulted in lost Sales and a deterioration of the relationship between Plaintiffs with both Gagwear and Urban Outfitters. Plaintiffs receive royalty revenue from Gagwear for the use of the Monroe/Shaw Photographs at the rate of 10% of gross sales. Gagwear's Sales prior to CMG's cease and desist letter were approximately $97,840.50 in the first quarter of 2006. By the second quarter of 2006, Gagwear's Sales dropped to $17,850.50; by the third quarter of 2006, Gagwear's Sales were only $136.00.

Plaintiffs contend that their lost royalty revenues from Gagwear are increasing every quarter because it is typical for Plaintiffs' successful licensees to increase their Sales by 20% per quarter. Thus, based on historical performance, Plaintiffs contend that, but for CMG's cease and desist

5

letter, Gagwear's Sales of products bearing the Monroe/Shaw Photographs would have increased by 20% every quarter. Plaintiffs' damages have increased proportionately.

2)      Plaintiffs have been damaged by a cease and desist letter dated October 3, 2005 that CMG sent to Madness S.A. ("Madness"). The letter threatened legal action against Madness based on its offer for sale and/or sale of products bearing the Monroe/Shaw Photographs (the "Sales"). CMG made a number of false claims in this letter, including but not limited to, CMG's representation that (i) Defendants have rights of publicity to the Marilyn Monroe image and likeness and (ii) Madness' use of the Monroe/Shaw Photographs and the Marilyn Monroe name violates Defendants' intellectual property rights. CMG's demand for, *inter alia*, compensation and threat of legal action proximately caused Madness to stop selling products bearing the Monroe/Shaw Photographs, which resulted in lost Sales and a deterioration of the relationship between Plaintiffs and Madness. Plaintiffs receive royalty revenue from Madness for the sale of the Monroe/Shaw Photographs at the rate of 11% of gross sales. Madness' Sales prior to CMG's cease and desist letter were approximately $30,556.90 in the fourth quarter of 2005. By the first quarter of 2006, Madness' Sales of products bearing the Monroe/Shaw Photographs dropped to $7,763.24; by the second quarter of 2006 those Sales were only $3,494.34.

Plaintiffs contend that their lost royalty revenues from Madness are increasing every quarter because it is typical for Plaintiffs' successful licensees' to increase their Sales by 20% per quarter. Thus, based on historical performance, Plaintiffs contend that, but for CMG's cease and desist letter, Madness' sales of products bearing the Monroe/Shaw Photographs would have increased by 20% every quarter. Plaintiffs' damages have increased proportionately.

3) Plaintiffs have been damaged by a telephone call that CMG made to Plaintiffs' licensee Freeze on or about December 7, 2005, where CMG improperly stated that a Freeze tee shirt with the Marilyn Monroe name constituted trademark infringement. CMG also threatened Freeze with a cease and desist letter. Plaintiffs receive royalty revenue from Freeze for the sale of the Monroe/Shaw Photographs (the "Sales") of 8% of gross sales. After CMG's cease and desist letter, Plaintiffs have experienced a significant drop in licensing revenue from Freeze. In particular, in fourth quarter of 2005, prior to the CMG cease and desist letter, Freeze had Sales of $398,359.64 of produces bearing the Monroe/Shaw Photographs. Subsequent to the cease and desist letter, Freeze's Sales dropped to $17,063.80 in the first quarter of 2006.

Plaintiffs contend that their lost royalty revenues from Freeze are increasing every quarter because it is typical for Plaintiffs' successful licensees' to increase their Sales by 20% per quarter. Thus, based on historical performance, Plaintiffs contend that, but for CMG's cease and desist letter, Freeze's Sales of products bearing the Monroe/Shaw Photographs would have increased by 20% every quarter. Plaintiffs' damages have increased proportionately.

4)      Plaintiffs have been damaged by a cease and desist letter that CMG sent to Creaciones Jugavi, S.L., ("Jugavi"), dated January 5, 2006. The letter threatened legal action against Jugavi because, according to the letter, "Jugavi is using Marilyn Monroe in conjunction with its business." CMG's demand for, *inter alia*, compensation and threat of legal action proximately caused Jugavi to stop selling products bearing the Monroe/Shaw Photographs (the "Sales"). Plaintiffs receive royalty revenue from Jugavi for the use of the Monroe/Shaw Photographs at the

6

rate of 12% of gross Sales. After CMG's cease and desist letter, Plaintiffs have experienced a significant drop in licensing revenue from Jugavi. In particular, in first quarter of 2006 prior to the CMG cease and desist letter, Jugavi had Sales of $54,252.00 of produces bearing the Monroe/Shaw Photographs. Subsequent to the cease and desist letter, Jugavi's Sales dropped to $0 in the second quarter of 2006 and $0 in the third quarter of 2006.

Plaintiffs contend that their lost royalty revenues from Jugavi are increasing every quarter because it is typical for Plaintiffs' successful licensees' to increase their Sales by 20% per quarter. Thus, based on historical performance, Plaintiffs contend that, but for CMG's cease and desist letter, Jugavi's Sales of products bearing the Monroe/Shaw Photographs would have increased by 20% every quarter. Plaintiffs' damages have increased proportionately.

5) Plaintiffs have been damaged by a cease and desist letter that CMG sent to Mitch Dowd Design ("MDD"), dated October 3, 2005. The letter threatened legal action against MDD based on the sale of products bearing the Monroe/Shaw Photographs. CMG made a number of false and damaging claims in this letter, including but not limited to, CMG's representation that Defendants have rights of publicity to the Marilyn Monroe image and likeness and (ii) MDD is selling unauthorized products bearing the Monroe/Shaw Photographs. CMG's demand for, *inter alia*, compensation and threat of legal action proximately caused MDD to stop selling products bearing the Monroe/Shaw Photographs (the "Sales"), which resulted in lost Sales and a deterioration of the relationship between Plaintiffs and MDD. Plaintiffs receive royalty revenue from MDD for the use of the Monroe/Shaw Photographs at the rate of 12.5% of gross Sales. MDD's Sales of products bearing the Monroe/Shaw Photographs prior to CMG's cease and desist letter were approximately $26,675.53 in the fourth quarter of 2005. By the first quarter of 2006, MDD's Sales dropped to $9.00; by the second quarter of 2006, MDD's Sales were $22.01; by the third quarter of 2006, MDD's Sales of products bearing the Monroe/Shaw Photographs were $0.

Plaintiffs contend that their lost royalty revenues from MDD are increasing every quarter because it is typical for Plaintiffs' successful licensees' to increase their Sales by 20% per quarter. Thus, based on historical performance, Plaintiffs contend that, but for CMG's cease and desist letter, MDD's Sales of products bearing the Monroe/Shaw Photographs would have increased by 20% every quarter. Plaintiffs' damages have increased proportionately.

Damages to Prospective License Relationships:

1) A company by the name of Nu World would have entered into a licensing arrangement with Plaintiffs but for its stated fear that CMG and MMLLC would sue Nu World. In particular, on July 12, 2005, Nu World stated to Plaintiffs that it heard of the trouble CMG was causing Plaintiffs' licensees and Nu World declined to enter into a licensing arrangement with Plaintiffs for the Monroe/Shaw Photographs on those grounds.

Nu World has a license for Marykateandashley, which license grosses approximately $100,000,000 in sales annually. On information and belief, Nu World's sales of products bearing the Monroe/Shaw Photographs would have been comparable. During phone discussions on July 12, 2005, Nu World stated they had heard about the troubles CMG was causing Plaintiffs

licensees and Nu World did not want to get involved in a licensing arrangement with Plaintiffs if Nu World or its retailers had a chance of receiving a CMG cease and desist letter. Using a conservative 10% royalty rate, Plaintiffs' damages caused by Plaintiffs for the loss of this relationship is approximately $2,500,000 per quarter or $10,000,000 per year.

2) A company by the name of Briefly Stated would have entered into a licensing arrangement with Plaintiffs but for its stated fear that CMG and MMLLC would sue them. In particular, on July 26, 2005, Briefly Stated commented to Plaintiffs that they heard about Defendants' lawsuit against Plaintiffs. Briefly Stated declined to enter into a licensing arrangement with Plaintiffs for the Monroe/Shaw Photographs because it was fearful that Defendants' would sue them.

Based on discussions between Briefly Stated and Plaintiffs, Briefly Stated would have agreed to guaranteed sales of $625,000 for two years. Based on a conservative 10% royalty rate, of approximately $80,000 per quarter, Plaintiffs' have been damaged by approximately $8,000 per quarter.

3) A company by the name of SD Toys would have entered into a license agreement with Plaintiffs for the Monroe/Shaw Photographs but they declined to do so once they received a cease and desist letter from CMG. In particular, SD Toys submitted a proposal to Plaintiffs for Marilyn Monroe dolls but declined to proceed once they received a cease and desist letter from CMG. On information and belief, SD Toys would have had sales of approximately $500,000 over two years. Using the conservative 10% royalty rate and sales of $65,000 per quarter, Plaintiffs would have received $6,500 in royalties per quarter but for Plaintiffs' improper acts.

4) A company by the name of Verigold, a seller of high end jewelry, would have entered into a license agreement with Plaintiffs for the Monroe/Shaw Photographs but declined to do so after hearing about Defendants' aggressive and improper interference with Plaintiffs' licensees. Plaintiffs estimate that Verigold's sales of products bearing the Monroe/Shaw Photographs would have been approximately $500,000 per year. Based on a conservative 10% royalty, Plaintiffs have been damaged at the rate of $12,500 in royalties per quarter.

5) In the fourth quarter of 2004, CMG represented to a company by the name of Maytag that it could only enter into a license through Defendants for the use of Marilyn Monroe images. Based on a conservative 10% royalty and an approximate $100,000 in sales per quarter, Plaintiffs have been damaged by approximately $10,000 in royalties per quarter. Moreover, Maytag's use of a Shaw/Monroe Photograph in advertising would have been a flat $250,000 fee per photo.

Other Damages:

1. Mark Roesler contacted Larry Shaw, purportedly in the spirit of settlement discussions. The owners of SFA showed Mr. Roesler the entire SFA archive. Mr. Roesler put Mr. Shaw in contact with Kitty Monte Alto, Vice President and Director of International Operations of CMG Worldwide in order to purportedly arrange three exhibitions of "Marilyn and Friends" in Brazil and Argentina. In reliance on Mr. Roesler's promise, SFA spent a few months and over $4,000.00, to scan images and promotional materials purportedly needed by Mr. Alto to secure

Museum venues and sponsorship. However, despite his prior promise and SFA's reasonable reliance thereon, Mr. Roesler inexplicably told Mr. Alto not to proceed with the Exhibitions.

### INTERROGATORY NO. 5:

Identify any person or entity that has an ownership interest in you, including their percentage of ownership.

### RESPONSE TO INTERROGATORY NO. 5

With respect to Plaintiff SFA:

Larry Shaw, 20%
Jakob Shaw, 15%
Austin Shaw 15%
Edith Marcus, 10%
Rebeka Marcus, 7.5%
David Marcus, 7.5%
Cindy Conti, 5%
Robert Conti, 5%
Melissa Stevens, 5%
Meta Stevens, 10%.

With respect to Plaintiff Bradford:

Mr. William M. Matthews, 52.41000%
Mr. Alfred Copeland, 11.65000%
Mr. Warren Cross, 11.65000%
Mr. Clyde Moonie, 11.65000%
Janet A. Harestad Trust, 5.820000%
Leonard Reiter, 5.820000%
LFR Inc.,1.000000%

### INTERROGATORY NO. 6:

State all facts regarding any instance where you stated to third parties that MMLLC does not own the Monroe Intellectual Property Rights.

### RESPONSE TO INTERROGATORY NO. 6

Plaintiffs objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further objects to the extent that it seeks discovery of information, which is subject to the attorney-client privilege, work product immunity, or any

other applicable privilege or immunity. Subject to and without waiving the foregoing general and specific objections, Plaintiffs state as follows:

Plaintiffs have never stated that MMLLC does not own the "Monroe Intellectual Property Rights." There are instances where individuals may have expressed an opinion on issues relating to MMLLC's intellectual property. Pursuant to F.R.C.P. 33(d), Plaintiffs have produced documents that may be relevant to this request, from which Defendants can draw their own conclusions as to their import. In particular, see the following documents:

1. SFA 509
2. SFA 281
3. Shaw Supplement Declaration in support of Plaintiffs' cross motion for summary judgment, dated January 15, 2007, Ex. A

## INTERROGATORY NO. 7:

Identify any person or entity that you have told that MMLLC does not own the Monroe Intellectual Property Rights.

## RESPONSE TO INTERROGATORY NO. 7

Plaintiffs objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further objects to the extent that it seeks discovery of information, which is subject to the attorney-client privilege, work product immunity, or any other applicable privilege or immunity. Subject to and without waiving the foregoing general and specific objections, Plaintiffs state as follows:

Plaintiffs have never stated that MMLLC does not own the "Monroe Intellectual Property Rights." There are instances where an officer of Shaw Family Archives may have expressed his individual opinion on issues relating to MMLLC's intellectual property. Pursuant to F.R.C.P. 33(d), Plaintiffs have produced documents that are relevant to this request, from which Defendants can draw their own conclusions as to their import. In particular, see the following documents:

1. SFA 509
2. SFA 281

## INTERROGATORY NO. 8:

State all facts concerning any Monroe/Shaw Photographs that have fallen in the public domain.

10

## RESPONSE TO INTERROGATORY NO. 8

On information and belief, Plaintiffs contend that none of the Monroe/Shaw Photographs have fallen into the public domain.

## INTERROGATORY NO. 9:

State all facts concerning your ownership of any copyrights in the Monroe/Shaw Photographs.

## RESPONSE TO INTERROGATORY NO. 9

Plaintiffs object to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further object to the extent that it seeks discovery of information, which is subject to the attorney-client privilege, work product immunity, or any other applicable privilege or immunity. Without waiving the foregoing objections, Plaintiffs state as follows:

Plaintiffs contend that Sam Shaw took thousands of photographs of Marilyn Monroe and that Mr. Shaw owned the copyrights thereto. Pursuant to F.R.C.P. 33(d), Plaintiffs refer Defendants to the following documents:

1. Plaintiffs' Amended Complaint, dated May 9, 2005, ¶¶ 11-13. Exhibits A through E.

2. SFA 1-167, 452-483.

3. Woodner-Shaw Partnership Agreement dated November 8, 1985, Agreement dated January 26, 1992 transferring shares in Woodner-Shaw Corporation to Sam Shaw and the March 30, 1993 letter from Deane F. Johnson, Esq. dated March 30, 1993. To be produced.

## INTERROGATORY NO. 10:

State all facts concerning Bradford's representation of the Monroe/Shaw Photographs for commercial purposes.

## RESPONSE TO INTERROGATORY NO. 10

Plaintiffs objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further objects to the extent that it seeks discovery

of information, which is subject to the attorney-client privilege, work product immunity, or any other applicable privilege or immunity.

On or about August 7, 2006, Shaw Family Archives hired Bradford to manage the licensing program for the SFA. Bradford's activities on behalf of SFA include contacting licensees, negotiating license agreements, executing agreements, managing all art and product development, and working closely with licensees on new marketing initiatives to expand distribution and consumer demand for all merchandise. The licenses Bradford arranges on behalf of SFA are a limited right solely to use the Monroe/Shaw Photographs.

The details of the Plaintiffs' licensing arrangements, including the identify of the licensees and the terms of the specific agreements, are irrelevant to any issue in this litigation. The relevancy of Plaintiffs' licensing arrangements is currently before Magistrate Judge Fox. Plaintiffs reserve the right to amend this interrogatory response pending Judge Fox's ruling

### INTERROGATORY NO. 11:

State all facts concerning all incidents of which you are aware in which MMLLC contacted your third party licensees, actual or prospective, regarding the licensing of the Monroe/Shaw Photographs.

### RESPONSE TO INTERROGATORY NO. 11

See Plaintiffs' Response to Interrogatory No. 4. Pursuant to F.R.C.P. 33(d), Plaintiffs have produced documents that may be relevant to this request. In particular, see the following documents:

1. SFA 289-292

### INTERROGATORY NO. 12:

Identify all persons or entities with knowledge or information concerning your response of Interrogatory No. 11.

### RESPONSE TO INTERROGATORY NO. 12

Larry Shaw, Edith Marcus, Meta Stevens, Len Reiter, Michelle Minieri, Sabrina Puleo, Romina Cuba, and Emrah Lepinski, Christopher Serbagi, Brian Greben, and David Marcus. See Plaintiffs' response to Interrogatory No. 11.

12

## INTERROGATORY NO. 13:

State all facts concerning your claim that Marilyn Monroe died a domiciliary of New York.

## RESPONSE TO INTERROGATORY NO. 13

Plaintiffs objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs further objects to the extent that it seeks discovery of information, which is subject to the attorney-client privilege, work product immunity, or any other applicable privilege or immunity. Without waiving the foregoing objections, Plaintiffs respond as follows:

Pursuant to F.R.C.P. 33(d), Plaintiffs have produced documents that are relevant to this request. In particular, see the following documents:

1. Plaintiffs' Memorandum in Support of their cross motion for summary judgment, dated November 26, 2006, Statement of Facts and declarations annexed thereto and Plaintiffs Memorandum in Reply and the declarations annexed thereto.

    Exhibit D to the Declaration of Larry Shaw, dated November 29, 2006 and Exhibits F through N and Q, R, S, of the Declaration of David Marcus dated November 28, 2006.

    Exhibits 6-10 of the Supplemental Declaration of Michelle Craven, dated December 22, 2006.

    Exhibits B through I and Exhibit L to the Supplemental Declaration of David Marcus, dated January 15, 2007.

2. Frosch v. Grosset & Dunlap, et al, 75 AD.2d 768; 427 NYS2d 828 (1st Dep't 1980)

3. Will of Marilyn Monroe, which was drafted, executed and probated in the City and State of New York.

## INTERROGATORY NO. 14:

State all facts concerning your allegation that MMLLC infringed your alleged copyright in the Monroe/Shaw Photographs.

## RESPONSE TO INTERROGATORY NO. 14

Plaintiffs objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague, ambiguous, and seeks information not reasonably calculated to lead to the

discovery of admissible evidence. Plaintiffs further objects to the extent that it seeks discovery of information, which is subject to the attorney-client privilege, work product immunity, or any other applicable privilege or immunity. Without waiving the foregoing objections, Plaintiffs respond as follows:

Pursuant to F.R.C.P. 33(d), Plaintiffs have produced documents that are relevant to this request. In particular, see the following documents:

1. Plaintiffs' Amended Complaint, dated May 9, 2005, ¶¶ 15-26.

Dated: March 2, 2007
New York, New York

                LAW OFFICES OF CHRISTOPHER SERBAGI

                By: *[signature]*
                Christopher Serbagi (CS 7746)
                488 Madison Avenue, Suite 1120
                New York, New York 10022
                Tele: (212) 593-2112
                Fax: (212) 308-8582

                Attorney for the Plaintiffs/Consolidated Defendants