**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X
SHAW FAMILY ARCHIVES, LTD., EDITH :
MARCUS and META STEVENS,

                                    :

                Plaintiffs,        :       Case No. 05 Civ. 3939 (CM)

                                    :

          -against-          :       Hon. Colleen McMahon

                                      :

CMG WORLDWIDE, INC. and MARILYN
MONROE LLC,                              :

                Defendants.       :
-------------------------------------------------------- X


### DEFENDANTS / CONSOLIDATED PLAINTIFFS' COMBINED STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT ON PUBLIC DOMAIN CLAIM, AND RESPONSE TO PLAINTIFFS / <u>CONSOLIDATED DEFENDANTS' STATEMENT OF UNDISPUTED FACTS</u>

       Defendants / Consolidated Plaintiffs Marilyn Monroe, LLC ("MMLLC") pursuant to

Local Rule 56.1 of the United States District Court for the Southern District of New York,

respectfully submits the following (i) statement of undisputed facts in support of Defendants /

Consolidated Plaintiffs' ("Defendants") cross-motion for summary judgment, and (ii) response to

Plaintiffs / Consolidated Defendants Shaw Family Archives, Ltd.'s ("SFA") and Bradford

Licensing, Inc.'s ("Bradford Licensing") (collectively, the "Shaw Family") statement of

undisputed facts.

<u>STATEMENT OF UNDISPUTED FACTS</u>

A.  <u>Defendants / Consolidated Plaintiffs' Public Domain Claim</u>

1.      Photographer Sam Shaw took numerous photographs of Marilyn Monroe in the 1950s.  (*See, e.g.,* Pls.' August 8, 2007 Sec. Am. Compl. ¶¶11-12, Declaration of Christopher Serbagi dated January 8, 2008 ("Serbagi Decl."), Ex. F.)

2.      In their Third Amended Complaint dated August 9, 2007, Defendants seek a declaratory judgment that certain photographs of Marilyn Monroe taken by Sam Shaw are in the public domain.  (*See generally* Third Am. Compl., Serbagi Decl., Ex. I.)  Defendants had previously asserted "public domain" claims in their original Complaint dated March 23, 2005 (Compl., Serbagi Decl., Ex. A ¶¶ 51-52), their Amended Complaint dated June 7, 2005 (Am. Comp., Serbagi Decl., Ex. B ¶¶ 75-76), and their Second Amended Complaint dated June 16, 2005 (Sec. Am. Compl, Serbagi Decl., Ex. C ¶¶ 76-77)).

3.      In their Third Amended Complaint, Defendants stated that, in 1999 the United States District Court for the Southern District of New York ruled, in the case of *Shaw v. Rizzoli Int'l Publ'ns, Inc.,* No. 96 Civ. 4259 (JFK) (S.D.N.Y.), that certain photographs of Marilyn Monroe taken by Sam Shaw that were published in a book entitled *Marilyn Monroe.  The Life. The Myth.* (the "Rizzoli Book") have entered the public domain.  (Third Am. Compl., Serbagi Decl., Ex. I ¶ 23.)

4.      In their Third Amended Complaint, Defendants / Consolidated Plaintiffs alleged, upon information and belief, that, in addition to the Sam Shaw photographs appearing in the Rizzoli Book, there are other photographs of Marilyn Monroe taken by Sam Shaw that have entered the public domain, either because no timely copyright renewal was obtained or because the works were published without, or with the incorrect, copyright notice.  (*Id.* ¶¶ 24, 26-27,

2

Prayer for Relief.)  For example, Defendants identified the book entitled *Marilyn Monroe as The Girl* as one such work that has entered the public domain because no timely renewal was obtained.  (*Id.* ¶ 25.)

5.     In their Prayer for Relief, Defendants sought a declaratory judgment declaring that "in addition to the *Rizzoli* Works, [the Shaw Family does] not possess valid and enforceable copyrights" in photographs of Marilyn Monroe taken by Sam Shaw "that were either:  (a) published prior to January 1, 1964, where no copyright renewals were obtained during the final year of the initial 28-year copyright term for such photographs; or (b) published prior to March 1, 1989, without the requisite copyright notice."  (*Id.* at p. 8.)

**B.  Sam Shaw's Photographs of Marilyn Monroe That Have Entered the Public Domain**

6.     On June 24, 1955, Ballantine Books, Inc. published *Marilyn Monroe as the Girl* (the "Ballantine Book").  The Ballantine Book contains a copyright notice "copyright, 1955 by Sam Shaw."  (Strauss Decl., Ex. 1.)

7.     On or about June 30, 1955, Sam Shaw filed an Application for Registration of a Claim to Copyright for the Ballantine Book, and received from the Register of Copyrights a Copyright Registration Certificate identified as A193450.  The application stated that the Ballantine Book was first published on June 24, 1955.  (Strauss Decl., Ex. 2.)

8.     The original 28 year term of copyright for the photographs published in the Ballantine Book expired in 1983.  The authors of the Ballantine Book did not renew the copyright prior to the expiration of the original term of copyright.  (Slotnick Decl. ¶ 6; Cloonan Decl. ¶ 15).

9.     On March 23, 1999, the United States District Court for the Southern District of New York (Hon. J.  Koeltl) decided the parties' motions for summary judgment in *Sam Shaw,*

*Edith Shaw Marcus, et al. v. Rizzoli International Publications, Inc., et al.* The Court granted summary judgment to the defendant, finding that 105 photographs that had been published in the Rizzoli Book were in the public domain. (Strauss Decl., Ex. 3) (*Shaw v. Rizzoli Int'l Pubs. Inc.*, No. 96 Civ. 4259 (JGK), 1999 WL 160084, at *4 n.6, *6 (S.D.N.Y. March 23, 1999)).

10.     The photographs ruled to be in the public domain include numerous photographs of Marilyn Monroe taken by Sam Shaw, specifically photographs appearing on the following pages of *Marilyn Monroe. The Life. They Myth*: Page 146 (3 photographs), Page 147 (6 photographs), Page 148 (1 photograph), Page 149 (1 photograph), and Page 184 (3 photographs). In each instance, the Court found that the photographs were published prior to 1964 and that the copyrights were not renewed in a timely fashion by Shaw. (Strauss Decl., Exs. 3, 4, 5.) (*Shaw v. Rizzoli*, 1999 WL 160084, at *4 n.6, *6 (S.D.N.Y. March 23, 1999)).

11.     Many of the Sam Shaw photographs appearing in the Rizzoli Book and the Ballantine Book were taken on the set of the film *The Seven Year Itch*, including the famous Flying Skirt Series depicting Marilyn Monroe's white dress blowing in the wind over a subway grate. Sam Shaw was hired by the producer of *The Seven Year Itch* to take photographs of Marilyn Monroe for the purpose of creating publicity for the film. (Strauss Decl., Ex. 6, ¶¶ 7-16.) In connection with these duties, Sam Shaw was required to be on the movie set at all times that Marilyn Monroe was on the set. (*Id.* at ¶ 8.)

12.     In his deposition in the *Rizzoli* case, Sam Shaw testified that he was assigned by the producers of the film to photograph the "logo" for the film. (Strauss Decl., Ex. 7, at MMLLC (Shaw) 000611.)

13.     Sam Shaw was paid by the producers of *The Seven Year Itch* for his work in connection with the film. (*Id.*)

4

14.     In connection with these efforts to publicize the film, in and around 1954 and 1955, numerous Sam Shaw photographs of Marilyn Monroe from the set of *The Seven Year Itch* were published in newspapers and magazines around the world.  (*See, e.g.*, Strauss Decl., Ex. 5, at 146, 147, 148, 149, 162, 184; Ex. 6 ¶ 16; Ex. 7, at MMLLC (Shaw) 000611; Ex. 8; Cloonan Decl., Exs. A-K)

15.     These published photographs include what Sam Shaw and the Shaw Family have described as "iconographic 'flying skirt'" photographs of Marilyn Monroe.  (Strauss Decl., Ex.10 ¶ 3; Ex. 11.)

16.     In addition to photographs taken on the set of *The Seven Year Itch*, numerous other photographs taken of Marilyn Monroe by Sam Shaw were published in newspapers and magazines in the 1950s, at or around the time that they were taken.  (*See, e.g.,* Strauss Decl., Ex. 9.)

17.     The photographs referred to in paragraphs 14-16, *supra* were published without proper copyright notice or, if they were published with proper notice, their copyrights were not renewed at the end of their original 28 year term.  The Shaw Family's copyright materials produced or made available for inspection in this litigation do not contain a single copyright notice or renewal relating to the photographs in question.  (*See* Slotnick Decl. ¶ 7.)  Review of the Copyright Office's website does not reveal the renewal of any copyright in the photographs discussed above during their original 28 year term.  (Cloonan Decl. ¶ 14.)

**C.  The Shaw Family Refuses to Produce Documents Relevant to the Public Domain Claim**

18.     On October 30, 2007, Defendants served a document request on the Shaw Family, requesting that they produce limited documents relating to the public domain claim.  In particular, Defendants sought production of documents falling into two categories:  first,

documents relating to photographs from four (4) specifically-identified Sam Shaw/Marilyn

Monroe photo shoots (including the "flying skirt" shoot), including all photographs taken at the

shoots, copyright registration certificates and applications relating to such photographs, all

deposit copies or documents filed with the Copyright Office, documents concerning publication

or copyright notices for such photographs, and all agreements relating to these specific

photographs.  (*See* Strauss Decl., Ex. 12 ¶¶ 1-10.)  <u>Second</u>, Defendants also requested documents

necessary to identify Sam Shaw's purported copyrights in other photographs of Marilyn Monroe,

namely documents identifying copyright registration certificates and copyright applications, any

deposit copies or documents filed with the Copyright Office, and any assignments which gave

Sam Shaw ownership over copyrights in Marilyn Monroe photographs.  (*See id.* ¶¶ 2-5.)

19.    The Shaw Family refused to produce such documents, stating that it would not

produce any documents relating to anything other than the Rizzoli Book and the Ballantine

Book.  (*See* Strauss Decl., Ex. 13, General Objections ¶ 14.)  Thus, the Shaw Family failed to

produce in this litigation any copyright notice or copyright registration materials relating to the

publication of Marilyn Monroe photographs in newspapers and/or magazines referenced in

paragraphs 14-16, *supra*.

20.    On December 7, 2007, MMLLC sent a letter to Magistrate Judge Fox, requesting

that the Court direct the Shaw Family to produce certain documents called for in the document

request.  (*See* Serbagi Decl., Ex. P.)

21.    On December 10, 2007, the Shaw Family sent a letter to Magistrate Judge Fox, in

which it requested that the Court "limit the universe of documents that [the Shaw Family] must

produce to documents relevant to [the Rizzoli Book] and [the Ballantine Book]."  In this letter,

the Shaw Family claimed that "those are the <u>only works</u> that the Defendants request the Court to

declare are in the public domain," (*see* Serbagi Decl., Ex. Q), despite the fact that the Third

Amended Complaint clearly alleges that, in addition to the Rizzoli and Ballantine Books, "other

photographs that comprise the Monroe/Shaw Photographs and/or the Shaw Collection were

initially published without copyright notice [and] have entered the public domain," and seeks a

declaration that "in addition to the *Rizzoli* Works . . . Shaw does not possess valid and

enforceable copyrights in those photographs . . . that were either:  (a) published prior to January

1, 1964, where no copyright renewals were obtained during the final year of the initial 28-year

copyright term for such photographs; or (b) published prior to March 1, 1989, without the

requisite copyright notice."  (Third Am. Compl., Serbagi Decl., Ex. I ¶¶ 26-27, 34.)

     22.     In the final sentence of their December 10, 2007 letter, the Shaw Family

requested that the Court order that the upcoming deposition of the Shaw Family's 30(b)(6)

witness be limited to the Rizzoli Book and the Ballantine Book.  (*See* Serbagi Decl., Ex. Q.)

     23.     The Rule 30(b)(6) deposition of the Shaw Family began on Monday, December

17, 2007.  For over a month prior to the deposition, the Shaw Family had represented that its

30(b)(6) witness would be Edith Marcus (one of the parties to this action).  In fact, MMLLC had

previously served an individual deposition notice on Ms. Marcus (*see* Strauss Decl., Ex. 14),

which it declined to pursue given its understanding that Ms. Marcus would be the Rule 30(b)(6)

witness.  However, on the afternoon of Friday, December 14, the Shaw Family switched course

and stated that its 30(b)(6) witness would be Melissa Stevens.

     24.     Magistrate Judge Fox never granted the Shaw Family's requested Order limiting

the scope of the Rule 30(b)(6) deposition.  Nevertheless, at the deposition, the Shaw Family's

counsel refused to allow Ms. Stevens to answer any questions except those directly relating to

the Ballantine Book and the Rizzoli Book.  (*See* Strauss Decl., Ex. 15, at Tr. 37-39, 41-42, 76,

112-13, 117-18, 122-23, 127, 129, 143, 147, 149.)  In addition, in preparing for the deposition,

Ms. Stevens only reviewed documents pertaining to the Rizzoli Book and the Ballantine Book.

(*Id.* at Tr. 42-43, 76.)

25.    On December 20, 2007, MMLLC sent a letter to Magistrate Judge Fox regarding

the Shaw Family attorney's conduct at the deposition.  (Serbagi Decl., Ex. R.)

26.    On December 26, 2007, the parties appeared before Magistrate Judge Fox to

address the discovery dispute.  At the hearing, the Shaw Family repeated its argument that

discovery should be limited because "all [Defendants] pled in the complaint is that the Risoli

[sic] and Ballantine books are in the public domain."  (Strauss Decl., Ex. 16, at 3.)  Magistrate

Judge Fox rejected this argument, stating that "[c]ertainly, the pleadings go beyond the Risoli

[sic] and the Ballantine book," and that "any [opportunity] to narrow down the complaint is . . .

long gone."  (*Id.* at 5.)

27.    At the December 26 hearing, when counsel for MMLLC informed Magistrate

Judge Fox of Ms. Stevens' refusal to answer many questions at the instruction of counsel,

Magistrate Judge Fox stated:

> Let me just say this to everybody before we go any further.  Under the Southern
> District rules, directing a witness not to answer is sanctionable conduct, unless it
> falls within one of the exceptions in Rule 30.  If it happens again, there will be
> sanctions.

(*Id.* at 4.)

28.    Magistrate Judge Fox ordered that the Shaw Family make Melissa Stevens

available for an additional four hours of testimony.  (*Id.* at 8.)

29.    At MMLLC's request (*id.* at 5), Magistrate Judge Fox also ordered that the Shaw

Family make available for inspection two binders of materials that purportedly contained its

collection of copyright registrations and related materials.  (*See id.* at 5-6, 8.)  Magistrate Judge

Fox stated that the binders need not be copied in the first instance, but that the parties could call the Court in the event of any dispute about the relevancy of the documents, and that MMLLC could make notes on the documents and mark any document necessary for the deposition.  (*Id.* at 8, 10-11.)

30.    The Shaw Family subsequently made available a single binder, purportedly containing the entirety of its copyright registrations and certificates.  (*See* Slotnick Dec. ¶ 4.) Many documents from the binder were marked as exhibits at the continued deposition of SFA's Rule 30(b)(6) witness – however, the Shaw Family has refused to make available to Defendants copies of even these deposition exhibits.  (*Id.* ¶ 5.)

31.    On January 2, 2008, MMLLC sent a letter to Magistrate Judge Fox asking that he compel production of the binder.  (*See* Serbagi Decl. Ex. T.)  On January 4, 2008, Magistrate Judge Fox ruled that he would not compel physical production of the binder because discovery had closed, but stated that MMLLC could either ask the Court to reopen discovery for the limited purpose of production of the binder, or issue a trial subpoena for the binder.  (Strauss Decl. ¶ 18.)

32.    MMLLC's counsel's review of the binder revealed that it did not contain a single copyright registration from the 1950s relating to the publication of Marilyn Monroe photographs in newspapers or magazines; nor did it contain a single copyright renewal from prior to 1983 relating to such publications.  (*See* Slotnick Decl. ¶ 6-7.)

**D.  The Shaw Family's Conduct Has Created a Real and Reasonable Apprehension of Liability on the Part of Defendants / Consolidated Plaintiffs**

33.    Plaintiffs SFA, Edith Marcus and Meta Stevens (collectively, "Plaintiffs") filed a Complaint against Defendants on April 19, 2005.  (Pls.' Compl., Serbagi Decl., Ex. D.) Plaintiffs' Complaint accuses Defendants, among other things, of copyright infringement.  (*Id.* ¶¶ 16-26.)  However, the Complaint does not specify all of the images that Defendants are accused

of infringing or the nature of the infringing conduct. It alleges instead that that "defendants have also made, distributed and/or displayed other copies of plaintiffs' copyrighted protected photographic works as part of defendants' advertising activities," and that "defendants may be advertising, offering for sale, and are selling other copyright protected works of the Shaw Collection in addition to those set forth above." (*Id.* ¶¶ 22-23.)

34.    Plaintiffs' Complaint also sought a declaration that Plaintiffs "have rights to the photographs contained within the Shaw Collection[,]" which included all photographs that Sam Shaw ever took. (*Id.* ¶¶ 11, 38.) In seeking such declaration, Plaintiffs did not make room for any copyrights in photographs that had entered into the public domain.

35.    Plaintiffs filed their First Amended Complaint on May 10, 2005, containing identical allegations to those described above. (*See* Pls.' Am. Compl., Serbagi Decl., Ex. E ¶¶ 22-23, 38.)

36.    Plaintiffs filed their Second Amended Complaint on August 8, 2007. In the Second Amended Complaint, Plaintiffs' again accuse Defendants copyright infringement. (Pls.' Sec. Am. Compl., Serbagi Decl., Ex. F ¶¶ 15-22.) Plaintiffs have since withdrawn their copyright infringement claims, but have moved the Court to dismiss them "without prejudice," leaving them free to reassert such claims in the future.

37.    Among the photographs Plaintiffs accused Defendants of infringing is a photograph appearing on page 46 of the book *Marilyn Among Friends*. (*Id.* ¶ 19, Strauss Decl., Ex. 17.)

38.    That photograph from page 46 of *Marilyn Among Friends* appears at page 162 of the Rizzoli Book, was used to promote the film *The Seven Year Itch*, and was published

numerous times in newspapers and magazines in and around 1954 and 1955.  (*See, e.g.,* Strauss

Decl. Ex. 5 at 162; Ex. 8; Cloonan Decl., Ex. G.)

39.    Plaintiffs' Second Amended Complaint also accuses Defendant CMG Worldwide,

Inc. ("CMG") of displaying Sam Shaw's photographs of Marilyn Monroe on its corporate

website.  (*See* Pls.' Sec. Am. Compl., Serbagi Decl., Ex. F ¶ 22.)  CMG had previously informed

Plaintiffs that any photographs displayed on its website were public domain photographs from

the Rizzoli Book.  (*See* Strauss Decl., Ex. 18 at Response 2, at p 5.)

40.    The Shaw Family has repeatedly refused to acknowledge whether any

photographs of Marilyn Monroe taken by Sam Shaw are in the public domain, or to identify any

such public domain photographs.  For example, as set forth above, in its discovery responses the

Shaw Family has refused to provide any information regarding the publication of or copyright

notices in any of Sam Shaw's photographs of Marilyn Monroe (other than the Rizzoli Book and

the Ballantine Book).  (*See supra* at ¶ 24.)  Moreover, SFA's Rule 30(b)(6) witness refused to

confirm whether any of Sam Shaw's photographs of Marilyn Monroe have entered the public

domain.  (*See* Strauss Decl., Ex. 15, at 58-59.)

41.    Indeed, the Shaw Family and its principals and representatives have repeatedly

sought to enforce rights in images that have entered into the public domain.  For example, in

November 2005, MSNBC used a photograph of Marilyn Monroe that it had obtained from the

Associated Press as part of a story in its program, *Scarborough Country.*  (*See* Strauss Decl., Ex.

19.)  In addition to having been previously published in newspapers, the photograph in question

appears on page 66 of the Ballantine Book.  (*See* Strauss Decl., Ex.1, at 66.)  Larry Shaw, on

behalf of the Shaw Family Archives, Ltd., sent a letter to MSNBC, attaching a copy of the

relevant pages from the Ballantine Book, and demanding payment for the use of the photograph. (*See* Strauss Decl., Ex. 20.)

42.     Similarly, on September 18, 2007, Michelle Minieri, President and Managing Director of Bradford Licensing, sent a letter to Image Source International ordering it to cease and desist from using a photograph of Marilyn Monroe taken on the set of *The Seven Year Itch,* and stating that the Shaw Family would seek a fee for the "unauthorized use." (*See* Strauss Decl., Ex. 21).  The photograph in question appears on page 61 of the Ballantine Book. (*Compare* Strauss Decl., Ex. 21 at BL 00074 *with* Ex. 1 at 61.)

43.     In addition, Larry Shaw, the Shaw Family's principal, sent numerous Notices of Claimed Infringement to EBay, Inc. relating to images of Marilyn Monroe purportedly owned by the Shaw Family.  (*See* Strauss Decl., Ex. 22.)  At least some of these claimed "infringements" involved public domain photographs from the Ballantine Book.  (*Compare* Strauss Decl., Ex. 22 at SFA 00349-350, 386 *with* Strauss Decl., Ex. 1 at 66; *compare* Strauss Decl., Ex. 22 at SFA 450, *with* Strauss Decl., Ex. 1 at 61.)

44.     The Shaw Family entered into a License Agreement with Scandecor Marketing granting Scandecor the non-exclusive right to use a photograph that had previously been published in numerous newspapers and used to publicize *The Seven Year Itch*, and also appeared on page 162 of the Rizzoli Book.  (*See* Strauss Decl., Ex. 23; Ex. 5 at 162; Ex. 8; Cloonan Decl., Ex. G.)

45.     On September 27, 2003, Larry Shaw on behalf of Shaw Family sent a letter to Bonnie Bogin at Twentieth Century Fox regarding a Sam Shaw photograph of Marilyn Monroe used in packaging, promotion, sale and distribution of Twentieth Century Fox Diamond Collection Volume 1 – DVD Item 2001402.  In his letter Mr. Shaw claimed ownership of certain

photographs taken by Sam Shaw "during the shooting of "The Seven Year Itch," notwithstanding that Twentieth Century Fox distributed the film and Sam Shaw had been hired to take photographs on the film set.  (*See* Strauss Decl., Ex. 24.)

46.    On July 28, 2005, David M. Marcus wrote to the New York Post regarding the use, in a newspaper article of a photograph of Marilyn Monroe taken by Sam Shaw during the filming of *The Seven Year Itch*.  Mr. Marcus complained that the article credited Twentieth Century Fox (the studio that distributed the film) for the photograph and demanded that a licensing fee be paid at "our normal page rate multiplied by 100%."  (*See* Strauss Decl., Ex. 11.)

47.    The Shaw Family has applied for copyright registrations in photographs that have already fallen into the public domain.  For example, in  November 2007, the Shaw Family filed a copyright registration application for a collection of photographic images entitled "The Making of the Seven Year Itch."  In the copyright application, the Shaw Family represented that none of the photographs in the collection had been previously published.  (*See* Slotnick Decl. ¶¶ 8-9; Strauss Decl. Ex. 15 at 252-262.)  In fact, a number of the photographs in the collection had indeed been previously published, in the Ballantine Book (at pages 65 and 78), the Rizzoli Book (at page 146) and *Marilyn Among Friends* (at page 52).  (*See* Slotnick Decl. ¶¶ 8-9; Strauss Decl. Ex. 15 at 252-262.)[1]

48.    The Shaw Family maintains a website, http://www.spc-promotions.com, which contains numerous photographs of Marilyn Monroe taken by Sam Shaw, many on the set of *The Seven Year Itch*.  Each photograph is accompanied by a copyright notice © Shaw Family

---

[1] As explained previously, the Shaw Family has refused to provide copies of any documents from its binders of copyright registration materials.  Defendants / Consolidated Plaintiffs intend to issue a trial subpoena for the binders, and believe that production of the binder will reveal additional purported "registrations" of public domain images.

Archives 2002 or 2003, even though none were created in 2002 or 2003, and many were previously published in, *inter alia*, the Ballantine Book.  For example:

- The website contains a photograph, purportedly copyrighted by the Shaw Family in 2002, (*see* Strauss Decl., Ex. 25), that was previously published on page 66 of the Ballantine Book, (*see* Strauss Decl., Ex. 1.)

- The website contains a photograph, purportedly copyrighted by the Shaw Family in 2002,  (*see* Strauss Decl., Ex. 26) that was previously published on page 61 of the Ballantine Book, (*see* Strauss Decl., Ex. 1.)

- The website contains a photograph, purportedly copyrighted by the Shaw Family in 2002, (*see* Strauss Decl., Ex. 27), that was previously published on page 67 of the Ballantine Book, (*see* Strauss Decl., Ex. 1**.**)

- The website contains a photograph, purportedly copyrighted by the Shaw Family in 2002, (*see* Strauss Decl., Ex. 28) that was previously published on page 162 of the Rizzoli Book, (*see* Strauss Decl., Ex. 5.)

- The website contains a photograph, purportedly copyrighted by the Shaw Family in 2003, (*see* Strauss Decl., Ex. 29) (left column, center row), that was previously published on page 62 of the Ballantine Book, (*see* Strauss Decl., Ex. 1.)

- The website contains a photograph, purportedly copyrighted by the Shaw Family in 2003, (*see* Strauss Decl., Ex. 29) (left column, top row) that was previously published on page 66 of the Ballantine Book, (*see* Strauss Decl., Ex. 1.)

49.     The Shaw Family maintains another website, http://www.samshaw.com, that also contains images, purportedly copyrighted by Sam Shaw, that were previously published in the Ballantine Book.  For example, the website contains a photograph (*see* Strauss Decl., Ex. 30) that was previously published on page 66 of the Ballantine Book, (*see* Strauss Decl., Ex. 1)**,** and another photograph (*see* Strauss Decl., Ex. 31) that was previously published on page 37 of the Ballantine Book (*see* Strauss Decl., Ex. 1).

50.     On May 5, 1987, Henry Holt and Company, Inc. published the book *Marilyn Among Friends* by Sam Shaw and Norman Rosten.  The book contains the following copyright information:  "Photographs copyright © 1972, 1979, 1987 by Sam Shaw and Ian Woodner.  Text

14

copyright © 1987 by Norman Rosten.  (*See* Strauss Decl., Ex. 17.)  On or about September 6,

1988, the Register of Copyrights issued Copyright Registration Certificate TX2-400-879 to

Norman Rosten as the claimant of a copyright of the "entire text" of *Marilyn Among Friends*.

(*See* Strauss Decl., Ex. 32.)  In November, 1997, Patricia Rosten as heir and successor in interest

to Norman Rosten executed an Assignment of Copyright in Registration No. TX2-400-879 to

Sam Shaw and such Assignment was recorded in the United States Copyright Office in Volume

3417, Page 745.  (*See* Strauss Decl., Ex. 33.)

     51.     Many of the photographs appearing in *Marilyn Among Friends*, and purportedly

protected by Copyright Registration Certificate TX2-400-879, were previously published in,

*inter alia,* the Ballantine Book and the Rizzoli Book.  For example:

- The photograph on page 19 of *Marilyn Among Friends* was previously published on page 37 of the Ballantine Book;

- The photograph on page 23 of *Marilyn Among Friends* (far right) was previously published on page 95 of the Ballantine Book;

- The photograph on page 26 of *Marilyn Among Friends* was previously published on page 48 of the Ballantine Book;

- The photograph on page 27 of *Marilyn Among Friends* was previously published on page 55 of the Ballantine Book;

- The photograph on page 40 of *Marilyn Among Friends* was previously published on page 69 of the Ballantine Book;

- The photograph on page 41 of *Marilyn Among Friends* was previously published on page 60 of the Ballantine Book;

- The photograph on page 42 of *Marilyn Among Friends* was previously published on page 64 of the Ballantine Book;

- The photograph on page 42 and 43 of *Marilyn Among Friends* was previously published on page 61 of the Ballantine Book;

- The four photographs on page 45 of *Marilyn Among Friends* were previously published on pages 62, 65, 67 and 69 of the Ballantine Book;

- The photograph on page 46 of *Marilyn Among Friends* was previously published on page 162 of the Rizzoli Book;

- The photograph on page 49 (bottom) of *Marilyn Among Friends* was previously published on page 113 of the Ballantine Book;

- The photograph on page 57 of *Marilyn Among Friends* was previously published on page 117 of the Ballantine Book;

- The photograph on page 60 of *Marilyn Among Friends* was previously published on page 72 of the Ballantine Book;

- The photographs on page 82 of *Marilyn Among Friends* were previously published on pages 123 and 124 of the Ballantine Book;

- The photograph on page 83 of *Marilyn Among Friends* was previously published on page 121 of the Ballantine Book;

- The photograph on page 75 of *Marilyn Among Friends* was previously published on page 126 of the Ballantine Book;

- The photograph on page 149 of *Marilyn Among Friends* was previously published on page 89 of the Ballantine Book.

(*Compare* Strauss Decl. Exs. 1, 17.)

52.     Other photographs in *Marilyn Among Friends* were taken on the set of the film *The Seven Year Itch*, such as the photographs appearing on pages 44, 48, 49 (top), 50, 51, 52, 53, 54, 55, 58, 59, 61, 62, 63, 64, 65, 67, 68 and 69.  The copyright notice for *Marilyn Among Friends* does not identify the producers of *The Seven Year Itch* as the owners of any copyrights. (*See* Strauss Decl., Ex. 17.)

53.     In 1979, Peebles Press International, Inc. published a book titled *The Joy of Marilyn:  In the Camera Eye.*  The copyright notice in that book gives photo credits to Sam Shaw for the cover page, title page, pages 6, 7, 9 through 131, 152, 153 and back cover.  (*See* Strauss Decl., Ex. 34.)

54.     On July 14, 2001, David Marcus wrote the Copyright Office requesting special relief of the deposit requirement for the book entitled *Marilyn Monroe:  In Camera Eye.*  The

letter annexed a copy of the book, which was actually entitled *The Joy of Marilyn:  In the Camera Eye.*  In his letter, Mr. Marcus represented that "this book was first published in 1979 and contained never before published photographs of Marilyn Monroe."  Mr. Marcus' letter annexed a Registration Certificate for *Marilyn Monroe:  In the Camera Eye,* signed by Edith Shaw Marcus, which represented that there were no prior registrations for this work or an earlier version of this work and stated "N/A" in response to a request to identify any pre-existing work or works on which the work was based which it incorporates.  (*See* Strauss Decl., Ex. 35.)  The Copyright Office granted a copyright registration certificate for *Marilyn Monroe in the Camera Eye* (a/k/a *The Joy of Marilyn:  In the Camera Eye*) and issued Registration Certificate TX5-342-425.  (*See* Strauss Decl., Ex. 36.)

      55.    The following photographs in *Marilyn Monroe in the Camera Eye* were previously published in the Ballantine Book:

- The photograph on page 9 was previously published on the back cover of the Ballantine Book;

- The photograph on page 19 was previously published on page 72 of the Ballantine Book

- The photograph on page 107 was previously published on page 112 of the Ballantine Book.

(*Compare* Strauss Decl. Exs. 1, 34.)

      56.    Other photographs in *The Joy of Marilyn:  In the Camera Eye* were taken on the set of the film *The Seven Year Itch*, such as the photographs appearing on pages 102, 103, 105, 106, 109, 109-110, 112 and 113.  The copyright notice for *The Joy of Marilyn:  In the Camera Eye* does not identify the producers of *The Seven Year Itch* as the owners of any copyrights.  (*See* Strauss Decl., Exs. 34, 36.)

17

E. **Defendants / Consolidated Plaintiffs Possess and License Intellectual Property Rights Relating to Marilyn Monroe**

57.    MMLLC was formed on July 5, 2001, for the purpose of allowing the residuary beneficiaries of Marilyn Monroe's Estate to properly protect, manage and develop Marilyn Monroe's right of publicity and other intellectual property rights.  (*See* Strasberg Decl. ¶ 2.)

58.    On July 5, 2001, Anna Strasberg transferred to MMLLC her entire 75% interest in the estate of Marilyn Monroe, including, but not limited to, any and all rights of publicity, trademarks, and copyrights.  Also on July 5, 2001, the Anna Freud Centre, the holder of the other 25% interest in the estate of Marilyn Monroe, including, but not limited to, any and all rights of publicity, trademarks, and copyrights, likewise transferred its interest to MMLLC.  (*See* Strasberg Decl. ¶ 3.)

59.    Prior to the formation of MMLLC, the estate of Marilyn Monroe hired Defendant CMG Worldwide, Inc. ("CMG") as its representative to manage and exploit Marilyn Monroe intellectual property rights.  (*See* Strasberg Decl. ¶ 4.)  CMG became the estate of Marilyn Monroe's exclusive licensing agent and agreed to use its best efforts to effect and administer licenses for, among other things, trademarks and copyrights related to Marilyn Monroe.  (*See* Strasberg Decl. ¶ 4, Roesler Decl. ¶ 2.)

60.    Defendants have been actively involved in the business of licensing and otherwise exploiting the name, image, persona and likeness of Marilyn Monroe.  (*See* Strasberg Decl. ¶ 5; Roesler Decl. ¶ 3.)  Prior to this Court's May 5, 2007 ruling, Defendants always understood and believed that MMLLC was the lawful owner of such publicity rights.  (*See* Strasberg Decl. ¶ 5; Roesler Decl. ¶ 4.)

61.    Defendants intend to continue with the business of licensing and otherwise exploiting Marilyn Monroe's right of publicity, provided that it is determined that Marilyn

Monroe died a domiciliary of the State of California and that MMLLC thus owns Marilyn

Monroe's right of publicity pursuant to California's right of publicity statute, Cal. Civ. Code. §

3344.1. (*See* Strasberg Decl. ¶ 6; Roesler Decl. ¶ 4.)

62. However, even if it is eventually determined that MMLLC does not possess any

right of publicity in Marilyn Monroe, MMLLC does possess other intellectual property rights,

namely trademarks and copyrights, that it intends to continue to exploit and license. (*See*

Strasberg Decl. ¶ 7, 20; Roesler Decl. ¶ 5.)

63. For example, MMLLC is the registered owner of over 35 trademark applications

and registrations in more than 25 countries worldwide, including five live U.S. federal trademark

registrations for the mark "MARILYN MONROE", either as a word mark or in the form of

Marilyn Monroe's stylized signature form. (*See* Strasberg Decl. ¶¶ 7-18, Exs. A-K.) Defendants

are actively in the business of licensing and otherwise exploiting those trademarks. (*See*

Strasberg Decl. ¶ 19; Roesler Decl. ¶ 6.)

64. In addition, MMLLC owns copyrights to a number of collections of photographs

of Marilyn Monroe, including a collection of photographs by the famous photographer Frank

Worth. (*See* Roesler Decl. ¶ 7; *see, e.g.,* Strauss Decl., Ex. 37 at Tr. 23, 31, 36, 127-28.)

65. As part of MMLLC's and CMG's business, CMG markets and licenses those

Marilyn Monroe-related trademarks and copyrights to third parties. (Roesler Decl. ¶ 3, 6, 7.)

66. MMLLC's and CMG's third-party licensees frequently use public domain images

of Marilyn Monroe on their products in conjunction with the trademarks and copyrights they

license from MMLLC and CMG. (Roesler Decl. ¶ 9-13, Exs. C, D, E.)

67.     CMG maintains a collection of public domain photographs of Marilyn Monroe on its website, which it offers to its licensees to use in conjunction with MMLLC's and CMG's Marilyn Monroe-related trademarks and copyrights.  (Roesler Decl. ¶ 10, Ex. B.)

68.     CMG also creates CDs containing the public domain photographs of Marilyn Monroe that are available on its website, the copyrighted photographs of Marilyn Monroe owned by MMLLC, and the copyrighted photographs of Marilyn Monroe that CMG has the right to license to third parties.  CMG distributes those CD to potential licensees to encourage them to use public domain images of Marilyn Monroe along with MMLLC's and CMG's Marilyn Monroe-related copyrights and trademarks.  (Roesler Decl. ¶ 11.)

69.     MMLLC and CMG have entered numerous licenses whereby a third-party uses a public domain image of Marilyn Monroe in conjunction with MMLLC's and CMG's Marilyn Monroe-related trademarks and copyrights. (Roesler Decl. ¶ 9, 12, 13, Exs. C, D, E.)

70.     If successful in this declaratory judgment action, Defendants intend to use any public domain images of Marilyn Monroe in conjunction with its existing intellectual property rights, such as by including them in CMG's collection of public domain images of Marilyn Monroe on its website and CDs, and by actively marketing them to potential licensees. (*See* Strasberg Decl. ¶ 23; Roesler Decl. ¶ 14.)

71.     In light of the Shaw Family's refusal to acknowledge that any photographs of Marilyn Monroe taken by Sam Shaw have entered into the public domain, their claims of copyright ownership to all photographs of Marilyn Monroe taken by Sam Shaw, as well as their assertions of copyright infringement claims against MMLLC and CMG in this action, MMLLC and CMG are currently refraining from using any such photographs absent a declaratory

judgment ruling that they are in the public domain.  (*See* Strasberg Decl. ¶ 23; Roesler Decl. ¶

15.)

## F.  <u>Defendants / Consolidated Plaintiffs Have Sued the Appropriate Parties</u>

72.    On April 22, 1998 Sam Shaw, as grantor, and Sam Shaw, Edith Marcus and Meta

Stevens, as Trustees, executed an Indenture of Trust, pursuant to which Sam Shaw transferred,

assigned, set over and delivered to the Trustees his entire collection of photographs, negatives,

transparencies, scripts, writings, books, works in progress and the copyrights and trademarks (if

any) pertaining thereto created by Sam Shaw or by any other artist.  The property described in

the Indenture of Trust included photographs of Marilyn Monroe.  (*See* Strauss Decl., Ex. 38.)

73.    In or about 1994, Sam Shaw commenced an action in the Supreme Court of the

State of New York, County of New York against Martin Bressler, Larry Shaw, Susan Shaw,

Bressler & Bressler, Valerie Goodman, 1912 Productions, Inc., Marc Weinstein, individually and

d/b/a Color Group.  After Sam Shaw's death in 1999, Edith Shaw Marcus and Meta Shaw

Stevens were substituted as plaintiffs as temporary administrators of the Estate of Sam Shaw.

(*See* Strauss Decl., Ex. 39; Ex. 40.)

74.    On June 5, 2002, the parties settled the action upon the following terms and

conditions:

i)    The Shaw Family Archives ("SFA") was to be formed with Larry

Shaw, Meta Shaw Stevens and Edith Shaw Marcus as principals.

ii)    Larry Shaw was to own 50% of SFA; Meta Shaw Stevens and

Edith Shaw Marcus would each own 25% of SFA.

iii)    SFA "was to "own and take possession of … all of the photographs

involved in the litigation."

21

iv)    The photographs in issue included "each and every photograph shot by either Sam Shaw or Larry Shaw during the course of their respective careers, lifetimes …"

v)    The settlement provided that "all of the photographs involved in this collection shall be the property – shall be deemed a part of the Shaw Family Archives."

vi)    The settlement contemplated that SFA would engage in "income generating transactions" such as "marketing the photos."

(*See* Strauss Decl., Ex. 39 at 3-6.)

75.    On or about November 23, 2004, the Honorable Emily Jane Goodman, Justice of the Supreme Court entered an Order in the action entitled *Jeffrey P. Tunick v. Larry Shaw, Edith Shaw Marcus, Meta Shaw Stevens, Shaw Family Archives, et al.* holding that "Shaw Family Archives, Ltd., a domestic corporation, was formed to take possession and ownership of all of the photographs involved in the Shaw action."   (*See* Strauss Decl., Ex. 41.)

76.    SFA is a family business, the owners of which are Melissa Stevens, Meta Stevens, Cindi Conti, Robert Conti, Edith Marcus, David Marcus, Rebecca Marcus and the Estate of Larry Shaw.  (*See* Strauss Decl., Ex. 15, at Tr. 7, 18.)

77.    Since the formation of SFA, the Shaw Family, and its principals and agents, has repeatedly claimed ownership by SFA of Sam Shaw's photographs of Marilyn Monroe.  Just recently, on December 13, 2007, the Shaw Family's counsel wrote to CMG Worldwide, Inc., claiming that the "Shaw Family Archives, Ltd. . . . is the holder of all worldwide rights . . . in the photos taken by Sam Shaw or Larry Shaw during the course of their professional careers as photographers."  (*See* Strauss Decl., Ex. 42.)

78.     In addition, in at least one notice of infringement that he sent to EBay, Inc., Larry Shaw, SFA's principal, specifically stated that he was the owner of copyrights, rather than an agent acting on the owner's behalf.  (*See* Strauss Decl., Ex. 22, at SFA00366.)

79.     On February 20, 2007, Michelle Minieri, Senior VP, Managing Director of Bradford Licensing sent a letter to Eric Epstein, VP Licensing of Romar International stating that the "Shaw Family Archives owns the copyrights in the Marilyn Monroe photographs that are the subject of the Program," and describing the photographs as the "Shaw Family Archive copyrighted Marilyn Monroe images."  (*See* Strauss Decl., Ex. 43.)

80.     The Shaw Family required its licensees to use the following copyright notice with any licensed photographs:  "© Sam Shaw / Shaw Family Archives."  (*See* Strauss Decl., Ex. 23 at SFA 00552.)

81.     In a February 28, 2004 email to A. Richmond at BSNYC.com, Len Reiter of Bradford Licensing stated "our client has just informed us that all of the images we will need to have a copyright notice referring to the photos owned by the Shaw Family Archives . . ."  (*See* Strauss Decl., Ex. 44 at 3.)

82.     On September 18, 2007, Michelle Minieri, as President and Managing Director of Bradford Licensing, wrote to Image Source International that Bradford Licensing "pursues and prosecutes all claims and causes of action arising out of, or relating to, the unauthorized use of the imagery of Marilyn Monroe owned by Sam Shaw and Shaw Family Archives."  (*See* Strauss Decl., Ex. 21.)

83.     The Shaw Family maintains websites which display certain photographs of Marilyn Monroe, each of which is accompanied by a copyright notice "© Shaw Family Archives."  (*See* Strauss Decl. Exs. 45.)

84.    Meta Stevens and Edith Marcus own 50% of SFA, and are its principals.  *See supra* ¶¶ 74, 76.

85.    Meta Stevens and Edith Marcus are plaintiffs in this action, and have been plaintiffs in this action since the filing of Plaintiffs' original Complaint on April 19, 2005. (Serbagi Decl. Ex. D-F.)

86.    Plaintiffs' Second Amended Complaint, dated August 8, 2007, was submitted by Christopher Serbagi and David Marcus as "Attorneys for Plaintiffs / Consolidated Defendants Shaw Family Archives, Bradford Licensing, Inc., Edith Marcus and Meta Stevens."  (*See* Pl. Sec. Am. Compl., Serbagi Decl. Ex. F.)

87.    Defendants / Consolidated Plaintiffs asserted public domain claims in their original Complaint dated March 23, 2005, their Amended Complaint dated June 7, 2005, their Second Amended Complaint dated June 16, 2005, and their Third Amended Complaint dated August 9, 2007.  *See supra*, at 2.  Neither Edith Shaw nor Meta Stevens were named as defendants in any of those complaints.

88.    The Shaw Family never, in answering Defendants / Consolidated Plaintiffs' complaints, asserted as a defense that Defendants / Consolidated Plaintiffs had failed to name Edith Marcus or Meta Stevens as parties.  (*See* Strauss Decl., Ex. 46 ¶¶ 84-98; Ex. 47 at 3-5).

## <u>RESPONSE TO THE SHAW FAMILY'S RULE 56.1 STATEMENT</u>

As indicated in MMLLC's individual responses, the Shaw Family has cited evidence does not support – or failed to cite evidence that supports – many of the statements made by them; certain statements of the Shaw Family's Rule 56.1 Statement contain legal arguments or argumentative and improper characterizations; and certain statements need additional facts, information or testimony to make the statements the Shaw Family has made not misleading.  In

addition, some statements of the Shaw Family's Rule 56.1 Statement do not contain facts material to the Shaw Family's motion for summary judgment.

MMLLC respectfully requests that the Court strike or disregard the Shaw Family's unsupported, inaccurate, inadmissible or argumentative and conclusory statements. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here the cited materials do not support the factual assertions in the statements, the Court is free to disregard the assertion.") (internal quotations omitted); *Epstein v. Kemper Ins. Co.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) ("Statements in a . . . Rule 56.1 statement are inappropriate if they . . . are conclusory or argumentative, or do not cite to supporting evidence.").

**MMLLC's Response to Statement No. 1:**

MMLLC admits that Defendants / Consolidated Plaintiffs filed a Complaint on March 23, 2005, a First Amended Complaint on June 7, 2005, and a Second Amended Complaint on June 21, 2005, and that, in each complaint, Defendants / Consolidated Plaintiffs asserted, among other things, that the Shaw Family did not possess a valid or enforceable copyright in one or more photographs that comprise the Shaw Collection, and that, absent a valid and enforceable copyright, such photographs enter the public domain. (*See* Serbagi Decl., Ex. A ¶¶ 51-52; Ex. B. ¶¶ 75-76; Ex. C ¶¶ 76-77.) MMLLC disputes the Shaw Family's remaining assertions, which constitute an argumentative, conclusory and slanted summary of Defendants / Consolidated Plaintiffs voluminous complaints. In particular, MMLLC notes that each of the complaints referenced in this statement asserted claims for, *inter alia*, trade libel / disparagement, interference with business advantage and potential business advantage, and interference with contract. (*See generally* Serbagi Decl. Exs. A, B, C.)

**MMLLC's Response to Statement No. 2:**

MMLLC admits the Shaw Family's assertions in this statement.

**MMLLC's Response to Statement No. 3:**

MMLLC admits that the Shaw Family served its first set of interrogatories on or about February 1, 2007, but disputes the remaining assertions in this statement, which misstate the cited evidence and constitute an incomplete, argumentative and conclusory summary of the referenced discovery exchange.

Contrary to the Shaw Family's assertions, Interrogatory No. 15 did not request that the Defendants "produce documents" concerning their "claim" that the Shaw Family's copyrights were cancelled, expired or lapsed. Rather, the interrogatory requested that Defendants "state all facts" concerning an "affirmative defense." (*See* Serbagi Decl., Ex. G, at 7.) MMLLC respectfully refers the Court to its response to Interrogatory No. 15 for the full and complete contents thereof. (*See* Serbagi Decl., Ex. H, Resp. 15.)

Moreover, the cited evidence does not support the Shaw Family's assertion that "Defendants have declined the Shaw Family's [request] to supplement this interrogatory" – there is no evidence of such a request in the record. In fact, the interrogatory in question requested information regarding an <u>affirmative defense</u> to an <u>outdated complaint.</u> (The Shaw Family filed its Second Amended Complaint on August 7, 2007, subsequent to serving the interrogatories in question. *See* Serbagi Decl., Ex. F). Thus, there was no request, or obligation, to "supplement" an outdated interrogatory.

**MMLLC's Response to Statement No. 4:**

MMLLC admits that, on May 5, 2007 and May 14, 2007, respectively, this Court and the United States District Court for the Central District of California issued orders granting summary

judgment against Defendant / Consolidated Plaintiffs on their right of publicity claims. However, MMLLC states that, since that time, the California legislature amended Senate Bill 771 ("SB 771") to abrogate such rulings and to clarify the meaning of California's right of publicity statute. (*See* Strauss Decl. Ex. 48.)

MMLLC further states that, on January 7, 2008, the United States District Court for the Central District of California (Morrow, J.) granted MMLLC's motion for reconsideration of its summary judgment order. (*See* Strauss Decl., Ex. 49.)

**MMLLC's Response to Statement No. 5:**

MMLLC does not dispute that Defendants / Consolidated Plaintiffs filed their Third Amended Complaint on August 9, 2007, or that the Third Amended Complaint does not contain causes of action that appeared in the previous Second Amended Complaint (other than the declaratory judgment action).

MMLLC disputes the remaining assertions in this statement, which completely misstate the allegations in Defendants / Consolidated Plaintiffs Third Amended Complaint and constitute argumentative and conclusory statements. Contrary to the Shaw Family's assertions, the Third Amended Complaint does not "request[] only that the Court declare the book entitled *Marilyn Monroe. The Life. The Myth.* (the "Rizzoli Works") to be in the public domain. To the contrary, the Third Amended Complaint expressly seeks a declaration "That, in addition to the *Rizzoli* Works, Defendants do not possess valid and enforceable copyrights in those photographs that comprise the Monroe/Shaw Photographs and/or the Shaw Collection that were either: (a) published prior to January 1, 1964, where no copyright renewals were obtained during the final year of the initial 28-year copyright term for such photographs; or (b) published prior to March

1, 1989, without the requisite copyright notice," and specifically identifies the Ballantine Book

as an example.  (*See* Serbagi Decl., Ex. I ¶ 25-27 and p.8 A.(I).)

    MMLLC further states that, at a December 26, 2007 Court hearing, Magistrate Judge Fox

expressly rejected the Shaw Family's argument that the Third Amended Complaint is somehow

limited to the Rizzoli Book and the Ballantine Book (much less just the Rizzoli Book).

Magistrate Judge Fox stated "[c]ertainly, the pleadings go beyond the Risoli [sic] and the

Ballantine book," and that "any [opportunity] to narrow down the complaint is . . . long gone."

(Strauss Decl., Ex. 16 at 5.)

**MMLLC's Response to Statement No. 6:**

    MMLLC does not dispute that Defendants / Consolidated Plaintiffs filed their Third

Amended Complaint on August 9, 2007, subsequent to the May 2007 summary judgment

decisions.

    MMLLC disputes the remaining assertions in this statement, which completely misstate,

misquote and take out of context the allegations in Defendants / Consolidated Plaintiffs Third

Amended Complaint and constitute argumentative and conclusory statements, and MMLLC

respectfully refers the Court to its Third Amended Complaint for the full contents thereof.  For

example, the Shaw Family fails to inform the Court that many of the cited allegations were, in

fact, made "upon information and belief."

    MMLLC specifically disputes the Shaw Family's assertions regarding Defendants /

Consolidated Defendants purported motivations or reasons for pleading certain facts in their

Third Amended Complaint, as the Shaw Family has failed to offer any evidence of these "facts."

The Court cannot consider "facts" on summary judgment that have absolutely no evidentiary

foundation.

MMLLC similarly specifically disputes the Shaw Family's assertion that any allegations in the Third Amended Complaint were "knowingly false."  The Shaw Family has failed to cite a single piece of evidence in support of this argumentative and inflammatory assertion of "fact." Indeed, the Shaw Family's assertion that any allegation in the Third Amended Complaint is "false" is contrary to the record evidence.  For example, one of the purportedly "false" allegations that the Shaw Family points to is that the Shaw Family represented to third parties that they required the Shaw Family's prior consent before using public domain photographs.  As set forth in paragraphs 41-49 of Defendants' Rule 56.1 Statement, *supra*, this allegation is indisputably true.

**MMLLC's Response to Statement No. 7:**

MMLLC disputes the Shaw Family's assertions in this statement, which misstate the allegations in paragraph 14 of the Third Amended Complaint.  Defendants allege in paragraph 14 of the Third Amended Complaint that "[f]or the past several decades, MMLLC has exercised various statutory and common law rights of publicity and other rights related to Marilyn Monroe. Until the issuance of this Court's May 2 Order, MMLLC has always understood and believed that it was the lawful owner of these publicity rights."

**MMLLC's Response to Statement No. 8:**

MMLLC disputes the Shaw Family's assertions in this statement.  First, the cited evidence does not support the Shaw Family's assertions.  The declarations of Edith Marcus and Michelle Minieri do not state that the Shaw Family "has never stated to anyone that they must obtain their prior permission to license the Rizzoli and Ballantine works" – to the contrary, the declarations only allege that they never "asserted to Defendants or their licensees" that they are not free to use images in the Rizzoli Book or the Ballantine Book.  (*See* Marcus Decl. ¶ 7;

Minieri Decl. ¶ 4.)  Moreover, as set forth in paragraphs 35-56 of Defendants' Rule 56.1

Statement, *supra*, the Shaw Family has asserted rights in public domain photographs, including

those appearing in the Ballantine Book and the Rizzoli Book, against Defendants, the public, and

third parties, and the Shaw Family has consistently refused to acknowledge whether any

photographs, including those in the Ballantine Book and the Rizzoli Book, are in the public

domain.

**MMLLC's Response to Statement No. 9:**

    MMLLC admits that the Shaw Family served its third set of interrogatories on or around

November 1, 2007.  MMLLC disputes the remaining contentions in this statement.  Interrogatory

Number 1 did not request "essentially the same information as Interrogatory No. 15 in the Shaw

Family's first set of interrogatories that it served back on February 1, 2007."  As explained in

MMLLC's Response to Statement No. 3, Interrogatory No. 15 in the Shaw Family's first set of

interrogatories requested that Defendants / Consolidated Plaintiffs provide information regarding

an affirmative defense to Plaintiffs' First Amended Complaint (which was since withdrawn and

replaced with Plaintiffs' Second Amended Complaint).  (*See* Serbagi Decl., Ex. G, at 7.)

Interrogatory No. 1 in Plaintiffs' Second Amended Complaint, by contrast, characterizes as a

single interrogatory what actually appears to be at least ten (10) separate Interrogatories

regarding the "detailed legal and factual basis" of Defendants / Consolidated Plaintiffs Third

Amended Complaint.  (*See* Serbagi Decl., Ex. J at 5.)

**MMLLC's Response to Statement No. 10:**

    MMLLC admits that Defendants / Consolidated Plaintiffs served responses to the Shaw

Family's third set of interrogatories on or about December 4, 2007 and that, as set forth in more

detail in their interrogatory responses,  Defendants / Consolidated Plaintiffs objected on

numerous grounds to the Shaw Family's improper interrogatories, which, among other deficiencies, exceeded the maximum number of interrogatories allowed, sought information subject to the attorney-client privilege, and constituted premature contention interrogatories filed while discovery was still ongoing (and, in fact, depositions had yet to be taken). MMLLC disputes the remaining assertions in this statement, which are contrary to the cited interrogatory responses – for example, contrary to the Shaw Family's Assertion, despite valid objections Defendants / Consolidated Plaintiffs responded fully to Interrogatory No. 2. (*See* Serbagi Decl., Ex. K.)

MMLLC also states that it supplemented its response to Interrogatory No. 1 in an email dated December 5, 2007, (*see* Strauss Decl., Ex. 50) and that the Shaw Family never raised any objections to Defendants / Consolidated Plaintiffs' interrogatory responses before Magistrate Judge Fox during the discovery process.

**MMLLC's Response to Statement No. 11:**

MMLLC admits that the Shaw Family deposed MMLLC's Rule 30(b)(6) witness, David Strasberg, on December 20, 2007. MMLLC disputes the Shaw Family's remaining assertions in this statement, which constitute an argumentative, conclusory and misleading summary of over twenty pages of deposition testimony. In particular, MMLLC disputes the Shaw Family's argumentative and unsupported statement that Mr. Strasberg gave certain testimony "obviously on the advice of counsel."

Contrary to the Shaw Family's assertions, Mr. Strasberg testified, among other things, that, he was aware that the Shaw Family had purported to license images in the Ballantine Book (*see* Serbagi Decl., Ex. N, at 165) and that the Shaw Family had filed claims against MMLLC asserting that MMLLC was precluded from using Sam Shaw's photographs of Marilyn Monroe.

Mr. Strasberg also testified as to MMLLC's belief that a variety of Sam Shaw's photographs of Marilyn Monroe were published without copyright notice or copyright registrations, that photographs in the Rizzoli Book had already been deemed to be in the public domain, and that the Ballantine Book is obviously in the public domain. (*See* Strauss Decl., Ex. 51 at 27-34.) With regard to the Shaw Family's assertion that Mr. Strasberg "had never seen all of the Shaw Family registrations of Marilyn Monroe," Mr. Strasberg specifically and repeatedly testified that he has "only seen the registrations that the [Shaw Family] has [produced]," that the Shaw Family had not produced all of their registrations for review, and that more would be known after the Shaw Family produced additional documents in discovery. (*Id.* at 28-32.)

**MMLLC's Response to Statement No. 12:**

MMLLC does not dispute that, as set forth in greater detail in the deposition transcript, in response to certain questions, David Strasberg testified that Mark Roesler might have greater knowledge. MMLLC disputes the Shaw Family's remaining assertions in this statement, which are argumentative, conclusory, and are not supported by the cited testimony. Contrary to the Shaw Family's argumentative and unsupported assertions, Mr. Strasberg did not "kn[o]w virtually nothing about Rizzoli and Ballantine and MMLLC's licensing activities" – in fact, Mr. Strasberg testified that he was aware that Rizzoli and Ballantine photographs were in the public domain (*see, e.g., id.* at 28-33) and that MMLLC was created for the purpose of licensing a variety of intellectual property rights relative to Marilyn Monroe. (*Id* at 173.)

**MMLLC's Response to Statement No. 13:**

MMLLC does not dispute that, at one point in the David Strasberg deposition, MMLLC's attorney instructed the witness not to answer a question regarding the number of copyrights that MMLLC owns in images of Marilyn Monroe, on the grounds that the question was unrelated to

the topics that the Shaw Family had listed in their Rule 30(b)(6) deposition notice. MMLLC

disputes the Shaw Family's remaining assertions in this statement, which misstate the cited

deposition transcript.

MMLLC states that the Rule 30(b)(6) deposition notice issued by the Shaw Family listed

only two topics: "1) The factual basis for Count I in Defendants' Third Amended Complaint,"

and "2) The factual basis for Defendants' contention that Marilyn Monroe died a domiciliary of

California and not New York." (*See* Strauss Decl., Ex. 52.) The Shaw Family's Rule 30(b)(6)

deposition notice to MMLLC did not indicate that they would seek testimony regarding

MMLLC's intellectual property rights (such as trademarks or copyrights) in Marilyn Monroe

images, or that the Shaw Family viewed such information as relevant to the issue of MMLLC's

standing.

Moreover, at the deposition, the Shaw Family's counsel did not explain the purported

"relevance" of this line of questioning in the manner set forth in Statement No. 13 – rather, the

Shaw Family's attorney confusingly argued that "In the complaint you are alleging that we are

harming you by asserting rights in public domain images. You can't possibly be harmed if you

don't have any rights to the images yourself." (*See* Serbagi Decl., Ex. N, at 191.)

In any event, Mr. Strasberg <u>did</u> answer questions regarding MMLLC's trademarks and

copyrights relating to Marilyn Monroe. (*Id.* at 189-90.) In addition, during the 30(b)(6)

deposition of CMG, Mark Roesler also provided information regarding MMLLC's various

intellectual property rights. (*See* Strauss Decl., Ex. 37, at 23, 31,36, 127-28.)

**MMLLC's Response to Statement No. 14:**

MMLLC disputes the Shaw Family's assertions in this statement, which are

argumentative, conclusory, and are not supported by the cited evidence. During the 30(b)(6)

deposition of MMLLC, MMLLC's attorney did instruct Mr. Strasberg not to instruct the inappropriate, irrelevant and harassing question "[w]hat were the revenues of MMLLC for licensing Marilyn Monroe images in 2001?" (*see* Serbagi Decl., Ex. N, at 177-180), correctly noting that the question was well beyond the scope of the Shaw Family's Rule 30(b)(6) deposition notice.  (*See* Strauss Decl., Ex. 52.)

Contrary to the Shaw Family's assertions in Statement No. 14, during the deposition the Shaw Family's counsel did not "represent[] that the information would be relevant to the manner in which MMLLC had purportedly been injured (which is a required element of a declaratory judgment action)."  Rather, during the deposition the Shaw Family's counsel incorrectly argued that information regarding MMLLC's revenues was relevant because MMLLC was seeking monetary damages in its Third Amended Complaint.  (*See* Serbagi Decl., Ex. N, at 177-180.)  Counsel for MMLLC correctly responded that MMLLC was <u>not</u> seeking such damages.  (*Id.*)  Nowhere in the Third Amended Complaint do Defendants / Consolidated Plaintiffs assert a claim for money damages.   In fact, Defendants / Consolidated Plaintiffs explicitly stated that they were not seeking monetary damages in their responses to the Shaw Family's interrogatories.  (*See* Serbagi Decl., Ex. K at Resp. to Int. 2).

Further, the Shaw Family's assertion that "the manner in which MMLLC had purportedly been injured . . . is  a required element of a declaratory judgment action" is incorrect as a matter of law.  In the intellectual property context, a plaintiff need not suffer actual damages, but rather need only demonstrate a reasonable apprehension of liability.  *See Starter Corp. v. Converse*, *Inc.*, 84 F.3d 592, 595 (2d Cir. 1996).

**MMLLC's Response to Statement No. 15:**

MMLLC does not dispute that David Strasberg testified that "MMLLC is a Delaware limited liability company that was created for the purposes of licensing a variety of intellectual property rights relative to Marilyn Monroe" and that "[t]he MMLLC licenses trademark – various trademarks, copyrights, as well as rights of publicity, all centering around Marilyn Monroe's career and image."

**MMLLC's Response to Statement No. 16:**

MMLLC disputes the Shaw Family's assertions in this statement because they are conclusory and argumentative, and therefore do not contain facts material to the determination of the Shaw Family's motion for summary judgment.

**MMLLC's Response to Statement No. 17:**

MMLLC disputes the Shaw Family's assertions in this statement, which misstate the cited evidence.  During David Strasberg's deposition, counsel for the Shaw Family asked counsel for MMLLC, on the record, whether MMLLC was claiming any damages in connection with its public domain claim.  In response, MMLLC's attorney stated that MMLLC was seeking a declaratory judgment and would also seek attorneys' fees, but was not seeking monetary damages.  (*See* Serbagi Decl., Ex. N at 177-80.)  The Shaw Family's efforts to somehow characterize this simple response to its own question as a "threat" are argumentative, misleading and irrelevant, and should be stricken.

**MMLLC's Response to Statement No. 18:**

MMLLC admits that CMG's 30(b)(6) witness, Mark Roesler, was deposed on December 26, 2007.  MMLLC disputes the Shaw Family's remaining assertions in this statement, which

constitute an argumentative, conclusory and misleading summary of over 120 pages of deposition testimony, and are not supported by the cited testimony.

By way of example only, the Shaw Family falsely quotes Mr. Roesler as stating "[a]ll the images that were published between – you know, prior to, I believe '77 . . . that did not have notice on them . . . and the Rizzoli book." The quoted phrase "and the Rizzoli book" appears nowhere in the cited testimony – to the contrary, Mr. Roesler testified that "[w]e know the Rizzoli book is in the public domain." (*See* Serbagi Decl., Ex. O, at 48.)

Contrary to the Shaw Family's assertions Mr. Roesler did not state that <u>only</u> photographs contained in a publication called "Photoplay" may be in the public domain – rather, he stated that "[t]here were many publications back in those times, like Photoplay, and different publications that published – continually published these different photos of people like Marilyn Monroe and other entertainment personalities. So there were many, many, many, many images all published at that time. Typically there were all published without notice, or many of them were published without notice." (*Id.* at 49.)

Contrary to the Shaw Family's assertions that Mr. Roesler was unable to testify regarding the *Rizzoli* decision, he testified that he was aware that photographs in the Rizzoli Book were in the public domain, that counsel had reviewed the *Rizzoli* decision and that he had discussed it with counsel. (*Id.* at 48, 58, 61-62.)

Contrary to the Shaw Family's assertion that "Mr. Roesler stated that he relied on his attorneys for basis of the allegations in a given paragraph," Mr. Roesler testified that he had "personal knowledge of photographs that were published prior to 1964 in which copyright renewals were not obtained. Yes, my legal conclusion is, those images are in the public domain, independent of what attorneys that drafted this told me." (*Id.* at 162-63.)

In short, Statement No. 18, in its entirety, is conclusory, argumentative, misleading, and unsupported by the cited testimony, and therefore does not contain facts material to the determination of the Shaw Family's motion for summary judgment.

**MMLLC's Response to Statement No. 19:**

MMLLC disputes the Shaw Family's assertions in this statement, which are argumentative, conclusory, misleading, and are not supported by the cited testimony.

Contrary to the Shaw Family's assertions, Mr. Roesler testified, among other things, that the Rizzoli Book is in the public domain (*see id.* at 48), that numerous pictures of Marilyn Monroe published without notice would have entered the public domain, (*see id.* at 49, 168, 174), and that photographs that were published prior to 1964 in which copyright renewals were not obtained have entered the public domain.  (*See id.* at 162.)  Mr. Roesler also stated numerous times during his deposition that he was familiar with the licensing activities of the Shaw Family that formed the basis for allegations in the Third Amended Complaint.  (*See, e.g., id.* at 81-82, 99-100, 174.)

**MMLLC's Response to Statement No. 20:**

MMLLC disputes the Shaw Family's assertions in this statement, which are argumentative, conclusory, misleading, and are not supported by the cited testimony.

Contrary to the Shaw Family's assertion, Mr. Roesler was not asked "to identify the specific representations that the Shaw Family made to various licensees about purported public domain works" – rather, he was asked vague questions such as "what type of activities are you referring to" and "what type of marketing activities are you referring to?"  (*See* Serbagi Decl., Ex. O at 81-82.)  Mr. Roesler responded that it was "hard to recount specifics" but that there were "numerous representations" that the Shaw Family had made to various licensees regarding

their purported ownership of copyrights.  (*Id.*)  Mr. Roesler cited as an example representations the Shaw Family had made to Dolce & Gabbana – he specifically noted that he was not a party to the representations, and only knew about them from "Dolce & Gabbana reporting back to us." (*Id.* at 83-84.)

Mr. Roesler also testified that many of the Sam Shaw's photographs of Marilyn Monroe are in the public domain, as such photographs were typically published in magazines without copyright notice.  (*Id.* at 49.)  Moreover, as set forth in more detail in paragraphs 41-49 of Defendants' Rule 56.1 Statement, *supra*, it is indisputable that the Shaw Family represented to various third parties that it owned copyrights in public domain works.

**MMLLC's Response to Statement No. 21:**

MMLLC disputes the Shaw Family's  assertions in this statement, which constitute an argumentative, conclusory, incomplete and misleading summary of over 25 pages of deposition testimony, and are not supported by the cited testimony.

Contrary to the Shaw Family's argumentative characterization, Mr. Roesler did not "rely" on any testimony during his deposition – he simply answered questions posed to him by the Shaw Family's counsel.  Moreover, Mr. Roesler's testimony referred to "in excess of 15 or 20 different companies," of which the company "Freeze" was but an example.  (*See* Serbagi Decl., Ex. O at 99-100.)  Moreover, while the Shaw Family challenges Mr. Roesler's purported inability to provide "details" of a conversation between the Shaw Family and Freeze, Mr. Roesler specifically testified that, understandably, he was unable to provide specifics of a conversation to which he was not a party, but that Freeze informed CMG that, as a result of its conversations with the Shaw Family, it would not seek to license any intellectual property from MMLLC.  (*Id.* at 101-02, 117.)

38

Also contrary to the Shaw Family's assertions, Mr. Roesler was not asked "to identify any other parties that the Shaw Family made representations to" – rather, he was asked whether, other than Freeze and Dolce & Gabbana, he could remember "any specific licensees or potential licensees of MMLLC that either any of my clients purportedly made representations to regarding rights to images of Marilyn Monroe." (*Id.* at 125.) Mr. Roesler responded that he did not have a specific recollection of the names of such companies, but that he recalled there were others. (*Id.* at 120-21, 125-26.)

The Shaw Family also falsely asserts that Mr. Roesler "testified that he did not know if CMG ever licensed or offered to license any of the Rizzoli or Ballantine images." In fact, Mr. Roesler testified that, rather than licensing and actually charging a fee for public domain images, CMG might have encouraged licensees to use public domain images in conjunction with MMLLC's other intellectual property rights, (*see id.* at 129,) and that, if the Shaw Family were to concede that certain photographs are in the public domain, CMG would encourage licensees to use such photographs. (*See id.* at 174.)

MMLLC also specifically disputes the Shaw Family's assertions in this statement to the extent they suggest that the allegations in the Third Amended Complaint are limited to the Rizzoli Book and the Ballantine Book.

**MMLLC's Response to Statement No. 22:**

MMLLC does not dispute that, on some occasions, the Shaw Family dissuaded potential licensees from doing business with Defendants / Consolidated Plaintiffs. MMLLC disputes the Shaw Family's remaining assertions in this statement, which constitute an argumentative, conclusory, incomplete and misleading summary of over 20 pages of deposition testimony, and are not supported by the cited testimony. For example, contrary to the Shaw Family's assertions,

Mr. Roesler did not "testif[y] that it was Bradford's purportedly aggressive marketing activities that compelled CMG to recommend that the Defendants file this lawsuit."  Rather, upon being asked what role CMG played in the decision to institute litigation in Indiana, Mr. Roesler responded that "[w]e brought the problem to the attention of Marilyn Monroe LLC and their counsel, Gibson Dunn & Crutcher, because of the – the aggressive marketing that was being undertaken by the Bradford Group and the position that there was no – that the Marilyn Monroe LLC did not have any enforceable intellectual property rights."  (*Id.* at 134-35.)

**MMLLC's Response to Statement No. 23:**

MMLLC disputes the Shaw Family's assertions in this statement, which constitute an argumentative, conclusory, incomplete and misleading summary of 30 pages of deposition testimony, and are not supported by the cited testimony.  Contrary to the Shaw Family's baseless and conclusory claim that Mr. Roesler "did not know the basis for any" statements in the Third Amended Complaint, the cited testimony demonstrates, among other things, that Mr. Roesler was aware that numerous photographs published without copyright notice are in the public domain, (*see id.* at 161-63,) that the Shaw Family had frequently represented to third parties that they had rights to all photographs taken by Sam Shaw and that Marilyn Monroe had no intellectual property rights, (*id* at 170-72,) that CMG would like to encourage its licensees to use public domain photographs of Marilyn Monroe taken by Sam Shaw, (*id.* at 174-76), and that the Shaw Family discouraged third parties from entering into licensing agreements with Defendants / Consolidated Plaintiffs.  (*Id.* at 179-80.)

**MMLLC's Response to Statement No. 24:**

MMLLC disputes the Shaw Family's assertions in this statement, which are argumentative and are not supported by the cited testimony, and constitute an (incorrect) legal argument, rather than a statement of material fact.

Contrary to the Shaw Family's assertions, Mr. Roesler clearly testified that, if not for the Shaw Family's refusal to recognize that certain photographs are in the public domain, Defendants / Consolidated Plaintiffs would encourage their licensees to make use of such public domain photographs in conjunction with their licenses of MMLLC's intellectual property rights. (*Id.* at 174-76; *see also* Strasberg Decl. ¶ 23; Roesler Decl. ¶ 14, 15.)

MMLLC also specifically disputes the Shaw Family's assertions in this statement to the extent they suggest that the allegations in the Third Amended Complaint are limited to the Rizzoli Book and the Ballantine Book.

**MMLLC's Response to Statement No. 25:**

MMLLC does not dispute that the Shaw Family's original Complaint, dated April 19, 2007, contains the language quoted in this statement.

MMLLC disputes the Shaw Family's remaining assertions in this statement. Contrary to the Shaw Family's assertion that "Defendants sued only Bradford Licensing Inc. and the Shaw Family Archives," Defendants / Consolidated Plaintiffs also named as defendants James E. Dougherty (in their original Complaint dated March 23, 2005 and their Amended Complaint dated June 7, 2007, and their Second Amended Complaint dated June 21, 2005), and Valhalla Productions, LLC (in their Second Amended Complaint dated June 21, 2005).

MMLLC states that Edith Marcus and Meta Stevens are plaintiffs in this action, and are 50% owners of SFA. (*See* Def. Rule 56.1 Stmt, *supra*, ¶¶ 74, 84-85.) SFA received rights to the

photographs and copyrights at issue pursuant to a June 5, 2002 settlement, (*see id.* ¶ 74), and, since its formation, SFA has repeatedly represented that it owns the copyrights at issue. (*See id.* ¶¶ 77-83.) Moreover, in answering Defendants / Consolidated Plaintiffs' various complaints in this action, The Shaw Family <u>never</u> asserted as a defense that Defendants / Consolidated Plaintiffs had failed to name Edith Marcus or Meta Stevens as parties. (*See id.* ¶ 88.)

**MMLLC's Response to Statement No. 26:**

MMLLC does not dispute that the Court's November 25, 2007 Memo Endorsed Order states that "All discovery must be concluded by the <u>end</u> of 2007. I will grant <u>no</u> further extensions. I will try this case during March 2008 unless criminal matters intervene."

**MMLLC's Response to Statement No. 27:**

MMLLC does not dispute that, after Defendants / Consolidated Plaintiffs withdrew their motion to dismiss the Shaw Family's Ninth cause of action, (*see* Strauss Decl., Ex. 53), the Court Ordered that "in view of the correspondence received from the parties," *inter alia*, the Shaw Family's Ninth Cause of Action would remain in the case. (*See* Serbagi Decl., Ex. M.)

**MMLLC's Response to Statement No. 28:**

MMLLC does not dispute that it did not pursue the deposition of Bradford Licensing's 30(b)(6) witness, but disputes any assertion that it "waived" such deposition.

**MMLLC's Response to Statement No. 29:**

MMLLC disputes the Shaw Family's assertions in this statement, which constitute a highly argumentative and slanted account of a discovery dispute, and are contrary to demonstrable facts. In fact, to the extent attorneys' fees were needlessly expended during the course of this discovery dispute, it is the result of the Shaw Family's improper refusal to turn over documents relevant to Defendants / Consolidated Plaintiffs' claims, as well as its attorney's

decision, at the deposition of the Shaw Family's 30(b)(6) witness, to repeatedly, and improperly, instruct the witness not to answer questions.

As explained in more detail in paragraphs 18-30 of Defendants Rule 56.1 Statement, the Shaw Family refused to produce documents that were highly relevant to Defendants' public domain claim.  In refusing to produce such documents, the Shaw Family argued that it would only produce documents relating to the Rizzoli Book and the Ballantine Book, despite the fact that the Third Amended Complaint clearly alleges that, in addition to the Rizzoli and Ballantine Books, "other photographs that comprise the Monroe/Shaw Photographs and/or the Shaw Collection were initially published without copyright notice [and] have entered the public domain." (*See* Serbagi Decl., Ex. I ¶¶ 26-27, 34.)

Subsequently, at the deposition of the Shaw Family's Rule 30(b)(6) witness, the Shaw Family's attorney repeatedly instructed the witness not to answer questions. (*See* Def. 56.1 Stmt., *supra*, ¶¶ 24.)  Moreover, for over a month prior to the deposition, the Shaw Family had represented that its 30(b)(6) witness would be Edith Marcus, one of the parties to this action, only to switch course and present a new, previously unknown, witness at the last moment. (*Id.* ¶ 23.)

After both parties sent letters to Magistrate Judge Fox regarding the discovery dispute, Magistrate Judge Fox ordered the parties to appear before him in White Plains.  At the hearing, which took place on December 26, 2007, Magistrate Judge Fox rejected the Shaw Family's argument that the Third Amended Complaint (and thus, the scope of discovery) was somehow limited to the Rizzoli and Ballantine Books, stating that "[c]ertainly, the pleadings go beyond the Risoli [sic] and the Ballantine book," and that "any [opportunity] to narrow down the complaint

43

is . . . long gone." (*Id.* ¶ 26.)  Magistrate Judge Fox also chastised the Shaw Family's counsel for

improperly instructing his witness not to answer questions, stating:

> Let me just say this to everybody before we go any further.  Under the Southern
> District rules, directing a witness not to answer is sanctionable conduct, unless it
> falls within one of the exceptions in Rule 30.  If it happens again, there will be
> sanctions.

As a result of the Shaw Family's conduct, Magistrate Judge Fox ordered that it make its

30(b)(6) witness available for an additional four hours of testimony.  (*Id.* ¶ 27-28.)  At

MMLLC's request, Magistrate Judge Fox also ordered that the Shaw Family make available for

inspection two binders of materials that purportedly contained its collection of copyright

registrations and related materials.  (*See id.* ¶ 29.)  Magistrate Judge Fox stated that the binders

need not be copied in the first instance, but that the parties could call the Court in the event of

any dispute about the relevancy of the documents, and that MMLLC could make notes on the

documents and mark any document necessary for the deposition.  (*Id.*).

The Shaw Family subsequently made available a single binder, purportedly containing

the entirety of its copyright registrations and certificates.  MMLLC marked many documents

from the binder were as exhibits during the continued deposition of SFA's Rule 30(b)(6) witness

– however, the Shaw Family has refused to even provide copies of these deposition exhibits.

(*See id.* ¶ 30.)

Subsequently, on January 2, 2008, having reviewed the Shaw Family's binder and

realizing that it contains information that is highly relevant to the public domain claim, MMLLC

sent a letter to Magistrate Judge Fox, requesting that he compel the production of the binder.

(*See* Serbagi Decl., Ex. T.)  The next day, the Shaw Family sent a letter opposing production of

the binder.  (*Id.* Ex. U.)  Magistrate Judge Fox subsequently ruled that he would not compel

production of the binder <u>because discovery had closed</u>, but stated that MMLLC could either ask

the Court to reopen discovery for the limited purpose of production of the binder, or issue a trial subpoena for the binder. (Def. 56.1 Stmt. ¶ 31.) MMLLC intends to issue a trial subpoena.

In addition to generally disputing the Shaw Family's gross distortion of the discovery dispute discussed above, MMLLC further disputes the Shaw Family's assertions in this statement to the extent they suggest that the allegations in the Third Amended Complaint, and thus the scope of discovery, are limited to the Rizzoli Book and the Ballantine Book. As explained above, Magistrate Judge Fox expressly rejected this assertion.

**MMLLC's Response to Statement No. 30:**

MMLLC does not dispute that, in its December 20, 2007 letter to Magistrate Judge Fox, it requested that Magistrate Judge Fox compel SFA to produce Edith Marcus as its 30(b)(6) witness. Neither party brought a copy of the 30(b)(6) Notice to the December 26, 2007 hearing, and because the hearing was held the day after the Christmas holiday, neither party was able to have a copy of the Notice faxed to the courthouse. (*See* Strauss Decl., Ex. 16 at 8-10.) Because he was unable to review the 30(b)(6) Notice, Magistrate Judge Fox stated that he was unable to determine whether SFA's 30(b)(6) witness was prepared to testify as appropriate, and thus denied MMLLC's application. (*Id.* at 11.)

**MMLLC's Response to Statement No. 31:**

MMLLC admits that it deposed Melissa Stevens on December 27, 2007. MMLLC disputes the Shaw Family's remaining assertions in this statement. The Declaration of Christopher Serbagi, to which the Shaw Family cites, in no way supports the Shaw Family's assertion that "Defendants did not ask Ms. Stevens a single question relevant to the Defendants' allegations concerning standing." The Court cannot consider "facts" on summary judgment that have no evidentiary foundation. Indeed, the entirety of Melissa Stevens' deposition went to the

issue of whether the Shaw Family owns any copyrights that are not in the public domain, and thus was highly relevant to the question of whether the Shaw Family has standing to seek a declaratory judgment on the issue of domicile.

**MMLLC's Response to Statement No. 32:**

MMLLC does not dispute that, in its January 2, 2008 letter to Magistrate Judge Fox, it stated that "absent proof that Shaw has a legitimate ownership interest in any Marilyn Monroe images, Shaw has no standing to pursue a declaratory judgment against MMLLC."  (*See* Serbagi Decl., Ex. T.)  MMLLC disputes the Shaw Family's remaining assertions in this statement, which are argumentative, contrary to the record evidence and are not supported by the cited testimony.

Contrary to the Shaw Family's assertions, MMLLC did not argue that it was entitled to "all the Shaw Family documents pertaining to all the Shaw Family's copyrights."  Rather, as in its December 7, 2007 letter, MMLLC requested that Magistrate Judge Fox compel the Shaw Family to produce documents falling into two categories:  (i) documents relating to four specific photo shoots, and (ii) limited documents sufficient to identify all of Sam Shaw's copyrights in photographs of Marilyn Monroe.  (Serbagi Decl., Ex. P).  Magistrate Judge Fox did not "deny" this request, but rather ordered the Shaw Family to make available for inspection multiple binders of copyright registration materials.  (*See* Def. 56.1 Stmt. ¶ 29).  And in its January 2, 2007 letter, MMLLC did not request production of "all Shaw Family documents pertaining to all the Shaw Family's copyrights" – it simply requested production of a single binder, which it had already reviewed.  (*See* Serbagi Decl., Ex. T.)

**MMLLC's Response to Statement No. 33:**

MMLLC disputes the Shaw Family's assertions in this statement.  As explained in

MMLLC's response to Statement No. 29, *supra*, Magistrate Judge Fox did not decline

MMLLC's request for production of the copyright binder – to the contrary, he ordered the Shaw

Family to make said binder available for inspection.  As further explained in MMLLC's response

to Statement No. 29, *supra*, Magistrate Judge Fox subsequently ruled that he would not compel

physical production of the binder <u>because discovery had closed</u>, but stated that MMLLC could

either ask the Court to reopen discovery for the limited purpose of production of the binder, or

issue a trial subpoena for the binder.


Dated:  New York, New York
         February 12, 2008



                    LOEB & LOEB LLP

                    By:  /s/ Jonathan Neil Strauss
                         Barry I. Slotnick
                         Jonathan Neil Strauss
                         Tal E. Dickstein
                         345 Park Avenue
                         New York, New York 10154-1895
                         (212) 407-4000

                    *Attorneys for Marilyn Monroe LLC*



                    SOVICH MINCH, LLP

                    By:  /s/ Theodore J. Minch
                         Theodore J. Minch
                         10099 Chesapeake Drive, Suite 100
                         McCordsville, Indiana 46055
                         (317) 335-3601

                    *Attorneys for CMG Worldwide, Inc.*

47