**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X

SHAW FAMILY ARCHIVES, LTD., EDITH   :
MARCUS and META STEVENS,

                                   :

                 Plaintiffs,

                                   :   Case No. 05 Civ. 3939 (CM)

          -against-

                                   :   Hon. Colleen McMahon

CMG WORLDWIDE, INC. and MARILYN
MONROE LLC,   :

                 Defendants.   :

-------------------------------------------------------- X

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS /**
**CONSOLIDATED DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**DISMISSING DEFENDANTS / CONSOLIDATED PLAINTIFFS' PUBLIC DOMAIN**
**CLAIM, AND IN SUPPORT OF DEFENDANTS / CONSOLIDATED PLAINTIFFS'**
**<u>CROSS-MOTION FOR SUMMARY JUDGMENT ON THE PUBLIC DOMAIN CLAIM</u>**

                            LOEB & LOEB LLP
                            345 Park Avenue
                            New York, New York 10154
                            Tel: 212-407-4000
                            Fax: 212-407-4990
                            *Attorneys for Defendant / Consolidated*
                            *Plaintiff Marilyn Monroe LLC*

                            SOVICH MINCH, LLP

                            10099 Chesapeake Drive, Suite 100
                            McCordsville, Indiana 46055
                            Tel: 317-335-3601
                            Fax: 317-3353602
                            *Attorneys for Defendant / Consolidated*
                            *Plaintiff CMG Worldwide, Inc.*

Defendants / Consolidated Plaintiffs Marilyn Monroe LLC ("MMLLC") and CMG

Worldwide, Inc. ("CMG") (together "Defendants") respectfully submit this memorandum of law

in opposition to Plaintiffs Shaw Family Archives, Ltd.'s ("SFA") and Bradford Licensing

Associates, Inc.'s ("Bradford Licensing") (together, the "Shaw Family") motion for summary

judgment dismissing Defendants' public domain claim and for attorney's fees, and in support of

Defendants' cross-motion for summary judgment on their public domain claim.

## PRELIMINARY STATEMENT

The 1909 and 1976 Copyright Acts carefully balanced the interests of authors and their

assignees to enjoy monopolistic rights to their works, and the interest of the public to benefit

from those works after a limited time of protection.  Those Acts also required that, in order to

obtain copyright protection, authors publish their works with a proper notice of copyright so that

the public was aware of the author's claim of exclusive use.  However, the Shaw Family has for

decades disregarded those provisions by claiming copyright protection for Sam Shaw's

photographs of Marilyn Monroe from the 1950's ("Monroe/Shaw Photographs"), despite the fact

that their copyright terms have indisputably expired or that they were published without the

requisite copyright notice.

In particular, the Shaw Family has asserted copyright protection for photographs that

were published in a 1955 book chronicling the filming of *The Seven Year Itch* titled *Marilyn

Monroe as the Girl* published by Ballantine Books, Inc. (the "Ballantine Book"), despite the fact

the copyright was not renewed at the end of the initial 28-year term, and the photographs in the

Ballantine Book were thereby permanently injected into the public domain as a matter of law.

It is equally indisputable that other Monroe/Shaw Photographs have fallen into the public

domain.  For example, a Court in this District has already held that certain Monroe/Shaw

Photographs are in the public domain because they were originally published in the 1950s, yet

Sam Shaw did not timely renew their copyright registrations. Nevertheless, the Shaw Family continues to assert copyright protection to many of these public domain Monroe/ Shaw Photographs in hopes of artificially prolonging their exclusive control over these iconic images.

Unable to argue that the Ballantine Book and other Monroe/Shaw Photographs are not, in fact, in the public domain, the Shaw Family instead argues that there is no need for a declaratory judgment because they never explicitly told Defendants that they are forbidden from using those public domain photographs. At the same time, however, the Shaw Family has refused to acknowledge that the photographs in the Ballantine Book, or any other photographs of Marilyn Monroe, <u>are</u> in the public domain, or to tell Defendants which Monroe/Shaw Photographs they <u>may</u> use without fear of an infringement suit. The Shaw Family is thus running a shell game.

The indisputable evidence shows that the Shaw Family <u>has</u> threatened infringement suits based on photographs, such as those in the Ballantine Book, that are indisputably in the public domain, and falsely represents that it holds valid copyrights in those public domain photographs. Moreover, the Shaw Family has asserted copyright infringement claims against Defendants in this very action, including claims based on at least one photograph that is believed to be in the public domain. Indeed, just this past December, the Shaw Family's counsel sent a letter to Defendant CMG, warning that the Shaw Family "is the holder of all worldwide rights . . . in the photos taken by Sam Shaw or Larry Shaw." The Shaw Family's implicit threat is unmistakable.

In these circumstances, and under controlling case law, Defendants are not required to begin using the public domain photographs – and invite an infringement suit by the Shaw Family – prior to obtaining a declaratory judgment clarifying the status of the disputed photographs.

The Shaw Family also absurdly argues that Defendants' public domain claims should be dismissed because Defendants did not individually name Edith Marcus ("Marcus") and Meta

Stevens ("Stevens"), rather than the SFA, as defendants, notwithstanding that (i) Marcus and Stevens transferred their purported copyrights to the Monroe/Shaw Photographs to the SFA, which has repeatedly proclaimed that <u>it</u> is the owner of all copyrights in the Monroe/Shaw Photographs; (ii) Marcus and Stevens are plaintiffs in this action, and 50% owners of Plaintiff / Consolidated Defendant SFA, and have been involved in this litigation from the outset; and (iii) the Shaw Family, Marcus and Stevens have been aware of Defendants public domain claims since <u>March 23, 2005</u>, yet waited almost three years to argue that Marcus and Stevens should be named as defendants (and, apparently with a straight face, accuse Defendants of undue delay). This is gamesmanship of the worst sort, and should not be countenanced.

## STATEMENT OF FACTS

Defendants respectfully refer the Court to their accompanying Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Def. 56.1 Stmt."). These facts are referenced as necessary in the argument section herein.

## ARGUMENT

**I.    Defendants' Cross-Motion for Summary Judgment Should be Granted Because Certain Monroe/Shaw Photographs are Indisputably in the Public Domain**

The core question on Defendants' public domain claim is whether there is any genuine dispute of fact as to whether certain of the Monroe/Shaw Photographs are in the public domain. The Shaw Family's brief is completely silent on this key issue. The reason is obvious – there is no dispute that many, if not all, of Sam Shaw's photographs of Marilyn Monroe are in the public domain.

### A.    All Photographs Published in the Ballantine Book are in the Public Domain Because the Copyright was Not Renewed

Under the 1909 Act,[1] the initial 28-year copyright term began to run on the date of first publication.  *See* 17 U.S.C. § 24 (1909 Act, as amended, July 30, 1947) (reprinted in 8 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* ("*Nimmer*") App. 6-26 to 6-28) ("The copyright secured by this title shall endure for twenty-eight years from the date of first publication").  If no renewal registration was filed with the United States Copyright Office in the last year of the initial 28 year term, the work was not subject to a renewal term, and was automatically injected into the public domain.  *Id.* ("[I]n default of the registration of such application for renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years from first publication."); *see Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 463 (S.D.N.Y. 2002) ("Failure to make a renewal application during the twenty-eighth year resulted in the work entering the public domain.  The rule was (and for our purposes is) undeniably strict."), *aff'd*, 409 F.3d 26 (2d Cir. 2005).[2]

In 1955, Sam Shaw published *Marilyn Monroe as the Girl* (the "Ballantine Book"), which captures the making of the film *The Seven Year Itch* starring Marilyn Monroe, and contains photographs of Marilyn Monroe taken by Sam Shaw.  (Def. 56.1 Stmt. ¶ 6; Strauss Decl. Ex.1).[3]  Several of the photographs in the Ballantine Book are of Monroe's white dress

---

[1] The 1909 Act applies to works created before January 1, 1979, *see Martha Graham School and Dance Found., Inc. v. Martha Graham Center of Contemporary Dance, Inc.*, 380 F.3d 624, 632 (2d Cir. 2004), such as the Monroe/Shaw Photographs.

[2] "[E]ven under the 1976 Act, the third *proviso* of [17 U.S.C.] Section 304(a) provided at enactment that failure to comply with the formality of renewal registration doomed the copyright in the work after expiration of the initial term of 28 years".  3 *Nimmer* § 9.05[A][1], at 9-42.  (emphasis in original)

[3] References to "Strauss Decl." are to the Declaration of Jonathan Neil Strauss dated February 12, 2008 submitted herewith.

blowing above a subway grate, which the Shaw Family has described as the "famous flying skirt series". (Def. 56.1 Stmt. ¶ 17.)

Sam Shaw registered his copyright in the Ballantine Book on or about June 30, 1955, identifying June 24, 1955 as the date of first publication. (*Id.* at ¶ 7; Strauss Decl. Ex.2). Thus, the initial 28-year copyright term for the Ballantine Book expired in 1983.

Shaw did not renew the copyright registration to the Ballantine Book prior to the expiration of the original 28-year term. The Shaw Family failed to produce any such renewal registration during discovery and inspection of the Shaw Family's collection of copyright materials revealed no such renewal registration. (Def. 56.1 Stmt. ¶ 17). Defendants' own search of the Copyright Office's website also revealed no renewal registrations for the Ballantine Book. (Cloonan Decl. ¶ X, Ex. X.).[4] Thus, there is therefore no dispute of fact that the photographs in the Ballantine Book are in the public domain.

Rather than acknowledge that the photographs in the Ballantine Book have been in the public domain since 1983, the Shaw Family has instead recently attempted to re-register many of those photographs, both as individual photographs and as part of newer books. (Def. 56.1 Stmt. ¶ 47, 50-51.) As explained in more detail in section I.D., *infra*, such belated registrations are entirely ineffective because "failure to comply with the formality of renewal registration doomed the copyright in the work after expiration of the initial term of 28 years." 3 *Nimmer* § 9.05[A][1], at 9-42. In light of the Shaw Family's efforts to cloud the legal status of these iconic images a declaratory judgment is particularly necessary.

---

[4] References to "Cloonan Decl." are to the Declaration of Maureen Cloonan dated February 12, 2008 submitted herewith.

**B.    It Has Already Been Determined That Monroe/Shaw Photographs Contained in the Rizzoli Book are in the Public Domain**

In *Shaw v. Rizzoli Int'l Publ'ns, Inc.*, No. 96 Civ. 4259 (JGK), 1999 WL 160084 (S.D.N.Y. Mar. 23, 1999), Sam Shaw and Edith Marcus, and others, claimed that Rizzoli's book *Marilyn Monroe. The Life. The Myth.* ("Rizzoli Book") infringed their copyrights in certain Monroe/Shaw Photographs. *Id.* at *2. Rizzoli claimed that 105 of those photographs and images were in the public domain. *See id.* at *4 and n.6.

The *Rizzoli* Court held that the 105 photographs in question were in the public domain, because they had been published prior to January 1, 1964 and the plaintiffs, including Sam Shaw and Edith Marcus, failed to renew the copyrights to those photographs within the original 28-year copyright term. *Id.* at *6. These "public domain" photographs included 14 Monroe/Shaw Photographs, including several taken on the set of *The Seven Year Itch*, that were previously published in a variety of newspapers and magazines. (Def. 56.1 Stmt. ¶¶ 10-11, 14, 16)[5] (Despite that ruling, the Shaw Family's 30(b)(6) witness still refused to recognize that any of Sam Shaw's photographs appearing in the Rizzoli Book were in the public domain. (Strauss Decl. Ex. 15 at 58-59)). Thus, there can be no real dispute that at least 14 Monroe/Shaw Photographs appearing in the Rizzoli Book are in the public domain.

**C.    Monroe/Shaw Photographs That Were Published in the 1950s Without the Required Copyright Notice, or Whose Copyrights Were Not Renewed, are in the Public Domain**

In addition to the photographs in the Rizzoli Book, numerous other photographs of Marilyn Monroe taken by Sam Shaw were published in newspapers and magazines around the world in the 1950s and 1960s. (Def. 56.1 Stmt. ¶ 14.) These include many of Sam Shaw's

---

[5] The photographs in question appear on the following pages of the Rizzoli Book: Page 146 (3 photos); page 147 (6 photos); page 148 (1 photo); page 149 (1 photo); and page 184 (3 photos). (*See* Def. 56.1 Stmt. ¶ 10; Strauss Decl., Ex. 4 at MMLLC (Shaw) 00626.)

photographs taken on the set of *The Seven Year Itch*, including the "flying skirt" photographs

that Sam Shaw described as "iconographic."  (*See* Def. 56.1 Stmt. ¶ 15).  This is not surprising,

as Sam Shaw was hired by the producer of *The Seven Year Itch* for the express purpose of taking

photographs to help publicize the film.  (*See* Def. 56.1 Stmt. ¶ 13).

To the extent any such photographs were published without copyright notice, or to the

extent Sam Shaw failed to renew the copyright in such photographs at the end of the original 28-

year term, the photographs are in the public domain.  Under the 1909 Copyright Act, publication

of a photograph without proper copyright notice automatically injected the work into the public

domain.  *See Martha Graham School and Dance Found., Inc.*, 380 F.3d at 633.[6]  A proper

copyright notice must include: (1) the symbol ©, the word "Copyright," or the abbreviation

"Copr.," (2) the year of first publication, and (3) the name, initials, monogram, mark or symbol

of the copyright owner.  *See* 17 U.S.C. § 19 (1909 Act, as amended, Oct. 15, 1971) (reprinted in

8 *Nimmer* App. 6-21 to 6-23).

Similarly, photographs first published as part of a collective work, such as a newspaper or

magazine, without a proper copyright notice on the individual photograph, automatically pass

into the public domain.  *See Milton H. Greene Archives, Inc. v. BPI Commc'ns, Inc.*, 378 F.

Supp. 2d 1189, 1196-97 (C.D. Cal. 2005) ("When a work is published in a larger copyrighted

collective work, the failure to place a copyright notice on the individual work forfeits the

individual's copyright. . . . .  Publication of a derivative work publishes whatever portion of the

---

[6] *See also Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. System, Inc.*, 672 F.2d 1095, 1101 (2d Cir. 1982) ("The owner secures federal protection by complying with the requirements of the 1909 Act; if he does not, his published work is in the public domain."); 2 *Nimmer* § 7.02[C][1], at 7-15 to 7-16 ("Under the 1909 Act, a work had to bear a valid copyright notice upon publication in order to secure copyright protection.  Works with defective notice were injected into the public domain immediately upon publication . . . .  Thus, as to all works published anywhere in the world prior to January 1, 1978, protection is gauged initially under the strictures of the 1909 Act.").

original work is incorporated into the derivative work."); *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. System, Inc.*, 672 F.2d 1095, 1102 (2d Cir. 1982); 2 *Nimmer* § 7.12[C][1], at 7-94 (under 1909 Act, first publication of an individual work as part of a collection, without the name of the individual work's owner, injected the work into the public domain).  In addition, as discussed above, photographs whose copyright registrations were not renewed during the 28th year of the initial copyright term fell into the public domain.

During discovery in this action, Defendants requested that the Shaw Family produce documents relevant to the pending public domain claim.  The Shaw Family inexcusably refused to produce any documents other than those relating to the Rizzoli Book and the Ballantine Book (*see* Def. 56.1 Stmt. ¶ 18-19), much less provide information showing that the Monroe/Shaw Photographs first published in the 1950s were published with proper copyright notice or that their copyright registrations were timely renewed.  Accordingly, Defendants conducted their own search of publicly available materials, and have identified numerous Sam Shaw photographs of Marilyn Monroe that were published in the 1950s (many of them from the filming of *The Seven Year Itch*).  These photographs are included as exhibits A-K to the Declaration of Maureen Cloonan, and exhibits 8-9 of the Strauss Declaration.[7]

Upon the order of Magistrate Judge Fox, the Shaw Family made available for inspection a binder purportedly containing the entirety of their Marilyn Monroe-related copyright registration certificates – that binder contained no registration or renewal certificates for any of the photographs identified above.  (Slotnick Decl. ¶ 7).[8]  And Defendants' own review of the

---

[7] It is likely that many more published Monroe/Shaw Photographs exist, but have not yet been uncovered due to the Shaw Family's refusal to identify them during discovery.

[8] References to "Slotnick Decl." are to the Declaration of Barry I. Slotnick dated February 11, 2008, submitted herewith.

United States' Copyright Office's website turned up no registration certificates or renewal certificates for any of the above works.  (Cloonan Decl., Ex. L.)  Therefore, the photographs identified above are in the public domain, because they were either published without copyright notice in the 1950s or because Sam Shaw failed to renew such copyrights.

Notably, this is the exact same scenario that was addressed in the *Rizzoli* case, where Judge Koeltl found that 14 Monroe/Shaw Photographs had entered the public domain because they were published in newspapers or magazines prior to 1964 but not renewed within the 28th year after first publication.  *See supra* at I.B..  Thus, there is, and can be, no genuine dispute that the photographs in question are in the public domain.

**D.    The Shaw Family Cannot "Revive" Copyright Protection in Public Domain Photographs by Attempting to Register or Re-Register the Photographs**

Once a photograph enters the public domain, copyright protection cannot be revived by later registration or by re-publication, even as part of a different collection.  See 17 U.S.C. § 7 (1909 Act, as amended, July 30, 1947) (reprinted in 8 *Nimmer* App. 6-8);[9] 1 *Nimmer* § 3.04[A], at 3-22.9 ("If the underlying work is in the public domain, a copyright in the derivative or collective work does not render the underlying work protectible.") (citing *Am. Code Co. v. Bensinger*, 282 F. 829 (2d Cir. 1922); *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc*, 482 F.

---

[9] That section provides:

> Compilations or abridgements, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new works shall not effect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.

17 U.S.C. § 7 (1909 Act, as amended, July 30, 1947).

Supp. 980 (S.D.N.Y. 1980)).  Similarly, when a photograph is reproduced as part of a new

collection, and the underlying photograph subsequently falls into the public domain, the

reproduced photograph is likewise in the public domain.  See 1 *Nimmer* § 3.07[C], at 3-50 to 3-

50.1 (citing *G. Ricordi & Co. v. Paramount Pictures, Inc.*, 189 F.2d 469 (2d Cir. 1951)

(theatrical play fell into the public domain when the copyright term was not renewed, despite the

fact that the play had been incorporated into a movie)).

　　　　The Shaw Family has recently begun applying for copyright registrations in photographs

that have already fallen into the public domain.  For example, in November 2007, the Shaw

Family filed a copyright registration application for a collection of photographs entitled "The

Making of the Seven Year Itch."  In the copyright application, the Shaw Family represented that

none of the photographs in the collection had been previously published – in fact, a number of

the photographs had been previously published, including in the public domain Ballantine Book.

(Def. 56.1 Stmt. ¶ 47).  In addition, on its websites the Shaw Family falsely maintains that

numerous public domain photographs originally published in the Ballantine Book are protected

by copyright and created in 2002 or 2003.  (*Id.* ¶ 48-49).

　　　　Moreover, in this litigation the Shaw Family has claimed copyrights in a book entitled

*Marilyn Among Friends.*  (*See* Am. Compl., Serbagi Decl. Ex. F at ¶15).  However, *Marilyn*

*Among Friends* contains over 20 photographs previously published in the Ballantine Book.  (Def.

56.1 Stmt. ¶ 51).  These photographs are in the public domain, notwithstanding any efforts to

claim protection pursuant to a copyright in *Marilyn Among Friends.*

　　　　Finally, in 1979 Peebles Press International, Inc. published a book titled *Joy of Marilyn:*

*In the Camera Eye* ("*In the Camera Eye*").  Although many of the photographic credits in the

book are given to Sam Shaw, the copyright notice, "Copyright © 1979 by Peebles Press

International, Inc." identifies Peebles Press as copyright owner. (*Id.* ¶ 53.). However, 22 years later in July 2001, the Shaw Family filed a copyright registration application for this book, falsely claiming that there were no prior registrations and that the book did not incorporate any pre-existing works. (Strauss Decl. Ex. 54). *In the Camera Eye* contains a number of photographs that were originally published in the Ballantine Book (*see* Def. 56.1 Stmt. ¶ 55) which are in the public domain.

In any event, notwithstanding the Shaw Family's efforts to copyright a work that does not belong to them, Peebles Press International remains the owner of the copyright in *In the Camera Eye*, and the Shaw Family's efforts to claim a copyright therein are a nullity.

> **E.     Photographs of Marilyn Monroe taken by Sam Shaw on the Set of the Film *The Seven Year Itch*, and Subsequently Published in *Marilyn Among Friends* and *In the Camera Eye*, are in the Public Domain Because They are Works Made for Hire and the Copyright Notice Did Not Name the True Copyright Owner**

The copyright to a work made for hire is owned by the hiring party, not the creator of the work. *See* 17 U.S.C. § 26 (1909 Act) ("In the interpretation and construction of this title . . . the word 'author' shall include an employer in the case of works made for hire."); *Martha Graham School and Dance Found., Inc*, 380 F.3d at 634 ("with respect to works for hire, the employer is legally regarded as the 'author'"). A work may be considered to have been made for hire even outside the traditional employment relationship. *See Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995) (work for hire under 1909 Act may include independent contractors); *see generally Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989). Under the 1909 Act, a work is considered to have been made for hire when an author's "work is produced at the instance and expense" of the hiring party, *Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909, 914 (2d Cir. 1974), and when the hiring party has the right "to direct and supervise" the manner in which the creator performs his work, *see Playboy Enters., Inc.*, 53 F.3d at 554. The hiring party need not actually exercise its right to direct and supervise creation of the work for the work

to be considered made for hire.  *See Martha Graham School and Dance Found., Inc.*, 380 F.3d at 635.

A work made for hire must be published, registered and renewed (if at all) in the name of the hiring party, not the creator of the work.  *See id.*  at 634 ("with respect to works for hire, the employer is legally regarded as the 'author,' . . . .  If a work is a work for hire under the 1909 Act, the employer as statutory 'author' owns the original term, and the renewal term vests in the employer if the employer makes an application for renewal within the last year of the original term."); 2 *Nimmer* § 7.09[A], at 7-59 ("The name of the copyright owner must be included in the copyright notice.  It was held under the 1909 Act that a notice defective in this respect would not be effective even as against one who had actual knowledge of the identity of the copyright proprietor") (citing *Ross Prods., Inc. v. New York Merchandise Co.*, 233 F. Supp. 260 (S.D.N.Y. 1964)).  As discussed *supra* at I. C., publication without proper notice automatically injected the work into the public domain.

Here, all of Sam Shaw's photographs of Marilyn Monroe taken on the set of *The Seven Year Itch* are works made for hire.  Sam Shaw was hired by the producer of the film *The Seven Year Itch* to take photographs of Marilyn Monroe for the purpose of creating publicity for the film.  (Def. 56.1 Stmt. ¶ 11.)  In connection with his duties, Shaw was required to be on the movie set whenever Marilyn Monroe was on the set.  (*Id.*)  Sam Shaw himself testified that he was assigned by the producers of the film to photograph the "logo" for the film.  (*Id.* ¶ 12.).  And the producers of *The Seven Year Itch* paid Sam Shaw for these efforts.  (*Id.* at 13).  As a result of the producers' desire to create publicity, Sam Shaw's photographs from the set of *The Seven Year Itch* were published throughout the world at or around the time of the film's premiere.  *See* (Id. at ¶¶ at14-16.  The copyrights in all photographs taken by Sam Shaw on the set of *The Seven Year Itch*, including the flying skirt photographs, are owned by the producers of the film.

The books *Marilyn Among Friends* and *In the Camera Eye* each contain a number of photographs from the set of *The Seven Year Itch*.[10]  Because the copyright notices to those books do not contain the name of the producers of *The Seven Year Itch*, the notice is defective, and the photographs from the set of *The Seven Year Itch* are therefore in the public domain.

## II.    The Shaw Family's Motion for Summary Judgment Should be Denied Because an Actual Controversy Exists Between the Parties Warranting a Declaratory Judgment

"The essential distinction between a declaratory judgment action and an action seeking other relief is that in the former no actual wrong need have been committed or loss have occurred in order to sustain the action."  *Horne v. Firemen's Retirement Sys. of St. Louis,* 69 F.3d 233, 236 (8th Cir. 1995).  A claim meets the "actual controversy" requirement of the Declaratory Judgment Act, 28 U.S.C. § 2201, when "the dispute presents a substantial controversy" as opposed to "merely an abstract question."  *Starter Corp. v. Converse*, *Inc.*, 84 F.3d 592, 594 (2d Cir. 1996) (citing *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). There is no bright line separating the two, and each case must be decided on its own facts.  *See Starter Corp.*, 84 F.3d at 594; *Maryland Cas. Co.*, 312 U.S. at 273.

In  declaratory judgment actions involving intellectual property,[11] the test for an "actual controversy" has two prongs:  "(1) has the defendant's [*i.e.*, the purported rights holder's] conduct created a real and reasonable apprehension of liability on the part of the plaintiff [*i.e.*, the potential infringer], and (2) has the plaintiff engaged in a course of conduct which has brought it into adversarial conflict with the defendant."  *Starter Corp.*, 84 F.3d at 595; *see Solin*

---

[10] These photographs are identified in paragraphs 51 and 55 of Defendants' 56.1 Statement.

[11] "'The same principles that control patent cases are applicable, though they are litigated far less often, if a declaratory judgment is sought about a copyright or trademark.'"  *Pocketmedicine.com, Inc. v. John Wiley & Sons, Inc.*, 04 Civ. 8369 (LMM), 2006 WL 785283, at *2 n.2 (S.D.N.Y. Mar. 23, 2006) (quoting 10B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2761 (3d ed. 1998)).

*v. Nat'l Ass'n of Sec. Dealers, Inc.*, No. 05 Civ. 4268 (RMB), 2006 WL 223156 (S.D.N.Y. Jan. 27, 2006) (applying two-pronged test to copyright declaratory judgment action).

Here, the Shaw Family, citing inapposite cases, essentially ignores the standard established by the Second Circuit for determining whether an actual controversy exists in a declaratory judgment action involving intellectual property.  Indeed, the vast majority of cases the Shaw Family cites for its "standing" argument are not in the declaratory judgment context at all.  The reason for this is obvious – under the well-settled standard set forth above, there can be no dispute that Defendants have standing to seek a declaratory judgment.

### A.     Defendants Have Standing Because They Seek to Use Public Domain Images in Conjunction with Their Marilyn Monroe-Related Intellectual Property Rights

As an initial matter, the Shaw Family argues that Defendants lack standing because they "do not have any intellectual property in the Rizzoli and Ballantine books or in any public domain image of Marilyn Monroe for that matter."  (Pl. Br. at 6).  Of course, if this argument were accepted, no one would ever be entitled to seek a declaratory judgment as to whether images are in the public domain, because by definition no one "owns" intellectual property in public domain photographs.  However, a declaratory judgment is appropriate here because Defendants are entitled, and intend, to utilize such public domain photographs in conjunction with their other intellectual property rights, and should be able to do so without fear of an infringement suit by the Shaw Family.

It is indisputable that Defendants do have intellectual property rights pertaining to Marilyn Monroe.  For years Defendants have been actively involved in the business of licensing and otherwise exploiting the name, image, persona and likeness of Marilyn Monroe.  (*See* Def. 56.1 Stmt. ¶ 60).  Prior to this Court's May 5, 2007 ruling, Defendants had always understood and believed that MMLLC was the lawful owner of such publicity rights, and Defendants intend

to continue with the business of licensing and exploiting Marilyn Monroe's right of publicity provided that it is determined that Marilyn Monroe died a domiciliary of the State of California (and thus that MMLLC owns Marilyn Monroe's right of publicity pursuant to the California right of publicity statute, Cal. Civ. Code. 3344.1). (*Id*. ¶ 61).

Significantly, however, Defendants also possess other forms of intellectual property rights pertaining to Marilyn Monroe, namely trademarks and copyrights, that Defendants are actively in the business of exploiting and licensing. (*Id*. ¶ 62).

In marketing these intellectual property rights, Defendants offer to licensees and potential licensees a portfolio of images, including both copyrighted and public domain images, that the licensees may wish to use in conjunction with the licensed intellectual property rights. (*Id*. ¶¶ 66-69). Defendants seek to add Sam Shaw's public domain photographs of Marilyn Monroe to this portfolio of images, and would do so but for the Shaw Family's refusal to acknowledge that certain photographs have entered the public domain. (*Id*. ¶¶ 70-71; Serbagi Decl., Ex. I at ¶ 4).

Accordingly, it is clear that Defendants are entitled to seek to package public domain photographs to their licensees in connection with their exploitation of intellectual property rights.

## B. The Shaw Family's Conduct has Created a Real and Reasonable Apprehension of Liability on the Part of Defendants

"Recent decisions of the Supreme Court and Federal Circuit have . . . changed the law with respect to the 'reasonable apprehension' test, in effect lowering the bar for a plaintiff to bring a declaratory judgment action in [an intellectual property] dispute." *Frederick Goldman, Inc. v. West*, No. 06 Civ. 3413 (LTS), 2007 WL 1989291, at *3 (S.D.N.Y. July 6, 2007) (citing *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764 (2007)). In *MedImmune*, the Supreme Court held that a party need not actually commit an act of infringement before it is entitled to a declaratory judgment as to the validity of the underlying intellectual property. *See* 127 S. Ct. at

777 (patent licensee need not terminate or breach license agreement prior to seeking declaratory judgment that underlying patent was invalid).

Indeed, even long before *MedImmune*, the Second Circuit recognized that the fear of liability requirement is met by either direct or indirect threats and "has been given a very liberal interpretation." *Muller v. Olin Mathieson Chemical Corp.*, 404 F.2d 501, 504 (2d Cir. 1968) (citing 6A Moore's Federal Practice § 57.20, at 3119 (2d ed. 1966)); *see also Ritz Hotel, Ltd. v. Shen Mfg. Co.*, 384 F. Supp. 2d 678, 682 (S.D.N.Y. 2005) (the Second Circuit has adopted a "broad interpretation of reasonable apprehension of being sued") (citing *Muller*); *Nippon Elec. Glass Co., Ltd. v. Sheldon*, 489 F. Supp. 119, 121 (1980) (citing cases).

The Shaw Family repeatedly argues that Defendants have no reasonable apprehension of being sued because "the Shaw Family has never asserted rights against the Defendants or their licensees with respect to the Rizzoli or Ballantine books." (Pl. Br. at 6). This is misleading at best – even during the course of this litigation, the Shaw Family has consistently refused to acknowledge that <u>any</u> photographs are in the public domain, including those held to be in the public domain in the *Rizzoli* case, they thus hold Defendants under the constant threat of litigation if Defendants ever use the public domain photographs. *See Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc.*, No. 06 Civ. 2652 (JGK), 2006 WL 2089926, at *3 (S.D.N.Y. July 21, 2006) ("it is well established that [even] an indirect threat can create a real and reasonable apprehension of liability").

In addition, the Shaw Family has created a reasonable apprehension of liability through the following conduct: (1) the Shaw Family has asserted numerous copyright infringement claims against Defendants, including in connection with photographs believed to be in the public domain; (2) the Shaw Family has purported to re-register public domain photographs, thus

representing to the public that they will allege copyright infringement against anyone who seeks

to use such photographs without permission; and (3) the Shaw Family has expressly threatened

infringement actions and sought to extract money from third parties in connection with their use

of public domain photographs, including photographs from the Ballantine Book.

> ### 1.    The Shaw Family has Asserted Numerous Copyright Infringement Claims Against Defendants, Including for Photographs Believed to be in the Public Domain

In *Starter Corp.*, it was undisputed that a real and reasonable apprehension of liability

was created by "Converse's unambiguous communication to Starter of its intent to bring an

infringement suit should Starter engage in the sale of footwear bearing its House Marks." 84

F.3d at 595; *see also Ritz Hotel, Ltd.*, 384 F. Supp. 2d at 683 (actual controversy existed where

there were defendant admitted "circumstances under which [it] might decide to bring a lawsuit in

the future").  Here, the Shaw Family has done one better.  They have <u>already</u> sued Defendants

for copyright infringement, including for photographs that appear to be in the public domain.

The Shaw Family first sued Defendants for copyright infringement in the Shaw Family's

original complaint, filed on April 19, 2005.  (*See* Serbagi Decl. Ex. D).  The complaint did not

identify all of the images that Defendants' were accused of infringing, instead vaguely alleging

that "defendants have also made, distributed and/or displayed other copies of plaintiffs'

copyright protected photographic works as part of defendants' advertising activities," and that

"defendants may be advertising, offering for sale, [or] selling other copyright protected works of

the Shaw Collection in addition to those set forth above."  (*Id.* ¶¶ 22-23).  The Shaw Family's

original complaint also alleged that Sam Shaw's family members own copyrights in <u>all</u>

photographs that he took, and sought a declaration that the Shaw Family has "EXCLUSIVE

RIGHT TO THE PHOTOGRAPHS CONTAINED WITHIN THE SHAW COLLECTION."

(Def. 56.1 Stmt. ¶ 34; Serbagi Decl. Ex. D  at 7 and ¶¶11-12, 38).[12]  The message of this complaint is clear – the Shaw Family claims rights to <u>all</u> photographs taken by Sam Shaw of Marilyn Monroe, and that Defendants use any such photographs at their peril.

Plaintiffs filed their Second Amended Complaint on August 8, 2007, again accusing Defendants of copyright infringement, *inter alia*, of a photograph appearing on page 46 of *Marilyn Among Friends*.  (*See* Serbagi Decl. Ex. F ¶ 19).  However, this photograph, from the "flying skirt series" in *The Seven Year Itch*, was published multiple times in newspapers and magazines in connection with publicity for the film, (*see* Strauss Decl. Ex. 17 at 46; Ex. 5 at 162**;** Ex. 8**;** Cloonan Decl. Ex. G), and is in the public domain for the reasons set forth *supra* at I.C. and I.E..[13]  For Defendants' purported infringements, the Shaw Family sought "copyright damages increased to the statutory maximum due to willful infringement." (Pl. Sec. Am. Compl. at 10).  *See Blessings Corp. v. Altman*, 373 F. Supp. 802, 806-807 (S.D.N.Y. 1974) (actual controversy existed where the "history of litigation between the parties . . . reveals no small willingness to contest differences in legal fora, and offers no hint that relations between the parties have reached quiescense."); *Research in Motion Ltd. v. Visto Corp.*, 457 F. Supp. 2d 708, 712 (N.D. Tex. 2006) (actual controversy existed where defendant had already sued plaintiffs for infringement of patents that are similar to the one at issue on the declaratory judgment claim and "has thus exhibited the proclivity to protect its patents against possible infringement by [plaintiffs].").

---

[12] The Shaw Family's First Amended Complaint, filed on May 10, 2005, contained identical allegations. (Def. 56.1 Stmt. ¶ 35; Serbagi Decl. Ex. D at ¶¶ 22-23, 38).

[13] The other photographs that formed the basis of the Shaw Family's infringement claims may very well be in the public domain as well, but the Shaw Family has refused to provide any discovery regarding publication or copyright registration of those photographs.  (Def. 56.1 Stmt. ¶ 19.)

Furthermore, on March 19, 2007, Defendants informed the Shaw Family that CMG had, for a short time, displayed a few public domain Sam Shaw photographs on its website. Defendants later confirmed, however, that the photographs in question came from the Rizzoli Book.  (Def. 56.1 Stmt. ¶ 39; Roesler Decl. ¶ 16).[14]  The Shaw Family responded by accusing Defendants of displaying Sam Shaw photos on its website, in the copyright infringement portion of the Shaw Family's Second Amended Complaint.  (Pl. Sec. Am. Compl. ¶ 22).  This further evidences the Shaw Family's refusal to acknowledge that <u>any</u> Sam Shaw photographs are in the public domain, and to implicitly threaten infringement actions if Defendants act on their understanding that certain photographs have fallen into public domain.

Finally, if there was any doubt of the Shaw Family's intention to chill Defendants' potential use of Sam Shaw's public domain photographs, just recently on December 13, 2007, the Shaw Family's counsel sent a letter to CMG, warning that the Shaw Family "is the holder of all worldwide rights . . . in the photos taken by Sam Shaw or Larry Shaw."  (*See* Strauss Decl. Ex. 42).  *See Kos Pharm. Inc. v. Barr Labs., Inc.*, 242 F. Supp. 2d 311, 316-17 (S.D.N.Y. 2003) (declaratory judgment warranted where patent owner pledged that it would enforce its patents, even though it did not specify the patents at issue).

These threats are underscored by the Shaw Family's recent efforts to withdraw their copyright infringement claims "without prejudice," so that they may later be re-asserted against Defendants at any time.  The Shaw Family's constant threat of litigation, combined with their

---

[14] The fact that CMG later removed those images from its website does not eliminate the actual controversy.  *See Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*, 523 F. Supp. 2d 376, 382 (S.D.N.Y. 2007) ("In *MedImmune, Inc. v. Genetech, Inc*, 127 S. Ct. 764, 771 (2007), the United States Supreme Court held that an actual controversy existed even where the plaintiffs complied with the demands of the private defendants and thus did not infringe upon the rights asserted by the defendants.").

refusal to acknowledge that a single photograph has fallen into the public domain, certainly creates a reasonable apprehension of liability.

> ### 2. The Shaw Family Has Attempted to Register or Re-Register Public Domain Photographs, Thus Representing to the Public That it will Bring Copyright Infringement Actions in Connection with Any Unauthorized Use of Such Photographs

"The accusation [of infringement warranting a declaratory judgment] need not be made directly to the declaratory judgment plaintiff, but may be made to its customers or to the industry at large." *Nippon Elec. Co., Ltd.*, 489 F. Supp. at 121.

As explained in section I.D., *supra*, the Shaw Family has attempted to register or re-register photographs that have already fallen into the public domain.  The Shaw Family has done so by applying for copyright registrations in specific photographs that have already fallen into the public domain (such as its November 2007 copyright registration for the "Making of the Seven Year Itch" series, which contains public domain photographs from, *inter alia*, the Ballantine Book).  The Shaw Family has also obtain copyright registrations in books that include previously-published public domain photographs.  These public second-bites at the apple send the message that the Shaw family will assert rights to all Monroe/Shaw Photographs.

Most egregiously, the Shaw Family's websites post numerous photographs, many from the set of *The Seven Year Itch*, each of which is accompanied by a copyright notice © 2002 or © 2003, even though none of the photographs were created in 2002 or 2003, and many were previously published in, *inter alia* the Ballantine Book and are in the public domain.  (*See* Def. 56.1 Stmt. ¶¶ 48, 49).  The Shaw Family thereby sends a clear message to anyone interested in using these photographs, including Defendants – the Shaw Family intends to assert a claim of copyright protection to those photographs, and will not acknowledge that any of them are in the public domain.

3.    **The Shaw Family has Threatened Infringement Actions Against Third Parties in Connection with Public Domain Photographs**

The Shaw Family repeatedly, and carefully, argues that it "has never asserted rights against the Defendants . . . with respect to the Rizzoli or Ballantine books." (Pl. Br. at 6) (emphasis added). What the Shaw Family does not, and cannot, say is that it does not publicly assert rights with respect to those public domain images. In fact, the evidence is indisputable that the Shaw Family repeatedly threatens third parties with infringement actions, and attempts to extract money through baseless claims that it owns copyrights in what are unquestionably public domain photographs. It is therefore no surprise that CMG's CEO, Mark Roesler, testified that the Shaw Family's marketing activities create confusion among consumers of Marilyn Monroe images. (*See* Serbagi Decl., Ex. O at 99).

For example, in November 2005, Larry Shaw, SFA's principal, accused MSNBC of copyright infringement and demanded payment based on MSNBC's use of an Associated Press photograph that also appeared in the Ballantine Book. (*See* Def. 56.1 Stmt. ¶ 41; Strauss Decl. Exs. 19-20). In his demand for payment, Larry Shaw attached pages from the Ballantine Book itself as part of his purported claim of "ownership" of the photograph in issue. (*Id.*). And just recently, in September 2007, Michelle Minieri of Bradford Licensing ordered Image Source International to cease and desist from using a photograph from the Ballantine Book, and warned that the Shaw Family would seek a fee for the "unauthorized use." (Def. 56.1 Stmt. ¶ 42; Strauss Decl. Ex. 21). These two incidents alone conclusively demonstrate the essential point that the Shaw Family forcefully asserts rights against potential licensees with respect to public domain images such as those in the Ballantine Book.

These are not the only instances of the Shaw Family's assertion of rights in public domain photographs. Larry Shaw has sent numerous notices of "infringement" to Ebay Inc. in

connection with the internet posting of public domain images from the Ballantine Book.  (Def. 56.1 Stmt. ¶ 43).  The Shaw Family has entered into licensing agreements for photographs that were originally published in the 1950s and have fallen into the public domain.  (*Id.* ¶ 44).  The Shaw Family has claimed copyright infringement and sought monetary payment for use of photographs from the set of *The Seven Year Itch*, including from the producer of that film, Twentieth Century Fox.  (*Id.* ¶ 45).  In one such instance, the Shaw Family demanded that a newspaper pay a licensing fee at "its normal page rate multiplied by 100%."  (*Id.* ¶ 46).

The *Rizzoli* litigation itself is further evidence of the Shaw Family's pattern of asserting rights to public domain Monroe/Shaw Photographs.  S*ee Muller*, 404 F.2d at 504 ("infringement suit against . . . another manufacturer of a similar product . . . ha[s] . . . been held sufficient implicit threats of infringement suit to create a justiciable controversy.").  There, Sam Shaw and Edith Marcus brought copyright infringement claims based on a number of photographs that were published prior to 1964 and whose copyrights were never renewed.  *Rizzoli Int'l Publ'ns, Inc.*, 1999 WL 160084, at *6;   Indeed, the Shaw Family still refuses to acknowledge that Monroe/Shaw Photographs from the Rizzoli Book are in the public domain, (Def. 56.1 Stmt. ¶ 40; Strauss Decl. Ex. 15 at 58-59).

These actions demonstrate that the Shaw Family continues to assert copyright protection in the Ballantine Book and other public domain images, and would likely assert additional copyright infringement claims if Defendants ever attempt to use such photographs in their marketing activities.  "To deny that a 'case or controversy' exists in this situation is to 'ignore the realities of business life."  *Muller*, 404 F.2d at 505 (citing 6A Moore's Federal Practice § 57.20, at 3120 (2d ed. 1966)).

**C.      Defendants have Engaged in a Course of Conduct that has Brought Them into an Adversarial Conflict with Plaintiffs**

The second prong of the test is met and "an actual case or controversy exists where a party has engaged in a course of conduct evidencing a definite intent and apparent ability to commence use" of the copyrights in question.  *Starter Corp.*, 84 F.3d at 595-96; *see also Re-Alco Indus., Inc. v. Nat'l Center for Health Educ., Inc.*, 812 F. Supp. 387, 395 (S.D.N.Y. 1993) ("Intention and ability must be decided on a case by case basis.").  A party need not actually make use of the disputed intellectual property prior to obtaining a declaratory judgment as to its validity.  *See Wembley, Inc. v. Superba Cravats, Inc.*, 315 F.2d 87, 90 (2d Cir. 1963) ("it would be economically wasteful to require a [party seeking a declaratory judgment] to embark on an actual program of manufacture, use or sale which may turn out to be illegal").

There can be no real doubt either as to Defendants' ability or intention to utilize public domain Monroe/Shaw Photographs in connection with their marketing activities.  First, Defendants already offer public domain images to their licensees and potential licensees to use in conjunction with Defendants' Marilyn Monroe-related intellectual property.  Such public domain photographs are posted on CMG's website, and are included in a CD of materials that Defendants provide to their licensees.  (*See* Def. 56.1 Stmt. ¶ 68; Roesler Decl. ¶ 11).[15]  Thus, Defendants actively utilize public domain images as part of their licensing activities, and could easily supplement their images with additional uncopyrighted photos.[16]  Indeed, CMG had

---

[15]  Significantly, there is no doubt that the Shaw Family closely monitors CMG's website, and has asserted copyright infringement claims based on alleged uses on such website of Sam Shaw photographs. (Serbagi Decl. Ex. F ¶¶ 16, 18, 21).

[16]  The Shaw Family's self-aggrandizing claim that Defendants "contribute nothing whatsoever to the artistic societal good. . . .  As directly contrasted to the significant artistic contribution of Sam Shaw who captured many iconic images of Marilyn Monroe" is irrelevant, false, and unintentionally ironic.  The Shaw Family itself has made no "significant artistic contribution" – rather, it purports to exploit the artistic contributions made by Sam Shaw pursuant to a grant of rights.  MMLLC similarly licenses

previously posted public domain images from the Rizzoli Book on its website in the past.  (*See* Roesler Decl. ¶ 16).

Despite all this, the Shaw Family argues that there is no controversy because the Defendants purportedly "have no immediate plans to license the Rizzoli and Ballantine images." (Pl. Br. at 8-9).  First, this completely misses the point – obviously, Defendants would never seek to <u>license</u> images that are in the public domain – rather, Defendants seek to offer these images to customers that license Defendants' Marilyn Monroe-related intellectual property rights.  Second, it is completely untrue.[17]  In fact, Defendants clearly <u>do</u> intend to immediately utilize public domain Monroe/Shaw Photographs in this manner, as soon as the threat of infringement claims by the Shaw Family is lifted.  (*See* Roesler Decl. ¶ 14; Strasberg Decl. ¶ 23).  This alone at least creates a triable issue of fact as to Defendants "intentions," and forestalls the Shaw Family's motion for summary judgment.

Indeed, the only thing Defendants have not done with respect to the claimed public domain Monroe/Shaw Photographs is to post them on their website or include them on a CD for their licensees to select from.  As the Supreme Court recently held, a party need not actually commit an act of infringement before it is entitled to a declaratory judgment as to the validity of the underlying intellectual property.  *See MedImmune,* 127 S. Ct. at 777; *see also Starter Corp.* 84 F.3d at 596 (Declaratory Judgment Act does not require that a party "go to substantial expense in the manufacture, marketing, and sale of [the disputed product], and subject itself to

---

intellectual property pursuant to a grant of rights from Marilyn Monroe, who certainly made profound artistic contributions during her lifetime.  Indeed, were it not for the creative efforts and innate beauty of Marilyn Monroe, Sam Shaw's "iconic" photographs would not exist.

[17] The testimony cited by the Shaw Family indicates only that Defendants have not licensed Rizzoli or Ballantine images in the past, not that they do not wish to utilize those photographs in the future once the threat of litigation is lifted.  Indeed, Mark Roesler went on to testify in his deposition that, but for the Shaw Family's refusal to acknowledge that certain photographs are in the public domain, Defendants would encourage their clients to use those photographs.  (Serbagi Decl., Ex. O at 174-76).

considerable liability . . . before its right to even engage in this line of commerce could be adjudicated.").  Here, there is  an actual controversy entitling Defendants to a declaratory judgment, especially under the relaxed standard set out in *MedImmune*.[18]

   D.    **The Court Should Exercise its Discretion to Decide Defendants' Claim for a Declaratory Judgment**

   Although a district court's exercise of  declaratory jurisdiction is "denominated as discretionary" *Starter Corp.*, 84 F.3d at 597, "a district court is required to entertain a declaratory judgment action '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'"  *Id.* (quoting *Continental Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992).  "It follows as a general corollary to this rule that if either of these objectives can be achieved the action should be entertained and the failure to do so is error."  *Broadview Chemical Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969).

   "Ordinarily, a judgment concerning the validity of the copyrights would serve a useful purpose in clarifying or settling the legal issues involved and would offer a sense of finality." *Interscope Records v. Kimmel*, No. 07 Civ. 0108 (TJM), 2007 WL 1756383, at *4 (N.D.N.Y. June 18, 2007). This case is no different.  Plaintiffs have repeatedly and continuously asserted copyright protection to works that are in the public domain.  By filing copyright registration

---

[18] The Shaw Family's reliance on *Pocketmedicine.com, Inc. v. John Wiley & Sons, Inc.*, No. 04 Civ. 8369 (LLM), 2006 WL 785283 (S.D.N.Y. Mar. 23, 2006) is misplaced, because in that case the plaintiff had not engaged "in a course of conduct evidencing a definite intent and apparent ability to commence use" of the intellectual property at issue.  *Id.* at * 3 (internal quotations omitted) (*see* Pl. Br. at 9).  Here, for the reasons stated above, Defendants have established the requisite intent and ability.

   Similarly irrelevant is *Re-Alco Indus., Inc. v. Nat'l Center for Health Educ., Inc.*, 812 F. Supp. 387 (S.D.N.Y. 1993) (cited by the Shaw Family, Pl. Br. at 9).  There, the Court dismissed plaintiff's declaratory judgment claim because the plaintiff had failed to "assert[ any] basis on which to invalidate [defendant's] copyright."  *Id.* at 394-95.  The Court there stated in *dicta* that, in any event, the plaintiff had failed to establish that it was prepared to immediately begin production of the materials in question. *Id.* at 395.  Unlike the plaintiff in *Re-Alco*, Defendants here already actively utilized public domain Marilyn Monroe images in conjunction with their licensing activities, and are prepared to immediately supplement such images with additional public domain Monroe/Shaw Photographs.

certificates for public domain Monroe/Shaw Photographs, they have tried to cloud the legal status of some of the most famous images of the 20th century. This Court should clarify that status by applying black letter copyright law.

Also relevant to the court's exercise of discretion to hear Defendants' declaratory judgment claim is the fact that Plaintiffs threaten "copyright damages increased to the statutory maximum due to willful infringement" of photographs that are in the public domain. (Serbagi Decl., Ex. F p. 10); *see Broadview Chemical Corp.*, 417 F.2d at 1001 (considering "amount of infringement damages normally recoverable together with, in this particular case, the probability of increased damages for willful infringement" in reversing district court's decision not to issue declaratory judgment). While the Shaw Family has withdrawn its copyright infringement claims, it seeks to do so without prejudice, so that it may continue to hold the constant threat of litigation over Defendants' heads.

A declaratory judgment will definitively determine Defendants' rights to use the disputed Monroe/Shaw Photographs and resolve the demonstrated uncertainty between the parties.

### III.    Defendants Have Named the Appropriate Parties

Perhaps most absurdly, the Shaw Family argues that Marcus and Stevens, not SFA, are the true owners of the copyrights at issue, and that Defendants' declaratory judgment claim should be dismissed for failure to name indispensable parties. This argument fails for two reasons. First, as discussed below, the Shaw Family's claims that SFA does not own the copyrights at issue are belied by the record, and by SFA's own actions and representations. Second, Edith Marcus and Meta Stevens are parties to this action, are 50% owners of SFA, and have been actively involved in this litigation from the beginning. As a matter of law, the Shaw Family's belated argument that they should have been individually named as Consolidated Defendants does not justify dismissing this action, particularly where absolutely no prejudice would result from simply joining them as defendants (should the Court deem that necessary).

A.      **SFA is the Purported Owner of Any Copyrights to Monroe/Shaw Photographs**

The facts show that the SFA owns the purported copyrights to the Monroe/Shaw Photographs.  In 1994, Sam Shaw commenced an action in the Supreme Court of the State of New York against his son Larry Shaw (and others) alleging theft and unauthorized use of his collection of photographs, including those of Marilyn Monroe.  (Def. 56.1 Stmt. ¶ 73.).  After Sam Shaw's death in 1999, his daughters Marcus and Stevens were substituted as plaintiffs as temporary administrators of his estate.  (*Id.*).

On June 5, 2002, the parties reached a settlement agreement, whereby the SFA was formed with Larry Shaw, Stevens and Marcus as principals, Larry Shaw to own 50% of SFA and Marcus and Stevens to own 25% each.  (*Id.* ¶ 74; Strauss Decl. Ex. 39 at 3).  The settlement agreement further provided that SFA was to "own and take possession of . . . each and every photograph shot by either Sam Shaw or Larry Shaw during the course of their respective careers," and that "all of the photographs involved in this collection shall be the property – shall be deemed a part of the Shaw Family Archives."  (*Id.* ¶ 74; Strauss Decl. Ex. 39 at 4).

Since the formation of SFA, the Shaw Family has repeatedly claimed that SFA owned all copyrights in Sam Shaw photographs of Marilyn Monroe:

- On December 13, 2007, the Shaw Family's counsel wrote to CMG, warning that "Shaw Family Archives, Ltd. . . . is the holder of all worldwide rights . . . in the photos taken by Sam Shaw or Larry Shaw during the course of their professional careers as photographers" (Strauss Decl. Ex. 42 at 1);

- In a notice of infringement sent to Ebay, Inc., Larry Shaw, SFA's principal, specifically stated that he was the owner of the copyrights, rather than an agent acting on the owner's behalf (Strauss Decl. Ex. 22 at SFA00337);

- On February 20, 2007, Michelle Minieri of Bradford Licensing stated in a letter that the "Shaw Family Archives owns the copyrights in the Marilyn Monroe photographs," and described the photographs as "Shaw Family Archive copyrighted Marilyn Monroe images" (Strauss Decl. Ex. 43);

- In a February 28, 2004 email, Len Reiter of Bradford Licensing stated "we will need to have a copyright notice referring to the photos owned by the Shaw Family Archives" (Strauss Decl. Ex. 44 at 3);

- In a September 18, 2007 letter, Michelle Minieri stated that Bradford Licensing "pursues and prosecutes all claims and causes of action arising out of, or relating to, the unauthorized use of the imagery of Marilyn Monroe owned by . . . the Shaw Family Archives" (Strauss Decl. Ex. 21);

- In its licensing agreements, SFA requires licensees to use the following copyright notice: "© Sam Shaw / Shaw Family Archives" (Strauss Decl. Ex. 23 at SFA00552);

Indeed, SFA's own website prominently displays the caption "© Shaw Family Archives" beneath each and every Monroe/Shaw Photograph, clearly indicating that it owns the purported copyrights to the subject photos (including photographs from the Ballantine Book). (Def. 56.1 Stmt. ¶ 83.; Strauss Decl. Exs. 25-29, 45).

### B.   As a Matter of Law, Any Failure to Join Edith Marcus or Meta Stevens as Defendants is Not Grounds for Dismissal of this Action

Even if the Court finds that Marcus and Stevens should be individually named as Consolidated Defendants, as a matter of law there are simply no grounds for <u>dismissing</u> Defendants' public domain claims. Fed. R. of Civ. P. 21 clearly provides that "[m]isjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party." Similarly, "in applying Rule 19 [addressing whether a party must be joined] a court should generally be reluctant to dismiss a case for failure to join a party." *Make Up For Ever, S.A. v. Soho Forever, LLC*, 198 F.R.D. 56, 60 (S.D.N.Y. 2000) (citing *Jaser v. N.Y. Prop. Ins. Underwriting Ass'n*, 815 F.2d 240, 242 (2d Cir. 1987)).

Here, there is no conceivable reason for Defendants' claim to be dismissed. Marcus and Stevens are <u>plaintiffs</u> in this action, and have been involved in the litigation from the outset. (*See* Def. 56.1 Stmt. ¶ 85). Indeed, they are <u>50% owners</u> of Consolidated Defendant SFA. (*Id.* ¶ 84). As parties in this action, Edith Marcus and Meta Stevens are represented by the exact same attorneys as the Shaw Family, including <u>Edith Marcus' son, David Marcus</u>. Indeed, Plaintiffs'

28

Second Amended Complaint was submitted by Christopher Serbagi and David Marcus as "Attorneys for Plaintiffs / Consolidated Defendants Shaw Family Archives, Bradford Licensing, Inc., Edith Marcus and Meta Stevens."  (Serbagi Decl., Ex. F, at 10).[19]

Any "delay" is the fault of the Shaw Family itself, not Defendants.  As the Shaw Family admits, Defendants asserted public domain claims against the Shaw Family in every iteration of their complaint in this action, beginning on March 23, 2005, but never sued Marcus or Shaw individually.  (Pl. Br. at 12, Def. 56.1 Stmt. ¶ 87).  Yet the Shaw Family never asserted the failure to name indispensable parties as a defense in any of its answers to Defendants' complaints.  (Def. 56.1 Stmt. ¶ 88).  As plaintiffs in the action and 50% owners of SFA, Marcus and Stevens, and their counsel, have always been aware of the public domain claims, but obviously never felt that their interests were not protected.  For the Shaw Family to wait almost three years and then try to dismiss the complaint on procedural grounds is rank gamesmanship.

Plainly, Marcus and Stevens have been fully represented in this action and have suffered absolutely no prejudice.[20]  The Shaw Family offers absolutely no support for their frivolous contention that adding Marcus and Stevens as Consolidated Defendants would somehow result in additional discovery, and the contention that Marcus and Stevens would have "to hire new counsel" is particularly outrageous as they are already being represented by Marcus' own son.

---

[19] The identity of interest between the SFA and Marcus and Stevens is further underscored by the Shaw Family's own 56.1 Statement.  In their opening sentence, plaintiffs collectively define SFA and Bradford Licensing as the "Shaw Family" (Pl. 56.1 Stmt at 1), yet, two paragraphs later, go on to state that "[o]n April 19, 2005, the Shaw Family filed their complaint in the Southern District of New York."  (Id. ¶ 2). Of course, that complaint was filed by SFA, Marcus and Stevens.

[20] Not surprisingly, the cases cited by the Shaw Family, which typically involve parties that seek to amend their pleadings late in the game to add a new claim or defense, are completely off-point.  See Randolph Found. v. Duncan, 00 Civ. 6445 (AKH) (THK), 2002 WL 32862, at *3 (S.D.N.Y. Jan. 11, 2002); MacDraw, Inc. v. CIT Group Equip. Fin., Inc., 157 F.3d 956, 962 (2d Cir. 1998); Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 284 (2d Cir. 2000).  Here, Defendants are not seeking to add claims or defenses – indeed, they are not seeking to amend their complaint at all.  Rather, it is the Shaw Family who, late in the game and for plainly strategic purposes, is arguing that new parties need to be added.

For the foregoing reasons, the Shaw Family's motion to dismiss Defendants' public domain claim for failure to name the proper parties should be denied.[21]

## IV.    The Shaw Family is Not Entitled to Attorney's Fees

Finally, the Shaw Family dedicates ten pages of its brief to hyperbolic and vitriolic attacks on Defendants, accusing Defendants (with no evidentiary support) of acting in bad faith in asserting their legitimate public domain claim, and completely mischaracterizing both the deposition testimony of Defendants' Rule 30(b)(6) witnesses and the nature, and result, of an ordinary discovery dispute between the parties.  It would take a brief in itself to fully respond to all of the Shaw Family's misstatements and distortions of the record.  Accordingly, Defendants respectfully request the opportunity, if necessary, to respond more fully to the Shaw Family's baseless assertions at a later and more appropriate time.[22]

In any event, Defendants' public domain claim is objectively reasonable, and the Shaw Family's conclusory and baseless arguments to the contrary should be rejected.  If either party is entitled to attorney's fees, it is Defendants.

---

[21] If the Court decides that Marcus and Stevens should be added as Consolidated Defendants, Defendants respectfully request that the Court join them as parties to Defendants' Third Amended Complaint pursuant to Rule 21.  Alternatively, Defendants respectfully request permission to amend their Complaint simply to add Marcus and Stevens to the caption.  As explained above, this will not prejudice the parties in any way.

[22] In any event, it must be noted that the Shaw Family's motion for attorneys' fees is entirely premature.  Rule 54(d)(2)(B) requires that a motion for attorneys' fees be made after the entry of final judgment.  Fed. R. Civ. P. 54(d)(2)(B); *see also Miroglio S.P.A. v. Conway Stores, Inc.*, No. 05 Civ. 00121 (BSJ) (GWG), 2007 WL 391565, at *8 (S.D.N.Y. Feb. 6, 2007) (denying application for attorneys because plaintiff did not provide a record of such fees, and stating that application may be made following entry of judgment) (citing Fed. R. Civ. P. 54(d)(2)).  Rule 54(d)(2)(B) also requires that a motion for attorneys' fees state the amount or fair estimate of the amount sought.  The Shaw Family has done neither, and their fee request should be denied for this reason alone.

### A.     Defendants' Public Domain Claim is Objectively Reasonable and was Brought in Good Faith

The Shaw Family's motion for attorneys' fees under the Copyright Act should be denied because Defendants' claims are objectively reasonable. *Matthew Bender & Co. v. West Publ'g Co.*, 240 F.3d 116, 121-22 (2d Cir. 2001) ("objective reasonableness is a factor that should be given substantial weight in determining whether an award of attorneys' fees is warranted"). Defendants have shown that numerous Monroe/Shaw Photographs are indisputably in the public domain, and that Defendants have standing to seek a such a declaration. *See supra,* Sections I, II. Defendants have also shown that the Shaw Family has unjustifiably refused to acknowledge that certain photographs are indisputably in the public domain, has attempted to prevent Defendants from using such public domain photographs by holding the threat of litigation over Defendants' heads, has wrongfully represented to the public that it holds copyrights in public domain photographs, and has repeatedly and improperly threatened third parties with baseless infringement suits. *See supra* at section II. Defendants' have clearly satisfied all of the elements of its declaratory judgment claim, and thus Defendants' claim is not only objectively reasonable, it is likely to succeed on the merits.

Unable to argue that the photographs in question are not in the public domain, and unable to defend its own conduct in asserting infringement claims based on rights that it does not own, the Shaw Family instead launches into a completely baseless and misleading attack on the testimony of Defendants' 30(b)(6) witnesses, conclusorily asserting that "both Defendants were unable to support any of the allegations in the Third Amended Complaint." (Pl. Br. at 16, 18-19). Defendants respectfully refer the Court to its Responses 11-24 to the Shaw Family's Statement of Undisputed Facts, which set forth just some of the Shaw Family's gross misstatements and mischaracterizations of the deposition testimony. Suffice to say, that contrary

to the Shaw Family's assertions, Defendants <u>have</u> satisfied all of the elements of their declaratory judgment claim, both through documentary evidence and the testimony of their witnesses.[23]

Nor does the Shaw Family offer a single piece of evidence in support for its statement that Defendants' public domain claim was "improperly motivated." (*See* Pl. Br. at 16-17). In fact, as set forth *supra* at Section II.A., Defendants have demonstrated a legitimate business interest in obtaining a declaration that certain Monroe/Shaw Photographs are in the public domain. Any notion that Defendants' public domain claim was brought in "bad faith" is entirely unfounded, and the Shaw Family's unsubstantiated attack on Defendants' motives should be rejected.

### B.    Ordinary Discovery Disputes are Not Evidence of "Bad Faith" on the Part of Defendants

The Shaw Family also accuses Defendants of "bad faith" in connection with ordinary discovery disputes. (Pl. Br. at 20-24). Obviously, the Shaw Family could have raised any purported improper discovery conduct on the part of Defendants before Magistrate Judge Fox – it did not, because no such improper conduct exists. Once again, the Shaw Family grossly distorts the record, and, if necessary, Defendants respectfully request the Court's permission to respond in greater detail to the Shaw Family's baseless assertions at a more appropriate time.

<u>First</u>, the Shaw Family's complaints are particularly ironic, given that it is the Shaw Family that has willfully failed to comply with its discovery obligations in connection with

---

[23] In addition, it bears noting that many of the allegations in Defendants' Third Amended Complaint were made "upon information and belief," including almost all of the allegations that the Shaw Family (incorrectly) claims Defendants' witnesses were unable to support. (*See, e.g.,* Serbagi Decl., Ex. I ¶¶ 4, 5, 24, 26, 30, 31, 32). Not surprisingly, the Shaw Family does not cite a single case suggesting that a 30(b)(6) witness' alleged inability to testify as to each and every allegation made upon information and belief somehow constitutes a showing of "frivolousness," particularly where, as here, the party has nevertheless made out all the elements of its claim.

Defendants' public domain claim.  As explained in more detail in Defendants' 56.1 Statement, the Shaw Family initially refused to produce <u>any</u> documents other than those expressly relating to the Rizzoli Book and the Ballantine Book (despite the fact that the Third Amended Complaint clearly alleged that "<u>in addition to</u>" to the Rizzoli and Ballantine Books, other photographs are in the public domain).  Moreover, at the deposition of SFA's 30(b)(6) witness, the Shaw Family's attorney repeatedly and improperly instructed the witness not to answer any questions.  (Def. 56.1 Stmt. ¶¶ 24).

     <u>Second</u>, the Shaw Family accuses Defendants of raising a "frivolous" discovery dispute before Magistrate Judge Fox, despite the fact that Defendants <u>prevailed</u> in this discovery dispute. Again, as explained in Defendants' 56.1 Statement, at the December 26, 2007, Magistrate Judge Fox <u>expressly rejected</u> the Shaw Family's contention that the Third Amended Complaint was limited to the Rizzoli and Ballantine Books, stating that "[c]ertainly, the pleadings go beyond the Risoli [sic] and the Ballantine book," and that "any [opportunity] to narrow down the complaint is . . . long gone."  (*Id.* ¶ 26; *see also* Resp. 29 to Pl. 56.1 Stmt.).  Magistrate Judge Fox also chastised counsel for the Shaw Family for repeatedly instructing his witness not to answer questions, stating:  "Under the Southern District Rules, directing a witness not to answer is sanctionable conduct . . . .  If it happens again, there will be sanctions."  (*Id.* ¶ 27).  As a result of the Shaw Family's conduct, Magistrate Judge Fox ordered that they make their 30(b)(6) witness available for an additional four hours of testimony.  At MMLLC's request, he also ordered that the Shaw Family make available for inspection two binders purportedly containing the entirety of SFA's copyright registration materials.  (*Id.* ¶ 29).[24]

---

[24] In addition, contrary to the Shaw Family's unsupported assertions, at no time did Defendants seek production of "all documents relating to every Shaw Family copyright relating to Marilyn Monroe."  (Pl Br. at 22).  Rather, Defendants sought limited documents (such as registration certificates and deposit

Third, while in one breath the Shaw Family accuses Defendants of "bad faith" for conducting unnecessary discovery, in the next it accuses Defendants of "bad faith" for choosing not to conduct a deposition of Bradford Licensing. (Pl. Br. at 20-21). Plainly, the decision to forego a deposition is not evidence of "bad faith." The Shaw Family also falsely implies that Mark Roesler testified that Bradford's actions compelled him to recommend that Defendants file the pending public domain claim (and thus that Bradford's deposition was necessary in this action). (*See id.*). But Mr. Roesler said no such thing – he merely testified that he informed MMLLC of Bradford's aggressive marketing activities prior to the filing of Defendants' original complaint in March 2005. (*See* Serbagi Decl. Ex. O at 134-35).

Fourth, the Shaw Family accuses Defendants of "bad faith" in refusing to answer a contention interrogatory, neglecting to inform the Court that Defendants supplemented their response to the interrogatory in question via an email dated December 5, 2005. (*See* Strauss Decl. Ex. 50). As explained in more detail in Defendants' Responses 3, 9 and 10 to the Shaw Family's Statement of Undisputed Fact, Defendants also asserted a number of legitimate objections to the improper interrogatory, including that it exceeded the maximum number of interrogatories allowed, sought information subject to the attorney-client privilege, and constituted an improper contention interrogatory filed while discovery was still ongoing (and depositions had yet to be taken). (*Id.*; Serbagi Decl. Ex. K, Resp. to Int. 1). Notably, the Shaw Family never raised any objections to this discovery response before Magistrate Judge Fox during the discovery process.

---

copies) necessary to identify Sam Shaw's purported copyrights, and additional documents relating to photographs from four specifically identified photo shoots. (Def. 56.1 Stmt. ¶ 18).

Fifth, the Shaw Family complains that MMLLC's counsel instructed its 30(b)(6) witness not to answer an irrelevant, and harassing, question about MMLLC's revenues.  The argument that revenues were relevant to the issue of Defendants' "damages" is baseless, because Defendants have not asserted a claim for monetary damages.  The Shaw Family's suggestion that an instruction not to answer constitutes "bad faith" is particularly ironic in light of the fact that the Shaw Family's counsel repeatedly instructed SFA's 30(b)(6) witness not to answer numerous questions during her deposition.  (Def. 56.1 Stmt. ¶ 24).

### C.     Defendants Did Not "Threaten" the Shaw Family

In yet another display of hyperbole, the Shaw Family argues that Defendants "threatened" the Shaw Family with attorney's fees simply by including ordinary claims for costs and attorneys' fees in their complaints.  (Pl. Br. at 23).

The Shaw Family also accuses MMLLC's counsel of "threatening" them on the record during MMLLC's 30(b)(6) deposition.  Review of the transcript, however, reveals that MMLLC's counsel was merely responding to an on-the-record question from the Shaw Family's attorney regarding the nature of damages that Defendants were claiming.  (*See* Serbagi Decl. Ex. N, at 178-79).  The Shaw Family's effort to characterize this simple response to its own question as a "threat" is truly frivolous and should be rejected.

## CONCLUSION

For all the above reasons, Defendants respectfully request that the Court deny the Shaw Family's motion for summary judgment dismissing Defendants' public domain claim, and grant Defendants' cross-motion for summary judgment on that claim.

Dated: New York, New York
        February 12, 2008

LOEB & LOEB LLP

By:    /s/ Jonathan Neil Strauss
        Barry I. Slotnick
        Jonathan Neil Strauss
        Tal E. Dickstein
        345 Park Avenue
        New York, New York 10154-1895
        (212) 407-4000

*Attorneys for Marilyn Monroe LLC*

SOVICH MINCH, LLP

By:    /s/ Theodore J. Minch
        Theodore J. Minch
        10099 Chesapeake Drive, Suite 100
        McCordsville, Indiana 46055
        (317) 335-3601

*Attorneys for CMG Worldwide, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ....................................................................................................3

ARGUMENT .........................................................................................................................3

I.     Defendants' Cross-Motion for Summary Judgment Should be Granted
       Because Certain Monroe/Shaw Photographs are Indisputably in the Public
       Domain..................................................................................................................3

       A.     All Photographs Published in the Ballantine Book are in the Public
              Domain Because the Copyright was Not Renewed .................................4

       B.     It Has Already Been Determined That Monroe/Shaw Photographs
              Contained in the Rizzoli Book are in the Public Domain.......................6

       C.     Monroe/Shaw Photographs That Were Published in the 1950s
              Without the Required Copyright Notice, or Whose Copyrights
              Were Not Renewed, are in the Public Domain .......................................6

       D.     The Shaw Family Cannot "Revive" Copyright Protection in Public
              Domain Photographs by Attempting to Register or Re-Register the
              Photographs.............................................................................................9

       E.     Photographs of Marilyn Monroe taken by Sam Shaw on the Set of
              the Film *The Seven Year Itch*, and Subsequently Published in
              *Marilyn Among Friends* and *In the Camera Eye*, are in the Public
              Domain Because They are Works Made for Hire and the Copyright
              Notice Did Not Name the True Copyright Owner..................................11

II.    The Shaw Family's Motion for Summary Judgment Should be Denied
       Because an Actual Controversy Exists Between the Parties Warranting a
       Declaratory Judgment ........................................................................................13

       A.     Defendants Have Standing Because They Seek to Use Public
              Domain Images in Conjunction with Their Marilyn Monroe-
              Related Intellectual Property Rights .....................................................14

       B.     The Shaw Family's Conduct has Created a Real and Reasonable
              Apprehension of Liability on the Part of Defendants ...........................15

              1.     The Shaw Family has Asserted Numerous Copyright
                     Infringement Claims Against Defendants, Including for
                     Photographs Believed to be in the Public Domain ....................17

              2.     The Shaw Family Has Attempted to Register or Re-
                     Register Public Domain Photographs, Thus Representing to

the Public That it will Bring Copyright Infringement
Actions in Connection with Any Unauthorized Use of Such
Photographs ........................................................................................20

3.   The Shaw Family has Threatened Infringement Actions
Against Third Parties in Connection with Public Domain
Photographs ........................................................................................21

C.   Defendants have Engaged in a Course of Conduct that has Brought
Them into an Adversarial Conflict with Plaintiffs ..................................23

D.   The Court Should Exercise its Discretion to Decide Defendants'
Claim for a Declaratory Judgment .........................................................25

III.   Defendants Have Named the Appropriate Parties ............................................26

A.   SFA is the Purported Owner of Any Copyrights to Monroe/Shaw
Photographs ............................................................................................27

B.   As a Matter of Law, Any Failure to Join Edith Marcus or Meta
Stevens as Defendants is Not Grounds for Dismissal of this Action .....28

IV.   The Shaw Family is Not Entitled to Attorney's Fees .......................................30

A.   Defendants' Public Domain Claim is Objectively Reasonable and
was Brought in Good Faith ....................................................................31

B.   Ordinary Discovery Disputes are Not Evidence of "Bad Faith" on
the Part of Defendants ............................................................................32

CONCLUSION ......................................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Code Co. v. Bensinger,*
  282 F. 829 (2d Cir. 1922)............................................................................10

*Barbarian Rugby Wear, Inc. v. PRL USA Holdings, Inc.,*
  No. 06 Civ. 2652 (JGK), 2006 WL 2089926 (S.D.N.Y. July 21, 2006) ................................16

*Blessings Corp. v. Altman,*
  373 F. Supp. 802 (S.D.N.Y. 1974) ................................19

*Broadview Chemical Corp. v. Loctite Corp.,*
  417 F.2d 998 (2d Cir. 1969)........................................................25, 26

*Cmty. for Creative Non-Violence v. Reid,*
  490 U.S. 730 (1989)....................................................12

*Continental Cas. Co. v. Coastal Sav. Bank,*
  977 F.2d 734, 737 (2d Cir. 1992)..............................................26

*Faulkner v. Nat'l Geographic Soc.,*
  211 F. Supp. 2d 450 (S.D.N.Y. 2002),
  *aff'd,* 409 F.3d 26 (2d Cir. 2005) ..................................................4

*Frederick Goldman, Inc. v. West,*
  No. 06 Civ. 3413 (LTS), 2007 WL 1989291 (S.D.N.Y. July 6, 2007)....................................15

*G. Ricordi & Co. v. Paramount Pictures, Inc.,*
  189 F.2d 469 (2d Cir. 1951)........................................................10

*Golden Gulf Corp. v. Jordache Enters. Inc.,*
  896 F. Supp. 337 (S.D.N.Y. 1995) ................................23

*Horne v. Firemen's Retirement Sys. of St. Louis,*
  69 F.3d 233 (8th Cir. 1995) ....................................................13

*Interscope Records v. Kimmel,*
  No. 07 Civ. 0108 (TJM), 2007 WL 1756383 (N.D.N.Y. June 18, 2007)................................25

*Jaser v. N.Y. Prop. Ins. Underwriting Ass'n,*
  815 F.2d 240, 242 (2d Cir. 1987)..............................................29

*Kos Pharm. Inc. v. Barr Labs., Inc.,*
  242 F. Supp. 2d 311 (S.D.N.Y. 2003)........................................19

# TABLE OF AUTHORITIES

**Page(s)**

*MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*,
    157 F.3d 956 (2d Cir. 1998)...................................................................................29

*Make Up For Ever, S.A. v. Soho Forever, LLC*,
    198 F.R.D. 56 (S.D.N.Y. 2000) ..............................................................................28

*Martha Graham School and Dance Found., Inc. v. Martha Graham Center of
    Contemporary Dance, Inc.*, 380 F.3d 624 (2d Cir. 2004).........................................4, 7, 11, 12

*Maryland Cas. Co. v. Pacific Coal & Oil Co.*,
    312 U.S. 270 (1941)................................................................................................13

*Matthew Bender & Co. v. West Publ'g Co.*,
    240 F.3d 116 (2d Cir. 2001)....................................................................................31

*MedImmune, Inc. v. Genentech, Inc.*,
    127 S. Ct. 764 (2007)..........................................................................................15, 24

*Milton H. Greene Archives, Inc. v. BPI Commc'ns, Inc.*,
    378 F. Supp. 2d 1189 (C.D. Cal. 2005) ...................................................................7

*Miroglio S.P.A. v. Conway Stores, Inc.*,
    No. 05 Civ. 00121 (BSJ) (GWG), 2007 WL 391565 (S.D.N.Y. Feb. 6, 2007)..............30

*Monahan v. New York City Dep't of Corrections*,
    214 F.3d 275 (2d Cir. 2000).....................................................................................29

*Muller v. Olin Mathieson Chemical Corp.*,
    404 F.2d 501 (2d Cir. 1968).............................................................................16, 22, 23

*Nippon Elec. Glass Co., Ltd. v. Sheldon*,
    489 F. Supp. 119 (1980) ........................................................................................ 20

*Playboy Enters., Inc. v. Dumas*,
    53 F.3d 549 (2d Cir. 1995) ................................................................................11, 12

*Pocketmedicine.com, Inc. v. John Wiley & Sons, Inc.*,
    No. 04 Civ. 8369 (LLM), 2006 WL 785283 (S.D.N.Y. Mar. 23, 2006) ..........................13, 25

*Randolph Found. v. Duncan*,
    00 Civ. 6445 (AKH) (THK), 2002 WL 32862 (S.D.N.Y. Jan. 11, 2002)........................29

*Re-Alco Indus., Inc. v. Nat'l Center for Health Educ., Inc.*,
    812 F. Supp. 387 (S.D.N.Y. 1993) .........................................................................23, 25

# TABLE OF AUTHORITIES

**Page(s)**

*Research in Motion, Ltd. v. Visto Corp.*,
457 F. Supp. 2d 708 (N.D. Tex. 2006) .................................................................18

*Ritz Hotel, Ltd. v. Shen Mfg. Co.*,
384 F. Supp. 2d 678 (S.D.N.Y. 2005)..................................................................17

*Ross Prods., Inc. v. New York Merchandise Co.*,
233 F. Supp. 260 (S.D.N.Y. 1964) .......................................................................12

*Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. System, Inc.*,
672 F.2d 1095 (2d Cir. 1982) ............................................................................7, 8

*Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc*,
482 F. Supp. 980 (S.D.N.Y. 1980) ................................................................... 9-10

*Russian Standard Vodka (USA), Inc. v. Allied Domecq Spirits & Wine USA, Inc.*,
523 F. Supp. 2d 376 (S.D.N.Y. 2007) ...................................................................19

*Shaw v. Rizzoli Int'l Publ'ns, Inc.*,
No. 96 Civ. 4259 (JGK), 1999 WL 160084 (S.D.N.Y. Mar. 23, 1999) ........................ Passim

*Siegel v. Nat'l Periodical Publ'ns, Inc.*,
508 F.2d 909 (2d Cir. 1974)..................................................................................12

*Solin v. Nat'l Ass'n of Sec. Dealers, Inc.*,
No. 05 Civ. 4268 (RMB), 2006 WL 223156 (S.D.N.Y. Jan. 27, 2006) ........................... 13-14

*Starter Corp. v. Converse, Inc.*,
84 F.3d 592 (2d Cir. 1996)........................................................................... Passim

*Wembley, Inc. v. Superba Cravats, Inc.*,
315 F.2d 87 (2d Cir. 1963).....................................................................................23

## STATUTES, RULES & REGULATIONS

17 U.S.C. § 7 (1909 Act, as amended, July 30, 1947).............................................9, 10

17 U.S.C. § 19 (1909 Act, as amended, Oct. 15, 1971)................................................7

17 U.S.C. § 24 (1909 Act, as amended, July 30, 1947)................................................4

17 U.S.C. § 26 (1909 Act) ...................................................................................11

# TABLE OF AUTHORITIES

**Page(s)**

28 U.S.C. § 2201 .................................................................................................13

Fed. R. of Civ. P. 21 .......................................................................................29, 30

Fed. R. Civ. P. 30(b)(6) .......................................................................................31

Fed. R. Civ. P. 54(d)(2) .......................................................................................31

Fed. R. Civ. P. 54(d)(2)(B) .................................................................................31

Cal. Civ. Code. 3344.1 .........................................................................................15

Local Rule 56.1 .......................................................................................................3

## OTHER AUTHORITIES

1 *Nimmer* § 3.04[A] ........................................................................................9, 10

1 *Nimmer* § 3.07[C] ............................................................................................10

2 *Nimmer* § 7.02[C][1] .........................................................................................7

2 *Nimmer* § 7.09[A] ............................................................................................12

2 *Nimmer* § 7.12[C][1] .........................................................................................8

3 *Nimmer* § 9.05[A][1] .....................................................................................4, 5

8 *Nimmer* App. 6-21 to 6-23 ...............................................................................7

8 *Nimmer* App. 6-26 to 6-28 ...............................................................................4

10B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2761 (3d ed. 1998) ..........13

6A Moore's Federal Practice § 57.20 (2d ed. 1966)...........................................16