Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Shaw Family Archives, Ltd., Bradford Licensing, LP., Meta Stevens, and Edith Marcus (the "Shaw Family") respectfully submit this memorandum of law in support of their motion for summary judgment that the Defendants are estopped from asserting that Marilyn Monroe died anything but a New York domiciliary and summary judgment on Count 9 of the Shaw Family's Second Amended Complaint, and for such other relief as the Court may deem just and proper.

## PRELIMINARY STATEMENT

No amount of lawyer argument can undo the simple fact that numerous courts decided the issue of Ms. Monroe's New York domicile many years ago. MMLLC, via its members Anna Strasberg and the Anna Freud Centre, as well as the Executor and Trustee of the Monroe Estate, all repeatedly argued that Ms. Monroe died a New York domiciliary to a probate court in New York, a probate court in California, the California tax authorities, and a federal district court in Hawaii. All those courts repeatedly adopted the foregoing representations and issued favorable rulings, from which the Monroe Estate, and by direct extension, MMLLC, directly benefited. Now that MMLLC's financial interests are better served by a contrary position, it discernibly shifts gears and expects this Court to believe that Marilyn Monroe died, magically, and for the very first time, a California domiciliary. For the Court to accept MMLLC's current position, it would mean that its members and Estate representatives committed repeated acts of perjury and tax fraud in New York and California. The Court should apply the doctrines of judicial estoppel, collateral estoppel, and *res judicata* to preclude MMLLC from playing so fast and loose now, by arguing something that the Defendants do not even believe to be true. The sanctity of the oath and the integrity of the judicial process demand it.

### The Hawaii Litigation

MMLLC heavily litigated the issue of where Ms. Monroe was domiciled in a 1992 case before a federal district court in Hawaii. In that case, a woman by the name of Nancy Miracle sued Anna Strasberg, in her capacity as Administratrix of the Monroe Estate. Ms. Miracle argued that she was the

daughter of Marilyn Monroe and was entitled to a 50% share of the Estate.  Ms. Strasberg repeatedly
represented that Ms. Monroe died a New York domiciliary in support of three separate issues.  First, in
support of the Estate's motion to dismiss the complaint for lack of personal jurisdiction, Ms. Strasberg
argued that Ms. Monroe's New York domicile supported the lack of her contacts with Hawaii.
Second, when Ms. Miracle moved to request discovery for purposes of proving that Ms. Monroe died a
California domiciliary, Ms. Strasberg argued that Ms. Monroe's New York domicile at death was such
a "non-issue" that additional discovery was unwarranted.  Third, in support of the Estate's motion to
dismiss for failure to state a claim, Ms. Strasberg argued that Ms. Monroe's New York domicile
required the court to apply New York's pretermission statute, which did not protect children (like Ms.
Miracle), who were born before the making of the will.

Ms. Miracle aggressively litigated the factual issue of Ms. Monroe's domicile at death.  For
example, in support of her effort to convince the Hawaii district court to apply California's
pretermission statute, Ms. Miracle argued that Ms. Monroe moved to California when she was
nineteen, lived in California for ten years, worked in California, bought and resided a home in
California, voted, died, and was buried in California – the exact arguments that Defendants raise here.
However, the Hawaii district court rejected those arguments and held that those facts show "only that
the decedent Marilyn Monroe had rather significant contacts with California at various times during
her life.  It does not show that Ms. Monroe was domiciled in California at the time of her death."  The
Hawaii district ruled that Marilyn Monroe died a New York domiciliary and, based on that ruling,
granted every motion that Ms. Strasberg requested.  The Hawaii court dismissed the case, the Estate
obtained a final appealable judgment because of the dismissal, and Ms. Miracle could not proceed with
her case in California or obtain the application of California law.  The court summarily denied Ms.
Miracle's motion for reconsideration and the Ninth Circuit Court of Appeals denied Ms. Miracle's
appeal.

**The Probate and Tax Proceedings**

When Mr. Frosch, as Executor and Trustee of Ms. Monroe's Estate, filed an "ancillary" probate proceeding in California Superior Court, he represented that Ms. Monroe died a New York domiciliary.  California law is well settled: the court's subsequent admission of Ms. Monroe's will to California "ancillary" probate was, in effect, <u>a conclusive decision that Ms. Monroe died a New York domiciliary</u>.  Both Mr. Frosch, as Executor, and later Ms. Strasberg, as Administratrix of the Monroe Estate, repeatedly represented that Ms. Monroe died a New York domiciliary in those probate proceedings and in related proceedings that were held to determine how Estate assets were to be taxed. Both the New York and California probate courts issued final decrees closing the Monroe Estate, which means that the Estate's jurisdictional representations concerning Ms. Monroe's New York domicile were *res judicata*, final and binding upon MMLLC's sole owners, Anna Strasberg and the Anna Freud Centre, as were any other issues that they could have raised or litigated and did not.

In 1964, the attorneys for the California "ancillary" Estate contacted Mr. Frosch and informed him that he had to obtain a series of affidavits attesting to Ms. Monroe's non-residence in California or there would be serious tax consequences.  Mr. Frosch subsequently submitted <u>five detailed affidavits </u>to the California tax authorities, including his own, from Ms. Monroe's friends and employees, all of whom set forth numerous facts supporting the Estate's position that Ms. Monroe died a <u>New York domiciliary</u>, including testimony that <u>Ms. Monroe told those parties</u> that she considered her New York apartment to be her permanent home and that she was only in California temporarily for filming of the movie "Something's Got to Give."  The California Tax Appraiser adopted Mr. Frosch's arguments and Mr. Frosch stated that he considered his efforts to be "successful," which they were because California did not levy inheritance taxes on the entire Estate based on Mr. Frosch's submissions.  Moreover, the affidavits that Mr. Frosch submitted on the issue of domicile also convinced California not to tax any of the Estate's intangible property.

**The Privity Issue**

Anna Strasberg's and Aaron Frosch's representations are clearly binding on MMLLC. From 1962 to 1989, Aaron Frosch was the Executor and Trustee of the Monroe Estate. From 1989 to 2001, Anna Strasberg was the Estate's Administratrix. Ms. Strasberg was also a 75% beneficiary, so any representations she made were in support of her overlapping and co-extensive fiduciary obligations and economic incentives to maximize the value of the Estate's assets. First, MMLLC is solely owned by the only living beneficiaries of the Monroe Estate, 75% owner, Anna Strasberg and 25% owner, the Anna Freud Centre. Documents from Anna Strasberg's lawyers and her personal admissions show that she created MMLLC at the close of Monroe Estate proceedings solely to insulate herself from personal liability from claims against the Estate. Ms. Strasberg obviously cannot escape the consequences of her judicial admissions simply by placing assets into an LLC. Second, MMLLC is in privity with the Estate because MMLLC is a successor to all the Estate's property, which it obtained from Estate beneficiaries Anna Strasberg and the Anna Freud Centre. Third, it is black letter law that an assignee of intellectual property can never obtain greater rights than the assignor of that property had, which means that MMLLC could only have taken the intellectual property that the Estate and Anna Strasberg gave it, as limited by her representations that Ms. Monroe died a New York domiciliary. Fourth, none of the Estate's beneficiaries ever challenged Frosch's decision to file the "ancillary" probate proceeding in California, the original probate proceeding in New York, or his (and Ms. Strasberg's) repeated judicial declarations that Ms. Monroe died a New York domiciliary. Well settled law precludes them from doing so now. Fifth, Anna Strasberg succeeded in Mr. Frosch's duties as Administratrix of the Estate and she therefore stands in his shoes. Had she disagreed with his representation to the New York and California Surrogate courts that Ms. Monroe died a New York domiciliary, it would have been her fiduciary obligation to correct the record or sue him for damages caused by any false representations. Not only did Ms. Strasberg not correct the record, but she adopted and ratified Mr. Frosch's representation that Ms. Monroe died a New York domiciliary by repeating it

before the New York Surrogate's court and a Hawaii federal judge, all in her capacity as Administratrix and beneficiary of the Monroe Estate.  Sixth, the Anna Freud Centre (the remaining 25% MMLLC owner) also admitted that Ms. Monroe died a New York domiciliary before the New York Surrogate's court.  Seventh, even in the absence of technical privity, MMLLC is bound by the Estate's representations by the doctrine of virtual representation.  That doctrine holds that a nonparty is bound if a party that had the same interests litigated the prior case, even though the nonparty was neither a participant nor in privity with that party in a prior proceeding.

Finally, it should not go unnoticed that every single Defendant in this action as well as their principles and agents have all expressly represented that Ms. Monroe died a New York domiciliary in non-judicial contexts as well, including (i) CMG's Mark Roesler; (ii) MMLLC's former licensing agent Roger Richman; and (iii) Anna Strasberg's attorney Irving Seidman.  Even Marilyn Monroe stated on a famous radio program that she intended to retire to Brooklyn.  The evidence in support of summary judgment is so overwhelming that for MMLLC (and CMG) to now argue that Ms. Monroe died a California domiciliary is absolutely frivolous.

For all the foregoing reasons, this Court should hold that MMLLC is judicially and collaterally estopped from arguing that Ms. Monroe died as anything but a New York domiciliary.   The Court should also grant the Shaw Family's motion for summary judgment on Count 9 of its Second Amended Complaint and confirm that MMLLC has no right of publicity in Marilyn Monroe no matter what MMLLC and its lobbying and public relations firms convinced the California legislature to do.

## PROCEDURAL HISTORY

The applicable procedural history involving Defendants' lack of disclosure of the critical domicile documents prior to the former summary briefing as well as the lack if import of Judge Morrow's January 7, 2007 decision on the estoppel issue, is set forth in the Declaration of Christopher Serbagi, dated February 14, 2008.

## STATEMENT OF FACTS

The Shaw Family respectfully submits and refers the Court to its Rule 56.1 Statement of

Undisputed Facts ("SUF").

## ARGUMENT

## I.     THE DOCTRINE OF JUDICIAL ESTOPPEL

The United States Supreme Court has repeatedly recognized that the doctrine of judicial

estoppel cannot be reduced to a precise formula or test.  Considerations of equity prevail.  Zedner v.

United States, 547 U.S. 489, *28, 126 S.Ct. 1976, 1987, 164 L.Ed.2d 749, 766 (2006).  Unlike

equitable estoppel, which is designed to ensure fairness between the parties, judicial estoppel protects

the sanctity of the oath.  Id.  The purpose of the doctrine is to "protect the integrity of the judicial

process by prohibiting parties from deliberately changing positions according to the exigencies of the

moment."  Id.  at 743.

The Court should apply Second Circuit law on judicial estoppel because this Court's ability to

protect the integrity of the federal judicial institution from manipulation by litigants, like MMLLC

should not vary according to the state in which the underlying dispute arose.  The Second Circuit

recognizes two elements for judicial estoppel to apply:  First, the party against whom estoppel is

asserted must have argued an inconsistent position in a prior proceeding and, second, a court must have

adopted the prior inconsistent position in some manner.  Bates v. Long Island R.R. Co., 997 F.2d 1028,

1038 (2d Cir.), cert denied, 510 U.S. 992, 114 S.Ct. 550 (1993).  For the second element to be

satisfied, all that is required is that there be evidence of "judicial endorsement" of the party's assertion.

Id.  The Second Circuit has also recognized that judicial estoppel does not apply when the first

statement resulted from a good faith mistake.  TM Patents, L.P. and TM Creditors, LLC v. Int'l

Business Machines Corp., 121 F.Supp.2d 349, 360 (S.D.N.Y. 2000) (citing Simon v. Safelite Glass

Corp., 128 F.3d 68, 71 (2d Cir. 1997)).

**II.    MMLLC IS JUDICIALLY ESTOPPED BECAUSE A FEDERAL DISTRICT COURT IN HAWAII EXPRESSLY ADOPTED ANNA STRASBERG'S REPEATED REPRESENTATION THAT MARILYN MONROE DIED A NEW YORK DOMICILIARY AND ISSUED THREE FAVORABLE RULINGS AS A RESULT**

On September 16, 1992, a woman by the name of Nancy Miracle sued Anna Strasberg, in her capacity as Administratrix of the Monroe Estate, in Hawaii federal district court.  SUF ¶ 7, Ex. 40. Ms. Miracle argued that she was the daughter of Marilyn Monroe and was entitled to a 50% share of the Estate.  SUF ¶ 8, Ex. 40, SFA1 0002-3.  On November 9, 1992, Ms. Strasberg filed a motion to dismiss the complaint, in which she repeatedly argued that Ms. Monroe died a New York domiciliary in support of three claims.  SUF ¶ 10, Ex. 41, pp. 7-16.  First, Ms. Strasberg argued that Ms. Monroe died a New York domiciliary so that the court would apply the favorable New York State's Decedent Estate Law, which did not permit recovery for children born before a testator executed her will.  SUF ¶ 10, at pp. 6-7  Ms. Miracle was born in 1946 and Ms. Monroe executed her will on January 14, 1961. Id. at 7.  Thus, whether or not the court applied New York law was central to the motion.  Ms. Strasberg stated:

> Under common law and the Hawaii Uniform Probate Code, then, the decedent's domicile  at the time of her death determines what law will be applied.  Plaintiff has not disputed the Surrogates determination that Marilyn Monroe was a **New York Domiciliary at the time of her death.**

Id. at p. 5 (emphasis added).

Second, Ms. Strasberg also argued that the Hawaii district court lacked personal jurisdiction over her because she lacked sufficient contacts with the forum.  Id. at pp. 9-15.  Again, Ms. Strasberg relied, at least in part, on her position that Ms. Monroe died a New York domiciliary.  Id.  Ms. Strasberg stated:

> The claim is to a share of the decedent's estate, allegedly as a pretermitted heir.  Yet plaintiff concedes that she herself was born in New York, the decedent's will was admitted to probate in New York (based upon at least one finding that **the decedent was domiciled in New York at her death**) and there is no claim that decedent possessed any property in Hawaii at her death.

7

Id. 13 (emphasis added).

      Third, prior to the court's decision on Ms. Strasberg's motion to dismiss, Ms. Miracle requested that the Court stay the motion to dismiss so that she could conduct discovery that would demonstrate that Marilyn Monroe died a California domiciliary.  SUF ¶ 9, Ex. 43, pp. 4-5.  In support of that motion, Ms. Miracle argued:

> Affiant is unable to adequately respond to the Motion to Dismiss the Complaint filed by the Defendant in the above-named case without a copy of the will and other requested documents concerning Marilyn Monroe which will be offered as evidence to prove that **Marilyn Monroe may not have been domiciled in New York at the time of her death** for purposes of the pretermitted heir statutes . . .

Id. at 4 (emphasis added).  Ms. Strasberg responded by stating that the fact of Ms. Monroe's New York domicile at death is so clear that Plaintiff's argument that decedent "may not have been domiciled in New York at the time of death . . ." is unsupported.   SUF at ¶ 10, Ex. 44, p. 4.  Ms. Strasberg stated:

> **The first non-issue – decedent's domicile at death** – was not raised as an issue in plaintiff's pleading; counsel's speculation that the decedent 'may not have been domiciled in New York at the time of her death . . .' is unsupported, is not an issue in plaintiff's pleading, and, in fact, is implicitly contrary to the New York Surrogate's Court Decree admitting the will to probate in New York. Even if judged to be of some relevance, plaintiff may not put the 'domicile at death' issue into play by mere speculation in his affidavit . . . the request for a continuance in order to do discovery should also be denied because the discovery cannot possibly defeat the motion to dismiss.

Id. (emphasis added).

      On November 24, 1992, the parties appeared before the court for oral argument concerning Ms. Miracle's request for additional discovery.  SUF ¶¶ 9, 10, Ex. 45.  Ms. Miracle repeatedly argued that she was entitled to discovery of the Monroe New York probate documents because they might show that Ms. Monroe died a California domiciliary.  Id. at pp. 1-20.  Again, Ms. Miracle stated:

> I mean – we're leaning more towards California law because she was domiciled there.  She was living in California for some 20 years, she owned property in California, and she's buried in California.  So, under the law we have a right to come in and contend that even though the

> Court says that she was domiciled in New York; that we have a right to
> proceed . . .

Id. at p. 9.  Ms. Strasberg argued that she believed that Ms. Miracle's domicile argument was invalid.

SUF ¶ 10, Ex. 45, pp. 15-21.  The court agreed with Ms. Strasberg, denied Ms. Miracle's request to

obtain additional domicile discovery, and ordered that the Plaintiff file its opposition to Ms.

Strasberg's motion to dismiss by December 1, 1992.  Id. at pp. 19, 22.  On November 27, 1992, Ms.

Miracle filed an Amended Complaint, in which she attempted to bolster her position that Ms. Monroe

died a California domiciliary by stating:

> Marilyn Monroe, aka Nancy Cusumano was a resident and domiciled in
> California at the time of her death and the Will was probated in New
> York in 1962.

SUF ¶ 9, Ex. 46, p. 2.  In opposition to the Estate's motion to dismiss the Complaint, Ms. Miracle

strenuously asserted that California had the most significant relationship with the subject matter of the

case.  SUF ¶ 9, Ex. 47, p. 3-4.  For example, Ms. Miracle argued:

> California has the most significant relationship and subject matter
> because Marilyn Monroe, aka Nancy Cusumano, moved to California
> when she was 19 years old and lived in California for about 10 years,
> worked in California in the entertainment industry, bought and resided in
> a home in California, voted in California, died in California, is buried in
> California and an ongoing murder investigation is continuing in
> California.

Id. at p. 3.  On December 14, 1992, the parties appeared for oral argument on Ms. Strasberg's motion

to dismiss before the Hawaii district court judge.  SUF ¶¶ 9, 10, Ex. 48.  Ms. Miracle again argued that

she was entitled to discovery on the California probate proceedings because those documents would

likely support her contention that Ms. Monroe died a California domiciliary.  SUF ¶ 9, Ex. 48, SFA1

0065-68.  Ms. Miracle stated:

> All of those wills go to where Marilyn Monroe was domiciled at the time
> of her death.  She was living in California at the time of her death, in
> 1962.  She owned a home there.  She had resided there.  She was
> working there.

<u>Id.</u> at 65.  Ms. Miracle also argued that the court should apply the California pretermitted heir statute

because Marilyn Monroe "owned a home in California, she lived there, she was working there." <u>Id.</u> at

66.  The Court soundly rejected that argument and stated in open court that Marilyn Monroe died

"while domiciled in New York."  SUF ¶ 11, Ex. 48, SFA1 0072-74.

Moreover, in its formal written order, the Hawaii federal court repeatedly and expressly issued

rulings that relied on Ms. Strasberg's representation that Ms. Monroe died a New York domiciliary.

SUF at ¶ 11, Ex. 49, pp. 8, 13, 14.  First, in partial support for its order that Hawaii lacked personal

jurisdiction, the court expressly stated:

> New York was where decedent was **domiciled at death**.  The will was
> admitted to probate in New York, and Anna Strasberg, as executor,
> presumably conducted all her estate-related activities out of New York.

<u>Id.</u> at 8 (emphasis added).  Second, the Court also accepted the Monroe Estate's argument that, because

New York has the strongest interest in the case, New York pretermission statute applies.  The Court

stated:

> Plaintiff's cause of action arose because of her alleged birth to the
> decedent in New York and the decedent's subsequent death (while
> **domiciled in New York**) with a will executed in New York that failed to
> provide for plaintiff.  The will was admitted to probate in New York, and
> the estate was administered in New York under the supervision of courts
> of that state.

<u>Id.</u> at 13.  Furthermore, the district judge also expressly considered and disregarded Ms. Miracle's

argument that Ms. Monroe moved to California when she was 19, lived in California for ten years,

worked in California, bought and resided in a home in California, voted, died, and was buried in

California – <u>the very same arguments that Ms. Strasberg intends to re-litigate here</u>.  <u>Id.</u>  In response to

Ms. Miracle's arguments, the Hawaii federal Judge ruled:

> However, this shows only that the decedent Marilyn Monroe had rather
> significant contacts with California at various times during her life.  It
> does not show that Ms. Monroe was domiciled in California at the time
> of her death.  The result is the same under the Hawaii Uniform Probate
> Code, which provides that the decedent's domicile at the time of death
> determines the law that will be applied.  Here, the New York Surrogate

Court determined that Marilyn Monroe was a New York domiciliary at the time of her death.

Id. Based on Ms. Strasberg's arguments that Ms. Monroe died a New York domiciliary, the court applied the New York's pretermission statute in effect at the time when Ms. Monroe died and held that Ms. Miracle failed to state a claim. Id. at 14. On January 4, 1993, Ms. Miracle filed a motion for reconsideration of the court's order, which the court summarily denied. SUF ¶ 9, Ex. 50, ¶ 15, Ex. 53. The Ninth Circuit denied Ms. Miracle's appeal. Id. at ¶ 16, Ex. 55.

Second Circuit law demands the application of judicial estoppel here. First, Anna Strasberg's positions in the Hawaii litigation and the present case are obviously inconsistent. In the Hawaii litigation, Ms. Strasberg repeatedly represented that Ms. Monroe died a New York domiciliary, whereas here, she argues that Ms. Monroe died a California domiciliary. Second, the Hawaii court adopted Ms. Strasberg's representation in support of its rulings on at least three issues. There is far more reason to apply judicial estoppel here than in any reported case we have see. See e.g. Whalen v. Chase Manhattan Bank, No. 00-9603, 2001 U.S. App. LEXIS 16158, *4 (2d Cir. July 17, 2001); see Bates, 997 F.2d at 1038.

The Second Circuit Court of Appeals has applied judicial estoppel even in the absence of an express representation. In the Whalen case, the plaintiff Linda Whalen sued under UCC § 3-149, alleging that Chase Bank unlawfully converted a check for which she was the sole payee. Whalen, 2001 U.S. App. LEXIS 16158, *1. The check, issued by Met Life Insurance, was stolen from Ms. Whalen by her Met Life financial planner. Id. at *1-*2. The financial planner deposited the check in his wife's account at First County Bank. Id. at *2. First County then presented the check to Chase Bank for payment and Chase honored it by debiting Met Life's account at Chase. Id. Prior to this lawsuit, Whalen sued First County and Met Life, but not Chase. Id. When Whalen later sued Chase Bank, the district court dismissed her suit based on the doctrine of ratification. Id. at *2-*3. Whalen appealed. Id. at *3.

11

The Second Circuit affirmed the district court decision, but did so on grounds of judicial estoppel, holding that Whalen was judicially estopped from suing a bank that was a drawee on her stolen check (Chase) because she previously sued and settled with the collecting bank, First County. Id. at *4.  The court held that judicial estoppel applied because the plaintiff implicitly represented that the funds were no longer in the drawee bank by suing the collecting bank in the first instance.  Id.

The District Court of the Northern District of New York  applied the doctrine of judicial estoppel to preclude a defendant from re-litigating the issue of domicile under a strikingly similar factual scenario to the present case.  In Steele v. Anderson, No. 03-CV-1251, 2004 U.S. Dist. LEXIS 136 (N.D.N.Y. Jan. 8, 2004), shareholders brought a state-court derivative action on behalf of a corporation against the former officers and directors of Dunes Hotels and Casinos, Inc. ("Dunes").  Id. at *1.  The issue before the court was whether the Defendants had properly removed the action to federal court on the basis of diversity jurisdiction or whether there was an absence of complete diversity between the parties.  Id.  Defendants (who were citizens of California) argued that the plaintiff's pleadings only stated that Dunes is a domestic corporation incorporated in the State of New York and did not identify any California principal place of business.  Id. at *8.  If the court found Dunes to be only a New York domiciliary, the court would have diversity, but diversity would be defeated if the court also found Dunes to be domiciled in California.  Id. at *9.  The court held that the defendants were judicially estopped from arguing that Dunes does not have a principal place of business in California because, in a prior litigation in California, Defendants represented that Dunes was domiciled in California.  Id. at *8-*9.  The Steele court held that because the Eastern District of California adopted that factual representation, "Defendants may not now deny this fact."  Id. at *9.

There are many more reasons for the Court to apply judicial estoppel here than were present in Whalen and Steele.  Here, not only did MMLLC (via Ms. Strasberg and Mr. Frosch) repeatedly argue in the Hawaii litigation that Ms. Monroe died a New York domiciliary, it  did so against an opponent who raised the very same facts that MMLLC does here.  Thus, not only did MMLLC argue Ms.

Monroe died a New York domiciliary, but it dismissed as irrelevant the very underlying facts that Defendants would have this Court believe are somehow relevant now.   Ms. Strasberg's statement that Ms. Monroe died a New York domiciliary was not only "adopted" by the Hawaii tribunal, it was the substantive basis for the court's decision to deny additional discovery and dismiss the case, both with respect to the failure to state a claim and for lack of personal jurisdiction.   Finally, there is no way to characterize Ms. Strasberg's representation to the Hawaii District Court as a mistake.   The only mistake she has made is in the current case, which is the mistake of trying to pull the wool over the eyes of this Court.

## III.    MS. STRASBERG'S REPRESENTATIONS TO THE HAWAII FEDERAL DISTRICT COURT COLLATERALLY ESTOP MMLLC HERE

A federal court must apply the collateral estoppel rules of the state that rendered the prior judgment on the same issues before the court.   LaFleur v. Whitman, 300 F.3d 256, 271 (2d Cir. 2002).   The federal district court in Hawaii is governed by Ninth Circuit law.   According to the Ninth Circuit, the doctrine of collateral estoppel (or issue preclusion) "prevents relitigation of issues actually litigated and necessarily decided, after a full and fair opportunity for litigation, in a prior proceeding."   Shaw v. Hahn, 56 F.3d 1128, 1131 (9th Cir.), cert. denied, 516 U.S. 964 (1995).   A federal court has preclusive effect where:

> (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party in the first proceeding.

Kourtis v. Cameron, 419 F.3d 989, 994 (9th Cir. 2005) (citing Hydranautics v. FilmTech Corp., 204 F.3d 880, 885 (9th Cir. 2000)).

First, the issue in both the Hawaii litigation and the issue before the Court is the location of Ms. Monroe's domicile when she died.   Ms. Miracle repeatedly argued that Marilyn Monroe died a California domiciliary and Ms. Strasberg repeatedly argued that Ms. Monroe died a New York

domiciliary.  The parties heavily litigated the issue.   Second, the Hawaii district court ended with a

final judgment on the merits, as evidenced by the court's decision dismissing the case for lack of

jurisdiction and for failure to state a claim, the court's denial of Ms. Miracle's motion for

reconsideration, and the Ninth Circuit's refusal to hear the case.  Third, Ms. Strasberg is clearly in

privity with Ms. Strasberg, as set forth in Section VI below.

For all the foregoing reasons, the Court should collaterally estop MMLLC from re-litigating the

issue of Ms. Monroe's domicile once again.

**IV.     MS. MONROE'S NEW YORK DOMICILE WAS CONCLUSIVELY DECIDED
DURING THE NEW YORK AND CALIFORNIA PROBATE PROCEEDINGS
SUCH THAT JUDICIAL ESTOPPEL, COLLATERAL ESTOPPEL, AND *RES
JUDICATA* PRECLUDE MMLLC FROM RE-LITIGATING THAT ISSUE HERE**

**A. The California Superior Court Conclusively Held That Ms. Monroe Died A New
York Domiciliary When It Admitted The "Ancillary" Letters for Probate in
California**

In California, the admission of a will to probate is, in effect, a conclusive decision on the

question of domicile.  Estate of Brace, 180 Cal. App.2d 797, 799 (Cal. App. 1960) (holding that "order

admitting will to probate is conclusive that he was domiciled in California at that time").  California

has repeatedly held that each stage of a probate proceeding is intended to be final, and not subject to

review in a subsequent stage of the administration of the estate.  Id. at 8038.  The fact of domicile is

jurisdictional fact upon which an order of the court admitting the will to probate is made and based.

Id.  Unless set aside upon direct appeal, "findings of jurisdictional facts supporting such an order are

final adjudications upon those facts for all subsequent stages of the administration proceedings and are

as conclusive as the order admitting the will to probate."  Id. at 803-04 (citing cases).

Former sections 360-62 of the California Probate Code (effective when Ms. Monroe died)

provides that an "ancillary" probate proceeding is, by definition, a foreign will that has been otherwise

originally probated in the state in which the decedent was domiciled.[1]  Marcus Decl. ¶¶ 73-75, Exs. 72-74.  See 24 Cal. Jur.3d Decedents' Estates, § 122 (1975) (Section 360-61 "provides for ancillary probate in this state of a foreign will that has been probated in the state in which the nonresident was domiciled").  Marcus Decl. at ¶ 76, Ex. 75.  Numerous courts have so ruled.  Estate of Estrem, 16 Cal.2d 563, 568 (Cal. 1940) (former Sections 360-362 of the Probate Code "provide the manner in which the will of a nonresident originally probated at his domicile may be offered for ancillary probate here"); Nelson v. Miller, 201 F.2d 277, 279  (9th Cir. 1952) (stating "[i]n the circumstance of property belonging to the estate but situated out of the domiciliary state, administration is had through ancillary proceedings in which the property rests"); McCully v. Cooper, 114 Cal. 258, 261-62 (Cal. 1896); Nelson, 201 F.2d at 279.

On October 26, 1962, Aaron Frosch filed a "Notice of Probate" with the New York Surrogate's Court.  SUF at ¶ 18, Ex.4.  The New York Surrogate's Court admitted the Monroe Will to probate on October 30, 1962.  SUF at ¶ 19, Ex. 5, MM 0001497-1498.  On December 17, 1962, when Mr. Frosch filed a "Petition for Probate of Foreign Will and Ancillary Letters Testamentary" in California Superior Court, he stated "[t]he Will was executed in conformity with the laws of the State of New York, the place where Testatrix was **domiciled at the time of her death** . . ." SUF at ¶ 21, Ex. 6, SFA1 222 (emphasis added).[2]  Had Mr. Frosch not made that representation, the California Superior Court would have had no basis upon which to accept the proceeding as "ancillary," which California law defines as the non-domiciliary estate.  A decedent's domicile is a jurisdictional fact that controls

---

[1] In 1931, the California Legislature enacted Section 360, which related to foreign wills and did not repeal that section until 1988.  The repeal did not make any substantive changes in California law because Probate Code section 12501 defines "ancillary administration" as "proceedings in this state for administration of the estate of a nondomiciliary decedent."

[2] When prosecuting Estate matters before the New York and California probate courts, Aaron Frosch repeatedly referred to the New York proceeding as the "domiciliary estate" and himself as the "domiciliary executor."  SUF ¶ 25, Ex. 24 SFA1 0239, 241, Ex. 26, SFA1 0159, 190, Ex. 28, SFA 00675, SUF ¶ 27 Ex.24, SFA 0243, Ex. 26, SFA1 0170, 190.

many aspects of a probate proceeding in California, including but not limited to, "the validity and construction of a will, the testator's power to exclude certain persons from sharing in his estate, the time which must elapse between the execution of the will bequeathing personal property to charity and the testator's death, the capacity of a beneficiary to take a bequest of personality, the validity of bequests of personality in trust, and the testator's power to limit a legatee's right to alienate personality bequeathed to him." Estate of Reynolds, 217 Cal. 557, 561-62 (Cal. 1933). Thus, had Mr. Frosch not stated to the California Superior Court that Ms. Monroe died a New York domiciliary, the court could not have accepted the petition for "ancillary" administration.

Based on Mr. Frosch's representation that Ms. Monroe died a New York domiciliary, the California Superior Court admitted Ms. Monroe's will to probate on January 21, 1963. SUF at ¶ 8, Ex. 7, p. 231-233. The Order stated: "It is Ordered, Adjudged and Decreed by the Court that said Marilyn Monroe died on August 5, 1962, then a resident of the County of New York, State of New York, and leaving Estate in the County of Los Angeles, State of California . . ." Id. at 231. Well established California law in existence both before and after Ms. Monroe died deems the California Superior Court's admission of Ms. Monroe's will to probate the equivalent of a decision on her domicile. Estate of Brace, 180 Cal.App.2d at 802. While the jurisdictional section of the applicable California Probate Code employs the term "residence" (Marcus Decl. at ¶ 71, Ex.70) as do many California courts, the California Supreme Court has expressly stated the term "residence" as used in the Section 301 of the former California Probate Code is "synonymous with domicile." Smith v. Smith, 45 Cal.2d 235, 239 (Cal. 1955); Estate of Brace, 180 Cal. App. at 802 ("[t]he word 'resident' as used in Section 301 is synonymous with 'domicile'"); Estate of Philips, 269 Cal.App.2d 656, 659 (Cal. App. 1969) (same); Estate of Glassford, 114 Cal. App.2d 181, 186 (Cal. App. 1952) (same); 24 Cal. Jur. 3d Decedents' Estates, § 122 (1975) (stating that as used in Probate Code § 301, "the word 'resident' connotes "residence," which in turn is synonymous with domicile") Marcus Decl. at ¶ 71, Ex. 70.

And because the time to appeal that decision has long passed, the court's jurisdictional finding that Ms. Monroe died a New York domiciliary is final and conclusive. <u>Estate of Estrem</u>, 16 Cal.2d at 570 (holding that jurisdictional fact of domicile may be reviewed only by appeal or direct attack and cannot be attacked in a collateral proceeding); <u>Estate of Barton</u>, 196 Cal. 508, 511 (Cal. 1925) (same); <u>Irwin v. Scriber</u>, 18 Cal. 499, 500, 505-08 (Cal. 1861) (same).

Finally, California law at the time of Ms. Monroe's death recognized that, as the "ancillary" proceeding, it was required to turn over to the "domiciliary" estate (New York), assets not used to pay creditors and expenses in the proceeding. <u>Estate of Patmore</u>, 141 Cal. App. 2d 416, 423 (Cal. App. 1956) ("the general rule was that surplus assets in an ancillary administration, i.e. personal assets not required for the payment of claims and expenses of administration lawfully filed and allowed in the ancillary administration, should be remitted to the domicile for final settlement and distribution of the estate"); <u>Estate of Barreiro</u>, 125 Cal. App. 752, 765-67 (Cal. App. 1932).   As California courts have long held:

> If there be assets in another state or states than that in which the principal letters are granted, an administration may be obtained there, and such administration will be regarded as **ancillary to the administration of the domicile**, and as a general rule, the excess of the assets resulting from such ancillary administration, after the payment of debts, expenses of administration and local legacies, if any, in the jurisdiction of the ancillary administration, will be transmitted to the administrator of the domicile, to be there distributed according to the law of the domiciliary estate.

<u>McCully</u>, 114 Cal. App. 2d at 261-62  (emphasis added); <u>see</u> <u>Wilkins v. Ellett</u>, 76 U.S. 740, 742, 19 L. Ed. 586, 587, 1869 U.S. LEXIS 1026, *4(1869) (stating that "letters that are merely ancillary to the original letters . . . are simply made subservient to the claims of the domestic creditors, the residuum being transmitted to the probate court of the county of the domicile, for the final settlement of the estate").

On May 21, 1976, Aaron Frosch filed his First and Final Account of Ancillary Executor with the Superior Court of the State of California and represented that Ms. Monroe died a New York

domiciliary so that the Court would order the California assets be delivered to him as the New York

domiciliary Executor.  SUF ¶¶ 29, 30, Ex. 26,  SFA1 00167-168.  In particular, Aaron Frosch stated:

> The Last Will and testament of decedent has been duly admitted to
> probate in the Surrogate's Court of he County of New York, State of
> New York, **where decedent was domiciled at the time of her death**,
> and Aaron R. Frosch has been duly appointed as executor by said Court
> and qualified therein.  It is necessary, in order that decedent's estate in
> California may be distributed according to decedent's will, that all of the
> assets herein be delivered to Aaron R. Frosch, as executor of decedent's
> will under the laws of the state of New York.

Id.  In that same document, when Mr. Frosch requested the court to provide him additional executor

fees for his extraordinary work on behalf of the Estate, he stated that "[t]here was not sufficient cash

available at her domicile in New York to meet all her obligations."  Id. at SFA1 0183.  In support of

his application, Mr. Frosch again stated that Marilyn Monroe died a domiciliary of New York.  Id. at

SFA 0167, 183.

By Order Settling First and Final Account of Ancillary Executor, dated July 15, 1976, the

California Superior Court acknowledged that Aaron Frosch had provided due notice of the hearing,

that all taxes and expenses had been paid and that the "balance of cash on hand or in savings accounts;

be distributed to Aaron R. Frosch, as Executor of decedent's will appointed by the Surrogate's Court of

the County of New York, State of New York."  SUF ¶ 32, Ex. 27, SFA1 135.  In December 1976, Mr.

Frosch filed a "Receipt" with the California Superior Court in which he acknowledged that he received

from the California ancillary estate a number of orders and reports that the California ancillary court

"distributed to him as executor of the domiciliary estate of the above named decedent."  Id. at ¶ 34, Ex.

28.  Accordingly, Mr. Frosch's request of the California Superior Court to release the ancillary assets

of the California "ancillary" Estate to him as the domiciliary executor was itself a judicial

representation that Ms. Monroe died a California domiciliary.  The court's approval of that request

demonstrates that it adopted Ms. Frosch's representation that Marilyn Monroe died a New York

domiciliary.  Id.  at ¶ 32, Ex. 27.  When the court granted Mr. Frosch's request to release the ancillary

(non-domiciliary assets) to him, the court acknowledged that New York was the domiciliary Estate and that California was the "ancillary" Estate. Id. All parties therefore acknowledged that Ms. Monroe could not have died a California domiciliary because that is where the "ancillary" proceeding was based.

### B.    Well Established Probate Law Prohibits MMLLC From Relitigating Issues Conclusively Established During The Administration Of Ms. Monroe's Estate, Including Her New York Domicile

In both California and New York, there is no principal of probate law more firmly settled than that an order of a probate court settling the executor's account is a final adjudication on the merits. An accounting decree is conclusive and binding with respect to all issues raised and as against all persons over whom the Surrogate's Court obtained jurisdiction. Bernhard v. Bank of America National Trust & Savings, Assoc., 19 Cal. 2d 807, 813 (Cal. 1942) (citing former Probate Code, section 931 [formerly Code Civ. Proc., sec. 1637]; Goldberg v. Frye, 217 Cal. App.3d 1258, 1266 (Cal. App. 1990) (holding that failure to raise objections to the administration of an estate prior to the time of the final accounting "results in loss of power later to do so."); Pray v. Hegeman, 98 N.Y. 351, 358 (Cal. 1885). In In re Slade's Estate, 154 Misc. 275, N.Y.S. 956 (N.Y. Sur. 1935), the court relied on the executor's representation in the initial probate proceeding that the testator was a nonresident of New York and estopped the decedent's widow from questioning this fact after the estate proceedings were closed. Id. at 277. The court held that it "was within her power to have litigated the issue of domicile in the probate proceeding . . . or to have moved directly to vacate the decree in probate for the purpose of determining the actual domicile of the testator." Id. Estate of Ziegler, 161 Misc.2d 203, 205, 613 N.Y.S.2d 316 (N.Y. Sur. Ct. 1994), aff'd, 213 A.D.2d 280, 623 N.Y.S.2d 589 (1995). As stated by the New York Court of Appeals, "this principle is so well settled that the drafters of the SCPA determined that it was so unnecessary to include former Section 274 of the Surrogate's Act which had codified this rule, noting that it was "self evident  . . that every decree whether upon an accounting or otherwise is binding upon all persons of whom jurisdiction was obtained." In re Hunter, 4 N.Y.3d 260, 270 (N.Y.

19

2005); Ziegler, 161 Misc.2d at 205. Because Estate beneficiaries Anna Strasberg and the Anna Freud Centre had notice of the probate proceedings, the issue of Ms. Monroe's New York domicile is now a judicially recognized fact.

In addition, under the doctrine of *res judicata*, a party may not litigate a claim where a judgment on the merits exists from a prior action between the same parties involving the same subject matter. Clark v. Bear Stearns & Co., 966 F.2d 1318, 1320 (9th Cir. 1992); Woods v. Dunlop Tire Corp., 972 F.2d 36, 38 (2d Cir. 1992). The rule applies not only to claims actually litigated, but also to claims that could have been raised in the prior litigation. Constantini v. Trans World Airlines, 681 F.2d 1199, 1201 (9th Cir. 1981). The rationale underlying this principle is that a party who has been given a full and fair opportunity to litigate a claim should not be allowed to do so again. In re Hunter, 4 N.Y.3d at 268 (N.Y. 2005) (holding that the principles of res judicata "apply with equal force to judicially settled accounting decrees"); Bernhard, 19 Cal. 2d 807, 813-14 (Cal. 1942) (order of probate court settling the executor's account was a final adjudication on the merits for purposes of *res judicata*); Estate of Ziegler, 161 Misc.2d at 204-05 ("under the general precepts of *res judicat*a, an accounting decree is conclusive not only as to issues which were actively presented and determined, but as to those which could have been raised regarding all matters set forth in the accounting"). Courts have held that when one serves as both an executor and trustee and/or executor and/or beneficiary, as Anna Strasberg did here, that "warrants the conclusion that the doctrine of *res judicata* should apply, with, if anything, stronger force than usual." In re Hunter, 6 A.D.3d 117, 119 (2nd Dep't 2004); Meagher v. The Board of Trustees, 921 F. Supp. 161, 165 (S.D.N.Y. 1995) ("although different interests generally represented by a person suing individually and later as a representative, where a litigant is a **beneficiary of estate** he or she represented, his or her interests necessarily at stake, and *res judicata* applies") (citation omitted) (emphasis added).

By Order dated July 22, 1977, the California Superior Court issued an Order of Final Discharge to Mr. Frosch. SUF at ¶ 35, Ex. 30. By Order dated June 19, 2001 and July 26, 2001, the New York

Surrogate's Court issued Orders closing the Estate and discharging Anna Strasberg from liability in connection with her duties as Administratrix of the Monroe Estate.  SUF ¶ 36, Exs. 63-64.  In October 18, 2000, Anna Strasberg released the Estate of Aaron Frosch from any liability that it may have incurred in connection with Mr. Frosch's duties and responsibilities as Executor and Trustee of the estate of Marilyn Monroe.  SUF ¶ 62, Ex. 61.  Thus, according to well established precedent, if anyone was to challenge the judicially established fact that Marilyn Monroe died a New York domiciliary, the time to litigate that matter would have been before the New York and California Estates closed and before the respective probate courts released Ms. Strasberg and Mr. Frosch from liability, not decades later.  The issue of Ms. Monroe's domicile is absolutely closed.

### C.    The Estate's Representation To The New York Surrogate's Court That Ms. Monroe Died a New York Domiciliary Judicially Estop Defendants Here

On July 28th, 1989, Anna Strasberg, as Administratrix of the Monroe Estate, filed a Petition for Construction of Wills with the New York Surrogate's Court.  SUF ¶ 40, Ex. 35.  Ms. Strasberg requested that the court construe the Will of Marianne Kris "upon grounds that a construction is necessary to enable petitioner to determine the proper beneficiary of the residuary Estate of Marilyn Monroe."  Id. at MM 242.  In support of Ms. Strasberg's Petition, she stated in paragraph 3 that "[t]he decedent died on August 5, 1962, **domiciled** in the City and State of New York . . ."  Id. (emphasis added).  SUF, ¶ 41, 35, 004364.  The Anna Freud Centre (25% owner of MMLLC) answered and, *inter alia*, admitted that Ms. Monroe died a New York domicile.  SUF at ¶ 42, Ex. 36, MM 0007335.  Thus, both owners of MMLLC have represented that Ms. Monroe died a New York domiciliary before the New York Surrogate's Court.

The New York Surrogate's Court adopted the representations of Ms. Strasberg and the Anna Freud Centre because it applied only New York law to the construction of the Kris' Will.  SUF ¶ 43, Ex. 39, MM 0005583-5588.  The law in New York is longstanding and well settled:  the courts of New

21

York will look to the law of the State where a decedent was domiciled in order to interpret her Will.

E.P.T.L. Section 3-5.1, subd. (e) states:

> Interpretation of a testamentary disposition of personal property shall be made in accordance with the local law of the jurisdiction in which the testator was domiciled at the time the will was executed:

E.P.T.L. Section 3-5.1, subd. (e) (emphasis added).  The New York legislature enacted that provision of the E.P.T.L. in 1966, which remains unmodified through today.  The Court of Appeals frequently reiterated that black letter law by stating:

> If anything is settled, it is that the courts of New York will look to the law of the testator's domicile for the meaning and interpretation of language used by him in disposing of his personal property by will.

In re Morgan Guarantee Trust Co., 28 N.Y.2d 155, 162, 320 N.Y.S.2d 905, 909 (N.Y. 1971).  In fact, the same law was in effect both prior to the time when Ms. Monroe executed her will and the time she passed in 1962.  Matter of Fabbri, 2 N.Y.2d 236, 239, 159 N.Y.S.2d 184, 186 (N.Y. 1957).  Thus, based on the applicable law, the Surrogate's Court had to have accepted the representations of the Anna Freud Centre and Strasberg that Ms. Monroe died a New York domiciliary because it would have had no basis to apply New York law in the absence of that determination.  Defendants have previously argued that the foregoing law only shows that the court applied the law where Ms. Monroe was domiciled when she executed her will, not when she died.  But the law is settled:  if a person changes his domicile after executing his will, the validity of the will is determined by the law of the state of his domicile at death, not the domicile at the time of executing the will.  Rest. (First) Conflict of Laws, § 306 (1934); In re Will of Fox, 9 N.Y.2d 400, 404 (N.Y. 1961) ("The validity and effect of a will of movables is determined by the law of the state in which the deceased died domiciled"); see also In re Gifford's Will, 279 N.Y. 470, 474 (N.Y. 1939); Estate of Brace, 180 Cal. App. 2d at 799.

Finally, there is absolutely no question that the Estate received a benefit sufficient for the application of judicial estoppel because it convinced the Court to do exactly what Strasberg requested, namely construe the Kris Will so that the Estate could identify the proper beneficiaries.

22

## V.  MR. FROSCH'S FACTUAL REPRESENATIONS CONCERNING MS. MONROE'S NEW YORK DOMICILE TO THE CALIFORNIA INHERITANCE TAX APPRAISER JUDICIALLY ESTOP MMLLC HERE

In April 1964, the law firm that represented the Monroe Estate in the California probate

proceedings, Gang, Tyre, Rudin & Brown, contacted Mr. Frosch in New York and requested that he

provide an Inheritance Tax Affidavit and various supporting Affidavits Concerning Residence, which

the Estate needed to submit to the California tax authorities to avoid California inheritance tax.  SUF at

¶ 46, Ex. 10.  In particular, the Gang Tyre firm stated:

> It is important that you answer all of the questions, and in doing so build
> as strong a case as possible.  With respect to these two documents,
> commencing two years after death any tax due the State of California
> bears interest at 7%.  Furthermore, the executor is under the usual duty to
> complete the tax forms as quickly as possible, and in any event **it is
> impossible to dispose of the estate until the inheritance tax has been
> determined.  In addition, should the State of California reject the
> contention that Ms. Monroe was a non-resident of California, then,
> of course, there would be a serious tax situation.**  Therefore, I do not
> think we should delay unduly in getting this matter determined.

Id. at MMLLC (SHAW) 00466.  By letter dated March 4, 1966, Mr. Frosch filed an inheritance tax

affidavit with the California Inheritance Tax Appraiser in order to avoid paying California inheritance

taxes on the entire Estate.  SUF ¶ 47, Ex. 13, Ex. 16, 9297-98.  In support of that application, Mr.

Frosch filed an affidavit along with four other notarized affidavits from Ms. Monroe's close friends

and employees, all of whom testified, in detail, that (i) they knew based on personal knowledge that

Ms. Monroe considered her New York apartment to be her permanent residence and (ii) Ms. Monroe

told them that she was only temporarily in California while filming and that she intended to return to

her permanent residence in New York.  SUF at ¶ 47, Ex. 16, MM 9297-98, 9350-9364.

While MMLLC would undoubtedly have the Court focus on the mere title of the affidavits

which refer to "Residence," that approach favors form over substance to an absurd degree because all

23

the affiants attested to Ms. Monroe's <u>domicile</u>, not residence.[3]  For example, Mr. Frosch submitted to

the California Tax Appraiser a notarized affidavit by Ralph L. Roberts, dated January 31, 1966, who

swore that he was a close personal friend of Ms. Monroe since 1955 and spoke with her once a day on

average.  <u>Id.</u> at 9352.  Mr. Roberts testified that Ms. Monroe told him that she (i) "considered her trips

to California merely as visits for the purpose of appearing in various motion picture films;" (ii)

purchased her California house only for the temporary purpose of appearing in a movie because she

disliked living in hotels; (iii) "considered her New York apartment as her permanent home and

permanent residence" which she retained on a full time basis while temporarily filming in California.

<u>Id</u>. at MM 9352-9353 (emphasis added).  Mr. Roberts also testified:

> Shortly prior to her death during several conversations, decedent
> specifically told me that she intended vacating her California house and
> was going to return to her New York apartment which she considered to
> be her permanent home and residence and to reside permanently thereat.

<u>Id</u>. at MM 9353.

Mr. Frosch submitted to the California Tax Appraiser, a signed affidavit dated January 26,

1966, from Ms. Hattie Stephenson Amos, stating that she was Marilyn Monroe's personal housekeeper

for approximately four years prior to her death.  <u>Id.</u> at MM 0009354.  Ms. Stephenson testified that Ms.

Monroe instructed her that she would be **in California only temporarily while filming** and that Ms.

Monroe told her on several occasions "that she considered her said apartment in New York as her

permanent residence and told me that her said New York apartment was her **permanent hom**e."  <u>Id</u>. at

MM 9355. Ms. Stephenson also testified:

> I know for a fact that decedent intended returning to her permanent
> residence in New York.  Approximately two days prior to decedent's
> death, decedent requested that I proceed to her California house to stay
> with her for approximately one month and then that I return back to New
> York with decedent.  I was told that decedent intended to return to her
> permanent residence in New York City.

---

[3] Moreover, longstanding California case law equates residence to domicile for probate purposes.  <u>See</u>
e.g., <u>Smith v. Smith</u>, 45 Cal.2d at 239.

24

Id.

Mr. Frosch submitted a sworn affidavit, dated January 11, 1966, from May Reis.  Id. at 9356-57.  Ms. Reis stated that she was Ms. Monroe's private secretary from February 1958 to September 1961; that Ms. Monroe retained an entire interest in her New York apartment upon her divorce to Arthur Miller, that she considered the New York apartment to be her "permanent residence."  Id.

Mr. Frosch submitted a sworn affidavit, dated January 24, 1966, from Patricia Newcomb, Ms. Monroe's public relations counsel and close personal friend.  Id. at MM 9358-60.  Ms. Newcomb testified that Marilyn Monroe went to California only for purposes of filming, that she purchased a California home only because she disliked hotels, and that she always considered her New York apartment to be her "permanent residence."  Id. at 9359.  Ms. Newcomb also testified:

> While she was in California for the purpose of performing in the aforesaid film, she purchased a house in West Los Angeles, California. Decedent advised me at the time she purchased the said premises, that she acquired same solely for the reason that she disliked living in hotels, and that she desired and preferred the privacy of living in a private home, even though it was a temporary residence. **She specifically indicated to me that she had no intention of making her permanent residence in her said California house, but intended leaving California and returning to her New York residence upon completion of her assignment in said motion picture film.**

Id. at MM 0009359 (emphasis added).  Finally, Mr. Frosch himself stated that Ms. Monroe resided only "temporarily in Los Angeles" while filming and considered New York to be her "permanent residence."  Id. at MM 9350-51.

The California probate documents demonstrate that the affidavits Mr. Frosch submitted (attesting to Ms. Monroe's New York domicile) convinced the California tax authorities not to tax the Estate's intangible property. [4]  For example, the California Inheritance Tax Appraiser determined that

---

[4] According to Mr. Frosch's sworn Inheritance Tax Affidavit, dated June 28, 1965, Marilyn Monroe paid California non-resident income tax from 1958-1962.  Mr. Frosch also stated that "the only estate subject to inheritance tax is the net estate in California, being the amount of the inventory and appraisement in the California ancillary administration less deductions attributable thereto . . ." SUF ¶ 47, Ex. 13, p. MM 12408.

the California "ancillary" Estate was valued at $36,144.22 and it owed the State of California a grand total of $777.63 in inheritance taxes, which was based only on property located in California (excluding bank accounts), as opposed to the New York probate court, which also taxed intangible property such as bank accounts, stocks, life insurance policy, and royalty income.[5]  Id. at SUF ¶ 50, Ex. 17, Ex. 18, ¶ 52, Ex. 21, MM 1. The California Tax Appraiser deducted the value of Ms. Monroe's California bank accounts from the value of her California estate because bank accounts are intangible property that are taxed only in the domiciliary estate.  Estate of Baer, No. 1387 CA 07-014555, 2007 N.Y. App. Div. LEXIS 13008, * 5 (Dec. 21, 2007) (holding that "[t]he three bank accounts are intangible personal property, and the 'usual rule [with respect to such property] is that for administrative purposes they have their situs at the domicile of the owner'") (4th Dep't 2007).  If Ms. Monroe was a California domiciliary, then California would have taxed the intangible Estate property even if it was located outside California.  See  California v. Texas, 457 U.S. 164 (1982) (holding that as to California and Texas, "each State's authority to impose a death tax on the intangibles owned by a decedent depends on the decedent's having been a domiciliary of that State").

Mr. Frosch submitted the foregoing affidavits on behalf of the Estate so that it could avoid paying California inheritance taxes on the entire estate.  Mr. Frosch later characterized his efforts on behalf of the Estate as "successful" because it only had to pay taxes based on property located in California.  Id. at SUF ¶ 53, Ex. 26, SFA 0161-62, 191, Ex. 31, MM 4483.  In particular, when Mr. Frosch filed his First and Final Accounting of Ancillary Executor in California in May 1976, he stated:

> Petitioner caused to be filed the California Inheritance Tax Affidavit and filed Affidavit of Non-Residence and supporting affidavits of other individuals, and obtained a determination that decedent was a **non-residence of California at the time of her death for inheritance tax purposes.**  The California Inheritance tax for said estate has been

---

[5] In New York, both Aaron Frosch and a court appointed independent appraiser both included intangible assets in the gross value of the New York Estate.  As a result, the New York Surrogate's Court valued Ms. Monroe's New York gross Estate at  $836,524.81, with a total New York tax burden of $17,698.42.  SUF ¶ 52, Ex. 20, Ex. 21.

> determined and paid in full as shown by the Report and Receipt on file in
> the within proceedings.

Id. at MM, Ex. 26, SFA1 0161-62.  Later in the same document, as part of his effort to secure

extraordinary fees, Mr. Frosch characterized his efforts to have the California tax authorities declare

Ms. Monroe to be a non-resident of California instrumental in avoiding California taxes on decedent's

contract rights.  Id. at SFA1 0192.  Likewise, in August 1980 when Mr. Frosch filed the Estate's

Petition for Final Accounting before the Surrogate's Court County of New York, he stated:

> Petitioner was compelled to defend a proceeding commenced by the
> State of California which claimed decedent was a resident of the State of
> California at the time of her death.  Petitioner was successful in said
> proceeding.

Id. at Ex. 31, MM 0004483.

   The Court should judicially estop MMLLC from arguing that Ms. Monroe died anything but a

New York domiciliary because it has repeatedly argued that fact to the California Inheritance Tax

Appraiser, who clearly adopted that fact.  MMLLC obtained a clear benefit.  Simon v. Safelite Glass

Corp., 943 F. Supp.  261, 266 (E.D.N.Y. 1996) ("the truth is no less important to an administrative

body acting in a quasi-judicial capacity than it is to a court of law"), aff'd, 128 F.3d 68 (2d Cir. 1997).

## VI.   ANNA STRASBERG'S AND AARON FROSCH'S JUDICIAL REPRESENTATIONS ARE BINDING ON MMLLC

   For MMLLC to say (as it has in prior briefing) that Ms. Strasberg is not in privity with

MMLLC for purposes of estoppel is truly absurd.  The New York Court of Appeals has defined privity

to include "successors to a property interest, those who control an action although not formal parties to

it, those whose interests are represented by a party to the action, and possibly co-parties to a prior

litigation."  Watts v. Swiss Bank Corp., 27 N.Y.2d 270,  277 (N.Y. 1970); Hallinan v. Republic Bank

& Trust Co., No. 06 Civ. 185 (HB), 2007 U.S. Dist. LEXIS 65821, *46 (S.D.N.Y. Sept. 7, 2007)

(same); Mobay Chemical Co. v. Hudson Foam Plastics, Corp., 277 F. Supp. 413, 416-17 (S.D.N.Y.

1967) ("privity between persons denotes the relationship arising out of mutual rights or successive

rights in the same property or interest, as, for example, successors to a particular office, or assignee and assignor, or executor and testator") (citing <u>Acheson v. Albert</u>, 195 F.2d 573 (1952); 72 C.J.S Privity; Privies; Privy, pp. 954-962 (1951)).

      **A.**    **Anna Strasberg's and Aaron Frosch's Judicial Representations Are Binding On MMLLC Because They Made Those Statements In Their Capacity As Executor, Trustee, and Administratrix Of The Very Assets MMLLC Purports To Assert In This Litigation**

MMLLC is itself the creation of Anna Strasberg; a company she formed at the close of Monroe Estate proceedings to hold the Estate's assets and intellectual property.  SUF ¶54, Ex. 59.  Documents show she created MMLLC solely to protect herself from personal liability from claims against the Estate. <u>Id.</u> at MM 0003743.  As fiduciary representatives of the Monroe Estate, Anna Strasberg (Administratrix) and Aaron Frosch (Executor and Trustee) spoke for the Estate, not themselves.   They had fiduciary obligations to maximize the value of the Estate's assets and any representation they made and any actions they took were presumptively with that in mind.  <u>United States v. Pyne</u>, 313 U.S. 127, 132, 561 S.Ct. 893, 85 L. Ed. 1231 (1941) (stating that the traditional duty of an executor is to conserve the estate and protect its income).  Because Ms. Strasberg was also a 75% beneficiary of the Monroe Estate, she had overlapping and co-extensive fiduciary obligations and economic incentives to maximize the value of the Estate's assets.  <u>Janis v. Comm'r of Internal Revenue</u>, 461 F.3d 1080, 1085-86 (9th Cir. 2006).

  MMLLC cannot now divorce itself of the Estate's representations concerning domicile, especially since that issue was so crucial to the proceedings.  Because Anna Strasberg and Aaron Frosch made the statements at issue in their capacity as conservators of the very assets at issue in this litigation, it would lead to an absurd result to say that the very assets they were sworn to protect are insulated from representations they made concerning those assets.   That is particularly true because Anna Strasberg was not only a fiduciary, but was also a 75% beneficiary.

**B.     Ms. Strasberg's Judicial Representations Are Binding On MMLLC Because MMLLC Is Merely A Successor to Ms. Strasberg's And The Anna Freud Centre's Property Interest**

Privity includes: "those who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and possibly coparties to a prior action." Pharr v. Evergreen Garden, Inc., No. 04-2006-cv, 2005 U.S. App. LEXIS 1391 (2d Cir. Jan. 25. 2005) (citing Watts v. Swiss Bank Corp., 27 N.Y.2d 270, 277 (N.Y. 1970)). The Second Circuit has held that two parties are in privity if one is a successor to the property interest of the other. Id. at *10.   For example, in the Pharr case, the plaintiffs, present and former tenants of an apartment building, sued the defendants, owner and its managing agent, challenging a 1998 rent increase. Id. at *8. The district court dismissed the plaintiffs' RICO claim as barred by the statute of limitations. On appeal, some of the plaintiffs argued that they were not all tenants at the time of the prior state action, but the Second Circuit held that there was sufficient privity between them because "they were nevertheless successors to the property interest of tenants who were parties to those actions." Id. at *9; Restatement (Second) of Judgments §§ 43-44.

MMLLC is in privity with both the Estate and Ms. Strasberg because MMLLC is a successor to all the Estate's property, which it obtained from Anna Strasberg and the Anna Freud Centre. Bernhard v. Bank of America National Trust & Savings, Assoc., 19 Cal. 2d 807, 811 (Cal. 1942) (holding that a "privy is one who, after rendition of the judgment, has acquired inheritance, succession, or purchase by the order of the probate court settling the account"). In fact, the precise property Ms. Strasberg served to protect and maximize (as Administratrix and 75% owner) she later purportedly placed into Defendant MMLLC, a company she owns and controls. Moreover, an assignee of intellectual property can never obtain greater rights than an assignee had, which means that MMLLC could only have taken the intellectual property that the Estate and Anna Strasberg gave it, as limited by her repeated representations that Ms. Monroe died a New York domiciliary. Cf. General Obligations Law, § 13-105. For MMLLC to argue that it is not bound by Anna Strasberg's representations as Administratrix

29

and beneficiary of the Monroe Estate is utterly baseless, especially since MMLLC is the creation of Anna Strasberg, which she solely designed to insulate her from personal liability.

    **C.    Mr. Frosch's Jurisdictional Statements Concerning Ms. Monroe's New York Domicile Are Binding Upon Estate Beneficiaries Anna Strasberg and the Anna Freud Centre Because They Had Notice And Failed To Object**

Well-established principles of probate law hold that statements made and actions undertaken by Aaron Frosch, as Executor and Trustee, are binding on those beneficiaries with notice, i.e. Anna Strasberg and the Anna Freud Centre. Bernhard, 19 Cal. 2d at 811 (Cal. 1942) (holding that a "privy is one who, after rendition of the judgment, has acquired inheritance, succession, or purchase" by the order of the probate court settling the account); (citing Prob. Code, sec. 931 [formerly Code Civ. Proc., sec. 1637]); Goldberg, 217 Cal. App.3d at 1266 (holding that failure to raise objections to the administration of an estate prior to by the time of the final accounting "results in loss of power later to do so."); Pray v. Hegeman, 98 N.Y. at 358. In re Slade's Estate, 154 Misc. at 277. Because all of the Estate beneficiaries had notice and even actively participated in the proceedings, they cannot now litigate an issue they formerly chose not to contest.

    **D.    As Estate Administratrix, Anna Strasberg Not Only Failed to Object To Mr. Frosch's Representations Concerning Ms. Monroe's New York Domicile, She Specifically Ratified, and Repeated Those Representations, Thereby Making Them Her Own And Binding Upon The Estate's Beneficiaries**

In 1989, Anna Strasberg succeeded in Mr. Frosch's duties as Executor of the Monroe Estate. SUF ¶ 38, Ex. 33, SUF ¶ 39, Ex. 34. Anna Strasberg adopted and ratified Mr. Frosch's representation that Ms. Monroe died a New York domicile by, not only letting those statements stand, but by repeating that Ms. Monroe died a New York domiciliary before the New York Surrogate's court in 1989 and a Hawaii federal judge in 1991. In all the surrogate proceedings and litigations that took place, never once did the Estate (via Mr. Frosch and Ms. Strasberg) ever once argue that Ms. Monroe died a California domiciliary or even a California resident, as they do now.

### E. The Doctrine of Virtual Representation Binds MMLLC To Ms. Strasberg's and Mr. Frosch's Representations Because Those Parties Represented MMLLC's Interests In the Prior Proceedings

Even in the absence of technical privity, MMLLC is bound by the Estate's representations by the doctrine of virtual representation. The doctrine holds that a non-party is bound if a party that had the same interests litigated the prior case, even though the nonparty was neither a participant nor in privity with that party in a prior proceeding. Chase Manhattan Bank v. Celotex Corp., 56 F.3d 343, 345 (2d Cir. 1995). In the Chase Manhattan case, the Second Circuit stated that the virtual representation doctrine can be used against a litigant "if one of the parties to the [prior] suit is so closely aligned with his interest as to be his virtual representative." Id. at 345. The doctrine is applied when the relitigation of any issues is precluded by a person sharing a substantial identity of interests with a nonparty. Zimmerman v. Harris, Inc., No. 94 Civ. 0438 (RLE), 1997 U.S. Dist LEXIS 6861, *10 (S.D.N.Y. May 14, 1997). A "substantial identity of interests" between parties may be deduced if there is evidence of an agreement between parties, or some kind of official relationship between the parties (e.g., a **trustee of an estate, executor, administrator, guardian**). Algie v. RCA Global Communications, Inc., 891 F. Supp. 839, 853 (S.D.N.Y. 1994), aff'd, 60 F.3d 956 (2d Cir. 1995). See Restatement (Second) of Judgments, § 41(1) (virtual representation applies when the non-party is represented by a party who is (i) **the trustee of an estate**; (ii) invested with authority to represent him; (iii) **executor, administrator or similar fiduciary**; (iv) an official or agency invested by law with authority to represent the person's interest; or (v) a class representative). The doctrine of virtual representation thus constitutes an exception to the basic rule that non-parties to an action are not bound by the outcome of that action.

As Administratrix and Executor respectively, Anna Strasberg and Aaron Frosch acted to maximize the Estate's intellectual and other property, which is the same interest that MMLLC currently has. Because Anna Strasberg was also the 75% Estate beneficiary and majority MMLLC owner, she had every reason to ensure that her actions as Administratrix benefited herself as well as the Anna Freud Centre. So did Aaron Frosch, whose fiduciary obligation was to act in the interest of the

Estate and its beneficiaries and who had every interest in avoiding personal liability for any false or misleading representations. The doctrine of virtual representation was designed for cases like the present.  Had MMLLC itself appeared in the prior proceedings (and it did by its owners), it would not have done anything differently, i.e. assert that Marilyn Monroe died a California domiciliary, and that is because everyone knew at the time that there was no postmortem right of publicity in Marilyn in New York or California.  Moreover, as officers of the courts, Strasberg and Frosch had obligations to tell the truth.

**VII.    SUMMARY JUDGMENT IS PROPER FOR THE ADDITIONAL REASONS THAT ALL THE DEFENDANTS, THEIR AGENTS AND LAWYERS, AND MARILYN MONROE HERSELF HAS PREVIOUSLY ASSERTED THAT MARILYN DIED A NEW YORK DOMICILIARY**

**A.  Defendant CMG's Mark Roesler Told Anna Strasberg That Marilyn Monroe Died A New York Domiciliary And He Confirmed At His Deposition that This Representation Was True And Accurate**

On May 2, 1995, CMG's Mark Roesler sent a business proposal to Anna Strasberg for the purpose of obtaining MMLLC's licensing business. SUF ¶ 56, Ex. 57.   He did so in his capacity as head of Curtis Management Group, which was later merged into Defendant CMG.  Id. at ¶ 56, Ex. 66, p. 12.  In that document, Mr. Roesler stated that Ms. Monroe[6] died a New York domiciliary and that New York "does not recognize a deceased's rights."  Id. at Ex. 57, MM 13315. Mr. Roesler admitted during his deposition that he wrote the document, that he would have made sure all his statements contained therein were true and accurate (Id. at Ex. 66, p. 234), and that he made the statement to Anna Strasberg that Ms. Monroe died a New York domiciliary.  Id. at 239-40.  Anna Strasberg testified that (i) she considered Mr. Roesler to be truthful to her and that his factual statements to her concerning Marilyn Monroe were accurate (SUF ¶ 58, Ex. 67, at 198-200); that she had no reason to believe that she did not receive the letter (Id. at 209).

_____

[6] The quote in question did not specifically identify Marilyn Monroe, but he later testified during his deposition that he was referring to Marilyn Monroe.  Roesler Dep., at 239.

**B. Anna Strasberg's Lawyer Irving Seidman, Licensing Agent Roger Richman, and Numerous Parties Whom Defendants Have Threatened To Sue In the Past Have All Represented That Marilyn Monroe Died A New York Domiciliary**

What is particularly disturbing is that MMLLC and its owners have always known that they had no right of publicity in Marilyn Monroe because Marilyn Monroe died a New York domiciliary. By letter dated February 27, 1990, licensing agent Roger Richman wrote a letter to Anna Strasberg's lawyer, Irving Seidman. SUF ¶ 56, Ex. 38.   Mr. Richman stated the following:

> I have earned the Estate of Marilyn Monroe almost $5,000,000 in close to eight years.  I am known as the 'father' of the California Celebrity rights law, which has contributed to much of this money.  Now, the recent babe Ruth court decision in New York says that no New York estate has any right of publicity claims.  You have stated that Marilyn Monroe was a **New York domiciliary** at the time of her death.  **Papers in her probate file, prepared by others, substantiate this.**  I wrote the New York celebrity rights law only to protect Marilyn Monroe because several lawyers reviewed her probate file and alleged that her domicile upon date of death was likely New York.  Should any licensee assert this, there may be no future licensing revenue from Marilyn Monroe.[7]

Id. at MM 44376.  Mr. Richman copied Anna Strasberg on this letter.  Id.  When the Shaw Family asked Ms. Strasberg at her deposition whether she knew that Irving Seidman stated that Ms. Monroe died a New York domiciliary, Ms. Strasberg merely stated "If he did that, then that's what he did, and he's the lawyer.  You have to trust somebody." SUF ¶ 59, Ex. 67, p. 196.  Ms. Strasberg testified that Irving Seidman handled her surrogate court proceedings when she was Administratrix, that she considered him to be honest, competent, and that she was unaware of any mistakes he may have made. Id. at 51-53, 156, 158, 166, 171, 180, 196

By letter dated March 28, 1996, the law firm Kenyon & Kenyon (on behalf of its client Renaissance Roads Production) sent a letter to CMG, in which it firmly rejected CMG's and MMLLC's assertion that there was a right of publicity in Marilyn Monroe.  Id. at ¶ 61, Ex. 58, MM

---

[7] Mr. Richman's letter strongly indicates that Anna Strasberg always knew, by advice of longtime and trusted counsel Irving Seidman, that it had no basis to assert a right of publicity in Marilyn Monroe. Nevertheless, it demanded (often by threat of lawsuit) many tens of millions it knew it had no right to demand.  That was the partial basis for many of the Shaw Family's additional causes of action.

3905-09.  One of the many arguments Kenyon & Kenyon asserted is that because Marilyn Monroe

died a New York domiciliary, MMLLC and CMG had no post-mortem right of publicity to assert.  Id.

at 3905-06.  Consistent with the Defendants' understanding that Ms. Monroe died a New York

domiciliary, and that they had no right of publicity in Marilyn Monroe, CMG and MMLLC took no

further action against Renaissance Road Productions.[8]

### C.  Marilyn Monroe Discussed Her Intent To Retire To Brooklyn On A Radio Program

On June 12, 1955, David Garroway interviewed Marilyn Monroe on a radio program called the

NBC Monitor.   Declaration of Dennis Hart,  ¶¶ 3-6.   In that interview,  the  following  colloquy

transpired:

> David Garroway:  I bet a lot of guys are scared of you, though, because you're such an
> institution now. Really, you are.  You're kind of a national possession.  Do you feel that you
> belong to the nation as a whole.
>
> Marilyn Monroe:  I live here.
>
> David Garroway:  I hear you're moving to New York City to live.
>
> Marilyn Monroe:  Yes,  This will be my home for now on.  That is, until I retire.  And when I
> retire I'm going to retire to Brooklyn.

SUF ¶ 62, Ex. 65, p. 208.   When the Shaw Family played for Mr. Strasberg during his 30(b)(6)

deposition a tape of the foregoing interview, he testified that the voice on the tape "sounds like Marilyn

Monroe."  Id.

Judicial estoppel, collateral estoppel, and *res judicata* are appropriate as a matter of law, as is

summary judgment on Count 9 of the Shaw Family's Second Amended Complaint.  The equities

particularly favor the Shaw Family because all the Defendants in this action, as well as their

representatives, agents, and lawyers have all stated at one time or another that Marilyn Monroe died a

New York domiciliary.  After forty-five years, their contrary representation to this Court is regrettable

---

[8] CMG's and MMLLC's predatory practice includes asserting rights against small entities like the
Shaw Family and the California Defendants who are represented by small firms and solo practitioners.
In stark contrast, it took no action against Renaissance Roads Productions, who was represented by
Kenyon & Kenyon.

and has cost the Shaw Family considerable resources and the Court an unnecessary expenditure of time.

## **CONCLUSION**

For all the foregoing reasons, the Shaw Family respectfully requests that the Court hold that Defendants are estopped from arguing that Ms. Monroe died anything but a New York domiciliary; confirm that Ms. Monroe had no right of publicity to pass to her heirs and beneficiaries (including MMLLC); and grant the Shaw Family's summary judgment motion on Count 9 of its Second Amended Complaint.  This is the only equitable and legally supportable decision under the facts of this case.

Dated:  New York, New York
       February 14, 2008

                      Respectfully Submitted,

                      LAW OFFICES OF CHRISTOPHER SERBAGI

                  By:_/s/_____
                      Christopher Serbagi, Esq.
                      David Marcus, Esq.
                      488 Madison Avenue, Suite 1120
                      New York, New York  10022
                      Tele: (212) 593-2112
                      Fax:  (212) 308-8582

                      Attorneys for Shaw Family Archives, Bradford Licensing, Inc., Edith Marcus and Meta Stevens