1  Estate of Marilyn Monroe:    LASC No. 458,935
2
3      A. **EXTRAORDINARY SERVICES OF ANCILLARY EXECUTOR**
4
5          The ancillary executor advised and consulted with
6  respect to all the matters set forth in the statement regard-
7  ing extraordinary attorneys' fees set forth in this
8  connection, further, said attorneys consulted with the
9  ancillary executor with respect to all decisions throughout
10 the entire period of almost fourteen years that this estate
11 has been in the process of administration. The ancillary
12 executor made four trips to California during said period of
13 time to supervise the handling of decedent's affairs in this
14 state.
15
16          Without limiting the generality of the foregoing,
17 the ancillary executor's extraordinary services with respect
18 to ancillary administration specifically included: (1) advice,
19 consultation and decision-making with respect to the sale of
20 the real and personal property, as set forth above in the Petition
21 to which this exhibit is attached; (2) assistance in determina-
22 tion of all matters relative to the California Inheritance Tax
23 Affidavit, including location of witnesses and procuring
24 their affidavits as to decedent's intention with regard to her
25 residence in California; and (3) consultation, review, fact-
26 finding and decision-making with respect to the claims and
27 litigation in respect of the California fiduciary income tax

EXHIBIT III
(2)

SFA10184

1  Estate of Marilyn Monroe:         LASC No. 458,935

3  liability of the estate more particularly described in
4  Section C of this Exhibit III.
5      Petitioner estimates that his said extraordinary
6  services, over the period of almost fourteen years, r...
7  more than one hundred forty (140) hours.

EXHIBIT III
(3)

SFA1 0785



1  Estate of Marilyn Monroe:        LASC No. 458,935

3       C.   EXTRAORDINARY SERVICES OF GANG, TYRE &
4            BROWN, ATTORNEYS FOR ANCILLARY EXECUTOR

6       1.   Extraordinary Services in Connection with
7            the preservation of assets:

8       Upon the death of decedent, petitioner's attorneys
9  immediately examined decedent's property; cooperated in
10 supplying information in connection with the coroner's inquest;
11 handled conferences with the press and media with reference
12 to the decedent and her affairs; negotiated and supervised
13 the disposition of decedent's pet dog; arranged for continuing
14 housekeeping services during the period immediately following
15 decedent's death and for secretarial services to be rendered
16 replying to the thousands of letters (literally) received fol-
17 lowing decedent's death; arranged to have private detectives
18 guard decedent's home day and night; arranged for the bank
19 which held the encumbrance on the property to advance funds
20 and take no steps to declare a default until such time as
21 moneys could be provided through a sale of the property; and
22 arranged for the Special Administratrix to be appointed so
23 that any loss or waste to the estate could be minimized.
24      Petitioner's attorneys allege that they expended
25 more than 25 hours in connection with the above services, all
26 of which were of an emergency nature.
27 ...
28 ...

EXHIBIT III
(18)

SFA1 0786

Estate of Marilyn Monroe: LASC No. 453,935

2. **Sale of Real Property:**

After the appointment of the ancillary executor, petitioner's said attorneys supervised the sale of the home and some of the personal property which involved the preparation and publication of a notice of Real and Personal Property As a Unit for Private Sale; preparation of a bid form with respect to the property, copies of which were circulated among a number of real estate brokerage houses; conferences with Mrs. Melson, who was instructed in showing the premises to prospective purchasers; negotiations with the ultimate bidder to obtain the best possible purchase price; preparation of Return of Sale of Real and Personal Property as a Unit; attendance at the court hearing thereon; preparation of the Order Confirming Sale and the Executor's Deed, and following through with respect to all of the details of the escrow until the transaction was finally complete.

Petitioner's attorneys estimate that they expended not less than twenty (20) hours in connection with the foregoing.

3. **Disposition of furniture and furnishings**

Since there were no special provisions made for the furniture and furnishings of the decedent and since it was believed that many of them would have a substantial value, either intrinsically or because of association with the decedent, it was necessary to specifically inventory and

...

...

EXHIBIT III
(19)

SFA1 0187

1  Estate of Marilyn Monroe:     LASC No. 458,033

2

3  arrange for storage of all of the items involved. However,
4  before the furniture and furnishings were
5  chaser of the real property requested
6  buying certain of the items that were
7  for use in the house. Petitioner's attorneys,
8  met with the buyer, so that the latter could designate which
9  items he desired. Thereafter, petitioner's attorneys had
10 these items separately appraised so that they
11 at not less than the appraised value, and prepared the
12 Return of Sale of Personal Property and the Order based
13 thereon, and drew the necessary documents to complete the
14 transaction. Said attorneys then arranged with the Special
15 Administratrix so that prior to delivery of possession of the
16 house to the buyer, all the remaining items of furniture and
17 furnishings could be boxed and stored with a warehouse.
18        Petitioner's said attorneys estimate that they
19 expended ten (10) hours in connection with the foregoing ser-
20 vices.
21    4.  **Extraordinary Services Re Creditors' Claims:**
22        Following decedent's death, there were thirty-five
23 creditors' claims filed against the estate in California.
24 While petitioner's attorneys recognize that the processing
25 of creditors' claims is part of the normal duties of admin-
26 istration, for which statutory fees are allowed, said
27  ...
28

EXHIBIT III
(20)

SFAI 0188

1  Estate of Marilyn Monroe:        LASC No. 458,935

3  attorneys point out that, in this estate, a portion of the
4  services were extraordinary in that there was no one alive to
5  a position to advise as to the accuracy of
6  or the extent of decedent's outstanding claims. In
7  consequence, said attorneys had to make investiga-
8  tions with respect to said claims, which involved, among
9  other things, separate meetings with many of the claimants
10  to examine into the nature of the claim.
11       Furthermore, in connection with the claim of Mrs.
12  Bright, the interior decorator, it was necessary to analyze
13  a large number of items to determine whether there was a
14  firm commitment or merely a proposed estimate which could
15  be canceled. In this connection, petitioner's attorneys
16  arranged to cancel an order for a rug from Mexico, which had
17  been ordered and woven to size in Mexico and was at that time
18  being held for delivery. In addition, there were demands
19  from the Los Angeles Bureau of Customs regarding a carton
20  containing a specifically constructed chest, which the Bureau
21  of Customs was holding for transportation and storage charges.
22  Upon investigation, it appeared that the decedent had paid
23  $360.00 for the chest and that the total charges to redeem
24  amounted to approximately $300.00. After several consulta-
25  tions with the interior decorator, petitioner's attorneys
26  recommended to the ancillary executor that the chest not be
27  ...
28  ...

EXHIBIT III

(21)

SFA1 0789

1  <u>Estate of Marilyn Monroe:</u>    LASC No. 458,935

3  redeemed but that the Bureau of Customs be allowed to sell

4  it for the charges.

5         In connection with the creditor's claim

6  Artists, Ltd., said attorneys were required

7  extensive agency contracts in order to advise the

8  executor as to the basis for the claim and its propriety.

9  Subsequently, when the time came to pay the claims, said

10 attorneys suggested to the ancillary executor the arrangement

11 whereby the creditor's claim of MCA Artists, Ltd.

12 paid out of the domiciliary probate estate in New York, so

13 that the claim, including the contingent portion thereof,

14 could be released in California, the ancillary administration

15 be released in California and the administration

16 Said attorneys, further, handled the negotiations with

17 thereto, insofar as the California representatives of the

18 claimant were involved.

19        Petitioner's said attorneys estimate that their services

20 in connection with the handling of those aspects of the

21 creditors' claims set forth above, over and apart from the

22 normal services of handling creditors' claims, involved ap-

23 proximately twenty-five (25) hours of time.

24 ...

25 ...

26 ...

27 ...

28 ...

EXHIBIT III
(22)

SFA10190

1  Estate of Marilyn Monroe:    LASC No. 458,935

2

3      9.  **Extraordinary Services Re Tax Matters:**

4          (a) Although decedent's domiciliary probate is

5          handled in New York, decedent was

6  in California and owned real property here at the time

7  of her death. Petitioner's attorneys rendered

8  services in connection with the preparation of the

9  California Inheritance Tax Affidavit and Affidavit

10 Concerning Residence, together with supporting affi-

11 davits, in order to establish that decedent was a

12 nonresident of California at the time of her death,

13 and in order to assemble and segregate correctly

14 those items of receipts and expenses attributable

15 to California for assessment. Petitioner's attorneys

16 corresponded with and interviewed several persons

17 with respect to decedent's nonresident status, sug-

18 gested to the ancillary executor the types of evidence

19 to be secured to substantiate this position and

20 prepared various affidavits which were submitted in

21 support of such position. Said attorneys engaged in

22 correspondence with the California State Controller's

23 office, explaining in detail their factual and legal

24 position and ultimately were successful in obtaining

25 a determination that decedent was not a resident of

26 California at the time of her death. As a result of

EXHIBIT III

(23)

SFA1 0191

Estate of Marilyn Monroe: LASC No. 458,935

such determination, none of decedent's contract rights were included in measuring such tax in California.

Petitioner's attorneys assembled the information with respect to the California assets and obligations of decedent for the ... Federal Estate Tax Return and in connection with a Notice of Levy from the U. S. Treasury Department, Internal Revenue Service, for federal estate taxes in the sum of approximately $135,000.00 which was served on said attorneys, and worked with the domiciliary executor in ultimately obtaining the necessary evidence of payment and the formal Release of Levy.

Said attorneys allege that they expended more than twenty (20) hours in connection with the foregoing complicated tax matters.

(b) Upon decedent's death, her estate became entitled to a percentage of the receipts from various motion pictures, including "Some Like It Hot" and "The Misfits", on a continuing basis. The moneys involved were paid to the domiciliary executor in New York and income tax returns reporting such receipts were filed, and taxes paid thereon, in New York.

In 1971, when the ancillary executor herein prepared to file his Petition for Final Distribution,

EXHIBIT III
(24)

SEA1 0192

Estate of Marilyn Monroe:   LASC No. 458,935

he sought an Income Tax Certificate from the Franchise Tax Board in accordance with the then applicable requirements of law. The Franchise Tax Board responded with a claim that petitioner owed the State of California fiduciary income taxes for the years 1963 through 1970, based upon the estate's share of gross receipts from the above entitled pictures attributable to decedent's services rendered in California.

In accordance with instructions furnished by petitioner's attorneys herein, the accountants for the estate prepared appropriate fiduciary income tax returns for the years in question and submitted them to the Franchise Tax Board under protest. Extensive negotiations and discussions were then carried on between said attorneys and representatives of the Franchise Tax Board with respect to the legal position of the estate that such income was not subject to tax. After considering the legal arguments asserted by the attorneys herein, the Franchise Tax Board served notice of proposed assessments of tax against the ancillary executor for the years 1963 through 1970. Petitioner, through his attorneys, appealed from such assessments.

EXHIBIT III

(25)

SFA1 0193

1  Estate of Marilyn Monroe:  LASC No. 458,935

2

3           The point in issue in the proceeding is a

4  completely novel point of law; namely, what under

5  California Revenue and Taxation Code and regulations

6  thereunder permitted the taxation of the

7  source income of receipts from contracts which had

8  been valued for tax purposes as assets of decedent's

9  domiciliary estate and were passively received by

10  such domiciliary estate outside of California. The

11  question involved matters of constitutional law,

12  statutory construction and the interpretation of

13  the Franchise Tax Board's own rulings.

14           Extensive research was carried on by said

15  attorneys, both with respect to the facts and the

16  law; an opening brief and a reply brief were filed

17  in support of the estate's position.  The matter

18  came on for hearing before the Board of Equaliza-

19  tion and was orally argued at length before the full

20  Board in December, 1973.

21           In 1975, the Board of Equalization ultimately

22  affirmed the Franchise Tax Board's determination of

23  tax.  The taxes, penalties and interest involved

24  totaled approximately $93,000.  Before determining

25  whether or not to appeal further, said attorneys

26  discussed with the Franchise Tax Board, and subse-

27  quently with the California Attorney General's office,

28  ...

EXHIBIT III
(26)

SFA1 0194

1  Estate of Marilyn Monroe:    LASC No. 458,935
2
3         the possibility of settlement.  Negotiations were
4         conducted on the basis that this was a matter of
5         first impression, that there were substantial
6         issues of law which the courts would have to
7         upon, and that it was advantageous both to
8         State and to the estate to dispose of the matter
9         as promptly as possible on a reduced basis.
10        Ultimately, after said attorneys, with the approval
11        of petitioner, had prepared and submitted various
12        proposals, the State of California agreed to a
13        settlement which waived all penalties and accepted
14        the sum of approximately $52,000, as payment in
15        full.  The domiciliary estate supplied a substan-
16        tial portion of the funds necessary to make this
17        settlement possible.  Said attorneys reviewed and
18        approved the settlement documents prepared.  Said
19        attorneys then prepared a Petition for Order
20        
21        tended a hearing thereon, and after approval by
22        the Court, prepared the Order of Approving Compro-
23        mise.  Payment has been effected and the action
24        has been dismissed.
25            In the preparation of the briefs, negotiations,
26        hearing, argument and settlement procedures, said
27        attorneys have expended in excess of one hundred
28        (100) hours.

EXHIBIT III
(27)

SFA10185