# EXHIBIT
# 48

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF HAWAII

3

4   NANCY MIRACLE,             ) CIVIL NO. 92-00605ACK

5            Plaintiff,   )

6     vs.                    )

7   ANNA STRASBERG, etc.,    )

8            Defendant.   )

9   ————————————————————)

10                TRANSCRIPT OF PROCEEDINGS

11       The above-entitled matter came on for hearing on

12  Monday, December 14, 1992, at 10:38 a.m., at Honolulu, Hawaii,

13  BEFORE:         HONORABLE ALAN C. KAY
                 Chief United States District Judge
14              District of Hawaii

15  REPORTED BY:    STEPHEN B. PLATT, CSR, RPR, CM
                 Official U.S. District Court Reporter
16              District of Hawaii

17  APPEARANCES:    JOHNAARON MURPHY JONES, ESQ.
                 Attorney At Law
18              1170 N. King Street
                 Honolulu, Hawaii 96817
19

20                    Attorney for the Plaintiff

21             MILTON M. YASUNAGA, ESQ.
                 CATHY CAREY, ESQ.
22              Cades Schutte Fleming & Wright
                 P.O. Box 939
23              Honolulu, Hawaii  96808

24                    Attorneys for the Defendant

25

CIVIL NO. 92-00605ACK

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 2 4 1993

at ___ o'clock and ___ min. ___ M.
WALTER A.Y.H. CHINN, CLERK

SEA1 0047

1  MONDAY, DECEMBER 14, 1992                    10:38 A.M.

2                           -ooOoo-

3          THE CLERK:  Civil 92-605, Nancy Miracle and others

4  versus Anna Strasberg.  This hearing is called on a motion to

5  dismiss.

6          MR. YASUNAGA:  Good morning, Your Honor.

7          Milton Yasunaga for the defendant, Anna Strasberg,

8  also with Cathy Carey, movants today.

9          THE COURT:  Good morning.

10         MR. JONES:  Good morning, Your Honor.

11         Johnaaron Murphy Jones on behalf of Nancy Miracle,

12  also known as Nancy Maniscalco Greene, who is present in the

13  courtroom.

14         THE COURT:  Good morning.

15         MS. MIRACLE:  Good morning.

16         THE COURT:  The court has read the memorandums of the

17  parties, and is ready to rule, unless the parties wish to

18  argue further.

19         MR. YASUNAGA:  Your Honor, I think we have covered it

20  in our memos.  We did point out one case that we found later,

21  "Green versus American Broadcasting," which points out that

22  even if certain documents convert the motion into a Rule 56,

23  there should not be any discovery allowed where it's a matter

24  within the other party's control and knowledge, as is the case

25  here, with the testimony that Ms. Green knew of the claim

JFAI 0048

1    since January of 1985, and possibly earlier.

2         MR. JONES:  If it please the court, we would like to

3    basically take ten minutes to sum up what we feel are the

4    germane issues involved in this particular matter.

5         THE COURT:  Very well.

6         MR. JONES:  First, Your Honor, we would like to

7    supplement our brief with an exhibit, Plaintiff's Exhibit

8    Number 15 -- uh, Number F (tendering documents to counsel and

9    the clerk) -- which is basically a copy of Hawaii Revised

10   Statute dealing with the issue of jurisdiction under the

11   long-arm statutes of the State of Hawaii.  The long-arm

12   statutes of the State of Hawaii provide for jurisdiction of

13   this court in any matter involving the transaction of business

14   within the state, or the commission of any tortious act within

15   the State of Hawaii.

16        The plaintiffs have contended all along that the

17   pretermitted heir statutes -- that under the pretermitted heir

18   statutes of California, that the defendants have been doing

19   business in the State of Hawaii.  We contended that this

20   business that they were and are doing presently, that the

21   millions of dollars that they are making through merchandising

22   agreements is, in effect, doing business in the State of

23   Hawaii.

24        Plaintiffs further contend that the statute under

25   number two, the commission of a tort, or tortious act, within

SFAZ 0049

1    the State of Hawaii, refers to the conduct of the defendants

2    in defrauding the plaintiff.  For the past six years the

3    plaintiff has been a resident, and domiciled in the City and

4    County of Honolulu.  For the past six years the defendants

5    have defrauded her, and failed to disclose to her that they

6    knew, back in 1962, at the death of Marilyn Monroe, that

7    Marilyn Monroe did, in fact, have a daughter.

8              THE COURT:  They knew what in '62?

9              MR. JONES:  In 1962, Your Honor, the defendants knew

10    that -- the defendant was, at that time, Your Honor,

11    Lee Strasberg.  Lee Strasberg, Your Honor, was the tutor, the

12    acting instructor for Marilyn Monroe, and her daughter, in

13    New York.

14              While the plaintiff was seven, eight, nine and ten

15    years old -- that's where she first met Lee Strasberg -- her

16    mother, Marilyn Monroe, would take the plaintiff and, two or

17    three times a week, as her affidavit states, they would go to

18    acting classes taught by Lee Strasberg.  Lee Strasberg was a

19    trusted member of the family.  They would go out to the

20    grandmother's house and have dinner on the weekends.  Marilyn

21    Monroe, a/k/a, Nancy Cusumano, and the plaintiff, her

22    daughter -- that's how Lee Strasberg gets into this particular

23    case.

24              THE COURT:  Well, in your amended complaint, at

25    Page 4, you say, as the direct and proximate result of the

SFAL 0050

1    defendant's intentional acts in inflicting said emotional

2    distress, and fraudulent conduct, the plaintiff did not

3    discover said fraud until 1992, and suffered special and

4    general damages, mental anguish, stress and anxiety, from

5    1962.

6         MR. JONES:  At the time of her mother's death

7    plaintiff was living with her older sister, with Marilyn

8    Monroe's older sister, okay?  At that time, the plaintiff was

9    a minor child.  She was a minor at that time, in 1962.

10   Lee Strasberg owed a duty to her, on the death of Marilyn

11   Monroe, to come to her and tell her that, yes, she was, in

12   fact, Marilyn Monroe's daughter; yes, in fact, that the estate

13   had to provide maintenances and support for her, a minor

14   child, at that time --

15        THE COURT:  Yeah, but what sort of mental anguish and

16   stress did she, in her ignorance, suffer?

17        MR. JONES:  Failure to know that her mother was dead.

18        THE COURT:  What?

19        MR. JONES:  Failure to know -- in 1962, when her

20   mother died --

21        THE COURT:  Yeah, but she didn't know she was her

22   mother at that time.

23        MR. JONES:  That's correct, Your Honor.

24        THE COURT:  But you are saying that, nevertheless,

25   she suffered damages because she didn't know that her mother

SEA1 0051

1    was dead?

2           MR. JONES:  That's correct, Your Honor.  We are

3    relating that back to the time she should have been told.  We

4    are saying, in 1962 --

5           THE COURT:  Somehow she had great anxiety over

6    something she didn't know about?  Is that what you are saying?

7           MR. JONES:  We are saying that she discovered this in

8    1985, Your Honor.  In 1985, 1986, the plaintiff discovers

9    that, yes, she is Marilyn Monroe's daughter.  And they tell

10   her.  So we are saying the mental anguish, the mental

11   distress, occurred in 1985, when she found out about it.

12          THE COURT:  Yeah, but you are saying from 1962 here

13   in the complaint.

14          MR. JONES:  Well, we are referring to that as the

15   time of death of Marilyn Monroe when the defendant should have

16   told her, and should have provided the maintenance and support

17   for her.

18          THE COURT:  But if she didn't know about it, how

19   could she have been suffering anxiety over it?

20          MR. JONES:  If she didn't have the money and support

21   that she should have had, she does suffer some damages.

22          THE COURT:  Well, I am addressing your claim for

23   mental anguish, stress and anxiety.

24          MR. JONES:  Yes, Your Honor.

25          THE COURT:  I mean, on one hand you are saying she

SFA1 0052

1    didn't know about it, and on the other hand you are saying she

2    suffered because of that fact.

3          MR. JONES:  Well, basically, what we are arguing is

4    as of -- in 1985, the mental anguish was placed on the

5    plaintiff when she knew about it.  We are saying the lack of

6    support and maintenance should have been provided for her in

7    1962, when her mother died --

8          THE COURT:  So you wish to amend your amended

9    complaint in that respect?

10         MR. JONES:  Yes, Your Honor, we are.

11         As of 1962 they should have told her that, yes, you

12   are Marilyn Monroe's daughter; yes, we know you are Marilyn

13   Monroe's daughter; we should provide maintenance and support

14   for you, a minor -- a minor child.  And they don't do it.

15         They conceal this from her, and they go on and take

16   the estate for themselves.  They defrauded the plaintiff first

17   in 1962, again in 1985, while she was a resident of the City

18   and County of Honolulu.  While she is here she finds out that

19   she is Marilyn Monroe's daughter -- in 1986, okay.

20         (Discussion off the record between Mr. Jones

21         and Ms. Miracle.)

22         MR. JONES:  In 1986 she finds out she is Marilyn

23   Monroe's daughter.  At that time she makes a demand on the

24   estate, through the Strasbergs, to turn over the money to her.

25   They tell her, No, you are not Marilyn Monroe's daughter.  We

SFA1 0053

1    are not going to turn over any of the estate to you.  She has

2    a certified letter that she sends to them to demand her part

3    of the estate.  At that time they continue the concealment.

4         THE COURT:  What does her adopted mother, or aunt say

5    about all this?

6         MR. JONES:  They say -- in 1986 they tell her -- her

7    grandmother tells her, for the first time --

8         MS. MIRACLE:  1985.

9         MR. JONES:  1985, her grandmother tells her, for the

10   first time, that, Yes, you are Marilyn Monroe's daughter.

11        THE COURT:  What does her aunt say about this?  Her

12   aunt-adopted mother?  What does she say?

13        (Discussion off the record between Mr. Jones

14        and Ms. Miracle.)

15        THE COURT:  I.e., Marilyn Monroe's sister.

16        (Discussion off the record between Mr. Jones

17        and Ms. Miracle.)

18        MR. JONES:  The plaintiff is saying that after her

19   grandmother told her, that was the time when they told her

20   about the thumb prints -- that's when they --

21        (Discussion off the record between Mr. Jones

22        and Ms. Miracle.)

23        MR. JONES:  She was told, in 1986, Your Honor --

24        MS. MIRACLE:  1985.

25        MR. JONES:  -- 1985, by Marilyn Monroe's older

JFA1 0054

1    sister --

2              MS. MIRACLE:  Huh-uh.

3              THE COURT:  "Mother."

4              MS. MIRACLE:  No.  No -- yes, "mother."

5              MR. JONES:  Your mother?

6              MS. MIRACLE:  My grandmother.

7              MR. JONES:  Your grandmother?  Her grandmother told

8    her -- that you were Marilyn Monroe's daughter --

9              MS. MIRACLE:  Someone else told me.  My grandmother

10   confirmed it.  I was reminded, okay?  It was brought back to

11   me.  I had the recollection, but way back in my mind, because

12   it was repressed, and I wasn't to know.  And I knew that there

13   were problems in the home at her death, and I knew that

14   Marilyn Monroe died; but, because of the circumstances -- she

15   was such a big star -- I was not told.

16             THE COURT:  Well, we had better let your counsel make

17   the argument.

18             MR. JONES:  Your Honor, let me move on to the issue

19   of, does this court have jurisdiction in the State of Hawaii?

20   We are contending that, as of 1985, that when the plaintiff

21   found out, she made a demand on the defendants.  The

22   defendants, at that point, continued the fraud, and what we

23   are arguing is not only as a civil fraud, we are arguing that

24   this is, in effect, a criminal fraud on the plaintiff while

25   she was in the State of Hawaii.

SFAI 0055

1        They failed to tell her who she was.  They failed to

2   disclose to her that she had a cause of action against them.

3   In 1985, in the State of Hawaii, they were on the telephone,

4   they say to her, No, you are not Marilyn Monroe's daughter,

5   and, No, you do not have a cause of action against us.  The

6   cause of action against them was for failure to pay

7   maintenance and support when Marilyn Monroe died, the failure

8   to pay over the estate.  They are doing this in the State of

9   Hawaii.  This is what we contend --

10       THE COURT:  When did she move to Hawaii?

11       MR. JONES:  198- --

12       MS. MIRACLE:  '86.  December of '86.

13       THE COURT:  Pardon me?

14       MS. MIRACLE:  December of '86.

15       MR. JONES:  So we are contending that the defendants,

16   while she was --

17       THE COURT:  But she found out in 1985, a year

18   earlier --

19       MS. MIRACLE:  In February.

20       THE COURT:  February of '85, that she was Marilyn

21   Monroe's daughter, and at that time spoke to Strasberg, and

22   Strasberg denied it.

23       MS. MIRACLE:  No.  No.

24       (Discussion off the record between Mr. Jones

25       and Ms. Miracle.)

SCA1 0056

1           MS. MIRACLE:  Okay, the day I was reminded, I was on

2    Virginia Beach with John Bellelo --

3           MR. JONES:  Okay.

4           MS. MIRACLE:  -- and he told me that I was Marilyn

5    Monroe's daughter.  And it made sense.  Everything made sense

6    that had happened prior to that.

7           MR. JONES:  1986 where were you?

8           MS. MIRACLE:  In Hawaii.  That's later.

9           MR. JONES:  Okay, stop.  Stop.

10          In 1986, she moved to Hawaii, okay.

11          MS. MIRACLE:  That's right.

12          MR. JONES:  At that point in time we are contending

13   that the defendants, upon the demands that she made, continued

14   to defraud her for the next six years, Your Honor.  From 1986

15   to 19- --

16          THE COURT:  But when did she first speak to

17   Lee Strasberg about whether or not she was --

18          MR. JONES:  One year prior.

19          THE COURT:  That was 1986.

20          MS. MIRACLE:  No.  Lee Strasberg, I think, died in

21   1984.

22          (Discussion off the record between Mr. Jones

23          and Ms. Miracle.)

24          MS. MIRACLE:  When I went to the surrogate's court

25   originally, in 1985 --

SCAZ 0057

1    MR. JONES:  No --

2    MS. MIRACLE:  -- to pursue the estate --

3    MR. JONES:  No, no -- stay on 1986.

4    MS. MIRACLE:  Okay.

5    1986, I never spoke to Lee Strasberg except when he

6    was my acting instructor, okay, when I was a child.

7    MR. JONES:  What demand did you make on the estate in

8    1986?  You sent the letter --

9    MS. MIRACLE:  To the judge's chambers in New York --

10   but I wasn't even aware then of this second will, of this

11   will, that it was the Strasbergs --

12   MR. JONES:  Okay, stop --

13   MS. MIRACLE:  -- that had the money.

14   MR. JONES:  Okay.

15   Your Honor, we are contending that the concealment of

16   the cause of action, itself, the statute provides that this

17   court has jurisdiction where they concealed from her -- they

18   had -- as she was a minor, they had an affirmative duty to

19   come forward and tell her, as a minor child, that she was the

20   daughter of Marilyn Monroe, and that they had an obligation to

21   provide maintenance and support for her.  They don't do this.

22   In the State of Hawaii, from 1986 until the

23   present -- that's six years -- during those six years they

24   tell her she has no cause of action in the courts, against the

25   estate, to recover the estate.  This is done in Hawaii.

SFM1 0058

12

1          THE COURT:  But the first contact with Anna Strasberg

2     was in New York; is that right?

3          MR. JONES:  Yes, that's correct.

4          MS. MIRACLE:  I was --

5          MR. JONES:  Stop talking.

6          Yes, that's correct.

7          THE COURT:  And that was in '86?  Or '85?

8          MR. JONES:  What year?  Just answer the year.

9          MS. MIRACLE:  '89.

10          (Discussion off the record between Mr. Jones

11          and Ms. Miracle.)

12          MR. JONES:  Your Honor, the defendants are arguing

13     the Statute of Limitations.  What they are contending --

14          THE COURT:  Well, I don't want to get into that now.

15     I'm just asking you, was the first demand on Anna Strasberg --

16          MR. JONES:  Was 1989.

17          THE COURT:  '89?

18          MR. JONES:  That's what she just said.

19          THE COURT:  What happened for four years?

20          MS. MIRACLE:  I had --

21          MR. JONES:  Go ahead.

22          MS. MIRACLE:  Okay.

23          Should I stand?

24          MR. JONES:  No, just go ahead.

25          MS. MIRACLE:  Okay.

SFA1 0059

1          MR. JONES:  Real short.

2          MS. MIRACLE:  Okay.

3          I didn't see this copy of the will -- I was given one

4    copy of the will originally in 1985, at the surrogate's court.

5    When I went to see Mr. Knox, on a trip to New York, after my

6    aunt-mom's death, Jenny Maniscalco's death, to see my

7    grandmother, I went to the surrogate's court again to show

8    Mr. Knox the photograph of myself with Lee Strasberg.

9          MR. JONES:  You are rambling.  Just get to the issue:

10   1989.

11         MS. MIRACLE:  And Mr. Knox then gave me, while I was

12   holding on to the photograph -- I never even showed him -- he

13   brought out another copy of the will which I had never seen,

14   which said that it was given to Lee Strasberg to be

15   distributed to those to whom I am devoted.

16         Then I saw --

17         THE COURT:  Excuse me.

18         Don't we have answers to interrogatories here that go

19   into all of this?

20         MR. JONES:  Yes, we do, Your Honor.

21         The plaintiff sued one of the magazines, the Globe

22   Magazine, in federal court here, earlier this year, for

23   defamation.  And when they found out -- when the news media

24   found out who she was -- when, basically, she did, a year

25   ago -- she was placed on all the television talk shows, etc.,

SFA1 0060

1    etc., but one of the magazines defamed her, and said she

2    was -- different things about her.

3         So the plaintiff sued Globe Magazine here, in this

4    courtroom, about a year and a half ago, and she recovered

5    damages for them claiming not only was she Marilyn Monroe's

6    daughter -- they claimed that, they admitted that, that she

7    was -- but they said bad things about her after that.

8         MS. MIRACLE:  Lies.

9         MR. JONES:  So the same Cades Schutte represented

10   Globe Magazine in this court earlier this year, when they --

11   (incomprehensible) -- and settled.  That's where the

12   depositions came from.  Those depositions were not from this

13   particular matter, but from the libel and slander of the

14   Globe Magazine.

15        And what the defendants did was, they went and took

16   the depositions from that earlier case, and then they gave

17   those to the court.  But those are the depositions not from us

18   at this present time.

19        (Discussion off the record between Mr. Jones

20        and Ms. Miracle.)

21        THE COURT:  Well, please proceed.

22        MR. JONES:  Thank you, Your Honor.

23        So, Your Honor, we conclude that, because of the

24   fraudulent concealment, the failure to tell her ahead of time

25   who she was, when she was a minor; the higher fiduciary duty

SF4I 0061

1    of loyalty that the estate executors owed her, a minor; the

2    failure of them -- when they breached that fiduciary duty,

3    that was one of the -- the first breach of fiduciary duty.

4            So, in conclusion, what we are saying is that the

5    long-arm statutes of the State of Hawaii provide jurisdiction

6    for this court, because there are three torts that we have

7    alleged that they have committed in the State of Hawaii:

8            The fraudulent concealment, the failure to advise her

9    that she had a cause of action against her, and the failure to

10   provide maintenance and support for her.  So those three torts

11   occurred from 1986 to 1992.

12           THE COURT:  Wait.

13           The third one that you list, provide maintenance and

14   support while she was a minor?

15           MR. JONES:  Yeah.  They didn't tell her that.  They

16   had an obligation, in 1962, to tell her, look, you are a

17   minor, and we have to provide maintenance and support for her.

18   In 1985 they still don't tell her that -- that they didn't do

19   it back in 1962.

20           THE COURT:  In 1985 she had moved to Hawaii.

21           MR. JONES:  I'm sorry, Your Honor, 1986.  I am

22   referring to -- 1986 to 1992, the six-year period, '86 to '92,

23   while she is a resident of the State of Hawaii.  That's all I

24   am referring to.  I am only referring to the times when she

25   was domiciled and a resident of the State of Hawaii.

SFA1 0062

1          So those are the three frauds that we contend that

2     the defendants did.   In addition to that, we claim that --

3     jurisdiction under doing business in the State of Hawaii.   So

4     those are reasons for this court to take jurisdiction.

5          Your Honor, moving on to the issue of the Statute of

6     Limitations, the defendants now admit that she is the daughter

7     of Marilyn Monroe.   They are coming into this court, for

8     purposes of the Statute of Limitations, and they are saying,

9     yes, the plaintiff knew -- found out about, in 1985, that she

10    was Marilyn Monroe's daughter.   So she should have brought the

11    cause of action from 1985.

12          THE COURT:   I don't think they are admitting that she

13    is the daughter of Marilyn Monroe.   They are saying for

14    purposes of that argument, even if she was, she is barred by

15    the Statute of Limitations.

16          MR. JONES:   That's their argument, Your Honor.

17    That's what we are contending -- what we state they are

18    saying.

19          But, Your Honor, in their briefs they say nothing of

20    the issue of estoppel.   They say nothing of the equitable

21    doctrine of estoppel.

22          Our case law that we submitted says that where a

23    party knowingly defrauds somebody, knowingly fails to tell

24    them of the cause of action against them, that that is fraud,

25    and not only does it toll the Statute of Limitations -- so it

SFAI 0063

1    tolled the Statute of Limitations for six years.  That's what

2    we are agreeing on.  The Statute of Limitations ran out one

3    year ago.  We are one year past the Statute of Limitations.

4    In their documents that's what they argue, and that's what we

5    are contending:  One year past the Statute of Limitations,

6    under California law.

7         What we are contending is that, as long as they are

8    defrauding her, they are equitably estopped from arguing the

9    issue of the Statute of Limitations.

10        We cite in our brief a case, on Page 8, under

11   California law, where a party fraudulently conceals the

12   existence of a cause of action against him, the statute is

13   tolled -- the Statute of Limitations is tolled, and the guilty

14   party is estopped to plead the limitations.  It's cited as

15   "Mills versus Mills."

16        THE COURT:  I want to ask you, what's the

17   significance of the second will?

18        MR. JONES:  Your Honor, we have always contended that

19   we were entitled to -- that this was basically a 12(b)(6)

20   motion.  This is basically a motion for summary judgment.  We

21   have all along contended that, under Rule 12 of the Federal

22   Rules of Civil Procedure, it states where the issue involves a

23   motion to dismiss, matters outside the pleading are permitted

24   to and not excluded by the court.  The motion shall be treated

25   as one for summary judgment, and disposition of -- as provided

SFAL 0064

1    in Rule 56, and all parties shall be given reasonable

2    opportunity to present all material.

3            The "all material" means we have asked them for two

4    things:  Give us all the wills that you've got, of Marilyn

5    Monroe -- because there are more than one, okay.  And, number

6    two, we asked them -- we are asking this court to ask them

7    only one question, Your Honor.  We are asking you to have them

8    tell this court what legal proceedings have transpired in

9    California.

10            THE COURT:  My question is, what's the significance

11    of the second will?

12            MR. JONES:  We are contending that the will was

13    originally probated in California.  All of those wills go to

14    where Marilyn Monroe was domiciled at the time of her death.

15    She was living in California at the time of her death, in

16    1962.  She owned a home there.  She had resided there.  She

17    was working there.

18            The wills, we are contending -- our contention is

19    that those wills pertain to California law.  We contend that

20    the defendants went into California probate court first, and

21    that's where they took the wills.  We are asking this court to

22    ask the defendants to disclose to this court what occurred in

23    the probate court in California, and what legal proceedings

24    transpired, since 1962, in California.  Those are the only two

25    questions we have asked for.

SEAI 0065

1          Going on, on the Statute of Limitations, we are

2    contending that the defendants are estopped because of

3    fraudulent concealment, and outright fraud.

4          Your Honor, the fraud that we are referring to here

5    is -- and what we are asking of this court --

6          THE COURT:  Getting back to the two wills, is it your

7    position that both wills were executed after her birth?  Do

8    you acknowledge that?

9          MR. JONES:  No, Your Honor, we are not prepared to do

10   that at this time.  Not without physically looking at the

11   wills.  They have access to the wills, and --

12         THE COURT:  Well, but the will that was probated in

13   New York, was --

14         MR. JONES:  Probated after the --

15         THE COURT:  -- and it was executed after her birth.

16         MR. JONES:  That's correct, Your Honor.

17         THE COURT:  Okay.

18         MR. JONES:  Going on, as to the issue of estoppel, we

19   have argued that the defendants are estopped to argue the

20   Statute of Limitations under the equitable doctrine, because

21   of their fraud.

22         Moving on to the pretermitted heir statute, the

23   plaintiffs contend that because of the facts of Marilyn

24   Monroe, insofar as she owned a home in California, she lived

25   there, she was working there, that under a case that we cite,

SFA1 0066

1    which is the "Robertson versus Robertson" case, where the

2    court held that the children of a testator brought suit

3    claiming they were entitled to force heirship rights, and even

4    though the will was probated in one state, the court allowed

5    them to proceed under another state's jurisdiction, to gain

6    greater rights under the estate.

7         So we are contending that, for all the reasons given,

8    the plaintiff can proceed under California law, under the

9    California pretermitted heir statute, which statute provides

10   that whether or not she was born before or after execution of

11   the will, that she is entitled to 50 percent of the estate.

12        Section 90 of the California Probate Code provides,

13   whether born before or after the making of the will, or born

14   before or after the death of testator -- and the cases that we

15   cite provide for cases where whether the plaintiff, or the

16   claimant, is born before or after the will makes no

17   difference.

18        (Discussion off the record between Mr. Jones

19        and Ms. Miracle.)

20        MR. JONES:  Under the issue of the conflict of laws

21   problem, with respect to the torts, the fraud issue and the

22   intentional infliction of emotional distress, those occurred

23   in Hawaii, and we are asking this court to apply Hawaii law to

24   them, because they occurred here for the six-year period 1986

25   to 1992.

SFA1 0067

1        As to the issue of the pretermitted heir part, we are

2    asking the court to enforce California law with respect to

3    that issue.

4        Your Honor, the birth certificate of the plaintiff,

5    from Wilcox General Hospital, Wykoff Heights Hospital, has on

6    it, under our Exhibit A, it has on it what we contend are the

7    footprints of the plaintiff.  It also has two thumb prints.

8    And the plaintiff's affidavit states that those are -- and our

9    allegation is that those are the thumb prints of Marilyn

10   Monroe.  We are asking this court, basically, to treat this as

11   a paternity action.

12       Our Exhibit A, of the birth certificate, and the

13   document right behind it, which is also part of that birth

14   certificate, we have provided for this court the footprints of

15   the plaintiff, and we have asked this court for leave to amend

16   to show that those, in fact, are the two right and left thumb

17   prints of Marilyn Monroe.  We are asking this court to allow

18   us to do DNA genetic testing upon the body of Marilyn

19   Monroe -- the body is not in the ground, the body is in a

20   mausoleum, in California.

21       We are requesting that three physicians be appointed

22   by the court, and that those three physicians be allowed to

23   take Marilyn Monroe's fingerprints and DNA from her at this

24   time, now.

25       We are asking this court to allow those three DNA

*SEAL 0068*

1    genetic specialists to compare the DNA -- just as they do with

2    Vietnam veterans who have been dead -- and Korean War

3    veterans --

4            THE COURT:  Well, what we are hearing this morning,

5    Mr. Jones, is the motion to dismiss.

6            MR. JONES:  Yes, I understand that, Your Honor, but

7    it goes to the issue of whether or not these documents are

8    true and correct.

9            We believe these documents are true and correct, and

10   that's the only way that we can show and prove to this court,

11   beyond a reasonable doubt, beyond any doubt, that she is, in

12   fact, the daughter of Marilyn Monroe.

13           Your Honor, going back now, as to the fact that the

14   defendants claim that the plaintiffs have not stated a cause

15   of action, we feel that we have stated a cause of action,

16   under California law, and we detailed that out on Page 5 as to

17   the restatement -- I mean as to the section of the probate

18   code, the 90.  We also provide the court with a case called,

19   "In re:  Torregano's Estate," where the court holds that the

20   pretermitted heir statutes --- it interprets the pretermitted

21   heir statutes.

22           So, Your Honor, we have talked about jurisdiction,

23   and feel that this -- in conclusion, Your Honor, we have said

24   that we feel that this court can take jurisdiction of this

25   case because the acts complained of occurred in the State of

5FA1 0069

1    Hawaii. Some of the acts occurred, where we contend, in the

2    State of California. We feel that this court has jurisdiction

3    to proceed.

4         As to the issue of the tolling of the Statute of

5    Limitations, and the estoppel, we have argued that the fraud

6    and intentional concealment, for 25 years, the defendants have

7    defrauded the plaintiff, and basically taken, basically stolen

8    what we believe to be an estate valued in excess of $100

9    million -- those are our figures -- of which the plaintiff has

10    gotten nothing.

11         We can prove, Your Honor, that she is Marilyn

12    Monroe's daughter. With DNA testing we can prove it. What we

13    are asking this court to do is give us our chance, to give the

14    plaintiff a chance to prove it beyond any doubt. This is a

15    one-time thing. Once DNA genetic testing is done, nobody else

16    in the world can come up and claim to be Marilyn Monroe's

17    offspring, because all they have to do --

18         THE COURT: Okay, I am going to ask Mr. Yasunaga if

19    he has any rebuttal at this point, because we are running

20    short on time.

21         MR. YASUNAGA: Thank you, Your Honor.

22         A few things. First, we raise the defense that he

23    has failed to plead fraud with particularity. He doesn't

24    plead any facts which would indicate that defendants knew that

25    Ms. Greene was the daughter of Marilyn Monroe. He says that

SFA1 0070

24

1    defendant's deceased husband saw plaintiff with Marilyn

2    Monroe, but that's not the same as saying that they knew she

3    was the daughter.

4              On the Statute of Limitations argument, I think

5    what's been said by plaintiff and her counsel have confirmed

6    that all the possible claims are time-barred.  She said here

7    today that she knew since 1985, or at least believed since

8    1985, that she was the daughter of Marilyn Monroe, and it made

9    a lot of sense because of indications she had earlier,

10   indicating she may have had notice even before that.

11             Her counsel says that the Statute of Limitations was

12   tolled by fraud, but the tolling for fraud and estoppel only

13   lasts until she knows of her claims.  She's admitted she has

14   known of her claims since 1985.  I think the materials we

15   attached show that from January 1985 she started going to the

16   surrogate's court to do research, and talking to lawyers, and

17   saying she was going to try to get part of the estate.  So

18   although estoppel may be a defense in some instances, it's not

19   a defense here because she knew the facts upon which she could

20   bring her claims from January '85, and her failure to file a

21   lawsuit at that time is not the fault of defendants.  There

22   was no ongoing fraud, so her claims are barred by the Statute

23   of Limitations.

24             As for the jurisdictional issue, I believe that

25   personal jurisdiction does not exist.  Mr. Jones has not

SFA1 0071

1      talked about the argument about the causes of action do not

2      arise out of the business contact.  I take it he concedes that

3      we've included authorities showing that it cannot be argued to

4      arise out of those contacts, because the business activity

5      didn't cause any of these claims.

6              He now argues that there were certain torts that were

7      committed here in Hawaii.

8              The fraudulent concealment -- first of all, the

9      maintenance, there was no duty to provide maintenance after

10     she became an adult, which was way back in the sixties.  And

11     then that leaves us with the fraudulent concealment and

12     failure to advise that she had a claim.  But she didn't move

13     to Hawaii until '86, and she already knew of her claim in '85,

14     so there was no ongoing tort here in Hawaii.

15             Also, I believe that, if there was a tort, it was

16     committed long before she ever got to Hawaii, and the fact

17     that a possible plaintiff moves here and there doesn't make

18     that tort follow her all over the place, giving jurisdiction

19     every place she may choose to travel.

20             That's all I have, Your Honor, unless you have any

21     specific questions.

22             THE COURT:  Well, the court's ready to rule.

23             The court will dismiss the claim of plaintiff for

24     lack of personal jurisdiction.  The court feels that this

25     claim should be brought in New York.  Anna Strasberg is

SFA1 0072

1    administratrix of Monroe.  Marilyn Monroe's estate is not

2    registered to do business in Hawaii, has no offices in Hawaii,

3    and has not executed a contract in Hawaii.

4            Entering into a license agreement for the sale of

5    products bearing the likeness of Marilyn Monroe is

6    insufficient to establish general jurisdiction over Anna

7    Strasberg.

8            To exercise general jurisdiction, courts require more

9    than selling a product in the forum state, citing to "Schute

10   versus Carnival Cruise Lines."  Therefore, under Ninth Circuit

11   authority, the exercise of general jurisdiction would be

12   improper.

13           In addition, Hawaii does not have specific

14   jurisdiction over Anna Strasberg.  Specific jurisdiction

15   requires that the cause of action relate to the defendant's

16   contacts in Hawaii.

17           Here plaintiff's main cause of action is her claim to

18   a fractional share of decedent's estate as a pretermitted

19   heir.

20           Plaintiff's claim to the estate does not arise out of

21   the sales of Marilyn Monroe products in Hawaii.  The plaintiff

22   does not demonstrate any connection between the cause of

23   action and defendant's business activities in Hawaii.

24           In addition, even if Anna Strasberg did commit fraud

25   and breach of fiduciary duties as administratrix and executrix

SFA1 0073



1   of the estate, there is nothing to show that this wrongful

2   conduct occurred in Hawaii; thus, the jurisdictional

3   allegations are insufficient, and plaintiff's complaint must

4   be dismissed.

5           In the alternative, the court further finds that

6   plaintiff has failed to state a cause of action under

7   pretermitted heir claim.

8           The court finds that New York law governs this case.

9   New York is the place where the relationship between the

10  parties is centered.  Plaintiff's cause of action arose

11  because of her alleged birth to the decedent in New York, and

12  the decedent's subsequent death while domiciled in New York,

13  with the will executed in New York, had failed to provide for

14  plaintiff.

15          The will was submitted to probate in New York, and

16  the estate was administered in New York under the supervision

17  of courts of that state.

18          Anna Strasberg is a domicile of New York, and her

19  authority as administratrix derives from the New York courts.

20  Under New York law, plaintiff has failed to state a claim.

21          New York pretermission statute that was in effect at

22  the time of the decedent's death did not allow actions to be

23  brought by children who were born prior to the execution of

24  the will.

25          The court will prepare the order.

SFA1 0074

1       We will take a short recess before the next matter.

2       THE BAILIFF:  All rise.

3       Court stands in recess.

4       (The proceedings in the above-entitled

5       matter were concluded at 11:19 a.m.)

6                       -ooOoo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SFA1 0075

1

2

3

4

5                              -ooOoo-

6            I, Stephen B. Platt, Official Court Reporter,

7    United States District Court, District of Hawaii, do hereby

8    certify that the foregoing is a true and correct transcript of

9    proceedings in Civil Number 92-00605ACK, Nancy Miracle versus

10   Anna Strasberg, etc., at Honolulu, Hawaii, on Monday,

11   December 14, 1992, before the Honorable Alan C. Kay, Chief

12   United States District Judge.

13

14

15

16

17

18
     FRIDAY, JANUARY 15, 1993    STEPHEN B. PLATT, CSR NO. 248
19

20

21

22

23

24

25

                                              SFA1 0076