EX. A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————x

SHAW FAMILY ARCHIVES LTD.,
BRADFORD LICENSING, INC., JAMES E.
DOUGHERTY, and VALHALLA
PRODUCTIONS LLC

      Plaintiffs/Consolidated Defendants,

-against-                                      05 Civ. 3939 (CM)

CMG WORLDWIDE, INC. and
MARILYN MONROE, LLC,

      Defendants/Consolidated Plaintiffs.

———————————————————————x

### DECISION AND ORDER GRANTING DEFENDANTS'/CONSOLIDATED PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT DISMISSING COUNT II OF PLAINTIFFS'/CONSOLIDATED DEFENDANTS' COMPLAINT

On March 23, 2005, Plaintiffs Marilyn Monroe, LLC ("MMLLC") and CMG Worldwide,

Inc. ("CMG") filed a complaint against the Shaw Family Archives and Bradford Licensing

Associates ("the SFA parties"), in the United States District Court for the Southern District of

Indiana, thereby setting in motion a tortuous series of events leading up to the instant cross-

motions for summary judgment. In its Second Amended Complaint pursuant to the Indiana

action, MMLLC alleges, among other things, that SFA and Bradford have violated Marilyn

Monroe's right of publicity by using her name, image and likeness for commercial purposes

without consent in violation of Indiana's Right of Publicity Act, 32 Ind. Code, Art. 36, Chap. 1,

§§ 1-20, and that MMLLC has suffered damages as a result of that alleged violation of Ms.

Monroe's right of publicity ("Count II"). On March 22, 27 and 28, 2005, MMLLC and CMG also

filed three related actions in the Southern District of Indiana against other photographers and their agents concerning these same intellectual property rights.

On April 19, 2005, apparently prior to being served in the Indiana action, SFA and others brought suit in this court against MMLLC and CMG (the "New York Action") seeking a declaratory judgment on whether there is any postmortem right of privacy or publicity in the name, likeness, and image of Marilyn Monroe as well as damages for certain alleged copyright violations, tortious interference with contractual relations and tortious interference with prospective economic advantage. On June 3, 2005, MMLLC and CMG filed a motion in this court seeking dismissal, a stay, or transfer of the New York Action in favor of the first-filed Indiana action. On July 5, 2005, SFA and Bradford filed a motion in the Indiana Court, seeking dismissal of the Indiana action on the grounds that the Indiana Court lacked personal jurisdiction over them and/or a transfer of the Indiana action to this court. On July 6, 2005, this court issued a memorandum order staying SFA's New York Action pending a determination of the motion to dismiss for lack of personal jurisdiction in the Indiana action. See Memorandum Order staying Decision, Shaw Family Archives et.al, v. CMG Worldwide, Inc. No. 05 Civ. 3939 (S.D.N.Y. July 6, 2005).

On March 23, 2006, the Southern District of Indiana ordered that the Indiana action be transferred to this court under 28 U.S.C. 1404(a). See Entry on Motions to Dismiss or to Transfer Venue, CMG Worldwide et al. v. Shaw Family Archives et al., No. 05 Civ. 0323 (S.D. Ind. Mar. 25, 2006). With both actions soon to be pending before it, this court issued an Order on March 27, 2006 lifting the stay on the second-filed New York action. On May 2, 2006, this court ordered the matters consolidated, see Order Consolidating 05 Civ. 3939 and 06 Civ. 2619, Shaw

2

Family Archives et.al. v. CMG Worldwide, Inc. No. 05 Civ. 3939 (S.D.N.Y. May 2, 2006), and on May 16, 2006, the court entered a memorandum decision ruling that 1) SFA and the other defendants in the Indiana action "were amenable to jurisdiction in Indiana"; 2) that, of the two actions pending before this Court, the Indiana action was the first-filed; and 3) that Indiana's choice of law principles apply to this case. See Memorandum Decision Regarding Choice of Law, Shaw Family Archives et.al. v. CMG Worldwide, Inc. No. 05 Civ. 3939 (S.D.N.Y. May 19, 2006).[1]

On October 25, 2006, MMLLC moved for summary judgment on the right of publicity claims set forth in Count II of its Second Amended Complaint, asserting that MMLLC is the holder of a 100% interest in Ms. Monroe's postmortem publicity rights under Indiana law, that Indiana's postmortem publicity statute applies to its right of publicity claims regardless of Marilyn Monroe's state of domicile at the time of her death, and that the SFA parties violated MMLLC rights under the statute by using Marilyn Monroe's name, photograph, image, and likeness on T-shirts that were marketed and sold in the State of Indiana and by maintaining a website that gives customers the ability to purchase licenses for the use of Ms. Monroe's picture, image, and likeness on commercial products.

On November 30, 2006, SFA and Bradford filed a cross-motion for summary judgment on Count II against MMLLC and CMG and served an opposition brief in which they argued, *inter alia*, that the Indiana Right of Publicity Act does not create any independent postmortem publicity rights but rather provides a mechanism for vindicating preexisting publicity rights when infringements occur in the state of Indiana; that Marilyn Monroe's right of publicity could not

---

[1]Familiarity with the facts set forth in that opinion is presumed.

3

survive her because she died domiciled in New York, a state that does not recognize postmortem publicity rights; and that, regardless of where Ms. Monroe was domiciled at the time of her death, MMLLC cannot show an ownership interest in Marilyn Monroe's right of publicity because she lacked the testamentary capacity to devise by will a right she did not own under the law of any state in which she could have been domiciled at the time of her death in 1962. In support of their cross-motion for summary judgment SFA and Bradford further argued that MMLLC should be judicially and collaterally estopped from arguing that Ms. Monroe died a California domiciliary by virtue of four decades of various proceedings in which representatives of the Monroe Estate purportedly maintained, and judicial tribunals purportedly determined that Ms. Monroe died a New York domiciliary.

Pursuant to a conference held on March 12, 2007, this court ordered supplemental briefing on the issue of Marilyn Monroe's domicile at the time of her death.

For the reasons stated below, Count II of MMLLC's Second Amended Complaint is dismissed.

## Factual Background

The parties' cross-motions for summary judgment on MMLLC's right of publicity claims are accompanied by numerous Rule 56.1 Statements containing countless disputes over purportedly material issues of fact. These heated disputes need not long detain the court, however, since the dispositive issue in the case is almost purely a matter of law, and the few relevant facts are undisputed.

Marilyn Monroe, perhaps the most famous American sex symbol of the twentieth century, died testate on August 5, 1962. (MMLLC Statement of Undisputed Facts ("MMLLC SUF") ¶ 8).

Her will, which did not expressly bequeath a right of publicity, contained the following residuary clause:

> SIXTH: All the rest, residue and remainder of my estate, both real and personal of whatsoever nature and whatsoever situate, of which I shall die seized or possessed or to which I shall be in any way entitled, or over which I shall possess any power of appointment by Will at the time of my death, including any lapsed legacies, I give, devise and bequeath as follows:
>
> (a) To MAY REIS the sum of $40,000 or 25% of the total remainder of my estate, whichever shall be the lesser.
>
> (b) To DR. MARIANNE KRIS 25% of the balance thereof, to be used by her as set forth in ARTICLE FIFTH (d) of this my Last Will and Testament.
>
> (c) To LEE STRASBERG the entire remaining balance.

(Strasberg Decl. at 6 and Exh. C.) The will also named Aaron Frosch, Ms. Monroe's New York-based attorney, as the executor. (MMLLC Statement of Supplemental Material Undisputed Facts ("MMLLC SMUF" ¶ 5). It was subject to primary probate in New York County Surrogate's Court. (SFA Statement of Facts ¶ 2).

In 1968, six years after probate of the Monroe Estate had commenced, Lee Strasberg married Anna Strasberg. (MMLLC SMUF ¶ 11). Lee Strasberg died in 1982, leaving his wife Anna Strasberg as the sole beneficiary under his will. (Id. at ¶ 12). Upon the death of Mr. Frosch in 1989, the New York Surrogate's Court appointed Anna Strasberg as Administratrix, c.t.a., of the Monroe Estate. (Id. at ¶ 19). The Monroe Estate remained open until June 19, 2001, on which date the Surrogate's Court authorized the Administratrix to close the estate and transfer the residuary assets to MMLLC, a Delaware company formed by Ms. Strasberg to hold and manage the intellectual property assets of the residuary beneficiaries of Marilyn Monroe's will. (Id. at ¶ 20).

5

SFA is a limited liability company organized under New York law with its primary place of business in New York. (SFA, Marcus, and Stevens Amended Complaint ¶ 3). Its principals are the three children of the late photographer Sam Shaw. (Id. at ¶11). Among the photographs owned by SFA and comprising the Shaw Collection is a series of photographs of Marilyn Monroe, including many "canonical" Marilyn images. (Id. at ¶¶ 10-11). The copyrights to the Marilyn photographs are purportedly owned by Sam Shaw's daughters, Edith Marcus and Meta Stevens. (Id. at 12).

This dispute arises out of (1) the alleged sale of a T-shirt at a Target retail store in Indianapolis, Indiana on September 6, 2006, which bore a picture of Marilyn Monroe and the inscription of the "Shaw Family Archives"on the inside neck label and tag, and (2) the alleged maintenance of a website by SFA and Bradford through which customers could purchase licenses for the use of Ms. Monroe's picture, image and likeness on various commercial products. (MMLLC SUF ¶¶ 1-7, 15-18). MMLLC asserts that it is the successor-in-interest to the postmortem right of publicity that was devised through the residuary clause of Ms. Monroe's will, and that the commercial use of Ms. Monroe's picture, image, and likeness by SFA and Bradford without MMLLC's consent violates its rights under Indiana's 1994 Right of Publicity Act. This statute, passed over three decades after Ms. Monroe's death, by a state with which she had (as far as the court is aware) absolutely no contact during her life, creates a descendible and freely transferable right of publicity that survives for 100 years after a personality's death. The statute purports to apply to an act or event that occurs within Indiana, regardless of a personality's domicile, residence, or citizenship. See Ind. Code §§ 32-36-1-1 to -20

6

## Standard of Review

Under Federal Rule of Civil Procedure 56(c), a court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548 (1986); *see also* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505 (1986). Summary judgment for the moving party is appropriate "where the nonmovant's evidence is merely colorable, conclusory, speculative, or not significantly probative." Travelers Ins. Co. v. Broadway W. Street Assoc's., 164 F.R.D. 154, 160 (S.D.N.Y. 1995) (citing Anderson, 477 U.S. at 248, 106 S. Ct. at 2510). Before a district court grants summary judgment, however, "the record must clearly establish both 'the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment.'" Pangburn v. Culbertson, 200 F.3d 65, 69 (2d Cir. 1999) (citing Ramsey v. Coughlin, 94 F.3d 71, 74 (2d Cir. 1996)). Summary judgment is improper if there is any evidence in the record that would allow a reasonable fact-finder to find in favor of the non-moving party. On a motion for summary judgment, the court views the record in the light most favorable to the non-moving party and resolves all ambiguities and draws all reasonable inferences against the moving party. *See* United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962); Donahue v. Windsor Locks Bd. of Fire Commn'rs, 834 F.2d 54, 57 (2d Cir. 1987).

## Discussion

In their cross-motion for summary judgment, the SFA parties argue, *inter alia*, that even if a postmortem right of publicity in Marilyn Monroe's name, likeness and persona exists, MMLLC and CMG cannot demonstrate that they are the owners of that right because only

7

property actually owned by a testator at the time of her death can be devised by will. Since

neither New York nor California (the only possible domiciles of Ms. Monroe at the time of her

death) – nor for that matter, Indiana – recognized descendible postmortem publicity rights at the

time of Ms. Monroe's death in 1962, she could not transfer any such rights through her will, and

MMLLC cannot be a successor-in-interest to them. Moreover, the SFA parties contend, neither

the California nor the Indiana right of publicity statutes allow for the transfer of the publicity

rights they recognize through the wills of personalities who were already deceased at the time of

their enactment. The court agrees.

1. <u>Ms. Monroe did not have the testamentary capacity to devise property rights she did not own at
the time of her death</u>.

MMLLC argues that its ownership interest in Ms. Monroe's postmortem right of publicity

– assuming *arguendo* that such a right exists – stems from Ms. Monroe's valid devise of this

right to Lee Strasberg through the residuary clause in her will. The court concludes – regardless

of Ms. Monroe's domicile at the time of her death, and regardless of any rights purportedly

conferred after her death by the Indiana Right of Publicity Act or by Cal. Civil Code § 3344.1 –

Ms. Monroe could not devise by will a property right she did not own at the time of her death in

1962.

Descendible postmortem publicity rights were not recognized, in New York, California,

or Indiana at the time of Ms. Monroe's death in 1962. To this day, New York law does not

recognize any common law right of publicity and limits its statutory publicity rights to living

persons. See e.g. Pirone v. MacMillan, Inc. 984 F.2d 579, 586 (2d. Cir. 1990)(citing <u>Stephano v.
News Group Pub.</u>, 64 N.Y. 2d 174, 183 (1984)). California recognized descendible publicity

8

rights when it passed its postmortem right of publicity statute in 1984, 22 years after Ms.

Monroe's death. See Cal. Civil Code 3344.1 (formerly Cal. Civil Code § 990). Prior to that time,

a common law right of publicity existed, but it was not freely transferable or descendible. See

Guglielmi v. Spelling-Goldberg Productions, 25 Cal. 3d 860, 861 (1979); Gionfriddo v. Major

League Baseball, 94 Cal. App. 4th 400, 408-09 (2001). Indiana first recognized a descendible,

postmortem right of publicity in 1994, when it passed the Indiana Right of Publicity Act. See Ind.

Code §§ 32-36-1-1-20; Phillips v. Scalf, 778 N.E. 2d 480, 483 (Ind. App. 2002). Prior to that

time, rights of publicity were inalienable in Indiana, since they could only be vindicated through

a personal tort action for invasion of privacy. See Continental Optic Co. v. Reed, 86 N.E. 2d 306,

309 (Ind. Ct. App. 1949); see also Time Inc. v. Sand Creek Partners, Inc., 825 F. Supp. 210, 212

(S.D. Ind. 1993); Ind. Code § 34-9-3-1.

Thus, at the time of her death in 1962 Ms. Monroe did not have any postmortem right of

publicity under the law of any relevant state. As a result, any publicity rights she enjoyed during

her lifetime were extinguished at her death by operation of law.

Nevertheless, MMLLC argues that her will should be construed as devising postmortem

publicity rights that were later conferred on Ms. Monroe by statute. Such a construction is

untenable.

Indiana follows the majority rule that the law of the domicile of the testator at his or her

death applies to all questions of a will's construction. White v. United States, 511 F.Supp. 570

(S.D. Ind. 1981). There are disputed issues of fact concerning whether Ms. Monroe was

domiciled in New York or California at the time of her death. (There is absolutely no doubt that

she was not domiciled in Indiana.) However, it is not necessary to resolve the question of

9

domicile because neither New York nor California – the only two states in which Ms. Monroe could conceivably have been domiciled – permitted a testator to dispose by will of property she does not own at the time of her death.

It is well-settled that, under New York law, "A disposition by the testator of all his property passes all of the property he was entitled to dispose of *at the time of his death*." N.Y. Est. Powers & Trusts Law § 3-3.1 (formerly N.Y. Decedent Est. Law 14)(emphasis added). The corollary principle recognized by the courts is that property not owned by the testator at the time of his death is not subject to disposition by will. In re Van Winkle's Will, 86 N.Y.S. 2d 597, 600 (Sur. Ct. 1949). See also In re Estate of Gernon, 226 N.Y.S. 2d 940 (1962)("In the absence of a contrary intent the will must be interpreted as applying to all property owned by [the testator] *at the date of his death*")(emphasis added.)

MMLLC – which clearly derived any interest in Monroe's post-mortem right of publicity through her will (via the legatees) – tries to distinguish Gernon by arguing that a testator's "contrary intent" can overcome the prohibition on passing property not owned by the testator at the time of his death. The argument is unpersuasive. The "contrary intent" contemplated by Gernon and the cases cited therein is an intent to devise only the property owned by the testator at the time of the will's execution rather than at the time of death. The legislative history of EPTL § 3-3.1 makes clear that it was enacted to codify the rule that a will is deemed pass all of the property the testator owns at the time of his death, rather than only the property owned at the time when the will was executed. Thus, when the Gernon court and others refer to "after-acquired" property, the term signifies property acquired after the execution of the will and before the testator's death – not property acquired after the testator's death. Nothing in EPTL § 3-3.1 or

10

<u>Gernon</u> stands for the proposition that any intent on the part of the testator can overcome his

testamentary incapacity to devise property he does not own at the time of his death.

California law does not differ from New York's. Section 21105 of the California Probate

Code provides that, with inapplicable exceptions, "A will passess all property *the testator owns*

*at death*, including property acquired after execution of the will." (emphasis added). In <u>In re</u>

<u>Buzza's Estate</u>, the court held that a testator/wife could not devise an inter vivos trust that

terminated by operation of law when her husband predeceased her. 194 Cal.App. 2d 598, 601

(1961) The <u>Buzza</u> court explained the probate rule as follows:

> It is settled law that a will is construed as applying to and disposing of the estate in its
> condition at the time of death. A testator may dispose only of such property as is subject
> to his testamentary power, and the testator is presumed to know the law. In interpreting a
> will, a court should view the will in a manner which will reveal the intent of the testator
> as diclosed by the language in the will and, if possible, effectuate the intent. This does not
> mean, however, that a testator may validly dispose of non-existent property.

<u>Id</u>. (citations omitted). <u>See also McKay v. Lauriston</u>, 204 Cal. 557, 569-70 (1928)(holding that

wife could not devise an interest in community property that terminated and became her

husband's upon her death); <u>See generally, In re Estate of Braman</u>, 258 A.2d 492, 494 (Pa.

1969)("During his lifetime, a person cannot give or dispose of property which he does not own or

in which he has no interest; no more so can a person make a postmortem distribution of property,

which at the time of his death he does not own or in which he has no right, legal or equitable.");

80 Am.Jur. 2d Wills 1168 ("A person cannot make a postmortem distribution of property which

he or she did not own, at the time of his or her death, or in which such a person had no legal or

equitable right. Thus, property acquired by a testator's estate after his or her death may not pass

under the residuary clause of the will."); 96 C.J.S. Wills 1088 (same).

MMLLC cites various provisions of the EPTL and the California Probate Code and asks this court to draw the inference that property not owned by Ms. Monroe at the time of her death can nonetheless pass through the residuary clause in her will. However, those provisions do not speak to the precise question presented – whether Ms. Monroe had the testamentary capacity to devise a right she did not own at the time of her death. Faced with the unequivocal language of the provisions and cases that are precisely on point, the court is unpersuaded by MMLLC's endeavor to reason from attenuated analogies.

Nor does § 2-602 of the Uniform Probate Code, which states that a will may pass "property acquired by the estate after the testator's death," have anything to do with the present case, because neither New York nor California is among the 18 states that have adopted the Uniform Probate Code in whole or even in part. This court has not found, nor has MMLLC cited, any provision in either the New York or the California probate laws that codifies § 2-602.

MMLLC's reliance on the case of In re Hite, 700 S.W.2d 713, 717 (Tex. App. 1985) for the proposition that a residuary clause may dispose of property "that the testator may have overlooked, property that lacked particular definition or property that the testatrix did not know that she was entitled to at the time the will was executed" is equally unavailing. First, the case is a Texas case and Texas law has nothing to do with the matter before the court. Second, Ms. Monroe's purported postmortem right of publicity does not fit into any of the categories mentioned by the Hite court. Ms. Monroe could not have overlooked a right that did not come into being (assuming she was domiciled in California) until 22 years after her death. The property right that she allegedly devised through the residuary clause did not "lack particular definition" – it did not exist. Nor, for identical reasons, is this a case where the testatrix was entitled to certain

12

property at the time her will was executed (or at the time of her death) but was unaware of her entitlement.

Third, In re Hite reaffirmed, rather than undermined, the rule that only property owned at death can be devised by will. In In re Hite, the court refused to alter the disposition of property as between two beneficiaries under a will in light of events that occurred after the testatrix's death. In her will, the testatrix devised to her husband an undivided one-half interest in "all oil and gas royalties to which I may be entitled" from leases on land, with the remainder passing to her son. At the time of her death, the testatrix owned a fee mineral estate that had no operating leases on it. Id. at 714-16. The court was called upon to determine whether royalties from an oil and gas lease on that fee mineral estate that was executed after the testatrix's death passed to the husband (as royalties to which the testatrix "may be entitled") or to the son (who took the land on which the lease was executed under the residuary clause of the will). Id.

The court held that the execution of a new lease after the death of the testatrix created a royalty interest for the benefit of the son, not for the benefit of the testatrix herself, so the son was entitled to the royalties from the lease executed after her death. Id. at 717. The court explained the rationale as follows:

> It is well established that a will speaks of the testator's estate as of the time of the testator's death, and it is the estate of the testator then possessed that passes according to the terms of the will. It has been said that there is no shorter interval of time from when a testator dies and his estate passes to the devisees under his will. Title to an estate vests immediately in the devisees at the very moment of the testator's death, though title to the estate is subject to administration. Here, at the time of the testatrix' death, she owned an undivided interest in a fee mineral estate which was not burdened with any royalty interests. This fee mineral estate was devised to appellee (her son) in the residuary clause of her will.

Id. (citations omitted). Thus, far from holding that property in which the testatrix held no ownership interest at the time of her death could pass through the residuary clause of her will, the In re Hite court reaffirmed that a will speaks of the testator's estate at the time of her death, and that rights that vested in devisees under a will at the moment of the testator's death cannot be altered by events occurring thereafter.

Even if, as MMLLC implies, there has been some recent shift away from the unequivocal rule that only property owned by the testator at the time of death can be passed by will (as evidenced by § 2-602 of the Uniform Probate Code), it does not help MMLLC's cause. "Testamentary disposition . . . is controlled by the law in effect *as of the date of death*." Dep't of Health Services v. Fontes, 169 Cal. Ap. 3d 301, 305 (1985)(emphasis added); In re Smith's Estate, 182 Misc. 711 (N.Y. Sur 1944). There is no question – based on the case law recited above – that at the time of Ms. Monroe's death in 1962, neither New York nor California permitted a testator to dispose by will of property she did not own at the time of her death. Any argument that the residuary clause of Ms. Monroe's will could devise a postmortem right of publicity is thus doubly doomed because the law in effect at the time of Ms. Monroe's death did not recognize descendible postmortem publicity rights and did not allow for distribution under a will of property not owned by the testator at the time of her death.

2. Ms. Monroe did not "intend" to devise any rights she may have acquired under the Indiana of California right of publicity statute through the residuary clause of her will.

MMLLC argues that Marilyn Monroe intended to bequeath a postmortem right of publicity to her testamentary legatees. The argument is unpersuasive. Adhering to the well-settled principles of probate law discussed above does no violence to Ms. Monroe's testamentary intent,

the touchstone in construing her will under both New York and California law. See e.g. In re Estate of O'Brien, 165 Misc. 2d 459, 461 (Sur. Ct. 1995)("As with any construction proceeding, the first and foremost consideration of the court is to ascertain and to give effect to the testator's intentions."); Cal. Probate Code § 21102(a)("The intention of the transferor as expressed in the instrument controls the legal effect of the dispositions made in the instrument."); see also Estate of Karkeet, 56 Cal. 2d 277, 281 (1961)(giving effect to testamentary intent is the "cardinal rule" in construing a will.) MMLLC makes much of Ms. Monroe's purported intent to include in her residuary estate all property "to which [she] shall be in any way entitled." In the absence of any other evidence concerning Ms. Monroe's intent, this boilerplate language is much too slender a reed on which to hang a devise of postmortem publicity rights that did not come into being until 22 years after her death.

First, the language Ms. Monroe used does not reveal any actual intent to devise property she did not own at the time of her death, much less an intent to devise a postmortem right of publicity whose existence Ms. Monroe could not have contemplated. The entire residuary clause reads as follows:

> All the rest, residue and remainder of my estate, both real and personal of whatsoever nature and whatsoever situate, of which I shall die seized or possessed or to which I shall be in any way entitled, or over which I shall possess any power of appointment by Will at the time of my death, including any lapsed legacies, I give, devise and bequeath as follows:

MMLLC improperly construes the "to which I shall in any way be entitled" phrase independently of the limitation that precedes it within the same clause. Because there is no comma separating the phrases "of which I shall die seized or possessed" and "to which I shall be in any way entitled," they are part of a single term or clause and must be construed together. The limitation

15

"of which I shall die" thus applies to every verb that follows it in the clause, including the verb "entitled." This reading is bolstered by Ms. Monroe's disposition in the very next clause of property over which she "shall possess any power of appointment by Will at the time of [her] death." The "to which I shall in any way be entitled" language is thus book-ended by phrases in which Ms. Monroe explicitly recognizes that her powers of testamentary disposition are limited to property she owns at the time of her death. This court cannot take this common phrase out of its context and attribute to it the preternatural foresight that MMLLC suggests.

Second, a testator is presumed, as a matter of law, to know that he cannot dispose of property over which he has no testamentary power, including property he does not own at the time of his death. In re Buzza's Estate, 194 Cal. App. 2d. 601 (A testator may dispose only of such property as is subject to his testamentary power, and the testator is presumed to know the law.); see also In re Resler's Estate, 43 Cal. 2d 726, 732-733 (1955)(only unequivocally expressed intention of the testator will overcome the presumption that he only intended to bequeath property that was subject to his power of disposition.); Bank of New York v. Kaufman, 26 N.Y.S. 2d 474 (N.Y. Sup. 1940)("The testator is presumed to have known the law, and presumed to have intended to respect it; and this latter presumption will yield only to plain evidence of the contrary in the words he had adopted.")

Even if the language Ms. Monroe employed clearly demonstrated her intent to devise property she had no capacity to devise, the effect would be to render the disposition invalid, because she had no legal right to dispose of property that did not exist at the time of her death. In In re Van Winkle's Will, the New York Surrogate's Court stated the rule unequivocally: "Under no circumstances, in the absence of a valid power, can any amount of testamentary intent produce

16

the effect of subjecting property not owned by a testator at the date of his death to any disposition whatever." 86 N.Y.S. 2d at 600; see also In re Buzza's Estate, 194 Cal. App. 2d at 601.

Finally, MMLLC's argument that refusing to allow property that did not exist at the time of Ms. Monroe's death to pass through the residuary clause of her will improperly favors intestacy without any countervailing considerations borders on the absurd. The countervailing consideration that MMLLC refuses to recognize is Ms. Monroe's legal incapacity to devise what she did not own. See In re Braman's Estate 435 Pa. at 578 (Principle that residuary clause should be construed broadly to avoid intestacy does not apply "until it has been demonstrated that the testator at the time of death actually had an interest, recognized in law or in equity, as opposed to an expectancy in the property; absent such an interest, postmortem disposition of the property cannot be exercised.")

3. Neither the California nor the Indiana postmortem right of publicity statutes allows for testamentary disposition of the rights it recognizes by celebrities already deceased at the time of its enactment.

Finally, MMLLC's case is doomed because both the California and Indiana postmortem right of publicity statutes recognize that an individual cannot pass by will a statutory property right that she did not possess at the time of her death. California's Civ. Code § 3344.1(b)-(d) provides that, if no transfer of a personality's postmortem right of publicity has occurred before the personality's death, either "by contract or by means of a trust or testamentary documents," then the rights vest in certain statutorily specified heirs. Since a testamentary transfer has no effect until the testator's death, such a transfer could not be effectuated "before death" for purposes of the California statute. Thus, any rights bestowed by § 3344.1 on a personality already

17

deceased at the time of its enactment could not be transferred by will (which is how the purported property right came to MMLLC from the Administratrix at the time the Monroe Estate wound up). It would vest instead in the persons provided for by statute.

The Indiana statute likewise provides that if a personality has not transferred her right of publicity by "contract," license," "gift," "trust," or "testamentary document," the right will "vest" in those individuals entitled to her property through the "[o]peration of the laws of intestate succession applicable to the state administering the estate and property of the intestate deceased personality, regardless of whether the state recognizes the property rights set forth under this chapter." See Ind. Code §§ 32-36-1-16 to -18. Ms. Monroe's legatees under her will are not her statutory heirs for intestacy purposes.

Thus, even if a postmortem right of publicity in Marilyn Monroe's persona could have been created after her death, neither of the statutes that arguably bestowed that right allows for it to be transferred through the will of a "personality" who, like Ms. Monroe, was already deceased at the time of the statute's enactment. To the extent that other courts, including Joplin Enterprises v. Allen, 795 F.Supp. 349 (W.D. Wash 1992) and Miller v. Glenn Miller Productions, 318 F.Supp. 2d 923 (C.D. Cal. 2004), assumed without explicitly deciding that California's right of publicity statute allows for the disposition of the rights it recognizes through wills of personalities already deceased at the time of its enactment, and that such disposition is permissible under the applicable probate principles, this court respectfully disagrees.

Having determined that any postmortem right of publicity in Marilyn Monroe could not have passed to MMLLC's predecessors-in-interest through the residuary clause in her will, the court need not consider the SFA parties' alternative arguments.

18

## Conclusion

MMLLC's motion for summary judgment on Count II of its Second Amended Complaint is denied, and SFA's cross-motion for summary judgment on the same Count is granted.

This constitutes the decision and order of the Court.

Dated: May 2, 2007

U.S.D.J.

BY FAX TO ALL COUNSEL

19