# EX. C

BILL NUMBER: SB 771	AMENDED
	BILL TEXT

		AMENDED IN ASSEMBLY  JUNE 28, 2007
		AMENDED IN SENATE  MAY 1, 2007
		AMENDED IN SENATE  APRIL 17, 2007

INTRODUCTED BY   ~~Senators~~  ~~Kuehl~~
~~and Runner~~   Senator
 Kuehl
   ~~(~~  ~~Principal coauthor:~~
~~Assembly Member~~  ~~Jones~~
~~)~~
   ~~(~~  ~~Coauthor:~~  ~~Senator~~
  ~~Romero~~  ~~)~~

				FEBRUARY 23, 2007

   ~~An act to amend Section 125290.30 of the Health and
Safety Code, relating to stem cell research.~~  An act to
amend Section 3344.1 of the Civil Code, relating to deceased
personalities.


		LEGISLATIVE COUNSEL'S DIGEST


   SB 771, as amended, Kuehl.  ~~Stem cell research standards:
licensing revenues.~~  Deceased personalities:
testamentary instruments.
   Existing law establishes a cause of action for damages on behalf
of specified injured parties for the unauthorized use of a deceased
personality's name, voice, signature, photograph, or likeness for
commercial purposes within 70 years of the personality's death,
except as specified. Existing law provides that the rights recognized
under these provisions are property rights, freely transferable, in
whole or in part, by contract or by means of trust or testamentary
documents, whether the transfer occurs before the death of the
deceased personality, by the deceased personality or his or her
transferees, or, after the death of the deceased personality, by the
person in whom the rights vest under these provisions or the
transferees of that person.
    This  bill would provide, instead, that the above
property rights are freely transferable or descendible by contract or
by means of any trust or any other testamentary instrument executed
before or after January 1, 1985. It would provide that those rights
shall be deemed to have existed at the time of death of any person
who died prior to January 1, 1985, and shall vest in the persons
entitled to these property rights under the testamentary instrument
of the deceased personality effective as of the date of his or her
death. The bill would provide that, in the absence of an express
provision in a testamentary instrument to transfer these rights, a
provision in the instrument that provides for the disposition of the
residue of the deceased personality's assets shall be effective to
transfer the rights.
   ~~Existing law, the California Stem Cell Research and Cures Act
establishes the Independent Citizen's Oversight Committee (ICOC) and
the California Institute for Regenerative Medicine, the purpose of~~

~~which is, among other things, to make grants and loans for stem cell research, for research facilities, and for other vital research opportunities to realize therapies, protocols, and medical procedures that will result in the cure for, or substantial mitigation of, diseases and injuries. Existing law authorizes the issuance of bonds, not to exceed $3,000,000,000, for the purpose of funding this research.~~
  ~~Existing law requires the ICOC to establish standards that require all awards be subject to intellectual property agreements.~~

  ~~This bill would require that the intellectual property standards include certain requirements, including, but not limited to, the requirement that every award recipient provide the state with 25% of the associated net licensing revenues and would authorize the institute to commission an audit of expenditures to ensure appropriate accounting.~~
  ~~The California Stem Cell Research and Cures Act, an initiative measure, provides that the Legislature may amend the non-bond statutory provisions of that act, to enhance the ability of the California Institute for Regenerative Medicine to further the purposes of the grant and loan programs created by that act, with a 70% vote of each house and compliance with specified procedural requirements.~~
  ~~This bill, which would declare that it enhances the ability of the institute to further the purposes of the grant and loan programs created by that act, would therefore require for passage a 70% vote.~~

   Vote: ~~70%~~ *majority* . Appropriation:
no. Fiscal committee: ~~yes~~ *no* .
State-mandated local program: no.


THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

   SECTION 1.    Section 3344.1 of the    Civil
Code    is amended to read:
   3344.1.   (a) (1) Any person who uses a deceased personality's
name, voice, signature, photograph, or likeness, in any manner, on or
in products, merchandise, or goods, or for purposes of advertising
or selling, or soliciting purchases of, products, merchandise, goods,
or services, without prior consent from the person or persons
specified in subdivision (c), shall be liable for any damages
sustained by the person or persons injured as a result thereof. In
addition, in any action brought under this section, the person who
violated the section shall be liable to the injured party or parties
in an amount equal to the greater of seven hundred fifty dollars
($750) or the actual damages suffered by the injured party or
parties, as a result of the unauthorized use, and any profits from
the unauthorized use that are attributable to the use and are not
taken into account in computing the actual damages. In establishing
these profits, the injured party or parties shall be required to
present proof only of the gross revenue attributable to the use and
the person who violated the section is required to prove his or her
deductible expenses. Punitive damages may also be awarded to the
injured party or parties. The prevailing party or parties in any
action under this section shall also be entitled to attorneys' fees
and costs.
   (2) For purposes of this subdivision, a play, book, magazine,
newspaper, musical composition, audiovisual work, radio or television
program, single and original work of art, work of political or

newsworthy value, or an advertisement or commercial announcement for any of these works, shall not be considered a product, article of merchandise, good, or service if it is fictional or nonfictional entertainment, or a dramatic, literary, or musical work.

(3) If a work that is protected under paragraph (2) includes within it a use in connection with a product, article of merchandise, good, or service, this use shall not be exempt under this subdivision, notwithstanding the unprotected use's inclusion in a work otherwise exempt under this subdivision, if the claimant proves that this use is so directly connected with a product, article of merchandise, good, or service as to constitute an act of advertising, selling, or soliciting purchases of that product, article of merchandise, good, or service by the deceased personality without prior consent from the person or persons specified in subdivision (c).

(b) The rights recognized under this section are property rights, freely transferable *or descendible*, in whole or in part, by contract or by means of *any* trust or *any other* testamentary ~~documents~~ *instrument*, ~~whether the transfer occurs before the death of the deceased personality, by the deceased personality or his or her transferees, or, after the death of the deceased personality, by the person or persons in whom the rights vest under this section or the transferees of that person or persons~~ *executed before or after January 1, 1985. The rights recognized under this section shall be deemed to have existed at the time of death of any person who died prior to January 1, 1985, and shall vest in the persons entitled to these property rights under the testamentary instrument of the deceased personality effective as of the date of his or her death. In the absence of an express transfer in a testamentary instrument of the deceased personality's rights in his or her name, voice, signature, photograph, or* likeness, *a provision in the testamentary instrument that provides for the disposition of the residue of the deceased personality's assets shall be effective to transfer the rights recognized under this section in accordance with the terms of that provision. The rights established by this section shall also be freely transferable or descendible by contract, trust, or any other testamentary instrument by any subsequent owner of the deceased personality's rights as recognized by this section*.

(c) The consent required by this section shall be exercisable by the person or persons to whom the right of consent, or portion thereof, has been transferred in accordance with subdivision (b), or if no transfer has occurred, then by the person or persons to whom the right of consent, or portion thereof, has passed in accordance with subdivision (d).

(d) Subject to subdivisions (b) and (c), after the death of any person, the rights under this section shall belong to the following person or persons and may be exercised, on behalf of and for the benefit of all of those persons, by those persons who, in the aggregate, are entitled to more than a one-half interest in the rights:

(1) The entire interest in those rights belong to the surviving spouse of the deceased personality unless there are any surviving children or grandchildren of the deceased personality, in which case one-half of the entire interest in those rights belong to the surviving spouse.

(2) The entire interest in those rights belong to the surviving children of the deceased personality and to the surviving children of any dead child of the deceased personality unless the deceased

personality has a surviving spouse, in which case the ownership of a one-half interest in rights is divided among the surviving children and grandchildren.

(3) If there is no surviving spouse, and no surviving children or grandchildren, then the entire interest in those rights belong to the surviving parent or parents of the deceased personality.

(4) The rights of the deceased personality's children and grandchildren are in all cases divided among them and exercisable in the manner provided in Section 240 of the Probate Code according to the number of the deceased personality's children represented. The share of the children of a dead child of a deceased personality can be exercised only by the action of a majority of them.

(e) If any deceased personality does not transfer his or her rights under this section by contract, or by means of a trust or testamentary ~~document~~ instrument, and there are no surviving persons as described in subdivision (d), then the rights set forth in subdivision (a) shall terminate.

(f) (1) A successor in interest to the rights of a deceased personality under this section or a licensee thereof may not recover damages for a use prohibited by this section that occurs before the successor in interest or licensee registers a claim of the rights under paragraph (2).

(2) Any person claiming to be a successor in interest to the rights of a deceased personality under this section or a licensee thereof may register that claim with the Secretary of State on a form prescribed by the Secretary of State and upon payment of a fee as set forth in subdivision (d) of Section 12195 of the Government Code. The form shall be verified and shall include the name and date of death of the deceased personality, the name and address of the claimant, the basis of the claim, and the rights claimed.

(3) Upon receipt and after filing of any document under this section, the Secretary of State shall post the document along with the entire registry of persons claiming to be a successor in interest to the rights of a deceased personality or a registered licensee under this section upon the World Wide Web, also known as the Internet. The Secretary of State may microfilm or reproduce by other techniques any of the filings or documents and destroy the original filing or document. The microfilm or other reproduction of any document under the provisions of this section shall be admissible in any court of law. The microfilm or other reproduction of any document may be destroyed by the Secretary of State 70 years after the death of the personality named therein.

(4) Claims registered under this subdivision shall be public records.

(g) No action shall be brought under this section by reason of any use of a deceased personality's name, voice, signature, photograph, or likeness occurring after the expiration of 70 years after the death of the deceased personality.

(h) As used in this section, "deceased personality" means any natural person whose name, voice, signature, photograph, or likeness has commercial value at the time of his or her death, whether or not during the lifetime of that natural person the person used his or her name, voice, signature, photograph, or likeness on or in products, merchandise or goods, or for purposes of advertising or selling, or solicitation of purchase of, products, merchandise, goods, or services. A "deceased personality" shall include, without limitation, any such natural person who has died within 70 years prior to January 1, 1985.

(i) As used in this section, "photograph" means any photograph or photographic reproduction, still or moving, or any video tape or live

television transmission, of any person, such that the deceased personality is readily identifiable. A deceased personality shall be deemed to be readily identifiable from a photograph when one who views the photograph with the naked eye can reasonably determine who the person depicted in the photograph is.

(j) For purposes of this section, a use of a name, voice, signature, photograph, or likeness in connection with any news, public affairs, or sports broadcast or account, or any political campaign, shall not constitute a use for which consent is required under subdivision (a).

(k) The use of a name, voice, signature, photograph, or likeness in a commercial medium shall not constitute a use for which consent is required under subdivision (a) solely because the material containing the use is commercially sponsored or contains paid advertising. Rather, it shall be a question of fact whether or not the use of the deceased personality's name, voice, signature, photograph, or likeness was so directly connected with the commercial sponsorship or with the paid advertising as to constitute a use for which consent is required under subdivision (a).

(l) Nothing in this section shall apply to the owners or employees of any medium used for advertising, including, but not limited to, newspapers, magazines, radio and television networks and stations, cable television systems, billboards, and transit ads, by whom any advertisement or solicitation in violation of this section is published or disseminated, unless it is established that the owners or employees had knowledge of the unauthorized use of the deceased personality's name, voice, signature, photograph, or likeness as prohibited by this section.

(m) The remedies provided for in this section are cumulative and shall be in addition to any others provided for by law.

(n) This section shall apply to the adjudication of liability and the imposition of any damages or other remedies in cases in which the liability, damages, and other remedies arise from acts occurring directly in this state. For purposes of this section, acts giving rise to liability shall be limited to the use, on or in products, merchandise, goods, or services, or the advertising or selling, or soliciting purchases of, products, merchandise, goods, or services prohibited by this section.

(o) ~~This section shall be known and may be cited as the Astaire Celebrity Image Protection Act.~~ The rights recognized by this section are expressly made retroactive, including to those deceased personalities who died before January 1, 1985.

SEC. 2. It is the intent of the Legislature to abrogate the summary judgment orders entered in The Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., United States District Court, Central District of California, Case No. CV 05-2200 MMM (MCx), filed May 14, 2007, and in Shaw Family Archives Ltd. v. CMG Worldwide, Inc., United States District Court, Southern District of New York, Case No. 05 Civ. 3939 (CM), dated May 2, 2007.

~~SECTION 1. Section 125290.30 of the Health and Safety Code is amended to read:~~
~~125290.30. Public and Financial Accountability Standards~~
~~(a) Annual Public Report~~
~~The institute shall issue an annual report to the public which sets forth its activities, grants awarded, grants in progress, research accomplishments, and future program directions. Each annual report shall include, but not be limited to, the following: the number and dollar amounts of research and facilities grants; the grantees for the prior year; the institute's administrative expenses;~~

~~an assessment of the availability of funding for stem cell research from sources other than the institute; a summary of research findings, including promising new research areas; an assessment of the relationship between the institute's grants and the overall strategy of its research program; and a report of the institute's strategic research and financial plans.~~
~~(b) Independent Financial Audit for Review by State Controller~~
~~The institute shall annually commission an independent financial audit of its activities from a certified public accounting firm, which shall be provided to the State Controller, who shall review the audit and annually issue a public report of that review.~~
~~(c) Citizen's Financial Accountability Oversight Committee~~
~~There shall be a Citizen's Financial Accountability Oversight Committee chaired by the State Controller. This committee shall review the annual financial audit, the State Controller's report and evaluation of that audit, and the financial practices of the institute. The State Controller, the State Treasurer, the President pro Tempore of the Senate, the Speaker of the Assembly, and the Chairperson of the ICOC shall each appoint a public member of the committee. Committee members shall have medical backgrounds and knowledge of relevant financial matters. The committee shall provide recommendations on the institute's financial practices and performance. The State Controller shall provide staff support. The committee shall hold a public meeting, with appropriate notice, and with a formal public comment period. The committee shall evaluate public comments and include appropriate summaries in its annual report. The ICOC shall provide funds for the per diem expenses of the committee members and for publication of the annual report.~~
~~(d) Public Meeting Laws~~
~~(1) The ICOC shall hold at least two public meetings per year, one of which will be designated as the institute's annual meeting. The ICOC may hold additional meetings as it determines are necessary or appropriate.~~
~~(2) The Bagley-Keene Open Meeting Act, Article 9 (commencing with Section 11120) of Chapter 1 of Part 1 of Division 3 of Title 2 of the Government Code, shall apply to all meetings of the ICOC, except as otherwise provided in this section. The ICOC shall award all grants, loans, and contracts in public meetings and shall adopt all governance, scientific, medical, and regulatory standards in public meetings.~~
~~(3) The ICOC may conduct closed sessions as permitted by the Bagley-Keene Open Meeting Act, under Section 11126 of the Government Code. In addition, the ICOC may conduct closed sessions when it meets to consider or discuss:~~
~~(A) Matters involving information relating to patients or medical subjects, the disclosure of which would constitute an unwarranted invasion of personal privacy.~~
~~(B) Matters involving confidential intellectual property or work product, whether patentable or not, including, but not limited to, any formula, plan, pattern, process, tool, mechanism, compound, procedure, production data, or compilation of information, which is not patented, which is known only to certain individuals who are using it to fabricate, produce, or compound an article of trade or a service having commercial value and which gives its user an opportunity to obtain a business advantage over competitors who do not know it or use it.~~
~~(C) Matters involving prepublication, confidential scientific research or data.~~
~~(D) Matters concerning the appointment, employment, performance, compensation, or dismissal of institute officers and employees.~~

~~Action on compensation of the institute's officers and employees shall only be taken in open session.~~
~~(4) The meeting required by paragraph (2) of subdivision (b) of Section 125290.20 shall be deemed to be a special meeting for the purposes of Section 11125.4 of the Government Code.~~
~~(e) Public Records~~
~~(1) The California Public Records Act, Article 1 (commencing with Section 6250) of Chapter 3.5 of Division 7 of Title 1 of the Government Code, shall apply to all records of the institute, except as otherwise provided in this section.~~
~~(2) Nothing in this section shall be construed to require disclosure of any records that are any of the following:~~
~~(A) Personnel, medical, or similar files, the disclosure of which would constitute an unwarranted invasion of personal privacy.~~
~~(B) Records containing or reflecting confidential intellectual property or work product, whether patentable or not, including, but not limited to, any formula, plan, pattern, process, tool, mechanism, compound, procedure, production data, or compilation of information, which is not patented, which is known only to certain individuals who are using it to fabricate, produce, or compound an article of trade or a service having commercial value and which gives its user an opportunity to obtain a business advantage over competitors who do not know it or use it.~~
~~(C) Prepublication scientific working papers or research data.~~
~~(f) Competitive Bidding~~
~~(1) The institute shall, except as otherwise provided in this section, be governed by the competitive bidding requirements applicable to the University of California, as set forth in Article 1 (commencing with Section 10500) of Chapter 2.1 of Part 2 of Division 2 of the Public Contract Code.~~
~~(2) For all institute contracts, the ICOC shall follow the procedures required of the Regents by Article 1 (commencing with Section 10500) of Chapter 2.1 of Part 2 of Division 2 of the Public Contract Code with respect to contracts let by the University of California.~~
~~(3) The requirements of this section shall not be applicable to grants or loans approved by the ICOC.~~
~~(4) Except as provided in this section, the Public Contract Code shall not apply to contracts let by the institute.~~
~~(g) Conflicts of Interest~~
~~(1) The Political Reform Act, Title 9 (commencing with Section 81000) of the Government Code, shall apply to the institute and to the ICOC, except as provided in this section and in subdivision (e) of Section 125290.50.~~
~~(A) No member of the ICOC shall make, participate in making, or in any way attempt to use his or her official position to influence a decision to approve or award a grant, loan, or contract to his or her employer, but a member may participate in a decision to approve or award a grant, loan, or contract to a nonprofit entity in the same field as his or her employer.~~
~~(B) A member of the ICOC may participate in a decision to approve or award a grant, loan, or contract to an entity for the purpose of research involving a disease from which a member or his or her immediate family suffers or in which the member has an interest as a representative of a disease advocacy organization.~~
~~(C) The adoption of standards is not a decision subject to this section.~~
~~(2) Service as a member of the ICOC by a member of the faculty or administration of any system of the University of California shall not, by itself, be deemed to be inconsistent, incompatible, in~~

~~conflict with, or inimical to the duties of the ICOC member as a member of the faculty or administration of any system of the University of California and shall not result in the automatic vacation of either such office. Service as a member of the ICOC by a representative or employee of a disease advocacy organization, a nonprofit academic and research institution, or a life science commercial entity shall not be deemed to be inconsistent, incompatible, in conflict with, or inimical to the duties of the ICOC member as a representative or employee of that organization, institution, or entity.~~

~~(3) Section 1090 of the Government Code shall not apply to any grant, loan, or contract made by the ICOC except where both of the following conditions are met:~~

~~(A) The grant, loan, or contract directly relates to services to be provided by any member of the ICOC or the entity the member represents or financially benefits the member or the entity he or she represents.~~

~~(B) The member fails to recuse himself or herself from making, participating in making, or in any way attempting to use his or her official position to influence a decision on the grant loan or contract.~~

~~(h) Patent Royalties and License Revenues Paid to the State of California~~

~~(1) The ICOC shall establish standards that require that all grants and loan awards be subject to intellectual property agreements that balance the opportunity of the State of California to benefit from the patents, royalties, and licenses that result from basic research, therapy development, and clinical trials with the need to assure that essential medical research is not unreasonably hindered by the intellectual property agreements.~~

~~(2) The standards that the ICOC develops shall do all the following:~~

~~(A) Require every recipient of a grant or loan award for research to provide to the state 25 percent of the net licensing revenues it receives associated with any institute-funded patented invention beyond a reasonable revenue threshold that the ICOC may establish. Net licensing revenue shall include all forms of financial consideration from licensing and shall be defined as gross licensing revenues, less patent expenses and reasonable payments to inventors.~~

~~(B) Require every recipient of a grant or loan award for research to grant exclusive licenses involving institute-funded patented inventions relevant to development of therapies, drugs, and diagnostics only to organizations that have plans which the institute determines will provide substantial access to the resultant therapies, drugs, and diagnostics to uninsured Californians. In addition, the licensees shall agree to provide to patients whose therapies, drugs, and diagnostics will be purchased in California with public funds, any drugs at the federal Medicaid price. A licensee shall not be required to establish a new best price for any drugs that the licensee develops with institute funds in order to comply with this subparagraph. Each licensee shall agree to provide any therapies or diagnostics that are not drugs at the best price for which the licensee provides those therapies or diagnostics to any purchaser.~~

~~(C) Require any recipient of a grant or loan award for research that commercializes any product that it develops using institute funds to agree, as a condition of accepting the funds, to make royalty payments to the state equal to 2 to 5 percent of the revenues over the life of the product, depending on the level of funds provided and contribution of institute-funded patented inventions to~~

~~the development of the product.~~
~~(3) The institute may commission an audit of any institute expenditure and all cofunding calculations to ensure appropriate accounting.~~
~~(i) Preference for California Suppliers~~
~~The ICOC shall establish standards to ensure that grantees purchase goods and services from California suppliers to the extent reasonably possible, in a good faith effort to achieve a goal of more than 50 percent of such purchases from California suppliers.~~

~~SEC. 2.  The Legislature finds and declares that this act enhances the ability of the California Institute for Regenerative Medicine to further the purposes of the grant and loan programs created by the California Stem Cell Research and Cures Act within the meaning of Section 8 of that act.~~