# EXHIBIT
# 26, PART F

arrange for storage of all of the items involved. However, before the furniture and furnishings were [illegible] chaser of the real property requested [illegible] buying certain of the items that were [illegible] for use in the house. Petitioner's attorneys, [illegible] met with the buyer, so that the latter could designate which items he desired. Thereafter, petitioner's attorneys had these items separately appraised so that they [illegible] at not less than the appraised value, and prepared the Return of Sale of Personal Property and the Order based thereon, and drew the necessary documents to complete the transaction. Said attorneys then arranged with the Special Administratrix so that prior to delivery of possession of the house to the buyer, all the remaining items of furniture and furnishings could be boxed and stored with a warehouse.

Petitioner's said attorneys estimate that they expended ten (10) hours in connection with the foregoing services.

4. Extraordinary Services Re Creditors' Claims:

Following decedent's death, there were thirty-five creditors' claims filed against the estate in California. While petitioner's attorneys recognize that the processing of creditors' claims is part of the normal duties of administration, for which statutory fees are allowed, said ...

Estate of Marilyn Monroe: LASC No. 458,9[illegible]

attorneys point out that, in this estate, a portion of the services were extraordinary in that there was no one alive [illegible] a position to advise as to the accuracy of [illegible] or the extent of decedent's outstanding [illegible] consequence, said attorneys had to make [illegible] tions with respect to said claims, which involved, [illegible] other things, separate meetings with many of the claimants to examine into the nature of the claim.

Furthermore, in connection with the claim of [illegible] Bright, the interior decorator, it was necessary to analyze a large number of items to determine whether there was a firm commitment or merely a proposed estimate which could be canceled. In this connection, petitioner's attorneys arranged to cancel an order for a rug from Mexico, which had been ordered and woven to size in Mexico and was at that time being held for delivery. In addition, there were demands from the Los Angeles Bureau of Customs regarding a carton containing a specifically constructed chest, which the Bureau of Customs was holding for transportation and storage charges. Upon investigation, it appeared that the decedent had paid $360.00 for the chest and that the total charges to redeem amounted to approximately $300.00. After several consultations with the interior decorator, petitioner's attorneys recommended to the ancillary executor that the chest not be

...

...

EXHIBIT III

SFA1 0189

Estate of Marilyn Monroe: LASC No. 458,935

redeemed but that the Bureau of Customs be allowed to sell it for the charges.

In connection with the creditor's [illegible] Artists, Ltd., said attorneys were [illegible] extensive agency contracts in order to advise the [illegible] executor as to the basis for the claim and its propriety. Subsequently, when the time came to pay the claims, said attorneys suggested to the ancillary executor the [illegible] whereby the creditor's claim of MCA Artists, Ltd. [illegible] paid out of the domiciliary probate estate in New York, so that the claim, including the contingent portion thereof, could be released in California, the ancillary administration be released in California and the administration [illegible] Said attorneys, further, handled the negotiations with [illegible] thereto, insofar as the California representatives of the claimant were involved.

Petitioner's said attorneys estimate that their services in connection with the handling of those aspects of the creditors' claims set forth above, over and apart from the normal services of handling creditors' claims, involved approximately twenty-five (25) hours of time.

...

...

...

...

EXHIBIT III

SFA10190

Estate of Marilyn Monroe: LASC No. 458,935

5. Extraordinary Services Re Tax Matters:

(a) Although decedent's domiciliary probate [illegible] handled in New York, [illegible] in California and owned real property here [illegible] of her death. Petitioner's attorney [illegible] services in connection with the preparation of the California Inheritance Tax Affidavit and Affidavit Concerning Residence, together with supporting affidavits, in order to establish that decedent was a nonresident of California at the time of her death, and in order to assemble and segregate correctly those items of receipts and expenses attributable to California for assessment. Petitioner's attorneys corresponded with and interviewed several persons with respect to decedent's nonresident status, suggested to the ancillary executor the types of evidence to be secured to substantiate this position and prepared various affidavits which were submitted in support of such position. Said attorneys engaged in correspondence with the California State Controller's office, explaining in detail their factual and legal position and ultimately were successful in obtaining a determination that decedent was not a resident of California at the time of her death. As a result of

...

EXHIBIT III

SFA1 0291

such determination, none of decedent's contract rights were included in measuring such tax in California.

Petitioner's attorneys assembled the information with respect to the California assets and obligations of decedent for the [illegible] Federal Estate Tax Return and in connection with a Notice of Levy from the U. S. Treasury Department, Internal Revenue Service, for federal estate taxes in the sum of approximately $135,000.00 which was served on said attorneys, and worked with the domiciliary executor in ultimately obtaining the necessary evidence of payment and the formal Release of Levy.

Said attorneys allege that they expended more than twenty (20) hours in connection with the foregoing complicated tax matters.

(b) Upon decedent's death, her estate became entitled to a percentage of the receipts from various motion pictures, including "Some Like It Hot" and "The Misfits", on a continuing basis. The moneys involved were paid to the domiciliary executor in New York and income tax returns reporting such receipts were filed, and taxes paid thereon, in New York.

In 1971, when the ancillary executor herein prepared to file his Petition for Final Distribution,

SFA1 0192

Estate of Marilyn Monroe: LASC No. 458,935

he sought an Income Tax Certificate from the Franchise Tax Board in accordance with the then applicable requirements of law. The Franchise Tax Board responded with a claim that petitioner owed the State of California fiduciary income taxes for the years 1963 through 1970, based upon the estate's share of gross receipts from the above entitled pictures attributable to decedent's services rendered in California.

In accordance with instructions furnished by petitioner's attorneys herein, the accountants for the estate prepared appropriate fiduciary income tax returns for the years in question and submitted them to the Franchise Tax Board under protest. Extensive negotiations and discussions were then carried on between said attorneys and representatives of the Franchise Tax Board with respect to the legal position of the estate that such income was not subject to tax. After considering the legal arguments asserted by the attorneys herein, the Franchise Tax Board served notice of proposed assessments of tax against the ancillary executor for the years 1963 through 1970. Petitioner, through his attorneys, appealed from such assessments.

...

EXHIBIT III



SFA1 0193

Estate of Marilyn Monroe: LASC No. 458,935

The point in issue in the proceedin[illegible] completely novel point of law; namely, what [illegible] California Revenue and Taxation Code and [illegible] thereunder permitted the taxation [illegible] source income of receipts from contracts which had been valued for tax purposes as assets of decedent's domiciliary estate and were passively received [illegible] such domiciliary estate outside of California [illegible] question involved matters of constitutional [illegible] statutory construction and the interpretation [illegible] the Franchise Tax Board's own rulings.

Extensive research was carried on by said attorneys, both with respect to the facts and the law; an opening brief and a reply brief were filed in support of the estate's position. The matter came on for hearing before the Board of Equaliza-tion and was orally argued at length before the full Board in December, 1973.

In 1975, the Board of Equalization ultimately affirmed the Franchise Tax Board's determination of tax. The taxes, penalties and interest involved totaled approximately $93,000. Before determining whether or not to appeal further, said attorneys discussed with the Franchise Tax Board, and subse-quently with the California Attorney General's office.

Estate of Marilyn Monroe: LASC No. 458,935

the possibility of settlement. Negotiations were conducted on the basis that this was a matter of first impression, that there were substantial issues of law which the courts would have [illegible] upon, and that it was advantageous both to [illegible] State and to the estate to dispose of the matter as promptly as possible on a reduced basis. Ultimately, after said attorneys, with the approval of petitioner, had prepared and submitted various proposals, the State of California agreed to a settlement which waived all penalties and accepted the sum of approximately $52,000, as payment in full. The domiciliary estate supplied a substantial portion of the funds necessary to make this settlement possible. Said attorneys reviewed and approved the settlement documents prepared. Said attorneys then prepared a Petition for Order [illegible], attended a hearing thereon, and after approval by the Court, prepared the Order of Approving Compromise. Payment has been effected and the action has been dismissed.

In the preparation of the briefs, negotiations, hearing, argument and settlement procedures, said attorneys have expended in excess of one hundred (100) hours.