EX. B, PT. 2

1    **C.**    **Whether Plaintiffs Have Demonstrated That They Own Marilyn Monroe's**

2    **Posthumous Right of Publicity**

3        In their motion for summary judgment, defendants argue that plaintiffs cannot show they

4    have standing to assert claims based on Marilyn Monroe's right of publicity.[25] They contend that,

5    even if a posthumous right of publicity in Marilyn Monroe's name, likeness and persona exists,

6    plaintiffs cannot establish that they are the owners of that right.[26]

7    _____

8    [25]Defs.' Mem. at 32-34.

9    [26]Defendants argue that, as a mere licensee of Marilyn Monroe's purported right of
publicity, CMG lacks "the requisite ownership interest" to "sue on violations of rights [it] merely
10    represent[s] on behalf of [its] principals." (*Id.* at 33.) This argument lacks merit. Under the
licensing agreement between Marilyn Monroe LLC ("MMLLC") and CMG, CMG was appointed
11    the "sole and exclusive licensing agent world-wide" for "merchandising and advertising" Marilyn
Monroe's right of publicity. (See Pls.' Facts, AMF ¶¶ 18; Defs.' Reply Facts, AMF ¶¶ 18).)
12    To the extent, therefore, that MMLLC owns and is capable of licensing Marilyn Monroe's right
of publicity, CMG has standing to sue for violation of that right. See *MJ & Partners Restaurant*
13    *Ltd. Partnership v. Zadikoff*, 10 F.Supp.2d 922, 930 (N.D. Ill. 1998) (noting that the "weight of
authority" favors the view that "a[n] [exclusive] licensee of a celebrity's name may state a cause
14    of action for misappropriation of the right to publicity"); *Bi-Rite Enterprises, Inc. v. Button*
*Master*, 555 F.Supp. 1188, 1199-1200 (S.D.N.Y. 1983) ("Plaintiff Bi-Rite, as the exclusive
15    licensee of various rock groups, may also assert this [right of publicity] claim. Unlike privacy
rights, which protect personality and feelings and are therefore not assignable, the right of
16    publicity gives rise to a 'proprietary' interest in the commercial value of one's persona which is
assignable and may be freely licensed. This proprietary interest is much like a copyright; it
17    embodies a bundle of exclusive marketing rights which its holder may transfer in its entirety by
an assignment or in part by exclusive licenses. Holders of exclusive licenses gain standing to
18    protect their interests against all who would encroach on the exclusive rights embodied in the
licenses" (citations omitted)), opinion supplemented on other grounds, 578 F.Supp. 59 (S.D.N.Y.
19    1983); see also 2 J. Thomas McCarthy, THE RIGHTS OF PUBLICITY AND PRIVACY § 10:53 (2d ed.
20    2005) ("A licensee of exclusive rights of publicity has standing to sue for infringements which
impinge upon its area of exclusive rights as defined in the license").
21
    The authorities cited by defendants for the proposition that CMG lacks standing to sue (see
22    Defs.' Reply at 18 n. 22) are inapposite. See *Exhibitors' Serv., Inc., v. Am. Multi-Cinema, Inc.*,
23    788 F.2d 574, 578-79 (9th Cir. 1986) (holding, on the specific facts of the case, that a motion
picture licensing agent was not a "proper party" to assert an antitrust claim against motion picture
24    exhibitors because its injury "was not of the type the antitrust laws were intended to forestall"
(internal quotation marks omitted)); *Pickett v. IBP, Inc.*, 197 F.R.D. 510, 516 (M.D. Ala. 2000)
25    (holding that "feedlot" owners lacked standing to "bring suit to recover for the injuries suffered
26    by the owners of cattle which they fed and marketed").

27

28

1  Plaintiffs counter:

2  "It is undisputed that in her last will and testament Marilyn Monroe devised 75%

3  of the 'rest, residue and remainder of [her] estate, both real and personal, or

4  whatsoever nature and whatsoever situate . . . to which I shall be in any way

5  entitled' to Lee Strasberg, her close friend and acting coach.  By definition, this

6  personal property included the right of publicity, and courts have uniformly held

7  that the right of publicity is a property right.  When Lee Strasberg died, Ms.

8  Monroe's publicity rights passed by will to his wife, Anna Strasberg.  In 2001,

9  Mrs. Strasberg formed MMLLC and transferred, along with the 25% interest

10  holder, all of her rights and interests in the estate of Marilyn Monroe, including,

11  but not limited to, the right of publicity, to MMLLC."[27]

12  Citing these transfers, plaintiffs assert "[t]he chain of title to Marilyn Monroe's Right of Publicity

13  is simple."[28]

14      Defendants argue that title to Marilyn Monroe's right of publicity could not have passed as

15  plaintiffs contend, since "no post mortem [right of publicity] existed in 1962 under either New

16  York[,] . . . California [or Indiana] law and . . . [thus] none could have been transferred by will

17  or through the New York surrogate proceedings."[29]  Additionally, they contend that "Ms. Monroe

18  could not transfer what she did not have and [that] her Will plainly transferred only property she

19  was seized in and had possession of at the time of her death."[30]

20      1.    **Whether Marilyn Monroe Could Transfer By Will a Statutory Publicity**

21          **Right that Was Not Created Until After Her Death**

22      As a general principle of probate law, "under no circumstances, in the absence of a valid

23

24

25  [27]Pls.' Opp. at 36.

26  [28]*Id.* at 35.

27  [29]Defs.' Reply at 17.

28  [30]*Id.*

14

1  power, can any amount of testamentary intent produce the effect of subjecting property not owned

2  by a testator at the date of his death to any disposition whatever." *In re Van Winkle's Will*, 86

3  N.Y.S.2d 597, 600 (Sur. Ct. 1949). This rule applies to wills probated in New York, see *id.*; see

4  also N.Y. EST. POWERS & TRUSTS LAW § 3-3.1 (formerly N.Y. DECEDENT EST. LAW § 14),[31] as

5  well as to wills probated in California.[32] See, e.g., *In re Buzza's Estate*, 194 Cal.App.2d 598, 601

6

7

8  [31]This provision states: "Unless the will provides otherwise, a disposition by the testator of all his property passes all of the property he was entitled to dispose of *at the time of his death.*"

9  N.Y. EST. POWERS & TRUSTS LAW § 3-3.1 (formerly N.Y. DECEDENT EST. LAW § 14) (emphasis added). Plaintiffs concede that the phrase "[u]nless the will provides otherwise" was inserted in

10  the statute to alter the common law rule that real property acquired by a testator after the execution of her will (but prior to death) did not pass through the will's residuary clause.

11  (Plaintiffs' Supplemental Brief in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Pls.'s Supp. Brief") at 8-9.) They argue, however, that the phrase should

12  be interpreted to mean that a testator can pass property she did not own at the time of her death by including appropriate language in her will. (*Id.*) Under New York law, the phrase "[u]nless

13  the will provides otherwise" makes the statutory provision that a disposition of "all . . . property"

14  passes all property owned at the time of death a presumption rather than a mandatory rule. See, e.g., *In re Will of McDonald*, 456 N.Y.S.2d 657, 659 (Sur. Ct. 1982) (stating that, as used in the

15  New York probate code, the phrase "unless the will provides otherwise" indicates that the legislature intends to permit testators to opt out of the requirement in question). In the context

16  of § 3-3.1, the provision permits a testator to state in his will that she intends to pass only such

17  property as she owns at the time of the will's execution, rather than all property owned at death. It does not permit the testator to pass rights to property that have not yet come into being as of

18  the time of death. As a result, the statute is not inconsistent with the general principle of probate

19  (and property) law articulated in *Van Winkle's Will*. This is made clear by the *Van Winkle* court's

20  observation that although no "amount of testamentary intent" can "subject[ ] property not owned by a testator at the date of his death to any disposition whatsoever," a testator's "will is operative

21  as to all the property of which the testator died seized or possessed, *provided only that the words*

22  *of the will are appropriate to the complete disposition of all property belonging to the estate. . . .*"

23  *Van Winkle's Will*, 86 N.Y.S.2d at 600 (emphasis added).

24  [32]As a result, the court is not required to conduct a choice of law analysis in order to determine whether Marilyn Monroe had testamentary power to bequeath a posthumous right of

25  publicity through her will. Typically, such questions are decided by reference to the law of the testator's domicile, see, e.g., N.Y. EST. POWERS & TRUSTS LAW § 3-5.1(b)(2) (formerly

26  DECEDENT EST. LAW § 47) ("The intrinsic validity, effect, revocation or alteration of a testamentary disposition of personal property, and the manner in which such property devolves

27  when not disposed of by will, are determined by the law of the jurisdiction in which the decedent

28  was domiciled at death"); *In re Moore's Estate*, 190 Cal.App.2d 833, 841-42 (1961) (recognizing

15

1   (1961) ("It is settled law that a will is construed as applying to and disposing of the estate in its

2   condition at the time of death. A testator may dispose only of such property as is subject to his

3   testamentary power, and the testator is presumed to know the law. In interpreting a will, a court

4   should view the will in a manner which will reveal the intent of the testator as disclosed by the

5   language in the will and, if possible, effectuate that intent. This does not mean, however, that a

6   testator may validly dispose of non-existent property" (citations omitted)); see also *McKay v.*

7   *Lauriston*, 204 Cal. 557, 569-70 (1928) ("[I]f . . . the wife had no vested interest in the

8   community property [before death], and upon her death her mere expectancy or inchoate interest

9   therein ceased and terminated, after her death there was no property, nor any interest in any

10  property, to which either the husband or any other person could succeed to by descent or

11  succession or by any other means or method").[33]

12

13  —————————————————

14  that, under California Civil Code § 946, a decedent's personal property should be distributed
    according to the law of his or her domicile). No party argues that Marilyn Monroe was domiciled

15  in a state other than California or New York at the time of her death. Since both California and
    New York treat property not owned by a testator at death in the same fashion, the court need not

16  resolve which state's law applies. As a result, the parties' factual dispute regarding Marilyn
    Monroe's domicile at the time of her death does not preclude the entry of summary judgment on

17  the right of publicity claims.

18      [33]As noted, this is a general principle of probate law that is applicable in many, if not all,

19  states. See, e.g., *In re Estate of Braman*, 258 A.2d 492, 494 (Pa. 1969) ("During his lifetime,
    a person cannot give or dispose of property which he does not own or in which he has no interest;

20  no more so can a person make a post-mortem distribution of property which at the time of his
    death he does not own or in which he has no right, legal or equitable"); *Ware v. Beach*, 322 P.2d

21  635, 639 (Okla. 1958) ("[P]roperty descends upon death and vests immediately in the heirs,
    legatees and devisees, subject only to control of the county court for purposes of administration.

22  Since one has a vested right in property to which he succeeds . . . under the will of a decedent

23  immediately upon the death of the decedent, it follows that an estate must be distributed among
    heirs and distributees according to the law as it exists at the time of death of the decedent"

24  (citations omitted)); *Conlee v. Conlee*, 269 N.W. 259, 263 (Iowa 1936) ("No matter what the
    provisions of the will are when probated, it confers no rights in property not owned by the testator

25  at the time of her death, and in no event could it be made to avoid contractual obligations assumed

26  during her life," quoting *Steward v. Todd*, 173 N.W. 619, 624 (Iowa 1919)); 80 AM. JUR. 2D

27  WILLS § 1168 ("A person cannot make a postmortem distribution of property which he or she did
    not own, at the time of his or her death, or in which such a person had [no] legal or equitable

28  right. Thus, property acquired by a testator's estate after his or her death may not pass under the

16

1    It is undisputed that none of New York,[34] California,[35] or Indiana[36] recognized a

2

3    ———————————

4    residuary clause of the will"); 96 C.J.S. WILLS § 1088 (same).

5    [34]Neither New York statutory nor common law recognizes a descendable, posthumous right
6    of publicity. See, e.g., *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585-86 (2d Cir. 1990)
     (observing that, under New York law, the right of publicity is exclusively statutory, is personal
7    to the individual, and is extinguished upon his death (citing, *inter alia*, *Smith v. Long Island
     Jewish-Hillside Medical Center*, 499 N.Y.S.2d 167, 168 (App. Div. 1986), and *Stephano v. News
8    Group Pubs.*, 474 N.E.2d 580, 584 (N.Y. 1984)); see also 4B William R. Golden & Kathryn E.
9    Diaz, N.Y. PRACTICE: COMMERCIAL LITIGATION IN NEW YORK STATE COURTS, § 83:7 (2d ed.
     West 2006) ("[T]he New York Legislature has routinely voted down bills over the years that
10   would have expanded the right of privacy to reach non-commercial usages or provide a
11   post-mortem right of publicity").

12   [35]California created a descendable, posthumous right of publicity in 1984, with the passage
     of its post-mortem right of publicity statute. See CAL. CIVIL CODE § 3344.1 (formerly CAL.
13   CIVIL CODE § 990). Before passage of this act, California recognized a common law right of
     publicity, but that right expired on an individual's death. See *Guglielmi v. Spelling-Goldberg
14   Productions*, 25 Cal.3d 860, 861 (1979) ("In *Lugosi v. Universal Pictures*, [25 Cal.3d 813
15   (1979)], we hold that the right of publicity protects against the unauthorized use of one's name,
     likeness or personality, but that the right is not descendible and expires upon the death of the
16   person so protected"); *Gionfriddo v. Major League Baseball*, 94 Cal.App.4th 400, 408-09 (2001)
17   ("In California the right of publicity is both a common law right and a statutory right. . . . [In
     *Lugosi*], the Supreme Court held that, because the common law right of publicity derived from
18   the right of privacy, it did not survive the death of the person whose identity was exploited and
19   was not descendible to heirs or assignees. In 1984, the Legislature enacted a second statutory
     right of publicity that was 'freely transferable' to the assignees or passed to the heirs of deceased
20   persons" (citations omitted)). Any ambiguity in the *Lugosi* court's holding that the common law
     right of publicity expired at death (see Pls.' Supp. Brief at 15) was dispelled by *Comedy III
21   Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal.4th 387, 391 (2001). There, the California
22   Supreme Court clearly stated that in its earlier decision in *Lugosi*, it had "held . . . that the
     [common law right of publicity] cause of action did not survive the death of the person whose
23   identity was exploited and was not descendible to his or her heirs or assignees." *Id.*; see also
     *Gionfriddo*, 94 Cal.App.4th at 408-09. The court is bound by these decisions, and may not credit
24   contrary suggestions by circuit courts. See, e.g., *Mullaney v. Wilbur*, 421 U.S. 684, 691 & n.
25   11 (1975) ("[S]tate courts are the ultimate expositors of state law, and [federal courts] are bound
     by their constructions except in extreme circumstances not present here," e.g., where the state
26   court decision violates federal law or is an "obvious subterfuge to evade consideration of a federal
     issue" (citations omitted)); *Meusy v. Montgomery Ward Life Ins. Co.*, 943 F.2d 1097, 1099 (9th
27   Cir. 1991) ("We are bound to follow the decisions of a state's highest court in interpreting that
28   state's law").

17

descendable, posthumous right of publicity in 1962 when Marilyn Monroe died. As a result, under either New York or California law, Marilyn Monroe could not have passed such a right through the residual clause of her will.[37] This is true regardless of her domicile at the time of death and despite any rights thereafter conferred on personalities such as Monroe by either the California or Indiana legislature.[38]

In supplemental briefing submitted following issuance of a tentative ruling on defendants' motion for summary judgment,[39] plaintiffs contend that the posthumous rights of publicity conferred by the California and Indiana legislatures in 1984 and 1994 respectively should not be

---

[36]Indiana created a descendable, posthumous right of publicity in 1994, with the passage of the Indiana Right of Publicity Act. See IND. CODE § 32-36-1-1 to -20 (formerly IND. CODE § 32-13-1-1 to -20); *Phillips v. Scalf*, 778 N.E.2d 480, 483 (Ind. App. 2002) (emphasizing that the state's Right of Publicity Act "*creates* a 'property right' in a personality's right of publicity" (emphasis added)). Before that time, Indiana common law protected the right of publicity through a personal tort action for invasion of privacy. See *Continental Optic Co. v. Reed*, 86 N.E.2d 306, 309 (Ind. App. 1949); see also *Time Inc. v. Sand Creek Partners, Inc.*, 825 F.Supp. 210, 212 (S.D. Ind. 1993) (applying Indiana law). As a personal right, this common law right of publicity was inalienable; under the Indiana survivorship statute, moreover, a cause of action for invasion of privacy does not survive an individual's death. See IND. CODE § 34-9-3-1.

[37]In addition, New York law deems certain property interests too speculative to be bequeathed by will, e.g., an individual's "distributive share" in another's estate. See *In re Penrose's Estate*, 299 N.Y.S. 844, 846-48 (Sur. Ct. 1937). Rather than passing through an individual's will, such interests – if and when they come into existence – are distributed by the laws of intestacy. See *id.* at 847-48 (holding that a testator could not bequeath by will his possible interest in the estate of his sister, and that the property had to be distributed according to the laws of intestacy). California appears to treat such interests similarly. See CAL. PROBATE CODE § 21109-21110 (formerly CAL. PROBATE CODE § 92) (abrogating the common law rule that bequests to predeceased devisees lapse, and providing that such bequests, if left to a testator's "kindred," pass to the predeceased devisee's "lineal issue," *but do not pass through the predeceased devisee's will*).

[38]This is not to say that the California or Indiana legislature could not vest a posthumous right of publicity *directly* in the residuary beneficiaries of a predeceased personality's estate, or in the successors-in-interest of those residuary beneficiaries. Neither legislature, however, has seen fit to do so. See *Infra* Part II.C.2.

[39]The court's tentative order was issued to the parties at the oral hearing on defendants' motion for summary judgment on December 11, 2006.

1   considered mere "expectancies" that Marilyn Monroe could not transfer through her will.  Rather,

2   they assert, they should be considered property rights that were in existence at the time of Marilyn

3   Monroe's death and that were, "at worst," simply "remote" or "unknown" to her at that time.[40]

4   "The term expectancy describes the interest of a person who merely foresees that he might receive

5   a future beneficence, such as the interest of an heir apparent, or a beneficiary designated by a

6   living insured who has a right to change the beneficiary. . . . [T]he defining characteristic of an

7   expectancy is that its holder has no enforceable right to his beneficence."  *In re Marriage of*

8   *Spengler*, 5 Cal.App.4th 288, 298 (1992) (quoting *In re Marriage of Brown*, 15 Cal.3d 838,

9   844-45 (1976)) (citations omitted, alterations original); see also *Hebron v. Hebron*, 456 N.Y.S.2d

10  957, 961 (Sup. Ct. 1982) ("The term expectancy describes the interest of a person who merely

11  foresees that he might receive a future beneficience, such as the interest of an heir apparent.  The

12  holder of such expectancy has no enforceable right to his beneficience").  Here, it is clear that at

13  the time of her death, Marilyn Monroe had no right to "enforce" rights of publicity that were

14  statutorily conferred on "personalities" more than 20 years (in California) and 30 years (in Indiana)

15  after her death.[41]  As a result, the court cannot accept plaintiffs' suggestion that the California and

16  Indiana statutory rights of publicity were extant but inchoate in 1962.[42]

17      Alternatively, plaintiffs assert that, even if California's and Indiana's statutory rights of

18

19  ───────────────────────

20  [40] See Pls.' Supp. Brief at 7 ("[T]he *Braman* court, quoting the Restatement of Property, defined an expectancy as 'the chance of obtaining property by inheritance or by will from a person now living.  Such chances are not in themselves rights in property.'  By definition, Ms. Monroe's interest in her right of publicity as of 1962 was not an 'expectancy.'  Instead, Ms. Monroe's right of publicity is at worst a remote and unknown property right, which the *Braman* court acknowledges may be devised through a residuary clause," quoting *Braman*, 258 A.2d at 493-94).

21

22

23

24  [41] Indeed, there is no evidence in the record that Marilyn Monroe *foresaw* the possibility that either California or Indiana would bestow a "future beneficience" in the form of the statutory

25  right of publicity upon "personalities."

26  [42] Cf. *Blank v. Kirwan*, 39 Cal.3d 311, 330 (1985) (holding that an individual had no pecuniary interest protected by the tort of intentional interference with prospective economic

27  advantage in an expectation that a municipality would grant him a particular license, given the

28  broad discretion vested in the board to grant or deny license applications).

19

1   publicity were not extant at the time of Marilyn Monroe's death, they could, once created, have

2   vested in Monroe's estate, which remained open until July 19, 2001, and thus could been

3   distributed under the terms of her will.[43] This argument too is unavailing. Under New York law,

4   "[t]he estate of a decedent is an entity which comprises all property in the broad sense of the word

5   which a decedent has at death as well as any property transferred before death which for one

6   reason or another can or should be recovered or brought into the estate for testamentary or intestate

7   administration by the fiduciary." *In re Basile's Will*, 313 N.Y.S.2d 513, 516 (Sur. Ct. 1970); *see*

8   *also* N.Y. EST. POWERS & TRUSTS LAW § 1-2.6 & practice commentary (1998) (defining an estate

9   for purposes of probate as "the aggregate of property which a person owns"). The definition of

10  "estate" under California law is similar. *See In re Glassford's Estate*, 114 Cal.App.2d 181, 189

11  (1952) ("The word 'estate,' when used in probate proceedings and statutes, is a comprehensive

12  term and is ordinarily applied to describe in a most general fashion the property comprising the

13  assets of a deceased").

14      As a result, an "estate" does not itself "own" any property; rather, it collects the property

15  a decedent owned at her death and distributes that property to her designated devisees. The

16

17  [43]Pls.' Supp. Brief at 15. Plaintiffs intimate, but do not explicitly argue, that the New
York Surrogate Court's order distributing Marilyn Monroe's "Intellectual Property Rights," i.e.,

18  her "participation rights in motion pictures and royalties from the licensing of the [d]ecedent's
name, likeness and signature," to plaintiff MMLLC is conclusive. (See *id.* at 14.) To the extent

19  plaintiffs advance this argument, the court disagrees. "[A] state-court judgment commands the

20  same res judicata effects in federal court that it would have in the court that entered it." 18B
Charles Allen Wright, Arthur R. Miller, & Edward H. Cooper, FEDERAL PRACTICE AND

21  PROCEDURE: JURISDICTION 2D § 4469, at 70 (2002); *see also*, e.g., *In re Bybee*, 945 F.2d 309,
316 (9th Cir. 1991) (same). Under New York law, a final decree upon judicial settlement of an

22  executor's account is not binding on non-parties to the probate proceeding. *See, e.g., In re Roe's*

23  *Will*, 24 N.E.2d 322, 324 (N.Y. 1939) (holding that a party who neither received notice of nor

24  attended the final accounting and who was not a party to proceedings for the probate of the
decedent's will was not precluded from challenging the surrogate court's disposition of a testator's

25  property on the ground that the residuary clause of his will was legally ineffective to pass certain
property rights). Because defendants were not parties to the New York proceeding that probated

26  Marilyn Monroe's will (see Supplemental Declaration of Anna Strasberg in Support of Plaintiffs'

27  Supplemental Brief in Support of Plaintiffs' Opposition to Defendants' Motion for Summary
Judgment, Exhibit D at 3-4), they are not precluded from arguing that the residual clause of

28  Marilyn Monroe's will was ineffective to devise posthumous statutory rights of publicity.

20

1  devisees, as noted, formally take title to the property at the moment of death. This principle is
2  clearly established under both New York[44] and California[45] law. As a result, the California and
3  Indiana legislatures could not have vested property directly in Marilyn Monroe's estate in 1984 and

---

[44] See, e.g., *In re Williams' Estate*, 295 N.Y.S. 56, 58 (Sur. Ct. 1937) ("'Law like nature abhors a vacuum. For this reason it is the prevalent conception that the rights of those succeeding to property upon a death attach immediately, with no intervening hiatus of ownership. . . . The effects of the Statutes of Wills and of Descent are in substance the same. Instead of taking to itself the property of the deceased, the sovereign directs its distribution among persons ascertainable in accordance with its laws. These persons are, by these laws, vested with the ownership of the property from the moment of the death,'" quoting *Matter of Killough's Estate*, 265 N.Y.S. 301, 317 (Sur. Ct. 1933) (citations omitted)), aff'd, 4 N.Y.S.2d 467 (App. Div. 1938); *Matter of Hilliard's Estate*, 299 N.Y.S. 788, 806 (Sur. Ct. 1937) ("It is the theory of the law that all valuable property must belong to some one and that devolution of the assets of a decedent to those entitled thereto takes place immediately on death without any intervening hiatus of ownership even though the ascertainment of the identity of such owner may at times be fraught with difficulty or even be presently impossible of absolute determination"), aff'd, 5 N.Y.S.2d 92 (App. Div. 1938); 38 N.Y. JURISPRUDENCE 2D: DECEDENTS' ESTATES § 53 (West 2007) ("Upon the death of a person his or her property vests, eo instanti, in his or her heirs or distributees, as the same may be defined by the then existing law. One has a vested right in property to which he or she succeeds under the law of descent and distribution immediately on the death of the ancestor" (footnotes omitted)).

[45] See, e.g., CAL. PROBATE CODE § 7000 ("Subject to [administration], title to a decedent's property passes *on the decedent's death* to the person to whom it is devised in the decedent's last will or, in the absence of such a devise, to the decedent's heirs as prescribed in the laws governing intestate succession" (emphasis added)); *U.S. Fidelity & Guaranty Co. v. Mathews*, 207 Cal. 556, 559 (1929) ("It is well-settled law that the title of a decedent in and to the properties of his estate vests immediately upon his death in his heirs subject only to payment of the debts of the decedent, the funeral expenses, the family allowance and the expenses of administration"); *Murphy v. Crouse*, 135 Cal. 14, 17 (1901) ("The respondent contends that title to personal property, wherever situated, is in the domiciliary executor, and that he has the absolute right to dispose of the same. This is the common-law doctrine, in pursuance of which it has been said that title to personalty derived from the executor is good the world over. The rule never prevailed in this state. Here both real and personal property descend directly to the heir or to the beneficiary named in the will, with a qualified right in the personal representative, who holds it, for the purposes of administration, more like a receiver than like a common-law executor. The title is not in him, nor has he the power of disposal, save by order of the court").

21

1    1994, just as they could not have vested property in Marilyn Monroe herself.[46] This is true despite

2    the fact that her estate remained open from 1962 to 2001, nearly forty years after her death.[47]

3    　　　Plaintiffs' supplemental brief cites no controlling[48] authority to the contrary. Plaintiffs rely,

_____

[46]Plaintiffs do not appear to argue that the California and Indiana legislatures could have vested property rights directly in Marilyn Monroe following her death, as it is a general principle of property law that "a dead man or woman may not take property." *In re Matthew's Estate*, 176 Cal. 576, 580 (1917); see also *State v. Hammons*, 126 S.W. 422, 424 (Mo. 1910) ("The accused is therefore alleged to be the property of one not in life. This cannot be, for the dead cannot own property. Death strips us of all rights and title to property and casts them on the living, who alone can own property,'" quoting *Pleasant v. State*, 17 Ala. 190 (1850)); *Mohlke v. People ex rel. Moore*, 17 Ill. App. 595, 1905 WL 1678, *2 (Ill. App. 1905) ("The statute refers to the property concerning which the proceeding is instituted as 'belonging to any deceased person.' That language taken literally does not state the legislative intent; a dead man can own no property; there is no property 'belonging to any deceased person.' Some words must be supplied. If the words 'at his death' are added, the phrase then reads 'belonging to any deceased person at his death,' and is intelligible. . ."); *Espalla v. Gottschalk*, 10 So. 755, 757 (Ala. 1892) ("It is necessarily true that death puts an end to all property ownership which had been in the decedent. A dead man cannot own property. It does not, however, abrogate the title. That continues, and passes at once to those on whom the law devolves it. It cannot be in abeyance").

[47]Plaintiffs' alternate argument that Marilyn Monroe's posthumous right of publicity vested in her estate is inconsistent with the policy rationale they advance for finding that the right passed by will. (See, e.g., Pls.' Supp. Brief at 19 ("Given the large number of celebrities who died prior to 1985, it is likely that the rightful ownership in many instances would be in question or altogether terminated. For example, Albert Einstein's statutory right of publicity is registered with the California Secretary of State to the Hebrew University in Jerusalem ('Hebrew University'), a university co-founded by Einstein, who died in 1955 but is still one of the highest earning deceased personalities. Under the holding of the Tentative Order, the Hebrew University would be divested of Albert Einstein's very valuable right of publicity, contrary to his testamentary intent, because the Hebrew University is not one of the specified familial heirs under the statute" (citations to record omitted)).) If testamentary intent overrides all other principles of property and probate law, as plaintiffs suggest, that intent might well be thwarted by a finding that a statutory right of publicity can pass through the will of a "personality" who died before enactment of the statute creating the right if, but only if, the personality's estate remained open at the time the statute took effect.

[48]The court acknowledges that the revised Uniform Probate Code supports plaintiffs' argument that "[a] will may provide for the passage of all property the testator owns at death and all property acquired by the estate after the testator's death." UNIFORM PROBATE CODE § 2-602 (rev. ed. 1990); accord RESTATEMENT (THIRD) OF PROPERTY: WILLS & OTHER DONATIVE TRANSFERS § 1.1 & cmt. c (1999). The revised model probate code provision was expressly

22

1    for example, on *In re Brunet's Estate*, 34 Cal.2d 105 (1949), as support for the proposition that
2    California's and Indiana's statutory rights of publicity passed through Marilyn Monroe's will to
3    the beneficiaries of her residual estate.[49] *Brunet's Estate*, however, held only that, as used in a
4    layperson's will, the term "estate" did not have to be given its technical legal meaning, and could
5    be interpreted to effectuate the testator's intent. *Id.* at 107-08 (concluding that a bequest to an
6    individual "or his Estate" was intended to bequeath property to the named devisee or to his legal
7    heirs, devisees, or legatees in the event he predeceased the testator). A similar conclusion was
8    reached in another case cited by plaintiffs, *In re Albert*, 445 N.Y.S.2d 355 (Sup. Ct. 1981),[50]
9    where the New York court was required to interpret the term "estate" as used in a trust document
10   drafted by a layperson who died prior to the litigation. *Id.* at 359-60 (concluding that it was
11   appropriate to interpret a trust provision that the remaining trust principal and interest be
12   distributed to the beneficiary's estate if he predeceased the trustor in light of the trustor's direction
13   that principal and interest be distributed to the beneficiary's surviving spouse and issue in the
14   shares appointed in his will, and limiting the individuals to whom the trust property could be
15   distributed through the estate to the beneficiary's spouse and issue). Neither case stands for the
16   proposition that an estate may "own" property. Each concerns how courts interpret the term
17
18   _____

19   intended to supersede the rule articulated in *Braman*, and allow "items such as bonuses awarded
20   to an employee after his or her death [to] pass under his or her will." UNIFORM PROBATE CODE
     § 2-602 cmt. The Uniform Probate Code, however, does not save plaintiffs' right of publicity
21   claim, because neither New York or California has adopted the provision. Indeed, even had New
     York or California adopted the provision following its promulgation in 1990, it is clear that it
22   would not control the passing of property under Marilyn Monroe's will. This is because the
23   construction or operation of a will is controlled by the law in force at the time of the testator's
     death. See, e.g., *In re Gaffken's Will*, 188 N.Y.S. 852, 854 (App. Div. 1921) ("[F]or the
24   meaning and effect of the will we are to look to the law at time of the testator's death"), aff'd,
25   135 N.E. 971 (N.Y. 1922); see also CAL. PROBATE CODE § 6103 (providing that specified code
     provisions governing wills do not apply where the testator died before January 1, 1985, but that
26   instead the law applicable prior to that date continues to apply).

27   [49]Pls.' Supp. Brief at 8.

28   [50]*Id.*

23

1    "estate" when used in documents drafted by lay people. As a result, the cases are inapposite.[51]

2    Equally inapposite is *In re Schunk*, 8 Misc.3d 1010(A), 2005 WL 1552844 (N.Y. Sur. Ct.

3    June 29, 2005) (Unpub. Disp.),[52] which involved a dispute between the wife and the mother of a

4    decedent over the proper division of compensation recovered from the September 11th Victim

5    Compensation Fund.[53] The *Schunk* court merely concluded that the "the rules and regulations of

6    the Fund"[54] mandated that the "presumed non-economic loss for a decedent" of $250,000 be

7    distributed according to the terms of the decedent's will. *Id.* at *4.[55] As a result, *Schunk* does not

8

9    _____

     [51]Notably, Marilyn Monroe did not designate Lee Strasberg "or his estate" as the residual
10   beneficiary in her will. Even had she done so, however, this would not alter the court's
     conclusion that she could not devise a property right in 1962 that the California and Indiana
11   legislatures did not bestow on celebrities until decades after her death. To the extent plaintiffs
     argue that *Brunet* and *Albert* —which involve the interpretation of wills and trusts – shed light on
12   proper interpretation of the California and Indiana *statutes* creating posthumous rights of
     publicity, the court cannot agree. The cases are particularly inapposite for this purpose, in fact,
13   since neither statute purports to bestow property rights on deceased personalities' "estates."

14
     [52]Pls.' Supp. Brief at 12-13.
15

16   [53]In order to provide compensation to the victims of the September 11, 2001 terrorist
     attacks, Congress created the September 11th Victim Compensation Fund as part of the Air
17   Transportation Safety and System Stabilization Act of 2001, Pub. L. No 107-42, §§ 401-409, 115
     Stat. 230, 237-41 (codified as amended at 49 U.S.C. § 40101 note). The Department of Justice
18   subsequently adopted implementing regulations, which are codified at 28 C.F.R. §§ 104.1-.71.

19
     [54]*Id.* § 104.44.
20

21   [55]The court made no determination regarding distribution of the economic losses awarded
     by the Fund, because the wife had withdrawn her consent to the distribution plan she and the
22   mother initially submitted to the Special Master. That plan contemplated that the economic loss
     portion of the award would be distributed in accordance with the testamentary instructions in the
23   decedent's will. *Schunk*, 2005 WL 1552844 at *2, 4. The court stated that it required additional
     information to determine whether the Special Master calculated the award with reference to the
24   mother as well as the wife, and whether there might be an equitable basis for the mother to claim
     a particular percentage of the award. *Id.* at *4. The alternative distribution arrangement sought
25   by the wife, moreover, did not rely on the terms of the decedent's will, but on the "*Kaiser* rule"
     used by New York courts to allocate wrongful death awards. The *Kaiser* rule provides that
26   distributees of the proceeds of a wrongful death action will receive a percentage of the award that
     is in arithmetic proportion to the number of years they would have looked to the deceased for
27   support. See *Matter of Kaiser*, 100 N.Y.S.2d 218, 220 (Sur. Ct. 1950).

28