# EX. B, PT. 3

1  stand for the proposition that "New York . . . law expresses a willingness to allow property

2  acquired after death . . . . to pass through a decedent's will,"[56] as the case involved the

3  interpretation of *federal* laws and regulations governing the compensation fund. Moreover, it

4  appears that the Surrogate Court's interpretation of "the rules and regulations of the Fund" may

5  have been incorrect. Rather than specifying that Fund awards should be distributed according to

6  the terms of deceased victims' wills, the regulations state that the decedent's "personal

7  representative"[57] should "distribute the [Fund] award [to the decedent's beneficiaries] in a manner

8  consistent with the law of the decedent's domicile or any applicable rulings made by a court of

9  competent jurisdiction."    See 28 C.F.R. § 104.52.    They suggest, moreover, that the

10  "beneficiaries" can include "the immediate family [members] of the decedent (including, but not

11  limited to, the decedent's spouse, former spouses, children, other dependents, and parents)" as

12  well as the "beneficiaries of the decedent's will." *Id.*, § 104.4; see also *Id.*, § 104.52

13  ("Notwithstanding any other provision of these regulations or any other provision of state law, in

14  the event that the Special Master concludes that the Personal Representative's plan for distribution

15  does not appropriately compensate the victim's spouse, children, or other relatives, the Special

16  Master may direct the Personal Representative to distribute all or part of the award to such spouse,

17  children, or other relatives"). Hence, the regulations do not require that Fund awards pass

18  according to the terms of the victims' wills; rather, they require that Fund awards be equitably

19  distributed among all of a decedent's "beneficiaries," not just a testate victim's residuary legatees.

20       Plaintiffs' reliance on *Miller v. Glenn Miller Productions*, 318 F.Supp.2d 923 (C.D. Cal.

21  2004), aff'd, 454 F.3d 975 (9th Cir. 2006), is also misplaced. Plaintiff cite *Miller* for the

22  proposition that California law has "expresse[d] a willingness" to allow property acquired after

23  death to pass through a decedent's will.[58] *Miller* involved competing claims to Glenn Miller's

24  statutory right of publicity, and was decided by Judge Howard Matz of this district. Like Marilyn

25  _____

26  [56]Pls.' Supp. Brief at 12.

27  [57]See 28 C.F.R. § 104.4 (defining "personal representative").

28  [58]Pls.' Supp. Brief at 12.

1  Monroe, Miller died before the enactment of the California right of publicity statute. See *Id.* at

2  926-31. No party to the case argued that Miller lacked the testamentary capacity to convey a right

3  of publicity through the residuary clause of his will. Consequently, Judge Matz had no reason to

4  examine this question.[59] "It is well settled [that] a case is not authority for an issue not decided."

5  *Draper Fisher Jurvetson Mgmt. Co. V., LLC v. I-Enter. Co. LLC*, No. C 03-1561, 2004 WL

6  2944055, *8 (N.D. Cal. Dec. 15, 2004) (quoting *People v. Parnell*, 16 Cal.App.4th 862, 872

7  (1993)); see also Hugo Black, LAW OF JUDICIAL PRECEDENTS 37 (1912) ("A decision is not

8  authority as to any questions of law which were not raised or presented to the court, and were not

9  considered and decided by it, even though they were logically present in the case and might have

10  been argued, and even though such questions, if considered by the court, would have caused a

11  different judgment to be given"). As a result, plaintiffs cannot rely on *Miller* – which does not cite

12  or discuss the California Probate Code or state court decisions regarding testamentary capacity or

13  testamentary intent – as evidence that under "California law[,] property acquired after death,

14  including rights of publicity, [can] pass through a decedent's will."[60]

15       In concluding that Marilyn Monroe could not pass through the residual clause of her will

16  rights that did not exist at the time of her death, the court recognizes – as it did in its tentative

17  order – that the "law attempts to avoid an intestacy and any construction which favors a residuary

18  disposition should be upheld and sustained whenever possible." *In re Estate of O'Brien*, 627

19  N.Y.S.2d 544, 546 (Sur. Ct. 1995); see also *In re Estate of Goyette*, 123 Cal.App.4th 67, 74

20  (2004) ("It is the strongly favored policy of the law that wills be construed in a manner that avoids

21  intestacy").[61] At the same time, however,

22       "the[ ] principle[ ] [that 'a General residuary clause carries every interest, known

23

24  ───────────────

25  [59]Judge Matz noted that Miller's residuary estate "would include *whatever intellectual property rights he had*" since his will did not otherwise dispose of "his publicity rights,

26  trademarks or other intellectual property rights." *Miller*, 318 F.Supp.2d at 927 (emphasis added).

27       [60]Pls.' Supp. Brief at 12.

28       [61]See also *id.* at 9-12.

1     or unknown, immediate or remote, unless such interest is clearly excluded'] do[es]

2     not apply until it has been demonstrated that the testator at the time of death

3     actually had an interest, recognized in law or in equity, as opposed to an

4     expectancy in the property; absent such an interest, post-mortem disposition of the

5     property cannot be exercised." *Estate of Braman*, 258 A.2d at 494-95.

6 See also RESTATEMENT (THIRD) OF PROPERTY: WILLS & OTHER DONATIVE TRANSFERS § 10.1 cmt.

7 b (1999) ("This section distinguishes between meaning and effect. . . .  The controlling

8 consideration in determining the meaning of a donative document is the donor's intention.  The

9 controlling consideration in determining whether the donor's intention is given effect is whether

10 the donor's intention is allowed by law. . . .  *Unless disallowed by law*, the donor's intention not

11 only determines the meaning but also the effect of a donative document" (emphasis added)).  As

12 a result, even if the court were to conclude that Marilyn Monroe's will unambiguously revealed

13 an intent that Lee Strasberg take her statutory right of publicity – a construction the court does not

14 believe is possible[62] – Marilyn Monroe could not devise what was, at the time of her death, a mere

15 expectancy in statutory rights that did not come into existence until decades later.

16      In reaching this conclusion, the court recognizes that none of the cases cited in this order

17 are directly on point, in that none addresses a factual scenario identical to the one presented here.

18 This is not surprising, however, as neither individuals nor legislatures routinely bestow property

19

20

21     [62]Plaintiffs have adduced no evidence that Marilyn Monroe contemplated during her lifetime the possibility that a future statutory enactment would grant her a descendable, posthumous right of publicity.  As a result, plaintiffs cannot show that the court would in some manner effectuate Marilyn Monroe's intent if it recognized that plaintiffs, as successors-in-interest to Lee Strasberg, hold such a right.  Rather, the court can only speculate as to what Monroe might have done.  Had Monroe known that following her death, her name, likeness, and imagine might be protected against third-party commercial exploitation through statutes granting a posthumous right of publicity, she might have devised those rights to someone other than Strasberg.  Even if one assumes that Monroe would have devised the rights to Strasberg, moreover, he died before the rights came into existence.  Had Monroe contemplated such a possibility, she might have included a provision in her will devising the rights to another individual.  There is no way to determine, however, which, if any, of these possibilities reflects Monroe's testamentary intent, as the rights were not in existence prior to her death.

1  upon the dead.[63]  Although they do not deal with a situation like that before the court, these cases

2  articulate general principles of property and probate law that compel the conclusion that Marilyn

3  Monroe could not devise posthumously created rights.    Plaintiffs, moreover, fail to offer any

4  principled basis for distinguishing them. Plaintiffs concede, for instance, that "*Van Winkle* . . .

5  holds that a testator cannot devise property that is legally owned by another at the time of the

6  testator's death," and that "*Buzza, McKay, Conlee* and *Stewart* all [held that] property interests that

7  terminated by operation of law at or before the testator's death [cannot be devised]."[64]  As a result,

8  the cases are not as inapposite as plaintiffs contend: whatever non-statutory right of publicity

9  Marilyn Monroe had during her life "terminated by operation of law" at her death,[65] at which point

10  they went into the public domain and became "legally owned by another."[66]    Consequently,

11

---

12    [63]The closest analogy is a testamentary devise to an individual who has predeceased the

13  testator. As noted, see *supra* note 37, such a devise does *not* pass through the dead devisee's will,

14  but either (i) "lapses" back to the testator's estate (where it vests in the residuary beneficiaries or,
    if none, the testator's heirs), or (ii) passes to the issue or heirs of the dead devisee, if he or she

15  is "kindred" of the testator.  As plaintiffs recognize in their supplemental brief, lapse and anti-

16  lapse are default rules that permit courts to presume a testator's intentions in the face of a failed
    devise. (See *id.* at 6 n. 3 ("If the devisee is kindred, [anti-lapse] assumes that the testator would

17  have wanted the devisee's lineal heirs to take; if the devisee is not kindred, [lapse] assumes that
    the testator would have wanted the transfer to fail").)  As discussed below, the California right

18  of publicity statute adopts a vesting scheme that in large part replicates the lapse and anti-lapse
    rules, i.e., the statute in essence presumes that a personality who did not make a testamentary

19  disposition of her right of publicity, because she died before enactment of the statute creating that

20  right, would now intend that the right be vested in her "kindred" (i.e., specified statutory heirs)
    rather than in the subsequent devisees of a non-kindred devisee, such as Anna Strasberg.

21

22    [64]Pls.' Supp. Brief at 4.

23    [65]See *supra* notes 34-35.

24    [66]Included in the legislative history of the bill that led to the California statute's enactment
    is a letter from Joe Robinson of Starpool, Inc. to Assemblyman Elihu Harris, expressing

25  opposition to the then-pending bill. (See Defendants' Request for Judicial Notice in Conjunction

26  with Defendants' Reply in Support of Motion for Summary Judgment, ¶ 6 & Exhibit 34:
    Legislative History Report and Analysis ("Leg. Hist. Report") at 292.) Robinson represented that

27  he manufactured a "novelty product called a window waver," and that "[a]lthough [he] license[s]
    living stars for [his] product . . . [he has] not pursued licensing agreements for deceased

28  celebrities – Marilyn Monroe, James Dean – because the courts have consistently ruled that

1  Monroe could not have devised a non-statutory right of publicity through her will and, for the

2  reasons stated in this order, could not have devised subsequently created statutory rights that did

3  not come into existence until decades after her death.

### 2.    Whether the California or Indiana Right of Publicity Statute Reveals a Contrary Legislative Intent

6  In their supplemental briefing following issuance of the court's tentative ruling on

7  defendants' motion for summary judgment, plaintiffs argue that the "plain language" of both the

8  California and Indiana statutes reveals a legislative "intention that intestacy be a last resort" and

9  mandates that the posthumous rights of publicity created by the statutes pass to the residuary

10 beneficiary of any predeceased personality's estate.[67] The court does not agree.  To the contrary,

11 the court finds support for its application of general principles of property and probate law in the

12 language of the California and Indiana statutes creating the rights of publicity at issue here.

### a.    The California Statute

14 The California right of publicity statute[68] expressly contemplates that a deceased personality

---

deceased persons' likeness or name can be used without permission." (*Id.*)

[67]Pls.' Supp. Brief at 17.

[68]The California statute provides, in pertinent part:
(a)(1) Any person who uses a deceased personality's name, voice, signature, photograph, or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods, or services, without prior consent from the person or persons specified in subdivision (c), shall be liable for any damages sustained by the person or persons injured as a result thereof. . . .
(b) The rights recognized under this section are property rights, freely transferable, in whole or in part, by contract or by means of trust or testamentary documents, whether the transfer occurs before the death of the deceased personality, by the deceased personality or his or her transferees, or, after the death of the deceased personality, by the person or persons in whom the rights vest under this section or the transferees of that person or persons.
(c) The consent required by this section shall be exercisable by the person or persons to whom the right of consent, or portion thereof, has been transferred in accordance with subdivision (b), or if no transfer has occurred, then by the person

29

1   who died *before* enactment of the statute would not have had the capacity to transfer the

2   subsequently created right of publicity (a "property right[ ]") before her death. See CAL. CIVIL

3   CODE § 3344.1(b) (providing that a "deceased personality" may, *before [his or her] death,*"

4   transfer the statutory publicity right "by contract or by means of trust or testamentary documents,"

5   but that "after the death of the deceased personality," the statutory publicity right "vest[s]" directly

6   in specified statutory beneficiaries (emphasis added)).[69] This is not surprising, because California

7   rules of statutory construction require that the court presume the legislature had knowledge of

8   existing judicial decisions and enacted a statute in light thereof. See, e.g., *Allis-Chalmers Corp.*

9   *v. City of Oxnard*, 126 Cal.App.3d 814, 819 (1981).[70] Given the clear common law prescription

10  that a testator cannot devise property not owned at the time of death, and the presumption that the

11  California legislature knew of this prescription, it is not surprising that, as respects personalities

12  who died before its enactment, the California right of publicity statute vests the posthumous

---

15  or persons to whom the right of consent, or portion thereof, has passed in
    accordance with subdivision (d).

16  (d) Subject to subdivisions (b) and (c), after the death of any person, the rights
    under this section shall belong to the following person or persons and may be

17  exercised, on behalf of and for the benefit of all of those persons, by those persons
    who, in the aggregate, are entitled to more than a one-half interest in the rights:

18  [the surviving spouse and surviving children or grandchildren, or the surviving
    parents of the deceased personality]." CAL. CIVIL CODE § 3344.1.

20  [69]Plaintiffs argue that, regardless of the date of the personality's death, subdivision (d)
    applies only where a deceased personality dies intestate or does not include a residuary clause in

21  his or her will. (See Pls.' Supp. Brief at 16-17.) Consequently, they contend, subdivision (d)
    merely alters the normal operation of California's intestacy laws by restricting the passage of an

22  intestate personality's right of publicity to a more limited number of individuals than could take
    title under the intestacy laws. Compare CAL. CIVIL CODE § 3344.1(d) with CAL. PROBATE CODE

23  §§ 6400 et seq. (superseding former CAL. PROBATE CODE §§ 200 et seq.). Plaintiffs offer no
    argument as to why the California legislature intended this result, nor any legislative history that

25  supports their interpretation.

26  [70]As a result, California courts construe "statute[s] . . . in light of the common law unless
    the Legislature 'clearly and unequivocally' indicates otherwise." *Reynolds v. Bement*, 36 Cal.4th

27  1075, 1086 (2005) (quoting *California Ass'n of Health Facilities v. Dep't of Health Servs.*, 16

28  Cal.4th 284, 297 (1997)).

1  publicity right in designated heirs rather than in the "personality" himself or herself.

2       The legislative history[71] of the California posthumous right of publicity statute supports this

3  interpretation of the vesting scheme.[72] The original text of the Senate bill that ultimately became

4  California's posthumous right of publicity statute provided:

5       "The right of a person to prohibit, recover damages for, and to contractually

6       authorize the commercial use of that person's name, photograph, or likeness may,

7       for a period of 50 years after the death of that person, be exercised or enforced *by*

8       *the heirs of that person* to the same extent that it could have been exercised by that

9       person during that person's lifetime."[73]

10 As this language demonstrates, the sponsor of the legislation creating California's posthumous right

11 of publicity it originally envisioned that *only* a personality's heirs could "exercise[ ] or enforce[ ]"

12 the right. The sponsor revealed the reasons for this in a letter to the governor requesting that he

13

-------------------------------------------------------------------

14

15     [71]Under Rule 201 of the Federal Rules of Evidence, the court may take judicial notice of
the legislative history of state statutes. See, e.g., *Chaker v. Crogan*, 428 F.3d 1215, 1223 n. 8
16 (9th Cir.2005) (granting plaintiff's request to take judicial notice of the legislative history of a
state statute); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir.2001) (explaining that a
17 court may judicially notice undisputed matters of public record but not disputed facts stated
therein).
18

19     [72]When interpreting a statute, a California court must determine legislative intent so as to
effectuate the purpose of the law. See, e.g., *People v. Cruz*, 13 Cal.4th 764, 775 (1996). "'In
20 order to determine this intent, [the court] begin[s] by examining the language of the statute.'" *Id.*
(quoting *People v. Pieters*, 52 Cal.3d 894, 898 (1991)). Generally, if the statute's language is
21 "'without ambiguity, doubt, or uncertainty, then the language controls.'" *Herman v. Los Angeles
County Metropolitan Transportation Authority*, 71 Cal.App.4th 819, 825 (1999) (quoting
22 *Halbert's Lumber, Inc. v. Lucky Stores, Inc.*, 6 Cal.App.4th 1233, 1239 (1992)). The California
Supreme Court has held, however, that even if the plain meaning of a statute is clear, a court may
23 nonetheless inquire whether the "literal meaning of [the] statute comports with its purpose."
*Lungren v. Deukmejian*, 45 Cal.3d 727, 729 (1988). To ascertain the intent of the legislature,
24 the court may look to "the history of the statute, committee reports, and staff bill reports."
*DeCastro West Chodorow & Burns, Inc. v. Superior Court*, 47 Cal.App.4th 410, 411 (1996).
25

26     [73]Leg. Hist. Report at 192 (emphasis added). The heirs of a person are those whom the
27 law appoints to succeed at the decedent's death to his or her estate in case of intestacy, by virtue
of the statutes of succession. See *Dickey v. Walrond*, 200 Cal. 335, 339 (1934).
28

31

1  sign the bill after its enactment by the California legislature.  He stated:

2    "I think it is very important that this [publicity] right is given to heirs.  Obviously,

3    there is a commercial value and compensation due to the estate of a celebrity from

4    the exploitation of a name and image that the celebrity made famous.  Additionally,

5    however, there is a question of propriety and good taste.  I believe that *heirs* of a

6    celebrity should be entitled to protect against offensive merchandising of their

7    *relatives'* likeness or name."[74]

8  As this letter reveals, although the statute created a new *property* right in a deceased personality's

9  "name, voice, signature, photograph, or likeness," it was also concerned with protecting the

10 *privacy* interests of relatives of the deceased personality, which the common law had previously

11 failed to recognize as worthy of recognition.[75]

12   Of course, as enacted, the California right of publicity statute contained vesting and

13 transferability provisions that were considerably more expansive than those originally proposed.

14 See 1984 Cal. Stat. ch. 1704 (S.B. 613), § 1, Sec. 990(a)-(d) (currently codified, with non-

15 substantive amendments, at CAL. CIVIL CODE § 3344.1(b),(d)).  Subdivision (d) was, according

16 to the final analysis of Senate Bill 613 prepared by the Assembly Committee on the Judiciary,

17 based upon a provision of the Copyright Act of 1976, 17 U.S.C. § 304(c), that governs the

18 termination of transfers and licenses.[76]  This statute provides, in pertinent part, that the "grant of

19

_____

20   [74]Leg. Hist. Report at 187 (emphasis added); see also *id.* at 259 (Final Analysis of Senate
21 Bill 613 by Assembly Committee on the Judiciary) ("According to the proponents of SB 613, the
   bill is intended to address circumstances in which (a) commercial gain is had through the
22 exploitation of the name, voice, signature, photograph, or likeness of a celebrity or public figure
   in the marketing of goods or services or (b) a celebrity or public figure is subjected to abuse or
23 ridicule in the form of a marketed product").

24   [75]See *supra* note 35.
25

26   [76]Leg. Hist. Report at 261.  The Copyright Act of 1976 increased the protection afforded
   to authors and their families by the Copyright Act of 1909.  For example, the 1976 Act extended
27 the duration of existing copyrights by creating a new nineteen-year extended renewal term in
   addition to the single twenty-eight-year renewal term provided by the 1909 Act.  See *Larry*
28 *Speier, Inc. v. Bourne Co.*, 953 F.2d 774, 778 (2d Cir. 1992) (citing former 17 U.S.C. § 304(b)).

32

1  a transfer or license of the renewal copyright or any right under it" made by the author, his widow,
2  or his children, "otherwise than by will," can be terminated by the author, his surviving spouse,
3  or his children.  See *id.*; see also *Steinbeck v. McIntosh & Otis, Inc.*, 433 F.Supp.2d 395, 397-98
4  (S.D.N.Y. 2006) ("Section 304(c) . . . of the Copyright Act, grants creators of pre-1978 works
5  or their statutory heirs[ ] an inchoate but inalienable property right to 'terminate' earlier grants of
6  copyrights made before January 1, 1978 and to do so beginning 56 years after the copyright was
7  first secured (i.e., upon expiration of both the original 28-year copyright term and the pre-1978
8  28-year renewal term)" (footnotes omitted)).

9       Although section 304(c) clearly provides that an author may devise his statutory right of
10  termination, see, e.g., *Venegas-Hernandez v. Peer*, 283 F.Supp.2d 491, 504 (D.P.R. 2003) ("If
11  there has been a will, the copyright renewal transfers by testament, and the statutory class
12  [including the author's surviving spouse and children] do[ ] not receive the termination rights"),
13  this was not the statute's purpose.  Rather, "the purpose of the statute [was] to protect the property
14  rights of widows and children in copyrights."  *Larry Speier*, 953 F.2d at 778; see also *id.*
15  ("Section 304(c) is not necessarily a provision for the effectuation of the author's 'intent'");
16  *Steinbeck*, 433 F.Supp.2d at 397 n. 5 ("Section 304(a) established a completely new family
17  property right in pre-1978 works . . .").  As a result, courts have concluded that the residuary
18  beneficiaries of testate authors who died before enactment of the Copyright Act of 1976 do *not*
19  receive the author's subsequently created statutory termination right, which instead passes to the
20  heirs specified in § 304(c).  See *id.* at 399-400 ("Turning to the facts here, when John Steinbeck
21  died in 1968, his third wife, widow Elaine, inherited his copyrights in his early works under the
22  residuary clause in Steinbeck's will.  However, with respect to these works, as well as those that
23  entered their renewal period after Steinbeck's death, his two sons from his second marriage –
24

25
26  In addition, to correct "the unequal bargaining position of authors, resulting in part from the
    impossibility of determining a work's value until it has been exploited," H.R. REP. No. 94-1476,
27  at 124, reprinted in 1976 U.S.C.C.A.N. 5659, 5740, authors or certain statutory successors were
    given a right to terminate prior transfers and renegotiate new grants after publishers had begun
28  to exploit such rights.  17 U.S.C. § 304(c).

1   Thomas Steinbeck and John Steinbeck IV – though inheriting no interest in the copyrights under
2   their father's will, nevertheless became possessed of a 50% share of the copyright termination
3   interest in each work pursuant to Section 304(c)(2)(B). . ." (footnotes omitted)).

4       Given the plain language of the California posthumous right of publicity statute, the
5   common law background against which it was enacted, and its legislative history, the court
6   concludes that the statute vests the posthumous right of publicity that it created directly in the
7   statutorily designated heirs rather than in the residuary beneficiaries under a predeceased
8   personality's will.

               b.    The Indiana Statute

10      For similar reasons, the court concludes that the Indiana statute operates in essentially the
11  same manner. The Indiana statute defines "personality" as "a living *or deceased* natural person,"
12  IND. CODE § 32-36-1-6 (emphasis added), and defines the "right of publicity" as a *"personality's*
13  property interest" in his or her name, likeness, image, etc. *Id.*, § 32-36-1-7 (emphasis added).
14  The statute thus appears to vest the publicity right that it created directly in the personality, even
15  if she is already dead and therefore incapable of owning property. Because the legislature's grant
16  of a statutory right to a deceased person would be ineffective,[77] however, the Indiana statute sets
17  forth an alternative vesting scheme, providing:

18          "If a transfer of a personality's recognized rights has not occurred under section 16
19          of this chapter [providing for the transfer of the statutory publicity right by
20          contract, license, gift, trust, testamentary document, or intestate succession], a
21          person to whom the personality's recognized rights are transferred under section
22          18 of this chapter may exercise and enforce the rights under this chapter and seek
23          the remedies provided in this chapter." *Id.*, § 32-36-1-17(b).

24  Section 18, which is titled "Exercise of rights and remedies post-mortem," states, in pertinent part,
25  "Subject to sections 16 and 17 of this chapter, after the death of an intestate personality, the rights
26  and remedies of this chapter may be exercised and enforced by a person who possesses a total of

27  _____

28      [77]See *supra* note 46.

                                        34

1  not less than one-half (1/2) interest of the personality's recognized rights." *Id.*, § 32-36-1-18.

2       Thus, read in light of Indiana rules of statutory construction,[78] the plain language of the

3  Indiana statute indicates that the legislature intended the statutory right of publicity to vest in a

4  predeceased personality's heirs rather than in the residual beneficiaries under his or her will.

5  Consistent with the common law probate principles discussed above, section 18 of the statute

6  recognizes that the "post-mortem" publicity right of a predeceased celebrity is a right as to which

7  the celebrity died "intestate"; consequently, the section provides that the statutory publicity right

8  should vest directly in the celebrity's heirs (i.e., "person[s] who possesses a total of not less than

9  one-half (1/2) interest of the personality's recognized rights"). Any other interpretation of the

10 statute would render section 18 mere surplusage, because section 16 – which unambiguously

11 provides for the transfer of a personality's publicity right by operation of intestacy laws – would

12 *always* govern the "transfer of a personality's recognized rights" if that person died without a will.

13 The statute expressly contemplates, however, that "a transfer . . . [may] not occur[ ] under section

14 16," *Id.*, § 32-36-1-17(b), i.e., because the personality died before the right was created, and

15 established the alternate vesting scheme provided by section 18 to address such a situation.[79]

16 _____

17    [78]In interpreting statutes, Indiana courts – like California courts – attempt to ascertain the
18 intent of the legislature by looking primarily to the "plain and ordinary meaning" of the statutory
   language itself. *Hendrix v. State*, 759 N.E.2d 1045, 1047 (Ind. 2001). To this end, "every word
19 is to be given effect and no part of the statute is to be construed so as to be meaningless if it can
   be reconciled with the rest of the statute." *Hannis v. Deuth*, 816 N.E.2d 872, 876 (Ind. App.
20 2004) (citing *State v. Rumple*, 723 N.E.2d 941, 944 (Ind. App. 2000)). Moreover, like
21 California's, Indiana's rules of statutory construction require that the court presume the legislature
   had knowledge of existing judicial decisions and enacted a statute in light thereof. See, e.g.,
22 *Midtown Chiropractic v. Illinois Farmers Ins. Co.*, 847 N.E.2d 942, 947 (Ind. 2006) ("[W]hen
   the legislature acts [to abolish or modify common law], we presume that it is aware of the
23 common law and that its intention is to not change the common law beyond what the express
24 terms of its enactments and fair implications allow").

25    [79]The parties did not submit the legislative history of the Indiana statute, and the court was
   unable to access it. The court assumes, however, that if the legislative history supported
26 plaintiffs' interpretation of the Indiana right of publicity statute, plaintiffs would have brought this
27 to the court's attention. This is particularly true since plaintiff CMG is an Indiana corporation
   with its principal place of business in Indiana (see, e.g., CMG Parties' First Amended Complaint
28 against Milton H. Greene Archives, ¶ 1) and is represented in this action, *inter alia*, by a law firm

1    Based on the plain language of the Indiana statute and the common law background against

2  which it was enacted, the court concludes that the statute vests the posthumous right of publicity

3  that it created directly in the statutorily designated heirs of a predeceased personality rather than

4  in the residuary beneficiaries under that personality's will.

6                              III. CONCLUSION

7      For the reasons stated, defendants' motion for summary judgment is granted.  Under either

8  New York or California law, Marilyn Monroe had no testamentary capacity to devise, through the

9  residual clause of her will, statutory rights of publicity that were not created until decades after her

10  death; moreover, even if her estate was open at the time the rights were created, the estate was not

11  an entity capable of holding title to the rights.  Because plaintiffs have not shown that they are

12  otherwise entitled to exercise Marilyn Monroe's posthumous right of publicity by operation of

13  either the California or Indiana statute, they have no standing to assert the publicity rights they

14  seek to enforce in this action.

15      The court reaches this conclusion with some reluctance because, as plaintiffs note, at least

16  some personalities who died before passage of the California and Indiana right of publicity statutes

17  left their residuary estates to charities, which will be "divested" of those rights under the court's

18  holding.[80]  As noted, however, nothing in this order prevents legislatures from enacting right of

19  publicity statutes so as to vest the right of publicity directly in the residuary beneficiaries of

20  deceased personalities' estates or their successors-in-interest.    Given the present statutory

_____

located in Indianapolis.

   [80]See Pls.' Supp. Brief at 19 & n. 10 ("Given the large number of celebrities who died
prior to 1985, it is likely that the rightful ownership in many instances would be in question or
altogether terminated.  For example, Albert Einstein's statutory right of publicity is registered . . .
to the Hebrew University of Jerusalem . . . , a university co-founded by Einstein, who died in
1955 but is still [ ] one of the highest earning deceased personalities.  Under the holding of the
[court's order], the Hebrew University would be divested of Albert Einstein's very valuable right
of publicity . . . because the Hebrew University is not one of the specified familial heirs under
the statute").

                                          36

1  enactments, however, the court is constrained to conclude that the California and Indiana

2  legislatures chose not to do so.  In the case of California, in fact, this appears to have been a

3  deliberate choice.

4

5  DATED: May 14, 2007

6  MARGARET M. MORROW
   UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28