# EX. D, PT. 2

images and likenesses of deceased celebrities such as Elvis Presley, John Wayne, and W.C. Fields.

Subsection (b) provides that "[t]he rights recognized under this section are property rights, freely transferable, in whole or in part, by contract or by means of trust or testamentary documents, whether the transfer occurs before the death of the deceased personality, by the deceased personality or his or her transferees, or, after the death of the deceased personality, by the person or persons in whom the rights vest under this section or the transferees of that person or persons." *Id.*, § 3344.1(b). Subsection (e) provides that "[i]f any deceased personality does not transfer his or her rights under this section by contract, or by means of a trust or testamentary document, and there are no surviving persons as described in subdivision (d), then the rights set forth in subdivision (a) shall terminate." *Id.*, § 3344.1(e).

The court earlier concluded that, because a deceased person cannot transfer a property right that she does not own at the time of death, subsection (b) meant that the publicity right of a predeceased celebrity automatically vested in the statutorily designated heirs. This interpretation flowed directly from the language of subsection (b), which distinguished between transfers that occurred "before the death of the deceased personality" and transfers that occurred "after the death of the deceased personality." The statute provided that transfers occurring "before the death of the deceased personality" were to be made "by the deceased personality or his or her transferees," while transfers occurring "after the death of the deceased personality" were to be made by "the person or persons in whom the rights vest under this section or the transferees of that person or persons."

MMLLC now argues that the definition of "deceased personality" found in subsection (h) injects ambiguity into the language of subsection (b), which states that a "deceased personality" can transfer the right before his or her death. Since subsection (h) defines "deceased personality" as an individual who died within 70 years of January 1, 1985, and since the bill did not take effect until that date, MMLLC contends that the legislature must have contemplated that celebrities who predeceased the enactment would be deemed to have held the right before their death and to have had the ability to transfer it via a residual clause in their will. It is to this possible ambiguity that SB 771 speaks. The bill makes explicit what was at best implicit, and at worst ambiguous, in the original version of § 3344.1 – i.e., that "[t]he rights recognized under this section shall be deemed to have existed at the time of death of any deceased personality who died prior to January 1, 1985. . . ."

18

The need for clarification is also supported by the fact that there was confusion in the marketplace as to the operation of the statute. As the court acknowledged in the May 14, 2007 order, some celebrities who died before § 3344.1 was passed in 1985 left their residuary estates to specified charities. Albert Einstein's statutory right of publicity, for instance, is registered to the Hebrew University of Jerusalem, a university co-founded by Einstein, who died in 1955. Similarly, the legislative history of SB 771 indicates that Wayne Enterprises, of which John Wayne's son is the president, is able to support the John Wayne Cancer Foundation and the John Wayne Cancer Institute through use of John Wayne's name and likeness. See SENATE JUDICIARY COMMITTEE BILL ANALYSIS at 9. The legislative history reports that many other "worthwhile causes and charitable institutions" are supported by exploitation of the publicity rights of deceased personalities such as Joan Crawford, Mae West, Edith Head, Janis Joplin, Alfred Hitchcock, Glenn Miller, Ozzie Nelson, Groucho Marx, and Bela Lugosi. *Id.* These charities evidently perceive that although the celebrity whose right of publicity they hold died before 1985, he or she was deemed to have transferred the right pursuant to § 3344.1. The charities and organizations have apparently relied on this and acted accordingly.

It is appropriate for the legislature to clarify the law to protect such expectations. See *Western Security Bank*, 15 Cal.4th at 245-46 ("The Legislature's unmistakable focus was the disruptive effect of the Court of Appeal's decision on the expectations of parties to transactions where a letter of credit was issued in connection with a loan secured by real property. By abrogating the Court of Appeal's decision, the Legislature intended to protect those parties' expectations and restore certainty and stability to those transactions. If the Legislature acts promptly to correct a perceived problem with a judicial construction of a statute, the courts generally give the Legislature's action its intended effect," citing *Escalante v. City of Hermosa Beach*, 195 Cal.App.3d 1009, 1020 (1987), *City of Redlands v. Sorensen*, 176 Cal.App.3d 202, 211-12 (1985), and *Tyler v. State of California*, 134 Cal.App.3d 973, 976-977 (1982)).

Defendants argue that SB 771 is not a clarification because it substantially changes prior law.[32] As noted, SB 771 rewords subsection (b) of § 3344.1 to provide that a deceased personality's right of

---

[32]Defs.' Opp. at 8.

19

publicity is deemed to have been in existence at the time of the celebrity's death, and to have been transferrable either through an express testamentary disposition or through the residual clause of the celebrity's will. 2007 Cal. Stat. ch. 439 (S.B. 771), § 3344.1(b). Recognizing that this intent was not necessarily apparent in § 3344.1 as originally drafted, and that the statute has potentially been misinterpreted by the public, SB 771 includes a savings provision as subsection (o). This subsection states that statutory heirs who, prior to May 1, 2007, "took action" to exercise a deceased celebrity's right of publicity, and whose "action" was not successfully challenged by a residuary beneficiary in court, continue to hold the right of publicity unless they were expressly disinherited by the deceased celebrity in a testamentary instrument. *Id.*, § 3344.1(o). The legislature also provided that "[t]he rights recognized [in the statute] are expressly made retroactive . . . to . . . deceased personalities who died before January 1, 1985." *Id.*, § 3344.1(p).

While it is true that SB 771 makes material changes to the right of publicity statute, the court need not view the changes as modifications given the potential ambiguity in the original version of § 3344.1. Under certain circumstances, "the Legislature may make material changes in language in an effort to clarify existing law." *Carter*, 38 Cal.4th at 929 (citing *Western Security Bank*, 15 Cal.4th at 243 (holding that a change was a clarification of existing law despite the addition of two sections by amendment); *Plotkin v. Sajahtera, Inc.*, 106 Cal.App.4th 953, 961 n. 3 (2003) ("The amendment's substantial narrowing of the definition of 'vehicle parking facility' does not necessarily preclude a finding that it merely clarifies, rather than changes, existing law"); see also *In re Angelique C.*, 113 Cal.App.4th 509, 518 (2003) (addressing the legislature's action to clarify law in response to *Renee v. Superior Court*, 26 Cal.4th 735 (2001)).

Additionally, "'the Legislature may choose to state all applicable legal principles in a statute rather than leave some to even a predictable judicial decision.'" *Id.* (quoting *Reno v. Baird*, 18 Cal.4th 640, 658 (1998)). Thus, SB 771 does not contain surplusage or create new law simply because it confirms that the right of publicity created by § 3344.1 is deemed to have existed at the time a predeceased celebrity died; sets forth the manner in which the right of publicity can be transferred; and declares that the rights recognized by § 3344.1 are retroactive to celebrities who died before January 1, 1985. "'Rather, [the provisions are statements that] may eliminate potential confusion and avoid the

20

need to research extraneous legal sources to understand the statute's full meaning. Legislatures are free to state legal principles in statutes, even if they repeat preexisting law, without fear the courts will find them unnecessary and, for that reason, imbued with broader meaning.'" *Id.* (quoting *Reno*, 18 Cal.4th at 658)).

In sum, in passing SB 771, the 2007 California legislature clearly expressed an intent to clarify § 3344.1 as originally enacted. The bill was passed promptly after, and in response to, the court's May 14, 2007 order, and the May 7, 2007 *Shaw* opinion in the Southern District of New York. It was intended to clarify potential ambiguities in the existing statute that had caused confusion among beneficiaries and heirs of deceased celebrities, and that had resulted in court decisions that were at odds with what this legislature believed an earlier legislature intended. In combination, these circumstances are sufficient to support a finding that in amending § 3344.1, the legislature clarified existing law by stating that the right of publicity of a personality who died before January 1, 1985 is deemed to have existed at the time that personality died.[33]

---

[33] Defendants argue that although SB 771 states that the posthumous right of publicity is deemed to have existed at the time a deceased personality died, it does not vest that right in the deceased personality directly. (Defs.' Opp. at 2, 9, 12). Therefore, they maintain, the personality does not have the power to pass the right by will. (*Id.*) The court finds this argument unpersuasive. While SB 771 does not expressly state that the right of publicity was "vested" in the deceased personality, it clearly expressed the legislature's intent that the personality be deemed to have owned the right at the time of her death, since this is the only way that she could transfer the right through a testamentary instrument. 2007 Cal. Stat. ch. 439 (S.B. 771), § 3344.1(b) (stating that the posthumous right of publicity "shall be deemed to have existed at the time of death of any deceased personality who died prior to January 1, 1985," and recognizing that the deceased personality could transfer the right by express provision in a testamentary instrument or through the residual clause in her will). This language is consistent with general probate law, which looks solely to what a decedent *owned at the time of death*. See, e.g., *In re Buzza's Estate*, 194 Cal.App.2d 598, 601 (1961) ("It is settled law that a will is construed as applying to and disposing of the estate in its condition at the time of death"); *Conlee v. Conlee*, 269 N.W. 259, 263 (Iowa 1936) ("No matter what the provisions of the will are when probated, it confers no rights in property not owned by the testator at the time of her death, and in no event could it be made to avoid contractual obligations assumed during her life," quoting *Steward v. Todd*, 173 N.W. 619, 624 (Iowa 1919)); *In re Van Winkle's Will*, 86 N.Y.S.2d 597, 600 (Sur. Ct. 1949) ("[U]nder no circumstances, in the absence of a valid power, can any amount of testamentary intent produce the effect of subjecting property not owned by a testator at the date of his death to any disposition whatever"); 80 AM.JUR.2D WILLS § 1168 ("A person cannot make a postmortem distribution of property which he or she did not own, at the time of his or her death, or in which such a person had [no] legal or equitable right. Thus, property acquired by a testator's estate after his or her death may not pass under the residuary clause of the will"); 96 C.J.S. WILLS § 1088 (same); see also CAL. PROB. CODE § 21105 ("[A] will passes all

Because the court determines that SB 771 clarifies existing law, the amendment does not change § 3344.1's substantive legal effect. See *Carter*, 38 Cal.4th at 923 ("If we conclude the amendment did more than clarify existing law, we would then address whether the amendment should apply retroactively to the conduct present here, and whether a retroactive application would implicate due process concerns. If, however, the amendment merely clarified existing law, then employers were potentially liable for sexual harassment of employees by nonemployees at the time of the conduct we address, and the amendment would not change the statute's substantive legal effect or require us to address the validity of the statute's application" (citations omitted)); *Western Security Bank*, 38 Cal.4th at 243 ("Such a [clarifying] legislative act has no retrospective effect because the true meaning of the statute remains the same").

Defendants' argument that SB 771 unconstitutionally takes property from the statutorily designated heirs of a predeceased celebrity, and that it interferes with contracts, are thus unavailing.[34] Because SB 771 clarifies that § 3344.1 always provided that a deceased personality's right of publicity existed at the time of his or her death and could be transferred either by a specific bequest or as part of the residue of his or her estate, the right of publicity never vested in the deceased personality's statutory

---

property the testator owns at death, including property acquired after execution of the will").

The fact that the bill states that the posthumous right of publicity "shall vest" in the persons entitled to it under the deceased personality's testamentary instrument does not change this conclusion. As plaintiffs note, "[s]ince a testamentary instrument is effective at death, the words 'shall vest' mean just that – i.e., the rights, which are deemed to exist at death, "shall vest" in the beneficiaries at the time of death." (Reply in Support of Marilyn Monroe, LLC's Motion for Reconsideration of the Court's May 14, 2007 Order Granting Summary Judgment ("Pl.'s Reply") at 14). Stated differently, as a matter of property and probate law, the right could not "vest" in the beneficiaries named in a personality's testamentary instrument unless it first vested in the personality herself.

Accordingly, because the court concludes that SB 771 was a clarification rather than a modification of existing law, and because it states expressly that the right of publicity of a predeceased celebrity is deemed to have been in existence on the date of the individual's death, the bill responds to the concern expressed in the May 14, 2007 order that Marilyn Monroe could not transfer a property right she did not possess at the time of her death. Moreover, it also makes clear that § 3344.1 is consistent with the principle that the "law attempts to avoid an intestacy and any construction which favors a residuary disposition should be upheld and sustained whenever possible." *In re Estate of O'Brien*, 627 N.Y.S.2d 544, 546 (Sur. Ct. 1995); see also *In re Estate of Goyette*, 123 Cal.App.4th 67, 74 (2004) ("It is the strongly favored policy of the law that wills be construed in a manner that avoids intestacy").

[34] *Id.* at 16.

22

heirs as defendants argue.[35] As a result, the court need not address defendants' due process concerns. It notes, however, that if a statutory heir exercised a predeceased celebrity's right of publicity prior to May 1, 2007 and no legal challenge was successfully mounted, subsection (o) vests the right of publicity in the heirs. This ameliorates any potential due process concerns.[36]

---

[35]SB 771's legislative history indicates that the legislature considered and apparently found unpersuasive defendants' takings arguments. See SENATE RULES COMMITTEE SENATE FLOOR ANALYSIS (S.B. 771 Sept. 4, 2007) (noting that opponents of the bill "also argue that, depending to whom a celebrity left the bulk of his/her estate through the residuary clause, this bill could strip statutory heirs of the rights of publicity of their deceased relatives").

[36]Although the court need not address of the constitutionality of California's posthumous right of publicity statute to decide the pending motion, it recognizes that, as clarified, the law created a retroactive property right when it was enacted in 1985. "Whether a statute should apply retrospectively or only prospectively is, in the first instance, a policy question for the legislative body enacting the statute." *Western Security Bank*, 15 Cal.4th at 244 (citing *Evangelatos*, 44 Cal.3d at 1206). "It does not follow, however, that what Congress can legislate prospectively it can legislate retrospectively. The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976).

Neither party has identified any due process concerns that arise from the fact that § 3344.1 applies retroactively to celebrities who died prior to January 1, 1985. "'The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.'" *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 902-03 (9th Cir. 2007) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972)). A property interest is more than a "unilateral expectation"; it is "a legitimate claim of entitlement." *Roth*, 408 U.S. at 577. "Entitlements are not created by the constitution, but are defined by independent sources such as state law, statutes, ordinances, regulations or express and implied contracts." *Saunders v. Knight*, CV 04-5924 LJO WMW, 2007 WL 3482047, *21 (E.D. Cal. Nov. 13, 2007) (citing *Lucero v. Hart*, 915 F.2d 1367, 1370 (9th Cir. 1990), *Brenizer v. Roy*, 915 F.Supp. 176, 182 (C.D. Cal. 1996), and *Coleman v. Dep't of Personnel Admin.*, 52 Cal.3d 1102, 1112 (1991) ("Property interests that are subject to due process protections are not created by the federal Constitution. Rather, they are created, and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law")). "'If a right has not vested, it is not a property interest protected by the due process or takings clause.'" *Id.* (quoting *Brenizer*, 915 F.Supp. at 182).

Before passage of the posthumous right of publicity law in 1985, California recognized a common law right of publicity, which expired on an individual's death. See *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal.3d 860, 861 (1979) ("In *Lugosi v. Universal Pictures*, [25 Cal.3d 813 (1979)], we hold that the right of publicity protects against the unauthorized use of one's name, likeness or personality, but that the right is not descendible and expires upon the death of the person so protected"). After an individual died, his name, image and likeness were in the public domain and anyone could use them for a legitimate commercial purpose. See *Lugosi*, 25 Cal.3d at 823 ("After Lugosi's death, his name was in the public domain. Anyone, including [plaintiffs], or either of them, or Universal, could use it for a legitimate commercial purpose"). In Marilyn Monroe's case, before the

23

### D. Reconsideration of the Court's Order

Because SB 771 is a new law that clarifies California's posthumous right of publicity statute, the court concludes that it must reconsider its ruling that MMLLC lacks standing to assert claims for infringement of Marilyn Monroe's statutory right of publicity. Under clarified § 3344.1(b), Marilyn Monroe's right of publicity is deemed to have existed at the time of her death in 1962. 2007 Cal. Stat. ch. 439 (S.B. 771), § 3344.1(b). Because Monroe's will did not expressly bequeath this right of publicity, under the statute as clarified, the court must examine the residual clause of her will. *Id.* That provision stated:

> "SIXTH: All the rest, residue and remainder of my estate, both real and personal, of whatsoever nature and wheresoever situate, of which I shall die seized or possessed or to which I shall be in any way entitled, or over which I shall possess any power of appointment by Will at the time of my death, including any lapsed legacies, I give, devise and bequeath as follows:

---

statutory right of publicity was created in 1985, her name, likeness, and image were in the public domain. It is possible that individual members of the public made use of her name and likeness for commercial purposes. It is not clear, however, that state law or any other source gave those individuals an *entitlement* to use her name and likeness – i.e., a vested property interest protected by Fourteenth Amendment – such as would preclude retroactive application of the posthumous right of publicity law.

Additionally, while the statute as clarified may raise constitutional concerns if it is enforced against individuals who used a deceased celebrity's image *prior to* the law's passage in 1985, it is not apparent that those concerns are implicated in this case. CMG and MMLLC's complaint against the Milton Greene Archives indicates that for many years, CMG and MHG had a business relationship pursuant to which a party seeking to use a Monroe/Greene photograph for commercial purposes secured a license from CMG covering Monroe's intellectual property rights, and a license from MHG covering MHG's interest in the photographs. (Plaintiffs' First Amended Complaint against Milton H. Greene Archives, Inc., ¶ 10). MHG ended this relationship in 2004 when it informed MMLLC and CMG that it would no longer seek permission to use Monroe's intellectual property rights and would not recognize plaintiffs' rights in Monroe's name, image, etc. (*Id.*, ¶ 11). It appears that MMLLC's claim for damages is limited to Greene's use of Monroe's image after 2004 – well after the statute's passage in 1985. As for the complaint against Tom Kelley Studios, plaintiffs' claim for damages is not limited as to time. (Plaintiffs' First Amended Complaint against Tom Kelley Studios, Inc., ¶¶ 12-16). Given that the court is obligated to interpret laws so as to avoid constitutional problems, however, see *I.N.S. v. St. Cyr*, 533 U.S. 289, 299-300 (2001), the court will not construe plaintiffs' complaint as seeking damages against Kelley for use of Monroe's image prior to 1985.

24

>   (a) To MAY REIS the sum of $40,000.00 or 25% of the total remainder of my estate, whichever shall be the lesser.
>
>   (b) To DR. MARIANNE KRIS 25% of the balance thereof, to be used by her as set forth in ARTICLE FIFTH (d) of this my Last Will and Testament.
>
>   (c) To LEE STRASBERG the entire remaining balance."

Because the right of publicity was deemed to have existed at the time of Marilyn Monroe's death, and because it was not expressly bequeathed in her will, it was transferred under the residual clause of the will to Lee Strasberg and other residuary beneficiaries.[37]

SB 771 makes clear that the posthumous right of publicity is "freely transferable or descendible by contract, trust, or any other testamentary instrument by any subsequent owner of the deceased personality's rights as recognized by this section." *Id.* MMLLC argued previously that when Lee Strasberg died, his property, which under SB 771 is deemed to have included Monroe's publicity rights, passed by will to his wife, Anna Strasberg.[38] In 2001, Ms. Strasberg formed MMLLC, and she and the

---

[37] Defendants argue that Marilyn Monroe's right of publicity could not have been transferred to Lee Strasberg under either SB 771 or § 3344.1 as enacted in 1985 because Strasberg died before the law's passage, and, as the court noted in its May 14 order, "a dead man or woman may not take property." (Defs.' Opp. at 13-14, citing *In re Matthew's Estate*, 176 Cal. 576, 580 (1917)). This ignores the fact that the original statute – as clarified – deemed the right to have existed at the time of Monroe's death. It is a longstanding principle that "[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *Kasza v. Browner*, 133 F.3d 1159, 1167 (9th Cir. 1998) (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)). While the legislature's creation of a retroactive statutory right perhaps conflicts with the common law property and probate principles on which the court relied in its prior holding, the legislature has clearly stated its intention to vest such a right in predeceased personalities at the time of their deaths. The statutory purpose is thus evident. As a result, even though both Monroe and Lee Strasberg had died by 1985, the right is deemed to have passed to Strasberg as Monroe's residuary beneficiary at the time of her death, and from Strasberg to Anna Strasberg at the time of his death.

[38] Defendants argue that Anna Strasberg cannot be deemed to have received Marilyn Monroe's posthumous right of publicity because Monroe's will did not provide for the *successors-in-interest* of her residuary beneficiaries to take the residue directly. (Defs.' Opp. at 14). They also argue that the right could not have passed through Lee Strasberg's will because he died before the effective date of § 3344.1. (*Id.* at 14-15). These arguments overlook the fact that the statute created a retroactive right deemed to have existed at the time of Monroe's death, and provided that it was transferred to Monroe's residuary beneficiary as of the date of her death. At that time, Lee Strasberg was alive and took possession of the right as a residuary beneficiary. Consequently, the fact that Strasberg died prior to the

25

holder of a 25% interest in the residue of Monroe's estate transferred their rights and interest in Monroe's estate, including, without limitation, the right of publicity, to MMLLC. This series of transfers by subsequent holders of the right is expressly permitted by § 3344.1 as clarified by SB 771. Therefore, under § 3344.1, MMLLC is deemed to possess Monroe's posthumous right of publicity, and the court vacates its prior ruling that MMLLC lacks standing to assert Monroe's posthumous right of publicity.

### 1. Domicile

Because the court finds that under § 3344.1 as clarified, MMLLC has standing to assert right of publicity claims under California law, and because it is clear that at the time of Marilyn Monroe's death, there was no posthumous right of publicity in New York, the court must conduct a choice of law analysis to determine whether Marilyn Monroe had testamentary power to bequeath a posthumous right of publicity through her will. Typically, such questions are decided by reference to the law of the testator's domicile, see, e.g., N.Y. EST. POWERS & TRUSTS LAW § 3-5.1(b)(2) (formerly DECEDENT EST. LAW § 47) ("The intrinsic validity, effect, revocation or alteration of a testamentary disposition of personal property, and the manner in which such property devolves when not disposed of by will, are determined by the law of the jurisdiction in which the decedent was domiciled at death"); *In re Moore's Estate*, 190 Cal.App.2d 833, 841-42 (1961) (recognizing that, under California Civil Code § 946, a decedent's personal property should be distributed according to the law of his or her domicile); see *Shaw Family Archives*, 434 F.Supp.2d at 210-11 ("[Under the Indiana choice of law rule,] its courts apply the substantive law of the place of the tort. . . . In property cases, Indiana seems to adhere to the majority view that the law of the situs of the property governs. The situs of intangible personal property, such the Marilyn Monroe publicity right, is the legal domicile of its owner," citing *Van Dusen v. Barrack*, 376 U.S. 612, 638-39 (1964)).

No party argues that Marilyn Monroe was domiciled in a state other than California or New York

---

enactment of § 3344.1, and the fact that Monroe's will did not provide that the residue would pass directly to successors-in-interest if a residuary beneficiary predeceased Monroe, do not change the outcome or demonstrate that MMLLC lacks standing to enforce Marilyn Monroe's right of publicity under California law.

26

at the time of her death. Neither New York statutory nor common law recognizes a descendible, posthumous right of publicity. See, e.g., *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585-86 (2d Cir. 1990) (observing that, under New York law, the right of publicity is exclusively statutory, is personal to the individual, and is extinguished upon his death (citations omitted)). California law, by contrast, deems Monroe to have owned a statutory right of publicity at the time of her death and thus affords her the ability to transfer that right. 2007 Cal. Stat. ch. 439, § 3344.1(b). As a result, the parties' factual dispute regarding Marilyn Monroe's domicile at the time of her death becomes relevant. See *Gaudin v. Remis*, 379 F.3d 631, 636 (9th Cir. 2004) ("'Domicile' is, of course, a concept widely used in both federal and state courts for jurisdiction and conflict-of-law purposes," quoting *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989)).

MMLLC argues that the issue of Monroe's domicile is not yet ripe for adjudication.[39] It asserts that discovery is ongoing and that it recently came into possession of thousands of documents that potentially bear on whether Monroe was domiciled in California or in New York. Plaintiffs' discovery of these materials, in fact, recently prompted the court to continue the fact discovery cut-off date to January 25, 2008.[40] Citing the facts set forth in MMLLC's opposition to the motion for summary judgment, defendants counter that MMLLC has failed to raise triable issues respecting the fact that Monroe was domiciled in California at the time of her death. Consequently, they argue, summary judgment must be entered in their favor.[41]

"'A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return.'" *Gaudin*, 379 F.3d at 636 (quoting *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001)). "'A person residing in a given state is not necessarily domiciled there.'" *Id.* (quoting *Kanter*, 265 F.3d at 857); see also *Weible v. United States*, 244 F.2d 158, 163 (9th Cir. 1957) ("Residence is physical, whereas domicile is generally a compound of physical presence plus an intention to make a certain definite place one's permanent abode, though, to be sure, domicile often

---

[39] Pl.'s Mem. at 13.

[40] *Id.*; see November 1, 2007 Minute Order.

[41] Defs.' Opp. at 18.

hangs on the slender thread of intent alone, as for instance where one is a wanderer over the earth. Residence is not an immutable condition of domicile").

Because a person may only have one domicile at a time, "a person's old domicile is not lost until a new one is acquired." *Lew v. Moss*, 797 F.2d 747, 750 (9th Cir. 1986) (citing *Barber v. Varleta*, 199 F.2d 419, 423 (9th Cir. 1952), and RESTATEMENT (SECOND) OF CONFLICTS §§ 18-20 (1971)). "A change in domicile requires the confluence of (a) physical presence at the new location with (b) an intention to remain there indefinitely." *Id.* (citing *Owens v. Huntling*, 115 F.2d 160, 162 (9th Cir. 1940); 13B C. Wright, A. Miller, & E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3613, at 544-45 (1984 & Supp. 1986)). Among the factors courts consider in determining domicile are an individual's "current residence, voting registration and voting practices, location of personal and real property, location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and payment of taxes." *Id.* (citations omitted). "[C]ourts have also stated that domicile is evaluated in terms of 'objective facts.'" *Id.* (citations omitted). Thus, the determination of a party's domicile is a mixed question of law and fact. *Id.*

Given the variety of factors that must be considered in determining where a person is domiciled, the court concludes that defendants' motion for summary judgment on the issue of domicile is premature. As noted in the court's prior order, defendants filed the motion less than two months after the parties first served written discovery. Neither party has adduced sufficient evidence to permit the court to determine whether Monroe was domiciled in New York or California at the time of her death. Defendants' argument that Monroe was domiciled in New York is based primarily on representations allegedly made by plaintiffs and their predecessors-in- interest in various public documents; it is not evidence bearing on the factors that are generally used to determine domicile.[42] Plaintiffs, for their part,

---

[42]Defendants' Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment ("Defs.' Mem.") at 41-43; Defendants' Opposition to Plaintiffs' Objections to and Request to Strike Evidence Submitted in Reply by Defendants on Their Motion for Summary Judgment ("Defs.' Reply Opp.") at 4 ("Plaintiffs' interrogatory sought all facts regarding Defendants['] contention that Marilyn Monroe was a domiciliary of New York at the time of her death. Defendants identified all facts they had at that time, namely the representations by plaintiffs and their predecessors in interest made

28

adduce evidence showing that Monroe purchased a home in California in 1962; that she licensed her dog in the state; that she attended psychotherapy sessions in Los Angeles; and that she maintained a Connecticut driver's license with a California address.[43]

Since the time of the court's May 14 ruling, discovery has continued and MMLLC asserts that it has recently obtained an extensive collection of documents that purportedly bear on the issue of domicile.[44] Because discovery is ongoing and the record contains only limited evidence regarding Monroe's domicile, the court declines to decide the issue on the basis of a premature and incomplete record. Defendants' request for a ruling on question of domicile is thus denied. See, e.g., *First Chicago Intern. v. United Exchange Co., Ltd.*, 836 F.2d 1375 (D.C. Cir. 1988) ("Petra and PIBC contend, however, that FCI cannot challenge the summary judgment order, because FCI failed to file a Rule 56(f) affidavit specifying the 'facts it hoped to adduce by further discovery, and how any facts so adduced would be material.' . . . We disagree. Under Rule 56(f), the district court may defer ruling on a summary judgment motion and permit further discovery so that the nonmoving party

---

from public documents Defendants were able to locate through their independent investigations").

[43]Plaintiffs' Statement of Genuine Issues of Material Fact ["MF"] and Additional Material Facts ["AMF"] in Response to Defendants' Statement of Uncontroverted Facts in Support of Defendants' Motion for Summary Judgment ("Pls.' Facts"), AMF ¶¶ 7-9, 12.

[44]Wytsma Decl., ¶ 17, Exh. M (letter dated March 26, 1962 from Monroe's secretary to The Actors Studio in New York requesting that they update their records to reflect her California address). At the time it opposed the motion, MMLLC did not request a continuance under Rule 56(f) of the Federal Rules of Civil Procedure so that it could conduct discovery and "present facts essential to justify its opposition." FED.R.CIV.PROC. 56(f) ("If a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order"). Parties seeking a continuance must show: "(1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion." *State of Cal., on Behalf of Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 779 (9th Cir. 1998). Although MMLLC did not seek a continuance under Rule 56(f), the court accepts its representation that it has recently obtained evidence supporting its claim that Monroe was domiciled in California; this evidence includes newly discovered documents acquired from the nephew of Monroe's business manager at the time of her death. (Pl.'s Reply at 21). Given the discovery of this new evidence, and the limited information presented by the parties in October 2006 in support of and opposition to defendants' motion for summary judgment, the court believes it is appropriate to defer ruling on the domicile issue.

may obtain the information necessary to show an issue of material fact in dispute. . . . . The purpose of the affidavit is to ensure that the nonmoving party is invoking the protections of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition. . . . Although several courts have held that filing an affidavit is necessary for the preservation of a Rule 56(f) contention, other circuits have excused the absence of a Rule 56(f) filing on the ground that other documents filed by the plaintiff – such as opposing motions and outstanding discovery requests – sufficed to alert the district court of the need for further discovery and thus served as the functional equivalent of an affidavit. . . . Given the particular facts before us, this latter, more flexible approach was the appropriate response"); *Sames v. Gable*, 732 F.2d 49, 51-52 & n. 3 (3d Cir. 1984) (where there were outstanding document requests, plaintiff's failure to file a Rule 56(f) affidavit was "not sufficiently egregious to warrant a non-merits resolution of the case"); see also *Cowan v. J.C. Penney Co.*, 790 F.2d 1529, 1532 (11th Cir. 1986) (holding that a Rule 56 affidavit was unnecessary where plaintiff brought to the court's attention the fact that discovery remained outstanding); *Investors Title Ins. Co. v. Bair*, 232 F.R.D. 254, 256 (D.S.C. 2005) (noting that "in some cases courts have held that summary judgment was premature even when the opposing party failed to file a Rule 56(f) affidavit. . . . When the nonmoving party, through no fault of its own, has had little or no opportunity to conduct discovery, and when fact-intensive issues, such as intent, are involved, courts have not always insisted on a Rule 56(f) affidavit if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary").

### 2. Collateral Estoppel

Alternatively, defendants contend that the court should enter summary judgment in their favor on the basis of collateral and/or judicial estoppel.[45] Defendants argue that MMLLC is collaterally estopped from asserting that Marilyn Monroe was domiciled in California at the time of her death, citing (1) *Frosch v. Grosset & Dunlap, Inc.*, 427 N.Y.S.2d 828 (N.Y. App. Div. 1980); (2) the Report of Appraiser filed December 30, 1969 in Monroe's probate proceedings; and (3) a 1975 opinion of the

---

[45] Defs.' Opp. at 17.

30