# EX. D, PT. 3

1  California State Board of Equalization ("BOE").[46] The court is not persuaded that MMLLC is estopped
2  from contending that Monroe was domiciled in California at the time of her death.
3        The Full Faith and Credit Act requires that federal courts give judgments issued by the courts
4  of a state the same preclusive effect they would have in state proceedings. *Robi v. Five Platters, Inc.*,
5  838 F.2d 318, 322 (9th Cir. 1988); see 28 U.S.C. § 1738. Because the *Frosch* case and Surrogate's
6  Court proceedings took place in New York state courts, New York's law of collateral estoppel
7  applies; because the BOE proceeding took place in California, California collateral estoppel law
8  applies in assessing its preclusive effect. See *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518,
9  523 (1986) ("... under the Full Faith and Credit Act a federal court must give the same preclusive effect
10 to a state-court judgment as another court of that State would give"); *Skillsky v. Lucky Stores, Inc.*, 893
11 F.2d 1088, 1095 (9th Cir. 1990) ("Title 28 U.S.C. § 1738 requires federal courts to apply the preclusory
12 rules of a particular state to judgments issued by courts of that state"); *Robi*, 838 F.2d at 322
13 ("[F]ederal courts must give state judicial proceedings 'the same full faith and credit... as they have
14 by law or usage in the courts of [the] State... from which they are taken.'... This Act requires the
15 federal courts to apply the res judicata rules of a particular state to judgments issued by courts of that
16 state").
17       Collateral estoppel, or issue preclusion, "prevents relitigation of all 'issues of fact or law that
18 were actually litigated and necessarily decided' in a prior proceeding." *Robi*, 838 F.2d at 322
19 (quoting *Segal v. American Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979)); see also *Branson
20 v. Sun-Diamond Growers*, 24 Cal.App.4th 327, 339-40 (1994) (noting that in California, the doctrine
21 of collateral estoppel governs issue preclusion). Under New York law, "[t]wo requirements must be
22 met before collateral estoppel can be invoked. There must be an identity of issue which has necessarily
23 been decided in the prior action and is decisive of the present action, and there must have been a full and
24 fair opportunity to contest the decision now said to be controlling." *Buechel v. Bain*, 97 N.Y.2d 295,
25 303-04 (2001) (citing *Gilberg v Barbieri*, 53 N.Y.2d 285, 291 (1981)). "The litigant seeking the benefit
26 of collateral estoppel must demonstrate that the decisive issue was necessarily decided in the prior action

---

28  [46]Defs.' Mem. at 38-43.

31

against a party, or one in privity with a party." *Id.* at 304 (citing *Gilberg*, 53 N.Y.2d at 291); see also *M.J. Woods, Inc. v. Conopco, Inc.*, 271 F.Supp.2d 576, 581 (S.D.N.Y. 2003) ("The issue must have been identical to the issue decided in the prior proceeding, see *Green v. Montgomery*, 219 F.3d 52, 55 (2d Cir. 2000), and 'the decision of the issue [must have been] necessary to support a valid and final judgment on the merits,'" quoting *Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir. 1992)). Similarly, under California law, certain threshold requirements must be met before collateral estoppel applies: (1) the issue whose relitigation a party seeks to preclude must be identical to that decided in the former proceeding; (2) the issue must have been actually litigated and necessarily decided in the earlier proceeding; and (3) the decision in the former proceeding must be final and on the merits. *Branson*, 24 Cal.App.4th at 346; see also *In re Executive Life Ins. Co.*, 32 Cal.App.4th 344, 373 (1995) ("Issue preclusion requires both an identity of issue in the later and earlier cases and that the issue be entirely necessary to the decision in the earlier case.")

*Frosch* examined whether the Estate of Marilyn Monroe possessed a right of publicity that it could protect from infringement by publication of a book titled "Marilyn." *Frosch*, 427 N.Y.S.2d at 828. The Appellate Division of the New York Supreme Court determined that "[t]he statutory right of privacy applies to the name, portrait or picture of 'any living person' (Civil Rights Law, § 50); and it is thus on its face not applicable to the present book." *Id.* The court noted, however, that "[p]laintiff claim[ed] that there [was] an additional property right, a right of publicity which survive[d] the death of Miss Monroe and belong[ed] to the estate." *Id.* At to this right, it held that "[n]o such nonstatutory right ha[d] yet been recognized by the New York State courts." *Id.* (citing *Wojtowicz v Delacorte Press*, 43 N.Y.2d 858 (1978)). The court went on to state that even if such a right existed, defendant's book was a "literary work[,] . . . not simply a disguised commercial advertisement for the sale of goods or services," and that "protection of the right of free expression [was] so important that [it] should not extend any right of publicity, *if such exists*, to give rise to a cause of action against the publication of a literary work about a deceased person." *Id.* (emphasis added).

Defendants argue that "where Marilyn Monroe was domiciled at the time of her death was

32

foundational to whether the Estate of Marilyn Monroe had a right to publicity."[47] As can be seen, however, the court's decision turned on the fact that the allegedly infringing book was a literary work, and that, as respects such a work, freedom of speech considerations outweighed any right of publicity that might exist. The opinion gives no indication that the issue of domicile was raised by the parties or necessarily decided by the court.[48] The court's observation that New York did not recognize a posthumous right of publicity does not demonstrate that it decided the question of Monroe's domicile;[49] instead, the court affirmed the trial court's conclusion that publication of a literary work could not give rise to a violation of a right of publicity.

Because defendants have not met their burden of showing "an identity of issue which has necessarily been decided in the prior action and is decisive of the present action," they are not entitled to have summary judgment entered in their favor on the basis that the *Frosch* decision collaterally estops plaintiffs from arguing that Marilyn Monroe was domiciled in California. See *Buechel*, 97 N.Y.2d at 304. In any event, as discussed below, defendants have not shown that Frosch, as the executor of Monroe's estate, was in privity with plaintiffs.

Defendants have also failed to show that domicile was definitively decided by the California BOE or the New York Surrogate's Court. The BOE's opinion states that "[a]t the time of her death in 1962, Marilyn Monroe was a resident of the state of New York."[50] Defendants extrapolate from this that the BOE necessarily determined that Monroe was a New York domiciliary at the time of her death.[51] As noted, however, residence and domicile are distinct concepts; domicile involves the party's intention

---

[47] *Id.* at 39.

[48] Frosch did not address the issue of domicile in his brief to the Appellate Division. (See Defendants' Compendium of Exhibits in Support of Defendant's Reply in Support of Motion for Summary Judgment ("Defs.' Reply Exhs."), Exh. 29).

[49] In fact, as of the date of the decision, California too did not recognize a posthumous right of publicity. Section 990 (which later became section 3344.1) did not take effect until January 1, 1985.

[50] See Declaration of Greg T. Hill Submitted in Support of Defendants' Motions for Summary Judgment ("Hill Decl."), Exh. 8.

[51] Defs.' Mem. at 40.

33

to make a particular location her home. See *Gaudin*, 379 F.3d at 636 ("'A person residing in a given state is not necessarily domiciled there'" (citation omitted)). There is no indication that the issue of domicile was litigated in the BOE proceeding or decided by the board.

Defendants' claim of collateral estoppel based on the New York probate proceedings fails for the same reason. Defendants cite a statement in the report of the estate appraiser that Monroe "died a resident of the State of New York on the 5th day of August 1962."[52] Because residence is not the same as domicile, this does not demonstrate that the court considered or weighed any of the usual factors that are used to determine domicile, or that it decided the question.

### 3. Judicial Estoppel

The court is further unpersuaded that MMLLC is judicially estopped, as defendants claim, from contending that Monroe was not domiciled in New York at the time of her death.[53] Judicial estoppel "'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citations omitted). Courts uniformly recognize that the purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from changing positions as circumstances warrant. *Id.* (citations omitted). Judicial estoppel can be invoked whether a party takes inconsistent positions in the same action or in two different actions. See *Rissetto v. Plumbers and Steamfitters Loca 343*, 94 F.3d 597, 605 (9th Cir. 1996) ("We now make it explicit that the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation").

Factors courts consider in determining whether to apply the doctrine include: (1) whether the party's later position is "clearly inconsistent" with its earlier position; (2) whether the party has successfully advanced the earlier position, such that judicial acceptance of an inconsistent position in the later proceeding would create the perception that either the first or the second court was misled; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 751

---

[52]Hill Decl., Exh. 11.

[53]Defs.' Mem. at 41-43.

34

(citations omitted).

Defendants cite several purportedly inconsistent positions that they contend judicially estop MMLLC from asserting that Monroe was domiciled in California. Defendants argue that plaintiffs are estopped by various statements made to the Surrogate's Court by Aaron Frosch, the executor of Monroe's estate, and Anna Strasberg, administratrix of Monroe's will, that Monroe was a resident of New York at the time of her death.[54] As noted, residence is distinct from domicile, and none of the statements addressed Monroe's domicile at the time of her death. A person may have more than one residence, but only one domicile, and may reside somewhere other than her domicile. See, e.g., *United States v. Venturella*, 391 F.3d 120, 125 (2d Cir. 2004) ("'Residency means an established abode, for personal or business reasons, permanent for a time. A resident is so determined from the physical fact of that person's living in a particular place. One may have more than one residence in different parts of this country or the world, but a person may have only one domicile. A person may be a resident of one locality, but be domiciled in another,'" quoting *Rosario v. INS*, 962 F.2d 220, 224 (2d Cir. 1992)). As a result, assertions that Monroe was a resident of New York are not "clearly inconsistent" with a contention that she was a domiciliary of California. See *New Hampshire*, 532 U.S. at 751; *Pegram v. Herdrich*, 530 U.S. 211, 228 n. 8 (2000) ("Herdrich argues that Carle is judicially estopped from denying its fiduciary status as to the relevant decisions, because it sought and successfully defended removal of Herdrich's state action to the Federal District Court on the ground that it was a fiduciary with respect to Herdrich's fraud claims. . . . [But] [b]ecause fiduciary duty to disclose is not necessarily coextensive with fiduciary responsibility for the subject matter of the disclosure, Carle is not estopped from contesting its fiduciary status with respect to the allegations of the amended complaint"); *Holder v. Holder*, 305 F.3d 854, 872 (9th Cir. 2002) (declining to apply judicial estoppel and noting that "Jeremiah's position that California had jurisdiction over his custody claim is not necessarily inconsistent with his position that Washington, not California, has jurisdiction over his [International Child Abduction Remedies Act ("ICARA"] claim, because the concept of 'home state' under California state law differs from the concept of 'habitual residence' under ICARA").

---

[54] *Id.* at 41-42; Hill Decl., Exhs. 12, 17, 18.

35

1   Defendants also argue that a statement by Frosch that the estate did not have an exclusive right
2   to Monroe's image judicially estops plaintiffs from claiming otherwise.[55] This statement was made by
3   Frosch in a 1972 affidavit to the Surrogate's Court. The affidavit concerned a dispute regarding
4   transparencies of photographs taken of Monroe by Tom Kelley; the photographs were in Monroe's
5   possession at the time of her death.[56] When Kelley sought to have the photographs returned, Lee
6   Strasberg, the beneficiary of Monroe's personal effects, argued that he was entitled them.[57] Frosch
7   distinguished between the transparencies themselves, and the right to reproduce the photographs. As
8   to the latter, he opined that Monroe's "Estate [had] no exclusive right to her image" and could not
9   "retain the photographs."[58] In a subsequent affidavit, Frosch stated that a "question remained [regarding
10  the identity of] . . . the owner of rights" to the photographs,[59] and suggested that "*if* they were owned
11  by [Monroe] at the time of her death, the Estate would be [the] Owner."[60] As can be seen, Frosch did
12  not take a firm position regarding the Estate's ownership of reproduction or other rights in the
13  photographs; moreover, the issue before the Surrogate's Court appears to have been ownership of the
14  physical transparencies, not ownership of rights to Monroe's image and likeness. Finally, there is no
15  evidence that the Surrogate's Court ever ruled on the Estate's ownership of reproduction or other rights
16  in Monroe's image. Consequently, to the extent Frosch advanced a position, the record does not support
17  a finding that he did so successfully.[61]

---

[55]Defs.' Mem. at 41.

[56]Hill Decl., Exh. 19.

[57]*Id.*

[58]*Id.*; Hill Decl., Exh. 20.

[59]Hill Decl., Exh. 21.

[60]*Id.*

[61]There is an additional reason for declining to estop plaintiffs judicially based on Frosch's statement. Frosch submitted his affidavits in 1973; he was correct that at that time, the estate had no right to Monroe's image, as neither California nor New York then recognized a posthumous right of publicity. The subsequent change in California law was not something Frosch could have anticipated; to the extent he took a position, and was in privity with Strasberg and his successors, therefore, his statement cannot be considered to be inconsistent with positions being taken now based on a subsequent

36

Finally, defendants contend that plaintiffs are judicially estopped to assert that Monroe was domiciled in California at the time of her death based on statements Frosch made to the BOE.[62] The issue in the BOE appeal was whether Monroe's estate should pay California income tax on her percentage payments, i.e., earnings she made from films in which she appeared.[63] Frosch asserted the percentage payments were not taxable in California, but was denied a tax clearance certificate. The BOE classified the earnings as "personal services income," whose source is the place where the services were performed.[64] California taxes "the entire taxable income of every nonresident which is derived from sources within [the] state."[65]

The Estate made several unsuccessful arguments to the BOE in an effort to avoid imposition of the tax. Among these was an assertion that the percentage payments were not taxable in California because they did not derive from California sources.[66] The Estate argued that the income was earned in New York because it derived from *the Estate's* ownership of "an intangible contract right whose situs, under the doctrine of *mobilia sequunter personam*, was the state" of *the Estate's* domicile or residence,[67] and that, "under the *mobilia* rule the source of the income was in appellant's domiciliary state, New York."[68] The BOE rejected this argument because no authority suggested that a contract right to receive

---

change in the law.

[62]Defs.' Mem. at 41-42; Hill Decl., Exh. 8.

[63]Hill Decl., Exh. 8 at 179.

[64]*Id.*, Exh. 8 at 180.

[65]*Id.*

[66]*Id.*, Exh. 8 at 185.

[67]*Id.* As the BOE explained, this doctrine distinguishes between the "immediate" source of income from intangibles such as dividend income from corporate stock or interest income from promissory notes "(which is the intangibles themselves) and the "ultimate" source of the same income (which . . . would be the activities of the corporations or the sale of property)." (*Id.*). It noted that, applying this principle, the Estate argued that "the immediate source of the income in question was *its* intangible contract right to receive the percentage payments, and that Miss Monroe's services were merely the ultimate source of that income." (*Id.*) (emphasis added).

[68]*Id.*

37

percentage payments for personal services was an intangible subject to this doctrine.[69] Rather, the Board concluded, the estate stood in the shoes of the decedent. Because Monroe performed the services in California, it stated, income from them was taxable in California.[70]

As with defendants' other arguments, the Estate's argument to the BOE does not judicially estop plaintiffs from asserting that Monroe was a domiciliary of California at the time of her death. First, the Estate's position that *it* was a New York domiciliary is not inconsistent with plaintiffs' present position that Monroe was domiciled in California when she died. There is no evidence, moreover, that the Estate made any argument respecting Monroe's domicile at the time of her death. Indeed, as the BOE noted, "[d]uring her lifetime Miss Monroe owned the same contract right [to receive the percentage payments], and [the Estate] does not contend that the *mobilia* rule would have applied to her receipt of the income."[71]

Additionally, the BOE rejected the Estate's argument. Consequently, defendants cannot show that the Estate prevailed on its argument in the BOE proceeding, while its purported privy relies on a contradictory argument in this action. See *New Hampshire*, 532 U.S. at 749. There is, therefore, no risk that judicial acceptance of plaintiffs' present position that Monroe was domiciled in California would create the perception that either the BOE or this court was misled. See *id.* at 751.[72] As a result, defendants have failed to show that plaintiffs are judicially estopped from arguing that Monroe was not a domiciliary of New York at the time of her death

---

[69]*Id.*, Exh. 186.

[70]*Id.*

[71]*Id.*

[72]Since the BOE determined that California could properly tax the percentage payments, the Estate sought a credit for the taxes it had paid to New York on that income. This argument too was unsuccessful; the BOE found that Monroe was a resident of New York at her death, and that only California residents are entitled to a credit for taxes paid in another state. (*Id.*, Exh. 8 at 186-87.)

.

### III. CONCLUSION

For the reasons stated, plaintiff MMLLC's motion for reconsideration is granted.

DATED: January 7, 2008

/s/ Margaret M. Morrow
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE