# EXHIBIT 26, PART F

```
 1  Estate of Marilyn Monroe:    LASC No. 458,393
 2
 3  arrange for storage of all of the items involved.  However,
 4  before the furniture and furnishings were s
 5  chaser of the real property requested the
 6  buying certain of the items that were
 7  for use in the house.  Petitioner's attorneys,
 8  met with the buyer, so that the latter could designate which
 9  items he desired.  Thereafter, petitioner's attorneys had
10  these items separately appraised so that they
11  at not less than the appraised value, and prepared the
12  Return of Sale of Personal Property and the Order based
13  thereon, and drew the necessary documents to complete the
14  transaction.  Said attorneys then arranged with the Special
15  Administratrix so that prior to delivery of possession of the
16  house to the buyer, all the remaining items of furniture and
17  furnishings could be boxed and stored with a warehouse.
18          Petitioner's said attorneys estimate that they
19  expended ten (10) hours in connection with the foregoing ser-
20  vices.
21      4.  Extraordinary Services Re Creditors' Claims:
22          Following decedent's death, there were thirty-five
23  creditors' claims filed against the estate in California.
24  While petitioner's attorneys recognize that the processing
25  of creditors' claims is part of the normal duties of admin-
26  istration, for which statutory fees are allowed, said
27  ...
28
```

EXHIBIT III

(20)

SFAI 0188

1  Estate of Marilyn Monroe:    LASC No. 458,900

3  attorneys point out that, in this estate, a portion of the
4  services were extraordinary in that there was no one alive in
5  a position to advise as to the accuracy of the claims
6  or the extent of decedent's outstanding obligations
7  consequence, said attorneys had to make investiga-
8  tions with respect to said claims, which involved, among
9  other things, separate meetings with many of the claimants
10 to examine into the nature of the claim.
11         Furthermore, in connection with the claim of Mrs.
12 Bright, the interior decorator, it was necessary to analyze
13 a large number of items to determine whether there was a
14 firm commitment or merely a proposed estimate which could
15 be canceled. In this connection, petitioner's attorneys
16 arranged to cancel an order for a rug from Mexico, which had
17 been ordered and woven to size in Mexico and was at that time
18 being held for delivery. In addition, there were demands
19 from the Los Angeles Bureau of Customs regarding a carton
20 containing a specifically constructed chest, which the Bureau
21 of Customs was holding for transportation and storage charges.
22 Upon investigation, it appeared that the decedent had paid
23 $360.00 for the chest and that the total charges to redeem
24 amounted to approximately $300.00. After several consulta-
25 tions with the interior decorator, petitioner's attorneys
26 recommended to the ancillary executor that the chest not be
27 ...
28 ...

(21)

SFA1 0189

1  Estate of Marilyn Monroe:    LASC No. 458,935
2
3  redeemed but that the Bureau of Customs be allowed to sell
4  it for the charges.
5         In connection with the creditor's claim
6  Artists, Ltd., said attorneys were required to
7  extensive agency contracts in order to advise the
8  executor as to the basis for the claim and its propriety.
9  Subsequently, when the time came to pay the claims, said
10 attorneys suggested to the ancillary executor the arrangement
11 whereby the creditor's claim of MCA Artists, Ltd. would be
12 paid out of the domiciliary probate estate in New York, so
13 that the claim, including the contingent portion thereof,
14 could be released in California, the ancillary administration
15 be released in California and the administration settled.
16 Said attorneys, further, handled the negotiations with respect
17 thereto, insofar as the California representatives of the
18 claimant were involved.
19        Petitioner's said attorneys estimate that their services
20 in connection with the handling of those aspects of the
21 creditors' claims set forth above, over and apart from the
22 normal services of handling creditors' claims, involved ap-
23 proximately twenty-five (25) hours of time.
24 ...
25 ...
26
27
28

EXHIBIT III
(22)

SFA10190

STA1 02791

Estate of Marilyn Monroe:   LASC No. 453,935

3. Extraordinary Services Re Tax Matters:

(a) Although decedent's domiciliary probate is handled in New York, decedent also ... in California and owned real property here at ... of her death. Petitioner's attorney ... services in connection with the preparation of the California Inheritance Tax Affidavit and Affidavit Concerning Residence, together with supporting affidavits, in order to establish that decedent was a nonresident of California at the time of her death, and in order to assemble and segregate correctly those items of receipts and expenses attributable to California for assessment. Petitioner's attorneys corresponded with and interviewed several persons with respect to decedent's nonresident status, suggested to the ancillary executor the types of evidence to be secured to substantiate this position and prepared various affidavits which were submitted in support of such position. Said attorneys engaged in correspondence with the California State Controller's office, explaining in detail their factual and legal position and ultimately were successful in obtaining a determination that decedent was not a resident of California at the time of her death. As a result of

(23)

EXHIBIT III

Estate of Marilyn Monroe: LASC No. 458,935

such determination, none of decedent's contract rights were included in measuring such tax in California.

Petitioner's attorneys assembled the information with respect to the California assets and obligations of decedent for the purpose of Federal Estate Tax Return and in connection with a Notice of Levy from the U.S. Treasury Department, Internal Revenue Service, for federal estate taxes in the sum of approximately $135,000.00 which was served on said attorneys, and worked with the domiciliary executor in ultimately obtaining the necessary evidence of payment and the formal Release of Levy.

Said attorneys allege that they expended more than twenty (20) hours in connection with the foregoing complicated tax matters.

(b) Upon decedent's death, her estate became entitled to a percentage of the receipts from various motion pictures, including "Some Like It Hot" and "The Misfits", on a continuing basis. The moneys involved were paid to the domiciliary executor in New York and income tax returns reporting such receipts were filed, and taxes paid thereon, in New York.

In 1971, when the ancillary executor herein prepared to file his Petition for Final Distribution,

EXHIBIT III

(24)

SFA1 0192

1  Estate of Marilyn Monroe:    LASC No. 458,935

3  he sought an Income Tax Certificate from the
4  Franchise Tax Board in accordance with the then
5  applicable requirements of law.  The Franchise
6  Tax Board responded with a claim that petitioner
7  owed the State of California fiduciary income
8  taxes for the years 1962 through 1970, based upon
9  the estate's share of gross receipts from the
10 above entitled pictures attributable to decedent's
11 services rendered in California.
12      In accordance with instructions furnished
13 by petitioner's attorneys herein, the accountants
14 for the estate prepared appropriate fiduciary income
15 tax returns for the years in question and submitted
16 them to the Franchise Tax Board under protest.
17 Extensive negotiations and discussions were then
18 carried on between said attorneys and representa-
19 tives of the Franchise Tax Board with respect to
20 the legal position of the estate that such income
21 was not subject to tax.  After considering the legal
22 arguments asserted by the attorneys herein, the
23 Franchise Tax Board served notice of proposed assess-
24 ments of tax against the ancillary executor for the
25 years 1963 through 1970.  Petitioner, through
26 his attorneys, appealed from such assessments.

EXHIBIT XII
(25)

SFA1 0193

1  Estate of Marilyn Monroe:   LASC No. 458,935

3          The point in issue in the proceedings [was a]
4   completely novel point of law; namely, what [under the]
5   California Revenue and Taxation Code and r[egulations]
6   thereunder permitted the taxation [as]
7   source income of receipts from contracts which had
8   been valued for tax purposes as assets of decedent's
9   domiciliary estate and were passively received [by]
10  such domiciliary estate outside of California.
11  question involved matters of constitutional law,
12  statutory construction and the interpretation [of]
13  the Franchise Tax Board's own rulings.
14         Extensive research was carried on by said
15  attorneys, both with respect to the facts and the
16  law; an opening brief and a reply brief were filed
17  in support of the estate's position.  The matter
18  came on for hearing before the Board of Equaliza-
19  tion and was orally argued at length before the full
20  Board in December, 1973.
21         In 1975, the Board of Equalization ultimately
22  affirmed the Franchise Tax Board's determination of
23  tax.  The taxes, penalties and interest involved
24  totaled approximately $93,000.  Before determining
25  whether or not to appeal further, said attorneys
26  discussed with the Franchise Tax Board, and subse-
27  quently with the California Attorney General's office,
28  ...

EXHIBIT III
(26)

SFA1 0194

1  Estate of Marilyn Monroe:    LASC No. 458,935

3  the possibility of settlement. Negotiations were
4  conducted on the basis that this was a matter of
5  first impression, that there were substantial
6  issues of law which the courts would have to
7  upon, and that it was advantageous both to
8  State and to the estate to dispose of the matter
9  as promptly as possible on a reduced basis.
10  Ultimately, after said attorneys, with the approval
11  of petitioner, had prepared and submitted various
12  proposals, the State of California agreed to a
13  settlement which waived all penalties and accepted
14  the sum of approximately $52,000, as payment in
15  full. The domiciliary estate supplied a substan-
16  tial portion of the funds necessary to make this
17  settlement possible. Said attorneys reviewed and
18  approved the settlement documents prepared. Said
19  attorneys then prepared a Petition for Order
20  
21  tended a hearing thereon, and after approval by
22  the Court, prepared the Order of Approving Compro-
23  mise. Payment has been effected and the action
24  has been dismissed.
25     In the preparation of the briefs, negotiations,
26  hearing, argument and settlement procedures, said
27  attorneys have expended in excess of one hundred
28  (100) hours.

EXHIBIT III
(27)

SFA10185