# EX. Q, pt. 1

COPY

1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   ----------------------------------x

4   SHAW FAMILY ARCHIVES, LTD.,
    EDITH MARCUS, and META STEVENS

5
                            Plaintiffs,
6
            - against -
7
    CMG WORLDWIDE, Inc., an Indiana
8   corporation, and MARILYN MONROE,
    Limited, a Delaware limited
9   liability company,

10                          Defendants.
    ----------------------------------x
11

12              Ellen Grauer Court Reporters
                126 East 56th Street
13              New York, New York

14

15

16              December 26, 2007
                12:01 p.m.
17

18

19              30(b)(6) deposition of MARK
    ROESLER, before Marlene Lee, CSR, CRR, a Notary
20  Public of the State of New York.

21

22

23      ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24              New York, New York
                212-750-6434
25              Ref: 86257

39

1                    ROESLER

2          MS. COLBATH:  Objection.

3     A.    The Indiana statute that was

4  enacted about 15 years ago provides for that

5  right.

6     Q.    Is that it?

7          MR. MINCH:  Objection.

8     A.    Yes.

9     Q.    That was the statute that you had

10  some role in, isn't it?

11          MR. MINCH:  Objection.

12          MS. COLBATH:  Objection.

13     A.    I was involved, yes.

14     Q.    How were you involved?

15          MR. MINCH:  Objection.

16     A.    Supported it.  Supported it -- I

17  guess that's my role.

18     Q.    How did you support it?

19          MR. MINCH:  Objection.

20          MS. COLBATH:  Objection.

21     A.    I don't recall exactly.  There were

22  a number of people on my staff involved in --

23  in -- after California enacted the right of

24  publicity statute in '85, it started a movement

25  for other states to clarify that.  And Indiana

40

ROESLER

2  was a natural state to clarify it.  So it

3  evolved over a couple of years.  And the bill

4  was introduced.  There was a sponsor.  We -- I

5  don't remember many more specifics other than

6  that.

7        Q.      Uh-huh.  That statute was passed

8  when?  The Indiana statute.

9                MR. MINCH:  Objection.

10                MS. COLBATH:  Objection.

11        A.      In the early '90s.

12        Q.      When did CMG begin its -- the

13  process of supporting the statute, as you put

14  it?

15                MR. MINCH:  Objection.

16                MS. COLBATH:  Objection.

17        A.      You know, maybe the late '80s,

18  early '90s.

19        Q.      Did CMG submit a draft of the

20  statute for the Indiana Legislature to review

21  before it was enacted?

22                MR. MINCH:  Objection.

23                MS. COLBATH:  Objection.

24        A.      I don't have a specific

25  recollection.

41

ROESLER

Q.    Do you recall ever saying to anybody anywhere that CMG was the one who wrote the statute?

MR. MINCH:  Objection.

MS. COLBATH:  Objection.

A.    I -- I may -- I may have taken -- our companies may have taken credit for helping support it and spearheading it through.  I don't know if "wrote" is the right terminology.

Q.    Now, turning to the California right of publicity that you assert exists, what is the basis for your statement that MMLLC has a right of publicity in the jurisdiction of California in Marilyn Monroe?

MR. MINCH:  Objection.

MS. COLBATH:  Objection.

A.    Just that the statute applies to California domiciliaries, and lasts for 70 years after death.

Q.    Anything else?

MR. MINCH:  Objection.

A.    No.

Q.    Do you ever recall representing to anyone that Marilyn Monroe died a domiciliary

46

ROESLER

A.    Mine's signed by Orin Snyder.

MR. MINCH:  Sorry about that.

Q.    On the next page after that there's a signature by Ted Minch.  Do you see that?

A.    I do.

Q.    Mr. Minch is your attorney in this matter; correct?

A.    Correct.

Q.    You have no reason to believe that this is not the document that was submitted in connection with this matter, do you?

A.    That's correct.

Q.    Did you review this document before it was filed?

A.    Yes.

Q.    When?

A.    Late July.  Early August.  I'm not sure.

Q.    To make sure that all the factual representations in here were true and accurate; is that right?

MS. COLBATH:  Objection.

MR. MINCH:  Objection.

A.    Yes, that's correct.

47

1                              ROESLER
2          Q.      Sitting here today, you don't have
3      any reason to believe that any of the factual
4      representations in this complaint are untrue,
5      do you --
6                  MR. MINCH:   Objection.
7          A.      Not that I know of.
8          Q.      -- or misleading in any way?
9                  MR. MINCH:   Objection.
10         A.      Not that I know of.
11         Q.      And as head of CMG, certainly if
12     there was anything in here that was incorrect,
13     you would notify your attorneys of that and
14     make the necessary corrections; correct?
15         A.      I would endeavor to, yes.
16         Q.      Turning to the 30(b)(6) notice, No.
17     1, the factual basis for Count 1 in defendants'
18     Third Amended Complaint, what is the factual
19     basis for Count 1 in defendants' Third Amended
20     Complaint as far as CMG is concerned?   To help
21     you, I turn you to page 6 where Count 1 starts
22     and goes on till the end.
23                 What is the factual basis for Count
24     1?
25         A.      Just that the Shaw Group, through

48

ROESLER

1
2   the representative Bradford, has -- represents
3   various licensees.  That their images are
4   protected by copyright and we do not believe
5   that to be the case.
6           Q.    Anything else?
7           A.    I think that's the basis, you know.
8   I think that's it.
9           Q.    What images does CMG -- let me
10  rephrase.  What images of Marilyn Monroe in the
11  Shaw family collection does CMG believe are in
12  the public domain?
13          A.    All of the images that were
14  published between -- you know, prior to, I
15  believe, '77.  All the images that were
16  published that did not have notice on them, we
17  know that those are in the public domain.  We
18  know the Rizzoli book is in the public domain.
19  And we -- and from my -- from my meetings with
20  the two daughters, I also knew that there were
21  issues with these images being -- having valid
22  copyrights.
23          Q.    Let's start with your first
24  statement, which is, "All images that were
25  published prior to '77 without notice are in

1                        ROESLER

2      the public domain."  1977, are you referring

3      to?

4                    What particular images are you

5      referring to in the Shaw family collection of

6      Marilyn Monroe?

7                    MS. COLBATH:  Objection.

8                    MR. MINCH:  Objection.

9           A.     Images taken by Mr. Shaw.

10          Q.     Can you identify them any further

11     than that?

12                   MR. MINCH:  Objection.

13                   MS. COLBATH:  Objection.

14          Q.     Any particular books?  Names of

15     photographs?

16          A.     There were many publications back

17     in those times, like Photoplay, and different

18     publications that published -- continually

19     published these different photos of people like

20     Marilyn Monroe and other entertainment

21     personalities.  So there were many, many, many,

22     many images all published at that time.

23     Typically they were all published without

24     notice, or many of them were published without

25     notice.

1                    ROESLER

2        Q.    Can you refer to any particular

3   books that were published that are in the Shaw

4   Family collection that were published before

5   1977 without notice?

6               MR. MINCH:  Objection.

7               MS. COLBATH:  Objection.

8        Q.    Any specific books?

9               MS. COLBATH:  Objection.

10       A.    No.  I don't know of any particular

11  books.

12       Q.    Can you identify any particular

13  Shaw Family registrations for images of Marilyn

14  Monroe that were published prior to -- that are

15  for images of Marilyn Monroe that were

16  published prior to 1977 without notice?

17              MS. COLBATH:  Could I have the

18         question read back?  I think I have an

19         objection.

20              (The pending question was read

21         back.)

22              MS. COLBATH:  Objection.

23              MR. MINCH:  Objection.

24       A.    I don't understand that question.

25       Q.    Often -- usually a registration

51

```
1                         ROESLER
2      will have a title to it.
3           A.     Right.
4           Q.     Some way to identify it; correct?
5                  (Discussion off the record.)
6           Q.     Generally a copyright registration
7      has a title to identify it; correct?
8                  MS. COLBATH:   Objection.
9                  MR. MINCH:   Objection.
10          A.     Often.
11          Q.     Can you identify any of the titles
12     of Shaw Family registrations for Marilyn Monroe
13     that are for images of Marilyn Monroe that were
14     published prior to 1977 without notice?
15                 MS. COLBATH:   Objection.
16                 MR. MINCH:   Objection.
17          A.     I'm aware of at least two copyright
18     registrations that were filed for the Shaw --
19     by the Shaws.   But I thought those were after
20     '77.   But I'm not sure, without looking at
21     them.   I thought they were for two different
22     books.   So I don't know if that's responsive to
23     your question.
24          Q.     Well, I'm referring to the ones
25     that were published prior to '77, following
```

52

ROESLER

2 your testimony.

3          MS. COLBATH:  Objection.

4      A.    I'm sorry.  I still don't

5 understand your question.

6      Q.    I'll rephrase it.

7          MR. SERBAGI:  If you can read it

8      back.

9          MS. COLBATH:  The witness said he

10      didn't understand the question.  Having

11      it read back I don't think cures that.

12          MR. SERBAGI:  Go ahead.

13          MS. COLBATH:  Objection to form.

14          MR. SERBAGI:  I'll start again.

15      Q.    To set up the question a little

16 bit, you were talking about copyright

17 registrations generally have titles to identify

18 them; correct?

19      A.    Okay.

20      Q.    And you had testified earlier

21 that -- when I asked you what images of Marilyn

22 Monroe from the Shaw Family collection were in

23 the public domain, you testified that those

24 published prior to 1977 without notice.  Do you

25 recall that?

53

```
 1                    ROESLER
 2        A.    That's correct.
 3              MR. MINCH:  Objection.
 4        Q.    And what I'm asking is: Can you
 5   identify the titles of any Shaw Family
 6   copyright registrations of Marilyn Monroe that
 7   are for images of Marilyn Monroe that were
 8   published prior to 1977 without notice?
 9              MS. COLBATH:  Objection.
10              MR. MINCH:  Objection.
11        A.    I -- I don't think I can.  I'm
12   still a little confused by the question.  But I
13   think my answer is, I don't think I can.
14        Q.    I want to make sure that I'm fair
15   to you and that you completely understand the
16   question.
17        A.    Okay.
18        Q.    Sometimes this process is
19   difficult.  I want to ask it in a way that you
20   understand.
21        A.    Okay.
22        Q.    Maybe if you tell me what you don't
23   understand about the question, I can clarify it
24   for you.
25              MS. COLBATH:  Objection.
```

54

1                           ROESLER

2                MR. MINCH:  Objection.

3          A.    I'm unclear about what registration

4     you're speaking about and what the time period

5     of that registration is.

6          Q.    Well, any registration that is

7     for -- in the Shaw Family collection for a

8     Marilyn Monroe image --

9          A.    Okay.

10         Q.    -- that covers an image of Marilyn

11    Monroe that was published prior to 1977 without

12    notice.

13                MS. COLBATH:  Objection.

14                MR. MINCH:  Objection.

15                MS. COLBATH:  Could I have that

16           question read back?  It didn't sound

17           like -- I think he appended a question at

18           the end.  Read back that last question.

19         Q.    What I'm asking you is to identify,

20    if you can, the title of any Shaw Family

21    copyright registration for Marilyn Monroe --

22                MS. COLBATH:  Objection.

23                MR. MINCH:  Objection.

24         Q.    -- that covers an image of Marilyn

25    Monroe prior to 1977 without notice.

55

1                        ROESLER

2              MS. COLBATH:  Objection.

3              MR. MINCH:  Objection.

4        A.    I'm trying to chart this out so I

5    understand your question.  But you're talking

6    subsequent to 1977, a registration that might

7    go back and cover something that was published

8    prior to '77; is that correct?

9        Q.    The registration itself can be any

10   date.  I'm just asking you to identify any Shaw

11   Family copyright registration for Marilyn

12   Monroe that is for an image that was published

13   prior to 1977 without notice.

14             MS. COLBATH:  Objection.

15             MR. MINCH:  Objection.

16       A.    I -- I can't do that.  I do know

17   that there were apparently two copyright

18   registrations in, I believe, after -- the late

19   1990s.  And for what period of time --

20   obviously they were photos of Marilyn while she

21   was alive.  But whether those were published

22   prior to that registration or not, I don't

23   know.

24       Q.    Okay.  You mentioned also, as part

25   of your answer when we were discussing -- let

56

```
1                           ROESLER
2      me start -- let me rephrase.  To give some
3      background, again, we're talking about your
4      testimony of Shaw Family images of Marilyn
5      Monroe that were published prior to '77 without
6      notice.  And part of your answer earlier was
7      that you referred to various publications where
8      images of Marilyn Monroe were published without
9      notice prior to '77.
10                 Can you identify, sitting here
11     today, the names of any of those publications
12     and when they were -- start with that.
13                 MR. MINCH:  Objection.
14                 MS. COLBATH:  Objection.
15         Q.     The names of those publications
16     that you referred to.
17                 MS. COLBATH:  Objection.
18                 MR. MINCH:  Objection.
19         A.     One was Photoplay.  I don't
20     remember all the names of the various
21     publications, but there were a myriad of
22     publications back then.
23         Q.     Let's start with Photoplay.
24                 MS. COLBATH:  Were you finished
25             with the answer?
```

57

1                         ROESLER

2         A.    There were a myriad of publications

3    back in those days.

4         Q.    Let's start with Photoplay.  Can

5    you identify any Shaw Family image of Marilyn

6    Monroe that was published in Photoplay prior to

7    '77 without notice?

8              MS. COLBATH:  Objection.

9              MR. MINCH:  Objection.

10        A.    I'm aware of many of them that were

11   published back then by --

12        Q.    Name one.

13             MS. COLBATH:  Objection.

14             MR. MINCH:  Objection.

15        A.    Name one particular photo?  Well, I

16   don't have the name of a particular photo.  I

17   mean, I could produce the -- I could produce

18   the Photoplays.

19        Q.    I'm just asking if you know.  Okay.

20   Now, the second part of your answer earlier was

21   that you believed -- I think you said you knew

22   that the Rizzoli book is in the public domain;

23   correct?

24        A.    That's correct.

25        Q.    The Rizzoli work, so we're clear,

58

```
 1                     ROESLER
 2   is what's referred to in the Second Amended
 3   Complaint; correct?
 4        A.    That's correct.
 5        Q.    What is the basis for your
 6   statement that the Rizzoli book is in the
 7   public domain?
 8        A.    Just the decision and my general
 9   knowledge about the -- about that decision.
10        Q.    What decision are you referring to,
11   sir?
12        A.    The decision involving the Rizzoli
13   book that was handed down.
14        Q.    What decision is that?
15             MR. MINCH:  Objection.
16             MS. COLBATH:  Objection.
17        A.    I don't have a specific name of it.
18        Q.    Did you review that decision?
19             MR. MINCH:  Objection.
20        A.    I don't know that I personally
21   reviewed it.  But counsel had reviewed it.
22        Q.    Do you know whether that decision
23   was final or not final?
24             MR. MINCH:  Objection.
25             MS. COLBATH:  Objection.
```

59

1                          ROESLER

2          A.    I don't have specific information

3     on that.

4          Q.    Well, prior to submitting this

5     complaint in this action, did you investigate

6     that matter?

7                MR. MINCH:  Objection.

8                MS. COLBATH:  Objection.

9          A.    Not specifically.

10         Q.    This decision that you're referring

11    to that you can't tell me what it is, can you

12    tell me what the Court held in that decision?

13               MS. COLBATH:  Objection.

14               MR. MINCH:  Objection.  For the

15          record, are you testifying?  Or is Mr.

16          Roesler testifying?

17               MR. SERBAGI:  I'm leading up to my

18          question, so he understands.

19               MR. MINCH:  I don't understand

20          who's testifying.

21               MS. COLBATH:  You frequently make

22          speeches before questions.  I find that

23          totally inappropriate.  The witness is

24          here to answer your questions but not to

25          listen to speeches.  I'd like to note

1                    ROESLER

2       that for the record and ask that you

3       conform to the Federal Rules.

4              MR. SERBAGI:  Let me tell you

5       something, Ms. Colbath.  What I'm saying

6       before the question is purposely to lead

7       up to the question so the witness

8       understands the context of the question.

9       Sometimes it's not easy to ask a

10      question.  I'm not making speeches.

11             Your speaking objections are

12      objectionable.  They're interfering with

13      this deposition.  And it's censurable

14      conduct, and I'm going to bring it before

15      Judge Fox.  Let's continue.

16      Q.     The decision that you're referring

17   to that spoke of Rizzoli as being in the public

18   domain, do you know what that Court held?

19             MS. COLBATH:  Objection.

20             MR. MINCH:  Objection.

21      A.     Not specifically.

22      Q.     I'm going to read you the question

23   that I asked earlier, and the answer, for

24   context purposes only so we understand where we

25   are right now.

61

ROESLER

I asked you, "What is the basis for your statement that the Rizzoli book is in the public domain?"

You stated, "Just the decision and my general knowledge about that decision?"

What general knowledge about that decision are you referring to, Mr. Roesler?

A.    Just that various images of Marilyn Monroe that were contained in that book were in the public domain because they were published without notice.

Q.    What's the basis for your statement that they were published without notice?

A.    Just my general knowledge of discussing it with Marilyn Monroe LLC's counsel.

Q.    Anything else?

A.    No.

Q.    What counsel are you referring to?

A.    Gibson Dunn & Crutcher.

Q.    When did that discussion take place?

MR. MINCH:  Objection.

MS. COLBATH:  Objection.

62

```
 1                        ROESLER
 2        A.    Around -- right after the decision.
 3   Shortly after the decision.
 4        Q.    What decision?  So we're clear for
 5   the record.
 6        A.    The Rizzoli.
 7        Q.    Who did you speak with at Gibson
 8   Dunn & Crutcher?
 9             MR. MINCH:  Objection.
10        A.    I believe a man named Mr. Wegner.
11        Q.    How long was that discussion?
12        A.    I don't recall exactly.  It was a
13   couple of years ago.
14        Q.    Over the phone?  Or in person?
15             MR. MINCH:  Objection.
16        A.    Phone.
17             MS. COLBATH:  Objection.
18        Q.    Longer than five minutes?
19             MR. MINCH:  Objection.
20        A.    I believe so.  It was longer than
21   five minutes.
22        Q.    Twenty minutes?
23             MR. MINCH:  Objection.
24             MS. COLBATH:  I'm going to caution
25        the witness not to disclose any of the
```

1                         ROESLER
2    acknowledgment that it was approved or an
3    e-mail or something.
4          Q.    And subsequent to the preparation
5    of a deal memo, is there any other document
6    prior to the formalized agreement between MMLLC
7    and the third party that is prepared?
8                MR. MINCH:  Objection.
9                MS. COLBATH:  Objection.
10         A.    Not -- not that I know of.  No.
11         Q.    Does the deal memo bind the
12   respective parties?
13               MS. COLBATH:  Objection.
14               MR. MINCH:  Objection.
15         A.    The respective parties being --
16         Q.    Being CMG, MMLLC, and the third
17   party that wants to license images of Marilyn
18   Monroe.
19               MR. MINCH:  Objection.
20               MS. COLBATH:  Objection.
21         A.    No.  No.
22         Q.    So until there's a formalized
23   license agreement, all the parties can walk
24   away without any legal consequences.
25               MR. MINCH:  Objection.

1                    ROESLER

2           MS. COLBATH:  Objection.

3      Q.    Is that correct?

4      A.    Presumably.  I mean, there's no

5  legally enforceable contract.

6      Q.    Now, getting back to your earlier

7  testimony, when I asked you the basis -- and

8  now we're finally getting back to where this

9  all came from, the basis for CMG's belief

10 that -- I'm referring now to Roesler 1 -- the

11 factual basis for Count 1 in defendants' Third

12 Amended Complaint.

13          When I asked you what is the

14 factual basis for Count 1 in defendants' Third

15 Amended Complaint earlier, do you recall saying

16 that part of that is representations that the

17 Shaw Family has made to various licensees that

18 their images are protected by copyright, and

19 CMG does not believe that to be the case?  Do

20 you recall that testimony?

21          MS. COLBATH:  Objection.

22          MR. MINCH:  I want to interject.

23      Perhaps he wants his answer read back to

24      him so that he can understand

25      specifically what his response was to

81

1                    ROESLER
2          that given question.
3          Q.    Well, if need be we'll go back to
4      it, but do you generally recall that testimony?
5          A.    I do.
6          Q.    Now, I want to ask you what you
7      meant by that.  Representations to various
8      licensees.  What did you mean?
9          A.    The --
10               MS. COLBATH:  Objection.
11         A.    The activities that the estate --
12     I'm sorry -- that the Shaw Family collectively
13     is involved in.  That was Larry when he was
14     alive, and their representative, the Bradford
15     Group.
16         Q.    And what type of activities are you
17     referring to?
18         A.    Their marketing activities.
19         Q.    What type of marketing activities
20     are you referring to?
21         A.    The manner in which they represent
22     the collection, the representations they make
23     to various licensees, the promotions they do,
24     the letters that they send out.
25         Q.    Okay.  Let's talk about the

82

ROESLER

1
2  representations made to various licensees.
3  What representations are you talking about?
4  Who made them, and to whom?
5           MS. COLBATH:  Objection.
6           MR. MINCH:  Objection.
7       Q.    Let me rephrase.  What
8  representations are you talking about?
9           MR. MINCH:  Objection.
10      A.    The representations that either the
11  family members make or their representative,
12  the Bradford Group, makes.
13      Q.    What I'm trying to do is get at the
14  specific representations that you're talking
15  about.  Who within the Shaw Family made the
16  representations that you're talking about?
17      A.    Well, I mean, it's hard to recount
18  specifics.  But it's -- I mean, numerous
19  representations.  Larry used to make those
20  representations to -- I remember a company
21  called Dolce & Gabbana that Larry was
22  negotiating with, telling them that they only
23  needed a license for his images, copyright to
24  his images, to the representations that
25  Bradford makes as their representative.

83

ROESLER

1

2      Q.    Anything else that you can think

3  of, sitting here today?

4      A.    No.  No.

5      Q.    Let's talk about the representation

6  that you claim Larry made to Dolce & Gabbana.

7  Was that representation made in writing?

8      A.    That Larry made to them?  I don't

9  recall.

10     Q.    So you don't know if it was writing

11  or verbally.

12     A.    Right.

13     Q.    What's the basis for the

14  representation?

15           MR. MINCH:  Objection.

16     Q.    Let me rephrase the question.  When

17  did Larry make this purported representation to

18  Dolce & Gabbana?

19           MS. COLBATH:  Objection.

20           MR. MINCH:  Objection.

21     A.    Maybe a year and a half ago, give

22  or take six months.

23     Q.    Who did Larry speak to at Dolce &

24  Gabbana?

25     A.    I don't remember the name.

84

```
 1                    ROESLER
 2        Q.    You don't know whether it was in
 3   writing?
 4              MR. MINCH:  Objection.
 5              MS. COLBATH:  Objection.
 6        A.    I just know from Dolce & Gabbana
 7   reporting back to us.
 8        Q.    Who at Dolce & Gabbana reported
 9   back to you?
10        A.    I don't know.
11        Q.    Was it a he or she?
12              MR. MINCH:  Objection.
13        A.    I don't even remember if it was a
14   he or she.
15        Q.    Was it in writing, or verbally?
16              MS. COLBATH:  Objection.
17              MR. MINCH:  Objection.
18        A.    I don't recall that.
19        Q.    So we're clear, what did -- was
20   this a representative of Dolce & Gabbana?
21              MR. MINCH:  Objection.
22        A.    Yes.  Yes.  It was -- go ahead.
23              It was on a tee-shirt program that
24   we were doing, and the thing we're doing
25   involving Marilyn Monroe.
```

85

```
1                        ROESLER
2         Q.    Do you recall the image that was at
3    issue of Marilyn Monroe?
4         A.    With respect to the Shaw?
5         Q.    Yes.
6         A.    No, I don't recall the specific
7    image.
8         Q.    Do you recall whether that image
9    was protected by copyright or not?
10        A.    No.
11              MR. MINCH:  Objection.
12        Q.    Do you remember the title of the
13   person within Dolce & Gabbana who made this
14   purported representation?
15              MR. MINCH:  Objection.
16              MS. COLBATH:  Objection.
17        A.    No.
18        Q.    Do you know whether they had
19   authority to bind Dolce & Gabbana in their
20   representations or not?
21              MR. MINCH:  Objection.
22              MS. COLBATH:  Objection.
23        A.    I'm assuming they did.
24        Q.    What's the basis for that
25   assumption?
```

86

                              ROESLER

1

2      A.    Just in the normal course of

3   dealings when you're dealing with -- with a

4   company.  A company representative.

5      Q.    Other than that, you have no other

6   basis?

7      A.    No.

8      Q.    How many images of Marilyn Monroe

9   were involved in this tee-shirt program that

10  you're referring to between Shaw Family

11  Archives and Dolce & Gabbana; do you know?

12            MR. MINCH:  Objection.

13     A.    I think there were four.

14     Q.    What's the basis for that

15  statement?

16            MS. COLBATH:  Objection.

17     A.    My recollection.

18     Q.    Do you, sitting here today, have a

19  basis for that recollection?

20            MR. MINCH:  Objection.

21            MS. COLBATH:  Objection.

22     A.    Just by memory.

23     Q.    Did this Dolce & Gabbana

24  representative tell you there were four images

25  involved?

87

ROESLER

1

2      A.    Yes.  But I was also dealing with

3    Larry on it, too.  I had had a couple

4    discussions with Larry and Meta on it.

5      Q.    What was the context of those

6    discussions?

7      A.    The context of the discussions were

8    that Meta really wanted to be able to do that

9    Dolce & Gabbana program.  So she asked me if I

10   could try to make it happen, and also involve

11   their images.  And I said I would do my best to

12   make it happen and have it involve their

13   images.  And I don't know -- I think.  So

14   discussions were with me and Dolce & Gabbana

15   personally.  I think some of the other

16   discussions were perhaps with Chris in the

17   office.

18     Q.    But you don't recall what

19   particular images of Marilyn Monroe, sitting

20   here today, were at issue in that tee-shirt

21   program with Dolce & Gabbana?

22            MR. MINCH:  Objection.

23     A.    I don't think I ever knew what

24   specific images.  I think they were dealing

25   directly with Larry on different images.

88

1                            ROESLER

2          Q.    Do you know if -- did Larry send a

3    cease-and-desist letter to Dolce & Gabbana?

4                MR. MINCH:   Objection.

5          A.    I don't know.

6          Q.    Do you know if anybody at Shaw

7    Family Archives sent a cease-and-desist letter

8    to Dolce & Gabbana in connection with this

9    tee-shirt program?

10               MR. MINCH:   Objection.

11         A.    I don't know.

12         Q.    Do you know if anybody at Shaw

13   Family Archives threatened Dolce & Gabbana in

14   any way with copyright infringement for using

15   Shaw Family images of Marilyn Monroe?

16               MR. MINCH:   Objection.

17         A.    I don't think they used them.   I

18   think there was a discussion to use them.

19         Q.    So Dolce & Gabbana had not

20   finalized any decision to use any particular

21   images of Marilyn Monroe during these tee-shirt

22   program discussions?

23         A.    That's correct.

24         Q.    Those discussions were in their

25   incipient stages; is that correct?

89

```
 1                         ROESLER
 2         A.    That's correct.
 3         Q.    Was a deal ever finalized with CMG
 4    or MMLLC in connection with Dolce & Gabbana?
 5               MS. COLBATH:  Objection.
 6               MR. MINCH:  Objection.
 7         Q.    For uses of images of Marilyn
 8    Monroe?
 9               MS. COLBATH:  Objection.
10               MR. MINCH:  Objection.
11         Q.    Let me rephrase.  In connection
12    with this particular tee-shirt program we're
13    talking about, was there ever a finalized
14    agreement deal between MMLLC, CMG, and Dolce &
15    Gabbana?
16               MR. MINCH:  Objection.
17               MS. COLBATH:  Objection.
18         A.    Yes.
19         Q.    What was the nature of that
20    agreement?
21               MR. MINCH:  Objection.
22         A.    Well, the nature of the agreement
23    was a licensing agreement.
24         Q.    Between Dolce & Gabbana and MMLLC?
25         A.    That's correct.
```

1                         ROESLER

2          Q.      For uses of images of Marilyn

3     Monroe?

4                  MR. MINCH:   Objection.

5                  MS. COLBATH:   Objection.

6          A.      License agreement for the Marilyn

7     Monroe LLC granted to Dolce & Gabbana, and they

8     also had an arrangement with different entities

9     for the selection of -- I think they were four

10    different photographs.  And who they ultimately

11    went with, I don't know, whether it was Corbus

12    or Getty or what.  So I don't know what images

13    they -- who they selected the images from.

14         Q.      When you say, "I think there were

15    four different photographs" in your prior

16    answer, were you referring to four different

17    photographs of Marilyn Monroe?

18         A.      Yes.

19                 MR. MINCH:   Objection.

20         Q.      When you said you don't know who

21    they ultimately went with, Corbus or Getty --

22                 MR. MINCH:   Objection.

23         Q.      -- what did you mean by that?

24         A.      They selected and paid for four

25    different photos from -- whether they got those

91

```
 1                    ROESLER
 2     from Getty, Corbus, Shaw, whoever, they paid
 3     for the use of those photos in addition to the
 4     license with the Marilyn Monroe LLC.
 5             Q.    When was that agreement signed?
 6                   MR. MINCH:  Objection.
 7             Q.    With Dolce & Gabbana?
 8             A.    As I testified a few moments ago, I
 9     don't know.  Eighteen months ago, give or take.
10     I seem to recall it was like a year ago this
11     past summer.  So 18 months ago.  I think that's
12     when I was in regular contact with Meta, Edie,
13     and Larry.
14             Q.    Is that deal ongoing?
15             A.    I'm sorry?
16                   MR. MINCH:  Objection.
17                   MS. COLBATH:  Objection.
18             Q.    Is that deal between MMLLC and
19     Dolce & Gabbana ongoing, in force as we sit
20     here today?
21                   MS. COLBATH:  Objection.
22             A.    I don't think so.  I think it was
23     pretty limited program.
24             Q.    In what way?
25                   MR. MINCH:  Objection.
```

92

ROESLER

1

2      Q.     Time?

3      A.     Timewise.

4      Q.     Who made the decision -- when you

5  say it was pretty limited timewise, what do you

6  mean?

7                MR. MINCH:   Objection.

8      A.     It may only have been a six-month

9  promotion.  Limited number of tee-shirts.  It

10  was a small deal.  It may have been a couple

11  thousand tee-shirts.  Higher-end tee-shirts

12  that they sold, but a small program.

13      Q.     And they paid MMLLC for the use of

14  those images?

15                MS. COLBATH:   Objection.

16                MR. MINCH:   Objection.

17      A.     No.   They paid -- they paid Marilyn

18  Monroe LLC for the license to use the

19  intellectual property rights of Marilyn Monroe.

20      Q.     Thank you.   You had mentioned

21  that -- getting back to the beginning of how we

22  got into this --

23                (Discussion off the record.)

24      Q.     You mentioned that Larry had

25  discussions -- was having discussions with

93

ROESLER

2  Dolce & Gabbana; correct?

3      A.    Correct.

4      Q.    And it's because of this unknown

5  party within Dolce & Gabbana that you know of

6  these discussions; correct?

7              MR. MINCH:  Objection.

8              MS. COLBATH:  Objection.

9      A.    Right.

10     Q.    Do you know what Larry said to

11  Dolce & Gabbana?

12             MR. MINCH:  Objection.

13     A.    He told them not to deal with us,

14  that they didn't need a license from us, that

15  they could get all the rights from him and just

16  use the photographs, and that they owned the

17  copyrights to the photographs, and there was no

18  reason to pay anything else.

19     Q.    But sitting here today, you don't

20  know what photographs were at issue.

21             MS. COLBATH:  Objection.

22             MR. MINCH:  Objection.

23     A.    Correct.

24     Q.    And sitting here today, you don't

25  know whether Larry ever sent a cease-and-desist

94

ROESLER

1
2  letter to Dolce & Gabbana, do you?

3          MR. MINCH:  Objection.

4      A.    Well, based on what we've talked

5  about, I don't know why he would have sent a

6  cease-and-desist letter.  I'm not sure what you

7  mean by that.

8      Q.    You had mentioned that this party

9  within Dolce mentioned that Larry had mentioned

10  to this employee of Dolce & Gabbana that they

11  didn't need a license from MMLLC.

12      A.    Right.  Well, I wouldn't

13  necessarily --

14          MS. COLBATH:  Let me object.

15          MR. MINCH:  Objection.

16          MS. COLBATH:  Could I have the

17      question read back?

18          MR. SERBAGI:  He is in the middle

19      of his answer.  That is blatant coaching.

20          THE WITNESS:  Maybe if I answer it

21      you won't need it read back.

22      A.    Just to clarify --

23      Q.    Let me know.

24      A.    I wouldn't characterize

25  communication from the Shaws or their

95

1                        ROESLER
2   representative to a licensee saying that they
3   own the copyrights as a cease-and-desist
4   letter.  I wouldn't characterize it as that,
5   because it's a negotiation at that point.
6               So it's -- there's nothing to cease
7   and desist, I mean unless you said you could
8   cease and desist the negotiation.  So there's a
9   discussion going on where -- where they're
10  making certain representations that you don't
11  need to continue those discussions with Marilyn
12  Monroe LLC.  You can just continue those
13  discussions with us.
14          Q.    Right.  Thank you for clarifying
15  that.
16          A.    Okay.  So we're on the same --
17          Q.    That's helpful.  Thank you.  Did --
18  do you know whether Dolce & Gabbana -- let's
19  get back do the purported representations that
20  this employee within Dolce made.
21          A.    Uh-huh.
22          Q.    So the record is clear and it
23  doesn't get garbled up in all the other
24  questions I've asked, you don't know the name
25  of the employee?

96

ROESLER

2   A.    No.

3         MS. COLBATH:  Objection.

4         MR. MINCH:  Objection.

5         (Discussion off the record.)

6   Q.    Do you know whether that employee

7   is currently at Dolce?

8   A.    No.

9   Q.    Did you take any notes when you had

10  a discussion with this employee at Dolce?

11  A.    No.

12  Q.    Is there anything in your files

13  that memorialize this purported discussion with

14  Dolce?

15        MR. MINCH:  Objection.

16  A.    Perhaps.  Perhaps.

17  Q.    Would that have been something that

18  you would have produced in connection with this

19  litigation?

20        MR. MINCH:  Objection.

21  A.    I don't know.

22  Q.    Other than -- and this is all

23  getting back to the initial question, which

24  was, you had stated there were representations

25  that the Shaw Family made to various licensees.

97

ROESLER

1

2      And one of those representations was in

3      connection with this tee-shirt program with

4      Dolce & Gabbana.  Putting that aside, are there

5      any other representations that you know of that

6      the Shaw Family made to licensees of MMLLC

7      regarding images of Marilyn Monroe?

8                      MR. MINCH:  Objection.

9                      MS. COLBATH:  Objection.

10          Q.      And rights they purportedly have in

11      them?

12                      MR. MINCH:  Objection.

13                      MS. COLBATH:  Objection.

14                      MR. MINCH:  I want to make sure,

15              for the record, that we understand -- I'm

16              a little bit lost right now what

17              representations you're speaking of.  I

18              don't want to testify for Mr. Roesler.

19              I'm confused.  I'm not sure -- I want to

20              make sure that Mr. Roesler is clear.

21          Q.      Do you understand what I'm talking

22      about?

23          A.      I have a question for you.

24          Q.      Sure.

25          A.      On your --

98

ROESLER

1
2      Q.    Just like a lawyer to ask a
3    question of the --
4      A.    When you say licensees of Marilyn
5    Monroe LLC, do you want to broaden that to
6    companies that they've done business with that
7    aren't licensees of Marilyn Monroe LLC?
8    Because the universe, so to speak, is companies
9    that have licenses with Marilyn, some of which
10   do and do not have also licenses with the
11   Shaws.  And then the rest of that universe is
12   the companies that just have licenses with the
13   Shaws and not with Marilyn Monroe LLC.
14          So I was confused by your question.
15   You said just Marilyn Monroe LLC.
16     Q.    You're absolutely right.  That is a
17   good distinction to make.  I'd like to make
18   that distinction right now.  Let's talk about
19   the universe of companies that have done
20   business with MMLLC or would like to do
21   business with MMLLC, anybody that -- any
22   company that had discussions with MMLLC.
23     A.    Okay.
24     Q.    Let's limit the next portion of
25   this discussion to that.  And are there any

99

ROESLER

1
2  specific communications that you know of from
3  the Shaw Family to those -- let's call them
4  prospective and actual licensees of MMLLC --
5  regarding rights that the Shaw Family has in
6  Marilyn Monroe?
7      A.    It's my understanding there are,
8  but the specifics of those would probably -- I
9  don't necessarily know the specifics of it
10  because I'm not necessarily on the front lines
11  of all of those discussions.  And I can just go
12  back to what I said earlier, which was I know
13  often the people that we're working with are
14  also being -- have encounters with the Shaw
15  Group or their representative, Bradford.  And
16  it creates the -- what do you call it --
17  confusion, the questions, and so forth.
18      Q.    Let's get into details of that.  Do
19  you know of any particular -- can you, sitting
20  here today, name a specific licensee that would
21  fall into what you describe as this confusion
22  that's been created?
23          MR. MINCH:  Objection.
24          MS. COLBATH:  Objection.
25      A.    Well, again, some of the details of

1                          ROESLER

2    all the various licensees that would fall in

3    there, I can't necessarily recite all of those,

4    but there's numerous ones.  I mean, there's --

5    you know, we had a situation with -- I believe

6    the company was Frieze.  It's just hard for me

7    to remember some of the names.  But quite a

8    few.  I'd say in excess of 15 or 20 different

9    companies in different parts -- I mean,

10   different discussions with these different

11   companies in terms of --

12        Q.   Let's talk about it.  With respect

13   to Frieze, what happened there?

14                  MR. MINCH:  Objection.

15        A.   Well, it's easier to explain the

16   end result, and then, you know, back it up from

17   the end result.  It's difficult for me to give

18   you all the details of what happened, you know,

19   in-between.  But the end result is often these

20   people either don't do a program at all, or

21   they do a program and just do a license with --

22   through Bradford with the Shaw -- with the Shaw

23   Group.

24                  So I guess, you know, if you ask me

25   all the various details of how all of those

101

1                          ROESLER
2       transpired, I don't necessarily know all those
3       details.
4              Q.     All right.  We were talking about
5       Frieze.
6              A.     Okay.
7              Q.     I'm going to ask you the details of
8       that.  If you can't remember, you can't
9       remember.
10             A.     Okay.  Fair enough.
11             Q.     What did -- what are the
12      representations that Shaw Family purportedly
13      made to Frieze?
14                    MR. MINCH:  Objection.
15             A.     Well, my recollection was that we
16      had communicated with Frieze and objected to
17      the use of -- the use of the words "Marilyn
18      Monroe" because we had a trademark in the
19      apparel class and they were using images of --
20      I'm sure it was Shaw.  I mean, sometimes they
21      get different photographers messed up, but I
22      think in this case it was Shaw.  And they said
23      that they were comfortable with the
24      representations and indemnities they had from
25      the Shaw and Bradford Group and they didn't

102

                              ROESLER

1

2      need a license for Marilyn Monroe LLC.

3            Q.    For what?  A license for what?

4                  MR. MINCH:  Objection.

5            A.    A license for, in this case,

6      trademarks of Marilyn Monroe.

7            Q.    You're referring to the written

8      word, "Marilyn Monroe"?

9            A.    Yes.

10           Q.    Specifically in stylized format;

11     correct?

12                 MS. COLBATH:  Objection.

13           Q.    Cursive.

14           A.    I'm not sure I'm referring to it

15     specifically in that --

16           Q.    Okay.  With respect to Frieze, were

17     there discussions between MMLLC -- you

18     mentioned that Frieze said they didn't need a

19     license from MMLLC with respect to the

20     trademarks.  Did they say to you, Frieze, that

21     they didn't need a license from MMLLC with

22     respect to any of the images of Marilyn Monroe

23     that you have in your collection --

24                 MR. MINCH:  Objection.

25                 MS. COLBATH:  Objection.

103

1                           ROESLER

2          Q.     -- and that MMLLC has in its

3     collection?

4          A.     I'm sorry.  The images.  I'm

5     confused by what you mean by that.  They'd

6     already selected their images.

7          Q.     So you had a deal with Frieze for

8     the images of Marilyn Monroe?

9                    MR. MINCH:  Objection.

10                   MS. COLBATH:  Objection.

11         Q.     What did you mean by they already

12    selected the images?

13                   MR. MINCH:  Objection.

14                   MS. COLBATH:  Objection.

15         A.     They had a license from the Shaws

16    for various images on tee-shirts of Marilyn

17    Monroe.  So presumably they had a copyright

18    license with the Shaws.  I never saw the

19    license.

20         Q.     You said that they have a license

21    from the Shaws for various images of Marilyn

22    Monroe; correct?

23         A.     That's correct.

24         Q.     Do you agree?

25                   (Brief interruption.)

104

1                         ROESLER

2              (Discussion off the record.)

3         Q.    Do you know what images of Marilyn

4    Monroe we're talking about?

5         A.    No.

6              MR. MINCH:  Objection.

7         Q.    Do you know if those images of

8    Marilyn Monroe were protected by copyright or

9    not?

10             MR. MINCH:  Objection.

11        A.    No.

12        Q.    Did you undertake to find out the

13   answer to that question prior to your

14   deposition today?

15             MR. MINCH:  Objection.

16        A.    No.

17        Q.    You said earlier that presumably

18   the deal between the Shaw Family and Frieze was

19   for the copyright -- licensing of the

20   copyright; correct?

21        A.    Correct.

22        Q.    But you don't know that's the case,

23   do you?

24             MR. MINCH:  Objection.

25        A.    I mean, I can't make a definitive

105

ROESLER

1

2    statement on that.  That's why I said

3    presumably.

4          Q.    You didn't see the agreement

5    between the Shaw Family and Frieze, did you?

6          MR. MINCH:  Objection.

7          A.    No.

8          (Discussion off the record.)

9          Q.    So we're clear, the MMLLC had not

10   offered Frieze -- did Frieze come to MMLLC and

11   request permission to license any images of

12   Marilyn Monroe?

13         MR. MINCH:  Objection.

14         A.    No.

15         Q.    So I'm going to ask you a couple of

16   obvious questions.  I'd like to get it for the

17   record.  With respect to images of Marilyn

18   Monroe, Frieze -- there was never a deal

19   memorandum between CMG, MMLLC, and Frieze for

20   the licensing of images of Marilyn Monroe;

21   correct?

22         MR. MINCH:  Objection.

23         A.    Correct.

24         Q.    And there was never any formalized

25   license agreement memorializing the terms of

106

ROESLER

1

2  any agreement for Frieze to license images of

3  Marilyn Monroe; isn't that right?

4              MR. MINCH:  Objection.

5       A.    Correct.

6       Q.    Now, to refresh my recollection,

7  what representations did you say that the Shaw

8  Family had made to Frieze regarding images of

9  Marilyn Monroe, if any?

10             MR. MINCH:  Objection.

11      A.    That they didn't need any license

12  to proceed with their program of -- that

13  involved Marilyn Monroe from Marilyn Monroe

14  LLC.

15      Q.    And in particular, you identified

16  the trademarks.

17      A.    The trademarks or right of

18  publicity.

19      Q.    So you're saying that Larry Shaw

20  said to someone at Frieze that they didn't need

21  a right of publicity for Marilyn Monroe?

22             MR. MINCH:  Objection.

23      A.    You're -- Larry was Dolce &

24  Gabbana.  I'm not sure who Frieze was, whether

25  it was Bradford or --