# EX. Q, pt. 2

107

ROESLER

2    Q.    So you don't know whether it was

3  Bradford, Meta Stevens, Edith Marcus, or Larry

4  Shaw that made this purported representation to

5  Frieze that they didn't need a right of

6  publicity from the estate?

7              MR. MINCH:  Objection.

8              MS. COLBATH:  Objection.

9    A.    That's correct.

10             MR. SERBAGI:  Did you hear the

11       question?  You just walked in the room.

12             (Discussion off the record.)

13   Q.    Do you know when this purported

14  representation was made to Frieze?

15             MR. MINCH:  Objection.

16   A.    I'd say that was early on in the

17  litigation, so I'd say three years ago.

18   Q.    Do you know who at Frieze the

19  representation was made to?

20   A.    No.

21   Q.    How did you find -- first find out

22  about this purported representation?

23             MR. MINCH:  Objection.

24   A.    Well, it was discussed for a number

25  of months.  The whole situation was discussed

108

1                              ROESLER
2      internally and with counsel.
3            Q.    The question is how did you first
4      find out about the purported representation
5      that one of the entities we've discussed
6      represented to Frieze that they didn't need a
7      right of publicity for Marilyn Monroe?
8                       MR. MINCH:  Objection.
9                       MS. COLBATH:  Objection.
10           A.    I don't recall how I first found
11     out.
12           Q.    You don't know if it was by
13     telephone?
14           A.    No.
15                      MR. MINCH:  Objection.
16           Q.    You don't know if it was by letter?
17                      MR. MINCH:  Objection.
18           A.    No.
19           Q.    You don't know who it was?
20                      MR. MINCH:  Objection.
21           A.    No.
22                      (Discussion off the record.)
23           Q.    You don't know who from my clients
24     made the representation?
25                      MR. MINCH:  Objection.

```
 1                         ROESLER
 2        A.    I do not.
 3        Q.    You don't know how they made the
 4   representation?
 5              MR. MINCH:  Objection.
 6        A.    I do not.
 7        Q.    You don't know when they made the
 8   representation?
 9              MR. MINCH:  Objection.
10        A.    You mean the year?
11        Q.    Yes.
12        A.    2005.
13        Q.    Do you know if it was prior to
14   Judge McMann's decision in this case --
15              MR. MINCH:  Objection.
16        Q.    -- ruling that the estate of
17   Marilyn Monroe has no right of publicity?
18              MR. MINCH:  Objection.
19              MS. COLBATH:  Objection.
20        A.    You said it was 2005.  So that
21   ruling was 2007.
22        Q.    So it was before.
23        A.    It was before.
24              (Discussion off the record.)
25              THE VIDEOGRAPHER:  We are now off
```

110

1                    ROESLER

2       the record at approximately 2:14 p.m.

3              (The luncheon recess was taken at

4       ' 2:14 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

111

1                          ROESLER

2              A F T E R N O O N   S E S S I O N

3                        2:40 p.m.

4              M A R K   R O E S L E R ,

5        having been previously duly sworn by the

6        notary, was examined and testified

7        further as follows:

8                THE VIDEOGRAPHER:  This is tape 3

9        in the deposition of Mark Roesler.  We

10       are now on the record at approximately

11       2:40 p.m.

12               EXAMINATION RESUMED BY MR. SERBAGI:

13       Q.    Good afternoon, Mr. Roesler.

14       A.    Good afternoon.

15       Q.    Now, you were speaking about

16  representations that Mr. Shaw purportedly made

17  to Frieze, prior to the break; correct?

18       A.    Correct.

19       Q.    And you stated that Larry had

20  represented to someone at Frieze that they

21  didn't need to go to the estate for right of

22  publicity; correct?

23       A.    No.  That's not correct.  What we

24  talked about was that the Larry discussion was

25  with Dolce & Gabbana.

112

1            ROESLER
2        Q.    I apologize.
3        A.    And we weren't sure who discussion
4    with Frieze was, whether it was Bradford or
5    Shaws or whoever.
6        Q.    Right.  At least with respect to
7    the right of publicity, whatever representation
8    somebody at Shaw or Bradford made -- let me
9    restate that.  So we're clear, sometime in --
10   to refresh my recollection, when was that
11   statement that somebody at Shaw made to Frieze,
12   in what year, approximately, that you're
13   referring to?
14           MR. MINCH:  Do you want to have
15        your answer read back to you?
16           THE WITNESS:  I don't think so.  I
17        think I remember what it was.
18       A.    It was when the litigation first
19   started.  So around 2005.
20       Q.    And one of my clients made the
21   representation that Frieze didn't need a right
22   of publicity from the estate of Marilyn Monroe,
23   MMLLC; correct?
24           MR. MINCH:  Objection.
25           MS. COLBATH:  Objection.

1                           ROESLER

2         Q.    That's what you're saying?

3         A.    No.   What I said was that Frieze

4    was told that they did not need to secure any

5    approvals other than from Bradford/Shaw.   That

6    it wasn't necessary to clear any other rights

7    with the Marilyn Monroe estate.

8         Q.    At least with respect to the right

9    of publicity, whoever made that statement was

10   correct, weren't they?

11               MS. COLBATH:   Objection.

12               MR. MINCH:   Objection.

13        Q.    That they didn't need at the time

14   clearance from MMLLC or CMG for a right of

15   publicity?

16               MR. MINCH:   Objection.

17               MS. COLBATH:   Objection.

18        A.    That was a pretty compound

19   question.   Do you want to repeat that?   My

20   short answer is no, that's not correct.   But if

21   you want to go back and dissect that a bit.

22        Q.    Judge McMann ruled in May of 2005

23   that are MMLLC does not have a right of

24   publicity --

25        A.    2007.

1                    ROESLER
2        Q.    Excuse me.  -- May of 2007 that
3    MMLLC does not have right of publicity in
4    Marilyn Monroe; correct?
5              MS. COLBATH:  Objection.
6        A.    That is -- there was a ruling
7    something to that effect, yes.
8        Q.    And soon after that decision, Judge
9    Morrow in California made a similar ruling;
10   correct?
11             MR. MINCH:  Objection.
12       A.    A similar ruling, yes.
13       Q.    So it turned out that the
14   representation from someone at the Shaw Family
15   or Bradford to Frieze that they didn't need
16   permission to -- in terms of having a right of
17   publicity, they didn't need to license a right
18   of publicity from MMLLC or CMG, that was a
19   correct representation at the time, wasn't it?
20             MR. MINCH:  Objection.
21             MS. COLBATH:  Objection.
22       A.    Well, my answer to that was no.  My
23   answer to that was no.
24       Q.    What's the basis for saying no?
25             MR. MINCH:  Objection.

ROESLER

1

2        MS. COLBATH:  Objection.

3        A.    Well, a couple comments about what

4   you just said.  Number one, you said with

5   respect to the right of publicity.  And our

6   position has always been that Marilyn Monroe

7   LLC has a portfolio of intellectual property

8   rights that we discussed earlier, including

9   whatever rights exist with respect to the right

10  of publicity is one of those assets that they

11  possess.

12            So jumping back ahead to your

13  comment on Frieze, no.  We think that the

14  actions by Frieze were, at a minimum, a clear

15  infringement on the trademark rights of Marilyn

16  Monroe LLC.

17       Q.    I'm speaking only about the right

18  of publicity now, putting aside the trademark

19  issue.

20            MR. MINCH:  Objection.

21       A.    If you want to rephrase your

22  question to hone in on that, I'll -- or however

23  you want to do that.  We can go back to it.

24       Q.    With respect to Frieze, you're

25  saying that somebody -- one of my clients made

116

ROESLER

1
2    a representation to someone at Frieze that they

3    didn't need the right to license a right of

4    publicity among other rights from MMLLC and

5    CMG.

6        A.    Okay.  Let's stop there if we

7    could, because I don't know exactly what the

8    extent of those representations were between

9    your client and Frieze and whether those

10   representations simply stopped at the

11   discussion on the right of publicity, or

12   included all rights of Marilyn Monroe, or what.

13   So I can't definitively answer that question.

14       Q.    Do you know whether one of my

15   clients, Shaw Family, or Bradford, Meta

16   Stevens, or Edith Marcus ever told Frieze that

17   they don't need to license a right of publicity

18   from CMG or MMLLC?

19            MR. MINCH:  Objection.

20       A.    I don't know specifically what they

21   said.  No.  I don't have specific knowledge.

22       Q.    So we're clear, you don't have

23   specific knowledge what my clients -- I'm

24   referring to my clients collectively as

25   Bradford, Meta Stevens, Edith Marcus and Shaw

117

ROESLER

1  
2  Family Archives.  For the remainder of this
3  deposition you'll understand what I mean when I
4  say "my clients"?
5       A.    Yes, I will.
6       Q.    To be clear, putting aside the
7  right of publicity issue which you've just
8  testified about, can you tell me the specifics
9  of what my clients purportedly said to Frieze
10 regarding the other purported intellectual
11 property in possession of MMLLC for Marilyn
12 Monroe?
13            MR. MINCH:  Objection.
14      A.    I can't tell you the specifics of
15 the conversation that any of your clients had
16 with Frieze.  I can only tell you that the end
17 result was Frieze telling us that they were
18 assured that they did not need to secure any
19 rights from Marilyn Monroe LLC, and therefore
20 would continue to sell the products as they
21 were, and would not -- would not negotiate any
22 type of license or whatever with Marilyn Monroe
23 LLC.
24            And we had an existing relationship
25 with Frieze with some of our other clients,

118

```
1                          ROESLER
2      some of our other celebrity clients who we
3      were -- had an open dialogue with Frieze.
4           Q.    And --
5           A.    It was not a contentious dialogue,
6      I guess is the best way do describe it.
7           Q.    Okay.  Now, you mentioned that
8      Frieze, you know what the ultimate result is,
9      that Frieze came to a determination that they
10     didn't need to license any intellectual
11     property from MMLLC.  My question is: Do you
12     know how they came to that determination?
13                MR. MINCH:  Objection.
14          A.    No.
15          Q.    Do you know whether that
16     determination was based on advice of their
17     legal counsel?
18                MR. MINCH:  Objection.
19          A.    I'm sure it involved their legal
20     counsel.  But I don't know the specifics of
21     that.  I don't know the specifics.
22          Q.    But you don't know one way or the
23     other --
24          A.    No.
25                MR. MINCH:  Objection.
```

119

1                    ROESLER

2               MS. COLBATH:  Objection.

3          Q.    -- whether Frieze's decision not to

4     license intellectual property from MMLLC was

5     based on advice of counsel or not.

6               MR. MINCH:  Objection.

7          Q.    Correct?

8          A.    That's correct.

9          Q.    You don't know whether the Friezes'

10    decision not to proceed with licensing

11    intellectual property relating to Marilyn

12    Monroe from MMLLC was a result of their own

13    in-house analysis from their business people;

14    correct?

15              MR. MINCH:  Objection.

16              MS. COLBATH:  Objection.

17         A.    Well, I mean, that wouldn't be

18    logical.  That assumption wouldn't be logical.

19    I mean, this was in their legal department, and

20    it was involving the legalities, not the -- not

21    whether or not they would proceed with the

22    program, because they were doing the program

23    with Marilyn.

24         Q.    I guess in essence what I'm getting

25    at, finally, to make the record clear, you

120

ROESLER

1

2  don't know how they came to the determination

3  to make the decision whether to proceed with

4  MMLLC licensing Marilyn Monroe-related

5  intellectual property.  You don't know how they

6  came to that decision, do you?

7            MR. MINCH:  Objection.

8            MS. COLBATH:  Objection.

9      A.    That is correct.

10     Q.    Again, getting back to the initial

11  question, was representations that you've

12  stated that my clients have made to licensees

13  or potential licensees of MMLLC regarding

14  Marilyn Monroe images, you've mentioned Frieze

15  and you've mentioned Dolce & Gabbana.  Sitting

16  here today, can you tell me any others where

17  Shaw Family or any of my clients represented

18  that they didn't need to go to the estate to

19  license Marilyn Monroe-related intellectual

20  property?

21            MR. MINCH:  Objection.

22     A.    Well, sometimes I can remember the

23  products, but I can't remember the names.  I

24  mean, I know there were different products out

25  there.  Like there was some ladies' underwear.

121

ROESLER

1

2   There was some -- there was a bath care line.

3   And there was a party good line.  But I can't

4   remember the companies.  The names.

5        Q.    So the record is clear, you can't,

6   sitting here today, tell me the name of any

7   company other than Frieze and Dolce & Gabbana

8   where my clients represented to them that they

9   didn't need to go to MMLLC or CMG to license

10  Monroe-related intellectual property, whether

11  that be right of publicity or any other

12  intellectual property that the estate

13  purportedly has; correct?

14            MR. MINCH:  Objection.

15       A.    Sitting here today with the

16  information that I have, I could not.  But my

17  office could, or I could -- we have access to

18  that information.  But I don't have a specific

19  recollection of all the names.

20       Q.    Well -- or any other name other

21  than the ones you've just mentioned; right?

22       A.    That's correct.

23       Q.    Now, with respect to these various

24  products that you're speaking of, ladies'

25  underwear, I think you said, bath care line,

122

1                           ROESLER
2     party care line, what did you mean by that,
3     specific products?  What were you referring to
4     when you spoke about products?
5                 MS. COLBATH:  Objection.
6          A.     Companies that -- companies that
7     were either engaged in discussions or were
8     doing programs with Bradford that reached the
9     conclusion that they did not need to work with
10    Marilyn Monroe LLC.
11         Q.     Can you identify the nature of any
12    specific communication to any specific
13    company -- let me rephrase that.  You testified
14    earlier you can't remember any other companies
15    other than the two you've mentioned, Frieze and
16    Dolce & Gabbana; correct?
17         A.     Correct.
18                MR. MINCH:  Objection.
19                MS. COLBATH:  Objection.
20         Q.     Can you recall, sitting here today,
21    any specific representation that was made by
22    any of my clients referring to any of the
23    companies that own the products that you've
24    referred to here regarding their necessity to
25    go to MMLLC to license Marilyn Monroe

```
 1                    ROESLER
 2   intellectual property?
 3              MR. MINCH:  Objection.
 4        A.    I cannot.
 5        Q.    Not only can you not remember the
 6   nature of the representation, but I'm sure
 7   you're not -- it would follow that you're not
 8   able to recall, sitting here today, who in
 9   particular of my clients, whether it was Meta
10   Stevens, Edith Marcus, Larry Shaw, Bradford,
11   made these purported representations; is that
12   right?
13              MR. MINCH:  Objection.
14              MS. COLBATH:  Objection.
15        A.    That's correct.
16        Q.    And with respect to these
17   additional products that you're talking about,
18   ladies' underwear, bath care line, party care
19   line, you don't know, sitting here today,
20   whether any of my clients asserted to the
21   owners of these products that we had -- meaning
22   my clients -- valid copyrights that would have
23   precluded -- valid copyrights that would
24   have -- let me rephrase.
25              With respect to these additional
```

124

ROESLER

1

2      products we're talking about and the

3      representations that my clients purportedly

4      made, do you know what images -- particular

5      images of Marilyn Monroe my clients purportedly

6      were speaking of when they had these

7      representations -- when they made these

8      representations to these other companies?

9                  MS. COLBATH:  Objection.

10                 MR. MINCH:  Objection.

11           A.    I'm sorry, Chris.

12           Q.    I'll try to rephrase.  What I'm

13     getting at is that you're asserting that

14     certain representations were made by my clients

15     regarding rights to images of Marilyn Monroe

16     that my clients may have had, purportedly,

17     copyrights.

18           A.    Correct.

19           Q.    I'm asking can you identify,

20     sitting here today, the copyrights at issue of

21     Marilyn Monroe?

22           A.    No, I cannot.

23           Q.    Or images of the Marilyn Monroe

24     issue?

25           A.    I cannot.

125

ROESLER

1

2      Q.    So we're absolutely clear for the

3   record, other than Frieze and Dolce & Gabbana,

4   sitting here today, you can't identify any

5   specific licenses or potential licenses of

6   MMLLC that either any of my clients purportedly

7   made representations to regarding rights to

8   images of Marilyn Monroe?

9            MR. MINCH:   Objection.

10           MS. COLBATH:   Objection.

11     A.    Not without specific information

12   from my office, that's correct.   I can't,

13   sitting here today, at this exact moment,

14   give -- recall any of the specifics.

15     Q.    Did you undertake to ascertain that

16   information before you came to the deposition

17   today?

18           MR. MINCH:   Objection.

19     A.    No.  Not that specific

20   information.

21     Q.    What information did you attempt to

22   ascertain?

23           MR. MINCH:   Objection.

24     A.    Well, I work in this every day, so

25   I have a wide -- a decent memory, not as good

126

ROESLER

1
2   as it used to be, so I'm testifying as to what

3   I know and what I recall.

4         Q.    I understand.

5         A.    I mean, to ask me for names and

6   specifics on companies and who said what,

7   that's hard for me to truthfully tell you.  I

8   don't have that information at my fingertips.

9         Q.    Sure.

10        A.    Or in my mind.

11        Q.    Has MMLLC, through CMG, ever

12  licensed any of the images of Marilyn Monroe --

13  well, let me rephrase.  CMG doesn't license

14  actual images of Marilyn Monroe.  It licenses

15  intellectual property; is that correct?

16              MS. COLBATH:  Objection.

17        A.    Will you clarify what the

18  difference is?  I mean, images are -- I mean,

19  if an image is protected by a copyright, that's

20  an intellectual property right that you could

21  license.  And what Bradford and Shaw folks do

22  is, they license the intellectual property

23  rights of the images they own.

24        Q.    Right.  But Shaw also has images of

25  Marilyn Monroe, actual prints, in their

127

```
 1                        ROESLER
 2    collection, don't they?
 3              MS. COLBATH:  Objection.
 4        A.    Yes.
 5        Q.    So they license actual images at
 6    times; right?
 7        A.    I'm confused what you mean by
 8    "license images."  You mean sell images.
 9    Specifically sell limited edition prints?
10        Q.    Let me rephrase the question.  With
11    respect to Marilyn Monroe, what MMLLC does is
12    license -- they have in the past and to date --
13    license a right of publicity in Marilyn Monroe;
14    correct?
15              MS. COLBATH:  Objection.
16        A.    That is not correct.  That's
17    partially -- partially correct, but standing on
18    its own would be incorrect.
19        Q.    Why don't you clarify it for me.
20        A.    Marilyn Monroe LLC has a portfolio
21    of intellectual property rights.  Those include
22    certain copyrights.  They have both film
23    footage and images that they own the copyrights
24    to.  They have artwork, illustrations that they
25    own the copyrights to.  They have various
```

128

ROESLER

1     trademarks around the world for Marilyn Monroe.

2     They have the right of publicity when and where

3     it exists.  They have common-law trademark

4     rights.  Common-law right of publicity rights.

5     They have Lanham Act rights.  So there's this

6     portfolio of intellectual property rights that

7     they -- that the entity owns.

8     Q.    And licenses.

9     A.    And licenses.  Correct.

10    Q.    Has MMLLC, through CMG, ever

11    licensed any of the images of Marilyn Monroe

12    that appear in the Rizzoli book?

13         MR. MINCH:  Objection.

14    A.    I don't --

15         MS. COLBATH:  Objection.

16    A.    I don't know.  I don't know.  I

17    don't know.

18    Q.    Did you undertake to find the

19    answer to that question prior to the submission

20    of the Third Amended Complaint in this action?

21         MR. MINCH:  Objection.

22    A.    I mean, there's -- I guess you'd

23    have to hone in on your question just a little

24    more, because there's two aspects to that.

129

ROESLER

1

2      Aspect number one would be, do any licensees

3      use those images in the Rizzoli book on their

4      own because they believe that they are in the

5      public domain?

6              And part two of that would be, do

7      we actually take those images and send them out

8      to people and encourage them to use those

9      images that are -- that were taken by Sam Shaw

10     and contained in the Rizzoli book?

11             Would you agree with me, those are

12     the two aspects of that?  I'm just trying to

13     answer it as efficiently and correctly as --

14         Q.    I guess -- let me rephrase the

15     question, then.  I'll take that.  When I say

16     "I'll take that," I'll leave that testimony and

17     go on to another -- rephrase the question I was

18     trying to ask.

19         A.    Okay.

20         Q.    Has MMLLC ever licensed to any of

21     its licensees, through CMG or anybody else, to

22     your knowledge, any of the images that appear

23     in the Rizzoli book?

24             MR. MINCH:  Objection.

25             MS. COLBATH:  Objection.

1                    ROESLER

2          A.    Will you define the word "license"?

3    Your definition of the word "license."

4          Q.    What's your definition of the word

5    "license"?

6                MR. MINCH:  Objection.

7                MS. COLBATH:  Objection.

8          A.    Well, to answer that, I think what

9    I'll do is tell you what I think you -- what I

10   hear you saying on that question, is: Have we

11   ever provided images and charged a fee for

12   images that were taken by the photographer Sam

13   Shaw and contained in the Rizzoli book?  Is

14   that the question?

15         Q.    That is the question.

16         A.    Okay.  Not to my knowledge.

17         Q.    Sitting here today, do you know of

18   any instances where MMLLC or CMG made offers to

19   specific licensees to use images of Marilyn

20   Monroe taken by Sam Shaw that are contained in

21   the Rizzoli book?

22               MS. COLBATH:  Objection.

23               MR. MINCH:  Objection.

24         A.    Not to my knowledge.  Not to my

25   knowledge.

131

1                          ROESLER

2        Q.    Do you know of any particular

3    company, sitting here today, that desired to

4    use, in connection with the sale of goods and

5    services, images of Marilyn Monroe taken by Sam

6    Shaw that are contained in the Rizzoli book?

7              MS. COLBATH:  Could I have that

8         read back again?

9        Q.    Let me rephrase it.  It's not

10   complete.  Let me add on to the end, "and

11   didn't do so because they were fearful of being

12   sued by the Shaw Family or any of my clients?"

13             MR. SERBAGI:  You can read the

14        whole thing back.

15             (The record was read as requested.)

16             MR. MINCH:  Objection.

17             MS. COLBATH:  Objection.

18   A.    No.

19             MR. SERBAGI:  Let's mark as Roesler

20        Exhibit 3 a book entitled "Marilyn

21        Monroe, the Life, the Myth."

22             (Roesler Exhibit 3 for

23        identification, book, "Marilyn Monroe,

24        the Life, the Myth.")

25             (Discussion off the record.)

132

1                          ROESLER

2          Q.    So the record is clear, I'm not

3    going to ask you any other questions about that

4    book other than when we're talking about the

5    Rizzoli book today.  Is that what is marked as

6    Roesler 3 in fact the Rizzoli book?

7          A.    It is.

8          Q.    Thank you.

9                (Discussion off the record.)

10         Q.    Has MMLLC or CMG ever licensed any

11   of the images of Marilyn Monroe contained in

12   what is referred to in this litigation as the

13   Ballantine book, otherwise known as "Marilyn

14   Monroe As the Girl"?

15               MR. MINCH:   Objection.

16         A.    I don't have specific knowledge of

17   that.

18         Q.    Do you know, sitting here today,

19   whether MMLLC or CMG ever engaged in any

20   negotiations with parties that desired to

21   license from MMLLC, CMG images of Marilyn

22   Monroe that are contained in the Ballantine

23   book?

24               MR. MINCH:   Objection.

25               THE WITNESS:  Do you mind repeating

133

ROESLER

1

2      that question?

3           (The pending question was read

4      back.)

5      A.    I don't have any specific knowledge

6      of that.

7      Q.    Sitting here today, do you know

8      whether any company or individual or entity

9      ever declined the opportunity to use images of

10     Marilyn Monroe that are contained in the

11     Ballantine book because they were fearful of

12     being sued by the Shaw Family?

13          MR. MINCH:  Objection.

14          MS. COLBATH:  Objection.

15     Q.    Or any of my clients?

16     A.    I do not.

17          (Discussion off the record.)

18     Q.    I'd like to talk about the Third

19     Amended Complaint a little bit with you, Mr.

20     Roesler.

21     A.    Okay.

22     Q.    What role did CMG play in filing

23     this litigation against my clients in Indiana?

24          MR. MINCH:  Objection.

25          MS. COLBATH:  Objection.

134

ROESLER

1

2      A.    I'm sorry.  You've confused me

3  because you said you're talking about the Third

4  Amended Complaint.

5      Q.    You are correct.  Let me rephrase

6  the question.  I'm trying to get a little

7  background.  Let's put aside the Third Amended

8  Complaint for now.  Thank you for clarifying

9  that.

10     A.    Put the Third Amended Complaint

11 aside?

12     Q.    Put it aside.  We'll get to it.

13           What role did CMG play in the

14 decision to sue my clients in Indiana for a

15 violation of the right of publicity and various

16 other criminal statutes and other causes of

17 action?

18           MR. MINCH:  Objection.

19     A.    We brought the problem to the

20 attention of Marilyn Monroe LLC and their

21 counsel, Gibson Dunn & Crutcher, because of

22 the -- the aggressive marketing that was being

23 undertaken by the Bradford Group and the

24 position that there was no -- that the Marilyn

25 Monroe LLC did not have any enforceable

140

ROESLER

1
2  there anything else you want to add?  I thought
3  you were done.
4          A.    No, I think that was it.
5          Q.    You read this complaint that's
6  marked as Roesler before it was filed; correct?
7          A.    The initial complaint?
8          Q.    Yeah.
9          A.    Yes.
10         Q.    And you checked to make sure
11 everything in here was true and accurate;
12 correct?
13         A.    I mean, I -- I read the complaint.
14 Yes.  And I believed it to be true and
15 accurate.
16         Q.    Turning to page 10, Count 7.  Do
17 you see where it says, "Declaration As to
18 Shaw's Copyrights and Shaw Collection"?
19              (Discussion off the record.)
20         A.    I'm sorry.  What am I looking at?
21         Q.    Let me ask you one question before
22 we talk about this.  You stated earlier that
23 Meta Stevens and Edith Marcus and Larry Shaw
24 were your friends; correct?
25         A.    Correct.

1                    ROESLER

2        Q.    Is that your common practice to

3    resolve disputes, to file litigations against

4    your friends?

5                    MR. MINCH:  Objection.

6                    MS. COLBATH:  Objection.

7        A.    No, I don't think that's a common

8    practice.

9        Q.    Are you aware of the financial --

10   the financial ability -- when you filed this

11   litigation, did you consider the limited

12   resources available to Edith Marcus, Meta

13   Stevens, and Larry Shaw to defend themselves

14   against a company like CMG and MMLLC?

15                   MR. MINCH:  Objection.

16                   MS. COLBATH:  Objection.

17       Q.    Did you consider that?

18                   MS. COLBATH:  Objection.

19                   MR. MINCH:  Objection.

20       A.    I don't know that that was a

21   consideration that went into what happened.

22       Q.    Let's talk about Count 7 here on

23   page 10.

24       A.    Okay.

25       Q.    "Declaration As to Shaw's

142

1                         ROESLER
2     Copyrights and Shaw Collection."  Do you see
3     that?
4              A.     Yes.
5              Q.     If you look from paragraph 49 to
6     52, or anywhere else in this complaint, do you
7     see any specific work of the Shaw Family or my
8     clients identified that CMG or MMLLC believes
9     is in the public domain?
10             A.     I'm sorry.  What am I looking for?
11             Q.     Do you see in this complaint,
12    specifically with respect to Count 7, any
13    specific work of my clients identified by name
14    that is purportedly in the public domain?
15                    MR. MINCH:  I object as to form.
16                    MS. COLBATH:  Objection.
17             A.     So your question is, are there
18    individual photographs listed here?
19             Q.     Or books, or the title of any name,
20    or book, or anything.  Is there identified any
21    particular work of the Shaw Family's or my
22    clients' that are in the public domain here?
23                    MR. MINCH:  Objection.
24                    MS. COLBATH:  Objection.
25             A.     No, I don't see any specific work.

143

ROESLER

1

2      Q.    Did CMG undertake an investigation

3   prior to filing this complaint to ascertain

4   whether any of the -- any of my clients' images

5   are in the public domain?

6            MR. MINCH:  Objection.

7            MS. COLBATH:  Objection.

8      A.    Did we undertake -- what was the

9   terminology used?

10     Q.    An investigation.  Prior to filing

11  this complaint, whether any specific works of

12  my clients are in the public domain?

13           MS. COLBATH:  Objection.

14     A.    I think you could say some type of

15  investigation.

16     Q.    What was the nature of that

17  investigation?

18           MR. MINCH:  Objection.

19     A.    The nature of the investigation was

20  the fact that many of these photographs were

21  published without notice, which automatically

22  kicks them into the public domain.

23     Q.    Which one?

24           MR. MINCH:  Objection.

25           MS. COLBATH:  Objection.

ROESLER

back.)

     MS. COLBATH:  Objection.

    A.  I think it's a collection that's --
of the work that was filed without proper
notices.

    Q.  And I'd like you to tell me --
identify particular works you're talking about.

     MR. MINCH:  Objection.

    A.  I can't identify those specific
works at this moment in time.

    Q.  Let's turn to what has been
previously marked as Roesler 2.  It's the Third
Amended Complaint.  Turn to paragraph 22, sir.
It's on page 5.  Can you read that into the
record?

    A.  "Shaws asserted either by itself
or through Bradford that it possesses valid,
enforceable copyrights pursuant to Copyright
Act 17 USC, Section 101, in each and every
photograph that constitutes the Monroe/Shaw
photographs in the Shaw limited edition
Marilyn/Norma Jean collection, hereinafter the
Shaw collection."

    Q.  Thank you.  What was the basis for

159

ROESLER

1

2      that?

3                  MR. MINCH:  Objection.

4                  MS. COLBATH:  Objection.

5          Q.    Let me rephrase.  What is the basis

6      for that statement?

7                  MR. MINCH:  Objection.

8          A.    I believe the basis is that

9      representations that Bradford makes with

10     respect to the collection.

11         Q.    Well, what representations are you

12     talking about?

13                 MR. MINCH:  Objection.

14                 MS. COLBATH:  Objection.

15         A.    I don't have specific information.

16         Q.    You don't have specific information

17     of representations that Bradford has made;

18     correct?

19         A.    That's correct.

20         Q.    Nor do you have specific

21     representations that the Shaw Family Archives

22     made; correct?

23                 MR. MINCH:  Objection.

24         A.    I personally don't.

25         Q.    Nor do you have specific

ROESLER

2  representations that were made by Edith -- that

3  may have been made by Edith Marcus or Meta

4  Stevens; correct?

5          MR. MINCH:  Objection.

6      A.    That's correct.  I don't.

7      Q.    Let's look at paragraph 23.  If you

8  could read that, sir.

9      A.    "In 1999 the United States

10 District Court for the Southern District of New

11 York ruled in the case of Shaw v. Rizzoli

12 International Publishing, No. 96 Civil - 4259

13 JFK SDNY, that certain photographs that

14 comprise the Monroe/Shaw photographs and/or the

15 Shaw collection and that were published in the

16 book entitled 'Marilyn Monroe, The Life, the

17 Myth,' quotes, 'the Rizzoli works,' have

18 entered the public domain.

19          "In that case the Honorable John G.

20 Cotell ruled that the copyrights in the Rizzoli

21 works expired and such photographs entered the

22 public domain and no renewals were obtained

23 with respect to them."

24     Q.    Thank you, sir.  What is the basis

25 for that statement?

ROESLER

2  MR. MINCH:  Objection.

3  A.  I don't know.  The attorneys

4  drafted -- handling the case drafted that.  I

5  don't specifically know.

6  Q.  Let's look at paragraph 24.  If you

7  could read that into the record, please.

8  A.  "Upon information and belief there

9  are photographs other than the Rizzoli works

10  that comprise the Monroe/Shaw photographs

11  and/or the Shaw collection that were published

12  prior to January 1, 1964 and for which

13  copyright renewals were not obtained during the

14  final year of the initial 28-year copyright

15  term for such works.

16  "Accordingly, upon information and

17  belief, such other photographs similarly

18  entered the public domain."

19  Q.  What was the basis for making that

20  statement?

21  MR. MINCH:  Objection.

22  A.  I'm assuming this was the various

23  photographs that were published without notice.

24  Q.  You say you're assuming that.  But

25  you don't know that to be a fact, do you?

162

                          ROESLER
 1
 2               MR. MINCH:  Objection.
 3               MS. COLBATH:  Objection.
 4        A.    That would be my educated
 5   assumption.
 6        Q.    You don't know that to be a fact,
 7   do you?
 8               MR. MINCH:  Objection.
 9               MS. COLBATH:  Objection.
10        A.    It would be my belief, yes.  My
11   belief.
12        Q.    Your belief based on what?
13               MR. MINCH:  Objection.
14        A.    Based upon the manner of research
15   that the attorneys did when they filed this.
16        Q.    Putting aside what your attorneys
17   may have told you or not told you, do you have
18   any independent basis to believe what is
19   contained in paragraph 24?
20        A.    Well, other than what my attorneys
21   have told me?  My own personal knowledge of
22   photographs that were published prior to 1964
23   in which copyright renewals were not obtained.
24   Yes, my legal conclusion is, those images are
25   in the public domain, independent of what

ROESLER

attorneys that drafted this told me.

    Q.    Let's talk about that, then.  What photos are you talking about?

    A.    Well --

    MR. MINCH:  Objection.

    A.    There exist photos other than the Rizzoli works.  Photos that were contained in the various periodicals that we keep talking about, that we go back to, such as Photoplay.

    Q.    Can you identify any of those photographs, sitting here today?

    MR. MINCH:  Objection.

    A.    We go back to the same discussion.

    Q.    Same discussion, meaning you can't identify the particular photographs; correct?

    MR. MINCH:  Objection.

    MS. COLBATH:  Objection.

    (Discussion off the record.)

    Q.    You can't identify the particular photographs; correct?

    MS. COLBATH:  Objection.

    MR. MINCH:  Objection.

    A.    At this moment, that's correct.

    Q.    You can't identify what photographs

164

ROESLER

1
2  were purportedly obtained -- published in the

3  photo op publications sitting here today --

4                MR. MINCH:  Objection.

5                MS. COLBATH:  Objection.

6        A.    Sitting here at this moment, that's

7  correct.

8        Q.    So in fact you really don't have

9  any personal knowledge of the information

10  contained in paragraph 24, do you?

11                MR. MINCH:  Objection.

12                MS. COLBATH:  Objection.

13        A.    That's incorrect.

14        Q.    Again, what is the personal

15  knowledge, so we're clear?

16                MR. MINCH:  Objection.

17        A.    My knowledge of the photographs

18  that have been published.

19        Q.    Which you can't identify.

20                MR. MINCH:  Objection.

21                MS. COLBATH:  Objection.

22        A.    At this moment.

23        Q.    Look at paragraph 25.  Read that

24  into the record, please, sir.

25        A.    "For example, in 1955 Ballantine

165

ROESLER

1

2    Books published a book entitled 'Marilyn Monroe

3    As the Girl,' featuring over 100 photographs of

4    Marilyn Monroe that were taken by Sam Shaw.

5                "Upon information and belief, Mr.

6    Shaw registered his copyright in this work in

7    the Library of Congress in 1955 under

8    registration No. A 193450 but failed to renew

9    such copyright during the final year of the

10   initial 28-year copyright term for such work or

11   at any time.

12               "As a result, the copyright for

13   this work expired in 1983 and photographs

14   contained in this work fell into the public

15   domain."

16        Q.    What's the basis for the

17   information in that paragraph?

18               MR. MINCH:  Objection.

19               MS. COLBATH:  Objection.

20        A.    I believe research at the law firm

21   that handled this did.

22        Q.    Do you have any of your own

23   personal knowledge or information contained in

24   this paragraph?

25        A.    No.

166

ROESLER

MR. MINCH:  Objection.

Q.    If you look at paragraph 26.  Read that into the record, please.

A.    "Further, on information and belief, other photographs that comprise the Monroe/Shaw photographs and/or the Shaw collection were initially published without copyright notice prior to March 1, 1989 when notice was required under the United States Copyright Act, and these photographs also have been in the public domain."

Q.    What's the basis for that statement, sir?

MR. MINCH:  Objection.

A.    The same.  Knowledge of the various photographs that were published by the various periodicals and publications.

Q.    Right.  And other than what you've testified, you have nothing else to add?

A.    That's correct.

Q.    And the same answer for 27?

MS. COLBATH:  Objection.

Q.    You don't have any personal knowledge but rely on your attorneys for that

167

1                           ROESLER

2    information?

3                MR. MINCH:  Objection.

4                MS. COLBATH:  Objection.

5         Q.    Is that right?

6         A.    That's correct.

7         Q.    Looking at -- continue on into

8    Count 1.  Well, let's -- strike that.

9                Turn to page 1, please, sir.

10               MR. MINCH:  Are we still working on

11        Exhibit --

12        Q.    What is identified as page 1 of the

13   Third Amended Complaint.

14               MR. MINCH:  That's Roesler 2;

15        correct?

16               MR. SERBAGI:  That's correct.

17        Q.    Paragraph 4.  Do you see that?

18        A.    I'm sorry?  Paragraph 4?

19        Q.    Yes.

20        A.    On page -- okay.  Yes.

21        Q.    What's marked as 1.

22        A.    Okay.

23        Q.    Look at the second sentence there,

24   please.  I'm going to read that into the

25   record.

168

1                              ROESLER

2                    "On information and belief,

3      however, certain of the photographs the

4      defendants purport to license to third parties

5      are in the public domain and can freely be used

6      by such licensees without defendants' consent."

7                    What photographs are you talking

8      about?

9                    MR. MINCH:  Objection.

10         Q.      That are owned by my clients.

11         A.      The photographs that were published

12     without notice.

13         Q.      What are they?

14                    MR. MINCH:  Objection.

15         A.      The same photographs that we keep

16     talking about.

17         Q.      The ones that you can't identify?

18                    MS. COLBATH:  Objection.

19                    MR. MINCH:  Objection.

20         A.      That I can't identify at this

21     moment.

22         Q.      If we read on, "Defendants have

23     refused to recognize that certain photographs

24     of Marilyn Monroe allegedly owned and

25     controlled by defendants are in the public

169

ROESLER

1
2    domain and defendants have asserted that

3    plaintiffs are prohibited from using such

4    photographs without defendants' consent."  Do

5    you see that?

6         A.    Yes.

7         Q.    So we're clear, "defendants" is

8    referred to as my clients here; is that right?

9         A.    That's correct.

10         Q.    Because this is the Indiana action

11    where we were the defendants?

12         A.    That's correct.

13              MS. COLBATH:  Objection.

14              MR. MINCH:  Objection.

15         Q.    What is the basis for that

16    statement?

17              MS. COLBATH:  Are you asking what

18         is the basis?  Caption of Southern

19         District.

20              MR. MINCH:  This isn't Indiana.  I

21         think that's a mischaracterization.

22         Q.    You know what I meant, don't you?

23              MR. MINCH:  How do you know?

24              MR. SERBAGI:  I'm talking to --

25         Q.    You know what I meant, don't you,

170

ROESLER

1

2 when I said this is derived from the Indiana

3 action?

4        A.    Okay.   Why don't you redo your

5 question.

6        Q.    Well, I think we have it on the

7 record.   All I'm really getting at here is

8 defendants -- the word "defendants" in this

9 paragraph refers to my clients; is that right?

10        A.    That's correct.

11        Q.    Now, again, what I want to know is

12 the basis for the following statement:

13 "Defendants have refused to recognize that

14 certain photographs of Marilyn Monroe allegedly

15 owned and controlled by the defendants are in

16 the public domain, and defendants have asserted

17 that plaintiffs are prohibited from using such

18 photographs without defendants' consent."   What

19 is the basis for that statement?

20              MR. MINCH:   Objection.

21              MS. COLBATH:   Objection.

22        A.    The basis is the activities of the

23 licensing representative for the Shaw Family

24 that asserts that they have the right to give

25 out licenses independent of any rights to the

171

                        ROESLER

Marilyn Monroe LLC.

     Q.    When you say the activities of the

licensing representatives for the Shaw Family,

when you refer to licensing representative, I

assume you're referring to Bradford; is that

correct?

     A.    That's correct.

     Q.    And when you say the basis is the

activities of Bradford, what do you mean?  What

activities are you referring to?

     A.    Their representations to other

parties.

     Q.    Who made the representations at

Bradford?

            MR. MINCH:  Objection.

     A.    Various promotions.  Just their

daily activities of holding themselves out as

possessing these rights to -- to be able to

license out Marilyn Monroe, completely

independent of Marilyn Monroe LLC.

     Q.    Who made the representations you're

referring to?

     A.    All I can say is the company of

Bradford.  I mean, whether it's their presence