# EX. Q, pt. 3

```
                        ROESLER
 1
 2   at a trade show or their various promotional
 3   pieces or communications with licensees.  All
 4   of that, collectively, would be their
 5   representations.
 6        Q.    I guess I'm trying to get -- maybe
 7   this is something that you can't recall,
 8   either, but I'm trying to get to the
 9   particulars of the representations that were
10   made.  Can you tell me what exactly the
11   representation is?  When it was made?
12        A.    I can't --
13              MR. MINCH:  Objection.
14              MS. COLBATH:  Objection.
15        A.    I can't give you those specifics.
16        Q.    So the record is clear, when you
17   say, in the -- when CMG says, in the Second
18   Amended Complaint, "Defendants have refused to
19   recognize that certain photographs of Marilyn
20   Monroe allegedly owned and controlled by
21   defendants are in the public domain and
22   defendants have asserted that plaintiffs are
23   prohibited from using any such photographs
24   without defendants' consent," you can't give me
25   any particulars about the basis for that
```

173

                              ROESLER
1
2   statement; is that right?
3                   MR. MINCH:  Objection.
4                   MS. COLBATH:  Objection.
5        A.    Beyond what I gave you, that's
6   correct.
7        Q.    You can't identify the particular
8   photographs that my clients have refused to
9   recognize -- rephrase.  You can't identify the
10  particular photographs of Marilyn Monroe that
11  my clients have refused to recognize are owned
12  and controlled by defendants; correct?
13                  MR. MINCH:  Objection.
14                  MS. COLBATH:  Objection.
15       A.    Not at this moment in this
16  deposition.
17       Q.    Let's go on.  The rest of paragraph
18  4 says, "But for defendants' false claims of
19  ownership of copyrights in and to photographs
20  of Marilyn Monroe that have, on information and
21  belief, entered the public domain, plaintiffs
22  would seek to utilize such public domain
23  photographs commercially in connection with
24  goods and services that are officially
25  authorized and/or licensed by plaintiffs."

174

ROESLER

What is the basis for that
statement?

MR. MINCH:   Objection.

A.    I believe what that would mean is,
except for the claim of the defendants in this
case, that they have valid copyrights.  If they
acknowledged they were in the public domain, we
would encourage licensees to use those photos.

Q.    Let's get into the details of that.
You say, "but for defendants' false claim of
ownership of copyrights in and to photographs
of Marilyn Monroe."  Start with that.  What are
the false claims of ownership of copyrights in
and to photographs of Marilyn Monroe that
you're referring to?  When I say "you," I mean
CMG.

A.    The licensing activities of the
Shaw Family and the licensing representative.

Q.    What particular copyrights are you
referring to in this sentence that I just read
that you say we falsely claim ownership to?

A.    The various photographs that have
been previously published.

Q.    Can you name, sitting here today,

175

ROESLER

1

2      the title of one copyright registration that we

3      have falsely claimed ownership rights to?

4                      MS. COLBATH:  Objection.

5                      MR. MINCH:  Objection.

6          A.      Not sitting here today.

7          Q.      And would the same answer apply to

8      the rest of the sentence, that sitting here

9      today, you can't provide me any information

10     regarding the part of the sentence that reads,

11     "Plaintiffs would seek to utilize such public

12     domain photographs commercially in connection

13     with goods and services that are officially

14     authorized or licensed by plaintiffs"?

15                      MR. MINCH:  Objection.

16                      MS. COLBATH:  Objection.

17         Q.      Let me strike the question and

18     reask it.  With respect to that portion I just

19     read into the record, what photographs of

20     Marilyn Monroe would CMG and MMLLC seek to

21     utilize that they haven't utilized because the

22     Shaw Family has asserted rights to them?

23                      MR. MINCH:  Objection.

24         Q.      Sitting here today, can you name

25     one?

176

ROESLER

1

2    A.    Any that would be clearly

3    recognized or acknowledged to be in the public

4    domain.

5    Q.    Sitting here today, can you

6    identify one of those registrations or images

7    of Marilyn Monroe?

8    MS. COLBATH:  Objection.

9    MR. MINCH:  Objection.

10    A.    Not sitting here at this moment.

11    Q.    Turning to page 6, please, under

12    the heading "Count 1."  Looking at paragraph

13    29, would you read that into the record,

14    please, sir.

15    A.    "Defendants have refused to

16    acknowledge that any of the works that comprise

17    the Monroe/Shaw photographs and/or the Shaw

18    collection have entered the public domain."

19    Q.    What's the basis for that

20    statement, sir?

21    MR. MINCH:  Objection.

22    A.    The basis would be that they claim

23    valid copyright ownership to photographs that

24    have been published without notice.

25    Q.    Which photographs are you talking

177

ROESLER

about?  Again, you don't recall?

          MR. MINCH:  Objection.

    A.    Again, the various photographs that appear in the various publications of Photoplay.

    Q.    But just for the record, so it's clear, you can't identify them, can you?

    A.    At this moment --

          MS. COLBATH:  Objection.

          MR. MINCH:  Objection.

    Q.    At this point.

    A.    At this point in the deposition, that's correct.

    Q.    If you read paragraph 30 into the record and tell me the basis for that statement.

    A.    "On information and belief, Shaw and/or Bradford communicated to licensees, potential licensees, business partners, and/or potential business partners that such licensees, potential licensees, business partners, and/or potential business partners require the prior permission and consent from Shaw and/or Bradford prior to utilizing the

178

                            ROESLER

public domain Monroe/Shaw photographs."

    Q.    What's the basis?

    MR. MINCH:  Objection.

    A.    Again, the licensing activities of
Bradford.

    Q.    Can you give me any particulars
other than just saying the licensing activities
of Bradford?

    MS. COLBATH:  Objection.

    MR. MINCH:  Objection.

    A.    Just the fact they're holding
theirselves out to represent these photographs.

    Q.    When you say "these photographs,"
can you, sitting here today, identify what you
mean by "these photographs" other than what
you've already stated?

    MR. MINCH:  Objection.

    A.    Not other than what I've already
stated.

    Q.    You say here that Shaw, under
Bradford, have communicated to CMG business
partners -- let me strike that.

    (Discussion off the record.)

    Q.    So we're clear, other than the

179

ROESLER

1

2   generalized testimony you've provided already

3   with respect to paragraph 30, you can't provide

4   me any other basis for the statements that are

5   contained in there?

6           MR. MINCH:  Objection.

7      A.    That is correct.

8      Q.    Turn to paragraph 31.  Please read

9   that into the record.

10     A.     "On information and belief,

11  defendants have actively discouraged licensees,

12  potential licensees, business partners, and/or

13  potential business partners from entering into

14  any relationship with plaintiffs in connection

15  with products or services that feature certain

16  public domain Monroe/Shaw photographs."

17     Q.    What's the basis for that

18  statement?

19           MR. MINCH:  Objection.

20     A.     The basis is the reality of what

21  was happening in the marketplace in terms of

22  Bradford discouraging in the various actions of

23  the Shaw Family with respect to various deals

24  that we were working on.

25     Q.    Okay.  Well, you say that

180

ROESLER

1

2   defendants -- again, defendants here and

3   throughout refers to my clients; is that

4   correct?

5          A.      Correct.

6          Q.      "Defendants have actively

7   discouraged licensees," and it goes on, "from

8   entering into relationships with purchasers."

9   Do you see that?

10         A.      That's correct.

11         Q.      What particular licensees did my

12  clients actively discourage from entering into

13  relationships with plaintiffs?

14         A.      We talked earlier about Dolce &

15  Gabbana.

16         Q.      And Frieze.

17         A.      Right.

18         Q.      Any others?

19                 MR. MINCH:  Objection.

20         A.      There are a number of others, yes.

21         Q.      Can you name some today?

22                 MR. MINCH:  Objection.

23         A.      I can't name any at this moment.

24         Q.      It goes on, just for the sake of

25  time, business partners, potential business

181

ROESLER

1

2    partners, so on and so forth.  Do you see that?

3        A.    Yes.

4            (Discussion off the record.)

5        A.    I'm sorry.  I was distracted.

6        Q.    You see the rest of 31?  I had

7    narrowed the last question to licensees.

8        A.    Right.  Right.

9        Q.    It goes on to talk about potential

10   licensees, business partners, potential

11   business partners that we purportedly

12   discourage from entering into relationships.

13       A.    Right.

14       Q.    Other than Frieze and Dolce &

15   Gabbana, can you, sitting here today, identify

16   any for us?

17           MR. MINCH:  Objection.

18       A.    No, I can't identify their names at

19   this moment.

20       Q.    And other than what you've

21   testified to already, can you identify the

22   particulars of any representations my clients

23   have purportedly made to all the entities that

24   are identified in 31 concerning rights to

25   images of Marilyn Monroe?

182

ROESLER

1

2    A.    None other than what I've testified

3    to.

4    Q.    And if you look at paragraph 32,

5    please.  If you could read that to yourself.

6    A.    Read it to myself?

7    Q.    Yes.  You can read 32 to yourself,

8    please.

9    A.    Okay.

10    Q.    It says, "Plaintiffs have been and

11    continue to be injured by defendants' conduct

12    in inducing or attempting to induce plaintiffs'

13    licensees, potential licensees" -- and it goes

14    on.  Do you see that?

15    A.    I do.

16    Q.    Other than what you've already

17    testified to, do you have any more information

18    to provide for us that would provide a basis

19    for the allegations in paragraph 32?

20    A.    Nothing other than what I've

21    already discussed.

22    Q.    How has CMG been injured by the

23    plaintiffs' conduct?

24    A.    There are many --

25    MR. MINCH:  Objection.

183

1                         ROESLER

2          A.      There are many --

3          Q.      Let me rephrase it for the record.

4    How has CMG been injured, as referred to in

5    paragraph 32, by my clients' conduct?

6          A.      There are many programs that have

7    not happened because of the conflict with

8    Bradford and Shaw.

9          Q.      Let's talk about that.  What

10   programs are you referring to?

11                 MR. MINCH:  Objection.

12         A.      There are many of them.  I can't

13   tell you, off the top of my head, all of them.

14   I mean, but they're --

15         Q.      Let's talk about one.

16         A.      Frieze would be one.

17         Q.      Other than Frieze and Dolce.

18                 MR. MINCH:  Objection.

19         Q.      Let me rephrase the question to

20   make it easy.

21         A.      You're right on Dolce.

22         Q.      Dolce went ahead.

23         A.      That's correct.

24         Q.      So that wasn't a relationship that

25   was terminated; correct?

184

ROESLER

1

2      A.     That's correct.  They'd have to

3  be -- someone else would have to testify as to

4  those specifics.

5      Q.     What specifics?

6      A.     On the specific companies that

7  haven't entered into arrangements because of

8  the situation with Bradford and --

9      Q.     So the record is clear, sitting

10  here today, you can't name any, can you?

11          MR. MINCH:  Objection.

12      Q.     Other than Frieze.

13      A.     You said the record is clear I

14  can't name any, and then you said other than

15  Frieze.  You've got Frieze.  You've got --

16  there's a party good company.  I mean, no, I

17  don't have specific names other than Frieze.

18      Q.     Since you can't name the companies

19  other than Frieze, sitting here today, you

20  don't know whether MMLLC has any relationships

21  with those companies, do you?

22          MR. MINCH:  Objection.

23      A.     You mean if they didn't proceed?

24      Q.     Right.  Let me rephrase the

25  question.  I want to get back to a question I

185

1                          ROESLER

2     asked earlier.  I said, "How has CMG been

3     injured as referenced to paragraph 32 by my

4     clients' conduct?"

5                    You answered, "There are many of

6     them.  I can't tell you, off the top of my

7     head, all of them," and we went on from there.

8                    I want to make clear for the record

9     that, sitting here today, you can't name any

10    particular companies that did not enter a

11    relationship with MMLLC pertaining to the

12    licensing of images of Marilyn Monroe because

13    of the conduct of my clients.

14                   MS. COLBATH:  Objection.

15                   MR. MINCH:  Objection.

16         A.     Well, I think that we just answered

17    that with respect to we said other than Frieze.

18    So --

19         Q.     Other than Frieze, there are no

20    others that you can think of, sitting here

21    today?

22         A.     That I can name, sitting here

23    today.

24                   MR. SERBAGI:  We have to go off the

25             record.  The tape has run out.

186

1                          ROESLER

2              THE VIDEOGRAPHER:  We are now off

3      the record at approximately 4:09.

4              (A brief recess was taken.)

5              THE VIDEOGRAPHER:  This is tape 4

6      of the deposition of Mark Roesler.  We

7      are now on the record at approximately

8      4:19 p.m.

9       Q.      Turning to paragraph 31 again, Mr.

10     Roesler, where it says that my clients "have

11     actively discouraged licensees, potential

12     licensees," and it goes on, "from entering into

13     relationships with plaintiffs."  Do you see

14     that?

15      A.      Yes.

16      Q.      Sitting here today, you can't

17     identify the particular photographs that we

18     purportedly discouraged these entities from

19     using, can you?

20              MR. MINCH:  Objection.

21      A.      That's correct.

22      Q.      Or the particular books at issue.

23              MR. MINCH:  Objection.

24      A.      Or the particular -- what?

25      Q.      Or the titles of the books that we

187

ROESLER

1
2    purportedly discouraged those entities,
3    licensees, potential licensees of CMG and MMLLC
4    from using.
5                    MS. COLBATH:  Objection.
6         A.    I'm not sure I understand your
7    question on the books.
8         Q.    I'll rephrase it.  I want to read
9    back my prior question and answer so we have a
10   context.  I asked you, "Sitting here today, you
11   can't identify the particular photographs that
12   we purportedly discouraged these entities from
13   using, can you?"  And you said, "That's
14   correct."
15                    I want to make it clear on the
16   record that looking at paragraph 31, can you
17   identify the title of any Marilyn Monroe --
18   let me rephrase.  Can you identify any specific
19   image of Marilyn Monroe that my clients
20   actively discouraged CMG or MMLLC's licensees
21   from using pertaining to Marilyn Monroe?
22                    MR. MINCH:  Objection.
23                    MS. COLBATH:  Objection.
24        A.    I cannot.
25        Q.    Let's turn to topic 2 on Schedule A

188

ROESLER

1
2    of what is identified as Roesler 1, namely the
3    30(b)(6) notice.  Do you see that, sir?
4          A.    Yes, sir.
5          Q.    Topic 2 states, "The factual basis
6    for defendants' contention that Marilyn Monroe
7    died a domiciliary of California and not New
8    York."  What is CMG's factual basis for
9    contending -- well, let me stop.  What is CMG's
10   contention as to where Marilyn Monroe was
11   domiciled when she died?
12         A.    It was our -- it was our belief
13   when we researched the issue that she was
14   probably domiciled in California at the time of
15   her death.  That was our belief.
16         Q.    And sitting here today, is that
17   your belief?  When I say "you," meaning CMG.
18         A.    I would say that's our belief, yes.
19         Q.    And what is that belief based upon?
20         A.    Just the knowledge that we know in
21   general about Marilyn Monroe and the knowledge
22   we know about her business affairs.
23         Q.    Tell me everything that you know
24   that would provide a basis for your belief,
25   sitting here today, that Marilyn Monroe died a

189

ROESLER

1
2    domiciliary of California.

3        A.    Well, she was born in California.
4    She attended an orphanage in California.  She
5    went to school in California.  She worked in
6    California.  She had a driver's license in
7    California.  She owned a home in California.
8    She died in California.  And she was buried in
9    California.

10        Q.    Anything else?

11        A.    Off the top of my head, I'd say
12    that's the main basis.

13        Q.    This is not off the top of your
14    head.  This is the No. 2 topic on the 30(b)(6)
15    notice that we're asking you to testify about.
16    So when I ask you a question about the location
17    of Ms. Monroe's domicile when she died, I'm
18    asking for the entire basis for CMG's
19    representation that Marilyn Monroe died a
20    domiciliary of California.

21        So my question is: Is there
22    anything else you have to add to the record as
23    the basis for CMG's belief that Marilyn Monroe
24    died a California domiciliary?

25        MS. COLBATH:  Objection.

190

                              ROESLER

1        A.    I would say also her movie

2   contracts are in California, from the movie

3   studios.  And I think that pretty well takes

4   care of that.

5        Q.    So nothing else?

6        A.    I don't think so.

7        Q.    Now, you testified earlier that CMG

8   researched the issue at one time of where

9   Marilyn Monroe was a domiciliary when she died.

10  What did you mean by "researched the issue"?

11       A.    Can you more fully tell me what the

12  context I said that in?

13       Q.    Sure.

14            MR. MINCH:  Can you read back?

15            MR. SERBAGI:  I'll find it.

16       Q.    I'm going to summarize for you, to

17  save time.  I asked you the factual basis for

18  CMG's contention that Marilyn Monroe died a

19  California domiciliary.  And your answer,

20  verbatim, "It was our belief that" -- strike

21  that.  "It was our" -- "it was our belief when

22  we researched the issue that she was probably

23  domiciled in California at the time of her

24  death.  That was our belief."

191

ROESLER

And I'm asking you what you meant
by "researched the issue."

    A.    Can I take about a 30-second break?
I have something in my eye that's bothering me.
Some dirt or something.  Is there a napkin?

    Q.    Sure.  We can do it on the record.
Take your time.

    (Discussion off the record.)

    THE WITNESS:  I'm sorry.

    Q.    Are you okay now?

    A.    I'm okay.

    Q.    I asked you what you meant by
"researched the issue" when you said you
"researched the issue" of Marilyn Monroe's --
the issue of where she was domiciled when she
died.

    A.    I think there are two aspects to
that.  The first aspect was what was our belief
prior to the litigation, and what was our
belief after the -- the law firm for Marilyn
Monroe LLC researched the subject.

    So it was our -- it was our belief
that she was probably domiciled in California
at the time of her death, based upon the

192

ROESLER

1    various factual information I gave you a few

2    moments ago.  After we got started there was

3    much more intensive research done, and at that

4    point we were advised by counsel for the --

5             MS. COLBATH:  I'm going to caution

6        the witness not to reveal anything that

7        counsel advised you.

8             MR. MINCH:  Thank you.

9             THE WITNESS:  Yes.  Okay.

10       A.    So I think -- based on what I've

11   said, have I answered your question?

12       Q.    Well, let me ask it again.  Maybe

13   you have; maybe you haven't.

14       A.    Okay.

15       Q.    When you said "researched the

16   issue," did CMG conduct any independent

17   investigation or independent research to

18   determine where Marilyn Monroe was domiciled

19   when she died?

20       A.    I think, as I was starting to say,

21   the research would have been after the

22   litigation started, as opposed to before.

23       Q.    Did CMG conduct an independent

24   research or investigation into the issue?

193

ROESLER

1
2      MS. COLBATH:  Objection.

3      MR. MINCH:  Objection.

4      A.    Prior to the litigation?

5      Q.    At any time.

6      MS. COLBATH:  Objection.

7      MR. MINCH:  Objection.

8      A.    I would say not -- at any time,

9  yes.  At some point in time, you know, we were

10  involved in that.  Yes.

11      Q.    Tell me about it.  When was it

12  conducted?  What happened?

13      A.    Well, as the litigation unfolded,

14  we were involved in trying to piece together

15  Marilyn Monroe's life and where she -- where

16  she lived and where she worked and what, you

17  know, homes that she owned, and so forth.  I

18  mean, just information that was --

19      Q.    Did you review -- I'm sorry.  Are

20  you done?

21      A.    I was just saying, just information

22  that was factual information that was -- that

23  was available about her, and any business

24  records that we had.  Business activities.

25      Q.    Did you review her probate file in

194

ROESLER

1
2    connection with coming to an opinion about
3    where she was domiciled when she died?
4         A.    I did not personally do that, no.
5         Q.    Have you ever seen a probate file?
6         A.    The question is have I ever seen
7    Marilyn Monroe's probate file?
8              MS. COLBATH:   Objection.
9         Q.    The documents that were submitted
10   to the Surrogate's Court and Supreme Court in
11   California in connection with her probate
12   proceedings over her will.
13        A.    I don't know that I've seen,
14   reviewed, the complete probate file.
15             MR. SERBAGI:   If the court reporter
16             will please mark as Roesler Exhibit No. 7
17             a document bearing production Nos. MM
18             0009381 through 89.
19             (Roesler Exhibit 7 for
20             identification, document, probate file,
21             production Nos. MM 0009381 through
22             0009389.)
23        Q.    What does the designation on the
24   bottom of the page, MM, along with the
25   production number, mean to you, Mr. Roesler?