Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

MAY 1 4 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT

MAY 1 5 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE MILTON H. GREENE ARCHIVES, INC., <br><br> Plaintiff, <br><br> v. <br><br> CMG WORLDWIDE, INC., an Indiana Corporation, and MARILYN MONROE, LLC, a Delaware Limited Liability Company, ANNA STRASBERG, an individual, <br><br> Defendants. <br><br> AND CONSOLIDATED ACTIONS | CASE NO. CV 05-2200 MMM (MCx) <br><br> ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

On March 25, 2005, The Milton H. Greene Archives, Inc. filed this action against CMG Worldwide Inc., Marilyn Monroe LLC, and Anna Strasberg. On May 3, 2005, the court consolidated the case with two other actions filed in this district – *Shirley De Dienes et al. v. CMG Worldwide, Inc. et al.* (No. CV 05-2516)[1] and *Tom Kelley Studio, Inc. v. CMG Worldwide,*

---

[1] The *De Dienes* action was dismissed without prejudice on February 2, 2006, pursuant to the parties' stipulation.

269

1    *Inc. et al.* (No. CV 05-2568).[2]  On December 14, 2005, the court consolidated two additional

2    actions with the pending case – *CMG Worldwide, Inc., et al. v. Tom Kelley Studios* (No. CV 05-

3    5973) and *CMG Worldwide, Inc., et al. v. The Milton H. Green Archives, Inc.* (No. CV 05-

4    7627).[3]  These actions were originally filed by CMG Worldwide, Inc. and Marilyn Monroe, LLC

5    (the "CMG Parties" or "plaintiffs") in the United States District Court for the Southern District

6    of Indiana, and were transferred to this district pursuant to 28 U.S.C. § 1404(a) on August 9,

7    2005.[4]  All of the actions seek to have the court resolve competing claims to ownership of the

8    legal right to use, license, and distribute certain photographs of Marilyn Monroe.

9         In their complaints against the Milton H. Green Archives, Inc. and Tom Kelley Studios,

10   Inc. (the "MHG Parties" or "defendants"), the CMG Parties assert that they own the "Right of

11   Publicity and Privacy in and to the Marilyn Monroe name, image, and persona" that was created

12   by "the Indiana Right of Publicity Act, I.C. § 32-36-1-1 et seq., and other applicable right of

13   publicity laws."  The CMG Parties contend that defendants have infringed this right by using

14   Marilyn Monroe's name, image and likeness "in connection with the sale, solicitation, promotion,

15   and advertising of products, merchandise, goods and services" without their consent or

16   authorization.[5]

17        On October 6, 2006, the MHG Parties filed a motion for summary judgment.  They argue,

18   *inter alia*, that plaintiffs' right of publicity claims are preempted by the Copyright Act, 28 U.S.C.

19   §§ 101-1332, and that, even if the claims are not preempted, plaintiffs have failed to adduce any

20

21

---

22        [2]Tom Kelley Studio, Inc. sued the same defendants as did The Milton H. Greene Archive,

23   Inc. – CMG Worldwide Inc., Marilyn Monroe LLC, and Anna Strasberg.

24        [3]Anna Strasberg was not a party to the Indiana actions.

25        [4]On February 6, 2006, the court issued a scheduling order, which denominated the CMG

26   Parties plaintiffs and the MHG Parties defendants for purposes of the consolidated actions.  The
     court based this order on the fact that the CMG Parties' Indiana action was the first filed action.

27
          [5]Plaintiffs' First Amended Complaint against Milton H. Greene Archives, Inc., ¶¶ 7, 24-

28   26; Plaintiffs' First Amended Complaint against Tom Kelley Studios, Inc., ¶¶ 7, 28-30.

                                                    2

1   evidence that they have standing to assert claims based on Marilyn Monroe's right of publicity.[6]

2   In essence, defendants argue that, even if a posthumous right of publicity in Monroe's name,

3   image and likeness exists, plaintiffs cannot show that they are presently in possession of that

4   right.[7]

5

6                                   **I.  FACTUAL BACKGROUND**

7          The parties expend considerable effort attempting to create triable issues of fact by

8   objecting to nearly every piece of evidence adduced by their opponent in support of or in

9   opposition to the motion for summary judgment.  After reviewing the applicable law, however,

10  the court concludes that resolution of this motion turns on a limited number of facts that are

11  undisputed.  Before discussing those undisputed facts, the court addresses defendants' "request

12  to strike," which seeks to have the court strike the bulk of the evidence adduced by plaintiffs in

13  opposition to the summary judgment motion.

14         **A.  The Request To Strike**

15         Defendants contend that virtually all of the evidence plaintiffs submitted in support of their

16  opposition should be excluded because it was not adequately identified in plaintiffs' initial

17  disclosures, and because it was improperly withheld from defendants during discovery.[8]  The

18  request is denied.

19         Plaintiffs' initial disclosures adequately identified by "category" the documents they submit

20  _____

21  [6]Defendants' Memorandum of Points and Authorities in Support of Their Motion for
    Summary Judgment ("Defs.' Mem.") at 32-34.

22

23  [7]Defendants also argue that (1) Marilyn Monroe was domiciled in New York at the time
    of her death, such that no right of publicity could survive her passing; (2) even if Marilyn Monroe

24  was not a New York domiciliary at the time of her death, plaintiffs are collaterally and judicially
    estopped from asserting otherwise; (3) Indiana's right of publicity statute does not apply to

25  Marilyn Monroe; and (4) plaintiffs' claims are barred by laches.  Defendants' motion also
    challenged plaintiffs' copyright infringement claims (see _id._ at 43-47); those claims have since

26  been dismissed without prejudice pursuant to the parties' stipulation.

27  [8]See Objections to and Request To Strike Evidence Submitted in Plaintiffs' Opposition to

28  Defendants' Motion for Summary Judgment.

                                              3

1   in opposition to defendants' motion for summary judgment.  Plaintiffs stated, for example, that

2   they would rely on documents that established Marilyn Monroe's domicile at the time of her death

3   (as did defendants), and on documents supporting their claim that defendants were aware of and

4   recognized plaintiffs' asserted rights in Marilyn Monroe's right of publicity.  This is all that is

5   required by Rule 26(a)(1)(B) of the Federal Rules of Civil Procedure.  See *DE Technologies, Inc.*

6   *v. Dell Inc.*, 238 F.R.D. 561, 566 (W.D. Va. 2006) ("Dell correctly argues that the initial

7   disclosure required by Rule 26 does not require the production of the documents upon which a

8   party intends to rely.  Instead, in lieu of production, Rule 26 allows a party to provide 'a

9   description by category and location of, all documents . . . that are in the possession, custody,

10   or control of the party and that the disclosing party may use to support its claims or defenses,

11   unless solely for impeachment"); *Sizemore v. Wal-Mart Stores, Inc.*, No. Civ.A. H-05-1589,

12   2006 WL 1698291, *3 (S.D. Tex. June 16, 2006) ("Plaintiff states in her Response that Wal-Mart

13   identified relevant documents in its Initial Disclosures but did not produce the documents.  Rule

14   26(a) of the Federal Rules of Civil Procedure, however, requires only that the documents be

15   described by category and location. . ."); *CP Solutions PTE, Ltd. v. General Elec. Co.*, No.

16   3:04cv2150(JBA)(WIG), 2006 WL 1272615, *1 (D. Conn. Feb. 6, 2006) ("The disclosing party,

17   however, does not have to produce actual documents.  It can comply fully with its initial

18   disclosure obligation by providing a description by category and location of all documents, data

19   compilations, and tangible things it expects to use during the proceeding").  Additionally,

20   plaintiffs represent that many of the documents they proffer in support of their opposition to the

21   pending motion were not in their possession, custody or control at the time they made initial

22   disclosures.   See FED.R.CIV.PROC. 26(a)(1)(B) (requiring disclosure of "all documents,

23   electronically stored information, and tangible things that are in the possession, custody, or

24   control of the party and that the disclosing party may use to support its claims or defenses, unless

25   solely for impeachment").

26        Defendants' contention that plaintiffs abused the discovery process by "producing"

27   documents for the first time in opposition to defendants' motion is also unavailing.  As plaintiffs

28   note, neither party produced *any* documents before defendants' motion for summary judgment was

4

1    filed.[9] Indeed, defendants concede that their motion – which was filed less than two months after

2    the parties first served written discovery on one another – was "a 'show me' motion . . . directed

3    at Plaintiffs' claims and their lack of basis."[10] If this was defendants' intent, plaintiffs' opposition

4    provided exactly what defendants sought – information regarding the "basis" of plaintiffs' claims.

5        Defendants, moreover, did not move to compel further responses to their discovery

6    requests before filing the motion, a recognized first step in enforcing an opponent's discovery

7    obligations. See FED.R.CIV.PROC. 37(a). Rather, they sought an order striking all of plaintiffs'

8    evidence. Such an order may be entered under Rule 37(d) where a party fails to serve a written

9    response to a request to produce or written answers or objections to interrogatories. See

10   FED.R.CIV.PROC. 37(d); see also 8A Charles A. Wright, Arthur R. Miller & Richard L. Marcus,

11   FEDERAL PRACTICE & PROCEDURE: CIVIL 2D § 2291, at 720 (1994) ("If [a party] serves a

12   response, but fails to say that inspection will be permitted as requested or fails to permit the

13   inspection itself a motion under Rule 37(a) to compel inspection is available, but Rule 37(d) is

14   inapplicable"); id. ("The provisions of Rule 37(d) with regard to interrogatories do not apply 'for

15   anything less than a serious or total failure to respond to interrogatories'"). There is no evidence

16   that plaintiffs failed to serve a written response to defendants' document production request or

17   written answers and objections to interrogatories; rather, it appears that defendants did not believe

18   the responses they received were adequate or complete. The proper forum for defendants'

19   discovery dispute with plaintiffs is therefore a hearing on a motion to compel before the

20   magistrate judge. Finally, to the extent Rule 37(d) is applicable, the court finds, under the

21   circumstances of this case, that it would not be "just" to strike all of plaintiffs' evidence. See

22   FED.R.CIV.PROC. 37(d) (stating that the court "may make such orders in regard to the failure as

23   are just").

24

25   _____

26       [9]See Plaintiffs' Opposition to Defendants' Objections to and Request to Strike Evidence
     in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 4.

27

28       [10]Defendants' Reply in Support of Objections to Strike Evidence Submitted in Plaintiffs'
     Opposition to Defendants' Motion for Summary Judgment, at 6 n. 5, 10 n. 7.

5

1    **B.    Undisputed Facts in the Summary Judgment Record**

2    Milton H. Greene and Tom Kelley, Sr. were professional photographers and

3    contemporaries of Marilyn Monroe.[11]    Defendants purport to own copyrights in various

4    photographs of Marilyn Monroe that Greene and Kelley took during her lifetime.[12]    Plaintiffs

5    allege that defendants are using the photographs "on or in connection with the sale, solicitation,

6    promotion, and advertising of products, merchandise, goods and services" without their

7    authorization or consent,[13] and thus that they are violating a right of publicity in Marilyn

8    Monroe's name, image, and likeness that purportedly passed to plaintiffs through her will.[14]

9    Marilyn Monroe died testate on August 5, 1962.[15]    Her will, which did not expressly

10    bequeath a right of publicity, contained the following residuary clause:

11    SIXTH: All the rest, residue and remainder of my estate, both real and personal,

12    or whatsoever nature and wheresoever situate, of which I shall die seized or

13    possessed or to which I shall be in any way entitled, or over which I shall possess

14    any power of appointment by Will at the time of my death, including any lapsed

15    legacies, I give, devise and bequeath as follows:

16

17    [11]Defendants' Statement of Uncontroverted Facts and Conclusions of Law Submitted in

18    Support of Their Motion for Summary Judgment ("Defs.' Facts"), ¶ 1; Plaintiffs' Statement of

19    Genuine Issues of Material Fact ["MF"] and Additional Material Facts ["AMF"] in Response to

       Defendants' Statement of Uncontroverted Facts in Support of Defendants' Motion for Summary

20    Judgment ("Pls.' Facts"), MF ¶ 1.

21    [12]Defs.' Facts, ¶¶ 4, 8.  Plaintiffs dispute this fact. (See Pls.' Facts, MF ¶¶ 4, 8.)

22    Whether defendants own copyrights in photographs of Marilyn Monroe is immaterial to court's

       resolution of the motion, however.

23    [13]Plaintiffs' First Amended Complaint Against Milton H. Greene Archives, Inc., ¶¶ 7, 24-

24    26; Plaintiffs' First Amended Complaint Against Tom Kelly Studios, Inc., ¶¶ 7, 28-30.

25    [14]Pls.' Facts, AMF ¶¶ 20-22; Defendants' Response to Plaintiffs' Statement of Genuine

26    Issues of Material Fact and Additional Material Facts Re Defendant's Motion for Summary

       Judgment ("Defs.' Reply Facts"), AMF ¶¶ 20-22 (disputing this fact only to the extent it states

27    the legal conclusion that Marilyn Monroe's right of publicity passed through her will).

28    [15]Pls.' Facts, AMF ¶ 10; Defs.' Reply Facts, AMF ¶ 10.

6

1    (a) To MAY REIS the sum of $40,000.00 or 25% of the total remainder of my

2    estate, whichever shall be the lesser.

3    (b) To DR. MARIANNE KRIS 25% of the balance thereof, to be used by her as

4    set forty in ARTICLE FIFTH (d) of this my Last Will and Testament.

5    (c) To LEE STRASBERG the entire remaining balance.[16]

6    The will was subject to primary probate in New York.[17]

7

8                              **II. DISCUSSION**

9    **A.    Standard Governing Motions for Summary Judgment**

10        A motion for summary judgment must be granted when "the pleadings, depositions,

11   answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

12   there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

13   as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the

14   initial burden of informing the court of the basis for its motion and identifying those portions of

15   the pleadings and discovery responses that demonstrate the absence of a genuine issue of material

16   fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have

17   the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no

18   reasonable trier of fact could find other than in its favor. On an issue as to which the nonmoving

19   party will have the burden of proof, however, the movant can prevail merely by pointing out that

20   there is an absence of evidence to support the nonmoving party's case. See *id*. If the moving

21   party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise

22   provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v.*

23   *Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC. 56(e).

24        In viewing evidence at the summary judgment stage, the court does not make credibility

25   _____

26   [16]Declaration of Greg T. Hill Submitted in Support of Defendants' Motions for Summary
     Judgment, Exhibit 13; Declaration of Anna Strasberg in Support of Plaintiffs' Opposition to
27   Defendants' Motion for Summary Judgment, Exhibit C.

28        [17]Defs.' Facts, ¶¶ 16, 18-19; Pls.' Facts, AMF ¶ 26.

                                      7

1    determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most

2    favorable to the nonmoving party. See *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,

3    809 F.2d 626, 630-31 (9th Cir. 1987). The evidence presented by the parties must be admissible.

4    FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is

5    insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway*

6    *Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub'g Co., Inc. v. GTE*

7    *Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

8    **B.      Whether Plaintiffs' Right of Publicity Claims Are Preempted by the Copyright**

9    **Act**

10    As a threshold matter, the court must determine whether plaintiffs' right of publicity claims

11    are preempted by the Copyright Act. State law claims are preempted by the Copyright Act only

12    if (1) they concern a work that is within the subject matter of copyright and (2) the state law rights

13    asserted are "equivalent" to rights protected by copyright law. See 17 U.S.C. § 301(a); *Laws v.*

14    *Sony Music Entertainment*, 448 F.3d 1134, 1138-39 (9th Cir. 2006); *Downing v. Abercrombie*

15    *& Fitch*, 265 F.3d 994, 1003 (9th Cir. 2001); see also *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905,

16    909 (7th Cir. 2005). State law claims are not "equivalent" if they contain "an element which

17    changes the nature of the action 'so that it is qualitatively different from a copyright infringement

18    claim.'" *Summit Machine Tool Manufacturing Corp. v. Victor CNC Systems, Inc.*, 7 F.3d 1434,

19    1439-40 (9th Cir. 1993); see also *Laws*, 448 F.3d at 1144 (noting that "[t]he mere presence of

20    an additional element . . . is not enough to qualitatively distinguish [a plaintiff's] right of publicity

21    claim from a claim in copyright"; instead, that "extra element must transform the [underlying]

22    nature of the action").

23    The parties dispute which of two Ninth Circuit decisions – *Laws* or *Downing* – provides

24    the standard for evaluating preemption in this case. The court concludes that *Downing* is the

25    applicable precedent. There, the Ninth Circuit considered whether a state law right of publicity

26    claim based on use of a copyrighted photograph was preempted by the Copyright Act. Retailer

27    Abercrombie & Fitch used a copyrighted photograph of plaintiffs, who were surfers, in a surf-

28    themed sales catalogue promoting its clothing lines. Abercrombie published the photograph

8

1   without obtaining the surfers' consent, having purchased it earlier from a professional surf

2   photographer. *Downing*, 265 F.3d at 1000. The catalogue identified the surfers by name, and

3   offered T-shirts identical to those they wore in the photograph for sale. *Id.* The Ninth Circuit

4   held that the surfers' right to control the use of their name, image, and likeness, which was the

5   basis for their claim, was not the "subject matter" of copyright. It stated:

6          "The photograph itself, as a pictorial work of authorship, is subject matter

7          protected by the Copyright Act. . . . However, it is not the publication of the

8          photograph itself, as a creative work of authorship, that is the basis for [the

9          surfers'] claims, but rather, it is the use of [their] likenesses and their names

10         pictured in the published photograph. . . . A person's name or likeness is not a

11         work of authorship within the meaning of 17 U.S.C. § 102. This is true

12         notwithstanding the fact that [the surfers'] names and likeness are embodied in a

13         copyrightable photograph." *Id.* at 1003-04 (citation omitted).

14  In reaching this conclusion, the Ninth Circuit relied, *inter alia*, on Professor McCarthy's treatise

15  on the right of publicity and privacy, which states:

16         "The 'subject matter' of a Right of Publicity claim is not a particular picture or

17         photograph of plaintiff. Rather, what is protected by the Right of Publicity is the

18         very identity or persona of the plaintiff as a human being. . . . While copyright in

19         a given photograph may be owned by the person depicted in it, the exact image in

20         that photograph is not the underlying 'right' asserted in a Right of Publicity case.

21         To argue that the photograph is identical with the person is to confuse illusion and

22         illustration with reality. Thus, assertion of infringement of the Right of Publicity

23         because of defendant's unpermitted commercial use of a picture of plaintiff is not

24         assertion of infringement of copyrightable 'subject matter' in one photograph of

25         plaintiff." J. Thomas McCarthy, RIGHTS OF PUBLICITY AND PRIVACY § 11.13[C],

26         at 11-72-73 (1997) (quoted in *Downing*, 265 F.3d at 1004).

27  The *Downing* court also concluded that the second prerequisite to copyright preemption was not

28  met, because "the subject matter of the [the surfers'] . . . right of publicity claims is their names

9

1  and likenesses, which are not copyrightable, [and therefore] the claims are not equivalent to the

2  exclusive rights contained in § 106." *Id.* at 1005.

3      *Downing* compels the conclusion that plaintiffs' right of publicity claims are not preempted

4  by the Copyright Act.  Plaintiffs allege that defendants have exploited Marilyn Monroe's name,

5  image, and likeness – as embodied in photographs defendants purport to have copyrighted – "on

6  or in connection with the sale, solicitation, promotion, and advertising of products, merchandise,

7  goods and services" without their authorization or consent.[18]    Plaintiffs do not challenge

8  defendants' right to publish or otherwise exploit their photographs as "creative work[s] of

9  authorship" protected by copyright.  Rather, they contend that defendants are commercially

10  exploiting Marilyn Monroe's name, image and likeness by licensing photographs containing her

11  image to third-party vendors for use in promoting various consumer products. The *Downing* court

12  held that claims based on precisely this kind of use of copyrighted photographs were not

13  preempted by federal law.

14      Defendants dispute this, and contend that *Laws*, rather than *Downing*, controls.  They

15  assert that *Laws* held that right of publicity claims are preempted if they are based solely on

16  commercial exploitation of copyrighted works.[19]    They also argue that the *Laws* court

17  distinguished *Downing* on the basis that Abercrombie did not simply exploit the copyrighted

18  photographs commercially, but suggested that plaintiffs endorsed its products by using their names

19

20
_____

21      [18]Plaintiffs' First Amended Complaint Against Milton H. Greene Archives, Inc., ¶¶ 7, 24-
    26; Plaintiffs' First Amended Complaint Against Tom Kelly Studios, Inc., ¶¶ 7, 28-30.  Plaintiffs
22  contend that defendants' pleadings in the consolidated cases constitute judicial admissions that they
    have used purportedly copyrighted photographs to exploit Marilyn Monroe's name, image, and
23  likeness commercially. (See Plaintiffs' Opposition to Defendants' Motion for Summary Judgment
    ("Pls.' Opp.") at 39 (citing Milton H. Greene Archives, Inc. Complaint Against CMG Worldwide
24  Inc. et al., ¶ 18 ("[MHG] photographs have been used for, among other things, advertising,
    magazines, calendars, and on wine bottles.  Such licenses can run as much as $25,000 for a single
25  use of one Marilyn Monroe photograph"); Tom Kelley Studio, Inc. Complaint Against CMG
26  Worldwide, Inc. et al., ¶¶ 16, 30 (alleging that Kelley Studios "works to . . . commercialize [its]
27  photographs" and to "commercially exploit the images of Marilyn Monroe").)

28      [19]Defendants' Reply in Support of Motion for Summary Judgment ("Defs.' Reply") at 22.

10

1    and reproducing the T-shirts they wore.[20] Defendants argue that, in contrast to Abercrombie, they

2    have done nothing more than license their photographs for commercial purposes. They assert

3    there is no evidence that they have licensed Marilyn Monroe's name, suggested her endorsement

4    of a particular product, or allowed their photographs to be used on products that look like those

5    being used by Monroe in the photographs.[21]

6          Defendants' reliance on *Laws* is unavailing.  There, the Ninth Circuit held that, when a

7    copyrighted sound recording is produced, the singer's interest in her "voice" and the copyright

8    holder's interest in the recording as "an original work[ ] of [creative] authorship" merge, so that

9    the Copyright Act preempts claims based on licensing of the sound recording for commercial

10   purposes, e.g., in advertising campaigns. *Laws*, 448 F.3d at 1139-41 ("Although California law

11   recognizes an assertable interest in the publicity associated with one's voice, we think it is clear

12   that federal copyright law preempts a claim alleging misappropriation of one's voice when the

13   entirety of the allegedly misappropriated vocal performance is contained within a copyrighted

14   medium").  In reaching this result, the *Laws* court recognized that use of copyrighted photographs

15   in advertising implicates a separate set of interests, and thus that such uses "are distinguishable"

16   from the commercial licensing of a sound recording. *Id.* at 1141.  In this regard, it acknowledged

17   *Downing*'s holding that "'a person's name or likeness is not a work of authorship within the

18   meaning of [the Copyright Act]'" *id.* (quoting *Downing*, 265 F.3d at 1004), and implicitly

19   recognized that an individual's likeness does not merge with a photograph that is a "work of

20   [creative] authorship" in the same manner that an artist's voice merges with a copyrighted sound

21   recording.   See also 1 Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT

22   § 1.01[B][1][c], at 1-28 (2006) ("[N]ame and likeness do not become a work of authorship simply

23   because they are embodied in a copyrightable work").[22]  In short, the *Laws* court distinguished

24

25          [20]*Id.*

26          [21]*Id.* at 22-23.

27          [22]In contrast, the *Laws* court noted that, like a person's "voice" captured on a sound

28   recording during a vocal performance, a person's "likeness" captured on film during a dramatic

11

1    a photographer's creative work, which is separate from the "likeness" of the person whose image

2    is captured in the photograph, from a singer's creative work, which merges with the voice" she

3    uses to record. Given this merger, the court stated, the singer's assertion of a right of publicity

4    in her voice necessarily "challeng[ed] control of the artistic work itself," and therefore concerned

5    the subject matter of copyright. *Laws*, 448 F.3d at 1142; *see also Toney*, 406 F.3d at 910

6    ("Toney's identity is not fixed in a tangible medium of expression. There is no 'work of

7    authorship' at issue in Toney's right of publicity claim. A person's likeness – her persona – is

8    not authored and it is not fixed. The fact that an image of the person might be fixed in a

9    copyrightable photograph does not change this," quoted in *Laws*, 448 F.3d at 1142).[23]

10        Consequently, the court concludes that *Downing*, not *Laws*, controls, and that plaintiffs'

11    right of publicity claims are not preempted by the Copyright Act.[24] Unlike a voice captured in

12    a sound recording, Marilyn Monroe's "likeness" did not merge with defendants' photographs so

13    completely that she (or her successors-in-interest) cannot assert an interest in her persona separate

14    and distinct from defendants' interest in their photographs as creative works of art.

15

16    performance merges with the creative work of authorship itself. As a result, it suggested, the

17    Copyright Act *would* preempt a right of publicity claim based on a copyright holder's screening
       of a motion picture that embodied an actor's "name, pictures, and likeness without [his] consent."

18    *Laws*, 448 F.3d at 1142-43 (discussing *Fleet v. CBS, Inc.*, 50 Cal.App.4th 1911 (1996)); *see also*

19    *Downing*, 265 F.3d at 1005 n. 4 ("In *Fleet*, the plaintiffs were actors in a copyrighted film. The
       claims of the plaintiffs were based on their dramatic performance in a film CBS sought to

20    distribute. . . . This is clearly distinguishable from this case where the Appellants' claim is based
       on the use of their names and likenesses, which are not copyrightable").

21

22    [23]Defendants assert that the *Laws* court questioned *Toney's* reasoning. (Defs.' Reply at 23
       n. 28.) The court disagrees. The *Laws* court simply found that *Toney* – which involved

23    commercial exploitation of a copyrighted photograph rather than commercial exploitation of a
       copyrighted sound recording – was inapposite in resolving the preemption issue before it.

24

25    [24]One other court that has considered precisely this issue is in accord. *See Bonner v. Fuji

26    Photo Film*, No. C 06-4274 CRB, 2006 WL 3327894, *2 (N.D. Cal. Nov. 13, 2006) (stating,
       in a case that involved the alleged misappropriation of plaintiff's photograph for use on the
       packaging of disposable cameras, that "[d]efendant's effort to force this case under the umbrella

27    of *Laws* is utterly unpersuasive. . . . The Court concludes that this case is squarely controlled by

28    the surfers' case and not the singer's").

                                                    12

1  **C.    Whether Plaintiffs Have Demonstrated That They Own Marilyn Monroe's**

2  **Posthumous Right of Publicity**

3      In their motion for summary judgment, defendants argue that plaintiffs cannot show they

4  have standing to assert claims based on Marilyn Monroe's right of publicity.[25] They contend that,

5  even if a posthumous right of publicity in Marilyn Monroe's name, likeness and persona exists,

6  plaintiffs cannot establish that they are the owners of that right.[26]

7  _____

8      [25]Defs.' Mem. at 32-34.

9      [26]Defendants argue that, as a mere licensee of Marilyn Monroe's purported right of
10  publicity, CMG lacks "the requisite ownership interest" to "sue on violations of rights [it] merely
    represent[s] on behalf of [its] principals." (*Id.* at 33.) This argument lacks merit.  Under the
11  licensing agreement between Marilyn Monroe LLC ("MMLLC") and CMG, CMG was appointed
    the "sole and exclusive licensing agent world-wide" for "merchandising and advertising" Marilyn
12  Monroe's right of publicity.  (See Pls.' Facts, AMF ¶¶ 18; Defs.' Reply Facts, AMF ¶¶ 18.)
13  To the extent, therefore, that MMLLC owns and is capable of licensing Marilyn Monroe's right
    of publicity, CMG has standing to sue for violation of that right.  See *MJ & Partners Restaurant*
14  *Ltd. Partnership v. Zadikoff*, 10 F.Supp.2d 922, 930 (N.D. Ill. 1998) (noting that the "weight of
15  authority" favors the view that "a[n] [exclusive] licensee of a celebrity's name may state a cause
    of action for misappropriation of the right to publicity"); *Bi-Rite Enterprises, Inc. v. Button*
16  *Master*, 555 F.Supp. 1188, 1199-1200 (S.D.N.Y. 1983) ("Plaintiff Bi-Rite, as the exclusive
17  licensee of various rock groups, may also assert this [right of publicity] claim.  Unlike privacy
    rights, which protect personality and feelings and are therefore not assignable, the right of
18  publicity gives rise to a 'proprietary' interest in the commercial value of one's persona which is
    assignable and may be freely licensed.  This proprietary interest is much like a copyright; it
19  embodies a bundle of exclusive marketing rights which its holder may transfer in its entirety by
20  an assignment or in part by exclusive licenses.  Holders of exclusive licenses gain standing to
    protect their interests against all who would encroach on the exclusive rights embodied in the
21  licenses" (citations omitted)), opinion supplemented on other grounds, 578 F.Supp. 59 (S.D.N.Y.
22  1983); see also 2 J. Thomas McCarthy, THE RIGHTS OF PUBLICITY AND PRIVACY § 10:53 (2d ed.
    2005) ("A licensee of exclusive rights of publicity has standing to sue for infringements which
23  impinge upon its area of exclusive rights as defined in the license").
        The authorities cited by defendants for the proposition that CMG lacks standing to sue (see
24  Defs.' Reply at 18 n. 22) are inapposite.  See *Exhibitors' Serv., Inc., v. Am. Multi-Cinema, Inc.*,
25  788 F.2d 574, 578-79 (9th Cir. 1986) (holding, on the specific facts of the case, that a motion
    picture licensing agent was not a "proper party" to assert an antitrust claim against motion picture
26  exhibitors because its injury "was not of the type the antitrust laws were intended to forestall"
    (internal quotation marks omitted)); *Pickett v. IBP, Inc.*, 197 F.R.D. 510, 516 (M.D. Ala. 2000)
27  (holding that "feedlot" owners lacked standing to "bring suit to recover for the injuries suffered
28  by the owners of cattle which they fed and marketed").

13

1     Plaintiffs counter:

2     "It is undisputed that in her last will and testament Marilyn Monroe devised 75%

3     of the 'rest, residue and remainder of [her] estate, both real and personal, or

4     whatsoever nature and whatsoever situate . . . to which I shall be in any way

5     entitled' to Lee Strasberg, her close friend and acting coach. By definition, this

6     personal property included the right of publicity, and courts have uniformly held

7     that the right of publicity is a property right. When Lee Strasberg died, Ms.

8     Monroe's publicity rights passed by will to his wife, Anna Strasberg. In 2001,

9     Mrs. Strasberg formed MMLLC and transferred, along with the 25% interest

10    holder, all of her rights and interests in the estate of Marilyn Monroe, including,

11    but not limited to, the right of publicity, to MMLLC."[27]

12 Citing these transfers, plaintiffs assert "[t]he chain of title to Marilyn Monroe's Right of Publicity

13 is simple."[28]

14    Defendants argue that title to Marilyn Monroe's right of publicity could not have passed as

15 plaintiffs contend, since "no post mortem [right of publicity] existed in 1962 under either New

16 York[,] . . . California [or Indiana] law and . . . [thus] none could have been transferred by will

17 or through the New York surrogate proceedings."[29] Additionally, they contend that "Ms. Monroe

18 could not transfer what she did not have and [that] her Will plainly transferred only property she

19 was seized in and had possession of at the time of her death."[30]

20       **1.**    **Whether Marilyn Monroe Could Transfer By Will a Statutory Publicity**

21               **Right that Was Not Created Until After Her Death**

22    As a general principle of probate law, "under no circumstances, in the absence of a valid

23

24 ―――――――――――――――

25 [27]Pls.' Opp. at 36.

26 [28]*Id.* at 35.

27 [29]Defs.' Reply at 17.

28 [30]*Id.*

14

1   power, can any amount of testamentary intent produce the effect of subjecting property not owned

2   by a testator at the date of his death to any disposition whatever." *In re Van Winkle's Will*, 86

3   N.Y.S.2d 597, 600 (Sur. Ct. 1949). This rule applies to wills probated in New York, see *id.*; see

4   also N.Y. EST. POWERS & TRUSTS LAW § 3-3.1 (formerly N.Y. DECEDENT EST. LAW § 14),[31] as

5   well as to wills probated in California.[32] See, e.g., *In re Buzza's Estate*, 194 Cal.App.2d 598, 601

---

7       [31]This provision states: "Unless the will provides otherwise, a disposition by the testator

8   of all his property passes all of the property he was entitled to dispose of *at the time of his death.*"

9   N.Y. EST. POWERS & TRUSTS LAW § 3-3.1 (formerly N.Y. DECEDENT EST. LAW § 14) (emphasis
    added). Plaintiffs concede that the phrase "[u]nless the will provides otherwise" was inserted in

10  the statute to alter the common law rule that real property acquired by a testator after the
    execution of her will (but prior to death) did not pass through the will's residuary clause.

11  (Plaintiffs' Supplemental Brief in Support of Plaintiffs' Opposition to Defendants' Motion for

12  Summary Judgment ("Pls.'s Supp. Brief") at 8-9.) They argue, however, that the phrase should
    be interpreted to mean that a testator can pass property she did not own at the time of her death

13  by including appropriate language in her will. (*Id.*)  Under New York law, the phrase "[u]nless

14  the will provides otherwise" makes the statutory provision that a disposition of "all . . . property"
    passes all property owned at the time of death a presumption rather than a mandatory rule. See,

15  e.g., *In re Will of McDonald*, 456 N.Y.S.2d 657, 659 (Sur. Ct. 1982) (stating that, as used in the
    New York probate code, the phrase "unless the will provides otherwise" indicates that the

16  legislature intends to permit testators to opt out of the requirement in question). In the context

17  of § 3-3.1, the provision permits a testator to state in his will that she intends to pass only such
    property as she owns at the time of the will's execution, rather than all property owned at death.

18  It does not permit the testator to pass rights to property that have not yet come into being as of

19  the time of death. As a result, the statute is not inconsistent with the general principle of probate
    (and property) law articulated in *Van Winkle's Will*. This is made clear by the *Van Winkle* court's

20  observation that although no "amount of testamentary intent" can "subject[ ] property not owned
    by a testator at the date of his death to any disposition whatsoever," a testator's "will is operative

21  as to all the property of which the testator died seized or possessed, *provided only that the words

22  of the will are appropriate to the complete disposition of all property belonging to the estate. . . .*"
    *Van Winkle's Will*, 86 N.Y.S.2d at 600 (emphasis added).

23
        [32]As a result, the court is not required to conduct a choice of law analysis in order to
24  determine whether Marilyn Monroe had testamentary power to bequeath a posthumous right of

25  publicity through her will. Typically, such questions are decided by reference to the law of the
    testator's domicile, see, e.g., N.Y. EST. POWERS & TRUSTS LAW § 3-5.1(b)(2) (formerly

26  DECEDENT EST. LAW § 47) ("The intrinsic validity, effect, revocation or alteration of a
    testamentary disposition of personal property, and the manner in which such property devolves

27  when not disposed of by will, are determined by the law of the jurisdiction in which the decedent

28  was domiciled at death"); *In re Moore's Estate*, 190 Cal.App.2d 833, 841-42 (1961) (recognizing

15

051

1  (1961) ("It is settled law that a will is construed as applying to and disposing of the estate in its

2  condition at the time of death.  A testator may dispose only of such property as is subject to his

3  testamentary power, and the testator is presumed to know the law.  In interpreting a will, a court

4  should view the will in a manner which will reveal the intent of the testator as disclosed by the

5  language in the will and, if possible, effectuate that intent.  This does not mean, however, that a

6  testator may validly dispose of non-existent property" (citations omitted)); see also *McKay v.*

7  *Lauriston*, 204 Cal. 557, 569-70 (1928) ("[I]f . . . the wife had no vested interest in the

8  community property [before death], and upon her death her mere expectancy or inchoate interest

9  therein ceased and terminated, after her death there was no property, nor any interest in any

10  property, to which either the husband or any other person could succeed to by descent or

11  succession or by any other means or method").[33]

12  _____

13  that, under California Civil Code § 946, a decedent's personal property should be distributed
   according to the law of his or her domicile).  No party argues that Marilyn Monroe was domiciled
14  in a state other than California or New York at the time of her death.  Since both California and
   New York treat property not owned by a testator at death in the same fashion, the court need not
15  resolve which state's law applies.  As a result, the parties' factual dispute regarding Marilyn
   Monroe's domicile at the time of her death does not preclude the entry of summary judgment on
16  the right of publicity claims.

17

18  [33]As noted, this is a general principle of probate law that is applicable in many, if not all,
   states.  See, e.g., *In re Estate of Braman*, 258 A.2d 492, 494 (Pa. 1969) ("During his lifetime,
19  a person cannot give or dispose of property which he does not own or in which he has no interest;
   no more so can a person make a post-mortem distribution of property which at the time of his
20  death he does not own or in which he has no right, legal or equitable"); *Ware v. Beach*, 322 P.2d
   635, 639 (Okla. 1958) ("[P]roperty descends upon death and vests immediately in the heirs,
21  legatees and devisees, subject only to control of the county court for purposes of administration.
   Since one has a vested right in property to which he succeeds . . . under the will of a decedent
22  immediately upon the death of the decedent, it follows that an estate must be distributed among
   heirs and distributees according to the law as it exists at the time of death of the decedent"
23  (citations omitted)); *Conlee v. Conlee*, 269 N.W. 259, 263 (Iowa 1936) ("No matter what the
24  provisions of the will are when probated, it confers no rights in property not owned by the testator
   at the time of her death, and in no event could it be made to avoid contractual obligations assumed
25  during her life," quoting *Steward v. Todd*, 173 N.W. 619, 624 (Iowa 1919)); 80 AM.JUR.2D
26  WILLS § 1168 ("A person cannot make a postmortem distribution of property which he or she did
   not own, at the time of his or her death, or in which such a person had [no] legal or equitable
27
28  right.  Thus, property acquired by a testator's estate after his or her death may not pass under the

16

1     It is undisputed that none of New York,[34] California,[35] or Indiana[36] recognized a

2

3
_____

4   residuary clause of the will"); 96 C.J.S. WILLS § 1088 (same).

5     [34]Neither New York statutory nor common law recognizes a descendable, posthumous right
6   of publicity.  See, e.g., *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585-86 (2d Cir. 1990)
    (observing that, under New York law, the right of publicity is exclusively statutory, is personal
7   to the individual, and is extinguished upon his death (citing, *inter alia*, *Smith v. Long Island
    Jewish-Hillside Medical Center*, 499 N.Y.S.2d 167, 168 (App. Div. 1986), and *Stephano v. News
8   Group Pubs.*, 474 N.E.2d 580, 584 (N.Y. 1984)); see also 4B William R. Golden & Kathryn E.
9   Diaz, N.Y. PRACTICE: COMMERCIAL LITIGATION IN NEW YORK STATE COURTS, § 83:7 (2d ed.
    West 2006) ("[T]he New York Legislature has routinely voted down bills over the years that
10  would have expanded the right of privacy to reach non-commercial usages or provide a
    post-mortem right of publicity").
11

12    [35]California created a descendable, posthumous right of publicity in 1984, with the passage
    of its post-mortem right of publicity statute.  See CAL. CIVIL CODE § 3344.1 (formerly CAL.
13  CIVIL CODE § 990).  Before passage of this act, California recognized a common law right of
    publicity, but that right expired on an individual's death.  See *Guglielmi v. Spelling-Goldberg
14  Productions*, 25 Cal.3d 860, 861 (1979) ("In *Lugosi v. Universal Pictures*, [25 Cal.3d 813
15  (1979)], we hold that the right of publicity protects against the unauthorized use of one's name,
    likeness or personality, but that the right is not descendible and expires upon the death of the
16  person so protected"); *Gionfriddo v. Major League Baseball*, 94 Cal.App.4th 400, 408-09 (2001)
17  ("In California the right of publicity is both a common law right and a statutory right. . . . [In
    *Lugosi*], the Supreme Court held that, because the common law right of publicity derived from
18  the right of privacy, it did not survive the death of the person whose identity was exploited and
19  was not descendible to heirs or assignees.  In 1984, the Legislature enacted a second statutory
    right of publicity that was 'freely transferable' to the assignees or passed to the heirs of deceased
20  persons" (citations omitted)).  Any ambiguity in the *Lugosi* court's holding that the common law
    right of publicity expired at death (see Pls.' Supp. Brief at 15) was dispelled by *Comedy III
21  Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal.4th 387, 391 (2001).  There, the California
22  Supreme Court clearly stated that in its earlier decision in *Lugosi*, it had "held . . . that the
    [common law right of publicity] cause of action did not survive the death of the person whose
23  identity was exploited and was not descendible to his or her heirs or assignees."  *Id.*; see also
24  *Gionfriddo*, 94 Cal.App.4th at 408-09.  The court is bound by these decisions, and may not credit
    contrary suggestions by circuit courts.  See, e.g., *Mullaney v. Wilbur*, 421 U.S. 684, 691 & n.
25  11 (1975) ("[S]tate courts are the ultimate expositors of state law, and [federal] courts are bound
    by their constructions except in extreme circumstances not present here," e.g., where the state
26  court decision violates federal law or is an "obvious subterfuge to evade consideration of a federal
    issue" (citations omitted)); *Meusy v. Montgomery Ward Life Ins. Co.*, 943 F.2d 1097, 1099 (9th
27  Cir. 1991) ("We are bound to follow the decisions of a state's highest court in interpreting that
28  state's law").

17

1   descendable, posthumous right of publicity in 1962 when Marilyn Monroe died. As a result, under

2   either New York or California law, Marilyn Monroe could not have passed such a right through

3   the residual clause of her will.[37] This is true regardless of her domicile at the time of death and

4   despite any rights thereafter conferred on personalities such as Monroe by either the California or

5   Indiana legislature.[38]

6        In supplemental briefing submitted following issuance of a tentative ruling on defendants'

7   motion for summary judgment,[39] plaintiffs contend that the posthumous rights of publicity

8   conferred by the California and Indiana legislatures in 1984 and 1994 respectively should not be

9

---

10     [36]Indiana created a descendable, posthumous right of publicity in 1994, with the passage

11  of the Indiana Right of Publicity Act. See IND. CODE § 32-36-1-1 to -20 (formerly IND. CODE

12  § 32-13-1-1 to -20); *Phillips v. Scalf*, 778 N.E.2d 480, 483 (Ind. App. 2002) (emphasizing that the state's Right of Publicity Act "*creates* a 'property right' in a personality's right of publicity"

13  (emphasis added)). Before that time, Indiana common law protected the right of publicity through a personal tort action for invasion of privacy. See *Continental Optic Co. v. Reed*, 86 N.E.2d 306,

14  309 (Ind. App. 1949); see also *Time Inc. v. Sand Creek Partners, Inc.*, 825 F.Supp. 210, 212 (S.D. Ind. 1993) (applying Indiana law). As a personal right, this common law right of publicity

15  was inalienable; under the Indiana survivorship statute, moreover, a cause of action for invasion

16  of privacy does not survive an individual's death. See IND. CODE § 34-9-3-1.

17     [37]In addition, New York law deems certain property interests too speculative to be

18  bequeathed by will, e.g., an individual's "distributive share" in another's estate. See *In re Penrose's Estate*, 299 N.Y.S. 844, 846-48 (Sur. Ct. 1937). Rather than passing through an

19  individual's will, such interests – if and when they come into existence – are distributed by the laws of intestacy. See *id.* at 847-48 (holding that a testator could not bequeath by will his possible

20  interest in the estate of his sister, and that the property had to be distributed according to the laws of intestacy). California appears to treat such interests similarly. See CAL. PROBATE CODE

21  § 21109-21110 (formerly CAL. PROBATE CODE § 92) (abrogating the common law rule that

22  bequests to predeceased devisees lapse, and providing that such bequests, if left to a testator's "kindred," pass to the predeceased devisee's "lineal issue," *but do not pass through the*

23  *predeceased devisee's will*).

24     [38]This is not to say that the California or Indiana legislature could not vest a posthumous

25  right of publicity *directly* in the residuary beneficiaries of a predeceased personality's estate, or in the successors-in-interest of those residuary beneficiaries. Neither legislature, however, has

26  seen fit to do so. See *infra* Part II.C.2.

27     [39]The court's tentative order was issued to the parties at the oral hearing on defendants'

28  motion for summary judgment on December 11, 2006.

· 18

1   considered mere "expectancies" that Marilyn Monroe could not transfer through her will. Rather,

2   they assert, they should be considered property rights that were in existence at the time of Marilyn

3   Monroe's death and that were, "at worst," simply "remote" or "unknown" to her at that time.[40]

4   "The term expectancy describes the interest of a person who merely foresees that he might receive

5   a future beneficence, such as the interest of an heir apparent, or a beneficiary designated by a

6   living insured who has a right to change the beneficiary. . . . [T]he defining characteristic of an

7   expectancy is that its holder has no enforceable right to his beneficence." *In re Marriage of*

8   *Spengler*, 5 Cal.App.4th 288, 298 (1992) (quoting *In re Marriage of Brown*, 15 Cal.3d 838,

9   844-45 (1976)) (citations omitted, alterations original); *see also Hebron v. Hebron*, 456 N.Y.S.2d

10  957, 961 (Sup. Ct. 1982) ("The term expectancy describes the interest of a person who merely

11  foresees that he might receive a future beneficence, such as the interest of an heir apparent.  The

12  holder of such expectancy has no enforceable right to his beneficence").  Here, it is clear that at

13  the time of her death, Marilyn Monroe had no right to "enforce" rights of publicity that were

14  statutorily conferred on "personalities" more than 20 years (in California) and 30 years (in Indiana)

15  after her death.[41]  As a result, the court cannot accept plaintiffs' suggestion that the California and

16  Indiana statutory rights of publicity were extant but inchoate in 1962.[42]

17          Alternatively, plaintiffs assert that, even if California's and Indiana's statutory rights of

---

19  [40]See Pls.' Supp. Brief at 7 ("[T]he *Braman* court, quoting the Restatement of Property,

20  defined an expectancy as 'the chance of obtaining property by inheritance or by will from a person
    now living.  Such chances are not in themselves rights in property.'  By definition, Ms. Monroe's

21  interest in her right of publicity as of 1962 was not an 'expectancy.'  Instead, Ms. Monroe's right

22  of publicity is at worst a remote and unknown property right, which the *Braman* court
    acknowledges may be devised through a residuary clause," quoting *Braman*, 258 A.2d at 493-94).

23

24  [41]Indeed, there is no evidence in the record that Marilyn Monroe *foresaw* the possibility
    that either California or Indiana would bestow a "future beneficence" in the form of the statutory

25  right of publicity upon "personalities."

26  [42]Cf. *Blank v. Kirwan*, 39 Cal.3d 311, 330 (1985) (holding that an individual had no

27  pecuniary interest protected by the tort of intentional interference with prospective economic
    advantage in an expectation that a municipality would grant him a particular license, given the

28  broad discretion vested in the board to grant or deny license applications).

19

1   publicity were not extant at the time of Marilyn Monroe's death, they could, once created, have

2   vested in Monroe's estate, which remained open until July 19, 2001, and thus could been

3   distributed under the terms of her will.[43] This argument too is unavailing. Under New York law,

4   "[t]he estate of a decedent is an entity which comprises all property in the broad sense of the word

5   which a decedent has at death as well as any property transferred before death which for one

6   reason or another can or should be recovered or brought into the estate for testamentary or intestate

7   administration by the fiduciary." *In re Basile's Will*, 313 N.Y.S.2d 513, 516 (Sur. Ct. 1970); see

8   also N.Y. EST. POWERS & TRUSTS LAW § 1-2.6 & practice commentary (1998) (defining an estate

9   for purposes of probate as "the aggregate of property which a person owns"). The definition of

10  "estate" under California law is similar. See *In re Glassford's Estate*, 114 Cal.App.2d 181, 189

11  (1952) ("The word 'estate,' when used in probate proceedings and statutes, is a comprehensive

12  term and is ordinarily applied to describe in a most general fashion the property comprising the

13  assets of a deceased").

14      As a result, an "estate" does not itself "own" any property; rather, it collects the property

15  a decedent owned at her death and distributes that property to her designated devisees. The

16  ──────────────────────

17      [43]Pls.' Supp. Brief at 15. Plaintiffs intimate, but do not explicitly argue, that the New
    York Surrogate Court's order distributing Marilyn Monroe's "Intellectual Property Rights," i.e.,

18  her "participation rights in motion pictures and royalties from the licensing of the [d]ecedent's
    name, likeness and signature," to plaintiff MMLLC is conclusive. (See *id.* at 14.) To the extent

19  plaintiffs advance this argument, the court disagrees. "[A] state-court judgment commands the
    same res judicata effects in federal court that it would have in the court that entered it." 18B

20  Charles Allen Wright, Arthur R. Miller, & Edward H. Cooper, FEDERAL PRACTICE AND
    PROCEDURE: JURISDICTION 2D § 4469, at 70 (2002); see also, e.g., *In re Bybee*, 945 F.2d 309,

21  316 (9th Cir. 1991) (same). Under New York law, a final decree upon judicial settlement of an

22  executor's account is not binding on non-parties to the probate proceeding. See, e.g., *In re Roe's
    Will*, 24 N.E.2d 322, 324 (N.Y. 1939) (holding that a party who neither received notice of nor

23  attended the final accounting and who was not a party to proceedings for the probate of the

24  decedent's will was not precluded from challenging the surrogate court's disposition of a testator's
    property on the ground that the residuary clause of his will was legally ineffective to pass certain

25  property rights). Because defendants were not parties to the New York proceeding that probated

26  Marilyn Monroe's will (see Supplemental Declaration of Anna Strasberg in Support of Plaintiffs'
    Supplemental Brief in Support of Plaintiffs' Opposition to Defendants' Motion for Summary

27  Judgment, Exhibit D at 3-4), they are not precluded from arguing that the residual clause of

28  Marilyn Monroe's will was ineffective to devise posthumous statutory rights of publicity.

20

1  devisees, as noted, formally take title to the property at the moment of death.  This principle is

2  clearly established under both New York[44] and California[45] law.  As a result, the California and

3  Indiana legislatures could not have vested property directly in Marilyn Monroe's estate in 1984 and

---

[44]See, e.g., *In re Williams' Estate*, 295 N.Y.S. 56, 58 (Sur. Ct. 1937) ("'Law like nature abhors a vacuum.  For this reason it is the prevalent conception that the rights of those succeeding to property upon a death attach immediately, with no intervening hiatus of ownership. . . . The effects of the Statutes of Wills and of Descent are in substance the same.  Instead of taking to itself the property of the deceased, the sovereign directs its distribution among persons ascertainable in accordance with its laws.  These persons are, by these laws, vested with the ownership of the property from the moment of the death,'" quoting *Matter of Killough's Estate*, 265 N.Y.S. 301, 317 (Sur. Ct. 1933) (citations omitted)), aff'd, 4 N.Y.S.2d 467 (App. Div. 1938); *Matter of Hilliard's Estate*, 299 N.Y.S. 788, 806 (Sur. Ct. 1937) ("It is the theory of the law that all valuable property must belong to some one and that devolution of the assets of a decedent to those entitled thereto takes place immediately on death without any intervening hiatus of ownership even though the ascertainment of the identity of such owner may at times be fraught with difficulty or even be presently impossible of absolute determination"), aff'd, 5 N.Y.S.2d 92 (App. Div. 1938); 38 N.Y. JURISPRUDENCE 2D: DECEDENTS' ESTATES § 53 (West 2007) ("Upon the death of a person his or her property vests, eo instanti, in his or her heirs or distributees, as the same may be defined by the then existing law.  One has a vested right in property to which he or she succeeds under the law of descent and distribution immediately on the death of the ancestor" (footnotes omitted)).

[45]See, e.g., CAL. PROBATE CODE § 7000 ("Subject to [administration], title to a decedent's property passes *on the decedent's death* to the person to whom it is devised in the decedent's last will or, in the absence of such a devise, to the decedent's heirs as prescribed in the laws governing intestate succession" (emphasis added)); *U.S. Fidelity & Guaranty Co. v. Mathews*, 207 Cal. 556, 559 (1929) ("It is well-settled law that the title of a decedent in and to the properties of his estate vests immediately upon his death in his heirs subject only to payment of the debts of the decedent, the funeral expenses, the family allowance and the expenses of administration"); *Murphy v. Crouse*, 135 Cal. 14, 17 (1901) ("The respondent contends that title to personal property, wherever situated, is in the domiciliary executor, and that he has the absolute right to dispose of the same.  This is the common-law doctrine, in pursuance of which it has been said that title to personalty derived from the executor is good the world over.  The rule never prevailed in this state.  Here both real and personal property descend directly to the heir or to the beneficiary named in the will, with a qualified right in the personal representative, who holds it, for the purposes of administration, more like a receiver than like a common-law executor.  The title is not in him, nor has he the power of disposal, save by order of the court").

21

1994, just as they could not have vested property in Marilyn Monroe herself.[46] This is true despite

the fact that her estate remained open from 1962 to 2001, nearly forty years after her death.[47]

        Plaintiffs' supplemental brief cites no controlling[48] authority to the contrary. Plaintiffs rely,

---

[46]Plaintiffs do not appear to argue that the California and Indiana legislatures could have vested property rights directly in Marilyn Monroe following her death, as it is a general principle of property law that "a dead man or woman may not take property." *In re Matthew's Estate*, 176 Cal. 576, 580 (1917); see also *State v. Hammons*, 126 S.W. 422, 424 (Mo. 1910) ("The accused is therefore alleged to be the property of one not in life. This cannot be, for the dead cannot own property. Death strips us of all rights and title to property and casts them on the living, who alone can own property,'" quoting *Pleasant v. State*, 17 Ala. 190 (1850)); *Mohlke v. People ex rel. Moore*, 17 Ill. App. 595, 1905 WL 1678, *2 (Ill. App. 1905) ("The statute refers to the property concerning which the proceeding is instituted as 'belonging to any deceased person.' That language taken literally does not state the legislative intent; a dead man can own no property; there is no property 'belonging to any deceased person.' Some words must be supplied. If the words 'at his death' are added, the phrase then reads 'belonging to any deceased person at his death,' and is intelligible. . ."); *Espalla v. Gottschalk*, 10 So. 755, 757 (Ala. 1892) ("It is necessarily true that death puts an end to all property ownership which had been in the decedent. A dead man cannot own property. It does not, however, abrogate the title. That continues, and passes at once to those on whom the law devolves it. It cannot be in abeyance").

[47]Plaintiffs' alternate argument that Marilyn Monroe's posthumous right of publicity vested in her estate is inconsistent with the policy rationale they advance for finding that the right passed by will. (See, e.g., Pls.' Supp. Brief at 19 ("Given the large number of celebrities who died prior to 1985, it is likely that the rightful ownership in many instances would be in question or altogether terminated. For example, Albert Einstein's statutory right of publicity is registered with the California Secretary of State to the Hebrew University in Jerusalem ('Hebrew University'), a university co-founded by Einstein, who died in 1955 but is still one of the highest earning deceased personalities. Under the holding of the Tentative Order, the Hebrew University would be divested of Albert Einstein's very valuable right of publicity, contrary to his testamentary intent, because the Hebrew University is not one of the specified familial heirs under the statute" (citations to record omitted)).) If testamentary intent overrides all other principles of property and probate law, as plaintiffs suggest, that intent might well be thwarted by a finding that a statutory right of publicity can pass through the will of a "personality" who died before enactment of the statute creating the right if, but only if, the personality's estate remained open at the time the statute took effect.

[48]The court acknowledges that the revised Uniform Probate Code supports plaintiffs' argument that "[a] will may provide for the passage of all property the testator owns at death and all property acquired by the estate after the testator's death." UNIFORM PROBATE CODE § 2-602 (rev. ed. 1990); accord RESTATEMENT (THIRD) OF PROPERTY: WILLS & OTHER DONATIVE TRANSFERS § 1.1 & cmt. c (1999). The revised model probate code provision was expressly

22

1  for example, on *In re Brunet's Estate*, 34 Cal.2d 105 (1949), as support for the proposition that

2  California's and Indiana's statutory rights of publicity passed through Marilyn Monroe's will to

3  the beneficiaries of her residual estate.[49]  *Brunet's Estate*, however, held only that, as used in a

4  layperson's will, the term "estate" did not have to be given its technical legal meaning, and could

5  be interpreted to effectuate the testator's intent. *Id.* at 107-08 (concluding that a bequest to an

6  individual "or his Estate" was intended to bequeath property to the named devisee or to his legal

7  heirs, devisees, or legatees in the event he predeceased the testator).  A similar conclusion was

8  reached in another case cited by plaintiffs, *In re Albert*, 445 N.Y.S.2d 355 (Sup. Ct. 1981),[50]

9  where the New York court was required to interpret the term "estate" as used in a trust document

10  drafted by a layperson who died prior to the litigation.  *Id.* at 359-60 (concluding that it was

11  appropriate to interpret a trust provision that the remaining trust principal and interest be

12  distributed to the beneficiary's estate if he predeceased the trustor in light of the trustor's direction

13  that principal and interest be distributed to the beneficiary's surviving spouse and issue in the

14  shares appointed in his will, and limiting the individuals to whom the trust property could be

15  distributed through the estate to the beneficiary's spouse and issue).  Neither case stands for the

16  proposition that an estate may "own" property.  Each concerns how courts interpret the term

17

18

_____

19  intended to supersede the rule articulated in *Braman*, and allow "items such as bonuses awarded
20  to an employee after his or her death [to] pass under his or her will."  UNIFORM PROBATE CODE
    § 2-602 cmt.  The Uniform Probate Code, however, does not save plaintiffs' right of publicity
21  claim, because neither New York or California has adopted the provision.  Indeed, even had New
22  York or California adopted the provision following its promulgation in 1990, it is clear that it
    would not control the passing of property under Marilyn Monroe's will.  This is because the
23  construction or operation of a will is controlled by the law in force at the time of the testator's
24  death.  See, e.g., *In re Gaffken's Will*, 188 N.Y.S. 852, 854 (App. Div. 1921) ("[F]or the
    meaning and effect of the will we are to look to the law at time of the testator's death"), aff'd,
25  135 N.E. 971 (N.Y. 1922); see also CAL. PROBATE CODE § 6103 (providing that specified code
    provisions governing wills do not apply where the testator died before January 1, 1985, but that
26  instead the law applicable prior to that date continues to apply).

27       [49]Pls.' Supp. Brief at 8.

28       [50]*Id.*

23

1    "estate" when used in documents drafted by lay people. As a result, the cases are inapposite.[51]

2        Equally inapposite is *In re Schunk*, 8 Misc.3d 1010(A), 2005 WL 1552844 (N.Y. Sur. Ct.

3    June 29, 2005) (Unpub. Disp.),[52] which involved a dispute between the wife and the mother of a

4    decedent over the proper division of compensation recovered from the September 11th Victim

5    Compensation Fund.[53] The *Schunk* court merely concluded that the "the rules and regulations of

6    the Fund"[54] mandated that the "presumed non-economic loss for a decedent" of $250,000 be

7    distributed according to the terms of the decedent's will. *Id.* at *4.[55] As a result, *Schunk* does not

8    _____

9    [51]Notably, Marilyn Monroe did not designate Lee Strasberg "or his estate" as the residual
10   beneficiary in her will. Even had she done so, however, this would not alter the court's
     conclusion that she could not devise a property right in 1962 that the California and Indiana
11   legislatures did not bestow on celebrities until decades after her death. To the extent plaintiffs
     argue that *Brunet* and *Albert* – which involve the interpretation of wills and trusts – shed light on
12   proper interpretation of the California and Indiana *statutes* creating posthumous rights of
13   publicity, the court cannot agree. The cases are particularly inapposite for this purpose, in fact,
     since neither statute purports to bestow property rights on deceased personalities' "estates."
14
15   [52]Pls.' Supp. Brief at 12-13.

16   [53]In order to provide compensation to the victims of the September 11, 2001 terrorist
     attacks, Congress created the September 11th Victim Compensation Fund as part of the Air
17   Transportation Safety and System Stabilization Act of 2001, Pub. L. No 107-42, §§ 401-409, 115
     Stat. 230, 237-41 (codified as amended at 49 U.S.C. § 40101 note). The Department of Justice
18   subsequently adopted implementing regulations, which are codified at 28 C.F.R. §§ 104.1-.71.

19
20   [54]*Id.* § 104.44.

21   [55]The court made no determination regarding distribution of the economic losses awarded
     by the Fund, because the wife had withdrawn her consent to the distribution plan she and the
22   mother initially submitted to the Special Master. That plan contemplated that the economic loss
23   portion of the award would be distributed in accordance with the testamentary instructions in the
     decedent's will. *Schunk*, 2005 WL 1552844 at *2, 4. The court stated that it required additional
24   information to determine whether the Special Master calculated the award with reference to the
     mother as well as the wife, and whether there might be an equitable basis for the mother to claim
25   a particular percentage of the award. *Id.* at *4. The alternative distribution arrangement sought
     by the wife, moreover, did not rely on the terms of the decedent's will, but on the "*Kaiser* rule"
26   used by New York courts to allocate wrongful death awards. The *Kaiser* rule provides that
27   distributees of the proceeds of a wrongful death action will receive a percentage of the award that
     is in arithmetic proportion to the number of years they would have looked to the deceased for
28   support. See *Matter of Kaiser*, 100 N.Y.S.2d 218, 220 (Sur. Ct. 1950).

24

1   stand for the proposition that "New York . . . law expresses a willingness to allow property

2   acquired after death . . . . to pass through a decedent's will,"[56] as the case involved the

3   interpretation of *federal* laws and regulations governing the compensation fund. Moreover, it

4   appears that the Surrogate Court's interpretation of "the rules and regulations of the Fund" may

5   have been incorrect. Rather than specifying that Fund awards should be distributed according to

6   the terms of deceased victims' wills, the regulations state that the decedent's "personal

7   representative"[57] should "distribute the [Fund] award [to the decedent's beneficiaries] in a manner

8   consistent with the law of the decedent's domicile or any applicable rulings made by a court of

9   competent jurisdiction."    See 28 C.F.R. § 104.52.    They suggest, moreover, that the

10  "beneficiaries" can include "the immediate family [members] of the decedent (including, but not

11  limited to, the decedent's spouse, former spouses, children, other dependents, and parents)" as

12  well as the "beneficiaries of the decedent's will."    *Id.*, § 104.4; see also *id.*, § 104.52

13  ("Notwithstanding any other provision of these regulations or any other provision of state law, in

14  the event that the Special Master concludes that the Personal Representative's plan for distribution

15  does not appropriately compensate the victim's spouse, children, or other relatives, the Special

16  Master may direct the Personal Representative to distribute all or part of the award to such spouse,

17  children, or other relatives").    Hence, the regulations do not require that Fund awards pass

18  according to the terms of the victims' wills; rather, they require that Fund awards be equitably

19  distributed among all of a decedent's "beneficiaries," not just a testate victim's residuary legatees.

20        Plaintiffs' reliance on *Miller v. Glenn Miller Productions*, 318 F.Supp.2d 923 (C.D. Cal.

21  2004), aff'd, 454 F.3d 975 (9th Cir. 2006), is also misplaced.    Plaintiff cite *Miller* for the

22  proposition that California law has "expresse[d] a willingness" to allow property acquired after

23  death to pass through a decedent's will.[58]    *Miller* involved competing claims to Glenn Miller's

24  statutory right of publicity, and was decided by Judge Howard Matz of this district. Like Marilyn

---

26  [56]Pls.' Supp. Brief at 12.

27  [57]See 28 C.F.R. § 104.4 (defining "personal representative").

28  [58]Pls.' Supp. Brief at 12.

25