1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

11 | THE MILTON H. GREENE ARCHIVES,  )   CASE NO. CV 05-02200 MMM (MCx)
   | INC.,                          )
12 |                                )
   |          Plaintiff,            )
13 |                                )
   |     v.                         )   ORDER GRANTING PLAINTIFF'S
14 |                                )   MOTION FOR RECONSIDERATION
   |                                )
15 | CMG WORLDWIDE, INC., an Indiana )
   | Corporation, and MARILYN MONROE,)
16 | LLC, a Delaware Limited Liability)
   | Company, ANNA STRASBERG, an     )
17 | individual,                     )
   |                                 )
18 |          Defendants.            )
   |                                 )
19 |                                 )
   | AND CONSOLIDATED ACTIONS        )
20 |                                 )
   |                                 )
21

22     Plaintiff Marilyn Monroe, LLC ("MMLLC") has moved under Local Rule 7-18 for

23 reconsideration of the court's May 14, 2007 order holding that it has no standing to enforce Marilyn

24 Monroe's posthumous right of publicity.

25

26                    **I. FACTUAL AND PROCEDURAL BACKGROUND**

27     On March 25, 2005, The Milton H. Greene Archives, Inc. filed this action against CMG

28 Worldwide Inc., Marilyn Monroe LLC, and Anna Strasberg.  On May 3, 2005, the court

1   consolidated the case with two other actions filed in this district – *Shirley De Dienes et al. v. CMG*

2   *Worldwide, Inc. et al.* (CV 05-2516)[1] and *Tom Kelley Studio, Inc. v. CMG Worldwide, Inc. et al.*

3   (CV 05-2568).[2] On December 14, 2005, the court consolidated two additional actions with the

4   pending case – *CMG Worldwide, Inc., et al. v. Tom Kelley Studios* (CV 05-5973) and *CMG*

5   *Worldwide, Inc., et al. v. The Milton H. Green Archives, Inc.* (CV 05-7627).[3] These actions were

6   originally filed by CMG Worldwide, Inc. and Marilyn Monroe, LLC (the "CMG Parties" or

7   "plaintiffs") in the United States District Court for the Southern District of Indiana, and were

8   transferred to this district pursuant to 28 U.S.C. § 1404(a) on August 9, 2005.[4] All of the actions

9   seek to have the court resolve competing claims to ownership of the legal right to use, license, and

10  distribute certain photographs of Marilyn Monroe.

11          In their complaints against the Milton H. Green Archives, Inc. and Tom Kelley Studios, Inc.

12  (the "MHG Parties" or "defendants"), the CMG Parties assert that they own the "Right of Publicity

13  and Privacy in and to the Marilyn Monroe name, image, and persona" that was created by "the

14  Indiana Right of Publicity Act, I.C. § 32-36-1-1 et seq., and other applicable right of publicity laws."

15  The CMG Parties contend that defendants have infringed this right by using Marilyn Monroe's

16  name, image and likeness "in connection with the sale, solicitation, promotion, and advertising of

17  products, merchandise, goods and services" without their consent or authorization.[5]

18          On October 6, 2006, the MHG Parties filed a motion for summary judgment. They argued,

19  *inter alia*, that plaintiffs' right of publicity claims were preempted by the Copyright Act, 28 U.S.C.

20

21  [1]The *De Dienes* action was dismissed without prejudice on February 2, 2006, pursuant to the
    parties' stipulation.

22

23  [2]Tom Kelley Studio, Inc. sued the same defendants as did The Milton H. Greene Archive, Inc.
    – CMG Worldwide Inc., Marilyn Monroe LLC, and Anna Strasberg.

24

25  [3]Anna Strasberg was not a party to the Indiana actions.

26  [4]On February 6, 2006, the court issued a scheduling order, which denominated the CMG
    Parties plaintiffs and the MHG Parties defendants for purposes of the consolidated actions. The
    court based this order on the fact that the CMG Parties' Indiana action was the first filed action.

27

28  [5]Plaintiffs' First Amended Complaint against Milton H. Greene Archives, Inc., ¶¶ 7, 24-26;
    Plaintiffs' First Amended Complaint against Tom Kelley Studios, Inc., ¶¶ 7, 28-30.

1   §§ 101-1332, and that, even if they were not preempted, plaintiffs had failed to adduce any evidence

2   that they had standing to assert claims based on Marilyn Monroe's right of publicity.[6]  In essence,

3   defendants argued that, even if a posthumous right of publicity in Monroe's name, image and

4   likeness exists, plaintiffs could not show that they were presently in possession of that right.[7]

5          On May 14, 2007, the court granted defendants' motion for summary judgment, concluding

6   that plaintiffs lacked standing to assert Marilyn Monroe's right of publicity.[8]  The court found that

7   Marilyn Monroe could not have devised a non-statutory right of publicity through her will, and also

8   could not have devised subsequently created statutory rights that did not come into existence until

9   decades after her death.  This conclusion was supported, in part, by the court's interpretation of the

10  California right of publicity statute.[9]  The court determined that under the statute, a deceased personality

11  _____

12       [6]Defendants' Memorandum of Points and Authorities in Support of Their Motion for Summary
    Judgment ("Defs.' Mem.") at 32-34.
13

14       [7]Defendants also argue that (1) Marilyn Monroe was domiciled in New York at the time of her
    death, such that no right of publicity could survive her passing; (2) even if Marilyn Monroe was not a
15  New York domiciliary at the time of her death, plaintiffs are collaterally and judicially estopped from
    asserting otherwise; (3) Indiana's right of publicity statute does not apply to Marilyn Monroe; and (4)
16  plaintiffs' claims are barred by laches.  Defendants' motion also challenged plaintiffs' copyright
    infringement claims (see id. at 43-47); those claims have since been dismissed without prejudice
17  pursuant to the parties' stipulation.

18       [8]California created a descendible, posthumous right of publicity in 1984, with the passage of its
19  post-mortem right of publicity statute.  See CAL. CIVIL CODE § 3344.1 (formerly CAL. CIVIL CODE §
    990).  Before passage of this act, California recognized a common law right of publicity, but that right
20  expired on an individual's death.  See Guglielmi v. Spelling-Goldberg Productions, 25 Cal.3d 860, 861
    (1979).
21

22       [9]The California statute provides, in pertinent part:
    (a)(1) Any person who uses a deceased personality's name, voice, signature, photograph,
23  or likeness, in any manner, on or in products, merchandise, or goods, or for purposes of
    advertising or selling, or soliciting purchases of, products, merchandise, goods, or
24  services, without prior consent from the person or persons specified in subdivision (c),
    shall be liable for any damages sustained by the person or persons injured as a result
25  thereof. . . .
    (b) The rights recognized under this section are property rights, freely transferable, in
26  whole or in part, by contract or by means of trust or testamentary documents, whether
    the transfer occurs before the death of the deceased personality, by the deceased
27  personality or his or her transferees, or, after the death of the deceased personality, by
    the person or persons in whom the rights vest under this section or the transferees of that
28

3

1    who had died *before* the measure was enacted was deemed not to have had the capacity to transfer the

2    subsequently created right of publicity, which was denominated a "property right[ ]" prior to death.  See

3    CAL. CIVIL CODE § 3344.1(b) (providing that a "deceased personality" may, "*before [his or her] death,*"

4    transfer the statutory publicity right "by contract or by means of trust or testamentary documents," but

5    that "after the death of the deceased personality," the statutory publicity right "vest[ed]" directly in

6    specified statutory beneficiaries (emphasis added)).  Given the clear common law prescription that a

7    testator cannot devise property not owned at the time of death, and the presumption that the California

8    legislature knew of this prescription, the court found that, as respects personalities who died before its

9    enactment, the California right of publicity statute vested the posthumous publicity right in designated

10   heirs rather than in the "personality" himself or herself.  A review of the relevant legislative history

11   confirmed this construction of the statute.  Because the California right of publicity statute did not

12   reveal a legislative intent that was contrary to general principles of property and probate law, the court

13   held that plaintiffs could not show that they were entitled to assert Marilyn Monroe's posthumous right

14   of publicity.

15         The court, however, reached this conclusion with reluctance because some personalities who

16   died before passage of the California and Indiana right of publicity statutes had left their residuary

17   estates to charities.  These charities had, since the California statute was enacted in 1984, assumed that

18   they controlled the personality's right of publicity, and it appeared that they would be "divested" of the

19   celebrities' posthumous rights of publicity as a result of the court's order.  The court therefore noted that

20   its ruling in no way prevented the California or Indiana legislature from enacting a right of publicity

21

22   _____

23       person or persons.
         (c) The consent required by this section shall be exercisable by the person or persons to
24   whom the right of consent, or portion thereof, has been transferred in accordance with
     subdivision (b), or if no transfer has occurred, then by the person or persons to whom the
25   right of consent, or portion thereof, has passed in accordance with subdivision (d).
         (d) Subject to subdivisions (b) and (c), after the death of any person, the rights under this
26   section shall belong to the following person or persons and may be exercised, on behalf
     of and for the benefit of all of those persons, by those persons who, in the aggregate, are
27   entitled to more than a one-half interest in the rights: [the surviving spouse and surviving
     children or grandchildren, or the surviving parents of the deceased personality]."  CAL.
28   CIVIL CODE § 3344.1.

                                            4

1    statute that vested the right directly in the residuary beneficiaries of a deceased personality's estate, or

2    in the successors-in-interest of those residuary beneficiaries.

3         On November 21, 2007, plaintiff MMLLC filed a motion for reconsideration of the court's order.

4    MMLLC bases its motion on the fact that, six weeks after the order was entered, California State Senator

5    Sheila Kuehl amended Senate Bill 771 ("SB 771") to abrogate the court's ruling and clarify the meaning

6    of California's right of publicity statute.[10]  SB 771 passed both houses of the California Legislature in

7    September 2007, and was signed by Governor Schwarzenegger on October 10, 2007.[11]

8         Based on this newly enacted measure, MMLLC seeks reconsideration of the court's conclusions

9    (1) that "under either California or New York law, Marilyn Monroe had no testamentary capacity to

10   devise, through the residual clause of her will, statutory rights of publicity that were not created until

11   decades after her death"; (2) that alternatively, even if Marilyn Monroe's estate was open at the time

12   the statutory rights of publicity were created, it "was not [an] entity capable of holding title to the

13   rights"; and (3) that MMLLC and CMG have "no standing to assert the publicity rights they seek to

14   enforce in this action."[12]

15

16                                    **II. DISCUSSION**

17   **A.    Consideration of the Motion for Reconsideration**

18        Local Rule 7-18 limits the grounds upon which a party may seek reconsideration of the court's

19   decision on a given motion.  Under Local Rule 7-18, a motion for reconsideration is proper only where

20   the moving party demonstrates:

21        "(a) a material difference in fact or law from that presented to the Court before such

22        decision that in the exercise of reasonable diligence could not have been known to the

23        party moving for reconsideration at the time of such decision, or (b) the emergence of

24   ———————————————————

25   [10]Memorandum of Points and Authorities in Support of Marilyn Monroe, LLC's Motion for
     Reconsideration of the Court's May 14, 2007 Order Granting Summary Judgment ("Pl.'s Mem.") at 1.

26

27   [11] Id. at 4; Declaration of Laura A. Wytsma Filed in Support of Marilyn Monroe, LLC's Motion
     for Reconsideration ("Wytsma Decl."), Exhs. F, G, H.

28   [12]Pl.'s Mem. at 12.

                                         5

1    new material facts or a change of law occurring after the time of such decision, or (c) a

2    manifest showing of a failure to consider material facts presented to the Court before

3    such decision." CA CD L.R. 7-18.

4    MMLLC does not identify the basis on which it seeks Rule 7-18 reconsideration. Presumably, however,

5    it asserts that the legislature's attempt to clarify Civil Code § 3344.1 is "a material difference in fact or

6    law" that could not have been presented to the court prior to its decision of the original motion, or that

7    the passage of the bill constitutes "the emergence of new material facts or a change of law" post-dating

8    the decision.  See CA CD L.R. 7-18.

9    **B.    SB 771's Purported Clarification of the Right of Publicity Statute**

10   **1.    The Legislative History of SB 771**

11   The legislative history[13] of SB 771 indicates that the measure was intended to respond to the

12   court's May 14, 2007 summary judgment order, as well as a recent decision by a court in the Southern

13   District of New York,[14] and to clarify existing law with respect to protection of a deceased personality's

14   publicity rights.  See SENATE JUDICIARY COMMITTEE BILL ANALYSIS at 1 (S.B. 771 Sept. 6, 2007).  The

15   bill states that all celebrities who died within seventy years of January 1, 1985 (the effective date of §

16   3344.1) have a posthumous right of publicity that is deemed to have existed at the time of their death.

17   It explains that, in the absence of an express provision in a will or other testamentary instrument that

18

19   [13]Under Rule 201 of the Federal Rules of Evidence, the court may take judicial notice of the
     legislative history of state statutes.  See, e.g., *Chaker v. Crogan*, 428 F.3d 1215, 1223 n. 8 (9th Cir.
20   2005) (granting plaintiff's request to take judicial notice of the legislative history of a state statute); see
     also *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (explaining that a court may judicially
21   notice undisputed matters of public record but not disputed facts stated therein).

22   [14]*Shaw Family Archives Ltd. v. CMG Worldwide, Inc.*, 486 F.Supp.2d 309 (S.D.N.Y. 2007), is
23   an action similar to this one that CMG and MMLLC filed in Indiana against the family archives of a
     photographer of Marilyn Monroe.  *Id.* at 312-13.  The case was transferred to the Southern District of
24   New York by a court in the Southern District of Indiana after the Shaw Family Archives filed suit in
     New York seeking a declaratory judgment regarding Marilyn Monroe's post-mortem right of privacy
25   or publicity.  *Id.* at 310-11.  On May 7, 2007, the New York court granted summary judgment in favor
26   of plaintiff on MMLLC's claim that plaintiff had violated Marilyn Monroe's right of publicity.  *Id.* at
     320.  Like this court in its May 14, 2007 order, the *Shaw* court determined that Marilyn Monroe could
27   not devise a right of publicity she did not possess at that time of her death, and also that California's
     right of publicity statute did not allow for transfer of the right of publicity through the will of a
28   personality who had died prior to the statute's enactment.  *Id.* at 319-20.

6

1    transfers the publicity right of a deceased personality, "disposition of the publicity right[ ] would be in

2    accordance with the disposition of the residue of the deceased personality's assets." *Id.* Finally, the bill

3    clarifies that publicity rights recognized in § 3344.1 are "freely transferable or descendible by contract,

4    trust, or any other testamentary instrument by any subsequent owner of the deceased personality's

5    publicity rights." *Id.*

6         Committee reports on the bill indicate that Senator Kuehl, the bill's sponsor, believed that the

7    court erred in ruling that Marilyn Monroe did not possess a statutory right of publicity when she died

8    and thus that the right could not pass to the residuary beneficiary under her will. *Id.* at 4.  Senator Kuehl

9    asserted that passage of SB 771 was necessary to clarify that in enacting § 3344.1, the legislature

10    intended "to create post-mortem publicity rights for celebrities, to extend those rights back to 50 years

11    from the date the statute became effective[15] and to enable the transfer of such publicity rights to the

12    deceased personality's designated beneficiaries."[16] *Id.*

13         **2.**     **Amended Text of § 3344.1**

14         In relevant part, SB 771 amends § 3344.1(b) to provide:

15         "The rights recognized under this section are property rights, freely transferable or

16         descendible, in whole or in part, by contract or by means of any trust or any other

17         testamentary instrument, executed before or after January 1, 1985.  The rights recognized

18

19        [15]A 1999 amendment to the statute extends publicity rights back seventy years from the date of

20    the law's enactment.  See 1999 Cal. Stat. ch. 998 (S.B. 209).

21        [16]The Senate Judiciary Committee analysis indicates that SB 771 was intended to clarify §

22    3344.1 in the following ways:

     "a)   It would provide that the 3344.1 rights of publicity are property rights that are

23    deemed to have existed at the time of death of any deceased personality who died prior

to or after January 1, 1985.

24         b)   It would provide that these rights are therefore transferable or descendible by

contract, trust, or other testamentary instrument.

25         c)   If the rights were not expressly transferred under a provision of the deceased

26    personality's will or other testamentary instrument, the rights are to be disposed under

the residue provision of the testamentary instrument.

27         d)   The rights established by this statute are freely transferable and descendible by

contract, trust, or other testamentary instrument by any subsequent owner of these

28    rights."  See SENATE JUDICIARY COMMITTEE BILL ANALYSIS at 5.

1    under this section shall be deemed to have existed at the time of death of any deceased

2    personality who died prior to January 1, 1985, and, except as provided in subdivision (o),

3    shall vest in the persons entitled to these property rights under the testamentary

4    instrument of the deceased personality effective as of the date of his or her death.  In the

5    absence of an express transfer in a testamentary instrument of the deceased personality's

6    rights in his or her name, voice, signature, photograph, or likeness, a provision in the

7    testamentary instrument that provides for the disposition of the residue of the deceased

8    personality's assets shall be effective to transfer the rights recognized under this section

9    in accordance with the terms of that provision.  The rights established by this section

10   shall also be freely transferable or descendible by contract, trust, or any other

11   testamentary instrument by any subsequent owner of the deceased personality's rights

12   as recognized by this section.  Nothing in this section shall be construed to render invalid

13   or unenforceable any contract entered into by a deceased personality during his or her

14   lifetime by which the deceased personality assigned the rights, in whole or in part, to use

15   his or her name, voice, signature, photograph or likeness, regardless of whether the

16   contract was entered into before or after January 1, 1985." 2007 Cal. Stat. ch. 439 (S.B.

17   771).

18        Newly added subsection (o) provides an exception to subsection (b) for parties who exercised

19   posthumous rights of publicity under the pre-amendment version of § 3344.1. Subsection (o) provides:

20   "(o) Notwithstanding any provision of this section to the contrary, if an action was taken

21   prior to May 1, 2007, to exercise rights recognized under this section relating to a

22   deceased personality who died prior to January 1, 1985, by a person described in

23   subdivision (d), other than a person who was disinherited by the deceased personality in

24   a testamentary instrument, and the exercise of those rights was not challenged

25   successfully in a court action by a person described in subdivision (b), that exercise shall

26   not be affected by subdivision (b).  In such a case, the rights that would otherwise vest

27   in one or more persons described in subdivision (b) shall vest solely in the person or

28   persons described in subdivision (d), other than a person disinherited by the deceased

1    personality in a testamentary instrument, for all future purposes." *Id.*

2    Finally, a new subsection (p) provides:

3    "(p) The rights recognized by this section are expressly made retroactive, including to

4    those deceased personalities who died before January 1, 1985." *Id.*

5    SB 771 expressly states that "[i]t is the intent of the Legislature to abrogate the summary

6    judgment orders entered in The Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., United States

7    District Court, Central District of California, Case No. CV 05-2200 MMM (Mcx), filed May 14, 2007,

8    and in Shaw Family Archives Ltd. v. CMG Worldwide, Inc., United States District Court, Southern

9    District of New York, Case No. 05 Civ. 3939 (CM), dated May 2, 2007." *Id.*

10    **C.    Whether the Court Should Reconsider its Order in Light of SB 771**

11    **1.    Standard for Determining When a Statute is a Legislative Clarification of**

12    **an Existing Law**

13    As a first step, the court must determine the effect on this case of the legislature's enactment of

14    SB 771. It is a basic canon of statutory construction that "statutes do not operate retrospectively unless

15    the Legislature plainly intended them to do so." *Western Security Bank, N.A. v. Superior Court*, 15

16    Cal.4th 232, 243 (1997) (citing *Evangelatos v. Superior Court*, 44 Cal.3d 1188, 1207-1208 (1988), and

17    *Aetna Cas. & Surety Co. v. Ind. Acc. Com.*, 30 Cal.2d 388, 393 (1947)); see also *Immigration and*

18    *Naturalization Service v. St. Cyr*, 533 U.S. 289, 316 (2001) ("Despite the dangers inherent in retroactive

19    legislation, it is beyond dispute that, within constitutional limits, Congress has the power to enact laws

20    with retrospective effect").

21    "A statute has retrospective effect when it substantially changes the legal consequences of past

22.    events." *Western Security Bank*, 44 Cal.3d at 243 (citing *Kizer v. Hanna*, 48 Cal.3d 1, 7 (1989)). "A

23    statute does not operate retrospectively simply because its application depends on facts or conditions

24    existing before its enactment." *Id.* When the legislature clearly intends a statute to operate

25    retrospectively, the court is obligated to carry out that intent unless due process considerations prevent

26    it from doing so. *Id.* (citing *In re Marriage of Bouquet*, 16 Cal.3d 583, 587, 592 (1976).

27    "A corollary to these rules is that a statute that merely *clarifies*, rather than changes, existing law

28    does not operate retrospectively even if applied to transactions predating its enactment." *Id.* (emphasis

9

1    original). A clarifying statute "'may be applied to transactions predating its enactment without being

2    considered retroactive' because it 'is merely a statement of what the law has always been.'" *In re*

3    *Marriage of Fellows*, 39 Cal.4th 179, 183 (2006) (quoting *Riley v. Hilton Hotels Corp.*, 100 Cal.App.4th

4    599, 603 (2002)); *Western Security Bank*, 44 Cal.3d at 243 ("Such a legislative act has no retrospective

5    effect because the true meaning of the statute remains the same" (citations omitted)); *Re-Open Rambla,*

6    *Inc. v. Bd. of Supervisors*, 39 Cal.App.4th 1499, 1511 (1995) ("[W]e honor the well-established precept

7    that '. . . the enactment of a statute or an amendment to a statute for the purpose of clarifying preexisting

8    law or making express the original legislative intent is not considered a change in the law; . . . it simply

9    states the law as it was all the time, and no question of retroactive application is involved,'" quoting *City*

10   *of Redlands v. Sorensen*, 176 Cal.App.3d 202, 211 (1985)); see also *Valles v. Ivy Hill Corp.*, 410 F.3d

11   1071, 1079 (9th Cir. 2005).

12          In determining whether a statute seeks to clarify existing law or constitutes a new measure, the

13   court considers the circumstances surrounding the legislature's change to the statute to ascertain whether

14   its sole intent is to clarify existing law.  *Western Security Bank*, 44 Cal.3d at 243 (citations omitted);

15   *Kern v. County of Imperial*, 226 Cal.App.3d 391, 400 (1990) ("The legislative history of a statute and

16   the wider historical circumstances of its enactment are legitimate and valuable aids in divining statutory

17   purpose" (citation omitted)).  One circumstance that may be relevant to the court's analysis is whether

18   the legislature's changes are a prompt reaction "to the emergence of a novel question of statutory

19   interpretation."  *Id.* ("'An amendment which in effect construes and clarifies a prior statute must be

20   accepted as the legislative declaration of the meaning of the original act, where the amendment was

21   adopted soon after the controversy arose concerning the proper interpretation of the statute. . . . [¶] If

22   the amendment was enacted soon after controversies arose as to the interpretation of the original act,

23   it is logical to regard the amendment as a legislative interpretation of the original act – a formal change

24   – rebutting the presumption of substantial change,'" quoting *RN Review for Nurses, Inc. v. State of*

25   *California*, 23 Cal.App.4th 120, 125 (1994) (quoting 1A Singer, SUTHERLAND STATUTORY

26   CONSTRUCTION (5th ed. 1993) § 22.31))).

27          The California Supreme Court has recognized, however, that even where a statute purports to

28   clarify the original meaning of the act, "a legislative declaration of an existing statute's meaning is

1   neither binding nor conclusive in construing the statute." *Id.* at 244. While such a declaration is given

2   due consideration, "[u]ltimately, the interpretation of a statute is an exercise of the judicial power the

3   Constitution assigns to the courts." *Id.* (citing *California Emp. etc. Com. v. Payne*, 31 Cal.2d 210, 213

4   (1947), *Bodinson Mfg. Co. v. California E. Com.*, 17 Cal.2d 321, 326 (1941), and *Del Costello v. State*

5   *of California*, 135 Cal.App.3d 887, 893 n. 8 (1982)); see *Alch v. Superior Court*, 122 Cal.App.4th 339,

6   398 (2004). Thus, "[w]hen [the state's highest court] 'finally and definitively' interprets a statute, the

7   Legislature does not have the power to then state that a later amendment merely declared existing law."

8   *Carter v. California Dep't of Veterans Affairs*, 38 Cal.4th 914, 922 (2006). Indeed, "there is little logic

9   and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an

10  earlier Legislature's enactment when a gulf of decades separates the two bodies." *Western Security*

11  *Bank*, 15 Cal.4th at 244; see also *Peralta Community College Dist. v. Fair Employment & Housing*

12  *Com.*, 52 Cal.3d 40, 52 (1990) ("The declaration of a later Legislature is of little weight in determining

13  the relevant intent of the Legislature that enacted the law" (citation omitted)).

14      "[E]ven [in cases where] the court does not accept the Legislature's assurance that an

15  unmistakable change in the law is merely a 'clarification,' the declaration of intent may still effectively

16  reflect the Legislature's purpose to achieve a retrospective change." *Western Security Bank*, 15 Cal.4th

17  at 244 (citing *California Emp. etc. Com.*, 31 Cal.2d at 214). "Whether a statute should apply

18  retrospectively or only prospectively is, in the first instance, a policy question for the legislative body

19  enacting the statute." *Id.* (citing *Evangelatos*, 44 Cal.3d at 1206). Ordinarily, "[t]he presumption of

20  prospectivity assures that reasonable reliance on current legal principles will not be defeated in the

21  absence of a clear indication of a legislative intent to override such reliance." *Evangelatos*, 44 Cal.3d

22  at 1214; see also CAL. CIVIL CODE § 3 ("No part of [the civil code] is retroactive, unless expressly so

23  declared"). "Thus, where a statute provides that it clarifies or declares existing law, '[i]t is obvious that

24  such a provision is indicative of a legislative intent that the amendment apply to all existing causes of

25  action from the date of its enactment. In accordance with the general rules of statutory construction, we

26  must give effect to this intention unless there is some constitutional objection thereto.'" *Western*

27  *Security Bank*, 15 Cal.4th at 244 (quoting *California Emp. etc. Com.*, 31 Cal.2d at 214, and citing *City*

28  *of Sacramento v. Public Employees' Ret. Sys.*, 22 Cal.App.4th 786, 798 (1994); *City of Redlands v.*

1   *Sorensen*, 176 Cal.App.3d 202, 211 (1985)).

2       **2.    MMLLC's Arguments in Favor of Reconsideration**

3       Applying these principles, MMLLC argues that SB 771 clarifies the law in two ways that

4 warrant reconsideration of the court's order granting summary judgment. First, it notes that SB 771

5 clarifies that "post-mortem publicity rights in California 'shall be deemed to have existed at the time of

6 death of any person who died prior to January 1, 1985.'"[17] MMLLC contends this provision makes clear

7 that, in enacting § 3344.1, the legislature intended that a celebrity who died prior to the bill's passage

8 would be deemed to have held the right of publicity at the time of death, such that the right could pass

9 through the residuary clause of his or her will. Such an intent may be gleaned, MMLLC asserts, from

10 the fact that § 3344.1 "always" defined a "deceased personality" as any person who died within 70 years

11 of January 1, 1985.[18] MMLLC also cites Senator Kuehl's remark that "[t]here is nothing in the statute

12 that indicates the Legislature intended to treat people differently depending on whether they died before

13 or after 1985."[19] It contends that this statement of intent by the bill's sponsor should be given "due

14 consideration by the court."[20] See *Kern*, 226 Cal.App.3d at 401 ("The statements of the sponsor of

15 legislation are entitled to be considered in determining the import of the legislation" (citations omitted)).

16       MMLLC next asserts that SB 771 clarifies that "'the property right to use a deceased

17 personality's name, voice, signature, photograph or likeness in a commercial product is freely

18 descendible by means of trust or any other testamentary instrument executed before or after January 1,

19 1985.'"[21] The legislative history of SB 771 indicates that "in the absence of an express [t]ransfer of

20 these rights, a provision in the will or other testamentary instrument that provides for the disposition of

[17]Pl.'s Mem. at 6 (citing SB 771).

[18]*Id.*

[19]*Id.* (citing SENATE JUDICIARY COMMITTEE BILL ANALYSIS at 5).

[20]*Id.* at 8.

[21]*Id.* at 7; Wytsma Decl., Exh. K (Analysis of SB 771 by Office of Senate Floor Analyses, Senate Rules Committee (prepared for Sept. 7, 2007 Senate floor vote) at 2).

12

1    the residue of the deceased personality's assets is effective to transfer them."[22]    The stated legislative

2    purpose of this amendment is not to "change[ ] existing law, but, rather . . . [to] clarif[y] it in order to

3    prevent needless litigation."[23]

4          MMLLC notes that the legislature acted swiftly to address a perceived judicial error in statutory

5    interpretation.[24] It argues that because SB 771 was introduced, passed, and signed into law within five

6    months of the court's order, the court should honor the legislature's statement that it was acting to

7    clarify existing law.[25] See *Western Security Bank*, 15 Cal.4th at 246 ("If the Legislature acts promptly

8    to correct a perceived problem with a judicial construction of a statute, the courts generally give the

9    Legislature's action its intended effect"). This is particularly true, MMLLC asserts, because the

10    legislature expressly stated, both in the legislative history of SB 771 and in the text of the bill, that it

11    intended to abrogate the court's May 14, 2007 order.[26] See 2007 Cal. Stat. ch. 439 (SB 771); SENATE

12    JUDICIARY COMMITTEE BILL ANALYSIS at 6.

13          That there is a direct link between the court's May 14, 2007 decision and SB 771 is highlighted

14    by the fact that the Senate Judiciary Committee's analysis specifically describes how *Marilyn Monroe's*

15    right of publicity would be transferred under the clarified scheme, i.e., that Monroe's posthumous right

16    of publicity would be deemed to have passed to Lee Strasberg as part of her residuary estate, that Lee

17    Strasberg would be deemed to have transferred the right by will to his wife, Anna Strasberg, thus

18    entitling Anna Strasberg to transfer the right to MMLLC. The bill analysis also references the CMG

19    Parties, observing that, after receiving the rights from Anna Strasberg, MMLLC "licensed CMG to use

20    the images and likenesses of Marilyn Monroe." See SENATE JUDICIARY COMMITTEE BILL ANALYSIS

21    at 6. As this aspect of the legislative history underscores, the legislature not only attempted to abrogate

22

23         [22]Wytsma Decl., Exh. K (Analysis of SB 771 by Office of Senate Floor Analyses, Senate Rules

24    Committee (prepared for Sept. 7, 2007 Senate floor vote) at 5).

25         [23]*Id.*

26         [24]Pl.'s Mem. at 8.

27         [25]*Id.* at 8-9.

28         [26]*Id.* at 9.

1    the court's interpretation of § 3344.1, but to delineate how the statute should be applied in this case.

2

3                **3.**      **SB 771 is a Clarification of Existing Law**

4       While recognizing the legislature's clearly expressed intent to abrogate the court's summary

5 judgment order and vest Marilyn Monroe's right of publicity in MMLLC, the court is cognizant that

6 interpretation of statutes is a judicial function. See *People v. Cruz*, 13 Cal.4th 764, 780 (1996) ("[T]he

7 interpretation of law is a judicial function"). Even when the legislature declares that an amendment

8 merely clarifies the meaning of a preexisting statute, its declaration is not dispositive. *Id.* at 781.

9 Rather, "[b]ecause the determination of the meaning of statutes is a judicial function, a court, faced with

10 the question of determining the scope of the earlier version, still must ascertain from all the pertinent

11 circumstances and considerations whether the subsequent amendment actually constitutes a modification

12 or instead a clarification of the preexisting provision." *Id.* (citing *Peralta Community College Dist.*, 52

13 Cal.3d at 52; *Harris v. Capital Growth Investors XIV*, 52 Cal.3d 1142, 1158 (1991) (noting that

14 subsequent legislative declarations are not binding as to the intent of the Legislature that enacted the

15 statute, and observing that the Legislature has no authority to interpret a statute)).

16       Applying the guidelines for statutory construction established by the California Supreme Court,

17 however, the court is persuaded that SB 771 is a clarification of existing law. First, it is significant that

18 the meaning of § 3344.1 has never been "finally and definitively" interpreted by the state's highest

19 court. See *Carter*, 38 Cal.4th at 922. "'[I]f the courts have not yet finally and conclusively interpreted

20 a statute and are in the process of doing so, a declaration of a later Legislature as to what an earlier

21 Legislature intended is entitled to consideration.'" *Id.* (quoting *McClung v. Employment Development

22 Dept.*, 34 Cal.4th 467, 473 (2004)). As noted in the May 14, 2007 order, in construing § 3344.1, the

23 court lacked guidance from a higher court. As a result, it looked to the language of the statute itself, the

24 common law background against which it was enacted, and the measure's legislative history. Under

25 these circumstances, the legislature's attempted clarification of the statute is entitled to due

26 consideration.

27       It is also significant that the legislature explicitly stated that it was clarifying existing law. In

28 interpreting a statute, a California court must determine legislative intent so as to effectuate the

1    purpose of the law. See, e.g., *Cruz*, 13 Cal.4th at 775. "'In order to determine this intent, [the court]

2    begin[s] by examining the language of the statute.'" *Id.* (quoting *People v. Pieters*, 52 Cal.3d 894,

3    898 (1991)). Generally, if the statute's language is "'without ambiguity, doubt, or uncertainty, then

4    the language controls.'" *Herman v. Los Angeles County Metropolitan Transportation Authority*, 71

5    Cal.App.4th 819, 825 (1999) (quoting *Halbert's Lumber, Inc. v. Lucky Stores, Inc.*, 6 Cal.App.4th

6    1233, 1239 (1992)). The California Supreme Court has held, however, that even if the plain

7    meaning of a statute is clear, a court may nonetheless inquire whether the "literal meaning of [the]

8    statute comports with its purpose." *Lungren v. Deukmejian*, 45 Cal.3d 727, 729 (1988) ("[T]he

9    'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a

10   statute comports with its purpose or whether such a construction of one provision is consistent with

11   other provisions of the statute. . . . Literal construction should not prevail if it is contrary to the

12   legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if

13   possible, be so read as to conform to the spirit of the act"). To ascertain legislative intent, the court

14   looks to "the history of the statute, committee reports, and staff bill reports." *DeCastro West*

15   *Chodorow & Burns, Inc. v. Superior Court*, 47 Cal.App.4th 410, 411 (1996).

16          As MMLLC notes, the legislative history of SB 771 contains numerous statements that "[t]he

17   bill would clarify" the meaning of the existing law protecting a deceased personality's right of

18   publicity.[27] See, e.g., SENATE JUDICIARY COMMITTEE BILL ANALYSIS at 3 ("SB 771 intends to clarify

19   the Legislature's intent to make the protections under 3344.1 of the Civil Code applicable to deceased

20   personalities who died between January 1, 1915 and January 1, 1985, the 70 year period of protection

21   under the statute"); *id.* at 4 ("The author states this bill is necessary to clarify the Legislature's intent,

22   when it enacted Civil Code 3344.1 (then 990 of the Civil Code) in 1984 to create post-mortem publicity

23   rights for celebrities, to extend those rights back to 50 years from the date the statute became effective

24   and to enable the transfer of such publicity rights to the deceased personality's designated

25   beneficiaries"); *id.* at 5 ("SB 771 would indeed clarify 3344.1 in several ways").

26          These expressions of intent are indicative of the legislature's purpose in enacting SB 771. See

27

28          [27]Pl.'s Mem. at 5-7.

15

1   *Valles*, 410 F.3d at 1080 ("In this case, the California legislature made clear that in its view the

2   amendment constituted a clarification and not a substantive change"); *Western Security Bank*, 15 Cal.4th

3   at 238 ("The Legislature soon acted to express a clear, contrary intent. It passed Senate Bill No. 1612

4   (1993-1994 Reg. Sess.) . . . as an urgency measure specifically meant to abrogate the Court of Appeal's

5   holding"); *Salazar*, 117 Cal.App.4th at 324 (noting that "AB 76 also includes the following declaration

6   of legislative intent: 'It is the intent of the Legislature in enacting this act to construe and clarify the

7   meaning and effect of existing law and to reject the interpretation given to the law in [the court's prior

8   decision]'"); *Kern*, 226 Cal.App.3d at 401 (noting that "it is clear the intent of the sponsor of the bill was

9   to clarify existing law and remove any ambiguity to specific fact situations, one of which was the type

10  of transfer which is the subject of this lawsuit"). Compare *Fonseca v. City of Gilroy*, 148 Cal.App.4th

11  1174, 1197 (2007) ("[P]articularly when there is no definitive 'clarifying' expression by the Legislature

12  in the amendments themselves, we will presume that a substantial or material statutory change, as

13  occurred here by the addition of section 65583 alone, bespeaks legislative intention to change, and not

14  just clarify, the law," citing *Reidy v. City and County of San Francisco*, 123 Cal.App.4th 580, 592

15  (2004), and *Garrett v. Young*, 109 Cal.App.4th 1393, 1404-05 (2003)).

16        Furthermore, SB 771 was enacted shortly after the court entered an order interpreting § 3344.1.

17  Senator Kuehl amended SB 771 to address § 3344.1 in June 2007, after the court entered its May 14,

18  2007 order construing the statute.[28] As amended, the measure passed in the Assembly without a single

19  negative vote on September 4, 2007; on September 7, 2007, the Senate also approved the bill, again

20  without a negative vote.[29] On October 10, 2007, just five months after the court entered a final order,

21  Governor Schwarzenegger signed the bill into law.[30] "'[W]here [an] amendment [is] adopted soon after

22  [a] controversy arose concerning the proper interpretation of the statute,'" the court should generally

23  construe it as a "'legislative declaration of the meaning of the original act.'" *Western Security Bank*,

24

25

26        [28]Wytsma Decl., Exh. F.

27        [29]*Id.*, Exh. G.

28        [30]*Id.*, Exh. H.

16

1    15 Cal.4th at 243 (quoting *RN Review for Nurses, Inc.*, 23 Cal.App.4th at 125).[31]  That this was the

2    legislature's intent in the present case is also evident from statements by the bill's author that the bill

3    was intended to abrogate the court's order.  See 2007 Cal. Stat. ch. 439 (SB 771), § 2.  Given the

4    legislature's clear statement that SB 771 was meant to clarify existing law, the court must give it "due

5    consideration," *Western Security Bank*, 15 Cal.4th at 244, and examine whether "all the pertinent

6    circumstances and considerations" support the legislature's declaration, see *Cruz*, 13 Cal.4th at 781; see

7    also *Fonseca*, 148 Cal.App.4th at 1197.

8        One relevant factor in assessing whether a bill is a clarification rather than a modification of

9    existing law is whether the measure as originally enacted was clear or contained some ambiguity.  See

10   *In re Marriage of McClellan*, 130 Cal.App.4th 247, 257 (2005) (noting that the legislature "indicates

11   an intent to merely clarify existing law where . . . it amends a statute to resolve ambiguity in the existing

12   law"); *Kern*, 226 Cal.App.3d at 401 (holding that an amendment clarified existing law, *inter alia*,

13   because the sponsor intended to "remove any ambiguity to specific fact situations"); see also *Tyler v.*

14   *State of California*, 134 Cal.App.3d 973, 977 (1982) (concluding that a statute clarified existing law

15   where it was enacted in response to "confusion" created by a court decision).

16       Subsection (h) of § 3344.1 states that the term "'deceased personality' . . . include[s], without

17   limitation, any . . . natural person who . . . died within 70 years prior to January 1, 1985."  CAL. CIVIL

18   CODE § 3344.1(h).  Because the statute was passed in 1984 and took effect on January 1, 1985, at the

19   time it became law the only individuals whose rights it impacted were celebrities who were already

20   deceased.  The legislative history of the statute shows, in fact, that it was enacted to protect the names,

21

22       [31]Defendants argue it is incongruous for the 2007 legislature to declare the intent of the 1984
     legislature. (See Defs.' Opp. at 9-11).  As noted earlier, courts have recognized that "there is little logic
23   and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an
     earlier Legislature's enactment when a gulf of decades separates the two bodies."  See *Western Security*
24   *Bank*, 15 Cal.4th at 244; see also *Salazar*, 117 Cal.App.4th at 333 (Kitching, J., dissenting) ("The length
     of time between the 1984 amendment and the 2003 amendment suggests that the Legislature's
25   declaration of its earlier intent should be disregarded").  Although acknowledging this, the California
     Supreme Court has nonetheless instructed that "the Legislature's expressed views on the prior import
26   of its statutes are entitled to due consideration, and we cannot disregard them."  *Western Security Bank*,
     15 Cal.4th at 244; see *Salazar*, 117 Cal.App.4th at 328 (holding that the 2003 legislature properly
27   clarified a 1984 law); *Carter*, 38 Cal.4th at 930 (affirming *Salazar*'s determination that a law was a
     clarification of a prior statute despite the fact that nearly twenty years had elapsed).
28
                                                     17

1    images and likenesses of deceased celebrities such as Elvis Presley, John Wayne, and W.C. Fields.

2    Subsection (b) provides that "[t]he rights recognized under this section are property rights, freely

3    transferable, in whole or in part, by contract or by means of trust or testamentary documents, whether

4    the transfer occurs before the death of the deceased personality, by the deceased personality or his or

5    her transferees, or, after the death of the deceased personality, by the person or persons in whom the

6    rights vest under this section or the transferees of that person or persons." *Id.*, § 3344.1(b). Subsection

7    (e) provides that "[i]f any deceased personality does not transfer his or her rights under this section by

8    contract, or by means of a trust or testamentary document, and there are no surviving persons as

9    described in subdivision (d), then the rights set forth in subdivision (a) shall terminate." *Id.*, § 3344.1(e).

10    The court earlier concluded that, because a deceased person cannot transfer a property right that

11    she does not own at the time of death, subsection (b) meant that the publicity right of a predeceased

12    celebrity automatically vested in the statutorily designated heirs. This interpretation flowed directly from

13    the language of subsection (b), which distinguished between transfers that occurred "before the death

14    of the deceased personality" and transfers that occurred "after the death of the deceased personality."

15    The statute provided that transfers occurring "before the death of the deceased personality" were to be

16    made "by the deceased personality or his or her transferees," while transfers occurring "after the death

17    of the deceased personality" were to be made by "the person or persons in whom the rights vest under

18    this section or the transferees of that person or persons."

19    MMLLC now argues that the definition of "deceased personality" found in subsection (h) injects

20    ambiguity into the language of subsection (b), which states that a "deceased personality" can transfer

21    the right before his or her death. Since subsection (h) defines "deceased personality" as an individual

22    who died within 70 years of January 1, 1985, and since the bill did not take effect until that date,

23    MMLLC contends that the legislature must have contemplated that celebrities who predeceased the

24    enactment would be deemed to have held the right before their death and to have had the ability to

25    transfer it via a residual clause in their will. It is to this possible ambiguity that SB 771 speaks. The bill

26    makes explicit what was at best implicit, and at worst ambiguous, in the original version of § 3344.1 –

27    i.e., that "[t]he rights recognized under this section shall be deemed to have existed at the time of death

28    of any deceased personality who died prior to January 1, 1985. . . ."

18

The need for clarification is also supported by the fact that there was confusion in the marketplace as to the operation of the statute. As the court acknowledged in the May 14, 2007 order, some celebrities who died before § 3344.1 was passed in 1985 left their residuary estates to specified charities. Albert Einstein's statutory right of publicity, for instance, is registered to the Hebrew University of Jerusalem, a university co-founded by Einstein, who died in 1955. Similarly, the legislative history of SB 771 indicates that Wayne Enterprises, of which John Wayne's son is the president, is able to support the John Wayne Cancer Foundation and the John Wayne Cancer Institute through use of John Wayne's name and likeness. See SENATE JUDICIARY COMMITTEE BILL ANALYSIS at 9. The legislative history reports that many other "worthwhile causes and charitable institutions" are supported by exploitation of the publicity rights of deceased personalities such as Joan Crawford, Mae West, Edith Head, Janis Joplin, Alfred Hitchcock, Glenn Miller, Ozzie Nelson, Groucho Marx, and Bela Lugosi. *Id.* These charities evidently perceive that although the celebrity whose right of publicity they hold died before 1985, he or she was deemed to have transferred the right pursuant to § 3344.1. The charities and organizations have apparently relied on this and acted accordingly.

It is appropriate for the legislature to clarify the law to protect such expectations. See *Western Security Bank*, 15 Cal.4th at 245-46 ("The Legislature's unmistakable focus was the disruptive effect of the Court of Appeal's decision on the expectations of parties to transactions where a letter of credit was issued in connection with a loan secured by real property. By abrogating the Court of Appeal's decision, the Legislature intended to protect those parties' expectations and restore certainty and stability to those transactions. If the Legislature acts promptly to correct a perceived problem with a judicial construction of a statute, the courts generally give the Legislature's action its intended effect," citing *Escalante v. City of Hermosa Beach*, 195 Cal.App.3d 1009, 1020 (1987), *City of Redlands v. Sorensen*, 176 Cal.App.3d 202, 211-12 (1985), and *Tyler v. State of California*, 134 Cal.App.3d 973, 976-977 (1982)).

Defendants argue that SB 771 is not a clarification because it substantially changes prior law.[32] As noted, SB 771 rewords subsection (b) of § 3344.1 to provide that a deceased personality's right of

---

[32]Defs.' Opp. at 8.

1   publicity is deemed to have been in existence at the time of the celebrity's death, and to have been

2   transferrable either through an express testamentary disposition or through the residual clause of the

3   celebrity's will. 2007 Cal. Stat. ch. 439 (S.B. 771), § 3344.1(b). Recognizing that this intent was not

4   necessarily apparent in § 3344.1 as originally drafted, and that the statute has potentially been

5   misinterpreted by the public, SB 771 includes a savings provision as subsection (o). This subsection

6   states that statutory heirs who, prior to May 1, 2007, "took action" to exercise a deceased celebrity's

7   right of publicity, and whose "action" was not successfully challenged by a residuary beneficiary in

8   court, continue to hold the right of publicity unless they were expressly disinherited by the deceased

9   celebrity in a testamentary instrument. *Id.*, § 3344.1(o). The legislature also provided that "[t]he rights

10  recognized [in the statute] are expressly made retroactive . . . to . . . deceased personalities who died

11  before January 1, 1985." *Id.*, § 3344.1(p).

12       While it is true that SB 771 makes material changes to the right of publicity statute, the court

13  need not view the changes as modifications given the potential ambiguity in the original version of §

14  3344.1. Under certain circumstances, "the Legislature may make material changes in language in an

15  effort to clarify existing law." *Carter*, 38 Cal.4th at 929 (citing *Western Security Bank*, 15 Cal.4th at

16  243 (holding that a change was a clarification of existing law despite the addition of two sections by

17  amendment); *Plotkin v. Sajahtera, Inc.*, 106 Cal.App.4th 953, 961 n. 3 (2003) ("The amendment's

18  substantial narrowing of the definition of 'vehicle parking facility' does not necessarily preclude a

19  finding that it merely clarifies, rather than changes, existing law"); *see also In re Angelique C.*, 113

20  Cal.App.4th 509, 518 (2003) (addressing the legislature's action to clarify law in response to *Renee v.*

21  *Superior Court*, 26 Cal.4th 735 (2001)).

22       Additionally, "'the Legislature may choose to state all applicable legal principles in a statute

23  rather than leave some to even a predictable judicial decision.'" *Id.* (quoting *Reno v. Baird*, 18 Cal.4th

24  640, 658 (1998)). Thus, SB 771 does not contain surplusage or create new law simply because it

25  confirms that the right of publicity created by § 3344.1 is deemed to have existed at the time a

26  predeceased celebrity died; sets forth the manner in which the right of publicity can be transferred; and

27  declares that the rights recognized by § 3344.1 are retroactive to celebrities who died before January 1,

28  1985. "'Rather, [the provisions are statements that] may eliminate potential confusion and avoid the

1   need to research extraneous legal sources to understand the statute's full meaning. Legislatures are free

2   to state legal principles in statutes, even if they repeat preexisting law, without fear the courts will find

3   them unnecessary and, for that reason, imbued with broader meaning.'" *Id.* (quoting *Reno*, 18 Cal.4th

4   at 658)).

5        In sum, in passing SB 771, the 2007 California legislature clearly expressed an intent to clarify

6   § 3344.1 as originally enacted. The bill was passed promptly after, and in response to, the court's May

7   14, 2007 order, and the May 7, 2007 *Shaw* opinion in the Southern District of New York. It was

8   intended to clarify potential ambiguities in the existing statute that had caused confusion among

9   beneficiaries and heirs of deceased celebrities, and that had resulted in court decisions that were at odds

10  with what this legislature believed an earlier legislature intended. In combination, these circumstances

11  are sufficient to support a finding that in amending § 3344.1, the legislature clarified existing law by

12  stating that the right of publicity of a personality who died before January 1, 1985 is deemed to have

13  existed at the time that personality died.[33]

14

15  [33]Defendants argue that although SB 771 states that the posthumous right of publicity is deemed
16  to have existed at the time a deceased personality died, it does not vest that right in the deceased
    personality directly. (Defs.' Opp. at 2, 9, 12). Therefore, they maintain, the personality does not have
17  the power to pass the right by will. (*Id.*) The court finds this argument unpersuasive. While SB 771
    does not expressly state that the right of publicity was "vested" in the deceased personality, it clearly
18  expressed the legislature's intent that the personality be deemed to have owned the right at the time of
    her death, since this is the only way that she could transfer the right through a testamentary instrument.
19  2007 Cal. Stat. ch. 439 (S.B. 771), § 3344.1(b) (stating that the posthumous right of publicity "shall be
    deemed to have existed at the time of death of any deceased personality who died prior to January 1,
20  1985," and recognizing that the deceased personality could transfer the right by express provision in a
    testamentary instrument or through the residual clause in her will). This language is consistent with
21  general probate law, which looks solely to what a decedent *owned at the time of death*. See, e.g., *In re
    Buzza's Estate*, 194 Cal.App.2d 598, 601 (1961) ("It is settled law that a will is construed as applying
22  to and disposing of the estate in its condition at the time of death"); *Conlee v. Conlee*, 269 N.W. 259,
23  263 (Iowa 1936) ("No matter what the provisions of the will are when probated, it confers no rights in
    property not owned by the testator at the time of her death, and in no event could it be made to avoid
24  contractual obligations assumed during her life," quoting *Steward v. Todd*, 173 N.W. 619, 624 (Iowa
    1919)); *In re Van Winkle's Will*, 86 N.Y.S.2d 597, 600 (Sur. Ct. 1949) ("[U]nder no circumstances,
25  in the absence of a valid power, can any amount of testamentary intent produce the effect of subjecting
    property not owned by a testator at the date of his death to any disposition whatever"); 80 AM.JUR.2D
26  WILLS § 1168 ("A person cannot make a postmortem distribution of property which he or she did not
27  own, at the time of his or her death, or in which such a person had [no] legal or equitable right. Thus,
    property acquired by a testator's estate after his or her death may not pass under the residuary clause
28  of the will"); 96 C.J.S. WILLS § 1088 (same); see also CAL. PROB. CODE § 21105 ("[A] will passes all

21

1    Because the court determines that SB 771 clarifies existing law, the amendment does not change

2    § 3344.1's substantive legal effect.  See *Carter*, 38 Cal.4th at 923 ("If we conclude the amendment did

3    more than clarify existing law, we would then address whether the amendment should apply

4    retroactively to the conduct present here, and whether a retroactive application would implicate due

5    process concerns.  If, however, the amendment merely clarified existing law, then employers were

6    potentially liable for sexual harassment of employees by nonemployees at the time of the conduct we

7    address, and the amendment would not change the statute's substantive legal effect or require us to

8    address the validity of the statute's application" (citations omitted)); *Western Security Bank*, 38 Cal.4th

9    at 243 ("Such a [clarifying] legislative act has no retrospective effect because the true meaning of the

10    statute remains the same").

11    Defendants' argument that SB 771 unconstitutionally takes property from the statutorily

12    designated heirs of a predeceased celebrity, and that it interferes with contracts, are thus unavailing.[34]

13    Because SB 771 clarifies that § 3344.1 always provided that a deceased personality's right of publicity

14    existed at the time of his or her death and could be transferred either by a specific bequest or as part of

15    the residue of his or her estate, the right of publicity never vested in the deceased personality's statutory

16

17    property the testator owns at death, including property acquired after execution of the will").

18    The fact that the bill states that the posthumous right of publicity "shall vest" in the persons
entitled to it under the deceased personality's testamentary instrument does not change this conclusion.

19    As plaintiffs note, "[s]ince a testamentary instrument is effective at death, the words 'shall vest' mean
just that – i.e., the rights, which are deemed to exist at death, "shall vest" in the beneficiaries at the time

20    of death." (Reply in Support of Marilyn Monroe, LLC's Motion for Reconsideration of the Court's May
14, 2007 Order Granting Summary Judgment ("Pl.'s Reply") at 14).  Stated differently, as a matter of

21    property and probate law, the right could not "vest" in the beneficiaries named in a personality's

22    testamentary instrument unless it first vested in the personality herself.

23    Accordingly, because the court concludes that SB 771 was a clarification rather than a
modification of existing law, and because it states expressly that the right of publicity of a predeceased

24    celebrity is deemed to have been in existence on the date of the individual's death, the bill responds to
the concern expressed in the May 14, 2007 order that Marilyn Monroe could not transfer a property right

25    she did not possess at the time of her death.  Moreover, it also makes clear that § 3344.1 is consistent
with the principle that the "law attempts to avoid an intestacy and any construction which favors a

26    residuary disposition should be upheld and sustained whenever possible." *In re Estate of O'Brien*, 627

27    N.Y.S.2d 544, 546 (Sur. Ct. 1995); see also *In re Estate of Goyette*, 123 Cal.App.4th 67, 74 (2004) ("It
is the strongly favored policy of the law that wills be construed in a manner that avoids intestacy").

28    [34]*Id.* at 16.

22

1    heirs as defendants argue.[35]  As a result, the court need not address defendants' due process concerns.

2    It notes, however, that if a statutory heir exercised a predeceased celebrity's right of publicity prior to

3    May 1, 2007 and no legal challenge was successfully mounted, subsection (o) vests the right of publicity

4    in the heirs.  This ameliorates any potential due process concerns.[36]

5

6        [35]SB 771's legislative history indicates that the legislature considered and apparently found
     unpersuasive defendants' takings arguments.  See SENATE RULES COMMITTEE SENATE FLOOR ANALYSIS
7    (S.B. 771 Sept. 4, 2007) (noting that opponents of the bill "also argue that, depending to whom a
8    celebrity left the bulk of his/her estate through the residuary clause, this bill could strip statutory heirs
     of the rights of publicity of their deceased relatives").

9
        [36]Although the court need not address of the constitutionality of California's posthumous right
10   of publicity statute to decide the pending motion, it recognizes that, as clarified, the law created a
     retroactive property right when it was enacted in 1985.  "Whether a statute should apply retrospectively
11   or only prospectively is, in the first instance, a policy question for the legislative body enacting the
12   statute."  Western Security Bank, 15 Cal.4th at 244 (citing Evangelatos, 44 Cal.3d at 1206).  "It does not
     follow, however, that what Congress can legislate prospectively it can legislate retrospectively.  The
13   retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process,
     and the justifications for the latter may not suffice for the former."  Usery v. Turner Elkhorn Mining Co.,
14   428 U.S. 1, 16-17 (1976).
15        Neither party has identified any due process concerns that arise from the fact that § 3344.1
     applies retroactively to celebrities who died prior to January 1, 1985.  "'The requirements of procedural
16   due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's
     protection of liberty and property.'"  Outdoor Media Group, Inc. v. City of Beaumont, 506 F.3d 895, 902-
17   03 (9th Cir. 2007) (quoting Board of Regents v. Roth, 408 U.S. 564, 569 (1972)).  A property interest
     is more than a "unilateral expectation"; it is "a legitimate claim of entitlement."  Roth, 408 U.S. at 577.
18   "Entitlements are not created by the constitution, but are defined by independent sources such as state
19   law, statutes, ordinances, regulations or express and implied contracts."  Saunders v. Knight, CV 04-
     5924 LJO WMW, 2007 WL 3482047, *21 (E.D. Cal. Nov. 13, 2007) (citing Lucero v. Hart, 915 F.2d
20   1367, 1370 (9th Cir. 1990), Brenizer v. Roy, 915 F.Supp. 176, 182 (C.D. Cal. 1996), and Coleman v.
     Dep't of Personnel Admin., 52 Cal.3d 1102, 1112 (1991) ("Property interests that are subject to due
21   process protections are not created by the federal Constitution.  Rather, they are created, and their
22   dimensions are defined by existing rules or understandings that stem from an independent source such
     as state law")).  "'If a right has not vested, it is not a property interest protected by the due process or
23   takings clause.'"  Id. (quoting Brenizer, 915 F.Supp. at 182).
24        Before passage of the posthumous right of publicity law in 1985, California recognized a
     common law right of publicity, which expired on an individual's death.  See Guglielmi v.
25   Spelling-Goldberg Productions, 25 Cal.3d 860, 861 (1979) ("In Lugosi v. Universal Pictures, [25 Cal.3d
     813 (1979)], we hold that the right of publicity protects against the unauthorized use of one's name,
26   likeness or personality, but that the right is not descendible and expires upon the death of the person so
     protected").  After an individual died, his name, image and likeness were in the public domain and
27   anyone could use them for a legitimate commercial purpose.  See Lugosi, 25 Cal.3d at 823 ("After
     Lugosi's death, his name was in the public domain.  Anyone, including [plaintiffs], or either of them,
28   or Universal, could use it for a legitimate commercial purpose").  In Marilyn Monroe's case, before the

23

1

2    **D.**     **Reconsideration of the Court's Order**

3         Because SB 771 is a new law that clarifies California's posthumous right of publicity statute,

4 the court concludes that it must reconsider its ruling that MMLLC lacks standing to assert claims for

5 infringement of Marilyn Monroe's statutory right of publicity. Under clarified § 3344.1(b), Marilyn

6 Monroe's right of publicity is deemed to have existed at the time of her death in 1962. 2007 Cal. Stat.

7 ch. 439 (S.B. 771), § 3344.1(b). Because Monroe's will did not expressly bequeath this right of

8 publicity, under the statute as clarified, the court must examine the residual clause of her will. *Id.* That

9 provision stated:

10      "SIXTH: All the rest, residue and remainder of my estate, both real and personal, of

11      whatsoever nature and wheresoever situate, of which I shall die seized or possessed

12      or to which I shall be in any way entitled, or over which I shall possess any power of

13      appointment by Will at the time of my death, including any lapsed legacies, I give,

14      devise and bequeath as follows:

15

16 ──────────────────

17 statutory right of publicity was created in 1985, her name, likeness, and image were in the public domain. It is possible that individual members of the public made use of her name and likeness for

18 commercial purposes. It is not clear, however, that state law or any other source gave those individuals an *entitlement* to use her name and likeness – i.e., a vested property interest protected by Fourteenth

19 Amendment – such as would preclude retroactive application of the posthumous right of publicity law.

     Additionally, while the statute as clarified may raise constitutional concerns if it is enforced

20 against individuals who used a deceased celebrity's image *prior to* the law's passage in 1985, it is not apparent that those concerns are implicated in this case. CMG and MMLLC's complaint against the

21 Milton Greene Archives indicates that for many years, CMG and MHG had a business relationship

22 pursuant to which a party seeking to use a Monroe/Greene photograph for commercial purposes secured a license from CMG covering Monroe's intellectual property rights, and a license from MHG covering

23 MHG's interest in the photographs. (Plaintiffs' First Amended Complaint against Milton H. Greene Archives, Inc., ¶ 10). MHG ended this relationship in 2004 when it informed MMLLC and CMG that

24 it would no longer seek permission to use Monroe's intellectual property rights and would not recognize

25 plaintiffs' rights in Monroe's name, image, etc. (*Id.*, ¶ 11). It appears that MMLLC's claim for damages is limited to Greene's use of Monroe's image after 2004 – well after the statute's passage in

26 1985. As for the complaint against Tom Kelley Studios, plaintiffs' claim for damages is not limited as to time. (Plaintiffs' First Amended Complaint against Tom Kelley Studios, Inc., ¶¶ 12-16). Given that

27 the court is obligated to interpret laws so as to avoid constitutional problems, however, see *I.N.S. v. St. Cyr*, 533 U.S. 289, 299-300 (2001), the court will not construe plaintiffs' complaint as seeking damages

28 against Kelley for use of Monroe's image prior to 1985.

1          (a) To MAY REIS the sum of $40,000.00 or 25% of the total remainder of my estate,

2          whichever shall be the lesser.

3          (b) To DR. MARIANNE KRIS 25% of the balance thereof, to be used by her as set

4          forth in ARTICLE FIFTH (d) of this my Last Will and Testament.

5          (c) To LEE STRASBERG the entire remaining balance."

6  Because the right of publicity was deemed to have existed at the time of Marilyn Monroe's death, and

7  because it was not expressly bequeathed in her will, it was transferred under the residual clause of the

8  will to Lee Strasberg and other residuary beneficiaries.[37]

9       SB 771 makes clear that the posthumous right of publicity is "freely transferable or descendible

10  by contract, trust, or any other testamentary instrument by any subsequent owner of the deceased

11  personality's rights as recognized by this section." *Id.* MMLLC argued previously that when Lee

12  Strasberg died, his property, which under SB 771 is deemed to have included Monroe's publicity rights,

13  passed by will to his wife, Anna Strasberg.[38] In 2001, Ms. Strasberg formed MMLLC, and she and the

14

---

15       [37]Defendants argue that Marilyn Monroe's right of publicity could not have been transferred to
16  Lee Strasberg under either SB 771 or § 3344.1 as enacted in 1985 because Strasberg died before the
    law's passage, and, as the court noted in its May 14 order, "a dead man or woman may not take
17  property." (Defs.' Opp. at 13-14, citing *In re Matthew's Estate*, 176 Cal. 576, 580 (1917)). This ignores
    the fact that the original statute – as clarified – deemed the right to have existed at the time of Monroe's
18  death. It is a longstanding principle that "[s]tatutes which invade the common law . . . are to be read
    with a presumption favoring the retention of long-established and familiar principles, except when a
19  statutory purpose to the contrary is evident." *Kasza v. Browner*, 133 F.3d 1159, 1167 (9th Cir. 1998)
    (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)). While the legislature's creation of a
20  retroactive statutory right perhaps conflicts with the common law property and probate principles on
    which the court relied in its prior holding, the legislature has clearly stated its intention to vest such a
21  right in predeceased personalities at the time of their deaths. The statutory purpose is thus evident. As
    a result, even though both Monroe and Lee Strasberg had died by 1985, the right is deemed to have
22  passed to Strasberg as Monroe's residuary beneficiary at the time of her death, and from Strasberg to
23  Anna Strasberg at the time of his death.

24       [38]Defendants argue that Anna Strasberg cannot be deemed to have received Marilyn Monroe's
    posthumous right of publicity because Monroe's will did not provide for the *successors-in-interest* of
25  her residuary beneficiaries to take the residue directly. (Defs.' Opp. at 14). They also argue that the
    right could not have passed through Lee Strasberg's will because he died before the effective date of
26  § 3344.1. (*Id.* at 14-15). These arguments overlook the fact that the statute created a retroactive right
27  deemed to have existed at the time of Monroe's death, and provided that it was transferred to Monroe's
    residuary beneficiary as of the date of her death. At that time, Lee Strasberg was alive and took
28  possession of the right as a residuary beneficiary. Consequently, the fact that Strasberg died prior to the