James M. Murphy (JM 3097)
SPIVAK LIPTON LLP
1700 Broadway, 21st Floor
New York, New York 10019
Telephone: (212) 765-2100
Facsimile: (212) 765-8954
Email: jmurphy@spivaklipton.com

Duncan W. Crabtree-Ireland (CA SBN 196878)
Danielle S. Van Lier (CA SBN 200435)
SCREEN ACTORS GUILD, INC.
5757 Wilshire Blvd., 7th Floor
Los Angeles, CA 90036
Telephone: (323) 549-6627
Facsimile: (323) 549-6624

Attorneys for Screen Actors Guild, Inc.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------X

| | |
|---|---|
| SHAW FAMILY ARCHIVES, LTD., EDITH MARCUS and META STEVENS, | ) ) ) |
| Plaintiffs, | ) ) 05 Civ. 3939 (CM) |
| -against- | ) ) ) |
| CMG WORLDWIDE, INC., an Indiana Corporation, and MARILYN MONROE, LLC, a Delaware Limited Liability Company, | ) ) ) ) ) |
| Defendants. | ) ) |

---------------------------------------------------X

**MEMORANDUM OF LAW OF SCREEN ACTORS GUILD, INC.
AS <u>AMICUS CURIAE</u> IN SUPPORT OF DEFENDANTS
CMG WORLDWIDE, INC. AND MARILYN MONROE, LLC**

**TABLE OF CONTENTS**

I. INTEREST OF THE AMICUS CURIAE .................................................................................... 1

II. INTRODUCTION ..................................................................................................................... 2

III. ARGUMENT ............................................................................................................................ 4

    A. A Descendible Publicity Right Was Believed to Exist at the Time of Marilyn Monroe's Death ................................................................................................................ 4

        1. The Lugosi Plaintiffs Believed They Had Inherited Bela Lugosi's Rights of Publicity ............................................................................................................... 4

        2. The Heirs of Other Prominent Performers Believed They Held Post-Mortem Rights of Publicity Contemporaneously to Marilyn Monroe's Death .................... 5

        3. Chief Justice Bird's Lugosi Dissent Recognized that Rights of Publicity Should be Descendible .......................................................................................... 6

    B. Senate Bill 771 Merely Clarified the Plain Language of Section 990 Which Allowed for the Testamentary Transfers at Issue in This Matter ...................................... 7

    C. Misappropriation of Publicity Rights Constitutes Unjust Enrichment and May Trigger Other Unjustifiable Consequences .................................................................... 10

        1. The Right of Publicity Protects a Commercial Value in a Public Figure's Persona ................................................................................................................ 10

        2. Performers and Personalities Suffer Substantial Harms Through Violation of their Rights of Publicity .................................................................................. 11

        3. Plaintiffs' Own Economic Prospects May Suffer if Monroe's Rights of Publicity are Cast into the Public Domain ........................................................... 12

    D. Plaintiffs Had Constructive Notice of the Defendants' Claims to Monroe's Publicity Rights ............................................................................................................... 12

IV. CONCLUSION ....................................................................................................................... 14

# TABLE OF AUTHORITIES

**Cases**

Comedy III Prods., Inc. v. Gary Saderup, Inc.,
   25 Cal.4th 387, 21 P.3d 797 (2001) ................................................................................. 2, 7

Delaney v. Superior Court,
   50 Cal.3d 785, 789 P.2d 934 (1990) ....................................................................................9

ETW Corp. v. Jireh Pub., Inc.,
   332 F.3d 915 (6th Cir. 2003) ............................................................................................... 2

Haelan Labs., Inc. v. Topps Chewing Gum, Inc.,
   202 F.2d 866 (2d Cir. 1953) ............................................................................................ 3, 6

Jim Henson Prods. Inc. v. John T. Brady & Assocs., Inc.,
   367 F. Supp. 175 (S.D.N.Y. 1975) .......................................................................................6

KNB Enters. v. Matthews,
   78 Cal. App.4th 362, 92 Cal. Rptr.2d 713 (2000) ............................................................... 3

Lugosi v. Universal Pictures, Inc.,
   25 Cal. 3d 813, 603 P.2d 425 (1979) ........................................................................... passim

Lungren v. Deukmejian,
   45 Cal.3d 727, 755 P.2d 299 (1988) ....................................................................................9

Milton Greene Archives, Inc. v. CMG Worldwide, Inc.,
   Case No. CV 05-2200 (C.D. Cal.) ...................................................................................... 3

Munden v. Harris,
   153 Mo.App. 652, 134 S.W. 1076 (1911) ........................................................................... 6

Price v. Hal Roach Studios, Inc.,
   400 F. Supp. 836 (S.D.N.Y 1975) ................................................................................... 5, 6

Pirone v. MacMillan, Inc.,
   894 F.2d 579 (2d Cir. 1990) .................................................................................................6

Uhlaender v. Henrickson,
   316 F. Supp. 1277 (D. Minn. 1970) ................................................................................... 10

Warner Bros. v. Curtis Mgmt. Group, Inc.,
   No. CV 91-4016-WMB, 1993 U.S. Dist. LEXIS 21279 (C.D. Cal. Mar. 30, 1993) ............... 5

<u>Zacchini v. Scripps-Howard Broadcasting Co.</u>,
    433 U.S. 562, 97 S.Ct. 2849 (1977) ............................................................................... 11, 12

**Statutes**

2007 Cal. Stat., ch. 439, § 2 ........................................................................................................... 9
1984 Cal. Stat. ch. 1704, § 1 ............................................................................................... 7, 13 n.3

California Civil Code Section 3344.1 ............................................................... 2, 7 n.2, 12, 13 n.3
California Civil Code Section 990 ....................................................................................... passim

**Treatises**

J. Thomas McCarthy, <u>The Rights of Publicity and Privacy</u> § 6:7 (2d ed. 2007) ............................ 2

Kalven, <u>Privacy in Tort Law - Were Warren and Brandeis Wrong?</u>,
    31 Law & Contemp. Prob. 326 (1966) ...................................................................................... 11

I. **INTEREST OF THE *AMICUS CURIAE***

Screen Actors Guild respectfully submits this memorandum of law to address the history and importance of the California's right of publicity statute that is under attack here.

Amicus Screen Actors Guild ("SAG" or the "Guild") is the nation's largest labor union representing working actors. It is the collective bargaining representative for over 120,000 professional actors and performing artists—including dancers, singers and stunt performers—in the theatrical and television motion picture industry, more than three-quarters of whom reside in California or New York. The Guild exists to protect and enhance actors' working conditions, compensation, and benefits and to be a powerful, unified voice on behalf of artists' rights.

Since its establishment in 1933, the Guild has represented performers in the motion picture industry. Many of these performers, like Marilyn Monroe ("Monroe"), are now deceased, but their likenesses and images may still have tremendous commercial value. Many others will never be "famous" in their own right but their images or likenesses have or will attain value in the marketplace. Like countless other public figures, these performers and their beneficiaries rely on laws such as California's right of publicity laws to protect some of their greatest assets—their names, likenesses and reputations. As misuse of these assets by unauthorized parties could have a significant effect on performers' careers and financial interests, as well as their intended beneficiaries' financial interests, the Guild and its members have a fundamental interest in ensuring that these protections are not eroded.

The Guild has long fought to preserve the rights of performers and others in their images, names, likenesses, and reputations, including through legislative efforts. In furtherance of those aims, the Guild strongly supported enactment of California's original post-mortem right of publicity statute, California Civil Code Section 990 ("Section 990"), as well as the subsequent

1

amendments in 1999 that renumbered it to California Civil Code Section 3344.1 ("Section 3344.1")[1] and extended its duration. The Guild also co-sponsored California Senate Bill 771 ("SB 771"), at issue here, which sought to clarify that, as its plain language states, the statute was always intended to accord protection to the names, voices, signatures, photographs, and likenesses of those who had died within 50 (later 70) years prior to its enactment.

## II.     INTRODUCTION

At any given point in time, there are tens, if not hundreds, of thousands of individuals making, or attempting to make, a career and living through the use of their names, voices, likenesses, images, reputations, and their very personas.  The cornerstone of their careers is their ability to exploit, and to control the exploitation of, their rights in these intangible but often very valuable assets. Critical to this ability are the protections embodied in the rights-of-publicity laws in at least twenty-eight (28) states.  These laws are intended to ensure that these public figures have the sole right to control how their names, images, and other personal traits are exploited.  J. Thomas McCarthy, The Rights of Publicity and Privacy § 6:7 (2d ed. 2007).

The right of publicity protects a form of intellectual property that society deems to have some social utility and rests in the inherent right of every human being to control the commercial use of his or her identity.  Comedy III Productions, Inc. v. Gary Saderup, Inc., 25 Cal.4th 387, 399, 400, 21 P.3d 797, 804-805 (2001); ETW Corp. v. Jireh Pub., Inc., 332 F.3d 915, 928 (6th Cir. 2003). Although derived originally from laws protecting privacy, the right of publicity has evolved into a protection of the proprietary interest in an individual's name, likeness, persona,

---

[1] Except as otherwise specifically indicated, all statutory citations are to the California Civil Code.

2

and other traits, as defined by the various states. See, e.g,. KNB Enters. v. Matthews, 78 Cal. App.4th 362, 92 Cal. Rptr.2d 713 (2000). The term "right of publicity" originated in 1953 when the Second Circuit recognized the publicity value in one's photograph as separate and apart from any right to privacy. Haelan Labs., Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866 (2d Cir. 1953).

The heirs of numerous deceased personalities have long protected and exploited the rights of publicity that they have inherited, either by lineage or testamentary device. The California Supreme Court's decision in Lugosi v. Universal Pictures, Inc., 25 Cal.3d 813, 603 P.2d 425 (1979), cast doubt upon those rights. In response, the California Legislature passed Section 990 in 1984 to clarify that rights of publicity are property rights, fully descendible by trust, by testamentary document, or to certain statutory heirs, and that those beneficiaries could also freely pass them in the same manner. For nearly two decades, California's post-mortem right of publicity law has successfully preserved and protected beneficiaries' rights in deceased personalities' rights of publicity, functioning as the Legislature intended it.

The California Legislature, last year, passed Senate Bill 771 in response to prior holdings in this matter and proceeding parallel to this one in the Central District of California – Milton Greene Archives, Inc. v. CMG Worldwide, Inc., Case No. CV 05-2200 (C.D. Cal.) (the "California Proceeding") – which cast doubt on the scope of Section 3344.1. Contrary to Plaintiffs' argument, SB 771 merely clarified existing rights – rights that were believed to exist long before Section 990 was passed in 1984. Had the Legislature not acted, existing rights would have been thrown into disarray and opportunistic individuals would have been able to profit from the goodwill that countless deceased personalities and their beneficiaries had created and nurtured.

**III.   ARGUMENT**

    **A.   A Descendible Publicity Right Was Believed to Exist at the Time of Marilyn Monroe's Death**

Plaintiff here contends that "the notion that a descendible publicity right existed in any form in 1962 was virtually unthinkable" and goes on to boldly proclaim that "the settled law at the time of [Marilyn Monroe's] death did not recognize such rights." Both assertions are flawed, even without the benefit of hindsight. That the <u>Lugosi</u> case was ever filed, coupled with the result reached by the trial court, is sufficient to indicate that the notion of a descendible publicity right existed and that the law clearly recognized such rights in some manner.

        **1.   The <u>Lugosi</u> Plaintiffs Believed They Had Inherited Bela Lugosi's Rights of Publicity**

Bela Lugosi ("Lugosi") died in 1956, six years <u>before</u> Monroe. Lugosi's widow and surviving son, believing they had inherited a property right in Lugosi's likeness, filed a complaint against Universal Studios on February 3, 1966, a decade after Lugosi's death. <u>Lugosi</u>, 25 Cal.3d at 816-17, 603 P.2d at 427. While the <u>Lugosi</u> complaint was filed four years after Monroe's death, it alleged violations starting in or around 1960, two years before Monroe's death. After nearly six years of proceedings, the <u>Lugosi</u> trial court agreed with Lugosi's heirs, finding that "Lugosi during his lifetime had a protectable property or proprietary right in his facial characteristics and the individual manner of his likeness" and that "said property or proprietary right was of such character and substance that it did not terminate with [his] death but descended to his heirs." <u>Id</u>. at 817, 603 P.2d at 427.

Five years passed before the Court of Appeal reversed the <u>Lugosi</u> trial court in 1977, and it was not until 1979 that the California Supreme Court issued its opinion. Although the Court's decision has been widely read to hold that rights of publicity were not descendible, it does not go so far as to say that rights of publicity were <u>never</u> descendible. In fact, to the contrary, it posited

4

a situation where heirs could have succeeded to property rights resulting from the deceased personality's exploitation of his right of publicity. Id. at 818-20, 603 P.2d at 428-29.

### 2. The Heirs of Other Prominent Performers Believed They Held Post-Mortem Rights of Publicity During the Period Surrounding Marilyn Monroe's Death

Lugosi's heirs were not alone in their belief that they held post-mortem rights of publicity. In the 1950s and 1960s, at least, the heirs of other prominent deceased personalities believed they held such rights and took steps to both protect and exploit those rights. Prior to the Lugosi court's decision, the existence of post-mortem rights of publicity was readily accepted.

James Dean died in 1955, seven years before Marilyn Monroe, and there was no question in his heirs' minds that they held his rights of publicity. Soon after his untimely death in 1955, his family formed the James Dean Memorial Foundation and took action "to exploit or protect their purported rights to license, manufacture and sell merchandise bearing James Dean's name and likeness." Warner Bros. v. Curtis Mgmt. Group, Inc., No. CV 91-4016-WMB, 1993 U.S. Dist. LEXIS 21279, at *11 (C.D. Cal. Mar. 30, 1993).

Additionally, while the Lugosi case was wending its way through the appellate courts in California, this court was called upon to decide a similar issue involving the rights of publicity of Stan Laurel and Oliver Hardy, who had died in 1965 and 1957, respectively. Price v. Hal Roach Studios, Inc., 400 F. Supp. 836 (S.D.N.Y 1975). The plaintiffs in that matter were the widows of Laurel and Hardy—the sole beneficiaries under their respective wills—and a corporation which had obtained the "exclusive right to utilize and merchandise the names, likenesses, characters and characterizations of Laurel and Hardy." Price, 400 F. Supp. at 838. The court astutely recognized that, while the right of publicity derived from the right of privacy, they were different concepts worthy of different protection, and held that the rights of publicity at issue were

5

descendible property rights.  Id. at 845-47.  But see Pirone v. MacMillan, Inc., 894 F.2d 579, 585-86 (2d Cir. 1990) (publicity right not descendible due to New York high court interpretation of New York statute); Jim Henson Prods. Inc. v. John T. Brady & Assocs., Inc., 367 F. Supp. 175, 190 n.17 (S.D.N.Y. 1994) (Price impliedly superseded by Pirone as to survival of publicity right after death under New York law).

Contrary to Plaintiff's assertion that such notions were unthinkable, it is clear that, even prior to Monroe's death, the heirs of other prominent deceased personalities believed they held, through inheritance, rights of publicity and could freely transfer, exploit, and protect them.  It is fully conceivable that, believing such rights were descendible, individuals such as Monroe intended that they be included within their estate.

### 3. Chief Justice Bird's Lugosi Dissent Recognized That Rights of Publicity Should Be Descendible

Chief Justice Bird, in her dissent to the Lugosi majority's opinion, noted the growing trend throughout the country to recognize the "individual's interest in the commercial value of his identity … as proprietary in nature and sometimes denominated a common law 'right of publicity'." Lugosi, 25 Cal.3d at 836, 603 P.2d at 439 (1979), (Bird, C.J., dissenting) (citing Haelan Labs., Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866 (2d Cir. 1953)).  Justice Bird supported this assertion with citations to cases from across the country, including a turn-of-the-century case which had the forethought to "recognize[e] the need to accord protection to the economic value in one's identity: 'If there is value in [one's likeness], sufficient to excite the cupidity of another, why is it not the property of him who gives it the value and from whom the value springs?'" Id. at 836 n.12, 603 P.2d at 439 n.12 (quoting Munden v. Harris, 153 Mo. App. 652, 134 SW. 1076 (1911)). Chief Justice Bird borrowed from copyright law, which she found similar in its recognition of an intangible right and proposed that the right of publicity should be

6

assignable and descendible, and should be accorded legal protection during the individual's lifetime and for 50 years thereafter. Id. at 847, 603 P.2d at 446-47.

The Lugosi court expressly invited the legislature, through amendment to Section 3344, "to recognize a right of action on behalf of the family or immediate heirs of persons such as Lugosi." Id. at 823, 603 P.2d at 430. The Legislature took the Court's suggestion a few years later by passing Senate Bill 613, in which it adopted Chief Justice Bird's suggestion that a right of publicity be declared a property right, descendible and protectable for 50 years after death. Cal. Civ. Code § 990.

### B. Senate Bill 771 Merely Clarified the Plain Language of Section 990 That Allowed for the Testamentary Transfers at Issue in This Matter

Following the California Supreme Court's decision in Lugosi, the Legislature acted to codify and protect the rights that were already being exploited by the estates of many deceased personalities. In 1984, it enacted Section 990 to create a statutory right of publicity, modeled largely on Section 3344, that was descendible to the heirs and assigns of deceased persons. Comedy III Prods., Inc., 25 Cal.4th at 391-92, 21 P.3d at 799-800 (citing 1984 Cal. Stat., ch. 1704, § 1). Although the language of Section 990 already provided that the rights of deceased personalities who died after 1934[2] may be conveyed by testamentary document, SB 771 added further clarification to the statute.

The definition of "deceased personality" in Section 990 made clear that it was intended to include the rights of personalities who died prior to the statute's enactment – personalities such as Monroe. "Deceased personality" is defined to include "without limitation, any such natural person who has died within 50 years prior to January 1, 1985." Cal. Civ. Code § 990(h).

---

[2] The 1999 amendments extended the protection for 70 years after death, such that it applied to personalities who died after 1914. Cal. Civ. Code § 3344.1.

7

Contrary to Plaintiff's assertion, this provision did not create a new right or divest anyone of existing rights. It merely clarified the belief held by many beneficiaries of celebrity estates prior to the Lugosi Court's decision: that they held the right to both protect and exploit the celebrity's right of publicity. The language of Section 990 could not be clearer as to the class of individuals whose rights were protected. If a "deceased personality" had died on or after January 1, 1935, his or her rights of publicity were descendible.

Section 990 made clear that rights of publicity were property rights that were freely transferable by testamentary document of the deceased personality and also by those who had inherited the right. Nothing in Section 990 prohibits transfer by means of a residuary clause in a testamentary document nor does anything prevent one who inherited the rights from transferring them. On the contrary, it expressly contemplates and provides for such transfers.

Section 990 stated, in pertinent part, that,

> [t]he rights recognized under this section are property rights, freely transferable, in whole or in part, by … means of … testamentary documents, whether the transfer occurs before the death of the deceased personality, by the deceased personality … or, after the death of the deceased personality, by the person or persons in whom such rights vest under this section….

Cal Civ. Code § 990(b).

The plain language is clear that rights could be transferred by the deceased personality's testamentary documents, with no requirement that the transfer be expressly stated. It further provides that the rights are exercisable by the recipient contemplated under subdivision (b) and that, "if no such transfer has occurred" they pass to the person or persons enumerated in subdivision (d). Id. § 990(c) (emphasis added). Section 990 has never mandated that the rights may only pass to the persons identified in subdivision (d), nor has it ever provided that the rights could not be passed through a residuary clause in a testamentary document.

8

Section 990(b) also makes clear that the rights could be transferred by one who received them, whether through a testamentary document or through operation of subdivision (d). Nothing in Section 990 ever provided that the rights terminate upon a beneficiary's death. On the contrary, it expressly provides that the rights may be transferred "by … means of … testamentary documents … by the person or persons in whom such rights vest under this section." Id. § 990(b). A testamentary beneficiary is clearly one in whom the rights vested under that section.

"If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature…." Delaney v. Superior Court, 50 Cal.3d 785, 798, 789 P.2d 934, 941 (1990) (quoting Lungren v. Deukmejian, 45 Cal.3d 727, 735, 755 P.2d 299, 303-04 (1988)). Nonetheless, questions as to the clarity of the statute's plain language have been raised recently in both this proceeding and in the California Proceeding. The Legislature, in an effort to clarify its original intent and abrogate the holdings in those cases, passed SB 771. 2007 Cal. Stat., ch. 439, § 2.

Having died in 1962, twenty-three years prior to the statute's effective date, Monroe was clearly included within Section 990's definition of "deceased personality," a definition made all clearer by SB 771. That Lee Strasberg, Monroe's testimony beneficiary, could succeed to those rights through Monroe's will should not be in question, nor should his ability to transfer it to his own heirs.

### C. Misappropriation of Publicity Rights Constitutes Unjust Enrichment and May Trigger Other Unjustifiable Consequences

#### 1. The Right of Publicity Protects a Commercial Value in a Public Figure's Persona

Performers and other public figures invest considerable time, money, and effort into developing skills and a persona that may create commercial value for themselves and their beneficiaries. Those, like Monroe, who have attained "celebrity" status have succeeded in creating an image or persona that has commercial value based on their "public visibility and the characteristics for which he or she is known." Lugosi, 25 Cal.3d at 834, 603 P.2d at 438 (Bird, C.J. dissenting). A performer's primary asset is him or herself and the ability to channel performances or a persona that can generate further economic opportunities. It is this goodwill that is protected by the right of publicity.

While luck and public acceptance may distinguish celebrities from other talented performers, there can be no question that the right of publicity simply reflects the ability of individuals to profit from the fruits of their labors. "A celebrity must be considered to have invested his years of practice and competition in a public personality which eventually may reach marketable status." Uhlaender v. Henrickson, 316 F. Supp. 1277, 1282 (D. Minn. 1970). Stardom sufficient to command commercial value is a valuable commodity, exploitation of which should rightfully be controlled by the personality or, upon his death, by his or her estate. This is as important, if not more important, for non-celebrities who develop iconic qualities with commercial value, as they may not have significant resources other than a particular image that is subject to misappropriation.

## 2. Performers and Personalities Suffer Substantial Harms Through Violation of Their Rights of Publicity

Just as violation of publicity rights through misappropriation of image or likeness triggers both short- and long-term economic losses that could ruin a living actor's career, such violations could erode or eliminate the commercial value of a deceased personality's name, voice, signature, photograph, or likeness. Loss of control over the nature of images, the manner in which such images are disseminated, the breadth of distribution, and the timing of dissemination may all occur through misappropriation, wreaking severe economic consequences. Unauthorized images could simply dilute a market that can accommodate only limited exploitation, or may diminish the value of a deceased personality's image. Section 990 was intended to preserve the value of a personality for the benefit of that personality's heirs as transferees.

Unauthorized commercial appropriation of one's identity converts the potential economic value in that identity to another's advantage. The user is unjustly enriched, reaping one of the benefits of the personality's investment in himself. Lugosi, 25 Cal.3d at 839, 603 P.2d at 441 (Bird, C.J., dissenting). This is no less the case when the personality's heirs have invested time, money, and effort in fostering and preserving that value.

The United States Supreme Court recognized with respect to the right of publicity that "[n]o social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 576, 97 S. Ct. 2849, 2857 (1977) (quoting Kalven, Privacy in Tort Law - Were Warren and Brandeis Wrong?, 31 Law & Contemp. Prob. 326, 331 (1966)). The Zacchini Court further pointed out that "the rationale for [protecting the right of publicity] is the straight-forward one of preventing unjust enrichment by the theft of good will." Id. (quoting

Kalven, supra, at 331). Those principles enumerated in Zacchini are no less important when the good will generated is held by the heirs of the now-deceased individual.

### 3. Plaintiffs' Own Economic Prospects May Suffer If Monroe's Rights of Publicity Are Cast into the Public Domain

In this matter, Plaintiffs' actions may proverbially cut off their nose to spite their face. The crux of this dispute is Plaintiffs' use of a photograph of Monroe, the copyright of which is owned by Plaintiffs, on commercial merchandise. Such use is commercially viable only because of Defendants' careful stewardship of Monroe's rights of publicity.

Plaintiffs' efforts to force Monroe's image into the public domain risks opening floodgates that would allow anyone to commercially appropriate her image. Any number of other photographers may have photographs of Monroe with just as much appeal as Plaintiffs'. If her image falls into the public domain, there is nothing to stop others from similarly exploiting their photographs, thus flooding the marketplace and diminishing any possible commercial value that might have been gained.

### D. Plaintiffs Had Constructive Notice of the Defendants' Claims to Monroe's Publicity Rights

Plaintiffs contend that they had been licensing images of Monroe since 1987 based on the "longstanding and settled expectation that there was no right of publicity in Marilyn Monroe." They argue that Section 3344.1, as amended in 2007, introduced a new right and interferes with settled property relationships. Notwithstanding the error in their conclusions, Plaintiffs completely ignore the registration scheme of Section 990(f), which has been in place since 1984,

and which created a public record of claims to ownership of deceased personalities' rights of publicity.[3]

Much like the registration schemes embodied in other areas of law, the registration scheme in Section 990(f) gives constructive notice of protected rights. With reasonable efforts, Plaintiffs could have inquired and learned of Defendants' claims to Monroe's rights prior to any efforts to commercially exploit their copyrights in the photographs they own. Plaintiff had constructive notice of the Defendants' claims to Monroe's rights of publicity since the time those rights were registered in 1985, two years before Plaintiffs began licensing the photographs. Plaintiffs therefore cannot credibly claim to be innocent infringers simply because they believed

---

[3] Civil Code § 990(f) stated:

  (1) A successor-in-interest to the rights of a deceased personality under this section or a licensee thereof may not recover damages for a use prohibited by this section that occurs before the successor-in-interest or licensee registers a claim of the rights under paragraph (2).

  (2) Any person claiming to be a successor-in-interest to the rights of a deceased personality under this section or a licensee thereof may register that claim with the Secretary of State on a form prescribed by the Secretary of State and upon payment of a fee of ten dollars ($10). The form shall be verified and shall include the name and date of death of the deceased personality, the name and address of the claimant, the basis of the claim, and the rights claimed.

  (3) Upon receipt and after filing of any document under this section, the Secretary of State may microfilm or reproduce by other techniques any of the filings or documents and destroy the original filing or document. The microfilm or other reproduction of any document under the provisions of this section shall be admissible in any court of law. The microfilm or other reproduction of any document may be destroyed by the Secretary of State 50 years after the death of the personality named therein.

  (4) Claims registered under this subdivision shall be public records.

1984 Cal. Stat. ch. 1704, § 1.

Current Section 3344.1 is virtually identical with the additional mandate that the registry of claimed successors-in-interest be made available online and the requirement that documents be held for 70 years after death.

the rights did not exist.[4]  Nor can Plaintiffs rest on inaccurate interpretations of the law to divest Defendants of what is rightfully theirs.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.


Dated: March 13, 2008

                                        Respectfully submitted,

                                        By:   /s/ James M. Murphy

                                        James M. Murphy (JM 3097)
                                        SPIVAK LIPTON LLP
                                        1700 Broadway, 21st Floor
                                        New York, New York 10019
                                        Telephone: (212) 765-2100
                                        Facsimile: (212) 765-8954
                                        Email: jmurphy@spivaklipton.com

                                        Duncan W. Crabtree-Ireland (CA SBN 196878)
                                        Danielle S. Van Lier (CA SBN 200435)
                                        SCREEN ACTORS GUILD, INC.
                                        5757 Wilshire Blvd., 7th Floor
                                        Los Angeles, CA 90036
                                        Telephone: (323) 549-6627
                                        Facsimile: (323) 549-6624

                                        Attorneys for Screen Actors Guild, Inc.

---

[4] Although Defendant Marilyn Monroe, LLC did not register its rights with the California Secretary of State until 2002, its predecessors-in-interests, the Estates of Lee Strasberg and Marianne Kris registered their on March 15, 1985 and February 8, 1985, respectively.