# ARTICLE VIII

# INDEMNIFICATION

Section 8.1 **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article VIII, each person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he, or a person of whom he is the legal representative, is or was a Manager or officer of the Company or while a Manager or officer of the Company is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the Delaware Act, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article VIII shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder. The rights granted pursuant to this Article VIII shall be deemed contract rights, and no amendment, modification or repeal of this Article VIII shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal. It is expressly acknowledged that the indemnification provided in this Article VIII could involve indemnification for negligence or under theories of strict liability.

Section 8.2 **Advance Payment.** The right to indemnification conferred in this Article VIII shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under Section 8.1 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Manager or officer of his good faith belief that he has met the standard of conduct necessary for indemnification under this Article VIII and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article VIII or otherwise.

Section 8.3 **Indemnification of Employees and Agents.** The Company, by adoption of a resolution of the Manager, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Manager and officers under this Article VIII; and the Company may indemnify and advance expenses to persons who are not or were not Manager, officers, employees or agents of the Company but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation,

partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Manager and officers under this Article VIII.

Section 8.4 **Appearance as a Witness.** Notwithstanding any other provision of this Article VIII, the Company may pay or reimburse expenses incurred by a Manager or officer in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

Section 8.5 **Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article VIII shall not be exclusive of any other right which a Manager, officer or other person indemnified pursuant to Section 8.3 may have or hereafter acquire under any law (common or statutory), the Certificate of Formation of the Company or this Agreement, agreement, vote of Members or disinterested Manager or otherwise.

Section 8.6 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article VIII.

Section 8.7 **Member Notification.** To the extent required by law, any indemnification of or advance of expenses to a Manager or officer in accordance with this Article VIII shall be reported in writing to the Members within the 12-month period immediately following the date of the indemnification or advance.

Section 8.8 **Savings Clause.** If this Article VIII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, the Company shall nevertheless indemnify and hold harmless each Manager, officer or any other person indemnified pursuant to this Article VIII as to costs, charges and expenses (including, without limitation, attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, to the full extent permitted by any applicable portion of this Article VIII that shall not have been invalidated and to the fullest extent permitted by applicable law.

Section 8.9 **Outside Businesses.** Any Member or Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper unless in direct violation of any covenant set forth herein or in any other agreement executed by any of the parties in connection herewith. No Member or Affiliate thereof shall be obligated to present any particular investment opportunity to the Company even if such opportunity is of a character that, if presented to the Company, could be taken by the Company, and any Member or Affiliate

15

thereof shall have the right to take for its own account (individually or as a partner, shareholder, fiduciary or otherwise) or to recommend to others any such particular investment opportunity.

## ARTICLE IX

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE MEMBERS

Section 9.1 <u>Representations and Warranties</u>. Each Member hereby represents and warrants to the Company and to the other Members that:

(a) Such Member understands and acknowledges that such Member's respective interest in the Company has not been registered under the Securities Act or any state securities laws;

(b) Such Member understands and acknowledges that its interest in the Company may not be sold unless it is registered under the Securities Act and applicable state securities laws, or pursuant to an exemption from such registration requirements;

(c) The limitations on transfer contained in this Section 9.1 and in Article II of this Agreement create an economic risk that such Member is capable of bearing;

(d) Such Member is acquiring its interest in the Company for investment and not with a view to the resale or distribution thereof;

(e) All property contributed to the Company as part of such Member's Capital Contribution has been or will be contributed free and clear of all liens, pledges, claims, security interests, encumbrances and similar interests of any kind whatsoever;

(f) If such Member is an entity, it is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization with all requisite power and authority to enter into this Agreement and to perform its obligations hereunder;

(g) This Agreement constitutes the legal, valid and binding obligation of such Member enforceable against such Member in accordance with its terms;

(h) No consents or approvals from, or notification of or filings with any governmental authority or other person or entity are required for such Member to enter into this Agreement. All action on the part of such Member necessary for the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, have been duly taken; and

(i) The execution and delivery of this Agreement by such Member and the consummation of the transactions contemplated hereby by such Member do not conflict with or contravene the provisions of any organizational document, agreement or instrument by which such Member or such Member's properties are bound or any law, rule, regulation, order or decree to which such Member or such Member's properties are subject.

Section 9.2 <u>Confidentiality</u>.

(a) <u>Confidential Information</u>. Each Member shall, except as may be specifically permitted hereunder, (i) use its best efforts to protect the proprietary or confidential information of the Company, (ii) not disclose to any other person or entity the existence or terms of this Agreement, or any other contract or agreement between the Company, the Members or any Affiliate of such Member (as defined below) unless all Members have consented thereto, and (iii) not use the confidential and proprietary information of the others except to the extent and for the purposes contemplated in this Agreement or permitted by any other contract or agreement between the Company, the Members or any of the Members' Affiliates. As used herein, "Affiliate" shall mean any person or entity that directly or indirectly controls, is controlled by, or is under common control with, a Member. For the purposes of the definition of "Affiliate" only, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

(b) <u>Exceptions</u>. The obligations of confidentiality and nonuse imposed under this Section 9.2 shall not apply to any confidential or proprietary information of the disclosing party which:

(i) is or becomes public or available to the general public otherwise than through any act or default of the non-disclosing party;

(ii) is obtained or derived from a third party which, to the best knowledge of the non-disclosing party, is lawfully in possession of such information and does not hold such information subject to any confidentiality or nonuse obligations; or

(iii) is required to be disclosed by one of the parties pursuant to applicable law, or under a government or court order; <u>provided, however,</u> that (A) the obligations of confidentiality and nonuse shall continue to the fullest extent not in conflict with such law or order, and (B) if and when a party is required to disclose such confidential or proprietary information pursuant to any such law or order, such party shall use its best efforts to (1) give the other party prompt notice of such requirement so as to permit such party time in which to appeal, oppose or take other protective action and (2) obtain a protective order or take such other actions as will prevent or limit, to the fullest extent possible, public access to, or disclosure of, such confidential or proprietary information.

## ARTICLE X

## MISCELLANEOUS

Section 10.1 <u>Notices</u>. All notices, requests, demands and other communications called for or contemplated by this Agreement shall be in writing and shall be deemed to have been duly given or delivered when mailed by United States certified or registered mail, postage prepaid, addressed to the Members, their successors in interest or their assignees, and to any attorney-in-fact appointed by a Member pursuant to Section 2.1 of this Agreement, at the addresses set forth hereinabove or at such other addresses as they may from time to time designate by written notice in the aforesaid manner.

17

Section 10.2 <u>Attorneys' Fees</u>. If any litigation is commenced between the parties hereto or their personal representatives concerning any provision of this Agreement or the rights and duties of any person in relation thereto, the party or parties prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to actual costs and expenses (including without limitation expert witness fees) and to a reasonable sum as and for his or their attorneys' fees in such litigation. This Section 10.2 shall not apply to arbitration proceedings pursuant to Section 10.8 of this Agreement or to any court proceeding in aid of such arbitration or to confirm the arbitrator's award.

Section 10.3 <u>Entire Agreement</u>. This Agreement constitutes the entire understanding between the Members with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements or understandings, written or oral.

Section 10.4 <u>Power of Attorney</u>. Each Member irrevocably constitutes and appoints the person or any of the persons that may be acting as Manager from time to time as his attorney-in-fact, in his name, place and stead to make, execute, acknowledge, file and record:

(a) Any instrument that may be required to be recorded or filed by the Company;

(b) All documents that may be required to effectuate the dissolution and termination of the Company; and

(c) Any other document that may be required to be filed or recorded by the Company or which the Manager deems advisable.

It is expressly understood and agreed that the grant of this power of attorney is coupled with an interest and shall survive the delivery of an assignment of a Company interest. In the event of any conflict between the provisions of this Agreement or any amendment to it and any document executed, acknowledged, sworn to, or filed by the Manager under this power of attorney, this Agreement and its amendments shall govern.

Section 10.5 <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective executors, administrators, successors in interest and assigns.

Section 10.6 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall constitute a binding and enforceable agreement, but all of which shall together constitute one and the same instrument.

Section 10.7 <u>Governing Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware.

Section 10.8 **Arbitration**.

(a) <u>Agreement to Arbitrate</u>. Any controversy, dispute or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement, including any claim based on contract, tort or statute, shall be settled, upon the written request of any Member, before a sole arbitrator conducted in Los Angeles, California, or such other location upon which the parties may mutually agree, and judgment upon any award rendered by the arbitrator may be entered by any State or Federal court having jurisdiction thereof. Any

18

controversy concerning whether a dispute is an arbitrable dispute shall be determined by the arbitrator. The parties intend that this agreement to arbitrate be valid, specifically enforceable and irrevocable. The designation of a situs or specifically a governing law for this agreement or the arbitration shall not be deemed an election to preclude application of the Federal Arbitration Act, if it would be applicable.

(b) <u>Selection of Arbitrator</u>. The sole arbitrator shall be an attorney admitted to practice in New York or California who has had experience in the field of licensing intellectual property rights in the entertainment industry, but has had no prior relationship with any Member or with the Estate of Marilyn Monroe. The Members shall endeavor to agree upon the selection of the sole arbitrator, but if no arbitrator has been agreed upon within seventy-five (75) days following receipt of a Notice of Objection pursuant to Section 5.10 or Section 5.11 of this Agreement, or within fifteen (15) days following receipt of a written request for arbitration pursuant to this Section 10.8(a) of this Agreement, then each Member shall submit the name of a proposed arbitrator meeting the qualifications set forth above, and the arbitrator shall be chosen by lot from the names submitted.

(c) <u>Expenses</u>. The arbitrator may, but need not, award to the prevailing party in any arbitration proceeding commenced hereunder, the prevailing party's costs and expenses (including without limitation expert witness expenses and reasonable attorneys' fees) of investigating, preparing and presenting or defending against such arbitration claim or cause of action, and, in the event that such an award of costs and expenses is made, the court shall include such award in its judgment for the prevailing party.

Section 10.9 **Additional Definitions**. Unless the context otherwise requires, the terms defined in this Section 10.9 shall, for the purposes of this Agreement, have the meanings herein specified.

"<u>Capital Account</u>" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 3.6 hereof.

"<u>Capital Contribution</u>" means, with respect to any Member, the aggregate amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company "Certificate" hereof with respect to such Member's Interest.

"<u>Certificate</u>" means the Certificate of Formation of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of Delaware pursuant to the Delaware Act.

"<u>Depreciation</u>" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period; <u>provided</u>, <u>however</u>, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

"Fiscal Year" means (i) the period commencing upon the formation of the Company and ending on December 31, 2001, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clause (ii) of this sentence for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Article IV hereof.

"Gross Asset Value" means, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(a) the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed to by the contributing Member and the Tax Matters Member;

(b) the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Tax Matters Member, as of the following times: (i) the distribution by the Company to a Member of more than a *de minimis* amount of Company assets as consideration for such Member's Interest; (ii) the contribution to the Company by a Member of more than a *de minimis* amount of assets in exchange for an Interest; and (iii) the liquidation of the Company within the meaning of Treasury Regulation § 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clause (i) or (ii) of this sentence shall be made only if the Tax Matters Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(c) the Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the Tax Matters Member.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a) or paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Interest" means a Member's share of the profits and losses of the Company and a Member's rights to receive distributions of the Company's assets in accordance with the provisions of this Agreement and the Delaware Act.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Net Cash Flow" means, for each Fiscal Year or other period of the Company, the gross cash receipts of the Company from all sources, but excluding any amounts, such as gross receipts taxes, that are held by the Company as a collection agent or in trust for others or that are otherwise not unconditionally available to the Company, less all amounts paid by or for the account of the Company during the same Fiscal Year or other period (including, without limitation, payments of principal and interest on any Company indebtedness and expenses reimbursed to the Members under Section 5.9 hereof), and less any amounts determined by the Manager to be necessary to provide a reasonable reserve for working-capital needs or any other contingencies of the Company. Net Cash Flow shall be determined in accordance with the cash

20

receipts and disbursements method of accounting and otherwise in accordance with generally accepted accounting principles, consistently applied. Net Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions, depletion, similar allowances or other non-cash items, but shall be increased by any reduction of reserves previously established.

"Permitted Disposition" means:

(i) A Transfer by any Member who is an individual to his or her spouse, adult lineal descendants, the adult spouses of the Member's lineal descendants or a trust, partnership, limited liability company or a corporation solely for the benefit of the Member, the Member's spouse and/or the Member's minor or adult lineal descendant and/or their spouses;

(ii) A Transfer of a Member's Interest to the Company;

(iii) A Transfer, in the event of the death of any Member who is an individual, to his or her (a) personal representatives (in their capacities as such), (b) estate and/or (c) named beneficiaries;

(iv) A Transfer by a Member which is a trust to the beneficiaries of such trust pursuant to the terms of the agreement or declaration of trust relating to such trust;

(v) A Transfer by a Member which is an estate to the beneficiaries of such estate pursuant to a court order;

(vi) A Transfer by a Member which is a partnership to one or more of its partners, by a Member which is a limited liability company to one or more of its members, or by a Member which is a corporation to one or more of its shareholders; or

(vii) A Transfer of a Member's Interest by a Member to one or more Affiliates of such Member if such Transfer is approved in writing by the Manager prior to such Transfer.

"Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with §703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to §703(a)(1) of the Code), with the following adjustments:

(a) any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b) any expenditures of the Company described in §705(a)(2)(B) of the Code (or treated as expenditures described in §705(a)(2)(B) of the Code pursuant to Treasury Regulation § 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(c) in the event the Gross Asset Value of any Company asset is adjusted in accordance with paragraph (ii) or paragraph (iii) of the definition of "Gross Asset Value" above,

21

the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d) gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value; and

(e) in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation" above.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Tax Matters Member" shall be the Manager.

"Transfer" shall have the meaning set forth in Section 2.5 of the Agreement. The terms "Transferring," "Transferor," "Transferee" and "Transferred" shall have meaning correlative to the meaning of "Transfer."

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

Section 10.9 **Heading.** The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

IN WITNESS WHEREOF, this Agreement has been executed by the Initial Member as of the date first written above.

_____
Anna Strasberg, Administrator C.T.A. of the Estate
of Marilyn Monroe, Deceased

## SCHEDULE A

### Initial Capital Contributions and Sharing Percentages

| | Member and Address | Capital Contributed | Agreed Value | Sharing Percentages |
|---|---|---|---|---|
| 1. | Anna Strasberg, Administrator C.T.A. of the Estate of Marilyn Monroe, Deceased | All remaining assets of Estate of Marilyn Monroe including without limitation the assets listed as Exhibit "1". | | 100% |



# FIRST SUPPLEMENT TO AND AMENDMENT OF LIMITED LIABILITY COMPANY AGREEMENT

## MARILYN MONROE LLC

### a Delaware Limited Liability Company

This First Supplement to and Amendment of Limited Liability Company Agreement (the "Supplement") is entered into as of July 6th, 2001, by and among Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, deceased, Anna Strasberg, as Executor of the Estate of Lee Strasberg and the Anna Freud Centre (collectively the "Members"); and Anna Strasberg, as Manager of Marilyn Monroe LLC.

Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, deceased, formed a limited liability company known as Marilyn Monroe LLC (the "Company") under the laws of the State of Delaware for the purposes and on the terms and conditions set forth in a Limited Liability Company Agreement dated as of July 5th, 2001 (the "Agreement"). Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, deceased, and Anna Strasberg, as Manager of Marilyn Monroe LLC, now (1) have agreed to the admission of two new members, namely, Anna Strasberg, as Executor of the Estate of Lee Strasberg, deceased, and the Anna Freud Centre; (2) have agreed to the transfer of the limited liability company interests of Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, deceased, to Anna Strasberg, as Executor of the Estate of Lee Strasberg, deceased, and the Anna Freud Centre; (3) have agreed to the withdrawal of Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, deceased, as a Member; and (4) desire to set forth in writing the modifications to the Agreement.

Accordingly, the modifications to the Agreement are hereby stated in this Supplement, and the Members agree as follows:

1. In executing this Supplement Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, deceased, and Anna Strasberg, as Manager of Marilyn Monroe LLC, consent, in accordance with the provisions of Section 2.1 of the Agreement, to the admission of two new Members, namely Anna Strasberg, as Executor of the Estate of Lee Strasberg, deceased, and the Anna Freud Centre, and consent, in accordance with the provisions of Section 2.1 of the Agreement, to the transfer of the interests in Marilyn Monroe LLC held by Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, deceased, as follows: seventy-five percent (75%) thereof to Anna Strasberg, as Executor of the Estate of Lee Strasberg, deceased, and twenty-five percent (25%) thereof to the Anna Freud Centre.

2. In executing this supplement, Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, deceased, Anna Strasberg, as Executor of the Estate of Lee Strasberg, deceased, Anna Strasberg, as Manager of Marilyn Monroe LLC, and the Anna Freud Centre agree to the withdrawal of Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, deceased, as a Member of Marilyn Monroe LLC without, however, affecting the Capital

Contribution heretofore made to the Company by Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, which shall hereafter remain an asset of the Company and the interests in which shall hereafter be divided as set forth in paragraph "1" above. The Capital Account of each remaining Member shall hereafter reflect the aforesaid division of the Capital Contribution made by Anna Strasberg as Administrator C.T.A. of the Estate of Marilyn Monroe.

3. In executing this Supplement, Anna Strasberg, as Executor of the estate of Lee Strasberg, deceased, and the Anna Freud Centre, agree, in accordance with the provisions of Section 2.1 of the Agreement, to be bound by the terms and provisions of the Agreement as modified by this Supplement.

4. Schedule A to the Agreement is hereby amended in its entirety as follows:

### SCHEDULE A

### SHARING PERCENTAGES

| | Member | Sharing Percentages |
|---|---|---|
| 1. | Anna Strasberg, as Executor of the Estate of Lee Strasberg, deceased | 75% |
| 2. | The Anna Freud Centre | 25% |

IN WITNESS WHEREOF, the Members and Manager have executed this First Supplement to and Amendment of Limited Liability Company Agreement as of the date first shown above.

MEMBERS:

_____
Anna Strasberg, as Administrator C.T.A. of the
Estate of Marilyn Monroe, deceased

_____
Anna Strasberg, as Executor of the estate of Lee
Strasberg, deceased

THE ANNA FREUD CENTRE

By: _____
Its: _____

Contribution heretofore made to the Company by Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, which shall hereafter remain an asset of the Company and the interests in which shall hereafter be divided as set forth in paragraph "1" above. The Capital Account of each remaining Member shall hereafter reflect the aforesaid division of the Capital Contribution made by Anna Strasberg as Administrator C.T.A. of the Estate of Marilyn Monroe.

3. In executing this Supplement, Anna Strasberg, as Executor of the estate of Lee Strasberg, deceased, and the Anna Freud Centre, agree, in accordance with the provisions of Section 2.1 of the Agreement, to be bound by the terms and provisions of the Agreement as modified by this Supplement.

4. Schedule A to the Agreement is hereby amended in its entirety as follows:

## SCHEDULE A

### SHARING PERCENTAGES

|   | Member | Sharing Percentages |
|---|--------|---------------------|
| 1. | Anna Strasberg, as Executor of the Estate of Lee Strasberg, deceased | 75% |
| 2. | The Anna Freud Centre | 25% |

IN WITNESS WHEREOF, the Members and Manager have executed this First Supplement to and Amendment of Limited Liability Company Agreement as of the date first shown above.

MEMBERS:

_____
Anna Strasberg, as Administrator C.T.A. of the Estate of Marilyn Monroe, deceased

_____
Anna Strasberg, as Executor of the estate of Lee Strasberg, deceased

THE ANNA FREUD CENTRE

By: *Steven B. Rosenfeld*
Its: *Attorney in Fact*

MANAGER:

_____
Anna Strasberg