UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
SHAW FAMILY ARCHIVES, LTD., EDITH     :
MARCUS and META STEVENS,

                                   :

              Plaintiffs,                Case No. 05 Civ. 3939 (CM)

                                   :

        -against-                Hon. Colleen McMahon

                                   :

CMG WORLDWIDE, INC. and MARILYN     :
MONROE LLC,                          :

             Defendants.      :
-------------------------------------------------------- X

## RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT
## AND ADDITIONAL MATERIAL FACTS

       Defendants / Consolidated Plaintiffs Marilyn Monroe LLC ("MMLLC") and CMG

Worldwide, Inc. ("CMG"), pursuant to Rule 56.1 of the Local Rules of the United States District

Court for the Southern District of New York, respectfully submit the following response to the

Rule 56.1 Statement of Facts in Support of the Motion of Shaw Family Archives, Ltd., Bradford

Licensing, Inc., Edith Marcus and Meta Stevens (collectively, "Plaintiffs") for Summary

Judgment.

       As indicated in MMLLC's individual responses, Plaintiffs have cited evidence that does

not support – or failed to cite any evidence that does support – certain of the statements made by

them as required by Local Rule 56.1(d); certain statements in the Plaintiffs Rule 56.1 Statement

contain legal arguments or improper characterizations; and certain statements need additional

facts, information or testimony to make the statements Plaintiffs have made accurate or not

misleading.  In addition, some statements in Plaintiffs' Rule 56.1 Statement contain inadmissible

evidence, and some statements contain facts that are not material to Plaintiffs' motion for

summary judgment.

MMLLC respectfully requests that the Court strike or disregard Plaintiffs' unsupported, inaccurate, inadmissible or argumentative and conclusory statements. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]here the cited materials do not support the factual assertions in the statements, the Court is free to disregard the assertion.") (internal quotations omitted); *Epstein v. Kemper Ins. Co.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002) ("Statements in a . . . Rule 56.1 statement are inappropriate if they . . . are conclusory or argumentative, or do not cite to supporting evidence.").

## MMLLC'S RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT

**MMLLC's Response to Statement No. 1:**

MMLLC disputes Plaintiffs' assertion in this statement and objects to it as based on inadmissible hearsay. To the contrary, as set forth in paragraphs 1-38 of MMLLC's Additional Material Facts ("AMF"), the indisputable facts of Marilyn Monroe's life establish that she died a California domiciliary.

**MMLLC's Response to Statement No. 2:**

MMLLC admits that Marilyn Monroe executed her will on January 14, 1961. MMLLC disputes the assertion that Marilyn Monroe executed the will in New York because the cited evidence does not indicate where the will was executed. (*See* Marcus Decl., Ex. 1).

**MMLLC's Response to Statement No. 3**:

MMLLC does not dispute that Marilyn Monroe's will named Aaron Frosch ("Frosch") as executor of her last will and testament. MMLLC disputes that Frosch was named as "trustee of her Estate" – the will only named Frosch as trustee of a $100,000 trust for the benefit of Monroe's mother, Gladys Baker, and Mrs. Michael Chekhov. (*See* Marcus Decl., Ex. 1, at MM-0000383).

**MMLLC's Response to Statement No. 4**:

MMLLC does not dispute Plaintiffs' assertions in this statement.

**MMLLC's Response to Statement No. 5:**

MMLLC disputes Plaintiffs' assertions in this statement.  The affidavits cited by

Plaintiffs in support of this assertion are inadmissible hearsay and should be disregarded.

Further, as set forth in more detail in paragraphs 12-38 of MMLLC's AMF, at the time of her

death Marilyn Monroe's permanent residence was her home at 12305 Fifth Helena Drive,

Brentwood, California.

**MMLLC's Response to Statement No. 6:**

MMLLC disputes Plaintiffs' assertion and object to it as based on inadmissible hearsay.

As set forth in more detail in paragraphs 12-38 of MMLLC's AMF, at the time of her death

Marilyn Monroe was a California resident.

**MMLLC's Response to Statement No. 7:**

MMLLC does not dispute Plaintiffs' assertions in this statement.

**MMLLC's Response to Statement No. 8:**

MMLLC does not dispute that Nancy Miracle ("Miracle") claimed she was the daughter

of Marilyn Monroe, whom Miracle believed to be a woman named "Nancy Cusumano" from

Brooklyn, New York, and sought a share of the Monroe estate.  (*See* Marcus Decl., Ex. 40 at

SFA1 0002-03).

**MMLLC's Response to Statement No. 9:**

MMLLC disputes Plaintiffs' assertions in this statement, which are conclusory and

argumentative, and do not contain facts material to the determination of Plaintiffs' summary

judgment motion.  Statements made by Miracle are completely irrelevant to the issue of Marilyn

Monroe's domicile.  Further, Plaintiffs cite to a number of exhibits that do not actually contain any representation on the part of Nancy Miracle that Marilyn Monroe was a California domiciliary, and to pages that do not actually exist in the cited exhibits.  (*See* Pl. Statement No. 9 (citing to Marcus. Decl., Ex. 42 p. 1-2, 4-5; Ex. 43 p.1; Ex. 50 p. 8, 19-20)).

In fact, Nancy Miracle's original complaint alleged that "Nancy Cusumano's" will was probated in New York Surrogate's Court, and said nothing about Marilyn Monroe's California domicile.  (*See* Marcus Decl., Ex. 40 ¶¶ 4, 5).  It was not until a November 24, 1992 hearing, that Miracle's attorney stated for the first time that Marilyn Monroe might have been domiciled in California.  (*See* Marcus Decl., Ex. 45 at 9).  Miracle subsequently amended her complaint to assert a claim that Marilyn Monroe was a California domiciliary (Marcus Decl., Ex. 46 ¶ 4), but never filed factual evidence supporting California domicile, and repeatedly misstated key historical facts.  (*See, e.g.,* Marcus Decl., Ex. 47 at 3) ("Marilyn Monroe, aka Nancy Cusumano, moved to California when she was 19 years old . . .").

**MMLLC's Response to Statement No. 10:**

MMLLC disputes Plaintiffs' assertions in this statement, which are conclusory and argumentative.  Much of the cited evidence does not actually reflect any factual representation that Marilyn Monroe died a New York domiciliary.  (*See* Pl. Statement No. 10 (citing to Marcus. Decl., Ex. 44 p. 4; Ex. 45 pp. 15-21; Ex. 51 p.1 )).  And as reflected in more detail in paragraphs 82-100 of MMLLC's AMF, while the Administratrix's attorney made legal arguments early in the Miracle proceedings based in part on Marilyn Monroe's domicile, such arguments were abandoned after Miracle raised the issue of Marilyn Monroe's California domicile.

**MMLLC's Response to Statement No. 11:**

MMLLC disputes Plaintiffs assertions in this statement, which are conclusory, argumentative, and factually unsupportable. The Hawaii District Court found that it lacked personal jurisdiction given the lack of sufficient minimum contacts between the Administratrix or Marilyn Monroe and the State of Hawaii, (*see* Marcus Decl., Ex. 48 at SFA1 0072; Ex. 49 at 2-9), and any alternative statement that Miracle could not state a claim under New York law was mere dicta. The Hawaii court certainly did not hold that Monroe was domiciled in New York. Further, even in its alternative dicta statements, the Hawaii District Court cited a number of factors in support of its finding that New York had the stronger interest, and relegated the issue of domicile to a parenthetical. (Marcus Decl., Ex. 49 at 13). Thus, Marilyn Monroe's domicile was mentioned only in passing, and was not an essential grounds for the Hawaii District Court's decision.

**MMLLC's Response to Statement No. 12**

MMLLC does not dispute that the Hawaii District Court dismissed Miracle's complaint because the court lacked personal jurisdiction. MMLLC disputes Plaintiffs' remaining assertions in this statement. Once the Hawaii District Court concluded that personal jurisdiction did not exist, it lacked jurisdiction to address the case on the merits, and any alternative holding on the merits is void. *See, e.g., Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1193 (2007). Accordingly, when Miracle reasserted her claims in New York, the New York Surrogate's Court refused to accord any estoppel effect to the Hawaii decision. (*See* AMF ¶¶ 99-100).

**MMLLC's Response to Statement No. 13**

MMLLC disputes Plaintiffs' assertions in this statement. The Hawaii District Court did not hold that "Nancy Miracle did not have personal jurisdiction over Anna Strasberg" – rather

the court held that the State of Hawaii lacked jurisdiction.  In addition, the Hawaii District Court did not hold that it lacked jurisdiction "because . . . Marilyn Monroe died a domiciliary of New York" – rather, it held that it lacked personal jurisdiction because neither Anna Strasberg nor Marilyn Monroe had sufficient minimum contacts with <u>Hawaii</u> to satisfy due process.  (Marcus Decl., Ex. 49 at 3).  Whether Marilyn Monroe was a New York or California domiciliary was irrelevant to the issue.

Further, the Hawaii District Court's decision speaks for itself, and MMLLC respectfully refers the Court to that decision, attached as exhibit 49 to the Declaration of David Marcus, for its full contents.

**MMLLC's Response to Statement No. 14:**

MMLLC disputes Plaintiffs' assertions in this statement.  As stated in MMLLC's Response to Statement No. 12, once it concluded that it lacked personal jurisdiction, the Hawaii District Court was powerless to address the merits of Miracle's pretermitted child claim, and that portion of the decision is void.  Further, as stated in MMLLC's Response to Statement No. 11, the Hawaii District Court cited a number of factors in support of its finding that New York had the stronger interest in Miracle's dispute with Monroe's estate, relegating the issue of Marilyn Monroe's domicile to a parenthetical.

**MMLLC's Response to Statement No. 15:**

MMLLC does not dispute that the Hawaii District Court denied Miracle's motion to reconsider the order dismissing her complaint.

**MMLLC's Response to Statement No. 16:**

MMLLC does not dispute that the Ninth Circuit denied Miracle's appeal. MMLLC further states that the Ninth Circuit denied Miracle's appeal on jurisdictional, rather than substantive, grounds. (*See* Marcus Decl., Ex. 55).

**MMLLC's Response to Statement No. 17:**

MMLLC does not dispute Plaintiffs' assertions in this statement.

**MMLLC's Response to Statement No. 18:**

MMLLC disputes Plaintiffs' assertions in this statement because Plaintiffs have failed to offer any admissible evidence of these facts, but rather have offered only an incomplete, first page of a purported "notice of probate" document, which does not indicate, among other things, whether Frosch filed the document in question, or in what capacity he was acting.

**MMLLC's Response to Statement No. 19:**

MMLLC does not dispute Plaintiffs' assertions in this statement.

**MMLLC's Response to Statement No. 20:**

MMLLC does not dispute Plaintiffs' assertions in this statement.

**MMLLC's Response to Statement No. 21:**

MMLLC disputes Plaintiffs' assertions in this statement, which are incomplete, inaccurate and misleading. For example, while Frosch did state in the petition that Marilyn Monroe's will was executed in conformity with the laws of the State of New York, he also stated that the will was executed in conformity with the laws of the State of California. (Marcus Decl., Ex. 6 at SFA1 0222). The petition speaks for itself, and MMLLC respectfully refers the Court to the petition, attached as exhibit 6 to the Declaration of David Marcus, for its full contents. MMLLC also disputes Plaintiffs' assertions in this statement to the extent they intend to imply that MMLLC is somehow bound by Frosch's statements.

**MMLLC's Response to Statement No. 22:**

MMLLC does not dispute that, on January 21, 1963, the California Superior Court issued an order admitting Marilyn Monroe's will to probate. MMLLC disputes Plaintiffs' remaining assertions in this statement as they are conclusory and assert legal arguments, particularly to the extent they suggest any significance to the court's phrase "foreign will" or "ancilliary."

**MMLLC's Response to Statement No. 23:**

MMLLC disputes Plaintiffs' assertions in this statement because they are conclusory, argumentative, and contain legal arguments (including to the extent they assert that a particular statement constitutes a "judicial finding of fact"). Plaintiffs have offered no evidence that the issue of Marilyn Monroe's residence was actually litigated before the California court.

**MMLLC's Response to Statement No. 24:**

MMLLC does not dispute that the 56-page document cited by Plaintiffs twice described New York as Marilyn Monroe's domicile. (*See* Marcus Decl., Ex. 26 at SFA1 0167, 0183). MMLLC disputes Plaintiffs' remaining assertions in this statement, which are conclusory, argumentative and misleading. The cited evidence does not support the assertion that Frosch referred to Marilyn Monroe as a New York domiciliary "throughout the pendency of the California probate proceedings." MMLLC also disputes Plaintiffs' assertions in this statement to the extent they imply that MMLLC is somehow bound by Frosch's statements.

**MMLLC's Response to Statement No. 25:**

MMLLC does not dispute that Frosch referred to New York probate proceedings as the "domiciliary" proceedings in a December 30, 1975 "Petition for Order Approving Compromise" and in a 56-page document filed on May 21, 1978. (*See* Marcus Decl., Ex. 24 at SFA1 0239, 0241; Ex. 26 at 0159, 0190). MMLLC disputes Plaintiffs' remaining assertions in this statement,

which are conclusory, argumentative, and misleading.  The cited evidence does not support the

assertion that Frosch referred to the New York proceedings as  "domiciliary" "throughout the

pendency of the California probate proceedings."  For example, Marcus Decl., Ex. 28, refers to

Frosch as the "domiciliary executor," but does not refer to New York as the "domiciliary" estate.

(Frosch acted as executor in both the New York and California proceedings.  (*See* Marcus Decl.,

Ex. 7).  MMLLC also disputes Plaintiffs' assertions in this statement to the extent they imply that

MMLLC is somehow bound by Frosch's statements.

**MMLLC's Response to Statement No. 26:**

MMLLC disputes Plaintiffs' assertions in this statement, which are conclusory,

argumentative, and misleading.  The cited evidence does not support the assertion that Frosch

ever referred to himself as the "Ancillary Executor in California," much less that he did so

"throughout the pendency of the California probate proceedings."  In fact, many of the exhibits

cited in Plaintiffs' Statement No. 26 reflect orders of the California probate court (*see* Marcus

Decl., Ex. 7; Ex. 25; Ex. 27), and not statements by Frosch.  Other exhibits, including a

memorandum of law filed with the California State Board of Equalization (*id.* Ex. 22) and an

opinion of the State Board of Equalizations (*id.* Ex. 25) similarly do not reflect any statements by

Frosch in the California probate proceedings.  MMLLC also disputes Plaintiffs' assertions in this

statement to the extent they imply that MMLLC is somehow bound by Frosch's statements.

**MMLLC's Response to Statement No. 27:**

MMLLC does not dispute that Frosch referred to a "domiciliary executor in New York"

in a December 30, 1975 "Petition for Order Approving Compromise" (Marcus Decl., Ex. 24 at

SFA1 0243), or that Frosch referred to himself as the "domiciliary executor of decedent's will

appointed by the Surrogate's Court of the County of New York, State of New York" in a 56-page

document filed on May 21, 1978, (Marcus Decl., Ex. 26 at 0170). MMLLC disputes Plaintiffs'

remaining assertions in this statement because the cited evidence does not support the

proposition that Frosch referred to himself as the "Domiciliary Executor in New York"

"throughout the pendency of the California probate proceedings." For example, Marcus Decl.,

Ex. 27, cited by Plaintiffs, is an Order of the California probate court, which does not refer to

Frosch as the "domiciliary executor." MMLLC also disputes Plaintiffs' assertions in this

statement to the extent they imply that MMLLC is somehow bound by Frosch's statements.

**MMLLC's Response to Statement No. 28:**

MMLLC disputes Plaintiffs' assertions in this statement, which are not supported by the

cited evidence. The cited evidence demonstrates that the firm of Gang, Tyre, Rudin & Browne

represented Frosch alone, and not the Monroe estate. (*See* Marcus Decl., Ex. 26 at SFA1 0186

(referring to the law firm as "Attorneys for Ancillary Executor"). The cited evidence does not

support Plaintiffs' assertion that the firm represented Frosch "during all stages of the California

probate proceedings."

**MMLLC's Response to Statement No. 29:**

MMLLC does not dispute that, on May 21 (not May 25) 1976, Frosch filed, among other

things, a first and final account of ancillary executor. MMLLC disputes Plaintiffs' remaining

assertions in this statement, which are not supported by the cited evidence. The May 21, 1976

filing speaks for itself, and MMLLC respectfully refers the Court to that document, attached as

exhibit 26 to the Declaration of David Marcus, for its full contents. MMLLC specifically

disputes Plaintiffs' assertions in this statement to the extent they are intended to suggest that

MMLLC is somehow bound by Frosch's spare and unnecessary statements in the filing.

**MMLLC's Response to Statement No. 30:**

MMLLC dispute Plaintiffs' assertions in this statement, which are conclusory, argumentative, and not supported by the cited evidence. Nowhere in the cited document does Frosch refer to himself as the New York "domiciliary executor." The May 21, 1976 filing speaks for itself, and MMLLC respectfully refers the Court to that document, attached as exhibit 26 to the Declaration of David Marcus, for its full contents.

**MMLLC's Response to Statement No. 31:**

MMLLC disputes Plaintiffs' assertions in this statement because they do not contain facts material to the determination of Plaintiffs' summary judgment motion. Frosch's allegations that he was entitled to certain executor's commissions are completely irrelevant to the issue of Marilyn Monroe's domicile. MMLLC specifically disputes any implication that Frosch performed "extraordinary" services on behalf of the Monroe estate, and notes that Dr. Kris filed objections to Frosch's account, asserting numerous instances of misfeasance by Frosch, and that Frosch ultimately paid approximately $350,000 of his own funds to settle the dispute. (*See* AMF ¶¶ 44).

**MMLLC's Response to Statement No. 32:**

MMLLC does not dispute that in a July 15, 1976 Order, the California Superior Court ordered that certain unspecified assets of Marilyn Monroe in California, consisting of clothing and personal effects, furniture and furnishings, and the balance of cash on hand or in savings accounts, be delivered to Frosch as executor of Marilyn Monroe's will. (Marcus Decl., Ex. 27 at SFA1 0154-55. MMLLC disputes Plaintiffs remaining assertions in this statement because they are not supported by the cited document, which states that Frosch had complied with all of the requirements required by the court. Nor did the Court order that all "remaining assets" be

delivered to Frosch – rather, the Court first authorized the payment of certain fees and commissions, and then authorized the distribution of the balance to Frosch.  (*Id.*).

**MMLLC's Response to Statement No. 33:**

MMLLC does not dispute that, in or around July 1976, Aaron Frosch received statutory and extraordinary executor's commissions totaling $8,269.15 in connection with the ancillary probate proceedings in the State of California.  (Marcus. Decl., Ex. 29).

**MMLLC's Response to Statement No. 34:**

MMLLC disputes Plaintiffs' assertions in this statement.  The cited "receipt" is dated July 1976, not December 1977 as Plaintiffs allege.  In addition, Plaintiffs' Statement No. 34 is vague and ambiguous to the extent it refers to unspecified "remaining California assets." MMLLC admits that, in July 1976, Frosch filed a receipt and refers to that receipt, attached as Exhibit 28 to the Declaration of David Marcus, for its full contents.

**MMLLC's Response to Statement No. 35:**

MMLLC does not dispute the assertions in this statement.

**MMLLC's Response to Statement No. 36:**

MMLLC disputes the assertions in this statement, because the statement is not supported by the cited evidence.  Nothing in the cited evidence demonstrates that Anna Strasberg "petitioned the New York Surrogate's Court . . . to be relieved of any fiduciary liability to the Estate of Marilyn Monroe."  Moreover, Anna Strasberg did not petition the Surrogate's Court "for a final accounting of the Estate of Marilyn Monroe" – rather, the petition requested, *inter alia*, a judicial settlement of the petitioner's final accounting.

In fact, as explained in more detail in paragraphs 50-52 of MMLLC's AMF, the petition of Anna Strasberg, filed on October 18, 2000, was for judicial settlement of her final account,

and for an order authorizing her to close the estate and to form and transfer the residuary assets to a limited liability company.

**MMLLC's Response to Statement No. 37:**

MMLLC disputes Plaintiffs' assertions in this statement, because the assertions are not supported by the cited evidence. The cited evidence establishes only that, on October 18, 2000, the Administratrix of the Monroe estate released "Marjorie M. Frosch from all liability for any and all matters relating to or derived from the administration of the estate." (Marcus Decl., Ex. 61).

**MMLLC's Response to Statement No. 38:**

MMLLC does not dispute the assertion in this statement.

**MMLLC's Response to Statement No. 39:**

MMLLC does not dispute the assertions in this statement.

**MMLLC's Response to Statement No. 40:**

MMLLC does not dispute that on July 28, 1989, attorney Irving P. Seidman, filed a petition with the Surrogate's Court on behalf of Anna Strasberg as Administratrix. MMLLC disputes Plaintiffs' remaining assertions in this statement. The petition was filed for the purpose of challenging Dr. Marianne Kris' ability to bequeath her portion of the residuary estate to the Freud Centre. (*See* AMF ¶¶ 79-81).

**MMLLC's Response to Statement No. 41:**

MMLLC disputes Plaintiffs assertions in this statement, which are not supported by the cited evidence. Contrary to Plaintiffs' assertions, the July 28, 1989 petition was filed by attorney Irving P. Seidman on the Administratrix's behalf, and contains no reference to New York law.

(Marcus Decl., Ex. 35).  Further, the spare and unnecessary reference to Marilyn Monroe's

domicile was unnecessary and inadvertent.  (*See* AMF ¶¶ 79-81).

**MMLLC's Response to Statement No. 42:**

MMLLC does not dispute that the Freud Centre cited New York case law in its

memorandum of law in opposition to the petition of the Administratrix.  The cases cited were

primarily for the simple proposition that a will is to be construed to give effect to the testator's

intent (*see* Marcus Decl., Ex. 36 at MM-0004451), a proposition that is equally recognized under

California law.  Further, much of the Freud Centre's memorandum of law related to the

construction of the will of Dr. Marianne Kris, not just Marilyn Monroe.  (*Id.* at MM-000459-63)

MMLLC disputes Plaintiffs' remaining assertions in this statement.  The Freud Centre's

answer to the Administratrix's petition merely "[a]dmitted[ed] on information and belief" the

allegations in paragraph three of the July 28, 1989 petition.  (Marcus Decl., Ex. 36 at MM-

0007335).

**MMLLC's Response to Statement No. 43:**

MMLLC does not dispute that the New York Surrogate's Court determined that the

Freud Centre was entitled to Dr. Kris's 25% residuary share of the Monroe estate, and further

states that, in so ruling, the Surrogate's Court rejected the Administratrix's requested

construction of Marilyn Monroe's will.  (*See* Marcus Decl., Ex. 39 at 5585-86, 5162-64).

MMLLC disputes Plaintiffs' remaining assertions in this statement.  The Surrogate's

Court based its decision on the well-settled rule that, in construing a will, the court should

ascertain and give effect to a decedent's intentions (a proposition that is recognized under both

New York and California law), ruling that "[i]n the case at hand, Monroe's will employs

ordinary words and phrases to clearly and completely dispose of her estate."  (Marcus Decl., Ex.

39 at 5584-85).  Nowhere in its decision did the Surrogate's Court mention the issue of Marilyn
Monroe's domicile.

**MMLLC's Response to Statement No. 44:**

MMLLC disputes Plaintiffs' assertions in this statement, which are not supported by the
cited evidence.  The cited Inventory and Appraisement filed by Frosch lists property that he
estimated as approximately $95,000.  (Marcus Decl., Ex. 9 at SFA1 0235).  Further, the
Inventory and Appraisement filed by Frosch failed to include royalties that Marilyn Monroe was
due relating to the films *Some Like it Hot* and *The Misfits*.  The California tax authorities later
determined that the Monroe estate owed California tax on these royalties, which were subject to
California taxation as "income attributable to a California source."  (Marcus Decl., Ex. 23 at
MM-0000089).

**MMLLC's Response to Statement No. 45:**

MMLLC does not dispute that Frosch's attorney Hermione Brown, of the firm of Gang,
Tyre, Rudin & Brown, sent Frosch's Inheritance Tax Affidavit and Affidavit Concerning
Residence to the California Inheritance Tax Appraiser on Frosch's behalf.  (Marcus Decl., Ex.
16).  MMLLC does not have information sufficient to form a belief as to the extent to which
Brown actually helped to "complete" Frosch's affidavits, but notes that, in a letter dated April
24, 1964, Brown informed Frosch that it was his obligation to complete the affidavits, and that
"they have to be completed with information which I do not have available."  (Marcus Decl., Ex.
10 at MMLLC (Shaw) 000465).

**MMLLC's Response to Statement No. 46:**

MMLLC does not dispute that on April 24, 1964, attorney Hermione Brown sent a letter
to Frosch.  MMLLC disputes Plaintiff's remaining assertions in this statement, which are

conclusory, argumentative, and are not supported by the cited evidence. The April 24, 1964 letter speaks for itself, and Plaintiffs respectfully refer the Court to that letter, attached as exhibit 10 to the Declaration of David Marcus, for its full contents.

**MMLLC's Response to Statement No. 47:**

MMLLC does not dispute that by letter dated March 4, 1966, Frosch submitted, among other things, an inheritance tax affidavit, and affidavit concerning residence, and affidavits of May Reis, Patricia Newcomb, Hattie Stephenson and Ralph Roberts with the California Inheritance Tax Appraiser.

MMLLC disputes Plaintiffs' remaining assertions in this statement, which are conclusory, argumentative, and are not supported by the cited evidence. None of the affidavits state that Marilyn Monroe was a "non-resident" of California. (Marcus Decl., Ex. 16). And there is no evidence supporting Plaintiffs' assertion that May Reis, Patricia Newcomb, Hattie Stephenson and Ralph Roberts were "four of Marilyn Monroe's most intimate friends and employees." To the contrary, May Reis was the only one of these individuals that Marilyn Monroe even included as a beneficiary in her will. (Marcus Decl., Ex. 1 at 1). Further, the purpose of the March 4, 1966 letter, as set forth in the letter itself, was to obtain "a no tax certificate so that a petition may be filed for termination of the California proceedings." (Marcus Decl., Ex. 16 at 1-2).

**MMLLC's Response to Statement No. 48:**

MMLLC disputes Plaintiffs' assertions in this statement, which are conclusory and argumentative, and thus should be disregarded. Further, the affidavits cited by Plaintiffs in support of this assertion are inadmissible hearsay and should be disregarded. In addition, as set

forth in more detail in paragraphs 1-38 of MMLLC's AMF, the affidavits are inherently

unreliable, and are contrary to facts demonstrating Marilyn Monroe's California domicile.

**MMLLC's Response to Statement No. 49:**

MMLLC disputes Plaintiffs' assertions in this statement, which are not supported by the

cited evidence.  Frosch's affidavit does not refer to taxes paid by <u>Marilyn Monroe</u> herself – in

particular, Marilyn Monroe would not be expected to have personally paid her 1962 taxes, since

she died in August of that year.  Indeed, the evidence demonstrates that Marilyn Monroe's tax

returns for 1961 and 1962 were not filed until after her death.  (Strauss Decl., Ex. 37; Ex. 81).

**MMLLC's Response to Statement No. 50:**

MMLLC disputes  Plaintiffs' assertions in this statement.  Among other things, there is

nothing to support Plaintiffs' assertion that the California Inheritance Tax Appraiser's report was

"based upon the documents submitted with the March 4, 1996 letter."  In addition, the documents

cited by Plaintiffs establish that the California Inheritance Tax appraiser valued the California

property at $92,781.00, not $36,144.22 as asserted by Plaintiffs.  (*See* Marcus Decl., Ex. 17 p. 2).

Further, as explained in more detail in paragraphs 70-76 of MMLLC's AMF, while the

California Inheritance Tax Appraiser initially issued a report stating that the Monroe estate owed

the State of California $777.63 in taxes, the California Franchise Tax Board effectively

overturned that decision.

**MMLLC's Response to Statement No. 51:**

MMLLC does not dispute that Frosch filed tax-related documents with the New York

Surrogate's Court which included reference to certain of Marilyn Monroe's intangible assets, and

states that the vast majority of such assets ($746,684.19) consisted of royalty payments for the

films *Some Like it Hot* and *The Misfits*.  (*See* Marcus Decl., Ex. 12 at MM-0000370).  MMLLC

disputes Plaintiffs' remaining assertions in this statement because they are not supported by the cited evidence (which only reflects filings with the Surrogate Court, and not with tax authorities).

**MMLLC's Response to Statement No. 52:**

MMLLC disputes Plaintiffs' assertions in the statement to the extent that they are intended to suggest that the New York Surrogate's Court made any "findings" regarding the value of Marilyn Monroe's estate, as such assertions are not supported by the cited evidence. MMLLC does not dispute that a total tax of $17,698.42 was affixed. MMLLC does not dispute that the New York Estate Tax Appraiser determined that the value of Marilyn Monroe's gross estate was $836,524.81, and further states that the vast majority of this amount ($746,684.19) consisted of royalty payments for the films *Some Like it Hot* and *The Misfits*. (*See* Marcus Decl., Ex. 12 at MM-0000370; Marcus Decl., Ex. 20 at MM-0004846).

**MMLLC's Response to Statement No. 53:**

MMLLC disputes Plaintiffs' assertions in this statement, which are conclusory, argumentative and misleading, and respectfully refers to the Court to the documents cited in this statement for their full contents. While Frosch did state, in self-serving documents, that he was "successful" in the California tax proceedings because "none of decedent's contract rights were included in measuring such tax in California," (Marcus Decl., Ex. 26 at SFA1 0191-92), later in that same document Frosch acknowledged that the estate did have to pay taxes on those same "contract rights" as a result of the California Franchise Tax Board proceedings. (*Id.* at SFA1 0192-95). Further, MMLLC specifically disputes any suggestion that Frosch actually was successful, for reasons set forth in paragraphs 70-76 of MMLLC's AMF.

**MMLLC's Response to Statement No. 54:**

18

MMLLC disputes Plaintiffs' assertions in this statement, which are not supported by the cited evidence. In fact, MMLLC was formed on July 5, 2001, after the close of the New York probate proceedings, to hold and manage the intellectual property of the residuary beneficiaries of Marilyn Monroe's will. (*See* AMF ¶¶ 40). MMLLC was formed for a variety of reasons, including to maintain coordinated management of Marilyn Monroe's intellectual property rights, to enable the closing of the Monroe estate (which had been open for 40 years), to avoid unnecessary costs on beneficiaries, to avoid burdening the Surrogate Court's docket, and to protect against "crank" claims such as the Nancy Miracle litigation. (*See* Marcus Decl., Ex. 60 at MM-0002794).

**MMLLC's Response to Statement No. 55:**

MMLLC disputes Plaintiffs' assertions in this statement. Plaintiffs' assertions are not supported by the cited evidence, which cannot prove a negative (i.e., that the Monroe estate never once argued that Marilyn Monroe died a California domiciliary or resident). To the contrary, Anna Strasberg, in her capacity as Administratrix, previously asserted Marilyn Monroe's California residence. (*E.g.* Strauss Decl., Ex. 124 ¶ 6).

**MMLLC's Response to Statement No. 56:**

MMLLC disputes Plaintiffs' assertions in this statement, which is not supported by the cited evidence. The letters cited by Plaintiffs in support of this assertion are inadmissible hearsay and should be disregarded. Further, the evidence does not establish that the Roger Richman Agency, Inc. ever "admitted" that Marilyn Monroe died a New York domiciliary, rather, it merely stated that others had asserted this. (Marcus Decl., Ex. 38 at MM-00044376). Moreover, CMG was not yet the Monroe estate's "licensing agent" at the time Mark Roesler wrote the May 2, 1995 marketing brochure cited by Plaintiffs (Marcus Decl., Ex. 57; Strauss

Decl., Ex. 122 at 235-36), and Plaintiffs have failed to cite any evidence even suggesting that

Mark Roesler had personal knowledge of Marilyn Monroe's state of domicile, particularly at that

early date.  In fact, at the time Roesler sent the May 2, 1995 marketing brochure, neither he nor

anyone else at CMG had investigated the fact of Monroe's domicile, and Roesler's belief as to

Monroe's domicile was based solely on a vague understanding from unreliable third-party

sources. (Roesler March 13, 2008 Decl. ¶ 8).  Once he began serving as the Monroe estate's

licensing agent and gained access to the true facts of Monroe's life, Roesler concluded the

Monroe was, in fact, a California domiciliary. (*Id.* ¶ 10).

    In any event, statements of present and future licensing agents without any personal

knowledge of the facts are not binding on MMLLC.

**MMLLC's Response to Statement No. 57:**

    MMLLC disputes Plaintiffs assertions in this statement, which are not supported by the

cited evidence.  The documents cited by Plaintiffs provide no evidence of what Seidman

"believed," and Plaintiffs offer no evidence that Seidman had any personal knowledge pertaining

to Marilyn Monroe's domicile.  Indeed, the spare and unnecessary reference to "domicile" in a

court document was inadvertent error.  (*See* AMF ¶¶ 77-81).

    In addition, the letter cited by Plaintiffs in support of this assertion is inadmissible

hearsay and should be disregarded, and any purported statement that Seidman made to a third

party is not binding on MMLLC.

**MMLLC's Response to Statement No. 58:**

    MMLLC disputes Plaintiffs assertions in this statement, which are misleading and are not

supported by the cited testimony.  The cited testimony merely reflects that Anna Strasberg

testified that she is not aware of Mark Roesler having ever lied to her, and that she was not

generally aware of him making inaccurate statements regarding licensing of images of Marilyn Monroe. Ms. Strasberg was not asked to assess the truth or accuracy of any specific statements by Mark Roesler. (*See* Marcus Decl., Ex. 67 at 198-200).

**MMLLC's Response to Statement No. 59:**

MMLLC disputes Plaintiffs assertions in this statement, which are misleading and are not supported by the cited testimony. The cited testimony merely reflects that Anna Strasberg testified that she generally considered Irving Seidman "difficult [but] competent," that she "hope[d]" he was honest, and that, "[s]itting here today," she was not aware of mistakes he made in the Surrogate's Court proceeding. (Marcus Decl., Ex. 66 at 53-54). Ms. Strasberg was not asked to assess the truth or accuracy of any specific statements by Mr. Seidman.

**MMLLC's Response to Statement No. 60:**

MMLLC does not dispute that, on July 7, 1993 (not July 11), Peter Eichler of Baker and Hostetler wrote a letter to the Roger Richman Agency, the Monroe estate's licensing agent. Plaintiffs respectfully refer the Court to that letter for the full contents thereof. (Marcus Decl., Ex. 56, at MM-0003905). MMLLC objects to the inclusion of that letter because it contains inadmissible hearsay and is irrelevant to Marilyn Monroe's domicile.

**MMLLC's Response to Statement No. 61:**

MMLLC disputes Plaintiffs' assertions in this statement. Plaintiffs offer no evidence in support of their assertion that CMG never responded to the letter in question. In fact, Christine Sovich of CMG had a telephone conversation with Jonathan Reichman of Kenyon & Kenyon in response to the letter in question. (Declaration of Christine M. Sovich dated March 13, 1998 ("Sovich Decl.") ¶ 6). Further, CMG has entered into a business relationship with Bernard of

Hollywood (Kenyon & Kenyon's client in the matter in question), and thus is no longer adverse to Bernard of Hollywood with regard to any potential infringement issues. (*Id.* ¶ 6).

In any case, as is to be expected, CMG does not always elect to pursue infringement matters for various reasons unrelated to the viability of the claim, including, *inter alia*, if the extent of the alleged misuse does not justify further action from a cost-benefit analysis. (*Id.* ¶ 7).

**MMLLC's Response to Statement No. 62:**

MMLLC disputes Plaintiffs' assertions in this statement, which are not supported by the cited evidence. Mr. Strasberg, who has never met Marilyn Monroe (and was not born until after her death) merely testified that the voice in recording played by Plaintiffs counsel "sound[ed] like Marilyn Monroe" after being told by Plaintiff's counsel "I'll represent to you [that this is] a recording in 1955 of what Ms. Monroe has stated." (Marcus Decl., Ex. 65 at 208). MMLLC further states that the out-of-context "snippet" of a purported radio interview of Marilyn Monroe has not been properly authenticated and constitutes inadmissible hearsay, and should be disregarded. The "snippet" certainly should not be considered out of the context of the interview as a whole, which Plaintiffs have not produced.

Further, Sam Shaw himself has acknowledged that any intent on the part of Monroe to ever live in Brooklyn was tied to her relationship to Arthur Miller, a Brooklyn native. Sam Shaw recounted that Monroe told him "I love Brooklyn, Arthur Miller lives there. I love Arthur Miller[.]" (See Strauss Decl., Ex. 123 at 249-50), and that she once said "Arthur. It was Arthur. He was why I stayed in New York. He was going to make my life different, better, a lot better." (*Id.* Ex. 5 at 146).

## ADDITIONAL MATERIAL FACTS

In addition, MMLLC submits these additional facts in opposition to Plaintiffs' motion for summary judgment.

### Marilyn Monroe's California Domicile

1.     Marilyn Monroe died on August 5, 1962 in her Brentwood, California home. (Strauss Decl., Ex. 1).

2.     Marilyn Monroe was born Norma Jeane Mortenson in California on June 1, 1926. (Strauss Decl., Ex. 2).

3.     She was raised and attended school in California, (*e.g.,* Strauss Decl., Ex. 3, Ex. 4, Ex. 5 at 132-33, Ex. 6 at 469), and resided exclusively in California for approximately the first thirty years of her life. (*E.g.,* Strauss Decl., Ex. 6 at 213-14, Ex. 7, Ex. 8, Ex. 9, Ex. 10).

4.     Her mother was a California domiciliary, and was institutionalized in that State. (Marcus Decl., Ex. 2 at SFA1 0260).

5.     While living in California, Norma Jeane Mortenson was discovered, first as a model and then as an actress. (Strauss Decl., Ex. 5 at 133-45, Ex. 11 at 86-97, Ex 12 at MMLLC (Shaw) 000553A). In 1946, while living in California, she adopted the name Marilyn Monroe, and went on to become a Hollywood actress and icon. (Strauss Decl., Ex. 11 at 113-14, Ex. 13).

6.     Marilyn Monroe was married twice while living in California, first to James Edward Dougherty in 1942 (Strauss Decl., Ex. 5 at 133, Ex. 26, Ex. 4 at MM-0036241), and then, in 1954, to the San Francisco-based former baseball player, Joe DiMaggio, with whom she lived in California. (Strauss Decl., Ex. 5 at 139; Ex. 14, Ex. 15, Ex. 8, Ex. 9; Ex. 10, Ex. 16).

7.     In 1955, Marilyn Monroe traveled east to study at the Actor's Studio with instructors Lee and Paula Strasberg (*e.g.* Strauss Decl., Ex. 17 at 88-91), as well as to begin a

production company with Milton Greene (with whom she resided at his Connecticut home), yet

that company broke up by February 1958.  (Strauss Decl., Ex. 18 at MM-0000068).

8.      On June 29, 1956, Marilyn Monroe married playwright Arthur Miller.  (Strauss

Decl., Ex. 5 at 146, Ex. 19, Ex. 20 at MMLLC (Shaw) 00715).  Marilyn Monroe and Miller

purchased and lived in a house that they had built on a 200-acre farm in Roxbury, Connecticut.

(Strauss Decl., Ex. 21, Ex. 22, Ex. 23, Ex. 24, Ex. 25).

9.      Miller also leased an apartment in Manhattan in late 1957 (for only $404.1 per

month) (Strauss Decl., Ex. 26, Ex. 27, Ex. 35), but Connecticut was their permanent home.

(Marcus Decl., Ex. 15 at MM-0057018).  They filed taxes in Connecticut, not New York (Strauss

Decl., Ex. 36, Ex. 37, Ex. 38), and Marilyn Monroe identified herself as being "of Roxbury,

Connecticut" in legal documents (Strauss Decl., Ex. 39, Ex. 40), and obtained a Connecticut

driver's license (Strauss Decl., Ex. 41; Ex. 42), and apparently voted in Connecticut (Marcus

Decl., Ex. 15 at MM-0057018).

10.      Marilyn Monroe and Arthur Miller divorced on January 20, 1961.  (Strauss Decl.,

Ex. 43).

11.      Following her divorce, Marilyn Monroe's therapist caused her to be committed to

the Payne Whitney Psychiatric Clinic and to be held there against her will, until she was released

with the help of her former husband, Joe DiMaggio.  (Strauss Decl., Ex. 11 at 455-59).

12.      In April 1961, less than three months after her divorce, Marilyn Monroe returned

to California.  (Strauss Decl., Ex. 44 at MC012165).

13.      In August 1961, Marilyn Monroe began renting an apartment at 882 North

Doheny Drive, the same apartment building that she had previously occupied.  (*Id.* at

MC012166; Ex. 6 at 214, Ex. 45, Ex.7, Ex. 46).

14.    Marilyn Monroe remained in California for all but nine days of the rest of 1961 (Strauss Decl., Ex. 44 at MC012166), during which time she performed renovations and landscaping at her new apartment, purchased furnishings, and obtained insurance for the apartment.  (Strauss Decl., Ex. 47, Ex. 48, Ex. 49, Ex. 27 at MC012581, Ex. 50, Ex. 51).

15.    Marilyn Monroe opened and maintained a bank account at City National Bank in Beverly Hills, California.  (*See generally* Strauss Decl., Ex. 27, Ex. 28, Ex. 29, Ex. 30, Ex. 31, Ex. 32, Ex. 33, Ex. 34).

16.    In 1961, Marilyn Monroe spent Christmas and New Year's with her former husband, Joe DiMaggio.  (Strauss Decl., Ex. 52 at 27-31).

17.    In California, Marilyn Monroe began meeting on an almost daily basis with Dr. Ralph Greenson, her Los Angeles-based therapist.  (Strauss Decl., Ex. 11 at 469, Ex. 29 at MC012568, Ex. 31 at MC012617, Ex. 33 at MC012639, Ex. 34 at MC003710).

18.    After Marilyn Monroe returned to California, May Reis stopped working as her secretary in New York.  (Marcus Decl., Ex. 16 at MM-0009356).

19.    Marilyn Monroe hired Eunice Murray as her personal assistant in California (Strauss Decl., Ex. 52 at 15-18), and Cherie Redmond as her secretary in California.  (Strauss Decl., Ex. 28 at MC012590; Ex. 53, Ex. 54).

20.    In addition, Inez Melson, Marilyn Monroe's business manager, was based in California (Strauss Decl., Ex. 11 at 199, Ex. 55, Ex. 56, Ex. 57 at 4043), as were her publicist, hair dresser, make up artist, masseur/driver, and personal physician.  (*E.g.*, Strauss Decl., Ex. 28 at MC012591, Ex. 29 at MC012568, Ex. 30 at MC012608).

21.    Marilyn Monroe obtained car insurance in California, and gave away her car in New York.  (Strauss Decl., Ex. 58, Ex. 59).

22.     On January 22, 1962, Marilyn Monroe purchased a house located at 12305 Fifth Helena Drive, Brentwood, California (Strauss Decl., Ex. 60), making a down payment of $42,500 and committing to a 15-year mortgage.  (Strauss Decl., Ex. 61, Ex. 62).

23.     In February 1962, Marilyn Monroe traveled to Mexico to purchase authentic furnishings for her Spanish-style home (Strauss Decl., Ex. 52 at 52-53, Ex. 63 at MM-0036214, Ex. 64 at MM-0036234-35, Ex. 65 at 295-96).

24.     Marilyn Monroe acquired fine art for her California home, including a Rodin sculpture and a Poucette oil painting.  (Strauss Decl., Ex. 30 at 12604, Ex. 66).

25.     Marilyn Monroe moved into her new house in March 1962, while renovations were still being performed (Strauss Decl., Ex. 52 at 67-68; Ex. 68 at MC003985), and while she was still paying rent on her Doheny Drive apartment.  (Strauss Decl., Ex. 32 at MC012624).

26.     Marilyn Monroe oversaw renovations on her California home, including building a guest-house above her garage where her friends could stay (Strauss Decl., Ex. 63 at MM-0036214; Ex. 64 at MM-0036236), and hired landscaping and pool maintenance companies. (*E.g.* Strauss Decl., Ex. 29 at MC012567; Ex. 30 at MC012607).

27.     Between February and July 1962, Marilyn Monroe spent over $50,000 renovating, furnishing and landscaping her home.  (Strauss Decl., Ex. 28 at MC012588, Ex. 29 at MC012560, Ex. 30 at MC012599, Ex. 31 at MC012613; Ex. 32  at MC012625; Ex. 33 at MC012635, Ex. 34  at MC003707).

28.     Marilyn Monroe told people that she loved her new home, and invited friends to visit.  (Strauss Decl., Ex. 67 at MMLLC (Shaw) 000574, Ex. 64 at MM-0036236; Ex. 57 at MC004053; Ex. 69 at 97-99, Ex. 70, Ex. 71, Ex. 17 at 188-90, Ex. 63 at MM-0036214).

29.     Marilyn Monroe changed her personal address to 12305 Fifth Helena Drive and her business address to a post office box in Los Angeles, and informed friends and associates of her new addresses.  (Strauss Decl., Ex. 41, Ex. 42, Ex. 68, Ex. 72, Ex. 73, Ex. 74, Ex. 75).

30.     After she returned to California in 1961, California became the new headquarters for Marilyn Monroe and her production company.  (Strauss Decl., Ex. 76).

31.     Marilyn Monroe hired prominent California attorney Mickey Rudin to act as her agent and attorney, replacing her New York-based attorney (Aaron Frosch).  (Strauss Decl., Ex. 35, Ex. 77 at MC001627, Ex. 78, Ex. 79).

32.     Marilyn Monroe hired Jack Ostrow, a Los Angeles C.P.A., as her accountant. (Strauss Decl., Ex. 44, Ex. 80, Ex. 81, Ex. 82).

33.     In or around 1962, all of Marilyn Monroe's business and legal files were transferred to California.  (Strauss Decl., Ex. 35 at MC000264, Ex. 83, Ex. 84, Ex. 85, Ex. 86).

34.     In a letter dated December 19, 1961, Marilyn Monroe asked Lee Strasberg, her close friend and acting coach, to move to California to continue training her and to become part of her new production company.  (Strauss Decl., Ex. 87).

35.     Marilyn Monroe began work on the film *Something's Got to Give* on April 30, 1962 (Strauss Decl., Ex. 88, Ex. 89, Ex. 62).  She was fired from the picture on June 8, 1962. (Strauss Decl., Ex. 11 at 534-35; Ex. 90 at MM-0036232).

36.     At the time of her death on August 5, 1962, Marilyn Monroe had spent 19 days in New York throughout 1962 (Strauss Decl., Ex. 91), including to perform at the Madison Square Garden birthday celebration for President John F. Kennedy.  (Strauss Decl., Ex. 92).

37.     Marilyn Monroe's funeral was arranged by Inez Melson and Joe DiMaggio (with whom she had renewed her relationship).  (Strauss Decl., Ex. 93, Ex. 94, Ex. 95).  Joe DiMaggio

had recently quit his $100,000-a-year job to set up home near Marilyn Monroe in California. (Strauss Decl., Ex. 96).

38.    Marilyn Monroe was buried in Westwood Memorial Park and Mortuary in Los Angeles, California.  (Strauss Decl., Ex. 97).

**The Distinct Legal Entities Involved in This Case**

39.    Aaron Frosch ("Frosch") was the New York-based attorney named as executor in Marilyn Monroe's will.  (Marcus Decl., Ex. 1 at 3, Ex. 2).  At the time Marilyn Monroe executed her will, she had only recently hired Frosch to represent her in her divorce from Arthur Miller. (Strauss Decl., Ex. 35).  Frosch served as executor of the Monroe estate for over 26 years, until his death on April 9, 1989.  (Declaration of Anna Strasberg dated Apr. 13, 2007 ("Strasberg Decl.") ¶ 8).

40.    MMLLC is a Delaware corporation formed on July 5, 2001 to hold and manage the intellectual property of the residuary beneficiaries of Marilyn Monroe's will.  (Strasberg Decl. ¶¶ 8-9).  Ownership interests in MMLLC were assigned 75% to Anna Strasberg and 25% to the Anna Freud Centre ("Freud Centre").  (*Id.* ¶ 9; Ex. F).

41.    Based in London, England, the Freud Centre is a world-renowned facility, dedicated to improving the mental health of children through research and treatment. (Declaration of Ros Bismead dated April 11, 2007) ("Bismead Decl.") ¶ 2).  As of April 2007, approximately 20% of the Freud Centre's operating expenses were funded by income received from MMLLC, resulting from the commercialization of Marilyn Monroe's publicity rights and other intellectual property associated with Marilyn Monroe.  (*Id.* ¶ 16).

42.    The residuary clause of Marilyn Monroe's will provided that the residue of her estate, after distribution of several specific devises to her mother and others, was to be

distributed 25 percent to Dr. Marianne Kris and 75 percent to Lee Strasberg, her close friend and acting coach.  (Marcus Decl., Ex. 1 at 2-3).

43.     Frosch initially claimed that he had no reason to believe certain transparencies were not owned by a photographer named Tom Kelley;  Lee Strasberg later asserted that he was entitled to the transparencies under Marilyn Monroe's will.  (Strauss Decl., Ex. 98).

44.     In October 1980, Dr. Kris objected to the settlement of Frosch's account in New York Surrogate's Court, and asserted numerous instances of misfeasance, including that Frosch had improperly failed to take tax credits in connection with the royalty payments and thus subjected the estate to double-taxation).  (Strauss Decl., Ex. 99 at MM-0013142-44).  Frosch ultimately paid approximately $350,000 of his own funds to settle the dispute, and renounced claims to over $16,000 in commissions.  (Strauss Decl., Ex. 100).

45.     The Freud Centre had no interest or involvement in the Monroe estate until 1980, when Dr. Kris died and passed to the Freud Centre her 25% interest in the residue of the Monroe estate.  (Bismead Decl. ¶¶ 11, 13).

46.     Anna Strasberg married Lee Strasberg in 1968.  (Strasberg Decl. ¶ 4).  Anna Strasberg had no involvement with the Monroe estate until 1982 when Lee Strasberg died, and Anna Strasberg was named executor of his estate.  (*Id.* ¶ 7).

47.     The Freud Centre has never taken the position or asserted that Marilyn Monroe was a New York domiciliary.  (Bidmead Decl. ¶ 19).  The Freud Centre has never authorized anyone to speak on its behalf – or bind its interests as an owner of MMLLC – regarded Marilyn Monroe's domicile, residence, or right of publicity.  (*Id.*).

48.     The Monroe estate remained open until June 19, 2001, when the Surrogate's Court authorized the Administratrix to close the estate and transfer the residuary assets to MMLLC.  (Strasberg Decl. ¶ 8, Ex. C).

49.     A final Account of Executors and Administrators was received by the New York Surrogate's Court on December 11, 2000, including schedules showing payments made to the estate of Marilyn Monroe between July 20, 1989 and October 3, 2001 by licensees who had licensed Marilyn Monroe's publicity rights from the estate's licensing agent.  (Strauss Decl., Ex. 101).

50.     On or about October 18, 2000, Anna Strasberg submitted to the New York Surrogate's Court a petition for judicial settlement of final account and for an order authorizing her to form MMLLC.  (Strauss Decl., Ex. 102).

51.     The petition included in its description of the assets of the estate "royalties from the licensing of the Decedent's name, likeness and signature."  (*Id.* ¶ 11).  Appended to the petition were several documents, including the articles of incorporation of MMLLC.  (*Id.*).

52.     On June 19, 2001, the New York Surrogate's Court issued a decree authorizing Anna Strasberg to transfer all assets of the Monroe estate to MMLLC.  (Strauss Decl., Ex. 102). In approving the final accounting of the estate, the Surrogate's Court found the state and condition of the account to include $15,956,520.01 in income collected between 1989 and 2000. This amount was taken from the final Account of Executors and Administrators submitted to the Surrogate's Court, and included revenues derived from the licensing of Marilyn Monroe's name, image and likeness.

**New York Probate Proceedings**

53.     Frosch, as executor, elected to probate Marilyn Monroe's will in New York, his state of residence.  (Marcus Decl., Ex. 4).

54.     In its decree admitting Marilyn Monroe's will for probate, the New York Surrogate's Court did not make any findings regarding Marilyn Monroe's state of residence or domicile.  (Marcus Decl., Ex. 5).

**California Ancillary Probate Proceedings**

55.     Five days after Marilyn Monroe's death, her close friend and business manager, Inez Melson, was appointed as Special Administratrix of the Estate of Marilyn Monroe by the Superior Court of the State of California, in and for the County of Los Angeles.  (Marcus Decl., Ex. 3).  The order appointing Melson stated that Marilyn Monroe died either a resident of New York or of California.  (*Id.*).

56.     The law firm of Gang, Tyre, Rudin & Browne represented Frosch, as ancillary executor, in connection with the California proceedings. (*See* Marcus Decl., Ex. 26 at SFA1 0186).  It did not represent the Monroe estate.

**California Tax Proceedings**

57.     The residence affidavits signed by May Reis, Hattie Stephenson Amos, Ralph Roberts and Patricia Newcomb were drafted by attorneys from Frosch's office.  (Strauss Decl., Ex. 103, Ex. 104, Ex. 105, Ex. 106).

58.     Frosch's representatives informed affiants that the purpose of their affidavits was to establish that New York was Marilyn Monroe's permanent home, for tax purposes.  (Strauss Decl., Ex. 106).

59.    Reis was the only beneficiary of the Monroe estate to submit a residence affidavit. (Marcus Decl., Ex. 1; Ex. 16 at MM-0009356-57).  Other beneficiaries, including Lee Strasberg and Dr. Kris, were either never asked to provide affidavits or refused to do so.

60.    In November 1965, May Reis told Frosch's office that Marilyn Monroe resided and voted in Connecticut during her marriage to Arthur Miller, and that she traveled to California in August 1961 and did not return to her New York apartment except to perform at President John F. Kennedy's birthday celebration in May 1962.  (Marcus Decl., Ex. 15; Strauss Decl., Ex. 92).  However, in her affidavit dated January 11, 1966, Reis stated that Marilyn Monroe resided in New York, not Connecticut, during the period in question.  (Marcus Decl., Ex. 16 at MM-0009356-57).

61.    Hattie Stephenson Amos told Frosch's office that she had received a phone call from an unknown individual about a week before Marilyn Monroe's death.  (Marcus Decl., Ex. 15).  However, in her affidavit Amos states that she received the call from Marilyn Monroe herself, two days before her death.  (Marcus Decl., Ex. 16 at MM-0009355).

62.    None of the affidavits mention Marilyn Monroe's former Connecticut residence. (*See generally* Marcus Decl., Ex. 16).

63.    The affidavits also claim that Marilyn Monroe went to California solely for the purpose of performing in the film *Something's Got to Give.*  (Marcus Decl., Ex. 16 at MM-0009354; 93556; 9359).  Frosch himself signed an affidavit stating that at the time of her death Marilyn Monroe was "temporarily in California performing services as a motion picture actress . . . for approximately six months prior to her death."  (*Id.* at MM-0009350-51).  May Reis stated in her affidavit that Marilyn Monroe departed for California "two to three weeks" prior to commencement of a film.  (*Id.* at MM-0009356).

64.    In fact, Marilyn Monroe had returned to California in April 1961 (*supra* ¶ 12), began renting an apartment in August 1961 (*supra* ¶ 13) and did not begin work on any film until April 30, 1962 (*supra* ¶ 35).

65.    The affidavits state that Marilyn Monroe intended to vacate her California home.  (Marcus Decl., Ex. 16 at MM-0009353, 9355).

66.    In fact, Marilyn Monroe was in the midst of renovating and furnishing her California home, and inviting guests to visit.  (*supra* ¶¶ 25-27).  Marilyn Monroe "exulted" in her home during an interview taken just weeks prior to her death.  (Strauss Decl., Ex. 63). And a book by Sam Shaw himself states that on the final day of her life, Marilyn Monroe was speaking excitedly about furnishing her home and inviting friends to visit.  (Strauss Decl., Ex. 17).

67.    In submitting the affidavits to the California Inheritance Tax Appraiser, Frosch's attorney requested that the appraiser "furnish a no tax certificate so that a petition may be filed for termination of the California proceedings in accordance with the requirements of law." (Marcus Decl., Ex. 16 at MM-009297-98).

68.    Frosch's representatives sought to obtain additional affidavits from other of Marilyn Monroe's friends and associates, including Mickey Rudin (Marilyn Monroe's Los Angeles-based attorney and agent), her personal physician, "and a number of other people on the Coast who were close to the decedent shortly prior to her death."  (Strauss Decl., Ex. 107).  It appears that Frosch was unable to obtain affidavits from such individuals.

69.    On September 21, 1966, Frosch's attorney asked Melson, Marilyn Monroe's close friend and business manager, to submit an affidavit stating that Marilyn Monroe was a New York resident.  Frosch's attorney stated that it was of "significant tax important to establish that New

York – not California – was Miss Monroe's domicile." (Strauss Decl., Ex. 108). It appears that Frosch was unable to obtain an affidavit from Melson.

70.     The Inheritance Tax Appraiser did not grant the requested "no tax certificate," instead stating, on April 5, 1967, that, after deductions, the estate owed inheritance taxes of $777.63 on Marilyn Monroe's California property. (Marcus Decl., Ex. 17). The Tax Appraiser's report listed the value of the California property at $92,781 ($36,144.22 after deductions, the largest of which was a first trust deed encumbrance on the California real property). (*Id.*; Strauss Decl., Ex. 109 at MM-0009212).

71.     The value of the California property listed on the Tax Appraiser's report did not include royalty payments that Monroe's estate received for her work on the films *Some Like it Hot* and *the Misfits*. (Marcus Decl., Ex. 17).

72.     Subsequently, in November 1969, the Estate Tax Appraiser for the County of New York determined the value of Marilyn Monroe's gross estate to be $836,524.81. (Marcus Decl., Ex. 20). Of this amount, the vast majority ($746,684.19) consisted of royalty payments relating to the films *Some Like it Hot* and *The Misfits*. (*Id.*; Strauss Decl., Ex. 110 at MM-0000005).

73.     In 1971, Frosch requested a tax clearance certificate from the California Franchise Tax Board in order to submit his final account to the probate court. (Marcus Decl., Ex. 23 at MM-0000089; Ex. 26 at SFA1 0193). The Franchise Tax Board denied this request, concluding that the Monroe estate owed California income taxes on royalties that it had earned for *Some Like it Hot* and *The Misfits* between 1963 and 1970, and imposing a 25% penalty (in the amount of $12,810.78) for Frosch's failure to file a return pertaining to such royalties. (Strauss Decl.,

Ex. 109 at MM-0009213-14; Marcus Decl., Ex. 23 at MM-0000088-89; Ex. 24 at SFA1 0245;

Ex. 26 at SFA1 0193).

74.     Frosch appealed to the California State Board of Equalization, arguing that (i)

California was not entitled to tax the royalty payments because Marilyn Monroe was allegedly

not a California resident, and (ii) if California did tax the royalty payments, in order to avoid

double taxation the Monroe estate should be entitled to a credit for taxes it already paid in New

York on such payments.  (Strauss Decl., Ex. 109 at MM-0009214-24).

75.     The State Board of Equalization affirmed the Franchise Tax Board's ruling,

holding that, notwithstanding Frosch's arguments as to Marilyn Monroe's residence, the royalty

payments were taxable in the State of California as "income attributable to a California source,

viz., Miss Monroe's performance of her personal, artistic services within California."  (Marcus

Decl., Ex. 23 at MM-0000088-89, 98).  The Board of Equalization affirmed the Franchise Tax

Board's assessment of $51,243.12 in taxes pertaining to the royalty payments, plus a $12,810.78

penalty for Frosch's failure to file tax returns on the royalty payments (concluding that Frosch

had failed to behave as a "reasonably prudent businessman").  (Marcus Decl., Ex. 23 at MM-

0000097-98; Marcus Decl., Ex. 24 at SFA1 0245).

76.     The Board of Equalization ruled that the Monroe estate was not entitled to a credit

for taxes already paid to the State of New York, because the credit that Frosch sought was only

available to California residents (which Frosch had argued Marilyn Monroe was not).  (Marcus

Decl., Ex. 23 at MM-0000095).

**The Will Construction Proceedings**

77.     A number of documents filed in New York Surrogate's Court in connection with

the Monroe estate proceedings (including pre-printed form documents) referred to Marilyn

Monroe residing in the State of New York.  (Strauss Decl., Ex. 111, Ex. 112, Ex. 113, Ex. 114, Ex. 115).  However, prior to July 28, 1989, no documents ever referred to Marilyn Monroe as a New York domiciliary.

78.    On July 28, 1989, attorney Irving P. Seidman, filed a petition with the Surrogate's Court on behalf of Anna Strasberg, as Administratrix, challenging the Freud Centre's entitlement to a share of the residuary estate.  (Marcus Decl., Ex. 35; Ex. 37).  Despite the fact that previous filings had referred, at most, to Marilyn Monroe's "residency," the July 28, 1989 petition recited in rote form that Marilyn Monroe "died on August 5, 1962, domiciled in the City and State of New York."  (Marcus Decl., Ex. 35 ¶ 3).

79.    The petition concerned only the interpretation, and not the underlying validity, of Marilyn Monroe's will, i.e. whether Marilyn Monroe intended to allow Dr. Marianne Kris to bequeath her 25% residuary share upon her death.  (Marcus Decl., Ex. 35, ¶¶ 15-17).

80.    The Surrogate's Court denied the Administratrix's challenge and found that the Freud Centre was entitled to a share of the Monroe estate.  (Marcus Decl., Ex. 39, at MM-0005585-86, 5162-64).  The Surrogate's Court based its decision on the widely-followed rule that, in construing a will, the court should ascertain and give effect to a decedent's intentions, ruling that "[i]n the case at hand, Monroe's will employs ordinary words and phrases to clearly and completely dispose of her estate."  (*Id.* at MM-0005584-85).

81.    The New York Surrogate's Court never once mentioned, and certainly did not base its ruling on, the issue of Marilyn Monroe's domicile.  (*Id.*).

**The Nancy Miracle Litigation**

82.    In 1992, a woman named Nancy Miracle filed suit against Anna Strasberg, as Administratrix, claiming that she was the long-lost daughter of Marilyn Monroe and was entitled to a share of the Monroe estate.  (Marcus Decl., Ex. 40).

83.    Miracle claimed that the woman we know as "Marilyn Monroe" was actually Nancy Cusumano from Brooklyn, New York.  (*Id.* ¶¶ 5, 8).

84.    Miracle's complaint alleged that Marilyn Monroe's will was probated in New York Surrogate's Court (*id.* ¶¶ 3, 5) – the complaint did not allege that Marilyn Monroe was domiciled in California.

85.    A motion to dismiss the complaint was prepared on the Administratrix's behalf by attorney Milton Yasunaga, Hawaii local counsel whom Anna Strasberg had never met.  (Strauss Decl., Ex. 116 at 173-77; Marcus Decl., Ex. 41at 15).

86.    The motion to dismiss argued that the complaint was barred by the statute of limitations, and that the Court lacked personal jurisdiction over the Administratrix since the Complaint lacked any allegations as to a Hawaii connection.  (Marcus Decl., Ex. 41 at 8-15).

87.    The motion to dismiss also stated that, based on the allegations in the complaint, New York law applied, and that Miracle could not state a claim under New York law.  (*Id.* at 3-5).  Among reasons for applying New York law, the motion stated that "Plaintiff has not disputed the Surrogate's determination that Marilyn Monroe was  New York domiciliary at the time of her death." (*Id.* at 5).

88.    A copy of the Surrogate Court's decree admitting Marilyn Monroe's will to probate was annexed as an exhibit to the motion to dismiss.  (Marcus Decl., Ex. 41 at ex. D).  No

factual evidence was submitted with the motion, and neither Anna Strasberg nor the Freud Centre submitted any affidavit regarding Marilyn Monroe's domicile.  (Marcus Decl., Ex. 41).

89.    The Administratrix's attorney argued that Miracle's request for discovery on the issue of domicile was inappropriate on a number of grounds, including that it was procedurally improper because Miracle had failed to raise the issue of domicile in her pleading, and that, in any event, none of the discovery sought would prevent her claim from being dismissed on personal jurisdiction or statute of limitations grounds.  (Marcus Decl., Ex. 44 at 4-5).

90.    During a November 24, 1992 hearing on the discovery dispute, Miracle argued for the first time that Marilyn Monroe might be domiciled in California.  (Marcus Decl., Ex. 45 at 9). In response, the Administratrix's attorney focused on the statute of limitations and personal jurisdiction defenses, stating that even if New York law did not apply to Miracle's substantive claim "the other two reasons [to dismiss the complaint] still exist."  (*Id.* at 15-19).

91.    In denying Miracle's request for discovery, the Hawaii district court said nothing about domicile or choice of law.  (*Id.* at 19).

92.    Miracle subsequently amended her complaint to add an allegation that Marilyn Monroe was a California domiciliary and assertions of fraud.  (Marcus Decl., Ex. 46 ¶¶ 4, 11).

93.    In her opposition to the Administratrix's motion to dismiss, Miracle argued that California law should apply to her claim.  Miracle relied on unsupported allegations contrary to the historical evidence, such as that "Marilyn Monroe, aka Nancy Cusumano, moved to California when she was 19 years old," and that "an ongoing murder investigation is continuing in California."  (Marcus Decl., Ex. 47 at 3).

94.    The Administratrix's reply memorandum filed in response to Miracle's amended complaint and her opposition to the motion to dismiss did not contain a single allegation

regarding Marilyn Monroe's domicile; nor did it argue that Miracle's claims were barred by New York law. (Strauss Decl., Ex. 117). The reply memorandum argued that Miracle's claims were barred by the statute of limitations and due to lack of personal jurisdiction, and that Miracle had failed to plead her newly-raised fraud claims with particularity. (*Id.*).

95.    At the December 14, 1992 hearing on the motion to dismiss, the Administratrix's attorney did not argue any issue regarding Marilyn Monroe's domicile or whether Miracle's claims should be dismissed under New York law. He only argued only that Miracle had failed to plead her newly-raised fraud claims with particularity, that her claims were barred by the statute of limitations, and that personal jurisdiction did not exist because no wrongful acts were committed in Hawaii. (Marcus Decl., Ex. 48 at 23-25).

96.    The Hawaii federal district court granted the Administratrix's motion to dismiss, finding that it lacked personal jurisdiction given the lack of sufficient minimum contacts between the Administratrix or Marilyn Monroe and the State of Hawaii. (Marcus Decl., Ex. 49 at 2-9). The Court stated, in the alternative, that Miracle had failed to state a claim for relief as a preterminated heir under New York law. (Marcus Decl., Ex. 48 at 27; Ex. 49 at 10).

97.    The Hawaii federal district court cited a number of factors in support of its finding that New York applied:

> New York is the place where the relationship between the parties is centered. Plaintiff's cause of action arose because of her alleged birth to the decedent in New York and the decedent's subsequent death (while domiciled in New York) with a will executed in New York that failed to provide for Plaintiff. The will was admitted to probate in New York, and the estate was administered in New York under the supervision of the courts of that State. Anna Strasberg is a domicile of New York, and her authority as administratrix derives from the New York courts.

(Marcus Decl., Ex. 49, at 13).

98.    Miracle's appeal to the Ninth Circuit was dismissed on jurisdictional grounds. (Marcus Decl., Ex. 55).

99.    Miracle filed a subsequent, copycat lawsuit against the Administratrix in New York. (Strauss Decl., Ex. 118). The New York Surrogate's Court declined to accord any estoppel effect to the failure-to-state-a-claim portion of the Hawaii district court's ruling, because that court had no jurisdiction to address the merits:

> [The Hawaii District Court] held that the court did not have personal jurisdiction over Strasberg. The decision, however, went on to explain that under New York law, she was not a pretermitted heir having been born before decedent executed her will. The fact that the Hawaii court addressed the merits does not give the decision preclusive effect to the current proceeding. New York law is clear that where there is no jurisdiction over the parties the decision will not preclude a subsequent suit on the merits.

(Strauss Decl., Ex. 119 at MM-0000363).

100.    Instead, the New York Surrogate's Court elected to determine the issue of whether Miracle was actually Marilyn Monroe's daughter on the merits, and ordered discovery on the issue. (Strauss Decl., Ex. 119 at MM-0000365-66, Ex. 120 at MM-0003081). After hearing the evidence, the Court concluded that there was no support for Miracle's claim because "it would have been practically impossible for Marilyn Monroe to have been in Brooklyn on the morning petitioner was born," and dismissed Miracle's claim. (Strauss Decl., Ex. 120).

Dated: New York, New York
      March 13, 2008

LOEB & LOEB, LLP

By: _____/s/ Jonathan Neil Strauss_____
    David M. Satnick
    Paula K. Colbath
    Jonathan Neil Strauss
    Tal E. Dickstein
    345 Park Avenue
    New York, New York 10154-1895
    (212) 407-4000

*Attorneys for Marilyn Monroe LLC*

SOVICH MINCH, LLP

By: _____/s/ Theodore J. Minch_____
    Theodore J. Minch, Esq.
    10099 Chesapeake Drive, Suite 100
    McCordsville, Indiana 46055
    Tel: (317) 335-3601
    Fax: (317) 335-3602

*Attorneys for CMG Worldwide, Inc.*