RECEIVED APR 1 1996

TELEX 422141

LAW OFFICES OF
**KENYON & KENYON**
ONE BROADWAY
NEW YORK, N.Y. 10004
(212) 425-7200
FACSIMILE (212) 425-5288

WASHINGTON, D.C. OFFICE
1025 CONNECTICUT AVENUE, N.W.
WASHINGTON, D.C. 20036-5405
TELEPHONE (202) 429-1775
FACSIMILE (202) 429-0795

EUROPEAN OFFICE
BOCKENHEIMER LANDSTRASSE 97-99
60325 FRANKFURT AM MAIN
FEDERAL REPUBLIC OF GERMANY
TELEPHONE (49 69) 97 58 05 0
FACSIMILE (49 69) 97 58 05 99

CABLE: ANAXIA

[attorney name listings omitted]

<u>**WITHOUT PREJUDICE**</u>

March 28, 1996

Christine M. Sovich, Esq.
CMG Worldwide, Inc.
1000 Waterway Boulevard
Indianapolis, Indiana 46202

      Re: <u>Renaissance Roads Productions, Inc.</u>

Dear Ms. Sovich:

      This is a follow-up to my letter of February 20, 1996.

      Based upon our analysis of this matter, we believe that CMG Worldwide, Inc. ("CMG") has no basis upon which to object to the commercial activities of our client Renaissance Roads Productions, Inc. d/b/a BERNARD OF HOLLYWOOD ("Bernard"). Hence, for at least the following reasons, we reject <u>in</u> <u>toto</u> CMG's legal claims on behalf of The Estate of Marilyn Monroe (the "Estate").

      First, Marilyn Monroe was a domiciliary of the State of New York and, as you know, New York Civil Rights Law Sections 50 and 51 do not recognize a post-mortem right of privacy or publicity. <u>Antonetty v. Cuomo</u>, 131 Misc.2d 1041, 502 N.Y.S.2d 902 (N.Y. Sup. Ct. 1986), <u>aff'd</u>, 125 A.D.2d 1010, 509 N.Y.S.2d 443 (1986), <u>appeal denied</u>, 70 N.Y.2d 602, 518 N.Y.S.2d 551 (1987).[1] Although Indiana Code Section 32-13-1-1(a) (which

---

[1] Furthermore, under <u>Stephano v. News Group Publications Inc.</u>, 64 N.Y.2d 174, 485 N.Y.S.2d 220 (1984), there is no common law right of privacy or publicity in New York beyond the limitations of Civil Rights Law Sections 50 and 51.

**CONFIDENTIAL CMG v. Shaw Family Archives**
**Subject to Protective Order**

MM-0019959

**KENYON & KENYON**

Christine M. Sovich, Esq.
March 28, 1996
Page 2

statute we understand was instigated by CMG itself) purports to override this limitation in according rights "regardless of a personality's domicile, residence, or citizenship," such rights <u>only</u> apply "to an act or event that occurs within Indiana . . . ." Moreover, we question the enforceability of a personal rights grant to a nondomiciliary, in the face of the domicile state's unequivocal decision not to recognize the rights in issue.

Second, even by the express terms of the Indiana statute, no publicity rights exist in favor of the Estate. The January 14, 1961 Last Will and Testament of Marilyn Monroe does not provide for the disposition of any publicity rights, and, according to Indiana Code Section 32-13-1-19, such rights therefore terminate: "If: (1) A deceased personality has not transferred the deceased person's rights under this chapter by: (A) Contract; (B) License; (C) Gift; (D) Trust; or (E) Testamentary document; and (2) There are no surviving persons as described in section 17 of this chapter; the rights set forth in this chapter terminate."[2]

Third, it was the customary business practice of Bruno Bernard to secure model releases from his subjects with respect to all photo sessions. Thus, for example, the photographs that came out of Bruno Bernard's famous 1946 photo session with Monroe -- which include all of the images marketed by <u>The Sharper Image</u> -- are covered by the July 24, 1946 Release signed by Monroe and reproduced in Susan Bernard's 1993 book, <u>Bernard of Hollywood's Marilyn</u> (Release copy attached as Exhibit "A" hereto). As the purported successor-in-interest to Monroe, the Estate cannot object to the commercial exploitation by Bernard and its licensees of any Monroe photographs covered by such a release. <u>See, Sharman v. C. Schmidt & Son, Inc.</u>, 216 F. Supp. 401 (E.D.Pa. 1963).

Fourth, even assuming <u>arguendo</u> that the Estate possessed any valid publicity rights, such rights would not apply to the sale of Bernard's copyrighted photographs in the form of limited edition fine prints. The sale of photographs <u>qua</u> photographs is clearly First Amendment-protected, and does not raise the "endorsement of merchandise" concern which is the underlying predicate of all right of publicity doctrine. Moreover, we note that Indiana Code Section 32-13-1-1(c)(1)(C) provides an exemption for "[o]riginal works of fine art," and we regard this exemption as applicable to such prints. <u>Cf. Simeonov v. Tiegs</u>, 159 Misc.2d 54, 602 N.Y.S.2d 1014 (N.Y. Civ.

---

[2] Under the present facts, there are clearly no such "surviving persons."

**CONFIDENTIAL CMG v. Shaw Family Archives**
**Subject to Protective Order**

MM-0019960

KENYON & KENYON

Christine M. Sovich, Esq.
March 28, 1996
Page 3

Ct. 1993); <u>Wayne Enterprises v. The Upstairs Gallery, Inc.</u>, No. C627-183 (Cal. Sup. Ct. Dec. 3, 1986).

  Fifth, any claims of the Estate are barred on principles of equitable estoppel, including, <u>inter alia</u>, laches and acquiescence. Bernard has been licensing its copyright property openly and notoriously for many years, with the full knowledge and awareness of the Estate through its prior agent, The Roger Richman Agency ("Richman"). See, <u>e.g.</u>, Susan Bernard's April 1, 1991 letter to Roger Richman (Exhibit "B" hereto), wherein she states "[t]o reiterate, I have been exclusively licensing my father's - Bruno Bernard PKA BERNARD OF HOLLYWOOD - legendary photographic work since his passing," and then goes on to protest the Estate's copyright infringement of Bernard images (discussed more fully <u>infra</u>). Richman and Bernard have had many contacts over this time period, yet at no time has Richman ever lodged a protest to Bernard's activities. Furthermore, Susan Bernard has even had communications over the years with Mark Roesler and Beth Vahle of CMG on the topic of CMG's acting as Bernard's agent in connection with the latter's exploitation of Monroe images. Under these circumstances, the Estate's claims cannot be maintained. <u>Cf. Sperry Rand Corp. v. Hill</u>, 356 F.2d 181 (1st Cir.), <u>cert</u>. <u>denied</u>, 384 U.S. 973 (1966); <u>Newton v. Thomason</u>, 22 F.3d 1455 (9th Cir. 1994).

  Sixth, beyond rights of privacy/publicity, you assert various additional rights of a trademark/service mark nature. However, we view such assertion as a mere bootstrap -- especially in the absence of any evidence from you as to the nature and extent of such alleged additional rights. You do not identify <u>any</u> trademarks or service marks owned by the Estate; do not state whether such claimed rights have been registered; make no showing of secondary meaning; and do not identify which of such purported trademarks or service marks have been used by Bernard. We are not surprised by this absence of evidence, because we do not believe that the Estate possesses any valid trademark or service mark rights in the first place. The image of Marilyn Monroe is one of the most ubiquitous in our society. A flip of the TV dial on any random evening will typically reveal images of Marilyn Monroe in one or more of her many films -- the primary vehicles by which her likeness is conveyed to the public. We believe that neither Monroe herself nor the Estate ever exercised any quality control over either the production or the commercial exploitation of such vehicles, <u>i.e.</u>, the films themselves, and, as you know, the consistent, uniform failure to exercise such quality control inevitably results in trademark abandonment. <u>Dawn Donut Company v. Hart's Food Stores, Inc.</u>, 267 F.2d 358 (2d Cir. 1959). Therefore, whatever rights the Estate may hold under a publicity theory (and, based upon the above analysis, we do not believe that the Estate holds <u>any</u>),

CONFIDENTIAL CMG v. Shaw Family Archives
Subject to Protective Order

MM-0019961

**KENYON & KENYON**

Christine M. Sovich, Esq.
March 28, 1996
Page 4

such rights surely do not rise to the level of enforceable trademarks or service marks.

Finally, as indicated *supra*, the Estate has infringed copyright rights belonging to Bernard. For example, in 1991, Bernard learned that the Estate had (through its licensee Boxer Rebellion, Inc.) produced and sold boxer shorts featuring a photograph of Monroe owned by Bernard. In response to Bernard's protest letter (Exhibit "C" hereto), this Estate licensee agreed to terminate such infringement. Please be on notice that, should Bernard learn (whether in the course of addressing the Estate's claim, or otherwise) that the Estate or its licensees have made other unauthorized uses of Bernard's images, Bernard will vigorously pursue claims against the Estate and such licensees for, *inter alia*, federal copyright infringement.

For each of the foregoing reasons, Bernard must reject CMG's demand that it cease and desist. However, notwithstanding such rejection, and CMG's complete and utter lack of a viable legal position, Bernard, like CMG, would prefer to address this matter in an amicable fashion. To this end, I invite you to telephone me at your convenience.

Very truly yours,

Jonathan D. Reichman

cc: Ms. Susan Bernard
    Arthur J. Stashower, Esq.

19918

CONFIDENTIAL CMG v. Shaw Family Archives
Subject to Protective Order

MM-0019962