UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

SHAW FAMILY ARCHIVES, LTD., EDITH   :
MARCUS and META STEVENS,

                                    :

             Plaintiffs,           Case No. 05 Civ. 3939 (CM)

                           :

        -against-           Honorable Colleen McMahon

                           :

CMG WORLDWIDE, INC., an Indiana
Corporation and MARILYN MONROE, LLC,  :
a Delaware Limited Liability Company,

             Defendants.

------------------------------------------------------- X


**MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION TO STRIKE
EVIDENCE IN PLAINTIFFS' ESTOPPEL SUMMARY JUDGMENT MOTION**

LOEB & LOEB LLP

345 Park Avenue
New York, New York 10154
Tel: 212-407-4000
Fax: 212-407-4990

*Attorneys for Defendant / Consolidated
Plaintiff Marilyn Monroe LLC*


SOVICH MINCH, LLP

10099 Chesapeake Drive, Suite 100
McCordsville, Indiana 46055
Tel: 317-335-3601
Fax: 317-335-3602

*Attorneys for CMG Worldwide, Inc.*

# TABLE OF CONTENTS

**Page**

I.   AFFIDAVITS FROM THE CALIFORNIA TAX PROCEEDING SHOULD BE STRICKEN ................................................................................................ 2

    A.   The Tax Affidavits are Inadmissible Hearsay ....................................... 3

    B.   The Tax Affidavits are Irrelevant Because they Refer to Marilyn Monroe's Residence, Not Her Domicile ............................................... 5

    C.   The Report of the Inheritance Tax Appraiser Should be Stricken Because it is Based Solely on the Inadmissible Tax Affidavits and is Wholly Irrelevant ................................................................................ 6

II.  STATEMENTS BY ESTATE EXECUTORS AFTER MONROE'S DEATH SHOULD BE STRICKEN ............................................................................... 7

    A.   Executors' Boilerplate Statements Cannot Affect a Person's True Domicile .............................................................................................. 8

    B.   Statements Concerning Marilyn Monroe's Residence Should be Excluded to the Extent They Refer to Residence, Not Domicile ........... 9

III. OTHER OUT-OF-COURT STATEMENTS MADE AFTER MONROE'S DEATH SHOULD BE STRICKEN ................................................................ 10

    A.   Mark Roesler's Hearsay Statement in a Marketing Brochure was Made Without Any Knowledge of the Underlying Facts and Before Any Relationship Between CMG and the Monroe Estate or MMLLC .................... 10

    B.   Roger Richman's Unsupported Hearsay Statement Should be Stricken ........... 11

    C.   Hearsay Letters by Attorneys Representing Clients Adverse to Defendants Should be Stricken .......................................................... 12

IV.  THE SNIPPET OF A PURPORTED 1955 RADIO INTERVIEW WITH MARILYN MONROE SHOULD BE STRICKEN ..................................................... 13

    A.   The Interview Snippet is Unreliable and Misleading Because it is Only a Tiny Portion of the Interview ........................................................ 14

    B.   The Interview Segment was Not Properly Authenticated ................................ 15

    C.   The Interview Snippet is Irrelevant Because Monroe Moved to California Six Years Later and Never Lived in Brooklyn ................................ 16

D.     The Interview Segment Conflicts with the Overwhelming Evidence of Monroe's Actions Demonstrating Her Intent to Live in California for the Foreseeable Future at the Time She Died .......................................................17

V.     DOCUMENTS PRODUCED AFTER THE DISCOVERY DEADLINE SHOULD BE PRECLUDED..........................................................................................19

# TABLE OF AUTHORITIES

**CASES**

*Cruz v. Oxford Health Plans, Inc.*,
 No. 03 Civ. 8863 (LTS), 2008 WL 509195 (S.D.N.Y. Feb. 26, 2008) ....................................9

*In re Beechwood*,
 142 Misc. 400, 254 N.Y.S. 473 (County Ct. Cayuga County 1931) .......................................24

*In re Curtiss' Will*,
 140 Misc. 185, 250 N.Y.S. 146 (Sur. Ct. N.Y. County 1931)........................................... 11-13

*In re Grant's Estate*,
 83 Misc. 257, 144 N.Y.S. 567 (Sur. Ct. N.Y. County 1913), *aff'd*, 166 A.D. 921, 151
 N.Y.S. 1119 (App. Div. 1st Dept. 1915)..................................................................................13

*In re Harkness' Estate*,
 183 A.D. 396, 170 N.Y.S. 1024 (App. Div. 1st Dept. 1918)...................................... 11, 23-24

*In re Johnson's Will*,
 259 A.D. 290, 18 N.Y.S.2d 958 (App. Div. 2d Dept. 1940) ...................................................22

*In re Mulhern's Estate*,
 31 A.D.2d 317, 297 N.Y.S.2d 485 (App. Div. 4th Dept. 1969) ..............................................14

*In re Rosenfeld's Estate*,
 76 N.Y.S.2d 177 (Sur. Ct. N.Y. Cty. 1944) ...........................................................................14

*In re Stone's Estate*,
 135 Misc. 736, 240 N.Y.S. 398 (Sur. Ct. N.Y. Cty. 1929)....................................................14

*Krause v. Buffalo and Erie County Workforce Dev. Consortium, Inc.*,
 425 F. Supp. 2d 352 (W.D.N.Y. 2006) ..................................................................................25

*Mississippi Band of Choctaw Indians v. Holyfield*,
 490 U.S. 30, 109 S. Ct. 1597 (1989)................................................................................ 11-12

*Nat'l Artists Mgmt. Co. v. Weaving*,
 796 F. Supp. 1224 (S.D.N.Y. 1991)................................................................................. 23-24

*Petition of Oganesoff*,
 20 F.2d 978 (S.D. Cal. 1927) ...................................................................................................9

*Pokorne v. Gary*,
 281 F. Supp. 2d 416 (D. Conn. 2003) .....................................................................................21

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997)................................................................................7

*San Diego Sav. Bank v. Goodsell*,
    137 Cal. 420, 70 P. 299 (1902) ..................................................................... 11-12

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*,
    434 F. Supp. 2d 203 (S.D.N.Y. 2006)..........................................................12, 19

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*,
    486 F. Supp. 2d 309 (S.D.N.Y. 2007)................................................................12

*Texas v. Florida*,
    306 U.S. 398, 59 S. Ct. 563 (1939)...............................................................10, 22

*United States v. Payden*,
    622 F. Supp. 915 (S.D.N.Y. 1985) ...................................................................16

*Willis v. Westin Hotel Co.*,
    651 F. Supp. 598 (S.D.N.Y. 1986) ...................................................................24

## OTHER AUTHORITIES

31 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 7110 (2007) ...........20

5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*
    ("*Weinstein's*") § 802.02[3], at 802-9 (2d ed. 2007) ....................................9, 16, 20

11 James W.M. Moore, *Moore's Federal Practice* ("*Moore's*") § 56.14[4][a], at 56-237
    (3d ed. 2007) .................................................................................. 8-9, 21

49 N.Y. Jur. 2d Domicil and Residence § 57............................................................25

Fed. R. Civ. P. 56(e) ...................................................................................7

Fed. R. Evid. 403 ...............................................................................Passim

Fed. R. Evid. 801 ......................................................................................9

Fed. R. Evid. 106 .....................................................................................20

Fed. R. Evid. 901(a) ..................................................................................21

Fed. R. Evid. 701 .....................................................................................21

Fed. R. Evid. 801(d)(2)(A) .............................................................................16

Fed. R. Evid. 901(b)(5) .......................................................................................................21

## PRELIMINARY STATEMENT

In their February 14, 2008 motion for summary judgment, Plaintiffs / Consolidated

Defendants ("Plaintiffs") seek a determination that Marilyn Monroe died a domiciliary of New

York, without the Court or the jury ever seeing a single piece of evidence of Monroe's actual

intentions before she died – except, of course, the evidence that is favorable to Plaintiffs.  Much

of the evidence Plaintiffs rely upon, however, would be inadmissible at trial and cannot properly

be considered on a motion for summary judgment.[1]

That evidence includes, (i) hearsay affidavits about Monroe's residence, not domicile, (ii)

boilerplate statements by representatives of Monroe's estate made without personal knowledge

of her actions, (iii) other out-of-court hearsay statements made years after Monroe's death and

without personal knowledge of her actions, and (iv) an unauthenticated transcript of a purported

audio recording of Monroe stating that she intended to retire to Brooklyn, although it is

undisputed that she never resided there and moved back to her native state of California years

later after divorcing New York-based Arthur Miller.


## ARGUMENT

Only evidence that would be admissible at trial may be considered on a motion for

summary judgment.  *See* Fed. R. Civ. P. 56(e) (an affidavit supporting summary judgment "must

be made on personal knowledge, set out facts that would be admissible in evidence, and show

that the affiant is competent to testify on the matters stated."); *Raskin v. Wyatt Co.*, 125 F.3d 55,

66 (2d Cir. 1997) ("The principles governing admissibility of evidence do not change on a

---

[1] For the reasons set forth in Defendants / Consolidated Plaintiffs' ("Defendants") March 13, 2008 Memorandum of Law in Opposition to Plaintiffs' Estoppel Motion, neither judicial estoppel, collateral estoppel nor res judicata applies to foreclose presentation of that evidence at trial.

motion for summary judgment. . . . . Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.") (citing Fed. R. Civ. P. 56(e)). Thus, "[m]aterials submitted by a party in connection with a summary judgment motion may be challenged on grounds that would preclude consideration of the material for the purposes of the motion. The vehicle to make this type of contention is a motion to strike." 11 James W.M. Moore, *Moore's Federal Practice* ("*Moore's*") § 56.14[4][a], at 56-237 (3d ed. 2007).

## I.    AFFIDAVITS FROM THE CALIFORNIA TAX PROCEEDING SHOULD BE STRICKEN

Plaintiffs rely on several documents that were submitted on behalf of Aaron Frosch, as ancillary executor of Monroe's California estate, to the California Tax Appraiser in 1966, several years after Monroe's death. These documents consist of an Inheritance Tax Affidavit by Frosch (Marcus Decl., Ex. 13),[2] an Affidavit Concerning Residence by Frosch (*id.*, Ex. 16), and supporting affidavits of Ralph Roberts, Hattie Stephenson Amos, May Reis, and Patricia Newcomb (*id.*) (together "Tax Affidavits"). Plaintiffs offer these Tax Affidavits to prove that "[w]hen Marilyn Monroe died, her permanent residence was 444 E. 57th Street, New York, New York." (Pls.' 56.1 Stmt. ¶ 5), and to "establish[] that Marilyn Monroe was a New York domiciliary at the time of her death." (Pls.' 56.1 Stmt. ¶ 48). Similarly, Plaintiffs offer the Report of Inheritance Tax Appraiser (Marcus Decl., Exs. 17-18) to prove the fact that "[w]hen Marilyn Monroe died, she was a non-resident of California." (Pls.' 56.1 Stmt ¶ 6).

The Tax Affidavits, however, are riddled with hearsay and in several respects were made without personal knowledge.

---

[2] References to "Marcus Decl." are to the Declaration of David Marcus dated February 14, 2008.

**A.   The Tax Affidavits are Inadmissible Hearsay**

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). "The hearsay rule seeks to eliminate the danger that evidence will lack reliability because faults in the perception, memory, or narration of the declarant will not be exposed." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* ("*Weinstein's*") § 802.02[3], at 802-9 (2d ed. 2007). Because an out-of-court statement is not subject to cross-examination and the declarant's demeanor cannot be evaluated, untested hearsay statements also pose a danger of insincerity. *See generally* Fed. R. Evid. 801 Advisory Committee's Introductory Note; The Hearsay Problem (1972).

"The Second Circuit has held that 'a court may . . . strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements.'" *Cruz v. Oxford Health Plans, Inc.*, No. 03 Civ. 8863 (LTS), 2008 WL 509195, *11 (S.D.N.Y. Feb. 26, 2008) (quoting *Hollander v. Amer. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999)); *see also* 11 *Moore's* § 56.14[4][a], at 56-237.

Moreover, "[r]esidence or domicile can be shown only by testimony competent and admissible under the general rules of evidence. Hearsay evidence, irrelevant or immaterial evidence, and opinion evidence is excluded." *Petition of Oganesoff*, 20 F.2d 978, 980 (S.D. Cal. 1927); *see also* 28 C.J.S. Domicile § 42 (2008) ("Domicile or residence may be shown only by evidence which is competent and admissible under the general rules of evidence. Accordingly, irrelevant or immaterial evidence is excluded on the question of domicile or the intention involved therein, as are hearsay and opinion evidence, and mere surmises of friends or connections.").

Tax Affidavits are rife with hearsay:[3]

- Ralph Roberts' Affidavit: "Decedent frequently *told me* that" she considered her trips to California merely as visits. "She *advised me* that" she purchased her California house because she disliked living in hotels. "She *indicated* that" her California house would be used only when she was in California. "On many frequent occasions, both in California and in New York, decedent *advised me* that" she considered her New York apartment as her permanent home and permanent residence. "She specifically *advised me* that" she never intended to relinquish her New York apartment. "Shortly prior to her death during several *conversations*, decedent specifically *told me* that" she intended to vacate her California house. "My understanding *based on numerous discussions and conversations* with the decedent was that" she considered her New York apartment as her permanent and official residence. (Marcus Decl., Ex. 16 at MM-0009352 to MM-0009353) (emphasis added).

- Hattie Stephenson Amos' Affidavit: "Prior to leaving for California, she *instructed me* to" clear her New York apartment as I had when she resided there. "Decedent had *told me* on several occasions" that she considered her New York apartment as her permanent residence. "Approximately two days prior to decedent's death, decedent *requested* that" I go to her California house for one month then return to New York. "I was then *told* that" decedent indented to return to her permanent residence in New York City. "Based on all of the aforesaid and on my *conversations* with the decedent" I believe she considered New York apartment as her permanent home and residence. (*Id.* at MM-0009354 to MM-0009355) (emphasis added).

- Patricia Newcomb's Declaration – Marilyn Monroe "always *conveyed the impression* to me" that she considered her New York apartment as her permanent residence. "Decedent *advised me*" that she purchased her California house because she disliked staying in hotels. "She specifically *indicated to me* that" she had no intention of making her permanent residence in her California house. "Decedent *further advised me* that she intended to return to her New York residence" for several reasons. (*Id.* at MM-0009358 to MM-0009360.)

Furthermore, May Reis' affidavit states that she was Monroe's personal secretary only until September 1961. (*Id.* at MM-0009356 to MM-0009357.) Hence, Reis did not work for Monroe for almost a full year prior to her death, which was when Monroe purchased her

---

[3] Because these affidavits were prepared several years after Monroe's death, the affiants' memory in recounting these supposed conversations with Monroe is a particularly suspect. In addition, because they were prepared and submitted to avoid taxation, there is also a danger that the affiants were insincere. *See Texas v. Florida*, 306 U.S. 398, 411, 59 S. Ct. 563, 570 (1939) (statements of domicile "made for the purpose of avoiding liability for state income and personal property taxes levied on the basis of domicile, tended to conceal rather than reveal" the decedents true domicile).

California home and moved her personal and business life to California.  (*See* Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Br.") at I.A.)  Reis therefore lacked personal knowledge of Monroe's intentions during the relevant time period.

Of course, Frosch's own conclusory statement that Monroe's New York City apartment was her permanent residence (*id.* at MM-0009350) is based solely on the inadmissible supporting affidavits discussed above.  Indeed, Frosch was replaced with Mickey Rudin as Monroe's attorney after she moved to California, (Declaration of Jonathan Neil Strauss dated March 13, 2008 ("Straus Decl."), Ex. 35, Ex. 77 at MC001627, Ex. 78, Ex. 79) and there is therefore no reason to believe that Frosch had any personal knowledge of Monroe's actions demonstrating her intent to make California her permanent home.

### B. The Tax Affidavits are Irrelevant Because they Refer to Marilyn Monroe's Residence, Not Her Domicile

Courts have long recognized that "residence" and "domicile" have different meanings. *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48, 109 S. Ct. 1597, 1608 (1989) ("'Domicile' is not necessarily synonymous with 'residence,' and one can reside in one place but be domiciled in another.") (citations omitted); *San Diego Sav. Bank v. Goodsell*, 137 Cal. 420, 427, 70 P. 299, 302 (1902) ("There is a well-recognized distinction between the term 'domicile' and the term 'residence.'  A person may have a residence separate from his domicile."); *In re Curtiss' Will*, 140 Misc. 185, 188, 250 N.Y.S. 146, 151 (Sur. Ct. N.Y. County 1931) (there is a "distinct difference in meaning between" domicile and residence, as shown by the fact that "a person may have his residence in one place while his domicile is in another.").[4]

---

[4] Indeed, one court has noted that "[r]esidence, as used in the law, is a most elusive and indefinite term." *Briggs v. Superior Court of alameda County*, 81 Cal. App. 2d 240, 245, 183 P.2d 758, 766 (1947).

Courts will therefore disregard statements of mere residence when deciding a person's domicile.  *See In re Harkness' Estate*, 183 A.D. 396, 405-06, 170 N.Y.S. 1024, 1030-31 (App. Div. 1st  Dept. 1918) (disregarding bank card giving decedent's residence as New York City because, among other things, it was a "statement of residence, and not domicile, made at a time when the decedent had three residences" and stating "with three residences, the statement of decedent's address at one of them, prepared by another person, is no proof of the decedent's domiciliary intent.")

This Court has decided that whether Marilyn Monroe transferred a right of publicity through the residuary clause of her will is governed by the law of Monroe's "domicile" at the time of her death.[5]  The Tax Affidavits, however, refer only to Monroe's *residence*, (*see* Marcus Decl., Exs. 13, 16), and there is no reason to believe that the affiants meant to address anything other than Monroe's residence.  The affidavits are thus irrelevant because although Monroe clearly lived in California at the time she died, she did maintain an apartment in New York City, and a person may have a residence in one place but be domiciled in another.  *See Mississippi Band of Choctaw Indians*, 490 U.S. at 48; *San Diego Sav. Bank*, 137 Cal. at 427; *In re Curtiss' Will*, 140 Misc. at 188.

### C.  The Report of the Inheritance Tax Appraiser Should be Stricken Because it is Based Solely on the Inadmissible Tax Affidavits and is Wholly Irrelevant

Plaintiffs also offer the Report of Inheritance Tax Appraiser to prove that "[w]hen Marilyn Monroe died, she was a non-resident of California."  (Pls.' 56.1 Stmt ¶ 6, Marcus Decl., Exs. 17, 18)  The document itself, however, states only that Monroe "died testate on or about

---

[5]  *See Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 434 F. Supp. 2d 203, 210 (S.D.N.Y. 2006) (deciding that Indiana choice of law rules apply); *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309, 314 (S.D.N.Y. 2007) (deciding that under Indiana law, "the domicile of the testator at his or her death applies to all questions of a will's construction.").

August 5, 1962, a resident of the County New York, State of New York and left property taxable under the inheritance tax laws of the State of California" (Marcus Decl., Ex. 17-18.) It says nothing about whether Monroe was a resident (much less a domiciliary) of California, and is therefore irrelevant. *See Mississippi Band of Choctaw Indians*, 490 U.S. at 48; *San Diego Sav. Bank*, 137 Cal. at 427; *In re Curtiss' Will*, 140 Misc. at 188. To the extent the report is based on the Tax Affidavits – and there is no indication it is based on anything else – it should be excluded for the additional reason that it is based on in admissible hearsay.

## II.    STATEMENTS BY ESTATE EXECUTORS AFTER MONROE'S DEATH SHOULD BE STRICKEN

Plaintiffs also rely on numerous pro-forma statements made well after Monroe's death by, or on behalf, of Aaron Frosch as executor, and Anna Strasberg as administratrix. These include: (i) documents filed by the Executor in the New York and California probate proceedings (Pls. 56.1 Stmt. ¶¶ 21, 24, 25, 27; Marcus Decl., Exs. 6, 24, 26, 27, 28), (ii) documents filed on behalf of the Administratrix in connection with the 1989 New York will construction proceeding (Pls.' 56.1 Stmt. ¶¶ 1, 41, 57; Marcus Decl., Ex. 35), and (iii) documents filed on behalf of the Administratrix in connection with the 1992 Nancy Miracle litigation in Hawaii (Pls.' 56.1 Stmt. ¶ 10; Marcus Decl., Exs. 41, 44, 45, 51).

Plaintiffs clearly offer these statements to show that Monroe was a New York domiciliary when she died. For example, citing the Administratrix's petition for construction of Monroe's will, Plaintiffs affirmatively assert that "Marilyn Monroe died a domiciliary of New York State." (Pls.' 56.1 Stmt. ¶ 1, citing Marcus Decl., Ex. 35.) All of the above cited statements, however, are hearsay, and were made without any personal knowledge of Monroe's own actions before she died. They are also legally irrelevant to the factual question of Monroe's domicile.

### A.   Executors' Boilerplate Statements Cannot Affect a Person's True Domicile

Several cases have held that statements of an estate representative, made after a testator's death are irrelevant to the testator's actual domicile.  *See In re Grant's Estate*, 83 Misc. 257, 260, 144 N.Y.S. 567 (Sur. Ct. N.Y. County 1913), *aff'd*, 166 A.D. 921, 151 N.Y.S. 1119 (App. Div. 1st Dept. 1915); ("An executrix cannot change the actual domicile of the testator by her own admissions after testator's death . . ."); *In re Rosenfeld's Estate*, 76 N.Y.S.2d 177, 179 (Sur. Ct. N.Y. Cty. 1944) ("Even an allegation of the domicile of the testator in the petition for probate is not an estoppel against a subsequent application for the determination of the true domicile."); *In re Mulhern's Estate*, 31 A.D.2d 317, 318, 297 N.Y.S.2d 485, 487 (App. Div. 4th Dept. 1969) ("An executor cannot change the actual domicile of the testator by his own admissions or allegations after the testator's death.  Such admissions are beyond the province of an executor.") (citing *Matter of Grant*, 83 Misc. at 260, 144 N.Y.S.2d at 569).

Thus, in *In re Rothschild's Estate*, where the applicability of a transfer tax depended on the decedent's last domicile, the court stated "The fact that the attorney or even the executor was under a misapprehension at an earlier stage concerning Mr. Rothschild's last domicile is of no consequence.  The principle of a decedent's domicile is not affected by estoppels against others, nor are the allegations of personal representatives conclusive on an issue of last domicile of their testator."  86 Misc. 364, 365, 148 N.Y.S. 368, 368 (Sur. Ct. N.Y. Cty. 1914); *see also In re Stone's Estate*, 135 Misc. 736, 739, 240 N.Y.S. 398, 401 (Sur. Ct. N.Y. Cty. 1929) ("Statements by the decedent's attorney in fact that the decedent was a resident of New York afford little proof as to her domiciliary intent.  It does not seem unusual that the attorney in fact, in preparing documents for the decedent who had two addresses, should use her New York address especially

since the transactions affected New York property and the documents were executed in New York.").[6]

The fact that Frosch chose to probate Monroe's will in New York, where he lived and practiced law (Marcus Decl., Ex. 4; Strauss Decl., Ex. 49),[7] and in the process made the bare allegation that Monroe died a New York domiciliary, has no bearing whatsoever on Monroe's actual domiciliary intent.

Similarly, statements made on behalf of Anna Strasberg, as administratrix of Monroe's estate, which merely parroted Frosch's mistaken assertions, are equally irrelevant to Monroe's domicile. (*E.g.*, Marcus Decl., Ex. 35, 41, 44, 45, 48.) These statements are hearsay, and there is no showing that the Administratrix, or any of her attorneys, had any personal knowledge of Monroe's actions when they made those statements years after Monroe's death.[8]

### B. Statements Concerning Marilyn Monroe's Residence Should be Excluded to the Extent They Refer to Residence, Not Domicile

Many of the statements made by, or on behalf of, the Executor or Administratrix refer to Monroe's residence at the time she died. (*See e.g.,* Marcus Decl., Exs. 6, 24, 26, 31.) For the reasons discussed above, *supra* I.B., such statements are therefore irrelevant to the issue of domicile and should be stricken.

---

[6] Even if such statements are considered marginally relevant, they are of such minimal probative value when compared to the overwhelming objective evidence of Monroe's California domicile, that they should be excluded under Fed. R. Evid. 403 because of the danger of unfair prejudice to Defendants.

[7] As explained in Defendants' Brief in Opposition to Plaintiffs' Estoppel Motion at II.B.1, the fact that Frosch chose to file original probate of Monroe's will in New York is immaterial because a will may be probated in New York based solely on the fact that the testators left property in New York.

[8] The fact that the Anna Freud Centre admitted the bare recital that Monroe died a New York domiciliary "on information and belief" (Marcus Decl., Ex. 36 at MM-0007335) demonstrates that it too lacked any personal knowledge of Monroe's actual domiciliary intent.

III.    OTHER OUT-OF-COURT STATEMENTS MADE AFTER MONROE'S DEATH
        SHOULD BE STRICKEN

Plaintiffs rely on other statements that constitute inadmissible hearsay, are not based on

personal knowledge, and are irrelevant to the factual question of Monroe's domicile at death.

### A.    Mark Roesler's Hearsay Statement in a Marketing Brochure was Made Without Any Knowledge of the Underlying Facts and Before Any Relationship Between CMG and the Monroe Estate or MMLLC

Plaintiffs offer a May 1995 business proposal that Mark Roesler sent to Anna Strasberg

as administratrix of Monroe's estate.  (Plaintiffs' Brief in Support of Motion for Summary

Judgment ("Pls.' Br.") 32; Marcus Decl., Ex. 57).  That document was sent months before any

business relationship existed between CMG and Monroe's estate, and over six years before the

creation of MMLLC (*see* Roesler Dep. Tr. 235:23-25, Marcus Decl., Ex. 66; Strauss Decl., Ex.

126.)  Roesler's comment that Monroe died a New York domiciliary is hearsay and cannot be

offered against MMLLC.  *See United States v. Payden*, 622 F. Supp. 915, 919 (S.D.N.Y. 1985)

("Simply because the statements are admissible as to Grant, the statements are not automatically

admissible against [co-defendants] Payden and Coleman because Rule 801(d)(2)(A) provides for

the use of admissions only against the party making the statement."); 5 *Weinstein's* § 801.30[1],

at 801-46 ("[T]he statements must be offered against the *party who made them* (or by someone

whose statements are attributable to that party).").

Roesler's statement should be excluded for the additional reason that it is irrelevant to the

issue of Monroe's last domicile because he lacked any personal knowledge of Monroe's actions

or intentions.  *See* 5 *Weinstein's* § 801.31[4], at 801-55 to 801-56 ("Party statements must still

comply with other evidence rules, such as Rule 402's requirement of relevance.  Similarly, Rule

403 would be grounds for excluding a party admission if its probative value is substantially

outweighed by its potential for unfair prejudice. . . . .  Furthermore, a proper foundation for the

statement must be laid or the statement will be disallowed.").  At Roesler's deposition, Plaintiffs neglected to explore the basis for the statement they now rely upon, such as whether Roesler had any personal knowledge of Monroe's actions during the years prior to her death.

In fact, when he made the statement in 1995 neither Roesler, nor anyone else at CMG had investigated where Monroe was actually domiciled at the time of her death, and he therefore had no personal knowledge regarding Monroe's domicile.  (Declaration of Mark Roesler dated March 13, 2007 "(Roesler Decl.")  ¶ 7-8.)  Thus, he knew nothing about Monroe's own actions, including her moving to California in April 1961, purchase of a home in California in January 1962, and transplanting her personal and professional life to California.  (Def.'s Br. at I.A.) Roesler's reference to Monroe as a New York domiciliary was based only on a vague understanding gained from unreliable third-party sources.  (Roesler Decl. ¶ 8.)  Once he became the Estate's licensing agent and gained access to the true facts of Monroe's life, Roesler came to believe that Monroe was, in fact, a California domiciliary.  (*Id.* at ¶ 10.)  Roesler's uninformed statement should therefore be stricken.

### B.  Roger Richman's Unsupported Hearsay Statement Should be Stricken

Plaintiffs cite to a February 1990 letter from Roger Richman to Irving Sideman, former counsel to the Administratrix, (*see* Pls.' Br. at 33; Marcus Decl., Ex. 38), which is also plainly hearsay.  In addition, the letter contains the following hearsay-within-hearsay statements, which are doubly inadmissible: (i)  "You have *stated* that" Monroe was a New York domiciliary, and (ii) "several lawyers reviewed her probate file and *alleged* that" her domicile at death was likely New York. (Marcus Decl., Ex. 38) (emphasis added).[9]

---

[9] To the extent any of Richman's comments were based on statements in Monroe's probate file, not only are they hearsay, they are also inadmissible because, as explained above,

From that unreliable hearsay letter, Plaintiffs ask the Court to draw the conclusion that Irving Seidman represented to Richman that Monroe died a New York domiciliary. (*See* Pls.' Br. at 33.) There is simply no admissible evidence from which to draw such a conclusion. When Anna Strasberg was asked at her deposition whether she was "aware that Seidman . . . had represented that Ms. Monroe died a New York domiciliary," she did not answer in the affirmative, or even accept the premise of the question. Instead, she merely stated "*If* he did that, then that's what he did, and he's the lawyer." (Strasberg Dep. Tr. 196:5-14, Marcus Decl., Ex. 67) (emphasis added).

### C. Hearsay Letters by Attorneys Representing Clients Adverse to Defendants Should be Stricken

Plaintiffs also rely on a March 1996 letter from the law firm Kenyon & Kenyon to CMG's counsel. (*See* Pls.' Br. at 33-34; Marcus Decl., Ex. 58.) That lawyers' letter, written on behalf of a third-party doing business as Bernard of Hollywood, which at the time was adverse to CMG, is hearsay and irrelevant to the factual question of Monroe's actual domicile at death because there is no evidence that its author had any knowledge of Monroe's actions. Contrary to Plaintiffs allegations, CMG did respond to that letter. Christine Sovich of CMG had a telephone conversation with the Kenyon and Kenyon attorney, Jonathan Reichman in response to his letter, in which they resolved any dispute. (Sovich March 13, 2008 Decl., ¶ 6.) In fact, CMG has entered into a business relationship with Bernard, and thus is no longer adverse to Bernard with regard to any potential infringement issues. (*Id.* ¶ 6.) Moreover, no conclusions can properly be drawn from the fact that CMG did not pursue legal action against Bernard of Hollywood. That decision was based on the fact that Bernard's minimal infringement was outweighed by the cost

---

*supra* at II.A., boilerplate statements by an estate executor do not affect the testators actual domicile.

of prosecuting an infringement suit. (*Id.* ¶ 7.) That type of decision, made by businesses every day throughout the country, is proof of nothing. The letter should be stricken from the record.

Lastly, in an apparent attempt to cobble together as many irrelevant and prejudicial lawyer's letters as possible, Plaintiffs offer a July 1993 letter from the law firm Baker & Hostetler to Roger Richman, which forwarded an opinion letter written by attorney Martin Bressler. (Marcus Decl., Ex. 56.) Bressler's opinion letter, which erroneously concluded that the Estate of Marilyn Monroe has no right of publicity in her persona,[10] was written on behalf of Larry Shaw, a predecessor-in-interest to Plaintiff Shaw Family Archives. (*Id.* at MM-0003906.) An unsupported opinion letter written by Plaintiffs' own attorney is no more evidence of Monroe's domicile than is Plaintiffs' memorandum of law. Indeed, Plaintiffs do not even mention the letter in their brief, which demonstrates that it has zero probative value and serves only to improperly prejudice Defendants. That unsubstantiated hearsay letter should be stricken from the record.

## IV.  THE SNIPPET OF A PURPORTED 1955 RADIO INTERVIEW WITH MARILYN MONROE SHOULD BE STRICKEN

In the second to last page of their brief, Plaintiffs rely on a short comment supposedly made by Marilyn Monroe during a June 12, 1955 radio interview with David Garroway. (Pls.' Br. at 34.) Based on that brief comment, in a program aired to thousands of adoring New York fans, Plaintiffs ask the Court to draw the conclusion that Marilyn Monroe actually indented to retire in Brooklyn.

---

[10] Bressler concluded that Monroe's estate could only be probated in New York if the petition recited that she was a New York domiciliary. (Marcus Decl., Ex. 56 at MM-0003907.) As explained in Defendants' Memorandum of Law in Opposition to Plaintiff's Estoppel Motion, at II.B.1, that conclusion is entirely incorrect because a will may be probated in New York based solely on a decedent's property in New York.

Not only is that statement plainly hearsay, it is irrelevant because it was made six years before Monroe's divorce from New York-based Arthur Miller and her subsequent move to California, and because it is rebutted by the overwhelming evidence of Monroe's intent at the time she died.  The interview segment is also inherently unreliable because it has not been properly authenticated and it is only a small snippet of a longer interview that would help explain Monroe's tongue in cheek comment.

### A.  The Interview Snippet is Unreliable and Misleading Because it is Only a Tiny Portion of the Interview

Federal Rule of Evidence 106 provides that "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."  Fed. R. Evid. 106.  In addition, under Rule 403, evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]"  Fed. R. Evid. 403.

Plaintiffs have provided only a tiny portion of the 1955 interview.  In fact, Dennis Hart, the individual from whom Plaintiffs obtained the recording, acknowledges that the radio broadcast he recorded in 1975 was a re-broadcast of only a "snippet" of the original June 12, 1955 interview.  (March 23, 2007 Decl. of Dennis Hart ¶ 3.)  MMLLC asked Plaintiffs for a complete recording of the purported interview, but Plaintiffs have not provided one.  MMLLC was thus prevented from inspecting any other portion of the interview that might explain or contradict Monroe's supposed intention to retire to Brooklyn.  In particular, the snippet ends immediately after Monroe's farcical comment that she would retire in Brooklyn, and it omits the laughter that undoubtedly followed.  As a result, the small portion of the interview Plaintiffs have provided is unreliable and misleading, and should therefore be stricken.  *See* 5 *Weinstein's*

§ 901.05[4], at 901-60.2 (tape recording is inadmissible "if the gaps are so substantial that they

render the recording as a whole untrustworthy."); 31 Charles A. Wright & Victor J. Gold,

*Federal Practice and Procedure* § 7110 (2007) ("gaps in a recording may reduce the probative

value of the evidence and raise the danger of misleading the trier of fact, which could justify

excluding the evidence under Rule 403.").

### B.   The Interview Segment was Not Properly Authenticated

Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or

identification as a condition precedent to admissibility is satisfied by evidence sufficient to

support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a).

Rule 901(b)(5) provides that a voice recording may be authenticated "by opinion based upon

hearing the voice at any time under circumstances connecting it with the alleged speaker."  Fed.

R. Evid. 901(b)(5).  In addition, Rule 701 requires that a lay witness's testimony be "rationally

based on the perception of the witness."  Fed. R. Evid. 701.

Evidence that has not been properly authenticated may be stricken from an affidavit

offered in support of a summary judgment motion.  *See Pokorne v. Gary*, 281 F. Supp. 2d 416,

418 (D. Conn. 2003) ("A motion to strike can also be used to challenge documentary evidence

that has not been properly authenticated.") (citing *Dedyo v. Baker Eng'g N.Y., Inc.*, No. 96 Civ

7152 (LBS), 1998 WL 9376, at *4 (S.D.N.Y. Jan. 13, 1998) ("A motion to strike will also be

granted when it challenges documentary evidence that was submitted in support of or in

opposition to a summary judgment motion, but which has not been properly authenticated.  It is

irrelevant that the documents may in the future be properly authenticated at trial through a

witness.")); 11 *Moore's* § 56.14[4][a], at 56-238 (3d ed. 2007) (same)

Plaintiffs have offered no testimony based on an independent familiarity with Monroe's

voice that the speaker in the interview snippet is in fact Marilyn Monroe.  Mr. Hart merely states

that "[t]he voices in this snippet are Marilyn Monroe and Dave Garroway.  It is a well known [sic] that Dave Garroway interviewed Ms. Monroe on the first NBC Monitor Show" (Hart Decl. ¶ 6), yet he provides no indication of any first-hand familiarity with Monroe's voice.

Plaintiffs also disingenuously state that at David Strasberg "identified the voice of Marilyn Monroe in a recorded interview of her on January 12, 1955" at his deposition.  (Pls.' 56.1 Stmt. ¶ 62.)  In reality, the Plaintiffs' counsel stated "I'm going to play you a tape for you which *I'll represent to you is a recording in 1955 of what Ms. Monroe has stated*" then, after playing the recording asked, "Do you have any reason to believe that that's not *Ms. Monroe*?" (Strasberg Dep. Tr. 207:10-208:23, Marcus Decl., Ex. 65 at 207-208) (emphasis added).  That type of suggestive questioning is entirely improper when attempting to authenticate a voice recording.  In addition, Plaintiffs have presented no evidence that David Strasberg's response was based on any first-hand knowledge of Marilyn Monroe's voice.  Thus, Plaintiffs have not met their burden of authenticating the purported radio interview snippet, and it should therefore be stricken.

## C.   The Interview Snippet is Irrelevant Because Monroe Moved to California Six Years Later and Never Lived in Brooklyn

It is well-settled that a person's domicile can only be established by a concurrence of actual residence and an intention to make that place one's home.  *See Texas v. Florida*, 306 U.S. 398, 424, 59 S. Ct. 563, 576 (1939) ("Residence in fact, coupled with the purpose to make the place of residence one's home, are the essential elements of domicile."); *In re Johnson's Will*, 259 A.D. 290, 291, 18 N.Y.S.2d 958, 959 (App. Div. 2d Dept. 1940) ("In order to effect a change there must have been proof that the decedent had freely chosen another domicile and that this choice was followed by physical presence at a dwelling place and the intention to make it a

home.  There must be concurrence of the fact and the intent, the factum and the animus.") (citing *Gilbert v. David*, 235 U.S. 561, 35 S.Ct. 164, 59 L.Ed. 360 (1915)).

There is no dispute that Marilyn Monroe never – either at the time of the 1955 interview snippet or any at other time of her life – resided in Brooklyn.  Indeed, six years after the interview snippet was recorded, and only months after her divorce from Arthur Miller, Monroe moved to California where she remained until her death.[11]  Thus, even assuming the Court takes Monroe's supposed desire to retire in Brooklyn seriously,[12] that alone is legally irrelevant to her domicile at the time of her death.  *Cf. In re Harkness' Estate*, 183 A.D. at 405, 170 N.Y.S. at 1030 (disregarding decedent's affidavit that he was a resident of New York City because it was made at a time that he had no residence in New York, and because he later referred to himself as a resident of Greenwich, Connecticut).

### D. The Interview Segment Conflicts with the Overwhelming Evidence of Monroe's Actions Demonstrating Her Intent to Live in California for the Foreseeable Future at the Time She Died

A determination of a person's domicile involves an inquiry into the "totality of the evidence" indicating a person's intent to make someplace their home.  *Nat'l Artists Mgmt. Co. v. Weaving*, 796 F. Supp. 1224, 1227-28 (S.D.N.Y. 1991).  Courts look at, among other things, "where civil and political rights are exercised, taxes paid, real and personal property (such as

---

[11] Further, Sam Shaw himself has acknowledged that any intent on the part of Monroe to ever live in Brooklyn was tied to her relationship to Arthur Miller, a Brooklyn native.  Sam Shaw recounted that Monroe told him "I love Brooklyn, Arthur Miller lives there.  I love Arthur Miller[.]" (*See* Strauss Decl., Ex. 123 at 249-50), and that she once said "Arthur.  It was Arthur.  He was why I stayed in New York.  He was going to make my life different, better, a lot better." (*Id*. Ex. 5 at 146).

[12] The interview was clearly broadcast in the New York area, for the benefit of New York listeners.  That Monroe said she would retire to Brooklyn shows only that she knew how to deliver a punch-line that would please her adoring fans.

furniture and automobiles) located, driver's and other licenses obtained, bank accounts
maintained, location of club and church membership and places of business or employment" as
well as "whether the person owns or rents his or her place of residence; the nature of the
residence (i.e., how permanent the living arrangement appears); affiliations with social
organizations, the location of a person's physician, lawyer, accountant, dentist, stockbroker, etc."
*Id.* at 1228.

    As explained in Defendants' Memorandum of Law in Opposition to Plaintiffs' Summary
Judgment Motion, I.A., virtually all of these factors indicate that Monroe intended to live in
California for the foreseeable future when she died.  In particular, after ending her four-year
marriage to the New York-based playwright Arthur Miller in January 1961, Monroe moved her
personal and professional life back to her native California, and in January 1962 purchased a
Brentwood, California  house – the only one she ever owned by herself – where she accumulated
all the trappings of a permanent home.  Nevertheless, Plaintiffs offer the interview snippet to
show that, years earlier in 1955, the quintessential Hollywood-icon supposedly indented to retire
in Brooklyn.

    Because the interview snippet so dramatically conflicts with the overwhelming objective
evidence of Monroe's actual intentions, and because it is so inherently unreliable (as discussed
above), the Court should strike it from the record under Fed. R. Evid. 403.  *See In re Harkness'*
*Estate*, 183 A.D. 396, 407, 170 N.Y.S. 1024, 1031-32 (App. Div. 1st Dept. 1918) ("Following
the statement of the rule in the leading case of *Dupuy v. Wurtz*, [53 N.Y. 556], this court has
repeatedly disregarded declarations, when they conflict with acts, which are more persuasive in
showing intent."); *Willis v. Westin Hotel Co.*, 651 F. Supp. 598, 601 (S.D.N.Y. 1986) ("Although
intent is crucial to domicile, mere subjective statements of affiliation with a particular state or of

18

intent to make it one's home, of course, cannot suffice for a finding of state citizenship if such statements are belied by objective indicia of actual residence and intent."); *In re Beechwood*, 142 Misc. 400, 401-402, 254 N.Y.S. 473, 475 (County Ct. Cayuga County 1931) ("Declarations of intention . . . have been denominated the lowest species of evidence, inferior to acts, and not to be considered when they conflict with acts and general conduct, which are regarded as more important and reliable and outweigh any declarations to the contrary.  Actions speak louder than words.") (citations omitted)  49 N.Y. Jur. 2d Domicil and Residence § 57 ("declarations are disregarded when they conflict with acts which are more persuasive in showing intent.").

## V.    DOCUMENTS PRODUCED AFTER THE DISCOVERY DEADLINE SHOULD BE PRECLUDED

In Plaintiffs' motion to preclude evidence from Defendants' cross-motion for summary judgment on public domain, Plaintiffs argue that Defendants should be precluded from relying on information that was not produced prior to the discovery deadline, even though much of that information is publicly available.  (Pls.' Mar. 4, 2008 Br. in Supp. Mot. to Preclude at 8-11.)  Not only is that argument legally incorrect, *see Krause v. Buffalo and Erie County Workforce Dev. Consortium, Inc.*, 425 F. Supp. 2d 352, 375 (W.D.N.Y. 2006) ("'[I]t is well-established that discovery need not be required of documents of public record which are equally accessible to all parties.'") (quoting *Securities and Exchange Commission v. Samuel H. Sloan & Co.*, 369 F. Supp. 994, 995 (S.D.N.Y. 1973)), it would also operate to exclude much of the evidence Plaintiffs rely on in their estoppel motion.  For example, all documents bearing production numbers with the prefixes "SFA1" were produced after the December 31, 2007 discovery cut-off. (Strauss Decl., Ex. 127.)  Thus, to the extent the Court adopts Plaintiffs' argument on their motion to preclude, all documents with the "SFA1" production number prefix should similarly be excluded.

## **CONCLUSION**

For all the foregoing reasons, MMLLC respectfully asks the Court to enter an order striking the above-identified documents from the Plaintiffs' summary judgment motion on domicile, and awarding such other and further relief as the Court deems just.

Dated: New York, New York

March 13, 2008

LOEB & LOEB LLP

By:___/s/  Paula K. Colbath_____
  Paula K. Colbath
  David Satnick
  Jonathan Neil Strauss
  345 Park Avenue
  New York, New York 10154-1895
  (212) 407-4000

  *Attorneys for Defendant*
  *Marilyn Monroe, LLC*

SOVICH MINCH, LLP

By: ____/s/__Theodore J. Minch_____
  Theodore J. Minch, Esq.
  10099 Chesapeake Drive, Suite 100
  McCordsville, Indiana 46055
  Tel: (317) 335-3601
  Fax: (317) 335-3602

  *Attorneys for CMG Worldwide, Inc.*