# EXHIBIT 117

ORIGINAL

CADES SCHUTTE FLEMING & WRIGHT

MILTON M. YASUNAGA
RICHARD R. CLIFTON
1000 Bishop Street
Honolulu, Hawaii 96813
Telephone: 521-9200

Attorney for Defendant
ANNA STRASBERG, as Administratrix,
c.t.a. of the Last Will and
Testament of MARILYN MONROE

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 1 0 1992

at ___ o'clock and ___ min. ___ M.
WALTER A. Y. H. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| NANCY MIRACLE,<br>aka, NANCY MANISCALCO GREENE,<br><br>             Plaintiff,<br><br>    vs.<br><br>ANNA STRASBERG, as<br>Administratrix, c.t.a. of<br>the Last Will and Testament<br>of MARILYN MONROE,<br><br>             Defendant. | CIVIL NO. 92-00605 ACK<br>(Non Motor Vehicle Tort)<br><br>DEFENDANT'S REPLY<br>MEMORANDUM IN SUPPORT OF<br>DEFENDANT'S 11/9/92 MOTION<br>TO DISMISS COMPLAINT;<br>AFFIDAVIT OF BLANE T.<br>YOKOTA; EXHIBITS "A"-"D";<br>CERTIFICATE OF SERVICE<br><br>Date:  December 14, 1992<br>Time:  10:30 a.m.<br>Judge: Alan C. Kay<br>Trial Date: Not Assigned |

DEFENDANT'S REPLY MEMORANDUM IN SUPPORT
DEFENDANT'S 11/9/92 MOTION TO DISMISS COMPLAINT

On December 2, 1992, Defendant received by mail Plaintiff's First Amended Complaint. The Court may, and (Defendant respectfully submits) should, consider the motion to dismiss as being addressed to the First Amended Complaint, which, like the Complaint, is deficient and should be dismissed. 6 Charles A. Wright & Arthur R. Miller, Federal Practice and

Procedure §1476 (1990) states:

> [D]efendants should not be required to file a new motion to dismiss simply because an amended pleading was introduced while their motion was pending. If some of the defects raised in the original motion remain in the new pleading, the court simply may consider the motion as being addressed to the amended pleading. To hold otherwise would be to exalt form over substance.

Therefore, Defendant addresses the First Amended Complaint in this Reply Memorandum, which is timely filed.[1]

For the purpose of this motion, but only for such purpose, Defendant treats Plaintiff's claim that she is the natural daughter of decedent Marilyn Monroe as true (¶ 7, First Amended Complaint).

## I. STATUTE OF LIMITATIONS

Plaintiff's First Amended Complaint should be dismissed because its claims are barred under all applicable or arguably applicable statutes of limitations. By Plaintiff's own admission in her answers to interrogatories and deposition testimony in another case, Plaintiff has believed since January 1985 that she is the daughter of Marilyn Monroe. These matters may be

---

[1] Upon Plaintiff's request, the Court gave Plaintiff six additional days, until Tuesday, December 1, 1992, to file her memorandum in opposition. Because Plaintiff chose to serve her memorandum by mail, Defendant did not receive it until after December 1, 1992. Plaintiff's delay in filing and serving her memorandum should not reduce the time Defendant is ordinarily afforded by the rules. The local rules provide that, ordinarily, the memorandum in opposition is filed 18 days before the hearing and the reply is filed 11 days before the hearing -- thus giving movant seven days to reply, but, under Fed. R. Civ. Pro. 6(e), an additional three days is allowed when service has been by mail. Thus, the rules ordinarily afford a movant served by mail 10 days to reply (18 - 11 = 7 + 3 = 10). However, Defendant has not taken the full period allowed in the hope that the original hearing date can be maintained.

MM-0001555

considered in determining a Rule 12(b) motion to dismiss.[2]

In 1991, Nancy Greene, aka Nancy Miracle, filed an amended complaint in this Court in an action entitled <u>Nancy Greene v. Globe International, Inc.</u>, Civil No. 91-00429 DAE, alleging that she had been defamed by an article appearing in the June 19, 1990 edition of the "National Examiner" and that "[a]t all times material herein ... the plaintiff held herself out to all as being Marilyn Monroe's daughter." (Exhibit "A" is a true and accurate copy of the First Amended Complaint in that action.)

In responding to interrogatories, Ms. Miracle gave the

---

[2]    <u>Mack v. South Bay Beer Distributors, Inc.</u>, 798 F.2d 1279, 1282 (9th Cir. 1986) (a court may take judicial notice of facts outside the pleadings such as records of administrative bodies and other matters of public record "and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment."); <u>Steiner v. Shawmut National Corp.</u>, 766 F. Supp. 1236, 1241 (D. Conn. 1991) ("In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although a wide range of material may be taken into account. 5A C. Wright and A. Miller, <u>Federal Practice and Procedure: Civil §1364</u>, at 475-81 (1990).... Plaintiffs suggest that defendants' citation to material outside the complaint such as newspaper articles should not be allowed in a motion to dismiss under Rule 12(b)(6). However, according to Wright and Miller:

> A wide range of material may be introduced in conjunction with a Rule 12(b)(6) motion, subject, of course, to the court's discretion to reject the evidence if it feels that it is not substantial or comprehensive enough to facilitate the disposition of the action. Illustrative of the type of evidence that has been used on a Rule 12(b)(6) motion are the following: admissions of counsel, affidavits, <u>answers to interrogatories</u>, ... contracts, ... <u>depositions</u>, exhibits, ... prior pleadings, transcripts of prior court proceedings and matters of public record.

<u>Id.</u> at 475-81."); <u>Pavlou v. Ocean Traders Marine Corporation</u>, 211 F. Supp. 320, 323 (S.D.N.Y. 1962) (In motions to dismiss, "depositions of the parties may be submitted and considered by the court...." The deposition of the corporation's officer was held to be binding on the corporation and the court relied upon the facts admitted in the deposition.).

3

MM-0001556

following verified answers:

> 11. For how long, and in what ways have you, as alleged in Paragraph 7 of the Complaint, "held [yourself] out to all as being Marilyn Monroe's daughter"?
>
>     <u>Answer</u>: Since 1985 I have sought to verify and later told others that I am Marilyn Monroe's daughter. I have contacted persons who I believe knew my mother during her time in New York. I have tried to locate documents supporting my claim....
>
> 12. Describe when and under what circumstances you claim to have learned that Marilyn Monroe was your natural mother.
>
>     <u>Answer</u>: In later January 1985, while in Virginia Beach, Virginia I was told by John Bilillo that my mother was Marilyn Monroe.

(True and correct copies of Defendant's First Request to Plaintiff for Answers to Interrogatories and Plaintiff's Answer to Defendant's First Set of Interrogatories served in the Globe case are attached hereto as Exhibits "B" and "C", respectively. The original of Exhibit C, with its signed and notarized verification, will be available at the hearing of this Motion To Dismiss.)

When she was deposed in the Globe case, Ms. Miracle confirmed that she knew of her claim from the time she talked to John Biliello in January 1985 and began pursuing it from that time (Relevant pages of Ms. Greene aka Miracle's deposition are attached as Exhibit D hereto. The original deposition transcripts will be available at the hearing of the Motion To Dismiss.):

4

<u>Deposition Transcript of Nancy Miracle taken on June 10, 1992</u>, Vol I, at page 14 (Exh D).

Q. When did you first become aware that there was money due from your mother's [Marilyn Monroe's] estate?

A. In 1985.

Q. How did you find out?

A. I was told.

Q. By who?

A. John Beliello.

Ms. Miracle testified that early in 1985 her grandmother confirmed what Mr. Biliello told her. Exhibit D at 18-19.

Ms. Miracle testified that, within "a couple of hours"[3] after being told in January 1985 that she was Marilyn Monroe's daughter, she called Roger Richmond, an attorney representing Monroe's estate,[4] "[i]n order to receive the monies from my mother's [Marilyn Monroe's] estate that are [owing] to me."[5].

After reviewing entries from her 1985 calendar, Ms. Miracle identified February 6, 1985 as the date on which she called Mr. Richman to make her claim for a portion of Monroe's estate. Exhibit D at page 260.

Vincent Bruno told Miracle that he was her real father in 1983 (This is confirmed in her affidavit.), and in February

---

[3] Volume III of the Transcript of the Deposition of Nancy Miracle at page 265.

[4] Volume I of the Transcript of the Deposition of Nancy Miracle at page 17-18.

[5] Volume I of the Transcript of the Deposition of Nancy Miracle at page 14

MM-0001558

1985, she told Bruno she was going after Ms. Monroe's estate:

> Q. [W]hen did your father tell you to call Jacobi and Meyers?
>
> A. It would be around the 7th or 9th or 10th, you know, in between the time that I saw Mr. Jacobi and I was told.... <u>I remember saying something about that I was going to get an attorney</u>. I probably told him I spoke with Mr. Richman and that I was getting an attorney and then he told me to, well, call Jacobi and Meyers....
>
> [Exhibit D at page 268-269 (emphasis added)]
>
> Q. Did you ever have any subsequent conversations with him [Ms. Miracle's alleged natural father] in which he said anything further about Marilyn Monroe being your mother?
>
> A. Well, yes, I mean, he tells me call Jacobi and Meyers when I tell him, you know, <u>I'm going for the estate of my natural mother</u> who is not no longer Jennie ....
>
> Q. In your conversation in 1985 when he told you to go see Jacobi and Meyer did he encourage you to pursue your claim as the daughter of Marilyn Monroe?
>
> A. Oh, yes. ... I mean, it wasn't really encouraging....
>
> [Exhibit D at page 271-272 (emphasis added)]

Ms. Miracle met with Mr. Jacobi before February 13, 1985. Exhibit D at 258-259. He told her Ms. Monroe's will was probated in New York and directed her to the Surrogate's Court:

> Q. After February 27 what's the next contact you had with Mr. Jacobi or anyone from his firm?
>
> A. I think pretty much Mr. Jacobi told me that the will had been probated in New York and gave me the address of the Surrogate's Court.
>
> [Exhibit D at page 275]

MM-0001559

> A. I guess when I got the copy of the will someone there told me to go to the legal department, or I think I was asking for the court-appointed lawyer or something and then I was to go in to see the legal department so I could find out a kind of procedure....

[Exhibit D at page 278]

Ms. Miracle made many visits to the Surrogate Court in New York before moving to Hawaii in 1986:

> Q. How many times did you go down to the Surrogate Court?
>
> A. Oh, about 15, 20.
>
> Q. Why did you keep going back?
>
> A. Different reasons. To try to . . . to try to get some legal action, to take some legal action, to see how to do that.

Exhibit D at page 38.

Thus, by her own sworn admissions, Plaintiff has known of her possible claims as the alleged daughter of Marilyn Monroe from at least January 1985 (Her affidavit attached to her memorandum in opposition indicates she had notice even earlier.[6]). Her filing of a complaint on September 16, 1992, more than seven-and-a-half years after notice of her claims, fails to meet any arguably applicable statute of limitations.

---

[6] The affidavit Plaintiff filed with her memorandum in opposition indicates she had notice of the facts giving rise to her claims even earlier than January 1985: she admits that in 1983, Vincent Bruno told her that he was her real father; she admits that she took acting lessons with Marilyn Monroe from Lee Strasberg near Carnegie Hall at least twice a week between 1954 and 1957 and, in addition, spent every Sunday during the summers with Strasberg and Monroe at Plaintiff's grandmother's house; she admits that she met many celebrities such as Frank Sinatra through Marilyn Monroe; she also admits that she remembers the day Marilyn Monroe died and was "filled with a terrible sense of dread."

MM-0001560

The applicable statute of limitations for a pretermitted heir claim in California is §338 of the California Code of Civil Procedure (which applies to "An action upon a liability created by statute") -- it requires claims to be brought within three years. As pointed out in Defendant's original memorandum in support, under Hawaii law, Plaintiff would have four years if the cause of action is deemed to arise in a foreign jurisdiction or six years if it is not. In New York, no special statute covers pretermitted heir claims, so the "omnibus" or "catchall" statute, §213(1) of the New York Civil Practice Law & Rules, would apply. It allows claims to be brought within six years of the accrual of the cause of action. However, pursuant to §203, where a statute is tolled because of excused ignorance, a plaintiff has only two years from the time of discovery of his claims or the original untolled period, whichever is longer. Thus, in this case, Plaintiff would have either six years from the 1962 death or two years from the January 1985 discovery. Thus, regardless of which state's law applied, Plaintiff's claim would fail.

The First Amended Complaint makes reference to fraudulent concealment resulting in deprivation of support and maintenance and in emotional distress. Even if these references are treated as stating separate claims, the entire First Amended Complaint would be time barred. The California limitations period for tort is one year (§340), fraud is three years (§338), and maintenance is four years (§343, the catchall provision). In Hawaii, the period for torts is two years (HRS §657-7 (1972), HRS §241-7 (1957)), the period for fraudulent concealment is six years

MM-0001561

from time of discovery (HRS §657-20 (1972), HRS §241-19 (1955)), the catchall period is six years (HRS §657-1(4) (1978), HRS §641-11(1955)), and for recovery pursuant to obligations arising in a foreign jurisdiction is four years (HRS §657-6 (1985), HRS §241-6 (1955)). In New York, the period for tort is three years (§214), for fraud six years (§213(8)), and for maintenance six years (§213, the catchall), but the latter two are subject to §203's limitation that only two years are allowed from the point of discovery when the time has been tolled due to lack of knowledge.

Each of the above limitations periods were in effect from 1962 to the present, so there is no issue of differing periods depending on which year's statute is deemed applicable.

Therefore, because Plaintiff waited at least seven-and-a-half years to file her complaint and all arguably applicable statutes of limitations bar claims not filed within six years or less after notice of the facts which would give rise to the claims, Plaintiff's claims should be dismissed with prejudice.

## II. LACK OF PERSONAL JURISDICTION

Plaintiff argues that personal jurisdiction over Defendant exists because Defendant has signed licensing agreements authorizing third parties to sell Marilyn Monroe-related products such as T shirts and posters across the country, including Hawaii. Even assuming *arguendo* that such licensing of third parties constitutes the "transaction of any business within this State" under H.R.S. §634-35, personal jurisdiction does not exist because §634-35's requirement that the cause of action must be one "arising from" the contact with Hawaii is not met. (For examples

9

of Hawaii cases recognizing that this requirement must be met, see, e.g., Hawaii Credit Card Corp. v. Continental Credit Card Corp., 290 F. Supp. 848, 851 (D. Haw. 1968) ("Defendants' activities all related directly to the cause of action alleged ...."); Cowan v. First Insurance Company, 61 Haw. 644, 652 (1980) ("HRS§634-35(c) requires that the cause of action relate to the defendant's contacts in Hawaii.").

The plain meaning of the phrase "arising from" is "caused by", and that is how "arising from" should be interpreted. In Chedid v. Boardwalk Regency Corp., 756 F.Supp. 941, 943 (E.D.Va. 1991), it was held:

> Resolving this question [whether the cause of action is one "arising from" defendant's transaction of business in the state] requires construing the phrase "arising from." Plain meaning is the starting point in the analysis, and "caused by" is the phrase's plain meaning. Thus, it is evident that [the legislature] used the phrase "arising from" to require that there be a causal link between the acts relied on for personal jurisdiction and the cause of action asserted. Significantly, courts agree that this causation element requires more than simple "but-for" causation; it requires something akin to legal or proximate causation. See, e.g., Pizarro v. Hoteles Concorde International C.A., 907 F.2d 1256, 1259 (1st Cir. 1990).

Thus, in Chedid, the federal court in Virginia held that, because the New Jersey casino's advertising activities in Virginia did not cause the injurious fall in the New Jersey casino, the court in Virginia did not have personal jurisdiction over the casino, despite the fact that it might be said that, but for the advertising in Virginia, plaintiff would never have gone to the casino where he was injured. Likewise, see Marino v. Hyatt Corp., 793 F.2d 427 (1st Cir. 1986), wherein a fall at a Hawaii hotel was

MM-0001563

held not to have arisen out of the contact with Massachusetts, which consisted of advertising and taking reservations in Massachusetts.

Plaintiff's claims that she be recognized as the daughter of Marilyn Monroe and treated as a pretermitted heir cannot be said to have been caused by Defendant's alleged licensing of third parties to sell T-shirts and posters across the country. (At the hearing on the motion to continue, the Court was entirely correct in asking counsel for Plaintiff if he was asserting that "whether or not the plaintiff is the daughter of Marilyn Monroe arises out of the fact that the estate is doing business here in Hawaii?") Likewise, Plaintiff's claim that there was fraudulent concealment of her relationship to Ms. Monroe and this caused her emotional distress and deprived her of support and maintenance cannot be said to have been caused by the alleged licensed sales.

The licensing activity did not cause any injury or create the rights claimed, it does not make Plaintiff's claims more or less likely to succeed, and it cannot even be said that, "but for" the selling of T shirts in Hawaii by licensees, the alleged injury or deprivation would not have occurred. To use the words of the First Circuit Court in Marino v. Hyatt, 793 F. 2d at 431, "it would be a case of the tail wagging the dog to hold that plaintiff's claims [to be the daughter of Marilyn Monroe with a right to half her estate] ... 'arise from'" the licensed sale of T-shirts in Hawaii.

MM-0001564

Gordon v. Granstedt, 61 Haw. 597 (1973), is instructive because it demonstrates that the Supreme Court of Hawaii recognizes that "arising from" means the same thing as "caused by," so there must be a showing of causal connection between the contact and the claims. It also shows that rights to an estate "arise from" or are caused by events such as being named under a will or being a child of the deceased, and not from the defendant's contacts with the forum state.

In Gordon, Grandstedt, a Hawaii resident, was given money in a California intestacy proceeding when it was believed that his father died in California without a will. A will was later found and Gordon was entitled to the entire estate by operation of the will. Using the California long-arm statute, Gordon sued Grandstedt in the California courts for return of the money. Grandstedt defaulted and Gordon began an action in Hawaii to collect on the California default judgment. Grandstedt argued that judgment was defective because the California court did not have personal jurisdiction over Grandstedt. Gordon argued that Grandstedt had many contacts with California and Gordon's claims arose from those activities. The contacts included the following: Grandstedt went to California to attend the California intestacy proceedings and even participated by nominating the administrator of the estate; Grandstedt accepted his share of the money in California and signed a receipt in the California court; when the will was discovered, Grandstedt began a will contest and took depositions in the contest, but later withdrew the action.

MM-0001565

> The Supreme Court held, <u>id.</u> at 603-6 (emphasis added):
>
> [The] nonresident's contacts with the forum state [must] be contacts which gave rise to, or were causally connected with the obligation sought to be enforced in a state court.
>
> \* \* \*
>
> The obligation sought to be enforced was the obligation of defendant to pay over to plaintiff the share of the estate ... paid to defendant, but to which plaintiff ... was entitled under the will ..... That obligation existed, first, because the administrator had made the payment; and, second, because plaintiff was entitled to the entire estate ....
>
> The payment by the administrator was not <u>due</u> to any action taken by defendant in California. [It was due to the Court ordering the administrator to pay as required by the rules of intestacy.]
>
> The filing by defendant in the Santa Clara court of a receipt ... <u>had no causal connection</u> whatsoever with the making of the payment by the administrator....
>
> ... Obviously, plaintiff's right to the estate ... did not arise from, nor was it causally connected in any manner with, defendant's appearance in the Santa Clara court to contest the probate of the will. <u>Plaintiff acquired the right because [the deceased] named her as the sole beneficiary in his will, not because of anything that defendant did in California.</u>

Likewise, Miracle's rights as a pretermitted heir and victim of alleged fraudulent concealment were caused by her alleged birth to Marilyn Monroe and the alleged concealment of that fact by persons in New York rather than because of the licensing of T shirt and poster sales in Hawaii.

13

MM-0001566

### III. FAILURE TO PLEAD FRAUD WITH PARTICULARITY

If the First Amended Complaint attempts to plead a fraud claim, the claim should be dismissed under Fed. R. Civ. Pro. Rule 9(b) for failure to plead fraud with particularity.

### CONCLUSION

For all of the reasons stated above and in the original memorandum in support, Plaintiff's First Amended Complaint should be dismissed.

DATED: Honolulu, Hawaii, *December 10, 1992*.

_____
MILTON M. YASUNAGA
Attorney for Defendant

MM-0001567