**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X
SHAW FAMILY ARCHIVES, LTD., EDITH    :
MARCUS and META STEVENS,

                                                          :

                         Plaintiffs,

                                       :   Case No. 05 Civ. 3939 (CM)

             -against-

                                       :   Hon. Colleen McMahon

CMG WORLDWIDE, INC. and MARILYN    :
MONROE LLC,

                       Defendants.    :


-------------------------------------------------------- X


## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF DOMICILE

LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
Tel: 212-407-4000
Fax: 212-407-4990
*Attorneys for Defendant / Consolidated
Plaintiff Monroe LLC*

SOVICH MINCH, LLP
10099 Chesapeake Drive, Suite 100
McCordsville, Indiana 46055
Tel: 317-335-3601
Fax: 317-3353602
*Attorneys for Defendant / Consolidated
Plaintiff CMG Worldwide, Inc.*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.   THE EXTRAORDINARY REMEDY OF JUDICIAL ESTOPPEL SHOULD NOT
     SUBVERT THE TRUTH THAT MONROE DIED A CALIFORNIA DOMICILIARY ....... 2

     A.   The Indisputable Facts Establish that, at the Time of Her Death, Monroe's Fixed and
          Permanent Home Was in California ................................................................. 2

     B.   Monroe Died a California Domiciliary ............................................................ 6

II.  NONE OF THE PROCEEDINGS OR STATEMENTS IDENTIFIED BY PLAINTIFFS
     SHOULD ESTOP MMLLC FROM DEMONSTRATING CALIFORNIA DOMICILE ....... 7

     A.   Judicial Estoppel Does Not Apply Here ......................................................... 7

          1.   The Doctrine of Judicial Estoppel ......................................................... 7

          2.   For Judicial Estoppel to Apply, MMLLC Must Have Made the Statements at Issue ...... 8

     B.   Nothing in the Miracle Litigation Should Estop MMLCC From Asserting Monroe's
          California Domicile .......................................................................................... 12

          1.   Judicial Estoppel Cannot Apply to Good-Faith Legal Arguments Made by the
               Administratrix's Attorney ................................................................. 12

          2.   The Administatrix Did Not Prevail Based on Any Domicile Argument ...................... 14

          3.   Neither the Administratrix (Nor MMLLC) Has Received any Unfair Advantage ........ 17

          4.   Collateral Estoppel Does Not Apply ..................................................... 17

     C.   No Statements in the New York Surrogate's Court Proceedings Justify the Application of
          Judicial Estoppel ............................................................................................. 19

          1.   The Administratrix Did Not Prevail ...................................................... 20

          2.   The Unnecessary Reference to Monroe's Domicile Was a Mere Inadvertency, And
               Cannot Give Rise to Judicial Estoppel .................................................. 22

     D.   MMLLC Cannot be Judicially Estopped Based on Statements of Frosch and Others in
          California Tax Proceedings ............................................................................. 23

1.   The Statements Were Not Made by MMLLC ...............................................23

Page

2.   Frosch Did Not Prevail in California Tax Proceedings ..................................24

3.   The Affidavits Go to Residence, not Domicile .............................................26

E.   MMLLC Is Not Estopped By Reason of Frosch's Actions in the California Ancillary Probate Proceedings .........................................................................27

1.   Monroe's Will Was Subject to "Ancillary" Probate in California Even if She Was a California Domiciliary .............................................................28

2.   "Res Judicata" Does Not Bar MMLLC ........................................................30

3.   The Bare Statement by the California Probate Court Is Not Conclusive, Particularly Outside of the Ancillary Proceedings ........................................33

III.   PLAINTIFFS REMAINING ARGUMENTS ARE FALSE AND IRRELEVANT, AND SHOULD NOT BE CONSIDERED ON THIS MOTION ....................................35

CONCLUSION ......................................................................................................35

TABLE OF AUTHORITIES

Page(s)

**CASES**

*Acridge v. Evangelical Lutheran Good Samaritan Soc.*,
  334 F.3d 444 (5th Cir. 2003) ................................................................... 7, 28, 31-32

*Adler v. Pataki*,
  185 F.3d 35 (2d Cir. 1999) .......................................................................... 8

*Algie v. RCA Global Commun., Inc.*,
  891 F. Supp. 839 (S.D.N.Y. 1994) .......................................................... 11

*Arizona v. California*,
  530 U.S. 392 (2000) ................................................................................. 18

*Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*,
  910 F.2d 1540 (7th Cir. 1990) ..................................................... 16, 21, 26

*Bernhard v. Bank of Am. Nat'l Trust Assoc.*,
  19 Cal.2d 807 (1942) ............................................................................ 34-35

*Bridgeway Corp. v. Citibank*,
  201 F.3d 134 (2d Cir. 2000) ...................................................................... 8

*Burdette v. Carrier Corp.*,
  158 Cal. App. 4th 1668 (Cal. App. 2008) .............................................. 30

*Chase Manhattan Bank, N.A. v. Celotex Corp.*,
  56 F.3d 343 (2d Cir. 1995) .................................................................... 9-11

*Clark v. Bear Stearns & Co.*,
  966 F.2d 1318 (9th Cir. 1992) ............................................................... 30-32

*Coal Resources, Inc. v. Gulf & Western Indus.*,
  865 F.2d 761 (6th Cir. 1989) .................................................................. 16

*Cont. Cas. Co. v. McAllen Indep. School Dist.*,
  1987 U.S. Dist. LEXIS 14150 (S.D. Tex. May 19, 1987) ................................ 14, 22

*Estate of Apple*,
  66 Cal. 432 (1885) ................................................................................... 28

*Estate of Barton*,
  196 Cal. 508 (1925) ................................................................................. 33

Page(s)

*Estate of Edwards*,
    203 Cal. App. 3d 1366 (Cal. Ct. App. 1988) .......................................................................... 21

*Estate of Estrem*,
    16 Cal. 2d 563 (1940) ......................................................................................................... 33-34

*Estate of Reynolds*,
    217 Cal. 557 (Cal. 1933) ................................................................................................. 28, 34

*Fed. of Hillside and Canyon Assocs. v. Los Angeles*,
    126 Cal. App 4th 1180 (Cal. App. 2004) ............................................................................ 31

*Fouke v. Schenewerk*,
    197 F.2d 234 (5th Cir. 1952) ................................................................................................. 10

*Froshiesar v. Babij*, CV-02-449-ST,
    2004 U.S. Dist. LEXIS 21463 (D. Or. Oct. 15, 2004) ........................................................ 16

*Hallinan v. Republic Bank & Trust Co.*,
    519 F.Supp.2d 340 (S.D.N.Y. 2007) .................................................................................... 11

*Henderson v. Pence*,
    50 Haw. 162 (1967) ........................................................................................................ 32, 34

*Henn v. Henn*,
    26 Cal. 3d 323 (1980) ........................................................................................................... 30

*Hoblock v. Albany Cty. Bd. of Elec.*,
    422 F.3d 77 (2d Cir 2005) ..................................................................................................... 11

*In re Gardner's Estate*,
    260 A.D.132, 21 N.Y.S.2d 247 (2d Dep't 1940) ........................................................... 20, 29

*Goldberg v. Frye*,
    217 Cal. App. 3d 1258 (Cal. App. 1990) ........................................................................ 23, 34

*In re Grant's Estate*,
    83 Misc. 257, 144 N.Y.S. 567 (Surr. Ct. N.Y. Cty. 1913) ............................................. 20, 29

*In re IPO Securities Litig.*,
    383 F. Supp. 2d 566 (S.D.N.Y. 2005) .................................................................................... 7

*In re Koch*,
    229 B.R. 78 (Bankr. E.D.N.Y. 1999) .................................................................................... 16

*In re Mulhern's Estate*,
    31 A.D.2d 317, 287 N.Y.S.2d 485 (4th Dep't 1969) ................................................ 13, 20, 29

Page(s)

*Long Beach Grand Prix Assn. v. Hunt*,
    25 Cal. App. 4th 1195 (Cal. Ct. App. 1994) ......................................................... 32

*Lowery v. Stovall*,
    92 F.3d 219 (4th Cir. 1996)............................................................................... 8

*Maharaj v. Bankamerica Corp.*,
    128 F.3d 94 (2d Cir. 1997)................................................................................8-9

*Matter of Bloom*,
    213 Cal. 575 (1931)................................................................................... 31, 33

*McNamara v. City of Chicago*,
    138 F.3d 1219 (7th Cir. 1998)........................................................................16-17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis*,
    903 F.2d 109 (2d Cir. 1990).............................................................................. 15

*In re Mesa's Estate*,
    87 Misc. 242, 149 N.Y.S. 536 (Surr. Ct. N.Y. Cty. 1914) ................................. 20, 29

*Metromedia Co. v. Fugazy*,
    983 F.2d 350 (2d Cir. 1992).............................................................................. 19

*Mississippi Band of Choctaw Indians v. Holyfield*,
    490 U.S. 30 (1989) ........................................................................................ 26

*In re Moran's Will*,
    180 Misc. 469, 39 N.Y.S.2d 929 (Surr. Ct. King's Cty. 1943) ....................... 20, 29

*Mycogen Corp. v. Monsanto Co.*,
    28 Cal. 4th 888 (2002)..................................................................................... 30

*Nat'l Presto Indus., Inc. v. Black & Decker Inc.*,
    1992 U.S. Dist. LEXIS 751 (N.D. Ill. Jan. 27, 1992) ........................................ 21

*Nat'l Artists Mgmt. Co. v. Weaving*,
    769 F. Supp. 1224 (S.D.N.Y. 1991) ................................................................... 6

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ...................................................................................8-9, 27

*Matter of Newcomb*,
    192 N.Y. 238,  84 N.E. 950 (1908) .................................................................... 22

*Office of Hawaiian Affairs v. Housing and Comty. Devel. Corp.*,
    No. 25570, 2008 Haw. LEXIS 23 (Jan. 31, 2008) ...........................................17-18

Page(s)

*Pacific Lumber Co. v. State Water Resources Control Bd.,*
  37 Cal. 4th 921 (2006)..................................................................................... 31

*Palmer v. Palmer,*
  207 F.3d 566 (9th Cir. 2000)........................................................................... 12

*Pardo v. Olson & Sons, Inc.,*
  40 F.3d 1063 (9th Cir. 1994)........................................................................... 18

*Rediker v. Rediker,*
  35 Cal. 2d 796 (1950)....................................................................................... 33

*Riley v. New York Trust Co.,*
  315 U.S. 343 (1942) .......................................................................................... 34

*In re Rothschild's Estate,*
  86 Misc. 364, 365, 148 N.Y.S. 368 (Surr. Ct. N.Y. Cty. 1914) ............................. 20

*In re Rosenfield's Estate,*
  76 N.Y.S.2d 177 (Surr. Ct. N.Y. Cty. 1944) .................................................. 20, 29

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,*
  81 F.3d 355 (3d Cir. 1996) ............................................................................ 2, 8

*Semtek, Int'l v. Lockheed Martin Corp.,*
  531 U.S. 497 (2001) .......................................................................................... 18

*Seneca Nation of Indians v. State of New York,*
  26 F. Supp. 2d 555 (W.D.N.Y. 1998) ................................................................. 8

*Shaw Family Archives Ltd. v. CMG Worldwide, Inc.,*
  486 F. Supp. 2d 309 (S.D.N.Y. 2007) ................................................................ 2

*Shook v. United States,*
  713 F.2d 662 (11th Cir. 1983) ..................................................................... 11, 24

*Simon v. Safelite Glass Corp.,*
  128 F.3d 68 (2d Cir. 1997)........................................................................ 8, 22, 27

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,*
  127 S. Ct. 1184 (2007) ...................................................................................... 15

*In re Slade's Estate,*
  154 Misc. 175 (N.Y. Surr. 1935)................................................................... 29, 35

Page(s)

*Spruance v. Comm'r*,
   60 T.C. 141 (1973) ................................................................................ 11

*In re Sokol*,
   113 F.3d 303 (2d Cir. 1997) ................................................................ 30

*State v. Alvey*,
   67 Haw. 49 (1984)................................................................................ 19

*Steele v. Anderson*,
   2004 U.S. Dist. LEXIS 136 (N.D.N.Y. Jan. 8, 2004) .......................... 15

*Sutton v. Golden Gate Bridge, Highway & Transp. Dist.*,
   68 Cal. App. 4th 1149 (Cal. Ct. App. 1998) ........................................ 32

*Taylor v. Taylor*,
   72 B.R. 696 (Bankr. E.D. Tenn. 1987)................................................ 16

*Texas v. Florida*,
   306 U.S. 398 (1939) ........................................................................ 6, 7

*Thaler v. Casella*,
   960 F. Supp. 691 (S.D.N.Y. 1997)...................................................... 18

*Tilt v. Kelsey*,
   207 U.S. 43 (1907) ............................................................................ 34

*TM Patents, L.P. v. IBM Corp.*,
   72 F. Supp. 2d 370 (S.D.N.Y. 1999)............................................ 12, 14

*Troll Company v. Uneeda Doll Company*,
   483 F.3d 150 (2d Cir. 2007)................................................................ 14

*United States Fid. & Guar. Co. v. Treadwell Corp.*,
   58 F. Supp. 2d 77 (S.D.N.Y. 1999)............................................... 14, 17

*United States v. Hussein*,
   178 F.3d 125 (2d Cir. 1999)......................................................... 18, 23

*Uzdavines v. Weeks Marine, Inc.*,
   418 F.3d 138 (2d Cir. 2005)........................................................8, 16-18

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
   396 F.3d 96 (2d Cir. 2005)................................................................. 20

vii

Page(s)

*Wit v. Berman,*
    306 F.3d 1256 (2d Cir. 2002)..................................................................... 7

*Whalen v. Chase Manhattan Bank,*
    2001 U.S. App. LEXIS 16158 (2d Cir. 2001)......................................... 17

*Ziegler v. Indian River County,*
    64 F.3d 470 (9th Cir. 1995)...................................................................... 18

*Zimmerman v. Harris,*
    1997 U.S. Dist. LEXIS 6861 (S.D.N.Y. May 15, 1997)....................... 11

STATUTES

E.P.T.L. § 3-5.1(e) & (d).................................................................................21, 22

OTHER AUTHORITIES

18 Moore's Federal Practice (hereinafter, "Moore's Fed. Prac.") § 132.03[5][d], at 132-135
    (3d ed. 2007) ............................................................................................ 18

18 Moore's Federal Practice (hereinafter, "Moore's Fed. Prac.") § 132.04[1][a], at 132-144
    (3d ed. 2007) ............................................................................................ 19

28 Am. Jur. 2d Estoppel & Waiver § 137 (2007) ................................... 10, 11

47 Am. Jur. 2d Judgments § 508 (2008) ................................................... 18

47 Am. Jur. 2d Judgments § 575 (2008) ................................................... 19

Wright & Miller et al., *Federal Practice and Procedure* § 4477 (2d ed. 2002) ........................... 10

Defendants Marilyn Monroe LLC ("MMLLC") and CMG Worldwide, Inc. ("CMG") respectfully submits this memorandum of law in opposition to Plaintiffs motion for summary judgment on the issue of domicile.

## PRELIMINARY STATEMENT

Marilyn Monroe's own words and deeds overwhelmingly demonstrate that, at the time of her death, she had established a permanent home and domicile in California.  Yet Plaintiffs ask this Court to close its eyes to the truth and to prevent a jury from even considering the true facts of Marilyn Monroe's life, arguing primarily that decisions made by attorney Aaron Frosch in the years after Marilyn Monroe's death should control.

The extraordinary remedy of judicial estoppel should be rejected in these circumstances. MMLLC has never asserted that Marilyn Monroe ("Monroe") was a New York domiciliary, and cannot be bound by statements made by others, including statements made by Frosch decades before MMLLC even existed.  Moreover, MMLLC has never prevailed upon, much less obtained any benefit from, any claim that Monroe was a New York domicile.

Nor do the doctrines of collateral estoppel or res judicata apply because, contrary to Plaintiffs' allegations, the issue of Monroe's domicile has never been actually litigated in, or necessarily determined by, any court.  Indeed, MMLLC has certainly never litigated (and lost) the issue of Monroe's domicile.

Frosch's actions in the years after Marilyn Monroe's death do not change the true facts of her life, and do not estop MMLLC here.  Plaintiffs efforts to elevate the words and deeds of Frosch over those of Marilyn Monroe herself must fail.

**ARGUMENT**

**I.     THE EXTRAORDINARY REMEDY OF JUDICIAL ESTOPPEL SHOULD NOT SUBVERT THE TRUTH THAT MONROE DIED A CALIFORNIA DOMICILIARY**

Judicial estoppel is an "extraordinary remedy" and is not meant to be a technical defense for litigants to derail potentially meritorious claims . . ." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996).  Here, it should not apply to subvert the simple truth that Monroe was a California domiciliary.

As explained below, Monroe's own words and deeds overwhelmingly demonstrate that, at the time of her death, she had established a permanent home and domicile in California.  The Court has previously held that "[t]here are disputed issues of fact concerning whether Ms. Monroe was domiciled in New York or California at the time of her death." *Shaw Family Archives Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309, 314-15 (S.D.N.Y. 2007).  Since that ruling, MMLLC discovered a vast collection of Monroe's personal property and records, much of which bears on her domicile, which was in the possession of Millington Conroy, the nephew of Monroe's former business manager.  This overwhelming and newly-discovered evidence makes it particularly unjust to judicially estop MMLLC based on the unsupported, erroneous and irrelevant assertions of an executor made decades ago (well before MMLLC even existed).

**A.     The Indisputable Facts Establish that, at the Time of Her Death, Monroe's Fixed and Permanent Home Was in California**

Monroe died on August 5, 1962, in her Brentwood, California home, the first and only home she had ever owned by herself.  (AMF ¶¶ 1, 22).[1]  Over a year earlier, she had returned to her native California, where she was born, raised, educated, and discovered.  She left behind a failed marriage (to Arthur Miller), a failed business partnership (with Milton Greene), and other painful memories (including having been committed to a psychiatric clinic against her will).  Following her return,

---

[1] Citations to "AMF" are to MMLLC's Additional Material Facts, filed with this memorandum.

Monroe re-established California as the "headquarters" for both her professional and personal life.

Monroe, née Norma Jeane Mortenson, was born in California on June 1, 1926, and resided exclusively in California for the first thirty years of her life. (*Id.* ¶ 2-3). During this time, she was discovered, first as a model and then as an actress, and adopted the name "Marilyn Monroe." (*Id.* ¶ 5). She would become the quintessential Hollywood actress and icon.

Monroe was married twice while living in California, first to James Edward Dougherty in 1942, and then, in 1954, to the San Francisco-based former baseball player, Joe DiMaggio, with whom she lived in California. (*Id.* ¶ 6).

In 1955, Monroe sojourned east to study at the renowned Actor's Studio with instructors Lee and Paula Strasberg, and to begin a production company with Milton Greene, with whom she resided at his Connecticut home (that partnership broke up by February 1958). (*Id.* ¶ 7). On June 29, 1956, Monroe married playwright Arthur Miller. (*Id.* ¶ 8). Miller and Monroe purchased and lived in a house that they had built on a 200-acre farm in Roxbury, Connecticut, a home that Miller described as "the place where we hope to live until we die." (*Id.*; Strauss Decl. Ex. 21 at MMLLC (Shaw) 000422). Miller also leased an apartment in Manhattan in late 1957 (for only $404.01 per month) (AMF ¶ 9), but Connecticut was their permanent home. They filed taxes as residents of Connecticut (not New York) (AMF ¶ 9), and Monroe identified herself as being "of Roxbury, Connecticut" in legal documents. (Strauss Decl. Exs. 39, 40). Monroe obtained a Connecticut driver's license (*id.* Ex. 41, 42) and apparently voted in Connecticut (Marcus Decl. Ex. 15).

Monroe and Miller divorced on January 20, 1961 (AMF ¶ 10.[2] Shortly thereafter, in April 1961, Monroe returned home to California (*Id.* ¶ 12). In August 1961, Monroe rented an apartment at 882 North Doheny Drive in Los Angeles, California, the same apartment building that she had

---

[2] Following her divorce, Monroe's therapist caused her to be committed to the Payne Whitney Psychiatric Clinic and held there against her will, until she was rescued by her former husband, Joe DiMaggio. (*Id.* ¶ 11).

previously lived in from 1952-54.  (*Id.* ¶ 13).  Monroe remained in California for all but nine days

of the balance of 1961, during which time she performed renovations and landscaping at, and

purchased furnishings for, her new apartment.  (*Id.* ¶ 14).  She also opened and maintained a

California bank account and obtained insurance for her new apartment.  (*Id.* ¶¶ 14-15).

      Monroe immediately took steps to firmly establish California as her new base of operations.

She began meeting on an almost daily basis with Dr. Ralph Greenson, her California therapist.  (*Id.*

¶ 17).  May Reis stopped working as Monroe's secretary in New York, and Monroe hired Eunice

Murray as her personal assistant and Cherie Redmond as her secretary in California.  (*Id.* ¶¶ 18-19).

She also obtained car insurance in California and gave away her New York car.  (*Id.* ¶ 21).

      On January 22, 1962, Monroe purchased a Spanish-style house located in Brentwood,

California, committing to a 15-year mortgage.  (*Id.* ¶ 22).  Immediately thereafter, in February 1962

she traveled to Mexico to purchase authentic furnishings for her home, and acquired fine art for her

home.  (*Id.* ¶¶ 23-24).  She also oversaw major renovations that she desired to make the home her

own.  (*Id.* ¶ 26).  In the ensuing months Monroe spent over $50,000 renovating, furnishing and

landscaping her California home.  (*Id.* ¶ 27).

      Despite the ongoing renovations to her new home, and even though she was still renting the

Doheny Drive apartment, Monroe moved into her home in March 1962, telling her assistant Eunice

Murray "<u>I'll walk on bare floors.  I'll eat out.  But I want to sleep in my house</u>."  (*Id.* ¶ 25; Strauss

Decl. Ex. 52 at 67-68) (emphasis added).  Monroe's friends unanimously described her love for her

California home, and she enthusiastically invited them to visit.  (*Id.* ¶ 28).  For example, in a letter

to Bobby Miller (Arthur Miller's son), she wrote:

> Bobby, I have the best news.  I have just completely bought my new house.  As I told
> you, it is an authentic little Mexican house, but it's got a gigantic swimming pool,
> and it looks just like Mexico.  You would just love it.  I have two guest rooms, plus a
> large playroom, plus lots of patios, and a big Mexican wall goes all around the place
> with big high Mexican gates . . . .  Anyway, I would love – for whichever vacation it

> can be arranged – if you and Janie [Arthur Miller's daughter] wanted to – at least for a part of the vacation even if it is for a few days, or a week – you are welcome to stay as long as you wanted to. . . .  I want you and Janie to know . . . that you are always welcome. . . .  I miss you very much and I think you would love my new home. . . . My new address is 12305, Fifth Helena Drive, Los Angeles 49, California.

(Strauss Decl. Ex. 70).

Indeed, during an interview only weeks before her death with Richard Meryman of Life magazine, Monroe insisted on showing Mr. Meryman around her California house, in Meryman's words "exult[ing]" in her home.  (Id. Ex. 63 at MM-0036214).  Even Sam Shaw, father of plaintiffs Edith Marcus and Meta Stevens and predecessor-in-interest to the Shaw Family Archives, wrote of a phone call in which Monroe stated that her house was almost furnished, and "spoke excitedly about the new kitchen, the Mexican tiles, the pots, the pans, the stove," and invited her friends Norma and Hedda Rosten to visit her in California.  (Id. Ex. 17 at 188-90).   Notably, that phone call took place on the final day of Monroe's life.

Having returned to California to live, Monroe informed her friends and associates that California was her new home, changing her personal address to 12305 Fifth Helena Drive, and her business address to a post office box in Los Angeles, California.  (AMF ¶ 29).  She also changed her Connecticut driver's license to reflect her new California address.  (Strauss Decl. Exs. 41-42).

Monroe also moved all of her business affairs to California, which became the new "headquarters" for Monroe and her production company.  (AMF ¶ 30).  She hired the prominent California attorney Mickey Rudin to act as her agent and attorney (replacing New York-based attorney Aaron Frosch), (id. ¶ 31), and hired Jack Ostrow, a Los Angeles C.P.A., as her accountant (id. ¶ 32).  All of her business and legal files were transferred to California. (Id. ¶ 33).

Indeed, on December 19, 1961 Marilyn Monroe wrote to Lee Strasberg, her close friend and acting coach, urging him to move to California to open an acting studio there and become part of her new production company, so that she could continue her training with him.  (Id. ¶ 34).

Monroe did not begin work on her next movie, the film *Something's Got to Give*, until April 30, 1962, <u>over a year</u> after she had returned to California.  (*Id.* ¶ 35).  She was fired from that film on June 8, 1962 (*id.*), but remained in her California home until her death.

At the time of her death, Monroe had spent a mere 19 days in New York throughout 1962 (including to perform at the Madison Square Garden birthday celebration for President John F. Kennedy) (*Id.* ¶ 36).  Her funeral was arranged by Inez Melson, her friend and business manager, and Joe DiMaggio, with whom she had rekindled her relationship.  (*Id.* ¶ 37).  DiMaggio had recently quit his $100,000-a-year job to set up home near Monroe in California (*Id.*).  Monroe was buried in Westwood Memorial Park and Mortuary in Los Angeles, California.  (*Id.* ¶ 38).

### B.    Monroe Died a California Domiciliary

Domicile is a person's legal "home."  *National Artists Mgmt. Co. v. Weaving*, 769 F. Supp. 1224, 1227 (S.D.N.Y. 1991); *see also, e.g., Texas v. Florida*, 306 U.S. 398, 424 (1939) ("Residence in fact, coupled with the purposes to make the place of residence one's home, are the essential elements of domicile.").  "There is no minimum period of residence necessary to establish domicile."  *National Artists Mgmt.*, 769 F. Supp. at 1227. "A person is born with a particular domicile, and is presumed to retain it unless it can be shown that she has established a new domicile."  *Id.*, 769 F. Supp. at 1228.

When a person has more than one residence or if residence is unclear, "the court should focus on the intent of the party."  *Id.* at 1227.  In determining intent, the "totality of the evidence" is considered, and key factors include: whether the person owns or rents her residence; the nature of the residence; the location of a person's physician, lawyer, accountant, etc.; where a person votes; where real and personal property (such as furniture and cars) are located; driver's and other licenses obtained; bank accounts maintained; and a person's place of business and employment.  *Id.* at 1228.

Applying these traditional factors to the facts here leads to only one conclusion:  Monroe

6

died a domiciliary of California.[3]  At the very least there are numerous issues of fact, and a jury should have the opportunity to decide the issue of Monroe's domicile.[4]

## II.    NONE OF THE PROCEEDINGS OR STATEMENTS IDENTIFIED BY PLAINTIFFS SHOULD ESTOP MMLLC FROM DEMONSTRATING CALIFORNIA DOMICILE

In an effort to avoid the true facts concerning Monroe's California domicile, Plaintiffs argue that MMLLC is estopped from litigating the issue.  In so arguing, Plaintiffs rely not on any acts of MMLLC itself, but rather on statements and actions by Frosch and other attorneys in four proceedings:  (i) a lawsuit filed by Nancy Miracle against the Administratrix of the Monroe estate in Hawaii federal court (the "Miracle Litigation"); (ii) a will construction proceeding in New York Surrogate's Court; (iii) tax proceedings conducted by Frosch in California; and (iv) California probate proceedings instituted by Frosch.  Plaintiffs' argument fails, for the reasons set forth below.

### A.    Judicial Estoppel Does Not Apply Here

#### 1.    The Doctrine of Judicial Estoppel

Plaintiffs rely primary on the doctrine of judicial estoppel, a "rare remedy," *In re IPO Securities Litig.*, 383 F. Supp. 2d 566, 575 (S.D.N.Y. 2005), designed to "prevent[] a party from

---

[3] While Plaintiffs contend that Monroe was a New York domiciliary, the evidence establishes, at most, that she may have been a <u>Connecticut</u> domiciliary during her marriage to Miller, (*supra* at 3), and that she returned to California almost immediately after her divorce.  Against this backdrop, the fact that Miller leased a Manhattan apartment (the rights to which Monroe received in the divorce, although Miller remained on the lease) is of small significance.  *See Texas*, 306 U.S. at 426 (retention of New York apartment did not defeat finding that "real home was in Massachusetts").

The only purported evidence from Monroe's lifetime that Plaintiffs point to is an out-of-context "snippet" from a 1955 radio interview (Pl. Br. at 34).  For the reasons set forth in MMLLC's Response to Statement No. 62 in Plaintiffs' 56.1 Statement, this "snippet" is completely irrelevant in assessing Monroe's intentions seven years later.

[4] Even if Monroe is ultimately deemed a New York domiciliary for probate or tax purposes, the quintessential Hollywood film icon should *also* be considered a California domiciliary for purposes of her right of publicity.  *See Wit v. Berman*, 306 F.3d 1256, 1260 (2d Cir. 2002) ("[O]ne may be legally domiciled in different places for different legal purposes."); *Acridge v. Evangelical Lutheran Good Samaritan Soc'y,*, 334 F.3d 444, 451 (5th Cir. 2003).

prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

Three requirements must be met for the doctrine to apply.  First, there must be a "clear" and "true" inconsistency between a party's present and former positions, such that the positions cannot possibly be reconciled.  *See Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72-73 (2d Cir. 1997); *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 141 (2d Cir. 2000); *see also New Hampshire*, 532 U.S. at 750.  Second, the prior tribunal must have "accepted the claim at issue by rendering a favorable decision," because the Second Circuit "limits the doctrine of judicial estoppel to situations where the risk of inconsistent results with its impact on judicial integrity is certain."  *Simon*, 128 F.3d at 72; *see also, e.g., Adler v. Pataki*, 185 F.3d 35, 41 n.3 (2d Cir. 1999) ("[J]udicial estoppel applies only when a tribunal in a prior separate proceeding has relied on a party's inconsistent factual representations and rendered a favorable decision.").  Third, the party seeking to assert an inconsistent position must derive an unfair advantage if not estopped.  *See New Hampshire,* 532 U.S. at 751; *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005).

Further, for judicial estoppel to apply "there must be some evidence of an intent to mislead or to deceive the court."  *Seneca Nation of Indians v. State of New York*, 26 F. Supp. 2d 555, 556 (W.D.N.Y. 1998);  *see also, e.g.,  Simon*, 128 F.3d at 73; *Lowery v. Stovall*, 92 F.3d 219,223 (4th Cir. 1996); *Ryan Operations*, 81 F.3d at 362-63.  If any of the requisite elements are missing, judicial estoppel does not apply.  *Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d Cir. 1997).

## 2.    For Judicial Estoppel to Apply, MMLLC Must Have Made the Statements at Issue

Plaintiffs base their judicial estoppel arguments not on statements made by MMLLC itself, but rather on statements made by Frosch in the 1960s and by attorneys for Anna Strasberg in her role as Administratrix of the Monroe estate.  But all of the statements were made years before

MMLLC even existed (and many were made before the members of MMLLC, Anna Strasberg and the Anna Freud Centre (the "Freud Centre") had any interest in the Monroe estate.[5]

Indeed, there is no recognized theory of "privity" under which statements made by an estate executor in the 1960s or 1970s can be deemed to be "statements" of an LLC that did not come into existence until decades later. The purpose of judicial estoppel is to preserve the "sanctity of the oath," *Bates*, 997 F.2d at 1038, and to prevent "a party" from attempting to win twice based on inconsistent positions. *See New Hampshire*, 532 U.S. at 749 (stating judicial estoppel applies to "a party"); *Maharaj*, 128 F.3d at 97-98 (stating that res judicata applies to parties in privity, but not stating the same as to judicial estoppel). These objectives are in no way furthered by holding MMLLC responsible for positions taken by Frosch decades ago.

Judicial estoppel has a completely different purpose from the distinct concepts of collateral estoppel and res judicata (which are designed "to conserve judicial resources and to allow the prevailing party to enjoy the benefits of its victory and avoid further costs," *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir. 1995)), and thus notions of "privity" do not apply

---

[5] Frosch was the New York-based attorney named as executor in Monroe's last will and testament dated January 14, 1961, whom Monroe had only recently hired to represent her in her divorce from Miller. (AMF ¶ 39).

MMLLC is a Delaware corporation formed on July 5, 2001 – forty years after Monroe's death (and twelve years after Frosch's death) – to hold and manage the intellectual property of the residuary beneficiaries of Monroe's will. (*Id.* ¶ 40). MMLLC is owned by Anna Strasberg and the Freud Centre. The Freud Centre is a world-renowned facility dedicated to improving the mental health of children through research and treatment. A substantial portion of its operating expenses are funded by income received from defendant MMLC. (*Id.* ¶¶ 40-41).

The Freud Centre first became interested in the Monroe estate in 1980, when Dr. Marianne Kris died and bequeathed to it her share of the residue of the Monroe estate. (*Id.* ¶ 45). Anna Strasberg, who married Lee Strasberg in 1968 (six years after Monroe's death), had no involvement with the Monroe estate until 1982, when Lee Strasberg died and passed to her his interest in the residue of the Monroe estate. (*Id.* ¶ 46). Following Frosch's death in 1989, Anna Strasberg was appointed Administratrix, c.t.a. of the Monroe estate. (Declaration of David Marcus dated February 14, 2008 ("Marcus Decl.") Ex. 34).

with equal force in the judicial estoppel context, if at all.[6]  As a leading treatise has explained:

> There can be few circumstances that would justify binding a nonparty to the judicial estoppel consequences of another litigant's behavior.  The purposes of the 'privity' rules that can bind a nonparty by the res judicata effects of a judgment ordinarily are exhausted by recognizing res judicata . . . .  [A] new party who has not participated in the unseemly conduct generally should not suffer for it.

18B Wright & Miller et al., *Federal Practice and Procedure* § 4477 (2d ed. 2002).

Even if the reach of judicial estoppel should be extended by some limited notion of privity, that reach should not extend so far as to cover statements made by Frosch long before MMLLC came into existence.  Plaintiffs do not, and cannot suggest that MMLLC, or any of its members, ever exercised "control" over Frosch, or that MMLLC is Frosch's "successor in interest."  *See* 28 Am. Jur. 2d Estoppel & Waiver § 137 (2007) ("[G]enerally the relation of privity does not exist between an administrator and the distributees of an estate); *Fouke v. Schenewerk*, 197 F.2d 234, 236 (5th Cir. 1952) ("[T]here is not necessarily any privity of estate . . . between heirs and trustees or executors").  This is especially true here, where the executor and the beneficiaries have disagreed with each other in the past.  (*See* AMF ¶¶ 43-44; Strauss Decl. Ex. 99 at MM-0013155 (Dr. Kris files objections to Frosch's account stating that the "Executor has shown no concern whatsoever for the interests or needs of the residuary legatees"); Ex. 100 (Frosch pays over $350,000 of his own funds to settle dispute with beneficiaries)).

Nor could the doctrine of "virtual representation" (Pl. Br. at 31) apply here, because that doctrine is uniquely keyed to the objectives of res judicata and issue preclusion, not judicial estoppel.  *See Chase Manhattan Bank*, 56 F.3d at 345 ("[T]he key [to when the doctrine can be applied] seems to be that the interests of the non-party have been adequately represented by others who have litigated the matter and have lost. . .") (quotation omitted).  Even Plaintiffs do not argue

---

[6] We are aware of no Supreme Court or Second Circuit decision holding that the concept of privity applies to the harsh remedy of judicial estoppel.

that Frosch ever "represented" MMLLC or its members in lawsuit, and lost, such that MMLLC should be bound by the judgment. Rather, Plaintiffs argue that statements made by Frosch years ago should be deemed to be statements of MMLLC.

Research has not uncovered a single case in which the doctrine of virtual representation was applied to judicially estop a non-party from taking a position. *Cf. Shook v. United States*, 713 F.2d 662, 668 (11th Cir. 1983) (doctrine of quasi-estoppel does not extend "to an estate beneficiary for merely indicating approval of the executors' handling [of an accounting issue] over which they have total control and the beneficiary none."). Even in the res judicata context, the doctrine of virtual representation is "controversial," *Hoblock v. Albany Cty. Bd. of Elec.*, 422 F.3d 77, 90 (2d Cir 2005), and can only be applied in "limited circumstances." *Zimmerman v. Harris*, 1997 U.S. Dist. LEXIS 6861, at *10, 12 (S.D.N.Y. May 15, 1997). Thus, none of Plaintiffs "virtual representation" cases arise in the judicial estoppel context, or actually apply the doctrine (even for res judicata purposes). *See Chase Manhattan Bank*, 56 F.3d at 346; *Zimmerman*, 1997 U.S. Dist. LEXIS 6861, at *12-14; *Algie v. RCA Global Commun., Inc.*, 891 F. Supp. 839, 852 (S.D.N.Y. 1994).

Plaintiffs have proffered no conceivable theory under which statements made by Frosch forty years ago should be deemed to be statements of MMLLC. In any event, whether privity exists is a factual issue, *Chase Manhattan Bank*, 56 F.3d at 346-47; *Zimmerman*, 1997 U.S. Dist. LEXIS 6861, at *8, on which Plaintiffs bear the burden of proof. *Hallinan v. Republic Bank & Trust Co.*, 519 F.Supp.2d 340, 358 (S.D.N.Y. 2007). Particularly given the tenuous-at-best relationship between Frosch and MMLLC, summary judgment is thus inappropriate.[7]

---

[7] Judicial estoppel is also inappropriate because acts taken by Anna Strasberg in her capacity as Administratrix cannot bind MMLLC. *See Spruance v. Comm'r*, 60 T.C. 141, 156 (1973) ("Acts done in a representative capacity may not estop one in an individual capacity and vice versa."); 28 Am. Jur. 2d Estoppel and Waiver § 137 (same). Plaintiffs do not even attempt to explain how the Freud Centre could possibly be bound to statements made on the Administratrix's behalf.

### B.    Nothing in the Miracle Litigation Should Estop MMLCC From Asserting Monroe's California Domicile

First, Plaintiffs argue that MMLLC should be both collaterally and judicially estopped as a result of a spare legal argument made early in the Miracle Litigation (and subsequently abandoned) that New York law barred Miracle's claim.  (Pl. Br. at 7-12).[8]  In that action, a woman named Nancy Miracle filed suit in Hawaii against Anna Strasberg in her capacity as Administratrix (the "Administratrix"), claiming that she was the long-lost daughter of Monroe (whom Miracle claimed was actually Nancy Cusumano from Brooklyn, New York).  (AMF ¶ 82).  Miracle's claims were ultimately dismissed on the ground of lack of personal jurisdiction, permitting Miracle to subsequently reassert her claims in the New York Surrogate's Court.  (AMF ¶¶ 96, 99-100).

In addition to the fact that MMLLC was not a party to the Miracle Litigation, neither judicial nor equitable estoppel can possibly apply because (i) judicial estoppel cannot apply to good-faith (and mistaken) legal arguments by the Administratrix's local counsel, (ii) the Administratrix did not prevail or receive any unfair advantage based on any argument as to Monroe's domicile, which was irrelevant to the ultimate outcome, and (iii) the doctrine of collateral estoppel does not apply for a number of reasons set forth below.

### 1.    Judicial Estoppel Cannot Apply to Good-Faith Legal Arguments Made by the Administratrix's Attorney

It is well established that, for purposes of judicial estoppel, the prior inconsistent statement must be one of <u>fact</u> – judicial estoppel does not apply to statements of law or legal theory.  *See, e.g., TM Patents, L.P. v. IBM Corp.*, 72 F. Supp. 2d 370, 379-80 (S.D.N.Y. 1999).  This is because a primary purpose of the doctrine is to preserve the sanctity of the oath by demanding truth and

---

[8] Plaintiffs' "collateral estoppel" claim is particularly confusing in that they argue that MMLLC prevailed in the Hawaii action, but the doctrine of collateral estoppel applies when "the issue was <u>lost</u> as a result of a final judgment in [a previous] action."  *E.g. Palmer v. Palmer*, 207 F.3d 566, 568 (9th Cir. 2000) (emphasis added).

consistency in <u>sworn</u> positions.  *Id.* at 1038.  Here, the only statements that Plaintiffs point to are <u>unsworn</u> legal arguments made by the Administratrix's local counsel.[9]

In her complaint, Miracle alleged that "Nancy Cusumano's" will was probated in New York Surrogate's Court (Marcus Decl. Ex. 40 ¶¶ 3, 5).  The motion to dismiss filed in response argued that the complaint was barred due to the statute of limitations and lack of personal jurisdiction, (Marcus Decl. Ex. 41 at 8-15), and also stated that Miracle's claim was barred by New York law, which applied, in part, because Miracle had "not disputed the Surrogate's determination that Monroe was a New York domiciliary at the time of her death."  (*Id.* at 5).  Other than asking the Hawaii court to take judicial notice of the Surrogate's Court's order admitting the will to probate, the Administratrix's counsel offered <u>no evidence</u> on the issue of Monroe's domicile, and certainly did not offer any sworn affidavit from either member of MMLLC.  (*Id.*)[10]

Any suggestion that the New York Surrogate's Court determined Monroe's domicile by accepting her will for probate was nothing more than an erroneous statement of law – it is undisputed that, in New York, the acceptance of a will for probate does not constitute a decision on domicile.  *See* N.Y. Surr. Ct. Proc. Act § 206 (1967); *In re Mulhern's Estate*, 31 A.D.2d 317, 318, 287 N.Y.S.2d 485, 487 (4th Dep't 1969).[11]  Indeed, the Surrogate's Court decree itself says nothing about Monroe's domicile, or even her residence.  (Marcus Decl. Ex. 5).  This mistaken interpretation of the legal significance of a court's order does not justify the exercise of judicial

---

[9] The relevant filings in the Miracle Litigation were prepared by attorney Milton Yasunaga, Hawaii local counsel whom Anna Strasberg had never met or spoken to.  (Strauss Decl. Ex. 116 at 173-77).

[10] Nor would any factual assertions be expected to be made in the context of a motion to dismiss. Moreover, because Miracle later argued in her amended complaint that Monroe was a California domiciliary (AMF ¶ 92), the Hawaii court was required to accept that as true for purposes of the motion to dismiss, and any decision to the contrary would have to be a legal conclusion.

[11] It appears that the Hawaii District Court was under the same mistaken understanding of New York law.  (Marcus Decl. Ex. 45, at 5 (Court asks "Wouldn't her will have been probated where she was domiciled?")).

estoppel. *See, e.g., Troll Company v. Uneeda Doll Company*, 483 F.3d 150, 155 (2d Cir. 2007)

(plaintiff not estopped from arguing that it acquired copyrights from one entity after previously

arguing that it had acquired the rights from a different entity, because differing theories of

ownership were legal positions); *United States Fid. & Guar. Co. v. Treadwell Corp.*, 58 F. Supp.

2d 77, 93 (S.D.N.Y. 1999) (judicial estoppel does not apply to inconsistent positions regarding

construction of insurance policies); *TM Patents, L.P. v. IBM Corp.*, 72 F. Supp. 2d 370, 380

(S.D.N.Y. 1999) (denying judicial estoppel based on prior constructions of patent).[12]

Further, once Miracle made domicile a factual issue by amending her complaint to allege

Monroe's California domicile, the Administratrix's counsel effectively <u>abandoned</u> any argument

based on New York law, instead arguing that the complaint should be dismissed for lack of

jurisdiction and based on the statute of limitations. (AMF ¶¶ 92-95). Thus, there is no evidence

that the Administratrix's counsel did anything other than make a good faith legal argument, much

less that he had the necessary intent to mislead or deceive the Hawaii District Court. *Cont. Cas. Co.*

*v. McAllen Indep. School Dist.*, 1987 U.S. Dist. LEXIS 14150, *2-3 (S.D. Tex. May 19, 1987)

(judicial estoppel does not preclude party from denying Texas citizenship despite prior counsel's

mistaken representation that the party was a Texas corporation).

## 2.    <u>The Administatrix Did Not Prevail Based on Any Domicile Argument</u>

Judicial estoppel cannot apply to the Miracle Litigation because the Administratrix prevailed

in that action because the Hawaii court lacked personal jurisdiction over her, and not as a result of

---

[12] Plaintiffs also claim that the Administratrix argued the domicile issue in opposing Miracle's request for discovery. (Pl. Br. at 8-9). In fact, the Administratrix's attorney argued only that Miracle had failed to raise the domicile issue in her pleading (Marcus Decl. Ex. 44 at 4). Moreover, the Administratrix's counsel based its opposition to discovery primarily on the grounds that "discovery cannot possibly defeat the motion to dismiss" on personal jurisdiction or statute of limitations grounds. (*Id.* at 4-5). In their brief, Plaintiffs intentionally take this quoted language out of context, implying that it related to the domicile issue. (Pl. Br. at 8). It did not. In any case, any statement as to the effect of the New York Surrogate Court's decree was merely an erroneous statement of law.

any determination regarding Monroe's domicile.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc.*

*v. Georgiadis*, 903 F.2d 109, 114 (2d Cir. 1990) (judicial estoppel applies only if the party "actually

obtained a judgment as a result of the inconsistent position").

   The Hawaii court dismissed Miracle's claims for lack of personal jurisdiction, given the lack

of any contact between either the Administratrix or Monroe and the State of Hawaii.  (Marcus Decl.

Ex. 49, at 2-9).[13]  The Court went on the state, in the alternative, that Miracle had failed to state a

claim under New York law, citing a number of factors justifying the application of New York law

(and relegating the issue of domicile to a parenthetical).  (AMF ¶¶ 96-97).  Having concluded that it

lacked personal jurisdiction over the parties, not only was it pure dicta for the Hawaii District Court

to address the merits, it was legally erroneous for it to have done so.[14]  *See, e.g., Sinochem Int'l Co.*

*v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1193 (2007).   (Court may not rule on merits

without first determining it has personal jurisdiction).

   Indeed, after having her claims dismissed for lack of jurisdiction in Hawaii, Miracle

reasserted her claims in the New York Surrogate's Court.  In a critical ruling, the New York Court

refused to provide any preclusive effect to the Hawaii court's decision, because the Hawaii court

lacked jurisdiction to make any determination on the merits:

_____

[13] Contrary to Plaintiffs' suggestion, Monroe's domicile was irrelevant to the Court's ruling that it
lacked personal jurisdiction.  The Hawaii District Court found that general jurisdiction was lacking
because the Administratrix was not registered to do business in Hawaii, had no offices in Hawaii,
and had not executed any contract in Hawaii (Marcus Decl. Ex. 49 at 7), and that specific
jurisdiction was lacking because the claims did not arise out of any Hawaii-related contacts, and
because none of the allegedly wrongful activity occurred in Hawaii.  (*Id.* at 7-9).  For purposes of
personal jurisdiction, it was irrelevant whether Monroe was domiciled in California or New York –
what mattered was that there was no nexus with Hawaii.

[14] *Steele v. Anderson*, 2004 U.S. Dist. LEXIS 136 (N.D.N.Y. Jan. 8, 2004), relied on by Plaintiffs, is
inapposite.  In that case, defendants tried to argue that diversity jurisdiction existed because they
were not California residents, even though they succeeded in *defeating* diversity jurisdiction in a
prior litigation precisely because they argued that they were a California resident.  *See Steele*, 2004
U.S. Dist. LEXIS 136, at * 8-9; Strauss Decl. Ex. 125 ¶¶ 16-17).  By contrast, in the Hawaii case
Monroe's domicile was irrelevant to the personal jurisdiction issue.

> [The Hawaii District Court] held that the court did not have personal jurisdiction over Strasberg. The decision, however, went on to explain that under New York law, she was not a pretermitted heir having been born before decedent executed her will. The fact that the Hawaii court addressed the merits does not give the decision preclusive effect to the current proceeding. New York law is clear that where there is no jurisdiction over the parties the decision will not preclude a subsequent suit on the merits.

(Strauss Decl. Ex. 119 at MM-0000363). Instead, the Surrogate's Court ordered discovery and ultimately dismissed Miracle's claims because the factual evidence demonstrated that she could not be Monroe's daughter. (AMF ¶ 100).

Thus, any decision in the Miracle Litigation based on Monroe's domicile was deemed to be a nullity, and the Administratrix did not prevail on those grounds. Because the "domicile" issue was irrelevant to the dismissal of the Hawaii case, and the Administratrix ultimately "prevailed" against Miracle for reasons having nothing to do with Monroe's domicile, judicial estoppel cannot apply. *Uzdavines*, 418 F.3d at 148 (judicial estoppel cannot apply unless "the risk of inconsistent results with its impact on judicial integrity is certain"); *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1547-48 (7th Cir. 1990) ("The offense is not taking inconsistent positions so much as it is *winning*, twice, on the basis of incompatible positions.") (Easterbrook, J.). If a party's assertion is preliminarily accepted but ultimately fails, judicial estoppel is inappropriate. *See Coal Resources, Inc. v. Gulf & Western Indus.*, 865 F.2d 761, 773 (6th Cir. 1989); *Taylor v. Taylor*, 72 B.R. 696, 699 (Bankr. E.D. Tenn. 1987); *In re Koch*, 229 B.R. 78, 85 (Bankr. E.D.N.Y. 1999); *Froshiesar v. Babij*, CV-02-449-ST, 2004 U.S. Dist. LEXIS 21463, at *23 (D. Or. Oct. 15, 2004).

Moreover, the issue of domicile was not even argued in the New York proceedings, and thus was not relevant to the ultimate disposition of Miracle's claims. As Judge Posner has held, judicial estoppel is inapplicable where a party originally prevails on a position, but subsequently abandons that position and thus does not ultimately prevail on the basis of it. *McNamara v. City of Chicago*,

16

138 F.3d 1219, 1225 (7th Cir. 1998).[15]

### 3.    Neither the Administratrix (Nor MMLLC) Has Received any Unfair Advantage

In addition, the Administratrix derived no unfair advantage from her attorney's spare legal argument.  The Miracle Litigation would have been dismissed for lack of jurisdiction regardless of any statement regarding domicile.  *See Uzdavines*, 418 F.3d at 148 (no unfair advantage where "claim would have been dismissed in any event").  Nor did she gain any benefit from the Hawaii court's decision once Miracle reasserted her claims in New York – rather, she was forced to expend time and money litigating Miracle's claims on the merits.  (AMF ¶ 100).[16]  And obviously, MMLLC did not receive any "unfair advantage" as a result of a litigation it was not even a party to.

### 4.    Collateral Estoppel Does Not Apply

Even assuming *arguendo* that a party can be collaterally estopped as a result of a litigation in which the it allegedly "prevailed," collateral estoppel cannot apply here.

First, the Hawaii court's decision was not a "final judgment on the merits," and thus cannot give rise to collateral estoppel.  *See, e.g., Office of Hawaiian Affairs v. Housing and Comty. Devel.*

---

[15] Plaintiffs' also argue that the Administratrix "prevailed" in a discovery dispute in the Hawaii litigation on the basis of Monroe's New York domicile.  This claim is not supported by the evidence.  In the discovery dispute, the Administratrix's attorney argued that discovery was not necessary because even if Miracle could establish California domicile, her claim would fail on statute of limitations and personal jurisdiction grounds.  (Marcus Decl. Ex. 45 at 15-19).  Moreover, the Hawaii District Court's decision on the discovery dispute said nothing about Monroe's domicile (*id.* at 19) – judicial estoppel is not appropriate where the Court's ruling gives no indication that it was based on the purportedly inconsistent position.  *See Treadwell Corp.*, 58 F. Supp. 2d at 93 (judicial estoppel inapplicable absent evidence in the record that the prior court actually accepted the inconsistent statement).

[16] *Whalen v. Chase Manhattan Bank*, 2001 U.S. App. LEXIS 16158 (2d Cir. 2001), relied on by Plaintiffs (Pl. Br. at 11-12), is inapposite.  While the Second Circuit's unpublished decision in that case is very short and does not include a detailed analysis, it is clear that the plaintiff in that case actually prevailed on and received a benefit from the prior inconsistent statement, i.e., a settlement payment from an earlier defendant.  *Id.* at *4.  Thus, the plaintiff would have received an unfair windfall had it been entitled to recover from two defendants based on inconsistent theories.

*Corp.*, No. 25570, 2008 Haw. LEXIS 23, at *57 (Jan. 31, 2008).[17]  It is well-established that a

dismissal for lack of jurisdiction does <u>not</u> constitute a judgment on the merits for collateral estoppel

purposes.  *See, e.g., Thaler v. Casella*, 960 F. Supp. 691, 697 (S.D.N.Y. 1997); 18 Moore's Federal

Practice (hereinafter, "Moore's Fed. Prac.") § 132.03[5][d], at 132-135 (3d ed. 2007).[18]

   <u>Second</u>, as stated *supra* at 15, once the Hawaii court concluded that it lacked jurisdiction, it

was legally erroneous to resolve Miracle's claims on the merits, and that portion of its decision is

non-binding dicta.  *See, e.g., Ziegler v. Indian River County*, 64 F.3d 470, 476 (9th Cir. 1995) ("The

declarations were dicta and of no force or effect because they were made after a finding of no

jurisdiction.").  It is axiomatic that "a judgment rendered by a court lacking jurisdiction cannot be a

basis for the application of the doctrine of res judicata," Am. Jur. 2d, Judgments § 508, and that

"dictum . . . cannot be the basis for collateral estoppel." *Pardo v. Olson & Sons, Inc.*, 40 F.3d 1063,

1067 (9th Cir. 1994); *see also United States v. Hussein*, 178 F.3d 125, 129 (2d Cir. 1999).  The New

York Surrogate's Court expressly found as much when it refused to afford any preclusive effect to

the Hawaii decision.  (*Supra* at 15-16).

   <u>Third</u>, collateral estoppel cannot apply because any determination regarding Monroe's

domicile was not "essential" to the court's decision.  *Office of Hawaiian Affairs*, 2008 Haw. LEXIS

23, at *57; *see also, e.g., Arizona v. California*, 530 U.S. 392, 414 (2000) (general rule is that

determination of issue must have been "essential" to judgment for collateral estoppel to apply).

---

[17] Hawaii's collateral estoppel law applies here.  The preclusive effect of a judgment rendered by a
federal court sitting in diversity (such as the Hawaii federal district court in the Miracle Litigation)
is governed by the law that would be applied in the state in which the federal diversity court sits.
*Semtek, Int'l v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001).  In any event, Hawaii law is
substantially similar to the federal common law of collateral estoppel.  *See, e.g., Uzdavines.*, 418
F.3d at 147.

[18] Contrary to Plaintiffs' argument, the Ninth Circuit's refusal to hear Miracle's appeal does not
establish that the decision was a "final judgment on the merits"  (Pl. Br. at 14) -- Miracle's appeal to
the Ninth Circuit was dismissed on jurisdictional, not substantive, grounds.  (Marcus Decl. Ex. 55).

Here, the Hawaii court would have dismissed Miracle's claims for lack of personal jurisdiction regardless of whether Monroe was a New York or California domiciliary. (*Supra* at 15 n.14).

Fourth, collateral estoppel is inappropriate because the Administratrix had no motive in the Miracle Litigation to argue that Monroe was a California domiciliary, and MMLLC cannot be bound by a judgment that she lacked any incentive to oppose. *See, e.g.,* Am. Jur. 2d Judgments §575 ("A party may be held to not have had a full and fair opportunity to litigate an issue where the party . . . lacked the incentive to vigorously litigate in the prior action"); Moore's Fed. Prac. § 132.04[1][a], at 132-144 (3d ed. 2007) ; *State v. Alvey*, 67 Haw. 49, 54 (1984).[19]

Finally, collateral estoppel is inappropriate because in determining that the Hawaii District Court lacked jurisdiction to resolve Miracle's claims on the merits, the New York Surrogate Court issued a subsequent, inconsistent decision. (*Supra* at 15-16). *See, e.g., Metromedia Co. v. Fugazy*, 983 F.2d 350, 366 (2d Cir. 1992) (when later court issues an inconsistent decision, collateral estoppel cannot apply to prior judgment.)

## C. No Statements in the New York Surrogate's Court Proceedings Justify the Application of Judicial Estoppel

While Plaintiffs boldly proclaim in a heading that "Ms. Monroe's New York Domicile was Conclusively Decided During the New York and California Probate Proceedings," (Pl. Br. at 14), in fact nowhere in their brief do they even attempt to argue that the New York Surrogate's Court ever ruled that Monroe was a New York domiciliary. Nor could they – Monroe did not need to be a New York domiciliary in order for her will to be probated in New York, and the order admitting the will

---

[19] Plaintiffs should not be heard to argue that MMLLC's current interests were nevertheless protected because Miracle argued in favor of Monroe's California domicile during the Hawaii litigation. There is no conceivable argument that MMLLC is in privity with Miracle. And Miracle did not effectively advocate her position -- she failed to rebut the erroneous statement of law by the Administratrix's attorney, offered no factual evidence and relied on outlandish claims that are contrary to historical fact (AMF ¶ 93).

for probate said <u>nothing</u> about Monroe's domicile. (*Supra* at 13).[20]

Instead, Plaintiffs' sole argument with respect to the Surrogate's Court proceedings is that MMLLC is judicially estopped due to a single statement in a July 28, 1989 petition. (Pl. Br. at 21-22). That petition, filed by the Administratrix's attorney, challenged the Freud Centre's entitlement to a share of the residuary estate. (AMF ¶ 78). For no apparent reason, the petition recited in rote form that Monroe "died on August 5, 1962, domiciled in the City and State of New York." (Marcus Decl. Ex. 35 ¶ 3). In addition to the fact that MMLLC was not a party to the proceedings (and did not yet even exist), this stray reference to Monroe's domicile cannot justify the application of judicial estoppel, because (i) the Administratrix did not prevail in the will construction proceedings, and (ii) the reference to domicile was an unnecessary inadvertency.

### 1.    <u>The Administratrix Did Not Prevail</u>

The Administratrix did not obtain a "favorable decision" in the will construction proceedings – rather, the Surrogate's Court <u>rejected</u> the Administratrix's proffered construction of Monroe's will, and ruled that Dr. Marianne Kris was entitled to bequeath to the Freud Centre her interest in the residuary estate. (Marcus Decl. Ex. 39 at MM-005585-86; 5162-64); *see Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 120 (2d Cir. 2005) (judicial estoppel required that the prior tribunal "relied on [the] party's inconsistent factual representations and rendered a favorable decision"). Indeed, there is no evidence that the Surrogate's Court adopted the idea of Monroe's

---

[20] Indeed, numerous New York courts have held that where, as here, the acceptance of a will for probate does not depend on the decedent's domicile, no preclusive effect is granted to either the decision admitting the will to probate or to any statements by the executor regarding domicile or residence. *See, e.g., In re Mulhern's Estate,* 31 A.D.2d at 318, 297 N.Y.S.2d at 487; *In re Gardner's Estate*, 260 A.D. 132, 133-34, 21 N.Y.S.2d 247, 249 (2d Dep't 1940); *In re Mesa's Estate*, 87 Misc. 242, 254, 149 N.Y.S. 536, 544 (Surr. Ct. N.Y. Cty. 1914); *In re Grant's Estate*, 83 Misc. 257, 260, 144 N.Y.S. 567, 569-70 (Surr. Ct. N.Y. Cty. 1913); *In re Rothschild's Estate*, 86 Misc. 364, 365, 148 N.Y.S. 368 (Surr. Ct. N.Y. Cty. 1914); *In re Rosenfield's Estate*, 76 N.Y.S.2d 177, 179 (Surr. Ct. N.Y. Cty. 1944); *In re Moran's Will*, 180 Misc. 469, 471, 39 N.Y.S.2d 929, 934 (Surr. Ct. King's Cty. 1943).

"New York domicile" even in ruling against the Administratrix – the opinion says <u>nothing</u> about Monroe's domicile, which was completely irrelevant to the proceedings. (Marcus Decl. Ex. 39).

Nevertheless, Plaintiffs suggest that the Surrogate's Court somehow "adopted" the representation as to Monroe's domicile because it applied New York law to the proceeding, (Pl. Br. at 21-22), even though choice of law was never argued or put in issue. Not surprisingly, Plaintiffs cite no legal authority in support for their proposal that a tribunal's decision to apply its state's law in ruling <u>against</u> a party could possibly be said to constitute the party having "prevailed" in the proceeding. *See Astor Chauffeured Limousine*, 910 F.2d at 1548 ("the offense is not taking inconsistent positions so much as it is *winning*, twice, on the basis of incompatible positions."); *Nat'l Presto Indus., Inc. v. Black & Decker Inc.*, 1992 U.S. Dist. LEXIS 751, at *4-5 (N.D. Ill. Jan. 27, 1992) (judicial estoppel does not apply where court accepted party's position but still ruled against party: "This is not the sort of 'judicial acceptance' or 'success' that supports judicial estoppel – it is a reversal!"). Moreover, the purported "New York law" that the Surrogate's Court applied was nothing more than the universally-recognized principle that, in construing a decedent's will, the court should ascertain and give effect to the decedent's intentions (AMF ¶ 80), a proposition that is also recognized under California law. *Estate of Edwards*, 203 Cal. App. 3d 1366, 1371 (Cal. Ct. App. 1988).[21]

In any event, the law is clear that, in interpreting a testamentary disposition of personal property, the law to be applied is "the local law of the jurisdiction in which the testator was domiciled <u>at the time the will was executed</u>." E.P.T.L. § 3-5.1(e) (emphasis added). Thus, even if the application of New York law was based on Monroe's purported New York domicile, it would <u>at</u>

---

[21] Nor can Plaintiffs argue that judicial estoppel is appropriate because the Freud Centre, a 25% shareholder of MMLLC, prevailed in the will construction proceeding. The Freud Centre made no statements regarding Monroe's domicile – it merely admitted "on information and belief" irrelevant allegations made by the Administratrix. (Marcus Decl. Ex. 36).

<u>most</u> evidence that she was domiciled in New York in <u>January 1961</u> (before she returned to California in April 1961).  (*Supra* at 3-4).[22]

**2.      The Unnecessary Reference to Monroe's Domicile Was a Mere Inadvertency, And Cannot Give Rise to Judicial Estoppel**

Judicial estoppel also cannot apply because it was a mere inadvertent error for the Administratrix's attorney to refer to "domicile" in the petition.  *See Simon*, 128 F.3d at 73 (judicial estoppel inapplicable where "the first statement was the result of a good faith mistake or an unintentional error").  Previous filings with the New York Surrogate's Court stated that Monroe was a New York <u>resident</u>, but <u>never</u> that she was a New York domiciliary.  (AMF ¶ 77).[23]  The isolated and unnecessary reference to domicile in the will construction petition was simply a mistake, and there is certainly no indication of the required intent to deceive necessary to justify the drastic remedy of judicial estoppel.  (*Supra* at 8).  *See, e.g., Cont. Cas. Co.*, 1987 U.S. Dist. LEXIS 14150, *2-3 (S.D. Tex. May 19, 1987) (party not judicially estopped from denying Texas citizenry despite its counsel's prior mistaken assertion of Texas citizenry – rigid doctrine of judicial estoppel does not apply to an "unthinking or confused blunder").

Indeed, the Administratrix had absolutely no motive to raise the issue of Monroe's domicile during the will construction proceedings, and certainly had no reason to seek the application of New

---

[22] Plaintiffs themselves quote E.P.T.L. § 3-5.1(e) in its entirety in their brief (Pl. Br. at 22), yet go on to argue that it is domicile at death (rather than execution) that controls, citing inapposite cases regarding a will's validity.  Of course, the issue in the will construction proceeding was the interpretation of Monroe's will, not its validity.  Moreover, Plaintiffs' cases are also incorrect because even intrinsic validity is determined by domicile at execution.  E.P.T.L. § 3-5.1(d).

[23] Plaintiffs do not, and cannot, argue that judicial estoppel applies as a result of any references to Monroe's New York "residence" in the New York probate proceedings.  It is long-settled that residence and domiciles have two separate meanings, and that an individual may have multiple residences.  *See Matter of Newcomb*, 192 N.Y. 238, 250, 84 N.E. 950, 954 (1908).  Because Monroe did maintain a New York apartment, in addition to her California home, references to a New York residence do not undermine any claim of California domicile.  *See Simon*, 128 F.3d at 72-73 ("If the statements can be reconciled there is no occasion to apply [judicial] estoppel.").

York law (which does not differ from California law. *See Hussein*, 178 F.3d at 130 (ruling prior statement was inadvertent error where party had "no incentive" to urge prior position). This is not the type of situation in which a party sought to gain an "unfair advantage" by asserting the prior position – thus, judicial estoppel does not apply.

### D.    MMLLC Cannot be Judicially Estopped Based on Statements of Frosch and Others in California Tax Proceedings

Plaintiffs argue that MMLLC should be judicially estopped because, in 1966 (four years after Monroe died), Frosch submitted affidavits to California tax authorities asserting that Monroe was a New York resident. (Pl. Br. at 23-27). Neither Lee Strasberg nor Dr. Kris, the predecessors in interest to Anna Strasberg and the Freud Centre, submitted such an affidavit.

Plaintiffs' efforts to bind MMLLC to statements made by unrelated entities decades before MMLLC even came into existence are totally unavailing, because (i) the statements were not made by MMLLC; (ii) Frosch did not prevail in the tax proceedings – rather, his ill-fated gambit to avoid paying taxes on certain film royalty payments resulted in the Monroe estate being subjected to double taxation; and (iii) the statements in question related to Monroe's residence, not her domicile.

### 1.    The Statements Were Not Made by MMLLC

First, and most significantly, MMLLC is not Frosch, a fact that Plaintiffs seem determined to ignore. And MMLLC is certainly not in privity or affiliated with any of the four individuals who submitted affidavits at Frosch's urging. The harsh remedy of judicial estoppel cannot apply based on statements made by other parties, decades before MMLLC even existed. (*Supra* at 8-11).

Plaintiffs efforts to attribute these statements to MMLLC are particularly inappropriate given that the statements were made not before a court, but in a letter that Frosch's attorneys[24]

---

[24] Plaintiffs falsely state that the attorneys represented the Monroe estate. In fact, they represented only Frosch. (*See* MMLLC's Resp. to Statement No. 28 in Pl. Rule 56.1 Statement). *See Goldberg v. Frye*, 217 Cal. App. 3d 1258, 1267 (Cal. App. 1990) ("[I]t is well established that the attorney for

mailed to the inheritance tax appraiser without any apparent notice to estate beneficiaries.  (Marcus
Decl. Ex. 16).  Indeed, there is no evidence that any estate beneficiaries ever saw Frosch's letter or
even knew of its existence.  In similar circumstances, the Eleventh Circuit has held that estate
beneficiaries cannot be estopped (pursuant to a quasi-estoppel theory) from taking tax positions
contrary to those taken by the executor, even where (unlike here) the beneficiary had previously
indicated approval of the executor's actions.  *Shook*, 713 F.2d at 668 ("None of the cited estoppel
cases extend the doctrine to an estate beneficiary for merely indicating approval of the executors'
handling over which they have total control and the beneficiary none.").

In fact, the evidence indicates that many of Monroe's friends and associates <u>refused</u> to
submit residence affidavits for Frosch (despite his request that they do so), including Inez Melson
(Monroe's friend and business manager), Mickey Rudin (her California attorney), Monroe's
personal physician, and "a number of other people on the Coast who were close to" her in the year
before her death.  (AMF ¶¶ 68-69).  Indeed, only <u>one</u> of the inheritance tax affidavits came from an
estate beneficiary (May Reis).  Other beneficiaries, including Lee Strasberg or Dr. Kris, were either
never asked to provide affidavits or refused to do so.  In these circumstances, Frosch's statements
cannot be deemed to be statements of MMLLC.[25]

### 2.    <u>Frosch Did Not Prevail in California Tax Proceedings</u>

Judicial estoppel also does not apply because the Monroe estate received no benefit as a
result of Frosch's actions in the California tax proceedings – to the contrary, as a result of Frosch's
actions, the Monroe estate was unnecessarily subjected to <u>double taxation</u> and severely penalized.

---

the administrator of an estate represents the administrator, and not the estate.").

[25] In addition the affidavits that Frosch did manage to procure are rife with inadmissible hearsay and
should not even be considered on this motion.  (*See* Motion to Strike, at I.A).  The affidavits are
also inherently unreliable, conflict with prior statements that the affiants had previously given to
Frosch's office, and are contrary to irrefutable facts.  (*See* AMF ¶¶ 57-66).

In submitting the residence affidavits to the California Inheritance Tax Appraiser, Frosch's attorney asked that the appraiser "furnish a no-tax certificate so that a petition may be filed for termination of the California proceedings in accordance with the requirements of law." (Marcus ex. 16). Plaintiffs argue that Frosch "succeeded" because the Inheritance Tax Appraiser imposed tax liability of $777.63,[26] and the Monroe estate did not need to pay California taxes on intangible property such as "royalty payments." (Pl. Br. at 26).

But when Frosch subsequently requested a tax clearance certificate from the California Franchise Tax Board in order to submit his final account to the probate court, the Franchise Tax Board concluded that the Monroe estate owed significant California taxes on royalties that it had earned for *Some Like it Hot* and *The Misfits* between 1963 and 1970. The Franchise Tax Board assessed $51,243 in taxes pertaining to the royalty payments, plus a $12,810.78 penalty for Frosch's failure to file a return pertaining to such royalties. (AMF ¶¶ 73, 75).[27]

The California State Board of Equalization affirmed the Franchise Tax Board's ruling, holding that notwithstanding Frosch's arguments as to Monroe's residence, the royalty payments were taxable as "income attributable to a California source, viz., Miss Monroe's performance of her personal, artistic services within California," and affirming the $12,810.78 penalty due to Frosch's failure to behave as a "reasonably prudent businessman." (Marcus Decl. Ex. 23 at MM-0000089, 98). Moreover, the Board of Equalization rejected Frosch's request for a credit for taxes already

---

[26] Plaintiffs falsely state that the Inheritance Tax Appraiser valued the California property at $36,144.42. (Pl. Br. at 26). In fact, he valued it at $92,781 ($36,144.22 after deductions, the largest of which was an encumbrance on the California real property). (AMF ¶ 70).

[27] Plaintiffs also argue that the New York tax appraiser valued Monroe's New York property at $836,524.81, with a total New York tax burden of $17,698.42. (Pl. Br. at 26 n.5). Plaintiffs fail to inform the Court that, of this amount, the vast majority ($746,684.19) consisted of royalty payments from *The Misfits* and *Some Like it Hot* (AMF ¶ 72), the exact same royalty payments for which the estate was subsequently double-taxed in California due to Frosch's actions.

paid on the royalty payments in New York, because the credit that Frosch sought was only available to California residents (and Frosch had taken the position that Monroe was not one). (*Id.* at MM-0000095). Thus, not only did the estate not "prevail" as a result of Frosch's statements to the California Tax Board, it was actually subjected to <u>double taxation</u>.[28] Indeed, prior to her death Dr. Kris objected to the settlement of Frosch's probate court account on this very ground. (Strauss Decl. Ex. 99 at MM-0013142-44).

Thus, Frosch did not ultimately prevail California tax proceedings, nor has MMLLC derived any "unfair advantage" as a result of Frosch's actions. Far from receiving any benefits from Frosch's actions, the Monroe estate was severely penalized and subjected to double taxation.[29] Judicial estoppel is meant to prevent a party from "*winning*, twice, on the basis of incompatible positions." *Astor Chauffeured Limousine*, 910 F.2d at 1548. The doctrine does not mandate that MMLLC should <u>lose</u>, twice, as a result of Frosch's actions.

### 3.    The Affidavits Go to Residence, not Domicile

Recognizing the weakness in their own arguments, Plaintiffs acknowledge that the affidavits, by their terms, refer to "residence," and not domicile. (Pl. Br. at 23). While Plaintiffs try to downplay the significance of this fact, it is conclusive. "'Domicile' is not necessarily synonymous with 'residence,' and one can reside in one place but be domiciled in another." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) (citations omitted). Because Monroe maintained a New York apartment, she had a New York "residence" – thus,

---

[28] Despite this, Plaintiffs rely on Frosch's self-serving statement (in request for "extraordinary executor's commissions," no less) that he was "successful" in the inheritance tax proceedings in that "none of decedent's contract rights were included in measuring such tax in California." (Pl. Br. at 27; Marcus Decl. Ex. 26 at SFA1 0191-92). Of course, the estate subsequently had to pay double-taxes on those same contract rights, in both California and New York.

[29] Even if the estate were not subject to double taxation, Plaintiffs have failed to explain what possible benefit the estate could have gained by paying taxes in New York instead of California.

Frosch's statement regarding Monroe's residence is not even necessarily inconsistent, let alone "clearly" so, *see New Hampshire*, 532 U.S. at 750, with MMLLC's position in this litigation regarding Monroe's domicile at death. *See, e.g., Simon*, 128 F.3d at 72-73 ("If the statements can be reconciled there is no occasion to apply an estoppel.").

### E.    MMLLC Is Not Estopped By Reason of Frosch's Actions in the California Ancillary Probate Proceedings

Finally, Plaintiffs argue that MMLLC is precluded from asserting Monroe's California domicile because the issue of domicile was purportedly "conclusively decided" during California ancillary probate proceedings, and thus principles of "res judicata" apply.  (Pl. Br. at 14, 20). (Plaintiffs make this argument despite the fact that the New York Surrogate's Court, the primary probate court, never determined or addressed the domicile issue).  (*Supra* at 13, 19-20).  Plaintiffs do not, and cannot, contend that the issue of Monroe's domicile was ever actually litigated in the California ancillary proceedings, or that <u>any</u> estate beneficiary ever appeared and contested what was, at the time, an immaterial issue.

Again, Plaintiffs arguments are unavailing for a number of reasons.  <u>First</u>, Plaintiffs claims rest entirely on the premise that, if Monroe was a California domiciliary, the California court would have been unable to accept her will for ancillary probate.  Plaintiffs are completely wrong, and once this slender reed is removed, their argument collapses.  <u>Second</u>, ordinary principles of res judicata and collateral estoppel do not apply because the issue of domicile was never actually litigated or necessarily decided, and the California ancillary probate proceedings involved different parties and a different cause of action than the present dispute.  <u>Third</u>, any statement regarding Monroe's residence in the California probate court's decision admitting the will to probate is not  "conclusive" on the issue of domicile, particularly outside of the context of the probate proceedings themselves.

1.    **Monroe's Will Was Subject to "Ancillary" Probate in California Even if She Was a California Domiciliary**

Plaintiffs argue that the California court conclusively determined that Monroe was not a California domiciliary, because if she <u>was</u> a California domiciliary the court would have been unable to accept her will for "ancillary," as opposed to primary, probate.  (Pl. Br. at 15-16).  This is entirely incorrect – as *Estate of Reynolds*, 217 Cal. 557 (Cal. 1933) (a case that Plaintiffs themselves cite) makes clear, at the time of Monroe's death a California court could accept a will for ancillary probate <u>even if the decedent was a resident or domiciliary of California</u>:

> [T]he legislature expressly authorized ancillary proceedings upon the will of a resident of this state. . . .  The matter of ancillary proceedings upon foreign wills is now governed by sections 360 and 301 of the Probate Code . . . .  [I]t is our opinion that they . . . should therefore be construed as authorizing ancillary proceedings on the will of a resident of this state.

217 Cal. at 559-60.[30]  Thus, contrary to Plaintiffs' assertions, Monroe's will was subject to ancillary probate in California even if she was a California domiciliary.[31]

Numerous courts have held that where a determination of domicile is not necessary for the admission of a will to probate, neither an executor's representations regarding domicile nor a court's decision admitting the will to probate precludes a subsequent determination of the decedent's true domicile (even in proceedings brought by the executor himself.  *See, e.g., Acridge v. Evangelical Lutheran Good Samaritan Soc.*, 334 F.3d 444, 452 (5th Cir. 2003) (New Mexico probate court's determination of domicile did not preclude executrix from subsequently alleging Texas domicile, because "whether or not [decedent] was a New Mexico domiciliary was not necessary to the determination that his estate was eligible for probate in New Mexico"); *In re*

---

[30] As Plaintiffs acknowledge in their brief, Section 360 was not repealed until 1988, after the Monroe ancillary proceeding was closed.  (Pl. Br. at 15 n.1).

[31] In any event, the denomination of "ancillary" and "primary" probate administrations is largely a distinction without a difference.  *See, e.g., Estate of Apple*, 66 Cal. 432, 435-36 (1885).

*Mulhern's Estate*, 31 A.D.2d at 318 (executor not estopped from asserting different domicile because New York domicile was not necessary for the Court to exercise jurisdiction, and "[a]n executor cannot change the actual domicile of the testator by his own admissions or allegations after the testator's death."); *In re Gardner's Estate*, 260 A.D. at 133-34 (court's determination of non-residence had no preclusive effect where "[j]urisdiction was not dependent on non-residence").[32]

Similarly groundless is Plaintiffs' claim that the California court could not have turned over unspecified "assets" to Frosch without first concluding that New York was the state of domicile. (Pl. Br. at 17-19).  None of the cases cited by Plaintiffs even suggest that where ancillary proceedings are conducted on the will of a California domiciliary, the court may not turn over excess assets to the estate executor (particularly where, as here, the same individual served as executor in the ancillary proceedings, (*see* Marcus Decl. Ex. 26, at 1)).  Indeed, in its order turning over unspecified assets to Frosch, the California court said nothing about Monroe's state of residence or domicile.  (Marcus Decl. Ex. 27 at SFA1 0135).[33]

---

[32] *See also, e.g., In re Moran's Will*, 180 Misc. at 471 (petitioner not precluded from arguing new domicile because determination on domicile was not necessary for prior court to accept will for probate); *In re Rosenfield's Estate*, 76 N.Y.S.2d at 179 ("Even an allegation of the domicile of the testator in the petition for probate is not an estoppel against a subsequent application for the determination of the true domicile."); *In re Mesa's Estate*, 149 N.Y.S. at 542-44 (beneficiaries not estopped from proving decedent's Cuban domicile even though will was probated in New York based on executor's allegations of New York residence -- "Grants of probate or administration are not . . . conclusive of the last domicile or residence of the deceased"); *In re Grant's Estate*, 83 Misc. at 260 (executrix's allegations "are not conclusive upon the question of [the decedent's] last domicile.  An executrix cannot change the actual domicile of the testator by her own admissions after testator's death . . .").

To the extent it is to the contrary, *In re Slade's Estate*, 154 Misc. 175 (N.Y. Surr. 1935) (Pl. Br. at 19) is against the great weight of authority.  *Slade's Estate* is further distinguishable because, unlike the present proceedings, it involved a dispute during the course of the probate proceedings themselves, amongst parties to the proceeding.  (*See infra* at 33-34).

[33] Plaintiffs do not appear to argue that "judicial estoppel" applies in connection with the California ancillary proceedings.  But even if Plaintiffs intended to argue that point, judicial estoppel could not conceivably apply.  First, MMLLC is not Frosch, and cannot be estopped by statements made by

## 2.    "Res Judicata" Does Not Bar MMLLC

Even though it was completely unnecessary for the California court to determine Monroe's

domicile, Plaintiffs argue that MMLLC's domicile argument is precluded by a bare statement in the

order admitting will for probate that Monroe was a "resident of [New York], leaving Estate in

[California." (Pl. Br. at 16). While Plaintiffs argue that the California court's statement is "res

judicata" against MMLLC, they due not even specify which aspect of res judicata they refer to –

claim preclusion or collateral estoppel. *See, e.g., Henn v. Henn*, 26 Cal. 3d 323, 329 (1980) ("The

doctrine of res judicata has long been recognized to have a dual aspect.").[34] In any case, it is clear

that neither doctrine binds MMLLC to a bare, and unnecessary, statement by the California court

regarding Monroe's New York "residence."

First, in its narrowest aspect, claim preclusion, the doctrine of res judicata bars "the

maintenance of a second suit between the same parties on the same cause of action." *Henn*, 26 Cal.

3d at 329 (emphasis added); *see also, e.g., Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th

Cir. 1992) (same);[35] *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 896 (2002); *Burdette v.

Carrier Corp.*, 158 Cal. App. 4th 1668, 1674 (Cal. App. 2008). Here, the present litigation is not a

him. (*Supra* at 8-11). And as set forth *supra* at 28-29, numerous courts have held that statements
by an executor do not estop a subsequent determination as to a decedent's true domicile. Second,
Frosch did not receive any "favorable decision" as a result of any statement as to Monroe's
domicile – the California court would have accepted Monroe's will for ancillary probate regardless
of her domicile. Finally, Plaintiffs cannot identify a single "unfair advantage" that MMLLC, or
even the Monroe estate, received as a result of Frosch's prior statements to the California probate
court. The doctrine of judicial estoppel should not be used to punish MMLLC for statements made
by another party decades ago, from which MMLLC has received no benefit.

[34] California law regarding res judicata applies. *See In re Sokol*, 113 F.3d 303, 306 (2d Cir. 1997)
("The preclusive effect of a state court determination in a subsequent federal action is determined
by the rules of the state where the prior action occurred.")

[35] Plaintiffs incorrectly cite *Clark* for the proposition that the prior action need only involve the
same "subject matter," not the same "cause of action."

"second suit between the same parties" as the California ancillary proceedings. Plaintiffs certainly were not parties to the California ancillary proceedings, and MMLLC did not even exist at the time the proceedings took place.[36]

In addition, the present case, which involves a dispute over Monroe's "right of publicity," does not present the same "cause of action" as Frosch's petition for probate, which was "instituted for the purpose of establishing the status of a written instrument." *Matter of Bloom*, 213 Cal. 575, 578 (1931); *see Fed. of Hillside and Canyon Assocs. v. Los Angeles*, 126 Cal. App 4th 1180, 1202 (Cal. App. 2004) (for purposes of claim preclusion, "a cause of action comprises the plaintiff's primary right, the defendant's corresponding primary duty, and the defendant's wrongful act in breach of that duty"). For these reasons, the doctrine of claim preclusion is completely inapposite.

<u>Second</u>, collateral estoppel cannot possibly apply for a number of reasons. The issue of Monroe's domicile was not "actually litigated" in the California ancillary proceedings. *See Pacific Lumber Co. v. State Water Resources Control Bd.*, 37 Cal. 4th 921, 943 (2006). Plaintiffs have not offered any evidence that any beneficiary under Monroe's will, much less any party in privity with MMLLC, appeared in the ancillary proceedings and contested the issue of Monroe's residence. *See Acridge*, 334 F.3d at 452 ("bare statement by the court that [decedent] was a New Mexico domiciliary" is not evidence that the issue of domicile was ever fully litigated in a state court").

Nor was the issue of Monroe's domicile "necessarily decided" in the ancillary proceedings, *Pacific Lumber*, 37 Cal. 4th at 943, since the court could have accepted the will for ancillary probate regardless of domicile because Monroe left property in California. *See Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992) ("[D]etermination of the issue in the prior

---

[36] Indeed, neither Anna Strasberg nor the Freud Centre even had an interest in the Monroe estate by the time the California proceedings closed, (*supra* at 9 n.6), and plaintiffs do not, and cannot, even argue that Lee Strasberg or Dr. Kris ever appeared in or participated in the California proceedings.

litigation must have been a critical and necessary party of the judgment. . . .").  Indeed, because the court could have accepted Monroe's will for probate regardless of domicile, no beneficiary had any conceivable <u>incentive</u> to challenge Frosch's gratuitous statement regarding Monroe's residence – this lack of incentive also renders collateral estoppel inapplicable.  *See, e.g., Sutton v. Golden Gate Bridge, Highway & Transp. Dist.*, 68 Cal. App. 4th 1149, 1155-57 (Cal. Ct. App. 1998); *Long Beach Grand Prix Assn. v. Hunt*, 25 Cal. App. 4th 1195, 1202-03 (Cal. Ct. App. 1994).[37]

*        *        *        *        *

Facing similar facts, the Court of Appeals for the Fifth Circuit refused to preclude a party from presenting evidence on domicile where, despite a "bare statement by [a New Mexico probate] court" as to decedent's domicile, there was "no evidence that the issue of . . . domicile was ever fully litigated in state court," and "whether or not [decedent] was a New Mexico domiciliary was not necessary to the determination that his estate was eligible for probate in New Mexico." *Acridge*, 334 F.3d at 452.  *Henderson v. Pence*, 50 Haw. 162 (1967), is also exactly on point. There, the daughter of the decedent sought a declaration that her mother died a domiciliary of California, even though "an order admitting the will to probate for ancillary proceedings in California decided that the decedent was a Hawaii domiciliary." *Id.* at 162.  The Hawaii Supreme Court reversed a trial court decision which applied res judicata to bar the daughter's claims, holding that the daughter had not appeared and actually litigated the issue of domicile in the California

---

[37] Res judicata is further inappropriate because the California court only referred to Monroe's <u>residence</u>, and did not say a thing about her <u>domicile</u>. (*Supra* at 30).  Recognizing this weakness in their arguments, Plaintiffs claim that that terms "residence" and "domicile" are equivalent for the purpose of certain California statutes. (Pl. Br. at 16).  But this is irrelevant – there is no reason to presume that the California court had "domicile" in mind when it used the term "residence," particularly as the statement regarding New York residence was entirely unnecessary to its decision to accept the will for ancillary probate.  "The party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment," *Clark*, 966 F.2d at 1321 – here, Plaintiffs cannot meet their burden of showing that the California court actually rendered a decision on domicile, particularly as that issue was never even litigated.

ancillary proceedings, "and therefore she is not personally bound by the factual conclusions in the California probate order." *Id.* at 164.

For these reasons, the doctrine of res judicata does not prevent MMLLC from raising an issue that was never actually litigated or decided against it in any prior proceeding.

### 3. The Bare Statement by the California Probate Court Is Not Conclusive, Particularly Outside of the Ancillary Proceedings

Finally, even though nothing in the California ancillary proceedings precludes MMLLC for the reasons set forth above, Plaintiffs nevertheless argue that the California ancillary probate proceedings "conclusively" establish that Monroe was a New York resident, for all proceedings and for all purposes. (Pl. Br. at 17). But the cases that Plaintiffs rely on state only that probate orders, as judgments in rem, are "conclusive" for the purposes of the probate proceedings themselves, and only amongst the parties to the probate proceedings. *See Estate of Estrem*, 16 Cal. 2d 563, 568 (1940) (decree admitting will to probate "is not conclusive in other jurisdictions simply because, as a will and for all purposes, it has not been duly proved and allowed"); *Estate of Barton*, 196 Cal. 508, 511-12 (1925) (findings are final "for all subsequent stages of the administration proceedings" and are "conclusive . . . in the present proceeding").

Thus, in *Matter of Bloom*, the California Supreme Court allowed an executor to prove that the decedent was a resident of San Salvador in a dispute with tax authorities, despite the fact that the executor had alleged California domicile in the probate petition and the will was admitted to probate on that ground. 213 Cal. at 578, 580 (holding that order admitting a will to probate is "conclusive as to the ultimate fact of the will," but is <u>not</u> conclusive "as to the facts upon which the question of will or no will depends . . . [w]hen the same issues arise with respect to a different subject matter"); *see also, e.g., Rediker v. Rediker*, 35 Cal. 2d 796, 802 (1950) ("[O]rder admitting will to probate . . . was not res judicata of the essential finding that decedent was a California domiciliary, except as

33

between parties to the probate proceeding.").

In addition, it is well-settled that the admission of a will to probate, as a proceeding in rem, is not binding on proceedings in other jurisdictions. Thus, in *Estate of Reynolds*, the California Supreme Court <u>refused</u> to grant preclusive effect to an Illinois probate court's determination of domicile. 217 Cal. at 558, 562. Noting that "the decision of one state, to the effect that a testator is domiciled there, is not binding on any other state," the Court permitted the appellant to present evidence during California ancillary proceedings that decedent was a California domiciliary, even though the primary probate court had determined that decedent died domiciled in Illinois. *Id.* at 562; *see also, e.g., Tilt v. Kelsey*, 207 U.S. 43, 53 (1907) ("[T]he full faith and credit due to the proceedings of the New Jersey court do not require that the courts of New York shall be bound by its adjudication on the question of domicil. On the contrary, it is open to the courts of any State, in the trial of a collateral issue, to determine, upon the evidence produced, the true domicil of the deceased."); *Riley v. New York Trust Co.*, 315 U.S. 343, 349-50 (1942); *Matter of Estrem*, 16 Cal.2d at 568 (decree admitting will to probate "is not conclusive in other jurisdictions").

As shown *supra* at 28-29, many courts have held that statements of probate courts in admitting a will to probate do not estop a subsequent determination of the true domicile even in the context of the probate proceedings themselves. Plaintiffs have not cited a single case suggesting that an unnecessary statement regarding domicile, when the issue was never actually litigated, is somehow preclusive in a completely <u>separate</u> action involving separate parties. The law is to the contrary. *See, e.g., Henderson*, 50 Haw. at 164.[38]

---

[38] Finally, Plaintiffs purport to cite a number of cases for the proposition that "an order of a probate court settling the executor's account is a final adjudication on the merits." (Pl. Br. at 19). But these cases merely state that the judicial settlement is a final adjudication of the *accounting issues* – they are completely irrelevant to the domicile question at issue here. *See, e.g., Goldberg v. Frye*, 217 Cal. App. 3d 1258 (Cal. App. 1990) (once account is settled, party to accounting proceeding cannot assert claim <u>against executor</u> that should have been raised during proceeding); *See Bernhard v.*

In light of these principles, it would be particularly inappropriate to bar MMLLC from asserting ownership of Monroe's right of publicity (an issue that was never addressed or decided in the California ancillary proceedings), because the New York Surrogate's Court (the primary probate court) was fully informed that the Monroe estate was licensing Monroe's name, image and likeness, and authorized the formation of MMLLC to continue these activities.  (AMF ¶¶ 48-52).

## III.  PLAINTIFFS REMAINING ARGUMENTS ARE FALSE AND IRRELEVANT, AND SHOULD NOT BE CONSIDERED ON THIS MOTION

Finally, Plaintiffs argue that summary judgment is somehow appropriate because parties other than MMLLC have allegedly made non-judicial statements regarding Monroe's domicile in the past.  (Pl. Br. at 32-33).  Many of the documents that Plaintiffs rely on in this section of their argument are inadmissible hearsay, and should not be considered.  (*See* Motion to Strike at III.A-C).[39]  In addition, Plaintiffs' assertions in this section are false and misleading for the reasons set forth in MMLLC's Responses to Statements 56-61 in Plaintiffs Rule 56.1 Statement.

In any case, the statements in question, made decades after Monroe's death by third parties without any actual knowledge as to her domicile, do not even create an issue of fact as to Monroe's domicile, much less entitle Plaintiffs to summary judgment.

## CONCLUSION

For all of the reasons set forth above, MMLLC respectfully request that the Court deny Plaintiffs' motion for summary judgment.

---

*Bank of Am. Nat'l Trust Assoc.*, 19 Cal.2d 807, 809-10 (1942) (party that litigated and lost issue during accounting proceeding is estopped from relitigating the issue in a suit against a third party).

*In re Slade's Estate* involved a dispute that arose during the probate proceeding itself, and thus is irrelevant to Plaintiff's argument that certain claims cannot be raised <u>after</u> the settling of the executor's account.  *See* 154 Misc. at 276.  In any event, *Slade* is inapposite and irrelevant for the reasons set forth *supra* at 29 n. 33.

[39] Citations to "Motion to Strike" are to MMLLC's Memorandum of Law in Support of Cross Motion to Strike Evidence From Plaintiffs' Estoppel Summary Judgment Motion.

Dated: New York, New York
       March 13, 2008

                          LOEB & LOEB LLP


                          By:___/s/ Jonathan Neil Strauss_____
                              David M. Satnick
                              Paula K. Colbath
                              Jonathan Neil Strauss
                              345 Park Avenue
                              New York, New York 10154-1895
                              (212) 407-4000

                              *Attorneys for Marilyn Monroe LLC*


                          SOVICH MINCH, LLP

                          By: ___/s/ Theodore J. Minch_____
                              Theodore J. Minch
                              10099 Chesapeake Drive, Suite 100
                              McCordsville, Indiana 46055
                              (317) 335-3601

                              *Attorneys for CMG Worldwide, Inc*

36