# EXHIBIT 99

SURROGATE'S COURT
COUNTY OF NEW YORK
STATE OF NEW YORK

-------------------------------------X
                                     :
In the Matter of the Final Accounting  :
of Aaron Frosch, as Executor,        :
                                     :        OBJECTIONS TO ACCOUNT
    ESTATE OF MARILYN MONROE,         :
                                     :        File No. P2781/62
                        Deceased.     :
                                     :
-------------------------------------X

        MARIANNE KRIS, a person interested in the Estate of Marilyn

Monroe, Deceased, as a reminderman of the Trust under Article

FIFTH of the Decedent's Last Will and Testament, and as a

twenty-five percent residuary legatee, hereby makes the following

Objections to the settlement of the Account of Aaron R. Frosch as

Executor of the Last Will and Testament of Decedent:

        1.    Failure to Minimize Income Tax Payments.  The largest

aggregate expense of the Estate was the payment of income taxes

on income received by the Executor.  Over the 18 years of Estate

Administration, the Executor paid $674,398 in income taxes.  A

very large percentage of these payments was unnecessary.  As a

consequence, virtually all of the funds that otherwise could have

been distributed to the Decedent's beneficiaries were

dissipated.  Although MARIANNE KRIS recognizes the necessity to

pay income taxes that cannot lawfully be avoided, in this Estate

the Executor improvidently paid income taxes he did not have to

pay, as follows:

MM-0013141

(a)    <u>Failure to Take All Available Deductions for</u>
<u>Income in Respect of a Decedent</u>.  The Executor failed to take
full advantage of the deduction for "income in respect of a
decedent" on the Fiduciary Income Tax Returns.  Included in the
gross estate on the Federal Estate Tax Return was $593,675 as the
value for Marilyn Monroe's entitlements under a contract
concerning the motion picture <u>Some Like It Hot</u> and $153,008 for
her entitlements under a contract covering the motion picture <u>The</u>
<u>Misfits</u>.  These dollar amounts were also required to be reported
in the Fiduciary income tax returns, to be included in gross
income subject to tax.  However, all of this income is what the
Internal Revenue Code called "income in respect of a decedent"
and thus Federal Estate Tax attributable to these amounts was
available to the Estate as a deduction in income tax returns.  In
this Estate the full $119,691 paid in Federal Estate Tax is
attributable to these amounts and is therefore all available as a
deduction on income tax returns of one or another tax years of
the Estate.

Despite the availability of this deduction, the Executor
took only $14,566 for the year 1965 by way of deduction for
income in respect of a decedent and $23,929 for that deduction
for the year 1966.  In no other year was any deduction for this
purpose taken.

-2-

MM-0013142

Instead of $119,691 in deductions, only $38,395 was taken. Accordingly, $81,196 of deductions were lost. Since the Estate was in a relatively high income tax bracket for the years in which the deduction was available but not used, the Executor's failure to seek this deduction cost the Estate a very high percentage of the $81,496. The following are illustrative incremental tax brackets of the Estate:

| | |
|---|---|
| 1963 | 90% bracket |
| 1964 | 76.5% " |
| 1965 | 70% " |
| 1966 | 70% " |
| 1970 | 60% " |
| 1974 | 55% " |

The above brackets are only those for federal income tax purposes. The same deduction is available for state income tax purposes.

On the basis of the tax returns supplied by the Executor, $65,030 is the Federal tax cost of the omitted deduction. Figures for the State tax cost are less certain but the amount is approximately $2,400.

-3-

MM-0013143

The surchargeable amount is therefore approximately $67,000 Federal tax, with appropriate interest.

(b)    Failure to Claim Available Credits on State Tax Returns.  The Estate paid income taxes to the State of California for the years 1963 to 1970.  Amounts paid to one State may be taken as a credit against the taxes payable to another State. The amount of taxes paid to California for the years 1967, 1968 and 1969 were not claimed as a credit against New York State tax.  $13,830 was paid in the year 1967, $3,241 was paid for the year 1968, and $140 was paid for the year 1969, the total being $17,211.  In each of those years, the Estate paid New York a sum greater than the credit; the Executor's failure to take the credit therefore cost the Estate the full amount of the credit. The Executor should be surcharged for this $17,211, with appropriate interest.

(c)    Failure to Take the Deduction for Distribution of "Distributable Net Income."  The greatest cost in unnecessary income tax payments was incurred because of the combination of circumstances improvidently permitted by the Executor to exist: He kept the Estate open for 18 years during all of which time the Estate earned sizeable income that fell within the Internal Revenue Code's definition of "distributable net income" ("DNI"); the Executor made no distribution of one cent of DNI throughout

-4-

MM-0013144

the 18 years.  As a result, unnecessary income taxes at very high brackets were paid by the Executor on Estate income because, under the Code, a distribution to a beneficiary entitled to DNI produces a deduction to the Estate in the precise amount of DNI so distributed.  Thus the Estate paid income taxes in each year between 1962 and 1980 at the Estate's high surtax brackets, which as noted, exceeded 60% in at least five years.

A prudent and responsible Executor would, in the face of such potentially large tax payments as a result of high tax brackets, resolve two issues:  First, would it be a greater tax burden on each of the beneficiaries were they to receive distributions of DNI, for under the Code the beneficiary is taxed at his or her effective bracket on such income.  Second, are there funds to make the DNI distributions.  On the first issue, as to MARIANNE KRIS, had the Executor asked her what her bracket was or had he reviewed correspondence between MARIANNE KRIS'S Counsel and himself, he would have known that the bracket of MARIANNE KRIS as a beneficiary of the Estate's DNI was zero, for she would have assigned her interest to the Anna Freud Foundation, an organization exempt from income tax under Section 501(c)3 of the Internal Revenue Code, that runs a renowned child therapy clinic and instructional program for child therapists. Therefore, every cent of DNI distributed to MARIANNE KRIS would have saved payment of income taxes at the effective bracket of the Estate and would have incurred no taxes for the recipient. As to other beneficiaries entitled to such distributions, it is probable,

-5-

MM-0013145

given the high Estate brackets, that each would have been in lower brackets than the Estate.

As to the issue of available funds, a cash flow analysis of the Estate's actual revenues from all sources _less_ disbursements for all purposes shows a positive cash flow at the end of every single year of the Estate's existence. The following table shows the net cash balance available to the Executor (even after taxes computed on the Executor's incorrect figures) for distribution of DNI; it also shows the amount of taxes the Executor directly paid with respect to each such year:

| Year | Cash available as of December 31 of each year of the Estate | Amount of Federal Taxes Actually Paid (Payment Made in Following Year) | Amount of State Taxes Paid (Payment Made In Following Year) |
|---|---|---|---|
| 1963 | 145,600 | 138,716 | 17,348 |
| 1964 | 155,200 | 116,643 | 16,852 |
| 1965 | 117,700 | 61,667 | 13,626 |
| 1966 | 152,700 | 80,282 | 14,306 |
| 1967 | 216,800 | 79,606 | 19,903 |
| 1968 | 178,300 | 19,293 | 8,974 |
| 1969 | 153,000 | 1,497 | 585 |
| 1970 | 147,600 | 22,784 | 5,771 |
| 1971 | 155,000 | 9,958 | 2,267 |
| 1972 | 168,900 | 10,548 | 3,663 |
| 1973 | 182,100 | 7,598 | 2,225 |
| 1974 | 212,700 | 15,234 | 4,603 |
| 1975 | 178,400 | 4,408 | 2,195 |
| 1976 | 61,000 | 156 | 1,700 |
| 1977 | 81,000 | 5,904 | 2,483 |
| 1978 | 100,300 | 8,260 | 2,761 |
| 1979 | 108,900 | 4,037 | 1,431 |

On the basis of such available cash and the deductions available to the Executor by reason of making distributions of DNI, upon information and belief, far smaller income taxes would have had to be paid by the Estate.

-6-

MM-0013146

Until the arithmetic for each beneficiary has been worked out, the amount of the surcharge cannot be ascertained. As to MARIANNE KRIS, however, the amount of the surcharge is ascertainable because no income tax would have been paid on her 25% of the available DNI. This is a fact the Executor knew or should have known for the these reasons: First, the legacy to MARIANNE KRIS itself contains the condition the funds given to her be used "for the furtherance of the work of such psychiatric institutions or groups as she shall elect". Secondly, MARIANNE KRIS' Counsel made it known to the Executor that she was going to assign her interest to the Anna Freud Foundation. Thirdly, the Executor would have learned of the zero bracket of the recipient had he asked her, an inquiry that is both customary and prudent especially where the estate will, but for a distribution of DNI, incur high income taxes.

(d)   The Executor Failed to Claim Certain Administrative Expenses Available as Deductions on Estate Income Tax Returns. The Executor incurred various administrative expenses as shown in the Accounting which were larger, at least in three years of which MARIANNE KRIS has records, than those claimed as deductions on the Estate's income tax returns for those years. Thus, in the year 1970, the accounting shows that $28,834 was incurred in Administrative expenses but only $23,334 was claimed

-7-

MM-0013147

as a deduction.  In 1975, a total of $16,633 was incurred in administrative expenses but only $1,633 was deducted for administrative expenses on the income tax returns for the year. In 1976, $33,488 is shown in the accounting as having been incurred in administrative expenses but only $18,750 was deducted.  As a result, deductions appear to have been lost in the aggregate amount of $35,238.  The amount of surcharge would be equal to the effect of applicable surtax bracket for each of these three years, establishing the amount of estate funds that could have been saved had the deductions been properly taken. Until all income tax returns are delivered, the correct surtax bracket is yet to be established.

2.    The Executor Incurred Unnecessary Interest Charges on Late Tax Payments.  The Executor paid a very substantial amount of money in interest for late payments of estate tax and income tax, as follows:

In 1964, $2,071 was paid to the Internal Revenue Service; in 1965, $1,041 was paid to the State of New York; in 1969, $15,149 was paid to the Internal Revenue Service; in 1970, $5,778 was paid to the State of New York for late payment of New York State Estate Tax; in 1972, $1,932 was paid to New York State; in

MM-0013148

1974, $29 was paid to the State of California; in 1976, $10,458 was paid to the State of California. The total amount of this interest is $36,458. Unless the Executor has a valid justification all of this is surchargable.

3. The Executor Incurred Unnecessary Storage Charges. The Executor kept the decedent's personal property in storage for many years after the date on which it could and should have been distributed. Storage charges were paid at least 10 years, into the year 1972. Over this period, on aggregate sum of $16,834 was paid in storage charges, this on property which itself had an estate tax value of only $11,057. It is submitted that all storage charges after 1963 are surchargable. Since $2,247 is the amount of storage charges for the year 1963, the surchargable amount would be $14,587.

4. The Executor Incurred Unnecessary Bond Premium Charges. Because the Executor kept the Estate open for 18 years, the payment of premiums on bonds was excessively high. Over the course of the Estate administration, a total of $26,229 was paid to bonding companies. The amount of the surcharge cannot be precisely ascertained until the amount of the total bond premium allocable to Trustee's bond, which does have to be paid for the duration of the trust, is known.

MM-0013149

5.    The Executor Improperly Paid Part of the Executor's Commissions. The Executor paid himself part of the Executor's commissions without a court order, as required by the Surrogate's Court Procedure Act. Not only was the payment without Court order wrong, but for reasons that will be set forth below, no commission at all should be paid to this Executor and therefore the entire amount of this payment is surchargable.

6.    The Executor Improperly Paid Legal Fees to His Own Law Firm. The Executor paid to his own law firm two amounts for legal fees aggregating $30,000, both without court order. The first was paid on November 30, 1970 in amount of $15,000 (Schedule D, Item 31) and the second was paid on December 30, 1971, also in the amount of $15,000 (Schedule C, Item 208). The former was a claimed debt of the decedent, but in view of the dual relationship of the Executor as both fiduciary and Counsel, this too should have been subject to court approval where the bona fides of the alleged debt would have been subject to review.

7.    The Executor Paid Excessive Professional Fees. The Executor paid excessive amounts for legal fees and for the accounting fees of the Estate. Since the overwhelming percentage of the Estate's assets derived from straightforward contracts entered into by decedent, legal activities of the Executor's

-10-

MM-0013150

Counsel cannot be claimed as having materially produced these assets. Revenue from the films Some Like It Hot  and The Misfits, and revenue from RCA on record contracts the decedent entered into generated a total of approximately $1,300,000 of the gross estate. Another approximately $90,000 was produced from the sale of the decedent's home, a routine function. Therefore, upon information and belief, approximately $1,400,000 out the total Gross Estate of $1,688,000 required very little, if any, legal services. For the balance of the gross revenue - $288,000 - the Executor incurred over $100,000 in professional fees.

Specific objection to specific professional fees will be presented to the Court once details of the services rendered, the time expended, and the result achieved have been made available through discovery. MARIANNE KRIS has requested details concerning these professional fees but no information has been provided.

Under the Account as submitted, the attorneys and accountants received more than Marilyn Monroe's mother and more than all residuary legatees combined. Because of the magnitude of these professional fees, and in light of the facts of the Estate, the Surrogate should permit an inquiry into the bona fides and propriety of the legal fees and accounting fees and the amount thereof so that a reasonable sum for them can be ascertained. The amount in excess would be subject to surcharge.

-11-

MM-0013151

8.    The Executor Did Not Receive an Adequate Price for the Shares of Marilyn Monroe Productions, Inc. The sale of the shares of Marilyn Monroe Productions, Inc. for a total of $85,000 was, on information and belief, an improvidently low purchase price. This company owned outright all rights to the film The Prince And The Show Girl. While MARIANNE KRIS knows very little about the circumstances of the sale of these shares to Warner Brothers, the Court should conduct an inquiry into the propriety of the price. At the very least, the Court should appoint an appraiser familiar with the values of motion picture films at the time and familiar with the value of this particular motion picture in which Marilyn Monroe appeared with Lawrence Olivier. On the basis of certain information available to MARIANNE KRIS, which she will present to the Court after full discovery from the Executor, upon information and belief, these shares were worth at least approximately twice the amount the Executor sold them for.

9.    The Executor Failed to Complete Correctly Certain New York State Income Tax Returns. Various refunds received by the Executor that were reported (correctly so) on the Federal Tax Returns as income should have been excluded from the New York income reported on State returns under New York income tax laws. In four different years the Executor failed to make this exclusion, as follows:  In 1963, the Federal return reported a refund of $4,935; this should have been excluded from the gross income reported on the New York return, but was not.  For the

-12-

MM-0013152

year 1965, there was a refund from California for $4,723; this
sum was not excluded on the New York return.  In 1967, there was
a refund of $6,853, for the year 1966; this sum was not excluded
on the New York return.  Finally, in 1978, a $750 refund for the
year 1977 was not excluded from the New York State return.  The
total of these sums is $17,261, and unnecessary tax was paid on
it.  Upon information and belief, the New York tax bracket
applicable to these amounts was 12% in the years in question.
Accordingly, the amount of the surcharge is $2,071.


    10.   The Executor Failed to keep Funds Invested to the
Maximum Extent Possible and Where Invested He Did Not Always
Secure the Highest Return Available on Equally Safe or Safer
Investments.  For certain periods of time, upon information and
belief, the Executor did not put at interest large amounts of
money after receipt.

    As to maximizing the return on funds invested, the
Accounting shows no investment in three or six month Treasury
Bills for the years 1972, 1973, 1977, 1978, 1979 and 1980, but
rather deposits in, or certificates of deposit of, savings banks;
in 1977, 1978, 1979 and 1980 funds were invested in savings
accounts of commercial banks.  Upon information and belief, three
and six month Treasury Bills in each of these years produced
returns higher than savings bank deposits, higher than commercial
bank deposits, and upon information and belief, higher than
savings bank certificates of deposit.

-13-

MM-0013153

The lost interest on uninvested funds and the difference in available interest on invested funds is surchargable.

11.    Failure to Supply Documents and Information. MARIANNE KRIS, through her attorneys, Dornbush Mensch & Mandelstam, requested in writing on August 27, 1980 various material documents and relevant information concerning items in the Account.  The Executor has failed to supply copies of many of the requested Fiduciary Tax Returns and other documents and has supplied only part of the requested data.  As a result, it has not been possible for MARIANNE KRIS to evaluate the propriety or correctness of a number of items in the Account nor to be able to know whether the Account is complete.  The objection is, therefore, that MARIANNE KRIS has been supplied insufficient information and will be obliged to conduct a deposition and other appropriate discovery before completing her Objections to the Account.

12.    The Executor is Not Entitled to Commissions.  In light of the Executor's mismanagement of the Estate, it is respectfully submitted that he be held not to be entitled to any Executor's commissions.  Without limiting the enumeration, the following support such a determination:

-14-

MM-0013154

(a)    The Executor has shown no concern whatsoever
for the interests or the needs of the residuary legatees.  This
can be demonstrated in a variety of ways.  First, he has not made
a single distribution of income or principal to any of the
residuary legatees over the entire eighteen years of the Estate
Administration.  This not only deprived them of funds decedent
intended them to have but it cost the Estate (and the
beneficiaries, in turn) thousands upon thousands of dollars in
lost tax deductions.  Second, the Executor's whole course of
conduct, at least with MARIANNE KRIS, was secretive.  From 1972
on, the Executor failed to supply information about the financial
status of the Estate.  Third, the Executor, between the years
1965 and 1970, failed to secure one penny of income from the film
The Prince and The Show Girl which the Estate in that period
owned outright throughout the world.  Fourth, in the years in
which the Estate had enormous income - for example, in the five
years in which its surtax bracket exceeded sixty percent (60%) -
the Executor failed to invest funds in tax-exempt securities,
instead investing them or leaving them invested in savings banks
where the after-tax yield was significantly less than the yield
from available tax-exempt securities.

(b)    Apart from these evidences of indifference to
his fiduciary responsibilities to beneficiaries, all the other

-15-

MM-0013155

improvident failings and undertakings bear on his entitlement to Executor's commissions.  The following are some of them:

      (i)  The Executor incurred unnecessary income tax because he failed to seek credits and tax deductions;

      (ii)  The Executor incurred unnecessary and excessive storage charges.

      (iii)  The Executor incurred unnecessary and excessive bond premiums.

      (iv)  The Executor incurred and paid unnecessary and excessive professional fees.

      (v)  The Executor kept the Estate open an excessive number of years.

      (vi)  The Executor incurred unnecessary interest charges.

      (vii)  The Executor has not promptly invested funds of the Estate and even after they were invested, failed to purchase the highest yielding securities.

      (viii)  The Executor over-reported income on New York State returns.

For these and other reasons, the Executor has forfeited his entitlement to any commissions.

-16-

MM-0013156

13.    On the basis of the data set forth in these
Objections to the Account, MARIANNE KRIS respectfully requests
the following relief:

(a)    The Executor should be surcharged for the
amounts (i) specified in these Objections and (ii) to be
determined after the hearing, all with appropriate interest on
such amounts.

(b)    The Surrogate should determine that the
Executor is not entitled to any commissions, directing him to
return $15,000 already paid to himself.

(c)    The Surrogate should direct the immediate
distribution of $75,000 to the residuary legatees, out of the
$101,229.25 the Executor states is on hand.  This would permit a
distribution to beneficiaries while other issues are resolved.
The amount requested will not prevent payment of the claims
presently pending, even assuming they are valid, for it leaves a
reserve in excess of the total of all such claims.

(d)    The Executor should be directed to produce all
documents requested by MARIANNE KRIS and to do so by a date
certain.

(e)    Upon delivery of the balance of requested data,
MARIANNE KRIS should be entitled to conduct a deposition of the
Executor and others with knowledge of the facts.

(f)    Upon completion of the investigation, MARIANNE
KRIS should be entitled to submit additional objections to the
Account.

-17-

MM-0013157

(g)   The Court should schedule a hearing for a consideration of the various questions raised in the objections.

(h)   The Surrogate should direct payment of reasonable fees to Objector's counsel and Objector's accountant for their services in this proceeding.

(i)   The Surrogate should direct such other and further relief as shall be just and proper.

October 23, 1980                    MARIANNE KRIS, Objector

                                    Dornbush Mensch & Mandelstam,
                                    Attorneys for Objector

                                    Office and P.O. Address:
                                      747 Third Avenue
                                      New York, N. Y. 10017
                                      (212 935-3900)

MM-0013158

STATE OF NEW YORK  )

                   :  SS.:

COUNTY OF NEW YORK )


     I, the undersigned Objector named in the foregoing
Objections to Account, being duly sworn depose and say that I
have read the foregoing Objections to Account subscribed by me
and know the contents thereof, and that the same is true of my
own knowledge, except as to the matters therein stated to be
alleged on information and belief, and that as to those matters I
believe it to be true.


                              /s/ Marianne Kris
                              _____
                              MARIANNE KRIS,
                              Objector


Sworn to before this
23rd day of October, 1980.

/s/ Charles L. Mandelstam
_____
Notary Public

          CHARLES L. MANDELSTAM
     NOTARY PUBLIC, STATE OF NEW YORK
             No. 31-2502800
        Qualified in New York County
     Commission Expires March 30, 19 81


                              -19-


MM-0013159