# Exhibit 4

## LIMITED LIABILITY COMPANY AGREEMENT

### MARILYN MONROE LLC

#### a Delaware Limited Liability Company

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") is effective as of _____, 2000, by Anna Strasberg, Administrator C.T.A. of the Estate of Marilyn Monroe (the "Initial Member", and together with any persons who may hereafter be admitted as such in accordance with the terms of this Agreement, may be known individually as a "Member" and collectively as the "Members"), for the purpose of providing for the organization and operation of MARILYN MONROE LLC (the "Company"), a limited liability company formed pursuant to the Delaware Limited Liability Company Act, Title 6, Sections 18-101 *et seq* of the Delaware Code (the "Delaware Act"). The Initial Member was authorized to enter into this Agreement by Order of the Surrogate's Court of the County of New York, State of New York entered on _____, 2000 (File No. P2781/1962).

NOW, THEREFORE, for good and valuable consideration, the parties, intending to be legally bound, agree as follows:

### ARTICLE I

### GENERAL PROVISIONS

**Section 1.1  Name of the Company.** The name of the Company shall be MARILYN MONROE LLC. The business of the Company may be conducted upon compliance with all applicable laws under any other name designated by the Manager.

**Section 1.2  Purpose.** The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, licensing the name and likeness of Marilyn Monroe, providing for the use of other assets and goodwill associated with Marilyn Monroe and engaging in any and all activities necessary, convenient, desirable or incidental to the foregoing.

**Section 1.3  Registered Agent.** The name of the Company's registered agent in the State of Delaware shall be National Registered Agents, Inc. The registered office of the registered agent shall be located at 9 East Loockerman Street, Dover, Kent County, DE 19901. At any time, the Manager may designate another registered agent and/or registered office.

**Section 1.4  Principal Place of Business.** The principal place of business of the Company shall be located at 7936 Santa Monica Boulevard, Hollywood, California 90046. At any time, the Manager may change the location of the Company's principal place of business.

**Section 1.5  Qualification in Other Jurisdictions.** The Manager shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business in which such qualification, formation or registration is required or desirable. The Manager, as an authorized person within the meaning of the Delaware Act, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

Exhibit 4

**Section 1.6  Initial Members.**  The name and address of the Initial Member is:

Anna Strasberg, as Administrator C.T.A. Estate of Marilyn Monroe
135 Central Park West
New York, NY  10023.

The name and mailing address of each Member and the amount contributed to the capital of the Company shall be listed on Schedule A attached hereto. The Manager shall be required to update Schedule A from time to time as necessary to accurately reflect the information therein. Any amendment or revision to Schedule A made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time.

**Section 1.7.  Term.**  The term of the Company shall commence on the date of the filing of the Certificate in the office of the Secretary of State of the State of Delaware and shall continue until dissolved in accordance with the provisions of this Agreement.

**Section 1.8  Powers of the Company.**

(a)  The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purpose set forth in Section 1.2

(b)  The Manager may authorize any person (including, without limitation, any other Member) to enter into and perform any document on behalf of the Company.

(c)  The Company may merge with, or consolidate into, another Delaware limited liability company or other business entity (as defined in Section 18-209(a) of the Delaware Act) upon the approval of the Manager in the Manager's sole discretion.

**Section 1.9  Limitation on Company Powers.**  Notwithstanding any provision in this Agreement to the contrary, the Company shall not do business in any jurisdiction that would jeopardize the limitation on liability afforded to the Members under the Delaware Act or this Agreement.

**Section 1.10  Agreement; Effect of Inconsistencies With the Act.**  It is the express intent of the Members that this Agreement shall be the sole source of agreement of the parties and, except to the extent a provision of this Agreement expressly incorporates federal income tax rules by reference to sections of the Internal Revenue Code or 1986, as amended (the "Code") or the Treasury Regulations or is expressly prohibited or ineffective under the Delaware Act, this Agreement shall govern, even when inconsistent with, or different than, the provisions of the Delaware Act or any other law or rule.  To the extent that any provision of this Agreement is prohibited or ineffective under the Delaware Act, this Agreement shall be deemed to be amended to the smallest degree possible in order to make this Agreement effective under the Delaware Act in accordance with the intent of the parties.  In the event that the Delaware Act is subsequently amended or interpreted in such a way to make any provision of this Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.  The Members hereby agree that each Member shall be entitled to rely on the provisions of this Agreement, and no Member shall be liable to the Company or to any Member for any action or refusal to act taken in good faith reliance on the

2

terms of this Agreement. The Members hereby agree that the duties and obligations imposed on the Members as such shall be those set forth in this Agreement, which is intended to govern the relationship among and between the Company and the Members, notwithstanding any provision of the Act or common law to the contrary.

**ARTICLE II**

**MEMBERS**

Section 2.1  Powers of Members. Each Member shall have the power to exercise, or to appoint, by written notice to each of the other Members, an attorney-in-fact to exercise on its behalf, any and all rights or powers granted to that Member pursuant to the express terms of this Agreement. Except as otherwise specifically provided by this Agreement or required by the Delaware Act, no Member shall have the power to act for or on behalf of, or to bind, the Company without the prior written approval of the Manager.

Section 2.2  Admission of Additional Members. No person shall have any right as a Member of this Company unless and until such person is admitted as a Member after such approval as is required by, and compliance with the other conditions set forth in, this Agreement. Any transferee not admitted as a Member shall be merely an assignee of an Interest, shall have only the right to receive such distributions when, as and if directed by the Manager, and to receive such allocations, with respect to the Transferred Interest, as are provided for in this Agreement, and no voting, consent, inspection or other rights whatsoever, except as otherwise provided by the Delaware Act, and the Member whose Interest or portion thereof is transferred shall continue as a Member.

(a)  Except as provided in Section 2.5(a), a new Member may be admitted to the Company only with the consent of a majority in interest of the Members, which approval may be granted or withheld in the sole and absolute discretion of Members for any reason or for no reason at all.

(b)  Any person may be admitted as a new Member only if such person shall have executed a counterpart of this Agreement or an appropriate supplement to it, in which such person agrees to be bound by the terms and provisions of this Agreement as they may be modified by that supplement. Any person so admitted shall have all the rights and obligations of a Member hereunder effective on and after the date of admission as a Member of the Company.

Section 2.3  Interest of A New Member. Upon receipt of any required Capital Contribution from any newly admitted Member, such Member's Capital Contribution and Sharing Percentage in the Company shall be set forth on an amended Schedule A to this Agreement by the Manager.

Section 2.4  Partition. Each Member waives any and all rights that it may have to maintain an action for partition of the Company's property.

Section 2.5  Assignments by and Withdrawal of Members.

(a)  Permitted Dispositions. A Transferee of an Interest in the Company that is a Transferee pursuant to a Permitted Disposition may become a Member as provided in this Section 2.5.

3

(b)     <u>Certain Prohibitions</u>.  Except as set forth in this Section 2.5, no Member may resign or withdraw from the Company.  No Member shall sell, transfer, assign, convey, pledge, mortgage, encumber, hypothecate or otherwise dispose of or suffer the creation of an interest in or lien on (a "Transfer") all or any part of its Interest without the consent of the remaining Member or Members.  Such consent shall not be necessary with respect to any proposed Transfer which constitutes a Permitted Disposition.

(c)     <u>Conditions to Transfer</u>.  Any purported Transfer by a Member, except a proposed Transfer constituting a Permitted Disposition, shall satisfy the following additional conditions (any one or more of which may be waived by the Manager in its sole discretion):

(i)     the Transferor or Transferee shall undertake to pay all expenses incurred by the Company in connection therewith;

(ii)     the Company shall receive from the proposed Transferor and Transferee such documents, opinions, instruments and certificates as the Manager may reasonably request;

(iii)     prior to making any such Transfer to a Transferee proposed by such Member, such proposed Transferor shall have delivered to the Company the opinion of counsel described in Section 2.5(d);

(iv)     the Company shall have received an opinion of counsel to the Company reasonably satisfactory to the Manager (or other assurances reasonably satisfactory to the Manager) substantially to the effect that consummating such Transfer:

(A)     will not cause the Company to be terminated pursuant to Section 708 of the Code, to lose its status as a partnership for United States federal income tax purposes, or to be considered a publicly traded partnership under Section 7704(b) of the Code;

(B)     will not require the Company to register as an investment company under the Investment Company Act or under any similar state securities laws; and

(v)     such Member is Transferring the Transferred Interest in the Company in such transaction to one or more Transferees, each of which is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act.

(d)     <u>Required Opinion of Counsel</u>.  The opinion of counsel referred to in Section 2.5(c)(iv) shall be in form and substance satisfactory to the Manager, shall be from independent counsel satisfactory to the Manager and (unless specified otherwise by the Manager) shall be substantially to the effect that:

(i)     the Transfer contemplated by the opinion is being made in a manner that is exempt from the registration requirements of the Securities Act and the registration or qualification requirements of applicable state securities laws; and

(ii)     such Transfer will not increase the number of "beneficial owners" (as defined in Section 3(c)(1) of the Investment Company Act) of the Interest originally

4

issued to the original Member from which the Interest to be Transferred derives to more than five (5) beneficial owners after giving effect to such proposed Transfer.

If the foregoing opinion is to be provided by counsel for a proposed Transferor, the Manager shall furnish to such Member and its counsel such factual information, certified by the Manager as being accurate and complete, as is within the knowledge of the Manager and is reasonably necessary for such counsel to render the foregoing opinion.

(e)     Nonconforming Transfers Void.  Any actual or purported Transfer of the Interest of any Member that does not comply with the provisions of this Section 2.5 shall be void and shall not bind the Company.  The Company shall incur no liability for distributions made to any Transferor prior to compliance with this Section 2.5 with respect to the Interest that is the subject of any such actual or purported Transfer.

## ARTICLE III

## CAPITAL CONTRIBUTIONS, ACCOUNTS AND WITHDRAWALS

Section 3.1  Capital Contributions.  The Members shall make contributions to the Company as set forth on Schedule A.

Section 3.2  No Additions.  No Member shall be required to make any additional capital contributions to the Company.  However, a Member may make additional capital contributions to the Company with the written consent of the Manger.

Section 3.3  Loans.  Any Member may, with the Manager's consent, make a loan or advance money or property to or on behalf of the Company, on such terms as the lending Member and the Manager may agree.  Such loan or advance shall not increase the lending Member's capital account, entitle the lending Member to any greater share of Company distributions, or subject the lending Member to any greater proportion of Company losses.  The amount of such loans or advances shall be a debt owed by the Company to the lending Member; any interest paid to the lending Member shall be charged as any other expense against income of the Company.

Section 3.4  Member's Interest.  A Member's Interest shall for all purposes be personal property.  A Member has no interest in specific Company property.

Section 3.5  Status of Capital Contributions.

(a)     No Member shall receive any interest, salary or draw with respect to its Capital Contributions or its Capital Account or for services rendered on behalf of the Company or otherwise in its capacity as a Member (including as a Manager), except as otherwise specifically provided in this Agreement or as may be approved by the Members unanimously.

(b)     Except as otherwise provided herein and by applicable state law, the Members shall be liable only to make their Capital Contributions pursuant to Section 3.1 hereof, and no Member shall be required to lend any funds to the Company or, after a Member's Capital Contributions have been fully contributed pursuant to Section 3.1 hereof, to make any additional capital contributions to the Company. No Member shall have any personal liability for the repayment of any Capital Contribution of any other Member.

5

**Section 3.6.  Capital Accounts.**

(a)    A separate Capital Account will be maintained for each Member.

(b)    Each Member's Capital Account will be increased by:

(i)    The amount of cash contributed by the Member to the Company;

(ii)    The Gross Asset Value of real, personal, tangible and intangible property contributed by the Member to the Company pursuant to Section 3.1 (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752);

(iii)    Allocations to the Member of Profits; and

(iv)    Allocations to the Member of income described in Code Section 705(a)(1)(B).

(c)    Each Member's Capital Account will be decreased by:

(i)    The amount of cash distributed to the Member by the Company;

(ii)    The Gross Asset Value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752);

(iii)    Allocations to the Member of Losses; and

(iv)    Allocations to the Member of expenditures described in Code Section 705(a)(2)(B).

(d)    In the event of a sale or exchange of a Membership Interest, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv).

(e)    The manner in which Capital Accounts are to be maintained pursuant to this Section 3.6 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If in the opinion of the Company's accountants the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 3.6 should be modified to comply with Code Section 704(b) and the Treasury Regulations thereunder, then, notwithstanding anything to the contrary contained in the preceding provisions of this Section 3.6, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members without the consent of all Members.

**Section 3.7.  Withdrawals.**  No Member may withdraw any portion of his interest in the Company without the prior written consent of a majority in interest of the Members, which consent may be withheld in the absolute discretion of each Member.  If withdrawal of part or all of a Company interest is thereby permitted, the Manager shall have the

6

power to deliver cash or other property, in the Manager's absolute discretion, in satisfaction of the obligation to the Member effecting a withdrawal.

## ARTICLE IV

### FINANCIAL ACCOUNTING, ALLOCATION OF PROFITS AND LOSSES AND DISTRIBUTIONS

**Section 4.1** **Books and Records.** All books of the Company shall be maintained at the principal office of the Company. Such books shall be open to inspection by any Member at any reasonable time during business hours. The books of the Company shall be kept on the basis of the tax year adopted for federal income tax purposes using such generally accepted accounting methods and procedures as the Manager deems appropriate.

**Section 4.2** **Profits and Losses.** For federal income tax purposes, income, gain, loss and deduction with respect to property contributed to the Company by a Member shall be shared among the Members so as to take account of the variation between the basis of the property to the Company and its fair market value at the time of contribution in accordance with Section 704(c) of the Code and the Treasury Regulations prescribed thereunder. Except as thus provided, the net profits, each item of income and gain, each allowable credit, the net losses and each item of deduction or loss of the Company during any tax year shall be allocated as of the close of such year to the respective accounts of the Members pursuant to the Sharing Percentages set forth in Schedule A. The Manager shall have the authority to adjust the allocation of items of income, gain, loss and deductions among the parties to ensure that the allocations have substantial economic effect within the meaning of Section 704(b) of the Code and the accompanying Treasury Regulations.

**Section 4.3** **Distributions.**

(a)    All distributions hereof shall be at such times and in such amounts as shall be determined by the Manager; *provided*, *however*, that the Manager shall use its best efforts to cause the Company to distribute to the Members an amount equal to Net Cash Flow.

(b)    All amounts withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, or distribution to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Section 4.3 for all purposes of this Agreement. The Manager is authorized to withhold from distributions and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provision of any other federal, state or local law.

**Section 4.4** **Limitations on Distributions.** Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member with respect to such Member's Interest if such distribution would violate Section 18-607 of the Delaware Act or other applicable law.

# ARTICLE V

## MANAGEMENT

**Section 5.1 Manager.** The Company shall be managed by one or more Managers who may or may not be a Member. Anna Strasberg is hereby designated to be the initial Manager. All references hereinafter to the "Manager" shall include all Co-Managers at any time that Co-Managers are acting hereunder. At any time that there are Co-Managers acting hereunder, all decisions of the Co-Managers shall be by majority vote, or, if there are only two Co-Managers, all decisions of the Co-Managers shall be unanimous.

**Section 5.2 Time Devoted to Company Affairs.** The management and control of the Company shall rest exclusively with the Manager. The Manager shall devote such time as the Manager in the Manager's sole discretion shall deem necessary to the affairs of the Company. Subject to the provisions of Section 5.10 of this Agreement, the Manager shall be entitled to such reasonable compensation as the Manager shall determine.

**Section 5.3 Powers of the Manager.** The exclusive right, power and authority to manage and operate the business and affairs of the Company shall be vested in the Manager until the Manager is unable or unwilling to act as Manager. Thereafter, a majority in interest of the Members may select one or more new Managers or, if they fail to do so, Company actions shall be taken by a majority in interest of the Members except as otherwise provided herein. Subject to all other provisions of this Agreement, the Manager shall have all powers necessary, advisable or convenient to manage and operate the business and affairs of the Company, including, without limitation, the power to acquire and hold for investment any property, real, personal or mixed, on behalf of the Company and to sell, exchange, convey title to or otherwise dispose of such property and to grant options for such purposes; to bind the Company in making contracts and incurring obligations in its name and on its credit; to fulfill any contractual obligations to which property which is transferred to the Company is subject; to borrow money and, as security for the borrowing, to encumber all or any part of the Company property; to modify, consolidate or extend any deed of trust or other security device encumbering any Company property; to employ from time to time, at the expense of the Company, accountants, attorneys, brokers, agents and other assistants on such terms and for such compensation as the Manager shall determine; to contract with other firms or entities to provide general managerial services to the Company; to expend Company funds for any ordinary and necessary secretarial, office, or general administrative expenses; to institute or defend any actions on behalf of the Company to enforce its rights against Members and third parties; to execute, acknowledge and deliver any and all instruments necessary to effectuate the foregoing; to prepare or cause to be prepared and filed on behalf of the Company all Federal, State and other tax returns required to be filed and to make or determine not to make (in the Manager's absolute discretion) all elections which the Company is entitled to make under federal, state and other tax laws, including elections under Section 754 of the Code. Notwithstanding anything to the contrary in this Agreement, the Manager shall be deemed to stand in the same fiduciary relationship to Members of the Company as corporate directors and officers stand in relation to stockholders of a corporation under the General Corporation Law of the State of Delaware.

## Section 5.4 Officers.

(a)    The Manager may appoint individuals with such titles as the Manager may elect, including the titles of President, Vice President, Treasurer and Secretary, to

act on behalf of the Company with such power and authority as the Manager may delegate in writing to any such person.

(b)    Any officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Manager. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any officer may be removed as such, either with or without cause, by the Manager whenever in the Manager's judgment the best interests of the Company will be served thereby; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed. Designation of an officer shall not of itself create contract rights. Any vacancy occurring in any office of the Company (other than Manager) may be filled by the Manager.

Section 5.5  **Actions by Manager.**  In managing the business and affairs of the Company and exercising its powers, the Manager shall have authority to act for or in the name of the Company, and, while more than one person is acting as the Manager, any such person shall have authority to act for or in the name of the Company; provided, however, that actions by the Manager in appointing a new licensing agent, or additional licensing agents, authorized to enter into licensing agreements on behalf of the Company, or materially changing the terms of compensation of any such licensing agent shall be subject to the provisions of Section 5.11 of this Agreement.

Section 5.6  **Limitation on Manager's Authority.**  The Manager shall not, except with the prior written consent of all Members, take any of the following actions:

(a)    Do any act in contravention of this Agreement;

(b)    Do any act which would make it impossible to carry on the business of the Company;

(c)    Confess a judgment against the Company;

(d)    Sell, assign, transfer or hypothecate all or substantially all of the business, assets or property of the Company.

Section 5.7  **No Management by Members.**  Except as otherwise expressly provided herein, no Member shall take part in the day-to-day management or in the operation or control of the business and affairs of the Company. Except and only to the extent expressly delegated by the Manager, no Member or other person other than the Manager shall be an agent of the Company or have any right, power or authority to transact any business in the name of the Company or to act for or on behalf of or to bind the Company.

Section 5.8  **Reliance by Third Parties.**  Any person or entity dealing with the Company or the Manager may rely upon a certificate signed by the Manager as to:

(a)    the identity of the Manager or any other Member hereof;

(b)    the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Manager or in any other manner germane to the affairs of the Company;

9

(c)    the persons who are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(d)    any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

Section 5.9  **Reimbursements.**  The Company shall reimburse the Members, including the Manager, for all ordinary and necessary out-of-pocket expenses incurred by the Members on behalf of the Company. The Manager's determination of which expenses may be reimbursed to a Member, including the Manager, and the amount of such expenses shall be conclusive. Such reimbursement shall be treated as an expense of the Company that shall be deducted in computing the Net Cash Flow and shall not be deemed to constitute a distributive share of Profits or a distribution or return of capital to any Member.

Section 5.10  **Procedure for Contesting Certain Expenditures.**  The Manager or a majority in interest of the Members may (1) set the compensation of the Manager or of any officer of the Company, or (2) increase the compensation of the Manager or of any officer of the Company, only after the Manager has first provided written notice to the Members of the Company, setting forth the proposed compensation or increase, at least ten (10) business days prior to taking such action (a "Notice of Company Expense"). The Members of the Company shall have ten (10) business days beginning on and including the date on which all of the Members have received a Notice of Company Expense to deliver written notice to the Company that such Member is contesting such compensation, as an impermissible expense of the Company (a "Notice of Objection"). If a Member does not deliver a Notice of Objection to the Company within such ten-day period, then such Member shall be deemed to consent to such action, in all respects. If a Member timely delivers a Notice of Objection within such ten-day period, then the Manager shall contact such contesting Member and attempt to resolve the issues raised in the Notice of Objection regarding such action. In the event that the parties shall fail to reach a mutually agreeable resolution of the issue or issues presented in the Notice of Objection within sixty (60) calendar days from the date of receipt by all Members of the Notice of Company Expense, then the parties shall submit the issue to an arbitrator for final resolution pursuant to the terms of Section 10.8 below. Nothing in this Section 5.10 nor in Section 10.8 nor in the Notice of Objection shall prevent the Manager from implementing the Manager's decision pending resolution by mutual agreement or arbitration. The arbitrator shall have the power to award reimbursement to the Company of any compensation that the arbitrator determines was an impermissible expense.

Section 5.11  **Procedure re Licensing Agent.**  The Manager or a majority in interest of the Members may not appoint a new licensing agent, or additional licensing agents, authorized to enter into licensing agreements on behalf of the Company, or materially change the terms of the compensation of any such licensing agent, unless and until the procedures of this Section 5.11 have been followed. At least ten (10) business days prior to taking any of the aforesaid actions, the Manager shall provide written notice to the Members of the Company, setting forth the action proposed to be taken by the Manager (a "Notice of Proposed Action"). The Members of the Company shall have ten (10) business days beginning on and including the date on which all of the Members have received a Notice of Proposed Action in which to deliver written notice to the Company that such Member objects to such action and the grounds for such objection (a "Notice of Objection"). If a Member does not deliver a Notice of Objection to the Company within such ten-day period, then such Member shall be deemed to consent to such action, in all respects. If a Member timely delivers a Notice of Objection within such ten-day

10

period, then the Manager shall contact such contesting Member and attempt to resolve the issues raised in the Notice of Objection regarding such action prior to taking such action; provided, however, that in the event that the parties shall fail to reach a mutually agreeable resolution of the issue or issues presented in the Notice of Objection within sixty (60) calendar days from the date of receipt by all Members of the Notice of Proposed Action, then the parties shall submit the issue to an arbitrator for final resolution pursuant to the terms of Section 10.8 of this Agreement, and the proposed action shall go into effect only if authorized by, and upon such terms as may be determined by, the arbitrator.

## ARTICLE VI

### AMENDMENTS AND MEETINGS

**Section 6.1  Amendments.**  This Agreement shall not be amended without the unanimous written consent of the Members.  No waiver of any rights under this Agreement shall be binding unless it is in writing signed by the party waiving such rights.  Any amendment to this Agreement shall be adopted and be effective as an amendment hereto if approved by the Members; provided, however, that no amendment shall be made, and any such purported amendment shall be void and ineffective, to the extent the result thereof would be to cause the Company to be treated as anything other than a partnership for purposes of United States income taxation.

**Section 6.2  Call of Meetings.**  Meetings of the Members may be called at any time by the Manager and shall be called within ten (10) days after written notice to the Manager from any other Member requesting a meeting.

**Section 6.3  Place of Meetings; Participation by Telephone.**  All meetings of the Members of the Company shall be held at such places, within or without the State of Delaware, as may from time to time be designated by the person or persons calling the meeting, and specified in the respective notices or waivers of notice thereof.  The Manager may permit participation in any meeting by means of conference telephone or similar communications equipment pursuant to which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at such meeting.

**Section 6.4  Notice of Meetings.**  Except as otherwise required by law, notice of each meeting of the Members of the Company shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each Member of record entitled to vote at such meeting by delivering a typewritten or printed notice thereof to such Member personally, or by depositing such notice in the United States mail, in a postage prepaid envelope, directed to such Member at such Member's post office address furnished by such Member to the Manager for such purpose or, if such Member shall not have furnished to the Manager an address for such purpose, then at such Member's post office address last known to the Manager, or by transmitting a notice thereof to such Member at such address by mail, personal delivery, facsimile, telegraph, cable or wireless.  Every notice of a meeting of the Members shall state the place, date and hour of the meeting, and the purpose or purposes for which the meeting is called.  Notice of any meeting of Members shall not be required to be given to any Member who shall have waived such notice, and such notice shall be deemed waived by any Member who shall attend such meeting in person or by proxy, except as a Member who shall attend such meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.  Except as otherwise expressly required

11

by law, notice of any adjourned meeting of the Members need not be given if the time and place thereof are announced at the meeting at which the adjournment is taken.

Section 6.5  **Waiver of Notice.**  When any notice is required to be given to any Member, a waiver thereof in writing signed by or on behalf of the Member entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

Section 6.6  **Quorum.**  The Members who own a majority in interest of all the Members, present in person or by proxy, shall constitute a quorum for the transaction of business at any meeting of the Members or any adjournment thereof. In the absence of a quorum at any meeting or any adjournment thereof, any Member may adjourn such meeting from time to time. At any such adjourned meeting at which a quorum is present any business may be transacted which might have been transacted at the meeting as originally called.

Section 6.7  **Voting.**

(a)    Each Member shall, at each meeting of the Members, be entitled to vote in person or by proxy the percentage interest of the interests of the Company owned by such Member as of the date of such meeting on the matter in question. At any meeting of the Members of the Company, except as provided in the Certificate of Formation of the Company, this Agreement or the Act, all matters shall be approved by a majority in interest of the Members voting as a single class. The vote at any meeting of the Members on any question need not be by ballot, unless so directed by the chairman of the meeting. On a vote by ballot each ballot shall be signed by the Member voting, or by its proxy if there be such proxy, and it shall state the percentage interest voted.

(b)    Any such voting rights may be exercised by the Member in person or by proxy appointed by an instrument in writing, subscribed by such Member or its attorney thereunder authorized and delivered to the secretary of the meeting; *provided, however*, that no proxy shall be voted or acted upon after three (3) years from its date unless said proxy shall provide for a longer period. The attendance at any meeting of a Member who may theretofore have given a proxy shall have the effect of revoking the same with respect to such meeting.

Section 6.8  **Action Without Meeting.**  Any action required to be taken or which may be taken at any meeting of Members of the Company may be taken without a meeting and with prior notice given not less than ten (10) nor more than sixty (60) days before the action is taken to each Member of record entitled to vote at a meeting in accordance with the provisions of Section 6.4 (unless such notice is waived in writing by all of the Members), if a consent in writing, setting forth the action so taken, shall be signed by the Members having not less than a majority in interest (or if the action to be taken requires a different specified percentage or other vote, such specified percentage or such other vote) that would be necessary to authorize or take such action at a meeting at which a quorum were present.

Section 6.9  **Manager to Preside at Meetings.**  Each meeting of Members shall be conducted by the Manager or by such other person that the Manager specifies or, if the Manager fails to do so, that a majority in interest of the Members present in person or by proxy specifies.

## ARTICLE VII

## DISSOLUTION

**Section 7.1  Events of Dissolution.**  Upon the occurrence of any of the following events, the Company shall be dissolved:

(a)  By the election of the Manager to dissolve the Company after thirty (30) days prior written notice to the Members; or

(b)  By the election of Members holding a majority in interest in the Company to dissolve the Company in a written notice to all other Members by certified or registered mail or by personal delivery.

**Section 7.2  Right to Continue Business.**  In the event of the death, insanity, incompetency or removal of a Member, the business of the Company shall continue unless a majority in interest of all Members determine to dissolve the Company.

**Section 7.3  Winding Up.**  Upon dissolution of the Company, unless all Members otherwise agree, the Manager, or if there is no Manager then acting, one (1) or more persons designated by the Members to do so, shall wind up the affairs of the Company and settle accounts between the Members in the following manner:

(a)  Such of the assets other than cash, as the Manager determines, shall be sold.  All Members shall have the right to bid on and purchase any or all of the assets being sold;

(b)  All of the debts and obligations of the Company other than secured obligations without recourse to the assets and credit of the Company, if any, shall be paid in full or otherwise provided for;

(c)  If the fair market value of any Company asset is more or less than its book value, each Member's capital account shall be adjusted by such Member's allocable share (determined as provided in Section 4.2) of the net unrealized gain or loss which would have been realized had said asset been sold at its fair market value;

(d)  All funds on hand after the foregoing shall be paid and all unsold assets shall be distributed among the Members such that money and/or assets having a value equal to the remaining balance in each Member's capital account shall be distributed to each said Member by the end of the taxable year in which the liquidation occurs (or, if later, within ninety (90) days after the date of such liquidation).

**Section 7.4  Publication of Notice.**  In the event of dissolution of the Company or the continuation of the business of the Company pursuant to Section 7.2, the remaining Members shall cause to be prepared, published, filed and served all notices and certificates required by law.

**Section 7.5  No Obligation to Restore Deficit Capital Account Balance.**  If any Member has a deficit in his capital account, that Member shall have no obligation to contribute cash to the Company to restore such deficit.

13

# ARTICLE VIII

## INDEMNIFICATION

Section 8.1  Right to Indemnification.  Subject to the limitations and conditions as provided in this Article VIII, each person who was or is made a party to or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative (hereinafter a "Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he, or a person of whom he is the legal representative, is or was a Manager or officer of the Company or while a Manager or officer of the Company is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent permitted by the Delaware Act, as the same exist or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such person in connection with such Proceeding, and indemnification under this Article VIII shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder.  The rights granted pursuant to this Article VIII shall be deemed contract rights, and no amendment, modification or repeal of this Article VIII shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.  It is expressly acknowledged that the indemnification provided in this Article VIII could involve indemnification for negligence or under theories of strict liability.

Section 8.2  Advance Payment.  The right to indemnification conferred in this Article VIII shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a person of the type entitled to be indemnified under Section 8.1 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Manager or officer of his good faith belief that he has met the standard of conduct necessary for indemnification under this Article VIII and a written undertaking, by or on behalf of such person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified person is not entitled to be indemnified under this Article VIII or otherwise.

Section 8.3  Indemnification of Employees and Agents.  The Company, by adoption of a resolution of the Manager, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Manager and officers under this Article VIII; and the Company may indemnify and advance expenses to persons who are not or were not Manager, officers, employees or agents of the Company but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation,

14

partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a person to the same extent that it may indemnify and advance expenses to Manager and officers under this Article VIII.

Section 8.4 **Appearance as a Witness.** Notwithstanding any other provision of this Article VIII, the Company may pay or reimburse expenses incurred by a Manager or officer in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

Section 8.5 **Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article VIII shall not be exclusive of any other right which a Manager, officer or other person indemnified pursuant to Section 8.3 may have or hereafter acquire under any law (common or statutory), the Certificate of Formation of the Company or this Agreement, agreement, vote of Members or disinterested Manager or otherwise.

Section 8.6 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself and any person who is or was serving as a Manager, officer, employee or agent of the Company or is or was serving at the request of the Company as a Manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under this Article VIII.

Section 8.7 **Member Notification.** To the extent required by law, any indemnification of or advance of expenses to a Manager or officer in accordance with this Article VIII shall be reported in writing to the Members within the 12-month period immediately following the date of the indemnification or advance.

Section 8.8 **Savings Clause.** If this Article VIII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, the Company shall nevertheless indemnify and hold harmless each Manager, officer or any other person indemnified pursuant to this Article VIII as to costs, charges and expenses (including, without limitation, attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, to the full extent permitted by any applicable portion of this Article VIII that shall not have been invalidated and to the fullest extent permitted by applicable law.

Section 8.9 **Outside Businesses.** Any Member or Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper unless in direct violation of any covenant set forth herein or in any other agreement executed by any of the parties in connection herewith. No Member or Affiliate thereof shall be obligated to present any particular investment opportunity to the Company even if such opportunity is of a character that, if presented to the Company, could be taken by the Company, and any Member or Affiliate

thereof shall have the right to take for its own account (individually or as a partner, shareholder, fiduciary or otherwise) or to recommend to others any such particular investment opportunity.

## ARTICLE IX

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE MEMBERS

**Section 9.1** **Representations and Warranties.** Each Member hereby represents and warrants to the Company and to the other Members that:

(a)  Such Member understands and acknowledges that such Member's respective interest in the Company has not been registered under the Securities Act or any state securities laws;

(b)  Such Member understands and acknowledges that its interest in the Company may not be sold unless it is registered under the Securities Act and applicable state securities laws, or pursuant to an exemption from such registration requirements;

(c)  The limitations on transfer contained in this Section 9.1 and in Article II of this Agreement create an economic risk that such Member is capable of bearing;

(d)  Such Member is acquiring its interest in the Company for investment and not with a view to the resale or distribution thereof;

(e)  All property contributed to the Company as part of such Member's Capital Contribution has been or will be contributed free and clear of all liens, pledges, claims, security interests, encumbrances and similar interests of any kind whatsoever;

(f)  If such Member is an entity, it is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization with all requisite power and authority to enter into this Agreement and to perform its obligations hereunder;

(g)  This Agreement constitutes the legal, valid and binding obligation of such Member enforceable against such Member in accordance with its terms;

(h)  No consents or approvals from, or notification of or filings with any governmental authority or other person or entity are required for such Member to enter into this Agreement. All action on the part of such Member necessary for the authorization, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, have been duly taken; and

(i)  The execution and delivery of this Agreement by such Member and the consummation of the transactions contemplated hereby by such Member do not conflict with or contravene the provisions of any organizational document, agreement or instrument by which such Member or such Member's properties are bound or any law, rule, regulation, order or decree to which such Member or such Member's properties are subject.

### Section 9.2 Confidentiality.

(a)    Confidential Information.  Each Member shall, except as may be specifically permitted hereunder, (i) use its best efforts to protect the proprietary or confidential information of the Company, (ii) not disclose to any other person or entity the existence or terms of this Agreement, or any other contract or agreement between the Company, the Members or any Affiliate of such Member (as defined below) unless all Members have consented thereto, and (iii) not use the confidential and proprietary information of the others except to the extent and for the purposes contemplated in this Agreement or permitted by any other contract or agreement between the Company, the Members or any of the Members' Affiliates.  As used herein, "Affiliate" shall mean any person or entity that directly or indirectly controls, is controlled by, or is under common control with, a Member. For the purposes of the definition of "Affiliate" only, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, whether through ownership of voting securities, by contract or otherwise.

(b)    Exceptions.  The obligations of confidentiality and nonuse imposed under this Section 9.2 shall not apply to any confidential or proprietary information of the disclosing party which:

(i)    is or becomes public or available to the general public otherwise than through any act or default of the non-disclosing party;

(ii)    is obtained or derived from a third party which, to the best knowledge of the non-disclosing party, is lawfully in possession of such information and does not hold such information subject to any confidentiality or nonuse obligations; or

(iii)    is required to be disclosed by one of the parties pursuant to applicable law, or under a government or court order; provided, however, that (A) the obligations of confidentiality and nonuse shall continue to the fullest extent not in conflict with such law or order, and (B) if and when a party is required to disclose such confidential or proprietary information pursuant to any such law or order, such party shall use its best efforts to (1) give the other party prompt notice of such requirement so as to permit such party time in which to appeal, oppose or take other protective action and (2) obtain a protective order or take such other actions as will prevent or limit, to the fullest extent possible, public access to, or disclosure of, such confidential or proprietary information.

### ARTICLE X

### MISCELLANEOUS

Section 10.1 Notices.  All notices, requests, demands and other communications called for or contemplated by this Agreement shall be in writing and shall be deemed to have been duly given or delivered when mailed by United States certified or registered mail, postage prepaid, addressed to the Members, their successors in interest or their assignees, and to any attorney-in-fact appointed by a Member pursuant to Section 2.1 of this Agreement, at the addresses set forth hereinabove or at such other addresses as they may from time to time designate by written notice in the aforesaid manner.

17

**Section 10.2  Attorneys' Fees.**  If any litigation is commenced between the parties hereto or their personal representatives concerning any provision of this Agreement or the rights and duties of any person in relation thereto, the party or parties prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to actual costs and expenses (including without limitation expert witness fees) and to a reasonable sum as and for his or their attorneys' fees in such litigation.  This Section 10.2 shall not apply to arbitration proceedings pursuant to Section 10.8 of this Agreement or to any court proceeding in aid of such arbitration or to confirm the arbitrator's award.

**Section 10.3  Entire Agreement.**  This Agreement constitutes the entire understanding between the Members with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements or understandings, written or oral.

**Section 10.4  Power of Attorney.**  Each Member irrevocably constitutes and appoints the person or any of the persons that may be acting as Manager from time to time as his attorney-in-fact, in his name, place and stead to make, execute, acknowledge, file and record:

(a)  Any instrument that may be required to be recorded or filed by the Company;

(b)  All documents that may be required to effectuate the dissolution and termination of the Company; and

(c)  Any other document that may be required to be filed or recorded by the Company or which the Manager deems advisable.

It is expressly understood and agreed that the grant of this power of attorney is coupled with an interest and shall survive the delivery of an assignment of a Company interest. In the event of any conflict between the provisions of this Agreement or any amendment to it and any document executed, acknowledged, sworn to, or filed by the Manager under this power of attorney, this Agreement and its amendments shall govern.

**Section 10.5  Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective executors, administrators, successors in interest and assigns.

**Section 10.6  Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall constitute a binding and enforceable agreement, but all of which shall together constitute one and the same instrument.

**Section 10.7  Governing Law.**  This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware.

**Section 10.8  Arbitration.**

(a)  Agreement to Arbitrate.  Any controversy, dispute or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement, including any claim based on contract, tort or statute, shall be settled, upon the written request of any Member, before a sole arbitrator conducted in Los Angeles, California, or such other location upon which the parties may mutually agree, and judgment upon any award rendered by the arbitrator may be entered by any State or Federal court having jurisdiction thereof.  Any

18

controversy concerning whether a dispute is an arbitrable dispute shall be determined by the arbitrator. The parties intend that this agreement to arbitrate be valid, specifically enforceable and irrevocable. The designation of a situs or specifically a governing law for this agreement or the arbitration shall not be deemed an election to preclude application of the Federal Arbitration Act, if it would be applicable.

(b)    Selection of Arbitrator. The sole arbitrator shall be an attorney admitted to practice in New York or California who has had experience in the field of licensing intellectual property rights in the entertainment industry, but has had no prior relationship with any Member or with the Estate of Marilyn Monroe. The Members shall endeavor to agree upon the selection of the sole arbitrator, but if no arbitrator has been agreed upon within seventy-five (75) days following receipt of a Notice of Objection pursuant to Section 5.10 or Section 5.11 of this Agreement, or within fifteen (15) days following receipt of a written request for arbitration pursuant to this Section 10.8(a) of this Agreement, then each Member shall submit the name of a proposed arbitrator meeting the qualifications set forth above, and the arbitrator shall be chosen by lot from the names submitted.

(c)    Expenses. The arbitrator may, but need not, award to the prevailing party in any arbitration proceeding commenced hereunder, the prevailing party's costs and expenses (including without limitation expert witness expenses and reasonable attorneys' fees) of investigating, preparing and presenting or defending against such arbitration claim or cause of action, and, in the event that such an award of costs and expenses is made, the court shall include such award in its judgment for the prevailing party.

Section 10.9  Additional Definitions. Unless the context otherwise requires, the terms defined in this Section 10.9 shall, for the purposes of this Agreement, have the meanings herein specified.

"Capital Account" means, with respect to any Member, the account maintained for such Member in accordance with the provisions of Section 3.6 hereof.

"Capital Contribution" means, with respect to any Member, the aggregate amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company "Certificate" hereof with respect to such Member's Interest.

"Certificate" means the Certificate of Formation of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of Delaware pursuant to the Delaware Act.

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

19

"Fiscal Year" means (i) the period commencing upon the formation of the Company and ending on December 31, 2000, (ii) any subsequent twelve (12) month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clause (ii) of this sentence for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Article IV hereof.

"Gross Asset Value" means, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(a)    the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as agreed to by the contributing Member and the Tax Matters Member;

(b)    the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Tax Matters Member, as of the following times: (i) the distribution by the Company to a Member of more than a *de minimis* amount of Company assets as consideration for such Member's Interest; (ii) the contribution to the Company by a Member of more than a *de minimis* amount of assets in exchange for an Interest; and (iii) the liquidation of the Company within the meaning of Treasury Regulation § 1.704–1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clause (i) or (ii) of this sentence shall be made only if the Tax Matters Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(c)    the Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined by the Tax Matters Member.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a) or paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"Interest" means a Member's share of the profits and losses of the Company and a Member's rights to receive distributions of the Company's assets in accordance with the provisions of this Agreement and the Delaware Act.

"Investment Company Act" means the Investment Company Act of 1940, as amended.

"Net Cash Flow" means, for each Fiscal Year or other period of the Company, the gross cash receipts of the Company from all sources, but excluding any amounts, such as gross receipts taxes, that are held by the Company as a collection agent or in trust for others or that are otherwise not unconditionally available to the Company, less all amounts paid by or for the account of the Company during the same Fiscal Year or other period (including, without limitation, payments of principal and interest on any Company indebtedness and expenses reimbursed to the Members under Section 5.9 hereof), and less any amounts determined by the Manager to be necessary to provide a reasonable reserve for working-capital needs or any other contingencies of the Company. Net Cash Flow shall be determined in accordance with the cash

receipts and disbursements method of accounting and otherwise in accordance with generally accepted accounting principles, consistently applied. Net Cash Flow shall not be reduced by depreciation, amortization, cost recovery deductions, depletion, similar allowances or other non-cash items, but shall be increased by any reduction of reserves previously established.

"Permitted Disposition" means:

(i)    A Transfer by any Member who is an individual to his or her spouse, adult lineal descendants, the adult spouses of the Member's lineal descendants or a trust, partnership, limited liability company or a corporation solely for the benefit of the Member, the Member's spouse and/or the Member's minor or adult lineal descendant and/or their spouses;

(ii)    A Transfer of a Member's Interest to the Company;

(iii)    A Transfer, in the event of the death of any Member who is an individual, to his or her (a) personal representatives (in their capacities as such), (b) estate and/or (c) named beneficiaries;

(iv)    A Transfer by a Member which is a trust to the beneficiaries of such trust pursuant to the terms of the agreement or declaration of trust relating to such trust;

(v)    A Transfer by a Member which is an estate to the beneficiaries of such estate pursuant to a court order;

(vi)    A Transfer by a Member which is a partnership to one or more of its partners, by a Member which is a limited liability company to one or more of its members, or by a Member which is a corporation to one or more of its shareholders; or

(vii)    A Transfer of a Member's Interest by a Member to one or more Affiliates of such Member if such Transfer is approved in writing by the Manager prior to such Transfer.

"Profits" and "Losses" means, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with §703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to §703(a)(1) of the Code), with the following adjustments:

(a)    any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(b)    any expenditures of the Company described in §705(a)(2)(B) of the Code (or treated as expenditures described in §705(a)(2)(B) of the Code pursuant to Treasury Regulation § 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(c)    in the event the Gross Asset Value of any Company asset is adjusted in accordance with paragraph (ii) or paragraph (iii) of the definition of "Gross Asset Value" above,

21

the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)      gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value; and

(e)      in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation" above.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Tax Matters Member" shall be the Manager.

"Transfer" shall have the meaning set forth in Section 2.5 of the Agreement. The terms "Transferring," "Transferor," "Transferee" and "Transferred" shall have meaning correlative to the meaning of "Transfer."

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

Section 10.9  Heading.  The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

IN WITNESS WHEREOF, this Agreement has been executed by the Initial Member as of the date first written above.

_____
Anna Strasberg, Administrator C.T.A. of the Estate
of Marilyn Monroe, Deceased

## SCHEDULE A

### Initial Capital Contributions and Sharing Percentages

| | Member and Address | Capital Contributed | Agreed Value | Sharing Percentages |
|---|---|---|---|---|
| 1. | Anna Strasberg, Administrator C.T.A. of the Estate of Marilyn Monroe, Deceased | All remaining assets of Estate of Marilyn Monroe including without limitation the assets listed as Exhibit "1". | | 100% |