# EXHIBIT 109

```
                    BEFORE THE STATE BOARD OF EQUALIZATION
                            OF THE STATE OF CALIFORNIA


        In the Matter of the Appeal

                    of

        AARON R. FROSCH, ANCILLARY EXECUTOR
        OF THE CALIFORNIA ANCILLARY ESTATE
        OF MARILYN MONROE, DECEASED.



        Assessment Nos.
          03109116, 03109117,
          03109118, 03109119,
          03109120, 03109121,
          03109122, 03109123



                         MEMORANDUM IN SUPPORT OF APPEAL
                         BY AARON R. FROSCH, ANCILLARY
                         EXECUTOR OF THE ANCILLARY ESTATE
                         OF MARILYN MONROE, DECEASED
                         _____




                                        GANG, TYRE & BROWN
                                        6400 Sunset Building
                                        Hollywood, California 90028
```

MM-0009211

INTRODUCTORY STATEMENT

This is an appeal from a denial by the California Franchise Tax Board of Appellant's tax assessment protest.

The Estate. Marilyn Monroe died in 1962, a resident of the State of New York. Her will was admitted to probate in the Surrogate Court, County of New York, on January 14, 1963, and Aaron R. Frosch, a New York resident, was named as Executor.

A Petition For Probate of Foreign Will and For Ancillary Executor was filed in California on January 17, 1963, alleging the existence in California of certain real property and incidental personal property. An Order Admitting Foreign Will to Probate and For Ancillary Executor was entered in the above proceeding on January 21, 1963, naming Aaron R. Frosch as ancillary executor. Ancillary Letters Testamentary were issued to Mr. Frosch on February 26, 1963. The total appraised value of decedent's estate in California was $92,781 in 1963, but the clear market value thereof (after allowable deductions, the largest of which was a first trust deed encumbrance on the California real property) was $36,144.22.

All beneficiaries under decedent's will are non-residents. Until her death in 1970, one beneficiary (entitled to a lifetime annuity of $2500 per year) was a resident of California, and, until moving from this State in 1966, another beneficiary (entitled to a lifetime annuity of $5000 per year) resided in California. All other beneficiaries have at all times been nonresidents.

The Income. During the course of her life, Marilyn Monroe performed in the theatrical motion pictures "Some Like It Hot" and "The Misfits" (the "Films"). "Some Like It Hot"

MM-0009212

was filmed entirely in California, while only 10% of "The Misfits" was filmed in this State. Pursuant to agreements between Miss Monroe and United Artists Corporation ("UA"), a Delaware corporation, whose principal place of business is New York City, New York, UA agreed to pay directly to Miss Monroe all compensation for her services in the Films. Apart from fixed compensation paid contemporaneously with the principal photography, UA agreed to pay contingent consideration based upon a percentage of the Films' earnings, as and when accruing (the "Percentage Payments").

Ever since Miss Monroe's death, all Percentage Payments have been paid to Aaron R. Frosch as executor of Miss Monroe's estate under the New York probate. All these Payments were made wholly within New York, by means of checks drawn by UA's New York offices on New York banks, and at no time was any portion of said moneys paid to or received by any person or entity in California or included in the California ancillary probate estate.

Because Miss Monroe died a resident of New York, the value at the date of death of her contractual rights to Percentage Payments under the UA agreements was included in the New York estate for purposes of New York estate taxes, and estate taxes were paid to New York based upon this valuation. Similarly, each post-death Percentage Payment, when received, was included in the New York estate's current income for purposes of New York income tax, and income taxes based upon these amounts were timely paid to the State of New York.

Even though no portion of the post-death Percentage Payments was ever paid to the California ancillary estate, the Franchise Tax Board ("FTB") seeks to tax these sums in proportion to the amount of filming conducted in this State. The FTB's assertions are as follows:

| Year | Purported Taxable Income | Tax Assessed | Penalty |
|------|--------------------------|--------------|---------|
| 1963 | $ 34,569.42 | $ 1,894.86 | $ 473.72 |
| 1964 | 151,893.97 | 10,107.58 | 2,526.89 |
| 1965 | 150,651.62 | 10,020.61 | 2,505.15 |
| 1966 | 152,013.12 | 10,115.92 | 2,528.98 |
| 1967 | 145,600.53 | 13,830.05 | 3,457.51 |
| 1968 | 39,709.09 | 3,240.91 | 810.23 |
| 1969 | 6,386.94 | 140.48 | 35.12 |
| 1970 | 26,227.09 | 1,892.71 | 473.18 |
| TOTAL | | $51,243.12 | $ 9,710.78 |

ARGUMENT

1. **California Is Not Entitled To Tax The Percentage Payments Because There Is No Statutory Or Regulatory Authority Permitting Such Taxation.**

Because the FTB has conceded the estate is a non-resident of California, it is only entitled to tax specific types of income from sources within this State. According to California Revenue and Taxation Code ("R&T") Regs. § 17742-17745(a)(2),

---

\* The FTB has based its assessments upon gross income figures. If a California tax is determined to be due, Appellant will supply appropriate deductions at such time.

> "If the settlor, the fiduciary and the beneficiaries are all nonresidents of this State, only income from real or personal property located in this State (see Reg. 17951-54(c)), business carried on within this State (see Reg. 17951-54(d)), and intangible personal property having a business or taxable situs in this State (see Reg. 17951-54(f)) is taxable."

This Regulation governing nonresident estates is more narrowly restrictive than are the provisions dealing with taxation of living nonresidents. Living nonresidents are taxed upon <u>all</u> income from sources within this State--not merely those specific income items set forth above for estates.** A very significant difference between the taxation of nonresident estates and individuals is the deletion in the estate provisions of <u>any reference to personal service income</u>. This omission is clearly deliberate because personal service income of living nonresidents is dealt with in Reg. § 17751-54(e), and the above Regulation carefully limits itself to Reg. §§ 17751-54(c), 17751-54(d) and 17751-54(f)--a conscious passing over of subsection (e). The reason for this deletion was to implement a policy excluding taxation of this type of income to nonresident estates. The draftsmen intended that estates of nonresident decedents be taxed only on income generated by the estate itself--i.e., that such

---

\* R&T § 17744 provides for an apportionment of income based upon the residence of beneficiaries, and Appellant concedes that if the FTB prevails upon this Section 1, this State may implement such formula for the years (if any) in which income was distributable to California resident beneficiaries. For simplicity, and because it is Appellaant's contention under Section 2 below that all claimed taxes in respect of the Percentage Payments are offset by a tax credit, the text deals with the estate's entire income as if there were no California resident beneficiaries.

\*\* R&T § 17951; Reg. § 17951-54(a)(1).

1 estates be taxed <u>only on the California-source income</u>
2 <u>generated by the estate's assets or activities</u>; <u>not</u> on income
3 created prior to the time the estate was in existence (such
4 as personal service income of the decedent) which is
5 <u>passively</u> received by the estate outside of California.
6 Thus the Percentage Payments, concededly personal service in-
7 come of Miss Monroe, are not intended by the governing
8 Regulations to be taxable under California law.

9       The FTB has argued that the Percentage Payments are
10 "income in respect of a decedent" under R&T § 17833 and there-
11 fore are taxable notwithstanding the limited authority of
12 Reg. § 17742-45(a)(2). This assertion is based upon the
13 language of R&T § 17833 which provides that income received
14 by an estate has the same "character" in the hands of the
15 estate as it did in the hands of the decedent.* According
16 to the FTB, this "character" rule enlarges California's
17 jurisdiction to tax this particular type of income because,
18 if Miss Monroe were a living nonresident, the Percentage
19 Payments would be taxable in this State under Reg. § 17951-
20 54(e).

21       The FTB's attempt to thus add Reg. § 17951-54(e)
22 to Reg. § 17742-45(a)(2) through the term "character" not
23 only runs contrary to the deliberate omission of personal

---

\* Sec. 17833. [CHARACTER OF INCOME DETERMINED BY REFERENCE TO DECEDENT.] The right, described in Section 17831 [income in respect of a decedent], to receive an amount shall be treated, in the hands of the estate of the decedent, . . . as if it had been acquired by the estate . . . in the transaction in which the right to receive the income was originally derived and the amount includible in gross income under Section 17831 or 17832 [sale of right to income in respect of a decedent] shall be considered in the hands of the estate . . . to have the character which it would have had in the hands of the decedent if the decedent had lived and received such amount.

service income from the Regulations dealing with nonresident estates, but it also fails to recognize the distinction between two very different issues: (1) Whether the Percentage Payments are taxable under California law; and, if so, (2) whether their taxable nature is ordinary income, capital gain, etc. R&T § 17833 is only designed to deal with the latter of these issues, and it would require an expansion beyond all legislative intent and decided authority to interpret the term "character" as including the former.

Section 17833 is identical to Internal Revenue Code ("IRC") § 691(a)(3), while R&T Reg. § 17831-17834(c) [character of gross income in respect of a decedent] is identical to IRC Reg. § 1.691(a)-3. Appellant has conducted an extensive search of the Regulations and legislative history of R&T § 17833 as well as IRC § 691, and nowhere in any of these materials is there mention, or indeed even indication, that the word "character" was ever intended to encompass "taxability."* Quite the contrary, the legislative history of § 691 makes it very clear that the purpose of this section was entirely different. Under case law before enactment of § 691, income which had accrued prior to the death of the decedent was valued for estate tax purposes, <u>given a basis at that value</u>, and then never taken into income when collected (the collections represented merely a recovery of basis). Solely to overcome this result, § 691 (formerly § 42 of the 1934 and 1938 Revenue Acts; § 126 of the 1942

---

* The examples under R&T Reg. § 17831-17834(c), e.g., deal with capital gains, tax-free governmental interest, and income averaging. Certainly none of these factors are relevant to determining the "taxability" of particular amounts; they are only concerned with the rate of tax based upon the type or "character" of the income involved.

.. 7 ..

MM-0009217

Revenue Act) was enacted.

The distinction between "character" and "taxability" has been recognized by the Franchise Tax Board in its own Legal Ruling No. 291, dated April 23, 1965. Although the problem in this Ruling was somewhat different from the instant case, it was nonetheless quite analogous and the reasoning and policy are the same.

In L.R. No. 291, the FTB was faced with the question of whether income received by a California resident from intangibles held by a nonresident trust was entitled to a tax credit in this State--if the amounts were from sources within California, no credit was available. In determining that the taxpayer could not claim a credit, the Ruling was careful to delineate the two issues set forth above (source vs. character). The first step in the analysis was to determine whether the income was from sources within California. In holding that it was instate income, the decision noted that a trust beneficiary is the "owner" of intangibles in the trust, and, accordingly, such intangibles have a situs (and therefore a source) at his residence. Only at that point, i.e., <u>only after deciding that these amounts were indeed from sources within California</u>, did the Ruling take the second step to consider the "character" of the income. Even though R&T § 17752(b) provided that amounts distributed to beneficiaries of a trust have the "same character in the hands

///
///
///
///
///
///
///

MM-0009218

of the beneficiary as in the hands of the trust,"\* the decision explicitly did not base its "taxability" determination on this "character" language:

> ". . . The rules governing jurisdiction to tax and the character (conduit)\*\* rule are entirely separate and distinct and have no relation to each other. As stated in <u>Bank of America v. U. S.</u>, 23 Fed.Supp. 152 (1962), <u>the conduit theory should be applied not to find tax liability</u>, but to determine only the character of the amounts distributed for the purposes of assessing taxes <u>after tax liability has been established</u>." (emphasis added).

For the FTB to expand the "character" definition contained in R&T § 17833 to include "jurisdiction to tax" would thus contradict its own Ruling and be without authority in either the law, regulations or legislative history. Accordingly, the FTB has approached this issue in a manner directly contrary to the existing precedents, and its analysis under § 17833 must be reversed: The question of whether the Percentage Payments are taxable under California law must be determined before the character rule (ordinary income, capital gain, etc.) can be considered.

---

\* The "character" aspects of § 17752 are virtually identical to the "character" language of § 17833:
> "Section 17752. (a) Subject to subsection (b), the amount of income for the taxable year required to be distributed currently by a trust described in Section 17751 shall be included in the gross income of the beneficiaries to whom the income is required to be distributed, whether distributed or not. . . .
> "(b) The amounts specified in subsection (a) shall have the same character in the hands of the beneficiary as in the hands of the trust. . . ."

§ 17833 is set forth in the footnote on page 6, supra.

\*\* The phrase "conduit rule" refers to the fact that § 17752 causes the character of income to flow through the trust to the beneficiary. Section 17833 causes the character of income to flow through the decedent to the estate.

As discussed above, the Percentage Payments are not taxable in California under existing law because they do not fall within any of the categories prescribed by R&T Reg. § 17742-17745(a)(2). This being so, there is no reason to determine whether the "character" of these amounts is ordinary income, capital gain, etc., and R&T § 17833 never comes into play. To hold otherwise would be to stretch the meaning of a section designed for an entirely different purpose in order to circumvent the clear language of a carefully drawn Regulation that deals with the precise question in point.*

By reason of the foregoing, no part of the Percentage Payments is taxable in California.

---

* The unfairness of taxing personal service income paid to the estate of a nonresident—as well as further evidence that such income was not intended by the legislature to be taxed—can be seen in R&T § 17836. According to this section, the estate is allowed a deduction from income in respect of a decedent only for California inheritance taxes paid on such income. [R&T § 17837 defines "inheritance tax" so as to exclude inheritance taxes paid to foreign states.] But where the decedent is a nonresident, no inheritance tax is paid in California on such asset because the estate of a nonresident is subject to California inheritance tax only on real property and tangible personal property located in California. Thus, under the FTB's analysis, the estates of nonresident decedents would be subjected to the burden of California income tax without the possibility of deduction for estate taxes paid with respect to such income. This would not be the case if the decedent were a resident, and there is no reason to assume this unfairness was intended by the legislature—particularly in the absence of clear authority, to tax these amounts. Quite the contrary, § 17836 is identical to IRC § 691(c)(1) where, of course, there are no such peculiar residency problems and the estate is always entitled to an income tax deduction for estate taxes paid on § 691 income.

2. **Even If California Is Entitled To Tax The Percentage Payments, It Must Allow A Credit For Taxes Paid To The State Of New York.**

To avoid the burden of double taxation, R&T § 18004(a) allows a California tax credit to estates whose income is taxed by two jurisdictions:

> "If an estate or trust is a resident of this State and also a resident of another state, it shall, notwithstanding the limitations contained in Sections 18001 and 18002[*], be allowed a credit against taxes imposed by this part for net income taxes imposed by and paid to the other state, subject to the following conditions:
>
> "(a) Credit shall be allowed only for such proportion of the taxes paid to the other state as the income taxable under this part and also subject to tax in the other state bears to the entire income upon which the taxes paid to the other state are imposed . . . ."

Pursuant to this formula, taxes paid to another state will be allowed as a credit against taxes levied in California with respect to the same income, and the California tax would be proportionately reduced. Indeed, in a case such as the instant one (where the foreign state's tax rate exceeds the California rate), the tax credit under R&T § 18004(a) will totally offset the California assessment.**

---

* § 18001 and § 18002 deal with restrictions on tax credits allowable to residents and nonresidents which are not estates or trusts.

** The fact that the New York rates exceeded the California rates for all years relevant hereto is established by the Affidavit of Aaron Frosch, Executor, a copy of which is attached hereto as Exhibit "A". Specific illustrations of the applicability of § 18004(a) to the instant case are set forth in Exhibit "B" hereto.

- 11 -

MM-0009221

R&T § 18004(a) is operative when an estate is a "resident" of both this State and another. The determination of residency for estates is not based upon the "minimum contacts" criteria employed for living individuals, but rather is governed by R&T § 18003 which provides that ". . . an estate or trust is a 'resident' of the state which taxes the income of the estate or trust <u>irrespective of whether the income is derived from sources within that state.</u>"

It has been suggested by the FTB that the California ancillary estate is not a "resident" within the meaning of R&T § 18003 (and hence is not entitled to the tax credit under R&T § 18004) but this position is based upon interpreting R&T § 18003 in the narrowest possible manner:

    1. As noted above, R&T § 18003 provides that an estate is a resident of the state which taxes its income ". . . irrespective of whether the income is derived from sources within that State."

    2. According to the FTB, this phrase means that an estate is only a resident of a state which taxes income both from sources within and without the state.

    3. By virtue of 1 and 2, the FTB asserts that, because California only taxes income from sources within this state, the domiciliary estate is not a California "resident" within the meaning of § 18003.*

---

* This position is presumably founded on R&T Reg. § 18003-18004 which provides that: ". . . If an estate or trust is taxable under the law on income from sources both within and without the State, it is a resident of California. If, however, it is taxable only on income from sources within this State, it is a non-resident."

1    To sustain the FTB's interpretation of § 18003,
2    one must construe "irrespective of whether such income is
3    derived from sources within that State" to mean "only if
4    some part of such income is derived from sources without
5    that State." Such an interpretation is contrary to the plain
6    meaning of the word "irrespective." Webster's Seventh New
7    Collegiate Dictionary defines "irrespective of" as "without
8    regard to; regardless of." The clear import of "irrespective"
9    in R&T § 18003 is that, in determining the "residence" of an
10   estate or trust, it is <u>unimportant</u> whether the income taxed
11   is from sources within or without the State. If <u>any portion</u>
12   of an estate's income, regardless of its source, is taxed by
13   a jurisdiction, the estate will be a "resident" of that
14   State under R&T § 18003 and entitled to a credit under R&T
15   § 18004(a).
16           Strong evidence sustaining the correctness of this
17   interpretation of R&T § 18003 is found in R&T § 18004. That
18   section provides "If an estate or trust is a resident of
19   this State and also a resident of another state, it shall,
20   <u>notwithstanding the limitations contained in</u> R&T §§ 18001
21   and <u>18002</u> be allowed a credit . . ." (emphasis added). Yet
22   R&T § 18002 deals only with limitations on the availability
23   of a tax credit to <u>nonresidents</u>. Thus, there would seem to
24   be only one reason for the legislature to have referred to
25   this section: While an estate may be considered a
26   "nonresident" for purposes of determining what portion, if
27   any, of its income is to be taxed in California, once any
28   part of its income is taxed by this State and another State
29   it is entitled to a tax credit in California. This would
30   not only seem an equitable rule for the avoidance of double
31   taxation, but, unless the legislature's reference to R&T §
32   18002 is merely surplusage, it is compelled by the statute.

Although R&T § 17032 states that headings should not be used in interpreting the law, it is nonetheless indicative of the authorities' interpretation that the heading of R&T § 18004 both in West's Annotated Code and the Prentice-Hall Tax Reporter states that this section deals with tax credits for an "Estate or Trust Having Both Resident and <u>Non-resident</u> Status" (emphasis added). Again, unless this was an idle act by the legislature, it would seem that the scheme of tax credit under § 18004 envisions precisely the instant situation--an estate which was a "resident" of a foreign state and also taxed upon certain types of instate income (i.e., as a "nonresident") by California. Moreover, any other interpretation of this heading would be inconsistent with the legislature's reference to § 18002 in the body of § 18004.

The unfair burden of the FTB's position is readily apparent in the instant case. California did not assert its tax on the Percentage Payments until December of 1971, almost eight years after the first New York taxes were due on this income. The estate would presumably have been entitled to a New York credit for California income taxes if it had paid the California taxes when the New York returns were filed, but by the time of California's assertion the New York returns had long since been filed and the period within which to apply for a New York refund had expired. Accordingly, if the FTB's position is sustained, the estate will have paid taxes to two states on the same income with no possibility of a tax credit.

By reason of the foregoing, if, contrary to Appellant's assertion, the Percentage Payments are held to constitute taxable income, California must nonetheless allow a credit for taxes paid to the State of New York.

3. **Even If No Credit Is Allowable, The Penalty Should Be Waived.**

R&T § 25931 allows relief from the California penalty in the event "the failure is due to reasonable cause and not due to wilful neglect. . . ." Appellant's basic position is that no income tax is due as claimed by the FTB; and if Appellant is successful, the penalty and interest will abate automatically. Yet, even if Appellant should fail in its position of "no tax due," relief from the penalty should nevertheless be allowed.

The instant case is one of first impression on both the question of taxability and credit, and Appellant is aware of no authority other than as set forth herein which would guide a determination of these issues. The Executor, an attorney in the State of New York, has at all times believed in good faith that no tax was due the State of California by reason of the Percentage Payments, and Appellant's failure to pay California taxes was based upon this understanding. Because of the difficulty in resolving these problems, and indeed the impossibility for either Appellant or the FTB to have come to conclusions with certainty, Appellant respectfully asks that, if it is finally determined a tax is due, the non-payment penalty be waived.

Authority that uncertainty in the law excuses the non-payment payment penalty may be found in FTB Legal Ruling No. 105, December 5, 1958. In that instance, the FTB ruled

> "The law affixes no standard as to what will constitute 'reasonable cause' for this purpose [waiver of penalty]. . . The Courts have ruled that reasonable cause means nothing more than the exercise of ordinary business care and prudence; that the mere failure to comply with provisions of revenue laws is not a per se 'without reasonable cause'

- 15 -

MM-0009225

> violation; that it is well settled that in the application of penalties, all questions of doubt must be resolved in favor of those from whom the penalty is sought; that it is not the purpose of the law to penalize frank differences of opinion. . . . [A] reasonable cause excusing the failure to file a return may exist where the belief that no return was required is based on adequate grounds. Misunderstanding due to reasonable doubt as to whether a return is required in view of conflicting rulings or decisions, or ambiguities in the law may be an acceptable excuse." (Emphasis added.)

See also Palm Beach Trust Co. v. Com'r, 174 F.2d 527 (D.C. Cir. 1949), rev'g 9 TC 1060, cert. den. 338 U.S. 825.

CONCLUSION

As set forth more fully above, Appellant respectfully asserts that the Percentage Payments are not taxable by the State of California. Moreover, even if these amounts are held to be so taxable, California must allow a tax credit under R&T § 18004 which would totally offset the taxes for each of the years in question. If a tax is found to be due, in light of the fact that Appellant has acted upon a good faith interpretation of the law, Appellant requests that the penalty for failure to file returns be waived.

Dated: December 7, 1972.

Respectfully submitted,

GANG, TYRE & BROWN

By _____
Donald S. Passman
Attorneys for Appellant

MM-0009226

FRANCHISE TAX BOARD

STATE OF CALIFORNIA

| | | |
|---|---|---|
| ESTATE OF MARILYN MONROE, DECEASED, | ) ) ) | AFFIDAVIT OF AARON R. FROSCH |
| Federal Employer I.D. No. 136129486 | ) | |

STATE OF NEW YORK ) ss.:
COUNTY OF NEW YORK )

        I, AARON R. FROSCH, being duly sworn, depose and say:

    1. I am an attorney at law duly licensed to practice in the State of New York, and I am now, and at all times have been, the sole executor of the domiciliary Estate of Marilyn Monroe, Deceased, in New York ("the Estate").

    2. I am familiar with the Estate's New York State Fiduciary Income Tax Returns for the years 1963 to the present, inclusive, and all such returns were filed over my signature. True and accurate copies of the returns for 1963 through 1970, inclusive, are attached hereto marked Exhibit A, Items 1 through 8.

    3. In each of the years 1963 through 1970, inclusive, the gross income figure on the Estate's New York Fiduciary Income Tax Returns (and, more specifically, the item entitled "other income" in Schedule 5, line 9 of the 1963 through 1966 returns, and in Schedule 5, line 8 of the 1967 through 1970 returns) included all sums derived from the motion pictures entitled "The Misfits" and "Some Like It Hot" which were paid to the Estate. Accordingly, the income taxes based upon such amounts were paid to the State of New York, as set forth in these returns.

    4. Exhibit B attached to this Affidavit is a true and accurate statement of the New York State Income Tax rates applicable to the Estate for the years in question.

    Dated _____, 1972, New York, New York.

Notarization:

                              _____
                                  Aaron R. Frosch

MM-0009227