# EXHIBIT D
# (PART ONE)

Melissa Stevens

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

———————————————————

SHAW FAMILY ARCHIVES, LTD., EDITH

MARCUS and META STEVENS,

               Plaintiffs,

      vs.            05 Civ. 3939(CM)

CMG WORLDWIDE, INC., an Indiana

Corporation, and MARILYN MONROE, LLC,

a Delaware Limited Liability Company,

              Defendants.

———————————————————

DEPOSITION OF MELISSA STEVENS

New York, New York

Monday, December 17, 2007

Reported by:

Adrienne M. Mignano

JOB NO. 199551

Melissa Stevens

## Page 2

1
2
3
4      December 17, 2007
5      10:03 a.m.
6
7      Deposition of MELISSA STEVENS,
8  held at the offices of Loeb & Loeb, 345
9  Park Avenue, New York, New York,
10  pursuant to Notice, before Adrienne M.
11  Mignano, a Notary Public of the State
12  of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2  A P P E A R A N C E S :
3
4  LAW OFFICES OF CHRISTOPHER SERBAGI
   Attorneys for Plaintiffs
5     488 Madison Avenue
      Suite 1120
6  New York, New York 10022
7  BY: CHRISTOPHER SERBAGI, ESQ.
      DAVID MARCUS, ESQ.
8
9
   LOEB & LOEB LLP
10  Attorneys for Marilyn Monroe LLC
      345 Park Avenue
11  New York, New York 10154
12  BY: BARRY I. SLOTNICK, ESQ.
13
14  BY TELEPHONE:
15  THEODORE J. MINCH
   Attorney for Defendant, CMG Wordwide, Inc.
16
17
18
19
20
21
22
23
24
25

## Page 4

1          Stevens
2  M E L I S S A   S T E V E N S,  called as
3  a witness, having been duly sworn by a
4  Notary Public, was examined and
5  testified as follows:
6  EXAMINATION BY
7  MR. SLOTNICK:
8    Q.  Good morning, Ms. Stevens.
9    A.  Good morning.
10    Q.  My name is Barry Slotnick.  I
11  represent Marilyn Monroe LLC, and you are
12  here pursuant to a notice, which we will
13  mark in a few moments, to testify with
14  respect to the activities of Shaw Family
15  Archives, Ltd.
16         I may from time to time refer to
17  it is SFA, and presumably you will
18  understand what that means.
19         Have you ever had your deposition
20  taken before?
21    A.  No.
22    Q.  There are actually very few rules.
23         I'm going to ask a question.  To
24  the best of your ability, you'll answer
25  the question.  You'll answer orally,

## Page 5

1          Stevens
2  audibly so that the reporter can take it
3  down.  Nodding your head, shaking your
4  head is good for me, but really doesn't do
5  much for the court reporter.
6         I would ask you to answer to the
7  best of your knowledge.  If it is not to
8  the best of your knowledge, please
9  indicate.  I'm sure your lawyers have
10  already indicated this to you, but it is
11  probably best for you to wait to hear my
12  entire question both so you'll understand
13  the question and so they will have an
14  opportunity to object to a question.
15         I have your name.  Can you provide
16  your business address, please?
17    A.  143 Independent Avenue, Tappan,
18  New York, 10983.
19    Q.  And for whom do you work?
20    A.  I work for Shaw Family Archives.
21    Q.  And how long have you worked for
22  SFA?
23    A.  I was officially hired two weeks
24  ago as an operations manager.
25    Q.  What is an operations manager?

2 (Pages 2 to 5)

Melissa Stevens

**Page 6**

1        Stevens
2    A.  I oversee the daily functioning of
3    our business imaging personnel.  I assign
4    jobs to particular people amongst other
5    things.
6    Q.  You said that you were officially
7    hired two weeks ago.  Have you -- were you
8    unofficially hired at another time?
9    A.  Well, I've been involved in the
10   business.  I'm a member of the family.
11   Q.  You anticipated my next question.
12       I know your last name is Stevens.
13   I take it you are related to one of the
14   parties in this lawsuit?
15   A.  Yes, I am.
16   Q.  Might you be her daughter?
17   A.  I am.
18   Q.  Prior to two weeks ago, what were
19   your relationship, other than family
20   relationships, what was your relationship
21   to SFA?
22   A.  I followed the business operations
23   for a number of years.  I have inquired
24   with people involved in the business how
25   things have been going.

**Page 7**

1        Stevens
2    Q.  Would it be accurate to
3    characterize SFA as a family business?
4    A.  Yes.
5    Q.  And you're part of the family?
6    A.  That's correct.
7    Q.  So you have an interest in the
8    business?
9    A.  Absolutely.
10   Q.  Prior to two weeks ago, where were
11   you employed?
12   A.  Could you specify the question?
13   Q.  Sure.
14       You said you started officially
15   two weeks ago as an employee of SFA, and
16   I'm asking where you were employed before
17   two weeks ago?
18   A.  My most recent job prior to being
19   hired as the operations manager was with
20   the Sopranos television show.
21   Q.  In what capacity?
22   A.  I was a locations coordinator.
23   Q.  And were you employed by the
24   Sopranos for -- that sounds bad.
25       Were you employed by the

**Page 8**

1        Stevens
2    production company for the Sopranos for
3    the entire duration of the show?
4    A.  No, I was not.
5    Q.  How long were you employed by the
6    Sopranos production company?
7    A.  Approximately two years.
8    Q.  Prior to that?
9    A.  Prior to that, I was employed by
10   the Rome show, also an HBO production.
11   Q.  In a similar capacity?
12   A.  Related, but not the same
13   position.
14   Q.  Having nothing to do with
15   licensing of photographs?
16   A.  The job I did for the Rome show?
17   Q.  Yes.
18       MR. SERBAGI:  Objection to form.
19   Q.  You can answer.
20   A.  It did not have to do with
21   licensing of photographs.
22   Q.  And prior to Rome?
23   A.  Prior to Rome, I believe I worked
24   on a film called The Life Aquatic.
25   Q.  Prior to that?

**Page 9**

1        Stevens
2    A.  Prior to that, I believe I worked
3    on a film called The Exorcist.
4    Q.  Not the original?
5    A.  No.
6    Q.  As I get older, I get very bad at
7    figuring out people's ages.
8       When did you graduate from
9    college?
10   A.  I graduated in the year 2000.
11   Q.  So I can stop asking about jobs
12   that went before that.
13       Where did you go to school?
14   A.  I went to Wesley.
15       MR. SLOTNICK:  I'm going to ask
16   the reporter to mark as Defendants'
17   Exhibit 1 a notice of deposition.
18       (Defendants' Exhibit 1, Notice of
19   Deposition, marked for identification,
20   as of this date.)
21   BY MR. SLOTNICK:
22   Q.  Ms. Stevens, I'm going to ask you
23   to look at what has been marked as
24   Defendants' Exhibit 1, and ask if you have
25   seen that before.

3 (Pages 6 to 9)

Melissa Stevens

**Page 10**

1          Stevens
2     A.  Yes, I have.
3     Q.  And when was the first time you
4   saw it?
5     A.  Approximately in this past week.
6     Q.  I'm sorry?
7     A.  Approximately in the past week.
8     Q.  Okay.
9          And under what circumstances did
10   you see it?
11    A.  Could you be a little more
12   specific?
13    Q.  Okay.
14        Who showed it to you?
15    A.  My attorneys.
16    Q.  Did you review it at that time?
17    A.  Yes, I did.
18    Q.  And after reviewing the notice,
19   did you do anything to prepare for this
20   deposition?
21    A.  Yes, I did.
22    Q.  What did you do?
23    A.  I read a lot of company files that
24   are available to me.  I also spoke to
25   relevant parties, including members of

**Page 11**

1          Stevens
2   Shaw Family Archives.
3     Q.  Let's start with that one first.
4        Who were the parties that you
5   spoke to?
6     A.  I spoke to Edith Marcus.  Meta
7   Stevens.  Susan Shaw, our accountant.
8     Q.  Anyone else?
9     A.  Charles Marcus.
10       MR. SERBAGI:  I'll note for the
11   record that this Exhibit 1 is
12   unsigned.
13       MR. SLOTNICK:  I trust that you
14   have received a signed copy?
15       MR. SERBAGI:  I have.
16       MR. SLOTNICK:  Thank you for
17   noting it for the record.  I'm
18   perfectly happy to sign all the
19   copies.
20       MR. SERBAGI:  But I'm not the
21   witness, so --
22       MR. SLOTNICK:  Life would be so
23   much easier if the lawyers became the
24   witnesses, perhaps.
25   BY MR. SLOTNICK:

**Page 12**

1          Stevens
2     Q.  Did you speak with anyone else?
3     A.  Yes, I did.
4     Q.  Who?
5     A.  I spoke to Michelle Minieri from
6   Bradford Licensing.
7     Q.  And?
8     A.  And anyone else?
9     Q.  Yes.
10    A.  I probably spoke to other contacts
11   from our business.
12    Q.  People outside the company?
13    A.  Correct.
14    Q.  Let's go through the list of the
15   people that you have mentioned.
16        Edith Marcus and Meta Stevens are
17   the daughters of Sam Shaw?
18    A.  That is correct.
19    Q.  Who is Susan Shaw?
20    A.  Susan Shaw is the wife, or now
21   widow of Larry Shaw.
22    Q.  And Larry Shaw was Sam's son?
23    A.  That is right.
24    Q.  And who is Charles Marcus?
25    A.  Charles Marcus is the husband of

**Page 13**

1          Stevens
2   Edith Marcus.
3     Q.  You said that you read certain
4   company files.  Can you identify which
5   files you reviewed?
6     A.  Yes, I can.
7     Q.  Will you, please?
8     A.  I will.
9        I reviewed a lot of
10   correspondence, including e-mails, faxes,
11   et cetera.  I also looked at agreements
12   that we have, contracts.  I also looked at
13   files related to our accounting
14   statements.  Other documents like that.
15    Q.  In connection with the agreements,
16   can you describe the nature of those
17   agreements?
18       MR. SERBAGI:  Objection to form.
19    Q.  I'll specify.
20        Were these agreements between SFA
21   and third-party licensees?
22       MR. SERBAGI:  Objection to form.
23    Q.  You can answer.
24    A.  Some of them.
25    Q.  And what were the others

4 (Pages 10 to 13)

Melissa Stevens

**Page 14**

```
1          Stevens
2  generally?
3        MR. SERBAGI:  Objection to form.
4     Q.  To the best of your recollection.
5        MR. SERBAGI:  Objection to form.
6     A.  For example, there are other ones
7  that might be between SFA and -- could you
8  repeat the question?
9     Q.  I'll ask a different question.
10       I'm trying to understand the
11 nature of the contracts that you looked
12 at.
13       You have indicated that some are
14 with licensees.  I am trying to determine
15 if the agreements that you looked at were
16 between SFA and entities that would use an
17 SFA photograph as opposed to some other
18 kind of agreement?
19       MR. SERBAGI:  Objection to form.
20    Q.  You can answer.
21    A.  I have looked at agreements that
22 are between SFA and companies that would
23 use our images.
24    Q.  And were there agreements other
25 than that type of agreement that you
```

**Page 15**

```
1          Stevens
2  looked at?
3        MR. SERBAGI:  Objection to form.
4     A.  Not to my knowledge.
5     Q.  Okay.
6        Were all the jobs that you looked
7  at agreements that were looked into by SFA
8  as one of the parties?
9     A.  Can you repeat the question?
10    Q.  Sure.
11       Were all of the agreements that
12 you looked at agreements in which SFA was
13 one of the contracting parties?
14    A.  To the best of my recollection,
15 yes, but I would qualify by saying the
16 agreements were often between someone
17 acting on behalf of SFA, so, for example,
18 Larry Shaw.
19    Q.  In the instance where Larry Shaw
20 had signed an agreement, was he signing on
21 behalf of SFA or was he signing in his own
22 individual capacity?
23       MR. SERBAGI:  Objection to the
24    form.
25    A.  It is my understanding that he was
```

**Page 16**

```
1          Stevens
2  signing on behalf of SFA.
3     Q.  Do you know when SFA was formed?
4     A.  Yes, I do.
5     Q.  When was that?
6     A.  2002.
7     Q.  So were all of the agreements that
8  you looked at executed from 2002 on?
9        MR. SERBAGI:  Objection.
10    A.  To the best of my recollection,
11 yes.
12    Q.  To the best of your recollection,
13 did you look at any agreements that were
14 entered into by Sam Shaw with companies or
15 individuals who engaged his services?
16       MR. SERBAGI:  Objection to form.
17    A.  Yes.
18    Q.  So those agreements would have
19 predated 2002?
20    A.  Yes.
21    Q.  Do you recall how far back they
22 may have predated 2002?
23    A.  If you supply me with a specific
24 example, I could try and give you a date.
25    Q.  Okay.
```

**Page 17**

```
1          Stevens
2        Did you look at any agreements
3  between Sam Shaw and Charles Feldman?
4        MR. SERBAGI:  Objection.
5     A.  You could refresh my recollection.
6  I don't believe that I have seen a
7  specific document between those two
8  people, however, I'm happy to look at a
9  document if you have one.
10    Q.  Let's look at something else for a
11 moment.
12       You stated that SFA was formed in
13 2002, I believe?
14    A.  Yes.
15    Q.  And is it a corporation?
16    A.  Yes.
17    Q.  And is it a New York corporation?
18    A.  Yes.
19    Q.  And do you know who were the
20 parties who formed SFA?
21    A.  Yes.
22    Q.  Who were they?
23    A.  Could you specify your question?
24    Q.  There were people who were
25 responsible for incorporating and in
```

5 (Pages 14 to 17)

Melissa Stevens

## Page 18

1        Stevens
2   forming SFA. You indicated that you know
3   who they are, and I'm asking, who they
4   are?
5        A.   Well, I know who the owners of SFA
6   are, if that's what you're asking.
7        Q.   I'm not sure if I am, but that's a
8   good enough question to answer.
9        So who are the owners of SFA?
10        A.   As of today?
11        Q.   Yes, as of today.
12        A.   ~~Well, the current owners are Melissa~~
13   ~~Stevens, Meta Stevens, Cindy Conti, Robert~~
14   ~~Conti, David Marcus, David Marcus, Rebecca~~
15   Marcus, the estate of Larry Shaw.
16        Q.   Do you know who the original
17   owners of SFA were?
18        A.   I'm not sure what you mean by
19   original.
20        Q.   Who were the owners in 2002?
21        A.   As of what date?
22        Q.   The date of formation.
23        A.   I would have to check my company
24   records, however, I believe it was Larry
25   Shaw, Edith Marcus, and Meta Stevens.

## Page 19

1        Stevens
2        MR. SERBAGI: I don't mean to
3   interrupt, but it is incredibly hot.
4        Is there anything that we can do?
5        (Discussion held off the record)
6        Q.   For the sake of brevity, would it
7   be accurate to say that the original
8   owners of SFA and the current owners of
9   SFA are all related in one way or another
10   to Sam Shaw?
11        A.   That is correct.
12        Q.   And originally it was the three
13   children of Sam Shaw?
14        A.   Originally?
15        Q.   In 2002.
16        A.   In 2002, yes.
17        Q.   And Larry, Edith and Meta were
18   all -- were Sam's only children?
19        A.   To my knowledge, yes.
20        Q.   I won't ask if you're the only
21   offspring of --
22        When did Sam Shaw die?
23        A.   1999.
24        Q.   Can you explain generally what the
25   business of SFA is?

## Page 20

1        Stevens
2        A.   Sure.
3        Q.   Please.
4        A.   Generally we license the use of
5   our images. We maintain a photographic
6   collection. We promote our photographic
7   collection and the photographers whose
8   work we have. We do exhibitions, amongst
9   other activities.
10        Q.   What photographers do you have
11   other than Sam Shaw?
12        A.   Larry Shaw.
13        Q.   Is there anyone else?
14        A.   We might have in our collection
15   photographs by other photographers. It's
16   a possibility.
17        Q.   Would it be accurate to say that
18   the majority of photographs at SFA were
19   photographs taken by Sam Shaw?
20        A.   Yes, that's accurate.
21        Q.   Do you know whether Sam Shaw
22   operated under some d/b/a or corporation
23   during his lifetime?
24        A.   Could you explain what d/b/a
25   stands for?

## Page 21

1        Stevens
2        Q.   Sure, I'm sorry. I'm just trying
3   to establish what, if any, business entity
4   Sam Shaw operated during his lifetime.
5        A.   If you could specify that
6   question, it would help me.
7        Q.   Do you know of any corporation or
8   other business entity that Sam was
9   involved with during his lifetime to
10   exploit his photographs?
11        MR. SERBAGI: Objection to form.
12        A.   I am aware of a business
13   arrangement that Sam Shaw had with Ian
14   Woodner.
15        Q.   Who is Ian Woodner?
16        A.   It's my understanding that Ian
17   Woodner was an art collector, also a
18   businessman, and also a friend of Sam
19   Shaw.
20        Q.   You stated before that part of
21   your job is to take care of some of the --
22   I think you said daily functions of SFA.
23        Can you explain what those daily
24   functions are?
25        A.   Sure.

6 (Pages 18 to 21)

Melissa Stevens

**Page 22**

1       Stevens
2       Various correspondence between SFA
3   and people we do business with, including
4   e-mail, faxing, phone calls. I would say
5   on a daily basis, we refer to our archive,
6   so there is a certain maintenance of the
7   photographs that we do fairly regularly.
8       I also oversee new deals on the
9   table, let's say.
10      Q.  How many other people are employed
11  by SFA?
12      A.  How many other people?
13      Q.  Besides yourself.
14      A.  Besides myself?
15      Q.  Yes.
16      A.  Well, Edith Shaw, Meta Stevens,
17  Susan Shaw.  We have an accountant.
18      Q.  You mentioned your office is in
19  Tappan?
20      A.  Yes.
21      Q.  How many people come to work every
22  day in Tappan to work for SFA?
23      A.  That depends.
24      Q.  On what?
25      A.  Every day is different.

**Page 23**

1       Stevens
2       Q.  How many people typically show up?
3   Is there -- how many offices are there?
4       A.  Sure.  We also have an office in
5   Piermont, which is where Larry Shaw's
6   residence is.  My mother also works out of
7   her home in New York City.
8       Q.  I hate to ask the question, what
9   percentage of people work for the company,
10  because you always get about a third, but
11  maybe in this instance, it's not such a
12  bad question.
13      Would it be accurate to say that
14  the more senior members of the Shaw family
15  work either from home or from the Tappan
16  office?
17      A.  Yes, that's correct.
18      Q.  And what are the functions of
19  Edith Marcus?
20      MR. SERBAGI:  Objection.
21      A.  Edith Marcus does a variety of
22  tasks, mainly, most notably, she is our
23  archivist.
24      Q.  And what does that job entail?
25      A.  She maintains the collection, she

**Page 24**

1       Stevens
2   houses the collection, she keeps track of
3   our inventory.  And she often facilitates
4   the use of the images in our collection.
5       Q.  What is the business function for
6   Meta Stevens?
7       A.  She also has a variety of tasks
8   that she does on a daily basis.  I would
9   say she has a role as a public relations
10  correspondent for Shaw Family Archives.
11  She is in contact with a lot of the people
12  that we do business with.
13      Q.  What role did Larry Shaw play in
14  the company prior to his passing away?
15      A.  Larry oversaw everything.  He was
16  really running the company.
17      Q.  We'll talk a little bit more about
18  the Shaw archives.
19      Is there a physical archive of
20  photographs?
21      A.  Yes, there is.
22      Q.  And where is that archive
23  maintained?
24      A.  At the house of Edith Shaw or
25  Edith Shaw Marcus.

**Page 25**

1       Stevens
2       Q.  Where is that?
3       A.  143 Independent Avenue.
4       Q.  So the office is also her home?
5       A.  That's right.
6       Q.  And approximately how many
7   photographs are in the archive?
8       MR. SERBAGI:  Objection.
9       A.  I really can't say.  It would be
10  difficult to estimate.
11      Q.  Well, can you estimate the
12  physical space that the archive takes?
13      A.  That's also a difficult answer.
14      Q.  Well, would it be bigger than this
15  room?  And I don't know what the
16  dimensions of this room are.  It will be
17  useless to anybody other than me.  Is the
18  archive bigger than this room?
19      A.  Depending on how you would stack
20  the photos, not necessarily.
21      Q.  But it is in a physical space?
22      A.  Sure.
23      Q.  I'm curious, is the physical space
24  bigger than this room?
25      A.  Yes, it is.

7 (Pages 22 to 25)

Melissa Stevens

Page 26

1      Stevens
2    Q.   Would it be double the space of
3   this room?
4    A.   I really can't say.  But to
5   qualify my answer, photographs are often
6   stored in boxes.  Sometimes there is one
7   photograph in a box.  Sometimes there are
8   many boxes are stacked on top of each
9   other.  Boxes are then on shelving units.
10   So shelving units can be quite large.
11   It's hard to get a sense of -- I don't
12   really think that -- it's hard to get a
13   sense and estimate.
14    Q.   Are the boxes of uniform size?
15      MR. SERBAGI:  Objection.
16    A.   We have multiple boxes that are
17   the same size.  But we have boxes of all
18   different sizes.
19    Q.   Does the archive hold more than
20   100 photographs to the best of your
21   knowledge?
22    A.   To the best of my knowledge, we
23   do.
24    Q.   More than a thousand?
25    A.   To the best of my knowledge, we

Page 27

1      Stevens
2   have more than one thousand.
3    Q.   More than ten thousand?
4    A.   I believe we have more than ten
5   thousand photographs.
6    Q.   More than 100,000 photographs?
7    A.   It would be hard for me to answer
8   that question.  But to the best of my
9   knowledge, if you could specify what you
10   mean by photo.
11    Q.   Different images.
12    A.   Once again, it's still vague for
13   me.  What do you mean by different images?
14    Q.   Well, if each click of a lens
15   constitutes an image, would there be --
16   how many images would there be?  That's
17   what I mean by images,
18    A.   Sure.
19      Based on your clarification, I
20   would estimate that we have more than
21   100,000 images.
22    Q.   Let's go higher.  More than a
23   quarter of a million?
24    A.   I really can't say.
25    Q.   Are the images that are maintained

Page 28

1      Stevens
2   as photographs or as negatives or in some
3   other format?
4      MR. SERBAGI:  Objection to form.
5    A.   Your question is general.  So I'll
6   give you a general answer.
7      Generally speaking, our images are
8   maintained in various forms.
9    Q.   And what are those various forms?
10    A.   We have prints, we have negatives,
11   we have transparencies, and we have
12   digital files, amongst probably other
13   things.
14    Q.   Well, what are the other things
15   that you can recall?
16    A.   I can't recall anything else right
17   now, but it's possible that there are
18   other ways that we maintain a collection.
19    Q.   Prints are another word for
20   photograph, what the common person would
21   consider a photograph?
22      MR. SERBAGI:  Objection.
23    A.   I really can't answer to what the
24   common person would think.
25    Q.   Can you define what a print is?

Page 29

1      Stevens
2    A.   A print to me is a piece of paper,
3   high quality piece of paper, on which an
4   image exists.
5    Q.   And then identify for me what you
6   mean by negative?
7    A.   A negative would be a piece of
8   celluloid on which an image exists in a
9   negative format.
10    Q.   And what is a transparency?
11    A.   To the best of my knowledge, or to
12   my knowledge, it would be or it is, I
13   believe it is also a piece of celluloid
14   that has a positive image on it.  But I
15   would really have to check, I think, the
16   dictionary.
17    Q.   It's okay.
18      Let's talk about digital files.
19      First of all, explain to me what
20   you mean by a digital file?
21    A.   By a digital file, I mean an image
22   that exists in electronic format.
23    Q.   And how are those maintained?
24    A.   I'm not entirely sure what you
25   mean by maintained, but we have -- we

8 (Pages 26 to 29)

Melissa Stevens

**Page 30**

1          Stevens
2   store digital files on hard drives.
3       Q.   Are those also maintained within
4   the archive or are those maintained
5   separately within a computer?
6       A.   I consider the digital files to be
7   a part of our archive, but they are
8   maintained either on a computer or on a
9   hard drive.
10      Q.   Are the digital files
11  reproductions of what would otherwise be
12  maintained as either a print or negative
13  or transparency?
14         MR. SERBAGI:  Objection to form.
15      A.   Can you repeat the question,
16  please?
17      Q.   Yeah, I'll ask it a different way.
18         What I'm trying to get to is
19  whether your digital files are simply
20  reproductions of the other formats in
21  photographs?
22         MR. SERBAGI:  Objection to form.
23      A.   Some of our digital files are
24  scans of our prints.
25      Q.   And others?

**Page 31**

1          Stevens
2       A.   Others are not.
3       Q.   Okay.
4          Well, where do they come from?
5       A.   I would really have to check our
6   collection, but it is possible that in our
7   collection we have digital files that have
8   been moderately altered from the print.
9   For example, if we have an old print that
10  requires restoration, we hire somebody to
11  digitally restore the image, so the
12  digital file image might be different from
13  the print.
14      Q.   I want to talk to you about how
15  the archive is organized.
16         Are photographs maintained -- when
17  I say photographs, I mean prints,
18  negatives, transparencies and digital, is
19  there a specific form of organization for
20  those files?
21      A.   If you could specify the question,
22  it would help me to answer.
23      Q.   Are they organized
24  chronologically?
25      A.   I don't believe so.

**Page 32**

1          Stevens
2       Q.   Would they be organized by subject
3   matter?
4          MR. SERBAGI:  Objection.
5       A.   Some of the photographs that I
6   have seen are organized by subject matter.
7       Q.   And others are organized in some
8   other fashion?
9       A.   It's a possibility.
10      Q.   Well, what other way have you seen
11  them organized besides by subject matter?
12         MR. SERBAGI:  Objection. Form.
13      A.   For example, I have seen
14  photographs organized differently than by
15  subject matter in regards to an
16  exhibition, for example.  So in this case,
17  if we are preparing images for the needs
18  of that exhibition, we would organize them
19  according to the needs of that exhibition.
20      Q.   And after the exhibition, would
21  you still maintain them in the archive as
22  an exhibition?
23         MR. SERBAGI:  Objection to form.
24      A.   Can you clarify your question,
25  please?

**Page 33**

1          Stevens
2       Q.   Would you then put them back in
3   subject matter files, or would you still
4   keep them together as an exhibition file,
5   or would you do both?
6          MR. SERBAGI:  Same objection.
7       A.   Well, once again, you would really
8   have to clarify what you mean by images.
9   After an exhibition -- let me back up.
10         We submit images to an exhibition,
11  but that does not necessarily mean we
12  submit prints to an exhibition.  So when
13  we get images back, it may have nothing to
14  do with the maintenance of our print
15  archive.
16      Q.   Other than prints, how would you
17  submit something for an exhibition?
18         MR. SERBAGI:  Objection to form.
19      A.   One possibility is the submission
20  of digital files.
21      Q.   And those digital files would then
22  be made available to be perceived by human
23  beings through the computer or via screen?
24         MR. SERBAGI:  Objection to form.
25      A.   I don't understand the question.

**9 (Pages 30 to 33)**

Melissa Stevens

**Page 34**

1           Stevens
2      Q.  If you're going to exhibit
3  photographs and you provide the exhibitors
4  with a digital file, how would those
5  photographs, images, be made perceptible
6  to the people coming to view the exhibit?
7      MR. SERBAGI:  Objection to form.
8      A.  If I understand your question
9  correctly, for example, when we submit
10  digital files, the people in charge of the
11  exhibition would print from the digital
12  files.  The prints would then be exhibited
13  in frames in an exhibition space, and that
14  is how people would have access to seeing
15  those photographs.
16     Q.  What happens to those prints after
17  the exhibition?
18     MR. SERBAGI:  Objection to form.
19     A.  It depends.
20     Q.  Would they be returned?
21     A.  Once again, it depends.  Sometimes
22  photographs are returned, but you would
23  have to specify your question in order for
24  me to give you a good answer.
25     Q.  Okay.

**Page 35**

1           Stevens
2      Well, you have some third-party
3  making copies of photographs, and I want
4  to know what the various forms of those
5  photographs would be after the exhibition.
6      MR. SERBAGI:  Objection to form.
7      A.  I can give you an example.
8      Q.  That would be good.
9      A.  For example, if we submit digital
10  files and this third-party that you refer
11  to prints from those digital files and
12  those prints are exhibited to the public,
13  in some cases, we receive those prints
14  that are on exhibition back.  They are
15  returned to us.  But like I said, every
16  exhibition, every deal is different.
17     Q.  And all of this would be set out
18  in a written agreement?
19     MR. SERBAGI:  Objection.
20     A.  We would try in all of our
21  agreements to specify the conditions.
22     Q.  So there would be an agreement
23  relating to an exhibition?
24     MR. SERBAGI:  Objection.
25     A.  Most exhibitions that we do

**Page 36**

1           Stevens
2  preclude an agreement.
3      Q.  And those agreements would be in
4  writing?
5      A.  I have seen some written
6  agreements relating to exhibitions.
7      Q.  Are you aware of any exhibitions
8  that are not subject of a written
9  agreement?
10     MR. SERBAGI:  Objection to form.
11     A.  You could refresh my recollection.
12  I cannot remember something right now of
13  what would be -- it's a possibility, but I
14  can't remember an instance of that.
15     Q.  Just so I'm clear, you cannot
16  recall a situation in which there would
17  be -- in which there wouldn't be a written
18  agreement?
19     MR. SERBAGI:  Objection.  Asked
20  and answered.
21     Q.  Go ahead.
22     A.  I would agree with your answer to
23  your question.
24     Q.  There you go, finally somebody who
25  agrees with me.

**Page 37**

1           Stevens
2      Do the images that are submitted
3  for exhibition all contain copyright
4  notices?
5      MR. SERBAGI:  Objection.  Form.
6      A.  Can you repeat the question,
7  please?
8      Q.  Do the images that you submit for
9  exhibition contain copyright notices?
10     MR. SERBAGI:  Objection.  I want
11  to make a statement for the record.
12     I have allowed you to go for
13  about an hour now with questions that
14  have nothing whatsoever to do with the
15  pending issues in the case.  We have a
16  motion for a protective order before
17  Judge Fox.  The subject of that
18  protective order is that the
19  deposition testimony be limited to the
20  pending claims that we have -- claim
21  that we have against you, namely, that
22  Marilyn Monroe was domiciled in New
23  York and your claim that the Rizzoli
24  is in the public domain.
25     Since you identified the

10 (Pages 34 to 37)

Melissa Stevens

**Page 38**

1     Stevens
2   Ballantine work, I allowed testimony
3   as to that. I think I'm going to note
4   for the record to the extent that
5   anything in this deposition testimony
6   is related to issues outside those
7   works, that we object to that, and I
8   ask you to limit your questioning to
9   the pending issues in the case.
10     MR. SLOTNICK: Number one, we
11   disagree significantly with your
12   characterization of what our claim is
13   and what our 30(b)(6) is. I don't
14   think there is any real need to have
15   significant questioning as to whether
16   the Rizzoli works are in the public
17   domain, because a court of competent
18   jurisdiction already ruled they are in
19   the public domain.
20     I am asking this witness about
21   the nature of her business. Frankly,
22   I suspect that the background is far
23   more significant than the specifics of
24   any photograph, whether it is limited
25   to Rizzoli or the other book or not,

**Page 39**

1     Stevens
2   and I'm going to continue to ask
3   questions regarding the background of
4   this business so I understand the
5   business better so we can deal with
6   the specifics.
7     Your request for a protective
8   order is still merely a request. Your
9   objection is noted. You can note it
10   as you feel appropriate. But I'm
11   going to ask the questions and you can
12   object to them, and we'll let the
13   judge and the magistrate address the
14   issue.
15     Is there a question pending?
16     (Record read)
17     MR. SERBAGI: Objection. You can
18   answer as to the Rizzoli and
19   Ballantine works.
20     A. Could you specify what you mean by
21   contain?
22     Q. First of all, do you know what a
23   copyright notice is?
24     A. I'm not a copyright expert, but I
25   am aware of the term.

**Page 40**

1     Stevens
2     Q. Copyright notice would be a C in
3   the circle or the word copyright with
4   either a date or the identification of the
5   claims, person claiming ownership.
6     So are you familiar with that?
7     A. I am familiar with that.
8     Q. You have seen copyright notices?
9     A. Yes, I have.
10     Q. And you have seen them on
11   photographs?
12     A. Yes, I have.
13     Q. And the question is: On
14   photographs or images that are utilized by
15   SFA, do each of them have a copyright
16   notice on each image in some form or
17   another?
18     MR. SERBAGI: Objection to form.
19     A. Could you repeat that question,
20   please?
21     (Record read)
22     MR. SERBAGI: Objection to form.
23     A. Are photographs utilized by SFA,
24   do each of those have a copyright notice
25   on them? Well, once again, responding to

**Page 41**

1     Stevens
2   your question -- let me respond this way.
3   We do our best to protect our copyrights
4   to all the images in our collection. But
5   in response to your question, I find it a
6   little unclear. Do images that we, that
7   SFA uses --
8     Q. Licenses, exploits through third
9   parties?
10     MR. SERBAGI: Objection.
11     A. Do they contain copyright notices?
12     Q. Yes.
13     MR. SERBAGI: Objection.
14     You can answer as to Rizzoli and
15   Ballantine.
16     A. I would really -- in regards to
17   Rizzoli and Ballantine, you would really
18   have to supply me with a specific example
19   with an image from those books.
20     Q. Okay.
21     First of all, I assume that you
22   are going to abide by your counsel's
23   direction to limit your answer to Rizzoli
24   and Ballantine?
25     MR. SERBAGI: Objection.

11 (Pages 38 to 41)

Melissa Stevens

| Page 42 | Page 44 |
|---|---|
| 1       Stevens | 1       Stevens |
| 2    MR. SLOTNICK: I want to know | 2    MR. SERBAGI: Objection. |
| 3 what the scope of her answer is going | 3    A. Once again, I'm not a copyright |
| 4 to be. She could ignore your advice. | 4 expert, but I have seen registrations for |
| 5    MR. SERBAGI: Ask her questions | 5 those two books. I cannot say, as you |
| 6 and she'll answer them. | 6 have said in your question, that they are |
| 7    MR. SLOTNICK: I just asked her a | 7 for specific images. I think those were |
| 8 question. | 8 your words. I'm not sure what you mean by |
| 9    A. My attorney has advised me, and | 9 that. I'm happy to look at a document, if |
| 10 I'm going to take the advice of my | 10 you have something in mind. |
| 11 attorney. | 11    Q. You have stated now several times |
| 12    Q. Okay. | 12 that you are certain that you have seen |
| 13     You stated before that you do your | 13 registrations for the Ballantine book and |
| 14 best to protect your rights and your | 14 for the Rizzoli book? |
| 15 images. | 15    A. That is correct. |
| 16     How do you do that; how does SFA | 16    Q. We've gotten that established? |
| 17 do that? | 17    A. Right. |
| 18    MR. SERBAGI: Objection to form. | 18    Q. Are you familiar with the |
| 19    A. Well, for example, we maintain | 19 photographs in those books? |
| 20 records that relate to issues of | 20    MR. SERBAGI: Objection to form. |
| 21 copyright. | 21    A. I have seen photographs of images |
| 22    Q. Such as? | 22 in both of those books. |
| 23    A. I have reviewed documents related | 23    Q. Have you seen, have you actually |
| 24 to copyright registrations. | 24 seen the books? |
| 25    Q. Such as? | 25    A. I see one of the books right there |

| Page 43 | Page 45 |
|---|---|
| 1       Stevens | 1       Stevens |
| 2    A. I have seen registrations for the | 2 on the table. Both books on the table. |
| 3 Ballantine and Rizzoli books. | 3    Q. Before seeing them sitting here on |
| 4    Q. Have you seen registrations for | 4 a stack on my desk, have you seen them |
| 5 any individual picture contained in the | 5 before? |
| 6 Ballantine or Rizzoli books? | 6    A. To the best of my recollection, I |
| 7    (Record read) | 7 have seen the Rizzoli book. I can't tell |
| 8    A. Have I seen -- can you repeat the | 8 you when. I was aware of its existence a |
| 9 question again, please? | 9 while ago. I have never seen the |
| 10    (Record read) | 10 Ballantine book. |
| 11    MR. SERBAGI: Objection to form. | 11    Q. Do you know if either the Rizzoli |
| 12    A. I will repeat that I have seen | 12 or the Ballantine books are maintained in |
| 13 registrations for the Ballantine book, the | 13 the archives of SFA? |
| 14 images in the Ballantine book. Really I | 14    MR. SERBAGI: Objection to form. |
| 15 would have to look at the -- in order to | 15    A. I'm really not sure, but I could |
| 16 really answer that question, I would have | 16 ask our archivist. |
| 17 to look at the specific registrations that | 17    Q. That would be Edith Marcus? |
| 18 refer to the Ballantine book and the | 18    A. Yes. |
| 19 Rizzoli book. But I have seen documents | 19    MR. SERBAGI: When you're done |
| 20 that relate to copyright registrations of | 20 with this line of questioning, we've |
| 21 those books. | 21 been going for an hour and five, can |
| 22    Q. And the question I'm asking is if | 22 we take a break? When you're done |
| 23 you have seen registrations of the | 23 with this line. |
| 24 photographs in the books as individual | 24    Q. So in preparation for today's |
| 25 photographs. | 25 deposition, you did not look at the |

12 (Pages 42 to 45)

**ESQUIRE DEPOSITION SERVICES, LLC.**
**1-800-944-9454**

Melissa Stevens

**Page 46**

1      Stevens
2  Rizzoli book or the Ballantine book?
3      A:  That's not completely true.  In
4  preparation for this deposition, I
5  reviewed the documents that I was required
6  to view.  Among those documents, I have
7  seen photocopies of the Rizzoli book and
8  the Ballantine book.
9      Q.  And those photocopies contain
10  copies of photographs?
11     A.  That is correct.  It's very post
12  modern.
13     Q.  And the question that I would ask,
14  with respect to any of those specific
15  photographs, you had seen a separate
16  copyright registration certificate?
17     MR. SERBAGI:  Objection to form.
18     A.  Once again, I'm not -- can you
19  repeat the question?  I'm not entirely
20  sure what you mean.
21     Q.  You have stated that you have seen
22  a registration certificate for the Rizzoli
23  book and for the Ballantine book?
24     A.  Yes.
25     Q.  You have stated that each book

**Page 47**

1      Stevens
2  contains photographic images which you
3  have also seen in preparation for today?
4      A.  That is correct.
5      Q.  I'm saying, in preparation for
6  today, did you see a separate registration
7  certificate for a specific photograph that
8  is contained in the book?
9      MR. SERBAGI:  Objection to form.
10     A.  I still have the same answer.  I'm
11  not entirely sure what you mean by that.
12  If you would like to show me a document,
13  I'm happy to look at it.  I have seen
14  quite a few documents, and I'm certain
15  that I have seen registrations for each of
16  those books, but I really cannot recall at
17  this moment whether or not I have seen
18  specific -- I can't even remember your
19  exact wording, but my answer is, I can't
20  recall, but I'm happy to look at the
21  documents.
22     MR. SLOTNICK:  Let's take a
23  break.
24     (Thereupon, a recess was taken,
25  and then the proceedings continued as

**Page 48**

1      Stevens
2  follows:)
3      MR. SLOTNICK:  I'm going to ask
4  the court reporter to mark as Exhibit
5  2 the book which we have alluded to,
6  which is a book entitled Marilyn
7  Monroe, The Life, the Myth, otherwise
8  known as the Rizzoli book.
9      I'm sorry, we only have one copy
10  of this, but this is what we have got.
11     (Defendants' Exhibit 2, Book
12  entitled, Marilyn Monroe, The Life, The
13  Myth, marked for identification, as of
14  this date.)
15  BY MR. SLOTNICK:
16     Q.  I'm going to ask you to take a
17  look at what's been marked as Defendants'
18  Exhibit 2.  For brevity, we'll call it the
19  Rizzoli book.
20     Is this the book you said you have
21  seen photographs of?
22     A.  Yes, it is.
23     Q.  And this is the book that you
24  looked at, or a photocopy of that book is
25  what you looked at to prepare for the

**Page 49**

1      Stevens
2  deposition?
3      A.  That is correct.
4      Q.  And to the best of your knowledge,
5  was it a photocopy of the entire book or
6  just sections of it?
7      A.  I would have to really see the
8  photographs again to verify page by page,
9  but I have seen photographs of a
10  significant -- of at least a significant
11  portion of the book.
12     Q.  I'm going to ask you to look at
13  what appears to be an unnumbered page and
14  specifically look at the top of the page,
15  which says, "Published on the occasion of
16  the exhibition Marilyn Lomito" and a list
17  of names under collectors and lenders.
18     A.  Okay.
19     Q.  Was this one of the pages that you
20  looked at in preparation for today's
21  deposition?
22     A.  I really do not recall seeing this
23  page, but it is possible that it was in
24  the documents.
25     Q.  Do you notice the name Edith Shaw

13 (Pages 46 to 49)

Melissa Stevens

| Page 50 | Page 52 |
|---|---|

**Page 50**

1          Stevens
2   Marcus?
3       A.   After scanning the page, I do not
4   see her name, but if it is there, you can
5   point it out to me.
6           MR. SERBAGI:   It would be helpful
7   to have a copy of this.
8           MR. SLOTNICK:   We're running on a
9    tight shoestring.  It's hard to find
10   this book.
11       Q.   I'm going to make a little mark
12   next to it with a pen.  I'm not changing
13   the book at all.
14         Do you see Marcus's name there
15   now?
16       A.   Yes, I see it now.
17       Q.   Do you know why she is listed as a
18   lender?
19           MR. SERBAGI:   Objection to form.
20       A.   No, I don't.  I would have to get
21   a definition of what lender means.
22       Q.   Do you know what it is that she
23   may have lent to the exhibit?
24           MR. SERBAGI:   Objection to form.
25       A.   Can you repeat the question,

**Page 51**

1          Stevens
2   please?
3         (Record read)
4       A.   What she may have lent?
5       Q.   Or did lend.
6           MR. SERBAGI:   Objection.
7       A.   I do not know what it is.
8       Q.   So you don't know why she is
9   listed under collectors and lenders?
10           MR. SERBAGI:   Objection. Form.
11       A.   I don't know why.
12       Q.   So consequently, you don't know
13   what she lent, if she lent anything?
14       A.   Well, once again, if you supply me
15   with more information, such as what
16   Rizzoli intended by the word collectors
17   and lenders, I might be able to respond
18   better, but I really can't answer the
19   question without more information.
20       Q.   There are a number of pages in the
21   book that I have tabbed with yellow
22   Post-Its, and I would like you to take a
23   look at some of those photographs, please.
24       A.   Sure.
25         Okay. I have looked at the marked

**Page 52**

1          Stevens
2   pages.
3       Q.   Are those photographs -- are those
4   pages something that you looked at in
5   preparation for the deposition today?
6       A.   Yes, they are.
7       Q.   And other than looking at those
8   specific photographs, is there anything
9   else that you viewed relating to those
10   photographs in preparation for today?
11           MR. SERBAGI:   Objection to form.
12       A.   It's a very broad question.  Could
13   you please specify?
14       Q.   Sure.
15         You stated that you looked at the
16   registration certificate for the Rizzoli
17   book, correct?
18       A.   Yes.
19       Q.   Were there any other documents
20   relating to this Rizzoli book that you
21   looked at?
22           MR. SERBAGI:   Objection to form.
23       A.   It's possible that some of the
24   legal papers that are part of the
25   pleadings might refer to the concepts

**Page 53**

1          Stevens
2   we're discussing today.
3       Q.   Do you mean the pleadings in the
4   lawsuit against Rizzoli?
5       A.   By legal papers, I mean papers
6   prepared by attorneys, and I believe that
7   a lot of the documents I have seen
8   potentially relate to issues that I'm here
9   to discuss for the deposition.
10       Q.   Do you know the difference between
11   a letter and a document filed with the
12   court, pleading, an answer, a complaint?
13           MR. SERBAGI:   Objection to form.
14       A.   Well, I'm certainly not an
15   attorney.  Do I know the difference -- can
16   you repeat your question, between a letter
17   and a what?
18       Q.   And a complaint.
19       A.   I can't give you a legal
20   definition of the difference.  If you show
21   me a document and tell me it's a letter,
22   I'm happy to look at it, versus a document
23   that's a complaint.
24       Q.   Let's stick with the more -- you
25   have testified that you have seen these

14 (Pages 50 to 53)

Melissa Stevens

**Page 54**

```
1          Stevens
2   photographs in the Rizzoli book, and you
3   testified that you have seen a copy of the
4   registration certificate, and you
5   testified that you have seen what you call
6   certain documents relating to some of the
7   legal issues, and I'm asking you to tell
8   me in any category you wish what those
9   documents were.
10         MR. SERBAGI:  Objection to form.
11     A.  Once again, it's a very general
12  question.  I'm happy to look at a specific
13  document, if you have something in mind.
14  I cannot recall.
15         MR. SLOTNICK:  I'll ask the
16     reporter to mark this as Exhibit 3.
17         (Defendants' Exhibit 3,
18     Complaint, marked for identification,
19     as of this date.)
20  BY MR. SLOTNICK:
21     Q.  I'm showing you what's been marked
22  as Defendants' Exhibit 3, which is
23  identified as a complaint in the action
24  Sam Shaw versus Rizzoli international.
25         Is this a document you recall
```

**Page 55**

```
1          Stevens
2   seeing in preparation for today's
3   deposition?
4      A.  Yes, I recall seeing this
5   document.
6      Q.  When exactly did you look at the
7   document?
8      A.  Sometime in the past week.
9      Q.  And without going into specific
10  discussions, when you reviewed the
11  document, was anyone else present while
12  you reviewed the document?
13     A.  No.
14     Q.  Was there ever a time where you
15  reviewed this document in the presence of
16  counsel?
17         MR. SERBAGI:  Objection.  It's a
18     yes or no.
19     A.  No.
20     Q.  Was there ever a time where you
21  had discussions regarding this document
22  with counsel?
23         MR. SERBAGI:  Objection.  You can
24     answer yes or no.
25     A.  No.
```

**Page 56**

```
1          Stevens
2      Q.  Do you understand what this
3   document is?
4      A.  Well, I'm not an attorney, but I
5   would have to read the whole thing right
6   now to really truly refresh my memory of
7   it.  But I think I generally have an
8   understanding.
9      Q.  And what is your general
10  understanding?
11     A.  My general understanding is
12  that -- my general understanding of the
13  situation is that Sam Shaw wrote text and
14  submitted a photo for -- to -- for the
15  purpose of a catalog, and I generally
16  understand that -- my general knowledge of
17  the situation is that he was unaware that
18  this book was going to be published or was
19  published, and I believe that they used
20  his text and perhaps the photo that he
21  supplied in the book and he disagreed with
22  that use.
23     Q.  And is your answer to my question
24  based solely upon reading the complaint?
25     A.  I recall seeing the complaint
```

**Page 57**

```
1          Stevens
2   amongst the documents that I was provided
3   for preparation today, and I also believe
4   that I am a member of the family, I have
5   been around, and am answering generally
6   because I do remember conversations
7   amongst the family about this issue.
8      Q.  And what family members did you
9   have those conversations with?
10     A.  I really can't recall a specific
11  person.  I remember the issue.  I
12  believe -- I'm not sure what year this
13  was.  Was it in the 90s, 1990s?
14     Q.  Yes.
15     A.  Right, 1996 is the date on the
16  complaint.  So it is more than ten years
17  ago.  I remember the issue.  I remember
18  mention of Rizzoli at the time, and I
19  remember that there was a legal action
20  that my grandfather, Sam Shaw, took
21  against Rizzoli publications.
22     Q.  Do you know what the disposition
23  of that legal action was?
24     A.  Can you define disposition?
25     Q.  Do you know what the court ruled?
```

15 (Pages 54 to 57)

Melissa Stevens

Page 58

```
1           Stevens
2      MR. SERBAGI:  Objection to the
3   form.
4      A.  I do not know what the court
5   ruled, but I'll happy to look at that
6   piece of paper if you have it.
7      Q.  Are you aware that certain
8   photographs of your grandfather's were
9   placed in the public domain?
10     A.  That's a legal conclusion I cannot
11  make.
12     Q.  I'm not asking you to make a legal
13  conclusion.  I'm not even asking you to
14  agree with my legal conclusion.
15     I'm just asking you to -- I'm
16  asking you a question of fact.  Are you
17  aware that the court ruled that certain of
18  your grandfather's photographs embodied in
19  the Rizzoli book are in the public domain?
20     MR. SERBAGI:  Objection to the
21  form.
22     A.  I'm aware that there was a
23  court -- you're calling it ruling.  I'm
24  not an attorney, so I'm going to stay away
25  from using legal jargon that I don't know
```

Page 59

```
1           Stevens
2   the exact meaning of, but I am aware of
3   that situation to which you refer.
4      Q.  So you're aware there was a
5   lawsuit?
6      A.  Yes, I am.
7      Q.  And you're aware that the lawsuit
8   ultimately ended?
9      MR. SERBAGI:  Objection.
10     A.  I am aware that there was a
11  settlement.
12     Q.  Settlement.  What was the
13  settlement?
14     A.  I believe money exchanged hands,
15  but, once again, I would have to verify
16  that.
17     Q.  Is there a document that would
18  identify that settlement?
19     A.  There might be.
20     Q.  I'm going to ask you to produce
21  that document.
22     MR. SERBAGI:  If we have it, we
23  certainly will.
24     It's my understanding we gave
25  that to you already.
```

Page 60

```
1           Stevens
2      MR. SLOTNICK:  Okay, if you can
3   identify the Bates number.
4      Q.  So you're not familiar other than
5   the settlement that there was a court
6   ruling or court decision or any kind of
7   determination by the court regarding
8   public domain nature of certain books?
9      MR. SERBAGI:  Objection to the
10  form.
11     A.  It's a long question.  Can you
12  please repeat it to me?
13     Q.  Are you familiar with any court
14  determination in regard to any of your
15  grandfather's works in the Rizzoli works?
16     MR. SERBAGI:  Objection to form.
17     A.  I'm aware there was some sort of
18  settlement regarding this legal dispute.
19     Q.  That's all you're aware of?
20     MR. SERBAGI:  Objection to form.
21     A.  I'm aware of this complaint.  I
22  gave a general understanding of the
23  situation surrounding the complaint, and I
24  am aware that there was a judge involved
25  in this lawsuit, and I'm aware that there
```

Page 61

```
1           Stevens
2   was a settlement of some sort.
3      Q.  How are you aware of the
4   settlement?
5      A.  Once again, because I'm a member
6   of the family, and I have been involved in
7   different capacities with the family
8   business over the years.
9      Let me qualify that by saying this
10  complaint is dated 1996, so SEA did not
11  exist at that time obviously, but Sam Shaw
12  is my grandfather, and I was very close to
13  him.
14     Q.  Let me show you what's been marked
15  as Exhibit 4.
16     (Defendants' Exhibit 4, Decision
17  dated March 19, 1999, marked for
18  identification, as of this date.)
19  BY MR. SLOTNICK:
20     Q.  The court reporter gave you what
21  was marked as Defendants' Exhibit 4, which
22  is a copy of a March 19, 1999 decision,
23  the U.S. District Court for the Southern
24  District of New York in the case Sam Shaw
25  and others versus Rizzoli and others.
```

16 (Pages 58 to 61)

Melissa Stevens

| Page 62 |
|---|
| 1      Stevens |
| 2      I will say since I think you said |
| 3  you're not a lawyer that this may be found |
| 4  in other formats.  Let me ask a question |
| 5  before you go too far in looking. |
| 6      If you look at the top, there are |
| 7  a number of names in capital letters.  As |
| 8  counsel will stipulate with me that those |
| 9  are the names of the parties in the |
| 10 lawsuit.  I notice Sam Shaw, and I also |
| 11 notice the name of Edith Shaw Marcus. |
| 12     Do you know why Edith Shaw Marcus |
| 13 was named as a party to this lawsuit? |
| 14     MR. SERBAGI:  Objection to form. |
| 15     A.  I do not. |
| 16     Q.  Did you make inquiry into that |
| 17 prior to coming here today? |
| 18     A.  I just answered that.  I was not |
| 19 aware that she was a party to it, so it |
| 20 would have been hard to ask. |
| 21     Q.  Well, you could have asked and |
| 22 gotten answers and said we don't know. |
| 23     MR. SERBAGI:  Objection. |
| 24     A.  I don't understand. |
| 25     Q.  Never mind. |

| Page 64 |
|---|
| 1      Stevens |
| 2      MR. SERBAGI:  Objection to form. |
| 3      A.  I think you just asked me two |
| 4  questions.  Can you please repeat that? |
| 5      (Record read) |
| 6      A.  I do not recall seeing this |
| 7  document. |
| 8      MR. SLOTNICK:  I'll ask the |
| 9      reporter to mark this as the next |
| 10     exhibit, please. |
| 11     (Defendants' Exhibit 5, Rule 56.1 |
| 12 Statement, marked for identification, |
| 13 as of this date.) |
| 14 BY MR. SLOTNICK: |
| 15     Q.  I'll ask you to look at what's |
| 16 been marked as Defendants' Exhibit 5, |
| 17 which is identified as a Rule 561 |
| 18 statement of material facts in the Sam |
| 19 Shaw versus Rizzoli case. |
| 20     Do you recall seeing this document |
| 21 before? |
| 22     A.  I do not recall seeing this |
| 23 document. |
| 24     Q.  So this is not a document that you |
| 25 looked at in preparation for today's |

| Page 63 |
|---|
| 1      Stevens |
| 2      I'm going to ask you to look at |
| 3  page 9 of 17 of this document.  I will ask |
| 4  you -- specifically you will see in the |
| 5  middle of the page, there are footnotes 6 |
| 6  and 7, and then there is a paragraph and |
| 7  footnote 7.  I ask you to just read that |
| 8  paragraph. |
| 9      A.  Beginning with "in their most |
| 10 recent brief"? |
| 11     Q.  Yes. |
| 12     A.  Okay. |
| 13     Q.  And you see the last sentence of |
| 14 that paragraph states, "To the extent that |
| 15 the plaintiffs now concede that United |
| 16 States copyright applies, it is plain as |
| 17 explained below that the 105 photographs |
| 18 are in the public domain and summary |
| 19 judgment must be granted dismissing the |
| 20 copyright infringement claims as to those |
| 21 photographs." |
| 22     Do you see that? |
| 23     A.  Yes, I do see it. |
| 24     Q.  Have you seen that document in |
| 25 preparation for today's deposition? |

| Page 65 |
|---|
| 1      Stevens |
| 2  deposition? |
| 3      A.  I do not recall seeing this |
| 4  document, however, if it is a part of the |
| 5  documents that you submitted, I believe |
| 6  that you submitted 23 boxes full of |
| 7  documents, so I did the best I could with |
| 8  it. |
| 9      Q.  What does that mean, you did the |
| 10 best that you could? |
| 11     A.  I'm just qualifying my answer.  So |
| 12 I have not seen this document, but perhaps |
| 13 it's part of the documents that you |
| 14 submitted, and because there was so many |
| 15 of them, I did my best to prepare for |
| 16 today. |
| 17     Q.  Explain to me what you did to |
| 18 actually prepare for today's deposition? |
| 19     MR. SERBAGI:  Asked and answered. |
| 20     Q.  You can answer. |
| 21     A.  I reviewed my company's files.  I |
| 22 reviewed the documents that relate to |
| 23 today's deposition.  I talked to people in |
| 24 my company, and I also talked to some |
| 25 people that we do business with. |

17 (Pages 62 to 65)

Melissa Stevens

**Page 66**

1          Stevens
2     Q.  When you say your company files,
3   which files did you look at?
4     A.  I looked at accounting documents,
5   statements, for example, I looked at
6   correspondence, faxes, e-mails, letters,
7   et cetera.  I also looked at contracts and
8   agreements that we have.
9     Q.  Were you provided with any
10  documents to specifically look at for
11  today's deposition?
12       MR. SERBAGI:  Objection.  You can
13    say yes or no.
14    A.  Yes.
15    Q.  And what documents were you
16  provided to specifically look at for this
17  deposition?
18       MR. SERBAGI:  Objection.
19    A.  I believe you possess those
20  documents.  There are a lot of them.
21    Q.  I'm asking you specifically what
22  you looked at that you were provided for
23  today's deposition.
24    A.  A large stack of paper.
25    Q.  Who provided those documents to

**Page 67**

1          Stevens
2   you?
3       MR. SERBAGI:  Objection.
4     A.  It depends.  I looked at papers
5   that are available to my company, so they
6   are company documents.
7     Q.  I'm sorry if I'm not being clear.
8       MR. SERBAGI:  She is answering
9     the question.
10      MR. SLOTNICK:  She is not.
11    Q.  But go ahead, you can continue.
12      MR. SERBAGI:  That is an improper
13    statement.  She was in the middle of
14    her answer.
15    A.  So I reviewed my company files and
16  I also reviewed the pleadings of this
17  case.  I prepared for the deposition as
18  stated in the notice of deposition, and I
19  read documents related to that, to today.
20    Q.  I'm not looking for what you
21  looked at.  I'm looking for the name of
22  the person or persons who provided you
23  with documents.  That's the question I
24  asked.
25    A.  Okay.

**Page 68**

1          Stevens
2     It's a general question, and my
3   general answer is, for example, the
4   company documents that I looked at for
5   today were provided to me by my company,
6   specific people that work in my company,
7   documents that are available to me because
8   I work in a company, so to a certain
9   extent, I guess I could say I provided
10  them to myself.  In addition, my attorneys
11  provided me with certain documents.
12    Q.  The documents that your company
13  provided you, were those documents
14  provided at anyone's direction to the best
15  of your knowledge?
16       MR. SERBAGI:  Objection to form.
17    Q.  Did you ask for the documents?
18    A.  It's a very general question.
19  Some documents by definition are available
20  to me because I work for the company, so
21  there are files that are available to me
22  because of that.
23       Did I specifically -- I might have
24  specifically in the course of the past
25  month, so it's possible that I

**Page 69**

1          Stevens
2   specifically requested certain documents
3   and had particular questions that I would
4   then direct to individuals in my company
5   who may or may not have been more informed
6   about a particular issue than I am.
7       I did my best to become informed.
8   I don't know if that answers your question
9   or not.
10    Q.  Can you identify the specific
11  people who provided documents to you that
12  you reviewed in preparation for today?
13    A.  I believe I already answered that.
14    Q.  I'm looking for specific names.
15    A.  Specific names of people that
16  provided documents to me for preparation
17  for today?
18    Q.  Yes.
19    A.  Edith Marcus might have assisted
20  me.  Meta Stevens may have assisted me.
21  Susan Shaw might have also assisted me.
22  My attorneys furnished me with documents.
23    Q.  What documents did your attorneys
24  furnish you with?
25       MR. SERBAGI:  Objection.  You're

18 (Pages 66 to 69)

Melissa Stevens

**Page 70**

1      Stevens
2   not entitled to inquire as to
3   documents that I gave her or didn't
4   give her.
5      MR. SLOTNICK: I'm just asking a
6   question. You can object to it and
7   direct her not to answer, if you want.
8      MR. SERBAGI: I'm going to direct
9   the witness not to answer that.
10      A.   I will not answer on the advice of
11   my attorney.
12      Q.   You already said you were going to
13   listen to your lawyer. I respect that.
14      I believe you stated, but it has
15   been so long ago, that you don't recall
16   seeing the Rule 51.6 statement?
17      A.   What is the Rule 51.6 statement?
18      Q.   The statement that is sitting in
19   front of you as Exhibit 5.
20      A.   I do not recall seeing this
21   document.
22      Q.   Do you recall any document, seeing
23   any document that identified certain works
24   as being in the public domain?
25      MR. SERBAGI: Objection to form.

**Page 71**

1      Stevens
2      A.   Can you repeat the question,
3   please?
4      Q.   I'll ask it a different way. Why
5   don't you look at page 2.
6      Do you recall seeing any document
7   in preparation for today dealing with
8   photographs on pages 146 and 147 that
9   dealt with whether or not those works were
10   in the public domain?
11      MR. SERBAGI: Objection to form.
12      A.   What are the photos on page 146
13   and 147?
14      Q.   The book is in front of you.
15   We're talking about the Rizzoli book.
16      A.   I will now go to page 146 and 147
17   in the Rizzoli book. Could you repeat
18   your question?
19      (Record read)
20      MR. SERBAGI: Objection to form.
21      MR. SLOTNICK: I'll withdraw the
22   question.
23      Q.   Have you seen these photographs
24   before, the ones on page 146 and 147?
25      A.   Yes, I have.

**Page 72**

1      Stevens
2      Q.   Would it be accurate to
3   characterize those generally as part of
4   the flying skirt series of photographs?
5      MR. SERBAGI: Objection to form.
6      A.   Some of them are part of the
7   flying skirt series.
8      Q.   Which ones are?
9      A.   Which ones are?
10      Q.   Are.
11      A.   Would you like me to point to
12   them?
13      Q.   Yes.
14      A.   This one, this one, this one, this
15   one, this one, this one, and this one.
16      Q.   So is it accurate to say that the
17   only photograph that is not part of the
18   flying skirt series is the red, rather
19   large red photograph or drawing on page
20   146?
21      MR. SERBAGI: Objection to form.
22      A.   I really can't say. It certainly
23   doesn't look like it is part of the
24   series. However, I'll qualify my answer
25   by saying it is a photo of just her head,

**Page 73**

1      Stevens
2   so I would have to say probably part of
3   the photo, the larger photo that it
4   belongs to.
5      Q.   "Her" being Marilyn Monroe?
6      A.   Correct.
7      Q.   Do you know how many photographs
8   are actually in the flying skirt series?
9      MR. SERBAGI: Objection to form.
10      A.   Did you say how many photos are
11   approximately in?
12      Q.   Yes.
13      A.   I really don't know.
14      Q.   Do you know if it is more than the
15   10 photographs that you pointed to?
16      MR. SERBAGI: Objection.
17      A.   I believe it is more than these
18   10, yes.
19      Q.   Do you know if it is more than 25?
20      A.   I really don't know, but I'm happy
21   to look at -- I would have to look at my
22   collection.
23      Q.   In preparing for today's
24   deposition, did you review what both
25   parties have called the flying skirt

19 (Pages 70 to 73)

Melissa Stevens

**Page 74**

1              Stevens
2    series?
3         MR. SERBAGI: Objection to form.
4         A.   That is a general question. I
5    have seen these photos, and I have looked
6    at them in preparation for today, and it
7    is my understanding that they are
8    considered what both parties have called
9    the flying skirt series.
10        Q.   And I'm asking you whether in
11   preparation for today you have looked at
12   other photographs third-party flying skirt
13   series?
14        MR. SERBAGI: Objection to form.
15        A.   It's possible that I looked at
16   other photographs that also would be
17   considered a part of this series.
18        Q.   And you looked at these
19   photographs this week, last week?
20        A.   I have seen these --
21        MR. SERBAGI: Objection to form.
22        A.   I have seen photos that would be
23   considered part of the flying skirt series
24   my entire life.
25        Q.   I'm only asking you what you did

**Page 75**

1              Stevens
2    in preparation for today's deposition.
3         A.   In preparation for today's
4    deposition, I looked at these photos that
5    are in front of me right now, and I looked
6    at the documents that were provided to me.
7    So is it possible that there is a flying
8    skirt photo in the other documents, it's
9    possible. If you want to show me a
10   particular document, I can tell you if I
11   have seen it.
12        Q.   Did you request in preparation for
13   today that someone provide you with the
14   entire flying skirt series of photographs?
15        MR. SERBAGI: Objection to form.
16        A.   Can you repeat the question,
17   please?
18        (Record read)
19        MR. SERBAGI: Objection.
20        A.   In preparation for today, I have
21   looked at a number of photographs that
22   could be considered a part of the flying
23   skirt series. As I said previously, I
24   cannot pinpoint an exact number of
25   photographs, so it would be hard for me to

**Page 76**

1              Stevens
2    answer your question because you have
3    asked me, you specifically said the entire
4    series. So it's hard for me to answer
5    that question.
6         Q.   Let's ask it a different way.
7         Did you ask -- this is only
8    dealing with what you requested -- did you
9    request seeing any of the photographs in
10   the flying skirt series other than the
11   ones in the Rizzoli book?
12        MR. SERBAGI: Objection to form.
13        A.   Well, I cannot recall specifically
14   requesting, as you have stated in your
15   question, however, in preparation for
16   today, I did review company files and
17   amongst the files I also reviewed are our
18   archive and our collection of images.
19        I believe I have been directed to
20   answer in regards to the Ballantine and
21   Rizzoli book, so I'm answering in regards
22   to this Rizzoli book right here in front
23   of me. I have prepared for today by
24   looking at these photographs. Perhaps
25   there are other ones that relate. I'm

**Page 77**

1              Stevens
2    happy to look at those if you would like
3    to show them to me and I can clarify
4    whether or not I have seen them or was
5    requested to see them.
6         Q.   I'm going to ask you to turn --
7    you're still in Exhibit 5. If you go past
8    the numbered pages of the Rule 56.1
9    statement, you will come across a page
10   that's identified at the bottom as page
11   17, and at the top it says "Shaw versus
12   Rizzoli, Sam Shaw, 05-29-97".
13        A.   You said at the bottom of the page
14   it says page 17?
15        Q.   Yes.
16        A.   Got it.
17        Q.   I'll represent to you that this
18   constitutes a section of the deposition of
19   your grandfather in the Shaw versus
20   Rizzoli case.
21        Do you recall seeing this in
22   preparation for your deposition?
23        A.   I do not.
24        Q.   I'm going to ask you to read what
25   is the segment that is identified as page

20 (Pages 74 to 77)

Melissa Stevens

| Page 78 |
| --- |

```
 1              Stevens
 2   76, which is the center section.
 3      A.  Sure.
 4         MR. SERBAGI:  I'd like to note
 5   for the record that none of these
 6   documents have production numbers, and
 7   to my knowledge, they have not been
 8   produced to us although they are
 9   clearly relevant.
10         MR. SLOTNICK:  They are documents
11   presumably from your own clients
12   files, but, okay.
13         MR. SERBAGI:  Well, you say
14   presumably.
15         MR. SLOTNICK:  Your client
16   testified that she has files related
17   to this lawsuit and she looked at
18   documents relating to the lawsuit.
19         THE WITNESS:  I'm not sure I
20   testified to that.
21         MR. SERBAGI:  We'll talk about it
22   later.
23      Q.  Please look at page 77 as well and
24   78.
25      A.  Okay.
```

| Page 79 |
| --- |

```
 1              Stevens
 2      Q.  Thank you.
 3         You'll see at the top right under
 4   where it says page 76, it says, on pages
 5   146 and 147 and skipping ahead to 149,
 6   "Did you take this photo?"  The A part of
 7   the Q and A is, I will represent to you,
 8   the testimony of your grandfather.
 9         Are you familiar with the fact
10   that your grandfather took those pictures
11   on 147, 1347 and 149?
12         MR. SERBAGI:  Objection to form.
13      A.  Can you repeat the question?  Am I
14   familiar with the fact that he took these
15   photos?
16      Q.  Did your grandfather take the
17   pictures on 146, 147 and 149 to the best
18   of your knowledge?
19      A.  To the best of my knowledge, he
20   took most of them.  I believe on page 146,
21   the photo of Marilyn Monroe, just her head
22   that appears on Modern Man, is credited to
23   Weegee, who is the photographer.  It's
24   actually spelled wrong on here.
25      Q.  On page 77, it's line 9, your
```

| Page 80 |
| --- |

```
 1              Stevens
 2   grandfather testified, "Yes, I designed, I
 3   laid out the composition, the design.  I
 4   was assigned by Billy Wilder, Charlie
 5   Feldman producers to come up with a logo
 6   for the picture.  I knew that that would
 7   become the logo."
 8         Are you familiar with the fact
 9   that your grandfather was assigned the
10   task by Billy Wilder and Charlie Feldman?
11      A.  Which task are you referring to?
12      Q.  To lay out the composition and the
13   design and come up with the logo?
14         MR. SERBAGI:  Objection to form.
15      A.  I am familiar -- I'm familiar with
16   the fact that Sam Shaw was the author of
17   the concept of these photos, concept
18   behind them, design behind them, and that
19   he took them.
20      Q.  And how are you familiar with
21   those facts?
22      A.  Well, these are some of the most
23   seen images in the world.  And Sam Shaw
24   was my grandfather, and I spent my entire
25   life knowing that he took these photos.
```

| Page 81 |
| --- |

```
 1              Stevens
 2      Q.  Do you know who Billy Wilder was?
 3      A.  Yes.
 4      Q.  Who was he?
 5      A.  He is a very famous writer and
 6   director, amongst probably other things,
 7   producer maybe.
 8      Q.  He was the director of The 7 Year
 9   Itch?
10      A.  I think so.  I'm not positive.
11      Q.  And Charlie Feldman was the
12   producer of The 7 Year Itch?
13      A.  It is my understanding that that
14   is correct.
15      Q.  Is it your understanding that, as
16   your grandfather said, he was assigned to
17   come up with a logo by them?
18         MR. SERBAGI:  Objection to form.
19      A.  I know that he had an arrangement
20   with Charlie Feldman to come up with this
21   concept.  He staged it, and he took the
22   photos.  It was part of the publicity
23   campaign that I believe also my
24   grandfather was in charge of for this
25   film.
```

21 (Pages 78 to 81)

Melissa Stevens

**Page 82**

```
1           Stevens
2      Q.  So when you say -- so they asked
3  him to do this and he did it?
4      MR. SERBAGI:  Objection to form.
5      A.  I cannot tell you exactly what
6  they asked him to do.  Obviously, I wasn't
7  even alive, in 19 -- I believe it was the
8  fifties.  So I really can't say.
9      Q.  But whether in your capacity as an
10  employee of SFA or as a family member, you
11  have never heard anything that would
12  contradict what your grandfather had sworn
13  to in this deposition?
14      MR. SERBAGI:  Objection to form.
15      A.  Can you repeat your question,
16  please?
17      (Record read)
18      MR. SERBAGI:  Objection.
19      A.  That's a very broad question.
20      Q.  I'll accept a broad answer.
21      MR. SERBAGI:  Objection.
22      A.  Which testimony are you referring
23  to?
24      Q.  Let's break it down.
25          You stated that your grandfather
```

**Page 83**

```
1           Stevens
2  had an arrangement with Charlie Feldman?
3      A.  Yes.
4      Q.  Regarding 7 Year Itch?
5      A.  Yes.
6      Q.  Is it your understanding that your
7  grandfather produced the film 7 Year Itch?
8      MR. SERBAGI:  Objection.
9      MR. SLOTNICK:  Trying to
10      eliminate things.
11      A.  It is not my understanding.
12      Q.  Is it your understanding that
13  Charlie Feldman produced the film?
14      MR. SERBAGI:  Objection.
15      A.  Yes, that is my understanding.
16      Q.  Is it your understanding that
17  Billy Wilder directed the film?
18      A.  It is my understanding that he
19  did.
20      Q.  Is it your understanding that your
21  grandfather took certain photographs for
22  the film?
23      MR. SERBAGI:  Objection.
24      A.  It is my understanding that my
25  grandfather took some of the very famous
```

**Page 84**

```
1           Stevens
2  photographs of the flying skirt series
3  that appear in that film.
4      Q.  And he did that because someone
5  requested that he do that?
6      MR. SERBAGI:  Objection.  We're
7  getting far afield from what's at
8  issue in this case.
9      MR. SLOTNICK:  We're talking
10  about depositions in the Rizzoli case.
11  I don't know how we're far afield.
12      MR. SERBAGI:  Because you're
13  talking about issues that are far
14  afield.
15      MR. SLOTNICK:  I disagree with
16  the characterization, but if you want
17  the witness not to answer any of these
18  questions, it's certainly your right
19  to tell her not to answer anything.
20  I'm perfectly comfortable with going
21  to the court with those directions if
22  you want.  I'm asking a question.  She
23  thought my question was too general.
24  I'm trying to be specific, I'm trying
25  to eliminate all of the things that
```

**Page 85**

```
1           Stevens
2  couldn't possibly have been within her
3  understanding.
4          You can direct your witness to do
5  whatever you want.
6      MR. SERBAGI:  I'll give you some
7  leeway.
8      A.  Can you please reread the question
9  to me?
10      (Record read)
11      MR. SERBAGI:  Objection to form.
12      Q.  You can answer.
13      A.  It is my understanding that Sam
14  Shaw and the producer of the 7 Year Itch,
15  Charles Feldman, worked together and were
16  friends.  And that they had an arrangement
17  which allowed Sam Shaw to, let's say,
18  which made him in charge of the concept
19  and execution of this particular publicity
20  campaign, the taking of the photographs,
21  et cetera.  I don't know if that answers
22  your question.
23      Q.  It does.
24          You said that they had an
25  arrangement.  Was that arrangement ever
```

22 (Pages 82 to 85)

ESQUIRE DEPOSITION SERVICES, LLC.
1-800-944-9454

Melissa Stevens

**Page 86**

1           Stevens
2    reduced to writing?
3           MR. SERBAGI:  Objection to form.
4       A.   I really can't say.  I imagine --
5    well, I shouldn't guess, so I won't guess.
6       Q.   You have never seen such a
7    document?
8       A.   No, I have not.
9       Q.   Do you know whether Sam Shaw was
10   paid pursuant to that arrangement?
11          MR. SERBAGI:  Objection.  What
12      does that have to do with the Rizzoli,
13      Ballantine books?
14          MR. SLOTNICK:  It has an
15      extraordinary amount to do with it.  I
16      don't feel that I have to explain that
17      to you.  If you want her not to
18      answer, you can tell her not to
19      answer.
20      A.   I do not know whether or not he
21   was paid.
22      Q.   Let's go down to page 78, line 5.
23      "Did the producers pay you for
24   these photographs?"  The answer is "Yes,
25   paid me for the assignment, the overall

**Page 87**

1           Stevens
2    assignment."
3           MR. SERBAGI:  I object to the use
4       of this exhibit.  It wasn't produced
5       to us.  The witness has nothing to do
6       with it.
7       Q.   Do you have any reason not to
8    believe what your grandfather's sworn
9    testimony was?
10          MR. SERBAGI:  Objection.
11      A.   Do I have reason not to believe --
12   no, I don't have reason unless you gave me
13   reason, unless someone gives me reason.
14      Q.   Fair enough.
15          Without beating what is already a
16   clearly dead horse here, you have
17   testified that your grandfather and
18   Charlie Feldman had an arrangement.
19      Do you know any of the specifics
20   of that arrangement?
21          MR. SERBAGI:  Objection to form.
22      A.   I have a general understanding of
23   the arrangement.
24      Q.   And what is that general
25   understanding?

**Page 88**

1           Stevens
2       A.   I believe I previously stated that
3    I'm generally -- it is my general
4    understanding that they had an arrangement
5    that put Sam Shaw in charge of this
6    publicity campaign.  You could probably
7    also define it as other things, but, for
8    example, it is also considered a publicity
9    campaign, and my grandfather, Sam Shaw,
10   was in charge of it.  By that I mean, it
11   was his concept.  He executed the concept
12   and subsequently it became one of the most
13   recognizable images in the world.
14      Q.   Let's talk about that.
15          When you say it became one of the
16   most recognizable images in the world,
17   what is your basis for that statement?
18      A.   The basis for that statement is,
19   of course, starts with me and my existence
20   in the world.
21      Q.   Presumably that's not a direct
22   causal relationship?
23      A.   Well, I have talked to a lot of
24   people who have said that to me.  I
25   believe there was recently -- I think, for

**Page 89**

1           Stevens
2    example, if I recall correctly, the BBC
3    had some sort of a television program, it
4    might have been a documentary film, I'm
5    not sure exactly, but it was certainly
6    something that was broadcast in which they
7    named and went through the stories of some
8    of the most recognizable images in the
9    world, and the skirt flying series was
10   named by the BBC, I think it was -- let me
11   clarify -- of the 20th Century
12   photography.
13          MR. SERBAGI:  When you finish
14      with this line, it's about time for a
15      break.
16          MR. SLOTNICK:  Let me go another
17      10, 15 minutes.
18      Q.   I was actually expecting a simpler
19   answer, so let me go there.
20          You said this was part of a
21   publicity campaign for the film?
22          MR. SERBAGI:  Objection.
23      A.   Once again, I wasn't there.  I
24   wasn't alive in the 1950s.  It is my
25   general understanding that Sam Shaw was in

23 (Pages 86 to 89)

Melissa Stevens

**Page 90**

1    Stevens
2  charge of a publicity campaign for the
3  film.
4    Q.  What is your understanding of what
5  a publicity campaign is?
6    MR. SERBAGI:  Objection to form.
7    A.  My general understanding is --
8  let's see, how can I describe this?
9    It's my general understanding that
10  a publicity campaign is a way to promote,
11  in this case, the film, 7 Year Itch, and
12  in this particular case, the primary way
13  in which the publicity campaign functioned
14  was through the use of these photographs.
15  That's my general understanding.
16    Q.  So they publicized the film by
17  publicizing the photographs?
18    MR. SERBAGI:  Objection to the
19    form.
20    A.  They promoted, I would say that
21  they promoted the film through the use of
22  images that also appear in the film.
23    Q.  But did they also include the
24  flying skirt series or parts of the flying
25  skirt series?

**Page 91**

1    Stevens
2    MR. SERBAGI:  Objection to
3    "they".
4    A.  Who is "they".
5    Q.  The publicity campaign.  Were the
6  flying skirt photographs used as part of
7  the publicity campaign, to the best of
8  your knowledge?
9    MR. SERBAGI:  Objection to form.
10    A.  To the best of my knowledge, it's
11  my general understanding that Sam Shaw was
12  in charge of a publicity campaign, and
13  that he took photographs for the publicity
14  campaign, and that those photos were used
15  to promote the film.
16    Q.  Okay.  Just one more small area of
17  inquiry in this category and then we can
18  take a break.
19    On page 78, line 12, your
20  grandfather said, "No, I retained the
21  rights as special photographer.  That's
22  the tradition of the special
23  photographer."
24    Are you familiar with the term
25  special photographer?

**Page 92**

1    Stevens
2    MR. SERBAGI:  Objection to form.
3    A.  I have seen the term special
4  photographer in documents.
5    Q.  Do you know what that term means?
6    MR. SERBAGI:  Objection to form.
7    A.  I can't be certain.
8    MR. SLOTNICK:  Why don't we take
9    a break.
10    MR. SERBAGI:  Come back around
11    1:30.
12    (Thereupon, a recess was taken,
13    and then the proceedings continued as
14    follows:)
15    A F T E R N O O N   S E S S I O N
16    (Time noted:  1:43 p.m.)
17  M E L I S S A   S T E V E N S,   resumed
18    and testified as follows:
19  EXAMINATION BY (Cont'd.)
20  MR. SLOTNICK:
21    Q.  Miss Stevens, you mentioned a name
22  early this morning.  Is it Michelle
23  Minieri at Bradford?
24    A.  I did mention her.
25    Q.  How do you spell Minieri?

**Page 93**

1    Stevens
2    A.  M-I-N-I-E-R-I.
3    Q.  Do you know what her title is at
4  Bradford?
5    A.  President.  She used to be senior
6  vice-president.
7    Q.  How long has Bradford Licensing
8  been affiliated with SFA?
9    A.  Since approximately 2005.
10    Q.  And what is their role with
11  respect to SFA?
12    A.  They represent Shaw Family
13  Archives.  They are a licensing agent for
14  us.
15    Q.  And what does that position
16  entail?
17    A.  What position?
18    Q.  Your licensing agent.
19    A.  They facilitate license agreements
20  on behalf of Shaw Family Archives, or
21  licensing deals.
22    Q.  Do they have anything to do with
23  registering copyrights in any of the
24  photographs?
25    A.  Can you repeat the question.

24 (Pages 90 to 93)

Melissa Stevens

**Page 94**

1      Stevens
2  please?
3      MR. SERBAGI: Objection.
4      A.  Registering the copyrights in what
5  photographs?
6      Q.  Do they register copyright claims
7  with the United States copyright office on
8  behalf of SFA?
9      MR. SERBAGI: Objection to form.
10     A.  Can you repeat the question to me,
11  please?
12     (Record read)
13     A.  To the best -- to my
14  understanding -- I really don't know
15  actually.
16     Q.  Are you familiar with -- do you
17  know what a copyright registration
18  certificate looks like?
19     A.  I have seen copyright registration
20  certificates.
21     Q.  And you have seen them in the SFA
22  files?
23     A.  Yes.
24     Q.  Is it your understanding that
25  someone at SFA actually files those with

**Page 95**

1      Stevens
2  the copyright office or takes care of
3  registering them?
4      MR. SERBAGI: Objection to form.
5      A.  Can you repeat the question to me,
6  please?
7      Q.  I'll ask it a different way.
8      Have you ever registered a
9  copyright for a Sam Shaw photograph with
10  the copyright office?
11     A.  Who do you mean by you?
12     Q.  You, you.
13     A.  Me, Melissa Stevens.
14     Q.  You.
15     A.  Have I personally registered
16  copyright -- have I personally -- repeat
17  the question.
18     Q.  Have you personally submitted a
19  copyright registration certificate to the
20  United States copyright office?
21     A.  No, I have not.
22     Q.  Do you know who, if anyone, at SFA
23  performs that function?
24     A.  With respect to Ballantine and
25  Rizzoli books?

**Page 96**

1      Stevens
2      Q.  We can start there.
3      A.  To give you -- to give you a good
4  answer, I would really have to see those
5  particular copyright registrations.
6      Q.  Okay.
7      A.  It is my understanding -- I'd have
8  to look at the documents to see who signed
9  them to really answer the question.
10     Q.  As a general matter, general
11  background, are you familiar with anyone
12  at SFA who performs the function of
13  registering copyrights in Sam Shaw
14  photographs?
15     A.  With respect to Ballantine and
16  Rizzoli books?
17     Q.  No, generally.
18     A.  Generally speaking, I am aware
19  that certain members of SFA have filed for
20  copyright registration.
21     Q.  And which members of SFA would
22  that be?
23     A.  Edith Shaw Marcus, Meta Stevens.
24  I would have to really look at the
25  particular documents to verify.

**Page 97**

1      Stevens
2      Q.  I should have asked you this
3  before.  Are there any employees of SFA
4  who are not family members of the Shaw
5  family in some form or another?
6      A.  If you count our accountant, he is
7  not a family member.
8      Q.  Is there anyone else?
9      A.  I don't think so.
10     Q.  Does SFA --
11     A.  Of course, we have hired lawyers,
12  so --
13     Q.  This is actually a more narrow
14  question for me.  I'm talking about
15  employees who are on the SFA payroll.
16     A.  Uh-huh.
17     Q.  On a day-to-day basis.
18     A.  And the answer is no.
19     Q.  Does SFA have a clerical staff?
20     A.  I'm not sure what you mean by
21  clerical staff.
22     Q.  One who does filing, secretarial
23  work, answers the phone.
24     A.  We don't have a specific position
25  assigned to anyone in particular of that

25 (Pages 94 to 97)

Melissa Stevens

**Page 98**

1          Stevens
2    nature.
3        Q.   So people who do any or all of
4    those tasks are the people that you have
5    already identified?
6        A.   That is right.
7        Q.   Once again, just generally, you
8    talked this morning about the maintenance
9    of the archive with respect to
10   photographs, images.
11       How are non-photographic materials
12   kept in the ordinary course of business at
13   SFA?
14       MR. SERBAGI: Objection to form.
15       A.   Could you be a little more
16   specific as to what you mean by
17   non-photographic materials?
18       Q.   Sure.
19       Contracts, is there a separate
20   file for contracts?
21       A.   We have a file for contracts.
22       Q.   Is that file maintained on a
23   contracting party basis or on an image
24   basis?
25       MR. SERBAGI: Objection to form.

**Page 99**

1          Stevens
2    A.   You have given me two options.
3    Can you repeat those two options?
4    Q.   Let's use as an example the flying
5    skirt profile photograph. Are you
6    familiar with the photograph I'm talking
7    about?
8    A.   No, I'm not.
9    Q.   You never heard the term flying
10   skirt profile?
11       MR. SERBAGI: Objection. Asked
12       and answered.
13   A.   I have heard the term flying skirt
14   series, which is what we have talked about
15   today, but you said profile.
16   Q.   You're not familiar with that?
17   A.   I don't know what you mean by the
18   way you stated it.
19   Q.   Let's stick with flying skirt
20   series.
21       Are contracts maintained in a file
22   by flying skirt series, or would they be
23   filed by contracting party?
24       MR. SERBAGI: Objection.
25   A.   It's really not a -- my answer is

**Page 100**

1          Stevens
2    not entirely one or the other of the two
3    options you have just given me. We
4    file -- I'd say mostly our contracts are
5    filed according to, let's say, by
6    category, of who they are -- the contracts
7    are with.
8        Q.   You say mostly, and in other
9    cases?
10       A.   Well, I really can't recall
11   another case at this particular moment. I
12   mean, for example, all of our Bradford
13   license agreements are together in the
14   same place.
15       (Defendants' Exhibit 6,
16       Complaint, marked for identification,
17       as of this date.)
18   BY MR. SLOTNICK:
19       Q.   I'd ask you to look at Exhibit 6,
20   which is a copy of a complaint in an
21   action by Sam Shaw against St. Martin's
22   Press and others.
23       The question I will ask after you
24   finish looking at it is whether or not you
25   recall seeing this document before?

**Page 101**

1          Stevens
2    A.   Sorry. Could you repeat the
3    question?
4        (Record read)
5    A.   I do not recall seeing this
6    document.
7    Q.   Are you familiar with a lawsuit
8    that Sam Shaw brought against St. Martin's
9    Press?
10   A.   I'm generally familiar with it.
11   Q.   How did you come to be generally
12   familiar with it?
13   A.   Well, on the last page of this
14   document, it is dated 1993.
15   Q.   Yes?
16   A.   I'm generally familiar with the
17   lawsuit because I'm a member of the
18   family. I was alive during the time that
19   it took place. And I had a close
20   relationship with my grandfather, however,
21   just to qualify, SFA did not exist in
22   1993. It existed from 2002 on. So that's
23   why I say I'm generally familiar with it.
24   Q.   Is SFA the owner of all of the
25   rights to your grandfather's photographs?

26 (Pages 98 to 101)

Melissa Stevens

| Page 102 | Page 104 |
|---|---|
| 1　　　　Stevens | 1　　　　Stevens |
| 2　　MR. SERBAGI: Objection to form. | 2　is our understanding that those rights |
| 3　A.　What do you mean by rights; could | 3　passed either through his Will or through |
| 4　you specify? | 4　a trust document into either your uncle, |
| 5　Q.　Sure. | 5　aunt and mother or to SFA, and I'm trying |
| 6　　Copyright rights, right to license | 6　to make sure that as far as we're all |
| 7　the work, is there anyone else that has, | 7　understanding, that within the family, |
| 8　to your knowledge, that your grandfather | 8　there is no one else that claims rights to |
| 9　left the rights to other than what now is | 9　these photographs? |
| 10　SFA? | 10　　MR. SERBAGI: Objection to form. |
| 11　　MR. SERBAGI: Objection to form. | 11　A.　Once again, it's a convoluted |
| 12　A.　I'm not sure I understand the | 12　question. Can you please repeat it, |
| 13　question.　Could you please repeat it? | 13　because I'm doing my best to answer, but |
| 14　Q.　I don't want to make this a | 14　it is a tricky question. |
| 15　mystery. | 15　Q.　You said your grandfather passed |
| 16　　Your grandfather, while he was | 16　away in 1999? |
| 17　alive, took thousands of photographs.　He | 17　A.　Yes. |
| 18　possessed certain legal rights based upon | 18　Q.　Do you know who the beneficiaries |
| 19　his taking those photographs.　It is my | 19　of his Will were with respect to his |
| 20　understanding that SFA has through your | 20　photographs? |
| 21　mother, your aunt, and your uncle | 21　A.　With respect to what about his |
| 22　succeeded to those rights, and I'm asking | 22　photographs? |
| 23　if there is anyone else out there that | 23　Q.　Possession, ownership of the |
| 24　would have a claim to those rights other | 24　photographs. |
| 25　than SFA? | 25　A.　In 1999, it is my understanding -- |

| Page 103 | Page 105 |
|---|---|
| 1　　　　Stevens | 1　　　　Stevens |
| 2　　MR. SERBAGI:　Objection to form. | 2　I'd have to look at his Will to really |
| 3　A.　So the question is, is there | 3　answer your question.　I would have to |
| 4　anyone else out there besides Edith, Meta | 4　read it line by line.　In 1999, my family |
| 5　and Larry that have rights to Sam Shaw's | 5　was in a lawsuit. |
| 6　rights? | 6　Q.　With whom? |
| 7　Q.　Yes. | 7　A.　Each other. |
| 8　A.　I really don't know how to answer | 8　Q.　So is your lack of clarity based |
| 9　that question.　What rights again are we | 9　upon not recalling what happened in the |
| 10　talking about, copyright? | 10　lawsuit? |
| 11　Q.　Copyright rights, the rights to | 11　　MR. SERBAGI:　Objection to the |
| 12　own the photographs. | 12　form. |
| 13　　MR. SERBAGI:　Objection to form. | 13　A.　Repeat the question.　Is my -- |
| 14　A.　There are two different things. | 14　　(Record read) |
| 15　Which one would you like me to respond to? | 15　A.　No, my lack of clarity is based |
| 16　Q.　Let's start with the copyrights. | 16　upon your question.　I'm a little unclear |
| 17　A.　So please restate the question | 17　about what exactly your question is. |
| 18　exactly. | 18　Q.　How was the lawsuit amongst the |
| 19　Q.　Sure.　Let's do this a different | 19　members of your family resolved? |
| 20　way. | 20　　MR. SERBAGI:　Objection to form. |
| 21　　At the time your grandfather | 21　A.　We made a settlement in 2002. |
| 22　passed away, he was possessed with | 22　Q.　And did that settlement ultimately |
| 23　physical copies of photographs, negatives, | 23　result in the creation of SFA? |
| 24　transparencies, and he was possessed with | 24　A.　Yes, it did. |
| 25　certain rights to use those objects.　It | 25　Q.　I'm going to ask you to look at |

27 (Pages 102 to 105)

Melissa Stevens

**Page 106**

1        Stevens
2    page 2 of the Sam Shaw complaint, and
3    specifically paragraph 3.
4        A.  Okay.
5        Q.  Is it your understanding that your
6    grandfather was, in addition to being a
7    photographer, a creative director?
8            MR. SERBAGI: Objection to form.
9        A.  In his lifetime?
10       Q.  Yes.
11       A.  Yes, he was also a creative
12   director in his lifetime.
13       Q.  Do you know what a creative
14   director does?
15       A.  I really don't.
16       Q.  Did you know that he was creative
17   director of the 7 Year Itch?
18           MR. SERBAGI: Objection to form.
19       A.  I really can't say. I wasn't
20   around during that time.
21       Q.  I'm going to ask you to look at
22   paragraph 4 of the complaint.
23       A.  Okay.
24           Okay.
25       Q.  Paragraph 4 refers to selected

**Page 107**

1        Stevens
2    photos of the flying skirt photographs to
3    be used by other persons. Are you
4    familiar with that at all?
5            MR. SERBAGI: Objection to form.
6        A.  Could you repeat the question,
7    please?
8        Q.  Paragraph 4 indicates that your
9    grandfather permitted selected photos of
10   the flying skirt photographs to be
11   reproduced.
12           Is it your understanding that that
13   is correct?
14           MR. SERBAGI: Objection to form.
15       A.  Are you asking me whether or not
16   paragraph 4 is correct?
17       Q.  Yes, to the best of your
18   knowledge.
19           MR. SERBAGI: Objection to form.
20       A.  Well, I'm reading paragraph 4 out
21   of context. I could read the whole
22   document. This is the first time I'm
23   seeing it.
24       Q.  Okay.
25       A.  So I really can't say whether or

**Page 108**

1        Stevens
2    not I agree to paragraph 4. That would be
3    a legal conclusion that I can't make.
4        Q.  Well, let's ask a different
5    question before I ask you to read the
6    whole thing.
7            Is it your understanding that SFA
8    has permitted photographs from the flying
9    skirt series to be reproduced?
10           MR. SERBAGI: Objection to form.
11       A.  Could you specify what photos
12   you're referring to?
13       Q.  I'm specifying any photograph
14   that's within the flying skirt series.
15           MR. SERBAGI: Objection to form.
16       A.  I'm not sure we defined what all
17   the photographs are in the flying skirt
18   series.
19       Q.  Well, what do you understand the
20   flying skirt series of photographs to be?
21       A.  I understand them to be
22   photographs taken during the filming of
23   the 7 Year Itch film, or around the
24   filming of the 7 Year Itch, or in
25   association with the 7 Year Itch.

**Page 109**

1        Stevens
2        Q.  And you and I have agreed what the
3    terms flying skirt series means.
4            In that context, are you aware of
5    SFA permitting selected photographs from
6    that series to be reproduced?
7            MR. SERBAGI: Objection to form.
8    As to the Rizzoli, Ballantine books.
9            MR. SLOTNICK: Are you directing
10   her not to answer?
11           MR. SERBAGI: I'm saying that's
12   the subject of this deposition.
13           MR. SLOTNICK: Are you directing
14   her not to answer?
15           MR. SERBAGI: You may answer as
16   it relates to the Rizzoli and
17   Ballantine books.
18           MR. SLOTNICK: I'm taking that as
19   you're directing her not to answer
20   with respect to anything else.
21       Q.  I'm asking you the question. I
22   want to ask you with respect to anything
23   other than Rizzoli and Ballantine, and I
24   haven't heard an objection to that, and I
25   haven't heard a direction from your

28 (Pages 106 to 109)

Melissa Stevens

| Page 110 |
| --- |

1        Stevens
2  attorney not to answer, so please answer
3  the question.
4        MR. SERBAGI:  You may answer.
5  Objection to form.
6        THE WITNESS:  You're permitting
7  me to answer that question?  You're
8  advising me to answer that question?
9        MR. SERBAGI:  Yes.
10    A.   It is possible that we license
11  some photographs from the flying skirt
12  series.
13    Q.   And "we" being SFA?
14    A.   Yes.
15    Q.   Are you aware of Sam Shaw or any
16  predecessor to SFA permitting selected
17  photos from the flying skirt series to be
18  reproduced?
19        MR. SERBAGI:  Objection to form.
20    A.   I think you have asked me two
21  questions.
22    Q.   Answer either one of them or both
23  in the series.
24        MR. SERBAGI:  Objection to form.
25    A.   Can you repeat the question,

| Page 111 |
| --- |

1        Stevens
2  because it was Sam Shaw or other
3  predecessors?
4    Q.   Did Sam Shaw permit selected
5  photos of the flying skirt series to be
6  reproduced?
7        MR. SERBAGI:  Objection to form.
8    A.   In his lifetime?
9    Q.   Yes.
10    A.   Photographs from the flying skirt
11  series have been reproduced.
12    Q.   And are -- does SFA maintain in
13  its files documents which would confirm
14  those reproductions authorized by your
15  grandfather?
16        MR. SERBAGI:  Objection to form.
17    A.   You would have to give me a
18  specific circumstance of reproduction, and
19  then I could confirm whether or not we
20  have files that back that up.
21    Q.   Okay.
22        In 1954, the day after the
23  photographs were taken in New York, the
24  flying skirt series, did your father --
25  grandfather, authorize Associated Press to

| Page 112 |
| --- |

1        Stevens
2  reproduce any part of the series?
3        MR. SERBAGI:  Hold on.
4        (Discussion held off the record)
5        MR. SERBAGI:  You can answer as
6  to Ballantine and Rizzoli.
7        I'm directing this witness not to
8  testify about anything in her
9  complaint which is the Ballantine,
10  Rizzoli only.
11        MR. SLOTNICK:  You're directing
12  the witness to answer only with
13  respect to Ballantine and Rizzoli?
14    A.   Could you please repeat the
15  question?
16        (Record read)
17        MR. SLOTNICK:  So you're
18  directing her not to answer that
19  question?
20        MR. SERBAGI:  No, you heard what
21  I said.  It's on the record.  As to
22  Ballantine and Rizzoli.
23    Q.   I'm asking about it being
24  reproduced by the Associated Press, which
25  would seem to be something different, but

| Page 113 |
| --- |

1        Stevens
2  go ahead.
3    A.   At the advice of my attorney, I
4  will respond that with respect to the
5  images in the Ballantine and Rizzoli book,
6  I would have to see those images.  I don't
7  know anything about what arrangement may
8  or may not have existed between Sam Shaw
9  and the Associated Press.  I was not alive
10  during the time.
11        It is my understanding that I'm
12  here today as a representative of Shaw
13  Family Archives that has existed from 2002
14  until the present day.  And I am, of
15  course, a member of my family, and I'm
16  aware of certain circumstances that
17  happened prior to SFA's existence.
18  However, I do not know anything about an
19  alleged relationship between Sam Shaw and
20  the Associated Press.
21    Q.   Is there any member of SFA that
22  was alive in 1954?
23    A.   Yes.
24    Q.   Who might that be?
25    A.   Meta Stevens, Edith Shaw Marcus,

29 (Pages 110 to 113)