**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- X
SHAW FAMILY ARCHIVES, LTD., EDITH  :
MARCUS and META STEVENS,

                                   :

           Plaintiffs,             Case No. 05 Civ. 3939 (CM)

                                   :

       -against-           Honorable Colleen McMahon

                                   :

CMG WORLDWIDE, INC., an Indiana
Corporation and MARILYN MONROE, LLC,  :
a Delaware Limited Liability Company,

           Defendants.
-------------------------------------------------------- X


**MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS /**
**CONSOLIDATED PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT ON**
**PUBLIC DOMAIN AND IN OPPOSITION TO PLAINTIFFS / CONSOLIDATED**
**DEFENDANTS' CROSS-MOTION TO PRECLUDE DEFENDANTS / CONSOLIDATED**
**PLAINTIFFS FROM ASSERTING PUBLIC DOMAIN CLAIM AND FOR SANCTIONS**


                              LOEB & LOEB LLP

                              345 Park Avenue
                              New York, New York 10154
                              Tel: 212-407-4000
                              Fax: 212-407-4990

                              *Attorneys for Marilyn Monroe LLC*

                              SOVICH MINCH, LLP

                              10099 Chesapeake Drive, Suite 100
                              McCordsville, Indiana 46055
                              Tel: 317-335-3601
                              Fax: 317-335-3602

                              *Attorneys for CMG Worldwide, Inc.*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ......................................................................................3

ARGUMENT ........................................................................................................3

I.      SUMMARY JUDGMENT STANDARD ......................................................3

II.     THE SHAW FAMILY PRESENTS NO EVIDENCE OF A GENUINE
        DISPUTE THAT SPECIFIC PHOTOGRAPHS OF MARILYN
        MONROE TAKEN BY SAM SHAW ARE IN THE PUBLIC DOMAIN.................4

        A.      The Shaw Family's Attempt to Artificially Narrow Defendants' Public
                Domain Claim to Include Only the Ballantine and Rizzoli Books
                Contradicts Judge Fox's Ruling and the Clear Language of Defendants
                Third Amended Complaint ...................................................................4

        B.      Defendants have Demonstrated that the Images in the Ballantine Book
                are Unquestionably in the Public Domain .............................................5

        C.      The Shaw Family Has Not Rebutted the Evidence that Monroe/Shaw
                Photographs from the Film *The Seven Year Itch* Were Works Made for
                Hire .................................................................................................7

        D.      The Shaw Family Has Not Rebutted the Evidence that the
                Monroe/Shaw Photographs Published in Newspapers and Magazines in
                the 1950s Were Published With Sam Shaw's Consent and Are
                Therefore in the Public Domain ...........................................................11

        E.      The Shaw Family Misunderstands the Significance of the *Rizzoli*
                Decision ..........................................................................................11

        F.      Documents Withheld by the Shaw Family Confirm that Defendants
                Named the Proper Parties....................................................................12

III.    THERE IS NO GENUINE DISPUTE THAT THERE IS AN ACTUAL
        CONTROVERSY OVER THE PUBLIC DOMAIN SHAW/MONROE
        PHOTOGRAPHS ................................................................................14

        A.      The Shaw Family Fails to Recognize the Nature of Defendants'
                Licensing Business.............................................................................15

i

B.    Defendants Have Demonstrated a Definite Intent and Apparent Ability to Use the Disputed Monroe/Shaw Photographs ................................................. 15

    1.    Defendants Intended to Use the Disputed Monroe/Shaw Photographs When the Third Amended Complaint was Filed .............. 16

    2.    Defendants' Course of Conduct Demonstrates Their Definite Intention to Use the Disputed Monroe/Shaw Photographs and that they are Once Step Away from Infringement ................................. 17

    3.    Defendants Currently License Marilyn Monroe-Related Trademarks and Did So When the Third Amended Complaint was Filed ........................................................................................ 20

    4.    A Declaration that the Disputed Monroe/Shaw Photographs are in the Public Domain Would Add Value to Defendants' Marilyn Monroe-Related Trademarks ................................................... 21

C.    Plaintiffs have Created a Reasonable Apprehension of Liability for Defendants' Planned Use of the Disputed Monroe/Shaw Photographs ............. 22

    1.    Plaintiffs have Refused to Acknowledge Whether Any Monroe/Shaw Photographs are in the Public Domain ........................... 22

    2.    An Abundance of Evidence Shows Plaintiffs' Public Assertions of Copyright Ownership to Public Domain Monroe/Shaw Photographs ..................................................................................... 22

        i)    Plaintiffs have Asserted Copyright Infringement Claims Against Defendants in this Action, Including Claims Based on Monroe/Shaw Photographs in the Public Domain ..................................................................................... 22

        ii)    Plaintiffs have Asserted to Third Parties that they have Rights to Public Domain Photographs ........................................ 24

        iii)    Plaintiffs Broadcast their Claims of Copyright Ownership of Public Domain Monroe/Shaw Photographs to the Entire World ................................................... 26

D.    The Court Should Exercise its Discretion to Hear Defendants' Public Domain Claim Because a Declaratory Judgment will Serve the Purposes of the Declaratory Judgment Act ........................................................ 28

E.    Defendants' Motion Papers are Sufficiently Definite to Put the Shaw Family on Notice of Defendants' Requested Relief ........................................... 28

IV.   THE SHAW FAMILY'S MOTION TO PRECLUDE DEFENDANTS
      FROM ASSERTING THEIR PUBLIC DOMAIN CLAIM IS IMPROPER
      AND ENTIRELY UNSUPPORTED BY THE RECORD...........................................28

      A.    The Shaw Family's Preclusion Motion is Improper ............................29

            1.    The Preclusion Motion is an Improper Attempt at a Second
                  Summary Judgment Motion, to Extends the Courts' Page
                  Limits, and to Submit an Unauthorized Sur-Reply...............................29

            2.    The Shaw Family's Preclusion Motion Violates Both Local
                  Rule 37.2 and Magistrate Judge Fox's June 6, 2006 Discovery
                  Order ........................................................................................................30

      B.    Plaintiffs' Preclusion Motion is Meritless ...........................................32

            1.    Defendants Properly Responded to the Shaw Family's
                  Interrogatories ........................................................................................32

                  i)     Contention Interrogatory.................................................32

                  ii)    Intellectual Property Interrogatory..............................36

                  iii)   Defendants' Interrogatory Responses Were Not Limited
                         to Rizzoli.......................................................................37

            2.    Defendants did Not Improperly Fail to Produce Any Documents..........38

            3.    Defendants' 30(b)(6) Testimony Supports, and Does Not
                  Contradict, their Declaratory Judgment Claim ......................................41

V.    PLAINTIFFS ARE NOT ENTITLED TO ATTORNEY'S FEES EITHER
      UNDER THE COPYRIGHT ACT OR FOR ANY ALLEGED
      DISCOVERY FAILURES ............................................................................44

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)......................................................................................................3

*Boisson v. Banian, Ltd.*,
   273 F.3d 262 (2d Cir. 2001).......................................................................................24

*Elizabeth Iron Works, Inc. v. Atlas Machine and Iron Works, Inc.*,
   No. 76 Civ. 1569 (PNL), 1983 U.S. Dist. LEXIS 10828 (S.D.N.Y. Dec. 14, 1983)..............36

*Guadagno v. Wallack Ader Leviathan Assocs.*,
   950 F. Supp. 1258 (S.D.N.Y. 1997)...........................................................................36

*Krause v. Buffalo and Erie County Workforce Dev. Consortium, Inc.*,
   425 F. Supp. 2d 352 (W.D.N.Y. 2006).......................................................................38

*Langman Fabrics, a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear, Inc.*,
   160 F.3d 106 (2d Cir. 1998).......................................................................................43

*Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624 (2d Cir. 2004) ............................................................8, 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574, 106 S. Ct. 1348 (1986)......................................................3, 7, 11, 25

*MedImmune, Inc. v. Genentech, Inc.*,
   127 S. Ct. 764 (2007).......................................................................... 14-15, 18, 20

*Newman-Green, Inc. v. Alfonzo-Larrain*,
   490 U.S. 826, 109 S. Ct. 2218 (1989)........................................................................17

*Nippon Elec. Glass Co. v. Sheldon*,
   489 F. Supp. 119 (S.D.N.Y. 1980) ............................................................................27

*Palazzo ex rel. Delmage v. Corio*,
   232 F.3d 38 (2d Cir. 2000)..........................................................................................43

*Pocketmedicine.com Inc. v. John Wiley & Sons, Inc.*,
   04 Civ. 8369 (LMM), 2006 U.S. Dist. LEXIS 13617 (S.D.N.Y. Mar. 23, 2006) ..................20

*Prince Group, Inc. v. MTS Prods.*,
    No. 95 Civ. 1160, 1998 U.S. Dist. LEXIS 7835 (S.D.N.Y. May 27, 1998) ........................... 36

*Re-Alco, Inc. v. Nat'l Center for Health Educ., Inc.*,
    812 F. Supp. 387 (S.D.N.Y. 1993) ........................................................................... 20

*Research in Motion Ltd. v. Visto Corp.*,
    457 F. Supp. 2d 708 (N.D. Tex. 2006) .............................................................. 23, 26

*Rule v. Brine, Inc.*,
    85 F.3d 1002 (2d Cir. 1996) .................................................................................. 43

*Shaw v. Rizzoli Int'l Publ'ns, Inc.*,
    No. 96 Civ. 4259 (JGK), 1999 WL 160084 (S.D.N.Y. Mar. 23, 1999) .................. 11

*Starter Corp. v. Converse, Inc.*,
    84 F.3d 592 (2d Cir. 1996) ....................................................................... *passim*

*Technical Tape Corp. v. Minnesota Min. & Mfg. Co.*,
    200 F.2d 876 (2d Cir. 1952) .................................................................................. 24

*Wechsler v. Hunt Health Sys., Ltd.*,
    No. 94 Civ. 8294 (PLK), 1999 U.S. Dist. LEXIS 13216 (S.D.N.Y. Aug. 27, 1999) ........ 35-36

*Weiss v. Chrysler Motors Corp.*,
    515 F.2d 449 (2d Cir. 1975) .......................................................................... 35, 36

*Wembly, Inc. v. Superba Cravats, Inc.*
    315 F.2d 87 (2d Cir. 1963) ............................................................................. 18, 19

*West Interactive Corp. v. First Data Resources, Inc.*,
    972 F.2d 1295 (Fed. Cir. 1992) ........................................................................... 23

*Windsurfing Int'l Inc. v. AMF Inc.*,
    828 F.2d 755 (Fed. Cir. 1987) .............................................................................. 19

## STATUTES

17 U.S.C. § 106 ....................................................................................................... 18

17 U.S.C. § 410(c) ................................................................................................... 24

Cal Civ. Code 3344.1 .............................................................................................. 15

**OTHER AUTHORITIES**

7 James W.M. Moore, *Moore's Federal Practice* § 33.172, at 33-99 (3d ed. 2007) ....................32

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.08, at 12-162 (2007)........27

Fed. R. Civ. P. 26(e)(2).........................................................................................................35

Fed. R. Civ. P. 56(f).......................................................................................................25, 39

Fed. R. Civ. Proc. 56(e)(2)........................................................................................................3

Local Rule 33.3(c) ...................................................................................................................33

Local Rule 37.2..................................................................................................................30, 33

## PRELIMINARY STATEMENT

Despite submitting *three* lengthy briefs, Plaintiffs[1] have utterly failed to raise any issue of fact that photographs of Marilyn Monroe taken by Sam Shaw in the 1950s ("Monroe/Shaw Photographs"), including those in the 1955 book *Marilyn Monroe as the Girl* ("Ballantine Book"), are in the public domain. Instead, Plaintiffs are relegated to raising merely speculative doubts about Defendants' evidence, including a Copyright Office website search confirming that the Ballantine Book was not timely renewed, while at the same time refusing to produce copyright certificates to substantiate their claimed rights to the Monroe/Shaw Photographs (if any such certificates actually exist). Plaintiffs also persist in misrepresenting the plain language of Defendants' Third Amended Complaint, which, as Magistrate Judge Fox has already ruled, includes various Monroe/Shaw Photographs published during the 1950s *in addition* to in the Ballantine Book and the book *Marilyn Monroe. The Life. The Myth.* published by Rizzoli Publications International ("Rizzoli Book").

Defendants have demonstrated both a concrete intent to use the disputed photos and a real and reasonable fear of an infringement suit if they do – making a declaratory judgment entirely appropriate. The February 12, 2008 declarations of CMG's Mark Roesler and MMLLC's David Strasberg show that Defendants presently use public domain photos of Marilyn Monroe in conjunction with licensing their Monroe-related intellectual property, including trademarks and copyrights. CMG, MMLLC's exclusive licensing agent, posts public domain images of Marilyn Monroe on its website and distributes them on CDs to potential licensees. Defendants' licensees use those public domain images in connection with the Marilyn Monroe-related trademarks they license from Defendants, as the exhibits to Roesler's declaration unequivocally establish.

---

[1] Plaintiffs / Consolidated Defendants are referred to herein as "Plaintiffs" or the "Shaw Family."

Indeed, the only thing left for Defendants to do to is to add the disputed photos to their website and CDs, which itself would constitute copyright infringement and invite more claims by Plaintiffs.

Even more compelling are Plaintiffs' own documents, which establish their repeated assertions of copyright ownership to the entire Monroe/Shaw Photograph collection, as well as to specific images that are in the public domain and should be available for anyone to use free from Plaintiffs' legal threats. Plaintiffs' proclivity for asserting copyright infringement claims based on public domain works, including claims still pending in this action against these Defendants, itself justifies Defendants' fears of additional infringement claims by Plaintiffs.

The Shaw Family could easily end this conflict by either acknowledging that the disputed Monroe/Shaw Photographs are in the public domain (thereby eliminating the threat of an infringement suit) or by producing copyright registrations (if any exist) or any other proof of their ownership of valid copyrights in the subject photos. The Shaw Family has done neither, and thereby continues their shell game with Defendants and the Court.

Finally, the Shaw Family's so-called "preclusion" motion is, in reality, nothing more than an attempt to file a second summary judgment brief rearguing many of the issues they already raised in their original summary judgment brief. To the extent their "preclusion motion" is an improper second bite at the apple, to artificially extend the Court's page limits, and to obtain an unauthorized sur-reply, it should be stricken. Plaintiffs' preclusion motion also violates both the Local Rules of this Court and Magistrate Judge Fox's Discovery Order entered in this case, because they failed to request a pre-motion discovery conference, or to timely raise the discovery dispute after it arose, so that it could be resolved. Even if the Court reaches the "merits" of the preclusion motion (which it should not), it should be denied because Defendants complied with

their discovery obligations and their Rule 30(b)(6) witnesses supported (and did not contradict) both their declarations submitted in connection with the present motions, and Defendants' operative complaint.

## STATEMENT OF FACTS

Defendants respectfully refer the Court to their Statement of Undisputed Facts in Support of Cross-Motion for Summary Judgment, dated February 12, 2008 ("Defs.' SUF"), and to their response to the Shaw Family's Additional Statement of Undisputed Facts, dated March 25, 2008 ("Defs.' Resp. to Pls.' ASUF").

## ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD

When the party moving for summary judgment meets its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986).  The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. Proc. 56(e)(2).

Defendants' cross-motion for summary judgment demonstrated that several specific categories of Monroe/Shaw Photographs are in the public domain, and that a declaratory judgment is appropriate because an actual controversy exists with respect to those photographs. In response, however, the Shaw Family offers no evidence of a genuine factual dispute as to either whether the disputed Monroe/Shaw Photographs are in the public domain, or whether an actual controversy exists.  Summary judgment in Defendants' favor is therefore appropriate.

II.  **THE SHAW FAMILY PRESENTS NO EVIDENCE OF A GENUINE DISPUTE
    THAT SPECIFIC PHOTOGRAPHS OF MARILYN MONROE TAKEN BY SAM
    SHAW ARE IN THE PUBLIC DOMAIN**

A.  **The Shaw Family's Attempt to Artificially Narrow Defendants' Public Domain
    Claim to Include Only the Ballantine and Rizzoli Books Contradicts Judge
    Fox's Ruling and the Clear Language of Defendants Third Amended Complaint**

As an initial matter, the Shaw Family continues to misstate Defendants' public domain

claim by arguing that it is limited to Monroe/Shaw Photographs from the Rizzoli and Ballantine

Books.  (*See, e.g.*, Plaintiffs' March 4, 2008 Memorandum of Law in Opposition to Defendants'

Summary Judgment Cross-Motion and in Further Support of Plaintiffs' Summary Judgment

Motion ("Pls.' Br.") at 11.)  Defendants do not dispute Plaintiffs' claim that "the issue of what

claims are fairly at issue has already been decided, decided by Judge Fox, and is now the law of

the case."  (Pls.' Br. 26.)  Indeed, at a December 26, 2007 discovery conference, Magistrate

Judge Fox expressly rejected the Shaw Family's argument that the Third Amended Complaint

was limited to Rizzoli and Ballantine.  When the Shaw Family's counsel argued "[a]ll they pled

in the complaint is that the Risoli [*sic*] and Ballantine books are in the public domain," Judge

Fox quoted directly from Defendants' Third Amended Complaint, which seeks a declaratory

judgment that:

> . . . *In addition* to the *Risoli [sic]* works, [the Shaw Family]
> … do not possess valid and enforceable copyrights in those
> photographs that compromise the Monroe/Shaw Photographs
> and/or the Shaw Collection that were either: [(a)] published prior
> to January 1, 1964, where no copyright renewals were obtained
> during the final year of the initial 28-year copyright term for such
> photographs; or B. published prior to March 1, 1989, without the
> requisite copyright notice.

(*See* Declaration of Jonathan Neil Strauss, dated February 12, 2008  ("Strauss Decl."), Ex. 16 at

6:11-14, 7:6-15) (emphasis added).  Judge Fox then rejected the Shaw Family's argument,

stating "Any attempt to narrow down the complaint is – any opportunity to do that is long gone.

4

. . . .  Certainly, the pleadings go beyond the Risoli [*sic*] and Ballantine book."  (Strauss Decl., Ex. 16 at 9:13-23.)  Nevertheless, the Shaw Family outrageously argues that Judge Fox <u>limited</u> Defendants' claims to Rizzoli and Ballantine (Pls.' Br. 26), which is exactly the opposite of what Judge Fox actually said.[2]  The Shaw Family's attempt to artificially narrow Defendants' Third Amended Complaint should again be rejected.

### B. Defendants have Demonstrated that the Images in the Ballantine Book are Unquestionably in the Public Domain

Defendants' moving brief demonstrated conclusively that the Monroe/Shaw Photographs contained in Ballantine Book are in the public domain because Sam Shaw published and registered the book (and all its photos) in 1955, but did not renew its copyright at the end of the original 28-year term.  (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment, dated February 12, 2008 ("Defs.' Br.") 4-5.)  During discovery, the Shaw Family produced the original registration certificate for the Ballantine Book, but no renewal registrations for the Ballantine Book.  (Defs.' SUF ¶ 6-8.)  Defendants conducted a search of the Copyright Office's website which confirmed that the Ballantine Book was not timely renewed and is therefore in the public domain.  (*Id.* at ¶ 8, 17.)  Further, a review of the Shaw Family's binder purporting to contain the entirety of Sam Shaw's registered copyrights revealed no renewal registrations for the Ballantine Book.  (*Id.* at ¶ 17.)

Tellingly, the Shaw Family does not come forward with any renewal registrations evidencing their claimed copyrights in the Ballantine Book – which they could easily do if any

---

[2] Moreover, the Shaw Family's assertion that Judge Fox denied Defendants' request for additional discovery beyond the Ballantine and Rizzoli Books is flat wrong.  (*See* Pls.' ASUF ¶ 39; (Defs.' Resp. to Pls.' SUF, No. 29 at 42, Defs.' Resp. to Pls.' ASUF No. 39 at 25).

actually existed.  Indeed, the Shaw Family does not even argue that the Ballantine Book is not in the public domain.  (Pls.' Br. 27-28.)

Instead, the Shaw Family makes baseless arguments directed at Defendants' Copyright Office website search, all of which lack merit.  (Pls.' Br. 27-28.)  First, they claim that even the complete absence of any information about a work in the Copyright Office's records does not mean the work is unprotected because the work might have been registered under a different name or as part of a larger work.  But the Copyright Office Circular attached to David Marcus's declaration states that "Copyright Office records . . . from January 1, 1978, to the present, including registration and renewal information . . . are available for searching from the Copyright Office website at www.copyright.gov."  (Declaration of David Marcus, dated March 4, 2008 ("Marcus Decl."), Ex. X at 3.)  Thus, the fact that a search of the Copyright Office website revealed no renewal information for the Ballantine Book (which would have been filed in 1983) is certainly evidence of non-renewal.  Any speculation that the Ballantine Book might have somehow been registered under a different title or as part of a larger work is baseless and cannot defeat summary judgment.  There is no danger that Defendants searched under the wrong title because they were searching for a renewal registration for a work that had already been registered, and the Shaw Family does not even attempt to explain how an entire book could be renewed as part of a larger work.

Second, Defendants' search methods are apparent from the computer printout attached to Maureen Cloonan's declaration (Cloonan Decl., Ex. M), yet the Shaw Family does not even hint at what flaws it believes that search contained.[3]

---

[3] If anything, the results of Cloonan's search show that her search terms were over-inclusive rather than under-inclusive.  (Cloonan Decl., Ex. M.)  Plaintiffs' contention that the Copyright Office "expressly characterizes" such a search as "untrustworthy" (Pls.' Br. 3), is

Lastly, as explained *infra* 38-40, there was no discovery violation in connection with Cloonan's declaration or website search because it is based entirely on publicly available information that is equally accessible to the Shaw Family. Further, the Shaw Family does not explain how Cloonan's declaration itself, which simply describes her website search, could possibly be precluded as a result of any discovery violation. In addition, Defendants <u>did</u> explain why the Ballantine Book was in the public domain in response to Plaintiffs' contention interrogatory. (Second Declaration of David Marcus, dated March 4, 2008 ("Sec. Marcus Decl."), Ex. N at 2.)

The Copyright Office website search, along with Defendants' examination of the Shaw Family's copyright binder and the Shaw Family's non-production of renewal certificates for the Ballantine Book, is valid *prima facie* evidence that the photos in the book are in the public domain. When the party moving for summary judgment meets its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986), which is all Plaintiffs have done here.. The fact that the Shaw Family comes forward with absolutely no affirmative evidence of copyright protection for the Ballantine Book warrants summary judgment for Defendants.

### C. The Shaw Family Has Not Rebutted the Evidence that Monroe/Shaw Photographs from the Film *The Seven Year Itch* Were Works Made for Hire

Defendants have offered competent evidence, including testimony from Sam Shaw himself, that photographs he took of Marilyn Monroe in connection with filming *The Seven Year Itch* were works made for hire. (Defs.' Br. 11-13; Defs.' SUF ¶¶ 11-16.) That evidence shows

---

simply not true. Circular 22 states that such a search "is *not always* conclusive" (Marcus Decl., Ex. X at 5). In any event, Defendants' search is not the only evidence of non-ownership; it merely confirms Plaintiffs' own inability to establish ownership.

that the producers of the film paid Sam Shaw to take pictures that would be used to publicize the film, that they required him to be on the set whenever Marilyn Monroe was there, and that they assigned him the role of taking a photograph that would become the "logo" for the film.  (*Id.*) Moreover, the Shaw Family's own attorney, David Marcus, has stated that "Sam Shaw was <u>hired</u> by Charles Feldman, the producer of 'The Seven Year Itch' to create publicity for that film.  He staged the famous skirt-blowing scene in New York, and recreated that scene in Los Angeles, for the purpose of creating publicity for the film."  (Strauss Decl., Ex. 11) (emphasis added).  That more than satisfies the "instance and expense" test applied to determine whether a work is considered made for hire, and its copyright therefore belongs by the hiring party.  *See Martha Graham Sch. and Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*, 380 F.3d 624, 634 -35 (2d Cir. 2004).  As a result, all Monroe/Shaw Photographs from the filming of *The Seven Year Itch* (*see, e.g.*, Defs.' SUF ¶¶ 6, 11, 14, 37, 38, 48, 49, 52, 56), are in the public domain because they were not published, registered, or renewed (if at all) in the name of the true copyright owners – the film's producers.

The Shaw Family unsuccessfully attempts to undermine Defendants' evidence.  The fact that Sam Shaw stated in the *St. Martin Press* complaint and his *Rizzoli* deposition that he owned the <u>photographs</u> taken in connection with *The Seven Year Itch* is irrelevant, because the Shaw Family themselves argue (Pls.' Br. 25) that ownership of physical photographs is distinct from ownership of <u>copyrights</u> to those photographs.  And any statements by Sam Shaw that he owned copyrights to those photos are self-serving, and, at most, create an issue of fact.

The Shaw Family claims to have "significant additional evidence" showing that *Seven Year Itch* photos were not works made for hire (Pls.' Br. 29), but that evidence is both inadmissible and immaterial.  Edith Marcus's Second Declaration is hearsay and shows no

personal knowledge of Sam Shaw's work for the producers of *The Seven Year Itch* in 1955.[4]
The same is true for the letters attached to the Second Declaration of Edith Marcus as Exhibits
A-C.   (*See* Defendants' Response to Plaintiffs' Statement of Additional Undisputed Facts, dated
March 25, 2008 ("Defs.' Resp. to Pls.' ASUF") No. 43, at 27-29.)

In any event, employment relationships often exist without a formal contract, which is
why that is not part of the "instance and expense" test.   In addition, although Edith Marcus
speculates that Sam Shaw did not have an employment contract in connection with *The Seven
Year Itch*, SFA's own 30(b)(6) witness did not know whether a written employment contract
existed.   (Dickstein Decl., Ex. D at Tr. 85-86.)   Furthermore, the argument that no one actually
supervised Sam Shaw on the set of *The Seven Year Itch* is irrelevant; all that matters is that the
producers had the <u>right</u> to do so.   *See Martha Graham Sch. and Dance Found., Inc.*, 380 F.3d at
635 ("The right to direct and supervise the manner in which work is created need never be
exercised" to find that the work was made for hire).   In any event, by Sam Shaw's own
admission he was required to be on the set whenever Marilyn Monroe was there (Defs.' SUF
¶ 11), which undermines Plaintiffs' speculation the he was not actually supervised.

The Shaw Family also argues that the "director" of *The Seven Year Itch* would not pay
Shaw's expenses (Pls.' Br. 29), but that too is irrelevant because, as one would expect, he was

---

[4] The Shaw Family claims that Defendants did not "bother to take the deposition of the
people who would possibly be knowledgeable of what happened in this case."   (Pls.' Br. 29.)
But Defendants took the deposition of the SFA's 30(b)(6) witness, expecting that person to be
the most knowledgeable about Sam Shaw's alleged copyrights.   Indeed, the Shaw Family
substituted Melissa Stevens for Edith Marcus as their 30(b)(6) witness, claiming that Stevens
was more knowledgeable about its business than Marcus.   (*See* Marcus Decl. ¶ 28.)   Ironically,
however, Melissa Stevens demonstrated surprisingly little knowledge of SFA's business (Defs.'
Resp. to Pls.' ASUF No. 32, at 22), while Edith Marcus suddenly professes intimate knowledge
of the history of SFA's photos, including Sam Shaw's work for the producers of *The Seven Year
Itch* (*See* Second Declaration of Edith Marcus, dated March 3, 2008 ("Sec. Edith Marcus Decl.")
¶¶ 2-5).   Notably, the Shaw Family offers *two* declarations of Edith Marcus in connection with
the instant motions, but does not offer *any* declaration of Melissa Stevens, its 30(b)(6) witness.

paid by the underline producers of film, not the director.  (Defs.' Resp. to Pls.' ASUF No. 43, at 28-29.)

Indeed, the document relied upon by Plaintiffs shows that the director, Billy Wilder, would not

pay the expenses for himself, George Axelrod (the screenwriter), or Sam Shaw because it was

the producer's obligation to do so.  (Sec. Decl. Edith Marcus, Ex. B.)  If anything, the fact that

Shaw was treated the same as a writer and director shows that his work was made for hire, just as

theirs was.[5, 6]

Most significantly, Plaintiffs admit that none of the "significant additional evidence" they

rely on was produced during discovery (Pls.' Br. 29), despite the fact that those documents are

directly responsive to Defendants' document requests (Defs.' Resp. to Pls.' ASUF No. 43, at 29;

Strauss Decl., Ex. 12 at No. 15 (calling for production of "[a]ll agreements and/or assignments

concerning the Flying Skirt Photographs, including but not limited to any and all correspondence

and/or agreements with 20th Century Fox, Billy Wilder or any of the producers of *The Seven

Year Itch*.")).[7]  It is a wonder that the Shaw Family can rely on documents they failed to produce

which are accessible only to them, and then, with a straight face, chastise Defendants for relying

on documents that are publicly available.

---

[5] Plaintiffs claim that the producers of *The Seven Year Itch* never challenged Sam Shaw's ownership of the copyrights in the photographs (Pls.' Br. 29), but the document they rely on is not from the producer, Charles Feldman, but from the executor of Feldman's estate to Twentieth Century Fox relaying statements purportedly made by Feldman (Defs.' Resp. to Pls.' ASUF No. 43, at 28).  Thus, that document is inadmissible double-hearsay.  It also mentions ownership of only Marilyn Monroe "photographs," not the copyrights thereto, and is therefore irrelevant.  (*Id.*) And there is no indication that 20th Century Fox accepted that position.

[6] As explained below, *infra* 38-41, the Shaw Family's argument that Defendants improperly failed to produce documents relevant to work for hire are entirely misplaced because these documents – a complaint and deposition by Sam Shaw himself – were equally, if not, more accessible to the Shaw Family than to Defendants.

[7] Plaintiffs cannot rest on their claim that Defendants' Third Amended Complaint was limited to the Ballantine and Rizzoli Books, because many of the photos in those books were from the filming of *The Seven Year Itch* and therefore fall squarely within Defendants' document request.

**D.  The Shaw Family Has Not Rebutted the Evidence that the Monroe/Shaw Photographs Published in Newspapers and Magazines in the 1950s Were Published With Sam Shaw's Consent and Are Therefore in the Public Domain**

The Shaw Family argues only that Defendants have provided "no basis for the Court to rule that Sam Shaw provided his consent" for publication of his Monroe/Shaw Photographs in newspapers and magazines in the 1950s.  (Pls.' Br. 30.)  It is ironic indeed for the Shaw Family to argue that Sam Shaw did not consent to publication of his own photographs, when their own complaint states that "the famous flying skirt series of photographs of Ms. Monroe . . . are known throughout the world" (Declaration of Christopher Serbagi, dated January 8, 2008 ("Serbagi Decl."), Ex. F ¶ 12), and their own attorney has acknowledged that those photos were taken "for the purpose of creating publicity for the film." (Strauss Decl., Ex. 11.)  The Shaw Family offers no explanation for how the photographs wound up published in newspapers and magazines without Sam Shaw's consent.  If that was the case, Sam Shaw would have undoubtedly taken some action against those publishers, but there is no evidence of any such action.  All Plaintiffs do is raise "metaphysical doubt," which is insufficient to avoid summary judgment.  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87, 106 S. Ct. at 1356.

**E.  The Shaw Family Misunderstands the Significance of the *Rizzoli* Decision**

The Shaw Family finally acknowledges that certain Monroe/Shaw Photographs were already held to be in the public domain in *Shaw v. Rizzoli Int'l Publ'ns, Inc.*, No. 96 Civ. 4259 (JGK), 1999 WL 160084 (S.D.N.Y. Mar. 23, 1999).  Defendants did not submit that decision for this Court to duplicate, but to show that Defendants' fear of an infringement suit is quite real.  In *Rizzoli*, Sam Shaw and Plaintiff Edith Shaw Marcus asserted copyright infringement claims based on Monroe/Shaw Photographs published in newspapers and magazines in the 1950s despite the fact that they were in the public domain because they were not timely renewed – the very same type of photographs Defendants now intend to utilize in connection with their

licensing activities.  (Defs.' Br. 9, 22.)  Indeed, even after the *Rizzoli* decision, the Shaw Family

refused to acknowledge that even those photos were in the public domain and that defendants are

free to use them.[8]  The *Rizzoli* decision is therefore highly relevant to the instant motions.

### F.    Documents Withheld by the Shaw Family Confirm that Defendants Named the Proper Parties

Defendants' moving brief demonstrated that SFA is the owner of the alleged copyrights,

and that, as a matter of law, any failure to join Edith Marcus or Meta Stevens is not grounds for

dismissal because their interests have been fully represented.  (Defs.' Br. 26-30.)  The Shaw

Family does not even attempt to rebut Defendants' showing that dismissal is inappropriate or that

they would suffer absolutely no prejudice from having Marcus and Stevens named as

Consolidated Defendants.  Instead, the Shaw Family states conclusorily, and without any

authority, that it would not be "just" to name them as parties.  (Pls.' Br. 25-26.)  Their

unsupported claim should be rejected.

Defendants' moving brief also showed that the SFA and its principals, including its 50%

owner, Larry Shaw, repeatedly represented that SFA owned the alleged copyrights to the

Monroe/Shaw Photographs. (Defs.' Br. 27-28.)  In response, the Shaw Family no longer argues

that Marcus and Stevens actually own the alleged copyrights,[9] instead, merely arguing that they

previously *asserted* that Marcus and Stevens are the true copyright owners.  (*See* Pls.' Br. 24-26;

---

[8] When Defendants' indicated to Plaintiffs that they made use of Rizzoli images, Plaintiffs responded by including that fact in their Second Amended Complaint.  Furthermore, Plaintiffs' claim in their brief, citing pages 58-59 of transcript of the deposition of Melissa Stevens, that "for some inexplicable reason" Defendants did not mark the *Rizzoli* decision as an exhibit.  (Pls.' Br. 22.)  However, they ignore the next page of the transcript where Defendants did mark it.  (Dickstein Decl., Ex. D at 60-64, Ex. E.)

[9] The Shaw Family now rationalizes their decision to assert their baseless "improper parties" argument on the ground that it would have been "malpractice to omit."  (Pls.' Br. 25.)

Plaintiffs' Additional Statement of Undisputed Fact, dated March 4, 2008 ("Pls.' ASUF") ¶¶ 19-21.)[10, 11]

The Shaw Family also tries to brush off Larry Shaw's prior statements that SFA owns the alleged copyrights to Monroe/Shaw Photographs as "equivocal." (Pls.' Br. 25.) However, as explained in Defendants' moving brief, those claims were not equivocal. (Defs.' Br. 27-28.) In any event, Defendants have recently discovered decidedly *un*equivocal evidence that SFA owns the purported copyrights, and that Defendants therefore named the correct party. On September 2, 2002, Larry Shaw, who, in the Shaw Family's own words, "ran the entire business since the inception of Shaw Family Archives" (Serbagi Decl., Ex. S at 1-2), assigned a portion of his interest in SFA to his sons, stating:

> SHAW FAMILY ARCHIVES, LTD. is the sole owner of all of the commercial photographic images formerly owned by Larry Shaw and or Sam Shaw. *SHAW FAMILY ARCHIVES, LTD. is the sole owner of all copyrights in these photographs* . . . .

---

[10] Even that is not entirely correct. In their Second Amended Complaint, the Shaw Family repeats the refrain that "Plaintiffs Marcus and Stevens own Shaw *photographs* of Marilyn Monroe . . . ." (Serbagi Decl., Ex. F ¶¶ 17, 20) (emphasis added). Further, even the allegation that "Marcus and Stevens own and control the copyrights of photographs of Marilyn Monroe contained within the Shaw Collection" is consistent with Defendants' claim that SFA owns the alleged copyrights, because Marcus and Stevens were 50% owners of SFA.

In addition, Plaintiffs claim that in response to Defendants' interrogatory about the Shaw Family's ownership of copyrights to Monroe/Shaw Photographs they informed Defendants that Stevens and Marcus were the purported copyright owners. (Pls.' Br. 24.) In fact, Plaintiffs merely referred Defendants to other documents (Pls.' ASUF ¶ 20; Defs.' Resp. to Pls' ASUF No. 20, at 12-13), including the 2001 settlement agreement by which SFA was formed. (*Id.*) The fact that Plaintiffs referenced the settlement agreement in that interrogatory response entirely undercuts their argument that it had nothing to do with ownership of copyrights.

[11] Defendants' object to Plaintiffs' assertion of "additional undisputed facts" in support of their motion for summary judgment, as Defendants are not afforded an opportunity to respond to such facts in a sur-reply. Accordingly, Defendants respectfully submit that the Court should disregard such "additional" facts in connection with Plaintiffs' motion for summary judgment.

(Dickstein Decl., Ex. C at 2) (emphasis added) ("Larry Shaw Assignment"). That Assignment establishes beyond any doubt that SFA owns the purported copyrights, just as Defendants have claimed all along.

The Shaw Family failed to produce the Larry Shaw Assignment in discovery even though it is responsive to Defendants' First Set of Document Requests, which asked for "[a]ll documents concerning your contention in Your Complaint that you own the copyrights in the Monroe/Shaw Photographs." (Dickstein Decl., Ex. J.) Moreover, as the Shaw Family acknowledges, "Defendants even asked the Shaw Family in an interrogatory that it served on January 11, 2007 to 'state all facts concerning your ownership in any copyrights in the Monroe/Shaw Photographs.'" (Pls.' Br. 24; Marcus Decl., Ex. D at 6.) Despite those demands, and despite the Larry Shaw Assignment's obvious relevance to Defendants' public domain claim, the Shaw Family did not produce that document or mention it in their interrogatory responses.[12]

## III. THERE IS NO GENUINE DISPUTE THAT THERE IS AN ACTUAL CONTROVERSY OVER THE PUBLIC DOMAIN MONROE/SHAW PHOTOGRAPHS

As Defendants' explained in their moving brief, a declaratory judgment in the intellectual property context is warranted if the declaratory defendants' conduct created a real and reasonable apprehension of liability, and the declaratory plaintiff has engaged in a course of conduct which has brought it into adversarial conflict with the defendant. (Defs.' Br. 13-14, citing *Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 595 (2d Cir. 1996)). In addition, as the Shaw Family now recognizes, a party need not actually infringe the rights in question before it is entitled to a declaratory judgment. *See id.* at 596; *MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 777

---

[12] That raises questions as to how the Shaw Family could argue that Edith Marcus and Meta Stevens own the alleged copyrights to the Monroe/Shaw Photographs, while at the same time withholding a document that directly undercuts their argument.

(2007); (Pls.' Br. 8, 10).[13]  Here, Plaintiffs have failed to rebut Defendants' showing that they

have a definite intent to use the disputed Monroe/Shaw Photographs and that Plaintiffs' conduct

has created a real and reasonable apprehension of liability.

### A. The Shaw Family Fails to Recognize the Nature of Defendants' Licensing Business

The Shaw Family repeats their misguided argument that Defendants lack standing

because they do not *license* public domain images of Marilyn Monroe.  (*See, e.g.*, Pls.' Br. 8, 11,

12.)  As explained in Defendants' moving brief, pp. 14-15, that argument entirely misses the

point.  Defendants (unlike the Shaw Family) do not assert rights to public domain Monroe/Shaw

Photographs.  They do, however, have the definite intention and ability to use the public domain

Monroe/Shaw Photographs in connection with their ongoing licensing of other Marilyn Monroe-

related intellectual property they own, such as trademarks to Marilyn Monroe's name and

stylized signature.  (Defs.' Br. 14-15; Defs.' SUF ¶¶ 57-71.)[14]  Indeed, that is exactly what

Defendants are presently doing.  (*Id.*; Declaration of Mark Roesler, dated March 25, 2008 ("Sec.

Roesler Decl.") ¶ 3-4.)

### B. Defendants Have Demonstrated a Definite Intent and Apparent Ability to Use the Disputed Monroe/Shaw Photographs

Defendants have offered concrete evidence of the steps they have taken to use the public

domain Monroe/Shaw Photographs in connection with their ongoing licensing activities.  (Defs.'

Br. 14-15; Defs.' SUF ¶¶ 57-71.)  CMG maintains a collection of Marilyn Monroe photos that

---

[13]  Nevertheless, the Shaw Family continues to cite inapplicable cases outside the declaratory judgment context.  (*See* Pls.' Br. 4, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136 (1992)).

[14]  In the event this Court determines that Monroe died a California domiciliary and that Defendants do possess a right of publicity in Monroe's name image and likeness under the California Right of Publicity Statute, Cal Civ. Code 3344.1, they will, of course, continue to license such images of Marilyn Monroe.

are in the public domain or that Defendants have acquired rights to license, which it posts on its website and copies to CDs for distribution to potential licensees. (Defs.' SUF ¶¶ 67, 68.) Defendants thereby market public domain images of Monroe to their licensees to use in connection with MMLLC's Marilyn Monroe-related trademarks. (*Id.*) Defendants have offered three examples of actual license agreements where the licensee used a public domain image of Marilyn Monroe from CMG's collection as part of their product. (Declaration of Mark Roesler, dated Feb. 12, 2008 ("Roesler Decl."), Exs. C-E.) Plaintiffs' attempts to discredit that evidence are unsuccessful.

### 1.    Defendants Intended to Use the Disputed Monroe/Shaw Photographs When the Third Amended Complaint was Filed

Plaintiffs first nitpick the declarations of CMG's Mark Roesler and MMLLC's David Strasberg, arguing that they do not specifically state that they intended to use the public domain Shaw/Monroe Photographs when the August 9, 2007 Third Amended Complaint was filed. (Pls.' Br. 6-7.)[15]  That intent, however, is evident from Roesler's and Strasberg's declarations and other evidence in the record. They both testified that back in 2001 (even before MMLLC existed) CMG agreed to use its best efforts to market the Marilyn Monroe-related intellectual property, including its trademarks. (Roesler Decl. ¶ 2; Strasberg Decl. ¶ 4.) In addition, all three of the sample licensing agreements were made prior to the Third Amended Complaint. (*See*

---

[15] Plaintiffs also quibble with Roesler's and Strasberg's statement that they "intend" or "wish" to use the disputed Monroe/Shaw Photographs, but at the same time recognize that the Second Circuit requires a "'course of conduct evidencing a definite *intent* and apparent ability to commence use' of the property in question" (Pls.' Br. 8, quoting *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 595-96 (2d Cir. 1996) (emphasis added), not that the declaratory plaintiff actually *use* the property in question. For the reasons explained below, Defendants have demonstrated that their intent is evidenced by their course of conduct, and that they have the apparent ability to begin using the disputed Monroe/Shaw Photographs.

Roesler Decl., Ex. C-E.)[16]  Furthermore, as the Shaw Family's own Second Amended Complaint recognizes, CMG posted Monroe/Shaw Photographs on its website well before the Defendants' Third Amended Complaint was filed.  (Serbagi Decl., Ex. F ¶ 22; Sec. Roesler Decl. ¶ 6.) Defendants' intentions to make use of the public domain Monroe/Shaw Photographs clearly existed prior to the Third Amended Complaint.[17]

> **2.     Defendants' Course of Conduct Demonstrates Their Definite Intention to Use the Disputed Monroe/Shaw Photographs and that they are Once Step Away from Infringement**

The Shaw Family argues that Defendants have not shown a "course of conduct" evidencing their ability to use the disputed photos.  (Pls.' Br. 8-10.)  However, the course of conduct is evidenced by Defendants' continuing use of public domain Monroe photos in connection with their licensing activities.  Indeed, Defendants used public domain images from the Rizzoli book in connection with such activities in the past.  (Defs.' Resp. to ASUF No. 10; Sec. Roesler Decl. ¶ 6.)

With respect to the photos at issue here, the only thing left for Defendants to do is upload them to CMG's website and copy them to CDs for their potential licensees.  (Sec. Roesler Decl.

---

[16] Furthermore, none of the cases the Shaw Family cites stands for the proposition that an affiant must specifically state that they intended to use the item at the time the operative complaint was filed.  Any such requirement would run contrary to the Supreme Court's statement in *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 837, 109 S. Ct. 2218, 2225 (1989), cited by Plaintiffs, that "[plaintiff] should not be compelled to jump through these judicial hoops merely for the sake of hypertechnical jurisdictional purity."

[17] Plaintiffs argue that Defendants' should be precluded from asserting that they intend to use the disputed Monroe/Shaw Photographs because they supposedly failed to provide that information in discovery. (Pls.' Br. 7, 8.)  As discussed below, *infra* 32-36, (i) Defendants did respond to Plaintiffs' contention interrogatory, which, in any event, did not specifically ask "how" Defendants' sought to use the public domain photos, (ii) Plaintiffs have not identified a single document Defendants improperly failed to produce, and (iii) Roesler testified at his deposition that Defendants would encourage their licensees to use public domain Monroe/Shaw Photographs but-for Plaintiffs' false claims of copyright ownership.

¶ 6.)[18]  But even that additional step would subject Defendants to liability for copyright

infringement, *see* 17 U.S.C. § 106 (copyright owner has exclusive right to reproduce, distribute

and display his work), which is precisely the situation the Declaratory Judgment Act was

designed to avoid.  *See MedImmune, Inc.*, 127 S. Ct. at 773 ("the dilemma posed by that coercion

– putting the challenger to the choice between abandoning his rights or risking prosecution – is 'a

dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'") (quoting

*Abbot Labs. v. Gardner*, 387 U.S. 136, 152, 87 S. Ct. 1507 (1967)); *Starter Corp.*, 84 F.3d at 596

("policy animating the Declaratory Judgment Act . . . is to enable parties to adjudicate their

disputes before either suffers great damage" and a party is not required to "subject itself to

considerable liability . . . before its right to even engage in this line of commerce could be

adjudicated").[19]  Indeed, the last time CMG posted Monroe/Shaw Photographs on its website, the

Shaw Family did not hesitate to mention that fact in support of their copyright infringement

claim, even though Defendants had informed the Shaw Family that they were from the Rizzoli

Book.  (Defs.' Br. 19; Pls.' Br. 18; Sec. Roesler Decl. ¶ 6.)  In addition, in their prior complaints,

the Shaw Family asserted infringement claims against Defendants for posting Monroe/Shaw

Photographs on other websites, (*see* Serbagi Decl., Ex. D ¶ 19, Ex. E ¶ 19), and is presently

asserting claims against Defendants for acts as trivial as copying photos onto a coffee mug and

---

[18]  Indeed, the Shaw Family recognizes that if the disputed photos were in the public domain, anyone could "simply copy them from the books at issue."  (Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment, dated January 9, 2008 ("Pls.' Moving Br.") 1.)

[19]  *Wembly, Inc. v. Superba Cravats, Inc.*, a case cited by the Shaw Family, states that "the declaratory judgment remedy should be construed with liberality in the patent field as in general" and that "while the early cases required that plaintiff actually be engaged in infringing conduct, this is no longer the law, and it is now sufficient that plaintiff either be engaged in manufacturing, using or selling the invention, *or that he has the immediate intention and ability to do so*."  315 F.2d 87, 89 (2d Cir. 1963) (emphasis added).

purse (*id.*, Ex. F, ¶¶ 16, 18, 21).[20]  Thus, the history of this very action demonstrates that Defendants' course of action has placed them just one small step away from having to defend additional infringement claims.

The cases the Shaw Family cites (Pls.' Br. 8-10), are readily distinguishable.  The court in *Wembly, Inc. v. Superba Cravats, Inc.* specifically stated that whether the plaintiff had the necessary intention and ability to manufacture and sell neckties that arguably infringed defendants' patent was a "difficult question."  315 F.2d 87, 90 (2d Cir. 1963).  Furthermore, after struggling to compare the facts to other declaratory judgment cases, the *Wembly* court recognized that "[q]uantitative comparisons of activities, however, are hardly profitable since ability or potential varies from product to product and industry to industry."  *Id.*  As the Shaw Family recognizes, "Defendants do not manufacture any products."  (Pls.' Moving Br. 9.)  Merely uploading images to CMG's website and copying them to CDs involves many fewer steps than does the physical manufacture of neckties at issue in *Wembly*, and, as discussed above, Defendants have taken virtually every step short of actually infringing the alleged copyrights.[21]

---

[20]  The Shaw Family also recently demanded that 20th Century Fox provide "the number of times the electronic transmissions of our photograph has sent through the 20th Century Fox website" when they suspected the movie studio was infringing one of their photos.  (Strauss Decl., 24.)

[21]  *Windsurfing Int'l Inc. v. AMF Inc.*, 828 F.2d 755 (Fed. Cir. 1987) is also distinguishable.  There, the declaratory plaintiff had not "engaged in any course of conduct, or indeed, any conduct at all, that has brought it into adversarial conflict with [declaratory defendant] respecting [defendants'] trademarks."  *Id.* at 758.  Here, by contrast, Defendants actively use public domain photographs of Marilyn Monroe (including photos from the Rizzoli Book, which Plaintiffs specifically referenced in their copyright infringement claims) as part of their ongoing licensing activities.  In addition, although *Windsurfing* contains little factual background, it is reasonable to assume that manufacture and sale of sailboards with defendant's trademark is a much more extensive process than merely uploading images to a website and copying them to CDs.  Further, to the extent the *Windsurfing* court required that the declaratory plaintiff actually use defendants' registered trademark and thereby incur liability, *see id.* at 758 (plaintiff not entitled to declaratory judgment because it did not "use the mark, get sued, and

*Pocketmedicine.com, Inc. v. John Wiley & Sons, Inc.*, 04 Civ. 8369 (LMM), 2006 U.S. Dist. LEXIS 13617 (S.D.N.Y. Mar. 23, 2006) is similarly distinguishable.  There, the declaratory plaintiff had yet to send the subject medical information "to software developers who [would] convert that material into a format that can be used on a PDA" and to physically publish the information in medical textbooks, 2006 U.S. Dist. LEXIS 13617, at *9, and had not specifically identified the material it sought to publish.  Here, Defendants have taken every step short of actual infringement, and have identified the specific Monroe/Shaw images they seek to use in connection with their licensing activities (*see e.g.,* Defs.' SUF ¶¶ 4, 14, 16, 48, 48, 49, 51, 52, 55, 56; Strauss Exs. 1, 5, 8, 9, 17, 25-31, 34; Cloonan Decl., Exs. A-K).[22]

### 3.    Defendants Currently License Marilyn Monroe-Related Trademarks and Did So When the Third Amended Complaint was Filed

The Shaw Family argues that Defendants have not shown that they currently license any Marilyn Monroe-related trademarks, or that they did so when the Third Amended Complaint was filed on August 9, 2007 (Pls.' Br. 11-12)[23] – but that is entirely incorrect.  The February 12, 2008 declarations of Mark Roesler and David Strasberg state that Defendants' licensing activities is continuing, and Plaintiffs offer no evidence to the contrary.  In fact, one of the license agreements attached to Roesler's declaration began on January 1, 2007 and continues through December 31, 2008 (Roesler Decl., Ex. D), and another began on January 1, 2006 and continues through December 31, 2009 (*id.*, Ex. E).  Moreover, those agreements specifically license MMLLC's Marilyn Monroe-related <u>trademarks</u> and require that the licensee place a notice of

---

fight it out in court"), it is contrary to more recent Second Circuit and Supreme Court authority. *See Starter Corp.*, 84 F.3d at 596; *MedImmune*, 127 S. Ct. 764.

[22]  *Re-Alco, Inc. v. Nat'l Ctr. for Health Edu., Inc.*, 812 F. Supp. 387 (S.D.N.Y. 1993) is also distinguishable for the reasons set forth in Defendants' moving brief, pp. 25 n.18.

[23] Furthermore, the Shaw Family cannot argue at the same time that all events after the Third Amended Complaint are irrelevant (Pls.' Br. 6-7) and that Defendants' have not provided evidence of their *current* licensing activities (Pls.' Br. 11-12).

MMLLC's trademark on their products.  (Roesler Decl., Ex. C at 1, Ex. D at 1, 4, Ex. E at 1, 4.)

If there was still any doubt, Mark Roesler's March 25, 2008 declaration confirms that

Defendants are actively engaged in licensing their Monroe-related intellectual property.  (Sec.

Roesler Decl. ¶ 3-4.)

> **4.      A Declaration that the Disputed Monroe/Shaw Photographs are in the
> Public Domain Would Add Value to Defendants' Marilyn Monroe-
> Related Trademarks**

Lastly, the Shaw Family argues that Defendants have not shown that adding the public

domain Monroe/Shaw Photographs would increase the value of Defendants' licensing

relationships.  (Pls.' Br. 11.)  The Shaw Family cites no authority requiring such a showing, and,

as they themselves recognize, all that is required to sustain a declaratory judgment claim is a

"'definite intent and apparent ability to commence use' of the property in question."  (Pls.' Br. 8,

quoting *Starter Corp.*, 84 F.3d at 596-97.)  In any event, the sample license agreements

demonstrate the value public domain Monroe images bring to Defendant's licensing activities

because each licensee used a public domain image of Monroe along with Defendants' Monroe-

related trademarks.  (*Compare* Roesler Decl., Ex. B *with* Exs. D-E.)  Moreover, Plaintiffs prove

this very point when they state "it would make no sense for anyone to . . . license [Defendants']

trademarks by themselves."  (Pls.' Br. 12.)  Indeed, a "Marilyn Monroe 2008 Official Calendar"

is obviously less valuable without pictures of Marilyn Monroe.  (*See* Roesler Decl., Ex. E).[24]

---

[24] The Shaw Family also argues that Defendants' claim should be precluded because they supposedly failed to answer an interrogatory about their intellectual property.  (Pls.' Br. 13.)  As explained below, *infra* 36-37, that interrogatory specifically related to a withdrawn claim in Defendants' Second Amended Complaint.  In addition, Defendants <u>did</u> produce several of the trademark registrations as well as numerous trademark licensing arrangement.  (Dickstein Decl., Ex. T, V.)

### C. Plaintiffs have Created a Reasonable Apprehension of Liability for Defendants' Planned Use of the Disputed Monroe/Shaw Photographs

#### 1. Plaintiffs have Refused to Acknowledge Whether Any Monroe/Shaw Photographs are in the Public Domain

Plaintiffs claim they have not refused to acknowledge that any Marilyn Monroe images are in the public domain, and that Defendants never requested that information in discovery. (Pls.' Br. 14.) That is completely untrue. Defendants' First Set of Interrogatories, dated January 11, 2007 asked Plaintiffs to "State all facts concerning any Monroe/Shaw Photographs that have fallen into the public domain." (Marcus Decl., Ex. D, No. 8.) In response, they stated "On information and belief, Plaintiffs contend that none of the Monroe/Shaw Photographs have fallen into the public domain." (*Id.*) That alone establishes Defendants' reasonable apprehension of liability, and demonstrates the lengths the Shaw Family will go to avoid a decision on Defendants' public domain claim.

#### 2. An Abundance of Evidence Shows Plaintiffs' Public Assertions of Copyright Ownership to Public Domain Monroe/Shaw Photographs

##### i) Plaintiffs have Asserted Copyright Infringement Claims Against Defendants in this Action, Including Claims Based on Monroe/Shaw Photographs in the Public Domain

As explained in Defendants' moving brief, pp. 17-18, Plaintiffs' first two complaints asserted broad claims of copyright infringement against Defendants. (Defs.' SUF ¶¶ 33-35.) While the Shaw Family characterizes those allegations as "old excerpts," (Pls.' Br. 15), they were operative up until the Shaw Family filed its Second Amended Complaint on August 8, 2007 – the day before Defendants filed their Third Amended Complaint. Further, while the Shaw Family now desperately tries to distance themselves from their own allegations (Pls.' Br. 15-16), nothing changes the fact that they asserted rights to the "Shaw Collection," threatened to "seek leave to amend this action once these other acts of infringement can be specifically identified"

and sought "an injunction restraining defendants . . . from engaging in any further acts in violation of the copyright laws."  (Serbagi Decl., Ex. D ¶¶ 23, 25; *id.*, Ex. E ¶¶ 23, 25.)[25, 26]

In their Second Amended Complaint, Plaintiffs again charged Defendants with copyright infringement, this time based expressly on a Monroe/Shaw Photograph that is in the public domain.  (Defs.' SUF ¶¶ 36-38.)  The Shaw Family mistakenly argues that the photograph is "completely separate" from the Rizzoli and Ballantine Books.  (Pls.' Br. 17.)  In fact, that photograph <u>was</u> published in the Rizzoli book.  (Defs.' SUF ¶¶ 36-38.)  Moreover, even after Defendants informed Plaintiffs that photos on CMG's website were from Rizzoli, Plaintiffs included those photographs in their infringement claims.  (Defs.' SUF ¶ 39.)  That demonstrates the controversy over similar Monroe/Shaw Photographs that are in the public domain for the same reasons, *i.e.*, they were previously published without proper notice and not timely renewed. *See Research in Motion Ltd. v. Visto Corp.*, 457 F. Supp. 2d 708, 712 (N.D. Tex. 2006) (actual controversy exists where defendant had sued plaintiffs for infringement of patents similar to the one at issue on the declaratory judgment claim and defendant "has thus exhibited the proclivity to protect its patents against possible infringement by [plaintiffs].").[27, 28]  Indeed, Plaintiffs have

---

[25] The Shaw Family's back-peddling implicates the reasoning expressed in *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1299 (Fed. Cir. 1992) (Lourie, J., dissenting) ("[W]e should not countenance parties pulling the wool over courts' eyes.  When they are acting threateningly, albeit in indirect ways, and then, when a threatened infringer brings a declaratory judgment action, they should not be permitted to throw up their hands and say, 'Who me?'").

[26] Plaintiffs' suggestion that the only reason the parties are before the Court is because of their sale of a t-shirt in Indiana is contradicted by the actual pleadings, such as Defendants' first complaint, which included several claims, including for a declaratory judgment that Plaintiffs' alleged copyrights were in the public domain.  (Defs.' SUF ¶ 2.)

[27] The fact that Defendants did not assert public domain as an affirmative defense to the Shaw Family's Second Amended Complaint is irrelevant.  (Pls.' Br. 17.)  The party alleging copyright infringement must show ownership of a valid copyright, and a certificate of copyright creates a presumption of validity only if it is made prior to or within five years of first

moved to withdraw those claims *without prejudice*, preserving their threat for another day, and recently warned CMG that the "Shaw Family Archives Ltd. . . . is the holder of all worldwide rights . . . in the photos taken by Sam Shaw or Larry Shaw during the course of their professional careers as photographers." (Strauss Decl., Ex. 42).

>    **ii)    Plaintiffs have Asserted to Third Parties that they have Rights to Public Domain Photographs**

Defendants have also offered substantial evidence that over the past several years Plaintiffs have vigorously enforced their purported rights to public domain Monroe/Shaw Photographs against several third parties, the vast majority of which occurred prior to the Third Amended Complaint. (Defs.' Br. 21-22.)[29] Plaintiffs either completely ignore this evidence or feebly argue that it should not be considered. (Pls.' Br. 20-22.) First, the fact that these documents were submitted with an attorney's declaration and were not discussed at Defendants' 30(b)(6) depositions is immaterial. It goes without saying that attorneys speak for their clients, and the test is whether there is an <u>objective</u> fear of liability for use of the disputed intellectual

---

publication. *See Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001); 17 U.S.C. § 410(c). Because the "Flying Skirt Series" photograph referenced in paragraph 19 of the Shaw Family's Second Amended Complaint was published in the 1950's (*see, e.g.,* Strauss Decl., Ex 8), the September 1988 registration certificate attached to the Shaw Family's Second Amended Complaint raises no presumption of copyright validity, and it remained their burden to prove ownership of a valid copyright. Moreover, Defendants asserted a public domain declaratory judgment claim in each of their three complaints. (Defs.' SUF ¶ 2.)

[28] Notably, Defendants' claim for a declaratory judgment based on photos which were the subject of Shaw Family's infringement claims against Defendants stands in stark contrast to the Shaw Family's claim for a declaration that Monroe died a New York domiciliary even though Defendants have not asserted any rights against the Shaw Family based on the newly clarified California right of publicity statute.

[29] *See Technical Tape Corp. v. Minnesota Min. & Mfg. Co.*, 200 F.2d 876, 878 (2d Cir. 1952) ("The actions by the defendant for infringement of its patent against third parties, the latest one instituted only ten days before the present action, would indicate a purpose to assert broad claims under its patent, and to confirm the seriousness of the threats . . . .").

property.  *See Starter Corp.*, 84 F.3d at 595.  Further, Plaintiffs have only themselves to blame

for not questioning Defendants' 30(b)(6) witnesses about these documents.[30]

Second, Plaintiffs speculate that some of the communications are not authentic or might

never have been sent or received.  (Pls.' Br. 20-21.)  However, they don't actually dispute the

authenticity of any documents or argue that any were drafts.  That unsupported conjecture is

plainly insufficient to defeat summary judgment, *see Matsushita Elec. Indus. Co*, 475 U.S. at

586-87, 106 S. Ct. at 1356.  In any event, Plaintiffs' suggestion that the communications may not

be authentic is particularly baseless, not only because they were all produced from Plaintiffs'

own files, but because Plaintiffs have stipulated that all such documents are indeed authentic.

(Dickstein Decl., Ex. L.)  Furthermore, several of the communications were signed by Larry

Shaw or were actually responded to, which demonstrates that they were not unsent drafts.  (*See*

Strauss Decl., Ex. 19, Ex. 20, Ex. 22 at 343, 352-356, 360, 362, 364, 366, Ex. 24; *see also*

Dickstein Decl., Ex. K.)  Even if the threatening documents were mere drafts, however, the fact

that Plaintiffs generated internal documents asserting rights to public domain Monroe/Shaw

Photographs, then produced them to Defendants in this litigation, itself creates a fear of

infringement claims.[31]

Plaintiffs are reduced to arguing that their claims and threats regarding several individual

photographs from the Ballantine and Rizzoli Books have no bearing on Defendants' fear of an

---

[30] If the Shaw Family legitimately needed to conduct further discovery, they could have
sought relief under Rule 56(f).  Having failed to do so, their complaints of inadequate discovery
cannot derail Defendants' summary judgment motion.

[31] The Shaw Family argues that the letters may be unauthentic or unsent drafts because
Defendants did not take Larry Shaw's deposition (Pls.' Br. 20), even though Larry Shaw passed
away on October 19, 2007 (Marcus Decl. ¶ 28) before depositions began in this case.  (Defs.'
Resp. to Pls.' ASUF No. 26.)

infringement suit based on use of those entire books.[32]  (Pls.' Br. 21.)  Notably, the Shaw Family offers absolutely no authority for that proposition, and, in fact, the case law is to the contrary. *See e.g., Research in Motion Ltd.*, 457 F. Supp. 2d at 712.  Moreover, the notion that threats and lawsuits involving various photographs from the Ballantine Book does not create a fear of liability for use of any and all photos from Ballantine completely ignores reality.  In any event, this entire dispute would vanish if Plaintiffs would simply tell Defendants which photographs from Ballantine and other 1950s publications they may use, or produce valid copyright notices and renewals for the photos they still claim rights to.  By refusing to do either, Plaintiffs prolong the dispute and force Defendants to spend enormous resources opposing their summary judgment motion.

Lastly, just over a month after the Third Amended Complaint was filed, Michelle Minieri of Bradford Licensing ordered Image Source International to cease and desist from using a public domain photograph from the Ballantine Book.  (Defs.' SUF ¶ 42; Strauss Decl., Ex. 21.)  The Shaw Family knows that the Ballantine book is in the public domain, yet they repeatedly assert rights to such photographs away from judicial scrutiny, and refuse to tell Defendants that they may use those photos without threat of an infringement suit.  The Shaw Family's expensive shell game should be put to an end by declaring the disputed works to be in the public domain.

### iii) Plaintiffs Broadcast their Claims of Copyright Ownership of Public Domain Monroe/Shaw Photographs to the Entire World

Plaintiffs' assertions of copyright ownership to public domain photographs are not limited to claims directed against Defendants or other individual third parties, but have been

---

[32] The Shaw Family also continues to artificially the narrow Defendants' public domain claim by insisting, contrary to Defendants' Third Amended Complaint and Magistrate Judge Fox's ruling, *supra* 4-5, that Defendants' claim is limited to Ballantine and Rizzoli.

broadcasted to the public at large. *See Nippon Elec. Glass Co., Ltd. v. Sheldon,* 489 F. Supp.

119, 121 (S.D.N.Y. 1980) ("The accusation [of infringement warranting a declaratory judgment]

need not be made directly to the declaratory judgment plaintiff, but may be made to its customers

or to the industry at large.").  For years, Plaintiffs have asserted copyright protection to public

domain photos from the Ballantine Book on their websites.  (Defs.' SUF ¶¶ 48, 49; Strauss Decl.,

Exs. 25-31.)[33]  The websites display the photos with the notation "© Shaw Family Archives."

(*Id.*)  Notably, the Shaw Family's opposition brief is completely silent about their own websites

– not because they overlooked this point, but because it shows conclusively that Defendants'

fears of an infringement suit are justified.

Plaintiffs have filed a copyright registration application for a collection of photos entitled

"The Making of the Seven Year Itch," although several of which had previously been published

in the Ballantine and Rizzoli Books and are in the public domain.  (Defs.' SUF ¶ 47.)  Plaintiffs

deceptively argue that that they "did not attempt to re-register either the Ballantine or Rizzoli

*books*," (Pls.' Br. 19) (emphasis added), but do not deny that a number of the photos they did

attempt to re-register were previously published in the Ballantine or Rizzoli Books.  Since the

ability to bring a copyright infringement lawsuit is the primary reason for registering a copyright,

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.08, at 12-162 (2007),

Plaintiffs' attempts to register public domain Monroe/Shaw Photographs is yet more evidence

that they intend to bring infringement suits for use of those photos.

---

[33] These website pages have been posted on the Shaw Family's website since at least November 2006 (*see* Dickstein Decl., Ex. Q at ¶ 10 and Exs. B, C), well before the August 2007 Third Amended Complaint was filed.  Furthermore, Larry Shaw's own testimony shows that the websites were operated by SFA, undermining Plaintiffs' scurrilous argument to the contrary. (Sec. Decl. Edith Marcus ¶ 14.)

**D.  The Court Should Exercise its Discretion to Hear Defendants' Public Domain Claim Because a Declaratory Judgment will Serve the Purposes of the Declaratory Judgment Act**

Notably, the Shaw Family no longer argues that the Court should exercise its discretion to decline jurisdiction under the Declaratory Judgment Act.  That is because, as explained in Defendants' moving brief, pp. 25-26, the Shaw Family recognizes that this case presents the situation where the Second Circuit has said "a district court is required to entertain a declaratory judgment action" *Starter Corp.*, 84 F.3d at 597 – *i.e.*, a simple application of black-letter copyright law will immediately decide the sole remaining claim in Defendants' complaint, and will clarify Defendants' and, indeed, the public's, rights to some of the 20th Century's most iconic images.

**E.  Defendants' Motion Papers are Sufficiently Definite to Put the Shaw Family on Notice of Defendants' Requested Relief**

The Shaw Family argues that Defendants' Notice of Cross-Motion is somehow defective because it does not list each and every Monroe/Shaw Photograph Defendants contend are in the public domain.  (Pls.' Br. 30-31.)  Those photographs are specifically referenced in Defendants' February 12, 2008 Statement of Undisputed Facts and are attached as exhibits to the February 12, 2008 Strauss Declaration.  Further, the Shaw Family obviously had no problem identifying the photographs at issue, as their brief is divided into roughly the same categories of photographs as Defendants'.  (Pls.' Br. III.A-D.)

**IV.  THE SHAW FAMILY'S MOTION TO PRECLUDE DEFENDANTS FROM ASSERTING THEIR PUBLIC DOMAIN CLAIM IS IMPROPER AND ENTIRELY UNSUPPORTED BY THE RECORD**

Recognizing that the disputed Monroe/Shaw Photographs are in the public domain as a matter of black-letter copyright law, and that Defendants have presented concrete and unrebutted evidence of an actual controversy, the Shaw Family resorts to filing what it refers to as a "cross-

motion to preclude [Defendants] from arguing that any photographic images of Marilyn Monroe taken by Sam Shaw are in the public domain"  (Plaintiffs' Memorandum of Law in Support of Cross-Motion to Preclude, dated March 4, 2008 ("Pls.' Precl. Br.") 1), but which is actually little more than an attempt to reargue the same issues that they raised in their original summary judgment brief under the guise of a different motion.  Thus to the extent the Shaw Family's preclusion motion does no more than reargue issues raised in their summary judgment motion, it should be stricken.[34]  Plaintiffs' so-called "preclusion" motion also violates both Local Rule 37.2 and Magistrate Judge Fox's June 6, 2006 Discovery Order because Plaintiffs filed it months after the supposed discovery failures, and without first seeking a discovery conference with the Court.

Finally, even if the Court does consider it on the merits, Plaintiffs' motion is filled with gross distortions of the record, and should be rejected.

## A.   The Shaw Family's Preclusion Motion is Improper

### 1.   The Preclusion Motion is an Improper Attempt at a Second Summary Judgment Motion, to Extends the Courts' Page Limits, and to Submit an Unauthorized Sur-Reply

The Shaw Family's preclusion motion is improper because it restates many of the same arguments made in their motion for summary judgment – but in an entirely separate motion.  First, the Shaw Family argues that Defendants' entire claim should be precluded because they allegedly did not answer a contention interrogatory.  (Pls.' Precl. Br. 4-8.)  But the Shaw Family already argued that issue in their summary judgment brief.  (Pls.' Moving Br. 2, 20)  Second, the Shaw Family argues that Defendants' 30(b)(6) testimony does not support Defendants' claim.  (Pls.' Br. 11-24.)  But the Shaw Family previously raised that same issue in their summary

---

[34] For the sake of bringing this briefing cycle to an end, and to conserve party and judicial resources, Defendants do not now move to strike those portions of the Shaw Family's preclusion motion.

judgment motion, in which they argued that Defendants' 30(b)(6) witnesses failed to establish a

case or controversy and that Plaintiffs were entitled to attorney's fees.  (Pls.' Moving Br. 6-8, 16,

18-20.)

Knowing that a motion to preclude Defendants' claim would be improper, the Shaw

Family disguised it as a motion to preclude "evidence" in two stipulations submitted to the

Court.  (Dickstein Decl., Ex. O at 2, Ex. P.)  Similarly, in an email to Defendants' counsel, the

Shaw Family's counsel stated that he intended to cross-move to preclude "evidence" Defendants

relied on in their public domain cross-motion (Dickstein Decl., Ex. N), not to preclude

Defendants from even *asserting* their public domain claim, which, of course, Defendants never

would have stipulated to.  The Shaw Family's misrepresentations in communications with

Defendants and in stipulations endorsed by this Court are regrettable.

The Shaw Family's new "preclusion motion" also puts the lie to their claim that

Defendants are the ones prolonging this lawsuit and overburdening their adversary – in fact, the

*Shaw Family* are the ones doing so.  To the extent the Shaw Family's preclusion motion makes

any arguments based on Defendants' 30(b)(6) testimony or responses to interrogatories, it should

be rejected and the Shaw Family should be denied the opportunity to submit a reply.

## 2.     The Shaw Family's Preclusion Motion Violates Both Local Rule 37.2 and Magistrate Judge Fox's June 6, 2006 Discovery Order

Local Rule 37.2 provides:

> No motion under Rules 26 through 37 inclusive of the
> Federal Rules of Civil Procedure shall be heard unless counsel for
> the moving party has first requested an informal conference with
> the court and such request has either been denied or the discovery
> dispute has not been resolved as a consequence of such a
> conference.

The Shaw Family's preclusion motion expressly seeks relief under Rule 37.  Nevertheless, the

Shaw Family never requested a conference with the Court to discuss Defendants' purported

discovery failures.  In fact, the parties appeared before Magistrate Judge Fox on a discovery

issue raised by Defendants' just days before the close of discovery (*see* Strauss Decl., Ex. 16),

but the Shaw Family made no mention of the supposed discovery disputes described in their

present application – deciding instead to sandbag Defendants with an improper motion and

subject them to additional costs that might could have been avoided by seeking an informal

conference with the Court.

Further, Magistrate Judge Fox's July 6, 2006 Order provides:

> The party objecting to disclosure, claiming an insufficient response to a discovery request, or asserting a privilege, bears the burden of coming forward by bringing the dispute to the attention of the court as hereinafter set forth.

> The objecting party has 2 business days from the date the dispute arises to attempt an amicable resolution of the dispute.  If for any reason the dispute is not affirmatively resolved within 2 business days, the objecting party then has 4 business days to bring the issue to the attention of the court . . . .

> A dispute arises on the day when the discovery request or discovery response objected to is received by the adverse party. . . . .

> Any failure to comply with the terms of this Order . . . may result in waiver of legal rights and privileges.  The time limitations set forth herein . . . are to be strictly observed[.]

(Dickstein Decl., Ex. M) ("Discovery Order") (emphasis in original).  All of the supposed

discovery disputes Plaintiffs now point to arose well more than six days before their March 4,

2008 preclusion motion.  In fact, the allegedly insufficient disclosure and discovery responses

occurred many months ago, but Plaintiffs waived any rights to dispute those responses by failing

to timely raise them with the Court.[35]  Thus, the Shaw Family's preclusion motion should be denied because it violates both this Court's Local Rules and Judge Fox's Discovery Order.

**B.   Plaintiffs' Preclusion Motion is Meritless**

**1.     Defendants Properly Responded to the Shaw Family's Interrogatories**

**i)     Contention Interrogatory**

The Shaw Family's principal argument in their preclusion motion is that Defendants supposedly failed to answer a contention interrogatory.  (Pls.' Br. 5-7.)  But Defendants <u>did</u> respond to that interrogatory, first in an interrogatory response dated December 4, 2007 (Sec. Marcus Decl., Ex. L at No. 1), and then in a supplemental response on December 5, 2007 (Sec. Marcus Decl., Ex. N at 2; Strauss Decl., Ex. 50).  Plaintiffs claimed that they "disagree[d]" with Defendants' objections in their supplemental response (*id.* at 1), but as explained above, if Plaintiffs were dissatisfied with that response, it was their obligation to raise the dispute with Judge Fox within four days.[36]  Had they raised their objections, the discovery dispute might have been resolved.[37]  Having failed to do so, Plaintiffs cannot now sidestep Judge Fox's Discovery

---

[35]  Significantly, Defendants complied with Judge Fox's July 6, 2006 Order and specifically referenced that Order in an email to the Shaw Family on December 3, 2007. (Dickstein Decl., Ex. R.)  The Shaw Family was therefore fully aware of the Order.

[36]  *Cf.* 7 James W.M. Moore, *Moore's Federal Practice* § 33.172, at 33-99 (3d ed. 2007) ("Once a responding party interposes objections, the parties must attempt to resolve the dispute without court action.  . . . .  If the parties cannot resolve the dispute, the propounding party may move for an order to compel answers to the interrogatories.  If it fails to move to compel, the propounding party may waive the right to seek answers to interrogatories.").

[37]  Indeed, the purpose of the Discovery Order was to "facilitate the progress of pre-trial discovery of this litigation in a just, speedy and inexpensive manner, to insure compliance with the case management plan, and to prevent the accumulation of unresolved discovery issues[.]" (Dickstein Decl., Ex. M at 1.)

Order (and Local Rule 37.2) by seeking to preclude an entire claim based on a typical discovery

dispute that should have been dealt with in the ordinary course.[38]

Second, the interrogatory did <u>not</u> request "specific detail for Defendants' claim that there

was a justiciable controversy between the parties" as the Shaw Family now claims.  (Pls.' Precl.

Br. at 6.)  As the Court can see, the interrogatory is rambling, non-specific and impossible to

fully answer, which is why Defendants objected on the grounds that it was overbroad, vague and

unduly burdensome.  (Sec. Marcus Decl., Ex. L at No. 1.)[39]  Indeed, Plaintiffs fail to even

specify what information Defendants' supposedly failed to provide in response to the

interrogatory, so that the Court can determine whether it was called for.  For example, in their

summary judgment reply brief, Plaintiffs argue that Defendants failed to disclose how they use

public domain images, (Pls. Br. 7) yet nowhere in the interrogatory does it ask "how" Defendants

would use those images.

Third, Defendants specifically indicated in their interrogatory response that they would

supplement their responses "after other discovery and depositions have concluded."  (Sec.

Marcus Decl., Ex. L at No. 1.)  Indeed, Local Rule 33.3(c) provides that contention

interrogatories may be sought "[a]t the conclusion of other discovery[.]"  In fact, in their

interrogatory responses, Defendants specifically objected to the request as premature.  (Sec.

Marcus Decl., Exs. L, N.)  The Shaw Family responded "Thank you for your response, which we

disagree with on many levels and will address more fully at the appropriate time."  (*Id.,* Ex. N at

---

[38] Indeed, the parties appeared before Judge Fox on December 26, 2007 on Defendants' discovery application, but Plaintiffs made no mention of Defendants' responses to their contention interrogatory.

[39] Defendants also properly objected on the grounds that the Shaw Family had exceeded the permissible number of interrogatories (including Magistrate Judge Fox's enlargement to 45). (Sec. Marcus Decl., Ex. L at No. 1; *see also* Sec. Marcus Decl., Ex. N at 2.)

1.)[40]  The Shaw Family now tries to excuse their failure to comply with the Discovery Order and Local Rule 37.2 by claiming that no responses were due until after depositions concluded.  (Pls.' Precl. Br. 7.)  But that begs the question why the Shaw Family brought on a motion on January 9, 2008, just three business days after depositions ended arguing "Defendants have actually refused to provide any substantive response to the Shaw Family's contention interrogatory . . . lending further credence to the bad faith nature of the Defendants' claim."  (Pls.' Moving Br. 2.)  No matter what Plaintiffs position is, their conduct was improper.  If the discovery dispute arose on December 5, they were obligated to raise it with Judge Fox within four business days.  If no response was due until after depositions, Plaintiffs' January 9 motion accusing Defendants of wrongdoing is premature and improper.

Indeed, Defendants did provide further information related to their public domain claim.  All *four* of Defendants' complaints sought a declaration that certain Monroe/Shaw Photographs were in the public domain (Defs.' SUF ¶ 2), and their Third Amended Complaint specifically stated that, in addition to photos in the Rizzoli and Ballantine Books, other Monroe/Shaw Photographs were in the public domain (Serbagi Decl., Ex. I ¶¶ 24-26.)  Further, on January 18, 2008, leading up to the February 1, 2008 submission of the Joint Pre-Trial Order ("PTO"), Defendants provided the Shaw Family with their contentions and proposed undisputed facts, which disclosed – in stark detail – the nature of Defendants' public domain claim.  (Dickstein Decl., Ex. A.)  If that was not enough, Defendants' factual and legal arguments supporting their public domain claim were also disclosed in the Final Pre-Trial Order and Defendants' Proposed

---

[40] Notably, the Shaw Family's response came only two days after Defendants cited Judge Fox's June 6, 2006 Discovery Order in an email to the Shaw Family. (*See supra* n.35.) Therefore, the Shaw Family's failure to raise with the Court any objections to Defendants' response cannot be attributed to mere inadvertence.

Jury Instructions that were filed on February 1, 2008.[41]  Because the information supporting Defendants' public domain claim was made known to the Shaw Family in writing, the Shaw Family's preclusion motion should be denied.  *See* Fed. R. Civ. P. 26(e)(2) (party must supplement interrogatory responses "if the additional or corrective information has not otherwise been made known to the other party during the discovery process or in writing[.]").

The cases Plaintiffs rely upon are all distinguishable.  In *Wechsler v. Hunt Health Sys., Ltd.*, No. 94 Civ. 8294 (PLK), 1999 U.S. Dist. LEXIS 13216, at *2-3 (S.D.N.Y. Aug. 27, 1999), relied upon by Plaintiffs, the defendant claimed that the plaintiff's non-payment constituted breach of contract, and justified defendant's non-performance.  In opposition to summary judgment, the plaintiff claimed that the contract had already expired prior to its alleged breach. *Id.*  Because the plaintiff conceded that he had not raised that argument in response to an interrogatory <u>specifically asking for</u> the reasons he had stopped payment, the plaintiff was precluded from arguing it at trial (not on summary judgment, as the Shaw Family contends).  *Id.* at *2-3, 11.  Similarly, in *Weiss v. Chrysler Motors Corp.*, 515 F.2d 449 (2d Cir. 1975), defendant was precluded from offering expert testimony that a fracture in the steering mechanism of plaintiff's car was caused by a collision with a tree stump, and not by a manufacturing defect, because the defendant did not disclose that crucial expert testimony in response to plaintiffs' interrogatory <u>specifically calling for</u> the identity of any expert witness

---

[41]  The fact that Defendants' contentions and proposed jury instructions did not address the Shaw Family's "standing" argument is irrelevant.  Defendants laid bare their affirmative arguments and legal theories, and were not required to anticipate responsive defenses the Shaw Family might make.

defendant planned to call at trial and the facts and opinions to which such expert would testify. *Id.* at 455-457.[42]

Here, by contrast, the Shaw Family's interrogatory did <u>not</u> specifically ask how Defendants would make use of public domain Monroe/Shaw Photographs, or even the reasons a justiciable controversy existed.   Moreover, Defendants' public domain claim was disclosed in their Third Amended Complaint (indeed, that is the only claim in the complaint), in their interrogatory responses, and in the exchange of information prior to submission of the PTO.[43]

### ii)     **Intellectual Property Interrogatory**

The Shaw Family next argues that Defendants failed to answer a July 10, 2007 interrogatory regarding Defendants' intellectual property rights.  (Pls.' Precl. Br. 7-8.)  That interrogatory, however, expressly related to Defendants' Second Amended Complaint (Sec. Marcus Decl., Ex F at 5-6), which included a claim for a declaration of Defendants' interest in the Monroe Intellectual Property Rights, (Serbagi Decl., Ex. C at 7-8).  By the time Defendants'

---

[42] Plaintiffs' other cases are either distinguishable or inapposite.  In *Elizabeth Iron Works, Inc. v. Atlas Machine and Iron Works, Inc.*, No. 76 Civ. 1569 (PNL), 1983 U.S. Dist. LEXIS 10828 (S.D.N.Y. Dec. 14, 1983), the responding party acknowledged that it was making "substantial changes" to its accounting and damages theories, *id.* at *3, which finds no parallel here, and the court recognized that "orders of preclusion are not lightly made and there should, in my view, be a substantial preference for the receipt of relevant proof" *id.* at *5.  Neither *Prince Group, Inc. v. MTS Prods.*, No. 95 Civ. 1160, 1998 U.S. Dist. LEXIS 7835 (S.D.N.Y. May 27, 1998) nor *Guadagno v. Wallack Ader Leviathan Assocs.*, 950 F. Supp. 1258 (S.D.N.Y. 1997) actually addressed answers to interrogatories, mentioning them only in dicta.

[43] Furthermore, in both *Wechsler* and *Weiss*, the propounding party raised the alleged failure to respond with the Court in a timely fashion.  *See Wecshler*, 1999 U.S. Dist LEXIS 13216, at *8 ("parties appeared at a discovery conference before Judge Pitman to address defendants' concerns regarding alleged deficiencies in interrogatory answers provided by plaintiff"); *Weiss*, 515 F.2d at 456 ("Two motions were made to strike Chrysler's answers for failure to respond to these interrogatories . . . .  It was the lack of such response and the fear that some undisclosed theory would be sprung at trial which prompted appellant's motion to strike.").  Here, of course, Plaintiffs failed to timely raise any dispute about Defendants' interrogatory responses with the Court.

responded to the interrogatory on August 13, 2007, that claim had been withdrawn by the filing of the Third Amended Complaint , which is why Defendants objected to it as irrelevant.  (Sec. Marcus Decl., Ex. H at 5-6.)[44]  If the Shaw Family thought the matter relevant, it was their burden to move to compel.  Indeed, under Judge Fox's Discovery Order, the Shaw Family was obligated to raise any dispute they had with that objection at that time.  Because they failed to do so, the Shaw Family's preclusion motion should be denied.

In any event, at CMG's 30(b)(6) deposition, Mark Roesler testified <u>repeatedly</u> that Defendants owned trademarks related to Marilyn Monroe.  (Strauss Decl., Ex. 37 at 23, 31, 36, 127-128; Sec. Marcus Decl., Ex. Q at 101.)  The Shaw Family was therefore on full notice that Defendants owned Marilyn Monroe-related trademarks.

Lastly, the Shaw Family ignores the fact that during discovery Defendants produced the licensing agreements attached to Mark Roesler's Declaration, which themselves reflect Defendants' ownership of trademarks in Marilyn Monroe's name and signature, (Roesler Decl., Exs. C-E), as well as other documents showing Defendants ownership of trademarks (Dickstein Decl., Exs. T, U.)  Those licenses also show that Defendants license their Marilyn Monroe trademarks along with public domain images of Marilyn Monroe, which is why a justiciable controversy exists.  The Shaw Family's preclusion motion should therefore be denied.

### iii) Defendants' Interrogatory Responses Were Not Limited to Rizzoli

The Shaw Family also argues that Defendants' public domain claim should the be precluded because their response to an earlier interrogatory was limited to the Rizzoli Book.

---

[44] The Shaw Family makes the unsupported argument that merely because Defendants objected to their interrogatory, Defendants entire claim should be precluded. (Pls.' Precl. Br. 8.) Having sat on their rights by not raising any dispute with the court, the Shaw Family cannot claim now that Defendants should be precluded by merely objecting to an interrogatory.

(Pls. Precl. Br. 8.)  However, that interrogatory expressly related only to Defendants'

"affirmative defense" to the Shaw Family's copyright infringement claims, not to Defendants'

subsequently-filed public domain claim (Sec. Marcus Decl., Ex. D at No. 15), and is therefore

irrelevant to the Shaw Family's present motion.  Moreover, Defendants' December 5, 2007

supplemental interrogatory response was expressly not limited to Rizzoli.  (Strauss Decl., Ex.

50.)

## 2.    <u>Defendants did Not Improperly Fail to Produce Any Documents</u>

In perhaps their most far-fetched argument yet, the Shaw Family argues that Defendants'

public domain claim should be precluded because they did not produce documents that are either

publicly available or are already in the Shaw Family's possession, including documents that were

not even in Defendants possession, custody or control (even though Defendants gave the Shaw

Family copies of all such documents in January 2008).  Defendants objected to the Shaw

Family's document requests to the extent they sought documents that were "already in Plaintiffs'

possession, are public or are otherwise readily available from sources to which Plaintiffs also

have access" or are "not in the Defendants' possession, custody or control." (Defs.' Resp. to Pls.'

ASUF No. 24 at 14.)[45]  Indeed, "'it is well-established that discovery need not be required of

documents of public record which are equally accessible to all parties.'"  *Krause v. Buffalo and*

*Erie County Workforce Dev. Consortium, Inc.*, 425 F. Supp. 2d 352, 375 (W.D.N.Y. 2006)

(quoting *Securities and Exchange Comm'n v. Samuel H. Sloan & Co.*, 369 F. Supp. 994, 995

(S.D.N.Y. 1973)).  By not raising any supposed disputes with the Court when Defendants'

---

[45] The Shaw Family mischaracterizes their document request as calling for documents relevant to "Defendants' trademarks" (Pls.' Precl. Br. 9.)  In fact, their document request called for documents related to the "prosecution of the MM Marks in the PTO" and to Defendants allegation that Plaintiffs "infringed" Defendants trademarks.  (Sec. Marcus Decl., Ex. G Nos. 3, 5, at 6.)

served their responses, and by failing to request a discovery conference, the Shaw Family waived

their right to contest Defendants' objections.

The Shaw Family identifies three categories of documents Defendants supposedly failed

to produce. (Pls.' Precl. Br. 9-11.) First, all the information contained in Maureen Cloonan's

declaration is publicly available. The Monroe/Shaw Photographs from 1950s newspapers were

obtained from the New York Public Library, and the copyright search reports were obtained

from the Copyright Office's Internet website. (Defs.' Resp. to Pls.' ASUF No. 24, at 14-18;

Cloonan Decl. ¶ 2-15.)[46] In any event, Defendants did not acquire that information until after

discovery (*id.* at ¶ 2, 14, 15), and did so only because the Shaw Family produced no copyright

information for those Monroe/Shaw Photographs. Defendants produced the newspaper photos

shortly after copying them from the library (Dickstein Decl., Ex. B at January 18, 2008 Letter),

and produced the Copyright Office website search results as part of their cross-motion for

summary judgment only days after performing the search.[47] That the Shaw Family blames

Defendants for not producing information related to the their own alleged copyrights is further

evidence of the shell game they are playing with Defendants and this Court.

Second, the Shaw Family does not even specify the "work for hire" evidence that

Defendants purportedly did not produce, but any such evidence consists only of publicly-

---

[46] As discussed above, *supra* 6-7, the Shaw Family does not even hint at why they believe Cloonan's search was unreliable, nor do they move for permission to take her deposition pursuant to Rule 56(f). In any event, the Shaw Family's non-production of any renewal certificates for Ballantine or any registrations for the Monroe/Shaw Photographs published in newspapers or magazines in the 1950s, along with Defendants' review of the Shaw Family's copyright registration binder (See Declaration of Barry I. Slotnick, dated February 11, 2008 ("Slotnick Decl."), ¶¶ 4-7), both independently confirm that those works are in the public domain.

[47] The Shaw Family does not even attempt to explain how Cloonan's declaration, which merely recounts a search she performed, could be precluded as the result of any alleged failure to produce documents.

available court papers from cases in which Sam Shaw himself, as well as SFA and its shareholders, were parties. These are: (i) a complaint filed by Sam Shaw in the *St. Martin Press* case (Strauss Decl. Ex. 6); and (ii) the complaint in the *Shaw v. Bressler* case (Strauss Decl. Ex. 10), to which Sam Shaw, Edith Marcus, Meta Stevens and Larry Shaw were all parties, and the settlement of which resulted in the formation of SFA. (Defs.' SUF ¶¶ 73-74).[48] These publicly-available court papers were always in the Shaw Family's possession.[49]

Third, as discussed above, the newspapers and magazines offered to show the Monroe/Shaw Photographs were published without proper notice were obtained from the New York Public Library or the Internet. (Defs.' Resp. to Pls.' ASUF No. 24, at 14-18.) There is no basis to exclude them.

Furthermore, in connection with the Shaw Family's motion for summary judgment on the domicile issue, the Shaw Family themselves relied on documents which they did not produce during discovery, but which were publicly available. (*See* Defs.' Mar. 12, 2008 Memorandum of Law in Support of Cross-Motion to Strike Evidence, at 19.) Having relied on publicly available information they themselves produced after discovery, the Shaw Family cannot then argue that Defendants should be precluded from doing the same. Moreover, as discussed above, *supra* 10, in opposing Defendants' cross-motion on the work for hire issue, the Shaw Family submits documents that they <u>admit were never produced</u>, even though they were directly responsive to Defendants' document requests. For the Shaw Family to then turn around and attack Defendants

---

[48] Other evidence used in support of Defendants' "work for hire" argument was produced in this litigation (*e.g.* Strauss Decl. Exs. 5, 11), including a publicly-available court paper from the *Rizzoli* litigation (Strauss Decl. Ex. 7), in which Sam Shaw and Edith Marcus were plaintiffs (Strauss Decl. Ex. 3). This court paper was marked as an exhibit at the Melissa Stevens deposition, prior to the discovery deadline. (Dickstein Decl. ¶ 7, Ex. D at 64, Ex. F).

[49] As explained in Defendants' Response to the Shaw Family's Additional Statement of Undisputed Facts No. 24, other documents Defendants rely upon were similarly publicly available or already in the Shaw Family's possession.

for relying on documents that are publicly available, or already in the Shaw Family's possession, is simply outrageous.

### 3.    Defendants' 30(b)(6) Testimony Supports, and Does Not Contradict, their Declaratory Judgment Claim

Finally,  the Shaw Family argues that Defendants entire public domain claim should be precluded because their 30(b)(6) witnesses allegedly failed to support that claim.  (Pls.' Br. 11-24.)  As discussed above, *supra* 29-30, Defendants object to the Shaw Family's inclusion of these voluminous arguments in an entirely separate motion after addressing the same issue in both their moving brief and reply brief on their motion for summary judgment, and ask the court to strike the Shaw Family's argument on that ground alone.

In any event, Defendants' 30(b)(6) witnesses <u>did</u> provide a basis for Defendants' public domain claim.  (Defs.' Resp. to Pls.' ASUF Nos. 11-14, 18.)  They testified that many Monroe/Shaw Photographs have entered the public domain, including photographs from the Rizzoli Book and Ballantine Book, as well as other photographs that were published without proper copyright notice or that were published prior to 1964 but never renewed.  (Serbagi Decl., Ex. O at 48-49, 58-62, 161-163, 174; Serbagi Decl., Ex. N at 165.)  They testified that the Shaw Family, through their marketing and licensing activities, as well as their claims against Defendants in this action, falsely represented that Monroe/Shaw Photographs are subject to their exclusive copyright (Serbagi Decl., Ex. O at 47-48, 81-82, 99-100, 170-171, 174; Pls.' Precl. Br. 14), and that but-for the Shaw Family's false claims of copyright ownership, Defendants would encourage their licensees to use any such photographs that the Shaw Family acknowledge to be

41

in the public domain. (Serbagi Decl., Ex. O at 174-176). They also testified that Defendants

owned various trademarks related to Marilyn Monroe, (*id.*, Ex. N at 190).[50]

The Shaw Family's questioning of Defendants' 30(b)(6) witnesses also demonstrates the

Shaw Family's misunderstanding of Defendants' licensing business. As explained above, *supra*

15, Defendants do not *license* public domain Monroe/Shaw Photographs, such as those in the

Ballantine or Rizzoli books; they offer them to third parties that license Defendants' Monroe-

related trademarks. Nevertheless the Shaw Family repeatedly questioned Defendants' 30(b)(6)

witnesses whether they ever "licensed" various public domain Monroe/Shaw Photographs. (*See*

Pls.' Precl. Br. 12-14, 20-21; Pls.' Br. 34.) That Roesler and Strasberg were not aware of any

such licensing of public domain images is completely consistent with Defendants' business and

their claims in this action.

Furthermore, despite the fact that a "30(b)(6) deposition 'is not designed to be a memory

contest[.]'" (Pls.' Precl. Br. 11) (quoting *Zappia Middle East Construction Co. v. The Emirate of*

*Abu Dhabi*, 94 Civ. 1942 (DC), 1995 U.S. Dist. LEXIS 17187, at *10 (S.D.N.Y. Nov. 17, 1995),

the Shaw Family repeatedly demanded specific information from Defendants' witnesses without

placing any document or exhibit before them. For example, the Shaw Family asked Mr. Roesler

to name the title of one specific copyright registration that the Shaw Family falsely claimed

ownership to. (Pls.' Br. 32; Serbagi Decl., O at 174-76.) Roesler answered that he could not do

so "sitting here today" (*id.*), which is not surprising considering no photographs were placed

before him. Indeed, in response to one question cited by Plaintiffs, Roesler responded that he

needed "specific information from my office" (Pls.' Precl. Br. 20.) His inability to identify by

---

[50] In addition, although Mr. Strasberg indicated that Mr. Roesler was more
knowledgeable about Defendants' business, Strasberg undoubtedly has sufficient personal
knowledge to testify about Defendants' business because he testified that he has been involved
with MMLLC's licensing activities. (Marcus Decl., Ex. V at 158, 202).

memory a specific title of a copyright registration in no way refutes his testimony, supported by

substantial documentary evidence, that Plaintiffs have falsely asserted ownership of copyrights to

all of Sam Shaw's photographs of Marilyn Monroe.

In any event, the Shaw Family cites no authority for the proposition that a witness'

inability to provide specific information by memory can operate to preclude a party's claim, or

that a party must rely only on deposition testimony to support its claim on summary judgment.[51]

Defendants provided the February 12, 2008 declarations of Mark Roesler and David Strasberg,

which fully support Defendants' public domain claim, and do not contradict their deposition

testimony.[52]  Further, the overwhelming documentary evidence, much of which came from

Plaintiffs' own files, demonstrates their repeated assertions of copyright protection to public

domain works, and justifies Defendants' fears of an infringement suit if they follow through on

their intentions to use the public domain Monroe/Shaw Photographs.

Lastly, the Shaw Family now complains that MMLLC instructed its witness not to

answer certain questions.  (Pls.' Precl. Br. 16)  Ironically, the Shaw Family acknowledges that

---

[51] Even if Defendants' 30(b)(6) witnesses somehow "failed to appear" (Pls.' Precl. Br. 11-12) (which they did not), it was Plaintiffs' burden to timely raise that issue with the Court and to request a discovery conference.

[52] "Although a party does not show a triable issue of fact merely by submitting an affidavit that disputes his own prior sworn testimony, a material issue of fact may be revealed by his subsequent sworn testimony that amplifies or explains, but does not merely contradict, his prior testimony, especially where the party was not previously asked sufficiently precise questions to elicit the amplification or explanation."  *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citation omitted).  Accordingly, the principle that "in opposing summary judgment, a party who has testified to a given fact in his deposition cannot create a triable issue merely by submitting his affidavit denying the fact . . . does not apply if the deposition and the later sworn statement are not actually contradictory."  *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000); *see also Langman Fabrics, a div. of Blocks Fashion Fabrics, Inc. v. Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998) ("If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete.").

Defendants raised that same issue before Judge Fox with respect to SFA's 30(b)(6) witness (and, as a result, received an additional four hours to continue the deposition) (Pls.' ASUF ¶ 38), yet the Shaw Family fails to mention that *they* never raised that issue with Judge Fox with respect to *MMLLC's* 30(b)(6) witness.  If the Shaw Family wanted to contest the adequacy of MMLLC's responses to any questions, it was their burden to raise that dispute with the Court.  By failing to do so, the Shaw Family waived their right to object.

## V.    PLAINTIFFS ARE NOT ENTITLED TO ATTORNEY'S FEES EITHER UNDER THE COPYRIGHT ACT OR FOR ANY ALLEGED DISCOVERY FAILURES

Defendants' moving brief demonstrated that the Shaw Family is not entitled to attorneys fees under the Copyright Act because Defendants' public domain claim was brought as a result of a good faith desire to use public domain photos in connection with their licensing business, and because their claim was objectively reasonable.  That is even more apparent now.  In response to Defendants' evidence that certain Monroe/Shaw Photographs are in the public domain, the Shaw Family offers no copyright registration certificates showing valid copyrights to those photos – which they could easily do (if any existed) – instead, desperately and unsuccessfully trying to undermine Defendants' evidence.  Thus, the Shaw Family still refuses to recognize that the disputed Monroe/Shaw Photographs are in the public domain, thereby showing the reasonableness of Defendants' fears of an infringement suit.

Recent events have also shown that the Shaw Family, not Defendants, have disregarded their discovery obligations.  Defendants have demonstrated that they properly responded to the Shaw Family's interrogatories and document requests, and that their 30(b)(6) depositions support, and do not contradict, their public domain claim.  If the Shaw Family had any legitimate dispute with Defendants' discovery responses, they were required to timely raise them with the Court, and to request a discovery conference before making their "preclusion" motion.  Because

the Shaw Family did neither, Defendants have been forced to incur substantial costs responding to the Shaw Family's belated and meritless arguments.

The Shaw Family, on the other hand, falsely argued that Edith Marcus and Meta Stevens owned the alleged copyrights to Monroe/Shaw Photographs, and that Defendants therefore named the incorrect parties, while at the same time withholding the Larry Shaw Assignment, which demonstrates that their position had no merit and that Defendants were right all along. The Shaw Family also relies on documents that they <u>never</u> previously produced yet were directly responsive to Defendants' document request concerning *The Seven Year Itch*, while at the same time baselessly chastising Defendants for relying on documents that are either publicly available or already in the Shaw Family's possession. All of this demonstrates the lengths the Shaw Family is willing to go to delay, obscure, and play shell games with Defendants and this Court. If any party is entitled to attorney's fees for discovery abuses, it is Defendants.

**CONCLUSION**

For all the foregoing reasons, Defendants respectfully ask the Court to deny the Shaw

Family's motion for summary judgment dismissing the public domain claim and for attorneys

fees, deny the Shaw Family's motion to preclude Defendants' public domain claim, and grant

Defendants' motion for summary judgment on their public domain claim.

Dated: New York, New York
         March 25, 2008

                              LOEB & LOEB LLP

                              By:     /s/  Tal E. Dickstein
                                   Barry I. Slotnick
                                   Paula K. Colbath
                                   Jonathan Neil Strauss
                                   Tal E. Dickstein
                                   345 Park Avenue
                                   New York, New York 10154-1895
                                   Tel: (212) 407-4000


                                   Attorneys for Defendant/Consolidated
                                   Plaintiff Marilyn Monroe, LLC
                                   Marilyn Monroe, LLC


                              SOVICH MINCH, LLP

                              By:    /s/ Theodore J. Minch
                                   Theodore J. Minch, Esq.
                                   10099 Chesapeake Drive, Suite 100
                                   McCordsville, Indiana 46055
                                   Tel: (317) 335-3601
                                   Fax: (317) 335-3602


                                   Attorneys for CMG Worldwide, Inc.

46