EX. A, PT. 2

5.    **Whether the Statements are Inconsistent With Plaintiffs' Current Position**

Because plaintiffs and Frosch are in privity, the question becomes whether plaintiffs' current position regarding Monroe's domicile is "clearly inconsistent" with the position Frosch and his attorneys took in the California tax proceedings. Plaintiffs argue that it is not, asserting that the question here is Monroe's domicile at the time of her death, while the statements that Frosch and others made on the estate's behalf addressed Monroe's residence. A careful review of California inheritance tax law belies this contention, and reveals that the statements are, in fact, inconsistent.

a.    **California Inheritance Tax Law**

As noted, "'[a] person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return.'" *Gaudin*, 379 F.3d at 636 (quoting *Kanter*, 265 F.3d at 857). "'A person residing in a given state is not necessarily domiciled there.'" *Id.* (quoting *Kanter*, 265 F.3d at 857). "It is true[, however,] that 'domicile' and 'residence' are usually in the same physical location." *Whittell v. Franchise Tax Bd.*, 231 Cal.App.2d 278, 284 (1964). As a result, in many statutes, "'residence' is frequently construed to mean domicile and the terms are often used synonymously." *Id.* (citing CAL. GOV'T CODE §§ 243, 244; CAL. PROB. CODE § 301; CAL. CIV. CODE § 128; CAL. CODE CIV. PROC. §§ 395, 417); The California Supreme Court has recognized that many statutes use "residence" and "domicile" synonymously:

"Courts and legal writers usually distinguish 'domicile' and 'residence,' so that

---

valuation election. He and Petitioner Betty Lou LeFever provided the information on which their accountant based the election. They both signed a consent form to the taking of the election. Lastly, as the qualified heirs of parcels 2 through 5, Petitioners had an economic interest in reducing the value of the taxable estate in 1984. Petitioners had sufficient privity of interest with the estate's executor for the application of the duty of consistency" (citations omitted)); *Beltzer v. United States*, 495 F.2d 211, 211-13 (8th Cir. 1974) (holding that under the duty of consistency, a brother and sister who were co-executors of and heirs to an estate were individually bound by their representations in an estate tax return).

Here, like the party in *Janis*, Frosch as executor had a fiduciary duty to minimize the taxes paid by Monroe's estate. Plaintiffs' predecessors-in-interest had an economic interest in reducing the value of the taxable estate. Given that the interests of Frosch and plaintiffs' predecessors were aligned as respects the representations made to the California inheritance tax appraiser, it is appropriate to find that they were in privity with one another.

36

'domicile' is the one location with which for legal purposes a person is considered to have the most settled and permanent connection, the place where he intends to remain and to which, whenever he is absent, he has the intention of returning, but which the law may also assign to him constructively; whereas 'residence' connotes any factual place of abode of some permanency, more than a mere temporary sojourn. 'Domicile' normally is the more comprehensive term, in that it includes both the act of residence and an intention to remain; a person may have only one domicile at a given time, but he may have more than one physical residence separate from his domicile, and at the same time. But statutes do not always make this distinction in the employment of those words. They frequently use 'residence' and 'resident' in the legal meaning of 'domicile" and 'domiciliary,' and at other times in the meaning of factual residence or in still other shades of meaning. For example, in our codes 'residence' is used as synonymous with domicile in the following statutes: sections 243 and 244 of the Government Code, giving the basic rules generally regarded as applicable to domicile; section 301 of the Probate Code, relating to jurisdiction for the administration of decedents' estates; and section 128 of the Civil Code, providing that a divorce must not be granted unless the plaintiff has been 'a resident' of the state for one year." *Smith v. Smith*, 45 Cal.2d 235, 239 (1955) (citations omitted).

See also *Kirk v. Board of Regents of University of Cal.*, 273 Cal.App.2d 430, 434-35 (1969) ("[D]espite the fact that the terms residence and domicile are often used synonymously, residence is not a synonym for domicile, and its meaning in particular statutes is subject to differing construction, depending on the context and purpose of the statute in which it is used").

Under California's Inheritance Tax Law, found at California Revenue & Tax Code § 13301 et seq.,[59] "the tax imposed is on the right to succeed to property." *In re Carson's Estate*, 234 Cal.App.2d 516, 523 (1965) (citing *Estate of Radovich*, 48 Cal.2d 116, 121 (1957)). Under § 13401, "'[a]n

---

[59]California's Inheritance Tax Law was repealed in 1982. See *Estate of Goshen*, 167 Cal.App.3d 97, 98 n. 1 (1985) (citing CAL. STATS. 1982, ch. 1535, § 14).

37

1    inheritance tax is hereby imposed upon every transfer subject to this part.'" See *In re Vai's Estate*, 65

2    Cal.2d 144, 157 n. 1 (1966) (Traynor, C.J., dissenting) (citing former CAL. REV. & TAX. CODE § 13401).

3    Under § 13601, "'[a] transfer by will or the laws of succession of this State from a person who dies

4    seized or possessed of the property transferred while a resident of this State is a transfer subject to this

5    part.'" *Id.* (citing former CAL. REV. & TAX. CODE § 13601, added by CAL. STATS. 1943, c. 658, § 1).

6    The transfer by a nonresident of tangible personal assets and real property located in California is also

7    subject to California inheritance tax. See *Chambers v. Mumford*, 187 Cal. 228, 230 (1921); see also 18

8    CAL. CODE REGS. § 13303.2 ("Real property in this State belonging to a nonresident transferor is subject

9    to the Inheritance Tax Law. . . . Tangible personal property permanently in this State belonging to a

10   nonresident transferor is subject to the Inheritance Tax Law").[60]

11          Regulations promulgated in 1945 to implement the Inheritance Tax Law define the terms used

12   in the statute. The regulations provide that "'residence,' as used in these Rules and Regulations, is

13   synonymous with legal residence or domicile." 18 CAL. CODE REGS. § 13303.4 (formerly 18 CAL. CODE

14   REGS. § 638 (1945)). A "resident' is defined as "a person whose residence is in the State of California."

15   18 CAL. CODE REGS. § 13303.6 (formerly 18 CAL. CODE REGS. § 640 (1945)). A "nonresident" is "a

16   person whose residence is outside the State of California." 18 CAL. CODE REGS. § 13303.7 (formerly

17   18 CAL. CODE REGS. § 641 (1945)).

18          These regulations demonstrate that under California's Inheritance Tax Law, residence and

19   domicile are synonymous. Therefore, a party arguing for inheritance tax purposes that a decedent was

20   a resident of another state (i.e., a non-resident of California) was effectively arguing that the decedent

21   was not domiciled in California. The procedure for making such an argument is set forth in the

22

23          [60]See also 18 CAL. CODE REGS. § 14651 ("In the case of a decedent who died a resident of
     California, the superior court of the county in which he last resided as a rule has jurisdiction to hear and
24   determine all questions relative to any tax imposed by the Inheritance Tax Law on any transfer by him");
     *id.*, § 14653 ("In the case of a decedent who died a nonresident of California, the superior court of the
25   county in which any of the decedent's real property is situated, or, if he owned no real property in this
     State, then the superior court of any county in which any of his personal property is situated, as a rule
26   has jurisdiction to hear and determine all questions relative to any tax imposed by the Inheritance Tax
     Law on any transfer by the decedent. If the decedent leaves real or personal property in more than one
27   county in this State, the superior court of any such county which first acquires jurisdiction will retain
     the same to the exclusion of the superior court of any other such county").
28

1    regulation defining "residence." It states that "[w]hen a claim is made that the residence [i.e., domicile]

2    of a transferor was outside the State of California and a court proceeding to determine the inheritance

3    tax is pending, an affidavit in support of the claim must be filed with the inheritance tax appraiser on

4    form IT-2, entitled 'Declaration Concerning Residence.'" 18 CAL. CODE REGS. § 13303.4.[61]

5                **b.    Frosch's Statements to the Inheritance Tax Appraiser**

6         These regulations demonstrate that in arguing to the inheritance tax appraiser that Monroe was

7    not a resident of California, but a resident of New York, at the time of her death, Frosch was contending

8    that Monroe was domiciled in New York. The letter prepared by Frosch's counsel and submitted to the

9    inheritance tax appraiser asserts that Monroe was a "non-resident of the State of California at the time

10    of her death."[62] In support, Frosch submitted Form No. I.T.2, the "Affidavit Concerning Residence,"as

11    required by the regulation defining "residence."[63] The questions on the form addressed many of the

12    factors typically used to determine a person's domicile,[64] e.g., the last place Monroe voted, where she

13    filed her last income tax return, whether and where she owned a home, where she actually lived at the

14    time of death, whether she belonged to a church in California, whether she engaged in business in

15    California, whether she had family in California, and whether she made statements or declarations

16    regarding her residence.[65] In his responses to the questions on the form, Frosch repeatedly asserted that

17    Monroe was residing temporarily in California for the sole purpose of working on a motion picture, and

18

19

20

21        [61]The original version of this regulation denominated the form "Form No. 2 entitled 'Affidavit Concerning Residence.'" 18 CAL. CODE REGS. § 638 (1945)).

22        [62]Soni Decl., Exh. F.

23        [63]*Id.*, Exh. G.

24        [64]Among the factors considered in determining domicile are an individual's "current residence,

25    voting registration and voting practices, location of personal and real property, location of brokerage and bank accounts, location of spouse and family, membership in unions and other organizations, place

26    of employment or business, driver's license and automobile registration, and payment of taxes." *Lew*, 797 F.2d at 750 (citations omitted).

27

28        [65]Soni Decl., Exh. G.

1    that she "in all respects retained her permanent residence in New York."[66]

2    The declarations submitted by Monroe's friends and employees likewise addressed Monroe's

3    "permanent residence" – i.e., her domicile.[67]  Monroe's friend, Ralph Roberts, stated that Monroe

4    repeatedly told him that her trips to California were merely visits and that she considered New York her

5    permanent home and permanent residence.[68]  Similarly, Monroe's personal housekeeper, Hattie

6    Stephenson, asserted that Monroe left all of her furnishings and many personal belongings in her New

7    York apartment when she went to California temporarily to work, and that Monroe intended to return

8    shortly to her permanent residence in New York.[69]

9    Based on the regulations defining "residence" and the content of counsel's cover letter, Frosch's

10    form affidavit, and the supporting declarations submitted to the inheritance tax appraiser, the court

11    concludes that Frosch took the position in the California inheritance tax proceeding that Monroe was

12    domiciled in New York at the time of her death.[70]

13

---

14    [66]*Id.*

15    [67]Plaintiffs object to the declarations on numerous grounds, arguing that they lack foundation,
16    state improper legal opinions, and are based on inadmissible hearsay. (Pl.'s Objections at 6).  Plaintiffs
      also contend that statements of Monroe's intent should be given little weight and that her domicile
17    should be determined by reference to objective facts.  (*Id.* at 5-6).
18    The court need not rule on these objections because the truth of the statements made and nature
      of the opinions expressed in the declarations are not relevant to the issue raised by defendants' motion.
19    The question before the court is not Monroe's *actual* domicile, but whether plaintiffs are estopped to
      assert that her domicile was other than that in New York.  The declarations are evidence that was presented
20    to the inheritance tax appraiser by Frosch and his counsel, and are relevant and admissible in this
      proceeding because they demonstrate the position taken by plaintiffs' privies in the prior proceeding.
21
22    [68]*Id.*, Exh. H.

23    [69]*Id.*, Exh. I.

24    [70]Further support for this conclusion is found in the correspondence of the executor's counsel,
      Gang, Tyre, Rudin & Brown, that has been submitted by plaintiffs.  Defendants object to this
25    correspondence, *inter alia*, as unauthenticated and lacking foundation.  (Defendants' Objections to the
      Declaration of Laura A. Wytsma in Support of Opposition to Motion for Reconsideration of Order
26    Finding No Judicial Estoppel and Collateral Estoppel as to Domicile of Marilyn Monroe ("Def.'s
      Objections") at 42-43).
27    Because the court does not rely on the letters, it need not rule on defendants' objections.  It notes,
28    however, that in a 1964 letter to Frosch, Hermione Brown, a partner at Rudin, Brown, enclosed an

40

1

### c.     Plaintiffs' Statements in this Action

2      Plaintiffs currently take the position that Monroe was domiciled in California at the time of her

3   death.[71] On its face, this position is "clearly inconsistent" with the position taken by Frosch on behalf

4   of the estate and its beneficiaries in the California tax proceeding. Apart from arguing that the positions

5   are not inconsistent because Frosch was addressing Monroe's residence – an argument with which the

6   court disagrees – plaintiffs adduce no evidence indicating that the positions are not "clearly

7   inconsistent." Instead, they argue that the doctrine of judicial estoppel applies to purely factual

8   statements only, and thus that it cannot bar inconsistent positions regarding a decedent's domicile, which

9

10   Affidavit Concerning Residence and asked Frosch to complete and return it. (Declaration of Laura A.
11   Wytsma in Support of Opposition to Motion for Reconsideration of Order Finding No Judicial Estoppel
     and Collateral Estoppel as to Domicile of Marilyn Monroe ("Wytsma Decl."), Exh. 83). Brown advised
12   that the Affidavit was needed "to counteract the fact that Miss Monroe owned a home and actually was
     living in California at the time of her death, and that her mother is physically in California." (Id.).
13   Brown noted that "should the State of California reject the contention that Miss Monroe was a non-
14   resident of California, then, of course, there would be a serious tax situation [for the estate]." (Id.)
        In a 1966 letter to Monroe's friend Ralph Roberts, attorney Elliot Lefkowitz of Weissberger &
15   Frosch explained that Roberts' affidavit was needed "to establish that decedent's permanent home was
     in New York and not in California." (Id., Exh. 84).
16      On March 4, 1966, Brown advised Lefkowitz that she had "pulled together all of the
17   documentation needed for the California Inheritance Tax Affidavit." (Id., Exh. 85). She explained that
        "[i]f the California non-residence is supported, the estate here is clearly insolvent and
18       there should be no tax problem with the California authorities. On the other hand, if the
         California authorities take the position that Miss Monroe was or may have been a
19       resident of California at the time of her death, then there will be a hearing at which
         Aaron [Frosch] will have to appear and at that time they will also examine in more detail
20       all of the New York assets and liabilities." (Id.).
21      In September 1966, Brown asked Inez Melson, an associate of Monroe's who had been
     appointed special Administratrix of Monroe's estate in California following her death, for an affidavit.
22   (Id., Exh. 87). Brown asked Melson if she recalled any information about Monroe that would
     "substantiate the fact that she regarded New York as her permanent residence and intended to return
23   there." Brown explained that such information would be of assistance because
24       "[t]he executor of Miss Marilyn Monroe's estate has taken the position that she died
         domiciled in the State of New York and that her physical presence in California was
25       merely a temporary sojourn for the purposes of acting in a motion picture and/or
         obtaining psychiatric treatment. For legal purposes, a person can have only one domicile
26       – although he or she may have many 'homes.' It is of significant tax importance to the
         estate to establish that New York – not California – was Miss Monroe's domicile." (Id.).
27

28   [71]See, e.g., Pl.'s Opp. at 12.

1  is a mixed question of law and fact.[72]

2  The Ninth Circuit has clearly held, however, that "[j]udicial estoppel applies to a party's stated

3  position whether it is an expression of intention, a statement of fact, or a legal assertion." *Wagner*, 354

4  F.3d at 1044 (citing *Helfand*, 105 F.3d at 535). Plaintiffs' reliance on *Cleveland*, 526 U.S. 795, in this

5  regard is unavailing. In *Cleveland*, the trial court entered summary in favor of a defendant employer

6  on judicial estoppel grounds, finding plaintiff's assertion that she was totally disabled in proceedings

7  to obtain social security disability benefits ("SSDI") contradicted her allegation in an Americans with

8  Disabilities Act ("ADA") claim that she was able to perform the "essential functions of her job." *Id.*

9  at 798-99. The Court reversed. It noted that under the ADA, a "qualified" disabled person is someone

10 who can perform the essential functions of a job with reasonable accommodation. *Id.* at 803. In

11 determining whether a person is disabled for SSDI purposes, by contrast, the Social Security Act

12 ("SSA") does not take the possibility of "reasonable accommodation" into account. *Id.* Given this

13 difference, the Court determined that the grant of summary judgment had been improper because

14 plaintiff had offered a sufficient explanation reconciling her apparently inconsistent statements regarding

15 "disability." In reaching this result, the Court noted that determining disability required a "context-

16 related legal conclusion," i.e., a mixed question of law and fact. *Id.* at 802, 807.

17 *Cleveland* does not hold that judicial estoppel cannot be applied to a mixed question of law and

18 fact. To the contrary, although noting that most cases that have applied the doctrine had involved purely

19 factual contradictions, the Court stated that "a similar insistence upon explanation [was] warranted . .

20 . where the conflict involve[d] a legal conclusion." *Id.* at 807. The Court applied the same standard

21 used in assessing whether inconsistencies in factual positions warrant application of judicial estoppel

22 – i.e., that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply

23 by contradicting his or her own previous sworn statement . . . without explaining the contradiction or

24 attempting to resolve the disparity" – and accepted plaintiff's explanation of the inconsistency between

25 her position in the SSA and ADA cases. *Id.* at 805, 807.

26 The *Cleveland* Court thus clearly signaled that a party who could not provide a sufficient

27 _____

28 [72]*Id.* at 24.

1  explanation for taking apparently contradictory legal positions could be estopped; it in no way held that

2  judicial estoppel applies only to purely factual statements. Nor has it been interpreted that way. See,

3  e.g., *Churchill v. Winter Chevrolet*, C 04-489 JCS, 2005 WL 281170, * 8 n. 3 (N.D. Cal. Feb. 4, 2005)

4  ("*Cleveland* is . . . relevant to Plaintiff's argument that judicial estoppel applies *only* to factual assertions.

5  The Court's discussion in *Cleveland* makes clear that Plaintiff oversimplifies the issue. As the Court

6  acknowledged, an assertion that an individual is totally disabled is a mixed question of fact and law

7  rather than a purely factual assertion. While the Court suggested that the doctrine of judicial estoppel

8  is less likely to be applied under those circumstances, it did not hold that the doctrine could not,

9  therefore, apply. Rather, the Court explained that the doctrine of judicial estoppel may, under some

10  circumstances, apply to mixed statements of fact and law").

11  Because plaintiffs offer no reasoned explanation of the inconsistency between Frosch's position

12  in the California inheritance tax proceedings and their position here, they have failed to demonstrate that

13  judicial estoppel cannot properly be applied to bar their current argument.

14  **6.    Whether the Inconsistent Statements Were Successfully Advanced,**

15  **Sufficient to Create the Perception That Either the First or Second Court**

16  **was Misled**

17  **a.    Whether the Inheritance Tax Appraiser is a Quasi-Judicial Body**

18  The doctrine of judicial estoppel applies not only where prior inconsistent statements are made

19  in a "judicial" proceeding, but also in an administrative proceeding. See *Rissetto*, 94 F.3d at 604

20  ("Though called judicial estoppel, the doctrine has been applied, rightly in our view, to proceedings in

21  which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a

22  subsequent judicial proceeding," citing *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th

23  Cir. 1993), and collecting cases); *Smith v. Montgomery Ward & Co.*, 388 F.2d 291, 292 (6th Cir. 1968)

24  (position taken in a workers' compensation proceeding estopped a party in a subsequent personal injury

25  action); *Simo v. Home Health & Hospice Care*, 906 F.Supp. 714, 718 (D.N.H. 1995) (Social Security

26  Administration disability proceeding); *UNUM Corp. v. United States*, 886 F.Supp. 150, 158 (D. Me.

27  1995) (Maine Bureau of Insurance approval proceeding); *Zapata Gulf Marine Corp. v. Puerto Rico*

28

43

1 *Maritime Shipping Auth.*, 731 F.Supp. 747, 750 (E.D. La. 1990) (Interstate Commerce Commission

2 proceeding); *Muellner v. Mars, Inc.*, 714 F.Supp. 351, 357-58 (N.D. Ill. 1989) (SSA proceeding)

3 (applying Illinois law)); *see also Synopsys, Inc. v. Magma Design Automation, Inc.*, C 04-3923 MMC,

4 2007 WL 322353, *26 (N. D. Cal. Jan. 31, 2007) (applying the doctrine with respect to prior statements

5 made to the U.S. Patent and Trademark Office); *In re Pich*, 253 B.R. 562, 569 n. 16 (Bankr. D. Idaho

6 2000) (holding that a county commission's ruling on a rezoning application qualified as quasi-judicial

7 activity). "This rule has been justified on the ground that '[t]he truth is no less important to an

8 administrative body acting in a quasi-judicial capacity than it is to a court of law.'" *Id.* (quoting

9 *Muellner*, 714 F.Supp. at 357).

10    The California inheritance tax appraiser, to whom the prior statements regarding Monroe's

11 domicile were made, performs quasi-judicial functions for the California state courts. As the California

12 Court of Appeal has explained, inheritance tax appraisers nominated by the State Controller's office[73]

13 are "appointed [by superior courts] to make specific appraisals of a tax due to the state." *Greenaway*,

14 269 Cal.App.2d at 52.

15    "In his work for the superior court and the judges there presiding in probate matters, . . . the

16 inheritance tax appraiser ha[s] duties as an employee designated by the judicial officers who were

17 carrying on necessary state and county duties." *Id.* at 54; *see also In re Castillo*, 297 F.3d 940, 947-48

18 (9th Cir. 2002) (indicating that "judicial immunity has been readily extended to such nonjudicial officers

19 as: . . . 'to assessors upon whom is imposed the duty of valuing property for the purpose of a levy of

20 taxes,'" quoting *Burns v. Reed*, 500 U.S. 478, 499-500 (1991)); *Worcester County Trust Co. v. Long*,

21 14 F.Supp. 754, 760 (D. Mass. 1936) ("It is quite apparent from an examination of the applicable

---

23 [73]"The appraiser is required to forward to the State Controller his reports, copies of work receipts
and other documents, which are then audited. The State Controller responds to the state inheritance tax

24 appraiser after the audit is completed, either by giving his permission to him to file the proposed report
with the superior court or requiring him to make partial or complete corrections in the report that are

25 necessary in order to comply with the law. Often an appraiser is required to rewrite the report or to
submit a new report for audit. In addition, the inheritance and gift tax division of the State Controller's

26 office requires information be submitted to it regarding appraisal in specific cases; for example, in cases
of closely held corporations, documents which bear on the question involved may be requested of the

27 appraiser to substantiate his work." *Greenaway v. Workmen's Comp. Appeals Bd.*, 269 Cal.App.2d 49,
51-52 (1969).

28

1  statutes of California Inheritance Tax Act of 1935 that the inheritance tax appraiser, designated by the

2  court having jurisdiction over the estate, performs functions which, at least, could be said to be

3  quasijudicial"); *In re Wyman's Estate*, 208 Cal.App.2d 489, 490-91 (1962) (noting that objections to an

4  inheritance tax appraiser's report were overruled and the report was approved by the superior court).

5      As *Greenaway* makes clear, inheritance tax appraisers act in a quasi-judicial capacity in

6  assessing the amount of inheritance tax to be paid.  In brief, the appraiser takes evidence from the parties

7  on the issue of residence/domicile,[74] seeks additional evidence as necessary,[75] makes a determination

8  of the decedent's residence, and submits a report to the superior court, which may or may not approve

9  the report.[76]  Given the quasi-judicial nature of the appraiser's duties, it is appropriate to apply judicial

10  estoppel to statements made to him in the course of his duties.

11              **b.      Whether the Statements Were Successfully Advanced**

12      Citing the fact that judicial estoppel is properly applied "only if the court has relied on the

13  party's previously inconsistent statement,"[77] see *Interstate Fire & Cas. Co. v. Underwriters at Lloyd's,*

14  *London*, 139 F.3d 1234, 1239 (9th Cir. 1998) (citing *Masayesva v. Hale*, 118 F.3d 1371, 1382 (9th Cir.

15  1997)), plaintiffs argue that Frosch did not "prevail" in the California tax proceeding.  Specifically, they

16  assert that the estate sought to avoid taxation and instead was taxed $777.[78]  This argument overlooks

17  the full extent of the rulings the estate sought from the inheritance tax appraiser, and the statements on

18  which the appraiser relied.

19      The letter the executor's attorney wrote to the appraiser requested (1) a determination that

---

21  [74]Indeed, the inheritance tax regulations provide that when there is a claim that a decedent
22  transferor was a nonresident of California, the "Declaration Concerning Residence" must be submitted
   to the inheritance tax appraiser, not to the superior court.  See 18 CAL. CODE REGS. § 13303.4.

23  [75]One of the documents submitted by plaintiffs indicates that the state controller's office sought
   additional information regarding Monroe's residence from the estate following submission of the
24  residence affidavits.  (See Wytsma Decl., Exh. 35).  Because defendants object to the document on
   foundational grounds, the court does not consider it.  (See Def.'s Objections at 19).

26  [76]See Soni Decl., Exh. N.

27  [77]*Id.*

28  [78]Pl.'s Opp. at 17.

45

1    Monroe was a non-resident of California under the Inheritance Tax Law; and (2) a "no tax certificate"

2    due to the estate's alleged insolvency.[79]  While it is true that the estate did not completely avoid taxation,

3    the appraiser nonetheless accepted the estate's position regarding domicile, determined that Monroe was

4    a resident of New York, and relied on this finding in assessing inheritance tax.  The appraiser's report

5    to the superior court stated that a hearing had been held, and that he had determined that Monroe was

6    "a resident of the county New York, State of New York" at the time of her death.[80]  He went on to state

7    that, despite being domiciled in New York, Monroe "left property taxable under the inheritance tax laws

8    of the State of California."[81]

9          Under the inheritance tax law, the only property of a non-resident decedent that is taxable is real

10    property and "tangible personal property"; "intangible personal property," such as stocks, bonds, notes,

11    and bank deposits, is not taxable.  See 18 CAL. CODE REGS. §§ 617, 664-666 (1945).  The appraiser

12    valued the portion of Monroe's estate that was taxable in California at $92,761.[82]  This is in stark

13    contrast to the gross value of Monroe's estate in New York, which was valued at $836,521.31, and

14    included stocks, insurance policies, and royalty payments.[83]  Given the difference in these numbers, it

15    is clear that the appraiser relied on his finding that Monroe was domiciled in New York in determining

16    the value of property that could be taxed in California.  Although the appraiser ultimately assessed tax

17    of $777, and denied the estate's request for a no tax certificate, there can be no doubt that the estate

18    successfully advanced its position regarding Monroe's domicile and avoided higher taxation.

19          It is undisputed, moreover, that the superior court ultimately accepted the appraiser's report.

20    This is evident from a later filing Frosch made in superior court seeking executor's commissions and

21

22

23

24          [79]Soni Decl., Exh. F.

25          [80]*Id.*, Exh. N.

26          [81]*Id.*

27          [82]*Id.*

28          [83]*Id.*, ¶ 11, Exh. O.

46

1  attorney's fees.[84] In a section addressing the "extraordinary services" the estate's attorneys had rendered

2  regarding tax matters, the petition stated:

3      "Although decedent's domiciliary probate is handled in New York, decedent was

4      physically in California and owned real property here at the time of her death.

5      Petitioner's attorneys rendered extensive services in connection with the preparation of

6      the California Inheritance Tax Affidavit and Affidavit Concerning Residence, together

7      with supporting affidavits, in order to establish that decedent was a nonresident of

8      California at the time of her death, and in order to assemble and segregate correctly those

9      items of receipts and expenses attributable to California for assessment. Petitioner's

10     attorneys corresponded with and interviewed several persons with respect to decedent's

11     nonresident status, suggested to the ancillary executor the types of evidence to be

12     secured to substantiate this position and prepared various affidavits which were

13     submitted in support of such position. *Said attorneys engaged in correspondence with*

14     *the California State Controller's office, explaining in detail their factual and legal*

15     *position and ultimately were successful in obtaining a determination that decedent was*

16     *not a resident of California at the time of her death. As a result of such determination,*

17     *none of decedent's contract rights were included in measuring such tax in California.*"[85]

18  Similarly, in a First and Final Account of Ancillary Executor that Frosch filed in superior court in 1976,

19  he stated that the estate had "obtained a determination that decedent was a non–resident of California

20  at the time of her death for inheritance tax purposes," and that "[t]he California Inheritance Tax for said

21  estate *has been determined and paid in full.*"[86]

22  _____

23      [84]Soni Decl,. Exh. W.

24      [85]*Id.* (emphasis added). Plaintiffs object to this document, as well as several others, on relevance
25  grounds, asserting that they speak only to Monroe's residence, not her domicile. (See Pl.'s Objections
    at 15). The court has determined, however, that for purposes of the inheritance tax proceeding,
26  residence was legally synonymous with domicile. Thus, the objections are overruled.

27      [86]Supplemental Declaration of Laura A. Wytsma in Opposition to Motion for Reconsideration
    of Order Finding No Judicial and Collateral Estoppel as to Domicile of Marilyn Monroe ("Wytsma
28  Supp. Decl."), Exh. A (emphasis added).

1    That the California taxing authorities accepted Frosch's argument regarding domicile is also

2    confirmed by subsequent tax proceedings in the state. As discussed in the court's January 7, 2008 order,

3    for example, the California Franchise Tax Board later sought to tax Monroe's percentage payments, i.e.,

4    the earnings she made from films in which she appeared.[87] In an appeal to the California State Board

5    of Equalization ("BOE"), Frosch argued that the estate should not have to pay California income tax on

6    these amounts. The BOE denied Frosch's appeal in 1975. In its decision, the Board classified Monroe's

7    earnings as "personal services income," whose source was the place where the services were

8    performed.[88] BOE stated that the percentage payments were taxable because Monroe performed the

9    services giving rise to them in California, and noted that personal income tax was due on "the entire

10   taxable income of every *nonresident* which is derived from sources within the state."[89] Because Monroe

11

---

12       [87]Soni Decl., Exh. V.

13       [88]*Id.*

14       [89]*Id.* (citing CAL. REV. & TAX CODE § 17041(a) (emphasis added)). Plaintiffs contend that they
15   should not be estopped by Frosch's representations regarding Monroe's domicile because those
     representations actually harmed the estate by resulting in double taxation of Monroe's percentage
16   payment income from "Some Like it Hot" and "The Misfits." As noted, although it determined that
17   Monroe was a "nonresident," California taxed her percentage payment income because it was derived
     from personal services Monroe performed in California. In addition, the estate also paid income tax on
18   the percentage payments in New York. (See Soni Decl., Exh. V). As a result, Frosch sought a credit
     under California Revenue & Taxation Code § 18004, which states that "[i]f an estate or trust is a resident
19   of this State and also a resident of another state, it shall . . . be allowed a credit against the taxes imposed
     by this part for net income taxes imposed by and paid to another state." (*Id.*)
20       The Board of Equalization concluded that the estate was not entitled to a credit because under
21   § 18003, "an estate or trust is considered a resident of the state which taxes the income of the estate or
     trust irrespective of whether the income is derived from sources within the state." (*Id.*). The Board
22   noted that, under § 18003,
         "an estate is a resident of California only if this state taxes its income from sources both
23       within and without the state. Since California taxes an estate's income from all sources
         only when the decedent was a resident of this state, only estates of resident decedents are
24       residents of California for purposes of the tax credit provisions of sections 18001-18011.
         Consequently, Miss Monroe having been a New York resident at the time of her death,
25       appellant is not a resident of California and is not entitled to the tax credit authorized by
         section 18004." (*Id.*).
26       While it is possible that the estate paid more taxes on Monroe's percentage payments than it
27   would had she been found to be a domicile of California, this does not change the fact that the estate
28   derived a benefit from the fact that California assessed inheritance tax only on $92,761 of Monroe's

1    continued to be taxed as a nonresident, it is apparent that the estate successfully advanced the position

2    that she was domiciled in another state.[90]

3        Given that the estate successfully argued to the California taxing authorities that Monroe was

4    domiciled in New York at the time of her death, it would appear that either this court or the California

5    taxing authorities had been misled were plaintiffs to prevail on their argument that Monroe died a

6    California domiciliary.[91]

7

8    assets rather than $836,521.31. As the BOE noted, the estate was taxed in California only on such
     income as Monroe derived from California sources, rather than on income from *all* sources. The fact
9    that the estate was double taxed on certain income thus does not rebut the court's conclusion that Frosch
     successfully advanced a position and gained an advantage by successfully urging California inheritance
10   tax authorities to find that Monroe was a domiciliary of New York at the time of her death.

11

12   [90]The court acknowledges that, unlike the Inheritance Tax Law, California's personal income
     tax laws do not use residence and domicile synonymously in every instance. Under the personal
13   income tax law, a "resident" includes "(1) [e]very individual who is in this state for other than a
     temporary or transitory purpose[; and] (2) [e]very individual domiciled in this state who is outside the
14   state for a temporary or transitory purpose." CAL. REV. & TAX. CODE § 17014(a). An individual is
     deemed to be outside the state for a temporary or transitory purpose while she "(1) [h]olds an elective
15   office of the government of the United States, or (2) [i]s employed on the staff of an elective officer in
     the legislative branch of the government of the United States . . . , or (3) [h]olds an appointive office in
16   the executive branch of the government of the United States." *Id.*, § 17014(b). A "nonresident" is
17   "every individual other than a resident." *Id.*, § 17015.
         This definition of resident is designed "to insure that all those who are in California for other
18   than a temporary or transitory purpose enjoying the benefits and protection of the state, should in return
     contribute to the support of the state." *Whittell v. Franchise Tax Bd.*, 231 Cal.App.2d 278, 285 (1964).
19   "Under [it,] a person may be a resident for income tax purposes although domiciled elsewhere and vice
20   versa." *Id.*; see also 18 CAL. CODE REGS. § 17014 ("Under this definition, an individual may be a
     resident although not domiciled in this State, and, conversely, may be domiciled in this State without
21   being a resident").
         Despite the differing definitions, the BOE's application of the nonresident personal income tax
22   law to Monroe is entirely consistent with the inheritance tax determination that Monroe was domiciled
     in New York.
23

24   [91]Plaintiffs contend defendants have not shown that Frosch acted with "intent to deceive" the
     California tax authorities regarding Monroe's domicile. See *Wyler Summit Partnership*, 235 F.3d 1184,
25   1190 (9th Cir. 2000) ("The doctrine of judicial estoppel requires, *inter alia*, a knowing antecedent
     misrepresentation by the person or party alleged to be estopped and prevents the party from tendering
26   a contradictory assertion to a court" (citation omitted)). It is clear that Frosch's intentionally advanced
     the position that Monroe was domiciled in New York at the time of her death, and that his position in
27   this regard was not the result of inadvertence or mistake. See *EaglePicher Inc.*, 2007 WL 2265659 at
28   *3 (in applying judicial estoppel, a court must look to "whether the party to be estopped acted

49

1            **c.**     **Whether It Is Appropriate to Estop a Party on the Basis of**

2                  **Statements Made by the Party's Representative**

3         Plaintiffs contend that courts estop parties based on positions taken by a privy in earlier litigation

4 only when applying the doctrines of claim or issue preclusion. They argue that there are virtually no

5 reported cases in which a court has held that a party is judicially estopped to assert a position because

6 of a prior inconsistent position taken by the party's privy. This assertion is incorrect. See, e.g.,

7 *Capsopoulos on behalf of Capsopoulos v. Chater*, No. 95 C 3274, 1996 WL 717456, *2 (N.D. Ill. Dec.

8 9, 1996) ("Although judicial estoppel has generally been applied only where the identical party has taken

9 the contradictory positions, a party in privity with the original party may also be estopped under judicial

10 estoppel. . . . [T]he justification for applying for judicial estoppel is present in this matter. Decedent

11 and his privy, Plaintiff, have adopted contradictory positions, each suiting the needs of the moment.

12 Decedent won SSI disability benefits by claiming he had not worked and could not work. Now Plaintiff

13 seeks to win survivor benefits by claiming that decedent had been working all along. Judicial estoppel

14 is meant to apply to exactly this type of behavior, where self-interest rather than truth determine the

15 argument of the day"); see also *Maitland*, 43 F.3d at 363-64 (under the doctrines of collateral estoppel,

16 equitable estoppel, promissory estoppel, and judicial estoppel, "the party who is to be estopped, *or one*

17 *in privity with that party*, must have asserted a fact or claim, or made a promise, that another party relied

18 on, that a court relied on, or that a court adjudicated" (emphasis added) (citations omitted)).

19        Plaintiffs, moreover, do not adequately articulate why it is inappropriate to apply judicial

20 estoppel when, as here, the privy who took the prior inconsistent position clearly acted for the benefit

21

22 inadvertently or with any degree of intent").

23        The entire purpose of Frosch's "Affidavit Concerning Residence" was to present facts regarding Monroe's domicile to the inheritance tax appraiser. Plaintiffs admit this, asserting that the residence

24 affidavits were "prepared years after Marilyn's death for the express purpose of trying to avoid tax liability at a time when the Monroe Estate was believed to be insolvent." (Pl.'s Opp. at 21). Plaintiffs

25 also assert that Frosch's Residence Affidavit was "patently inconsistent with the objective, contemporaneous evidence," and that the other residence declarations were "riddled with blatant

26 inaccuracies." (*Id.* at 21-22). Given plaintiffs' characterization of the content and purpose of the documents, the fact that the inheritance tax appraiser relied on them in determining that Monroe was

27 domiciled in New York is strong, uncontroverted evidence that a quasi-judicial body was misled by a

28 "knowing antecedent misrepresentation."

1  of the present parties, such that he was their "virtual representative." It is true that the doctrine of

2  "virtual representation" must be carefully applied. This case, however, presents precisely the type of

3  situation in which it is equitable to invoke the doctrine. See *Gonzalez v. Banco Cent. Corp.*, 27 F.3d

4  751, 761 (1st Cir. 1994) (noting that "virtual representation is best understood as an equitable theory

5  rather than as a crisp rule with sharp corners and clear factual predicates, . . . such that a party's status

6  as a virtual representative of a nonparty must be determined on a case-by-case basis," and observing that

7  important considerations in applying the doctrine are "actual or constructive notice of the earlier

8  litigation" and whether "there has been 'an express or implied legal relationship in which parties to the

9  first suit are accountable to non-parties who file a subsequent suit raising identical issues,'" citing, *inter*

10  *alia, Stone v. Williams*, 970 F.2d 1043, 1058-61 (2d Cir. 1992) (holding that a decedent's son was bound

11  by a prior ruling concerning the paternity of an illegitimate daughter of the decedent), cert. denied, 508

12  U.S. 906 (1993); see also *Tyus v. Schoemehl*, 93 F.3d 449, 454 (8th Cir. 1996) (noting that courts

13  attempting to determine whether to employ the equitable doctrine of virtual representation often require

14  that there be "an express or implied legal relationship in which parties to the first suit are accountable

15  to non-parties who file a subsequent suit raising identical issues," and that "[e]xamples of such a

16  relationship would be '"estate beneficiaries bound by administrators. . . and a trust beneficiary by the

17  trustee"'"); cf. *Becherer v. Merrill Lynch, Pierce, Fenner, and Smith, Inc.*, 193 F.3d 415, 431 (6th Cir.

18  1999) (Moore, J., concurring) (noting that the doctrine of virtual representation "originated in probate

19  practice, in which it is often necessary to bind absent interests"); 18A Charles Alan Wright, Arthur R.

20  Miller & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 4457 at p. 513 (2008) ("The virtual

21  representation phrase is drawn from probate proceedings, in which it is often necessary to establish a

22  procedure that will bind persons unknown, unascertained, or not yet born. The need to bind nonparties

23  in such circumstances is apparent. Protection is provided for the nonparties, moreover, by requiring

24  representation by someone with clearly aligned interests").

25      The Ninth Circuit has identified certain factors that should be considered in deciding whether

26  a party to prior litigation was the virtual representative of a party to current litigation. These include

27  whether there is a close relationship between the parties; whether the parties shared an identity of

28

1   relevant interests; whether the current party participated in the prior action; whether the prior party

2   engaged in tactical maneuvering; and whether the prior party adequately represented the interests of the

3   current party. See *Irwin v. Mascott*, 370 F.3d 924, 929-30 (9th Cir. 2004) ("In short, a close

4   relationship, substantial participation, and tactical maneuvering all support a finding of virtual

5   representation; identity of interests and adequate representation are necessary to such a finding"). Here,

6   these criteria are largely satisfied. Plaintiffs' predecessors had a close relationship with Frosch, as they

7   were the beneficiaries of the estate for which he served as executor. See *id.* at 930 (senior corporate

8   officer had close relationship with corporation and its president). Plaintiffs themselves assert that

9   Frosch was engaged in tactical maneuvering to ensure that Monroe was deemed to be a domicile of New

10  York for tax purposes. Most importantly, there was a complete identity of interests regarding the tax

11  issue between Frosch and those now contending that Monroe was domiciled in California at the time

12  of her death.[92] For all of these reasons, the court concludes it is appropriate, on the facts of this case,

13

14  [92]Plaintiffs contend there is no evidence that Lee Strasberg and Marianne Kris participated in the
    inheritance tax proceedings. It is clear, however, that Frosch was acting for their individual benefit, and

15  that Strasberg and Kris had reason to acquiesce to the positions he took. Under California law, "[a]n
    'estate tax' is levied on the right to transmit property, while an 'inheritance tax' is levied on the right

16  to receive property. The 'transferee of the property in respect to the transfer of which the tax is
    imposed' is liable for payment of the tax." *Allen v. Flournoy*, 26 Cal.App.3d 774, 780 (1972) (citing

17  *Estate of Hyde*, 92 Cal.App.2d 6 (1949); CAL. REV. & TAX. CODE § 14101)). Inheritance tax is paid out

18  of the property transferred to the beneficiary. See *Cohn v. Cohn*, 20 Cal.2d 65, 67-68 (1942)
    ("Generally speaking, the state assesses the privilege of succeeding to property, and computes the tax

19  upon the interests of the legatees or devisees and the degree of relationship, if any, to the decedent. The
    tax is not one of the expenses of administration or a charge upon the general estate of the decedent; it

20  is collectible out of each specific share or interest to which the beneficiary succeeds, and not from the
    general property of the estate" (citations omitted)); *In re McLaughlin's Estate*, 243 Cal.App.2d 516, 520

21  (1966) ("Although, as an administrative matter, the personal representative pays the tax in the first
    instance, the transferee is ultimately liable for the tax out of the property transferred" (citations

22  omitted)). Under New York law, by contrast,"[t]he New York tax on property passing at death is an
    'estate tax,' taxable 'on the transfer of the New York taxable estate,' not an 'inheritance tax' imposed

23  on or computed with reference to the receipt of property by estate beneficiaries." *In re O'Brine's Estate*,
    37 N.Y.2d 81, 85 (1975).

24

25       It appears from the inheritance appraiser's report that, because Monroe was found to be a
    domiciliary of New York, only $64 in tax was paid from property transferred to Lee Strasberg. (See

26  Soni Decl., Exh. N.) No inheritance tax was assessed on property transferred to Kris. (*Id.*) Had Monroe
    been deemed a domiciliary of California, however, tax would have been taken from Strasberg's and

27  Kris's respective shares based on *all* property transferred by Monroe, not just property located in
    California. In arguing in the inheritance tax proceeding that Monroe was domiciled in New York,

28

1  to hold that plaintiffs are judicially estopped to take a position contrary to that which their predecessors'

2  virtual representative took in the inheritance tax proceedings.

3        **d.    Whether a Party Can Be Estopped By an Executor's Statements**

4            **About Domicile**

5        Plaintiffs argue that even if their position is inconsistent with that taken by Frosch, they cannot

6  be estopped by an executor's statements regarding domicile. They cite several cases for the proposition

7  that "[a]n executor cannot change the actual domicile of the testator by his own admissions or

8  allegations after the testator's death. Such admissions are beyond the province of the executor." See

9  *In re Mulhern's Estate*, 297 N.Y.S.2d 485, 487 (App. Div. 1969); see also *Kanz v. Wilson*, 703 So.2d

10  1331, 1340 (La. App. 1997); *In re Rosenfield's Estate*, 76 N.Y.S.2d 177, 179 (Sur. Ct. 1944) ("[A]n

11  allegation of the domicile of the testator in the petition for probate is not an estoppel against a

12  subsequent application for the determination of the true domicile"); *In re Grant's Estate*, 144 N.Y.S.

13  567, 83 Misc. 257, 260 (Sur. Ct. 1913) ("An executrix cannot change the actual domicile of the testator

14  by her own admissions after testator's death, nor can she do so by her own acts, even if amounting to

15  an estoppel as against herself. Such acts and admissions are beyond the province of executors in such

16  matters as this").

17        The present situation is distinguishable from the cases cited by plaintiffs. In several, the court

18  determined that an executor or beneficiary who sought to prove a decedent's domicile was not estopped

19  by the executor's declaration supporting admission of the decedent's will to probate in a particular

20  jurisdiction. In *In re Mulhern's Estate*, for example, a testator's surviving spouse sought to determine

21  the validity of her election to take an intestate share of the estate under New York's Decedent Estate

22  Law. *In re Mulhern's Estate*, 297 N.Y.S.2d at 486. The executor sought to introduce evidence

23  regarding the testator's domicile that was relevant to whether the law of the Province of Ontario or the

24  law of New York applied. *Id.* The Surrogate's Court refused to consider the evidence, holding that the

25  executor was estopped to argue that the law of any jurisdiction other than New York applied because

26

27  therefore, Frosch was clearly acting to preserve and protect the assets transferred to Strasberg and Kris.
28  This too supports a finding of virtual representation.

1   he had alleged in a petition for probate of the decedent's will that the testator died a resident of Erie

2   County, New York. *Id.* at 486-87. The Appellate Division determined that estoppel did not apply

3   because the decree admitting the will to probate did not adjudicate the testator's domicile or residence,

4   and because the executor's earlier declaration was not necessary to confer jurisdiction on the

5   Surrogate's Court. Rather, jurisdiction existed, the court said, because the testator had died in Erie

6   County and left personal property there. *Id.* at 487. The Appellate Division concluded that

7        "[w]here, as here, the executor does not attack the jurisdiction of the court rendering the

8        decree and where the fact of decedent's residence within the territorial jurisdiction of the

9        court is not essential to confer jurisdiction upon the court even though it is the only

10        jurisdictional fact recited in the petition for probate, the parties to the probate proceeding

11        are not estopped from thereafter disputing the allegations of the petition for probate as

12        to the testator's domicile." *Id.*

13       The court in *In re Rosenfield's Estate* explained why a declaration in a petition for probate does

14   not estop further litigation over domicile. There, a co-executor who was also a residuary legatee sought

15   to challenge the validity of the widow's election to take her intestate share against the provisions of the

16   will under certain provisions of the Decedent Estate Law. *In re Rosenfield's Estate*, 76 N.Y.S.2d at 178.

17   The co-executor asserted that the widow was estopped from exercising her statutory rights because, *inter*

18   *alia*, she had been one of the proponents of the probate proceeding. *Id.* The court found this contention

19   unavailing because "[w]here a will is validly executed by a competent testator free from und[ue]

20   influence, a person named as executor in it is under a duty to offer it for probate and to procure its

21   admission by decree. Under such circumstances a proponent is never barred from asserting after probate

22   his or her rights in a construction proceeding or in a proceeding for the determination of a right of

23   election as a surviving spouse or in an accounting or in any other form of proceeding." *Id.* at 178-79.

24

25       The court noted that various problems could arise after a will was admitted to probate that might

26   require further proceedings. It noted that "[e]ven an allegation of the domicile of the testator in the

27   petition for probate is not an estoppel against a subsequent application for the determination of the true

28

1   domicile." *Id.* at 179. The reason estoppel does not apply, the court stated, was that "[i]n all of these

2   proceedings the elementary rule is that probate logically precedes construction for otherwise there is no

3   will to construe. The widow is not estopped in any manner whatsoever, therefore, from asserting her

4   right of election conferred upon her by law." *Id.* (citations omitted).

5       Each of these cases is distinguishable, in that the statements made by the party against whom

6   estoppel was sought were made only to get the will admitted to probate. As the court noted in *In re*

7   *Rosenfield's Estate*, initial administration of the will is a necessary prerequisite to determining how it

8   will be construed and how the decedent's property will be distributed. In *In re Mulhern's Estate*,

9   moreover, the court noted that the declaration of domicile was not necessary to admission of the will

10  to probate. Here, by contrast, the statements Frosch made that underlie defendants' estoppel argument

11  were not made merely in securing admission of Monroe's will to probate in New York. They were

12  made in a separate proceeding before the California tax authorities to obtain tax benefits for the estate.[93]

13  Frosch submitted an affidavit and obtained declarations from other witnesses; the appraiser requested

14  additional evidence; a hearing was held, a determination as to Monroe's domicile was made; and tax

15  was assessed accordingly. It is quite clear that the question of Monroe's domicile was adjudicated in

16  the California tax proceedings; it was, in fact, the central issue in the proceeding. *Rosenfield's Estate*

17  and *Mulhern's Estate* simply do not stand for the proposition that after such an adjudication has

18  occurred, the executor and/or parties in privity with him are not estopped from making an inconsistent

19  claim regarding the decedent's domicile.

20      *Kanz v. Wilson*, another cased cited by plaintiffs, is also distinguishable. In *Kanz*, the executor

21  of a decedent's estate sought a judgment in Louisiana against the decedent's niece declaring that certain

22  funds were the property of the estate and awarding the full amount of the funds to the executor. *Kanz*,

23  _____

24      [93]At the time he submitted the Affidavit Concerning Residence and sought a legal determination
    regarding Monroe's domicile for tax purposes, Frosch was in the same legal position as the individuals

25  in *Mulhern's Estate* and *Rosenfield's Estate* who disputed domicile, and was not estopped from seeking
    a determination of Monroe's true domicile. Stated differently, applying the rule in *Mulhern's Estate*

26  and *Rosenfield's Estate*, Frosch could have argued that Monroe was domiciled in a state *other* than New
    York at the time of her death, and would not have been estopped from doing so based on statements he

27  made in getting the will admitted to probate. Neither case suggests that the same is true for statements

28  made to secure a specific adjudication of the issue, however.

703 So.2d at 1333. The executor argued that the decedent had died a domiciliary of Louisiana, although her will had been admitted to probate in Texas. The niece sought to estop the executor from making this argument, citing sworn statements he made in the Texas probate proceeding that the decedent was domiciled in Texas at the time of her death. *Id.* at 1340.

Applying state law, the court determined that the executor's earlier statements were "extra-judicial" admissions that could estop him only under circumstances that were not present. Under Louisiana law, a "judicial admission" has two elements: "(1) it must be an expressed articulation of an adverse fact, sufficient to dispense with the need for any further evidence; [and] (2) the adverse party must have believed the fact was no longer an issue or must have detrimentally relied on it." See *Terrell v. Town of Merryville*, 886 So.2d 1278, 1282 (La. App. 2004) (Thibodeaux, C.J., dissenting); see also *Kanz*, 703 So.2d at 1340 ("'The Louisiana jurisprudence is clear that such an 'extra-judicial' confession does not bind the claimant in subsequent litigation. The party who has made such an admission in a previous suit is not barred from denying the facts contained in that admission in a subsequent suit, unless the adverse party has been prejudiced by his reliance upon that admission. Rather, the admission is to be given the probative value it deserves as an admission of the party who made it,'" quoting *Alexis v. Metropolitan Life Ins. Co.*, 604 So.2d 581, 582 (La. 1992)). Because "appellant [did] not maintain she [had] been prejudiced by relying on statements made by [the executor] regarding domicile in the probate proceedings," the court concluded that the executor was not estopped by his previous position regarding domicile. *Kanz*, 703 So.2d at 1340. In dicta, the court observed that even had it considered the executor's statements, they would have had "no probative value regarding a determination as to [decedent's] domicile [because] the actual fact of residence and a real intention of remaining there, as disclosed by a person's entire course of conduct, are the controlling factors in ascertaining that person's domicile." *Id.*

*Kanz* is not controlling because it was decided under a body of state law that conflicts with the federal law governing judicial estoppel. As noted, a federal court applies the federal law of judicial estoppel. See *Rissetto*, 94 F.3d at 603. Unlike Louisiana law, federal law does not require that a party seeking to estop another on the basis of prior judicial statements have detrimentally relied on the prior

56

1   statements. The federal law of judicial estoppel focuses on the effect of a party's prior inconsistent

2   statement on the court, not on the litigants; it therefore does not require privity or detrimental reliance

3   on the part of the party seeking to invoke the doctrine. See *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d

4   1282, 1286 (11th Cir. 2002) ("The doctrine of judicial estoppel protects the integrity of the judicial

5   system, not the litigants; therefore, numerous courts have concluded, and we agree, that '[w]hile privity

6   and/or detrimental reliance are often present in judicial estoppel cases, they are not required,'" quoting

7   *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 360 (3d Cir. 1996), and citing

8   *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 214 (1st Cir. 1987) (same), and *Edwards*

9   *v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982) (same)); see also *Wagner*, 354 F.3d at 1044

10  ("Judicial estoppel is an equitable doctrine that is intended to protect the integrity of the judicial process

11  by preventing a litigant from 'playing fast and loose with the courts'" (citation omitted)).

12  Additionally, the *Kanz* court stated that the domicile issue was not fully adjudicated in the Texas probate

13  proceedings. As *Kanz* notes, domicile is "disclosed by a person's entire course of conduct." *Kanz*, 703

14  So.2d at 1340. It thus appears that, in contrast to Frosch's submissions in the California tax proceeding,

15  the executor in *Kanz* did not present evidence regarding the decedent's course of conduct, such as where

16  she owned property, voted, paid taxes, attended church, or had family.   Here, of course, Frosch

17  presented such evidence to the tax appraiser and obtained a favorable determination regarding domicile.

18

19       Plaintiffs' final citation is to *In re Grant's Estate*, 83 Misc. 257, which involved a transfer tax

20  proceeding respecting the estate of General Frederick Dent Grant, the son of President Ulysses S. Grant.

21  *Id.* at 258. The tax appraiser determined that Grant was not domiciled in New York and therefore

22  refused to tax the estate.   *Id.*   The comptroller appealed to the Surrogate's Court, which likewise

23  determined that Grant was not domiciled in New York at the time of his death.   *Id.*   In reaching this

24  conclusion, the court noted that the will had been probated in New York based on an assertion that Grant

25  had been a resident of New York; it also observed that the executrix had submitted an affidavit to the

26  tax appraiser alleging Grant's residence in New York. *Id.* at 260. The court reasoned, however, that

27  "these things [were] not conclusive upon the actual question" of Grant's last domicile, because "[a]n

28

1   executrix cannot change the actual domicile of the testator by her own admissions after [a] testator's

2   death." *Id.* The court therefore permitted the executrix to argue that Grant was actually domiciled in

3   Washington D.C. when he died. *Id.*       Although *Grant's Estate* appears to speak to the issue

4   joined in this case, in that the declarations in the transfer tax affidavit did not estop the executrix from

5   later changing her position, the court finds it unpersuasive. *Flatauer v. Loser*, 156 A.D. 591 (N.Y. App.

6   Div. 1913), the case on which the Surrogate's Court relied in determining that estoppel did not apply,

7   was later reversed on that very point. See *Flatauer v. Loser*, 211 N.Y. 15, 19 (1914) ("That the

8   surrogate of the county of New York determined that Flatauer at the time of his death was an inhabitant

9   of that county; that he died possessed of certain personal property and left a last will and testament,

10  which was there admitted to probate, and letters testamentary thereon issued to defendant – appears

11  upon the face of the complaint. Such adjudication cannot be collaterally attacked in this action"

12  (citation omitted)). Furthermore, later cases have applied *Grant's Estate* only to situations in which the

13  party against whom estoppel is sought made statements regarding domicile or residence in seeking

14  admission of a will to probate. See *In re Moran's Will*, 39 N.Y.S.2d 929, 936 (Sur. Ct. 1943) ("Since

15  this Court holds that domicile was not requisite to the taking of jurisdiction in the Cuban protocolization

16  and testamentary proceedings and such courts otherwise had jurisdiction and did assume jurisdiction

17  on the ground of 'death' in Cuba, the doctrine of estoppel urged by objectant by reason of petitioner's

18  appearance in those proceedings and her subsequent acts and statements here and in Cuba will not be

19  applied as a bar to litigating that issue here"); *In re Riley's Will*, 148 Misc. 588, 591 (Sur. Ct. 1933)

20  ("The statements in the power of attorney and the later will which state that decedent was 'of the Village

21  of Castile' are not conclusive in fixing decedent's last domicile"); *In re Riley's Estate*, 86 Misc. 628,

22  630 (Sur. Ct. 1914) ("It is to be gathered from these statements that it was decedent's intention to be

23  considered a resident of Mexico, and that the recital in his will 'now of the city of New York' and in the

24  codicil 'of New York' are mere descriptive recitals and should not be regarded as conclusive in fixing

25  decedent's last domicile"); *In re Mesa's Estate*, 87 Misc. 242, 253 (Sur. Ct. 1914) ("Grants of probate

26  or administration are not conclusive as to the death of a testator or intestate. Nor are they conclusive

27  of the last domicile or residence of the deceased" (citation omitted)). As applied by subsequent courts,

28

                                               58

1  therefore, *Grant's Estate* adds nothing to the court's analysis of *Mulhern's Estate* and *Rosenfield's*

2  *Estate*, and is distinguishable for similar reasons.

3        Indeed, in a later case, the Surrogate's Court did not follow *Grant's Estate* and applied an

4  estoppel based on statements regarding domicile in estate tax affidavits. In *In re Slade's Estate*, 276

5  N.Y.S.2d 956 (Sur. Ct. 1935), executors asserted in an initial proceeding seeking admission of a will

6  to probate in New York, that the decedent was a nonresident of New York and resided in Paris at the

7  time of his death. *Id.* at 957. When the decedent's widow later sought to exercise her right of election

8  under the Decedent Estate Law, the executors stated that the decedent "may have been a resident of New

9  York and not of the republic of France." *Id.* at 958. The court rejected this contention because the issue

10  had already been adjudicated in an estate tax proceeding. It reasoned:

11        "In so far as this contention is made by the executors, it is clear that it is without

12        foundation since they are concluded and estopped by their own petition for probate in

13        which the testator was stated to be a non-resident and by the decree admitting the will

14        to probate upon that petition. *In addition to the verified representations in the probate*

15        *proceeding, they unequivocally stated in the estate tax proceeding that the decedent was*

16        *a resident of France and not of the State of New York. Supporting evidence of the*

17        *domicile of the decedent was also supplied by them and upon their representations the*

18        *succession of the property was exempted from the estate tax in this State by the formal*

19        *order of the surrogate.* The widow likewise is estopped in the present situation from

20        questioning the determination in the probate proceeding that her husband was a

21        non-resident of this State. She executed and filed the usual waiver and consent to the

22        admission of the will to probate. It was within her power to have litigated the issue of

23        domicile in the probate proceeding, or upon presentation of proper extenuating

24        circumstances to have moved directly to vacate the decree in probate for the purpose of

25        reopening and having determined the actual domicile of the testator. She sought neither

26        of these remedies, in all probability, because her husband was not a resident of this State

27        and proofs to sustain a contrary finding must necessarily have been lacking." *Id.* at 958-

28

1    59 (emphasis added).

2        The court finds the analysis in *In re Slade's Estate* more persuasive than that in the cases cited

3    by plaintiffs. It therefore concludes that plaintiffs can be estopped by Frosch's statements in the

4    California tax proceedings, and must consider, as a result, whether plaintiffs would derive an unfair

5    advantage or defendants suffer an unfair detriment if judicial estoppel is not applied.

6

7        **7.    Whether Plaintiffs Would Obtain an Unfair Advantage or Impose an Unfair**

8            **Detriment on Defendants if Not Estopped**

9        As noted, judicial estoppel "precludes a party from gaining an advantage by taking one position,

10   and then seeking a second advantage by taking an incompatible position." *Rissetto*, 94 F.3d at 601

11   (citations omitted). In the California tax proceedings, Frosch and his lawyers, acting on behalf of

12   beneficiaries of the estate, sought and received a determination that Monroe was domiciled in New York

13   at the time of her death. The estate and its beneficiaries obtained a resulting advantage, since

14   inheritance tax was assessed only on Monroe's real and tangible personal property in California. See

15   18 CAL. CODE REGS. §§ 617, 664-666 (1945). More specifically, the estate was taxed only on $92,761

16   of California property, and did not pay inheritance tax on Monroe's intangible property, which

17   reportedly included more than $70,000 in stocks and bonds, mortgages, notes, cash, and insurance.[94]

18   If, as plaintiffs now claim, Frosch's position regarding domicile was inaccurate and Monroe was indeed

19   domiciled in California, the estate and beneficiaries were not legally entitled to the tax advantage they

20   received, and it was therefore unfairly obtained.

21       Plaintiffs in this case seek to advance a position inconsistent with that taken by the estate in the

22   prior proceeding and obtain a second advantage. They contend that Monroe was domiciled in California

23   at the time of her death because California domicile is a necessary prerequisite to their ability assert

24   Monroe's statutory posthumous right of publicity. As the court has discussed extensively in prior

25   orders, under California Civil Code § 3344.1, as recently clarified by SB 771, celebrities who died

26   _____

27       [94]Soni Decl., Exh. O. The value of Monroe's intangible property was potentially far greater than
     $70,000. In a petition for determination of estate tax filed in the Surrogate's Court in New York, the
28   estate claimed more than $750,000 in "other miscellaneous property." (*Id.*)

                                                    60

1  within 70 years of 1985 are deemed to possess a posthumous right of publicity at the time of their death

2  that can be expressly bequeathed by will or transferred to the residuary beneficiary under the deceased

3  celebrity's will. See CAL. CIV. CODE § 3344.1(b).

4       Plaintiffs claim to have acquired Monroe's posthumous right of publicity from her residuary

5  beneficiary, Lee Strasberg. To demonstrate that they have standing to assert the right, however,

6  plaintiffs must first establish that Monroe herself possessed the right. This requires a showing that she

7  was domiciled in California at the time of her death.[95] See, e.g., N.Y. EST. POWERS & TRUSTS LAW §

8  3-5.1(b)(2) (formerly DECEDENT EST. LAW § 47) ("The intrinsic validity, effect, revocation or alteration

9  of a testamentary disposition of personal property, and the manner in which such property devolves

10 when not disposed of by will, are determined by the law of the jurisdiction in which the decedent was

11 domiciled at death"); *In re Moore's Estate*, 190 Cal.App.2d 833, 841-42 (1961) (recognizing that, under

12 California Civil Code § 946, a decedent's personal property should be distributed according to the law

13 of his or her domicile); see *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 434 F.Supp.2d 203,

14 210-11 (S.D.N.Y. 2006) ("[Under the Indiana choice of law rule,] its courts apply the substantive law

15 of the place of the tort. . . . In property cases, Indiana seems to adhere to the majority view that the law

16 of the situs of the property governs. The situs of intangible personal property, such the Marilyn Monroe

17 publicity right, is the legal domicile of its owner," citing *Van Dusen v. Barrack*, 376 U.S. 612, 638-39

18 (1964)).

19       If plaintiffs successfully advance a position regarding Monroe's domicile that is inconsistent

20 with the position Frosch took in the inheritance tax proceedings, they will gain the advantage that they

21 can assert Monroe's right of publicity. Because the estate and its beneficiaries clearly benefitted from

22 the determination that Monroe was a New York domiciliary in the California tax proceedings, however,

23 plaintiffs, by asserting an inconsistent position here, are obtaining an unfair advantage and attempting

24

25

26

27       [95]As noted, New York – where Frosch and the estate claimed Monroe was domiciled – does not

28 recognize a descendible, posthumous right of publicity. See, e.g., *Pirone*, 894 F.2d at 585-86.

1    to "play fast and loose with the courts."[96]  Cf. *In re Stroh*, 34 Fed. Appx. 562, 565 (9th Cir. Apr. 30,

2    2002) (Unpub. Disp.) ("[R]egardless of whether Stroh would now benefit from his lawsuit against Grant,

3    Stroh derived an unfair advantage when he deceived the bankruptcy court into closing his case.  Thus,

4    the bankruptcy court's application of judicial estoppel was necessary to preserve the integrity of the

5

6

7        [96]In asserting a judicial estoppel defense, defendants need not establish that they were in privity
     with any party in the California tax proceeding or that they relied on Frosch's statements in that
8    proceeding.  See *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) ("Because the doctrine
     is intended to protect the judicial system, rather than the litigants, detrimental reliance by the opponent
9    of the party against whom the doctrine is applied is not necessary," citing *Matter of Cassidy*, 892 F.2d
     637, 641 & n. 2 (7th Cir. 1990), cert. denied, 498 U.S. 812 (1990)); *In re Chambers Dev. Co., Inc.*, 148
10   F.3d 214, 229 (3d Cir. 1998) ("The party asserting the estoppel is not required to demonstrate
     detrimental reliance upon the prior representation" (citation omitted)); *United States v. $186,416.00 in*
11   *U.S. Currency*, 527 F.Supp.2d 1103, 1124 (C.D. Cal. 2007) (" Judicial estoppel generally applies only
     where a court relies on and accepts a party's past position.  UMCC's reply brief focuses nearly
12   exclusively on its own reliance, which is not pertinent to the analysis").  The court notes, however, that
13   defendants plausibly argue that they will suffer an unfair detriment if plaintiffs are permitted to contend
     that Monroe was a California domiciliary at the time she died because defendants have made business
14   decisions in reliance on plaintiffs' repeated assertions that Monroe died a domiciliary of New York.
     Defendants contend that "they believed they had a right to license their copyrighted photos because of
15   the Estate's repeated public sworn attestations that Ms. Monroe was a domicile of New York when she
16   died.  Defendants knew that no [right of publicity] survived the death of Ms. Monroe since she was
     domiciled in New York when she died."  (Def.'s Reply at 14.)
17        Defendants apparently reference not only the statements made by the estate in the inheritance
18   tax proceeding, but also its various representations regarding Monroe's residence in probate proceedings
     in California and New York.  Frosch and Anna Strasberg, who was appointed administratrix c.t.a. of the
19   Monroe estate in 1989 and who is a named party in this litigation, made various representations to the
     Surrogate's Court regarding that Monroe was a resident and/or domiciliary of New York at the
20   time of her death.  (See, e.g., Soni Decl., Exhs. O (Frosch asserting in a 1969 Surrogate's Court petition
     for the determination of estate tax that Monroe died a resident of New York); X (Frosch asserting in a
21   1980 petition for final accounting that Monroe died a resident of New York); Y (Strasberg stating in a
     1989 petition for letters of administration that Monroe died a resident of New York); AA (Strasberg
22   stating in a 1989 petition for construction of Monroe's will that she "died on August 5, 1962, domiciled
23   in the City and State of New York").
          Defendants' reliance on these statements is understandable, as the terms domicile and residence
24   are often used synonymously in probate law as well.  See, e.g., *In re Glassford's Estate*, 114 Cal.App.2d
     181, 186 (1952) ("While residence has different meanings for different purposes, it is plain that
25   residence as used in section 301, [California] Probate Code, is synonymous with domicile"); *In re*
26   *Britton's Will*, 100 N.Y.S.2d 969, 971 (Sur. Ct. 1950) ("Exclusive jurisdiction to probate the will of a
     decedent rests in the Surrogate's Court of the county where the decedent was, at the time of his death,
27   a resident, whether his death happened there or elsewhere.  Residence as used in this section is
     synonymous with and denotes domicile," citing Surrogate's Court Act, § 45 and *Matter of Greene's*
28   *Will*, 186 App.Div. 903 (N.Y. App. Div. 1918)).

                                                    62

1  bankruptcy process").

2         In sum, all the relevant factors favor application of judicial estoppel here: plaintiffs currently

3  take a position that is inconsistent with that intentionally advanced by Frosch and the estate in the

4  California inheritance tax proceedings; the inheritance tax appraiser accepted and relied on Frosch's

5  assertions that Monroe was domiciled in New York at the time of her death; and plaintiffs, having

6  benefitted from Frosch's assertions because their predecessors were beneficiaries under Monroe's will,

7  would gain an unfair advantage if permitted now to establish that Monroe was in fact domiciled in

8  California. See *New Hampshire*, 532 U.S. at 751. Compare, e.g., *In re Parker*, 204 Fed. Appx. 598, 600

9  (9th Cir. Nov. 2, 2006) (Unpub. Disp.) ("The bankruptcy court did not abuse its discretion in declining

10  to apply the doctrine of judicial estoppel against the Resort. The Resort gained no 'unfair advantage'

11  from advancing the position that the Rodriguez deed of trust resulted from mutual mistake because the

12  Arizona Supreme Court rejected its private plat dedication theory, resulting in the district court's

13  reversal of the bankruptcy court's initial grant of summary judgment. When a party advances a position

14  that is ultimately rejected on appeal, that party may advance an alternative theory in future proceedings

15  with no risk of inconsistent court determinations" (internal quotations and citations omitted)).

16         Plaintiffs have raised no triable issues of fact respecting any of the factors. Stated differently,

17  they have not "sufficiently explained" the inconsistency. See *Cleveland*, 526 U.S. at 806.

18  Consequently, the court concludes that the doctrine of judicial estoppel bars plaintiffs from asserting

19  that Monroe was domiciled in California at the time of her death.[97] As a result, it reconsiders its prior

20  ruling and grants defendants' motion for summary judgment on plaintiffs' statutory right of publicity

21  claims, as these are dependent on establishing that Monroe was a California domiciliary.

22

23

24                              **III. CONCLUSION**

25

26  ────────────────

27         [97]Because the court determines that plaintiffs are judicially estopped by the statements made in
   the California tax proceedings, it need not consider defendants' additional arguments that they are
   judicially and collaterally estopped by statements made in a proceeding in the district court for the

28  District of Hawaii. (See Def.'s Mot. at 9-14, 30).

                                        63

1    For the reasons stated, defendants' motion for reconsideration is granted.  On reconsideration,

2  the court grants defendants' motion for summary judgment on plaintiffs' right of publicity claims on

3  judicial estoppel grounds.

4

5  DATED: March 17, 2008

6                                                     MARGARET M. MORROW
                                                      UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28