# EX. A, PT. 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE MILTON H. GREENE ARCHIVES, INC., | ) CASE NO. CV 05-2200 MMM (MCx) |
| Plaintiff, | ) |
| v. | ) ORDER GRANTING DEFENDANTS' MOTION FOR RECONSIDERATION |
| CMG WORLDWIDE, INC., an Indiana Corporation, and MARILYN MONROE, LLC, a Delaware Limited Liability Company, ANNA STRASBERG, an individual, | ) |
| Defendants. | ) |
| AND CONSOLIDATED ACTIONS | ) |

Defendants The Milton H. Greene Archives, Inc. and Tom Kelley Studios, Inc. have moved under Local Rule 7-18 for reconsideration of the court's January 7, 2008 order finding that plaintiffs are not collaterally or judicially estopped from claiming that Marilyn Monroe died a domiciliary of California.

# 1. FACTUAL AND PROCEDURAL BACKGROUND

## A.    Past Proceedings

The Milton H. Greene Archives, Inc. filed this action against CMG Worldwide Inc., Marilyn Monroe LLC, and Anna Strasberg on March 25, 2005. On May 3, 2005, the court consolidated the case with two other actions filed in this district – *Shirley De Dienes et al. v. CMG Worldwide, Inc. et al.* (CV 05-2516)[1] and *Tom Kelley Studio, Inc. v. CMG Worldwide, Inc. et al.* (CV 05-2568).[2] On December 14, 2005, the court consolidated two additional actions with the pending case – *CMG Worldwide, Inc., et al. v. Tom Kelley Studios* (CV 05-5973) and *CMG Worldwide, Inc., et al. v. The Milton H. Green Archives, Inc.* (CV 05-7627).[3] These actions were originally filed by CMG Worldwide, Inc. and Marilyn Monroe, LLC (the "CMG Parties" or "plaintiffs") in the United States District Court for the Southern District of Indiana, and were transferred to this district pursuant to 28 U.S.C. § 1404(a) on August 9, 2005.[4] All of the actions seek to have the court resolve competing claims to ownership of the legal right to use, license, and distribute certain photographs of Marilyn Monroe.

In their complaints against The Milton H. Green Archives, Inc. and Tom Kelley Studios, Inc. (the "MHG Parties" or "defendants"), the CMG Parties assert that they own the "Right of Publicity and Privacy in and to the Marilyn Monroe name, image, and persona" that was created by "the Indiana Right of Publicity Act, I.C. § 32-36-1-1 et seq., and other applicable right of publicity laws." The CMG Parties contend that defendants have infringed this right by using Marilyn Monroe's name, image and likeness "in connection with the sale, solicitation, promotion, and advertising of

---

[1]The *De Dienes* action was dismissed without prejudice on February 2, 2006, pursuant to the parties' stipulation.

[2]Tom Kelley Studio, Inc. sued the same defendants as did The Milton H. Greene Archive, Inc. – CMG Worldwide Inc., Marilyn Monroe LLC, and Anna Strasberg.

[3]Anna Strasberg was not a party to the Indiana actions.

[4]On February 6, 2006, the court issued a scheduling order, which denominated the CMG Parties plaintiffs and the MHG Parties defendants for purposes of the consolidated actions. The court based this order on the fact that the CMG Parties' Indiana action was the first filed action.

1  products, merchandise, goods and services" without their consent or authorization.[5]

2  On October 6, 2006, the MHG Parties filed a motion for summary judgment. They argued,

3  *inter alia*, that plaintiffs' right of publicity claims were preempted by the Copyright Act, 28 U.S.C.

4  §§ 101-1332, and that, even if they were not preempted, plaintiffs had failed to adduce evidence that

5  they had standing to assert claims based on Marilyn Monroe's right of publicity. In essence,

6  defendants argued that, even if a posthumous right of publicity in Monroe's name, image and

7  likeness exists, plaintiffs could not show that they were presently in possession of that right.

8  Defendants also argued that MMLLC was judicially and collaterally estopped from claiming that

9  Monroe was domiciled anywhere other than New York at the time of her death.

10  On May 14, 2007, the court granted defendants' motion for summary judgment, concluding

11  that plaintiffs lacked standing to assert Monroe's right of publicity.[6] The court found that Marilyn

12  Monroe could not have devised a non-statutory right of publicity through her will, and also could not

13  have devised a statutory right that was created only decades after her death. This conclusion was

14  supported, in part, by the court's interpretation of the California right of publicity statute, Civil Code

15  § 3344.1. The court determined that under the statute, a deceased personality who had died *before* the

16  measure was enacted was deemed not to have had the capacity to transfer the subsequently created right,

17  which was denominated a "property right[ ]," prior to death. See CAL. CIVIL CODE § 3344.1(b)

18  (providing that a "deceased personality" could, "*before [his or her] death*," transfer the statutory right

19  of publicity "by contract or by means of trust or testamentary documents," but that "after the death of

20  the deceased personality," the statutory publicity right "vest[ed]" directly in specified statutory

21  beneficiaries (emphasis added)). Consequently, the court held that plaintiffs could not show they were

22  entitled to assert Marilyn Monroe's posthumous right of publicity.

23

_____

24  [5]Plaintiffs' First Amended Complaint against Milton H. Greene Archives, Inc., ¶¶ 7, 24-26;
25  Plaintiffs' First Amended Complaint against Tom Kelley Studios, Inc., ¶¶ 7, 28-30.

26  [6]California created a descendible, posthumous right of publicity in 1984, with the passage of its
post-mortem right of publicity statute. See CAL. CIVIL CODE § 3344.1 (formerly CAL. CIVIL CODE §
27  990). Before passage of this act, California recognized a common law right of publicity, but that right
expired on an individual's death. See *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal.3d 860, 861
28  (1979).

1    On November 21, 2007, plaintiff MMLLC filed a motion for reconsideration of the court's order.

2  MMLLC based its motion on the fact that, six weeks after the order was entered, California State

3  Senator Sheila Kuehl amended Senate Bill 771 ("SB 771") to include provisions designed to abrogate

4  the court's ruling and clarify the meaning of California's right of publicity statute. SB 771 passed both

5  houses of the California Legislature in September 2007, and was signed by Governor Schwarzenegger

6  on October 10, 2007.  The bill expressly provided that the statutory right of publicity created by §

7  3344.1 was deemed to exist at the time of death of any deceased personality who died before January

8  1, 1985.  It also stated: "The rights recognized under this section are property rights, freely transferable,

9  in whole or in part, by contract or by means of trust or testamentary documents, whether the transfer

10  occurs before the death of the deceased personality, by the deceased personality or his or her transferees,

11  or, after the death of the deceased personality, by the person or persons in whom the rights vest under

12  this section or the transferees of that person or persons."  The bill explained that, in the absence of an

13  express provision in a will or other testamentary instrument transferring a deceased personality's right

14  of publicity, "disposition of the publicity right[ ] would be in accordance with the disposition of the

15  residue of the deceased personality's assets."

16    Citing this measure, MMLLC asked the court to reverse its conclusions (1) that "under either

17  California or New York law, Marilyn Monroe had no testamentary capacity to devise, through the

18  residual clause of her will, statutory rights of publicity that were not created until decades after her

19  death"; (2) that alternatively, even if Marilyn Monroe's estate was open at the time the statutory rights

20  of publicity were created, it "was not [an] entity capable of holding title to the rights"; and (3) that

21  MMLLC and CMG had "no standing to assert the publicity rights they seek to enforce in this action."[7]

22

23

24

25

26

27

---

28    [7]Pl.'s Mem. at 12.

4

**B.    The Court's January 7, 2008 Order**

1.    **Marilyn Monroe's Posthumous Right of Publicity**

On January 7, 2008, the court granted plaintiff's motion for reconsideration. It noted that SB 771 clearly expressed the California legislature's intent to clarify § 3344.1 as originally enacted, explicitly outlining that intent in the bill and emphasizing it in the legislative history. The court observed that the bill had been passed promptly after, and in response to, the court's May 14, 2007 order, a factor of significance under California Supreme Court law addressing when subsequently passed bills should be considered clarifications, rather than modifications, of existing law. Finally, in light of SB 771, the court reconsidered the text of § 3344.1 as originally enacted, and found there was a potential ambiguity that the clarifying legislation addressed. It concluded that the definition of "deceased personality" in § 3344.1(h) injected ambiguity into the court's earlier construction of § 3344.1(b), i.e., its conclusion that subsection (b) permitted transfer of the statutory right of publicity after a personality's death only by the personality's heirs. Because the statute defined a "deceased personality" as "any . . . natural person who . . . died within 70 years prior to January 1, 1985," and because subsection (b) provided that a "deceased personality" could transfer the statutory right before his or her death, the court concluded that whether the legislature intended to provide that a predeceased personality could transfer the right through his or her will was ambiguous. The court noted that this potential ambiguity had caused beneficiaries, particularly charitable beneficiaries, of deceased personalities to act in a manner that conflicted with its earlier interpretation of the statute, and that it had resulted in court decisions that were at odds with what the 2007 legislature believed the earlier legislature had intended.

In combination, the court found that these circumstances supported a finding that SB 771 clarified existing law by making explicit the fact that the right of publicity of a personality who died before January 1, 1985 was deemed to have existed at the time the personality died, such that it could pass through the residual clause of her will. As a result, the court determined that it was appropriate to reconsider its ruling that MMLLC lacked standing to assert claims for infringement of Marilyn Monroe's statutory right of publicity. Interpreting § 3344.1 as clarified, the court held that because

5

1   Marilyn Monroe's statutory right of publicity was deemed to have existed at the time of her death, and

2   because it was not expressly bequeathed in her will, it was transferred under the residual clause of the

3   will to Lee Strasberg and other residuary beneficiaries. Additionally, because SB 771 made clear that

4   a deceased personality's posthumous right of publicity was "freely transferable or descendible by

5   contract, trust, or any other testamentary instrument by any subsequent owner of the deceased

6   personality's rights. . . ," the court determined that when Lee Strasberg died, his property, which, under

7   SB 771, was deemed to include Monroe's publicity right, passed by will to his wife, Anna Strasberg.

8   Anna Strasberg and the holder of a 25% interest in the residue of Monroe's estate, in turn, formed

9   MMLLC and transferred their interest in Monroe's estate, including, without limitation, the right of

10   publicity, to MMLLC. As a result, the court found that, under § 3344.1 as clarified, MMLLC possessed

11   Monroe's posthumous right of publicity, and vacated its prior ruling that MMLLC lacked standing to

12   assert the right.[8]

13         The court made clear that these holdings were conditional, in the sense that they were dependent

14   on a finding that Monroe was a domiciliary of California when she died.   The parties agreed that

15   Monroe could only have been a domiciliary of New York or California at the time of her death. Unlike

16   California, New York did not recognize either a common law or statutory posthumous right of publicity

17   in 1962. See, e.g., *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585-86 (2d Cir. 1990) (observing that,

18   under New York law, the right of publicity is exclusively statutory, is personal to the individual, and

19   is extinguished upon his death (citations omitted)). Whether Monroe could bequeath such a right,

20   therefore, depended on whether she was domiciled in California or in New York.

21

22

23       **2.**     **Reconsideration of the Order**

24             **a.**     **Domicile**

25         In their original motion, defendants argued that plaintiffs were judicially estopped from asserting

26

---

27       [8]On January 20, 2008, the court denied defendant Milton H. Greene's motion for certification
of the order granting plaintiffs' motion for reconsideration under 28 U.S.C. § 1292(b), and for a stay of

28   the case.

1  that Monroe was domiciled in California at the time of her death.  The court did not address that

2  question in its original order because it determined that MMLLC lacked standing to assert the right

3  under § 3344.1 in any event.  Having reconsidered the standing question, the court concluded that it was

4  necessary to address domicile.[9]

5      MMLLC asserted that the court should not summarily adjudicate the issue of domicile, since

6  discovery was ongoing and it had recently come into possession of thousands of documents potentially

7  bearing on whether Monroe was a domiciliary of California or New York.  Given this representation,

8  the paucity of evidence in the record regarding Monroe's domicile, and the fact that defendants' motion

9  was premised on an assertion that MMLLC could not adduce evidence of California domicile, the court

10 concluded that defendants' motion was premature and declined to decide the issue on the basis of an

11 incomplete record.

12                         **b.      Collateral Estoppel**

13     The court also addressed the argument in defendants' original motion that summary judgment

14 should be entered in their favor on the basis of collateral and/or judicial estoppel.  Defendants argued

---

16
17 [9] "'A person's domicile is her permanent home, where she resides with the intention to remain
   or to which she intends to return.'"  *Gaudin v. Remis*, 379 F.3d 631, 636 (9th Cir. 2004) (quoting *Kanter*
18 *v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001)).  "'A person residing in a given state is not
   necessarily domiciled there.'"  *Id.* (quoting *Kanter*, 265 F.3d at 857); see also *Weible v. United States*,
19 244 F.2d 158, 163 (9th Cir. 1957) ("Residence is physical, whereas domicile is generally a compound
   of physical presence plus an intention to make a certain definite place one's permanent abode, though,
20 to be sure, domicile often hangs on the slender thread of intent alone, as for instance where one is a
   wanderer over the earth.  Residence is not an immutable condition of domicile").
21     Because a person may only have one domicile at a time, "a person's old domicile is not lost until
   a new one is acquired."  *Lew v. Moss*, 797 F.2d 747, 750 (9th Cir. 1986) (citing  *Barber v. Varleta*, 199
22 F.2d 419, 423 (9th Cir. 1952), and RESTATEMENT (SECOND) OF CONFLICTS §§ 18-20 (1971)).  "A change
   in domicile requires the confluence of (a) physical presence at the new location with (b) an intention to
23 remain there indefinitely."  *Id.* (citing *Owens v. Huntling*, 115 F.2d 160, 162 (9th Cir. 1940); 13B C.
24 Wright, A. Miller, & E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3613, at 544-45 (1984 & Supp.
   1986)).  Among the factors courts consider in determining domicile are an individual's "current
25 residence, voting registration and voting practices, location of personal and real property, location of
26 brokerage and bank accounts, location of spouse and family, membership in unions and other
   organizations, place of employment or business, driver's license and automobile registration, and
27 payment of taxes."  *Id.* (citations omitted).  "[C]ourts have also stated that domicile is evaluated in terms
   of 'objective facts.'"  *Id.* (citations omitted).  Thus, the determination of a party's domicile is a mixed
28 question of law and fact.  *Id.*

1    that MMLLC was collaterally estopped from asserting that Monroe was domiciled in California at the

2    time of her death, citing (1) *Frosch v. Grosset & Dunlap, Inc.*, 427 N.Y.S.2d 828 (App. Div. 1980); (2)

3    the Report of Appraiser filed December 30, 1969 in Monroe's probate proceedings; and (3) a 1975

4    opinion of the California State Board of Equalization ("BOE").

5         The court concluded that defendants were not entitled to summary judgment on the basis that

6    the *Frosch* decision collaterally estopped plaintiffs from arguing that Monroe was domiciled in

7    California because they had not met their burden of showing "an identity of issue which has necessarily

8    been decided in the prior action and is decisive of the present action." See *Buechel v. Bain*, 97 N.Y.2d

9    295, 304 (2001) (citing *Gilberg v Barbieri*, 53 N.Y.2d 285, 291 (1981)). *Frosch* examined whether

10   the Estate of Marilyn Monroe could assert that publication of a book titled "Marilyn" invaded Monroe's

11   right of publicity. *Frosch*, 427 N.Y.S.2d at 828. The Appellate Division of the New York Supreme

12   Court determined that "[t]he statutory right of privacy applies to the name, portrait or picture of 'any

13   living person' (Civil Rights Law, § 50); and it is thus on its face not applicable to the present book."

14   *Id.* The estate contended, however, "that there [was] an additional property right, a right of publicity

15   which survive[d] the death of Miss Monroe and belong[ed] to [it]." *Id.* As respects this right, the court

16   held that "[n]o such nonstatutory right ha[d] yet been recognized by the New York State courts." *Id.*

17   (citing *Wojtowicz v Delacorte Press*, 43 N.Y.2d 858 (1978)). It went on to state that even if such a right

18   existed, defendant's book was a "literary work[,] . . . not simply a disguised commercial advertisement

19   for the sale of goods or services," and that "protection of the right of free expression [was] so important

20   that [it] should not extend any right of publicity, *if such exists*, to give rise to a cause of action against

21   the publication of a literary work about a deceased person." *Id.* (emphasis added).

22        Although defendants argued that "where Marilyn Monroe was domiciled at the time of her death

23   was foundational to whether the Estate of Marilyn Monroe had a right to publicity," the court disagreed,

24   concluding that the Appellate Division's decision turned on the fact that the book was a literary work,

25   and that freedom of speech considerations outweighed any right of publicity that might exist. The court

26   noted that there no indication in the opinion that the parties had raised domicile or that it had been

27   necessarily decided by the New York court. It declined to find that the Appellate Division's observation

28   regarding the lack of a posthumous right of publicity in New York implied a decision regarding

1  Monroe's domicile.

2      The court similarly found that defendants had failed to show that Monroe's domicile at death

3  was definitively decided by the California BOE or the New York Surrogate's Court. The BOE's opinion

4  stated that "[a]t the time of her death in 1962, Marilyn Monroe was a resident of the state of New

5  York." Defendants extrapolated from this that the BOE necessarily determined that Monroe was a New

6  York domiciliary. The court noted, however, that residence and domicile are distinct concepts, and that

7  there was no indication that domicile had been litigated in the BOE proceeding or decided by the board.

8      As respects the New York probate proceedings, defendants cited a statement in the report of the

9  estate appraiser that Monroe "died a resident of the State of New York on the 5th day of August 1962."

10 Once again, because residence is not the same as domicile, the court found that this did not show that

11 the court considered or weighed the factors usually relevant in determining domicile, or that it decided

12 the question.

13                      **c.      Judicial Estoppel**

14      Finally, the court found that defendants had failed to show that MMLLC was judicially estopped

15 from contending that Monroe was domiciled in California at the time of her death. Courts uniformly

16 recognize that the purpose of the judicial estoppel doctrine is to protect the integrity of the judicial

17 process by prohibiting parties from changing positions as circumstances warrant. *New Hampshire v.*

18 *Maine*, 532 U.S. 742, 749 (2001) (citations omitted). Judicial estoppel can be invoked whether a party

19 takes inconsistent positions in the same action or in two different actions. See *Rissetto v. Plumbers and*

20 *Steamfitters Loca 343*, 94 F.3d 597, 605 (9th Cir. 1996) ("We now make it explicit that the doctrine of

21 judicial estoppel is not confined to inconsistent positions taken in the same litigation").

22      Defendants cited several purportedly inconsistent positions that purportedly estopped MMLLC

23 from asserting that Monroe was domiciled in California. Among these were statements made to the

24 Surrogate's Court by Aaron Frosch, the executor of Monroe's estate, and Anna Strasberg, the

25 administratrix of Monroe's will, that Monroe was a resident of New York at the time of her death.

26 Noting that residence is distinct from domicile, and that a person may reside somewhere other than her

27

28

                                          9

1    domicile, the court concluded that none of the statements addressed Monroe's domicile at death.[10]

2    Because assertions that Monroe was a resident of New York were not "clearly inconsistent" with a

3    contention that she was a domiciliary of California, the court found that the statements did not judicially

4    estop MMLLC from asserting now that Monroe was domiciled in California. See *New Hampshire*, 532

5    U.S. at 751; *Holder v. Holder*, 305 F.3d 854, 872 (9th Cir. 2002) (declining to apply judicial estoppel

6    and noting that "Jeremiah's position that California had jurisdiction over his custody claim is not

7    necessarily inconsistent with his position that Washington, not California, has jurisdiction over his

8    [International Child Abduction Remedies Act ("ICARA"] claim, because the concept of 'home state'

9    under California state law differs from the concept of 'habitual residence' under ICARA").

10    Defendants also argued that a statement by Frosch that the estate did not have an exclusive right

11    to Monroe's image judicially estopped plaintiffs from contending otherwise. Frosch made this statement

12    in a 1972 affidavit filed in the Surrogate's Court. The affidavit concerned a dispute regarding

13    transparencies of photographs taken of Monroe by Tom Kelley; the photographs were in Monroe's

14    possession at the time of her death. When Kelley sought to have the photographs returned, Lee

15    Strasberg, the beneficiary of Monroe's personal effects, argued that he was entitled them. Frosch

16    distinguished between the transparencies themselves, and the right to reproduce the photographs.

17    Regarding the latter, he opined that Monroe's "Estate [had] no exclusive right to her image" and could

18    not "retain the photographs." In a subsequent affidavit, Frosch stated that a "question remained

19    [regarding the identity of] . . . the owner of rights" to the photographs he suggested that "*if* they were

20    owned by [Monroe] at the time of her death, the Estate would be [the] Owner." After reviewing these

21    statements, the court found that Frosch had not taken a firm position regarding the estate's ownership

22    of reproduction or other rights in the photographs; it noted that the issue before the Surrogate's Court

23    appeared to have been ownership of the physical transparencies, not ownership of rights to Monroe's

---

25    [10]See, e.g., *United States v. Venturella*, 391 F.3d 120, 125 (2d Cir. 2004) ("'Residency means

26    an established abode, for personal or business reasons, permanent for a time. A resident is so
determined from the physical fact of that person's living in a particular place. One may have more than

27    one residence in different parts of this country or the world, but a person may have only one domicile.
A person may be a resident of one locality, but be domiciled in another,'" quoting *Rosario v. INS*, 962

28    F.2d 220, 224 (2d Cir. 1992)).

1   image and likeness. Additionally, the court observed, there was no evidence that the Surrogate's Court

2   ever ruled on the estate's ownership of reproduction or other rights in Monroe's image. Consequently,

3   to the extent Frosch advanced a position, it stated, the record did not support a finding that he did so

4   successfully.

5        Defendants next contended that plaintiffs were judicially estopped from asserting that Monroe

6   was domiciled in California at the time of her death based on statements Frosch made to the BOE. The

7   issue in the BOE appeal was whether Monroe's estate should pay California income tax on earnings she

8   made from films in which she appeared ("percentage payments"). Frosch asserted the percentage

9   payments were not taxable in California, but was denied a tax clearance certificate. California taxes "the

10  entire taxable income of every nonresident which is derived from sources within [the] state," and the

11  BOE classified the earnings as "personal services income," whose source was the place where the

12  services were performed.

13       The estate made several unsuccessful arguments to the BOE in an effort to avoid imposition of

14  the tax. Among these was an assertion that the percentage payments were not taxable in California

15  because they did not derive from California sources. The estate argued that the income was earned in

16  New York because it derived from *the estate's* ownership of "an intangible contract right whose situs,

17  under the doctrine of *mobilia sequunter personam*, was the state" of *the Estate's* domicile or residence.

18  "[U]nder the *mobilia* rule[, it noted,] the source of the income was in appellant's domiciliary state, New

19  York." The BOE rejected this argument because no authority suggested that a contract right to receive

20  percentage payments for personal services was an intangible subject to this doctrine. Rather, the Board

21  concluded, the estate stood in the shoes of the decedent. Because Monroe performed the services in

22  California, it stated, income from them was taxable in California.

23       As with defendants' other arguments, the court determined that the estate's argument to the BOE

24  did not judicially estop plaintiffs from asserting that Monroe was a California domiciliary at the time

25  of her death. First, the court noted, the estate's position that *it* was a New York domiciliary was not

26  inconsistent with plaintiffs' present position that Monroe was domiciled in California when she died.

27  Additionally, it observed, there was no evidence that the estate made any argument respecting Monroe's

28  domicile at the time of her death. Indeed, as the BOE noted, "[d]uring her lifetime Miss Monroe owned

11

1    the same contract right [to receive the percentage payments], and [the estate] does not contend that the

2    *mobilia* rule would have applied to her receipt of the income."

3         Finally, the court noted, the BOE rejected the estate's argument. Consequently, defendants could

4    not show that the estate prevailed on an argument in the BOE proceeding that was contrary to the

5    argument its purported privy asserted in this action. See *New Hampshire*, 532 U.S. at 749.

6    Consequently, the court concluded, there was no risk that judicial acceptance of plaintiffs' present

7    position would create the perception that either the BOE or this court had been misled. See *id.* at 751.

8    As a result, the court found that defendants had not shown plaintiffs were judicially estopped from

9    arguing that Monroe was a California domiciliary at death.

10        **C.**    **Defendants' Motion for Reconsideration**

11         On February 5, 2008, defendants filed a motion for reconsideration of those portions of the

12    January 7, 2008 order that addressed collateral and judicial estoppel. Defendants contend that

13    reconsideration is appropriate because newly discovered evidence shows that plaintiffs' privies took

14    positions in prior proceedings that are directly contrary to plaintiffs' argument in this action that Monroe

15    was a California domiciliary at the time of her death.[11]

16                        **II. DISCUSSION**

17        **A.**    **Legal Standard Governing Motion for Reconsideration Under Local Rule 7-18**

18         In this district, motions for reconsideration are governed by Local Rule 7-18, which states:

19        "A motion for reconsideration of the decision on any motion may be made only on the

20        grounds of (a) a material difference in fact or law from that presented to the Court before

21        such decision that in the exercise of reasonable diligence could not have been known to

22        the party moving for reconsideration at the time of such decision, or (b) the emergence

23        of new material facts or a change of law occurring after the time of such decision, or (c)

24        a manifest showing of a failure to consider material facts presented to the Court before

25        such decision." CA CD L.R. 7-18.

26

27    _____

28        [11]Defendants The Milton H. Greene Archives, Inc. and Tom Kelley Studios, Inc.'s Memorandum of Points and Authorities in Support of Motion for Reconsideration of Order Finding No Judicial and Collateral Estoppel as to Domicile of Marilyn Monroe ("Def.'s Mem.") at 2.

                    12

1    Rule 7-18 states that "[n]o motion for reconsideration shall in any matter repeat any oral or

2    written argument made in support of or in opposition to the original motion." *Id.*; see also *School Dist.*

3    *No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (reconsideration is

4    appropriate if the movant demonstrates clear error, manifest injustice, newly discovered evidence, or

5    an intervening change in controlling law).  Whether to grant a motion for reconsideration under Local

6    Rule 7-18 is a matter within the court's discretion.  *Navajo Nation v. Confederated Tribes and Bands*

7    *of the Yakama Indian Nation*, 331 F.3d 1041, 1046 (9th Cir. 2003).

8    **B.    Whether the Court Should Consider the Evidence Adduced by Defendants**

9    In support of their motion for reconsideration, defendants proffer additional evidence they

10    contend shows that plaintiffs should be judicially and collaterally estopped from asserting that Monroe

11    was a California domiciliary at the time of her death.  Defendants acknowledge that they have been in

12    possession of this documentation since it was produced to them by plaintiffs in December 2006.[12] They

13    represent, however, that they did not receive it until the Greene/Kelley motions for summary judgment

14    were fully briefed,[13] and that they were unable to discover and present it to the court previously because

15    it was "buried in the more than 58,000 documents [that plaintiffs] produced" after briefing was

16    complete.[14]

17    The court does not condone defendants' delay in presenting this evidence to the court.  It accepts

18    their explanation, however, that plaintiffs produced a large volume of documents in response to requests

19    for production after the motions for summary judgment were fully briefed. Given the basis upon which

20    the court initially granted summary judgment, defendants had no incentive immediately to comb through

21    the voluminous materials produced to uncover evidence relevant to judicial or collateral estoppel. When

22    the court reconsidered and reversed its decision regarding MMLLC's standing to assert right of publicity

23    claims, moreover, it reviewed the questions of judicial and collateral estoppel on the basis of the existing

24    record – i.e., the record prior to the date plaintiffs produced documents to defendants. Defendants were

---

26    [12]Def.'s Mem. at 2.

27    [13]*Id.*

28    [14]*Id.*

1   not given an opportunity to supplement the record before that decision was made. The court determined

2   on the record before it that defendants' judicial and collateral estoppel arguments lacked merit. It did

3   not, however, preclude defendants from raising the defenses in the future.

4          Under these circumstances, the court exercises its discretion to consider the newly presented

5   evidence. Although the need for reconsideration is partially a product of the fact that defendants filed

6   a premature motion for summary judgment, the court concludes it is appropriate to review the evidence

7   they have now adduced because the doctrine of judicial estoppel concerns protection of the integrity of

8   the courts and the judicial process. See *Wagner v. Professional Engineers in California Government*,

9   354 F.3d 1036, 1044 (9th Cir. 2004) ("Judicial estoppel is an equitable doctrine that is intended to

10  protect the integrity of the judicial process by preventing a litigant from 'playing fast and loose with the

11  courts,'" quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)).

12

13  **C.     Whether the Court Should Reconsider its Order Regarding Judicial Estoppel**

14         **1.     Standard Governing Motions for Summary Judgment**

15         A motion for summary judgment must be granted when "the pleadings, the discovery and

16  disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

17  fact and that the movant is entitled to judgment as a matter of law." FED.R.CIV.PROC. 56(c). A

18  party seeking summary judgment bears the initial burden of informing the court of the basis for its

19  motion and of identifying those portions of the pleadings and discovery responses that demonstrate

20  the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

21  (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must

22  affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.

23  On an issue as to which the nonmoving party will have the burden of proof, however, the movant

24  can prevail merely by pointing out that there is an absence of evidence to support the nonmoving

25  party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set

26  forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine

27  issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC.

28  56(e)(2).

14

1    Evidence presented by the parties at the summary judgment stage must be admissible.

2 FED.R.CIV.PROC. 56(e)(1). In reviewing the record, the court does not make credibility

3 determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most

4 favorable to the nonmoving party. See *T.W. Electric Service, Inc. v. Pacific Electric Contractors*

5 *Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Conclusory, speculative testimony in affidavits and

6 moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See

7 *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co.,*

8 *Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

9        **2.    Standard Governing Judicial Estoppel**

10    As noted in the January 7, 2008 order, judicial estoppel "'generally prevents a party from

11 prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail

12 in another phase.'" *New Hampshire*, 532 U.S. at 749 (citations omitted). "[F]ederal law governs the

13 application of judicial estoppel in federal court." *Rissetto*, 94 F.3d at 603. The doctrine applies to

14 positions taken in the same action or in different actions. See *id.* at 605 ("We now make it explicit that

15 the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation").

16 It also "applies to a party's stated position whether it is an expression of intention, a statement of fact,

17 or a legal assertion." *Wagner*, 354 F.3d at 1044 (citing *Helfand v. Gerson*, 105 F.3d 530, 535 (9th Cir.

18 1997)).

19    Factors relevant in deciding whether to apply the doctrine include: (1) whether the party's later

20 position is "clearly inconsistent" with its earlier position; (2) whether the party has successfully

21 advanced the earlier position, such that judicial acceptance of an inconsistent position in the later

22 proceeding would create a perception that either the first or the second court had been misled; and (3)

23 "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose

24 an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 751 (citations

25 omitted).

26    In addition to these factors, the Ninth Circuit examines "whether the party to be estopped acted

27 inadvertently or with any degree of intent." *EaglePicher Inc. v. Federal Ins. Co.*, CV 04-870 PHX

28 MHM, 2007 WL 2265659, *3 (D. Ariz. Aug. 6, 2007) (citing *Johnson v. Oregon Dep't of Human*

15

1    *Resources Rehab. Div.*, 141 F.3d 1361, 1369 (9th Cir. 1998)); see also *Prach v. Bowen Property Mgmt.*,

2    CV 03-250 EFS, 2007 WL 397453, *4 (E.D. Wash. Feb. 1, 2007) ("Although Defendants cite authority

3    that litigants should be bound by the actions of their attorneys, the inquiry is not whether Plaintiff Kriger

4    is 'bound' by the mistakes in the original schedules, but rather whether the Plaintiff Kriger (along with

5    his counsel) acted intentionally, as opposed to inadvertently"). "Judicial estoppel applies when a party's

6    position is 'tantamount to a knowing misrepresentation to or even fraud on the court.'" *Johnson*, 141

7    F.3d at 1369 (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362-63 (3d

8    Cir. 1996)). Thus, "[i]f incompatible positions are based not on chicanery, but only on inadvertence or

9    mistake, judicial estoppel does not apply." *Id.* (citing *In re Corey*, 892 F.2d 829, 836 (9th Cir. 1989));

10    see also *Wyler Summit Partnership v. Turner Broadcasting Sys., Inc.*, 235 F.3d 1184, 1190 (9th Cir.

11    2000) ("The doctrine of judicial estoppel requires, *inter alia*, a knowing antecedent misrepresentation

12    by the person or party alleged to be estopped and prevents the party from tendering a contradictory

13    assertion to a court," citing *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)). "Thus, if a claimant's

14    particular representations are so inconsistent that they amount to an affront to the court, judicial estoppel

15    may apply." *Johnson*, 141 F.3d at 1369.

16         A party may invoke the doctrine of judicial estoppel in a motion for summary judgment to bar

17    a claim based on an inconsistent position. See *Elston v. Westport Ins. Co.*, No. 05-16728, 2007 WL

18    3268429, *2 (9th Cir. Nov. 6, 2007) (Unpub. Disp.) (affirming district court's grant of summary

19    judgment against plaintiff on the basis that her claims were barred by judicial estoppel); A party seeking

20    to defeat summary judgment on judicial estoppel grounds must "sufficiently explain" a prior judicial

21    position that is inconsistent with an essential element of its claim.  See, e.g., *Cleveland v. Policy

22    Management Systems Corp.*, 526 U.S. 795, 806 (1999) (stating that a party must "provide a sufficient

23    explanation" for a prior inconsistent position to defeat summary judgment); *Fewer v. Copper & Brass

24    Sales, Inc.*, 183 Fed. Appx. 696, 696 (9th Cir. June 9, 2006) (Unpub. Disp.) ("John J. Fewer appeals the

25    district court's grant of summary judgment in favor of Copper & Brass Sales and Thyssen, Inc. ("C &

26    B") on Fewer's claims of failure to accommodate, disability and age discrimination in violation of

27    California's Fair Employment and Housing Act ('FEHA') and his claim of wrongful termination in

28    violation of public policy. . . . Because Fewer failed to 'proffer a sufficient explanation' to the district

1  court for these inconsistent positions, the court did not abuse its discretion applying the doctrine of

2  judicial estoppel," citing *Cleveland*, 526 U.S. at 806); *Zurich Am. Ins. Co. v. Felipe Grimberg Fine Art*,

3  Civ 04-763 RLE, 2008 WL 394808, *4 (S.D.N.Y. Feb. 13, 2008) ("To survive a motion for summary

4  judgment, . . . individual must explain why his or her previous position or contention is consistent with

5  his or her current position," citing *Mitchell v. Washingtonville Central School District*, 190 F.3d 1, 7

6  (2d Cir. 1999)); compare *Abercrombie & Fitch Co. v. Moose Creek, Inc.*, 486 F.3d 629, 634 (9th Cir.

7  2007) (concluding that the evidence plaintiff presented distinguishing its position from the position it

8  took in prior litigation "fail[ed] to rebut the determination of clear inconsistency" and thus "[t]he

9  application of judicial estoppel . . . was not an abuse of discretion"); *Committee of Russian Federation*

10 *on Precious Metals and Gems v. United States*, 987 F.Supp. 1181, 1185 (N.D. Cal. 1997) (denying

11 summary judgment on judicial estoppel grounds in part because "this court neither finds that the IRS's

12 position that the diamonds and valuables were fraudulently converted from the Committee has been

13 adopted by the Tax Court at this time, nor that the IRS is 'playing fast and loose' with the judicial

14 system").

15        **3.    New Evidence Presented by Defendants**

16        Defendants argue that plaintiffs should be estopped from claiming that Monroe was a California

17 domiciliary when she died due to, *inter alia*, statements made to the California Inheritance Tax

18 Appraiser by Aaron Frosch, the executor of Monroe's estate, and by counsel for the estate.[15] Defendants

19 proffer a March 4, 1966 letter to the appraiser from Gang, Tyre, Rudin & , a law firm that represented

20 Monroe when she was alive and also served as counsel for the estate.[16]  The letter enclosed an

21 "Inheritance Tax Affidavit" concerning Monroe's estate,[17] as well as an Affidavit Concerning Residence

22 supported by affidavits from Ralph L. Roberts, Hattie Stephenson Amos, May Reis, and Patricia

23 Newcomb."  The letter stated that the latter items were being submitted "[s]ince Miss Monroe was a

24

---

25        [15]*Id.* at 5.

26        [16]Declaration of Surji P. Soni in Support of Defendants' Motion for Reconsideration ("Soni

27 Decl."), ¶ 7, Exh. F.

28        [17]*Id.*, Exh. F.

non-resident of the State of California at the time of her death . . . ,"[18] and observed: "Since the estate in California is clearly insolvent and the estate in New York is probably insolvent also, we trust you will be in a position to furnish a no tax certificate so that a petition may be filed for termination of the California proceedings in accordance with the requirements of law."[19]

The "Affidavit Concerning Residence," which was executed by Frosch,[20] was a form containing questions regarding Monroe's residence at the time of her death.  In it, Frosch attested that Monroe was "a resident of the City of New York, County of New York, State of New York" when she died.[21]  He stated that she filed her last income tax return prior to death in April 1962 in New York City, New York.[22]  He also asserted that Monroe purchased "a home in Los Angeles to live at while engaged in performing services in a motion picture film."[23]  He contended that, at the time of her death, Monroe was "[r]esiding temporarily in Los Angeles," and that she "had a fully furnished apartment in New York City, which was her permanent residence."[24]  Frosch stated that in the five-year period immediately preceding her death, Monroe spent time in California "[o]nly for purpose of performing as an actress in Motion Picture Films and not for purpose of residing there[ ]."[25]  Asked whether Monroe had engaged in business in California, Frosch responded affirmatively, noting that Monroe had engaged in business in the state since she was "temporarily in California performing services as a motion picture actress .

---

[18]*Id.*

[19]*Id.*

[20]*Id.*, Exh. G.  MMLLC objects to the contents of this and the other declarations on numerous grounds.  (See Plaintiffs' Objections to Declaration of Surjit P. Soni Filed in Support of Motion for Reconsideration of Court's January 7, 2008 Order ("Pl.'s Objections") at 5-9.)  The court addresses MMLLC's objections *infra.*

[21]Soni Decl., Exh. G.

[22]*Id.*

[23]*Id.*

[24]*Id.*

[25]*Id.*

18

1 . . for approximately six months prior to death."[26]

2        Frosch contended that Monroe made declarations regarding her residence "on a number of

3 occasions," that she stated she "was returning to New York after completing [her] motion picture

4 commitment [and] that she considered [New York] her residence."[27]  He represented that Monroe's

5 actions showed that she viewed New York as her residence up to the time of her death, citing the fact

6 that she "in all respects [retained] her New York residence. Said Residence was not sublet. It remained

7 fully furnished and contained [Monroe's] personal effects, clothing, and substantially all of its contents.

8 Furthermore, [Monroe's] maid continued to look after and maintain said residence and its contents."[28]

9 Frosch noted that Monroe had filed New York State Residence Income Tax returns for 1962 and prior

10 years.[29]

11        The remaining declarations were similar. Ralph L. Roberts stated that he was a close personal

12 friend of Monroe's, and that she "frequently told [him] that she considered her trips to California merely

13 as visits for the purpose of appearing in various motion picture films and for the conduct of business

14 interests in relation thereto."[30]  Roberts asserted Monroe told him that she purchased a house in

15 California "primarily for the reason that she disliked living in hotels and preferred both the comfort and

16 privacy of a private home. . . ." He also reported that, "[o]n frequent occasions, both in California and

17 in New York, [Monroe] advised [him] that she considered her New York apartment as her permanent

18 home and permanent residence." Finally, Roberts asserted that, shortly prior to her death, Monroe

19 "specifically told [him] that she intended [to vacate] her California house and [that she] was going to

20 return to her New York apartment which she considered her permanent home and residence and [was

21 going] to reside permanently thereat."[31]

22 
---

23        [26]*Id.*

24        [27]*Id.*

25        [28]*Id.*

26        [29]*Id.*

27        [30]*Id.*, Exh. H.

28        [31]*Id.*

19

Hattie Stephenson, Monroe's personal housekeeper for approximately four years prior to her death, declared that she was required to clean and maintain Monroe's New York apartment as part of her job duties.[32] She stated that in September 1961, Monroe departed her New York apartment and went to California temporarily to appear in a movie, but instructed Stephenson to be at her New York apartment every day, cleaning and performing the same functions that she did when Monroe was in residence.[33] Stephenson asserted that when Monroe traveled to California, she left all of her furniture and furnishings at the New York apartment, as well as a substantial portion of her clothes, treasured possessions, and personal effects.[34] Stephenson contended that Monroe told her on several occasions that she considered the New York apartment "her permanent residence."[35] She asserted that two days prior to Monroe's death, Monroe "requested that I proceed to her California house to stay with her for approximately one month and then that I return to New York with [Monroe]. I was . . . told that [Monroe] intended to return to her permanent residence in New York City."[36]

In her declaration, May Reis, who was employed as Monroe's private secretary from February 1958 to September 1961, stated that Monroe "maintained her permanent residence in her New York apartment except for such occasions when she was required to be away from New York for business purposes."[37] Reis explained that it was Monroe's custom to "temporarily depart from her New York apartment approximately two to three weeks prior to the commencement of [a] motion picture film[,]" which time she "generally utilized for various pre-production consultations, make-up tests, wardrobe preparations, etc. Generally she would remain away from her New York residence until after the completion of the film and any consultations thereafter required. She would then return to her

---

[32]*Id.*, Exh. I.

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]*Id.*

[37]*Id.*, Exh. J.

permanent residence in New York."[38]   Reis asserted that it was "always [her] understanding that subsequent to [Monroe's divorce from Arthur Miller in January 1961] and while [she] was employed by [Monroe, Monroe] considered her said New York apartment as her official and permanent residence."[39]

Patricia Newcomb, Monroe's "Public Relations Counsel" and close personal friend, made similar statements.   She declared that Monroe "always conveyed the impression to [Newcomb] that she considered her . . . apartment . . . in New York City as her permanent residence."[40]  Despite the fact that Monroe traveled extensively and was occasionally away from New York on business matters for prolonged periods of time, Newcomb asserted, "she always returned to her permanent New York City residence."[41]  Newcomb reported that Monroe had told her she purchased a house in Los Angeles solely because she disliked living in hotels, and "that she had no intention of making her permanent residence in her . . . California house, but intended [to] leav[e] California and return[ ] to her New York residence upon the completion of her assignment" in California.[42]   Newcomb stated that, based on her "close association with [Monroe]," she believed Monroe "considered New York as her permanent residence and . . . intended to return to her permanent New York residence apartment after the completion of her business activities in California."[43]

On April 5, 1967, the inheritance tax appraiser filed his report with the superior court in Los Angeles.[44]  He stated that "after due and regular hearing and appraisement made," he had concluded that Monroe "died a resident of the County of New York, State of New York, and left property taxable under

---

[38]*Id.*

[39]*Id.*

[40]*Id.*, Exh. K.

[41]*Id.*

[42]*Id.*

[43]*Id.*

[44]*Id.*, Exh. N.

the inheritance tax laws of the State of California."[45]  The report determined that the California tax on

estate property was $777.63.[46]

Defendants argue that the declarations submitted to the inheritance tax appraiser regarding

Monroe's "permanent residence" were in fact arguments regarding her domicile.[47]  They contend that

the tax appraiser accepted the arguments and concluded that Monroe was a New York resident at the

time of her death.  As a result, they maintain, the estate successfully avoided California taxes on the bulk

of Monroe's estate.[48]  Given the favorable tax treatment that estate beneficiaries received as a result of

these representations, defendants maintain that plaintiffs will gain an unfair benefit if they are allowed

to maintain inconsistently in this litigation that Monroe was a California domiciliary when she died.[49]

### 4.    Whether the Alleged Inconsistent Statements Were Made By the Same Party

In order to determine whether plaintiffs are judicially estopped by statements to the California

inheritance tax appraiser made on behalf of Monroe's estate, the court must first determine whether

plaintiffs are in privity with Frosch, such that they may be deemed the "same party" as participated in

the tax proceeding.  See *Maitland v. Univ. of Minnesota*, 43 F.3d 357, 363-64 (8th Cir. 1994) (under the

doctrines of collateral estoppel, equitable estoppel, promissory estoppel, and judicial estoppel, "the party

who is to be estopped, *or one in privity with that party*, must have asserted a fact or claim, or made a

promise, that another party relied on, that a court relied on, or that a court adjudicated" (emphasis added)

(citations omitted)).  Privity permits "a non-party to an action . . . [to] be bound by the issues decided

there if it substantially controls, or is represented by, a party to the action."  *United States v. Bonilla*

---

[45]*Id.*

[46]*Id.*

[47]Def.'s Mem. at 5-7.

[48]Defendants' Reply Memorandum of Points and Authorities in Support of Motion for Reconsideration ("Def.'s Reply") at 8.

[49]*Id.* at 14.

*Romero*, 836 F.2d 39, 43 (1st Cir. 1987) (citing RESTATEMENT (SECOND) OF JUDGMENTS §§ 39, 41

(1982); *Montana v. United States*, 440 U.S. 147, 154 (1979); *Chicago, R.I. & P. Ry. Co. v. Schendel*,

270 U.S. 611, 618-19 (1926); and *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1572

(Fed. Cir. 1983)). "The party estopped due to representation by a party to the action must have been 'so

closely related to the interest of the party to be fairly considered to have had his day in court.'" *Id.*

(quoting *In re Gottheiner*, 703 F.2d 1136 (9th Cir. 1983)); see also *EEOC v. United States Steel Corp.*,

921 F.2d 489, 493 (3d Cir. 1990) ("One relationship long held to fall within the concept of privity is that

between a nonparty and party who acts as the nonparty's representative. . . . If the representative party

litigates first, subsequent litigation involving persons on whose behalf the representative appeared may

be precluded," citing *Martin v. Wilks*, 490 U.S. 755, 762 n. 2 (1989), and RESTATEMENT (SECOND) OF

JUDGMENTS § 41 (1980)). For privity to exist, "[t]here must be a 'substantial identity' of the parties such

that the party to the action was the virtual representative of the party estopped." *Bonilla Romero*, 836

F.2d at 43 (citing *Chicago, R.I. & P. Ry. Co.*, 270 U.S. at 621; *Pan American Match Inc. v. Sears,

Roebuck and Co.*, 454 F.2d 871 (1st Cir. 1972)). "Whether a party is virtually representative of a

non-party is a question of fact determined on a case-by-case basis." *Id.* (citing *United States v. ITT

Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir. 1980); and *Aerojet-General Corp. v. Askew*, 511 F.2d 710,

719 (5th Cir. 1975), cert. denied, 423 U.S. 908, reh'g denied, 423 U.S. 1026 (1975)).

> ### a. Whether There is Privity Between an Executor of an Estate and the Estate's Beneficiaries

Plaintiffs do not deny that they are the ultimate beneficiaries of the Monroe estate. As noted in

the court's January 7, 2008 order, the residual clause of Monroe's will stated:

"SIXTH: All the rest, residue and remainder of my estate, both real and personal, of

whatsoever nature and wheresoever situate, of which I shall die seized or possessed

or to which I shall be in any way entitled, or over which I shall possess any power of

appointment by Will at the time of my death, including any lapsed legacies, I give,

devise and bequeath as follows:

(a) To MAY REIS the sum of $40,000.00 or 25% of the total remainder of my estate,

whichever shall be the lesser.

1    (b) To DR. MARIANNE KRIS 25% of the balance thereof, to be used by her as set

2    forth in ARTICLE FIFTH (d) of this my Last Will and Testament.

3    (c) To LEE STRASBERG the entire remaining balance."

4    Lee Strasberg was a residuary beneficiary under Monroe's will. MMLLC argues that when Strasberg

5    died, his property passed by will to his wife, Anna Strasberg. In 2001, Ms. Strasberg formed MMLLC,

6    and she and the holder of a 25% interest in the residue of Monroe's estate transferred their rights and

7    interest in Monroe's estate to MMLLC.

8    Plaintiffs argue, however, that they should not be estopped by the statements made by the

9    estate's executor in the California tax proceedings because "there is generally no privity between an

10   estate's executor and its beneficiaries."[50]  To determine whether the executor of Monroe's estate was

11

---

12   [50]Plaintiffs' Opposition to Motion for Reconsideration of Court's January 7, 2008 Order ("Pl.'s
13   Opp.") at 18. As plaintiffs note, "federal law governs the application of judicial estoppel in federal
     court." (Pl.'s Opp. at 18 n. 3 (citing *Risetto*, 94. F.3d at 603)). In support of their contention that there
14   is no privity between the executor and beneficiaries of an estate, plaintiffs cite two cases and a
     secondary source. In *Fouke v. Schenewerk*, 197 F.2d 234, 235 (5th Cir. 1952), plaintiffs sought a to
15   recover the surface and mineral rights to a tract of land in Texas, which had been deeded to third parties
     by the executrix and trustee of two testators. Several defendants, who were citizens of Texas, as were
16   plaintiffs, were dismissed from the action in order to maintain diversity jurisdiction. *Id.* at 236. The
17   court determined that those defendants, who were the children or devisees of the testators, were
     indispensable parties to the action. It stated that nothing in the record showed that the executrix and
18   trustee represented the interests of the testators' children, and that the children were therefore not
     estopped to prove the facts about the ownership of the land. *Id.* The court noted that "[e]stoppel applies
19   only to those in privity. Donor and donee are in privity of estate, as are a lessor and lessee; an heir is in
20   privity with his ancestor; an executor is in privity with his testator; a trustee is in privity with his trustor;
     but there is not necessarily [any] privity of estate or by blood between heirs and trustees or executors."
21   *Id.*
22   Plaintiffs also rely on *Matter of Herm's Estate*, 284 N.W.2d 191, 193 (Iowa 1979). There, a
     temporary administrator of a testatrix's estate sought to set aside a deed and nullify numerous inter vivos
23   transfers of assets by the testatrix to her nephew. Following a trial, a decree was entered voiding the
     deed and transfers. *Id.* at 194. The nephew appealed, arguing that the administrator's claim was barred
24   by the "clean hands" doctrine. The nephew asserted that the administrator was in privity with the
     testatrix's nieces, who were the parties who would directly benefit from voiding the transfers at issue.
25   The doctrine of clean hands applied, he asserted, because purportedly, the nieces had improperly
     removed furnishings from the testatrix's home. *Id.* at 196. The court declined to apply the "clean
26   hands" doctrine because it found there was no privity between the administrator and the nieces. It noted
27   that "[a]n executor or administrator is an officer of the court. Such officer is not an agent of the heirs
     or beneficiaries: He or she does not derive his or her powers from them and is not subject to their
28   control. It follows that the relation of privity ordinarily does not exist between an administrator and the

24

1   in privity with her beneficiaries for purposes of judicial estoppel, the court looks to federal law. See

2   *Risetto*, 94 F.3d at 603.   In *Chicago, Rock Island & Pacific Railway Co. v. Schendel*, 270 U.S. 611

3   (1926), the United States Supreme Court considered whether a judgment against the beneficiary of an

4   estate was binding in another proceeding brought by the administrator of the estate on behalf of the

5   beneficiary.   The two actions arose out of an accident on the line of a railway company in which one

6   employee died. *Id.* at 612.   The first proceeding was initiated by the administrator of the estate for the

7   sole benefit of the surviving widow in Minnesota district court under the federal Employers' Liability

8   Law. *Id.* at 614.   The second was an administrative proceeding initiated by the railway company under

9   the Iowa Workmen's Compensation Act; the widow was made a party to this action as sole beneficiary

10  under the act.   *Id.*   The dispositive issue in both cases was whether the deceased had been engaged in

11  interstate or intrastate commerce.   Although the administrative proceeding was the second filed, the

12  arbitration panel in that proceeding ruled first, finding that the decedent had been engaged in intrastate

13  commerce.   As a result, the widow was awarded benefits; this award was subsequently confirmed in the

14  Iowa courts. *Id.*

15         The railway company introduced the final Iowa judgment in proceedings before the Minnesota

16  court and argued that it was res judicata on the issue of the interstate or intrastate nature of the

17  decedent's activities.   The district court agreed.   *Id.* at 615.   This ruling was later reversed by the

18  Minnesota Supreme Court, based, in part, on "lack of identity of parties, since under the Iowa statute

19  the right of recovery is in the beneficiary while under the federal act the right is in the personal

20  _____

21  distributees from an estate; hence, there can be no estoppel of an administrator by any action or
    non-action of a distributee." *Id.* (citations omitted).

22         Plaintiffs' final authority – American Jurisprudence 2d Estoppel & Waiver § 137 – states that
    "[w]hile generally the relation of privity does not exist between an administrator and the distributees

23  of an estate, and therefore there can ordinarily be no estoppel of an administrator by any action or

24  nonaction of a distributee, the factual situation may call for an exception." 28 AM. JUR. 2D Estoppel &
    Waiver § 137 (2007) (citing *Matter of Herm's Estate*, 284 N.W.2d 191; and *Broom's Adm'r v. National*

25  *Auto Sales*, 246 S.W.2d 1008, 1011 (Ky. 1952) (holding that an administrator was estopped from

26  maintaining an action to recover a decedent's vehicle that was fraudulently sold because the
    beneficiaries knew of the fraud and did nothing to prevent it, and "[i]n a situation like the present, the

27  beneficiaries of the estate are the real parties in interest and the only parties in interest.   The
    administrator is but their agent and would be but a mere conduit through which the recovery would flow

28  to them")).

                                              25

1   representative." *Id.*

2          The Supreme Court, in turn, reversed the Minnesota Supreme Court, holding that the

3   administrator and the widow, as beneficiary of the estate, were in privity. The Court noted that "it [was]

4   the right of the widow, and of no one else, which was presented and adjudicated in both courts." *Id.* at

5   618. This was confirmed by the fact that under the Employers' Liability Law, the administrator was

6   given statutory authority to sue only "in the right and for the sole benefit of the widow." As a result,

7   the Court observed, the widow would have been bound by any decision obtained by the administrator

8   "in accordance with the general rule that 'whenever an action may properly be maintained or defended

9   by a trustee in his representative capacity without joining the beneficiary, the latter is necessarily bound

10   by the judgment.'" *Id.* at 620 (quoting 1 FREEMAN ON JUDGMENTS (5th Ed.) § 500). The Court also

11   cautioned generally that "[i]Identity of parties is not a mere matter of form, but of substance. Parties

12   nominally the same may be, in legal effect, different; and parties nominally different may be, in legal

13   effect, the same." *Id.* (citing BIGELOW ON ESTOPPEL (6th Ed.) 145); *Calhoun's Lessee v. Dunning*, 4

14   Dall. (Pa.) 120, 121, 1 L. Ed. 767 (1792); *Follansbee v. Walker*, 74 Pa. 306, 309 (1873); and *In re Estate

15   of Parks*, 147 N. W. 850 (Iowa 1914)).

16          Applying these principles, the Court held that

17          "[i]f a judgment in the Minnesota action in favor of the administrator had been first

18          rendered, it does not admit of doubt that it would have been conclusive against the right

19          of the widow to recover under the Iowa compensation law. And it follows, as a

20          necessary corollary, that the Iowa judgment, being first, is equally conclusive against the

21          administrator in the Minnesota action; for if, in legal contemplation, there is identity of

22          parties in the one situation, there must be like identity in the other." *Id.* at 618.

23   Consequently, the Court held, the Iowa judgment had res judicata effect in the Minnesota action. *Id.*

24   at 623.

25          Federal courts have frequently cited *Chicago, Rock Island & Pacific Railway Co.* in holding that

26   a "beneficiary is bound by a judgment properly maintained or defended" by an executor, administrator,

27   or trustee. See, e.g., *Davies v. Guinn Resources Co.*, 978 F.2d 714, 1992 WL 317249, *4 (9th Cir. Oct.

28

                                                    26

1    29, 1992) (Unpub. Disp.) ("Beneficiaries of a trust are bound by a judgment against their trustee in her

2    capacity as trustee," citing *Chicago, Rock Island & Pac. Ry.*, 270 U.S. at 620); *Pollard v. Cockrell*, 578

3    F.2d 1002, 1008-09 (5th Cir. 1978) ("Virtual representation demands the existence of an express or

4    implied legal relationship in which parties to the first suit are accountable to non-parties who file a

5    subsequent suit raising identical issues. In reviewing cases decided under the doctrine, we have

6    described the types of relationships contemplated: 'estate beneficiaries bound by administrators,

7    presidents and sole stockholders by their companies, parent corporations by their subsidiaries, and a trust

8    beneficiary by the trustee," citing *Southwest Airlines Co. v. Texas Int'l Airlines,* 546 F.2d 84, 97 (5th

9    Cir. 1977)); *Southwest Airlines Co.*, 546 F.2d at 97 ("In *Aerojet*[-*General Corp. v. Askew*, 511 F.2d 710

10   (5th Cir. 1975),] most of the cases cited represent factual settings with little relevance to the Southwest

11   dispute because they involved only private parties: estate beneficiaries bound by administrators,

12   presidents and sole stockholders by their companies, parent corporations by their subsidiaries, and a

13   trust beneficiary by the trustee," citing *Chicago, Rock Island & Pac. Ry.*, 270 U.S. 611, for proposition

14   that estate beneficiaries are bound by administrators);[51] *Meador v. Oryx Energy Co.*, 87 F.Supp.2d 658,

15   665 (E.D. Tex. 2000) ("[I]f both Plaintiff and the Robbins plaintiffs are in privity with their common

16   ancestor for a claim belonging to that ancestor, it follows that they are also in privity with each other

17   regarding such a claim. Further support for this conclusion is found in *Chicago, R.I. & P. Ry. Co. v.*

18   *Schendel*, where the U.S. Supreme Court held that an estate (represented by its administrator) and

19   beneficiaries of that estate are in privity sufficient to constitute identity of parties. . . . Therefore, it

20   seems apparent that Plaintiff, the Robbins plaintiffs, and all other alleged beneficiaries of James

21   Meaders' estate should be regarded as in privity with the estate and with each other regarding claims

22   of that estate that have been filed by purported representatives of that estate," also citing *Pollard*, 578

23   F.2d at 1008-09); *United States v. Schnick*, 66 B.R. 491, 494 (W.D. Mo. 1986) ("In *Pollard v. Cockrell*,

24   578 F.2d 1002 (5th Cir. 1978), the court provides examples of the types of relationships encompassed

25   ─────────────────

26   [51]As plaintiffs note, the Fifth Circuit held in *Fouke v. Schenewerk*, 197 F.2d at 236, that "there
     is not necessarily [any] privity of estate or by blood between heirs and trustees or executors." Although

27   the court's use of the conditional "not necessarily" suggests that it was not articulating a categorical rule,
     to the extent it had any such intent, the Fifth Circuit decisions in *Southwest Airlines Co.* and *Pollard*

28   clearly reject the rule.

                                                    27

within the virtual representation doctrine: (1) presidents and sole stockholders are in sufficient privity to be deemed adequately represented by their companies; (2) parent corporations are virtually represented by their subsidiaries; (3) trust beneficiaries are adequately represented by the trustee of the trust; and (4) estate beneficiaries are bound by actions brought by the administrator").

Other federal courts have reached the same conclusion without citing *Chicago, Rock Island & Pacific Railway Co.* See, e.g., *Pelfresne v. Village of Williams Bay*, 865 F.2d 877, 881 (7th Cir. 1989) ("As noted, the Village claims that Eley and Koch, who were defendants in the state nuisance suit, held the property as trustees for a trust of which Pelfresne was a beneficiary. If this is true, Pelfresne's current action would clearly be barred – a trust beneficiary is collaterally estopped by a previous adjudication for or against a trustee, so long as the trustee and beneficiary did not have adverse interests in the conduct of the prior litigation and the trustee was authorized to prosecute and defend litigation on behalf of the trust" (citations omitted)); *Bender v. City of Rochester*, 765 F.2d 7, 12 (2d Cir. 1985) ("The administrator of a decedent's estate is in privity both with the decedent and with the decedent's beneficiaries," citing 1B MOORE'S FEDERAL PRACTICE ¶ 0.411[12] (1984)); *McCrocklin v. Fowler*, 285 F.Supp. 41, 43 (E.D. Wis. 1968) ("[T]he Board, as beneficiary of the estate of Caroline Durkee, is in privity with, and is bound by the acts of Mr. Foulkes, the administrator. Likewise, Mr. McCrocklin, as an assignee, is in privity with the Board," citing 1B MOORE'S FEDERAL PRACTICE, 2d Ed., p. 1665)); *Conney v. Erickson*, 251 F.Supp. 986, 990 (W.D.. Wis. 1965) ("It is true that there is privity between the administrator of an estate and a beneficiary of an estate in certain situations"). As a matter of federal law, therefore, estate beneficiaries are in privity with the estate's administrator or executor.

Federal cases discussing privity between beneficiaries and executors, administrators, or trustees often refer to state law. See, e.g., *Carter v. City of Emporia*, 815 F.2d 617, 620 (10th Cir. 1987) ("Kansas follows the general rule that 'a judgment binds not only the parties to the action but also those who are in privity with them,' and under Kansas law an administrator of an estate is sufficiently in privity with heirs or beneficiaries of an estate to be subject to principles of claim preclusion," citing *Wells v. Ross*, 204 Kan. 676, 680 (1970)). Thus, although privity or the lack thereof is a matter of federal law, the law of California and New York is nonetheless instructive because that is whether the

1    tax and estate proceedings at issue took place.  The duties and responsibilities of an executor or

2    administrator are most often governed by statutes and/or cases in the state where a will is being

3    probated.  To confirm its conclusion that federal law treats the executor and beneficiaries of an estate

4    as privies, therefore, the court looks to the law of the two states where Monroe's will was probated –

5    California and New York.

6          Contrary to the two cases cited by plaintiffs, California courts have determined that executors

7    and administrators are, indeed, in privity with beneficiaries. In *Luckhardt v. Mooradian*, 92 Cal.App.2d

8    501,(1949), for example, the administratrix of an estate filed claims with the American Mexican Claims

9    Commission regarding land expropriated by the government of Mexico. *Id.* at 507.  The estate that the

10   administratrix represented was adjudged not to be the owner of the land. *Id.* at 504.  Heirs of the testator

11   filed a separate lawsuit claiming an interest in the land; their claims were rejected by the California

12   Court of Appeal.  The court noted first that "[t]he administratrix and the heirs [were] in privity." *Id.* at

13   519 (citing 11B CAL.JUR. § 836).  It then held that "[a] judgment entered in an action in which an

14   administratrix of an estate of a deceased person is a party, is binding not only upon the administratrix

15   but also upon the heirs of the deceased person, even though the heirs have not been made parties to the

16   action.  The rule in this state is that the judgment concludes not only the adverse party but also all those

17   claiming under the title he represents." *Id.* (citations omitted).

18         Likewise, in *Bernhard v. Bank of America National Trust & Savings Association*, 19 Cal.2d 807

19   (1942), the California Supreme Court determined that defendant could assert a res judicata defense

20   against plaintiff by virtue of plaintiff's position as administratrix of an estate. In an earlier case, plaintiff

21   Bernhard, a beneficiary under a testatrix's will, filed objections to the executor's account because it

22   omitted the fact that the executor had transferred funds from the decedent's bank account to his own

23   account. *Id.* at 809.  The court settled the account and declared that the amount transferred to the

24   executor had been a gift from the decedent. *Id.* at 809-10.  After the executor was discharged, plaintiff

25   was appointed administratrix of the will. *Id.* at 810.  She then instituted an action against the bank

26   where the decedent's money had been on deposit, seeking to recover the funds transferred to the

27   executor on the ground that the decedent had never authorized its withdrawal. *Id.*

28         The court sustained the bank's res judicata defense.  It noted that "because the issue as to the

29

1  ownership of the money [was] identical with the issue raised in the probate proceeding, and [because]

2  the order of the probate court settling the executor's account was a final adjudication of this issue on

3  the merits, it remain[ed] only to determine whether the plaintiff in the present action [had been] a party

4  or in privity with a party to the earlier proceeding." *Id.* at 813. The court held that, because she brought

5  the action as administratrix of the estate, plaintiff "represent[ed] the very same persons and interests that

6  were represented in the earlier hearing on the executor's account. In that proceeding plaintiff and the

7  other legatees who objected to the executor's account represented the estate of the decedent. *They were*

8  *seeking not a personal recovery but, like the plaintiff in the present action, as administratrix, a recovery*

9  *for the benefit of the legatees and creditors of the estate, all of whom were bound by the order settling*

10  *the account.*" *Id.* at 813-14 (emphasis added). The court therefore concluded that "[t]he plea of res

11  judicata is . . . available against plaintiff as a party to the former proceeding, despite her formal change

12  of capacity." *Id.* at 814.[52]

13      Under New York law, an administrator or executor of a decedent's estate is a fiduciary of the

14  estate's beneficiaries.[53] See N.Y. EST. POWERS & TRUSTS LAW § 11-1.1(a) (McKinney 1992); *Knox v.*

15  _____

16  [52]Other California cases have concluded as well that the executor or administrator of a will is
    in privity with the will's beneficiaries. See, e.g., *Spotts v. Hanley*, 85 Cal. 155, 167 (1890) ("The

17  administrator is in privity with and represents both heirs and creditors, and a judgment in ejectment
    recovered by or against an administrator is an estoppel in favor or against the heir and those claiming

18  under him," citing *Cunningham v. Ashley*, 45 Cal. 485 (1873), and *McLeran v. Benton*, 73 Cal. 329

19  (1887)); see also *Estate of Baumann*, 201 Cal.App.3d 927, 935 (1988) ("We are satisfied the district
    court judgment is binding on the Baumann children as beneficiaries of the trust created by Leola's will.

20  As such, the trust is merely a derivative entity of the estate. Thus, any rights of the children in the
    property accrue solely through the estate which, of course, is bound because it was a party to the district

21  court action. '[W]hen a party acts in a representative capacity, and as such is lawfully authorized to

22  litigate the questions at issue for those whom he represents, they as well as he are bound by the
    judgment.' Moreover, '[o]ne who succeeds to the interests of a party in the property or other subject

23  of the action, after its commencement, is bound by the judgment with respect to those interests in the
    same manner as if he were a party" (citations omitted)).

24

25  [53]The notion that an executor is the fiduciary of the beneficiaries of an estate also finds support
    in California law. See *Larrabee v. Tracy*, 21 Cal.2d 645, 650 (1943) ("As executor of the estate and its

26  residuary legatee appellant had a clear duty to refrain from taking an unfair advantage of the impression
    he had created. An executor has numerous fiduciary obligations to the beneficiaries of the estate. In

27  1 Scott on Trusts (1939) it is stated (§ 6, p. 48): 'An executor is often called a trustee; and in the broad
    sense of the term so he is. * * * The relation between an executor or administrator and the legatees and

28  distributees, like that between a trustee and the beneficiaries of the trust, is a fiduciary relation'"); *Estate*

30

1   *HSBC Bank, USA*, 791 N.Y.S.2d 101, 101 (N.Y. App. Div. 2005) ("[A]n estate trustee's fiduciary duties

2   to estate beneficiaries persist until affairs of estate are finally wound up"). The fiduciary is given power,

3   *inter alia*, to act on the beneficiaries' behalf in numerous ways, including "[t]o invest and reinvest

4   property of the estate or trust under the provisions of the will, deed or other instrument or as otherwise

5   provided by law," "[t]o contest, compromise or otherwise settle any claim in favor of the estate, trust

6   or fiduciary or in favor of third persons and against the estate, trust or fiduciary," and "[t]o execute and

7   deliver agreements, assignments, bills of sale, contracts, deeds, notes, receipts and any other instrument

8   necessary or appropriate for the administration of the estate or trust." N.Y. EST. POWERS & TRUSTS LAW

9   § 11-1.1(b)(3), (13), (17); see also *Estate of Elder*, 395 N.Y.S.2d 337, 338-39 (Sur. Ct. 1977) ("Letters

10   of administration were granted to petitioner on November 14, 1972 and the same are still in full force

11   and effect. Under such letters and pursuant to EPTL 11-1.1 she was granted the right to contest,

12   compromise or otherwise settle any claim in favor of the estate, trust or fiduciary or in favor of third

13   persons and against the estate, trust or fiduciary. She had and has the right to maintain an action as

14   administratrix of decedent's estate, to recover damages for a wrongful act, neglect or default which

15   caused the decedent's death against a person who would have been liable to the decedent by reason of

16   such wrongful conduct if death had not ensued, EPTL 5-4.1. The only restrictions were and are that she

17   is restricted and prohibited from receiving any money resulting from compromise, settlement or

18   judgment as to any such action and from making any distribution thereof to any person until further

19   order of this court").

20        The Second Circuit recognized the significance of the fiduciary relationship between the

21   executor and the beneficiaries in *Bender v. City of Rochester*, 765 F.2d 7 (2d Cir. 1985). There, it held

22   that the City satisfied the requirements of due process in foreclosing on a decedent's estate by mailing

23   notices of the tax foreclosure proceedings to the decedent's last known address instead of to the

24   decedent's distributees. The court reasoned that the City was entitled to expect that the administrator

---

26   *of Hammer*, 19 Cal.App.4th 1621, 1637 (1993) ("An executor is an officer of the court and occupies a
fiduciary relation toward all parties having an interest in the estate. Executors occupy trust relations

27   toward the legatees, and are bound to the utmost good faith in their transactions with the beneficiary.
"An executor also bears a 'duty to disclose all the facts . . . and to refrain from taking an unfair

28   advantage of [the legatees],'" citing *Estate of Sanders*, 40 Cal.3d 607, 616 (1985)).

1    of the decedent's estate would take steps to put the world on notice of the property owner's death and

2    to obtain mail addressed to the decedent. *Id.* at 11.  It noted that "[b]ecause in many cases it is

3    impractical to expect a decedent's beneficiaries to act for themselves, state law provides for appointment

4    of a fiduciary who is empowered to act on their behalf." *Id.* at 11-12 (citations omitted).  In the case

5    before it, the court held, the administrator of the estate "had the legal duty to collect and preserve his

6    father's assets, to pay his father's debts, and to account for his acts to the distributees and deliver to

7    them their intestate shares." *Id.* at 12 (citations omitted). Stated differently, the court observed, "[t]he

8    administrator of a decedent's estate is in privity both with the decedent and with the decedent's

9    beneficiaries." *Id.* (citing 1B MOORE'S FEDERAL PRACTICE ¶ 0.411[12] (1984)).  Consequently, it

10   concluded that the administrator, who had sued on his own behalf as a tenant in common of the property

11   and as administrator of the estate of his father on behalf of the co-tenants, could not challenge the

12   constitutionality of the City's procedures because, as administrator, he "was legally obligated to

13   preserve the decedent's assets and, in order to protect himself from liability for breach of fiduciary duty,

14   to inform the heirs of pending proceedings." *Id.*[54]

15        The fact that there is privity between an executor or administrator and the beneficiaries of an

16   estate finds further support in the Restatement of Judgments. Section 41 of the Restatement (Second)

17   of Judgments states:

18        "(1) A person who is not a party to an action but who is represented by a party is bound

19        by and entitled to the benefits of a judgment as though he were a party.  A person is

20        represented by a party who is:

21        (a) The trustee of an estate or interest of which the person is a beneficiary; or . . .

22        (c) The executor, administrator, guardian, conservator, or similar fiduciary manager of

23        an interest of which the person is a beneficiary. . . .

24

---

25        [54]See also *Cicatello v. Brewery Workers Pension Fund*, 434 F.Supp. 950, 956 (W.D.N.Y. 1977)
26   ("Here, the trustees, in defending the state court suit, were attempting to avoid a merger they believed
     would be deleterious to the Teamsters Fund and, necessarily, deleterious to the Teamsters Fund
27   participants.  This court finds that privity exists between the trustee and the trust beneficiaries, and the
     state court decision is thus binding on them by virtue of the doctrine of res judicata," citing 1B MOORE'S
28   FEDERAL PRACTICE 0.411, at 1256 (2d ed. 1974)).

1    (2) A person represented by a party to an action is bound by the judgment even though

2    the person himself does not have notice of the action, is not served with process, or is not

3    subject to service of process." RESTATEMENT (SECOND) OF JUDGMENTS § 41 (1982).[55]

4         Based on the federal authority discussed above, the statutes and case law of California and New

5    York – the only two states in which Monroe's will was probated – and the Restatement (Second )of

6    Judgments, the court is not persuaded by plaintiffs' argument that there was no privity between Frosch,

7    the executor of Monroe's estate, and the beneficiaries of that estate.

8              **b.     Whether Frosch Was Acting on Plaintiffs' Behalf in the California**

9                       **Tax Proceedings**

10        Having determined that there is privity as a legal matter between an executor and an estate's

11   beneficiaries, the court must next examine whether, as a matter of fact, Frosch was representing

12   plaintiffs' interests in the California tax proceedings. See *Bonilla Romero*, 836 F.2d at 43 ("Whether

13   a party is virtually representative of a non-party is a question of fact determined on a case-by-case

14   basis").

15        It is clear that Frosch submitted an affidavit to the inheritance tax appraiser in his capacity as

16   executor of the estate – indeed, the affidavit so states.[56]  Furthermore, as it was the estate that was to be

17   taxed and not Frosch in his individual capacity, it is clear that Frosch was acting on behalf of the estate

18   and its beneficiaries in seeking to have state inheritance tax authorities find that Monroe was a non-

19   resident of California when she died.  Such a finding was necessary to ensure that California would tax

20   only Monroe's California property, and not the entirety of her estate.

21        As noted, plaintiffs do not dispute that they are the ultimate beneficiaries under Marilyn

22

23
_____

24        [55]The Restatement (First) of Judgments, which was in effect at the time of Monroe's death, states
     that "a person who is not a party but who is in privity with the parties in an action terminating in a valid
25   judgment is, to the extent stated in §§ 84-92, bound by and entitled to the benefits of the rules of res
     judicata." RESTATEMENT (FIRST) OF JUDGMENTS § 83 (1942).  It further states that "[w]here a judgment
26   is rendered in an action in which a party thereto properly acts on behalf of another, the other is (a) bound
     by and entitled to the benefits of the rules of res judicata with reference to such of his interests as at the
27   time are controlled by the party to the action." *Id.*, § 85.

28        [56]Soni Decl., Exh. G.

                                    33

1   Monroe's will. Apart from arguing that privity does not exist as a matter of law, plaintiffs have raised

2   no triable issues regarding the fact that Frosch was acting in a representative capacity for the benefit of

3   the   estate   and   its   beneficiaries   in   the   California   tax   proceedings.[57]   Stated

---

[57]Plaintiffs argued at the hearing on this motion that Frosch should not be deemed to have been in privity with the beneficiaries of the estate because the beneficiaries later argued that he had mismanaged the estate. Plaintiffs assert that, in particular, Dr. Marianne Kris objected to Frosch's handling of the inheritance tax proceedings. They cite a petition to compel final accounting filed by Kris in the Surrogate's Court in March 1980. (This petition was submitted in support of plaintiffs' separate motion for partial summary judgment, which was filed after defendants' motion for reconsideration.) In the petition, Kris contends that during the more than seventeen years of administration of the estate, she had not received adequate information regarding the estate or her entitlements as a beneficiary. (See Confidential Declaration of David Strasberg in Support of Marilyn Monroe LLC's and Anna Strasberg's Motion for Partial Summary Judgment ("Strasberg Decl."), Exh 16). Kris complained that Frosch "ha[d] retained possession of assets of the Estate that [were] not required for the trust or for any debt or expense, to the detriment of the legatees and the Estate." (*Id.*).

As can be seen, Kris's objection did not concern Frosch's administration of tax issues in general or the inheritance tax proceeding in particular. To the contrary, Kris apparently asserted that she was entitled to receive her distribution from the estate because she understood "that the California tax proceedings had been completed" and that "all outstanding debts of the Estate [had] been satisfied and all estate taxes had been paid by the end of 1976." (*Id.*). Far from reflecting an objection to the manner in which Frosch handled the tax proceedings, these statements demonstrate Kris's acquiescence in Frosch's approach. The only complaint Kris made respecting taxation was that Frosch had "failed during several tax years to make a distribution of Estate income to those entitled to receive the same, . . . with the result that the Estate was obliged to pay unnecessary income taxes and with the further result that assets of the Estate were unnecessarily depleted." (*Id.*) This criticism regarding tax liability resulting from Frosch's failure to distribute assets does not show, as plaintiffs contend, that Kris objected to the inheritance tax proceeding that defendants cite as grounds for judicial estoppel. Plaintiffs, therefore, have not successfully raised triable issues regarding the fact that Kris, one of MMLLC's predecessors-in-interest, was not in privity with Frosch in the California inheritance tax proceedings.

Plaintiffs also argued at the hearing that Frosch did not act for the benefit of Lee Strasberg, another predecessor-in-interest, in connection with a later dispute regarding transparencies of Monroe photographs taken by Tom Kelley. Strasberg claimed that he was entitled to the transparencies because Monroe had purchased them before her death, and disputed Kelley's claim that he was the owner. Plaintiffs cite two affidavits Frosch submitted to the Surrogate's Court, which were offered as exhibits to defendants' initial motion for summary judgment and cited in plaintiffs' opposition to that motion.

In the first affidavit, Frosch stated that he had no basis to dispute Kelley's assertion that the transparencies were owned by him and had simply been loaned to Monroe before her death. (Declaration of Greg T. Hill Submitted in Support of The Milton H. Greene Archives, Inc.'s and The Tom Kelley Studios, Inc.'s Motion for Summary Judgment ("Hill Decl."), Exh. 19). Ultimately, however, Frosch took "no position in relation to the ownership of the said transparencies but pray[ed] the Court . . . reach a decision in regard to the ownership thereof, so they [could] be distributed by the Estate to their rightful owner." (*Id.*). In the second affidavit, Frosch reiterated that a "question exist[ed]

34

differently, plaintiffs have not shown that triable issues remain as to whether Frosch was acting for *their* ultimate benefit. The court therefore concludes that MMLLC and Anna Strasberg are in privity with Frosch.[58]

---

as to whether said transparencies were owned by Miss Monroe at the time of her death, and [whether] they were assets of the Estate." (*Id.*, Exh. 20). Strasberg apparently relied on the statements of Monroe's friends and associates, who advised him that Monroe had purchased the transparencies from Kelley. (*Id.*). Not being a witness to the alleged purchase, Frosch was unable to represent to the court that Strasberg was the rightful owner of the transparencies. While Frosch does not appear to have advocated for Strasberg's interests in connection with this dispute, he clearly did not, as plaintiffs claim, act contrary to Strasberg's interests. Frosch merely stated that, lacking sufficient facts, he was unable to take a position as to ownership. (See *id.*, Exh. 19). As respects this transaction as well, therefore, plaintiffs have failed to show that Frosch acted contrary to the interests of the estate and its beneficiaries, such that a finding of privity would be inappropriate.

[58]This conclusion finds support in cases applying the somewhat analogous "duty of consistency," which "serves to prevent inequitable shifting of positions by taxpayers" in proceedings before the Internal Revenue Service. See *Janis v. Commissioner of Internal Revenue*, 461 F.3d 1080, 1085 (9th Cir. 2006). The duty "'is usually understood to encompass both the taxpayer and parties with sufficiently identical economic interests.'" *Id.* (quoting *LeFever v. Comm'r*, 100 F.3d 778, 788 (10th Cir. 1996)). The Ninth Circuit set forth the elements necessary for application of the duty of consistency in *Estate of Ashman v. Commissioner*, 231 F.3d 541 (9th Cir. 2000):

> "(1) A representation or report by the taxpayer; (2) on which the Commission [er] has relied; and (3) an attempt by the taxpayer after the statute of limitations has run to change the previous representation or to recharacterize the situation in such a way as to harm the Commissioner. If this test is met, the Commissioner may act as if the previous representation, on which he relied, continued to be true, even if it is not. The taxpayer is estopped to assert the contrary." *Id.* at 545.

In *Janis*, the court applied the duty of consistency to a party, Conrad, who had "overlapping and co-extensive interests" as a beneficiary and co-executor of an estate. *Janis*, 461 F.3d at 1085. "As an heir, Conrad had an economic interest in reducing the value of the taxable estate, and as co-executor, he had privity of interest with the estate, thus making the duty of consistency appropriate under these circumstances." *Id.* at 1085-86 (citing *LeFever*, 100 F.3d at 789 (holding that heirs to an estate are bound by the duty of consistency when they have an economic interest in the matter and sufficient privity with the executor of an estate); *Hess v. United States*, 537 F.2d 457, 464 (Ct. Cl. 1976) (holding that a taxpayer who had a sufficient economic interest in an estate and a trust was bound by an earlier representation); *Letts v. Comm'r*, 109 T.C. 290, 298-99 (U.S. Tax Ct. 1997) (applying the duty of consistency to bind taxpayers who were heirs and fiduciaries of an estate to representations made on estate tax returns)). The court reasoned that "Conrad was not only a beneficiary of the estate – giving him ample economic interest in minimizing the estate taxes – he was also a co-executor of the estate – giving him a clear fiduciary duty. As co-executor and beneficiary of the estate, Conrad had an incentive to minimize the value of the collection, thereby minimizing the estate's tax and maximizing his inheritance." *Id.* at 1086; see also *LeFever*, 100 F.3d at 788-89 ("[T]he duty of consistency is usually understood to encompass both the taxpayer and parties with sufficiently identical economic interests. In this case, Petitioner William LeFever was the executor of Decedent's estate. He filed the special use

35