UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
SHAW FAMILY ARCHIVES, LTD., EDITH MARCUS, :
and META STEVENS,                                                 :
                                                                  :
                                                                  :
                              Plaintiffs,         :  Index No. 05 CV 3939 (CM)
                                                                  :
       -against-                                                  :
                                                                  :
                                                                  :
CMG WORLDWIDE, INC., an Indiana Corporation       :
and MARILYN MONROE, LLC, a Delaware               :
Limited Liability Company,                                        :
                                                                  :
                              Defendants.         :
                                                                  :
-------------------------------------------------------------------X


# THE SHAW FAMILY'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR A BOND PURUSANT TO LOCAL RULE 54.2


                                    LAW OFFICES OF CHRISTOPHER SERBAGI
                                    488 Madison Avenue, Suite 1120
                                    New York, New York 10022
                                    Tele: (212) 593-2112
                                    Fax: (212) 308-8582

                                    Attorneys for the Plaintiffs

On the Brief:
Christopher Serbagi, Esq.
David Marcus, Esq.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT......................................................................................1

ARGUMENT...................................................................................................................6

I.   AMPLE CASE LAW PERMITS THE SHAW FAMILY'S REQUEST FOR A
     BOND AT THIS STAGE OF THE PROCEEDING...............................................6

II.  THE RELEVANT FACTORS WEIGH IN FAVOR OF A LARGE BOND..........7

     A.   Despite The Defendants' Present Representation That Discovery Has Been
          Ordinary," Defendants Formerly Told The Court That Discovery Has Been
          Extensive"........................................................................................................7

     B.   The Defendants Have Not Complied With The Court's Prior Orders...........8

     C.   The Merits of Defendants' Claims Are All Weak............................................9

     D.   CMG's Gross Marilyn Monroe Revenues Do Not Preclude The Imposition
          of a Bond Here..................................................................................................9

     E.   Defendants Are Both Non-New York Entities................................................12

III. THE SHAW FAMILY IS ENTITLED TO ITS ATTORNEY'S FEES FOR ALL
     ASPECTS OF THIS CASE....................................................................................12

     A.   The Defendants Assertion that the Shaw Family's Legal Fees Were Only
          $900,000 Is Absolutely False...........................................................................12

     B.   The Shaw Family Is Entitled To The Vast Majority Of Its Legal Fees
          Pursuant to the Indiana Right of Publicity Statute, Which Includes The
          Domicile And Constitutional Briefing.............................................................13

     C.   The Shaw Family Is Entitled To Its Fees For the Public Domain Related
          Briefing Under the United States Copyright Act.............................................15

     D.   The Shaw Family Did Not Include Its Negligible Fees In Connection With
          Its Withdrawn Claims.......................................................................................16

CONCLUSION................................................................................................................16

## TABLE OF AUTHORITIES

**CASES:**

Baker v. Urban Outfitters, Inc.,
    01 Civ. 5440 (LAP), 2004 U.S. Dist. LEXIS 22737 (S.D.N.Y. Nov. 3., 2004)....................6

Selletti v. Carey,
    96 Civ. 0016 (DC), 1997 U.S. Dist. LEXIS 7063 (S.D.N.Y. May 21, 2007)..............7, 9, 10

Watson v. E.S. Sutton, Inc.,
    02 Civ. 2739 (KMW), 2006 U.S. Dist. LEXIS 88415 (S.D.N.Y. Dec. 6, 2006)................6

**STATUTES:**

28 U.S.C. § 1927..................................................................................8

S.D.N.Y. R. 54.2 ............................................................................ 6, 7, 13

Shaw Family Archives, Ltd., Bradford Licensing Associates, LP., Meta Stevens, and Edith Marcus (the "Shaw Family") respectfully submit this reply memorandum of law in further support of a bond, and for such other relief as the Court may deem just and proper.

## PRELIMINARY STATEMENT

By reading the Defendants' memorandum, one would think that this is a litigation that the Shaw Family sought. To the contrary, the Shaw Family did everything possible to avoid this litigation, including, as the Court has recognized in its May 16, 2006 Order, directing its licensees not to sell any product in Indiana. It was Strasberg's and Roeslers' unmitigated desire to monopolize every aspect of the Marilyn Monroe market that caused it to sue the Shaw Family in Indiana over the use of a Marilyn Monroe image in a documentary. The Shaw Family has expended many millions of dollars as a result of Defendants' vexatious conduct, and they should now post a bond to ensure that they have the funds to cover the statutorily mandated award of attorneys' fees against it. Attorneys' fees are mandated by the Indiana Right of Publicity Statute, which includes the majority of the Shaw Family's fees in this case. The Shaw Family is also likely to obtain its attorneys' fees under the United States Copyright Act because the discovery revealed that the Defendants fabricated facts concerning standing in the Third Amended Complaint. While the Defendants would have the Court believe it is too late for a bond, the relevant case law supports an award of a bond at exactly this stage of the proceeding, especially since Judge Morrow just characterized Defendants as "fast and loose" litigants.

It is hard to imagine a case where a large bond would be more appropriate. First, it is difficult to fathom that Defendants' attorneys never advised them that they could not possibly own a right of publicity in Marilyn Monroe. But putting that aside, the documents reveal Anna Strasberg and Mark Roesler always knew that Marilyn Monroe died a New York domiciliary and that they had no right of publicity in Marilyn Monroe as a result. In 1990, Anna Strasberg's licensing agent

warned her that if anyone obtained the New York probate files, "there may be no more licensing revenue from Marilyn Monroe." Nevertheless, Strasberg and CMG vigorously policed the market and improperly demanded licensing fees from anyone who wanted to use Marilyn Monroe for virtually any purpose. By their own admission, they earned over thirty million dollars on a right they never had. They repeatedly threatened the Shaw Family and Bradford with having to pay Gibson Dunn & Crutcher's attorneys' fees, which were undoubtedly astronomical and would have devastated the Shaw Family.

The Defendants plan to quickly oppress the Shaw Family took an unexpected turn when the case was transferred from CMG's home base in Indiana, where they hoped to rely on a statute Roesler helped to pass. By Order dated May 19, 2006, the Court clearly held that under Indiana law, the situs of Marilyn Monroe's publicity rights is determined by her legal domicile. Nevertheless, the Defendants ignored that order and argued in their October 2006 summary judgment papers that the Indiana Statute magically provided Marilyn Monroe a right of publicity, no matter what this Court stated. They also told this Court that Marilyn Monroe died a California domiciliary, and secreted the very Monroe probate documents they knew contradicted this claim. When the Shaw Family uncovered the Defendants' secretion of the domicile documents, the Court chastised the Defendants and said that it would investigate any possible "chicanery" at the conclusion of the case.

On May 2, 2007, the Court issued a ruling that correctly ruled what everyone in the market knew for decades, which is that there is no right of publicity in Marilyn Monroe. The Court characterized the Defendants' arguments as "attenuated analogies," "doubly doomed," and "unpersuasive." But not even this Court's rulings deterred Defendants. They stated in the press that they were "baffled" by the Court's decision and they conducted business as if the Court never

2

issued its ruling. By way of one example, even today, Roesler continues to assert on his web site that there is a right of publicity in Marilyn Monroe.

After the Court's May 2, 2007 Order, the Shaw Family would have gladly walked away from the litigation and continued to do what it properly did before the litigation – license its images. But when the Shaw Family moved for its attorneys' fees, the Defendants refused to pay those fees on grounds that the Court had not yet issued a final judgment. In order to avoid paying the Shaw Family's relatively minor fees, the Defendants set out to abrogate the Court's decision. The Shaw Family learned that by June 2007, Defendants hired a lobbying firm in Sacramento to change California's right of publicity law. Because these efforts appeared to be working, the Shaw Family amended its Complaint in August 2007, as a purely defensive measure, and requested that the Court declare that Marilyn Monroe died a New York domiciliary. By October 2007, Anna Strasberg not only convinced the California legislature to pass new right of publicity legislation, she convinced them to "abrogate" this Court's and Judge Morrow's well reasoned decisions and "deem" that Marilyn Monroe died with a vested right of publicity, and to make Shaw Family's acts that were legal when they occurred, retroactively illegal. Thus, just two months after the Court's May 2, 2007 Decision and Order, the Shaw Family was potentially liable for millions of dollars in attorneys' fees under the Indiana Statute. Thus, to the extent the Shaw Family could have requested a bond after the Court's May 2, 2007 Decision and Order, that request was rendered fruitless only five months later, when it was the Shaw Family that faced liability.

If there was any doubt of Defendants' efforts to wield the new California legislation against the photographers, they requested that Judge Morrow reconsider her May 14, 2007 Order, which she subsequently did. Judge Morrow also held that the California statute was constitutional, albeit on briefing that did not cover the due process issues currently before the Court. The impact of Defendants' effort was to put the Shaw Family in a worse position than it was before the litigation

commenced. Unless the Shaw Family was able to obtain a ruling that Marilyn Monroe died a New York domiciliary and/or that the California statute was unconstitutional, it would be subject to millions of dollars in attorneys' fees under the Indiana Statute. This was a serious threat, especially since Mark Roesler had threatened the Shaw Family with these fees in the past. It is for this reason that all the attorneys' fees that the Shaw Family expended in litigating the domicile question and the constitutional question were purely defensive and inextricably tied to Defendants' right of publicity claim under the Indiana Statute. Defendants' current efforts to argue that the domicile and constitutional issue are somehow affirmative claims that are not tied to the right of publicity cause of action are silly, as they well know. It was the Defendants who chose to seek the abrogation of this Court's ruling and to revive their claim under the Indiana Statute – they can hardly now complain that the Shaw Family had to take defensive measures to ensure that Defendants' efforts to abrogate the Court's May 2, 2007 Decision and Order were ineffective.

Despite their former overtures, Defendants' attorneys refused to settle and stated that Anna Strasberg was "emboldened" by the newly passed California legislation and all prior offers to settle the litigation were off the table. When the Shaw Family would not settle on the terms that Defendants' demanded, Defendants threatened to attack the Shaw Family's copyrights and threatened that we would have to pay their attorneys' fees.

It was only on May 17, 2008 that Judge Morrow held that the Defendants played "fast and loose" by misrepresenting the location of Ms. Monroe's domicile to the California tax authorities or to the court. Moreover, as the accompanying Shaw Family motions on the public domain and preclusion issue demonstrate, discovery revealed that Defendants' former attorneys fabricated the existence of a justiciable controversy in the Third Amended Complaint. Defendants declined to substantiate those claims in a contention interrogatory and their 30(b)(6) witnesses could not provide any basis for a justiciable controversy either. They relied on documents that they produced

4

either after discovery or in connection with summary judgment briefing itself. Their attorney directed a witness not to answer a question about Defendants' existing intellectual property by stating that it was irrelevant to the Third Amended Complaint. However, on summary judgment, Defendants claimed that they "intended" to use public domain Monroe photographs along with the very intellectual property they formerly asserted was irrelevant. They misrepresent fact after fact, which is all set forth in the concurrent preclusion and domicile briefing.

Accordingly, to the extent that a bond was proper after the Court's May 2, 2007 Order, it was a matter of weeks before Defendants convinced the California legislature to abrogate that Order. The Shaw Family faced liability under the Indiana Statute and are still fighting to declare it invalid on Constitutional grounds. Despite the Defendants' false representation of the applicable case law, there is ample case law in this Circuit that supports the imposition of a bond at this stage of the proceedings. Virtually ever factor that courts consider support the imposition of a bond, especially in light of Defendants' bad acts and pursuit of baseless claims in this case. Had the Defendants accepted the Court's May 2, 2007 Order, this case would have been over long ago. They could have paid the relatively minor fees they owed at that time and then sought to change the laws after the conclusion of the case. But instead of paying what they owed, they decided to keep the case open, expressly refused to consent to a final judgment and sought to abrogate the Court's May 2, 2007 Order in California and New York. It was Defendants that kept the case alive and Defendants who insisted on maintaining their claim under the Indiana Statute. They cannot now legitimately complain that the Shaw Family had to take measures to defend itself accordingly.

# ARGUMENT

## I. AMPLE CASE LAW PERMITS THE SHAW FAMILY'S REQUEST FOR A BOND AT THIS STAGE OF THE PROCEEDING

The Defendants argue that it is too late for the Shaw Family to request a bond. Defs' Mem. 1, 3. The case law provides no support for Defendants' position, especially under the unusual facts of this case.

Whether to impose a bond in the beginning of a case, after discovery, or after final judgment depends on the facts of the specific case. Some cases in the District have awarded a bond after the close of discovery and after the court decided summary judgment motions. Baker v. Urban Outfitters, Inc., 01, Civ. 5440 (LAP), 2004 U.S. Dist. LEXIS 22737, *10 (S.D.N.Y. Nov. 3., 2004). In the Baker case, Judge Preska Ordered a bond in a copyright infringement case based on a variety of factors, the most prominent of which was the Defendants' pursuit of weak claims throughout the case. Id. at * 1-*9. Because the court deemed it likely that the defendants would be required to pay the plaintiffs attorneys' fees under the Copyright Act, it ordered a bond as security for costs, even though discovery was closed and summary judgment motions decided. Id. at *10. Likewise, in Watson v. E.S. Sutton, Inc., 02 Civ. 2739 (KMW), 2006 U.S. Dist. LEXIS 88415 (S.D.N.Y. Dec. 6, 2006), Judge Kimba Wood imposed a substantial bond of under Local Rule 54.2 after a jury trial under Title VII of he Civil Rights Act. Id. at *7-*8. Thus, there is no legal impediment to imposing a substantial bond after discovery has closed. Judge Preska and Judge Wood imposed Local Rule 54.2 bonds after summary judgment and after trial, respectively.

Accordingly, the only question is whether the facts of this specific case warrant the imposition of a bond now. A bond is warranted because it was Defendants who insisted in their relentless pursuit to render the Shaw Family liable under the Indiana Statute. Defendants formerly refused to pay the Shaw Family's attorneys' fees under the Indiana Statute on grounds that the request was premature, all the while seeking to abrogate the Court's decision in the interim. Both

6

this Court and Judge Morrow have ruled that Defendants have no right of publicity in Marilyn Monroe and Judge Morrow has recently characterized Defendants as "fast and loose" litigants, who have either misled the California tax authorities or the court. Now is precisely the time when Defendants should post a bond.

**II.     THE RELEVANT FACTORS WEIGH IN FAVOR OF A LARGE BOND**

Defendants would like the Court to believe that it is somehow restricted in making its decision of whether to award a bond or not. To the contrary, the Court has broad latitude to do what it feels is just and necessary under the facts of each case. Selletti v. Carey, 96 Civ. 0016 (DC), 1997 U.S. Dist. LEXIS 7063, *15 (S.D.N.Y. May 21, 2007) (holding that "under Local Rule 54.2, an individual determination is made by the court on the facts of each case").

**A.     Despite The Defendants' Present Representation That Discovery Has Been "Ordinary," Defendants Formerly Told The Court That Discovery Has Been "Extensive"**

Defendants argue that discovery "has been by no means out of the ordinary" and that the Shaw Family has "dramatically overstated discovery." Defs' Mem., at 7-8. But, in contrary representations that are reminiscent of the domicile briefing, it was only a few months ago when Defendants told this Court another story. In particular, in its opposition to the Shaw Family's motion to dismiss its claims "without prejudice," Defendants repeatedly characterized discovery as "extensive." Second Declaration of David Marcus, dated April 9, 2008 ("Second Marcus Decl."), at ¶ 2, Ex. A, at 15. In fact, Defendants devoted pages and pages of its brief to providing examples of how discovery has been anything but what they now characterize as "ordinary." Id. at 1, 7-9, 15-18. In the very first page of their opposition brief, Defendants lead with the following statement:

> Defendants have spent hundreds of thousands of dollars and countless attorney and paralegal hours preparing and responding to dozens of document requests and interrogatories, reviewing and producing over sixty-five thousand pages of documents, reviewing over a thousand pages of documents produced by Plaintiffs, preparing for depositions,

7

> appearing at numerous pretrial conferences, and briefing a lengthy motion to dismiss.

Id., at 1. Of course, the time that the Shaw Family spent on discovery is greater because its resources are far less and the defendants produced sixty-five thousand pages of documents, all of which the Shaw Family had to review. By way of one of many additional examples, Defendants state "[a]ll of the above discovery was conducted under Court-ordered discovery deadlines, and the parties appeared for **seventeen separate pretrial conferences before Judge Fox**." Defs' Mem., at 8 (emphasis added). Now, when it does not favor Defendants to state that discovery has been extensive, Defendants state "Defendants current counsel are aware of only two such in-person hearings . . ." Defs' Mem., at 8. That Defendants expressly stated that discovery has been "extensive" and now state that discovery is "by no means out of the ordinary" is a typical of how they have litigated this case. The problem for the Shaw Family is that Defendants' contrary judicial representations have cost the Shaw Family many millions of dollars. This is precisely why a large bond is warranted, and why the Shaw Family is entitled to its attorneys' fees under the United States Copyright Act, the Indiana Right of Publicity Statute, 28 U.S.C. § 1927, and the Court's inherent authority.

    **B.**    **The Defendants Have Not Complied With The Court's Prior Orders**

Defendants argue that they have complied with the Court's prior Orders. Defs' Mem. Even that representation is false. On May 2, 2007, the Court ruled that Defendants had no right of publicity in Marilyn Monroe. Despite that Order, Defendants have repeatedly represented that they do have a right of publicity in Marilyn Monroe. For example, on November 21, 2007, CMG wrote to one of the Shaw Family's licensees and stated that MMLLC owns a publicity right in Marilyn Monroe. Second Marcus Decl., at ¶ 3, Ex. B. Even today, Mark Roesler maintains on his web site that Defendants have a right of publicity in Marilyn Monroe. Id., at ¶ 4, Ex. C.

8

### C. The Merits of Defendants' Claims Are All Weak

Defendants do not argue that their claims are strong. Defs' Mem., at 9-10. Instead, the Defendants contest the extent to which the Shaw Family is entitled to its fees, which is another question. The Shaw Family already presented its arguments as to why Defendants' claims were weak in its opening memorandum. Shaw Bond Mem., at 7-9. Because the Defendants have not contested those statements, the Shaw Family respectfully refers the Court to what is has already stated and to its fully briefed domicile, public domain, and preclusion briefs. Selletti, 1997 U.S. Dist. LEXIS 7063 at *15 (where "the merits of plaintiffs case [are] questionable, security bonds are considered appropriate"). The merits of Defendants' claims are very weak.

### D. CMG's Prior Marilyn Monroe Revenues Do Not Preclude The Imposition of a Bond Here

Defendants rely entirely on the declaration of Mark Roesler in support of the argument that CMG alone could satisfy the potentially large judgment against it. Defs' Mem., at 4-5. The Roesler declaration is far too generalized to reach the conclusion that CMG would or could satisfy a large judgment against it and MMLLC. The absence of any testimony by anyone at MMLLC is highly significant and speaks volumes about their inability to satisfy any judgment.

Roesler provides the history of CMG and a client roster. As to the client roster, Roesler provides no information whatsoever as to the yearly revenue CMG obtains from those clients, the costs associated with servicing those clients, or the net income available to CMG at the end of the day. And while Roesler characterizes those clients as active, he does not explain what that means, e.g. the extent that those clients provide revenue for CMG on an ongoing basis. In short, the Shaw Family could provide a long list of clients, but that does not mean that those clients consistently earn revenue for the Shaw Family. Thus, the client list that CMG provides conveys no useful information whatsoever as to the ability of CMG to satisfy a large judgment against it. CMG also

provides a bar graph of Marilyn Monroe "gross" revenue by year. Again, CMG does not explain the costs and expenses associated with generating that revenue and the net profit left for CMG.

Roesler does not tell the Court what percentage of its overall revenues is based on Marilyn Monroe licensing. This is an important omission because without that information, the Court has no way to ascertain the manner in which CMG's revenue will decrease when its clients finally realize that Defendants never had a right of publicity in Marilyn Monroe. Roesler does not even tell the Court what percentage of its purported 2007 Marilyn Monroe revenues CMG earned prior to the Court's May 2, 2007 Decision and Order. And while Roesler tries to make the Court believe that it obtains significant revenues on Monroe trademark and copyright licensing, it is well known that these revenues are paltry, which is why he did not provide that information for the Court. Thus, it is highly likely that the vast majority of the Monroe licensing revenue is now virtually non-existent and is likely to further decrease by the time the Court enters final judgment. Indeed, this is exactly what David Strasberg indicated during MMLLC's 30(b)(6) deposition, where he stated that Marilyn Monroe licensing revenues have significantly decreased. Shaw Bond Opening Mem., at 6. See Selletti, 1997 U.S. Dist. LEXIS 7063, at *15 (holding that circumstances warrant the imposition of security for costs and attorneys' fees where the precise financial condition of a party is unclear).

Moreover, the Shaw Family is not the only party to whom Defendants will owe money under the Indiana Statute. Judge Morrow also recently held that the Defendants had no right of publicity in Marilyn Monroe, which means that the fees that these Defendants owe are astronomical. The Shaw Family's fees and costs alone are approximately three million dollars at the time the Shaw Family filed the bond motion, and it is represented by two solo practitioners. The fees in California are at least comparable, if not more.

Finally, quite frankly, even if CMG had the money to pay these high fees, the Shaw Family has excellent reason to believe that CMG (and MMLLC) would do whatever is possible to avoid

10

paying. They have already shown an inclination to avoid paying fees by refusing to pay the Shaw Family's fees after the Court's May 2, 2007 Order. Instead, they sought to change the law in the in the middle of the case. That the Defendants did not wait until final judgment to seek to abrogate the Court's May 2, 2007 Decision reveals their desire to escape the consequences of their conduct. Moreover, the Shaw Family has excellent reason not to trust that Mark Roesler will generously cover all the fees for which both Defendants are potentially liable. Roesler testified at his deposition that the members of the Shaw Family were his friends. Second Marcus Decl., at ¶ 5, Ex. D, at 138-139. Without any notice whatsoever, Roesler sued his "friends" in a distant forum and threatened them with attorneys' fees. They secreted key domicile documents at the critical juncture of the case, consistently misrepresented where they believed Marilyn Monroe was domiciled, and vexatiously litigated this case while they simultaneously sought relief from this Court's ruling in the legislatures. That Defendants are currently pushing the New York Legislature for a similar result and continue to threaten the Shaw Family with that legislation is all the more reason for the Defendants to put up a large bond now. Given the lack of basis for this case in the first instance and Judge Morrow's characterization of Defendants as "fast and loose," these are not parties that can be trusted to satisfy the potentially large judgment against them.

In short, the absence of any testimony by MMLLC as to its ability to satisfy a judgment speaks volumes and confirms their attorneys' consistent representations that they may run out of money. As for CMG, the evidence that they provided is meaningless, for all the reasons discussed above. After weathering the years of baseless litigation and threats that Defendants, Gibson, Dunn, & Crutcher and now Loeb & Loeb has levied upon the Shaw Family, the Shaw Family is at least entitled to the assurance that these Defendants will have the funds to satisfy the statutorily mandated judgment against it.

### E. Defendants Are Both Non-New York Entities

It is true that the Defendants are not based outside the United States, but that they are based in Indiana and Delaware would undoubtedly contribute to the difficulty that the Shaw Family would encounter in collecting against them. And given that the Court is permitted to consider the facts of each case in determining whether a bond is appropriate, there is no reason why the Defendants location outside of New York would not favor the Shaw Family.

### III. THE SHAW FAMILY IS ENTITLED TO ITS ATTORNEY'S FEES FOR ALL ASPECTS OF THIS CASE

The Defendants seem to think that the Shaw Family should have provided hundreds of pages of invoices along with this motion for the Court's review. Defs. Mem, at 10. None of the reported bond cases in this Circuit or Local Rule 54.2 require that the Shaw Family provide its invoices along with its opening brief. The Shaw Family calculated its attorneys' fees to date and provided that number for the Court. The Shaw Family would be happy to provide its invoices for the Court's consideration if it so requires. One thing is for certain, if the Court asks Defendants the attorneys' fees the Shaw Family would have had to pay had it lost under the Indiana Statute, it would far exceed the approximately 3 million the Shaw Family accrued. There is something inherently unfair that Roesler expressly threatened the Shaw Family with having to pay attorney's fees of Gibson Dunn & Crutcher, one of the most expensive firms in the world, yet now balk at having to pay fees that are a small fraction of that amount. Roesler and Strasberg lived by the sword, so they should have no problem with what the Shaw Family has requested.

#### A. The Defendants Assertion that the Shaw Family's Legal Fees Were Only $900,000 Is Highly Misleading

As set forth in the accompanying declarations of Christopher Serbagi and David Marcus, Ms. Colbath misrepresents the significance of the $900,000 figure that the Shaw Family provided. She does not appear to understand what that number reflected or, especially, for what purposes it

was offered. But Ms. Colbath did expressly promise to keep that number confidential – a promise she blatantly broke. Because Ms. Colbath's representations as to what was stated in settlement discussions has no bearing on any issue before the Court, the Shaw Family sees no point in disclosing the entire context of those discussions here. Suffice it to say that the Shaw Family's counsel provided that number long ago and it did not reflect the actual value of the work the Shaw Family's attorneys conducted.

Despite Ms. Colbath's decision to reveal a confidential settlement communication, the only relevant issue is the actual value of the legal work that the Shaw Family conducted, which the Court is free to evaluate for itself if it so chooses. Accordingly, the Shaw Family is ready to provide for the Court detailed invoices for all legal work its attorneys have conducted in this case.

**B.     The Shaw Family Is Entitled To The Vast Majority Of Its Legal Fees Pursuant to the Indiana Right of Publicity Statute, Which Includes The Domicile And Constitutional Briefing**

Defendants argue that the Shaw Family is not entitled to its legal fees for work that it conducted in support of its request that the Court declare Marilyn Monroe a New York domiciliary or for work involved in requesting the Court to declare the California statute unconstitutional. As the Defendants well know, those claims were defensive measures that were inextricably tied to its defense against Defendants' assertion of the Indiana Right of Publicity statute.

Defendants would have the Court believe that the many hundreds of thousands of dollars that the Shaw Family spent on the domicile issue was an academic exercise, but it was anything but. On May 2, 2007, the Court ruled that Defendants had no right of publicity in Marilyn Monroe. In June of 2007, the Shaw Family learned that the Defendants were seeking to abrogate the Court's decision in the California and New York legislatures, so it amended its complaint to request that the Court declare Marilyn Monroe died a New York domiciliary. The Shaw Family took that action for obvious defensive reasons. It soon became necessary to litigate the domicile issue because the

13

Defendants convinced the California Legislature to abrogate this Court's May 2, 2007 Decision and somehow "deem" that Marilyn Monroe died with a right of publicity. Judge Morrow also held that the California statute was constitutional, albeit in the absence of the proper briefing currently before this Court. Had the Shaw Family not asserted its domicile cause of action, it would have been potentially subject to millions of dollars in attorneys' fees under the Indiana Statute. If there is any doubt that this is what the Defendants intended to do, we can look at their request of Judge Morrow to reconsider her May 14, 2007 decision, which is exactly what she did. The only thing that saved the California Defendants (and the Shaw Family) from millions in attorney's fees under the Indiana Statute is that Judge Morrow recently held that the Defendants are estopped from asserting that Monroe died anything but a New York domiciliary. In light of this history, Defendants' have no basis to argue that the Shaw Family is not entitled to its fees under the Indiana Statute for the domicile briefing.

Defendants themselves admitted that the domicile issue was tied to the Indiana Statute they asserted, which is exactly why they withdrew their motion to dismiss the Shaw Family's request for a declaratory judgment action. Defendants withdrew their motion immediately after the Shaw Family stated that the domicile was obviously relevant in light of the passage of California Legislation. Second Marcus Decl. at ¶¶ 6-7, Exs. E-F. Indeed, the Court So Ordered that the domicile issue remained in the case in light of the California Legislation. Second Marcus Decl. at ¶ 8, Ex. G.

As for the Shaw Family's fees associated with briefing whether the California statute is constitutional or not, those fees were also directly tied to the Shaw Family's defense against the Defendants' assertion of the Indiana Statute. But for the Indiana Right of Publicity Statute and the Defendants' repeated assertion that Marilyn Monroe died a California domiciliary, the Shaw Family had no conceivable reason to brief the constitutionality of the California statute. Indeed, but for the

14

Indiana Statute that the Defendants asserted, the Court would never have invited the Shaw Family to brief that issue because it would have had no relevance.

It was Defendants own refusal to accept this Court's May 2, 2007 Order that made the domicile and constitutional issue relevant to the Defendants' right of publicity cause of action. In its May 2, 2007 Order, the Court ruled that the domicile issue was academic because, whether Ms. Monroe was domiciled in New York or California when she died, neither of those states recognized a post mortem right of publicity. It was not until the Defendants pushed through the passage of the California Legislation that the domicile and constitutional issue were front and center, as the Defendants previously admitted and the Court previously ruled. It is simply baseless for Defendants to now say that those issues were not inextricably tied to the Shaw Family's defense against the Defendants' assertion of the Indiana Statute. Besides, there is also something inherently equitable and fair about holding the Defendants fully liable for an attorney's fees provision Roesler was instrumental in passing and which he used to threaten the Shaw Family into capitulation. Roesler and Strasberg should have no qualms about accepting the punishment they were so willing to distribute.

C.  **The Shaw Family Is Entitled To Its Fees For the Public Domain Related Briefing Under the United States Copyright Act**

Although the Defendants provide <u>no discovery</u> to substantiate the allegations of standing in the Third Amended Complaint, it now asserts that "there is no likelihood that Plaintiffs will prevail on that issue, much less recover attorneys' fees." Defs' Mem., at 14. The Shaw Family demonstrated during the public domain briefing that Defendants had no basis to allege the facts concerning a justiciable controversy in the Third Amended Complaint. That is exactly why they were unable to substantiate those allegations during depositions, interrogatory responses or otherwise. That is also exactly why their new attorneys abandoned those assertions and came up with a last minute story that neither Roesler nor Strasberg could support in their concurrent

15

declarations. The Shaw Family is entitled to its fees for that briefing under the United States Copyright Act.

### D. The Shaw Family Did Not Include Its Negligible Fees In Connection With Its Withdrawn Claims

The Defendants allege that the Shaw Family is not entitled to attorneys' fees for its withdrawn claims. Defs' Mem., at 13. The Shaw Family did not litigate those claims and the parties conducted absolutely no discovery directed to those claims. Thus, the issue is a red herring that Defendants use to distract the Court from the real issues. The Shaw Family is happy to concede that it is not entitled to a bond for these fees, although it will note that Defendants asserted a number of frivolous and highly misleading claims in the briefing associated with the Shaw Family's attempt to withdraw those claims "without prejudice," which the Shaw Family reserves the right to raise at the conclusion of the case.

### **CONCLUSION**

For all the foregoing reasons, the Shaw Family respectfully requests that the Court ensure that these Defendants have the funds to cover the very same attorneys' fees that they so frequently threatened against the Shaw Family. A bond of $4,500,000 is necessary and appropriate now.

Dated: New York, New York
April 9, 2008

Respectfully Submitted,

LAW OFFICES OF CHRISTOPHER SERBAGI

By: _____
Christopher Serbagi, Esq.
David Marcus, Esq.
488 Madison Avenue, Suite 1120
New York, New York 10022
Tele: (212) 593-2112
Fax: (212) 308-8582

16