UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————x

SHAW FAMILY ARCHIVES LTD.,
EDITH MARCUS, and META STEVENS,

       Plaintiffs/Consolidated Defendants,

-against-

CMG WORLDWIDE, INC., an Indiana Corporation
and MARILYN MONROE, LLC, a Delaware
Limited Liability Company,

       Defendants/Consolidated Plaintiffs.

——————————————————————x

```
┌─────────────────────────────┐
│ USDS SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____            │
│ DATE FILED: __9|2|08__      │
└─────────────────────────────┘
```

05 Civ. 3939 (CM)

## DECISION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNT II OF PLAINTIFFS' SECOND AMENDED COMPLAINT AND DENYING DEFENDANTS' CROSS-MOTION TO STRIKE EVIDENCE

McMahon, J.:

The dispute between plaintiffs Shaw Family Archives Ltd., Edith Marcus, and Meta

Stevens (collectively, the "plaintiffs" or "SFA") and defendants/consolidated plaintiffs CMG

Worldwide, Inc. and Marilyn Monroe, LLC (collectively, the "defendants") concerns plaintiffs'

right to exploit several famous photographs of Marilyn Monroe taken by photographer Sam

Shaw. The photos include some of the most famous, not to say iconic photographs of the actress,

including the picture of Monroe standing over a subway grate, her white skirt billowing around

her waist, from the movie "The Seven Year Itch." The descendants of Shaw, Shaw Family

Archives Ltd., claim that as holders of the copyrights in these photographs, they can license and

otherwise exploit Shaw's photographs of Monroe commercially. MMLLC and CMG claim that

-1-

they alone have the right to exploit any photograph of Monroe, because they own Ms. Monroe's "right of publicity."

In the instant motion, plaintiffs seek a judgment declaring that Ms. Monroe was domiciled in New York, not California, at the time of her death. If she was, defendants hold no "right to publicity" in Ms. Monroe's image, because New York did not at the time of Monroe's death, and does not today, recognize a posthumous right to publicity. Furthermore, SFA asserts that defendants are judicially estopped from asserting that Marilyn Monroe died anything but a New York domiciliary, because of contrary positions that Monroe's estate took in proceedings relating to that estate.

MMLLC and CMG oppose SFA's motion and have cross-moved to strike certain evidence related to these prior proceedings.

This precise issue was fully and finally resolved by my learned colleague, The Hon. Margaret Morrow, in a companion case litigated in the Central District of California. See The Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., -- F. Supp. 2d --, 2008 WL 1922980 (C.D. Cal. Mar. 17, 2008). Judge Morrow held that CMG and MMLLC are judicially estopped from arguing that Ms. Monroe died anything but a New York domiciliary. Although the parties in this matter did not brief the issue of collateral estoppel (because the instant motion for summary judgment was filed prior to Judge Morrow's decision), that doctrine of former adjudication bars defendants relitigating issues that were fully litigated and resolved against them in the California Action. Therefore, plaintiffs' motion for summary judgment on their request for a declaratory judgment is granted, and defendants/consolidated plaintiffs' cross-motion is denied.

-2-

## *A.    Background*

Marilyn Monroe died in 1962 in California. Her will was probated in New York. She had lived in both states during the decade preceding her death. Both of her ex-husbands (Joe DiMaggio and Arthur Miller) lived on the East Coast, and she resided with them during her marriages. She also studied acting with Lee Strasberg of The Actors Studio, which was located in New York. But Monroe spent plenty of time on the West Coast as well, making movies. However, for tax reasons, her executor—Aaron Frosch—chose to probate the estate in New York.

When Marilyn Monroe died, neither New York nor California recognized any posthumous right of publicity. To this day, New York persists in refusing to recognize such a right. In 1984, California passed a statute guaranteeing movie stars like Monroe a post-mortem right of publicity. The statute, which had an effective date of January 1, 1985, did not purport to be retroactive. In 2007, the California legislature "clarified" the statute by purporting to make it retroactive—but of course, that only applied to California domiciliaries.

When Marilyn Monroe's estate wound up in June 2001, the Adminstratix, Anna Strasberg (who was appointed by the New York Surrogate's Court in 1989 after Mr. Frosch died) transferred the residuary assets to MMLLC, a Delaware company formed by Ms. Strasberg to hold and manage the intellectual property assets of the residuary beneficiaries of Marilyn Monroe's will.

Since then, MMLLC has sued various photographers who, like Shaw, photographed Marilyn Monroe and held copyrights in those photographs.1  A copyright, of course, gives its

---

1 Sam Shaw's daughters, Edith Marcus and Meta Stevens, purportedly own the copyrights to the Marilyn photographs. (Id. at 12).

holder the right to exploit the work commercially, including making derivatives. Nonetheless, MMLLC and CMG assert that these copyright holders may not exploit their works without MMLLC's permission.

This particular dispute arises out of (1) the alleged sale of a T-shirt at a Target retail store in Indianapolis, Indiana on September 6, 2006, which bore a picture of Marilyn Monroe and the inscription of the "Shaw Family Archives" on the inside neck label and tag, and (2) the alleged maintenance of a website by SFA and Bradford through which customers could purchase licenses for the use of Ms. Monroe's picture, image and likeness on various commercial products. (MMLLC SUF ¶¶ 1-7, 15-18). The suit was predicated on Indiana's 1994 Right of Publicity Act. This statute, passed over three decades after Ms. Monroe's death, by a state with which she had (as far as the court is aware) absolutely no contact during her life, creates a descendible and freely transferable right of publicity that survives for 100 years after a personality's death. The statute purports to apply to an act or event that occurs within Indiana, regardless of a personality's domicile, residence, or citizenship. See Ind. Code §§ 32-36-1-1 to – 20. MMLLC asserted that it is the successor-in-interest to the postmortem right of publicity that was devised through the residuary clause of Ms. Monroe's will, and that the commercial use of Ms. Monroe's picture, image, and likeness by SFA and Bradford without MMLLC's consent violates its rights under Indiana's 1994 Right of Publicity Act.

Through procedural machinations, which need not be restated here, cross-suits by MMLLC and SFA ended up before this court.

On May 7, 2007, this Court denied MMLLC's motion for summary judgment on Count II of the Indiana Complaint, its Right of Publicity Claim, and granted SFA's cross-motion for summary judgment dismissing MMLLC's claim. I held that, because neither New York nor

-4-

California (the only possible domiciles of Ms. Monroe at the time of her death) recognized descendible postmortem publicity rights in 1962, Monroe could not have transferred any such rights to her heirs through her will. I further concluded that neither the California nor the Indiana right of publicity statutes allowed for the transfer of the publicity rights they recognize through the wills of personalities who were already deceased at the time of their enactment. As a result, MMLLC did not acquire any exploitable right from the heirs and had no basis to assert any claim against SFA. Because that the laws of California and New York were identical on this issue as of the date of Monroe's death, this Court found it unnecessary to decide whether Monroe died a domiciliary of New York or California.

The 2007 California statute that purported to make the descendible right of publicity ("DROP") applicable to celebrities who died before 1985 (the effective date of the original statute) was occasioned by this court's decision. It requires this Court to revisit the issue of domicile.

However, as previously stated, a federal California court beat this Court to the punch. Judge Morrow presided over in a similar action between MMLLC and CMG and the archives of another photographer, the late Milton Greene, whose son holds copyrights in Milton Greene's photos of Monroe. On March 25, 2005, Milton H. Green Archives, Inc. ("MHG") filed an action against CMG Worldwide Inc., MMLLC and Anna Strasberg in the United States District Court for the Central District of California, seeking to have the California court resolve competing claims to ownership of the legal right to use, license, and distribute certain photographs of Marilyn Monroe.2

2 On May 3, 2005, the California court consolidated the case with two other actions filed in the Central District of California– Shirley De Dienes et al. v. CMG Worldwide, Inc. et al. (CV 05-2516) and Tom Kelley Studio, Inc. v.

On October 6, 2006, the MHG Parties filed a motion for summary judgment, arguing,
*inter alia*, that plaintiffs' right of publicity claims were preempted by the Copyright Act, and
that, even if they were not preempted, plaintiffs had failed to adduce evidence that they had
standing to assert claims based on Marilyn Monroe's right of publicity. Defendants also argued
that MMLLC was judicially and collaterally estopped from claiming that Monroe was domiciled
anywhere other than New York at the time of her death.

On May 14, 2007, the California court granted defendants' motion for summary
judgment, concluding (as this court had previously concluded) that plaintiffs lacked standing to
assert Monroe's right of publicity. The court found that, under California's Right of Publicity
Statute, Civil Code § 3344.1, Marilyn Monroe could not have devised a non-statutory right of
publicity through her will, and also could not have devised a statutory right that was created only
decades after her death. Given this holding, the court did not find it necessary to address the
domicile issue. (Op. Ex. A at 7.)

---

CMG Worldwide, Inc. et al. (CV 05-2568). On December 14, 2005, the California court consolidated two
additional actions with the pending case– CMG Worldwide Inc. et. al. v. Tom Kelley Studios (CV 05-5973) and
CMG Worldwide, Inc. et al. v. The Milton H. Green Archives, Inc. (CV 05-7627)– which were originally filed in
the United States District Court for the Southern District of Indiana and were transferred to the Central District of
California on August 9. 2005. All these cases sought to resolve the same issue—the legal right to use, license, and
distribute certain photographs of Marilyn Monroe.

On November 21, 2007, MMLLC filed a motion for reconsideration of the California court's order, The motion was prompted by the California legislature's passing of SB 771, which amended § 3344.1 and included provisions specifically designed to abrogate the standing decisions reached by both Judge Morrow in the Greene litigation and this court in this action. The bill expressly provided that the statutory right of publicity created by § 3344.1 was deemed to exist at the time of death of any deceased personality who died before January 1, 1985.

On January 7, 2008, the California court granted MMLLC's motion for reconsideration. Interpreting § 3344.1 as amended, the court vacated its prior ruling that MMLLC lacked standing to assert the right. However, the court made its holding conditional, "in the sense that they were dependent on a finding that Monroe was a domiciliary of California when she died." (Morrow Opinion, Ex. A at 6.) Judge Morrow recognized that, if Monroe died a domiciliary of New York -- which to this day refuses to recognize any posthumous right to publicity -- the amendments to § 3344.1 are irrelevant and the court's original ruling would stand. She therefore decided to address the issue of domicile, on which SFA had already moved for summary judgment.

MMLLC asserted that the California court should not summarily adjudicate the issue of domicile, since discovery was ongoing and it had recently come into possession of thousands of documents potentially bearing on whether Monroe was a domiciliary of California or New York. Judge Morrow concluded that defendants' judicial estoppel motion was premature, and declined to decide the issue on the basis of what MMLLC had convinced her was "an incomplete record." (Op. At 7.) In her January 7 opinion, Judge Morrow stated that plaintiffs were not judicially or collaterally estopped from asserting that Monroe was domiciled in California at the time of her death.

On February 5, 2008, MHG filed a motion for reconsideration of so much of the January

7, 2008 order as denied MHG's request for application of the judicial and collateral estopped

doctrines. This motion was predicated on the discovery of new evidence– the same "new

evidence" that is at issue in this case (namely, the same probate documents submitted to the

California Tax Appraiser, which are at issue in this case). Judge Morrow decided to review this

new evidence.

On July 31, 2008, Judge Morrow – after reviewing the same evidence that has been

submitted to this court – reversed herself and ruled, in a sixty-four page opinion, that MMLLC,

CMG, and Anna Strasberg (the Executor) were judicially estopped by the following statements.

### 1.  *The statements made by Aaron Frosch and counsel to the Monroe Estate to the California Inheritance Tax Appraiser*

Because Monroe had property in California, her executors had to file probate proceedings

in that state. In April 1964, the law firm that represented the Monroe Estate in the California

probate proceedings– Gang, Tyre, Rudin & Brown– contacted Aaron Frosch, the Executor of the

Monroe Estate, in New York and asked that he provide an Inheritance Tax Affidavit and various

supporting Affidavits Concerning Residence. The Estate needed to submit these documents to

the California tax authorities in order to avoid California inheritance tax. (Marcus Decl. Ex.

10.)3 The Executor's lawyers clearly wanted to establish that Monroe was not a resident of

California when she died, because the tax implications for her Estate would be dire were she to

be found to be a California domiciliary:

---

3 Because the same documents were filed in this action and the California Action, the citations refer to exhibits filed in conjunction with this motion.

It is important that you answer all of the questions, and in doing so build as strong a case as possible. With respect to these two documents, commencing two years after death any tax due the State of California bears interest at 7%. Furthermore, the executor is under the usual duty to complete the tax forms as quickly as possible, and in any event it is impossible to dispose of the estate until the inheritance tax has been determined. In addition, should the State of California reject the contention that Ms. Monroe was a non-resident of California, then, of course, there would be a serious tax situation. Therefore, I do not think we should delay unduly in getting this matter determined.

(Ex. 10 at MMLLC (SHAW) 466.)

On March 4, 1966, the Gang Tyre firm sent a letter to the California Tax Appraiser, enclosing an "Inheritance Tax Affidavit" concerning Monroe's estate, as well as an Affidavit Concerning Residence, which was supported by affidavits from four persons: Ralph L. Roberts, Hattie Stephenson Amos, May Reis, and Patricia Newcomb. (Marcus Decl. Ex. 16, MM 9350-64.) The letter states that the items were being submitted, "Since Miss Monroe was a non-resident of the State of California at the time of her death . . ." and observed: "Since the estate in California is clearly insolvent and the estate in New York is probably insolvent also, we trust you will be in a position to furnish a no tax certificate so that a petition may be filed for termination of the California proceedings in accordance with the requirements of law." (Id. at MM9297-98.)

The Affidavit Concerning Residence, which was executed by Mr. Frosch, was a form containing questions regarding Monroe's residence at the time of her death. In it, Frosch attested that Monroe was "a resident of the City of New York, County of New York, State of New York" when she died. (Id. at MM 9350.) He stated that she filed her last income tax return prior to death in April 1962 in New York City, New York. (Id.) He also said that she "[p]urchased a house in Los Angeles to live at while engaged in performing services in a motion picture film." (Id.) He contended that, at the time of her death, Ms. Monroe was "[r]esiding temporarily in Los

-9-

Angeles," and that she had a "fully furnished apartment in New York City, which was her permanent residence." (Id.)

Frosch stated that, in the five-year period immediate preceding her death, Monroe spent time in California "[o]nly for the purpose of performing as an actress in Motion Picture Films and not for [sic] purpose of residing therein." (Id.) In response to question about whether Monroe had engaged in business in California, Frosch responded affirmatively, noting that Monroe was "temporarily in California performing services as a motion picture actress . . . for approximately six months prior to death." (Id. at MM 9351.)

Frosch contended that Monroe made declarations regarding her residence "[o]n a number of occasions during conversations with Ralph Roberts and Mae Reis," and stated that she would "return to New York after completing the motion picture commitment [and] considered N.Y. her residence." (Id.) He also represented that Monroe's actions demonstrated that she viewed New York as her residence up to the time of her death, citing the fact that she "in all respects retained her New York residence. Said Residence was not sublet. It remained fully furnished and contained Decedent's personal effects, clothing, and substantially all of its contents. Furthermore, [Monroe's] maid continued to look after and maintain said residence and its contents." (Id.)

The remaining declarations were similar. Ralph L. Roberts stated that he was a close personal friend of Monroe's, and that she "frequently told [him] that she considered her trips to California merely as visits for the purpose of appearing in various motion picture films and for the conduct of business interests in relation thereto." (Id. MM 9352.) Roberts asserted Monroe told him that she purchased a house in California "primarily for the reason that she disliked living in hotels and preferred both the comfort and privacy of a private home." (Id.) He also

-10-

reported, "On many frequent occasions, both in California and in New York, [Monroe] advised [him] that she considered her New York apartment as her permanent home and permanent residence." (Id.) Finally, Roberts asserted that, shortly before her death, Monroe "specifically told [him] that she intended [to vacate] her California house and [that she] was going to return to her New York apartment which she considered her permanent home and residence and [was going] to reside permanently thereat." (Id.)

Hattie Stephenson, Monroe's personal housekeeper for approximately four years prior to her death, declared that she was required to clean and maintain Monroe's New York apartment as part of her job duties. (Id. MM 9354.) She stated that in September 1961, Monroe left her New York apartment and "went temporarily to California appear in a motion picture film," but instructed Stephenson to be at her New York apartment every day, cleaning and performing the same functions that she did when Monroe was in residence. (Id.) Stephenson asserted that when Monroe traveled to California, she left all of her furniture and furnishings at the New York apartment, as well as a substantial portion of her clothes, treasured possessions, and personal effects. (Id.) Stephenson contended that Monroe told her on several occasions that she considered the New York apartment "her permanent residence." (Id. at MM 9355) She asserted that two days prior to Monroe's death, Monroe "requested that I proceed to her California house to stay with her for approximately one month and then that I return to New York with [Monroe]. I was ... told that [Monroe] intended to return to her permanent residence in New York City." (Id.)

In her declaration, May Reis, who was employed as Monroe's private secretary from February 1958 to September 1961, stated that Monroe "maintained her permanent residence in her New York apartment except for such occasions when she was required to be away from New

York for business purposes." (Id. at MM 9356.) Reis explained that it was Monroe's custom to "temporarily depart from her New York apartment approximately two to three weeks prior to the commencement of [a] motion picture film[,]" which time she "generally utilized for various pre-production consultations, make-up tests, wardrobe preparations, etc. Generally she would remain away from her New York residence until after the completion of the film and any consultations thereafter required. She would then return to her permanent residence in New York." (Id. at MM 9356-57.) Reis asserted that it was "always [her] understanding that subsequent to [Monroe's divorce from Arthur Miller in January 1961] and while [she] was employed by [Monroe, Monroe] considered her said New York apartment as her official and permanent residence." (Id. at MM9357.)

Patricia Newcomb, Monroe's "Public Relations Counsel" and close personal friend, made similar statements. She declared that Monroe "always conveyed the impression to [Newcomb] that she considered her ... apartment ... in New York City as her permanent residence." (Id. at MM 9358.) Despite the fact that Monroe traveled extensively and was occasionally away from New York on business matters for prolonged periods of time, Newcomb asserted, "she always returned to her permanent New York City residence." (Id.) Newcomb reported that Monroe had told her she purchased a house in Los Angeles solely because she disliked living in hotels, and "that she had no intention of making her permanent residence in her ... California house, but intended [to] leav[e] California and return[ ] to her New York residence upon the completion of her assignment" in California. (Id. at MM 9359.) Newcomb stated that, based on her "close association with [Monroe]," she believed Monroe "considered New York as her permanent residence and ... intended to return to her permanent New York residence apartment after the completion of her business activities in California." (Id. at MM 9360.)

-12-

CMG and MMLLC objected to the declarations on numerous grounds, arguing that they lack foundation, state improper legal opinions, and are based on inadmissible hearsay. They also contended that statements of Monroe's intent should be given little weight and that her domicile should be determined by reference to objective facts. The court dismissed the objections, because the truth of the statements made and nature of the opinions expressed in the declarations were not relevant to the issue raised by defendants' motion. 2008 WL 2952074, at *34 n.67. The question before the court was not Monroe's *actual* domicile, but whether plaintiffs were estopped to assert that her domicile was other than in New York. Id. Judge Morrow ruled that the declarations are evidence that was presented to the inheritance tax appraiser by Frosch and his counsel, and are relevant and admissible because they demonstrate the position taken by plaintiffs' privies in the prior proceeding. Id.

On April 5, 1967, the inheritance tax appraiser filed his report with the Superior Court in Los Angeles. (Ex. 17.) He stated that "after due and regular hearing and appraisement made," he had concluded that Monroe "died a resident of the County of New York, State of New York, and left property taxable under the inheritance tax laws of the State of California." (Id.) The report determined that the California tax on estate property was $777.63. (Id.) It is undisputed that the California court accepted this report.

Thus, Judge Morrow found that on a prior occasion, the Executor of Marilyn Monroe's Estate represented to a court that Monroe died a New York domiciliary – and prevailed on that contention.

### 2.    *Privity between MMLLC and Frosch*

The California Court devoted eleven pages to its thorough analysis of whether MMLLC is in privity with Frosch, such that they may be deemed the "same party" as participated in the

tax proceedings. The California court concluded that, under Federal law, MMLLC was in privity with Frosch, because MMLLC conceded that it is the ultimate beneficiary of the Monroe estate, and there is privity between an estate's executor and its beneficiaries.

In Chicago, Rock Island & Pacific Railway Co. v. Schendel, 270 U.S. 611 (1926), the Supreme Court considered whether a judgment against the beneficiary of an estate was binding in another proceeding brought by the administrator of the estate on behalf of the beneficiary. The two actions arose out of an accident on the line of a railway company in which one employee died. Id. at 614. The first proceeding was initiated by the administrator of the estate for the sole benefit of the surviving widow in Minnesota district court under the Federal Employer's Liability Law. Id. at 614. The second was an administrative proceeding initiated by the railway company under the Iowa Workmen's Compensation Act; the widow was made a party to the action as sole beneficiary under the act. Id. The dispositive issue in both cases was whether the deceased had been engaged in interstate or intrastate commerce.

Although the administrative proceeding was filed second, the arbitration panel in that proceeding ruled first, finding that the decedent had been engaged in intrastate commerce. The widow was thus awarded benefits; this award was subsequently confirmed by the Iowa courts. Id.

The railway company introduced the final Iowa judgment in proceedings before the Minnesota court and argued that it was *res judicata* on the issue of the interstate or intrastate nature of the decedent's activities. The district court agreed. Id. at 615. The Minnesota Supreme Court reversed this ruling, in part on the "lack of identity of parties, since under the Iowa statute the right of recovery is in the beneficiary while under the federal act the right is in the personal representative." Id.

-14-

The United States Supreme Court reversed the Minnesota Supreme Court, holding that the administrator and the widow, as beneficiary of the estate, were in privity. The Court noted that "it [was] the right of the widow, and of no one else, which was presented and adjudicated in both courts." Id. at 618. This was confirmed by the fact that under the Employers' Liability Law, the administrator was given statutory authority to sue only "in the right and for the sole benefit of the widow." As a result, the Court observed, the widow would have been bound by any decision obtained by the administrator "in accordance with the general rule that 'whenever an action may properly be maintained or defended by a trustee in his representative capacity without joining the beneficiary, the latter is necessarily bound by the judgment.' " Id. at 620 (quoting 1 Freeman on Judgments (5th Ed.) § 500). The Court also cautioned generally that, "Identity of parties is not a mere matter of form, but of substance. Parties nominally the same may be, in legal effect, different; and parties nominally different may be, in legal effect, the same." Id. (citing Bigelow on Estoppel (6th Ed.) 145); Calhoun's Lessee v. Dunning, 4 Dall. (Pa.) 120, 121, 4 Dall. 120, 4 U.S. 120, 1 L.Ed. 767 (1792); Follansbee v. Walker, 74 Pa. 306, 309 (1873); and In re Estate of Parks, 166 Iowa 403, 147 N.W. 850 (Iowa 1914)).

Applying these principles, the Court held that

> [I]f a judgment in the Minnesota action in favor of the administrator had been first rendered, it does not admit of doubt that it would have been conclusive against the right of the widow to recover under the Iowa compensation law. And it follows, as a necessary corollary, that the Iowa judgment, being first, is equally conclusive against the administrator in the Minnesota action; for if, in legal contemplation, there is identity of parties in the one situation, there must be like identity in the other.

Id. at 618, 147 N.W. 850.  Consequently, the Court held, the Iowa judgment had *res judicata* effect in the Minnesota action. *Id.* at 623, 147 N.W. 850.

Judge Morrow noted that federal courts have frequently cited Chicago, Rock Island & Pacific Railway Co. in holding that a "beneficiary is bound by a judgment properly maintained or defended" by an executor, administrator, or trustee. 2008 WL 1922980, at *15 (citing Davies v. Guinn Resources Co., 978 F.2d 714, 1992 WL 317249, *4 (9th Cir. Oct.29, 1992) (Unpub.Disp.); Pollard v. Cockrell, 578 F.2d 1002, 1008-09 (5th Cir. 1978); Southwest Airlines Co. v. Texas Int'l Airlines, 546 F.2d 84, 97 (5th Cir. 1977); Meador v. Oryx Energy Co., 87 F.Supp.2d 658, 665 (E.D. Tex. 2000); United States v. Schnick, 66 B.R. 491, 494 (W.D.Mo. 1986). In addition, other federal courts have reached the same conclusion without citing Chicago, Rock Island & Pacific Railway Co. *See, e.g.,* Pelfresne v. Village of Williams Bay, 865 F.2d 877, 881 (7th Cir.1989); Bender v. City of Rochester, 765 F.2d 7, 12 (2d Cir.1985) ("The administrator of a decedent's estate is in privity both with the decedent and with the decedent's beneficiaries," citing 1B Moore's Federal Practice ¶ 0.411[12] (1984)); McCrocklin v. Fowler, 285 F. Supp. 41, 43 (E.D. Wis. 1968); Conney v. Erickson, 251 F. Supp. 986, 990 (W.D.Wis.1965). Thus, Judge Morrow concluded that, "[a]s a matter of federal law . . . estate beneficiaries are in privity with the estate's administrator or executor." 2008 WL 1922980, at *16.

Additionally, as Judge Morrow explained, this conclusion finds further confirmation in the law of the two states where Monroe's will was probated– New York and California. Under the laws of both these states, as well as under the Restatement of Judgments, there is privity between an executor or administrator and the beneficiaries of an estate. See id. at *16-18.

MMLLC and CMG argued to Judge Morrow that courts estop parties based on positions taken by a privy in earlier litigation only when applying the doctrines of claim or issue preclusion (i.e., collateral estoppel or res judicata). They argue that there are virtually no reported

-16-

cases in which a court has held that a party is judicially estopped to assert a position because of a prior inconsistent position taken by the party's privy. Judge Morrow found their assertion incorrect. See, e.g., Capsopoulos on behalf of Capsopoulos v. Chater, No. 95 C 3274, 1996 WL 717456, *2 (N.D.Ill. Dec.9,1996) ("Although judicial estoppel has generally been applied only where the identical party has taken the contradictory positions, a party in privity with the original party may also be estopped under judicial estoppel.... [T]he justification for applying for judicial estoppel is present in this matter. Decedent and his privy, Plaintiff, have adopted contradictory positions, each suiting the needs of the moment. Decedent won SSI disability benefits by claiming he had not worked and could not work. Now Plaintiff seeks to win survivor benefits by claiming that decedent had been working all along. Judicial estoppel is meant to apply to exactly this type of behavior, where self-interest rather than truth determine the argument of the day"); see also Maitland v. Univ. of Minnesota, 43 F.3d 357, 363-64 (8th Cir. 1994) (under the doctrines of collateral estoppel, equitable estoppel, promissory estoppel, and judicial estoppel, "the party who is to be estopped, or one in privity with that party, must have asserted a fact or claim, or made a promise, that another party relied on, that a court relied on, or that a court adjudicated" (emphasis added) (citations omitted)).

### 3.    *Frosch was acting on behalf of the estate*

Having determined that there is privity as a legal matter between an executor and an estate's beneficiaries, Judge Morrow examined whether, as a matter of fact, Frosch was representing plaintiffs' interests in the California tax proceedings. Judge Morrow examined the same Frosch affidavits that were submitted in this case, and concluded that Frosch was clearly acting on behalf of the estate in asserting that Ms. Monroe was domiciled in New York at the

time of her death. This declaration was necessary to ensure that California would tax only Monroe's California property, and not the entirety of her estate.

### 4. *The statements are inconsistent with MMLLC and CMG's current position*

Because MMLLC and Frosch were in privity, Judge Morrow had to decide whether MMLLC and CMG's current position regarding Monroe's date-of-death domicile was "clearly inconsistent" with the position Frosch and his attorneys took in the California tax proceedings. MMLLC and CMG argued that the issue raised by the Greene lawsuit was Monroe's domicile at the time of her death, while the statements that Frosch and others made on the estate's behalf addressed Monroe's residence at the time of her death. Judge Morrow found that a careful review of California inheritance tax law belied this contention, and concluded that the positions taken by the privies in the two lawsuits were in fact inconsistent.

### A. *California Inheritance Tax Law*

"A person's domicile is her permanent home, where she resides with the intention to remain or to which she intends to return.' " Gaudin v. Remis, 379 F.3d 631, 636 (9th Cir. 2004) (quoting Kanter v. Warner-Lambert Co., 265 F.3d 853, 857 (9th Cir. 2001)). "A person residing in a given state is not necessarily domiciled there." Kanter, 265 F.3d at 857. "It is true [, however,] that 'domicile' and 'residence' are usually in the same physical location." Whittell v. Franchise Tax Bd., 231 Cal.App.2d 278, 284, 41 Cal.Rptr. 673 (1964). As a result, in many statutes, " 'residence' is frequently construed to mean domicile and the terms are often used synonymously." Id. (citing Cal. Gov't Code §§ 243, 244; Cal. Prob.Code § 301; Cal. Civ.Code § 128; Cal.Code Civ. Proc. §§ 395, 417); The California Supreme Court has recognized that many statutes use "residence" and "domicile" synonymously:

Courts and legal writers usually distinguish 'domicile' and 'residence,' so that 'domicile' is the one location with which for legal purposes a person is considered to have the most settled and permanent connection, the place where he intends to remain and to which, whenever he is absent, he has the intention of returning, but which the law may also assign to him constructively; whereas 'residence' connotes any factual place of abode of some permanency, more than a mere temporary sojourn. 'Domicile' normally is the more comprehensive term, in that it includes both the act of residence and an intention to remain; a person may have only one domicile at a given time, but he may have more than one physical residence separate from his domicile, and at the same time. But statutes do not always make this distinction in the employment of those words. They frequently use 'residence' and 'resident' in the legal meaning of 'domicile" and 'domiciliary,' and at other times in the meaning of factual residence or in still other shades of meaning. For example, in our codes 'residence' is used as synonymous with domicile in the following statutes: sections 243 and 244 of the Government Code, giving the basic rules generally regarded as applicable to domicile; section 301 of the Probate Code, relating to jurisdiction for the administration of decedents' estates; and section 128 of the Civil Code, providing that a divorce must not be granted unless the plaintiff has been 'a resident' of the state for one year.

Smith v. Smith, 45 Cal.2d 235, 239, 288 P.2d 497 (1955) (citations omitted). See also Kirk v. Board of Regents of University of Cal., 273 Cal.App.2d 430,434-35 (1969) ("[D]espite the fact that the terms residence and domicile are often used synonymously, residence is not a synonym for domicile, and its meaning in particular statutes is subject to differing construction, depending on the context and purpose of the statute in which it is used").

Under California's Inheritance Tax Law, found at California Revenue & Tax Code § 13301 et seq., "the tax imposed is on the right to succeed to property." In re Carson's Estate, 234 Cal.App.2d 516, 523, 44 Cal.Rptr. 360 (1965) (citing Estate of Radovich, 48 Cal.2d 116, 121, 308 P.2d 14 (1957)). Under § 13401, " '[a]n inheritance tax is hereby imposed upon every transfer subject to this part.' " See In re Vai's Estate, 65 Cal.2d 144, 157 n. 1, 52 Cal.Rptr. 705, 417 P.2d 161 (1966) (Traynor, C.J., dissenting) (citing former Cal. Rev. & Tax.Code § 13401). Under § 13601, " '[a] transfer by will or the laws of succession of this State from a person who

dies seized or possessed of the property transferred while a resident of this State is a transfer subject to this part.' " Id. (citing former Cal. Rev. & Tax.Code § 13601, added by Cal. Stats. 1943, c. 658, § 1). The transfer by a nonresident of tangible personal assets and real property located in California is also subject to California inheritance tax. See Chambers v. Mumford, 187 Cal. 228, 230, 201 P. 588 (1921); see also 18 Cal.Code Regs. § 13303.2 ("Real property in this State belonging to a nonresident transferor is subject to the Inheritance Tax Law.... Tangible personal property permanently in this State belonging to a nonresident transferor is subject to the Inheritance Tax Law").

Regulations promulgated in 1945 to implement the Inheritance Tax Law define the terms used in the statute. The regulations provide that "'residence,' as used in these Rules and Regulations, is synonymous with legal residence or domicile." 18 Cal.Code Regs. § 13303.4 (formerly 18 Cal.Code Regs. § 638 (1945)). A "resident' is defined as "a person whose residence is in the State of California." 18 Cal.Code Regs. § 13303.6 (formerly 18 Cal.Code Regs. § 640 (1945)). A "nonresident" is "a person whose residence is outside the State of California." 18 Cal.Code Regs . § 13303.7 (formerly 18 Cal.Code Regs. § 641 (1945)).

As Judge Morrow found, these regulations demonstrate that, under California's Inheritance Tax Law, residence and domicile are synonymous. Therefore, a party arguing for inheritance tax purposes that a decedent was a resident of another state (i.e., a non-resident of California) was effectively arguing that the decedent was not domiciled in California. The procedure for making such an argument is set forth in the regulation defining "residence." It states that "[w]hen a claim is made that the residence [i.e., domicile] of a transferor was outside the State of California and a court proceeding to determine the inheritance tax is pending, an

-20-

affidavit in support of the claim must be filed with the inheritance tax appraiser on form IT-2,

entitled 'Declaration Concerning Residence.' " 18 Cal.Code Regs. § 13303.4.

### B.    Frosch's Statements to the Inheritance Tax Appraiser

The aforementioned regulations demonstrate that, in arguing to the inheritance tax

appraiser that Monroe was not a resident of California, but a resident of New York, at the time of

her death, Frosch was contending that Monroe was domiciled in New York. The letter prepared

by Frosch's counsel and submitted to the inheritance tax appraiser asserts that Monroe was a

"non-resident of the State of California at the time of her death." (Marcus Decl. Ex. 16.)  In

support, Frosch submitted Form No. I.T.2, the "Affidavit Concerning Residence," as required by

the regulation defining "residence." (Id.) The questions on the form addressed many of the

factors typically used to determine a person's domicile: the last place Monroe voted, where she

filed her last income tax return, whether and where she owned a home, where she actually lived

at the time of death, whether she belonged to a church in California, whether she engaged in

business in California, whether she had family in California, and whether she made statements or

declarations regarding her intent to remain permanently in California or to return elsewhere (in

this case, to New York) after a sojourn in California.  (Id.)  In his responses to the questions on

the form, Frosch repeatedly asserted that Monroe was residing temporarily in California for the

sole purpose of working on a motion picture, and that she "in all respects retained her permanent

residence in New York." (Id.)

The declarations submitted by Monroe's friends and employees likewise addressed

Monroe's "permanent residence"-i.e., her domicile. (Id.) Monroe's friend, Ralph Roberts, stated

that Monroe repeatedly told him that her trips to California were merely visits and that she

considered New York her permanent home and permanent residence.  (Id.) Similarly, Monroe's

personal housekeeper, Hattie Stephenson, asserted that Monroe left all of her furnishings and many personal belongings in her New York apartment when she went to California temporarily to work, and that Monroe intended to return shortly to her permanent residence in New York. (Id.)

Judge Morrow thus concluded that Frosch took the position in the California inheritance tax proceeding that Monroe was domiciled in New York at the time of her death.

### C.    MMLLC and CMG's Statements in the Action

MMLLC and CMG took the position in the Greene lawsuit (as they do in this lawsuit) that Monroe was actually domiciled in California at the time of her death. On its face, this position is "clearly inconsistent" with the position taken by Frosch on behalf of the estate and its beneficiaries in the California tax proceeding. Judge Morrow found that MMLLC and CMG offered no reasoned explanation for the inconsistency between Frosch's position in the California inheritance tax proceedings and their position in Greene. Accordingly, they failed to demonstrate that judicial estoppel could not properly be applied to bar their current argument.

### 5.    The statements were successfully advanced

#### A.    The Inheritance Tax Appraiser is a quasi-judicial body

Judge Morrow noted, "The doctrine of judicial estoppel applies not only where prior inconsistent statements are made in a 'judicial' proceeding, but also in an administrative proceeding. Milton Greene, 2008 WL 1922980, at * 23 (citing Rissetto v. Plumbers and Steamfitters Local 343, 94 F.3d 597, 604 (9th Cir. 1996) ("Though called judicial estoppel, the doctrine has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a subsequent judicial proceeding," citing Chaveriat v. Williams Pipe Line Co., 11 F.3d 1420, 1427 (7th Cir.

1993), and collecting cases); <u>Smith v. Montgomery Ward & Co.</u>, 388 F.2d 291, 292 (6th Cir.

1968) (position taken in a workers' compensation proceeding estopped a party in a subsequent

personal injury action); <u>Simo v. Home Health & Hospice Care</u>, 906 F. Supp. 714, 718 (D.N.H.

1995) (Social Security Administration disability proceeding); <u>UNUM Corp. v. United States</u>, 886

F. Supp. 150, 158 (D.Me. 1995) (Maine Bureau of Insurance approval proceeding); <u>Zapata Gulf</u>

<u>Marine Corp. v. Puerto Rico Maritime Shipping Auth.</u>, 731 F. Supp. 747, 750 (E.D.La. 1990)

(Interstate Commerce Commission proceeding); <u>Muellner v. Mars, Inc.</u>, 714 F. Supp. 351,

357-58 (N.D.Ill. 1989) (SSA proceeding) (applying Illinois law)); <u>Synopsys, Inc. v. Magma</u>

<u>Design Automation, Inc.</u>, C 04-3923 MMC, 2007 WL 322353, *26 (N.D.Cal. Jan.31, 2007)

(applying the doctrine with respect to prior statements made to the U.S. Patent and Trademark

Office); <u>In re Pich</u>, 253 B.R. 562, 569 n. 16 (Bankr.D.Idaho 2000) (holding that a county

commission's ruling on a rezoning application qualified as quasi-judicial activity)). "This rule

has been justified on the ground that '[t]he truth is no less important to an administrative body

acting in a quasi-judicial capacity than it is to a court of law.' " <u>Risetto</u>, *supra*, 94 F.3d at 604

(quoting <u>Muellner</u>, *supra*, 714 F. Supp. at 357).

    Judge Morrow thus concluded that the California inheritance tax appraiser, to whom the

prior statements regarding Monroe's domicile were made, performed quasi-judicial functions for

the California state courts. As the California Court of Appeal has explained, inheritance tax

appraisers nominated by the State Controller's office are "appointed [by superior courts] to make

specific appraisals of a tax due to the state." <u>Greenaway v. Workmen's Compensation Appeals</u>

<u>Bd.</u>, 269 Cal.App.2d 49, 52, 74 Cal.Rptr. 452 (1969). "In his work for the superior court and the

judges there presiding in probate matters, ... the inheritance tax appraiser ha[s] duties as an

employee designated by the judicial officers who were carrying on necessary state and county

duties." Id. at 54, 74 Cal.Rptr. 452; see also In re Castillo, 297 F.3d 940, 947-48 (9th Cir.2002) (indicating that "judicial immunity has been readily extended to such nonjudicial officers as: ... 'to assessors upon whom is imposed the duty of valuing property for the purpose of a levy of taxes,' " quoting Burns v. Reed, 500 U.S. 478, 499-500, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)); Worcester County Trust Co. v. Long, 14 F. Supp. 754, 760 (D.Mass. 1936) ("It is quite apparent from an examination of the applicable statutes of California Inheritance Tax Act of 1935 that the inheritance tax appraiser, designated by the court having jurisdiction over the estate, performs functions which, at least, could be said to be quasijudicial"); In re Wyman's Estate, 208 Cal.App.2d 489, 490-91, 25 Cal.Rptr. 280 (1962) (noting that objections to an inheritance tax appraiser's report were overruled and the report was approved by the superior court).

As Judge Morrow found, "Greenaway makes clear that inheritance tax appraisers act in a quasi-judicial capacity in assessing the amount of inheritance tax to be paid." Milton Greene, 2008 WL 1922980, at * 24. The appraiser takes evidence from the parties on the issue of residence/domicile, seeks additional evidence as necessary, makes a determination of the decedent's residence, and submits a report to the superior court, which may or may not approve the report.

### B.    *The statements were successfully advanced*

Mr. Frosch persuaded the California superior court to accept the appraiser's report, and his statements concerning Ms. Monroe's domicile contained therein. The letter the executor's attorney wrote to the appraiser requested (1) a determination that Monroe was a non-resident of California under the Inheritance Tax Law, and (2) a "no tax certificate" due to the estate's alleged insolvency.

Even though the estate did not completely avoid taxation, Judge Morrow concluded that the appraiser accepted the estate's position regarding domicile, determined that Monroe was a resident of New York, and relied on this finding in assessing the modest inheritance tax imposed on Monroe's estate.

It is undisputed that Frosch succeeded in persuading the superior court to accept the appraiser's report.

The appraiser's report to the superior court stated that a hearing had been held, and that he had determined that Monroe was "a resident of the county New York, State of New York" at the time of her death. (Marcus Decl. Ex. 17.) He went on to state that, despite being domiciled in New York, Monroe "left property taxable under the inheritance tax laws of the State of California." (Id.) That the estate did not escape taxation altogether is not surprising, since it is undisputed that Monroe owned a home in California, where she lived while making movies.

Judge Morrow then noted, "Under the inheritance tax law, the only property of a non-resident decedent that is taxable is real property and "tangible personal property"; "intangible personal property," such as stocks, bonds, notes, and bank deposits, is not taxable." 2008 WL 1922980, at *25 (citing 18 Cal.Code Regs. §§ 617, 664-666 (1945)). The appraiser valued Monroe's California "ancillary" estate at $36,144.22, and determined that the Estate only owed the State of California a grand total of $777.63 in inheritance taxes. This is in stark contrast to the gross value of Monroe's estate in New York, which was valued at $836,521.31, and included stocks, insurance policies, and royalty payments. (Marcus Decl. Ex. 20.)

Given the difference in these numbers, Judge Morrow found that the appraiser clearly relied upon his finding that Monroe was domiciled in New York in determining the value of property that could be taxed in California. Although the appraiser ultimately assessed tax of

$777.63, and denied the estate's request for a no tax certificate, there can be no doubt that the

estate successfully advanced its position regarding Monroe's domicile and avoided higher

taxation.

Judge Morrow addressed MMLLC and CMG's argument that they should not be

estopped by Frosch's representations regarding Monroe's domicile because those representations

actually harmed the estate by resulting in double taxation of Monroe's percentage payment

income from "Some Like it Hot" and "The Misfits." See 2008 WL 1922980, at *26, n. 89. She

stated:

> Although it determined that Monroe was a "nonresident," California taxed her
> percentage payment income because it was derived from personal services
> Monroe performed in California. In addition, the estate also paid income tax on
> the percentage payments in New York. As a result, Frosch sought a credit under
> California Revenue & Taxation Code § 18004, which states that "[i]f an estate or
> trust is a resident of this State and also a resident of another state, it shall ... be
> allowed a credit against the taxes imposed by this part for net income taxes
> imposed by and paid to another state." The Board of Equalization concluded that
> the estate was not entitled to a credit because under § 18003, "an estate or trust is
> considered a resident of the state which taxes the income of the estate or trust
> irrespective of whether the income is derived from sources within the state." The
> Board noted that, under § 18003, "an estate is a resident of California only if this
> state taxes its income from sources both within and without the state. Since
> California taxes an estate's income from all sources only when the decedent was a
> resident of this state, only estates of resident decedents are residents of California
> for purposes of the tax credit provisions of sections 18001-18011. Consequently,
> Miss Monroe having been a New York resident at the time of her death, appellant
> is not a resident of California and is not entitled to the tax credit authorized by
> section 18004."
>
> While it is possible that the estate paid more taxes on Monroe's percentage
> payments than it would had she been found to be a domicile of California, this
> does not change the fact that the estate derived a benefit from the fact that
> California assessed inheritance tax only on $92,761 of Monroe's assets rather than
> $836,521.31. As the BOE noted, the estate was taxed in California only on such
> income as Monroe derived from California sources, rather than on income from
> *all* sources. The fact that the estate was double taxed on certain income thus does
> not rebut the court's conclusion that Frosch successfully advanced a position and

gained an advantage by successfully urging California inheritance tax authorities to find that Monroe was a domiciliary of New York at the time of her death.

Judge Morrow also noted that it is undisputed that the superior court ultimately accepted the appraiser's report. This is evident from a later filing Frosch made in superior court seeking executor's commissions and attorney's fees. (Marcus Decl. Ex. 26.) In a section addressing the "extraordinary services" the estate's attorneys had rendered regarding tax matters, the petition stated:

> Although decedent's domiciliary probate is handled in New York, decedent was physically in California and owned real property here at the time of her death. Petitioner's attorneys rendered extensive services in connection with the preparation of the California Inheritance Tax Affidavit and Affidavit Concerning Residence, together with supporting affidavits, in order to establish that decedent was a nonresident of California at the time of her death, and in order to assemble and segregate correctly those items of receipts and expenses attributable to California for assessment. Petitioner's attorneys corresponded with and interviewed several persons with respect to decedent's nonresident status, suggested to the ancillary executor the types of evidence to be secured to substantiate this position and prepared various affidavits which were submitted in support of such position. Said attorneys engaged in correspondence with the California State Controller's office, explaining in detail their factual and legal position and ultimately were successful in obtaining a determination that decedent was not a resident of California at the time of her death. As a result of such determination, none of decedent's contract rights were included in measuring such tax in California.

(Marcus Decl. Ex. 26, SFA1 191-192.)

Similarly, in a First and Final Account of Ancillary Executor that Frosch filed in superior court in 1976, he stated that the estate had "obtained a determination that decedent was a non-resident of California at the time of her death for inheritance tax purposes," and that "[t]he California Inheritance Tax for said estate has been determined and paid in full." (Id., SFA1 161-162.

-27-

Finally, Judge Morrow noted that subsequent tax proceedings in the estate confirm that the

California taxing authorities accepted Frosch's argument regarding domicile. For example, the

California Franchise Tax Board later sought to tax Monroe's percentage payments, i.e., the

earnings she made from films in which she appeared. In an appeal to the California State Board

of Equalization ("BOE"), Frosch argued that the estate should not have to pay California income

tax on these amounts. The BOE denied Frosch's appeal in 1975. (*See* Marcus Decl., Ex. 25.) In

its decision, the Board classified Monroe's earnings as "personal services income," whose source

was the place where the services were performed. (Id.) The BOE stated that the percentage

payments were taxable because Monroe performed the services giving rise to them in California,

and noted that personal income tax was due on "the entire taxable income of every nonresident

which is derived from sources within the state." (Id., MM-89.) Judge Morrow noted that,

because Monroe continued to be taxed as a nonresident, it is apparent that the estate successfully

advanced the position that she was domiciled in another state

### 6.    *MMLLC and CMG would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped*

As Judge Morrow noted, in the California tax proceedings, Frosch and his lawyers, acting

on behalf of beneficiaries of the estate, sought and received a determination that Monroe was

domiciled in New York at the time of her death. The estate and its beneficiaries obtained a

resulting advantage, since inheritance tax was assessed only on Monroe's real and tangible

personal property in California. The estate did not pay inheritance tax on Monroe's intangible

property, which reportedly included more than $70,000 in stocks and bonds, mortgages, notes,

cash, and insurance. If, as defendants claimed in Greene, Frosch's position regarding domicile

was inaccurate, and Monroe was indeed domiciled in California, the estate and beneficiaries were not legally entitled to the tax advantage they received, and it was therefore unfairly obtained.

Judge Morrow concluded that defendants were seeking to advance a position inconsistent with that taken by the estate in the prior proceeding in order to obtain a second advantage – the benefit of a statute that only applied to California residents. Were defendants successfully to advance their current position, they would be obtaining an unfair advantage and attempting to "play fast and loose with the courts."

Judge Morrow found it unnecessary to consider defendants' additional arguments that MMLLC and CMG were judicially and collaterally estopped by statements made by Anna Strasberg and counsel in certain posthumous litigation in Hawaii. Judge Morrow dismissed MMLLC and CMG's claim that they controlled Monroe's DROP, because the claim depended on their establishing that Ms. Monroe died a California domiciliary. See The Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc., -- F. Supp. 2d --, 2008 WL 2952074 (C.D. Cal. July 31, 2008). The same day, Judge Morrow entered a final judgment, closing the case. See C.D. Cal. Case No. 2:05cv2200 (Dkt. #474.)

## DISCUSSION

"Under either federal law or New York State law, collateral estoppel, or issue preclusion, bars the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding, regardless of whether the two suits are based on the same cause of action." See Postlewaite v. McGraw-Hill, 333 F.3d 42, 48 (2d Cir. 2003) (citing Lawlor v. National Screen Service Corp., 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); Capital Telephone Co. v. Pattersonville Telephone Co., 56 N.Y.2d 11, 17, 451 N.Y.S.2d 11, 13, 436 N.E.2d 461 (1982);

18 Moore's Federal Practice § 132.01[2] (3d ed. 2003) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination-even if erroneous-is conclusive in a subsequent action between the parties, whether on the same or a different claim."). Specifically, a party is collaterally estopped from relitigating an issue if a four-part test is met: "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'" Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 91 (2d Cir.1997) (quoting Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A., 56 F.3d 359, 368 (2d Cir.1995)).

While the doctrine of mutuality previously limited issue preclusion to disputes between the parties to the first litigation, today persons who were not parties to the original action may assert issue preclusion either offensively or defensively. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979) (permitting nonmutual offensive issue preclusion); Blonder-Tongue Lab., Inc. v. University of Ill. Found., 402 U.S. 313, 350 (1971) (permitting nonmutual defensive issue preclusion).

In addition, while collateral estoppel is a defense that can be waived, see Fed. Rule Civ. Proc. 8(c), a court may dismiss the action *sua sponte*, even though the defense has not been raised. See Doe v. Pfrommer,148 F.3d 73, 80 (2d Cir. 1998); Salahuddin v. Jones, 992 F.2d 447, 449 (2d Cir. 1993), *cert. denied,* 510 U.S. 902, 114 S.Ct. 278, 126 L.Ed.2d 229 (1993).

If ever there were a case for collateral estoppel– this would be it. The judicial estoppel argument asserted against MMLLC and CMG in this case is identical in all relevant respects to the argument asserted against MMLLC and CMG in the California action. The only difference is

-30-

that this action involves a different photographer. The MHG parties and SFA seek to vindicate exactly the same rights. MMLLC and CMG had a full and fair opportunity to litigate this issue in the California action. This issue of judicial estoppel was fully briefed in the California action, and the parties argued their positions before Judge Morrow on March 10, 2008. On July 31, 2008, Judge Morrow resolved the issue against MMLLC and CMG, ruling that they were judicially estopped from asserting that Ms. Monroe died anything but a New York domiciliary because of statements made by Frosch and Estate counsel to the California Tax Appraiser. Judge Morrow also considered—and rejected—MMLLC and CMG's argument that these statements lack foundation, state improper legal opinions, and are based on inadmissible hearsay. See 2008 WL 2952074, at *21, n.67.

The resolution of these issues was necessary to support a valid and final judgment on the merits—a grant of summary judgment in favor of Milton Greene on the DROP count. See C.D. Cal. Case No. 2:05-cv-2200 (Dkt. #474.) A final judgment was entered on July 31, 2008, and there has been no change in the controlling legal principles since that date.

## CONCLUSION

For the foregoing reasons, the Court grants plaintiffs' motion for summary judgment on Count 9 of its Second Amended Complaint on judicial estoppel grounds. Defendants' cross motion to strike evidence in plaintiffs' estoppel summary judgment motion is denied. (Dkt # 235). This decision moots SFA's motion on the constitutionality of the California publicity statute (Dkt #192).

This constitutes the decision and order of the court.

-31-

Dated: September 2, 2008

_____
U.S.D.J.

BY ECF TO ALL COUNSEL