UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————x

SHAW FAMILY ARCHIVES, LTD., EDITH
MARCUS and META STEVENS,

        Plaintiffs,

    -against-

CMG WORLDWIDE, INC., an Indiana Corporation
and MARILYN MONROE, LLC, a Delaware
Limited Liability Company,

        Defendants.

—————————————————————————x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/5/08
```

05 Civ. 3939 (CM)

DECISION AND ORDER GRANTING IN PART AND DENYING IN
PART PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND
SANCTIONS; DENYING AS MOOT PLAINTIFFS' MOTION FOR
THE POSTING OF A BOND; DIRECTING THE ENTRY OF
JUDGMENT AND THE CLOSING OF THS FILE BY THE CLERK

McMahon, J.:

    Familiarity with the court's many opinions in this overly-long litigation is
presumed.

    I will deal with the issues raised in the following order: plaintiffs' claim for
attorneys' fees under the Indiana Right of Publicity Statute; plaintiffs' motion for
sanctions in connection with the Indiana Right of Publicity Claim and related issues;
plaintiffs' claim for attorneys' fees in connection with litigation concerning the
constitutionality of amendments to the California Right of Publicity Statute; plaintiffs'
claim for attorneys' fees in connection with copyright claims asserted in defendants'
Third Amended Complaint (filed in the transferred Indiana action); and plaintiffs' claim
for sanctions in connection with those copyright claims.

*Indiana Right of Publicity Claim*

**A Brief History of this Litigation**

    Defendants, who control whatever intellectual property rights were owned by the
heirs of the deceased actress Marilyn Monroe, brought an action in the United States
District Court for the District of Indiana against the heirs of photographer Ted Shaw,

1

alleging that their commercial exploitation in Indiana of certain photographs of Monroe that were taken by Shaw violated Indiana's Right of Publicity Statute, Ind. Code § 32-36-1-8.

The Shaw heirs responded by commencing this action in which they originally sought injunctive relief and damages, including attorneys' fees and any and all gains, profits, and advantages obtained by defendants as a result of alleged infringement of copyrights owned by the Shaw Family. They also sought an order, pursuant to 28 U.S.C. § 2201-2202, declaring that defendants had no authority or right to copy or publish photographs on which Shaw Family Partners held the copyright.

Defendants moved to have this case dismissed or stayed in favor of the action they had commenced in Indiana, or in the alternative to have this case transferred to Indiana. They also moved in the Central District of California to have that court transfer to Indiana virtually identical cases brought against CMG and MMLLC by other photographers, The Milton H. Greene Archives, Shirley De Deines et al., and Tom Kelley Studios - who had registered copyrights in photographs of Monroe. See Milton H. Greene Archives v. CMG Worldwide, Inc., CV 05-02200, Docket # 47. Both courts declined to grant the motions. Eventually, the Indiana action against the Shaws was transferred here and consolidated with the lawsuit pending before me.

The central claim in both lawsuits, as originally filed, was whether the Indiana statute – passed more than a quarter century after Monroe's death, by a state with which she had no known contact during her life – could possibly have conferred any right of publicity on Monroe or on her heirs.

The Indiana statute provided that it applied to all sales made into Indiana regardless of the domicile of the famous person. It also purported to bestow a right of publicity on famous people ('personalities") both living and deceased, regardless of their domicile on the date of their death.

However, whether a famous person already dead had managed to leave behind for his/her heirs any descendible right of publicity is not a function of Indiana law (unless, of course, the famous person died a domiciliary of Indiana). Instead it is a function of where that famous person happened to be domiciled at the time of death. New York (where Monroe maintained an apartment and where her estate was probated and administered) and California (where she owned a house, made movies and committed suicide) were the only states that could possibly have been Monroe's domicile at the time of her death; no one has ever suggested that she was domiciled in Indiana. And in 1962, when Monroe died, neither New York nor California recognized any post-mortem, descendible right of publicity. California passed a law creating such a right for California domiciliaries in 1984, but nothing in the text of the statute or its history suggested that the Legislature intended the statute to be anything other than prospective in its application.

The Shaw Family were of the view that Monroe's right of publicity had died with her, and that Indiana could not retroactively confer any such right on the Monroe Estate,

or on defendants, the entities formed by Monroe's heirs to exploit Monroe's intellectual property on their behalf. Defendants argued otherwise, claiming that the Indiana statute created a retroactive right of publicity that passed to the Estate, and so to them, via the residuary clause in Monroe's will.

From the inception of the lawsuits, it was crystal clear that the issue of Monroe's date-of-death domicile would be central to resolution of the dispute among the parties. In fact, in their initial Rule 26(1)(1), CMG and MMLLC indicated that "documents related to Marilyn Monroe's domicile at the time of her death" would be relevant to the case and were within the possession, custody or control of defendants. The court's personal notes indicate that the issue of Monroe's domicile was discussed at the initial pre-trial conference in the Shaw's case, which was held on April 24, 2006.

Despite its centrality, the issue appeared to recede in importance after this court issued an opinion, on March 27, 2007, in which I granted summary judgment dismissing CMG and MMLLC's right of publicity claim under Indiana law. I concluded that Monroe had no descendible right of publicity to bequeath to her heirs, so defendants had nothing they could enforce using the cudgel of Indiana's Right of Publicity law. Because the law in 1962 was the same in both states, I did not need to determine, and did not determine, whether Monroe had died a domiciliary of New York or California (although I ruled that it had to be one or the other).

In response, the Monroe Estate (and, I assume, others) convinced California's Legislature to pass a statute purporting to confer a right of publicity on Californians who had died prior to passage of the 1984 law mentioned above. The 2007 law was notable for indicating that it was specifically intended to overrule the March 27 decision in this action, as well as a decision reaching the same result by Judge Morrow in the Central District of California action. The Monroe Estate lobbied for passage of a similar law in New York, but its efforts were unsuccessful.

Because the California Legislature purported to confer a descendible right of publicity – but only on persons who died as domiciliaries of California -- the issue of Monroe's date-of-death domicile had to be resolved. In this action, as part of their Second Amended Complaint, plaintiffs had asserted a claim (on August 7, 2007) seeking a declaration that Monroe died a New York domiciliary (Second Amended Complaint, Count 9). Plaintiffs moved on February 14, 2008 for summary judgment on this claim. Docket #186.

While the court was preparing decisions on this and other pending motions, Judge Morrow, in the California case, decided a corresponding motion for summary judgment that raised exactly the same issues. Judge Morrow concluded that defendants were barred by the doctrine of judicial estoppel from asserting that Monroe died a domiciliary of California -- or anywhere except New York -- because Monroe's Estate had gone to great lengths to convince courts in both states that Monroe was NOT domiciled in California at the time of her death. These representations included statements to many courts by counsel and affidavits from numerous persons attesting that Monroe considered

New York to be her domicile, and that any residence in California was temporary. The position taken by the Monroe Estate had resulted, among other things, in California's decision not to tax Monroe's Estate as the estate of a California domiciliary – which saved it considerable money.

Once Judge Morrow's opinion was published, this court ceased working on a draft opinion that would have reached the same result on the basis of the record before me. Instead, on Sept. 2, 2008, I granted plaintiffs' motion for summary judgment, on the ground that the issue had already been decided adversely to defendants, who had a full and fair opportunity to litigate it on the merits.

Both Judge Morrow's well-reasoned decision and mine are presently on appeal, although one of the defendants, CMG, failed to file a timely notice of appeal from this court's judgment, and this court declined to grant an application permitting it to file out of time. Docket #321.

That, in a nutshell, is what this case was about. It is not all of the case, of course – both sides managed to gum up the record with a lot of extraneous matters. Plaintiffs also made a motion challenging the constitutionality of the 2007 California statute; Judge Morrow's disposition of the right of publicity claim rendered it unnecessary to wade into that constitutional thicket. All of the above was a sideshow, however; the center ring of this three-ring circus was the right of publicity claim, and the parties' argument over whether Monroe had any such right to leave to her heirs. And that depended on where Monroe lived when she died.

## Plaintiffs' Claim for Attorneys' Fees for Prevailing on
## The Indiana Right of Publicity Claim

The Indiana statute mandates an award of attorneys' fees, costs and expenses to the prevailing party on any claim brought thereunder. Section 12 of the statute provides:

> In addition to any damages awarded under section 10
> of this chapter, the court (1) *shall* award to the *prevailing*
> *party* reasonable attorney's fees, costs, and expenses
> relating to *an action under this chapter*.....

Ind. Code §32-36-1-12 (emphasis added).

Defendants brought a claim for injunctive relief and damages against plaintiffs "under" the Indiana Right of Publicity Act. Plaintiffs prevailed on that claim by securing its dismissal. As I read Section 12 of the Indiana statute, the Shaw Family plaintiffs are entitled to an award of attorneys' fees, costs and expenses relating to the dismissal of that claim. Although the fee award is available "in addition to any damages awarded," the statute does not provide that a "prevailing plaintiff" shall recover fees, but that a "prevailing *party*" shall do so. Defendants do not appear to dispute this.

4

Defendants do assert that no fees are awardable under the Indiana statute for work performed after May 2, 2007, because from and after that date, no claim was pending "under" the Indiana statute. Defendants contend that the issue of Monroe's domicile – which is relevant only to claims asserted under the Indiana right of publicity statute, and not to any other claims – remained alive only because plaintiffs found ways to keep it alive. Defendants note that they asserted no claim in this action under the Indiana statute after this court dismissed their original claim. Even after California passed its new statute, defendants did not seek reconsideration of their right of publicity claim in this court. (They did seek reconsideration of Judge Morrow's decision dismissing their analogous claim against The Milton H. Greene Archives, Shirley De Deines et al., and Tom Kelley Studios in California, apparently concluding that they were more likely to prevail before Judge Morrow than before me). Defendants argue that the constitutional attack mounted by plaintiffs in this court on the California statute is not a claim brought "under" the Indiana statute.

Plaintiffs argue that the right of publicity issue remained central to the case even after the court dismissed the claim brought pursuant to the statute, thereby entitling it to attorneys' fees incurred after this court's May 2, 2007 decision.

Plaintiffs are technically correct that the Indiana right of publicity issue did not disappear from the case after this court issued its May 2, 2007 decision.

In their Third Amended Complaint filed on September 13, 2007, CMG/MMLLC noted that "The May 2 Order dismissed Plaintiffs' right of publicity claim and implicitly rendered moot Plaintiffs' claim for a declaration regarding Plaintiffs' right of publicity. Defendants intend to appeal the May 2 Order and Plaintiffs intend to incorporate by reference, as if fully set forth herein, Counts 1 and 2 of the Second Amended Complaint to the extent such incorporation is necessary to preserve the appeal . . . ." See Third Amended Complaint at ¶ 3, Docket #119. Count 2 of the Second Amended Complaint is, of course, the claim by defendants under the Indiana Right of Publicity Statute, which the court had dismissed in the May 2 Order.

Furthermore, with the passage of the California statute in October 2007, the Shaws' cause of action for a declaration that Monroe died a domiciliary of New York – a claim that was germane only because of the prospect that defendants' Indiana right of publicity claim would be resurrected[1] – brought the right of publicity specter once again to the forefront of this litigation. However, defendants did not seek leave to amend their Third Amended Complaint to reassert their Indiana right of publicity claim after the California Legislature passed the statute giving post-mortem publicity rights to deceased California domiciliaries.

---

[1] The claim could have been resurrected in one of two ways: if Judge Morrow reconsidered her decision dismissing the right of publicity claim in the California action, the parties could have come to this court and sought reconsideration – though it would have been untimely. Or it could have been restored following a successful appeal of this court's May 2, 2007 decision and order.

The technical (and wholly unnecessary) "reassertion" of claims already dismissed by this court cannot serve as a basis for the recovery of attorneys' fees and costs incurred subsequent to May 2, 2007. There was no affirmative claim pending under the Indiana statute from and after May 2, and the May 2 order necessarily disposed of plaintiffs' claim for a declaration that the Indiana statute did not prohibit them and their licensees from exploiting Shaw's photographs of Monroe.

Plaintiffs' assertion of a claim for a declaration that Monroe died a decedent of New York is obviously *related to* the Indiana right of publicity statute – indeed, it has no other significance – but it is not a claim *under* that statute. Unfortunately for plaintiffs, the Indiana legislature has authorized the recovery of prevailing party attorneys' fees only for claims brought under the Indiana statute. The Legislature has not mandated the recovery of fees and costs for claims that are related to claims under the statute.

I thus agree with defendants that plaintiffs' statutory right to fees and costs expired along with the defendants' claim under the Indiana statute. That occurred on May 2, 2007, when this court dismissed that claim. I specifically decline to award fees incurred in connection with plaintiffs' attempt to obtain entry of an immediate partial final judgment following the grant of partial summary judgment.

There remains to determine how much to award in attorneys' fees, costs and expenses in connection with the Indiana Right of Publicity claim.

The full amount of fees requested by plaintiffs through May 2, 2007 is $627,790.

Defendants argue that these fees are excessive. They make a number of arguments, some of which are more persuasive than others:

**First**, defendants suggest that it might be inappropriate to award fees for work performed by attorney Marcus and by Melissa Stevens, a paralegal, because Marcus and Stevens are among the owners of the plaintiff Shaw Family Archives and so may not have been paid for their work on this case on an ongoing basis. They ask for disclosure of any fee arrangements between the Marcus firm and the plaintiffs.

The issue that occurs to the court is whether the time of Marcus and Stevens (and Marcus' firm) is non-reimbursable because it was expended *pro se*. Although this appears to be an issue of first impression on the peculiar facts of this case, I conclude that the Marcus firm is not entitled to any fee shifting award.

The relevant facts are these: David Marcus, who is the grandson of plaintiff Edith Marcus and the great-grandson of Ted Shaw, owns 7.5% of Shaw Family Archives, Ltd., an entity that was apparently created to resolve a will contest among Shaw's daughters and his son, whom he disinherited.[2]

---

[2] Sam Shaw's copyrights were held by a Trust, whose trustees were his two daughters, plaintiffs Marcus and Stevens. See Cplt. ¶ 11 & Cplt. Exhibits A, B, C, & D. When Shaw died, his shares in the aforementioned Trust passed to Marcus and Stevens, per stirpes. Id. In his Last Will and Testament

*Pro se* litigants, including those who are themselves attorneys, are not entitled to attorney's fees in Indiana, which is where the Right of Publicity statute was drawn. Miller v. West Lafayette Comm. Sch. Corp., 665 N.E.2d 905, 906-07 (Ind. 1996); *accord* Counceller v. Counceller, 810 N.E.2d 372, 378 (Ind. App. 2004). Therefore, if Marcus and his firm qualify as *pro se* litigants by virtue of Marcus' interest in plaintiff SFA, they are not entitled to reimbursement for their fees under the Indiana Right of Publicity Statute.

Indiana's rule follows from a ruling of the U.S. Supreme Court, which refused to allow a pro se plaintiff to recover attorney's fees under the Civil Rights Act (18 U.S.C. § 1988). See Kay v. Ehrler, 499 U.S. 432, 438 (1991). The high court concluded that such an award would not further the public policy considerations that are relevant to a legislative decision to by-pass the usual (American) rule that each party bears it own costs:

> A rule that authorizes awards of counsel fees to *pro se* litigants –
> even if limited to those who are members of the bar - would create
> a disincentive to employ counsel whenever such a plaintiff considered
> himself competent to litigate on his own behalf. The statutory policy of
> furthering the successful prosecution of meritorious claims is better served
> by a rule that creates an incentive to retain counsel in every such case.

While the Supreme Court has not spoken to the issue in the context of other statutes, the principle behind the decision has led lower courts to adopt it in other contexts. The Second Circuit has applied Kay to preclude *pro se* attorney litigants under Equal Access to Justice Act, S.E.C. v. Price Waterhouse, 41 F.3d 805, 808 (2d Cir. 1994), and 42 U.S.C. §1981, Hawkins v. 1115 Legal Service Care, 163 F. 3d 684, 695 (2d Cir. 1998). Similarly a parent who is also an attorney was denied could not receive attorneys' fees for the representation of his minor child in a suit brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1487. S.N. ex rel. J.N. v. Pittsford Cent. School Dist., 448 F.3d 601, 601-02 (2d Cir. 2006).

The rule is the same in New York State. Mayerson *ex rel.* M.M. v. DeBuono, 181 Misc. 2d 55, 63-66, 694 N.Y.S.2d 260, 267-68 (Sup. Ct. NY Co., 1999). In Mayerson, the

---

(Cplt. Exhibit A), Shaw explicitly gave his "collection of photographs, negatives, transparencies, and any rights related to same" to the Trustees of the Sam Shaw Family Trust. See Cplt. Exhibit A ¶ 3. Other documents reveal that the Shaw Family Archives, Ltd. was created to exploit the photographic rights of the Sam Shaw Family Trust. Sam Shaw also had a son, Larry, whom he disinherited under his will. However, Larry. There may have been some sort of will contest, the result of which appears to have been the creation of plaintiff Shaw Family Archives, in which Larry as well as his sisters had an interest. Shaw Family Archives, Ltd. is duly authorized to market and license the Shaw Collection by virtue of a settlement agreement reached among the members of the Shaw Family on June 5, 2002. Id. ¶ 13. That settlement gave Larry a 50% interest in SFA and each of his sisters a 25% interest. I do not know how Mr. Marcus and Ms. Stevens obtained their interests (7.5% and 5%, respectively), but Mr. Marcus has advised me that they have such interests, by letter dated today, December 4, 2008.

New York State Supreme Court denied fees even though the attorney-parent, who was then a partner in a law firm, sought the advice of other attorneys from his firm in connection with his child's case. The court reasoned, "It cannot be denied that such advice came, not from a wholly independent attorney, but from a member of Mr. Mayerson's own firm, who, out of concern and compassion for the child of one of the firm's other partners, may not have exercised that degree of objectivity which the Supreme Court contemplated as being required in all cases."

Mr. Marcus, while related to parties who are plaintiffs in this action, is not named as a party to this action; and while he is a shareholder of Shaw Family Archives he is, in the most technical sense, not Shaw Family Archives. So one could argue that he is not literally a *pro se* plaintiff. But in S.N. and Mayerson, the lawyer-parents were technically suing on behalf of their children. It could have been (and no doubt was) argued that the plaintiff children were not proceeding *pro se,* but that is nonsense: The parents were the real parties in interest, since they had a legal obligation to support their disabled children and were seeking reimbursement for funds they had expended to educate those children. So here, Marcus (and Stevens as his apparent employee) can expect to reap a pro rata share of any benefit that SFA obtains from this lawsuit.

I do not read the above cases so expansively as to bar parties who retain relatives to act as their counsel from ever obtaining a fee award. Nor do I quarrel with Marcus' statement, in his letter to me dated December 4, 2008, that, "The respective ownership interest of Ms. Stevens and myself in no way impacted the attorney-client relationship between me and my family or me and Bradford."

However, I do read Kay and its progeny, including specifically the Indiana cases, as preventing an award of fees to a relative who has an actual (not contingent) financial interest in a lawsuit involving a closely-held or family entity, because such a person is not the "independent" counsel whose retention is the object of a fee-shifting statute.[3] The facts of this case more than bear out the concerns that led the Supreme Court to adopt the "no fee shifting to pro se lawyers" rule in Kay. Marcus started the litigation, but obviously did not feel that he was able to handle it, because he brought in Mr. Serbagi -- who, from the date of his retention, was the driving representational force on behalf of plaintiffs. Furthermore, there are indications that Marcus (and his cousin) viewed this lawsuit as an opportunity to enrich themselves at someone else's expense. Stevens' role in the case has varied over time, from party witness (under Rule 30(b)(6)) to paralegal; and Marcus is seeking a fee award at a rate double the one he charges to other clients (see discussion below).

I therefore decline to award fees to Marcus or to reimburse him for fees paid to any "employee" of his firm, including Stevens.

---

[3] I draw this holding narrowly – limiting it to persons with actual financial interests in closely-held or family entities – because if this holding were taken to extremes, it could disqualify a lawyer who owned 100 share of stock in, say, Microsoft from representing that corporation in a lawsuit where there was the possibility of fee shifting. That would be an absurd result, and not one that I believe the Supreme Court or the Second Circuit would ever reach.

Recognizing, however, that this aspect of my decision is likely to be appealed, and that adopting an expansive issue of "pro se" presents an issue of apparent first impression, I am going to rule on the other aspects of Marcus' fee application

**Second**, they argue that the hourly rates charged by attorneys Serbagi and Marcus are unreasonably high.

I agree.

Mr. Serbagi,and to the extent he is able to, Mr. Marcus, are seeking reimbursement for their time at rates of $600 and $400, respectively. Both attorneys are sole practitioners. It is widely recognized in this district that sole practitioners charge rates lower than those charged by attorneys affiliated with large law firms, which have much greater overhead than do sole practitioners. McDonald ex rel Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund, 450 F.3d 91, 98 n.6 (2d Cir. 2006); Chambless v. Masters, Mates & Pilots Pension Plan, 885 F.2d 885 F.2d 1053, 1058-59 (2d Cir. 1989); Algie v. RCA Global Commc'ns, Inc., 891 F. Supp. 875, 895 (S.D.N.Y. 1994).

Serbagi has been practicing for 13 years; Marcus for 12. Serbagi touts the fact that he teaches at Cardozo Law School; in fact, he teaches legal writing, not a substantive course. Legal writing is often taught by relatively young and inexperienced lawyers. Serbagi claims that he has published articles, but fails to cite the court to any such articles. He has not demonstrated that his litigation prowess had resulted in major victories in intellectual property cases. He has done yeoman work in connection with this case, and he is entitled to be paid for it, but at a fair rate. $600/hour is not a fair rate; it is an excessive rate.

Marcus, as noted above, has submitted invoices indicating that his regular billing rate, as a partner of the firm of Marcus & Greben, was $200/hour, except for "hours billed to SFA only," which were shown, at least beginning in July 2007, at $400/hour. (See Third Serbagi Dec. Ex. E-A) I find it extraordinary that Marcus should double his customary rate for a matter subject to a fee shifting statute, and question why he should expose his family members to an obligation to pay elevated rates, rather than a discounted rate, which is the result to which the familiar bond usually leads. This illogical arrangement suggests to me Mr. Marcus may not be receiving payment from his grandmother, great-aunt and Shaw Family Archives, but is instead attempting to reap an unfair benefit from a third party.

Serbagi's fees will be awarded at a rate of $400/ hour. If my ruling on the *pro se* litigant issue is overturned and Marcus is deemed entitled to a fee award, the rate will be his customary $200/hour.

**Third**, defendants argue that the fees that relate to the Indiana right of publicity claim have not been segregated from other fees sought.

The invoices originally provided by Messers. Serbagi and Marcus did not segregate the time attributable to various aspects of this case. This was because, as Mr. Serbagi put it, plaintiffs were seeking "fees for the entire litigation because all the work was either 'related' to the Indiana ROP Statute or the United States Copyright Act." (Reply Mem. in Support of Fee Application at 2). Apparently, Mr. Serbagi realized that this extreme position was unlikely to win the court's favor. So after defendants advanced this argument, he prepared an alternative invoice identifying work performed in connection with each particular issue. (Serbagi Third Dec. Ex D).

The case commenced in this district in 2006. Mr. Marcus, through his law firm Marcus & Greben, began billing on the case on April 5, 2006. He put in 727.3 hours prior to May 2, and I find that 90% of this time is properly attributable to the ROP claim. 90% of Marcus's total hours from April 5, 2006 through May 2, 2007 is 654.57 hours. At a rate of $200 per hour, the claimed fees are $130,914.

Mr. Serbagi was retained on this case in late December 2006. He diaried 561.45 hours to the case between that time and May 2, 2007, when the court issued its decision dismissing defendants' Indiana Right of Privacy Claim. 100% of Serbagi's time during this four-month period can fairly be attributed to work relating to the Right of Privacy Claim. At a revised rate of $400 per hour, this comes to $224,540.

The court concludes, however, that the number of hours worked on this action by the two lawyers – a total of 1200 hours – is unreasonably high, even taking into account that the lawyers are small practitioners who could not delegate much work to lower paid staff. A reasonable award of attorneys' fees for the work actually produced would not exceed 800 hours of attorney time – 400 by Mr. Marcus and 400 by Mr. Serbagi. This yields provisional fees of $160,000 to Mr. Serbagi and (were he eligible to collect it) $80,000 to Mr. Marcus – numbers much more in line with the court's idea of reasonableness.

**Fourth**, defendants argue that before any fees are awarded, plaintiffs should be required to disclose their fee arrangement with Serbagi and should also disclose any arrangement they may have with Travelers Insurance, which may be subsidizing this litigation on behalf of plaintiffs. But it is irrelevant whether whether fees to date were being fronted by the attorneys, paid by plaintiffs out of their own pockets, or paid by an insurance company. The statute entitles the plaintiffs to their reasonable attorneys' fees. If Travelers has been paying for this litigation, it will undoubtedly have a lien on any fees awarded by the court.

**Fifth**, defendants urge that plaintiffs have failed to file a bill of costs in compliance with Rule 54.1, so no costs can be awarded.

I have not been presented with a bill of costs. Therefore, no statutory costs are awarded under the Indiana statute.

**Sixth,** defendants argue that plaintiffs have failed to document the expenses for which they seek reimbursement.

Defendants are both right and wrong. Some of the expenses are documented and some are not.

The expenses for which plaintiffs seek reimbursement, as the court understands it, are as follows:

(1) Expenses in the amount of $1796.50, found at the back of Mr. Marcus' invoice for his purported right of privacy time. On their face, some of these expenses (FedEx binding costs dating from January and February 2008) are not allowable because they were not incurred in connection with any claim brought under the Indiana Right of Privacy Statute. No dates are provided for most of the other expenses. They are disallowed in their entirety.

(2) Expenses appended to the invoice of Mr. Serbagi (Third Serbagi Dec. Ex. D): Many of these invoices, including invoices for paralegal services performed by various individuals after October 1, 2007, are not allowed under the Indiana statute because they post-date the May 2, 2007 decision. However, the April 2007 Red Rose vendor charges for printing out the TIFF files from discs ($610.40) and the April 2007 file folder purchase from Staples ($100.51) are allowed. So are charges incurred in March 2007 from Red Rose copy (two items totaling $4,533.73) and an in house copying charge associated with the supplement briefing necessitated by the belated production of those domicile documents ($688.38). I thus reimburse Mr. Serbagi for his expenses to the extent of $5,933.02.

In light of the above rulings, the total award under the Indiana Right of Publicity Statute is $165,933.02, all of which is due to Mr. Serbagi.

**Plaintiffs' Claim for Sanctions for Litigation and Discovery Abuses In Connection with the Indiana Right of Publicity Claim**

The court indicated, at a conference held in March 2007, that it would consider the issue of sanctions relating to the production of documents concerning Monroe's date-of-death domicile at a later date. The moment has arrived.

There is no question that defendants and their first attorneys for CMG/MMLLC, Gibson, Dunn & Crutcher, engaged in unacceptable shenanigans when it came to producing documents relating to Monroe's domicile.

As noted above, defendants admitted that documents relating to Monroe's domicile were relevant to claims or defenses they intended to assert in this action, because they identified those documents in their Rule 26(a) disclosures. Those

documents – consisting for the most part of pleadings and affidavits filed with various courts and administrative bodies in New York, California and Hawaii – were publicly available, and the court assumes that counsel, in keeping with their obligations under Fed. R. Civ. P. 11, accessed and reviewed them prior to bringing their lawsuit – or, at the very least, prior to disclosing their existence in the Rule 26(a) disclosure statement.

The domicile documents establish that attorneys representing Monroe's Estate, as well as MMLLC's 75% owner, Anna Strasberg (a Monroe heir and the Administratrix of her Estate after the death of the Executor), argued to all these courts and bodies that Monroe had died a domiciliary of New York – and that she had expressly disclaimed domicile in California. The documents also reveal that the courts and adjudicative bodies accepted the lawyers' argument and made certain rulings based on a finding that Monroe was domiciled in New York, not California – the most significant of which was California's decision not to tax the Monroe Estate as though she were a resident of that state.

Despite their knowledge of these documents, attorneys from Gibson, Dunn took positions in this lawsuit and made affirmative representations to this court that were utterly inconsistent with the position of the Monroe Estate, and that were deceptive in that they failed to apprise the court of the existence of documents that contradicted their position. Of greatest significance are representations made in and omitted from the papers filed in support of defendants' motion for summary judgment on their claim under the Indiana statute.

Defendants filed their motion for summary judgment in October 2006. In their original moving papers, they asserted that the Indiana statute had conferred rights on Monroe's heirs. They noted that the Indiana statute purported to apply regardless of Monroe's domicile, or whether the state where she lived at the time of her death recognized any post-mortem right of publicity. And they urged that the undisputed evidence demonstrated a violation of Monroe's post-mortem right of publicity by the Shaw plaintiffs.

Plaintiffs opposed the motion and cross-moved for summary judgment dismissing Count II (the claim under the Indiana statute) in defendants' Indiana complaint. They urged that Monroe's right of publicity had died with her and did not descend to her heirs, so Indiana could not have conferred any publicity rights on the heirs. In support of their argument, they pointed to several documents in which it was asserted that Monroe was a "resident" of New York at the time she died. New York is, of course, a state in which rights of publicity are extinguished upon death.

In their reply brief, which was filed with the court on or about December 22, 2006, defendants, through their attorneys at Gibson, Dunn, did the following:

1. They argued that Monroe's date-of death domicile was irrelevant, because the Indiana statute expressly states that domicile is not relevant to a celebrity's ability to

recover for right of privacy infringements and retroactively confers property rights on deceased persons, including nondomiciliaries. Reply Mem. at 1-3 (Docket No. 74).

2. They further argued that the residuary clause of Monroe's will sufficed to devise property acquired by the Estate after death to her heirs. Defendants contended that this was true whether Monroe died a domiciliary of New York or California. Reply Mem. at 7-8 & n.7, 10-11.

3. They affirmatively stated "Marilyn Monroe was a domiciliary of California at her death, accordingly, California estate law should determine whether her will was effective to transfer her right of publicity." Reply Mem. at n.1 and 5.

4. They argued that the evidence submitted by plaintiff in opposition to their motion – documents from proceedings in the New York Surrogate's Court that refer to Monroe as a New York "resident" and a statement from the California Board of Equalization to the same effect -- was insufficient to estop defendants, either collaterally or judicially, from asserting that Monroe was domiciled in California, because "domicile" and "residence" are not the same thing. Reply Mem. at 19, 21.

5. They urged that the Monroe Estate had not prevailed before the California Board of Equalization – indeed, they stated that Monroe lost before the Board. Reply Mem. at 27-28.

6. Acknowledging that a person's domicile is "the place of his true, fixed and permanent home and principal establishment, [ ] to which he has the intention of returning whenever he is absent therefrom......," they affirmatively asserted that "indisputable facts establish that [Monroe] died a California domiciliary." Reply Mem. at 30.

When the brief was filed, defendants and their attorneys had not yet produced to plaintiff, or revealed to the court, the many documents demonstrating beyond peradventure that:

1. Attorneys for Monroe's Estate had repeatedly represented, in courts in several States and before the California Board of Equalization, that Monroe was a domiciliary – not a resident – of New York at the time she died.

2. Monroe's attorneys viewed it as vitally important for the Estate that Monroe be found to be a New York domiciliary, and not a California domiciliary.

3. Contrary to the implication in defendants' Reply Memorandum that the Estate's attorney did nothing more concerning domicile than fill out preprinted forms containing boilerplate statements about the decedent's residence, the attorney actually obtained and submitted multiple affidavits, from persons close to Monroe, to the California Board of Equalization attesting that Monroe's fixed and firm intention was to be domiciled in New

13

York and to return to her apartment in New York when she was not making movies in California.

4. Contrary to their representation in the Reply Memorandum, the Monroe Estate succeeded in being treated as the estate of a non-California domiciliary for inheritance tax purposes, which saved the estate a considerable sum of money.

5. Contrary to their affirmative representation that Monroe had been domiciled in California, the Estate, and particularly Ms. Strasberg, who was a defendant in her capacity as Administratrix, had previously taken the position that Monroe was not a California domiciliary. In an action filed in the District of Hawaii by a person claiming to be Monroe's pretermitted heir, Strasberg moved to dismiss, arguing that Monroe died a New York domiciliary, so New York, not California, law governed the action. The district court adopted Strasberg's argument, refused to apply California law, and dismissed the case for failure to state a substantive claim and for lack of personal jurisdiction. SSUF ¶ 30-35.

The documents that would have revealed all the contradictions between the position that MMLLC and CMG and their counsel were taking before this court and the positions that their privies, the Estate of Marilyn Monroe and Anna Strasberg its Administratrix, of this were eventually produced to plaintiffs during February 2007. They were produced on electronic disks. Each of the 59,000 pages of documents was embedded in a separate "TIFF" file.[1] The court declines to become involved in a dispute over whether it is a good thing or a bad thing to produce documents in TIFF files. Suffice it to say that plaintiff became aware of the contents of the TIFF files by the second week in March 2007, and immediately notified the court. This necessitated an in-court conference and additional briefing on the pending cross-motions for summary judgment. And while the court decided that motion without deciding whether Monroe died a New York or a California domiciliary, considerable work had to be done and undone as a result of the court's belated awareness of the position taken by the Monroe Estate concerning her date-of-death domicile.

There was similar misconduct in the analogous proceeding in the Central District of California. As Judge Morrow revealed in her decision in Milton H. Greene Archives v. CMG Worldwide, Inc., 568 F. Supp. 2d 1152 (C.D. Cal. 2008), the California plaintiffs also did not receive these similar documents from CMG/MMLLC "until the . . . motions for summary judgment were fully briefed, and that they were unable to discover and present it to the court previously because it was 'buried in the more than 58,000 documents [that plaintiffs] produced' after briefing was complete." Id. at 1162-63.

---

[1]TIFF is an acronym for Tagged Image File Format. A TIFF file is an image file commonly used in color printing, and you need a TIFF viewer program in order to open and view TIFF files. TIFF is a popular format for high-color depth (32-bit) images. There are those who think that using TIFF is cumbersome, see John Bringardner, *PDF or TIFF?*, PDFZone (Sept. 23, 2005), http://www.pdfzone.com/c/a/Document-Management/PDF-or-TIFF/ ("For the majority of users who are putting text in their documents, the PDF is hands down a better choice.").

The failure by defendants and their counsel to reveal to the court the position that taken by the Monroe Estate (though whom defendants and their privies took whatever rights they had) concerning Monroe's domicile at the date of their date, as well as their affirmative representation that she died a domiciliary of the State of California -- which was completely contrary to the representations made by the Estate to courts and administrative bodies involved in settling her estate -- subject defendants and the firm of Gibson, Dunn & Crutcher to sanctions.

Defendants and Gibson Dunn cannot evade sanctions by saying that they had no obligation to reveal these documents because they were possessed of a good faith belief that the Indiana statute made Monroe's date-of-death domicile irrelevant. I recognize that they took the position that domicile was irrelevant. However, defendants and their counsel knew all of the following: (1) the Shaw plaintiffs were arguing the relevance of domicile, (2) the issue of relevance had not been finally resolved in their favor; (3) in a tentative ruling from Judge Morrow in California their position that domicile was irrelevant had been rejected, and (4) this court, from the very first pre-trial conference, had expressed interest in the issue of domicile. Moreover, defendants themselves had identified documents concerning Monroe's domicile as being "relevant" to this action in their Rule 26 disclosures, and they knew the contents of those documents were utterly inconsistent with their representation to this court that Monroe had died a domiciliary of California. Counsel were, or should have been, aware that they had a duty to disclose the documents -- especially once they elected, on behalf of defendants, to assert flatly that Monroe died a California domiciliary. That defendants might eventually have prevailed about the importance of Monroe's date-of-death domicile does not mean that they could keep secret evidence that plainly undercut their position and bolstered their opponent's.

I therefore conclude that sanctions against defendants and their lawyers are appropriate. The only question is what form that sanction ought to take.

The most serious aspect of this misconduct was the omission to disclose to this court information needed in order to make not misleading the defendants' representations concerning Monroe's domicile, in papers filed in connection with defendants' original motion for summary judgment on the Indiana Right of Publicity claim.

A logical sanction for this would be to award the additional attorneys' fees incurred by the plaintiffs as a result of the delayed production of those documents, specifically fees incurred in connection with the filing of an additional brief after the documents were produced. However, a significant portion of those fees (those relating to a reasonable amount of work by Serbagi) have already been awarded to plaintiffs under the "prevailing party" clause in the Indiana statute. I cannot award them twice.

One option would be to award the fees incurred by Mr. Marcus and his firm for working on this motion as a sanction, since they cannot be awarded under the Indiana statute. I conclude that it would not be appropriate to award as a sanction fees attributable to Mr. Marcus' work, because doing so would violate the spirit, if not the letter, of the prohibition on reimbursing pro se parties for legal fees, as discussed above.

Another possibility would be to sanction defendants with an award of attorneys' fees incurred in connection with plaintiffs' 2008 motion for summary judgment on Count 9 of the Second Amended Complaint – their claim for a declaration that Monroe died a New York domiciliary. The withheld documents are clearly relevant to that motion, and defendants took a position in opposition to that motion that was directly contradicted by the withheld documents. Plaintiffs espouse this position, arguing that defendants' and Gibson Dunn's conduct in continuing to pursue their right of publicity claim, while knowing about the withheld documents, was itself sanctionable conduct.

In an exercise of my discretion, however, I conclude that it would not be appropriate to award attorneys' fees on the 2008 motion as a sanction for defendants' belated production of the domicile documents, and the failure to apprise the court about the contents of those documents. The sanctionable conduct occurred a year prior to the time when plaintiffs made their 2008 motion, in filings made with the court during 2006 and 2007. The documents had long since been produced by the time the Count IX motion was made. By 2008, Gibson Dunn, the firm that withheld the documents, had ceased to represent defendants. And by 2008, defendants were no longer pursuing any right of publicity claim in this court (although they gave every indication that they would appeal the court's 2007 ruling dismissing that claim once they had a final judgment).

Therefore, for misconduct in failing to disclose the Monroe Estate's position on domicile until after the briefing was closed on defendants' motion for summary judgment, and for affirmatively representing that Monroe was a domiciliary of California without advising the court of prior contrary positions taken by Monroe's estate, I impose sanctions as follows:

(1)     On Defendants severally in the amount of $10,000.

(2)     On the law firm of Gibson, Dunn & Crutcher severally in the amount of $10,000

to be paid to the Clerk of the United States District Court for the Southern District of New York. The awards are several, not joint and several; the total amount of the sanction is $20,000.

This award covers only the conduct discussed above: withholding the documents about domicile during the briefing of the motion for summary judgment on defendants' right of publicity claim, while arguing positions that were contradicted by the withheld documents. Whether defendants and their new counsel, Loeb & Loeb, should be sanctioned for continuing to argue that Monroe died a California domiciliary after the documents were produced presents a different – and more difficult -- question.

After careful consideration, the court concludes that defendants and their counsel should be sanctioned for continuing to argue that Monroe was domiciled in California, even after the documents relevant to domicile were disclosed.

Defendants are entities set up by the Monroe Estate to manage Monroe's intellectual property rights. They do this for the benefit of the Estate, and no one else. The Estate's long-time Administratrix has a significant ownership position in one of the defendants. While, MMLLC and CMG are not technically the Monroe Estate, they act as the de facto agents of the Estate's beneficiaries in connection with matters involving the exploitation of the Marilyn Monroe "brand," including the prosecution of this and similar lawsuits.

Obviously, the Estate's beneficiaries cannot have it both ways – they cannot argue that Monroe was domiciled in New York when it suits them and in California when it suits them, because *a person can have only one domicile at a time*. From 1962, Monroe's Estate took the consistent position that Monroe died while domiciled in New York. It prevailed consistently in that position.

In this lawsuit, defendants undertook, on behalf of the beneficiaries of the Estate, to advance a position that they well knew was inconsistent with their principals' prior position – one that the principals (including Strasberg herself) would have been collaterally estopped to assert – without having any good faith basis to believe that the Estate's prior position was wrong. Doing so unnecessarily and vexatiously prolonged this litigation, by forcing plaintiffs to continue litigating the issue of domicile until it was finally resolved by Judge Morrow.

I therefore conclude that defendants and their counsel, Loeb & Loeb, should be sanctioned for persisting in the position that Monroe died a California domiciliary, when they were aware that the Monroe Estate had specifically and repeatedly denied that Monroe was domiciled in California and had prevailed on that claim.

One appropriate sanction for this conduct might be the attorneys' fees for the preparation of plaintiffs' 2008 Count 9 summary judgment motion papers. But I am not going to award those fees. After painstakingly reconstructing the claimed amount of those fees for Mr. Serbagi – 604.45 hours, which, even at the reduced rate of $400 per hour, totals $241,780 – I conclude that the amount of time he expended is utterly out of proportion to the work that needed to be done. The summary judgment papers on Count 9 were in large measure a rehash of information and arguments that had previously been provided to this court and to Judge Morrow on other, prior motions.[4] That Mr. Serbagi spent over 600 hours on that motion is incomprehensible – and this does not take into account that Mr. Marcus, whose fees I have declined to award as a sanction, worked another 227.6 hours on the same motion papers!

Rather than try to figure out how many hours of work would be reasonable in connection with this motion, I award the following sanction for the continued maintenance of their untenable litigation position:

---

[4] Mr. Serbagi's motion papers got longer and longer as the case went on. He seemed to feel it necessary to attach all his old motion papers and then to make all the same points again and again – only more hysterically each time.

On Defendants severally in the amount of $5,000
On Loeb& Loeb severally in the amount of $5,000

to be paid to the Clerk of the United States District Court for the Southern District of
New York. The total sanction is $10,000.

### Litigation Relating to the California Right of Publicity Amendment

After the California Legislature amended the state's right of publicity statute to
make it applicable to dead celebrities as long as they were California domiciliaries,
plaintiffs moved in this court to have the statute declared unconstitutional. They seek an
award of attorneys' fees in connection with this motion, which was never decided.

The court declines to award any fees, for the following reasons:

(1) There was no need to make such a motion unless the court found that Monroe
died a domiciliary of California, because the statute specifically applied only
to domiciliaries of California. Plaintiffs mounted their constitutional challenge
prematurely – and, as it turned out, unnecessarily.

(2) Plaintiffs did not prevail on their challenge, which the court never reached.

Thus, this aspect of the motion is denied.

### Copyright Claims in the Third Amended Complaint

**A Brief History of the Litigation**

After the court's May 2, 2007 order dismissing the defendants' Indiana Right of
Publicity claim, there remained in the case three claims asserted in the Shaws' Amended
Complaint -- a claim of copyright infringement concerning defendants' commercial
exploitation of certain Ted Shaw photographs of Monroe, and claims for tortuous
interference with plaintiff's contractual relations and tortuous interference with
prospective economic advantage that were related to the Indiana right of publicity claim.
The Amended Complaint also sought a declaration that defendants owned no right of
publicity in and to the name and likeness of Monroe, that plaintiffs "have rights" in the
photographs in the Shaw collection, and that plaintiffs Marcus and Stevens owned the
copyrights in certain Shaw photographs -- the May 2 order effectively disposed of the
request for a declaration that defendants owned no right of publicity in the name and
likeness of Monroe, but it did not disposed of the remained of the declaratory judgment
claim.

On August 8, 2007, the Shaw plaintiffs filed a Second Amended Complaint, in
which they asserted nine claims. Count 9 – a claim for declaratory judgment that Monroe
died a domiciliary of New York – was disposed of by Judge Morrow's decision in the

California lawsuit, and this court's ruling that her decision was collateral estoppel. That claim was discussed above and will not feature further in this decision.

In Counts 1 and 2 of the Second Amended Complaint, SFA asserts that CMG and MMLLC infringed on copyrights held by SFA, both directly and as contributory infringers. (Id. ¶¶ 35-38.)  The copyrights related to three photographs from the book *Marilyn: Among Friends*, by Sam Shaw and Norman Rosten, and two photographs from the book, *Marilyn Monroe in the Camera Eye* by Sam Shaw. (Id.)

Count 3 seeks a declaration that CMG and MMLLC do not own any property rights in the image of Ms. Monroe. (Id. ¶¶ 39-40.)  That count was effectively disposed of by the Court's ruling on May 7, 2006 – three months prior to its re-assertion in the Second Amended Complaint – and was unnecessarily reasserted.

Counts 4 and 5 reassert the original claims for tortious interference with contractual relations and prospective economic advantage as a result of defendants' assertion of their non-existent right of publicity in the image of Marilyn Monroe. (Id. ¶¶ 41-44.)  Counts 6 through 8 assert claims for unfair competition on a similar theory. (Id. ¶¶ 45-53.)

The Second Amended Complaint did not contain any claim for declaratory judgment concerning the ownership of Shaw works.

On August 13, 2007, the defendants (acting as plaintiffs in the transferred Indiana action) filed a Third Amended Complaint, seeking a declaration that a number of photographs of Marilyn Monroe taken by photographer Sam Shaw are in the public domain -- either because their copyrights have been allowed to expire, or because they were "works for hire" and so could not have been copyrighted by Sam Shaw.  The photographs that are the subject of this action include images that were originally published in the so-called "Ballantine" and "Rizzoli" books, as well as photographs (not specifically identified by the defendants) that allegedly appeared in newspapers and magazines prior to 1964 without attribution of Shaw's purported copyright in the images.[5]  Apparently, they also include all the photographs taken by Shaw on the set of the motion picture "The Seven Year Itch," the making of which he documented extensively with pictures that were used for publicity purposes by the producer of the film.

The better part of the next year passed in motion practice, relating to issues both substantial and procedural.

On the merits: on September 4, 2007, defendants moved to dismiss counts 3 – 8 asserted in plaintiffs' Second Amended Complaint. But when SFA principal Larry Shaw died a month later, plaintiffs began wrestling with the implications of his demise, which

---

[5] Under the 1909 Copyright Act, which was then in force, publication of a work without attribution of copyright (the familiar © followed by the author's name and year) forfeited copyright protection
.

rendered proving certain of their claims more difficult. On December 16, 2007, after considerable negotiation with defendants,[6] plaintiffs moved for leave to withdraw Counts 1 through 8 of their Second Amended Complaint without prejudice, leaving only Count 9 – the count seeking a declaration that Monroe had died a domiciliary of New York – for adjudication in this lawsuit. Plaintiffs specifically sought to withdraw their copyright infringement claims without prejudice

Defendants cross-moved to have the withdrawal of all counts be with prejudice, and at the same time sought dismissal of Counts 1 and 2 (the copyright infringement claims) with prejudice, on the ground that plaintiffs had previously agreed to withdraw those claims with prejudice.

The court granted leave to withdraw Counts 3 through 8 without prejudice. The court found Counts 1 and 2 (the copyright infringement claims) to be compulsory counterclaims to the claim for declaratory judgment that had been asserted by defendants in the Third Amended Complaint in the Indiana action. I directed plaintiffs either to pursue them or see them dismissed with prejudice. (Docket # 283). Plaintiffs elected to have Counts 1 and 2 dismissed with prejudice rather than pursue those claims in this lawsuit.

On procedure: The parties engaged in considerable, and extremely contentious, discovery following the filing of the amended pleadings. As noted in my decision at Docket # 283, this resulted in virtually no actual discovery's being exchanged, but consumed a great deal of court time and generated huge amounts of attorneys' fees.

On January 8, 2007, plaintiffs moved for summary judgment dismissing the only claim left in the case – the so-called "public domain" claim for declaratory relief asserted in defendants' Third Amended Complaint. Plaintiffs argued that the claim raised no justiciable controversy. Defendants opposed the motions.

The court granted the motion in a decision dated September 11, 2008 (Docket # 285). The claim was dismissed as non-justiciable for two reasons. To the extent that the public domain claim was a rehash of claims already litigated in a case tried before my esteemed colleague, Judge Keenan, it was non-justiciable because the matter had already been decided. As for the rest of the case, it was non-justiciable because defendants failed to allege, or produce any evidence tending to show, that they had definite intent and apparent ability to exploit any identifiable photograph taken by Ted Shaw.

The questions for the court are whether fees are awardable to plaintiffs, either under the Copyright Act, or as sanctions for forcing plaintiffs to litigate this non-justiciable claim.

---

[6] There is absolutely no need to go into the entire history of these negotiations, which are summarized in the court's September 2, 2008 decision found at Docket # 283.

### Attorneys' Fees Under the Copyright Act

Section 505 of the Copyright Act provides, *inter alia*, that a court in its discretion may allow the recovery of full costs by or against any party, and may (again in its discretion) award attorneys' fees as part of costs to the prevailing party. The two key aspects of this grant of authority are as follows: (1) a fee award is limited to a prevailing party; and (2) a fee award is not mandatory, so whether to make such an award lies within the sound discretion of the court.

To qualify as a prevailing party, plaintiffs "must not only achieve some material alteration of the legal relationship of the parties, but that change must also be judicially sanctioned." Robertson v. Giuliani, 346 F. 3d 75, 79 (2d Cir. 2003). Generally speaking, in order to be a prevailing party, one must either secure a judgment on the merits or be a party to a settlement agreement that is expressly enforced by a court. NXIVM Corp. v. Ross Institute, 2005 WL 184275, *2 (S.D.N.Y. Aug. 2, 2005).

Plaintiffs are not prevailing parties in this action within the meaning of the Copyright Act. They succeeded in getting the public domain claim dismissed, but not on the merits. Part of the reason the claim was dismissed was that certain aspects of the claim had already been litigated – before Judge Keenan some years ago – and I am constrained to note that, far from prevailing, plaintiffs LOST that case and Judge Keenan found that a number of Ted Shaw's photographs of Monroe had fallen into the public domain. If defendants had pointed to some other Shaw photograph(s) that the Shaw plaintiffs were preventing them from using under threat of a copyright infringement suit, we would have had a justiciable controversy in this case. But defendants did not identify any photographs taken by Shaw that they were being prevented from using by the Shaw Family Archive. Thus, there was nothing for this court to do except issue some sort of advisory ruling about Ted Shaw's photographs generally – an act that lies beyond my jurisdiction.

That plaintiffs did not prevail on the merits of the public domain claims should be clear from a statement made in my September 11 opinion: if defendants found themselves in a dispute with the Shaw Family Archive over photographs that they believed were in the public domain – and that had not already been adjudicated to be in the public domain – they would be free to bring a new action.

Therefore attorneys' fees are not available to plaintiffs under the Copyright Act for litigation expenses (including attorneys' fees) incurred in connection with obtaining the dismissal of the public domain claim.

### Sanctions

Plaintiffs also seek an award of attorneys' fees as a sanction, issued pursuant to the court's inherent authority, for defendants' prosecution (to the limited extent it was prosecuted) of the public domain claim.

Plaintiffs assert that the public domain claim was asserted only in order to keep this litigation alive while defendants lobbied the California and New York Legislatures for passage of a statute that would retroactively confer descendible right of publicity property rights on deceased celebrities. Defendants counter that they asserted their "public domain" claim to counter the copyright infringement claims that were in plaintiffs' Second Amended Complaint.

I am certainly not going to sanction defendants for petitioning legislatures. That is their right as United States citizens. And as plaintiffs *did* accuse defendants of infringing certain of their copyrights, I cannot see any reason to penalize defendants for asserting claims that photographs taken by Shaw were not covered by any valid copyright, and so had fallen into the public domain, where they could be used by anyone. The copyright infringement claims were in the case until September 10, 2008 – the day before the court issued its decision dismissing the public domain claims – when plaintiffs finally agreed to drop the claims with prejudice.

Finally, I decline to award any sanctions for alleged discovery defalcations relating to the claims asserted in the plaintiffs' Second Amended Complaint (other than Count 9) and the defendants' Third Amended Complaint. Except for the claim concerning Monroe's date of death domicile, none of those claims was adjudicated on the merits or settled. All but one was dropped, and that one was dismissed as non-justiciable.

### *Plaintiffs' Motion for a Pre-Judgment Bond*

I deny plaintiffs' renewed motion for a pre-judgment bond to secure the payment of fees and costs (Docket # 322) as moot. Judgment can now be entered for the fees and costs awarded herein. If defendants want to appeal from that judgment, they will have to post an appeal bond. Otherwise, plaintiffs can begin the process of collecting the fee award by levying on the judgment.

Per the Court's previous orders, the plaintiffs' Second Amended Complaint has been voluntarily discontinued – with prejudice as to counts 1 and 2, and without prejudice as to counts 3 through 8. (Docket # 283).

To dispose of the remainder of the case, the Clerk of the Court is directed to enter final judgment as follows:

(1) Dismissing defendants' Third Amended Complaint in its entirety;

(2) Granting  plaintiffs' motion for an award of attorneys' fees and costs pursuant to the Indiana Right of Privacy statute, and awarding attorneys' fees and costs to plaintiff, as the prevailing party on the dismissal of  defendants' Second Cause of Action in their Second Amended Complaint (the Indiana Right of Privacy claim), in the amount of $165,933.02.

(3) Awarding sanctions in the total amount of $30,000 as follows: $15,000 against defendants; $10,000 against the law firm of Gibson, Dunn & Crutcher, and $5,000 against the law firm of Loeb & Loeb.

(4) Otherwise denying plaintiffs' various motions for an award of attorneys' fees and costs, and for various forms of sanctions.

Once judgment has been entered, all other pending motions, including the motion for a bond, shall be denied as moot, and the Clerk of the Court will CLOSE THE FILE.

Dated: December 4, 2008

_____
U.S.D.J.

BY ECF TO ALL COUNSEL